STRUCK LOVE ACEDO, PLC
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dignity Not Detention Coalition and John Doe,<br><br>Petitioners,<br><br>v.<br><br>City of California City; CoreCivic, Inc.,<br><br>Respondents.<br>_____<br>CoreCivic, Inc.,<br><br>Real Party in Interest. | Case No.<br><br>**NOTICE OF REMOVAL**<br><br>U.S. District Judge:<br>U.S. Magistrate Judge:<br><br>Complaint Filed:<br>Trial Date: |

Pursuant to 28 U.S.C. §1442(a)(1), and in accordance with 28 U.S.C. § 1446(b)(2)(B), Respondent CoreCivic, Inc. notices removal of the above-captioned case from the Kern County Superior Court, filed under Case No. BCV-25-103365, to the United States District Court for the Eastern District of California, and in support thereof asserts:

1. On September 16, 2025, Plaintiffs Dignity Not Detention Coalition and John Doe filed a Complaint against City of California City and CoreCivic in Kern County Superior Court, captioned as *Dignity Not Detention Coalition and John Doe v. City of California City, and CoreCivic, Inc*.

2. A true and correct copy of Plaintiffs' Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief and Damages is attached hereto as **Exhibit 1**.

3. This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b)(1).

4. CoreCivic owns and operates California City Immigration Processing Center, a private detention facility located in California City, California. (Ex. 1, ¶¶ 1, 12.)

5. CoreCivic is a Maryland corporation with its headquarters in Brentwood, Tennessee. (*Id.*, ¶ 12.)

6. Plaintiff Dignity Not Detention Coalition alleges that it "is a group of nearly twenty community organizations defending immigrants' and detainees' civil rights, protecting the public's right to participate in municipal planning processes affecting those rights, and fighting against the negative impacts of mass immigration detention on society at large and on local communities, including California City." (*Id.*, ¶ 7.)

7. Plaintiff Dignity Not Detention Coalition alleges that "[t]he conversion and population of the Facility would frustrate the Coalition's mission and goals by undermining the protections of SB 29, a state law the Coalition passed, thereby setting a precedent that other cities or corporations could ignore the law as well, and diverting the Coalition's resources by requiring the Coalition to monitor yet another detention site and mobilize additional efforts to compel compliance with the law." (*Id.*, ¶ 8.)

8. Plaintiff John Doe[1] alleges that he was transferred to the California City Immigration Processing Center "on around September 1, 2025, and is currently an occupant of the Facility." (*Id.*, ¶ 9.)

9. Plaintiff John Doe alleges "[b]ecause CoreCivic is not properly authorized to operate the Facility, and the City and CoreCivic have failed to comply with the City's Municipal Code and SB 29 in allowing the Facility to operate and receive detainees, John Doe's detention at the Facility is unlawful under state and local laws, and places him at risk of imminent harm from substandard and inhuman conditions at the Facility." (*Id.*)

10. Plaintiffs seek a "writ of mandate to require the City to set aside any approval of the Project and comply with and enforce its Municipal Code" and to enjoin "CoreCivic

---

[1] Plaintiff John Doe "filed under a conditional pseudonym in this action and will file a request to proceed under pseudonym." (Ex. 1, n.1.)

from proceeding further with the Project until it has received the proper permits and approvals, and complied with state law." (*Id.*, ¶ 15.)

