JOSEPH D. PETTA (State Bar No. 286665)
MINDY K. JIAN (State Bar No. 336139)
RYAN K. GALLAGHER (State Bar No. 344349)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
Petta@smwlaw.com
Mjian@smwlaw.com
Rgallagher@smwlaw.com

Attorneys for Dignity Not Detention Coalition

CALLARD E. COWDERY (State Bar No. 329697)
AFRICAN ADVOCACY NETWORK
3106 Folsom St
San Francisco, California 94110
Telephone: (415) 889-9573
ccowdery@aansf.org

Attorneys for John Doe

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CITY OF CALIFORNIA CITY and CORECIVIC, INC.,<br><br>Respondents and Defendants.<br>_____<br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:      October 20, 2025<br>Time:      1:30 p.m.<br>Judge:     Hon. Hon. Kirk E. Sherriff<br>Crtrm.:    6<br><br>Hon. Hon. Kirk E. Sherriff, District Judge<br>Hon. Christopher D. Baker, Magistrate Judge<br><br>Trial Date:        None set<br><br>Filed Concurrently with Ex Parte Application; Declarations of Joseph Petta and Jehan Laner, [Proposed] Temporary Restraining Order and Order to Show Cause re Preliminary Injunction |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF FACTS .................................................................................................. 3

STANDARD OF REVIEW ................................................................................................ 7

ARGUMENT ..................................................................................................................... 8

    I.      Petitioners will suffer irreparable harm unless injunctive relief is granted. ............ 8

    II.     Because the City and CoreCivic have violated local ordinances and state law, Petitioners are likely to succeed on the merits. ............................................... 12

           A.     The City's tacit approval of the Facility violated the Zoning Ordinance, and the City has a mandatory duty to enforce the Zoning Ordinance. .............................................................................................. 13

           B.     The City's tacit approval of the Facility violates SB 29, as would issuance of any permit without compliance with Civil Code section 1670.9(d). ........................................................................ 16

           C.     CoreCivic's operation of the Facility violates the City's Zoning Ordinance. ............................................................................................ 17

           D.     CoreCivic's operation of the Facility violates the UCL. ........................... 17

CONCLUSION ................................................................................................................ 18

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Aiello v. One West Bank*,
No. 2:10-cv-0227-GEB-EFB, 2010 WL 406092 (E.D. Cal. Jan. 29, 2010) ...................... 7

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................. 7, 8, 12

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ................................................................. 11

*Caribbean Marine Servs., Inc. v. Baldridge*,
844 F.2d 668 (9th Cir. 1988) ................................................................. 7

*CTIA-The Wireless Ass'n. v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ................................................................. 11

*Enyart v. National Conference of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ................................................................. 8

*Geo Grp., Inc. v. Inslee*,
No. 151 F.4th 1107 (9th Cir., Aug. 19, 2025) ................................................................. 14

*League of Residential Neighborhood Advocates v. City of Los Angeles*,
498 F.3d 1052 (9th Cir. 2007) ................................................................. 15

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ................................................................. 7

*Univ. of Haw. Prof. Assembly v. Cayetano*,
183 F.3d 1096 (9th Cir. 1999) ................................................................. 7

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................. 7

**STATE CASES**

*Herrmann v. Superior Court of Imperial County*,
75 Cal.App.5th 535 (2022) ................................................................. 16

*Los Angeles Cnty. Employees Retirement Assn. v. County of Los Angeles*,
102 Cal.App.5th 1167 (2024) ................................................................. 13

*Zhang v. Superior Court*,
57 Cal.4th 364 (2013) ................................................................. 17

**FEDERAL STATUTES**

Fed. R. Civ. P. 65 ................................................................................................ 7

**STATE STATUTES**

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ...................................................... 17

Cal. Bus. & Prof. Code § 17203 ...................................................................... 18

Cal. Civ. Code § 1670.9 ........................................................................... passim

Cal. Code Civ. P. § 1085 ......................................................................... 13, 16

Cal. Gov. Code § 12532 .................................................................................. 14

Cal. Gov. Code §§ 65853-57 ........................................................................... 14

Cal. Penal Code § 6082 .................................................................................. 14

**RULES**

L.R. 231 ............................................................................................................ 7

**CALIFORNIA CITY MUNICIPAL CODE**

§ 1-3.01 ..................................................................................................... 17, 18

§ 1-4.02 ..................................................................................................... 11, 15

§ 3-2.3.201 ....................................................................................................... 2

§ 9-2.102 ..................................................................................................... 2, 13

§ 9-2.103 ........................................................................................ 11, 13, 15, 17

§ 9-2.401 ......................................................................................................... 13

§ 9-2.402 .................................................................................................. passim

§ 9-2.2501 ................................................................................................. 11, 15

§ 9-2.2803 ......................................................................................... 13, 15, 16

§ 9-2.2804 ......................................................................................... 15, 16, 17

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

This application seeks immediate injunctive relief to address Respondent and Defendant California City's ("City") unlawful approval of the California City Correctional Facility ("Facility") reopening as the largest facility in the state for mass civil detention of immigrants. Petitioners and Plaintiffs ("Petitioners") Dignity Not Detention Coalition ("Coalition") and John Doe,[1] an individual currently detained at the Facility, also seek immediate injunctive relief to halt Respondent and Defendant and Real Party in Interest CoreCivic ("CoreCivic"), the company that owns the Facility, from continuing to unlawfully accept detainees and from expanding the Facility unless and until the Facility is authorized to operate.

