JOSEPH D. PETTA (State Bar No. 286665)
MINDY K. JIAN (State Bar No. 336139)
RYAN K. GALLAGHER (State Bar No. 344349)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
Petta@smwlaw.com
Mjian@smwlaw.com
Rgallagher@smwlaw.com

Attorneys for Dignity Not Detention Coalition

CALLARD E. COWDERY (State Bar No. 329697)
AFRICAN ADVOCACY NETWORK
3106 Folsom St
San Francisco, California 94110
Telephone: (415) 889-9573
ccowdery@aansf.org

Attorneys for John Doe

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION and JOHN DOE, | Case No. 1:25-cv-01292-KES-CDB |
| Petitioners and Plaintiffs, | **DECLARATION OF JEHAN LANER IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF CALIFORNIA CITY and CORECIVIC, INC., | Date:      October 20, 2025 |
| Respondents and Defendants. | Time:      1:30 p.m.<br>Judge:    Hon. Hon. Kirk E. Sherriff<br>Crtrm.:    6 |
| CORECIVIC, INC., | Hon. Hon. Kirk E. Sherriff, District Judge<br>Hon. Christopher D. Baker, Magistrate Judge |
| Real Party in Interest. | Trial Date:      None set |
| | Filed Concurrently with Ex Parte Application; Memorandum of Points and Authorities, Declaration of Joseph Petta, [Proposed] Temporary Restraining Order and Order to Show Cause re Preliminary Injunction |

DECLARATION OF JEHAN LANER

I, Jehan Laner, declare as follows:

1.      I am an attorney on the legal team for the Dignity Not Detention Coalition ("Coalition"), a Petitioner and Plaintiff ("Petitioner") in the above-entitled action. I am also an attorney licensed to practice in the State of California and a Senior Staff Attorney at the Immigrant Legal Resource Center ("ILRC"). I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2.      On June 24, 2025, the ILRC sent a letter to California City ("City") public officials, including Mayor Marquette Hawkins, raising concerns about the California City Correctional Facility's reopening as an immigration detention center (the "Facility"), and the City's compliance with Civil Code section 1670.9 (also known as Senate Bill ["SB"] 29) and other state laws, including the California Environmental Quality Act ("CEQA"). A true and correct copy of this letter is attached hereto as Exhibit 1.

3.      On August 4, 2025, the ILRC sent a second letter to the City, reiterating the concerns in the ILRC's June 24, 2025 letter. In particular, the August 4, 2025 letter responded to a reference in the City Planning Commission's August 5, 2025 regular meeting agenda materials to a business license being processed for the Facility, despite the City's noncompliance with SB 29, CEQA, and other laws. A true and correct copy of this letter is attached hereto as Exhibit 2.

4.      On or around August 27, 2025, the ILRC began receiving reports from affiliate organizations, including directly from lawyers at those organizations representing individuals detained at or being transferred to the Facility, that the Facility had opened and was actively receiving detainees. At that time, the City had not publicly issued any approvals for the Facility's operations. The ILRC believes that as of September 12, 2025, approximately 420 people were detained there, and based on reporting from the Fresno Bee, approximately 500 people were detained there as of September 24, 2025. Declaration of Joseph Petta ("Petta Decl."), Exh. 18.

1

5.      On August 28, 2025, City Manager Lopez in a statement to the Fresno Bee conceded that SB 29 likely applies to any permit or license the City would need to issue for the Facility's operation. Lopez also said he had no information on a long-term contract to reopen the Facility. Petta Decl., Exh. 13.

6.      On or around August 29, 2025 two days after the Facility opened, reporters began asking City officials about the Facility's acceptance and detention of immigrants.

7.      On September 2, 2025, the City Planning Commission held a regular meeting. The posted agenda materials again indicated that City approvals for the Facility remained in process. During the meeting, City officials disclosed that CoreCivic had submitted a new "business plan," "operational statement," and "SPR [site plan review] statement." At the same meeting, an attorney for the City confirmed that there had been no public hearings on any approvals for the Facility.

8.      On September 3, 2025 the Fresno Bee reported that Ryan Gustin, CoreCivic's Senior Director of Public Affairs, stated that CoreCivic had addressed all of the fire safety issues identified in the City Manager's July 29, 2025 letter regarding the City's July 22, 2025 fire inspection of the Facility. Petta Decl., Exh. 13.

9.      As reported in a September 4, 2025 KQED article, Mayor Hawkins said that the City Council had not had a chance to discuss the Facility due to a lack of quorum in the past weeks. Petta Decl., Exh. 15.

10.      On September 24, 2025, the Fresno Bee reported that Mayor Hawkins acknowledged that the Facility opened without the proper permits. Petta Decl., Exh. 18

11.      According to the American Immigration Counsel's December 2018 report, "The Landscape of Immigration Detention in the United States," sixty percent of detained immigrants are transferred at least once during their detention for an average distance of 270 miles for each transfer. In addition, people in immigration detention are often transferred to their court hearings on a daily basis or released on parole, bond, or when they win their cases. A true and correct copy of the AIC Report is attached hereto as Exhibit 3.

DECLARATION OF JEHAN LANER IN SUPPORT OF EX PARTE APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

12.    Furthermore, without immediate injunctions against both the City and CoreCivic, City residents on whose behalf the Coalition advocates will suffer the negative externalities of the Facility's intensifying operations, including dust and other air quality impacts from increased transfers of detainees to and from the Facility. Immigration detention is typically shorter term than prison incarceration, with detained individuals transferred between facilities more frequently than those serving criminal sentences in prison.

13.    The substantial increase in ingress to and egress from immigration detention facilities as compared to correctional facilities, combined with the further increase in visits from detainees' families and the community, as well as any construction needed to make facilities comply with federal standards for housing detainees, results in increased vehicle miles traveled, traffic, noise, air pollution, and greenhouse gas emissions. These increased impacts from detention facilities, compared with correctional facilities, fall not only upon detainees, their families, and facility employees, but also on local residents.

14.    Petitioner Coalition has suffered frustration of its organizational mission, injury in fact, and monetary harm due to it and its member organizations needing to dedicate substantial resources to investigating and preventing the City's and CoreCivic's unlawful conduct. Many coalition members have traveled at least 100 miles one-way for each California City government meeting that they have attended. While some of these members do not live in the area, the opening of this detention center puts their immigrant friends and family at greater risk of detention. I have had to shift approximately 20 percent of my work to focus on the California City detention center. This includes time I have spent virtually attending City meetings, community meetings, speaking with immigration attorneys whose clients are detained within the Facility, and speaking with those detained inside. Other Coalition members are dedicating at least 20-25 percent of their time to monitoring the situation, including speaking to those detained inside, educating residents on the issue, and planning community events to speak out against the harms occurring because of the detention center. But for CoreCivic's illegal actions, this frustration of the Coalition's mission would not have occurred, and diversion of Coalition's

DECLARATION OF JEHAN LANER IN SUPPORT OF EX PARTE APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

limited financial resources to preventing City's and CoreCivic's unlawful conduct would not have been necessary.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 17th day of October, 2025, at Oakland, California.

/s/ Jehan Laner (original signature retained by attorney Joseph Petta)

| INDEX OF EXHIBITS | |
|---|---|
| 1 | Letter from Immigrant Legal Resource Center to City of California City, dated June 24.2025 |
| 2 | Letter from Immigrant Legal Resource Center to City of California City, dated August 4.2025 |
| 3 | "The Landscape of Immigration Detention in the United States," report by the American Immigration Counsel dated December 2018, available at https://www.americanimmigrationcouncil.org/report/landscape-immigration-detention-united-states/ |

DECLARATION OF JEHAN LANER IN SUPPORT OF EX PARTE APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

EXHIBIT 1

**TEACHING, INTERPRETING,**
**& CHANGING LAW** SINCE **1979**

**EXECUTIVE DIRECTOR**
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

     

June 24, 2025

***Via Electronic Mail and FedEx***

Marquette E. Hawkins
Mayor, California City
City Hall
21000 Hacienda Blvd.
California City, CA
93505

      **Re: Conversion of the California City Correctional Center**

Dear Mayor Hawkins:

These comments are submitted on behalf of the Immigrant Legal Resource Center ("ILRC") regarding the conversion of the California City Correctional Center located at 22844 Virginia Boulevard, California City, CA 93505, for use to detain immigrant detainees (the "Project"). As an organizational co-sponsors of SB 29, codified at Cal. Civil Code § 1670.9(d), we are concerned with the compliance of Cal. Civil Code § 1670.9(d) and other California state laws such as the California Environmental Quality Act ("CEQA").

If the City moves to approve the conversion of this facility or otherwise approves or supports any actions to use this facility as an immigration detention center without following applicable state laws, the city could be liable for any violations of state law, including under a writ of administrative mandamus under Cal. Civ. Proc. Code § 1094.5 or § 1085.[1]

I.      **Background on the Immigrant Legal Resource Center**

The Immigrant Legal Resource Center (ILRC) is a national expert in immigration law and policy, and has staff dedicated exclusively to supporting the Central Valley. At the local level, the ILRC provides resources and support to communities and organizations working on immigration enforcement issues of which immigration detention is a tremendous component.

