Daniel P. Struck, Pro Hac Vice
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
STRUCK LOVE ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com
sknorr@strucklove.com

Nicholas H. Rasmussen, Bar #285736
Nancy Flores-Castaneda, Bar #357148
McCORMICK, BARSTOW, SHEPPARD,
WAYTE & SMITH, LLP
7647 North Fresno Street
Fresno, CA  93720
Tel:  (559) 433-1300
Fax: (559) 433-2300
nrasmussen@mccormickbarstow.com
nancy.flores-castaneda@mccormickbarstow.com

Attorneys for Respondent-Defendant
CoreCivic, Inc.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dignity Not Detention Coalition, et al.,<br><br>        Petitioners and Plaintiffs,<br><br>   v.<br><br>City of California City, et al.,<br><br>        Respondents and Defendants. | Case No. 1:25-cv-01292-KES-CDB<br><br>**CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:    November 3, 2025<br>Time:   1:00 PM<br>Judge:  Hon. Kirk E. Sherriff<br>Crtrm:  6<br><br>U.S. District Judge: Kirk E. Sherriff<br>U.S. Magistrate Judge: Christopher D. Baker |

1

**TABLE OF CONTENTS**

2  I.    INTRODUCTION ................................................................................................... 1

3  II.   BACKGROUND ................................................................................................... 1

4  III.  PETITIONERS FAIL TO MEET THE STANDARD FOR ISSUANCE OF A

5        TEMPORARY RESTRAINING ORDER ............................................................ 4

6        A.   Petitioners Are Not Likely to Succeed on the Merits ................................. 5

7             1.   The Coalition Has Not Demonstrated Article III Standing ................ 5

8             2.   CoreCivic Has a Valid CUP ............................................................. 6

9             3.   SB 29 Does Not Apply to CoreCivic's Operation of the Facility ...... 9

10            4.   Petitioners' Claims Are Barred by the Supremacy Clause ............... 10

11                 a.   SB 29 Violates Intergovernmental Immunity ........................ 11

12                 b.   SB 29 Is Preempted ............................................................... 13

13                 c.   CoreCivic Is Entitled to Derivative Sovereign Immunity .......... 14

14       B.   Petitioners Have Not Shown They Will Suffer Irreparable Harm ............ 14

15            1.   Petitioners' Delay in Seeking Relief and the Specific Injuries Alleged Do
                   Not Support a Finding of Immediate and Irreparable Harm ............... 14

16            2.   Petitioners' Allegations of Direct Harm Are Insufficient ................. 15

17            3.   John Doe's Allegations Regarding His Conditions of Detention Are
                   Inaccurate and Would Not Be Addressed by the Requested Injunction .......... 16

18            4.   Petitioners' Reliance on a July 2025 Safety Inspection Is Misplaced ......... 18

19            5.   Petitioners' Contentions Regarding Heat and Environmental Impacts Are
                   Unfounded ...................................................................................... 19

20            6.   Articles Regarding Past Incidents Occurring at Other Facilities Do Not
                   Support a Finding of Imminent Harm at the Facility ......................... 21

21       C.   The Balance of Equities Does Not Tip in Petitioners' Favor ................... 23

22       D.   Issuing the Requested Injunctive Relief Is Not in the Public Interest ....... 24

23  IV.   PETITIONERS HAVE NOT POSTED THE BOND REQUIRED BY RULE 65 ............. 25

24  V.    CONCLUSION .................................................................................................. 25

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All for the Wild Rockies v. Pena,*
  865 F.3d 1211 (9th Cir. 2017) ................................................................. 5

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
  750 F.2d 1470 (9th Cir. 1985) ................................................................. 22

*Anderson v. U.S.,*
  612 F.2d 1112 (9th Cir. 1979) ................................................................. 4

*Avitan v. Kirchmeyer,*
  2023 WL 2372384 (C.D. Cal. Jan. 20, 2023) ......................................... 15

*Barrientos v. CoreCivic, Inc.*
  52023 WL 2666852 (M.D. Ga. Mar. 28, 2023) ....................................... 21

*Campbell-Ewald Co. v. Gomez,*
  577 U.S. 153 (2016) ................................................................................. 14

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ............................................................. 14, 22

*Childs v. San Diego Fam. Hous. LLC,*
  22 F.4th 1092 (9th Cir. 2022) ................................................................. 14

*Citizens for Responsible Equitable Env't Dev. v. City of San Diego,*
  184 Cal. App. 4th 1032 (2010) ............................................................... 7

*City of Monterey v. Carrnshimba,*
  215 Cal. App. 4th 1068 (2013) ............................................................ 7, 8

*Coldwell Banker Real Estate LLC v. Smile Enters, Inc.,*
  2011 WL 13220121 (C.D. Cal. Mar. 11, 2011) ...................................... 25

*CoreCivic, Inc. v. Governor of New Jersey,*
  145 F.4th 315 (3d Cir. 2025) ................................................................... 11

*CoreCivic, Inc. v. Murphy,*
  690 F. Supp. 3d 467 (D.N.J. 2023) .................................................... 10, 13

*Dixon v. Larosa,*
  2010 WL 4982530 (E.D. Cal. Dec. 2, 2010) .......................................... 14

*Food & Drug Admin. v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ................................................................................. 6

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ................................................................... 4

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Geo Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) ................................................................ 11, 12, 13

*Immigrant Defs. L. Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025) ................................................................... 6

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) .................................................................. 22

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ..................................................................................... 12

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ................................................................... 6

*Leslie Miller, Inc. v. Arkansas*,
    352 U.S. 187 (1956) ................................................................................... 12

*Levy v. Am. Med. Collections Bureau, Inc.*,
    2016 WL 5462722 (E.D. Va. Sept. 29, 2016) ............................................. 5

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ..................................................................................... 14

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ..................................................................................... 5

*Meachum v. Fano*,
    427 U.S. 215 (1976) ................................................................................... 16

*Mullins v. City of New York*,
    634 F.Supp.2d 373 (S.D.N.Y. 2009) ........................................................ 22

*Nance v. Miser*,
    2012 WL 6674404 (D. Ariz. Dec. 20, 2012) .............................................. 5

*Native Ecosystems Council v. Krueger*,
    40 F. Supp. 3d 1344 (D. Mont. 2014) ....................................................... 21

*Nevada v. United States*,
    364 F. Supp. 3d 1146 (D. Nev. 2019) ....................................................... 21

*Nielsen v. Thornell*,
    101 F.4th 1164 (9th Cir. 2024) ................................................................. 16

*Northpoint Tech., Ltd v. Directv, Inc*,
    2010 WL 11444098 (W.D. Tex. Oct. 25, 2010) .......................................... 5

*Padilla v. City of McFarland*,
    2022 WL 17546281 (Cal. App. Dec. 9, 2022) ...................................... 16, 22

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) .................................................................. 23

-iii-

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*People v. LM Connexions, Inc.*,
    2019 WL 397182 (Cal. App. Jan. 31, 2019) ............................................................... 7

*Pub. Utilities Comm'n of State of Cal. v. United States*,
    355 U.S. 534 (1958) ................................................................................................. 12

*Reno Air Racing Ass'n., Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ................................................................................... 5

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ................................................................................... 15

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ................................................................................................... 5

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ............................................................................... 23

*San Gabriel Trib. v. Super. Ct.*,
    143 Cal. App. 3d 762 (1983) ..................................................................................... 9

*Satanic Temple v. Labrador*,
    149 F.4th 1047 (9th Cir. 2025) ................................................................................. 6

*Stanley v. Univ. of S.C.*,
    13 F.3d 1313 (9th Cir. 1994) ..................................................................................... 5

*State v. Musk*,
    769 F.Supp.3d 1 (D.D.C. 2025) ............................................................................... 22

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ................................................................................... 4

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
    507 F.Supp.2d 1096 (C.D. Cal. 2007) ..................................................................... 22

*Uhlig LLC v. CoreLogic, Inc.*,
    2021 WL 5758564 (D. Kan. Dec. 3, 2021) .............................................................. 22

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ................................................................... 10, 11, 13

*United States v. King County*,
    122 F.4th 740 (9th Cir. 2024) ................................................................... 11, 12, 13

*United States v. Washington*,
    596 U.S. 832 (2022) ..................................................................................... 11, 12

*United Supreme Council, 33 Degree of Ancient & Accepted Scot. Rite of Freemasonry v. United
    Supreme Council of Ancient Accepted Scot. Rite for 33 Degree of Freemasonry*,
    329 F. Supp. 3d 283 (E.D. Va. 2018) ....................................................................... 5

*Winter v. Nat. Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 4, 5, 14

*Yearsley v. W.A. Ross Const. Co.*,
   309 U.S. 18 (1940) .................................................................................................. 14