11. Plaintiffs' Complaint alleges the following causes of action:[2]

a. **Unlawful Approval of the Project in Violation of the City's Municipal Code and State Planning and Zoning Law.** Plaintiffs allege that the City cannot allow the use of the Facility as an immigration detention facility without amending the zoning code, and "[e]ven if the Facility were considered to be a '[g]overnmental or quasi-governmental correction, probation or prison facility . . . ,' it would be allowed . . . only upon issuance of a [Conditional Use Permit (CUP)] for the operation of an immigration detention facility." (*Id.*, ¶¶ 44–45.) Plaintiffs contend that the previous CUP for the operation of a prison facility is not valid because "[a] 'prison facility' and immigration detention center are two substantially different uses with different impacts on the community and environment." (*Id.*, ¶ 46.) Plaintiffs further contend that the prior CUP no longer authorizes any use of the Facility because "no use as a prison facility has been conducted 'in accordance with the CUP' for more than a year." (*Id.*) Plaintiffs also assert that "CoreCivic's intended use of the Facility as a 2,560-bed immigration detention facility also exceeds the prison's prior permitted capacity of 2,304 beds by more than 10 percent," and "CoreCivic must also obtain a new CUP to enable this proposed expansion." (*Id.*, ¶ 47.)

b. **Failure to Enforce the City's Zoning Code.** Plaintiffs allege that "the use of any land or building contrary to the Zoning Regulations is a public nuisance" but the City has failed to comply with its mandatory duty to take

---

[2] CoreCivic denies liability for any of Plaintiffs' claims and further denies that Plaintiffs are entitled to the relief sought.

action to abate or enjoin CoreCivic's unlawful use of the Facility for immigrant detention." (*Id.*, ¶¶ 53–54.)

    c. **Violation of SB 29.** Plaintiffs contend that pursuant to SB 29, the City was required to provide notice of any action to approve the reopening of the Facility at least 180 days prior to execution of any conveyance or permit and solicit public comment through at least two separate meetings open to the public. Plaintiffs further contend that "the City cannot lawfully issue the required business license, CUP, or any other entitlement unless and until it provides public notice and a hearing." (*Id.*, ¶¶ 59, 61.)

    d. **CoreCivic's Illegal Operation of the Facility.** Plaintiffs allege that "the City's Zoning Regulations bar use of the Facility as an immigration detention center," "CoreCivic's population and ongoing use of the Facility for that purpose is therefore unlawful and subject to enforcement," and "[e]ven if the use of the Facility for immigration detention were allowed as a conditional use, CoreCivic has not obtained a CUP, a business license, or any permit allowing its use of the Facility under the Zoning Code." (*Id.*, ¶ 66.)

    e. **Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.** Plaintiffs allege "the City's Municipal Code bars the Facility from reopening and converting into an immigration detention facility," and CoreCivic's opening and population of the Facility constitutes "unlawful conduct under California Business and Professions Code section 17200 et seq." (*Id.*, ¶¶ 72–74.)

12. Plaintiffs' Complaint seeks, in part, the following relief: (1) a writ of mandate "directing the City to vacate and set aside any approval of the Project"; (2) a writ of mandate "directing the City to comply with SB 29 and the City's Municipal Code"; (3) "a temporary stay, temporary restraining order, and preliminary and permanent injunctions restraining the City and CoreCivic, and all others acting in concert with the City or CoreCivic on their

behalf, from taking any actions to implement the Project, unless and until the City and CoreCivic fully comply with SB 29 and the requirements of the City's Municipal Code"; and (4) a "Court order pursuant to Business and Professions Code section 17203 enjoining CoreCivic from violating the City's Municipal Code and California Civil Code section 1670.9." (Plaintiffs' Prayer for Relief, ¶¶ 1–4.)

## GROUNDS FOR REMOVAL – 28 U.S.C. § 1442(a)(1)

13. This case is removable by CoreCivic pursuant to 28 U.S.C. § 1442(a)(1), which permits "any person acting under [any officer of the United States or any agency thereof, in an official or individual capacity] to remove "[a] civil action . . . that is commenced in a State court that is against or directed to" them "for or relating to any act under color of such office."