U.S. Immigration and Customs Enforcement ("ICE") began transferring people to the previously dormant Facility on or around August 27, 2025. CoreCivic has since continued to accept and detain immigrants at the Facility despite not having authority to conduct civil immigration detention operations in California City. The City's Municipal Code contains no provision authorizing civil immigration detention centers in the zoning district where the Facility is located. Even if the City were to construe this *civil* immigration detention center as a *criminal* "correction, probation or prison facilit[y]" qualifying as a conditional use in that zoning district, CoreCivic would first be required to obtain a conditional use permit ("CUP") for the new use. Under the City's Code, either of these actions would require a noticed, public hearing. None has occurred. Although the City has claimed that CoreCivic needs only a business license to begin operations, CoreCivic continues to operate without one, a clear violation of local law which the City has so far failed to enforce despite a mandatory duty to do so. In short, both the City and CoreCivic are violating the Municipal Code: the City by tacitly authorizing and failing to enforce its Code against the illegal Facility and CoreCivic by operating the Facility without the necessary approvals.

---

[1] With this application, Petitioners are moving ex parte (1) for leave for John Doe to appear pseudonymously, and (2) to file under seal the portions of the record including Doe's identifying information.

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

In addition to violating the Municipal Code, the City has violated Civil Code section 1670.9, also known as Senate Bill 29 ("SB 29"), which the state legislature specifically enacted to prevent situations such as this. The law prohibits the City from entering into any "contract" with a private corporation, on or after January 1, 2018, that would enable or expand the civil detention of immigrants "in a locked detention facility." Cal. Civ. Code § 1670.9(a), (b). SB 29 also prohibits the City from issuing any "permit" to a private corporation to construct or reuse a building for the civil detention of immigrants, *unless* the City provides public notice at least 180 days before executing the permit, and "solicit[s] and hear[s] public comments on the proposed . . . permit action in at least two separate meetings open to the public." *Id.* § 1670.9(d). The City concedes that SB 29 applies here but that it has not complied with the law.

Additionally, CoreCivic is violating the Unfair Competition Law ("UCL"), Business and Professions Code sections 17200 *et seq.* CoreCivic is violating Municipal Code sections 9-2.102(b), 9-2.402, and 3-2.3.201,[2] and other Code provisions as set forth herein, by having opened and populated the Facility with no official City approvals. A practice or act is unlawful under the UCL if it is forbidden by law.

The City's and CoreCivic's multiple violations of local and state law are untenable and must be immediately enjoined. Without an injunction prohibiting the City's issuance of further approvals to the Facility in violation of the City's Municipal Code and SB 29, the City will deprive the public, including the Coalition and its individual members, of their right to open and fair hearings on the Project *before* it receives the City's official imprimatur. Without an injunction prohibiting CoreCivic from accepting and detaining new immigrant transferees unless it obtains the proper approvals—a legislative amendment to allow civil immigration detention centers in the Facility's zoning district, a new CUP, *and* a business license—Petitioner John Doe and other immigrant detainees currently at the Facility, and in civil immigration proceedings elsewhere, will suffer imminent harm from the Facility's conditions rapidly worsening as more individuals are packed into unlawful confinement. Furthermore, without an immediate

---

[2] Municipal code sections cited herein are attached as Exhibit 3 to the Declaration of Joseph Petta.

1  injunction against both the City and CoreCivic, California City residents on whose behalf the

2  Coalition advocates will suffer the negative externalities of the Facility's expanding operations,

3  including unmitigated dust and other air quality impacts from increased transfers of detainees to

4  and from the Facility.

5      Petitioners will suffer irreparable injury unless the Court issues injunctions against the

6  City and CoreCivic, and Petitioners are likely to succeed on the merits of their claims. Thus, the

7  Court should grant Petitioners' request for immediate injunctive relief until the case can be

8  resolved on the merits.

9                              **STATEMENT OF FACTS**

10     California City is a small community located at the western tip of the Mojave Desert.

11 Declaration of Joseph Petta (filed concurrently) ("Petta Decl."), Exh. 4. Since 1999, the

12 privately owned California City Correctional Facility has sat in a remote area about seven miles

13 east of the City's small downtown. Petta Decl., Exh. 5. Over its lifetime, the Facility has almost

14 exclusively been used to incarcerate state and federal prisoners serving out criminal sentences.

15 Petta Decl., Exh. 5. The Facility briefly housed a small number of immigrant detainees more

16 than a decade ago—the only aberration, as far as Petitioners are aware, from the Facility's

17 primary use as a prison for criminal detainees.[3] Petta Decl., Exh. 6. Most recently, between 2013

18 and 2024, the Facility was used to detain prisoners held in custody by the California Department

19 of Corrections and Rehabilitation ("CDCR"). Petta Decl., Exh. 7. The Facility shut down in

20 March 2024 after CDCR declined to renew its annual lease agreement with CoreCivic. *Id.* Until

21 the recent events giving rise to this lawsuit, the Facility had been vacant and dormant for over a

22 year.

23     CoreCivic signed a letter contract with ICE for use of the Facility starting on April 1,

24 2025. Petta Decl., Exh. 8. Meanwhile, CoreCivic began discussions with the City over

25 reopening its dormant, for-profit prison in the desert as a civil immigration processing center. In

26

27 ─────────────────

28 [3] It is not clear on what legal basis the Facility was temporarily used for detaining immigrants, who
   according to one source rarely exceeded a few hundred in number at any given time. Petta Decl., Exh. 6.