---

[1] *Bixby v. Pierno*, 4 Cal. 3d 130 (1971); *Citizens for Amending Proposition L v. City of Pomona*, 239 Cal. Rptr. 3d 750 (2018) (The city violated its duty to comply with the ballot initiative by entering into a contract that directly violated its terms).

1

The ILRC has a public and beneficial interest in this matter. The ILRC works on immigration detention-related matters across the state of California, including in the Central Valley. If this Project moves forward, we would have to divert considerable resources to providing support to the Central Valley region. Because there is a direct relationship between detention capacity and ICE arrest,[2] this is an issue of regional and state concern. In addition, as we co-sponsored Cal. Civil Code 1670.9(d), we are uniquely committed to ensuring that agencies comply with the law.

## I.        Compliance with Cal. Civil Code § 1670.9(d)

California City is bound by all applicable California state laws including Cal. Civil Code § 1670.9(d) which states that a city, county, or public agency may not "approve or sign a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation…" unless the entity has satisfied two conditions.

The first condition requires public notice of the action at least 180 days before the execution of the conveyance or permit. The second condition, which must also be fulfilled, requires that public comment be solicited and heard on the proposed conveyance or permit action in at least two separate meetings which are open to the public. Cal. Civil Code § 1670.9(d)(1),(2).

It appears based on publicly available information posted to your City's Granicus website that as of December 2022, CoreCivic's Conditional Use Permit Application (20-02) remained pending and unresolved. This was apparently due to a lack of response from CoreCivic to the City Planning Department's effort to conduct a Site Plan Review (SPR 20-14).

Based on your public statements and other reporting, it appears as though you recently visited the prison and spoke with CoreCivic officials about their plans to reopen it as an ICE processing facility. While ICE and CoreCivic have reportedly signed a letter agreement allowing the company to prepare the facility to accept detained immigrants, California City has failed to publicly notice or agendize any action the City may take to permit, levy special taxes, or collect a bed tax based on this ICE-CoreCivic agreement. You have presented this initiative as though it is a done deal, and ICE has reportedly provided up to $10 million to CoreCivic between April and September. However, in the absence of a properly noticed, agendized, and publicly discussed conditional use permit for the site, it cannot open in compliance with California law.

---

[2]ILRC, *If You Build it ICE Will Fill It,* (2022) https://www.ilrc.org/sites/default/files/resources/if_they_build_it_ice_will_fill_it_report_2022.pdf (finding that where a detention center has at least 850 beds, it is 6.5 times more likely that undocumented residents nearby will be detained. Here, in California City, we are more likely to see an even greater risk of detention because the center has the capacity for 2,300 beds).

Any attempt by the City to assist CoreCivic and ICE in circumventing the plain language of California's obligations for permitting this facility will expose the City to legal liability and will be met with steadfast insistence that you uphold the law.

We request an explanation of any steps taken by California City to comply with Cal. Civil Code § 1670.9(d).

## II.    Compliance with the California Environmental Quality Act ("CEQA")

California law provides that the object of a contract or permit must be lawful and not contrary to public policy. (*Russell v. Soldinger* (1976) 59 Cal.App.3d 633, 641-642, citing Civ. Code, §§ 1607, 1608, 1667, 1596.) Courts will void any contract or permit that is contrary to public policy or otherwise illegal. (*Id*. at 642.) In enacting the California Environmental Quality Act ("CEQA"), the legislature set forth a policy that public agencies shall regulate activities "so that major consideration is given to preventing environmental damage…" (Cal. Pub. Res. Code § 21000.) Towards this end, CEQA sets forth a policy of ensuring public participation in the environmental planning process. (*See Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist.*

*Agricultural Assn.* (1986) 42 Cal. 3d 929, 949 ("CEQA compels an interactive process of assessment of environmental impacts and responsive project modification which must be genuine. It must be open to the public, premised upon a full and meaningful disclosure of the scope, purposes, and effect of a consistently described project, with flexibility to respond to unforeseen insights that emerge from the process.").) Furthermore, CEQA (Pub. Res. Code §21000 *et seq*.) and the State Planning and Zoning Law (Government Code § 65300 *et seq*.) both provide for judicial review of agency actions through Code of Civil Procedure sections 1094.5 and/or 1085.

This Project is subject to CEQA because it has the potential to cause environmental impacts. The City must prepare an Environmental Impact Report (EIR) or at minimum a mitigated negative declaration. CEQA requires that a project be analyzed based on existing physical conditions on the ground, not speculative or hypothetical conditions. Therefore, it is irrelevant whether the space is currently permitted for some other use. Immigration detention facilities, as opposed to other state or federal prison uses, are more temporary. As immigration detention is a federal, civil process, federal agencies such as U.S. Immigration & Customs Enforcement ("ICE") transfer people to other immigration detention facilities regularly. For example, according to one report, 60 percent of detained immigrants are transferred at least once.[3] In addition, people in immigration detention are often transferred

---

[3] AIC, The Landscape of Immigration Detention in the United States, (Dec 2018), https://www.americanimmigrationcouncil.org/research/landscape-immigration-detention-united-states

to their court hearings on a daily basis or released on parole, bond, or when they win their cases. Additionally, asylum seekers and other immigrants recently detained are brought into the facility often daily. This reality, combined with the increase in visits from family and the community to the facilities as well as any construction or improvements needed to make the facilities comply with federal standards for housing ICE detainees will result in increased traffic, traffic noise, and air pollution. By opening this facility as a detention center without complying with CEQA, the City is risking the public's health. The Central Valley suffers from one of the highest air pollution burdens in the country. This Project will only exacerbate it.

Given the possibility that appropriate legal action may be taken to ensure enforcement of Cal. Civil Code Section 1670.9(d) or other state laws, we would like to remind the City of its duty to maintain and preserve all documents and communications that may constitute part of the "administrative record." As you may know, the administrative record encompasses any and all documents and communications which relate to any and all actions taken by the City with respect to the Project. The administrative record further contains all correspondence, emails, and text messages sent to or received by the City's representatives or employees, which relate to the Project, including any correspondence, emails, and text messages sent between the City's representatives or employees and CoreCivic's representatives or employees. Maintenance and preservation of the administrative record requires that, *inter alia*, the City (1) suspend all data destruction policies; and (2) preserve all relevant hardware unless an exact replica of each file is made.

Thank you for the opportunity to submit comments on the Project. We look forward to working to ensure that the City upholds its duty to the public under California law. We request an explanation of any steps taken by California City to comply with Cal. Civil Code § 1670.9(d) no later than Tuesday, July 8, 2025, Attn: Grisel Ruiz (gruiz@ilrc.org). Thank you for your time.

Best,

Grisel Ruiz
Senior Managing Attorney
Immigrant Legal Resource Center

Cc: Councilmembers Jesse B. Hightower, Ronald Smith, Michael Kulikoff, and Michael Hurles
Cc: City Attorney Victor Ponto

4

# EXHIBIT 2

**EXECUTIVE DIRECTOR**
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

   

August 4, 2025

***Via Electronic Mail***

Mr. Marquette E. Hawkins
Mayor, California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

**Re: Applicability of State Laws in Conversion of the California City Correctional Center**

Dear Mayor Hawkins:

These comments are submitted on behalf of the Immigrant Legal Resource Center ("ILRC") regarding the conversion of the California City Correctional Center located at 22844 Virginia Boulevard, California City, CA 93505, for use to detain immigrant detainees (the "Project"). As an organizational co-sponsors of SB 29, codified at Cal. Civil Code § 1670.9(d), we are concerned with the compliance of Cal. Civil Code § 1670.9(d) and other California state laws such as the California Environmental Quality Act ("CEQA").

If the City moves to approve the conversion of this facility or otherwise approves or supports any actions to use this facility as an immigration detention center without following applicable state laws, the city could be liable for any violations of state law, including under a writ of administrative mandamus under Cal. Civ. Proc. Code § 1094.5 or § 1085.[1]

## I.    Background on the Immigrant Legal Resource Center

The Immigrant Legal Resource Center (ILRC) is a national expert in immigration law and policy, and has staff dedicated exclusively to supporting the Central Valley. At the local level, the ILRC provides resources and support to communities and organizations working on immigration enforcement issues of which immigration detention is a tremendous component.

---

[1] *Bixby v. Pierno*, 4 Cal. 3d 130 (1971); *Citizens for Amending Proposition L v. City of Pomona*, 239 Cal. Rptr. 3d 750 (2018) (The city violated its duty to comply with the ballot initiative by entering into a contract that directly violated its terms).

The ILRC has a public and beneficial interest in this matter. The ILRC works on immigration detention-related matters across the state of California, including in the Central Valley. If this Project moves forward, we would have to divert considerable resources to providing support to the Central Valley region. Because there is a direct relationship between detention capacity and ICE arrest,[2] this is an issue of regional and state concern. In addition, as we co-sponsored Cal. Civil Code 1670.9(d), we are uniquely committed to ensuring that agencies comply with the law.

## I.    California City is bound by Cal. Civil Code § 1670.9(d)

California City is bound by all applicable California state laws including Cal. Civil Code § 1670.9(d) which states that a city, county, or public agency may not "**approve** or sign a deed, **instrument**, or other document related to a conveyance of land **or issue a permit** for the building or reuse of existing buildings by any private corporation…**to house noncitizens for purposes of civil immigration proceedings**" (emphasis added) unless the entity has satisfied two conditions.