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969) ................................................................................................ 14

**Statutes**

6 U.S.C. § 112(b)(2) .................................................................................................. 13

8 U.S.C. § 1231(g) .............................................................................................. 11, 13

28 U.S.C. § 530C(a)(4) ............................................................................................. 13

Cal. Civ. Code § 1670.9 ..................................................................................... passim

Cal. Civ. Code § 1670.8.5 ........................................................................................... 9

Cal. Civ. Code § 1785.27(d) ....................................................................................... 9

Cal. Civ. Code § 1798.69(a) ....................................................................................... 9

Cal. Civ. Code § 1812.302(e) ..................................................................................... 9

Cal. Gov. Code § 12585(a) ......................................................................................... 5

Cal. Gov. Code § 54950 ............................................................................................ 15

U.S. Const. amend. XIV, § 1 ...................................................................................... 8

U.S. Const. art. VI, cl. 2 ........................................................................................... 10

**Regulations**

8 C.F.R. § 235.3 ....................................................................................................... 11

48 C.F.R. § 3017.204-90 .......................................................................................... 11

**Other Authorities**

AB 32 ....................................................................................................................... 12

SB 29 ................................................................................................................. passim

S.B. 29, 2017 Cal. Legis. Serv. ch. 494 ................................................................... 13

## I.    INTRODUCTION.

Petitioners seek to freeze the operation of a federal immigration detention facility and disrupt enforcement of our Nation's immigration laws because of alleged permit and licensing infractions. But their factual allegations are not true—the facility at issue has a valid conditional-use permit and has been operating for more than 25 years with the approval of local and state officials—and their legal contention that SB 29 imposes insurmountable red tape is not only contradicted by the plain language of the statute but barred by constitutional doctrines. Thus, Petitioners are not likely to succeed on their claims. Nor have they established that they will sustain irreparable harm if the Court does not immediately enjoin the facility from accepting additional detainees and physically expanding or remodeling the facility. Their assertions are speculative, inconsistent with other allegations, contradicted by the facts, and/or unrelated to any available injunction. Indeed, neither Petitioner can establish that they even have standing to bring their claims. But whatever their alleged harm, the real and certain injuries that CoreCivic and the federal government will sustain if the facility's operation is stalled far outweighs it. A mere delay in a non-discretionary ministerial act (approval of a business license) does not warrant the sweeping and severe restraining order that Plaintiffs request.

## II.    BACKGROUND.

In 1997, CoreCivic, previously known as Corrections Corporation of America ("CCA"),[1] submitted a proposal to the City of California City ("City") to construct a private prison consisting of 2,304 general population beds, a 256-bed segregation unit, and a 4-bed medical unit. (Dkt. 1-5, ¶ 7.) The City issued a Notice of Preparation for an Environmental Impact Report ("EIR") Supplement on September 11, 1997, and the Final EIR Supplement was completed in January 1998 (State Clearinghouse Number 97091045).[2] (Ex. 1: M. Ariola Decl., ¶ 9.) At a noticed public hearing

---

[1] CCA was renamed CoreCivic in 2016.

[2] In 1993, the California Department of Corrections ("CDCR") commenced an EIR (State Clearinghouse Number 93082030) evaluating the environmental effects resulting from construction and operation of a new 2,200-bed prison or up to a 4,400-bed prison complex on one of two properties in California, including the site of the current facility. The EIR was completed and certified, but CDCR decided not to move forward with the project. When CCA sought approval for its proposed project on the site, the City elected to prepare a supplement to the existing CDCR EIR, rather than preparing a new EIR, and

1    on January 15, 1998, the California City Planning Commission recommended granting Conditional

2    Use Permit ("CUP") 97-01 for the proposed facility. (*Id.*, ¶ 11.) The City Council granted CUP 97-

3    01 on January 20, 1998, and in June 1998, CoreCivic purchased the 320-acre site, which consisted

4    of vacant terrain surrounded by natural desert. (*Id.*, ¶ 11, 14.) The site was then subdivided into

5    three parcels: Parcel 1 is approximately 70 acres and is the site of the current facility; Parcel 2 is

6    approximately 35 acres and is directly south of Parcel 1; and Parcel 3 is approximately 215 acres

7    to the east of Parcels 1 and 2. (*Id.*)

8        Construction began in 1998 on the California City Correctional Facility ("the facility" or

9    "CCCF"). (*Id.*, ¶ 4, 16.) During construction, CoreCivic applied to amend CUP 97-01 and construct

10   two additional 256-bed housing units on the current site. (*Id.*, ¶ 17.) On December 1, 1998, the City

11   granted CUP Amendment 98-02, which expanded the permitted use of the site by 512 general

12   population beds. (*Id.*) That Amendment was extended, and on November 15, 2001, the City

13   Manager/Planning Director clarified that the Amendment extension was "granted indefinitely."

14   (*Id.*) At no point did the City ever revoke, rescind, or cancel either CUP 97-01 or CUP Amendment

15   98-02. (*Id.*, ¶ 17.)

16       In addition to the current facility, CoreCivic also submitted and received approval for

17   construction of a second 2,200-bed facility on the 35-acre parcel. (*Id.*, ¶ 20.) The December 2009

18   Addendum to the Final Subsequent EIR noted that this proposed second 2,200-bed facility would

19   not have significant operational impacts relating to traffic, air quality, noise, or other factors

20   required for consideration under the California Environmental Quality Act ("CEQA"). (*Id.*) On

21   December 22, 2009, the California City Planning Commission approved CUP 09-04 for the

22   construction and operation of a 2,200-bed facility on the 35-acre parcel. (*Id.*, ¶ 21.) CUP 09-04 does

23   not contain any expiration date. (*Id.*) In 2017, CoreCivic began to explore proposed development

24   of the 215-acre parcel to construct two identical 1,512-bed facilities. (*Id.*, ¶ 28.) An application for

25   CUP 20-02 was opened with the City, and on May 21, 2021, the City issued a notice of Availability

26   of a Draft Environmental Impact Report (State Clearinghouse No. 2017121069). (*Id.*) However,

27

28   incorporated the original report.

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1  because CoreCivic placed this separate project on "pause," CUP 20-02 has not been approved and

2  remains pending. (*Id.*)

3      Following completion of construction of the 2,560-bed facility on the current site,

4  CoreCivic operated CCCF as a federal detention center from 2000 to 2013. (*Id.*, ¶ 18; Dkt. 1-5, ¶¶

5  10–14.) From 2000 to 2010, CoreCivic housed criminal aliens in the custody of the Bureau of

6  Prisons ("BOP") through a direct contract with BOP.[3] (Dkt. 1-5, ¶¶ 10–12.) From 2010 to 2013,

7  CoreCivic housed federal detainees in the custody of the United States Marshals Service ("USMS")

8  and civil immigration detainees in the custody of United States Immigration and Customs

9  Enforcement ("ICE") through an Intergovernmental Services Agreement ("IGSA") with the City.

10  (*Id.*, ¶¶ 13–14.) During that period, there were more than 9,500 ICE detainees at the facility. (*Id.*, ¶

11  14.) In 2013, CoreCivic leased CCCF to CDCR to house California inmates.[4] (*Id.*, ¶ 15; Ex. 1, ¶

12  22.) In 2014, the City confirmed that a land-use review had been completed and provided

13  authorization and full permitting for use of 2,560 beds at the facility. (Ex. 1, ¶ 16.) CDCR made

14  full use of the available space and regularly housed more than 2,304 inmates at the facility. (Dkt.

15  1-5, ¶ 16; Ex. 2: M. Giardina Decl., ¶ 8, 13.)

16      Following expiration of CDCR's lease in 2024, CoreCivic never shuttered the facility or

17  discontinued its use as an Institutional Group I-3 facility. (Ex. 1, ¶ 29.) To the contrary, CoreCivic

18  continued to staff the facility with operations and maintenance employees to maintain the facility

19  while it identified and explored opportunities to enter into a new contract. (*Id.*, ¶¶ 30–31.) During

20  that time, CoreCivic submitted multiple permits for repairs to the facility. (*Id.*, ¶ 33–34.) The City

21  issued plumbing permit No. 21170 on January 7, 2025, for waterline repairs, permit number 20989

22  on January 15, 2025, for roof repairs, and plumbing permit No. 21309 on May 14, 2025, to remodel

23  a handicapped shower stall for ADA compliance. (*Id.*) These repairs have been completed for all

24  three permits, and the only outstanding item is the final inspection by the City. (*Id.*) None of these

25

26      [3] Under the Criminal Alien Requirement program, BOP sought to obtain housing in privately owned and operated facilities for criminal aliens who were serving federally imposed sentences, and who would be subject to removal at the completion of their sentences. (Dkt. 1-5, ¶ 10.)