14. Section 1442(a)(1) "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 869 (E.D. Mo. 2016).

15. Removal pursuant to 28 U.S.C. § 1442(a) differs from other types of removal in that the general presumption against removal does not apply; rather, § 1442(a) "should be liberally construed to give full effect to [its] purpose." *See Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1250–51 (10th Cir. 2022) ("The statute's basic purpose is to protect against the interference with federal operations that would ensue if a state were able to arrest federal officers and agents acting within the scope of their authority and bring them to trial in a state court for an alleged state-law offense."); *see also Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("Th[e] policy [of providing the protection of a federal forum to federal officers] should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)."); *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

16. Removal pursuant to § 1442(a) further differs from other types of removal in that the removing defendant is not required to obtain the consent of other served defendants. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034–35 (10th Cir. 1998) (holding that

1 | "G.E. properly removed the case to federal court without the consent of co-defendants" and citing cases from the Second, Fifth, Ninth, and Tenth Circuits in support of the holding).

17. Finally, unlike with other types of removal, an order remanding a case removed pursuant to § 1442 is reviewable by appeal. 28 U.S.C. § 1447(d).

18. A party seeking removal under § 1441(a)(1) bears the burden of showing that (a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiffs' claims; and (c) it can assert a colorable federal defense. *Goncalves By and Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017).

19. To establish the "acting under" element, a private person or corporation must allege that their actions "involve[d] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Suncor*, 25 F.4th at 1251 (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007); *Goncalves*, 865 F.3d at 1245. In other words, the work carried out by the private actor "must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Suncor*, 25 F.4th at 1253.

20. With respect to the causal nexus element, a private person or corporation must allege "a causal connection between the charged conduct and the asserted official authority. In other words, the removing party must show that it is being sued because of the acts it performed at the direction of the federal officer." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010) (cleaned up). "[T]he hurdle erected by this requirement is quite low." *Id.* (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d. Cir. 2008)); *see also Maryland v. Soper*, 270 U.S. 9, 33 (1926) ("It is enough that [the federal officer's] acts or his presence at the place in performance of his official duty constitute[s] the basis" for the lawsuit.).

21. Importantly, the asserted federal defense need only be plausible, and the court "is not required to determine its validity at the time of removal." *Bennett*, 607 F.3d at 1088.

- 6 -

NOTICE OF REMOVAL

"For example, in *Acker*, the Supreme Court concluded that the defendant had presented a colorable federal defense of inter-governmental tax immunity even though the Court ultimately rejected that defense." *Id.* (citing *Acker*, 527 U.S. at 431); *see also Lind v. Ne. Ohio Corr. Ctr.*, No. 4:21CV2165, 2022 WL 429453, at *2 (N.D. Ohio Jan. 27, 2022) ("The final prong presents a low bar and merely requires that the defendant's assertion is both defensive and based in federal law.") (quoting *In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1077 (N.D. Ohio 2018), and *Mesa v. California*, 489 U.S. 121, 129 (1989) (internal quotations removed)).

22.     Should Plaintiffs file a motion to remand this case, CoreCivic respectfully requests an opportunity to respond more fully in writing, including the submission of further affidavits and authorities, but offers the following at this time:

23.     CoreCivic, its agents, and its employees are persons within the meaning of 28 U.S.C. § 1442(a)(1). *See Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756–57 (9th Cir. 2022) (finding that private individuals and corporate entity government contractors are "persons" under 28 U.S.C. § 1442(a)(1)).

24.     ICE does not operate its own detention facilities but rather contracts out operation of its five Service Processing Centers and arranges detention bed space through privately owned and operated Contract Detention Facilities, as well as through Intergovernmental Service Agreements with local or state agencies, where a private contractor may ultimately be the service provider. (**Ex. 2**: Decl. of Juan Acosta, ¶ 6.)

25.     CoreCivic operates 19 immigration detention centers in 11 states under contract with federal and local governmental agencies. The immigration detention centers house approximately 14,000 immigration detainees. (**Ex. 3**: Decl. of Brad Verhulst, ¶ 6.)

26.     In 1997, CoreCivic, formerly known as Corrections Corporation of America ("CCA") submitted a proposal to the City of California City to construct a private prison, with 2,304 general population beds, as well as a 256-bed segregation unit and a 4-bed medical unit, which was ultimately approved. (Ex. 3, ¶ 7.)