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

June 2025, newspapers began to report on CoreCivic's efforts to open the Facility, including installing a new sign identifying the Facility as "California City Immigration Processing Center," posting of job listings, and CoreCivic's undertaking of purported "preliminary activation activities." Petta Decl., Exh. 9. News reports described Mayor Marquette E. Hawkins as expecting the prison to reopen as an immigration processing center (*id.*), and CoreCivic hosted the Mayor and two other councilmembers for a tour of the Facility. Petta Decl., Exh. 10. Alarmed by these developments, Coalition member Immigrant Legal Resource Center ("ILRC") sent a letter to the City Council and other City officials on June 24, 2025, raising concerns about the City's compliance with SB 29 (Cal. Civ. Code § 1670.9) and other state laws, including the California Environmental Quality Act. Declaration of Jehan Laner (filed concurrently) ("Laner Decl."), Exh. 1.

During subsequent weeks, the Mayor claimed that the City lacked jurisdiction over CoreCivic's use of its property and described the City as powerless to stop CoreCivic from reopening and converting the Facility. Petta Decl., Exh. 11. Nonetheless, on July 29, 2025, the City Manager sent CoreCivic a letter regarding an inspection of the Facility undertaken by the City's Fire Department on July 22, 2025. Petta Decl., Exh. 12. According to the letter, the Facility did not, on the date of the inspection, comply with the fire code and would "pose a serious and imminent threat to the health and safety of the community of California City, City's emergency personnel, future detainees, those employed at the facility and visitors." Petta Decl., Exhs. 12, 13. The letter stated that the Facility could not legally operate until it addressed code violations and that it would not be possible to address those violations within 120 days. *Id.*

Despite this, the City moved forward with processing a business license for the Facility. The Planning Commission's August 5, 2025 regular meeting agenda listed a "Site Plan Review ('SPR') Minor Application" for the Facility as an "Active Planning Project[] under Review," and stated that a "[b]usiness license will be considered for approval once Fire & Building Dept. requirements and inspections are met." Petta Decl., Exh. 14. In response, ILRC sent another letter expressing its concerns to the City Council and City officials on August 4, 2025. Laner

Decl., Exh. 2.

On or around August 27, 2025, ICE began transferring immigrant detainees to the Facility. Laner Decl. ¶ 4. CoreCivic proceeded to lock them in cells while the City stood idly by. *See* Declaration of John Doe ("Doe Decl.") ¶¶ 7-8; Petta Decl., Exh. 15 (quoting Mayor Hawkins claiming the City lacks jurisdiction to regulate CoreCivic "as long as they have their ducks in a row"). Petitioner Coalition's legal counsel sent a third letter to the City on August 29, 2025, reiterating the ILRC's concerns and noting that the Facility could not proceed without City discretionary approvals, including at a minimum, a CUP. Petta Decl., Exh. 16. At the Planning Commission's September 2, 2025 meeting, City officials noted that CoreCivic had submitted a new business plan, operational statement, and SPR statement. Laner Decl. ¶ 7. At the same meeting, the City Attorney confirmed that there had been no public hearings on the Project to date. *Id.*

Though it has only been open for a few weeks, conditions inside the Facility are already dire, much as they are reported to be at immigrant detention centers across the country. Petta Decl., Exh. 17. Petitioner John Doe has been detained by ICE since he presented himself to officials at the border seeking asylum in July 2024. Doe Decl. ¶¶ 3-4. He was transferred to the Facility during the night around September 1, 2025. *Id.* ¶¶ 4-6. Upon arrival, he was immediately locked in a cell and left there for eighteen hours. *Id.* ¶ 7. Petitioner Doe and others brought to the Facility continue to spend much of each day locked into small cells, which they have to share with another person. *Id.* ¶¶ 8, 10-12. He and others were subjected to "prison searches," with guards "run[ning] their hands all the way up to our genitals, and in between our buttocks' cheeks." *Id.* ¶¶ 8, 12. There is not enough seating for everyone to eat in their communal dining area, so some individuals are required to eat sitting on the floor or in their cells, and the only toilets available are within plain view of other detainees and guards. *Id.* ¶ 14. Showers are likewise in an open area such that no person can bathe without being observed by other detainees and guards. *Id.* ¶ 13. Many of the people so far transferred to the Facility "do not understand [the] rules" being enforced upon them, and "[i]f someone cannot speak English, the

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

officers yell at them." *Id.* ¶¶ 9, 24. Recent in-depth reporting by the *Fresno Bee* corroborates Doe's claims regarding the "inhumane" conditions and mistreatment of detainees at the Facility. *See* Petta Decl., Exh. 18.

In short, Doe and other immigrants being held at CoreCivic's criminal detention facility, supposedly converted for civil immigration processing while operating without any official City approvals, are subjected each day to prison-style conditions. According to Doe, "[t]he conditions at California City are inhumane," and "[o]fficers treat us as though we are prisoners in a corrections facility." Doe Decl. ¶ 9. The Facility, in sharp contrast to previous locations where he was detained, "is set up like a prison" (*id.* ¶ 10) and is not remotely suited for its current unpermitted, unstudied, unlawful use for the civil detainment of immigrants. *See generally id.* ¶¶ 9-27, 29. As Doe declares, at the Facility, "I feel as though I am serving a criminal sentence for having asked for asylum in the United States."[4] *Id.* ¶ 31.