The first condition requires public notice of the action at least 180 days before the execution of the conveyance or permit. The second condition, which must also be fulfilled, requires that public comment be solicited and heard on the proposed conveyance or permit action in at least two separate meetings which are open to the public. Cal. Civil Code § 1670.9(d)(1),(2).

The city is bound by this process when considering the conversion of the California City Correction Center to an immigration detention center. California city is bound through multiple provisions of the statute.

To start, these conditions apply to the Planning Commission's consideration of the business license submitted by CoreCivic to run an Immigration Processing Center. Approval of a business license is covered by this statute as the city is considering the approval an "instrument" to house noncitizens for immigration proceedings. A business license is a type of instrument. "Instrument" is used interchangeably with "business license" in various California state licensing codes. *See e.g.,* Cal. Bus. & Prof. Code § 16000.2 (West), Cal. Bus. & Prof. Code § 16000.3(a) (West) ("When applying to a city for an initial business license, equivalent instrument, or permit…").

---

[2]ILRC, *If You Build it ICE Will Fill It,* (2022)
https://www.ilrc.org/sites/default/files/resources/if_they_build_it_ice_will_fill_it_report_2022.pdf (finding that where a detention center has at least 850 beds, it is 6.5 times more likely that undocumented residents nearby will be detained. Here, in California City, we are more likely to see an even greater risk of detention because the center has the capacity for 2,300 beds).

Furthermore, approval of a business license is covered by this statute because a business license is a type of permit. The statute applies to the issuance of permits and a business license is a type of regulatory permit to conduct business in a city as it grants official permission to operate and is issued pursuant to the city's authority to regulate land use and commercial activity. Therefore, before the city may approve CoreCivic's business license to operate an Immigration Processing Center, it must satisfy both conditions under Cal. Civil Code § 1670.9(d): providing 180 days' public notice and holding at least two public meetings to solicit comment.

Finally, in addition to approval of the business license, California City will also need to approve additional permits, such as the modification of conditional use permits, to allow the California City Correctional Center to operate as an immigration detention center. When the City considers these permits, the City will also be bound by the process laid out in the statute.

Currently, approval of the business license is agendized for the August 5, 2025 Planning Commission Meeting, referred to in the Department Report as Project Number SPR 25-09. To our knowledge, this is the first public meeting to consider "approval" of an "instrument" or "permit" subject to Cal. Civil Code § 1670.9(d). Per the statute, prior to approving the business license, California City *must* hold two separate meetings during which public comment must be solicited and heard.  Furthermore, there must be at least 180 days public notice before the execution of the business license. These procedures must also be followed when approving the requisite operating permits. Taken together, these provisions ensure that there is public transparency and public input when considering the approval of a project which undoubtedly will impact California City for decades.

Any attempt by the City to assist CoreCivic in circumventing the plain language of California's obligations could expose the City to a violating of state law. We kindly request confirmation that the City will comply with this state law, and an explanation of any steps taken.

## II.    Saying no to immigration detention, means saying yes to millions in HEAL (Healthy Economies Adapting to Last) funding for California City

If the City declines to approve the operation of the immigration detention center, the City will receive fast track access to up to five million in California Workforce Development funds, through HEAL.[3] California created Healthy Economies Adapting to Last (HEAL), the first program of its type in the nation aimed at responding to job transitions and the maintenance of local economies when a local government declines to facilitate an immigration detention center. HEAL funds are administered through the California Workforce Development Board (CWDB) and may be used for such projects as the High Roads Training Partnership program, which offers job training in sustainable industries. The CWDB oversees workforce development

---

[3] HEAL Act available at, https://www.ilrc.org/sites/default/files/2023-09/California%20State%20Budget.pdf (HEAL was later amended to extend through 2030)

throughout California. Tasked with creating a strategic workforce plan for the state, the CWDB carries out three distinctive policy goals for California: fostering demand-driven skills attainment; enabling upward mobility for all Californians; and aligning, coordinating, and integrating programs and services. If California City declines to approve the operation of the California City Correctional Center as an immigration detention center, workers and the local economy will be supported by this broad array of state funding and CWDB support.

### III.    California City must comply with the California Environmental Quality Act ("CEQA")

Additionally, we re-submit our comments about the need to comply with CEQA, first submitted for your review on June 24, 2025.

California law provides that the object of a contract or permit must be lawful and not contrary to public policy. (*Russell v. Soldinger* (1976) 59 Cal.App.3d 633, 641-642, citing Civ. Code, §§ 1607, 1608, 1667, 1596.) Courts will void any contract or permit that is contrary to public policy or otherwise illegal. (*Id*. at 642.) In enacting the California Environmental Quality Act ("CEQA"), the legislature set forth a policy that public agencies shall regulate activities "so that major consideration is given to preventing environmental damage…" (Cal. Pub. Res. Code § 21000.) Towards this end, CEQA sets forth a policy of ensuring public participation in the environmental planning process. (*See Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal. 3d 929, 949 ("CEQA compels an interactive process of assessment of environmental impacts and responsive project modification which must be genuine. It must be open to the public, premised upon a full and meaningful disclosure of the scope, purposes, and effect of a consistently described project, with flexibility to respond to unforeseen insights that emerge from the process.").) Furthermore, CEQA (Pub. Res. Code §21000 *et seq*.) and the State Planning and Zoning Law (Government Code § 65300 *et seq*.) both provide for judicial review of agency actions through Code of Civil Procedure sections 1094.5 and/or 1085.

This Project is subject to CEQA because it has the potential to cause environmental impacts. The City must prepare an Environmental Impact Report (EIR) or at minimum a mitigated negative declaration. CEQA requires that a project be analyzed based on existing physical conditions on the ground, not speculative or hypothetical conditions. Therefore, it is irrelevant whether the space is currently permitted for some other use. Immigration detention facilities, as opposed to other state or federal prison uses, are more temporary. As immigration detention is a federal, civil process, federal agencies such as U.S. Immigration & Customs Enforcement ("ICE") transfer people to other immigration detention facilities regularly. For example, according to one

report, 60 percent of detained immigrants are transferred at least once.[4] In addition, people in immigration detention are often transferred to their court hearings on a daily basis or released on parole, bond, or when they win their cases. Additionally, asylum seekers and other immigrants recently detained are brought into the facility often daily. This reality, combined with the increase in visits from family and the community to the facilities as well as any construction or improvements needed to make the facilities comply with federal standards for housing ICE detainees will result in increased traffic, traffic noise, and air pollution. By opening this facility as a detention center without complying with CEQA, the City is risking the public's health. The Central Valley suffers from one of the highest air pollution burdens in the country. This Project will only exacerbate it.

Given the possibility that appropriate legal action may be taken to ensure enforcement of Cal. Civil Code Section 1670.9(d) or other state laws, we would like to remind the City of its duty to maintain and preserve all documents and communications that may constitute part of the "administrative record." As you may know, the administrative record encompasses any and all documents and communications which relate to any and all actions taken by the City with respect to the Project. The administrative record further contains all correspondence, emails, and text messages sent to or received by the City's representatives or employees, which relate to the Project, including any correspondence, emails, and text messages sent between the City's representatives or employees and CoreCivic's representatives or employees. Maintenance and preservation of the administrative record requires that, *inter alia*, the City (1) suspend all data destruction policies; and (2) preserve all relevant hardware unless an exact replica of each file is made.

Thank you for the opportunity to submit a written comment on the Project. We look forward to working to ensure that the City upholds its duty to the public under California law. We request an explanation of any steps taken by California City to comply with Cal. Civil Code § 1670.9(d) no later than Tuesday, August 19, 2025, Attn: Jehan Laner (jlaner@ilrc.org). Thank you for your time.

Best,

Jehan Laner
Senior Staff Attorney

---

[4] AIC, The Landscape of Immigration Detention in the United States, (Dec 2018), https://www.americanimmigrationcouncil.org/research/landscape-immigration-detention-united-states

Immigrant Legal Resource Center

Cc: Councilmembers Jesse B. Hightower, Ronald Smith, Michael Kulikoff, and Michael Hurles; Planning Commissioners David Brottlund, Ralph Cantrell, Della Clark, Salena Coleman, and Gesele Marsh via Granicus eComment; and City Attorney Victor Ponto

EXHIBIT 3

# THE LANDSCAPE OF IMMIGRATION DETENTION IN THE UNITED STATES

By Emily Ryo, J.D., Ph.D., and Ian Peacock, M.A.

SPECIAL REPORT | DECEMBER 2018



American Immigration Council

# About the Authors

Emily Ryo is an associate professor of law and sociology at the University of Southern California Gould School of Law. She received a J.D. from Harvard Law School and a Ph.D. in sociology from Stanford University. She served as a law clerk to the Honorable M. Margaret McKeown of the Ninth Circuit Court of Appeals, and practiced law at Cleary, Gottlieb, Steen, and Hamilton. Her current research focuses on detention and incarceration, legal enforcement and compliance, and legal socialization of noncitizens. As an Andrew Carnegie Fellow, she is conducting empirical legal research on immigration detention in the United States.