27

28      [4] On May 27, 2014, the City confirmed that CDCR was "authorized and fully permitted to operate 2,560 beds" at the facility. (Ex. 1, ¶ 23 & Attach. G.)

-3-

repairs is a major or significant repair or renovation which requires the issuance of a new Certificate of Occupancy. (*Id.*)

At the present time, there is extremely limited detention space in California. (Dkt. 1-4, ¶ 8.) ICE does not operate its own detention facilities but instead arranges bed space through privately owned and operated Contract Detention Facilities, as well as through IGSAs with local or state agencies. (*Id.*, ¶ 6.) In April 2025, CoreCivic entered into a new contract with ICE to once again operate the facility as a federal detention facility. (Dkt. 1-5, ¶ 20.) The contract provided a monthly payment to CoreCivic for the ramp up and preparation of the facility and authorized the detention of 512 ICE detainees during the ramp-up period. (Dkt. 1-4, ¶ 20.) In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the facility, and the first group of detainees arrived on August 27, 2025. (*Id.*, ¶ 21.) In September 2025, ICE formalized the contract for the facility, authorizing use of up to 2,560 beds, with a term of April 1, 2025 to August 31, 2027. (*Id.*, ¶ 22.) CoreCivic expects the facility to reach capacity in early 2026.[5] (*Id.*, ¶ 25.)

## III.  PETITIONERS FAIL TO MEET THE STANDARD FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER.

To obtain a temporary restraining order ("TRO"), Petitioners must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) the injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Likelihood of success is the most important factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

Mandatory injunctions, such as that sought by Petitioners here, "are not issued in doubtful cases" and should not be issued "unless extreme or very serious damage will result." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979). Indeed, "[a] preliminary injunction is an extraordinary and drastic remedy and 'one that should not be granted unless the movant, by a clear

---

[5] As of October 25, 2025, the facility held 746 detainees—595 males and 151 females. (Ex. 4, n.2.) Detainees are classified as High/Mod-High or Low/Mod-Low; all detainees classified as High/Mod-High have criminal convictions, the majority of which are in the United States, but some are in their countries of origin. (*Id.*) Currently, 250 male detainees (42%), including John Doe, are classified as High/Mod-High and thus have criminal convictions. (*Id.*)

1  showing, carries the burden of persuasion.'" *Nance v. Miser*, 2012 WL 6674404, at *1 (D. Ariz.

2  Dec. 20, 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter*, 555

3  U.S. at 24 (holding a TRO is "an extraordinary remedy that may only be awarded upon a clear

4  showing that the plaintiff is entitled to such relief"); *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) ("[I]t

5  has long been held that an injunction is to be used sparingly, and only in a clear and plain case.")

6  (internal citations and quotations omitted); *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126,

7  1131–32 (9th Cir. 2006) (affirming denial of an ex parte application for injunctive relief where the

8  plaintiff's evidence was "thin" and primarily relied on opinion statements of plaintiff's counsel);

9  *Stanley v. Univ. of S.C.*, 13 F.3d 1313, 1322–23 (9th Cir. 1994) (affirming the district court's denial

10  of a motion for injunctive relief where the plaintiff failed to rebut the defendant's evidence).

11  Without "serious questions" as to the likelihood of success on the merits, the Court cannot issue a

12  TRO. *All for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).

13  **A.    Petitioners Are Not Likely to Succeed on the Merits.**

14  **1.    The Coalition Has Not Demonstrated Article III Standing.**

15  Petitioner Dignity Not Detention Coalition describes itself as "a group of nearly twenty

16  community organizations." (Dkt. 1-3 at 4, ¶ 7.) But it does not appear that this coalition is a legal

17  entity. There is no record that the Coalition has registered with the California Attorney General, as

18  required by California Government Code section 12585(a), or as a tax-exempt organization with

19  the Internal Revenue Service. Nor does the Complaint allege its place of residence. "A question as

20  to legal existence is an issue of standing. This is because standing requires, among other things,

21  that the party bringing an action have a personal stake in the outcome of the case. If it does not

22  legally exist, [it] can hold no stake in the outcome of this or any case." *Northpoint Tech., Ltd v.*

23  *Directv, Inc*, 2010 WL 11444098, at *2 (W.D. Tex. Oct. 25, 2010) (internal citations omitted).

24  Unless the Coalition can prove that it has "independent legal status such that it may sue or be sued,"

25  the Court lacks jurisdiction to entertain its claims. *Levy v. Am. Med. Collections Bureau, Inc.*, 2016

26  WL 5462722, at *2 (E.D. Va. Sept. 29, 2016); *see also United Supreme Council, 33 Degree of*

27  *Ancient & Accepted Scot. Rite of Freemasonry v. United Supreme Council of Ancient Accepted*

28  *Scot. Rite for 33 Degree of Freemasonry*, 329 F. Supp. 3d 283, 289 (E.D. Va. 2018) ("[B]ecause

1   Plaintiff USC-SJ has failed to establish that it has any legal existence, it has no standing to bring

2   the claims asserted in the Amended Complaint.").

3        Whether one or more of the organizations underneath the Coalition's umbrella has standing

4   to proceed is irrelevant because they are not named as petitioners. Even then, any organization

5   seeking to proceed as a petitioner must establish its own standing. An organization does not have

6   standing simply because it is part of a coalition consisting of other organizations with similar goals

7   or beliefs. Nor does it suffice to say that the defendant's conduct has frustrated its advocacy mission

8   or caused it to divert resources in response. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602

9   U.S. 367, 394–95 (2024); *Satanic Temple v. Labrador*, 149 F.4th 1047, 1053 (9th Cir. 2025); *but

10  see Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025). Moreover, an organization

11  "cannot manufacture [its] injury by incurring litigation costs or simply choosing to spend money

12  fixing a problem that otherwise would not affect the organization at all." *La Asociacion de

13  Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Unless

14  the Coalition can establish that it has standing, its claims cannot proceed.[6]

15        **2.    CoreCivic Has a Valid CUP.**

16        Petitioners contend that the facility is in an area zoned as O-RA (Open Space –

17  Residential/Agricultural District), which does not allow for an immigration detention center, even

18  as a conditional use.[7] (Dkt. 10-3 at 6, 17.) Petitioners further contend that even if the facility is

19  considered a "correction, probation or prison" facility or service, as permitted by California City

20  Municipal Code section 9-2.402(p), CoreCivic must secure a new CUP because the prior CUP

21  allowed only a 2,304-bed facility (versus a 2,560-bed facility as currently intended). (*Id.* at 17–19.)

22  Both arguments fail.

23        First, Petitioners' contention that CoreCivic's CUP does not cover the detention of ICE

24  immigration detainees is contrary to historical precedent and the City's, Kern County's, and the

25

26        [6] Petitioner John Doe alleges that he is "currently an occupant of the Facility." (Dkt. 1-3 at 4, ¶ 9.)
    Because Petitioners have concealed John Doe's identity from Respondents, CoreCivic is unable to determine

27  whether he has ever been or is currently a detainee at the facility.

28        [7] *See* California City Municipal Code sections 9-2.401 (permitted uses), 9-2.402 (conditional uses).

State of California's interpretation of the CUP. The California City Final General Plan 2009-2028, adopted by the City Council in 2009, states the following regarding the facility:

> **6. Corrections Corporation of America (CCA) at 22844 Virginia Boulevard, California City, California,** *incorporated by reference, Environmental Impact Report (SCH #1993082030 and SEIR 1997091045). Documents are on file in the California City Planning Dept., 21000 Hacienda Blvd., California City.* California City has within its jurisdictional boundaries a minimum security, privately owned and operated prison by Corrections Corporation of America (CCA) at 22844 Virginia Boulevard, California City, California. **The California City Correctional Facility houses over 2,300 Federal detainees awaiting deportation**. The overall site is 320 acres and zoned open space/residential agricultural (O/RA), of which there is a 105-acre footprint that incorporates the existing 70-acre facility and an additional 35 acres for future expansion. This 105-acre footprint has received all of its environmental approvals.

(Ex. 2, Attach. F at 23 (bold underlining added).) Indeed, between 2000 and 2010, the facility housed criminal aliens in the custody of the BOP who would be subject to removal at the completion of their sentences, and between 2010 and 2013, the facility housed nearly 10,000 civil immigration detainees in the custody of ICE—the same population currently housed at the facility. (Dkt. 1-5, ¶ 10, 14.) The City did not require CoreCivic to obtain a new CUP for any of these populations, nor has it found CoreCivic needs one now. *See City of Monterey v. Carrnshimba*, 215 Cal. App. 4th 1068, 1091 (2013) ("[E]vidence of the City's interpretation of its own City Code 'is entitled to deference' in our independent review of the meaning or application of the law."); *Citizens for Responsible Equitable Env't Dev. v. City of San Diego*, 184 Cal. App. 4th 1032, 1041–42 (2010) ("Greater deference should be given to an agency's interpretation where 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.'" (citation omitted)); *People v. LM Connexions, Inc.*, 2019 WL 397182, at *4 (Cal. App. Jan. 31, 2019) ("In resolving that ambiguity, we may defer to the City's interpretation of its own zoning code in our independent review of the meaning or application of the law.").