27. On January 20, 1998, the City Council of City of California City granted Conditional Use Permit 97-01 to establish and operate the facility, which was then called the California City Correctional Facility. Construction began later that year. (*Id.*, ¶ 8.)

28. On December 1, 1998, the City Council of the City of California City granted Conditional Use Permit Amendment 98-02, which expanded the permitted use of the site by 512 general population beds. That Amendment was extended, and on November 15, 2001, the City Manager/Planning Director clarified that the Amendment extension was "granted indefinitely." (*Id.*, ¶ 9.)

29. In September 2000, the Federal Bureau of Prisons ("BOP") awarded CCA a contract to utilize the California City Correctional Facility under the Criminal Alien Requirement program. The Criminal Alien Requirement sought to obtain housing in privately owned and operated facilities of Criminal Aliens who were serving federally imposed sentences, and who would be subject to removal at the completion of their sentences. (*Id.*, ¶ 10.)

30. On September 28, 2000, the BOP provided CoreCivic with a Notice to Proceed, and the facility began receiving BOP inmates on October 2, 2000. (*Id.*, ¶ 11.) After several extensions, the BOP contract terminated on October 1, 2010. (*Id.*, ¶ 12.)

31. In September 2010, the City of California City entered into a 15-year Intergovernmental Service Agreement ("IGSA") with the Office of the Federal Detention Trustee, which authorized the U.S. Marshals Service and ICE to use 2,532 beds at the California City Correctional Facility, with CCA as the City's Service Provider. (*Id.*, ¶ 13.)

32. Under that IGSA, more than 9,500 ICE detainees were placed at the California City Correctional Facility between 2010 and 2013. (*Id.*, ¶ 14.)

33. In December 2013, CCA began leasing the California City Correctional Facility to the California Department of Corrections and Rehabilitation ("CDCR") to house sentenced state prisoners. (*Id.*, ¶ 15.)

34. CDCR made full use of the available space at the California City Correctional Facility, and, in January 2019, CDCR housed more than 2,500 state inmates at the California City Correctional Facility. (*Id.*, ¶ 16.)

35. Due to declining state inmate populations, CDCR removed its inmates from the California City Correctional Facility by November 1, 2023, and the lease expired in March 2024. (*Id.*, ¶ 17.)

36. Despite the removal of CDCR inmates and lease termination, CoreCivic continued to maintain the California City Correctional Facility so that it could remain in use. Among other things, CoreCivic maintained staff on-site, marketed, responded to requests for proposals, and engaged in contract negotiations for use of the California City Correctional Facility with potential partners, including ICE. (*Id.*, ¶ 18.)

37. On January 20, 2025, President Trump signed Executive Order 14159, titled "Protecting the American People Against Invasion," which, in part, reversed prior decisions limiting federal contracts for the operation of detention facilities. (*Id.*, ¶ 19.)

38. In April 2025, CoreCivic entered into a letter contract with ICE to utilize all available bed space at the Facility. The contract provided a monthly payment to CoreCivic for the ramp up and preparation of the Facility and authorized the detention of 512 ICE detainees during the ramp-up period. (*Id.*, ¶ 20.)

39. In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the Facility, and ICE did so on August 27, 2025. (*Id.*, ¶ 21.)

40. In September 2025, ICE formalized the contract for the Facility, authorizing use of up to 2,560 beds at the Facility. The contract calls for services to be provided from April 1, 2025 until August 31, 2027. (*Id.*, ¶ 22.)

41. The operation and structure of the Facility is the same today for ICE detainees as it was for all prior inmate and detainee populations since the Facility opened. Detainees are housed in bunks in the same cells, have access to a medical area, are provided meals prepared in a central kitchen, and can attend religious services, access a library, go to recreation, and visit with friends, family, and legal counsel, either in person or by video. As

with all prior inmate and detainee populations, ICE detainees are escorted by CoreCivic personnel at all times when outside their housing units. (*Id.*, ¶ 23.)