At the time of filing this application, approximately 500 people are detained at the Facility. Petta Decl., Exh. 20; Laner Decl. ¶ 4. Without interim relief from this Court, at least 2,000 more could soon follow.[5] Petta Decl., Exh. 15. To date, the City has not responded to any of the ILRC's or Petitioner Coalition's letters, nor has the City complied with the Coalition's request under the California Public Records Act ("CPRA") for records related to the Facility, submitted on August 29, 2025.[6] The City has not publicly addressed how CoreCivic was able to remedy the serious fire code violations observed in the July 22, 2025 inspection, months earlier than the City anticipated. Nor have City officials explained how the Facility was able to open and begin operating without express authorization in the Zoning Ordinance, without a CUP and a business license, and without complying with SB 29's requirements for at least two noticed,

---

[4] ICE primarily detains people with no criminal convictions of any kind. Petta Decl., Exh. 19.

[5] The Trump Administration has deported at least 180,000 people so far this year; at least 60,000 more people are currently in ICE custody, a number that grew at a rate of 1,500 people per day during August 2025. Petta Decl., Exh. 21.

[6] A separate lawsuit, *R. Andrew Free v. City of California City*, Case No. BCV-25-103364, was filed in Kern County Superior Court on September 16, 2025, challenging the City's failure to respond to multiple requests under the CPRA for records related to the Facility.

1  public hearings before issuance of any permit for the Facility, and 180 days' notice of any

2  executed approval for the Facility. Cal. Civ. Code § 1670.9(d). Mayor Hawkins has recently

3  acknowledged that CoreCivic opened the Facility without the proper permits, after previously

4  claiming to be unable to confirm or deny this fact. Petta Decl., Exh. 18. At the same time,

5  CoreCivic representatives have described the company's leadership team as having an "open

6  line of communication" with top City officials. Petta Decl., Exh. 22.

## STANDARD OF REVIEW

8      The purpose of a temporary restraining order is to preserve the status quo pending a fuller

9  hearing. *See* Fed. R. Civ. P. 65. In general, "[t]emporary restraining orders are governed by the

10  same standard applicable to preliminary injunctions." *Aiello v. One West Bank*, No. 2:10-cv-

11  0227-GEB-EFB, 2010 WL 406092 at *1 (E.D. Cal. Jan. 29, 2010); *see also* L.R. 231(a).

12  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing

13  that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

14  22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "A plaintiff

15  seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2]

16  that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the

17  balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*,

18  555 U.S. at 20.

19      In addition, "the district court must always consider whether the public interest would be

20  advanced or impaired by issuance of an injunction in any action in which the public interests is

21  affected." *Caribbean Marine Servs., Inc. v. Baldridge*, 844 F.2d 668, 677 (9th Cir. 1988).

22  Therefore, in evaluating a plaintiff's motion for preliminary injunction, a district court may

23  weigh the plaintiff's showings on the *Winter* factors using a sliding-scale approach. *Alliance for*

24  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). A significant consideration

25  when weighing the *Winter* factors are the degrees of "the possible harm caused by the

26  preliminary injunction" and that of the "harm caused by not issuing it." *Univ. of Haw. Prof.*

27  *Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Consequently, injunctive relief is

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

1  routinely granted where the denial of an injunction would cause great harm to the plaintiffs and

2  issuance of an injunction would cause minimal harm to defendants even if a different factor

3  weighs against issuing relief. *See Enyart v. National Conference of Bar Examiners, Inc.*, 630

4  F.3d 1153, 1166-67 (9th Cir. 2011); *Alliance for the Wild Rockies*, 632 F.3d at 1135 (injunctive

5  relief may issue where the balance of hardships weights strongly in favor of plaintiffs even

6  though there are "serious questions on the merits.").

7  <center>**ARGUMENT**</center>

8  **I.    Petitioners will suffer irreparable harm unless injunctive relief is granted.**

9          CoreCivic has a long history of abusing the people it is paid to imprison. Human rights

10  organizations have documented horrific experiences at CoreCivic's immigrant detention centers

11  for decades. At multiple facilities, detainees have been served maggot-filled food. Petta Decl.,

12  Exh. 23. Observers at one facility found that detainees lost "an average of 10 pounds" during

13  their detainment. *Id.* Delays and denials of medical care, including for detainees diagnosed with

14  cancer, are common. Petta Decl., Exh.. 24. At one CoreCivic facility, the employee hired to

15  transport immigrants to the airport for their deportation flights was a serial sexual predator. He

16  assaulted at least eight detained women in CoreCivic's van immediately before loading them

17  onto planes that removed them from the country. Petta Decl., Exh. 25. Detainees at CoreCivic

18  facilities have been shuttered into solitary confinement for weeks at a time; some have

19  committed suicide. Petta Decl., Exhs. 26, 27. CoreCivic has been sued on multiple occasions for

20  subjecting detainees to forced labor. Petta Decl., Exh. 28. Immigrants at CoreCivic facilities

21  have been deprived of access to clean water. Petta Decl, Exh. 29. At least once, immigrants were

22  held in cells where raw sewage pooled on the floor from broken septic infrastructure. *Id.*

23          Numerous immigrants have also died in or shortly after being released from CoreCivic's

24  custody. For example, Huy Chi Tran had a heart attack after being placed in solitary

25  confinement at CoreCivic's Eloy Detention Center in Arizona; staff did not notice, and he died.