Ian Peacock is a fourth-year Ph.D. student at UCLA's Department of Sociology. He has a B.A. in Spanish and a B.S. in sociology from Brigham Young University, and an M.A. in sociology from UCLA. He currently serves as a Computational Sociology Fellow at the UCLA Department of Sociology. He has published in areas of entrepreneurship in Mexico and workplace language policy in the United States. His current research interests include international migration, immigration law and enforcement, organizations, work, and labor markets.

## Acknowledgements

This report is adapted from the authors' article, "A National Study of Immigration Detention in the United States," forthcoming in *Southern California Law Review* (2018), available at https://ssrn.com/abstract=3216865. We are grateful to Ben Johnson, Sue Long, Grace Meng, Brian Root, and Tizita Wasihun for providing us with invaluable data access. This study was made possible by a grant from the Carnegie Corporation of New York and the California Wellness Foundation. The statements made and views expressed are solely the responsibility of the authors.

## About the American Immigration Council

The American Immigration Council works to strengthen America by shaping how America thinks about and acts towards immigrants and immigration and by working toward a more fair and just immigration system that opens its doors to those in need of protection and unleashes the energy and skills that immigrants bring. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with information about how the immigration system works, the impact of policy proposals, and the crucial role that immigration plays in our communities and workplaces.

Visit us at www.AmericanImmigrationCouncil.org and www.ImmigrationImpact.com.

# CONTENTS

**1**    Executive Summary

**5**    What Do We Know about Immigration Detention?

**8**    Who Was Detained and Where Were They Confined?

**17**    What Were the Outcomes of Detention?

**29**    Conclusion

**30**    Endnotes

# EXECUTIVE SUMMARY

On any given day, U.S. Immigration and Customs Enforcement (ICE) detains tens of thousands of individuals who are accused of violating U.S. immigration laws. ICE currently relies on a complex network of jails and jail-like facilities to confine these individuals.

The average daily population of immigrant detainees has increased more than fivefold in the past two decades. At the same time, immigration detention facilities have faced numerous civil and human rights violation complaints, including allegations of substandard medical care, sexual and physical abuse, and exploitative labor practices. Yet, the current administration has sought to further expand immigration detention. To assess the full implications of these expansion efforts, it is critical for policymakers and the public to understand fundamental aspects of the current U.S. detention system.

This report presents findings from an empirical analysis of immigration detention across the United States. We analyze government and other data on all individuals who were detained by ICE during fiscal year 2015, the latest fiscal year for which the federal government has released comprehensive data of this kind on immigration detention. Our analysis offers a detailed look at whom ICE detained, where they were confined, and the outcomes of their detention.

We find that ICE relied on over 630 sites scattered throughout the United States to detain individuals, often moving them from one facility to another. Our analysis reveals that individuals detained by ICE were commonly held in privately operated and remotely located facilities, far away from basic community support structures and legal advocacy networks.



The main findings presented in this report include:

**A majority of detainees were men, from Mexico or Central America, and many detainees were juveniles.**

- About 79 percent of the detainees were men. The population as a whole was relatively young, with the average age of 28 (mean and median). Over 59,000 detainees—about 17 percent—were under the age of 18.
- Mexican nationals by themselves made up about 43 percent of the detainee population, and individuals from the Northern Triangle region of El Salvador, Guatemala, and Honduras made up about 46 percent of the detainee population.

**ICE used one or more facilities in every state, with Texas and California having the highest number of facilities and detainees.**

- Every state in the United States had at least one facility that ICE used to detain individuals in fiscal year 2015.
- The top five states in terms of the number of facilities used by ICE in fiscal year 2015 were Texas, California, Florida, New York, and Arizona. The top five states in terms of the detainee population were Texas, California, Arizona, Louisiana, and New Mexico.

**Detention in privately operated facilities and in remotely located facilities was common.**

- Many detainees were confined in more than one facility during their detention stay. About 67 percent of all detainees were confined at least once in privately operated facilities. About 64 percent of detainees were confined at least once in a facility located outside of a major urban area.
- About 48 percent, 26 percent, and 22 percent of detainees were confined at least once in a facility that was located more than 60 miles, 90 miles, and 120 miles away, respectively, from the nearest nonprofit immigration attorney who practiced removal defense.



**A majority of adult detainees experienced interfacility transfers involving movements across different cities, states, or federal judicial circuits.**

- Many adults were transferred between facilities during their detention, leading to confinement in multiple locations. About 60 percent of adults who were detained in fiscal year 2015 experienced at least one interfacility transfer during their detention.
- Of those adults who were transferred, about 86 percent experienced at least one intercity transfer, 37 percent experienced at least one interstate transfer, and 29 percent experienced at least one transfer across different federal judicial circuits.

**Detention length was significantly longer in privately operated facilities and in remotely located facilities.**

- Among 261,020 adults who were released from detention during fiscal year 2015, the average detention length (mean) was about 38 days. More than 87,000 of these adults were detained longer than 30 days.
- Confinement in privately operated facilities and facilities located outside of major urban areas, respectively, was associated with significantly longer detention.

**The number of grievances was significantly higher in privately operated facilities and in remotely located facilities.**

- In fiscal year 2015, the ICE Enforcement and Removal Operations' Detention Reporting and Information Line (DRIL) received over 48,800 detention-facility related grievances from detainees and community members. The most common type of grievances involved access to legal counsel and basic immigration case information.
- Privately operated facilities and facilities located outside of major urban areas were associated with higher numbers of grievances.



## About the Data

We analyze three major datasets in this study. The first dataset—the **Detention Data**—contains government records pertaining to all individuals who were detained by ICE during fiscal year 2015 (355,729 individuals, including juveniles). To be included in the Detention Data, the individual had to have been detained at some point during fiscal year 2015, but his or her detention need not have begun nor ended in fiscal year 2015. The Transactional Records Access Clearinghouse (TRAC) obtained the Detention Data from ICE under the Freedom of Information Act (FOIA).

The second dataset consists of geocoordinates that we compiled on (1) all of the detention facilities included in the Detention Data, (2) the principal cities of metropolitan statistical areas (MSAs), and (3) legal service providers. We merged these geocoordinates with the Detention Data to produce the **Geocoded Data** that allows us to examine distances between detention facilities, MSAs, and legal service providers.

The third dataset contains records on 48,849 facility-related grievances submitted by detainees and community members to the Detention Reporting and Information Line. We merged these records with the Detention Data to produce the **Grievance Data**, which contains 47,145 grievances pertaining to 304 facilities used by ICE in fiscal year 2015 (including juvenile facilities used by ICE). Human Rights Watch obtained the Grievance Data from ICE through FOIA.



# WHAT DO WE KNOW ABOUT IMMIGRATION DETENTION?

Immigration detention refers to the U.S. federal government's practice of confining individuals accused of immigration law violations. Criminal incarceration, on the other hand, allows state or federal governments to confine individuals charged with, or convicted of, a criminal offense. Immigration detention occurs in a range of facilities and may last the duration of an individual's immigration proceedings and, in certain situations, even after his or her immigration proceedings are completed.

**Immigration detention is civil confinement that implicates core due process issues.**

The law considers immigration detention to be strictly civil—that is, "nonpunitive and merely preventative" in nature.[1] Accordingly, the U.S. government does not grant immigrant detainees the same set of legal protections that are afforded to criminal defendants, such as the right to government-appointed counsel, the privilege against self-incrimination, the ban on cruel and unusual punishment, and the right to a speedy trial.

Yet many aspects of immigration detention make detention indistinguishable from criminal incarceration.[2] Immigrant detainees are typically held in jails and jail-like facilities. Detainees must wear government-issued uniforms and wristbands with identifying information at all times. Their daily lives are regimented, and they face constant surveillance. Moreover, the detainees can be subjected to discipline and segregation, and their contacts with the outside world are limited.

There are growing reports of civil and human rights violations in detention, including substandard medical care, sexual and physical abuse, and exploitative labor practices.[3] ICE acknowledged at least 185 deaths in detention between October 2003 and July 2018.[4] According to a report written by the Office of the Inspector General at the Department of Homeland Security (DHS) in December of 2017: "Overall, the problems we identified undermine the protection of detainees' rights, their humane treatment, and the provision of a safe and healthy environment."[5] These problems ranged from the use of strip searches to the misuse of segregation.



**The average daily detained population increased more than fivefold between 1994 and 2017.**

The modern era of immigration detention in the United States began with the enactment of two laws in 1996: The Antiterrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Immigrant Responsibility Act. These laws broadened the type of criminal offenses that could trigger removal proceedings. Both sets of laws also expanded the categories of noncitizens who could be detained without the possibility of release pending the completion of their removal proceedings.

### Figure 1. Average Daily Detained Population, Fiscal Years 1994-2017



**Source**: For 1994-2000 statistics, see Alison Siskin, Congressional Research Serv., *Immigration-Related Detention: Current Legislative Issues* 11-12 (2004), https://perma.cc/2VSR-BFQ5. For 2001-2015 statistics, see U.S. Immigration & Customs Enf't, *Weekly Departures and Detention Report* 9 (2016), https://perma.cc/5K8K-MVJ6. For 2016-2017 statistics, see U.S. Dep't of Homeland Sec. & U.S. Immigration & Customs Enf't, *Budget Overview, Fiscal Year 2019 Congressional Justification* 5 (2018), https://perma.cc/4P37-NCUG.