The distinction Petitioners seek to draw is not recognized by other government agencies. The Kern County Assessor classifies the facility with a use code of "1716 – Detention Facility/Prison." (Ex. 1, ¶ 32 & Attach. M.) And the Certificates of Occupancy issued to the facility

by the State Fire Marshal list the occupancy classification as Institutional Group I-3. (Ex. 1, ¶ 25.) California Building Code section 308.4 defines Institutional Group I-3 occupancy to "include buildings or portions of buildings and structures that are inhabited by more than five persons who are under restraint or security." (*Id.*, ¶ 25 & Attach. J.) Section 308.4 further provides that Institutional Group I-3 "shall include, **but not be limited to** the following: Correctional Centers … **Detention centers** … Jails … Prisons … Temporary holding facility." (*Id.* [emphasis added].)

Contrary to Petitioners' claims, the CUP and Amended CUP have not expired. (Ex. 1, ¶ 19.) The City granted CUP 97-01 on January 20, 1998. (*Id.*, ¶ 12.) CUP 97-01 states, "[t]his conditional use permit expires twelve (12) months from that date of the City Council's approval if the prison facility operation is not commenced and diligently pursued."(*Id.*, ¶ 13 & Attach. B.) Because CoreCivic diligently pursued the facility by purchasing the land and commencing construction on the facility the same year, the expiration provision never triggered. (*Id.*, ¶¶ 14–16.) CUP 97-01 further authorizes CoreCivic "to establish and operate a prison facility … for as long as the use is conducted in accordance with the use permit." (*Id.*, Attach. B.) CoreCivic has operated the facility consistently with CUP 97-01 throughout its existence. (*Id.*, ¶ 30; Dkt. 1-5, ¶¶ 10–18; Ex. 3: J. Malloy Decl., ¶¶ 5–8.)

Moreover, the City has never taken any action to revoke the CUP or Amended CUP. (Ex. 1, ¶ 19.) *Carrnshimba*, 215 Cal. App. 4th 1068, 1091. California City Municipal Code section 9-2.2502(a) provides that a CUP when "granted shall run with the land and shall continue to be valid upon a change of ownership" and "shall expire on the date specified by the Commission … unless the permit is extended or revoked."[8] Section 9-2.2502(c) further provides that "[n]otice of revocation shall be sent to the persons responsible for compliance by the Planning Director" and "[t]he same notice and hearing procedure shall be used for revocation as for consideration of a conditional use permit." These requirements are consistent with the City's constitutional due process obligations, which prohibit the state from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. If the City were to attempt to revoke

---

[8] Copies of cited California City Municipal Code sections are provided in Ex. 2, Attach. HH.

1  the CUP without complying with these revocation requirements, the City would be in violation of

2  not only its own regulations but also CoreCivic's constitutional rights.

3       As to Petitioners' bed-capacity argument, while the text of the CUP provides for a 2,304-

4  bed facility, the plans, as approved and as built, included an additional 260 segregation and medical

5  beds. (Dkt. 1-5, ¶ 7.) In 2010, the City entered into an IGSA permitting the USMS and ICE to use

6  more than 2,500 beds at the facility. (Ex. 3, ¶ 6 & Attach. A at 1.) In 2014, the City confirmed that

7  a land use review had been completed and provided authorization and full permitting for use of

8  2,560 beds. (Ex. 1, ¶ 23 & Attach. G.) Thus, the existing CUP is valid.

9       **3.    SB 29 Does Not Apply to CoreCivic's Operation of the Facility.[9]**

10      California Civil Code section 1670.9(d) states that a "city, county … or public agency shall

11  not, on and after January 1, 2018 … issue a **permit** for the building or reuse of existing buildings

12  by any private corporation, contractor, or vendor to house or detain noncitizens for the purposes of

13  civil immigration proceedings unless" it has provided 180 days' notice and two public hearings on

14  the proposed permit. (Emphasis added.) Petitioners' attempt to read "license" into section 1670.9(d)

15  is not supported by its plain language—there is no mention of a "license" anywhere in the text of

16  section 1670.9(d); rather, its reach is limited to "a **permit** for the building or reuse of existing

17  buildings." (Emphasis added.) The California Legislature knows the difference between a license

18  and a permit and uses the word "license" when it intends to do so, including in this Title. *See, e.g.*,

19  Cal. Civ. Code §§ 1670.8.5(a), 1670.8.5(c)(2), 1785.27(d), 1798.69(a), 1812.302(e). The

20  Legislature did not include business licenses in a statutory provision aimed at building permits and

21  zoning actions, which makes sense given the differences between these instruments. *See San

22  Gabriel Trib. v. Super. Ct.*, 143 Cal. App. 3d 762, 779 (1983) ("[A] license, defined 'as a permission

23  or privilege to do what otherwise would be unlawful,' is most typically 'employed to designate

24  official municipal authorization of a continuing business or activity.'"). Unlike approvals for

25  building permits and zoning actions, which often require the exercise of professional judgment and

26

27      [9] CoreCivic reserves its argument that SB 29 applies only when there is a contract between a California "city, county, city and county, or local law enforcement agency" and the federal government. *See, e.g.*, Cal. Civ. Code §§ 1670.9(a), (b). But even standing alone, subsection (d) and its notice and hearing

28  requirements do not apply to business licenses. (Ex. 2, Attach. GG at 3.)

1  discretion by a city or county planning department and inspection by trained and licensed

2  professionals, approval of a business license is a purely ministerial function, requiring only that the

3  licensee submit an application and pay a fee. As long as the proposed business is not expressly

4  prohibited by the City Code, the City does not have discretion to deny it.

5  The Co-Sponsors of SB 29 state its purpose is to promote "more public transparency and a

6  specific public comment period for whenever a privately-run immigration detention facility is

7  trying to expand, buy, or lease property." (Ex. 2, Attach. GG at 2.) Their goal was to impact the

8  national immigration detention landscape and ultimately outlaw immigration detention in the

9  United States. (*Id.*) This limited interpretation is at odds with the position they are taking here.

10  Petitioners' reading of SB 29 is also inconsistent with actions taken by other public entities

11  falling within the statute's ambit, including Kern County and the State of California. The California

12  Department of Public Health issued CoreCivic a Clinical and Public Health Laboratory License

13  "authorizing operation of a clinical laboratory" at the facility, the California Bureau of Security and

14  Investigative Services issued CoreCivic a Private Patrol Operator Branch license to allow for armed

15  transports to and from the facility, and Kern County issued CoreCivic an Environmental Health

16  Permit to operate the facility as a Food Facility—all without following SB 29's notice and comment

17  provisions. (Ex. 4: C. Chestnut Decl., ¶ 93 & Attach. A, B; Ex. 2, ¶ 26.) The City similarly

18  recognizes the boundaries of section 1670.9, having approved CoreCivic's sign permit for the

19  facility the same day it was submitted. (Ex. 1, ¶ 24.) The Court should not countenance Petitioners'

20  attempt to expand the reach of section 1670.9(d) beyond that expressly stated by the Legislature.

21  **4.    Petitioners' Claims Are Barred by the Supremacy Clause.[10]**

22  Under the Supremacy Clause, federal law is "the supreme Law of the Land … any … Laws

23  of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause can

24  invalidate a state law under the doctrines of intergovernmental immunity or preemption. *United*

25

26  [10] Due to the government shutdown, CoreCivic is presently unable to obtain a Statement of Interest from the United States in support of its opposition. However, the United States has filed statements of
27  interests in other similar actions in which states have attempted to interfere with the operation of ICE detention centers. *See, e.g., CoreCivic, Inc. v. City of Leavenworth*, No. 2:25-cv-02457-TC-GEB (D. Kan.),
28  Dkt. 27; *CoreCivic, Inc. v. Murphy*, No. 3:23-cv-00967-RK-TJB (D.N.J.), Dkt. 37.

*States v. California*, 921 F.3d 865, 878 (9th Cir. 2019). For substantially the same reasons articulated in *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025); *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), and *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), both doctrines bar Petitioners' claims.