42. ICE detainees at the Facility can attend Immigration Court proceedings by video so that Immigration Court proceedings can be held at the Facility, which will reduce detainee transport needs. (*Id.*, ¶ 24.)

43. Strategically positioned in the western United States, the California City Immigration Processing Center serves as a full-service detention facility and as a vital hub for the short-term and transitional housing of detainees who are subject to removal proceedings or awaiting deportation. Additionally, its proximity to major transportation corridors and ICE field offices allows for efficient detainee processing, efficient transfers to ease overcrowding, and access to immigration court appearances, asylum processes, and removal operations. (Ex. 2, ¶ 7.)

44. At the present time, there is extremely limited detention space in California. Based upon the lack of other available detention options in California, in August 2025, and after learning that actions had been taken to remedy the minor concerns raised relating to the fire inspection of the facility, ICE determined that the California City Immigration Processing Center was suitable for its use as a safe and secure detention facility and began directing detainees from other facilities to be transferred to it. ICE determined that its urgent need to use detention space at the facility made it necessary for the facility to begin accepting detainees immediately, even if there were delays in obtaining an administrative license from the City of California City. (*Id.*, ¶¶ 8, 10.)

45. Each ICE field office places ICE detainees at numerous facilities under that field office's supervision. These facilities must be geographically diverse to reduce the distance detainees are transported from point of arrest or apprehension. CoreCivic's current ability to admit detainees to the Facility reduces difficulties for ICE's San Franciso Field Office because detainees can be easily transferred to the Facility, which frees up space in smaller facilities located closer to larger population centers. If ICE cannot utilize the Facility, it would need to transport these detainees more frequently over longer distances to

1  be placed in suitable housing. For these reasons, the Facility is essential to ICE's operations. Enjoining CoreCivic from accepting any more ICE detainees will severely disrupt ICE's ability to discharge its statutory duties and strain CoreCivic's relationship with ICE at this and other locations. (Ex. 3, ¶ 28.)

46.  The California City Immigration Processing Center is also essential to relieve pressure on other detention centers, ensuring compliance with federal detention standards, upholding safe, humane, and orderly facility operations and supporting ICE's mandate to enforce the nation's immigration laws effectively. Interruptions to the availability or operation of the California City Immigration Processing Center significantly disrupt ICE's nationwide and regional national security, public safety, and border enforcement capabilities and strain its overall network. (Ex. 2, ¶ 11.)

47.  California is a sanctuary state, so that only facilities available to ICE for the detention of removable or inadmissible aliens from California are subject to various restrictions, including but not limited to, a prohibition against local law enforcement cooperating with federal immigration enforcement. As a result, the only existing facilities which could be used by ICE in California are those privately owned and operated facilities, such as the California City Immigration Processing Center. Due to the lack of facilities with capacity, without the California City Immigration Processing Center, the closest locations for ICE to safely house immigration detainees through the asylum process or removal proceedings are in Nevada, Arizona, or Texas, although facilities in those locations are currently operating near capacity, meaning that detainees may be transferred even greater distances from their families, legal networks, and other support that may be available to them. Relocating detainees or restricting their admission at the California City Immigration Processing Center will increase the detainees' time in custody, generate delays in appearances before the immigration court, and interfere with timely asylum processes. (*Id.*, ¶ 12.)

48.  All facilities housing ICE detainees, whether operated by a state or local entity or private contractor, "are required to follow a strict set of detention standards" set by ICE.

*See* https://www.ice.gov/detain/detention-management ("Detention Facility Oversight"), last visited September 30, 2025. Specifically, as to the California City Immigration Processing Center, the ICE contract requires compliance with the ICE National Detention Standards ("NDS") 2025. (Ex. 2, ¶ 6.)