26  Petta Decl., Exh. 24. Abelardo Avellaneda Delgado, a father of six with no prior health

27  conditions, was drugged into a stupor and died while being transported by CoreCivic to its

28

<center>8</center>

Stewart Detention Facility in Georgia. Petta Decl., Exh. 30. Kelsey Vial, a 23-year-old, died by suicide after being detained at CoreCivic's notorious Torrance County Detention Center in New Mexico for four months. A CoreCivic employee had told Vial that he would be "staying locked up in here for two years" to taunt him; Vial killed himself "because of the stress," other detainees at the facility explained in a letter announcing a hunger strike in response. Petta Decl., Exh. 31. Mariee Juárez, a one-year-old, became sick in the congregate setting of CoreCivic's Dilley Detention Center in Texas. She was not given proper medical treatment when she began coughing, vomiting, and running a 104.2 degree fever. She died shortly after release from CoreCivic custody. Petta Decl., Exh. 32. It is worth reiterating that most of the individuals CoreCivic detains for civil immigration processing purposes, including those detained at the Facility, have no criminal convictions of any kind. Petta Decl., Exh. 19. Yet CoreCivic routinely subjects them to inhumane conditions that would not be allowed in punitive criminal custody.

Petitioners would be justified to fear irreparable harm based on CoreCivic's track record alone—particularly given that in this case, the company has not bothered to comply with local permitting requirements before opening its doors. However, Petitioners have further, concrete, and particularized reasons to believe that this specific Facility poses imminent, irreparable harm to those who are imprisoned there. Petitioner John Doe has attested that the Facility "do[es] not seem ready to house human beings." Doe Decl. ¶ 15. The first cell that he was placed in was filled with junk, including "tools and televisions" scattered on the floor. *Id.* The Facility is filthy. *Id.* ¶¶ 15-16. It has no law library or legal resources. *Id.* ¶ 18. Multiple people detained at the Facility, including Petitioner, have been denied medical care. *Id.* ¶¶ 20, 22-23, 26. Petitioner has been denied medication needed to manage his diabetes, and he has received no medication to treat flu-like symptoms he developed after being transferred to the Facility. *Id.* ¶¶ 20, 22. Another person detained with Petitioner in the same room needs a hernia surgery and cannot walk without experiencing extreme pain. *Id.* ¶ 23. Guards have "accused him of faking his injury and are forcing him to walk," and they have threatened that if he does not comply with their orders, they will "tell the immigration court." *Id.* Muslim detainees have been harassed by

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

officers at the Facility for practicing their religion. When one individual knelt to the ground to pray, an officer yelled that "[t]his isn't the time to [expletive] be praying." *Id.* ¶ 25. On or around October 9, 2025, an individual in Doe's dormitory attempted to hang himself. Doe Decl. ¶ 31. When Doe and others called for help, guards did not come right away, and once they did they appeared untrained and did not have proper equipment to immediately assist the individual. *Id.* Doe believes this individual tried the day before to inform CoreCivic personnel of his suicide attempt, but was mocked for not speaking English. *Id.* If the Facility is allowed to continue populating further, Petitioner John Doe's and other current detainees' conditions of confinement will worsen as more people are packed into the substandard Facility, and new immigrant transferees—on whose behalf Petitioner Coalition advocates—will be subjected to these unlawful abuses of their constitutional rights.

The Facility's structural deficiencies also pose imminent harms to Petitioner John Doe and other current and future detainees. On July 22, 2025, the California City Fire Department and the City's Director of Public Safety inspected the Facility. Petta Decl., Exh. 12. The Facility failed the inspection, which revealed that the Facility "does not comply with applicable codes" and that reopening it "will pose a serious and imminent threat to the health and safety of the community of California City, City's emergency personnel, future detainees, those employed at the facility and visitors." *Id.* at 1. The City determined that even if it granted CoreCivic 120 days to cure the issues, the deficiencies were so substantial that such a feat was "not possible." *Id.* at 2. In other words, the Facility's safety deficiencies were so substantial that the City determined it was "not possible" for CoreCivic to fix them before November 19, 2025. Yet just 36 days later, starting on August 27, 2025, CoreCivic began locking people inside the Facility, claiming that all of the fire safety issues had been addressed. Laner Decl. ¶ 5. Despite Petitioners' CPRA requests submitted on August 29, 2025 and September 2, 2025, neither the City nor CoreCivic has provided evidence that these serious fire safety problems have been remedied. Interim relief must issue before CoreCivic's negligence and the City's indifference result in catastrophe.

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

Petitioners also believe that the Facility, located in the Mojave Desert, will cause imminent harm because it is ill-equipped to handle extreme heat events. A 2023 spatial analysis using climate modeling data from U.C. Berkeley found that the Facility is among the detention facilities most vulnerable to heat-related endangerment of human health. Petta Decl., Exh. 33. The Facility is projected to annually experience close to 70 "extreme heat days" in the coming years, defined as days "where temperatures are above 103 degrees Fahrenheit." *Id.* Heat stress is "the leading cause of weather-related deaths and can exacerbate underlying illnesses including cardiovascular disease, diabetes, mental health, asthma, and can increase risk of accidents and transmission of some infectious diseases." Petta Decl., Exh. 34. Without any public process, and without any evidence that the Facility is safely habitable, CoreCivic continues to crowd immigrants into a demonstrably dangerous building in the middle of the desert. Irreparable harm to Petitioner Doe and others will result if interim relief is not granted.