Since 1996, the number of noncitizens detained by immigration authorities rose steadily and dramatically. As Figure 1 shows, on any given day in fiscal year 1994, the federal government detained an average of 6,785 noncitizens. Twenty years later, that daily average surpassed 33,200. By fiscal year 2017, the average daily population of detainees stood at over 38,100. This represents a more than fivefold increase between 1994 and 2017.

Maintaining this system of confinement is costly. DHS's budget for fiscal year 2017 estimated an average rate of $126.46 per day for adult detention beds, and an average rate of $161.36 per day for family detention beds. In total, the estimated cost of all detention beds amounted to over $1.4 billion in fiscal year 2017.[6] This amount does not take into account millions of additional dollars needed to transport the detainees.

**Detention has become a key enforcement strategy.**

In 2014, the Obama administration set out enforcement priorities that focused on the removal of serious criminal offenders and recent border crossers. Notably, the average daily population of immigrant detainees dipped between fiscal years 2014 and 2015, as arrests and removals declined.[7] Since 2015, however, the detained population has been rising again. Most recently, the Trump administration sought to target virtually all unauthorized immigrants regardless of whether they were ever convicted of a crime.[8] This policy shift resulted in the increased removal rates of noncitizens without criminal convictions[9] and the expanded use of detention as an essential immigration enforcement strategy.[10]

According to the latest government statistics, the number of people booked into ICE custody through its interior enforcement program has increased steeply under the Trump administration.[11] The President's fiscal year 2019 budget request included funding to support 52,000 detention beds.[12] To understand the implications of this expansion in detention, we need to understand the basic detention system that has been in place. The rest of this report describes the major findings from our empirical analysis of ICE detention during fiscal year 2015.



# WHO WAS DETAINED AND WHERE WERE THEY CONFINED?

To understand whom ICE detained, we examined basic characteristics of the detainees such as gender, region of origin based on the country of citizenship, age at the time of first entry into ICE detention, legal status at the time of last entry into the United States (entry status), and whether or not they had been classified as an aggravated felon by ICE. Here, we focus on the following basic characteristics: gender, region of origin, and age.

To better understand the basic properties of all facilities used by ICE in fiscal year 2015, we examined the following key detention facility characteristics: (1) whether a given facility was operated by a for-profit company (Privately Operated), (2) whether a given facility was located outside of a major urban area (Outside MSA, as we describe in "Defining Facility Characteristics" below), and (3) distance to the nearest nonprofit immigration attorney who practice removal defense.

**A majority of detainees were men, from Mexico or Central America, and about 17 percent of them were under the age of 18.**

First, the detained population was heavily male—about 79 percent were men. Second, as shown in Figure 2, most detainees were from Mexico (43 percent) or the Northern Triangle region of Central America—El Salvador, Guatemala, and Honduras (46 percent). Together, these four countries constituted about 89 percent of the detainee population. The U.S. deportation regime has been called a "gendered racial removal program" that targets Latino men.[13] Our findings call for systematic investigations into whether and how detention practices in particular might contribute to that dynamic.



**Figure 2: Region of Origin of Detainees, Fiscal Year 2015**



**Source:** Authors' original analysis of the Detention Data.

The population as a whole was relatively young, with an average age of 28 (mean and median). As shown in Figure 3, over 59,00 detainees—about 17 percent of the detainees—were under the age of 18. Adults between the ages 18 to 30 made up the largest segment of the population (42 percent), followed by adults between the ages 31 to 40 (26 percent).





**Figure 3. Age at Entry into Detention, Fiscal Year 2015**

**Source:** Authors' original analysis of the Detention Data.

## Defining Detention Facilities

ICE uses the term "facility" in the Detention Data to refer to a range of locations that ICE used to detain individuals. Applying TRAC's coding of detention facility types, we found that ICE used all of the following types of detention facilities during fiscal year 2015: (1) contract detention facilities, (2) holding/staging facilities, (3) ICE service processing centers, (4) facilities under intergovernmental service agreements with the federal government, (5) juvenile facilities, and (6) other facilities such as Federal Bureau of Prisons facilities, medical facilities, U.S. Marshals Service facilities, and motels or hotels.[14]

The list of facilities that we analyze in this report is much broader than other lists of facilities that ICE has released in the past.[15] This is because the other released lists include only those facilities that are authorized by the Detention Management Control Program (DMCP) and subject to DMCP inspections. The list of DMCP authorized facilities excludes many other facilities used by ICE for detention, such as temporary holding and/or processing facilities, Bureau of Prisons facilities, family or residential facilities, juvenile facilities, hospitals, hotels or motels, and short-term facilities.[16]



**All states had one or more facilities that ICE used to detain individuals, with Texas and California having the highest number of facilities and detainees.**

In fiscal year 2015, ICE used 638 facilities to detain noncitizens, including juveniles. By far, the largest category—43 percent—were facilities with intergovernmental service agreements (IGSAs). IGSAs are agreements between the federal government and a state or local government to provide detention beds in jails, prisons, and other local or state government detention facilities. These facilities are government owned, but they may be operated by either local or state agencies or by for-profit companies.

As shown in Figure 4, every state in the United States had at least one immigration detention facility in FY 2015. Most of the facilities were located either in the South (39 percent) or the West (30 percent), followed by the Midwest (15 percent) and the Northeast (14 percent). The top five states in terms of the total number of facilities were: Texas (115 facilities), California (70 facilities), Florida (43 facilities), New York (39 facilities), and Arizona (33 facilities).

**Figure 4. Number of Detention Facilities Used by ICE, Fiscal Year 2015**

**Note:** U.S. territories of Guam, Puerto Rico, the Northern Mariana Islands, and the Virgin Islands are not shown, but each territory had at least one detention facility.

**Source:** Authors' original analysis of the Geocoded Data.



Table 1 shows the top 15 states in terms of the total number of individuals detained in fiscal year 2015. By far, Texas had the highest number of detainees, followed by California, then Arizona. Interestingly, Arizona, Louisiana, and New Mexico had some of the highest levels of detainee populations in fiscal year 2015, yet they maintained relatively few facilities compared to Texas and California. Drilling down further to understand which counties and cities are likely to hold immigrant detainees will help us to better understand how federal-local partnerships in immigration enforcement might be shaping spatial patterns of immigration detention.

**Table 1. Top 15 States by Detainee Population, Fiscal Year 2015**

| Rank | State | Percent of Total Detainee Population | Total Number Detained |
|------|-------|--------------------------------------|-----------------------|
| 1 | Texas | 43.6 % | 192,771 |
| 2 | California | 11.6 | 51,162 |
| 3 | Arizona | 10.0 | 44,283 |
| 4 | Louisiana | 6.0 | 26,481 |
| 5 | New Mexico | 4.5 | 19,927 |
| 6 | Georgia | 2.9 | 12,736 |
| 7 | Florida | 2.6 | 11,310 |
| 8 | New York | 1.9 | 8,374 |
| 9 | New Jersey | 1.5 | 6,772 |
| 10 | Illinois | 1.5 | 6,765 |
| 11 | Pennsylvania | 1.5 | 6,543 |
| 12 | Washington | 1.4 | 6,356 |
| 13 | Virginia | 1.0 | 4,460 |
| 14 | Colorado | 0.8 | 3,682 |
| 15 | South Carolina | 0.8 | 3,603 |

**Source:** Authors' original analysis of the Detention Data.



## Defining Facility Characteristics

Facilities are coded as **privately operated** if they were operated by non-governmental, for-profit correctional companies, such as the GEO Group, CoreCivic, and MTC Corrections.[17] Publicly-owned facilities, such as county jails, may be privately operated.

Detention facilities located outside of the principal (largest) cities of metropolitan statistical areas (MSAs) are treated as placed outside of **major urban areas**. The U.S. Office of Management and Budget defines an MSA as consisting of "at least one urbanized area that has a population of at least 50,000."[18]

Each facility's **distance to the nearest nonprofit immigration attorney** is measured by driving distance to the nearest immigration attorney who was an active member of the American Immigration Lawyers Association (AILA) in fiscal year 2015. Specifically, we focus on AILA attorneys who practice removal defense at legal services/nonprofit organizations or law schools.[19]

This report provides portraits of detention facilities both at the facility level and at the detainee level. The estimates at the facility level indicate the percentage of facilities falling within a given category (for example, Privately Operated). The estimates at the detainee level indicate the percentage of detainees who were confined at least once in a facility falling within a given category. Detainee level analysis is different than the facility level analysis because some detainees moved in and out of various facilities during their detention due to interfacility transfers.



**Detention in privately operated facilities and in remotely located facilities was common.**

According to a recent government report, 65 percent of the average daily detainee population as of September 2016 was confined in facilities operated by private, for-profit contractors.[20] The expanding role of for-profit companies in the U.S. detention system has become a focal point of growing concern among advocates, scholars, and policymakers.[21] Chief among these concerns is that certain issues may be considerably magnified in privately operated facilities, including a lack of transparency and accountability and substandard or dangerous conditions of confinement.