### a.    SB 29 Violates Intergovernmental Immunity.

"[T]he intergovernmental immunity doctrine prohibits states from 'interfering with or controlling the operations of the Federal Government.'" *King County*, 122 F.4th at 756. It "prohibits state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals (e.g., contractors)." *Geo Grp.*, 50 F.4th at 758 (quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)). "A state law regulates the United States directly when it 'places either a prohibition' or mandate on the federal government," or "substantially interferes with the federal government's activities." *CoreCivic*, 145 F.4th at 321 (citations omitted); *Geo Grp.*, 50 F.4th at 759 & n.8 (citations omitted). "[A] state law discriminates against the federal government when it 'treats similarly situated state and federal actors differently in a way that cannot be explained by 'significant differences' between the two." *CoreCivic*, 145 F.4th at 321. SB 29 does both.

By its plain terms, SB 29 prohibits the federal government and its contractors from contracting with California cities, counties, or law enforcement agencies for the detention of civil immigration detainees and further prohibits a California city, county, or public agency from conveying land or issuing building permits to federal contractors for the purpose of housing civil immigration detainees unless certain conditions are met. Cal. Civ. Code §§ 1670.9(a), (b), (d). These provisions directly regulate the federal government "by banning contracts that only the federal government can make" and "substantially interfering with a core federal function"— enforcement of the United States' immigration laws.[11] *See CoreCivic*, 145 F.4th at 325–38 (striking

---

[11] "Federal law gives federal officials discretion to contract for immigration detention." *CoreCivic*, 145 F.4th at 327 (quoting 8 U.S.C. § 1231(g), 48 C.F.R. § 3017.204-90, 8 C.F.R. § 235.3). Moreover, a state law that regulates or discriminates against a federal contractor is similarly barred by the Supremacy Clause. *King County*, 122 F.4th at 756; *CoreCivic*, 145 F.4th at 322–23, 325–26, 329; *Geo Grp.*, 50 F.4th at 75, 758–60.

1  New Jersey law banning local governments and federal contractors from "making, renewing, or

2  extending any contract to detain people for civil immigration violations"); *Geo Grp.*, 50 F.4th at

3  758 (striking California statute prohibiting the operation of a private detention facility).

4      Although § 1670.9(d) places conditions on the conveyance of land and issuance of a

5  building permit that may be satisfied, it nonetheless prohibits the federal government from engaging

6  in a core federal function (the detention of civil immigration detainees) for "at least 180 days," and

7  it leaves to the discretion of the local government whether and when to provide notice to the public,

8  schedule public meetings, and execute a permit. Thus, it impermissibly requires the local

9  government to control whether the federal government is allowed to perform that federal function.

10  *See Geo Grp.*, 50 F.4th at 757–58 ("If California had passed a licensing scheme requiring private

11  detention operators in California to obtain a state license, there is no doubt that it would be struck

12  down …. There is 'no important difference' for Supremacy Clause purposes between a state

13  'requiring a permit' and 'ordering compliance with state regulations.") (citation omitted); *see also*

14  *Pub. Utilities Comm'n of State of Cal. v. United States*, 355 U.S. 534, 535–39 (1958) (striking state

15  law requiring private carriers to obtain state approval before charging the federal government

16  reduced rates and noting that the federal government cannot "be subjected to the discretionary

17  authority of a state agency for the terms on which, by grace, it can make arrangements for services

18  to be rendered it"); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188–90 (1956) (striking state law

19  that imposed licensing requirements on federal contractor); *Johnson v. Maryland*, 254 U.S. 51, 57

20  (1920) (striking state law that barred federal contractors "until they satisfy a state officer upon

21  examination that they are competent"); *Geo Grp.*, 50 F.4th at 760 (striking AB 32 because it

22  "give[s] California a 'virtual power of review' over ICE's detention decisions and allow[s] the

23  'discretion of the federal officers to be exercised only if the state approves'") (citations omitted).

24      Section 1670.9 also impermissibly discriminates against the federal government and its

25  contractors "'by singling out' out the federal government and its contractors 'for unfavorable

26  treatment'" and "regulating them unfavorably on some basis related to their governmental 'status.'"

27  *King County*, 122 F.4th at 757 (quoting *Washington*, 596 U.S. at 839). On its face, SB 29 applies

28  only to "the federal government or any federal agency or private corporation" and "any private

-12-

corporation, contractor, vendor" that "house[s] or detain[s] noncitizens for purposes of civil immigration proceedings," i.e., federal immigration contractors. Cal. Civ. Code §§ 1670.9(a), (b). Indeed, in enacting SB 29, California declared that "it is the intent of the Legislature that this bill declare that the state does not tolerate profiting from the incarceration of Californians held in immigration detention." S.B. 29, 2017 Cal. Legis. Serv. Ch. 494, § 1(a) (enacted). Because "the only entity in the business, so to speak, of [housing] immigration detainees, is the federal government," *King County*, 122 F.4th at 757, SB 29 impermissibly discriminates against the federal government in violation of the Supremacy Clause.

### b.    SB 29 Is Preempted.

"Obstacle preemption applies when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Geo Grp.*, 50 F.4th at 762 (quoting *California*, 921 F.3d at 879). "Congress sought to delegate to the [Department of Homeland Security] Secretary the responsibility to 'arrange for appropriate places of detention'" for civil immigration detainees. *Id.* (quoting 8 U.S.C. § 1231(g)); *see also* 28 U.S.C. § 530C(a)(4) (authorizing Secretary to carry out the immigration enforcement activities of the [DHS] in his "reasonable discretion" "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties"); 6 U.S.C. § 112(b)(2) (authorizing Secretary "to make contracts … as may be necessary and proper to carry out [his] responsibilities"). SB 29 "frustrates that congressional intent" because it "regulate[s] whether or where an immigration detainee may be confined" and causes "active frustration of the federal government's ability to discharge its operations." *Geo Grp.*, 50 F.4th at 762; *see also CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 491–93 (D.N.J. 2023) (ruling that New Jersey law banning immigration detention facilities "conflicts not just with the federal government's determination of the manner of detention but also on its decision whether or not to detain someone at all"). It is therefore preempted.[12]

---

[12] The presumption against preemption does not attach to SB 29 because the statute "interfere[s] with inherently federal relationships" between the federal government and its contractors. *Geo Grp.*, 50 F.4th at 762; *see also Murphy*, 690 F. Supp. 3d at 487 ("[T]he State's mere reference to its health and safety interests is insufficient alone to invoke the presumption's protections and end the Court's inquiry.").

### c. CoreCivic Is Entitled to Derivative Sovereign Immunity.

The Supreme Court has held that "there is no ground for holding the government's agent liable who is simply acting under the authority thus validly conferred." *Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir. 2022) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–22 (1940)). Thus, a federal contractor is immune from liability if it acted at the behest of the federal government and followed the government's directives. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) ("Where the Government's 'authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress,' we explained, 'there is no liability on the part of the contractor' who simply performed as the Government directed.") (quoting *Yearsley*). Here, ICE determined that its urgent need for detention space made it necessary for the facility to begin accepting detainees immediately, even if there were delays in obtaining a business license from the City. (Dkt. 1-4, ¶ 10.) ICE directed the first transfers of detainees into the facility on August 27, 2025. (Dkt. 1-5, ¶ 21.) Thus, CoreCivic is immune.

### B. Petitioners Have Not Shown They Will Suffer Irreparable Harm.

Irreparable harm is harm that constitutes a "presently existing actual threat," that could be remedied by a preliminary injunction. *Dixon v. Larosa*, 2010 WL 4982530, at *1 (E.D. Cal. Dec. 2, 2010) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130–131 (1969)); *accord Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). An injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged [] – a 'likelihood of substantial and immediate irreparable injury.'" *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter*, 555 U.S. at 22.

#### 1. Petitioners' Delay in Seeking Relief and the Specific Injuries Alleged Do Not Support a Finding of Immediate and Irreparable Harm.

Petitioners filed their complaint on September 16, 2025, and CoreCivic removed the matter to federal court on October 1, 2025. (Dkt. 1, 1-3.) Petitioners filed their TRO in state court that same day. They did not refile their Application in this Court until October 17, 2025. (Dkt. 10.)

1    Their 16-day delay in seeking this Court's immediate relief alone weighs heavily against a finding

2    of irreparable harm. *See Avitan v. Kirchmeyer*, 2023 WL 2372384, at *1 (C.D. Cal. Jan. 20, 2023)

3    ("[A] party's delay in seeking relief weighs against granting a TRO or preliminary injunction."). If

4    Petitioners reasonably believed that immediate and irreparable harm would ensue from the facility's

5    continued ramp up, they should have acted with greater haste, particularly given their own

6    admission that their federal and state court filings are nearly identical.

**2.    Petitioners' Allegations of Direct Harm Are Insufficient.**

8        The asserted harm to Petitioner Dignity Not Detention Coalition is that some of its member

9    groups have diverted resources to challenging the opening and continued operation of the facility.