49. The NDS 2025 are a comprehensive set of standards covering all aspects of detention, including health and safety, transportation, admission and release, classification, searches, use of force and restraints, discipline, food service, personal hygiene, medical and mental health care, recreation, religion, mail services, telephone access, visitation, voluntary work programs, grievances, legal access, and transfers. *See* www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

50. ICE likewise employs a "multilevel oversight and compliance program" to "ensure compliance with each contract's terms and conditions and the applicable [ICE] detention standards." (Ex. 2, ¶ 6.)

51. CoreCivic meets the "acting under" element of 28 U.S.C. § 1442(a)(1), as it assists ICE with, or helps carry out, the performance of a federal task—namely, the provision of housing, sustenance, programming, and medical care to federal immigration detainees housed at the California City Immigration Processing Center for ICE while they await the completion of various stages of their federal immigration proceedings. In doing so, CoreCivic performs a fundamental governmental function which the federal government would otherwise have to perform itself. *See Suncor*, 25 F.4th at 1253. And in the performance of this function, CoreCivic and its employees are subject to detailed regulation through the ICE NDS and regular monitoring and supervision by ICE. *See Lind*, 2022 WL 429453, at *1 (finding that CoreCivic satisfied the first element of § 1442(a) because "the relationship between [CoreCivic] and the Government is an unusually close one involving detailed regulation, monitoring, or supervision") (citing cases).

52. CoreCivic demonstrates the requisite causal nexus to government-directed conduct because it would not be sued in this action if not for its contractual relationship

1  with ICE and its commencement of operations at the California City Immigration
2  Processing Center at ICE's direction.

3      53.    Plaintiffs' claims against CoreCivic are premised on the performance of its
4  federal contract with ICE to provide secure residential detention services at the California
5  City Immigration Processing Center.

6      54.    Here, CoreCivic assists and helps carry out the duties and tasks of the United
7  States in the detention of federal ICE detainees at the California City Immigration
8  Processing Center on behalf of the federal government, thereby fulfilling the federal
9  government's responsibility to provide for their safety and security. These actions go well
10 beyond simple compliance with the law. *Goncalves*, 865 F.3d at 1247. Accordingly, and as
11 demonstrated above, CoreCivic is acting on behalf of the federal government with respect
12 to the detention of its federal detainees. *See Arizona v. Manypenny*, 451 U.S. 232, 242
13 (1981) ("[T]he right of removal is absolute for conduct performed under color of federal
14 office" and "the policy favoring removal should not be frustrated by a narrow, grudging
15 interpretation of § 1442(a)(1)") (internal citations omitted).

16     55.    CoreCivic was acting under the direction of ICE, an officer of the United
17 States within the meaning of 28 U.S.C. § 1442(a)(1), when it commenced operation of the
18 California City Immigration Processing Center to immediately begin housing ICE detainees
19 at the end of August 2025, despite a delay in receiving an administrative license from the
20 City of California City. Thus, there is a causal nexus between its actions, taken pursuant to
21 a federal officer's directions, and Plaintiffs' claims.

22     56.    Because CoreCivic is operating the California City Immigration Processing
23 Center under the explicit direction of a federal officer of the United States, and in
24 accordance with federally mandated detention standards and federal contractual
25 requirements, CoreCivic has colorable federal defenses to Plaintiffs' claims, which are
26 premised on an invalid interpretation of local and state laws that serves to frustrate the
27 Congressionally mandated mission of ICE to enforce this country's immigration laws.

28

57. CoreCivic has not yet filed its responsive pleading but will raise colorable federal defenses to this action under the doctrines of derivative sovereign immunity and intergovernmental immunity, as well as under principles of federal preemption.

**Derivative Sovereign Immunity**

58. "The United States may not be sued without its consent." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). It is therefore immune from suit unless a plaintiff can point to a statute that says otherwise. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016); *Mitchell*, 463 U.S. at 212 ("[T]he existence of consent is a prerequisite for jurisdiction."). Similarly, government contractors may not be sued for carrying out the sovereign's will. *Yearsley v. W.A. Ross Construction Company*, 309 U.S. 18, 20 (1940); *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 341–43 (4th Cir. 2014) (private employees receive *Yearsley* immunity when performing same functions as government employees); *see generally Filarsky v. Delia*, 566 U.S. 377, 387 (2012) ("[I]t should come as no surprise that the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities."). That is because the government has an "unquestioned need to delegate [its] functions," and "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).