Petitioner Doe and other immigrant detainees are not the only parties who will be imminently and irreparably harmed without interim relief. The general public, including residents of California City, will also be harmed, particularly those with environmental, financial, infrastructural, religious, reputational, or moral objections to reopening the Facility for the mass civil detention of immigrants. As described below, the public, including the Coalition and its individual members, have the right under the Municipal Code and SB 29 to voice those concerns and participate in a public-facing decision-making process. *See, e.g.*, California City Municipal Code §§ 1-4.02(a); 9-2.103(b); 9-2.2501; Cal. Civ. Code § 1670.9(d). If the City's tacit approval of the Facility and any further official approvals in violation of the Municipal Code go unchecked, and CoreCivic fills up the Facility with detainees before Petitioners can even reach the merits of their claims, then the very outcome that SB 29 is designed to prevent will have transpired without any opportunity for public input. *See CTIA-The Wireless Ass'n. v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) ("accurate and balanced disclosures" and "a free flow of accurate information" are public interests to be weighed when deciding whether to grant injunctive relief"); *see also California v. Azar*, 911 F.3d 558, 581-82 (9th Cir. 2018)

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

1    (public interest is served by compliance with processes that require "a careful and open review

2    of proposed" government decisions); *Alliance for the Wild Rockies*, 632 F.3d at 1139

3    (recognizing a public interest in "comply[ing] faithfully with . . . procedures" that facilitate

4    "careful consideration of environmental impacts" of projects).

5        Furthermore, without immediate injunctions against both the City and CoreCivic, City

6    residents on whose behalf the Coalition advocates will suffer the negative externalities of the

7    Facility's intensifying operations, including dust and other air quality impacts from increased

8    transfers of detainees to and from the Facility. Immigration detention is typically shorter term

9    than prison incarceration, with detained individuals transferred between facilities more

10   frequently than those serving criminal sentences in prison. Laner Decl., ¶¶ 11, 12. For example,

11   according to one report, sixty percent of detained immigrants are transferred at least once. In

12   addition, people in immigration detention are often transferred to their court hearings on a daily

13   basis or released on parole, bond, or when they win their cases. Laner Decl. ¶ 11 & Exh. 3. This

14   substantial increase in ingress and egress, combined with the further increase in visits from

15   family and the community, as well as any construction needed to make the Facility comply with

16   federal standards for housing detainees, will result in increased vehicle miles traveled, traffic,

17   noise, air pollution, greenhouse gas emissions, and other impacts that fall not only upon

18   detainees, their families, and Facility employees, but also local residents. Laner Decl. ¶ 12. City

19   residents will pay a heavy price for serving as unwilling hosts to CoreCivic's unlawful detention

20   operation, in the form of unstudied and unmitigated impacts to their wellbeing.

21       The City and CoreCivic can cite no comparable harm resulting from the injunction

22   sought here. Requiring the City to abide by its own Code and California law is not a harm. Nor

23   will CoreCivic incur any comparable harm. At worst, the company could experience a

24   temporary and marginal reduction in the profitability of its human detention business. The

25   shareholders will survive. Without interim relief, there is no guarantee that the people detained

26   inside or destined for the Facility can expect the same.

27   **II.    Because the City and CoreCivic have violated local ordinances and state law,
         Petitioners are likely to succeed on the merits.**

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

**A.**    **The City's tacit approval of the Facility violated the Zoning Ordinance, and the City has a mandatory duty to enforce the Zoning Ordinance.**

Under Code of Civil Procedure section 1085, a writ of mandate will lie to compel a public agency to perform a mandatory legal duty, meaning a duty the agency is "required to perform in a prescribed manner under the mandate of legal authority without the exercise of judgment or opinion concerning the propriety of the act." *Los Angeles Cnty. Employees Retirement Assn. v. County of Los Angeles,* 102 Cal.App.5th 1167, 1199 (2024). The City has such a clear mandatory duty under its Municipal Code, which is enforceable under section 1085.

The California City Municipal Code provides that "[d]epartments, officials, and employees vested with the duty or authority to issue permits or licenses . . . shall issue no permit or license for uses, buildings, or purposes in conflict with" the City's Zoning Regulations. California City Municipal Code § 9-2.2803(a).[7] "A permit or license issued in conflict with" the Zoning Regulations is considered "null and void." *Id.* The City has violated this mandatory duty by enabling the Facility's reopening and conversion despite provisions in the Zoning Ordinance that categorically prohibit such use, unless the City's Planning Commission and City Council determine to allow this *type* of use in that Zoning District, *and* decide to issue a new CUP and business license for the Facility.

The Facility is located on land zoned O/RA (Open Space Residential Agricultural). Under the Municipal Code, only uses explicitly permitted in a given zoning district are allowed; all others are barred. § 9-2.102(b). The O/RA zoning district does not list civil immigration detention or processing centers as principally or conditionally permitted uses. *See* §§ 9-2.401, 9-2.402. The City therefore may not allow the use of the Facility to commence without holding noticed public hearings of the Planning Commission and City Council. The City's legislative bodies must first resolve the current ambiguity in the Code as to whether *civil* immigration detention centers are nonetheless conditionally allowed in the O/RA zone as "[g]overnmental or quasi- governmental correction, probation or prison facilities [or] services." § 9-2.103(b); *see*

---

[7] Further unattributed code sections herein reference the City's Municipal Code.