Figure 5 shows that while for-profit companies operated only about 10 percent of the facilities, about 67 percent of individuals (including juveniles) were detained at least once in a privately operated facility. This is attributable to the relatively large capacity of privately operated facilities. For example, during fiscal year 2015, non-privately operated facilities each held on average 500 detainees, whereas privately operated facilities each held on average 5,581 detainees.

**Figure 5. Privately Operated versus Not Privately Operated Facilities, Fiscal Year 2015**



**Source:** Authors' original analysis of the Detention Data.



Another prominent feature of the current U.S. detention system relates to the location—or more precisely, the relative remoteness—of many of the detention facilities.[22] Remoteness is of concern because confinement in remote locations that are outside of and distant from urban areas can separate detainees from their families, and community and legal support networks that may be critical to their well-being and chances of achieving favorable case outcomes.[23] Figure 6 shows that about 50 percent of all facilities were located outside of major urban areas, and about 64 percent of all individuals (including juveniles) were detained at least once in facilities located outside of major urban areas.

**Figure 6. Location of Facilities Used by ICE, Fiscal Year 2015**

Location Relative to Major Urban Area

■ In MSA    ■ Outside MSA

Percent of Total

| | Facilities | Detainees |
|---|---|---|
| In MSA | 50.5 | 36.4 |
| Outside MSA | 49.5 | 63.6 |

**Note:** A metropolitan statistical area (MSA) is an urbanized area that has a population of at least 50,000. We treat detention facilities located outside of the largest cities of MSAs as outside of major urban areas (Outside MSA).

**Source:** Authors' original analysis of Geocoded Data.



In addition, we found that about 58 percent of individuals were detained at least once in a facility that was more than 30 miles away (in terms of driving distance) from the nearest nonprofit immigration attorney who practiced removal defense.[24] A large proportion of detainees were confined in facilities that were even further away. For example, about 48 percent, 26 percent, and 22 percent of detainees were confined at least once in a facility that was located more than 60 miles, 90 miles, and 120 miles away, respectively, from the nearest nonprofit immigration attorney who practiced removal defense. Taken together, these results indicate that many detainees were held in locations that were relatively far from basic community structures and legal-services networks.



# WHAT WERE THE OUTCOMES OF DETENTION?

To understand what happened to individuals once detained, we examined the following key detention outcomes: the number and type of transfers between facilities during detention, detention length, and the number and type of facility-related grievances. Our detention outcome analysis primarily focuses on adult detainees (N = 296,703) given that a different set of legal requirements applies for the detention of juveniles.

### Defining Transfers

For each detainee in the Detention Data, ICE generated a new detention record each time the individual was booked into a facility. In addition, ICE assigned each such record a release reason to indicate what had happened to the detainee at the end of the detention stint corresponding to each book-in. We treat a movement as a transfer if a given record has the release reason of "transferred" or "U.S. Marshals or other agency."

We refer to these movements as interfacility transfers for the following reason: each facility in the Detention Data has a code assigned by ICE that is supposed to uniquely identify each facility. During our data cleaning, we ensured that for any given detainee with multiple detention records, each of his or her consecutive detention records had different facility codes. In effect, all of the transfers that we analyze in this study involved movements from one location to another location with distinct facility codes.[25]

**A majority of adult detainees experienced transfers, many of which involved movement across different cities, states, or federal judicial circuits.**

The government has interpreted the law as providing the Attorney General broad discretion to transfer detainees.[26] Accordingly, ICE has detained individuals where they were first taken into custody or transferred them to remote and distant facilities, including ones that are outside the jurisdiction of the presiding immigration court.[27]



Transfers during detention can negatively impact detainees and their legal cases in a number of ways. For example, transfers may sever the detainees' familial and social contacts, disrupt the continuity of their medical care and legal representation, and interfere with their efforts to navigate the legal system more generally.[28]

Figure 7 shows that among all adults who were released during fiscal year 2015 (261,020 individuals), 70,254 detainees (27 percent) experienced one transfer before their release, 39,296 detainees (15 percent) experienced two transfers before their release, and 32,577 detainees (12 percent) experienced three or more transfers before their release. In all, about 54 percent of released individuals experienced at least one transfer during their detention.

**Figure 7. Number of Detention Facility Transfers among Adults Released in Fiscal Year 2015**



**Source:** Authors' original analysis of Detention Data.



It is also helpful to consider the types of transfers that the detainees experienced, because different types of transfers may impose different types of challenges for the detainees, as we discuss below. We coded the transfers into three broad categories: intercity, interstate, and intercircuit. Intercity transfers are transfers between detention facilities that are located in two different cities (within the same state or across different states). To understand the extent to which these intercity transfers involved movements across different states, we also examined interstate transfers, which refer to transfers between two different states. Intercircuit transfers refer to transfers between two different federal judicial circuits, including the D.C. circuit.

Intercircuit transfers are of special concern, as such transfers can result in changes in the law governing the detainees' immigration cases.[29] In some instances, an intercircuit transfer can dramatically alter the outcome of a case and increase the likelihood of deportation without due process, because some federal district courts are less willing to issue a stay of deportation while the case is being appealed.[30]

Table 2 shows that 177,402 out of 296,703 adults who were detained by ICE in fiscal year 2015 (60 percent) experienced at least one transfer. Among these 177,402 adults, about 86 percent experienced at least one intercity transfer, about 37 percent experienced at least one interstate transfer, and about 29 percent experienced at least one intercircuit transfer. Table 2 also shows that among 353,704 total transfers experienced by 177,402 adults, about 89 percent of the transfers were intercity transfers, about 28 percent were interstate transfers, and about 19 percent were intercircuit transfers.



**Table 2. Type of Transfers for Detained Adults with at Least One Transfer, Fiscal Year 2015**

| Transfer Type | Percent of Detainees | Number of Detainees | Percent of Transfers | Number of Transfers |
|---|---|---|---|---|
| Intercity | 85.8 % | 152,214 | 88.7 % | 313,813 |
| Interstate | 36.9 | 65,500 | 27.7 | 97,887 |
| Intercircuit | 29.2 | 51,850 | 19.4 | 68,601 |
| Total | | 177,402 | | 353,704 |

**Source:** Authors' original analysis of Detention Data and Geocoded Data.

Another way of examining the transfers is to consider the average distance (mean) involved in different types of transfers. Figure 8 shows that intercircuit transfers involved the longest distance, an average of about 820 miles. Intercity transfers involved the shortest driving distance, an average of about 297 miles. Across all types of transfers, the average distance traveled was about 270 miles.

**Figure 8. Average Driving Distance of Transfers among Detained Adults, Fiscal Year 2015**



**Source:** Authors' original analysis of Geocoded Data.



The policy directive issued by ICE in 2012 enumerates a series of officially-sanctioned reasons for transfers, including reasons related to "medical or mental health care to the detainee" and the "safety and security of the detainee, other detainees, detention personnel or any ICE employee."[31] Advocates and researchers, however, have reported a variety of other reasons for transfers, including retaliation against detainees for speaking up or organizing.[32] To our knowledge, ICE does not maintain electronic records of why any given detainee is transferred, nor how ICE's placement and transfer policies work in practice on the ground. Yet the basic patterns of transfers that we have described here underscore the critical need for the government to collect and to make publicly available precisely such information as a first step toward reducing transfers and mitigating their associated harms.

### Defining Release from Detention

In examining detention length, we conducted separate analyses for the individuals who were **removed**, **granted relief**, or **temporarily released**. This subgroup analysis approach reduces the risk that our findings might be confounded by fundamental dissimilarities across individuals who experienced different types of releases.

The removed category includes individuals who were removed to their countries of origin. The granted relief category includes individuals whose recorded release reason was "Proceedings Terminated," "Deferred Action for Childhood Arrivals," "Deferred Action for Parents of Americans and Lawfully Admitted Residents," or "Prosecutorial Discretion." The granted relief category includes individuals who won their claims for relief from removal, such as asylum, adjustment of status, and cancellation of removal. The temporarily released category includes individuals whose recorded release reason was "Alternatives to Detention," "Bonded Out," "Order of Recognizance," or "Order of Supervision." In short, the temporarily released category includes individuals who were released so that they could await the completion of their removal proceedings on the outside.



**Among adult detainees, detention length was significantly longer in privately operated facilities and in remotely located facilities.**

The second key outcome we examine is detention length. Figure 9 shows that about 17 percent of adult detainees released in fiscal year 2015 were released on the same day as their initial book-in. But many—about one-third of the population—were detained for more than 30 days. The average length of detention (mean) was about 38 days. The longest detention length among adults who were released in fiscal year 2015 was 2,943 days, indicating that one person was detained for over eight years. This detainee was not alone in experiencing years of detention. For example, 1,800 adults who were released in fiscal year 2015 were detained between 1 to 2 years; another 273 adults were detained between 2-3 years, and 117 adults were detained more than 3 years, before being released in fiscal year 2015.

**Figure 9. Total Days Detained among Adults Released in Fiscal Year 2015**



Source: Authors' original analysis of Detention Data.



Did detention lengths vary by type of facility operators and facility locations? Figure 10 shows that across all major release categories, the average detention length was consistently and substantially longer in privately operated facilities than in non-privately operated facilities. Figure 11 shows that across all major release categories, the average detention length was consistently and substantially longer in facilities located outside of major urban areas compared to facilities located within major urban areas.