10    (Dkt. 10-4, ¶ 14.) But economic injury does not constitute irreparable harm as required to warrant

11    granting an injunction. *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944

12    F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury alone does not support a finding of irreparable

13    harm, because such injury can be remedied by a damage award."). And contrary to Petitioners'

14    assertion that the public, including members of Petitioner Dignity Not Detention Coalition, will be

15    deprived of the opportunity to have their voices heard if the Court does not enjoin the City from

16    issuing "further approvals to the Facility in violation of the City's Municipal Code and SB 29"

17    (Dkt. 10-3 at 6), a review of recent City meetings occurring since CoreCivic and ICE entered into

18    the contract to reopen the facility reveals that there have been 284 public comments received

19    regarding the facility to date.[13] (Ex. 2, ¶¶ 33, 49.) Additionally, the agenda for the upcoming

20    October 28, 2025 City Council meeting includes a "Hearing on CoreCivic['s] Operation of an

21    Immigrant Detention Facility within the City." (Ex. 2, Attach. FF at 12.)

22        Although not clearly stated, it appears that the alleged harm to John Doe is being subject to

23    conditions of detention at the facility that he views as more akin to being in a prison than he

24    experienced at a prior detention facility. There are several flaws with this argument. First, it

25    contradicts Petitioners' position that CoreCivic needs a new CUP to operate the facility due to an

26    alleged change in use. Second, this lawsuit is not the appropriate vehicle to challenge John Doe's

---

[13] Pursuant to the Brown Act, Gov. Code § 54950 *et seq.*, members of the public can be heard on any topic at a meeting of the legislative body of a local agency even if the item is not listed on the agenda.

continued detention, the conditions of detention, or the location thereof. To challenge the conditions of his detention, he would need to file a state court tort action and to challenge the fact of his detention, he would need to file a federal habeas corpus action.[14] As to location, courts have routinely held that there is no right to incarceration or detention in any particular facility. *See Nielsen v. Thornell*, 101 F.4th 1164, 1172 (9th Cir. 2024) ("[T]he Constitution does not give prisoners a right to demand placement at their preferred facility."); *see also Meachum v. Fano*, 427 U.S. 215, 224 (1976). Moreover, Petitioners have not named ICE as a party, and CoreCivic lacks authority to transfer John Doe to another facility. Third, Petitioners have not asserted—nor can they—that their requested relief would have any impact on the complained of conditions of detention at the facility. At most, the injunction would merely delay the issuance of a business license to CoreCivic, a purely ministerial exercise, but would have no effect on the manner in which the facility is operated. Because the proposed injunction would not remedy John Doe's alleged injury, Petitioners cannot establish that he would suffer irreparable harm if the Court denies their request. *See Padilla v. City of McFarland*, 2022 WL 17546281, at *13 (Cal. App. Dec. 9, 2022) (no irreparable harm where injunction "would not mitigate this threat since the detainees currently being held at the facilities would remain there").

### 3. John Doe's Allegations Regarding His Conditions of Detention Are Inaccurate and Would Not Be Addressed by the Requested Injunction.

John Doe's Declaration[15] contains outright falsehoods and fails to establish any present, irreparable harm that could be addressed through the requested injunction. Contrary to John Doe's assertions, the facility is not "overcrowded" or "packed" with detainees. (Ex. 4, ¶ 11.) The facility is currently operating at only one-third capacity, and the physical plant is designed to accommodate

---

[14] A review of the docket in the Eastern District of California reveals that a habeas petition has recently been filed by a "John Doe." *See* Case No. 1:25-cv-01372-CDB. Because Petitioners refuse to reveal the identity of John Doe to Respondents or their counsel, CoreCivic is unable to determine whether the same individual is involved in both proceedings. If John Doe is the same individual and obtains habeas relief, he will no longer have standing in this action.

[15] For the purposes of this Response, CoreCivic refers to the redacted version of John Doe's Declaration that was emailed to undersigned counsel on October 17, 2025. If the Court orders Petitioners to reveal his identity, CoreCivic reserves the right to file a supplemental response addressing the allegations in his Declaration specific to medical care and alleged retaliation.

1  its full capacity without crowding. (*Id.*) Despite John Doe's claim that detainees are forced to eat

2  meals on the floor because there are not enough seats, the number of seats at the tables in the day

3  room of each general population housing pod equals the number of detainees in the pod. (*Id.*, ¶ 20.)

4  Detainees are provided nutritious meals approved by a registered dietician based on USDA

5  guidelines, and they have access to the same drinking water as the residents of California City. (*Id.*,

6  ¶¶ 61-66.) Petitioners assert that John Doe "has been denied medication needed to manage his

7  diabetes" (Dkt. 10-3 at 13), yet he contradicts this by stating in his Declaration that he was provided

8  a packet of his medication to keep on person ("KOP").[16] Medications that are not designated as

9  KOP are delivered to detainees twice a day on medication carts in the housing units. (Ex. 4, ¶¶ 67–

10  68.) Detainees are provided cleaning chemicals and supplies to clean their cells, and detainees

11  participating in the voluntary work program are assigned to clean the showers and common areas

12  daily. (*Id.*, ¶ 32.) Detainees have access to law library research applications, including Lexis Nexis,

13  on the tablets, and there is a legal kiosk in each housing pod. (*Id.*, ¶¶ 34, 36.) The tablets also allow

14  for video visitation, electronic messaging, entertainment applications, as well as access to facility

15  forms, including sick call requests and grievance forms. (*Id.*, ¶ 34.)

16       John Doe's criticisms of the response to an attempted suicide in his pod on October 9, 2025,

17  are also unfounded. (*Id.*, ¶ 88.) Contrary to his allegation, there were four staff members present in

18  the pod at the time of the incident, and they immediately responded. (*Id.*) Other corrections and

19  medical staff also rapidly deployed to the pod, well within policy timelines. (*Id.*) Most officers at

20  the facility carry cut-down tools on their belts, but no tool was needed for this incident, as the first

21  officer to respond was able to remove the ligature without cutting it. (*Id.*) Notably, this officer also

22  successfully intervened to prevent the same detainee from a previous suicide attempt. (*Id.*)

23

24  _____

25       [16] Without knowing John Doe's identity, CoreCivic is unable to review his records to address his allegation that he was denied medication for flu-like symptoms shortly after his transfer. (Doe Decl., ¶ 22.)

26  Likewise, Petitioners have not provided the name of the detainee John Doe alleges was awaiting surgery and was told by staff that he was faking his injuries and forced to walk. (*Id.*, ¶ 23.) However, a detainee who was scheduled for surgery prior to being transferred to the facility and reported to staff that he was having

27  difficulty walking was evaluated by medical staff onsite, referred for an offsite surgical consult, and provided a wheelchair. (Ex. 4, ¶ 71.) The facility has a large supply of wheelchairs that can be provided to detainees

28  who are determined by medical staff to have a clinical need for them. (*Id.*)

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

**4.  Petitioners' Reliance on a July 2025 Safety Inspection Is Misplaced.**

Petitioners' attempt to paint the facility as a dangerous place based on a July 22, 2025 fire and safety inspection at the facility fails. (Dkt. 10 at 14.) The primary finding during that inspection was that a portable fire department radio did not have a signal in a few of the areas tested throughout the facility by then Director of Public Safety Justin Vincent. (Ex. 1, ¶ 41; Ex. 3, ¶ 12.) There were also three minor findings during the inspection: (1) the facility did not have "704 placards" posted to indicate to first responders the location of potentially hazardous materials; (2) there was no key for first responders to use to access the secure perimeter of the facility in the Knox box outside the facility gate; and (3) there was an exit sign above a door in the visitation room that led out to an enclosed courtyard. (Ex. 3, ¶ 12; Ex. 4, ¶ 89.) Each of these findings was promptly addressed by CoreCivic prior to any detainees entering the facility. (Ex. 3, ¶ 15; Ex. 4, ¶¶ 89–90.)

Following the inspection, and at Director Vincent's recommendation, CoreCivic hired the City's radio consultant to address radio transmissions within the facility. (Ex. 3, ¶ 14; Ex. 4, ¶ 42.) The temporary solution consisted of CoreCivic's purchase of a repeater trailer at a cost of $75,000 to boost the radio signal to the facility and having emergency responders switch their radios to a different channel when entering the facility. (Ex. 3, ¶¶ 14–15, 17; Ex. 4, ¶ 45.) On August 7, 2025, the City tested and approved this temporary solution—nearly three weeks prior to any detainees entering the facility. (Ex. 3, ¶ 18; Ex. 4, ¶ 45.) That same day, the Deputy Fire Marshal issued a fire clearance for the facility and told CoreCivic to "contact city hall to obtain your business license." (Ex. 3, ¶ 18.) Deputy Fire Marshal Hightower also gave CoreCivic 90 days to install a permanent solution to boost radio signals in the facility. (Ex. 4, ¶ 45.) For the permanent solution, CoreCivic hired Berk-Tel Communications to install an emergency responder radio system in the facility at a cost of nearly $700,000. (*Id.*, ¶ 46–48.) The City Fire Department and Kern County Communications tested and confirmed that the emergency responder radio system was fully operational on October 14, 2025, well ahead of the 90-day deadline set by the City. (*Id.*, ¶ 48.)