59. Thus, "a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646 (4th Cir. 2018) (citing *In re KBR*, 744 F.3d at 342; *Yearsley*, 309 U.S. at 20–21). In *Campbell-Ewald*, the U.S. Supreme Court affirmed the two prong *Yearsley* standard, and explained the standard as follows: "Where the Government's 'authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress,' we explained, 'there is no liability on the part of the contractor' who simply

1  performed as the Government directed." *Campbell-Ewald*, 577 U.S. at 165 (quoting *Yearsley*, 309 U.S. at 20–21).

60. Accordingly, CoreCivic is immune from suit for carrying out the sovereign's will and commencing operations of the California City Immigration Processing Center in accordance with ICE's instructions. *Yearsley*, 309 U.S. at 20.

**Intergovernmental Immunity**

61. A state law directly regulates the federal government—and is therefore unconstitutional—if it "involve[s] a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). In assessing whether a state law substantially burdens federal operations, there is no distinction between state regulation of federal employees and state regulation of private contractors carrying out federal operations.

62. The Supreme Court has consistently relied on the Supremacy Clause to strike down state laws that dictate how the federal government carries out its federal functions. In *Johnson v. Maryland*, Maryland sought to require a federal postal employee to comply with a state licensing regime before he could perform his federal duties. 254 U.S. 51, 55 (1920). In holding the state law unconstitutional, the Court observed:

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on.

*Id.* at 57.

63. In *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas law that prevented a contractor selected by the federal government from bidding, contracting, and commencing work on a military base "without having obtained a license under Arkansas law for such activity." 352 U.S. 187, 188 (1956). The Court, in rejecting the state law, reasoned that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review" over

the federal government's determination of who was qualified to perform federal work. *Id.* at 190.

64. Courts have held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land. *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

65. Plaintiffs' claims call for a discriminatory application of local and state laws in an attempt to override ICE's decision to award a contract to CoreCivic and commence operation of the California City Immigration Processing Center.

66. The relief Plaintiffs seek, including but not limited to writs of mandate directing "the City to vacate and set aside any approval of the Project" and "restraining the City, CoreCivic, and all others acting in concert with the City or CoreCivic on their behalf [presumably including ICE], from taking any actions to implement the Project" directly regulates the federal government by limiting their ability to continue to assign ICE detainees to the Facility, even if such a delay is only temporary.

67. Plaintiffs' attempts to enforce SB 29 by requiring the City of California City to interpret it in a manner inconsistent with its textual language would result in impermissible regulation, control, and interference with federal activities in violation of the Intergovernmental Immunity Doctrine. *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 483–85 (2023), *aff'd sub nom CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 325–28 (3d Cir. 2025).

68. A state law impermissibly discriminates against the federal government or its contractors if it "single[s them] out" for less favorable "treatment," *Washington v. United States*, 460 U.S. 536, 546 (1983), or if it regulates them unfavorably on some basis related to their governmental "status," *North Dakota v. United States*, 495 U.S. 324, 438 (1990) (plurality opinion). Preventing discrimination against the federal government or those with whom it deals lies at the heart of the Constitution's intergovernmental immunity doctrine. *United States v. Washington*, 596 U.S. 832, 841 (2022).

- 16 -
NOTICE OF REMOVAL

69. Plaintiffs' attempts to block federal immigration operations at the California City Immigration Processing Center through the enforcement of less favorable treatment of ICE and its contractor, CoreCivic, under local, state, and administrative requirements is unconstitutional and invalid because it impermissibly discriminates against the federal government and its contractors. *United States v. California*, 921 F.3d 865, 883–84 (9th Cir. 2019); *see also GEO Group, Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) ("When a state regulation of a contractor would control federal operations, '[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government.'") (citation omitted); *Washington*, 596 U.S. at 835.