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

*also id.* ("The Planning Commission *shall* resolve ambiguities by resolution transmitted to the Council. If approved by the Council, the clarifications shall govern until modified by amendment to this chapter." (emphasis added)); *id.* § 9-2.402(p) (listing criminal facilities as conditional uses in the O/RA zone). If the Council were to decide not to treat civil immigration detention facilities as criminal "correction, probation or prison" facilities, the Council would be required, at minimum, to amend the Zoning Ordinance to allow for such use. *See* Cal. Gov. Code §§ 65853-57 (requiring approval of both Planning Commission and City Council for such zoning amendments). The City has done neither.

Even if the City Council were to determine that a civil immigration detention center is sufficiently similar to a criminal "correction, probation or prison" facility to conditionally allow the use in the O/RA district, the City would still be required to publicly consider issuing a new CUP for the Facility. On January 20, 1998, the City Council granted CUP 97-01 to Corrections Corporation of America (the name under which CoreCivic previously operated) to establish and operate a 2,304 bed "prison facility" at the Facility site. Yet, that CUP does not authorize the Facility because it was expressly approved for the "operat[ion] of a *prison facility* . . . for as long as *the use is conducted in accordance with* the [CUP]." Petta Decl., Exh. 35 (emphasis added).

Civil detention centers used to hold immigrants pending an immigration hearing are not prisons, nor are they "correctional" in nature. *Compare* Cal. Penal Code § 6082 ("prisons refer to all facilities . . . for the confinement, treatment, employment, training, and discipline of persons in the legal custody of the Department of Corrections"), *with* Cal. Gov. Code § 12532 (discussing "detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings"); *see Geo Grp., Inc. v. Inslee*, No. 151 F.4th 1107, 1120 (9th Cir., Aug. 19, 2025) (distinguishing facilities that "hold and punish convicted criminals" from facilities that "hold[] civil detainees" none of whom "has been convicted of—or even charged with—a crime"). Moreover, the Facility's prior use as a prison has not been conducted "in accordance with the" CUP for more than a year (Petta Decl., Exh. 10); therefore, by its own terms, the CUP no longer authorizes this use. Petta Decl., Exh. 35. Further, CoreCivic's

intended use of the Facility as a 2,560-bed immigration detention facility also exceeds the prison's prior permitted capacity of 2,304 beds, by more than 10 percent. Thus, even if the Council were to legislate that civil immigration detention centers are conditionally allowed in the O/RA zone, the City would not be able to approve the Facility without issuing a new CUP for a new, different, and larger use.

A business license is the only official entitlement that the City has even contemplated for the Facility. Laner Decl. ¶ 3. But issuance of a business license without first taking both of the steps above would also violate the Zoning Ordinance. § 9-2.2803 (the City "shall issue no permit or license for uses, buildings, or purposes in conflict with" the City's Zoning Regulations); *League of Residential Neighborhood Advocates v. City of Los Angeles,* 498 F.3d 1052, 1056 (9th Cir. 2007) ("Any such agreement to circumvent applicable zoning laws is invalid and unenforceable."). And approving the Facility under only a business license would deprive the public of its right to noticed and public hearings with opportunity to comment, including the right to appeal any CUP approval to the City Council. §§ 1-4.02(a), 9-2.103(b), 9-2.402, 9-2.2501. The City cannot circumvent mandatory procedures related to its zoning regulations simply because a proposed conditional use is likely to generate controversy. Indeed, it is *most* important for the public to have an opportunity to be heard on controversial issues such as this.

Even if the City had taken no action, and takes no further action to approve the Facility, the City is nonetheless violating the Municipal Code by failing to enforce its Zoning Ordinance. The use of any land or building contrary to the Zoning Regulations is a public nuisance. § 9-2.2804(b). Under the Municipal Code, "[t]he City *shall* commence actions and proceedings for the abatement, removal, and enjoinment in the manner provided by law and *shall take such other steps and shall apply to any court as may have jurisdiction* to grant such relief as will abate or remove such . . . use, and *restrain and enjoin any person from erecting or maintaining such building or structure or using any property contrary* to" the City's Zoning Regulations. § 9-2.2804(c) (emphasis added). Despite its clear mandatory duty, the City has taken no action

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

against the Facility. To the contrary, the City has claimed that it can do *nothing* to prevent CoreCivic's unlawful use of the Facility.

In sum, the City has violated its mandatory duty to "conform" to its own Zoning Ordinance. § 9-2.2803(a). The City has also violated, and continues to violate, its duty to "commence actions . . . and take other steps . . as will abate or remove" illegal land uses, and to "restrain and enjoin any person from . . . using any property contrary to" the Zoning Ordinance." § 9-2.2804(c). These mandatory duties are enforceable under Code of Civil Procedure section 1085. Petitioners are likely to prevail on their First and Second Causes of Action against the City.

### B. The City's tacit approval of the Facility violates SB 29, as would issuance of any permit without compliance with Civil Code section 1670.9(d).