**Figure 10. Average Days Detained among Adults by Type of Operation, Fiscal Year 2015**



**Source:** Authors' original analysis of Detention Data.

**Figure 11. Average Days Detained among Adults by Facility Location, Fiscal Year 2015**



**Note:** A metropolitan statistical area (MSA) is an urbanized area that has a population of at least 50,000. We treat detention facilities located outside of the largest cities of MSAs as outside of major urban areas (Outside MSA).

**Source:** Authors' original analysis of Detention Data.

We tested the robustness of these findings by analyzing detention length while controlling for a variety of individual and contextual factors, including gender, region of origin, age, legal status at the time of last U.S. entry, and criminal history, count of transfers, miles to nearest nonprofit immigration attorney, as well as the regional location of facilities. Our regression analysis results are consistent with the patterns presented in Figures 10 and 11. For example, among those who were removed, confinement in a privately operated facility was associated with an 82 percent increase in detention length. The same is true of confinement in facilities located outside of major urban areas, which was also associated with an 82 percent increase in detention length.

Why might detention length be longer in privately operated facilities and facilities located outside major urban areas? Data scarcity prevents us from empirically addressing this question. However, a number of potential explanations are worth considering. First, ICE may be systematically identifying and placing detainees who are likely to be detained longer into these types of facilities.



Second, privately operated facilities and facilities located outside of major urban areas tend to detain a substantially higher number of individuals on average. Geographical concentrations of large detainee populations are likely associated with longer court backlogs, and in turn, longer time to release, all else being equal.

Third, certain conditions of confinement in privately operated facilities and facilities located outside of major urban areas may be systematically linked to longer detention. For example, insofar as telephone calls are more expensive in privately operated facilities, or visitation is more difficult in facilities located outside of major urban areas, detainees may face greater challenges in obtaining legal counsel or obtaining materials necessary for their court hearings. If so, we might expect detainees in such facilities to seek court continuances at higher rates, leading to longer detention.

In sum, our findings raise important questions about whether certain structural conditions in privately operated facilities and in remotely located facilities may produce longer detention lengths.

**The number of grievances was significantly higher in privately operated facilities and in remotely located facilities.**

The conditions of confinement in detention have generated concern and litigation across many different facilities.[33] Examining the types and prevalence of grievances that detainees and community members filed against detention facilities provides one insight into the conditions of confinement. The grievances that we examine here were captured through calls that the ICE Enforcement and Removal Operations' Detention Reporting and Information Line (DRIL) received from detainees and community members in fiscal year 2015.

It is important to note that DRIL is only one mechanism through which detainees and community members can report grievances related to detention facilities.[34] Nonetheless, the Grievance Data is an important source of information on grievances given that detainees may be more likely to be aware of its existence than other reporting mechanisms.



The original data relating to grievances that Human Rights Watch received from ICE contained a total of 48,849 grievances pertaining to specific detention facilities. Matching these facilities to the facilities in the Detention Data and restricting the sample to only those facilities used by ICE in fiscal year 2015 produced an analysis sample of 47,145 grievances pertaining to 304 facilities. We consolidated 18 different grievance categories as reported by ICE into seven broad grievance types, as shown in Table 3.

**Table 3. Number and Types of Grievances, Fiscal Year 2015**

| Grievance Type | Percent of Total Grievances | Number of Grievances |
|---|---|---|
| Access to Counsel/ Case Information | 66.6 % | 31,417 |
| Access to Outside/ Family Separation | 12.5 | 5,892 |
| Bond/Release from Facility | 7.9 | 3,741 |
| Asylum Related | 4.8 | 2,241 |
| Health/Medical Care Related | 1.6 | 772 |
| ICE or Facility Misconduct/Abuse | 1.5 | 729 |
| Other | 5.0 | 2,353 |
| Total | 100% | 47,145 |

**Source:** Authors' original analysis of Grievance Data.

American Immigration Council

The majority of the grievances involved issues relating to access to legal counsel and basic immigration case information—a total of 31,417 grievances constituting 67 percent of all grievances. We also found a high prevalence of grievances relating to access to the outside and family separation issues. This grievance type includes the following categories of grievances as reported by ICE: "Online Detainee Locator," "Telephone Access," "Visitation," and "Separation from Minor Child or Other Dependent or Parental Related."

Next, we examined whether the number of grievances varied by the type of facility operator and facility location. Figure 12 shows that a substantially higher number of grievances on average (mean) were filed against privately operated facilities and facilities located outside of major urban areas.

**Figure 12. Average Number of Grievances by Type of Operation and Facility Location, Fiscal Year 2015**



**Note:** A metropolitan statistical area (MSA) is an urbanized area that has a population of at least 50,000. We treat detention facilities located outside of the largest cities of MSAs as outside of major urban areas (Outside MSA).

**Source:** Authors' original analysis of Grievance Data.

To assess the robustness of these results, we conducted a regression analysis of grievances that controls for other possible determinants of grievances. These control variables include (1) proportion male (the proportion of detainees confined in any given facility during fiscal year 2015 who were male); (2) proportion Mexican (the proportion of detainees confined in any given facility during fiscal year 2015 who were of Mexican origin); (3) total detainee population (the total number of detainees confined in a given facility during fiscal year 2015); (4) average detention length (the average number of days detained in any given facility in fiscal year 2015; and (5) whether or not the facility was a juvenile facility.

The results of this regression analysis are consistent with our findings shown in Figure 12. In short, we find that privately operated facilities are expected to have about 175 percent more grievances than non-privately operated facilities, controlling for the factors noted above. Facilities located outside of major urban areas are expected to have about 51 percent more grievances than facilities located inside major urban areas, all else being equal.

There is no evidence to suggest that it is easier to submit grievances in privately operated facilities and in remotely located facilities. On the contrary, existing research suggests that the opposite is likely true. For example, reports suggest that privately operated facilities are more likely to lack transparency and public accountability.[35] It is also important to note that our findings are consistent with the findings resulting from investigations of correctional facilities in the criminal justice system. These investigations revealed that privately operated prisons had a worse record on most safety and security measures relative to comparable facilities operated by the Federal Bureau of Prisons.[36]



# CONCLUSION

This report's findings highlight several key aspects of immigration detention that should be central to any current policy discussions about detention oversight and reform. These key aspects include: (1) the reasons for and the frequency of interfacility transfers, (2) the length of detention, and (3) the nature and volume of grievances filed against detention facilities.

As the federal government expands the use of detention in support of its strict enforcement regime, many of the issues that we have highlighted in this report may become magnified in scope and severity. For example, with the surge in immigration apprehensions under the current administration, there have been numerous reports of sudden, chaotic, and mass transfers of detainees across various facilities.[37] These reports raise renewed concerns about ICE's use of interfacility transfers and the serious challenges that these transfers raise for detainees in terms of their well-being and ability to pursue legal relief from removal.

Finally, our findings suggest that privately operated facilities and remotely located facilities require special scrutiny, given that placement in these types of facilities is associated with longer detention length and higher volume of grievances. Comprehensive investigations and independent monitoring focused on these types of outcomes and facilities are urgently needed to address the ongoing humanitarian issues and legal concerns raised by immigration detention.



# ENDNOTES

1.  Rodriguez v. Robbins, 804 F.3d 1060, 1065 (9th Cir. 2015), *rev'd sub nom.* Jennings v. Rodriguez, 138 S. Ct. 830 (2018).

2.  Dora Schriro, *Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees*, 47 Am. Crim. L. Rev. 1441, 1442 (2010); Emily Ryo, *Fostering Legal Cynicism through Immigration Detention*, 90 S. Cal. L. Rev. 999, 1024-34 (2017).

3.  *See, e.g.*, Am. Civil Liberties Union et al., Fatal Neglect: How ICE Ignores Deaths in Detention (2016), https://perma.cc/J4VP-NU75; S. Poverty Law Ctr. et al., Shadow Prisons: Immigrant Detention in the South (2016), https://perma.cc/2GMD-M9RD; Human Rights Watch & Cmty Initiatives for Visiting Immigrants in Confinement, Systematic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention (2017), http://perma.cc/VQW5-UNMV; Pa. State Law Ctr. for Immigrants' Rights Clinic, Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers (2017), https://perma.cc/57ZK-SWEY.

4.  *See* Immigration & Customs Enf't (ICE), List of Deaths in ICE Custody – Data From: 10/01/2003 to 06/05/2017 (2017), https://perma.cc/BK4P-SYEL; *Deaths at Adult Detention Centers, AILA Doc. No. 16050900,* Am. Immigration Lawyers Ass'n (July 26, 2018), https://perma.cc/Q2NC-WRST.

5.  Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-32 Concerns about ICE Detainee Treatment and Care at Detention Facilities 3 (2017), https://perma.cc/ZPM7-32Z2. *See also* U.S. Comm'n on Civil Rights, With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities 25 (2015), https://perma.cc/38Q3-BMFY.

6.  U.S. Dep't of Homeland Sec. (DHS), Budget-in-Brief: Fiscal Year 2017 38 (2017), https://perma.cc/DY3R-4N8Q.

7.   Randy Capps et al., Migration Policy Institute, Revving Up the Deportation Machinery: Enforcement and Pushback under Trump 4 (2018), https://perma.cc/7V4T-RJD5.