And while a July 29, 2025, correspondence from City Manager Chris Lopez stated CoreCivic would be unable to address the City's remaining safety concerns within 120 days (Dkt. 11 at 76–78) , the only other concern articulated by the City was that police, fire, and EMS

-18-

responses to the facility would strain the City's budget. (Ex. 3, ¶ 19.) CoreCivic fully addressed this concern on August 8, 2025, through letters from CoreCivic's Chief Corrections Officer and General Counsel. (*Id.*, ¶¶ 20–21.) It explained that the ICE detainee population tends to generate fewer incidents requiring emergency response than other populations, assured the City that CoreCivic has sufficient resources onsite and regionally to respond to major security incidents at the facility, and noted that there have been no fire department responses to the facility during the entirety of its operation and CoreCivic has contracted with an ambulance service for any emergency medical transports, and agreed to reimburse the City for the cost of any future police, fire, or EMS responses to the facility. (*Id.*) On September 29, 2025, the City's Acting Director of Public Safety and Deputy Fire Marshal toured the facility and had no further concerns. (Ex. 4, ¶ 91.) Since then, the City has not notified CoreCivic of any additional fire or safety concerns with the facility. (*Id.*, ¶ 92.)

### 5. Petitioners' Contentions Regarding Heat and Environmental Impacts Are Unfounded.

Petitioners claim the facility "will cause imminent harm because it is ill-equipped to handle extreme heat events." (Dkt. 10-3 at 15.) This is false. The entire facility is equipped with central air conditioning, including in all areas accessible by detainees. (Ex. 4, ¶ 8.) Additionally, precautions are taken to minimize the risk of heat-related incidents during outdoor recreation, including providing coolers with drinking water, limiting outdoor recreation to one-hour blocks and allowing detainees to come in early, and curtailing outdoor recreation during heat waves. (*Id.*, ¶ 9.)

Petitioners also assert that City residents "will suffer the negative externalities of the facility's intensifying operations, including dust and other air quality impacts" from increased transfers and visitation and daily court transports, resulting in "unstudied and unmitigated impacts to their wellbeing." (Dkt. 10-3 at 16.) These contentions fail for multiple reasons. First, the facility conducts court proceedings and asylum hearings through video teleconferencing ("VTC") in dedicated VTC rooms onsite. (Ex. 4, ¶ 81.) In fact, there has not been a single court transport since the facility was reactivated. (*Id.*) Additionally, the facility has installed soundproof booths for virtual attorney visits. (*Id.*, ¶ 79.) And while the facility does allow for onsite visitation, most

-19-

detainees elect to connect with their friends and families through video visits on the tablets provided to them in the housing units. (*Id.*, ¶ 77.) Moreover, the ICE detainee population tends to have fewer offsite transports than other federal populations, such as USMS or state prisoner populations, both of which have historically been housed at the facility. (*Id.*, ¶ 87; Ex. 3, ¶ 25.)

Second, the facility is on a remote parcel located approximately seven miles outside the City proper with no neighbors, and the entire route from California City to the facility is paved, limiting any potential dust or noise impacts. (Ex. 4, ¶ 94, Ex. 2, ¶¶ 16–17 & Attach. D, E.) Moreover, California City is a popular destination for offroad enthusiasts, who take advantage of over 1,800 miles of combination use roads/dirt trails and 33.5 miles of designated OHV trails in and around California City, including a large offroad recreation area located directly off the road between the City and the facility. (Ex. 2, Attach. H, I.) California City is also host to Wasteland Weekend, an annual, five-day Mad Max festival, with thousands of people camping in the desert in post-apocalyptic costumes and vehicles to enjoy concerts, films, vehicle cruises, and movie reenactments. (*Id.*, Attach. J–M.) These activities generate far greater dust, noise, and impact on the surrounding area than the facility.

Finally, the environmental impacts of the facility were studied prior to the approval and issuance of the CUP in 1998.[17] (Ex. 1, ¶¶ 5–12.) In addition to the current facility and the approved 512-bed expansion on the same site, CoreCivic has also obtained environmental approvals and a CUP for the construction and operation of a 2,200-bed facility on the adjacent 35-acre parcel. (*Id.*, ¶ 17, 20–21.) The 2009 Addendum to the Final Subsequent EIR concluded that the proposed second 2,200-bed facility would not have significant operational impacts relating to traffic, air quality, noise, or other factors required for consideration under the CEQA. (*Id.*, ¶ 20.) Moreover, the environmental approvals for the facility and other projects were based on evaluation of data regarding vehicle emissions from then-existing vehicles, which were substantially higher than those generated by current vehicles. (Ex. 2, Attach. G at 3–4, 6.)

Petitioners cannot demonstrate imminent harm based on generalized, highly speculative,

---

[17] There was also a certified EIR in 1994 for a 2,200-bed prison or up to a 4,400-bed prison complex proposed by CDCR on the site of the current facility. (Ex. 1, ¶¶ 5–6.)

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

and unsupported environmental allegations. *See Nevada v. United States*, 364 F. Supp. 3d 1146, 1156 (D. Nev. 2019) ("Nevada's claims of other harms, including environmental injury, are too speculative to rise to the level of the required likelihood of irreparable harm."); *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) ("[C]onclusory allegations of an environmental injury, without more, are insufficient to meet the requirements for an injunction.").

### 6. Articles Regarding Past Incidents Occurring at Other Facilities Do Not Support a Finding of Imminent Harm at the Facility.

Petitioners attempt to recast prior alleged harms into a present risk to distract from a lack of evidence supporting the requested injunction. But the majority of Petitioners' alleged "support" for a finding of imminent harm at the facility consists of media and other reports related to *past* incidents at *other* facilities—some of which date back over a decade.[18] Petitioners also cite articles and reports involving *past* incidents at *non-CoreCivic* facilities.[19] Petitioners additionally include two historical documents regarding the facility. (Ex. 6 [report regarding 2013 tour findings]; Ex. 15 [temporary water line break at the facility during CDCR lease in 2023].)

Critically, none of the alleged past incidents resulted in a judicial determination of liability against CoreCivic. To the contrary, in one of the alleged incidents (Petta Decl., Ex. 32), CoreCivic obtained a full defense verdict. *See Coyoy v. CoreCivic*, Case No. SA-19-CA-00916-FB (W.D. Tex.), Dkt. 153-1, ¶ 22; Dkt. 206; Dkt. 212. And in another (Petta Decl., Ex. 28), a federal judge denied the plaintiffs' request for class certification on their claims that CoreCivic coerced them into working. *See Barrientos v. CoreCivic, Inc.*, 2023 WL 2666852 (M.D. Ga. Mar. 28, 2023).

---

[18] *See* Petta Decl., Ex. 23 (CRCL report citing 2012 articles noting complaints from detainees regarding maggots in the food at a facility in Georgia); Ex. 24 (CRCL report noting a 2018 medical death at a facility in Arizona and a 2017 suicide at a facility in Georgia; the report also cites deaths at two non-CoreCivic facilities in 2017); Ex. 25 (ACLU Written Statement discussing detention officer who sexually assaulted female detainees as he was transporting them to the airport for deportation flights);[18] Ex. 27 (article regarding 2018 suicide at a Georgia facility); Ex. 31 (article regarding 2022 suicide at a New Mexico facility), Ex. 32 (article regarding 2018 death occurring six weeks *after* the infant's release from a Texas facility).

[19] *See* Ex. 17 (article on attempted and completed suicides at facilities in Louisiana and Pennsylvania); Ex. 23 (detainee complaints about food at the Willacy County Correctional Facility in Texas and the Etowah County Detention Center in Alabama); Ex. 24 (citing deaths at two facilities in 2017); Ex. 37 (reviewing grievances filed at the Mesa Verde and Golden State Annex facilities); Ex. 38 (ACLU report discussing hunger strikes at a family residential center run by Berks County, Pennsylvania and the Yuba County Jail).)

Petitioners' "parade of horribles" is unavailing, as the Court cannot issue an injunction to punish alleged past acts. *See Padilla*, 2022 WL 17546281, at * 7 ("Since the 'purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act,' injunctive relief is available 'only to prevent threatened injury and has no application to wrongs that have been completed.'") (citation omitted).