**Federal Preemption**

70. Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1). To effectively arrange for appropriate places of detention for removal of aliens, Congress further granted the Secretary authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress further authorized the Secretary, in his "reasonable discretion," to carry out the immigration enforcement activities of the Department of Homeland Security "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4).

71. Federal statutory directives and a comprehensive set of federal detention standards known as the NDS and the Performance Based National Detention Standards ("PBNDS") govern the operation of private ICE detention facilities as set forth in the

1  operative contract with ICE. The NDS was recently revised in 2025 to align with Executive
2  Order 14168.[3]

3  72.  The comprehensive framework enacted by Congress regarding the detention of aliens for removal leads to the conclusion that the federal government has occupied the field. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) ("*Arizona II*"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420, n.11 (2003). Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even complementary state regulation is impermissible.

73.  Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law." *California*, 921 F.3d at 878 (quoting *Arizona II*, 567 U.S. at 399). This includes cases where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 879 (quoting *Arizona II*, 567 U.S. at 399 (internal quotation marks omitted)); *Murphy v. NCAA*, 584 U.S. 453, 471 (2018).

74.  Plaintiffs' request for the Court to override ICE's determination that the California City Immigration Processing Center meets ICE's requirements for contract award presents a direct conflict with the objectives of Congress. Allowing Plaintiffs to exercise a veto over ICE's contracting decisions through the discriminatory application of local, state, and administrative codes stands as an impermissible obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *CoreCivic*, 690 F. Supp. 3d at 486–93, *aff'd sub nom. Governor of New Jersey*, 145 F.4th at 325–28; *GEO Grp.*, 50 F.4th at 762–63.

75.  CoreCivic has the right to remove this action to this Court under 28 U.S.C. §§ 1442(a)(1) and invokes this Court's jurisdiction under 28 U.S.C. § 1446. *See Lind*, 2022 WL 429453, at *2 (finding lawsuit involving federal contractor that housed a USMS

---

[3] The California City Immigration Processing Center contract requires CoreCivic to comply with the NDS 2025 standards.

1  detainee was properly removed under 28 U.S.C. § 1442); *Bowers v. J & M Disc. Towing, LLC.*, 472 F. Supp. 2d 1248, 1255 (D.N.M. 2006) (same).

76. Because the Court has federal officer jurisdiction over at least one of the claims asserted by Plaintiffs, it has supplemental jurisdiction over all of Plaintiffs' claims pursuant to 28 U.S.C. § 1367(a).

77. CoreCivic's efforts to affect this removal are in accordance with 28 U.S.C. § 1446.

78. CoreCivic anticipates that the United States is likely to file a Statement of Interest in this action, under 28 U.S.C. § 517, in support of CoreCivic's effort to confirm its right to continue to operate the California City Immigration Processing Center in coordination with ICE. CoreCivic is aware that the filing of a Statement of Interest requires approval of the Department of Justice through the Acting Assistant Attorney General for the Civil Division in coordination with numerous government agencies, which may be delayed due to current budgetary constraints.

79. A Notice of Filing Notice of Removal, a true and correct copy of which is attached as **Exhibit 4**, will be filed in the Kern County Superior Court.

80. True and correct copies of publicly available pleadings on file with the Kern County Superior Court as of September 30, 2025 are attached as **Exhibit 5**.

WHEREFORE, CoreCivic respectfully requests that this action now pending in Kern County Superior Court be removed to this Court.

DATED this 1st day of October 2025.

          STRUCK LOVE ACEDO, PLC

          By /s/ Dana M. Keene
              Dana M. Keene
              Shannon L. Knorr
              dkeene@strucklove.com
              sknorr@strucklove.com

          Attorneys for Respondent CoreCivic, Inc.