The City's tacit approval of the Facility's reopening and operation also violates SB 29. Civil Code section 1670.9(d) provides that the City may not "issue a permit for the building or reuse of existing buildings by any private corporation . . . to house or detain noncitizens for purposes of civil immigration proceedings" unless the agency has satisfied two conditions: (1) provide public notice of the action at least 180 days before the execution of the conveyance or permit, and (2) solicit and hear public comment on the proposed conveyance or permit action in at least two separate meetings open to the public. Cal. Civ. Code § 1670.9(d)(1), (d)(2); *see also Herrmann v. Superior Court of Imperial County,* 75 Cal.App.5th 535, 544-45 (2022) (setting forth the requirements of section 1670.9(d)). The California State Legislature enacted this provision to increase public transparency and address the fact that many local decisions about detention facilities "are done with little public awareness." Petta Decl., Exh. 36.

The City has conceded that SB 29 applies to any permit or license it issues for the Facility's operation, *and* that it has done nothing to comply with the law. Laner Decl. ¶¶ 5, 7; Petta Decl., Exh. 12. The City has failed to publicly notice or agendize any proposed approval or execution of any permit related to the Project. The City Attorney conceded at the Planning Commission's September 2, 2025 meeting that no public hearing on the Project had been held. Laner Decl. ¶ 7. These admissions are fatal not only as to the tacit approval of the Facility the

16

City has already given, but also to any further approvals the City may attempt to issue without adhering to SB 29's strict notice and hearing requirements. Petitioners are therefore likely to prevail on their Third Cause of Action against the City.

**C.      CoreCivic's operation of the Facility violates the City's Zoning Ordinance.**

By reopening its defunct prison as a civil immigration detention center without any official City approvals, CoreCivic has violated the City's Municipal Code. As discussed, the City's Zoning Regulations bar use of the Facility as an immigration detention center, *unless* both the Planning Commission and City Council find that a civil immigration detention facility is conditionally allowed in the O/RA zoning district as a "correction, probation or prison" facility (§§ 9-2.103(b), 9-2.402(p)), or the City Council amends the Zoning Ordinance to explicitly allow such use; *and* unless the City approves a new CUP and business license. *See supra*, pp. 11-13. CoreCivic has not obtained *any* of these approvals.

CoreCivic's population and ongoing operation of the Facility is therefore unlawful and subject to enforcement by Petitioners. The Municipal Code prohibits a corporation from "violat[ing] any provision, restriction, or requirement of this Code or any code adopted herein . . . or any condition of any approval, permit, license, or other entitlement issued pursuant hereto." § 1-3.01(a)(1). The City's Zoning Regulations "may . . .  be enforced by injunction issued by the Superior Court upon the suit of the . . . occupant of real property affected by a violation or prospective violation of [its] provisions." § 9-2.2804(a). As an occupant of real property affected by CoreCivic's existing and prospective violations of the City's Code, Petitioner Doe is authorized to bring an enforcement action to enjoin those violations. Thus, Petitioners are likely to prevail on their Fourth Cause of Action against CoreCivic.

**D.      CoreCivic's operation of the Facility violates the UCL.**

California's UCL prohibits CoreCivic from engaging in any unlawful, fraudulent business act or practice. Cal. Bus. & Prof. Code §§ 17200, *et seq.*; *see also Zhang v. Superior Court*, 57 Cal.4th 364, 370 (2013) (a business practice or act is unlawful under the UCL if it is forbidden by law). As described above, the Municipal Code prohibits CoreCivic from violating

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

its provisions. § 1-3.01(a)(1). The Code therefore bars CoreCivic from reopening the Facility and converting it into an immigration detention facility without the necessary City actions, none of which has occurred. *See supra*, pp. 11-13. And any City actions to approve the Facility also must comply with SB 29's public notice and hearing requirements (Cal. Civ. Code § 1670.9(d)), which the City concedes have not been met. Laner Decl. ¶¶ 5, 7. Thus, CoreCivic is violating multiple, mandatory provisions of the Municipal Code by having opened and continuing to populate the Facility without any official City approvals. Under the UCL, this Court may enjoin CoreCivic from continuing these violations. Cal. Bus. & Prof. Code § 17203.

Petitioners have suffered and will continue to suffer immediate injury due to CoreCivic's unlawful conduct unless that conduct is enjoined. Petitioner Coalition has suffered injury in fact and monetary harm due to it and its member organizations needing to dedicate resources to investigating and stopping CoreCivic's conduct prior to the filing of this litigation, as part of their organizational missions of advocating for the rights and wellbeing of immigrant detainees. Laner Decl. ¶ 13. But for CoreCivic's illegal actions, diversion of the Coalition's limited financial resources to investigating the Facility and advocating for the City to take enforcement actions against it would not have been necessary. *Id.* Thus, Petitioners are likely to prevail on their Fifth Cause of Action against CoreCivic.

## CONCLUSION

For these reasons, Petitioner respectfully requests that the Court enjoin the City and CoreCivic, pending the entry of final judgment in this matter, from taking any action to expand the Facility or its operations or to accept new civil detainees, unless and until the City issues all necessary approvals.

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB

DATED:  October 17, 2025                    SHUTE, MIHALY & WEINBERGER LLP


                                            By:      /s/Joseph D. Petta
                                                  JOSEPH D. PETTA
                                                  MINDY K. JIAN
                                                  RYAN K. GALLAGHER

                                                  Attorneys for Dignity Not Detention Coalition

MEMORANDUM OF POINTS AND AUTHORITIES ISO EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
Case No. 1:25-cv-01292-KES-CDB