8.  Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017); Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017); Memorandum from John Kelly, Sec'y of Homeland Sec., to Kevin McAleenan, Acting Comm'r of U.S. Customs & Border Protection et al. (Feb. 20, 2017), https://perma.cc/LVX3-EGMY.

9.  Between February and September of 2016, non-criminal removals were 41% of all removals. That figure rose to 43% during the same time period in 2017. *See* U.S. Immigration & Customs Enf't, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report* (Dec. 13, 2017), https://www.ice.gov/removal-statistics/2017 (select "Local Statistics" tab; then view PDF of "Local Statistics 2013–2016" for the 2016 statistics, and view PDF of "Local Statistics 2017" for the 2017 statistics).

10.  *See* Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) (requiring the detention of all noncitizens apprehended for violating immigration laws and calling for an allocation of "all legally available resources" for the immediate construction, operation, and control of detention facilities near the border with Mexico, or for the establishment of contracts for such facilities).

11.  DHS, Fiscal Year 2017 ICE Enforcement and Removal Operations Report 10 (2017), https://perma.cc/AJX4-TF3H.

12.  DHS, Budget-in-Brief: Fiscal Year 2019 36 (2018), https://perma.cc/5D7R-MWFQ.

13.  Tanya Golash-Boza & Pierrette Hondagneu-Sotelo, *Latino Immigrant Men and the Deportation Crisis: A Gendered Racial Removal Program*, 11 Latino Stud. 271 (2013). *See also* Doris Provine & Roxanne Lynn Doty, *The Criminalization of Immigrants as a Racial Project*, 27 J. Contemp. Crim. Just. 261 (2011); Amada Armenta, *Racializing Crimmigration: Structural Racism, Colorblindness, and the Institutional Production of Immigrant Criminality*, 3 Soc. Race and Ethnicity 82 (2017).

14.  For definitions of facility types, see Emily Ryo & Ian Peacock, *National Study of Immigration Detention*, S. Cal. L. Rev. (forthcoming 2018) (manuscript at 59, Appendix Table A), https://ssrn.com/abstract=3216865.

15.  *See, e.g., ICE Detention Facility List as of December 2015,* Nat'l Immigrant Justice Ctr, https://perma.cc/VGC2-9BS8; *New Information from ICE ERO's July Facility List, AILA Doc. No. 17113037,* Am. Immigration Lawyers Ass'n (November 30, 2017), https://perma.cc/P37H-P5XB.

16.  *See ICE Detention Facility List as of November 2017,* Nat'l Immigrant Justice Ctr, https://perma.cc/USY6-E3GF (see notes found on "Authorized List - DMCP" worksheet).

17.  For further details on the coding of facilities as privately operated, see Ryo & Peacock, *National Study of Immigration Detention*, manuscript at 65-66, Methods Appendix.

18.  Office of Mgmt. & Budget, 2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas, 75 Fed. Reg. 37246, 37252 (June 28, 2010), https://perma.cc/K63B-WWG8; U.S. Census Bureau, *Metropolitan and Micropolitan* (Jan. 17, 2018), https://perma.cc/AD3L-YAT5.

19.  There is no comprehensive database of all immigration



lawyers who work in legal services/nonprofit settings, which means it is impossible to know what proportion of legal services/nonprofit immigration lawyers join AILA. However, our analysis of AILA membership data from 2015 suggests that many legal services/nonprofit immigration lawyers are indeed AILA members.

20.  *See* DHS, REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 6 (2016), https://perma.cc/5FR5-JJY4.

21.  *See generally* Jennifer M. Chacón, *Privatized Immigration Enforcement*, 52 HARV. C.R.-C.L. L. REV. 1 (2017); Denise Gilman & Luis A. Romero, *Immigration Detention, Inc.* 6 J. ON MIGRATION & HUM. SECURITY 145 (2018).

22.  *See, e.g.*, Kyle Kim, *Immigrants Held in Remote ICE Facilities Struggle to Find Legal Aid Before They Are Deported*, L.A. TIMES, Sept. 28, 2017, https://perma.cc/CAD9-FMSH; HUMAN RIGHTS WATCH, A COSTLY MOVE: FAR AND FREQUENT TRANSFERS IMPEDE HEARINGS FOR IMMIGRANT DETAINEES IN THE UNITED STATES (2011), https://perma.cc/LP5F-XZUG.

23.  *See, e.g.*, Emily Ryo & Ian Peacock, *Beyond the Walls: The Importance of Community Contexts in Immigration Detention*, AM. BEHAV. SCIENTIST (forthcoming 2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3216868.

24.  *See id.* (providing further analysis of the importance of legal service providers in communities where the detention facilities are located).

25.  Although ICE describes the facility codes as uniquely identifying each facility, we found 64 records pertaining to 61 detainees in which two consecutive records differed in their facility codes but shared the same address. We suspect that these transfers involved movements from one part of a building complex with one facility code, to another part of the same building complex with a different facility code.

26.  *See, e.g.*, Avramenkov v. Immigration & Naturalization Serv., 99 F. Supp. 2d 210, 213 (D. Conn. 2000); Comm. of Cent. Am. Refugees v. INS, 682 F. Supp. 1055, 1064 (N.D. Cal. 1988); Rady v. Ashcroft, 193 F. Supp. 2d. 454, 456-57 (D. Conn. 2002).

27.  HUMAN RIGHTS WATCH, A COSTLY MOVE: FAR AND FREQUENT TRANSFERS IMPEDE HEARINGS FOR IMMIGRANT DETAINEES IN THE UNITED STATES (2011), https://perma.cc/LP5F-XZUG; Libby Rainey, *ICE Transfers Immigrants Held in Detention Around the Country to Keep Beds Filled*, DENVER POST, Sept. 17, 2017, https://perma.cc/L2JS-96WF.

28.  *See, e.g.*, INTER-AMERICAN COMM'N ON HUMAN RIGHTS, REPORT ON IMMIGRATION IN THE UNITED STATES: DETENTION AND DUE PROCESS 26-27, 137-140 (2010); César Cuauhtémoc García Hernández, *Due Process and Immigrant Detainee Prison Transfers: Moving LPRs to Isolated Prisons Violates Their Right to Counsel*, 21 BERKELEY LA RAZA L.J. 17, 17 (2011); Steering Comm. of the N.Y. Immigrant Representation Study Report, *Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings*, 33 CARDOZO L. REV. 357, 363 (2011); Mark Noferi, *Cascading Constitutional*

*Deprivation: The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings*, 18 MICH. J. RACE & L. 63, 76-77 (2012).

29.  Peter L. Markowitz & Lindsay C. Nash, *Constitutional Venue*, 66 FLA. L. REV. 1153, 1200 (2015) (noting that "federal immigration authorities' unchecked control over venue allows them to manipulate the controlling law of a case because the case will be governed by the law of the federal circuit in the jurisdiction in which the immigration court sits").

30.  Nancy Morawetz, *Detention Decisions and Access to Habeas Corpus for Immigrants Facing Deportation*, 25 B.C. THIRD WORLD L. J. 13, 16 (2005).

31.  U.S. IMMIGRATION. & CUSTOMS ENF'T, POLICY 11022.1: DETAINEE TRANSFERS 3, (2012), https://perma.cc/R7ME-ZN6J.

32.  Nancy Hiemstra, "*You Don't Even Know Where You Are*": *Chaotic Geographies of U.S. Migrant Detention and Deportation, in* CARCERAL SPACES: MOBILITY AND AGENCY IN IMPRISONMENT AND MIGRANT DETENTION 68 (Dominique Moran et al. eds., 2013); Deirdre Conlon & Nancy Hiemstra, *Examining the Everyday Micro-Economies of Migrant Detention in the United States*, 69 GEOGRAPHICA HELVETICA 335, 342 (2014).

33.  For a review, see Emily Ryo, *Understanding Immigration Detention: Causes, Conditions, and Consequences*, ANN. REV. L. & SOC. SCI. (forthcoming 2019) (on file with authors).

34.  *See* U.S. GOV'T ACCOUNTABILITY OFFICE, IMMIGRATION DETENTION: ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND OVERSIGHT OF DETAINEE MEDICAL CARE (GAO-16-231) 11 (2016), https://perma.cc/6VN6-BS5Z.

35.  *See* AM. CIVIL LIBERTIES UNION OF N.M., OUTSOURCING RESPONSIBILITY: THE HUMAN COST OF PRIVATIZED IMMIGRATION DETENTION IN OTERO COUNTY 59 (2011), https://perma.cc/2MPC-P4FL; DHS, REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 45 (2016), https://perma.cc/5FR5-JJY4.

36.  *See* OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, REVIEW OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF CONTRACT PRISONS (2016), https://perma.cc/AQF2-L9Q9.

37.  *See, e.g.*, Chantal da Silva, *Immigrants Detained in Victorville Prison Sue over "Inhumane" Conditions*, NEWSWEEK, August 2, 2018, https://perma.cc/94S6-M5TR; Andrea Castillo, *Contra Costa County Cuts Ties with ICE, Ending Contract for Jailing Immigrant Detainees*, LOS ANGELES TIMES, July 11, 2018, https://perma.cc/QJ5N-LR3E.