Petitioners also cite a few recent articles regarding *other* CoreCivic facilities. (Ex. 17 (suicide in Georgia); Ex. 29 (alleged water shortage and flooding in New Mexico); Ex. 30 (article regarding death of detainee in transit from a local county jail to a Georgia facility; the coroner reportedly stated that the county should have sent the detainee to the hospital instead of transferring him).) These articles fail to establish a clear and present need for equitable relief where Petitioners merely speculate that similar harms *could* conceivably occur at this facility. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."); *Caribbean Marine Servs.*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction"); *Uhlig LLC v. CoreLogic, Inc.*, 2021 WL 5758564, at *3 (D. Kan. Dec. 3, 2021) (holding an "irreparable harm … must be certain, great, actual, and not theoretical.").

The few contemporaneous articles Petitioners cite that actually refer to alleged conditions at the facility (Ex. 11; Ex. 18; Ex. 22) constitute hearsay that should be given little to no weight[20] and fail to establish the likelihood of irreparable injury because they contain only vague and conclusory statements by unnamed individuals. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc*., 750 F.2d 1470, 1473 (9th Cir. 1985) (finding irreparable harm not established by statements that "are conclusory and without sufficient support in facts"); *State v. Musk*, 769 F.Supp.3d 1, 6 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court."). Moreover, these allegations are rebutted by

---

[20] While courts have latitude to consider hearsay evidence in the preliminary injunction context, *see Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 507 F.Supp.2d 1096, 1114 (C.D. Cal. 2007), the Court should still weigh the evidence based on whether it would be admissible under the Federal Rules of Evidence. *See Mullins v. City of New York*, 634 F.Supp.2d 373, 384 (S.D.N.Y. 2009).

CoreCivic's Declarations and other competent evidence regarding current conditions at the facility as stated above in Section III.B.1–3. In sum, Petitioners have not established present, immediate, and irreparable harm that can be addressed through the requested relief.

### C.    The Balance of Equities Does Not Tip in Petitioners' Favor.

This factor requires the Court to balance the alleged irreparable harm claimed by Petitioners against the harm that issuance of an injunction would cause CoreCivic. Petitioners' asserted harms are speculative and almost entirely based on past incidents at other facilities. While Petitioners contend that they have an interest in the enforcement of state and local laws and ordinances, CoreCivic also has an interest in their fair and appropriate enforcement. And CoreCivic has an even stronger interest in the protection of its property rights and investments and opportunities related to those property rights. The harm that a TRO will cause CoreCivic far outweighs any threatened or purported injury Petitioners have identified. *See, e.g.*, *Park Village Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("It is well-established that the loss of an interest in real property constitutes an irreparable injury."); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (describing "unique nature" of property interest and finding significant, irreparable harm where property owner would be denied "unfettered ownership of … property").

CoreCivic has devoted substantial time and resources in reactivating the facility to fulfill its contractual obligations to ICE. CoreCivic has invested more than $22 million for staffing and equipping the facility, including spending nearly $800,000 to install temporary and permanent radio signal boosting equipment at the City's request, and has committed to spend $5.3 million in incremental capital costs to convert existing program space to immigration courtrooms and offices for use by ICE. (Dkt. 1-5, ¶ 26; Ex. 1, ¶¶ 45, 48.) CoreCivic has a run rate of approximately $4.5 million in monthly operating costs to maintain the facility in its current state with a projection to reach a normalized run rate of approximately $7.5 million in monthly operating costs. (Dkt. 1-5, ¶ 26.) These investments cannot be recouped if the facility ramp up is enjoined and the detainee population is capped at current numbers. (*Id.*, ¶ 27.) This is because the contract value increases based on occupancy rates. (*Id.*, ¶ 25.) The contract is valued at more than $10 million per month,

-23-

1  or $130 million annually, at full occupancy. (*Id.*) If CoreCivic were enjoined from accepting any

2  new intakes from ICE at the facility, CoreCivic would lose millions of dollars per month in revenue

3  from the contract.

4         Moreover, CoreCivic's relationship with ICE depends on delivering timely service in the

5  highly competitive field of private immigrant detention at various locations nationwide. (*Id.*, ¶ 28.)

6  The facility is essential to ICE's operations, and enjoining CoreCivic from accepting new ICE

7  detainees would severely disrupt ICE's ability to discharge its statutory duties and strain

8  CoreCivic's relationship with ICE, as CoreCivic would be unable to fulfill its contractual

9  obligations, and ICE would be forced to find other facilities to house its detainees.[21] (*Id.*)

10        While Petitioner Dignity Not Detention Coalition claims that it has expended resources to

11  monitor the facility and voice its concerns, these unquantified expenditures, consisting of

12  attendance at City meetings and conversations with detainees (Dkt. 10-4, ¶ 14), are minor in

13  comparison to the substantial harm that CoreCivic would face if the Court were to enjoin it from

14  accepting new intakes. The Court should find that the balance of equities tips in CoreCivic's favor.

15        **D.    Issuing the Requested Injunctive Relief Is Not in the Public Interest.**

16        The Court cannot issue injunctive relief without intruding on ICE's congressionally

17  approved mandate to enforce immigration laws. The requested injunction would also deprive the

18  City and its residents of valuable revenue and employment opportunities.[22] Moreover, a ruling that

19  SB 29 applies to licenses or permits for the facility, even permits for minor repairs, would force

20  CoreCivic to wait six months to make necessary repairs, such as fixing plumbing or re-roofing to

21  stop leaks. Doing so would be to the detriment of detainees and staff who live and work in the

22  facility at no corresponding public benefit. Petitioners' alleged interest in enforcing City and State

23  _____

24        [21] The other ICE detention facilities in California are all at or near capacity, and ICE would either
      need to exceed capacity limits at its existing California facilities or transfer detainees greater distances to
25  detention facilities in other states, such as Nevada, Arizona, and Texas, where they would be further away
      from support that they may receive from family, friends, legal networks, or support groups located in
26  California. (Dkt. 1-4, ¶ 12.)

27        [22] The City Public Works Department estimates that the earlier than anticipated opening of the
      facility will increase its revenue by $300,000 to $400,000, enabling the City to purchase two much needed
28  vehicles for the Wastewater Division. (Ex. 2, Attach. EE.) When operating at full capacity, the facility will
      also employ nearly 500 people. (Ex. 4, ¶ 95.)

1   laws pertaining to CUPs and business licensing does not warrant a TRO, where CoreCivic has a

2   valid CUP and approval from the City for the full capacity of the facility, CoreCivic has a pending

3   business license application which is subject to approval by the City as a purely ministerial act, SB

4   29 does not apply to this facility or to business licenses, and the statutory mechanism for

5   enforcement of the City's business licensing ordinances is issuance of a fine pursuant to California

6   City Municipal Code section 1-3.01, not a private civil action.

7   **IV.    PETITIONERS HAVE NOT POSTED THE BOND REQUIRED BY RULE 65.**

8           Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction

9   or a temporary restraining order only if the movant gives security in an amount that the court

10  considers proper to pay the costs and damages sustained by any party found to have been

11  wrongfully enjoined or restrained." As noted above, CoreCivic will face significant financial losses

12  if the Court enjoins it from accepting any new ICE intakes at the facility. The Court should require

13  Petitioners to post a bond in an amount sufficient to compensate CoreCivic for the lost contract

14  revenue should CoreCivic prevail on the merits in this action. *See Coldwell Banker Real Estate*

15  *LLC v. Smile Enters, Inc.*, 2011 WL 13220121, at *3 (C.D. Cal. Mar. 11, 2011) ("When setting the

16  amount of security, district courts should err on the high side … [A]n error in the other direction

17  produces irreparable injury, because the damages for an erroneous preliminary injunction cannot

18  exceed the amount of the bond."). The $100 bond suggested by Petitioners (Dkt. 10-2 at 3) is wholly

19  insufficient to compensate CoreCivic for its financial losses, which will run in the millions of

20  dollars per month. The Court should require a bond of at least $2 million.

21  **V.    CONCLUSION**

22          For the foregoing reasons, the Court should deny Petitioners' Application.

23

24

25

26

27

28

1    DATED this 27th day of October 2025.

2                                By /s/ Daniel P. Struck
                                     Daniel P. Struck
3                                    Dana M. Keene
                                     Shannon L. Knorr
4
                                     Nicholas H. Rasmussen
5                                    Nancy Flores-Castaneda
                                     McCORMICK, BARSTOW, SHEPPARD,
6                                    WAYTE & CARRUTH LLP

7                                    Attorneys for Respondent-Defendant
                                     CoreCivic, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORECIVIC'S RESPONSE TO PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION