**EXHIBIT 1**

**EXHIBIT 1**

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>               Petitioners and Plaintiffs,<br><br>     v.<br><br>City of California City and CoreCivic, Inc.,<br><br>         Respondents and Defendants.<br>———————————————————<br>CORECIVIC, INC.,<br><br>         Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF MARCELO ARIOLA**<br><br>U.S. District Judge: Kirk E. Sherriff<br>U.S. Magistrate Judge: Christopher D. Baker |

I, Marcelo Ariola, state the following based upon my personal knowledge.

1.     I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2.     I have been employed by CoreCivic[1] since April 2007, when I was hired as Senior Director of Site Acquisition.  I became Managing Director of Project Development in 2012.  As Managing Director of Project Development, I was responsible for leading a team which provided financial analysis, land development oversight, due diligence,

---

[1] Until November 2016, CoreCivic was known as Corrections Corporation of America ("CCA").

DECLARATION OF MARCELO ARIOLA                   CASE NO. 1:25-CV-01292-KES-CDB

entitlements, operational systems improvements, and pre-construction services (including planning and ensuring zoning compliance), as well as fostering governmental relations for all projects. In January 2025, I assumed my current position of Vice President, Real Estate. In that new role, I continue to discharge my prior responsibilities relating to Project Development but also assumed responsibility of oversight and management of facility maintenance at all CoreCivic-owned facilities.

3.     The facts set forth are based on my personal knowledge and/or information obtained in my capacity as a corporate representative of CoreCivic, including information obtained through discussions with other CoreCivic employees and my review of CoreCivic's corporate records.

4.     The CoreCivic facility ("the facility") is located at 22844 Virginia Boulevard, California City. It is at the terminus of Virgina Boulevard and south of Twenty Mule Team Parkway.

5.     In 1993, the then California Department of Corrections ("CDCR") commenced an Environmental Impact Report ("EIR") (State Clearinghouse Number 93082030) evaluating the environmental effects resulting from construction and operation of a CDCR prison facility on one of two properties located in California City, which included the current site of the facility. Specifically, the CDCR Final EIR addressed a new 2,200-bed prison or up to a 4,400-bed prison complex, and an associated wastewater treatment facility on an adjacent 160-acre parcel.

6.     While that report was completed and certified by CDCR in August 1994, due to funding constraints, CDCR chose not to proceed with development of a prison facility in California City.

7.     In 1997, CoreCivic's predecessor, CCA, proposed the construction and operation of a medium security facility in California City, which would occupy approximately 70 acres of a site approximately five miles from downtown California City. The proposal specified that the facility would have 2,304 general population beds, and

- 2 -

1   consistent with federal facility requirements, also include an additional 260 beds over

2   design capacity, for special uses including Restrictive Housing and medical housing.

3       8.      Pursuant to the California Environmental Quality Act ("CEQA") guidelines

4   (Section 15163), the City of California City, as lead agency, elected to prepare a supplement

5   to the CDCR Environmental Impact Report and incorporated the original report.

6       9.      The City of California City issued a Notice of Preparation for an EIR

7   Supplement on September 11, 1997.  The Draft EIR was completed and circulated for

8   review beginning on October 24, 1997, and comments were prepared and included in the

9   Final EIR Supplement in January 1998 (State Clearinghouse Number 97091045).

10      10.     On January 20, 1998, the City Council of City of California City adopted

11  Resolution No. 01-98-1801, Making Certain Environmental Findings and Adopting a

12  Statement of Overriding Considerations in Connection with the Corrections Corporation of

13  America Prison.  Attachment A is a true and correct copy of that resolution, which is

14  maintained as a business record of CoreCivic.

15      11.     As noted in Attachment A, the most significant environmental impacts tend

16  to arise during the construction phase of the facility, rather than during the operations of a

17  completed facility.

18      12.     At a duly noticed public hearing on January 15, 1998, the City of California

19  City Planning Commission recommended granting Conditional Use Permit ("CUP") 97-01

20  for the proposed facility.  The City Council granted CUP 97-01 on January 20, 1998.

21  Attachment B is a true and correct copy of Resolution No. 01-98-1902, A Resolution of the

22  City Council Granting Conditional Use Permit 97-01 Prison Facility, which is maintained

23  as a business record of CoreCivic.

24      13.     CUP 97-01 contained a provision stating that it expired twelve months from

25  January 20, 1998 (the date of the City Council's Approval) if the prison facility operation

26  was not commenced and diligently pursued.

27      14.     In June 1998, CoreCivic diligently pursued the prison facility operation by

28  acquiring the 320-acre site originally contemplated by CDCR and considered by the City.

DECLARATION OF MARCELO ARIOLA                    CASE NO. 1:25-CV-01292-KES-CDB

1    Attachment C is a true and correct copy of the Deed for the property, which is maintained

2    as a business record of CoreCivic.

3        15.    Following the acquisition of the property by CoreCivic, the site was

4    subdivided into three parcels.  Parcel 1 is approximately 70 acres at the northwest corner of

5    the property and is the site of the facility.  Parcel 2 is approximately 35 acres and is directly

6    south of Parcel 1.  Parcel 3 is comprised of approximately 215 acres to the east and south

7    of Parcel 1.

8        16.    Completing the requirement to commence and diligently pursue facility

9    operation, construction of the facility began later in 1998.

10        17.    Based upon the final configuration of the site when construction began, in

11    1998 CoreCivic applied to the City of California City to amend CUP 97-01 and construct

12    two additional 256-bed housing units on the site.   A Mitigation Monitoring Plan was

13    approved and adopted by the City on December 1, 1998, and CUP Amendment 98-02

14    approving the 512-bed expansion of the facility was issued that same date.  After an initial

15    extension, in November 2001 the City extended the time for CUP Amendment 98-02

16    "indefinitely."  Attachment D is a true and correct copy of records relating to the issuance

17    and extension of CUP Amendment 98-02, which are maintained as business records of

18    CoreCivic.

19        18.    Construction of the facility was completed, and in 2000 CoreCivic began to

20    receive Federal Bureau of Prisons inmates at the facility.

21        19.    At no point did the City of California City ever revoke, rescind, or cancel

22    either CUP 97-01 or CUP Amendment 98-02.

23        20.    In 2006, CoreCivic submitted a proposal to the City for construction of a

24    second 2,200-bed facility on the southern 35-acre parcel.  The December 2009 Addendum

25    to the Final Subsequent Environmental Impact Report, noted that this proposed second

26    2,200-bed facility would not have significant operational impacts relating to traffic, air

27    quality, noise, or other factors required for consideration under the California

28    Environmental Quality Act.  Attachment E is a true and correct copy of the December 2009

- 4 -

1   Addendum to the Final Subsequent EIR, which is maintained as a business record of
2   CoreCivic.

3        21.    On December 22, 2009, the City of California City Planning Commission
4   approved CUP 09-04 for the construction and operation of a 2,200-bed facility on that
5   parcel.  Attachment F is a true and correct copy of the City of California City Planning
6   Commission Resolution No. 12-09-2990PC to Approve Conditional Use Permit 09-04,
7   which is maintained as a business record of CoreCivic, and does not contain any expiration
8   date.

9        22.    In December 2013, CDCR entered into a lease agreement for the facility.  The
10  lease agreement permitted CDCR to utilize up to 2,560 beds at the facility but required
11  CDCR to request permission from CoreCivic if they were to have more than 2,560 inmates
12  assigned to the facility.

13       23.    On May 27, 2014, the City Manager for California City confirmed to both
14  CDCR and CoreCivic that a land use review had been completed and provided authorization
15  and full permitting for use of 2,560 beds at the facility.  Attachment G is a true and correct
16  copy of the May 27, 2014 letter from City Manager Tom Weil and is maintained as a
17  business record of CoreCivic.

18       24.    As part of the CDCR lease agreement, significant upgrades related to ADA
19  compliance were made to the facility in two phases.  Attachment H is a true and correct
20  copy of the Certificate of Occupancy issued by the Office of the State Fire Marshal for
21  Phase 1 on May 29, 2014, which is maintained as a business record of CoreCivic.
22  Attachment I is a true and correct copy of the Certificate of Occupancy issued by the Office
23  of the State Fire Marshal for Phase 2 on December 11, 2014, which is maintained as a
24  business record of CoreCivic.

25       25.    Notably, the Office of the State Fire Marshal noted on the Certificates of
26  Occupancy that the occupancy classification of the facility under CCR Title 24 (2013
27  Edition) was "I-3."  "I-3" is an Occupancy Classification under the California Building
28  Code, formerly known as Institutional Group 3, which includes "buildings or portions of

- 5 -

buildings and structures that are inhabited by one or more persons who are under restraint or security [and] are generally incapable of self-preservation due to security measures not under the occupants' control which includes persons restrained." The California Building Code notes that this group "shall include, **but not be limited to** the following: Correctional Centers … Detention centers … Jails … Prisons … Temporary holding facility." *See* Attachment J, 2022 California Building Code, Title 24, Part 2, Section 308.4 (emphasis added).

26.    On August 18, 2014, the Office of the State Fire Marshal completed and issued its Final Inspection Report and grant of occupancy for the ADA renovations. Attachment K is a true and correct copy of that Inspection Report, which is maintained as a business record of CoreCivic.

27.    In 2016, at the request of CDCR, construction of three additional structures for use as administrative office space outside of the secure southern perimeter of the facility began. Those spaces were completed, and the California City Building Department issued a Certificate of Occupancy for the administrative buildings on January 31, 2017. Attachment L is a true and correct copy of the Certificate of Occupancy for the administrative structures, which is maintained as a business record of CoreCivic.

28.    Beginning in 2017, CoreCivic began to explore proposed development of the eastern 215-acre parcel to construct two 1,512-bed correctional centers. An application for CUP 20-02 was opened with the City, and the notice of Availability of a Draft Environmental Impact Report (State Clearinghouse No. 2017121069) was issued by the City on May 21, 2021. However, because this separate project was placed on "pause" by CoreCivic, CUP 20-02 has not been approved and remains pending.

29.    Despite the expiration of the lease of the existing facility to CDCR in 2024, CoreCivic never "shuttered" the facility or discontinued its use as an Institutional Group I-3 facility.

30.    CoreCivic has consistently utilized and maintained its property for use as an Institutional Group I-3 facility since its completion. It has no intent, and never had any

- 6 -

1   intent, to discontinue or abandon the property or to change the use or occupancy
2   classification of the facility.

3       31.   CoreCivic has always employed individuals to provide nearly around-the-
4   clock operations and maintenance at the property, seven days a week.

5       32.   Attachment M is a true and correct copy of the Kern County Assessor
6   Record's Property Detail Report for the facility, which is available at:
7   https://www.kerncounty.com/government/departments/assessor-
8   recorder/property/assessor-property-search. Of note, the Assessor assigned the facility Use
9   Code 1716 – Detention Facility/Prison.

10      33.   Specifically, while continuing to proactively market the facility, CoreCivic
11  applied to the City of California City and was issued Plumbing Permit No. 21170 on January
12  7, 2025 for waterline repairs. Similarly, the City issued permit number 20989 on January
13  15, 2025 for repairs to the facility roof.

14      34.   In addition, the City issued Plumbing Permit No. 21309 on May 14, 2025 to
15  remodel a handicapped shower stall for ADA compliance.

16      35.   Each of those three permits expires one year from the date of issue. The
17  permitted work has been completed for all three permits, and the only outstanding item is
18  the final inspection by the City. None of these permits is a major or significant repair or
19  renovation which requires the issuance of a new Certificate of Occupancy, as confirmed to
20  me by the Building Department on August 14, 2025. Attachment N is a true and correct
21  copy of an email I received from the City of California City Building Department on August
22  14, 2025 confirming that these permits do not require a new Certificate of Occupancy.

23      36.   On July 14, 2025, I became aware that the City was requiring CoreCivic to
24  submit a Site Plan Review Application Form for the facility.

25      37.   Because there has been no change in use and the Institutional Group I-3
26  Occupancy Classification of the facility has never changed, there is no need to undertake a
27  Site Plan Review. A Site Plan Review is usually required for a different use which requires

28

DECLARATION OF MARCELO ARIOLA                    CASE NO. 1:25-CV-01292-KES-CDB

a change in the Occupancy Classification, such as reuse of a warehouse space into a restaurant.

38.     I had numerous telephone calls with Joe Barragan, the City's Public Works Director, regarding the City's request that CoreCivic submit a Site Plan Review.  He agreed that the City had most of the documents already and noted that CoreCivic was only required to make minimal additional submissions, consisting mainly of ADA Compliance certificates and studies.  He represented that this was simply a ministerial review, which would be quickly completed after the fees were paid.

39.     As specified by Mr. Barragan, CoreCivic submitted the Site Plan Review Minor application, which I signed on July 22, 2025, along with a letter from me regarding the ADA requirements, a Disabled Accessibility Certification completed after the renovations requested by CDCR in 2014, and some other potentially relevant documents. Attachment O is a true and correct copy of that submission, which is a business record of CoreCivic.

40.      On July 23, 2025, CoreCivic received confirmation that it had paid the City's $250.00 fee for the Site Plan Review.  Attachment P is a true and correct copy of that email confirmation and attached receipt, which are business records of CoreCivic.

41.     On the morning of July 24, 2025, I participated in a meeting involving former Public Safety Director Justin Vincent, who had raised some concerns relating to emergency radio communications observed during his inspection of the facility on July 21, 2025. Specifically, Director Vincent reported that a portable fire department radio did not receive an adequate signal in a few of the locations he tested throughout the facility.

42.     At Director Vincent's suggestion, CoreCivic engaged the City's radio consultant to obtain and install a mobile repeater trailer to extend the radio signal range.

43.     On July 24, 2025, I received confirmation from the City that the ADA Certification we submitted was sufficient and CoreCivic was not required to remit payment for a building inspection.   Attachment Q is a true and correct copy of that email communication and is a business record of CoreCivic.

- 8 -

44.    A few hours later, I received a second email communication from Public Works Director Barragan, stating that only the fire inspection remained to be completed before CoreCivic's business license would issue.  Attachment R is a true and correct copy of that email communication and is a business record of CoreCivic.

45.    On August 7, 2025, CoreCivic received confirmation from Deputy Fire Marshal Hightower that the temporary radio system, which included the repeater trailer acquired by CoreCivic at a cost of more than $75,000, had been tested and approved.  Ms. Hightower further instructed that CoreCivic would have 90 days to install a permanent solution to boost radio signals in the facility.

46.    CoreCivic engaged Berk-Tel Communications to install an Emergency Responder Radio System in the facility.  Plans were submitted to Deputy Fire Marshal Hightower on August 19, 2025, and after submission of a permit to the Fire Department and payment of a $1,000 plan review fee, the permit was issued by the Fire Department. The City also stated that an additional commercial electrical permit would be required for the installation of the permanent system.  Attachment S is a true and correct copy of an email thread I was copied on during the period from August 19–21, 2025 regarding the permitting for the permanent radio solution and is a business record of CoreCivic.

47.    Eventually, the commercial electrical permit was issued, and the permanent radio solution was installed with final testing scheduled for Tuesday, October 14, 2025. Attachment T is a true and correct copy of the email thread I was copied on during the period from August 19 to October 8, 2025, confirming the schedule for the inspection and testing and is a business record of CoreCivic.

48.    The City Fire Department, in conjunction with Kern County Communications, confirmed that the permanent radio Emergency Responder Radio System, which CoreCivic installed at a cost of nearly $700,000, was fully operational on October 14, 2025.

49.    The facility at issue was, and has been at all times, constructed and operated pursuant to CUP 97-01 and CUP Amendment 98-02, for an Occupancy Classification

- 9 -

1 Institutional Group I-3 facility.  While the identity of the government partner utilizing the

2 facility has changed several times since 2000, from a zoning and permitting standpoint, the

3 classification and use of the 70-acre site at issue have not changed.

4      50.    Aside from the permitted ADA upgrades requested by CDCR which were

5 completed in 2014 and the construction of additional administrative office space outside of

6 the secure perimeter of the facility, but still on the 70-acre site, CoreCivic has not

7 undertaken any major renovations or modifications of the facility requiring further

8 amendment of the CUP, which remains valid and effective for an Occupancy Classification

9 Institutional Group I-3 facility.

10      51.    CoreCivic has also obtained CUP 09-04 for construction of a separate 2,200-

11 bed facility on the southern 35-acre site, which is separate and distinct from the facility at

12 issue in this lawsuit, and also has a pending CUP 20-02 for construction of a separate and

13 distinct 3,324-bed correctional complex on the eastern 215-acre site.  Neither of these

14 permits or applications, however, are relevant to the facility currently being utilized by

15 Immigration and Customs Enforcement.

16      52.    Although no CEQA study is required to continue using the existing facility

17 for its intended use, the fact that two additional proposed facilities with a combined capacity

18 of 5,500-beds have been studied extensively on the site with no findings of significant

19 adverse environmental impact further demonstrates that the continued use of the existing

20 facility, merely by a different government partner, will not have any significant adverse

21 environmental impact.

22      I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS

23 TRUE AND CORRECT.

24      Executed on October 25, 2025.

25                        _Marcelo Ariola_

26                      Marcelo Ariola

27

28

DECLARATION OF MARCELO ARIOLA                    CASE NO. 1:25-CV-01292-KES-CDB

**ATTACHMENT A**

**ATTACHMENT A**

ORIGINAL

## RESOLUTION NO. 01-98-1801

## A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS AND ADOPTING A STATEMENT OF OVERRIDING CONSIDERATIONS IN CONNECTION WITH THE CORRECTIONS CORPORATION OF AMERICA PRISON

WHEREAS, Corrections Corporation of America (CCA) has filed various applications with the City requesting approval to construct a 2,304-inmate capacity prison and related utility improvements (the "Project"); and

WHEREAS, the Planning Department has determined an Environmental Impact Report (EIR) Supplement be prepared pursuant to the California Environmental Quality Act (CEQA) to determine the individual and cumulative environmental impacts associated with the Project; and

WHEREAS, the Draft EIR Supplement was prepared by RUST Environment and Infrastructure under contract to the City and under the supervision of the Planning Department, and circulated for review from October 24, 1997 to December 9, 1998; and

WHEREAS, responses to comments were prepared and included in the Final EIR Supplement; and

WHEREAS, the Planning Commission considered and approved an application for a conditional use permit at a duly noticed public hearing on January 15, 1998;

NOW THEREFORE BE IT RESOLVED by the City Council of the City of California City as follows:

## SECTION 1

## INTRODUCTION

### 1. PRELIMINARY

CCA will develop a 2,304 bed prison on a 320 acre property in California City, Kern County. The Project will accommodate medium security inmates. The City was the Lead Agency for the preparation of an Environmental Impact Report (EIR) Supplement in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources Code §§ 21000 et seq.) and the CEQA Guidelines ( California Administrative Code §§ 15000 et seq., as amended).

Because the EIR Supplement identified significant effects which may occur as a result of the Project, City adopts these findings as part of the approval of the CCA Project. In adopting this Statement of Findings, the City approves the construction of the CCA Prison at California City on a 320 acre property known as the Virginia Boulevard site.

Section 1 of these findings provides an introduction and description of the proposed Project and the certification of the Final EIR Supplement. Section 2 discusses potential environmental effects considered to have no significant impacts and require no mitigation. Section 3 discusses potential environmental effects which are not significant or which have been mitigated to a level that is less than significant. Section 4 discusses the significant unavoidable environmental effects of the Project, which cannot be feasibly mitigated to a level that is less than significant. Section 5 discusses Project alternatives. Section 6 discusses changes in mitigation measures and recirculation. Section 7 discusses the Mitigation Monitoring Plan. Section 8 presents the Statement of Overriding considerations. Section 9 presents a Section 21092.1 finding regarding independent judgment.

### 2. DESCRIPTION OF THE APPROVED PROJECT

The site is located at the terminus of Virginia Boulevard, approximately one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The site encompasses 320 acres of vacant terrain comprised of, and surrounded by, natural desert environment.

Approximately 70 acres of the proposed prison site will be developed for the prison facility and support uses.

The 2,304 bed prison will accommodate 2,304 inmates at 100 percent design bed capacity, and meet the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.

- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates.

- Provide excellent long term employment and career opportunities for surrounding communities.

## 3. CERTIFICATION

The Planning Department has reviewed the Final EIR Supplement for the proposed Project and has considered the public record on the Project, including without limitation the following:

- Record of Public Hearing on the Final Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, on January 15, 1998, before the Planning Commission.

- Final Environmental Impact Report Supplement, January, 1998.

- Responses to Comments on the Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, 1997 (Volume II).

- Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, October 1997.

The custodian of the documents and other materials which constitute the record upon which these findings are based is the Planning Department. The record is available for public review at the City of California City, 2100 Hacienda Boulevard, California City, California, 93505.

**Finding**

Based upon complete review of the record, the Planning Commission certifies that the Final EIR Supplement is adequate and has been completed in compliance with CEQA.

# SECTION 2

## POTENTIAL ENVIRONMENTAL EFFECTS CONSIDERED TO HAVE NO SIGNIFICANT IMPACTS AND REQUIRE NO MITIGATION MEASURES

**Finding**

The EIR Supplement identified thresholds of significance and evaluated environmental impacts for the following issues. The EIR Supplement determined that these environmental impacts did not cross

the thresholds of significance for these issues. Therefore, no mitigation measures are required for these issues.

Land Use, Employment, Population and Housing, Hospitals, Judicial Services, Law Enforcement, Fire Protection, Wastewater Treatment and Disposal, Solid Waste Disposal, Energy, Telephone and Cable.

## SECTION 3

## POTENTIAL ENVIRONMENTAL EFFECTS WHICH ARE NOT SIGNIFICANT OR WHICH HAVE BEEN MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

## A.    PUBLIC UTILITIES AND COMMUNITY SERVICES

### School Impacts

Implementation of the Project would result in enrollment of approximately 124 new students in the Mojave Unified School District (MUSD) resulting in the need for up to four additional classrooms.

### Mitigation

The following mitigation measure will be employed to reduce potential impacts to MUSD schools to a less than significant level:

- Mitigation for impacts resulting from additional students generated indirectly by the proposed prison would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules.

  The school mitigation fees for MUSD which are collected by the California City Building Department at issuance of building permits are as follows:

  - $0.32 per square foot of new industrial/commercial floor space.

  - $1.84 per square foot of new residential floor space.

  Based on the conceptual building plans for the proposed prison, which indicate approximately 500,000 square feet of floor space, CCA would be responsible for payment of approximately $160,000 to offset any direct impacts to MUSD. Additionally, new residential development resulting from any direct and indirect growth would contribute separately to school fees at the rate noted above. The collected fees could be utilized to lease the portable classrooms or contribute to funding for permanent facilities necessary for additional students.

Information provided by the MUSD Superintendent's office indicates that payment of the school mitigation fees by CCA and other new developments, and other funding mechanisms will mitigate potential impacts to a less than significant level.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to schools to a less than significant level.

<u>Water Supply Impacts</u>

The proposed Project would require 392,000 gallons per day of water. Implementation of the proposed Project would include improvements to the offsite water infrastructure facilities to provide adequate operational and fire/emergency water service to the site.

**Mitigation**

The following mitigation measures will be adopted to ensure that water is available to serve the Project, and that the Project uses the minimum practical amount of water.

- Design of the proposed prison would include provisions to minimize water use at the proposed prison:

    - Use of low-flow fixtures, and

    - Use of drought-tolerant, native landscaping.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to the water system to a level that is less than significant.

**B.   TRANSPORTATION**

<u>Traffic Impacts</u>

During operations, the Project would generate approximately 1,320 daily vehicle trips on peak weekdays. This impact would contribute to an existing unacceptable level of service at the intersection of SR 58 / California City Boulevard in the unincorporated area of Kern County. Cumulative plus peak weekday traffic would result in a significant impact between 5:30 AM and 6:30 AM at the SR 58 / California City Boulevard intersection.

**Mitigation**

The following measure would reduce the project-related impact to a less than significant level:

- The addition of a traffic signal is shown to be warranted for existing conditions and this improvement would mitigate the unacceptable Level of Service (LOS) condition. Caltrans has jurisdiction over SR 58 and according to Caltrans the Project would be required to participate in funding interim improvements at SR 58/ California City Boulevard, rather than a traffic signal at this intersection. The proposed CCA Prison would contribute 4.2% of the interim improvement costs based on the proportionate share of Project traffic impact to this intersection. Implementation of this mitigation measure would reduce the Project's impact to a less than significant level.

**Finding**

The impacted intersection is within the dual jurisdiction of Caltrans, a state agency, and Kern County. California City shall ensure through the Mitigation Monitoring Plan that the applicant makes its proportionate share of funds available to Caltrans and Kern County for interim improvements to the intersection. However, California City, as lead agency, has no jurisdiction to implement this mitigation. Caltrans and Kern County can and should implement this mitigation measure to reduce project-related impacts to a less than significant level.

Should Caltrans and Kern County implement this mitigation measure, changes or alterations will have been required in, or incorporated into, the Project which will avoid or reduce Project-related traffic impacts to a less than significant level. If, however, Caltrans and Kern County do not utilize fair share contributions to mitigate the Project's contribution to the current unacceptable LOS condition at SR 58/California City Boulevard, then the increased traffic generated by the Project would be considered a significant and unavoidable adverse impact. Therefore, and in that case, the City shall find that the impact is overridden by the Project benefits stated in the Statement of Overriding Considerations as set forth in Section 8 below.

**C.    NOISE**

**Noise Impacts**

If dwellings were to be constructed in the approved residential subdivision to the east of the site prior to prison construction, future residents could be subjected to high noise levels during Project construction.

**Mitigation**

No sensitive receptors are currently located near the Project. Prison operations will not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operations. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore the Final EIR recommends the following mitigation measures to reduce the noise impacts of construction should residences be built adjacent to the Project prior to Project construction:

- Construction activities within 2,000 feet of occupied residences will be limited to the hours of 7 a.m. to 8 p.m. Monday through Saturday, with no construction allowed on Sundays or City holidays.

- Properly muffled equipment and trucks will be used.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce noise impacts to a less than significant level.

## D.    HYDROLOGY, STORM DRAINAGE, AND FLOOD CONTROL

### Hydrology Impacts

Implementation of the Project would result in the covering of between 50 and 70 acres with impervious surfaces such as buildings, access roads, and parking areas. Implementation of the Project as proposed could result in an increase of the 100-year storm peak runoff from the watershed.

### Mitigation

The City will adopt the following measures to reduce the potential impacts related to stormwater runoff to a less than significant level:

- Stormwater drainage and collection facilities will be designed to maintain the volume of surface water runoff at pre-Project levels. Facilities will include ditches or swales, constructed along the perimeter of the prison complex, and lined only with natural vegetation. The ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to an on-site detention basin.

- An unlined storm water detention basin will be developed on-site to retain a volume of storm water necessary to control runoff from impervious surfaces, and maintain surface runoff volumes at the property boundaries at pre-Project levels. The capacity of the detention basin will be based on calculated storm water flows above natural conditions, resulting from impervious surfaces of the proposed Project. The sizing and design of this detention basin will be reviewed and approved by the City Engineering Department as part of the final site plan approval.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hydrology impacts to a less than significant level.

### Storm Drainage Impacts

Project implementations could result in urban pollutants entering stormwater runoff. Such pollutants may include oil, grease, antifreeze, trace metals, dust and dirt, fertilizers, herbicides and pesticides.

**Mitigation**

The City will adopt the following measure to reduce potential water quality impacts to a less than significant level:

• The proposed Project will comply with all applicable requirements of the NPDES permit program.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce storm drainage impacts to a less than significant level.

## E.    BIOLOGICAL RESOURCES

### Utility Infrastructure Impacts

Based on the low quality of habitat, and complete absence of presence or sign for any sensitive species within the 25-acre utilities construction path, significant impacts which would require comprehensive mitigation measures are not anticipated. Biologists estimated that approximately ten percent (10%) or 2.5 acres of property along the utility installation area contain habitat which could be considered Category III as designated by the Bureau of Land Management.

**Mitigation**

The City will adopt the following measures to reduce the potential impact on utilities construction path to less than significant:

• The off-site compensation measures described in Section 4(A) include preservation of 2.5 acres of habitat to off-set the loss described above.

• Prior to installing underground utilities, a final inspection of these areas will be conducted to verify the findings of previous biological surveys

• Biologist shall survey utility construction path immediately prior to trenching activities, and biologist shall move any tortoise from the construction path to adjacent habitat, out of harms way.

• All vehicles, including heavy equipment and personal vehicles, shall use established roadways to access the site. All vehicles shall be restricted to the site and shall not disturb areas adjacent to the utility construction area.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- The open utility trench will be kept to the minimum width and length as practicable for construction purposes which can be completed on a day-to-day basis.

- The utility trench shall be filled or covered at the completion of each construction day.

- The utility trench shall be visually inspected for tortoise immediately prior to commencing construction each morning.

- Areas disturbed within the utilities construction path will be regraded to blend with adjacent topography.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce utility infrastructure impacts to a less than significant level.

## F.    CULTURAL RESOURCES

### Cultural Resources Impacts

A recorded archaeological site is located on a portion of the site. Because implementation of the proposed Project could result in the disturbance of prehistoric material, this impact is considered significant.

**Mitigation**

The City will adopt the following measures to reduce potential impacts on cultural resources to a less than significant level:

- If human skeleton remains are encountered during construction, work within 20 meters of the discovery will be stopped immediately and the County Coroner notified. If the remains are Native American, the Coroner has 24 hours to notify the Native American Heritage Commission.

- If any buried cultural remains are encountered during development and construction, work within 20 meters of the discovery will be stopped until a professional archeologist is retained to determine the significance of the find and to develop management actions. Actions needed to manage the resource will be implemented.

- Avoidance of archaeological sites is the preferred management technique. Avoidance may be achieved through implementation of the following measure:

> ► A qualified archaeologist will be retained to fence the perimeter of the archaeological site prior to Project grading. The fence will be located approximately 15 feet outside the actual resource site boundary and remain there for the duration of construction activities. The fenced area will be unmarked to prevent unauthorized collecting.

If avoidance is infeasible, the following measure will be implemented:

> ► Prior to site grading or other construction activities, a qualified archaeologist will collect surface artifacts. A report containing a lithic analysis will be filed with the Southern San Joaquin Valley Information Center at California State University, Bakersfield.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce cultural resource impacts to a less than significant level.

## G. GEOLOGY, SOILS, SEISMICITY AND GROUNDWATER

### Soil Impacts

Potentially expansive soil was encountered in one boring at the site during a geotechnical investigation conducted for the 1994 EIR. Construction on expansive soils can result in structural damage or failure.

**Mitigation**

The City will adopt the following measures to reduce potential impacts relative to expansive soils to a less than significant level:

• Expansive soil, will be removed or treated, and/or an expansion-resistant foundation system will be constructed.

• A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce soil impacts to a less than significant level.

### Soils Impact

The surface soil, upper 1 to 4.5 feet, at the site is generally of a loose consistency and may be subject to excessive immediate settlement under loading. Such settlement can result in structural damage or failure.

**Mitigation**

The following measures will be adopted to reduce potential impacts relative to collapsible or compressible soils to a less than significant level:

- Collapsible soils or compressible soils, if determined to be present at the site, will be mitigated by modification of soil, or through structural foundation design.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce collapsible or compressible soils impacts to a less than significant level.

## Seismic Impacts

Based on probabilistic analysis conducted for the preparation of the 1994 Final EIR, the highest maximum peak horizontal accelerations at the site could range from 0.30g to 0.35g for the estimated maximum credible event of M7.5 at the Lockhart Fault.

**Mitigation**

The following measure will be adopted to reduce potential impacts relative to seismic shaking to a less than significant level:

- Facilities will be designed to the standards required by the regulatory agencies governing the Project, or other pertinent building codes, to withstand the expected ground motions. Through site specific studies, seismic criteria has been developed that should be evaluated by structural designers to determine whether the standard seismic design for prisons meets or exceeds the criteria.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce seismic impacts to a less than significant level.

## H.    HAZARDOUS MATERIALS

### Hazardous Materials Impacts

Review of historic aerial photographs, and local, state, and federal records revealed no evidence of hazardous substance use, storage, or releases on the Project site. No evidence of hazardous materials storage or contamination was identified on the site or in adjacent areas. However, due to the size of the site, the possibility of an isolated area of contamination, e.g. isolated illegal dumping of hazardous waste, cannot be completely dismissed.

### Mitigation

The City will adopt the following measure to reduce potential impacts with respect to potential site contamination to less than significant:

- In the event that hazardous materials or waste contamination are encountered during grading, construction or operation of the proposed Project, the subject wastes shall be assessed, reported to appropriate agencies, and remediated. Appropriate remediation shall be determined through consultation with the affected health and state agencies.

### Finding

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts to a less than significant level.

### Hazardous Materials Impacts During Construction and Operations

Construction and operation of the Project would require the use and storage of hazardous materials such as paints and solvents. The misuse, improper disposal, and/or mismanagement of these materials could affect groundwater quality, soil quality, and possibly create hazards to human health and safety.

### Mitigation

The City will adopt the following measures to reduce potential hazardous materials impacts during Project construction and operation to a level that is less than significant:

- Hazardous materials on the prison grounds will be properly stored in suitable containers and in accordance with manufacturers directions for safe storage.

- Hazardous materials used at the prison will be properly disposed of as needed, at a Class I landfill, a County-sponsored "hazardous materials round-up", or other suitable disposal method sanctioned by the Department of Toxic Substances Control.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts during construction to a less than significant level.

## SECTION 4

## SIGNIFICANT UNAVOIDABLE ENVIRONMENTAL IMPACTS WHICH CANNOT BE MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. BIOLOGICAL RESOURCES

**Desert Tortoise Habitat Impacts**

The Project site is located outside of U.S. Fish and Wildlife (USFWS) designated critical habitat areas for the desert tortoise. However, the Project would result in the loss of approximately 70 acres of desert tortoise habitat. The loss of occupied habitat could be considered a take pursuant to Section 2081 of the California Endangered Species Act (CESA). Any net loss of any occupied desert tortoise habitat is considered a significant and unavoidable impact. Individual tortoises could be destroyed as a result of grading and construction activities. Destroying a tortoise would be considered a take of a listed species pursuant to both the ESA and the CESA, and considered a significant impact.

**Mitigation**

To mitigate the above impacts and comply with the Federal Endangered Species Act (ESA) and California Endangered Species Act (CESA), the applicant will obtain necessary permits from both USFWS and California Department of Fish and Game (CDFG). USFWS will require the submittal of a ESA Section 10(a) permit application and the preparation of a Habitat Conservation Plan (HCP) that includes a Project description with an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. This document will also provide the information required during CDFG Section 2081 permitting process as mandated by CESA.

The following mitigation recommendations are typical of those included in desert tortoise habitat HCP's. Actual mitigation requirements will be determined by USFWS and CDFG during the required permitting process. The agencies may require additional measures to mitigate for the proposed habitat loss for the desert tortoise.

**Construction Site Measures**

•    Prior to implementation of any of the following measures, CCA must provide fees for the

acquisition of up to 70-acres of compensation lands to the Desert Tortoise Preserve Committee (DTPC) to mitigate impacts of the prison development.

- Grading limits should be chosen in an effort to minimize impacts to mapped tortoise activity areas.

- An enclosure should be placed around the boundary of the limits of grading and should consist of an appropriate type of fencing to keep desert tortoises from re-entering the construction area.

- Clearance surveys should be conducted by qualified and permitted biologists to locate and remove any tortoises from within the limits of grading. All tortoises will be relocated to an appropriate, and preferably, adjacent habitat within the western one-half which are not part and placed within created, artificial burrows of any area disturbed by the proposed prison or any potential future facility expansions.

- The undeveloped portion of the western one-half of the site will be dedicated as a conservation easement to provide and enhance habitat for sensitive biological species.

- A biological monitor should be present during all initial ground clearing and grading activities to ensure that no incidental take of desert tortoise occurs.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- Access to the 320-acre site will be strictly controlled by perimeter signage and 24-hour patrols by prison correctional officers. Human recreational activities will be prohibited within the undeveloped portions of the site for environmental and security purposes. Native wildlife activity and migration within the property boundary, and outside the boundaries of prison security fencing, will not be disturbed.

- Provide signage along site access road to beware of desert tortoise.

**Finding**

The Project impacts to desert tortoise and related habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which significantly reduce the potential for take of listed species and substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Mojave Ground Squirrel Habitat Impacts**

Although no Mojave ground squirrels were observed at the site, the loss of Mojave ground squirrel

habitat is considered a significant impact.

**Mitigation**

The impact on the Mojave ground squirrel habitat will be significant and unavoidable, however, the. City will adopt the following measure to partially mitigate the impact on the Mojave ground squirrel habitat:

- A mitigation plan for the loss of habitat will be approved in coordination with the permitting for the loss of desert tortoise habitat discussed above.

**Finding**

The impacts to the Mojave ground squirrel habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Burrowing Owl Impacts**

Although no burrowing owls were observed at the site, the loss of burrowing owl habitat is considered a significant impact.

**Mitigation**

Project impacts on the burrowing owl habitat will be significant and unavoidable, however, the City will adopt the following measure to partially mitigate the impact on the burrowing owl habitat:

- Although no burrowing owls were observed at the site, and no impacts to burrowing owls are expected, mitigation which will be developed for the desert tortoise includes protection of Mojave creosote bush scrub habitat form grazing and recreational vehicle activity. This mitigation will enhance the potential for use of the protected area of the site as burrowing owl habitat.

**Finding**

The impact identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## B.    AIR QUALITY

### Construction Impacts

The Project would modify/develop between 50 to 70 acres, and up to 35 acres could be exposed at any one time during construction. The Project could generate 1,848 pounds per day of fine particulate matter ($PM_{10}$). Construction related emissions would exceed Kern County Air Pollution Control Department CEQA thresholds of significance for $PM_{10}$ and nitrogen oxides ($NO_x$) , and would therefore represent a significant and unavoidable impact of the Project.

### Mitigation

Although the impacts associated with $NO_2$ and $PM_{10}$ are significant and unavoidable, construction activities shall be partially mitigated by employing the best available control measures for fugitive dust control described in the EIR Supplement and included in the Mitigation Monitoring Program.

### Finding

Project construction air quality impacts identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement.

### Construction Equipment Impacts

Use of employee vehicles, trucks and heavy equipment would result in construction emissions throughout the construction period. The Project would generate approximately 172 tons/year of carbon monoxide, 21 tons/year of total organic gases, 59.8 tons/year of nitrogen oxides, 5.7 tons/year of sulfur oxides, and 6.4 tons/year of particulate matter during construction. Construction related emissions would exceed KCAPCD CEQA thresholds of significance for $PM_{10}$ and $NO_2$.

### Mitigation

Although the impacts from construction equipment and construction employee vehicles will be significant and unavoidable, the following measures will partially mitigate the identified impacts:

- Equipment will be maintained to minimize emissions.

- Information will be provided to construction employees to facilitate car pooling.

- Information will be provided to construction employees to facilitate extended stays in the Project vicinity to reduce long distance commuting.

**Finding**

Project air quality impacts arising from construction activities cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## Operations Impacts

Total daily trips to the site during operation peak weekdays are estimated to be 1,320. Vehicle emissions would total 48.4 tons/year reactive organic gases, 330 tons/year carbon monoxide, 37.5 tons/year nitrogen oxides, and 6.1 tons/year of $PM_{10}$. Operation of the Project would result in significant and unavoidable impacts from emissions of organic compounds and nitrogen oxides, which exceed KCAPCD CEQA thresholds of significance.

**Mitigation**

City will adopt the following measures to partially mitigate the air quality impacts from operational emissions:

*   Information will be provided to employees to facilitate car pooling.

*   Equipment, such as generators, will meet all Kern County Air Pollution Control District requirements.

**Finding**

Project air quality impacts arising from operations cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## C.    AESTHETICS/VISUAL CONSIDERATIONS

## Aesthetic Impacts

The Project would result in the conversion of vacant desert lands to a developed prison facility with buildings, parking lots, lighting, and other related features. Although no residences presently exist in the immediate vicinity, the prison would represent a significant change in the visual landscape, or viewshed, to future residents of approved residential subdivisions adjacent to the proposed prison site.

Even with mitigation in place, implementation of the proposed Project will result in an unavoidable significant visual impact to future residents of the approved subdivisions east of the Project site. The

site is relatively small, thereby affording limited flexibility in terms of placement of the prison structures. There are no feasible mitigation measures available to reduce the potential visual impact to less than significant

**Mitigation**

The Project impact on the viewshed will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Areas of the site disturbed during Project construction which would remain unpaved will be revegetated for runoff control and to enhance visual blending with the surrounding area.

**Finding**

Changes or alterations to the Project to reduce visual and aesthetic impacts have been incorporated into the Project as the mitigation measures, however, the visual and aesthetic impacts associated with the Project cannot be mitigated to a less than significant level. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Lighting Impacts**

Indirect lighting of adjacent areas and skyglow from the proposed prison would occur because the Project site is surrounded by vacant desert lands with no light-blocking features, and because there are no other sources of nighttime lighting in the vicinity. Although currently no residences exist in the immediate vicinity, skyglow would be visible and would be a visual nuisance to existing and future sensitive receptors.

Even with mitigation in place, skyglow will be noticeable in California City. Only the no-Project alternative would avoid significant light and glare impacts. However, implementation of this alternative would not meet the basic objectives of the Project.

**Mitigation**

The impact from nighttime lighting and skyglow will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Mast lighting posts will not exceed 30 feet in height, and where applicable and required by design, the lighting will be shielded and directed downward to minimize off-site illumination.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which substantially

lessen the significant environmental effects as identified in the Final EIR Supplement. However, the residual effect, after mitigation, of nighttime lighting has been identified as significant and unavoidable. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## SECTION 5

## ALTERNATIVES

The Final EIR Supplement identifies and evaluates five potential alternatives to the Project that "could feasibly accomplish most of the basic purposes of the Project". The five alternatives include (1) no Project, (2) Virginia Boulevard-Less Intense Prison, (3) Randsburg-Mojave site, (4) Remote Site, and (5) Virginia Boulevard/190% Development alternative. The alternatives discussed in the Final EIR Supplement constitute a reasonable range of potential options necessary to permit a reasoned choice of alternatives in light of the Project Objectives identified in Sections 1.3 and 7.0 of the Draft EIR Supplement. The Final EIR identifies the No Project Alternative and the Less-Intensive Prison Alternative as environmentally superior to the Project and they would reduce or eliminate the unavoidable significant impacts associated with the Project. However, neither of these alternatives fulfill the Project objectives. In addition, specific economic and social considerations make the environmentally superior alternatives identified in the Final EIR Supplement infeasible. Therefore, pursuant to CEQA Guideline 15364, and Public Resources Code Section 21081(a)(3), the Planning Commission will reject the environmentally superior alternatives as infeasible.

The alternatives considered in the Final Supplement are summarized below:

1.    **No Project Alternative**- Under the no-Project alternative, a correctional facility would not be constructed. None of the potential impacts associated with development of the Project would occur. Unavoidable adverse impacts related to light and glare, biological resources and air quality (particulate and ozone-producing gases) during both construction and facility operation would be avoided.

**Finding**

The Planning Commission finds the No-Project Alternative is infeasible and rejects this alternative for the following reasons:

•    This alternative will fail to meet any of the Project objectives identified in the Final EIR; and

•    This alternative would forego the substantial benefits of the Project, particularly:

    •    Construction of the Corrections Corporation of America Prison at California City is necessary to provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for surrounding communities. Between 85 to 90 percent of the prison employees are expected to be drawn from the Project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

- In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees will stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

2.    **The Virginia Boulevard-Less Intense Prison-** The EIR Supplement evaluated a smaller scale Project on the same site comprised of 1,000 beds on a 40 acre site.

**Finding**

The Planning Commission finds the Virginia Boulevard-Less Intense Prison Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative provides environmental benefits, however, this alternative will not provide as many employment opportunities as the proposed Project and would provide less capacity to serve the incarceration needs of government correctional agencies. Thus, this alternative will do less to meet Project objectives; and

- Based on the required investment in land and facility development costs, a smaller prison on the 320- acre site would not be economically viable. Thus, this alternative does not present a cost effective alternative to a publicly funded and operated correctional facility.

3.    **Randsburg-Mojave Site-**While not an unavoidable significant impact, this alternative would remove potential (but somewhat degraded) habitat for the burrowing owl and the Mojave ground squirrel. Additionally, the Randsburg-Mojave property is not currently served by paved access roads, and public utilities would require extension from a greater distance to serve the site. Furthermore, as discussed in the 1994 EIR, construction at this site would require enhanced engineering design and more stringent building requirements to withstand potential levels of seismic shaking due to the proximity of an active fault, thus representing a fiscal constraint. Lastly, during the initial search by CCA for an appropriate site to accommodate the proposed Project, the Randsburg-Mojave property was not available for sale.

4.    **Remote Site Alternative-**Through the site selection process used to find the prison site, properties located in the region which would be reasonably feasible alternatives, would meet the majority of the Project objectives, and fit most of the criteria identified as necessary, were

---

not found. Specifically, the biological resources and habitat quality of more remote sites tended to improve; however, the areas further to the east and north tend to be served by fewer paved roads with limited access to utilities and services. Thus a Remote Site alternative was not feasible.

5.    **The Virginia Boulevard/190% Development Alternative-** This alternative would result in additional significant unavoidable impacts such as viewshed impacts; increased light, glare and aesthetic impacts; impacts to Mojave Unified School District; additional particulate and ozone producing impacts generated during operations; and loss of additional acreage of potential desert tortoise, burrowing owl, and Mojave ground squirrel habitat. The larger prison could also result in land use incompatibilities and incrementally increase demands on public utilities and community services which could potentially limit the ability to provide adequate services. This alternative was rejected since it would not offer an environmental advantage over the proposed Project.


# SECTION 6

# RECIRCULATION

## SECTION 21092.1 FINDING

Finding: Pursuant to CEQA Guideline 15088.5, and Public Resources Code Section 21092.1, on the basis of its review and consideration of the Final EIR Supplement this Planning Commission finds that:

• The Project mitigation for impacts to biological resources has been revised from an on-site habitat conservation plan to an off-site habitat conservation plan as described in Section 3 of these findings and as shall be incorporated into the Project as part of the Mitigation Monitoring Plan.

• The revised mitigation measures and revised water system design are not substantial changes in the Draft EIR Supplement that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative; and

• The revised mitigation measures and revised water system design will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR Supplement; and

• The revised mitigation measures and revised water system design will not involve or require mitigation measures or alternatives which are considerably different from those analyzed in the Draft EIR Supplement that would substantially reduce one or more significant effects on the environment; and

- The revised mitigation measures and revised water system design do not render the Draft EIR Supplement so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded;

- Thus, none of the conditions set forth in CEQA Guideline 15088.5 or Public Res. Code § 21092.1 requiring recirculation of a Draft EIR Supplement have been met. Incorporation of the revised mitigation measures and revised water system design into the Final EIR Supplement does not require that the EIR Supplement be recirculated for public comment.

## SECTION 7

## FINDINGS REGARDING THE MITIGATION MONITORING PROGRAM

Section 21081.6 of the Public Resources Code requires that when a public agency is making the findings required by State CEQA Guidelines Section 15091(a)(1) and Section 21081(a) of the Public Resources Code the public agency shall adopt a program for reporting on or monitoring the changes which it has either required of the Project or made a condition of approval to avoid or substantially lessen significant environmental effects. These measures must be fully enforceable through permit conditions, agreements, or other measures.

The Planning Commission hereby finds that the Mitigation Monitoring Program dated January, 1998, and adopted as part of the Project's Conditional Use Permit meets the requirements of Section 21081.6 of the Public Resources Code by providing for and enforcing the implementation and monitoring of Project conditions intended to mitigate potential environmental effects of the Project.

## SECTION 8

## STATEMENT OF OVERRIDING CONSIDERATIONS

Having reduced the effects of the proposed Project by adopting mitigation measures, and balanced the benefits of the proposed Project against the proposed Project's potential unavoidable adverse impacts, the City hereby determines the benefits of the proposed Project outweigh the potential unavoidable adverse impacts, and the unavoidable adverse impacts are acceptable, based on the following overriding considerations, which are sufficient to outweigh the proposed Project's unavoidable adverse impacts:

- Construction of the Corrections Corporation of America Prison at California City will provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for

Surrounding communities. Between 80 to 90 percent of the prison employees are expected to be drawn from the project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees wil stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

## SECTION 9

## INDEPENDENT JUDGEMENT

## SECTION 21082.1 (C) (3) FINDING

Facts: The Planning Department, acting as lead agency, has reviewed and edited as necessary the Draft EIR Supplement and the Final EIR Supplement to reflect its own independent judgement to the extent of its ability, including reliance on concerned County technical personnel from other departments.

Finding: Pursuant to Public Resources Code Sec. 21082.1 (c) (3) the City Council hereby finds that the Final EIR Supplement reflects the independent judgement of the lead agency.

---

Introduced, approved and adopted this 20th Day of January, 1998 by the following vote:

| | |
|---|---|
| AYES: | 5 |
| NAYS: | 0 |
| ABSTAIN: | 0 |
| ABSENT: | 0 |

Larry Adams, Mayor

January 20, 1998
Date

ATTEST:

Helen Dennis, City Clerk

23

**ATTACHMENT B**

**ATTACHMENT B**

ORIGINAL

# RESOLUTION NO. 01-98-1802
## A RESOLUTION OF THE CITY COUNCIL
## GRANTING CONDITIONAL USE PERMIT 97-01
## PRISON FACILITY

**WHEREAS,** governmental and quasi-governmental uses, such as prison facilities may be permitted in Residential/Agricultural District zones with a conditional use permit (Ord. No. 96-529); and

**WHEREAS,** the property located approximately 0.5 miles South of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian also known as Assessor's Parcel Number (APN) 350-031-02 is within the R/A, Residential/Agricultural District zone and that a portion of the 320-acre site is zoned Conservation Land, which is a compatible use with the R/A zone as defined by the City of California City General Plan 2012 Land Use Designation Chart; and

**WHEREAS,** Corrections Corporation of America has requested and filed an application with the Planning Commission to establish and operate a 2,304 bed prison facility on approximately 70 acres of the 320-acre above-mentioned address; and

**WHEREAS,** notice of a public hearing was mailed to all property owners within 300 feet of the above-mentioned parcel and published as required by the Zoning Regulations; and

**WHEREAS,** the Planning Commission did conduct a public hearing on January 15, 1998, heard public testimony, and made the following findings:

1. That a prison facility use is necessary for the preservation and enjoyment of a substantial property right.
2. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.

3. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.

4. That the Final Environmental Impact Report (EIR) Supplement State Clearinghouse (SCH) #97091045 is certified as adequate and in compliance with California Environmental Quality Act (CEQA) for the proposed prison project.

5. That the Mitigation Monitoring Program dated January 1998 for the proposed prison be adopted as part of Conditional Use Permit 97-01.

6. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).

7. Site plan review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.

8. This conditional use permit expires twelve (12) months from that date of the City Council's approval if the prison facility operation is not commenced and diligently pursued.

9. All provisions of the City of California City Municipal Code currently in effect must be complied with.

**WHEREAS,** the Planning Commission hereby approves the conditional use permit and directs that this resolution be prepared and presented to the City Council for the consideration and granting of Conditional Use Permit 97-01.

**APPROVED THIS 15TH DAY OF JANUARY, 1998** by the Planning Commission.

Planning Commission Chairman

Attest:

Planning Secretary

**NOW, THEREFORE, BE IT RESOLVED** by the City Council of the City of California City that the Conditional Use Permit 97-01 is granted to Corrections Corporation of America to establish and operate a prison facility in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**PASSED, APPROVED AND ADOPTED** this __20th__ day of __January__, 1998, by the City Council, by the following Roll Call Vote: AYES: _5_ ; NOES: _0_ ; ABSTAIN: 0; ABSENT: 0.

_____
Mayor

ATTEST:

_____
Secretary
(SEAL)

**ATTACHMENT C**

**ATTACHMENT C**

*California City*
*Real Estate*

Recording Requested by:
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ RECORDING IN
_____ COUNTERPART        County  $        City
_____ Computed on the consideration or value of property conveyed; OR
_____ Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to   CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF CALIFORNIA           } ss
COUNTY OF *Los Angeles*
On *6/9/98*        before me *Lisa Christine Hendry*
personally appeared *Channing C. Ahn*

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature *Lisa Christine Hendry*

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

Moohay A. Choe

Angela H. Ahn Mouradian

Channing C. Ahn

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

(This area for official notarial seal)

Recording Requested by:
Commonwealth Land Title Company

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 1,812.80 _____ County  $ _____ City

____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to
an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single
woman as to an undivided 1/3 interest and     Channing C. Ahn, a single man, as to an
undivided 1/3 interest
hereby GRANT(S) to  CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION

all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or
hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from
and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the
surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and
through said property at depths below 100 feet from locations on adjacent or neighboring lands in  such manner as not to disturb
the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as
reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

THIS DEED IS BEING SIGNED IN COUNTERPART.

Dated: June ~~5~~ 10, 1998

STATE OF ~~CALIFORNIA~~ Massachusetts }ss
COUNTY OF  Norfolk
On 6-10-1998 before me Tracy K Kenney
personally appeared
Angela H Ahn Mouradian
personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/~~are~~ subscribed to the within instrument and acknowledged
to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~
authorized capacity(ies), and that by ~~his~~/her/~~their~~
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature Tracy K Kenney
My Commission expires Oct. 13, 2000

MAIL TAX STATEMENTS TO ADDRESS ABOVE

Moohay A. Choe
_____

Angela H. Ahn Mouradian
Angela H. Ahn Mouradian

_____
Channing C. Ahn

(This area for official notarial seal)

James Maples Assessor Recorded
Kern County Official Records

Recording Requested by 01292-JLT-CDB
Commonwealth Land Title Company

Pages: 3
6/19/1998
8:00:00

DOCUMENT #:0198081113

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

▮0198081113▮

Fees.... 13.00
Taxes... 1812.80
Other...
TOTAL
PAID.. 1825.80

THIS SPACE FOR RECORDER'S USE ONLY:    Stat. Types: 1

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ RECORDING IN    County    $ _____ City
              COUNTERPART
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances
     remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to
an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single
woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an
undivided 1/3 interest
hereby GRANT(S) to   CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION

all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or
hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from
and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the
surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and
through said property at depths below 100 feet from locations on adjacent or neighboring lands in  such manner as not to disturb
the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as
reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF CALIFORNIA            }ss
COUNTY OF Los Angeles          }
On 6/9/98 before me MORTON M. Schneider
personally appeared Moohay A. Choe.

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _Morton M. Schneider_

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

Moohay A. Choe

_____
Angela H. Ahn Mouradian

_____
Channing C. Ahn

MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999

(This area for official notarial seal)

**ATTACHMENT D**

**ATTACHMENT D**

# CITY OF CALIFORNIA CITY
# MEMORANDUM TO THE FILE

**DATE:**      November 15, 2001

**FROM:**      Jack Stewart, City Manager/Planning Director

**SUBJECT**    Extension of Conditional Use Permit - Amendment (CUP-A)
               98-02 512-bed Expansion for CCA Prison

### MEMO TO THE FILE

CCA's current extension expires on November 30, 2001 for CUP-A 98-02 for the 512-bed expansion. The expansion is on-going in the confines of the existing approved 70 acres and within the existing structures. This extension is granted indefinitely and is limited to the above referenced expansion.

This approval is granted by the City Council through their authority to delegate such power to the City Manager as their representative and in accordance with the Zoning Ordinance, Section 9-2.2202 (b) 2, page 104 and Section 9-2.2503 (a) 2., page 116 with the pre-existing conditional use being CUP 97-01.



# City of California City

City Hall



PHONE (760) 373-8661

21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

November 9, 1999

Mr. Kenneth M. Avant, Director
Maintenance and Construction
10 Burton Hills Boulevard
Nashville, Tennessee 37215

SUBJECT:    Request for Two-Year Extension to Conditional Use Permit
            Amendment (CUP-A) 98-02 for the 512-bed Prison Expansion

        The Planning Commission reviewed and approved your request for
an extension to November 30, 2001 for Conditional Use Permit
Amendment (CUP-A) 98-02 for the 512-bed prison expansion.

        If you have any questions, please contact my office at 760-
373-8670.

Sincerely,

*Jack Stewart*

Jack P. Stewart
City Manager

cc:  James M. Hunter
     ✓File

# PLANNING COMMISSION
Meeting Date: October 26, 1999

**DATE OF PREPARATION:** October 22, 1999

**TO:**       Planning Commission

**FROM:**   Planning Director

**SUBJECT:**  Consider Request for Two-Year Extension to Conditional Use Permit Amendment (CUP-A) 98-02 from CCA for the 512-bed Prison Expansion – Planning Director

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## BACKGROUND:
Staff has received a request from CCA for a two-year extension to CUP-A 98-02 scheduled to expire on November 30, 1999.   The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion.

## RECOMMENDATION:
Staff recommends granting CCA's request for an extension to November 30, 2001 for CUP-A 98-02.

## SOURCE OF FUNDING: N/A

## ENVIRONMENTAL ACTION: None.

Attachments:
1.  CCA's letter of request (10-12-99)

# NB 2.

17671 Cowan Avenue, Suite 150, Irvine, California 92614-6031

RECEIVED

OCT 1 5 1999

Ken a_____

October 12, 1999

Mr. Jack Stewart
City Manager
City of California City
21000 Hacienda Boulevard
California City, CA 93505

Subject: **Modified Conditional Use Permit for 512-Bed Expansion at CCA's California City Correctional Center**

Mr. Stewart:

As you may be aware, the City Council of California City on December 1, 1998, passed, approved and adopted a Resolution modifying Conditional Use Permit (CUP) 97-01 to allow a 512-bed expansion at Corrections Corporation of America's (CCA) California City Correctional Center – CUP Amendment 98-02. Provisions of the California City Municipal Code Section 9-2.2202(b) indicate the following:

Telephone

949.251.6400

Facsimile

949.251.6444

> "A use permit shall lapse and shall become void twelve (12) months following the date on which the use permit became effective unless by conditions of the use permit, a lesser or greater time is prescribed below, or unless prior to the expiration of the twelve months, Building Permit is issued by the Building Official and construction is commenced and diligently pursued toward completion on the site which was the subject of the use permit application. A use permit may be renewed for an additional period of twelve (12) months or for a lesser or greater period as prescribed in paragraph b(2); provided that prior to the expiration of the time period granted, an application of renewal of the use permit is filed with the Planning Commission ...."

Since the current use permit for the 512-bed expansion will expire on November 30, 1999, a two-year renewal is requested for CUP Amendment 98-02. The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion require a certain amount of regulatory flexibility. Please accept this letter as CCA's formal application to the City of California City for a two-year renewal of CUP Amendment 98-02. If you have any questions regarding this request, please feel free to contact me at 949.251.6417.

Very truly yours,

*Earth Tech, Inc.*

James M. Hunter
Irvine Operations Manager

CC: Ken Avant - CCA

E A R T H  T E C H

A *tyco* INTERNATIONAL LTD. COMPANY

# CITY COUNCIL

Meeting Date:  December 1, 1998

**DATE OF PREPARATION:**  November 25, 1998

TO:          Mayor and City Council
FROM:    Interim City Manager

SUBJECT:    Consider Conditional Use Permit-Amendment 98-02 to
Conditional Use Permit 97-01 and Mitigated Negative
Declaration for the Proposed 512-Bed Expansion at
Corrections Corporation of America's California City
Correctional Center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:**  On November 24, 1998 this matter was reviewed by the
Planning Commission during their regular Planning Commission meeting.  The
Commission voted on the following two separate issues.

Resolution 11-98-02 modifying Conditional Use Permit 97-01 as it relates to the
proposed 512-bed expansion at Corrections Corporation of America's California
City Correctional Center (Conditional Use Permit-Amendment 98-02):  AYES:
4, NOES: 0, ABSTAIN: 1, ABSENT: 0

The Planning Commission further voted to forward the Proposed Mitigated
Negative Declaration, to the City Council for approval and after full
consideration, approved the application:  AYES: 4, NOES: 0, ABSTAIN: 1,
ABSENT: 0

**RECOMMENDATION:**  The City Council approved Resolution 11-98-02 and
the Proposed Mitigated Negative Declaration as presented.

**SOURCE OF FUNDING:**  N/A.

**ENVIRONMENTAL ACTION:**  Direct staff to file a Notice of Determination
with the Kern County Clerk's Office.

Attachments:
   1.  Planning Commission's 11-24-98 Agenda Item
   2.  Resolutions

**PH** 2.

Correspondence:    None

Public Comment:    None

Motion to close the public hearing at 6:24 by Councilman Bailey, second by Councilman Lessenevitch. Carried.

Council action: Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the extension to September 1, 2000, and adopt "A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 96-05 AS IT RELATES TO THE DEADLINE FOR COMPLETING A FINANCIAL PLAN." Roll Call vote as follows:

AYES:        Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams.
NAYS:        None
ABSENT:     None

PH 2. Consider approving amendment to Conditional Use Permit-Amendment (CUP-A) for Proposed 512-Bed Expansion at California City Correctional Center -

Mayor Adams declared the Public Hearing open at 6:27 pm. Staff report was given by the City Engineer. There was no correspondence received on either part 1 or part 2 of the public hearing.

Council discussion: Procedural matters were discussed on how to conduct the two-part hearing.

Public comment:    None

Motion to close the public hearing at 6:35 p.m. by Councilman Lessenevitch, second by Councilman Bailey. Carried.

Council action: On the advice of the City Attorney, the second Resolution, making certain environmental findings, was adopted first, as follows:

Motion by Councilman Lessenevitch, second by Councilman Bailey, to adopt the Mitigated Negative Declaration and adopt "A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS IN CONNECTION WITH THE 512-BED EXPANSION OF THE CALIFORNIA CITY CORRECTIONAL CENTER." Roll

Call vote as follows:

| | |
|---|---|
| AYES: | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| NAYS: | None |
| ABSENT: | None |

Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the Amendment to Conditional Use Permit-Amendment to allow a 512-bed expansion to the original CUP, by adopting **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTION CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER."** Roll call vote as follows:

| | |
|---|---|
| AYES: | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| NAYS: | None |
| ABSENT: | None |

**CONTINUED BUSINESS:**     None

**NEW BUSINESS:**
NB 1. Council members consider making appointments for Vice Mayor, as well as appointments to various boards and commissions:

Councilman Lessenevitch suggested they review the whole list and vote the appointments as decided by a single vote at the end. Mayor Adams said he had no problem with that approach, but asked that the position of Vice Mayor be settled first and separately. He asked that the position return to its historical roots where the Vice Mayor serves for one year only, with the position rotating through the Council so everyone has an opportunity to be Vice Mayor for one year out of their four-year term.

Councilman Lessenevitch nominated Harry Bailey for Vice Mayor, second by Councilman Dempsey. Carried.

The balance of the list was determined as follows:

| | |
|---|---|
| **KernCOG:** | Councilman Lessenevitch; alternate is Councilman Eddington. |
| **KCAC:** | Councilman Eddington. |
| **KCBOT:** | (appointed by supervisors) |
| **League of Cities:** | Councilman Dempsey |
| **KCEDC:** | Councilman Dempsey |

4

# NOTICE OF PUBLIC HEARING

**NOTICE IS HEREBY GIVEN** that the City Council of the City of California City will hold a **PUBLIC HEARING** on Tuesday, December 1, 1998, for the purpose of Adopting a Mitigated Negative Declaration of Environmental Impact and to consider a Conditional Use Permit Amendment (CUP-A) Application No. 98-02, for a proposed 512-bed expansion at the California City Correctional Center.

**ALL INTERESTED PARTIES** are invited to attend and express opinions and commentary on the above-calendared matter

DATE:     Tuesday, December 1, 1998
TIME:     6:00 p.m. or as soon thereafter as possible
PLACE:    City Council Chambers, City Hall, 21000 Hacienda Blvd., Calif. City

DATED:     November 16, 1998

_Helen Dennis_

Helen Dennis, City Clerk

**AFFIDAVIT OF POSTING:**
**I, Helen Dennis, City Clerk of California City** do hereby attest that I caused this Notice of Public Hearing to be posted on Tuesday, November 17, 1998 on all official City bulletin boards, and that said Notice was published in the Mojave Desert News, a newspaper of general circulation within California City, on Thursday, October 29, 1998.

_Helen Dennis_

Helen Dennis, City Clerk

**NOTICE OF INTENT TO ADOPT MITIGATED NEGATIVE DECLARATION (MND), AND NOTICE OF PUBLIC HEARING TO CONSIDER CONDITIONAL USE PERMIT-AMENDMENT 98-02 FOR PROPOSED 512-BED EXPANSION AT CALIFORNIA CITY CORRECTIONAL CENTER BY CORRECTIONS CORPORATION OF AMERICA (CCA) BY CITY OF CALIFORNIA CITY PLANNING COMMISSION AND CITY COUNCIL**

NOTICE IS HEREBY GIVEN that two public hearings will be held in the Council Chambers of City Hall, 21000 Hacienda Boulevard, California City, California, to consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 for the proposed 512-bed expansion at Corrections Corporation of America's California City Correctional Center, located at 22844 Virginia Boulevard, California City, CA.

Public hearing dates are:

Tuesday, November 24, 1998, 6:00 p.m. - Planning Commission

Tuesday, December 1, 1998, 6:00 p.m. - City Council

This Public Hearing will be necessary depending upon the action of the Planning Commission on November 24, 1998.

NOTICE IS FURTHER GIVEN that the City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The initial study was undertaken for the purpose of deciding whether the proposed project may have a significant effect on the environment. The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. A proposed Mitigated Negative Declaration has been prepared and is available for public review at City Hall, 21000 Hacienda Boulevard, California City, from 8 a.m. to 5 p.m., Monday through Friday. The required public comment period begins on October 29, 1998 and ends on November 17, 1998 at 5:00 p.m. Written comments on the proposed MND should be addressed to Mike Shahbakhti at City Hall. Publication in a local newspaper satisfies notification requirements under PUB. RES. CODE ("PRC") Section 21092 (b) (3) and CEQA Guideline Section 15072 (b) (1).

DATED: October 26, 1998
/s/ Terry Hicks
Terry Hicks
Interim City Manager
Published in The Mojave Desert News
October 29, 1998

# PLANNING COMMISSION

Meeting Date: November 24, 1998

**DATE OF PREPARATION:** November 17, 1998

**TO:**      Planning Commission
**FROM:**   Planning Director

**SUBJECT:**   Consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 and Mitigated Negative Declaration for the Proposed 512-Bed Expansion at Corrections Corporation of America's California City Correctional Center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:**
On January 15, 1998 the Planning Commission approved Conditional Use Permit 97-01 and certified the Draft Environmental Impact Report (EIR) Supplement for the 2,304-bed Corrections Corporation of America's (CCA) California City Correctional Center, located at 22844 Virginia Boulevard, California City.

Staff has received an application from CCA to consider Conditional Use Permit-Amendment 98-02 for the proposed additional 512 beds.

The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. The proposed Mitigated Negative Declaration was available for public review at City Hall from October 29, 1998 and the review period ended on November 17, 1998. Staff published a notice of public hearing in the local newspaper. Notice of Preparation letters were sent certified return receipt requested to 33 affected property owners on October 28, 1998. The same letter was sent first class to 13 public agencies on October 27, 1998. One response letter, generally supporting the proposed prison expansion was received at the Planning Department on November 10, 1998.

1

**PH 2.**

CUP-A 98-02
November 24, 1998

The Planning Commission shall review the information, receive pertinent evidence and testimony, make required findings, and approve, modify and approve or deny the application. If approved, the Planning Commission shall adopt resolution(s) setting forth its findings and conditions of approval within thirty (30) days following the closing of the public hearing. The use permit becomes effective when granted by resolution of the Council.

Staff has reviewed the information submitted by the applicant and the Mitigated Negative Declaration (MND) prepared by Rust Environment and Infrastructure, and finds that the use complies with the provisions of the Zoning Regulations and The Municipal Code. Of particular note is the following findings:

1. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.
2. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
3. That the Conditional Use Permit-Amendment 98-02 and the Proposed Mitigated Negative Declaration appears adequate and in compliance with CEQA for the proposed 512-bed prison project expansion.
4. That the Mitigation Monitoring Program is being enforced.
5. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
6. Site Plan Review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
7. All provisions of the California City Municipal Code currently in effect must be complied with.

2

CUP-A 98-02
November 24, 1998

**RECOMMENDATION:**
The Planning Commission conduct the public hearing and consider the attached resolution(s) which would make findings and set conditions for the adoption of the Mitigated Negative Declaration (MND) and approval of Conditional Use Permit-Amendment 98-02. Direct the Planning Director to pass the resolution(s) onto the City Council for its consideration and approval.

**SOURCE OF FUNDING:** N/A.

**ENVIRONMENTAL ACTION:** The City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The initial study was undertaken for the purpose of deciding whether the proposed project may have a significant affect on the environment.

Attachments:
1. CUP-A 98-02 Application w/Environmental Information Form
2. Proposed Mitigated Negative Declaration
3. Public Hearing Notice
4. Letter to public agencies and property owners
5. Mailing List
6. Communications: Mr. and Mrs. Richard Manuell
7. Resolution(s)

3

RESOLUTION NO. 11-98-02

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT— AMENDMENT 98-02)

BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF

CALIFORNIA CITY as follows:

**Section 1.    Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America

(CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee

filed an application to expand the permitted use by 512 beds. This resolution sets forth the

Commission's decision on the application.

**Section 2.    Findings**

The Commission finds as follows:

(a)    Operation of a prison facility is in accordance with the general plan and the

objectives of the Zoning Regulations;

(b)    Facility complies with the applicable provisions of the Municipal Code; and

(c)    A Mitigated Negative Declaration for the proposal will satisfy California

Environmental Quality Act (CEQA).

**ATTACHMENT E**

**ATTACHMENT E**

# Addendum No. 1 to California City Prison Project Final Subsequent Environmental Impact Report

Lead Agency:

### City of California City
21000 Hacienda Boulevard
California City, CA 93505
(760) 373-8661

Project Applicant:

### Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, TN 37215

December 2009

Prepared by

 **CH2M**HILL

1000 Wilshire Boulevard, 21st Floor
Los Angeles, CA 90017

# Contents

**Section**                                                                                   **Page**

**1  Introduction**................................................................................................ 1-1
    1.1    Purpose of this Addendum ............................................................. 1-1
        1.1.1    CEQA Requirements.......................................................... 1-1
    1.2    Overview of the Environmental Review Process ...................... 1-3
        1.2.1    Subsequent Environmental Impact Report (Subsequent EIR) ..... 1-3
**2  Description of Project Changes** ........................................................... 2-1
    2.1    Project Location and Setting ......................................................... 2-1
    2.2    Proposed Changes to the Project Description ............................. 2-3
**3  Environmental Impact Analysis** ........................................................... 3-1
    3.1    Land Use .......................................................................................... 3-1
    3.2    Aesthetic and Visual Considerations............................................ 3-1
    3.3    Employment, Population, and Housing ....................................... 3-2
        3.3.1    Impacts ............................................................................... 3-2
        3.3.2    Mitigation Measures ......................................................... 3-3
    3.4    Public Utilities and Community Services ..................................... 3-3
        3.4.1    Law Enforcement .............................................................. 3-3
        3.4.2    Fire Protection ................................................................... 3-3
        3.4.3    Schools ................................................................................ 3-4
        3.4.4    Hospitals ............................................................................ 3-4
        3.4.5    Judicial Services ................................................................ 3-4
        3.4.6    Water Supply ..................................................................... 3-5
        3.4.7    Wastewater Treatment and Disposal .............................. 3-5
        3.4.8    Solid Waste ........................................................................ 3-5
        3.4.9    Energy ................................................................................. 3-6
        3.4.10  Telephone and Cable ...................................................... 3-6
    3.5    Transportation ................................................................................ 3-6
        3.5.1    Construction Impacts ........................................................ 3-6
        3.5.2    Operation Impacts ............................................................ 3-6
    3.6    Air Quality....................................................................................... 3-7
        3.6.1    Construction Impacts ........................................................ 3-8
        3.6.2    Operation Impacts ............................................................ 3-9
    3.7    Noise................................................................................................. 3-10
    3.8    Hydrology, Storm Drainage, and Flood Control ....................... 3-11
    3.9    Biological Resources...................................................................... 3-11
        3.9.1    Environmental Setting ..................................................... 3-12
        3.9.2    Environmental Impacts .................................................... 3-13
    3.10  Cultural Resources ........................................................................ 3-15
    3.11  Cumulative Impacts ...................................................................... 3-15
    3.12  Environmental Impact Analysis Conclusions ............................ 3-15

**Figures**

1    Project Option ................................................................................................................. 2-2
2    Corrections Corporation of America Revised Project ................................................. 2-4

**Tables**

AAQS, Designation Classification, and Monitoring Values[1] ...................................... 3-7

# Acronyms and Abbreviations

| | |
|---|---|
| AAQS | Ambient Air Quality Standards |
| ARB | Air Resources Board |
| BMP | best management practice |
| CAAQS | California Ambient Air Quality Standards |
| CCA | Corrections Corporation of America |
| CCCF | California City Correctional Facility |
| CCFD | California City Fire Department |
| CCPD | California City Police Department |
| CDCR | California Department of Corrections and Rehabilitation |
| CDFG | California Department of Fish and Game |
| CEQA | California Environmental Quality Act |
| CESA | California Endangered Species Act |
| CNDDB | California Natural Diversity Database |
| CO | carbon monoxide |
| ESA | Endangered Species Act |
| gpid | gallons per inmate per day |
| gpm | gallons per minute |
| HCP | Habitat Conservation Plan |
| LOS | level of service |
| MBTA | Migratory Bird Treaty Act |
| MUSD | Mojave Unified School District |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | nitrogen oxide |
| NPDES | National Pollutant Discharge Elimination System |
| OHV | off-highway vehicle |
| OHWM | Ordinary High Water Mark |
| $PM_{10}$ | particulate matter less than 10 micrometers in aerodynamic diameter |

| | |
|---|---|
| PM$_{2.5}$ | particulate matter less than 2.5 micrometers in aerodynamic diameter |
| ppm | parts per million |
| RFP | Request for Proposal |
| SCE | Southern California Edison Company |
| SO$_2$ | sulfur dioxide |
| Subsequent EIR | Subsequent Environmental Impact Report |
| USFWS | U.S. Fish and Wildlife Service |
| VMT | vehicle miles traveled |

SECTION 1

# Introduction

This document is Addendum Number 1 to the certified 2006 Final Subsequent Environmental Impact Report (Subsequent EIR) for the California City Prison Project, dated November 2006 (State Clearinghouse No. 2006071009). This addendum provides an evaluation of proposed revisions to one of the two project options evaluated in the Subsequent EIR.

## 1.1    Purpose of this Addendum

The purpose of Addendum No. 1 is to address the potential environmental effects of the increased capacity of the 2,200-bed correctional facility described in Section 2, and to determine whether the findings associated with the California City Prison Project Subsequent EIR remain valid in light of the revision to the Proposed Project and the Project Option. To the extent that these changes may constitute additional information that was not previously anticipated or analyzed in the Subsequent EIR, the City of California City Planning Department determined such changes should be addressed in an Addendum (No. 1) to the Subsequent EIR. This method of documentation presents a clear and informative document to specifically outline the subsequent changes to the project, and mitigation measures, as it was presented to the Planning Commission in the Subsequent EIR.

The project revisions assessed in Addendum No. 1 do not change the basic objectives for the project and do not substantially change the conclusions of the environmental analysis as stated in the Subsequent EIR. The revisions to the project do not raise any new significant environmental impacts that were not previously identified in the Subsequent EIR.

### 1.1.1    CEQA Requirements

Prepared in accordance with the California Environmental Quality Act (CEQA) (PRC 21000 et seq.) and the Guidelines for Implementation of the California Environmental Quality Act, as amended, this Addendum summarizes minor revisions associated with a project analyzed in the Subsequent EIR. Section No. 15164 of the CEQA Guidelines provides the following directions for the preparation of an Addendum:

(a)    The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR [...] have occurred;...

(c)    An addendum need not be circulated for public review but can be included in or attached to the final EIR [...];

(d)    The decision-making body shall consider the addendum with the final EIR [...] prior to making a decision on the project.

(e)   A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's findings required on the project, or elsewhere in the record. The explanation must be supported by substantial evidence.

The relevant conditions described in Section 15162 indicate that:

(a)   When an EIR has been certified […], no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in light of the whole record, one or more of the following:

   (1)   Substantial changes are proposed in the project which will require major revisions of the previous EIR […] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

   (2)   Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR … due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

   (3)   New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete […], shows any of the following:

      (A)   The project will have one or more significant effects not discussed in the previous EIR […];

      (B)   Significant effects previously examined will be substantially more severe than shown in the previous EIR;

      (C)   Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

      (D)   Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

As discussed in Chapter 2 of this Addendum, project impacts resulting from changes to the project are not substantially different from those assessed in the Subsequent EIR. In all respects, the proposed changes result in impacts that would be the same, more beneficial to the environment, or would further reduce the level of impact to levels below significance.

Regarding Section 15162 (a)(1) above, revisions to the project as described in Chapter 2 of this Addendum are not considered substantial and do not require major revisions to the Subsequent EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

Regarding Section 15162 (a)(3) above, there has been no new information of substantial importance that has come to light since the certification of the EIR. More specifically,

(A)     The information in this Addendum does not reveal a new significant environmental effect not discussed in the previous EIR;

(B)     The information in the Addendum does not reveal that a substantial increase in the severity of an environmental impact would result.

(C) & (D)     The information in the Addendum does not reveal feasible mitigation measures or alternatives different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

A lead agency may not prepare a Subsequent EIR unless any of the conditions identified in CEQA Guidelines §15162 are found to exist. As discussed previously, none of those conditions has been met and, therefore, no Subsequent EIR can be required. Consequently, an Addendum is considered the appropriate document to discuss the environmental implications of the Revised Project. Nonetheless, CEQA requires that the lead agency support this determination with substantial evidence in the record. This Addendum serves as that vehicle, and a review of its contents substantiates the conclusion that the information provided herein merely updates, clarifies, and amplifies the information provided in the Subsequent EIR for the California City Prison Project.

## 1.2    Overview of the Environmental Review Process

### 1.2.1    Subsequent Environmental Impact Report (Subsequent EIR)

Under CEQA Guidelines, Section 15162, the lead or responsible agency may choose to prepare a Subsequent EIR if, following circulation of a previous EIR, the lead agency determines that there are substantial changes proposed in the project, substantial changes occur with respect to the circumstances under which the project is undertaken, or there is new information of substantial importance that would result in new significant effects or significantly greater impacts than previously disclosed.

In 2006, the lead agency for the project, the City of California City, determined that a Subsequent EIR should be prepared to evaluate an additional portion of the Virginia Boulevard site for construction and operation of a smaller prison facility than that proposed in the previous 1994 EIR. Specifically, the Subsequent EIR contained a co-equal level of environmental analysis for two projects: a 550-bed Modified Community Corrections Center in response to a solicitation from California Department of Corrections and Rehabilitation (CDCR); and a 1,596-bed detention center to meet federal detention needs.

The Subsequent EIR required only information necessary to make the previous EIR adequate for the current project. Therefore, the 1994 certified EIR (SCH No. 93082030) and the Subsequent EIR (SCH No. 2006071009) are incorporated by reference into this Addendum. The California City Planning Commission certified the Subsequent EIR in November 2006.

SECTION 2
# Description of Project Changes

## 2.1    Project Location and Setting

Figure 2-1 shows the project site, which is located in the City of California City, Kern County, California, approximately 0.5 mile south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The project site elevation is roughly 2,540 feet above mean sea level, approximately 5 miles east of downtown California City. The property and most of the vicinity are composed of vacant undeveloped desert land, characterized by creosote bush vegetation. The project site is adjacent to the existing California City Correctional Facility (CCCF) and, as such, the project site is served by public utilities. The CCCF is the only property within 0.5 mile that contains any significant structural improvements. Detailed information on the regional setting is set forth in the Subsequent EIR.

The certified Subsequent EIR evaluated two project options: (1) a 550-bed *Proposed Project* to respond to CDCR Male Bed Expansion Request for Proposal (RFP) Number 050271; and (2) a 1,596-bed *Project Option* to meet to federal demands for detention space in the event that the CDCR contract for the 550-bed facility was not awarded.

If Corrections Corporation of America (CCA) had implemented the 2006 Proposed Project, CCA would have constructed and operated a 550-bed Modified Community Corrections Center on approximately 35 acres located at the southwestern corner of the 320-acre Virginia Boulevard site. The Proposed Project would have been a state-of-the-art, secure correctional facility designed to meet American Correctional Association standards with several facilities including a 125,790-square-foot main building, an outdoor recreation area, an armory for storing weapons and riot gear, a perimeter compound security system, and site improvements including a parking lot for 177 vehicles, an access road, and petroleum-powered generators.

The 2006 Project Option was a 1,596-bed detention center CCA proposed to design, construct, and manage to meet federal demands for detention space. Like the Proposed Project, CCA proposed the Project Option on the same 35-acre section of the 320-acre Virginia Boulevard site, and intended to design the facility to meet American Correctional Association standards. Unlike the previous CDCR proposal, CCA intended the Project Option to accommodate federal prisoners and detainees in a medium-security facility. Figure 1 shows a conceptual site plan of the prison.

It is noteworthy that the Subsequent EIR contained a co-equal and detailed environmental impact analyses for both the 550-bed CDCR Modified Community Correctional Center for State of California inmates and a 1,596-bed detention center intended for federal inmates or detainees. Because the 1,596-bed Project Option had more significant impacts identified than the 550-bed Proposed Project, this Addendum describes and evaluates the 2,200-bed Revised Project in relation to the 1,596-bed detention center.



Existing California City Correctional Facility

**FIGURE 1**
Project Option
Conceptual Site Plan
*California City, California*

SCO345802.ED.02 conceptsiteplan_rev.ai 12/09

The 1,596-bed Project Option evaluated in the Subsequent EIR included a state-of-the-art secure correctional facility consisting of the following:

- Secure inmate housing buildings equipped with staff and inmate support facilities, and a central, linear courtyard containing five partially covered recreation areas for inmate recreation activities.

- An administration building composed of offices for prison management, support staff, and support spaces for correctional officers. An armory, containing weapons and riot gear, would be located in a secure portion of the administration building (CCA correctional officers do not carry weapons as part of normal operations).

- With the exception of the outside administration building, all improvements described previously would be located within a perimeter compound security system that would include two rows of chain-link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system and nighttime security lights on 30-foot-tall posts. To facilitate security patrols, a perimeter road would encompass the exterior of the entire fenced prison compound.

- Site improvements located external to the secured inmate housing would include an extension of the existing parking lot for the adjacent CCCF to accommodate an additional 285 employee and visitor vehicles.

## 2.2   Proposed Changes to the Project Description

As stated previously, the proposed revisions to the Project Option, as defined and analyzed in the Subsequent EIR, do not materially change the objectives or general development pattern for the project site.

Since certification of the Subsequent EIR, CCA is proposing a design revision to accommodate an additional 604 beds—totaling 2,200 beds. The proposed change is necessary to meet CCA's needs for new potential business opportunities with federal and other correctional agencies. CCA proposes to construct and operate a similar correctional facility on the same 35 acres of vacant land on the 320-acre Virginia Boulevard site. Like the Project Option design, the Revised Project design includes several single-story and single-story-with-mezzanine buildings, with heights of 20 to 40 feet, intended to accommodate federal prisoners and detainees. The Revised Project will include all of the ancillary facilities listed for the Project Option described previously. A significant design change is in the secure inmate housing area. Where the 2006 Project Option had mostly double-bunk hard-wall cells, the Revised Project would include a mix of dormitory-style housing units and cells. To accommodate various potential federal clients, the Revised Project would also have expanded administrative facilities for inmate programs and agency management, and an additional 120 parking spaces. Figure 2 shows a conceptual site plan of the Revised Project.



NOTES:
1. TOTAL SITE AREA: 35 ACRES
2. ADDITIONAL PARKING SPACES:
   - 292 STALLS
   - 8 BUS
3. 12-FOOT PERIMETER PATROL ROAD
4. 32-FOOT MAIN ENTRY/EXIT
5. PROPOSED SITE IS NOT IN DESIGNATED FLOOD PLAIN

KERN COUNTY ASSESSORS MAP NO. 350-03

FIGURE 2
Corrections Corporation of America
Revised Project
2200 Bed Correctional Facility
California City, California
December 2009

SECTION 3
# Environmental Impact Analysis

The following discussion examines the environmental impacts of the Revised Project (see Section 2 for a description of revisions to the Project Option). Except where specifically noted, the assessment methodologies are the same as those employed in the Subsequent EIR.

## 3.1   Land Use

The Subsequent EIR identified no adverse land use impacts from construction and operation of the 1,596-bed detention center. A prison would be consistent with the adjacent CCCF and would not affect other adjacent land uses, since all other surrounding parcels are vacant. As noted in the Subsequent EIR, the prison facility could be located in proximity to future residential development, resulting in a potential land use conflict due to air quality, noise, and visual/aesthetic issues. These potential impacts were addressed in the appropriate sections of the Subsequent EIR.

Because the Revised Project will be constructed on the same site as the 2006 Project Option, no adverse impacts to land use are anticipated. The zoning for the project site, unchanged since certification of the Subsequent EIR, allows for governmental or quasi-governmental correction, probation, or prison facilities, and services with a conditional use permit. Because CCA will obtain a conditional use permit for the Revised Project described in this Addendum, the project will be consistent with the zoning and land use designated for the project site. No adverse impacts relative to land use are anticipated from the proposed revisions. As such, the conclusions of the land use analysis in the Subsequent EIR would not be affected.

## 3.2   Aesthetic and Visual Considerations

Similar to the 1,596-bed detention center evaluated in the Subsequent EIR, the Revised Project would impact daytime viewsheds, resulting in degradation of the existing visual character and quality of the project site. Like the 1,596-bed detention center, the Revised Project would also cause nighttime light and glare. The project site is adjacent to vacant undeveloped desert land that has been entitled for residential subdivisions. While there are no immediate plans for construction in these neighboring subdivisions, the Revised Project would subject future residents to direct and unobstructed views of the prison facility.

The 1,596-bed detention center included single-story and single-story-with-mezzanine structures with a building height of 20 to 40 feet (similar to the adjacent CCCF). The Project Option also included mast light posts up to 30 feet in height (similar to the adjacent CCCF). Where feasible, lighting would be shielded and directed downward. Further, the prison buildings would have an exterior finish that would blend with the surrounding natural environment. Because the Project Option would substantially degrade the visual character

and quality of the project site and cause nighttime light and glare, the Subsequent EIR considered these visual impacts significant. The Subsequent EIR contained mitigation measures that (1) restricted mast lighting posts to 30 feet in height and (2) required lighting to be shielded and directed downward to minimize offsite illumination, where applicable, and required by design.

Because the Revised Project does not (1) increase the severity of the previously identified visual and aesthetic impacts, and (2) incorporates the mitigation measures for the 2006 Project Option, no significant effects examined in this Addendum will be substantially more severe or change the conclusions in the Subsequent EIR.

# 3.3    Employment, Population, and Housing

Similar to the project site development options evaluated in the Subsequent EIR, the Revised Project would create employment opportunities that would likely increase population and demand for housing in California City and the surrounding areas.

## 3.3.1    Impacts

### Employment

The Revised Project would generate approximately 250 temporary construction jobs and approximately 320 full-time permanent positions during facility operations. Approximately 70 percent of the permanent employment opportunities would be for correctional officers; other job opportunities would include medical, education, administrative, trade, and clerical positions. In addition to jobs provided by the prison, the purchase of local goods and services for the prison facility, and by CCA employees individually, would stimulate the local economy, resulting in additional employment opportunities in the region. The additional employment opportunities are considered a beneficial effect of the Revised Project.

### Population

The Revised Project would have a prison inmate population of 2,200 at full operating capacity. Based on CCA's experience with more than 60 correctional facilities, generally 1 percent of the inmate families and 10 to 15 percent of the prison employees would relocate to the region. For the Revised Project, approximately 20 families may relocate to the project vicinity. The remainder of prison employment and indirect job opportunities from the prison would be filled by the existing population of California City and surrounding communities. Using the California average household size of 2.9 persons per household, the population increase from relocating inmate and employee families may be approximately 135 persons for the Revised Project.

Population growth associated with a prison typically increases demand for public services, such as water and wastewater facilities. As described in Section 3.4 of this Addendum, and consistent with the Subsequent EIR, impacts resulting from population growth would be less than significant.

**Housing**

The vacancy rate in California City and surrounding communities indicates that ample housing is available to accommodate relocation of inmate families and employee families resulting from the Revised Project.

### 3.3.2    Mitigation Measures

No adverse impacts to employment, population, and housing would result from construction and operation of the Revised Project. As such, no mitigation measures are required. The proposed changes to the project will not affect the findings and conclusions of the Subsequent EIR with respect to employment, population, and housing.

# 3.4    Public Utilities and Community Services

Like the 550-bed Proposed Project and 1,596-bed Project Option evaluated in the Subsequent EIR, the Revised Project has the potential to affect public utilities and community services in California City and in surrounding communities. These effects can occur in two primary ways: (1) by increasing the demand for California City services to the Revised Project directly; and (2) by increasing the demand for services in California City and the surrounding communities to accommodate population growth. The Revised Project would directly and indirectly generate significant tax benefits to the City of California City's general revenue fund and regional governments, which would offset the potential costs of community services.

### 3.4.1    Law Enforcement

The Subsequent EIR determined that the Proposed Project or Project Option would cause (1) a slight increase in calls requesting assistance from the California City Police Department (CCPD), and (2) an increase in the demand for law enforcement services due to project-related and indirect population growth. Based on the small number of additional phone calls for service, the Subsequent EIR concluded that significant impacts to CCPD services would not occur and mitigation measures would not be required.

The Revised Project proposes a 604-bed increase in capacity from the Project Option. Compared to the Project Option, the larger Revised Project would generate a slightly higher number of calls to CCPD and possibly an increased demand for law enforcement services due to population growth directly and indirectly related to the project. Despite the potential increase in calls to CCPD and increased demand for law enforcement services due to direct and indirect project-related population growth, the impacts to law enforcement from the Revised Project would remain within the service capability of CCPD and would not be significant; mitigation measures, therefore, would not be required.

### 3.4.2    Fire Protection

The Proposed Project and Project Option analyzed in the Subsequent EIR were designed to comply with all applicable fire building codes, to be equipped with a comprehensive fire suppression system, and to be constructed with primarily noncombustible building materials. The Subsequent EIR determined that the Proposed Project or Project Option may (1) increase demand on the California City Fire Department (CCFD) for fire suppression, fire

prevention, and investigation duties, and (2) increase the demand for fire protection services resulting from project-related and indirect population growth. Based on the design features included in the facility and CCFD's indication that current staffing levels would be able to accommodate the increased duties that may be generated by the project, impacts to CCFD would be less than significant.

Like the projects analyzed in the Subsequent EIR, the Revised Project described in this Addendum will also be designed to comply with applicable fire building codes, equipped with a comprehensive fire suppression system, and constructed primarily with noncombustible building materials. The 604-bed increase proposed in the Revised Project may cause a slightly increased demand on CCFD for fire suppression, fire prevention, and investigation duties, and a slight increase in the demand for fire protection services due to project-related and indirect population growth. Impacts of the Revised Project would not, however, affect the service capability of CCFD or be significant. As such, the conclusions of the fire protection services analysis in the Subsequent EIR would not be affected.

## 3.4.3    Schools

The Subsequent EIR determined that the Proposed Project and Project Option would cause population growth that would affect student enrollment with the Mojave Unified School District (MUSD). However, MUSD has indicated that it would be able to accommodate additional students resulting from the Proposed Project and Project Option without adverse impacts. Further, mitigation for impacts from additional students generated indirectly by the Revised Project would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules. Based on this description, the Subsequent EIR determined that no adverse impacts would occur from the project or from direct or indirect population growth.

Similarly, the Revised Project described in this Addendum may cause increased demand on MUSD to accommodate additional students; however, based on existing MUSD school capacity, impacts of the Revised Project would not be significant.

## 3.4.4    Hospitals

The Subsequent EIR determined that no significant impact to hospital services would occur because (1) both the Proposed Project and Project Option would include medical facilities onsite 24 hours per day, and (2) the number of hospitals available for the community around California City would be able to accommodate project-related direct or indirect population growth. Because the Revised Project also proposes onsite medical facilities available 24 hours per day, no significant or different impacts would occur.

## 3.4.5    Judicial Services

The Subsequent EIR determined that impacts to judicial services would vary based on the contracting agency providing inmates to the proposed facility. The Project Option would have generated up to two court cases per month, while the adjacent CCCF generates only two court cases per year. The impacts on judicial services are fiscal issues and not environmental impacts. Similarly, the Revised Project proposed in this Addendum would

generate two to three court cases per month. Like the Project Option in the Subsequent EIR, environmental impacts resulting from the Revised Project would not be significant.

## 3.4.6     Water Supply

The Subsequent EIR estimated water demand for the Proposed Project and Project Option by calculating the average daily water usage over time at the existing CCCF and dividing that usage by the number of inmates. The data showed that the water demand in a facility such as that described in the Project Option is approximately 230 gallons per inmate per day (gpid), inclusive of prison staff and support services. California City Public Works Department staff indicated that the Project Option could be served from existing City supply and conveyance facilities. The Project Option proposed design features to minimize water use at the proposed prison, including use of low-flow fixtures and drought-tolerant, native landscaping.

The Revised Project includes the following water-conserving features: ultra low-flow showerheads (1.2 gallons per minute [gpm]); 1.28-gallon-per-flush toilets; grey water recycling for toilet flushing and laundry water recycling; and a water management system to provide correctional officers control of the function of the inmate water closets and inmate showers. Solar-powered hot water could be utilized depending on design parameters and local conditions.

These design features are part of the Revised Project, not mitigation measures, and with implementation of these design and operational features, the Revised Project would significantly reduce the anticipated per-inmate water use and related environmental impacts. Therefore, the proposed changes would not affect California City water services, water conservation efforts, or the water conservation impact analysis as presented in the Subsequent EIR.

## 3.4.7     Wastewater Treatment and Disposal

The Subsequent EIR determined that no significant impacts to wastewater treatment and disposal would be anticipated for the Proposed Project or the Project Option. This determination was based on an estimated wastewater flow of 230 gpid, inclusive of all prison staff and support services. The Revised Project described in this Addendum incorporates additional water-conserving features that would also reduce the amount of wastewater generated per inmate (i.e., grey water recycling, laundry water recycling). A reduction in the quantity of wastewater produced by each inmate is a beneficial or reduced impact of the Revised Project compared to the 2006 Proposed Project or the Project Option.

## 3.4.8     Solid Waste

The Subsequent EIR determined that no significant impacts to solid waste disposal would be anticipated for the Proposed Project or the Project Option. Landfill capacity is expected to remain adequate to accommodate the additional waste generated by the Revised Project and associated direct and indirect population growth related to the project. Kern County has seven landfills and additional recycling facilities that are estimated by County staff to have approximately 70 years of operational capacity to manage solid waste generated in Kern County (Ferguson, 2009). No significant impacts related to solid waste disposal would occur

from the Revised Project. As such, the conclusions of the solid waste impact analysis in the Subsequent EIR would not be affected.

## 3.4.9    Energy

The Subsequent EIR determined that no significant impacts to energy would occur from the Proposed Project or the Project Option. Southern California Edison Company (SCE) has indicated that the electrical loads of the Revised Project are within the parameters of projected load growth that SCE is planning to meet in the vicinity. Southern California Gas Company has indicated that it has adequate natural gas supply and facilities to supply the Revised Project. The existing propane tanks on the adjacent CCCF property also have the capacity to serve the Revised Project. No significant impacts related to energy would occur from the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

## 3.4.10    Telephone and Cable

The Subsequent EIR determined that no significant impacts to telephone and cable would be anticipated for the Proposed Project or the Project Option. With regard to telephone service, telephone line improvements previously installed to support the adjacent CCCF would also serve the Revised Project. As such, the conclusions of the public utilities telephone and cable analysis in the Subsequent EIR would not be affected.

# 3.5    Transportation

## 3.5.1    Construction Impacts

The Subsequent EIR determined that construction of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, construction of the 2,200-bed Revised Project would require similar numbers of construction workers and equipment and a similar duration time to the requirements to construct the 1,596-bed Project Option evaluated in the Subsequent EIR. Because the Revised Project would cause similar construction traffic trip generation, including ready-mix concrete truck, tractor trailer, and flatbed truck trips, impacts to traffic and transportation during construction would not be significant, and no additional mitigation measures would be required to address construction of the Revised Project. As such, the conclusions of the transportation project construction impact analysis in the Subsequent EIR would not be affected.

## 3.5.2    Operation Impacts

The Subsequent EIR determined that operation of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, operation of the Revised Project may result in a slight increase in trip generation due to a nominal increase in the number of employees required to operate a prison facility that accommodates an additional 604 beds. Further, additional increases to trip generation may occur as a result of increased inmate visitations, inmate transfers, and deliveries to the 2,200-bed Revised Project facility. Although the Revised Project could result in an incremental increase in traffic in the areas surrounding the prison facility, as explained in the following paragraphs, these impacts to

traffic and transportation would not be significant, and no additional mitigation measures would be required to address operation of the Revised Project.

The 2006 California City Prison Subsequent EIR traffic analysis was based on projected 2008 traffic operations. The projected traffic was based on available field data collected in 2004 and 2006. Those 2004/2006 counts were factored up to 2008 with an assumed 1 percent annual growth factor.

The Caltrans database annual traffic counts for the last 4 years (2004 to 2008) for the two state highways (State Routes [SR] 14 and 58) was reviewed to assess the need for changes in the traffic estimates. The volumes were nearly unchanged where there are common data points. For example, for SR 14, the traffic volumes increased by 1 percent between 2004 and 2005 and have stayed the same for the last 3 years. In other words, the estimates for 2008 were likely higher than actually occurred. Therefore, the projected 2008 volumes are reasonable estimates for 2010 or 2011.

Even if some increase in volume occurred, it would take very high changes in volumes to change the conclusions. Most of the roadway segments would operate at level of service (LOS) A to C. The stated significance threshold value is LOS E, and only one segment (SR 14) is projected to operate at LOS D. It would take increases in background volumes of 60 percent (for the proposed project analysis) or 43 percent (for the Project Option analysis) to reach LOS E. Therefore, the revised project timeline and additional inmate capacity would not result in new or more significant traffic impacts than those analyzed in the Subsequent EIR.

## 3.6   Air Quality

Table 1 in the Air Quality section of the Subsequent EIR showed the latest 3 years available at that time (that is, 2003 through 2005) of the concentrations of criteria pollutants at the nearest monitoring site: the Mojave monitoring station, which is located less than 20 miles southwest of the project site. Table 1 below shows an updated version of Table 1 from the Air Quality section of the Subsequent EIR, with the latest 3 years currently available, 2006 to 2008. Based on the updated monitoring station data (summarized in Table 1), the air quality environmental setting has not experienced meaningful change since the Subsequent EIR was certified.

TABLE 1
AAQS, Designation Classification, and Monitoring Values[1]

| Pollutant | Ozone (ppm) | PM$_{2.5}$ (µg/m3) | | PM$_{10}$ (µg/m3) | | CO (ppm) | | NO2 (ppm) | | SO$_2$ (ppm) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Averaging Period | 8-hr | 24-hr | Annual | 24-hr | Annual | 8-hr | 1-hr | 1-hr | Annual | 1-hr | 3-hr | 24-hr | Annual |
| CAAQS | 0.070 | * | 12 | 50 | 20 | 9.0 | 20 | 0.25 | * | 0.25 | * | 0.04 | * |
| NAAQS | 0.08 | 65 | 15 | 150 | 50 | 9 | 35 | * | 0.053 | * | 0.5 | 0.14 | 0.030 |
| Mojave Monitor 2006 | 0.102 | 21.3 | * | 58 | 19.5 | * | * | * | * | * | * | * | * |
| Mojave Monitor 2007 | 0.085 | 21.1 | * | 70 | * | * | * | * | * | * | * | * | * |

| 2008 | 0.103 | 19.1 | * | 145 | 22.4 | * | * | * | * | * | * | * | * |
|------|-------|------|---|-----|------|---|---|---|---|---|---|---|---|

*An ambient standard has not been established or the pollutant was not monitored at the Mojave monitor.

[1] The monitor data is from the California ARB Web site http://www.arb.ca.gov/adam/cgi-bin/db2www/adamtop4b.d2w/start.

## 3.6.1    Construction Impacts

The Subsequent EIR concluded that potential impacts from construction of the Proposed Project and the Project Option were shown to be less than significant for all pollutants, except for daily emissions of nitrogen oxide (NO2) and particulate matter less than 10 micrometers in aerodynamic diameter ($PM_{10}$). The following best management practices (BMPs) were implemented as mitigation measures to control fugitive $PM_{10}$ during construction:

- Water exposed areas to increase the stability of the soil by increasing moisture content on a continuous basis, or as needed.

- Water soil prior to removal to the depth of the proposed cuts.

- Compact soil following grading to 85 to 95 percent and maintain surfaces.

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications.

- Provide information to construction employees to facilitate carpooling.

- Provide information to construction and operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

To improve the Revised Project's air quality performance during construction including greenhouse gas reductions to meet AB 32 requirements, the Revised Project proposes to incorporate the following:

- Prior to construction, certify that all onsite construction equipment meets the Tier 2 and Tier 3 California Air Resources Board (ARB) certification standards.

- During construction, require all onsite construction equipment to meet the Tier 2 and Tier 3 California ARB certification standards, and that each piece of equipment has proof of certification from the ARB.

- Prior to construction and any land disturbances, require certification that all onsite construction equipment utilizes 20 percent biodiesel fuel.

- During construction, require that all construction equipment utilize 20 percent biodiesel fuel.

- During construction, prohibit the use of portable generators and require that all electrical power be provided by an energy supplier.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction intensity compared to the Project Option. The construction air quality impacts would be similar because the duration and

anticipated equipment mix of construction would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. As such, the conclusions of the project air quality construction impact analysis in the Subsequent EIR would not be affected.

## 3.6.2    Operation Impacts

The Subsequent EIR determined that potential impacts from stationary sources associated with operation of the Project Option would be less than significant. To improve the Revised Project's air quality performance during operation including greenhouse gas reductions to meet AB 32 requirements, the Revised Project would incorporate the following design features to implement energy efficiency and water conservation measures, and programs to reduce vehicle miles traveled (VMT):

- Plumbing measures including ultra low-flow fixtures - 1.2 gpm for showers and 1.28 gallon/flush toilets; implementation of a water management system to reduce waste; high-efficiency gas or propane water heaters (92 percent efficiency condensing type) plus solar hot water; and recycling grey water from showers to water closets and laundry grey water recycling.

- Electrical measures including the use of premium T8 lamps for indoor lighting and an optimized lighting design; and daylight harvesting and automatic networked lighting control systems in dayrooms and dormitories.

- Architectural measures including use of R-28.8 exterior wall insulation and R-30 roof insulation; use of skylights for dayrooms, administrative and other support areas with 54 percent transmittance value to allow daylight harvesting; facility design and implementation may be LEED-certified and may include additional measures to meet LEED certification requirements.

- Kitchen measures including use of variable volume kitchen hoods and more efficient freezers and coolers; use of low-emitting stoves that meet EnergyStar requirements; and implementation of an enhanced onsite recycling /waste reduction/diversion and reuse program.

- Landscape measures including a design and maintenance program that includes drought-resistant and low water use plantings; and use of light-colored/high-albedo materials for paved surfaces including parking lots and walkways.

- Measures to reduce VMT including preferential parking for carpools and vanpools to the facility; bicycle racks and end-of-trip facilities for employees; and onsite lunch services for employees.

The additional operational emissions associated with vehicle exhaust from the Revised Project would also be less than significant for all pollutants except for carbon monoxide (CO), NO2, and $PM_{10}$ emissions, which would remain significant after mitigation. Thus, the conclusions of the operational air quality impact analysis contained in the Subsequent EIR would not change.

### Mitigation

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications, and ARB-certified as described previously.

- Provide information to construction employees to facilitate carpooling.

- Implement project construction features addressing fuel and electrical energy use.

- Provide information to operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

### Finding

The Revised Project does not substantially increase the significant air quality CO, $PM_{10}$, and NO2 impacts of the 2006 Project Option. Air quality impacts arising from CO, $PM_{10}$, and NO2 emissions during project operation cannot be mitigated to a less-than-significant level. However, changes or alterations have been required in, or incorporated into, the project that substantially lessens the significant environmental effects identified in the Subsequent EIR. This finding would also apply to the Revised Project.

## 3.7  Noise

No sensitive noise receptors are currently located near the Revised Project. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore, the following mitigation measures would be implemented to reduce the noise impacts of construction only in the event that residences are built adjacent to the Revised Project prior to project construction: limit construction activities within 2,000 feet of occupied residences to the hours of 7 a.m. to 8 p.m., Monday through Saturday, with no construction allowed on Sundays or federal holidays; and use properly muffled equipment and trucks.

Prison operation would not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operation. Thus, the conclusions of the Subsequent EIR would not change.

# 3.8    Hydrology, Storm Drainage, and Flood Control

The Revised Project would cover approximately 16 acres with impervious surfaces such as buildings, access roads, and parking areas. By covering approximately 16 acres of vacant desert land, the Revised Project would cause similar stormwater flow from the project site as the 2006 Project Option. Thus, the conclusions of the drainage analysis contained in the Subsequent EIR would not change.

**Mitigation**

The following measures were adopted in the prior Subsequent EIR to reduce the potential impacts related to stormwater runoff to a less-than-significant level:

- The project will comply with all applicable requirements of the National Pollutant Discharge Elimination System (NPDES) permit program.

- Unlined ditches or swales that will be allowed to revegetate naturally will be constructed along the perimeter of the project site. Erosion control structures will be constructed to reduce the potential for sedimentation. Most ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to at least one detention basin located on the project site. Other ditches may direct runoff offsite, but the total flow rates leaving the site will be maintained at pre-project levels.

- An unlined stormwater detention basin will be developed onsite to retain a volume of stormwater necessary to (1) control runoff from impervious surfaces, and (2) maintain pre-project levels of surface runoff volumes at the property boundaries. The capacity of the detention basin will be based on calculated stormwater flows above natural conditions, resulting from impervious surfaces of the proposed project. The sizing and design of this detention basin will be reviewed and approved by the California City Engineering Department as part of the final project site plan approval.

# 3.9    Biological Resources

Biologists from CH2M HILL reviewed and updated the evaluation of biological resources provided in the previously certified Subsequent EIR. To complete this updated evaluation of biological resources, CH2M HILL biologists conducted a 1-day site reconnaissance on May 12, 2009, to assess current biological conditions and determine whether significant changes have occurred since the previous biological surveys. The current legal status of biological resources onsite was also verified. In addition, an updated search of the California Natural Diversity Database (CNDDB) was conducted for known records of occurrence of sensitive biological resources on or in the site vicinity of the proposed project. Because CEQA significance criteria for biological resources have not changed since the Subsequent EIR, the impact analysis methodology remains unchanged. Finally, the recommended

biological mitigation measures from the previous Subsequent EIR were reviewed for current applicability.

## 3.9.1    Environmental Setting

### Vegetation and Habitat

The 35-acre study area remains generally unchanged from surveys conducted in July 2006, as reported in the Subsequent EIR, except that off-highway vehicle (OHV) use of the project site has continued to result in habitat degradation. The project site lies just south of existing developed prison facilities, and although undeveloped, shows extensive evidence of off-highway travel by vehicles and motorcycles. Vegetated land is relatively homogeneous, composed of sandy soils with sparse vegetation resembling a creosote bush community. Plant species occurring on the project site include, but are not limited to, creosote bush (*Larrea tridentata*), burro bush (*Ambrosia dumosa*), split grass (*Schismus barbatus*), desert trumpet (*Eriogonum inflatum*), spine flower (*Chorizanthe* sp.), filaree (*Erodium cicutarium*), and fiddleneck (*Amsinckia tessellata*). Other species observed included saltbush (*Atriplex* spp.), annual woollystar (*Eriastrum* spp.), and cheesebush (*Hymenoclea salsola*).

The creosote bush on the project site is highly disturbed from heavy OHV traffic. The area receives intensive use from OHV traffic year-round, but use in this and surrounding areas is reported to be exceptionally high on weekends and holidays. Trails from OHV traffic bisect the landscape, and the proposed project site is not currently fenced or excluded from OHV traffic. The resulting disturbed and degraded landscape does not support high-quality wildlife habitat, as evidenced by the scarcity of tortoise sign on portions of the project site, which might otherwise have supported this species. While creosote bushes remain intact, additional shrub coverage is significantly reduced relative to that of an undisturbed creosote bush community. In addition, the herbaceous plant community, while it could not be assessed during optimal seasonal conditions, is probably also severely degraded.

### Special-status Plants

Consistent with findings in the Subsequent EIR, no state-listed or federally listed rare plants are anticipated in the vicinity of the project site. Conditions for establishment of special-status plant species are unlikely as a result of the lack of suitable conditions, past disturbances, and the naturally sparse nature of the vegetation community at the study area.

### Special-status Wildlife

Conditions for special-status wildlife remain unchanged from the Subsequent EIR, except that OHV use has further degraded the habitat. Because of sparse vegetation providing limited cover and forage within the study area, wildlife diversity and abundance are considered low. Wildlife observed during the survey were consistent with observations during the 2006 survey, consisting of common species typically associated with Mojave desert scrub habitats.

A pair of burrowing owls (*Athene cunicularia*) was observed in the southeastern corner of the parking lot of the existing correctional facility, north of the 35-acre project site. The nest burrow was located on the north side of the berm that runs along the southern perimeter of the parking lot. Although the nest burrow was located on the facility, the owls would be

expected to forage within the proposed project area. No additional nest burrows or burrow complexes were observed on the project site.

The study area does not lie within critical habitat for the desert tortoise. Based on the 2009 surveys, conditions for desert tortoise remain generally unchanged on the proposed project site from the 2006 field surveys, except that OHV use has further degraded the quality of the habitat. Live desert tortoises or their burrows were not observed during the survey on the project site, and there appears to be a relatively low density of sign in the general vicinity of the project site. A higher density of sign occurs in areas surveyed approximately 1 mile east of the 35-acre project site; nevertheless, because habitat is present, and tortoises have been observed in the area, the potential occurrence of desert tortoise cannot be precluded.

### Regulated Waters

An analysis of all drainages in the vicinity of the proposed project site indicated a general lack of consistent flows or channel-forming events. Most drainages were small, incipient channels that appeared to only infrequently convey flows. Evidence of Ordinary High Water Mark (OHWM), which normally defines waters regulated by either federal or state agencies, was lacking. Evidence of OHWM within drainages normally includes recent evidence of flow showing as erosion, depositional surfaces, bent or scoured vegetation, sediment sorting, cracking, mineral staining, or debris deposits. None of these characteristics is consistently observed within drainages on the project site, and it is anticipated that drainages would not be jurisdictional under federal or state regulations.

In addition, no riparian vegetation, which normally consists of desert wash vegetation in arid regions, was present. Riparian vegetation, with potential to support certain wildlife species, in conjunction with OHWM, is normally a requirement for jurisdictional streambed and bank regulated by the California Department of Fish and Game (CDFG).

## 3.9.2    Environmental Impacts

Based on findings from the updated survey in 2009, the Revised Project causes no new impacts to biological resources and does not substantially increase the severity of the impacts identified in the Subsequent EIR. CEQA significance criteria remain unchanged, and because biological conditions on the project site have not changed substantially since 2006, impacts remain the same. This section provides a summary of those impacts and proposed mitigation measures.

### General Wildlife and Habitat

The impacts to general wildlife or their habitats would not differ significantly from those described in the Subsequent EIR. This loss of habitat for general wildlife species (not protected or otherwise designated as sensitive) would not be considered significant under CEQA because it is abundant in the area. Established native resident or migratory wildlife corridors as well as nursery sites do not occur onsite and would not be affected by project activities. Joshua trees (*Yucca brevifolia*) and other tree species do not occur onsite and would not be affected by project activities. Wetlands, marshes, ephemeral washes, or riparian areas do not occur onsite and would not be affected by project activities.

## Migratory Birds

Conditions affecting migratory birds protected under the federal Migratory Bird Treaty Act (MBTA) and CDFG Code Section 3513 remain unchanged. The proposed prison structure may attract these species, and operations represent a potential significant impact to migratory birds. Mitigation has been identified in the Subsequent EIR to reduce these impacts to less than significant.

## Special-status Plants

Because project site conditions are not favorable for desert cymopterus or other rare plants, there are no anticipated impacts to this special-status plant species.

## Special-status Wildlife

Like the Proposed Project and Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. However, because the habitat is previously disturbed, and generally of a low quality, the loss of habitat is not likely to cause the population of these species to decrease to less-than-sustainable levels.

Adverse effects may also include injury or death of individual burrowing owls, desert tortoise, or Mohave ground squirrel encountered during project construction, especially during earth-moving activities and when species are underground in burrows. The loss of individuals of these species would be considered a significant impact under CEQA, requiring mitigation, described as follows.

## Habitat Loss

Like the Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. In order to comply with the federal Endangered Species Act (ESA) and the California Endangered Species Act (CESA), CCA would be required to obtain necessary approvals and permits with the U.S. Fish and Wildlife Service (USFWS) and CDFG. USFWS requires the submittal of an ESA Section 10(a) permit application and preparation of a Habitat Conservation Plan (HCP) that includes an impact assessment; mitigation measures to avoid or minimize impacts; compensation for any unavoidable impacts; implementation measures; and provisions for any unforeseen circumstances and amendment to the HCP and permits. CDFG requires the submittal of a 2081 permit application and a copy of the HCP.

In 1998, CCA prepared a Supplemental EIR for development of a prison facility (the CCCF). In the course of coordinating with USFWS and CDFG and obtaining appropriate permits for the CCCF, CCA prepared the appropriate ESA and CESA permit applications and HCP for 105 acres, including the 70-acre CCCF site, as well as the 35-acre project site evaluated in the Subsequent EIR and this Addendum. As a result, the Revised Project has the necessary HCP, Incidental Take Permits, and Implementing Agreement in place, as required by USFWS and CDFG. The Revised Project would be required to comply with all mitigation measures of USFWS and CDFG Incidental Take Permits (#PRT-842781 and #2081-1998-17-4, respectively).

**Finding**

The Revised Project does not cause new significant impacts or make more severe the significant impacts identified in the Subsequent EIR. The impacts of the Project Option associated with the loss of 35 acres of habitat for burrowing owl, desert tortoise, Mojave ground squirrel cannot be mitigated to a less-than-significant level and similar impacts would occur if the Revised Project were implemented. However, changes or alterations have been required in, or incorporated into, the Subsequent EIR and carried forward in this Addendum that substantially lessen the significant environmental effects identified in the previous EIR. Thus, the conclusions of the Subsequent EIR would not change.

## 3.10 Cultural Resources

A recorded archaeological site is located adjacent to the project site. The potential disturbance of prehistoric material is considered a significant project impact. The mitigation measures contained in the Subsequent EIR would apply to the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

## 3.11 Cumulative Impacts

The Subsequent EIR identified significant cumulative impact contributions for the Proposed Project and Project Option in the following resource areas.

- Aesthetics and Visual Considerations – Changing the visual character of the project vicinity over time as the urbanized area expands.

- Air Quality – Emitting emissions of CO, NO2, and $PM_{10}$ from construction and operation is considered significant and unavoidable.

- Biological Resources – Loss of habitat for burrowing owl, desert tortoise, and Mohave ground squirrel.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction and operation intensity compared to the Project Option. The construction impacts would be similar because the duration and anticipated equipment mix would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. Revised Project operations would occur on the same 35 acres as the 2006 Project Option. While staffing levels and other operational facets would incrementally increase for the Revised Project as compared to the 2006 Project Option, no additional significant impacts or new impacts not analyzed in the prior EIR would occur. As such, the conclusions of the cumulative impacts analysis in the Subsequent EIR would not be affected.

## 3.12 Environmental Impact Analysis Conclusions

Based on the previously stated information, there are no changes in circumstances that would constitute a substantial change that would require major revisions of the previously

certified Subsequent EIR due to new environmental effects; no increases in severity of previously identified substantial effects would occur; no new information of substantial importance, which was not previously known, shows that the project would have one or more significant effects not discussed in the previously certified Subsequent EIR; no significant effects previously examined would be substantially more severe than shown in the previously certified Subsequent EIR; no mitigation measure or alternative previously found not to be feasible would be feasible and would substantially reduce one or more significant effects; and/or no mitigation measures or alternatives not considered in the previously certified Subsequent EIR would substantially reduce one or more significant effects on the environment.



NOTES:
1. TOTAL SITE AREA: 34 ACRES
2. ADDITIONAL PARKING SPACES:
   - 392 STALLS
   - 18 BUS
3. 12-FOOT PERIMETER PATROL ROAD
4. 24-FOOT MAIN ENTRYWAY ROAD
5. PROPOSED SITE IS NOT IN DESIGNATED FLOOD PLAN

KERN COUNTY
ASSESSORS MAP
NO. 350-03

CORRECTIONS CORPORATION OF AMERICA
2200 BED CORRECTIONAL FACILITY
CALIFORNIA CITY, CA
DECEMBER 2009

CH2MHILL

PROJ # 345802

**ATTACHMENT F**

**ATTACHMENT F**

## RESOLUTION NO. 12-09-2009PC
## A RESOLUTION OF THE PLANNING COMMISSION
## OF THE CITY OF CALIFORNIA CITY
## TO APPROVE CONDITIONAL USE PERMIT (CUP) 09-04

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**SECTION 1. PURPOSE.**

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Sace/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

**WHERE AS**; the property is located in North one-half of Section 13, T32S, R38E, MDB&M, APN 350-031-02.

**WHERE AS**; conditions of approval for the prison as per Exhibit A (2-pages), hereinafter referred to as "prison conditions," were prepared.

**SECTION 2. FINDINGS.**

The Planning Commission finds, determines and declares:

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department

1

prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2.      The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3.      CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4.      Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide

2

redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5.    If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6.    CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7.    The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8.    CUP 09-04 allows for construction and operation of a 2,200-bed prison facility.

9.    There shall be no expiration date associated with CUP 09-04.

10.    A mitigation monitoring and reporting plan to document compliance with all mitigation

3

measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.

### SECTION 3. ENVIRONMENTAL FINDINGS

An addendum as required by CEQA for the revised project has been conducted and all conclusions of the 2006 Subsequent Environmental Impact Report (EIR) are valid and accurate.

**NOW, THEREFORE, BE IT RESOLVED** that the Planning Commission of the City of California City does hereby approve CUP 09-04, with all conditions of approval as stipulated in Exhibit A, and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**I HEREBY CERTIFY** that the foregoing resolution was duly passed and adopted by the Planning Commission on the 22nd day of December, 2009.

AYES:      4
NOES:      0
ABSENT:    1
ABSTAIN:   0

_____
Chairman

ATTEST:

_____
Recording Secretary

4

## CCA 2200-Bed Prison
## CUP 09-04

## CONDITIONS OF APPROVAL

## "EXHIBIT A"

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Space/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2. The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3. CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4. Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5. If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6. CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7. The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8. CUP 09-04 allows for construction and operation of a 2,200-bed prison facility. There shall be no expiration date associated with CUP 09-04.

10.    A mitigation monitoring and reporting plan to document compliance with all mitigation measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.
diligently pursued.

# ATTACHMENT G

# ATTACHMENT G

*City of California City*

**City Hall**



PHONE (760) 373-8661

21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

May 27, 2014

Ms. Deborah Hysen, Deputy Director
Facility Planning, Construction and Management
California Department of Corrections and Rehabilitation
1515 S Street, Suite 502S
Sacramento, CA 95811

Dear Ms. Hysen:

Reference is made to the Lease Agreement made between Corrections Corporation of America ("CCA") and the California Department of Corrections and Rehabilitation ("CDCR"), in which CDCR leases and operates the California City Corrections Center (CCCC), located at 22844 Virginia Boulevard, California City CA 935055.

The Planning Department has completed a review of the land use permitting associate with the CCCC, and this is to notify you that CDCR is authorized and fully permitted to operate 2,560 beds at the CCCC.

We look forward to working with you, and please let me know if I may answer any questions.

Sincerely,

Tom Weil
City Manager

Cc: Brad Wiggins, CCA

**ATTACHMENT H**

**ATTACHMENT H**



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**



# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111  Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal.  Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

> **Facility:  CCA- California City Correctional Facility**
>
> **Address: 22844 Virginia Blvd. California City, Ca.**
>
> **CA State Fire Marshal File #: 02-15-44-0020**
>
> **Occupancy Classification: I-3 (Under CCR Title 24 2013 Edition)**
>
> **Project No. or Name: ADA Phase 1 Upgrades (S.S., Dayrooms & Cells)**
>
> **Name and Title of Approving Official: George D. Mavrikis, Deputy State Fire Marshal**
>
> **Signature:**                                            **Date: May 29, 2014**

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*
**This Certificate Shall Be Filed on Location**

**ATTACHMENT I**

**ATTACHMENT I**



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**



# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111  Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal.  Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

**Facility:  CCA- California City Correctional Facility**

**Address: 22844 Virginia Blvd. California City, Ca.**

**CA State Fire Marshal File #: 02-15-44-0020**

**Occupancy Classification: I-3 (Under CCR Title 24 2013 Edition)**

**Project No. or Name: ADA Phase 2 Upgrades (Entire Facility)**

**Name and Title of Approving Official: George D. Mavrikis, Deputy State Fire Marshal III Specialist**

**Signature:**                                        **Date: December 11, 2014**

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*

**This Certificate Shall Be Filed on Location**

**ATTACHMENT J**

**ATTACHMENT J**

CHAPTER 3 OCCUPANCY CLASSIFICATION AND USE

**308.4 Institutional Group I-3.**

Institutional Group I-3 occupancy shall include buildings *or portions of buildings* and structures that are inhabited by *one or* more persons who are under restraint or security. A Group I-3 facility is occupied by persons who are generally incapable of self-preservation due to security measures not under the occupants' control *which includes persons restrained*. This group shall include, but not be limited to, the following:

Correctional centers
    *Correctional hospitals*
    *Correctional nursing facilities*
    *Correctional mental health facilities*
    *Correctional treatment centers*
    *Courthouse holding facility*
    Detention centers
    *Detention treatment room*
    Jails
    *Juvenile halls*
    Prerelease centers
    Prisons
    Reformatories
    *Secure interview rooms*
    *Temporary holding facility*

Buildings of Group I-3 shall be classified as one of the occupancy conditions specified in Sections 308.4.1 through *308.5.8* and shall comply with Section 408.

**308.4.1 Condition 1.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas, and other spaces where access or occupancy is permitted, to the exterior via means of egress without restraint. A Condition 1 facility is permitted to be constructed as Group R.

**308.4.2 Condition 2.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas and any other occupied smoke compartment to one or more other smoke compartments. Egress to the exterior is impeded by locked exits.

**308.4.3 Condition 3.**

This occupancy condition shall include buildings in which free movement is allowed within individual smoke compartments, such as within a residential unit composed of individual sleeping units and group activity spaces, where egress is impeded by remote-controlled release of means of egress from such a smoke compartment to another smoke compartment.

**308.4.4 Condition 4.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Remote-controlled release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

**308.4.5 Condition 5.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Staff-controlled manual release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

**308.4.6 Condition 6.**

*This occupancy condition shall include buildings containing only one temporary holding facility with six or fewer persons*

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
*Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.*

under a *installed in accordance with Section 903.3.1.1 and where the temporary holding facility is protected throughout with an automatic fire alarm system with notification appliances. A Condition 6 building shall be permitted to be classified as a Group B occupancy.

### 308.4.7 Condition 7.

This occupancy condition shall include buildings containing only one temporary holding facility with nine or less persons under restraint or security where limited to the first or second story, provided the building complies with Section 408.1.2.6. A Condition 7 building shall be permitted to be classified as a Group B occupancy.

### 308.4.8 Condition 8.

This occupancy condition shall include buildings containing not more than four secure interview rooms located within the same fire area where not more than six occupants under restraint are located in the same fire area. A Condition 8 building shall be is permitted to be classified as a Group B occupancy, provided the requirements in Section 408.1.2.7 are met.

### 308.4.9 Condition 9.

This occupancy condition shall include buildings where the use of the building is for correctional medical care or correctional mental health care.

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.

PDF from: http://codes.iccsafe.org/content/CABC2022P4/chapter-3-occupancy-classification-and-use#CABC2022P4_Ch03_Sec308.4

**ATTACHMENT K**

**ATTACHMENT K**

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY
DEPARTMENT OF FORESTRY AND FIRE PROTECTION
**OFFICE OF THE STATE FIRE MARSHAL**
FIRE AND LIFE SAFETY DIVISION
**INSPECTION REPORT**
EN-02 (12/08)



## INSPECTION REPORT

| FILE NUMBER | | | PAGE | OF | PAGE |
|---|---|---|---|---|---|
| **02-15-44-0020** | | | **01** | | **01** |
| NAME OF FACILITY | | | HOURS | | MINUTES |
| **CCA- California City Correctional Facility- California City  (Kern County)** | | | | | |
| NAME OF BUILDING | | | | | |
| **_Project # I-000803_** | | | | | |
| ADDRESS | | | | | |
| **22844 Virginia Blvd. California City, Ca.** | | | | | |
| DISCUSSED WITH | | TITLE | | | |
| **Gary Stowers** | | **_CSII / IWL_** | | | |
| ACCOMPANIED BY | | TITLE | | | |
| **Mike Mejia** | | **CDCR Fire Captain** | | | |

On August 18, 2014, a final inspection was conducted of the above mention facility, Accompanied by Gary Stowers – CSI-2, Randy Monette-CSI, David Silva-CSI, Mike Mejia-CDCR Fire Captain. The following Projects was noted:

2014-01 – HVAC for Room B103
2014-02 – Yard Toilets, Lavatories & drinking fountains
2014-03 – Trunk Radio, Trailer, Tower & Infrastructure
2014-04 – Exercise Yard Fencing & Gates (Main Yard)
2014-07 – Administrative Segregation Unit Modification
201408 – Change Glazing in AD Seg. Exterior Windows.

## ~ A Final & a Grant of Occupancy is issued on today's Date ~

###

| RECEIVED BY | DATE |
|---|---|
| | **_August 18, 2014_** |
| DEPUTY STATE FIRE MARSHAL | DATE OF INSPECTION |
| **_George D. Mavrikis_** | **_August 18, 2014_** |

# ATTACHMENT L

# ATTACHMENT L

# Certificate of Occupancy

## California City Building Department

*This Certificate issued pursuant to the requirements of Section 109 of the California Building Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following:*

## Corrections Corporation of America

Use Classification: I1        Occupancy Group:  B        Type of Construction:  **V**        Permit No. 15990

Use Zone:                                               Building Address:  22844 Virginia Blvd.

Locality :  **California City**        Final Date:  **1/31/17**



1/31/17

Joe Barragan

1/31/17

Date

**ATTACHMENT M**

**ATTACHMENT M**

**KERN** COUNTY  Assessor Recorder

# Assessor Property Search - Property Details

Note: You are not currently in a decline in value status.

## General Property Information

| | | | |
|---|---|---|---|
| ATN | 350-031-28-00-0 | Status | Active |
| Parcel Num. | 350-031-28-2 | View Assessor's Parcel Map | View GIS Map |
| Site Addr. | 22844 VIRGINIA BL CALIFORNIA CITY | | |
| Legal | PARCEL MAP 12374 LOT 1 | | |
| Acres | 61.19 | | |
| Use Code | 1716 - DETENTION FACILITY/PRISON | | |
| Prior APN(s) | 350-031-02 | | |
| Supervisorial District | 2 - Chris Parlier | | |

## Property Characteristics

| | |
|---|---|
| No. of Buildings | 6 |
| Total No. of Units | 0 |
| Total Sq. Ft. of All Buildings | 510980 |
| Has Parking Lot | No |
| Has Parking Structure | No |
| Yard Improvements | |
| **Building #1** | |
| Year Built | 1999 |
| No. of Stories | 2 |
| Construction Type | S |
| Roof Cover Type | Hot Mop |
| Roof Type | Flat |
| Heating Type | Electricity |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 501208 |
| Total Building Area (Sq. Ft.) | 501208 |
| **Building #2** | |
| Year Built | 2008 |
| Construction Type | S |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 1200 |
| Total Building Area (Sq. Ft.) | 1200 |
| **Building #3** | |
| Year Built | 2008 |
| Quality | Average |
| Construction Type | S |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 4000 |
| Total Building Area (Sq. Ft.) | 4000 |

| Building #4 | |
|---|---|
| No. of Stories | 2 |
| Has Escalators | No |
| **Building #5** | |
| Year Built | 2013 |
| Construction Type | S |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2340 |
| Total Building Area (Sq. Ft.) | 2340 |
| **Building #6** | |
| Year Built | 2013 |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2232 |
| Total Building Area (Sq. Ft.) | 2232 |

| **Current tax roll values that are used to calculate the bills due in December 2025 and April 2026** | |
|---|---|
| Land Value | $532,121 |
| Mineral Value | $0 |
| Improvement Value | $162,120,561 |
| Other Improvements | $1,084,566 |
| Personal Property Value | $2,638,655 |
| Total | $166,375,903 |
| Less Exemption Value | $0 |
| Net Total Taxable Value | $166,375,903 |
| Tax Rate Area | 011-010 - CALIFORNIA CITY INSIDE-MOJAVE |

## Tax Bill Information

Current Year Billing in progress, bill information will be available in September.

**Go to prior year tax information on Kern County Treasurer-Tax Collector's website**

### INFORMATION FOR PROPERTY OWNER

**Overview**

Pursuant to California Revenue & Taxation Code § 619 and § 621, this notice informs you of THE TAXABLE VALUE of your property. It also serves to inform you of your opportunity to request reconsideration of our findings or to file an assessment appeal.  If you believe that your property is worth less than the indicated amount, you may discuss the matter with the Assessor's staff by calling (661)-868-3485. Decline-in-value review requests are taken between July 2 and November 30.  For details, visit the Decline-in-Value Review (Proposition 8) page

If you and the County Assessor cannot agree on the assessed value, you may appeal the assessment to the Assessment Appeals Board.  Applications are accepted between July 2 and November 30, and are processed by the Clerk of the Assessment Appeal Board, located at the County Administration Center, 5th floor, 1115 Truxtun Avenue, Bakersfield, California 93301. For more information, visit the Assessment Appeals page

Revenue and Taxation Code § 1605 provides that the taxpayer need not attend the scheduled equalization hearing and testify to the property's value. If an agreement can be reached with the Assessor, the applicant or applicant's agent may sign a written stipulation setting forth the facts upon which a reduction in value is premised. The Board can either accept the stipulation or reject it and set a new hearing date.

**How and when property is assessed**

Article XIIIA of the California Constitution provides that property shall be taxed in proportion to its value. In part:

- Property is appraised at its 1975-76 market value unless it has been sold, newly constructed, or had a change in ownership after March 1, 1975.
- Property transferred after March 1, 1975 will have a new base year market value established as of the date of the change in ownership.
- New construction will be assessed at market value and added to the base year value as of its date of completion.
- The base year value is subject to an annual rate of inflation not to exceed 2 percent increase per year.
- The taxable value of real property on the local roll shall be the lesser of: (a) factored base year value, (b) current market value, or (c) the value of the property if it was damaged or destroyed by calamity pursuant to Revenue and Taxation Code § 170

A copy of the local assessment roll is available for public inspection during regular office hours (8-5) Monday through Friday in the Assessor's Office at 1115 Truxtun Ave, 2nd floor.

# ATTACHMENT N

# ATTACHMENT N

| | |
|---|---|
| **From:** | "Susan Weber" <sweber@californiacity-ca.gov> |
| **Sent:** | 08/14/2025 2:37:30 PM (-07:00) |
| **To:** | "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com> |
| **Cc:** | "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Anu Doravari" <adoravari@californiacity-ca.gov>; "Stone, Stacey" <Stacey.Stone@corecivic.com>; "Malloy, John" <John.Malloy@corecivic.com>; "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Wiggins, Brad" <Brad.Wiggins@corecivic.com> |
| **Subject:** | RE: Open Permits |

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Good afternoon Marcelo,

That is correct. Per our conversation the only "open" permits we have would only be for mild modifications/repairs. A certificate of occupancy is typically required for new construction, significant renovations, additions, or changes in the occupancy category. Since minor plumbing and a re-roof do not fall into those categories, a C of O should not be required.

You mentioned cancelling these permits during or phone call, please let me know if you would like to move forward with cancelling the 3 open permits we have.

Also, Roseann called and made payment on the sign permit and it will be issued shortly.

Thank you,



**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, August 14, 2025 2:22 PM
**To:** Susan Weber <sweber@californiacity-ca.gov>
**Cc:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Anu Doravari <adoravari@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Malloy, John <John.Malloy@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Wiggins, Brad <Brad.Wiggins@corecivic.com>
**Subject:** Open Permits

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Susan

Thank you for your time this afternoon. To confirm our conversation, you confirmed that there are 3 open permits for our facility in California City. These permits do not require a new Certificate of Occupancy, and a valid one is in place. The open building permits should not hold up issuance of our business license. Please acknowledge receipt and understanding of our conversation. We look forward to our continued partnership with California City.

Best regards,

Marcelo Ariola
Vice President, Real Estate

 CoreCivic

CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office:  615-263-3047
Cell:  615-445-9163
NYSE: CXW

# ATTACHMENT O

# ATTACHMENT O

| | |
|---|---|
| **From:** | "Montanary, Roseann" |
| **Sent:** | 07/22/2025 1:15:40 PM (-07:00) |
| **To:** | "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <jbarragan@californiacity-ca.gov> |
| **Cc:** | "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com> |
| **Subject:** | City of California City Business License and SPR Plan |
| **Attachments:** | Backup for Cal City SPR.pdf, CCA Name Change CoreCivic, Inc. 1116.pdf, Business License Application CoreCivic California City.pdf, SPR Minor 2025 Application CoreCivic California City.pdf |

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office  615-263-3068



July 21, 2025


Joe Barragan MBA, CBO

Public Works Director

City of California City

21000 Hacienda Blvd.

California City, CA 93505


Dear Mr. Barragan:

Pursuant to our Site Plan Review (SPR) Minor Application, the letter shall serve as a formal statement to confirm ADA requirements listed on the application.

California City Correctional center was originally built in 1998 and opened for operation in 1999. The facility was originally permitted under the Americans with Disabilities Act of 1990 (ADA). In 2013, the facility was leased to the California Department of Correction and Rehabilitation (CDCR). As a condition of the Lease the facility required CASp certification in compliance with the Americans with Disabilities Act (ADA) and California's Building Code (Title 24). Sally Swanson Architects was hired to do a full ADA inspection. As a result of the inspection, approximately $1.5 Million dollars in ADA upgrades to the facility were completed to meet CASp certification by a registered (Certified Access Specialist, Registered in the State of California. See attached letter from Sally Swanson Architects dated October 20, 2014.

Subsequently in 2017 as part of the lease extension/renewal with CDCR, an Administrative Office Building was added near the parking lot and part of the parking lot was modified to accommodate the new building. That building and parking was required to be CASp certified. See attached CASp certification. No additional construction has been performed at the facility since 2017.

The facilities past CASp certifications demonstrate our commitment to ADA standards. The California City Correctional Center is fully compliant with ADA and Title 24 requirements, as evidenced by the attached documentation. All facilities and modifications have been inspected and certified by a Certified Access Specialist (CASp) to ensure that they meet the necessary standards for accessibility. We are committed to maintaining compliance with these regulations and will continue to address any issues that may arise promptly.

Should you have any further questions or require additional information, please do not hesitate to contact our office.


Sincerely,

*Marcelo Ariola*

Marcelo Ariola

Vice President, Real Estate

Disabled Accessibility Certification (Provisional)

SALLY SWANSON
ARCHITECTS, INC.

Date:   September 30, 2014

Timothy S. Aebie, AIA, NCARB, DBIA, LEED
Sr. Director, Project Development - Real Estate Development
Corrections Corporation of America, Inc.
10 Burton Hills Blvd.
Nashville, TN 37215

Re: Project:          Disabled Accessibility Certification (Provisional) CASp Corrective Action Plan
                      Certification Limited to:
                      Phase 2 Inmate Housing Pods

Project location:     CCA, California City, CA
SSA project #:        13054.03
Certification by:     Brian H. Lee
Title:                Sr. Technical Architect

In accordance with contract provisions for the above named Architect to act as a Disabled
Accessibility Consultant representing the owner – Corrections Corporation of America (CCA)  and
the Architect-of-Record – Arrington Watkins Architects (AWA) for the said project, by due diligence of
reviewing the project plans, reviewing alternate means of compliance for specific application to the
prison environment, making personal site observations with measurements  of the subject project
work , and ensuring any concerns raised were successfully corrected; the  following declaration is
made:

The project area identified above (clarifications and exceptions as noted below) has been found
in compliance (provisional clarifications and exceptions as noted below) with applicable disabled
access code requirements in the 2013 California Building Code (CBC) and pertinent provisions
applicable in  the 2010 ADA Accessibility Standards and Title II of the Americans with Disabilities
Act.

Clarified as part of this certification is the guard use only type-restrooms which were not modified as
part of this project and which were found to be in general (albeit, not strict) compliance with the
standards associated with 1991 ADA and respective edition of the CBC.  Correction of any and all
non-compliant conditions is required when CCA/CDCR should have an employee that requires these
accommodations be made as part of Title 1 – Employment requirements of the Americans with
Disabilities Act and of the State of California Unruh Act.

CCA California City
Phase 2: Provisional Disabled Access Certification
Letter September 30, 2014

Respectfully Submitted to the Corrections Corporation of America (CCA),

Brian H. Lee,
Architect Lic. No. C-32739
CASp No. 0182

cc:     Michael Conder, Arrington Watkins Architects
        Andrew Johnson, Lydig Construction
        Colm McGlynn, Lydig Construction
        Kevin Atkinson, Lydig Construction
        Sally Swanson, SSA
        Arfraraz Khambatta, SSA
        Jasper Kirsch, SSA
        Mike Connell, SSA

end

*Real Estate*

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $RECORDING IN COUNTERPART N_____ County  $_____ City
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to  CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF CALIFORNIA                    } ss
COUNTY OF  Los Angeles                }
On 6 9 98          before me Lisa Christine Hendry
personally appeared Channing C. Ahn

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature  *Lisa Christine Hendry*

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

Moohay A. Choe

_____
Angela H. Ahn Mouradian

_____
Channing C. Ahn

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

**(This area for official notarial seal)**

Recording Requested by:
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ **1,812.80**_____ County  $_____ City
___ Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to
an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single
woman as to an undivided 1/3 interest and    Channing C. Ahn, a single man, as to an
undivided 1/3 interest
hereby GRANT(S) to  CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION

all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or
hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from
and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the
surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and
through said property at depths below 100 feet from locations on adjacent or neighboring lands in  such manner as not to disturb
the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as
reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF ~~CALIFORNIA~~ Massachusetts } ss
COUNTY OF   Norfolk
On  6-10-1998 before me Tracy K Kenney
personally appeared
Angela H Ahn Mouradian
personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/~~are~~ subscribed to the within instrument and acknowledged
to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~
authorized capacity(ies), and that by ~~his~~/her/~~their~~
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _____
My Commission expires Oct. 13, 2000
**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

Moohay A. Choe

_Angela H. ahn Mouradian_
Angela H. Ahn Mouradian

Channing C. Ahn

**(This area for official notarial seal)**

James Filed Cat... Pages: 3
Kern County C  'cial Records
6/19/1998
**DOCUMENT #:0198081113**
8:00:00


∎0198081113∎

| | |
|---|---|
| Fees | 13.00 |
| Taxes | 1812.80 |
| Other | |
| TOTAL PAID | 1825.80 |

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

Stat. Types: 1

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ RECORDING REA IN  County  $_____ City
___  Computed on the consideration or value of property conveyed; OR
___  Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to

an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single
woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an
undivided 1/3 interest
hereby GRANT(S) to  CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION

all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or
hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from
and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the
surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and
through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb
the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as
reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF CALIFORNIA        } ss
COUNTY OF Los Angeles
On 6/9/58  before me MORTON M. Schneider
personally appeared MOOHAY A. Chue.

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _Morton M. Schneider_

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

_Moohay A. Choe_
Moohay A. Choe

_____
Angela H. Ahn Mouradian

_____
Channing C. Ahn

MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999

(This area for official notarial seal)

C.   Emergency Lighting - Housing units have battery back-up emergency and exit lighting to provide sufficient illumination for entry into areas during emergencies. An emergency power generator will be used as an emergency power source when commercial power has failed.

## XIV.   PLAN REVIEW

The facility fire plan shall be reviewed annually by the facility safety manager for accuracy and any changes.  Approval from the California City Fire Marshal will be obtained before re-issuance.  If no changes are required a memorandum shall be prepared by the facility safety manager for submission to the California City Fire Marshal stating this fact.

## XV.   IMT

Incident Management may be initiated based upon the severity of the fire.

---

**CORE CIVIC/CALIFORNIA CITY IMMIGRATION PROCESSING CENTER
FIRE AND EMERGENCY EVACUATION PLAN**

By: _____        DATE: 7/21/25
Director, Safety & Environmental

By: _____        DATE: 7/21/25
Warden

REVIEWED:
By: _____        DATE: 7/21/25
California City Fire Marshal's Office

Property of Core Civic/California City Immigration Processing Center

**ARTICLES OF AMENDMENT**
**OF**
**CORRECTIONS CORPORATION OF AMERICA**

The undersigned, being duly authorized to execute and file these Articles of Amendment of Corrections Corporation of America, a Maryland corporation (the "Corporation"), hereby certifies to the State Department of Assessments and Taxation of the State of Maryland that:

FIRST:  The Corporation desires to amend its charter as currently in effect.

SECOND:  The charter is hereby amended by deleting Article FIRST in its entirety and inserting the following in place thereof:

FIRST:  The name of the corporation (which is hereinafter called the "Corporation") is:

**CoreCivic, Inc.**

THIRD:   The foregoing amendment was unanimously approved by the entire board of directors and the amendment is limited to a change expressly authorized by § 2-605 of the Maryland General Corporation Law to be made without action by the stockholders.

FOURTH:  The undersigned President acknowledges these Articles of Amendment to be the corporate act of the Corporation and, as to all matters or facts required to be verified under oath, the undersigned President acknowledges that, to the best of his knowledge, information and belief, those matters and facts are true in all material respects and that this statement is made under the penalties for perjury.

IN WITNESS WHEREOF, the Corporation has caused these Articles of Amendment to be signed in its name and on its behalf by its President on this  9th  day of November 2016.

ATTEST:

CORRECTIONS CORPORATION OF
AMERICA

Scott D Irwin
Secretary

Damon T. Hininger
President and Chief Executive Officer

CUST ID:0003482065
WORK ORDER:0004698642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

STATE OF MARYLAND
I certify that this is a true and complete copy of the ____ on file in this office.  DATED: _____
DEPARTMENT OF ASSESSMENTS AND TAXATION:
_____ , Custodian
This stamp replaces our previous certification system. Effective: 6/95

# CORPORATE CHARTER APPROVAL SHEET
## ** EXPEDITED SERVICE **          ** KEEP WITH DOCUMENT **

DOCUMENT CODE _09A_    BUSINESS CODE _____

\# _D 05095757_

Close _____    Stock _____    Nonstock _____

P.A. _____    Religious _____

Merging (Transferor) _____

_____

_____

Surviving (Transferee) _____

_____

_____

### FEES REMITTED

Base Fee: _____ _100_
Org. & Cap. Fee: _____ _465_
Expedite Fee: _____
Penalty: _____
State Recordation Tax: _____
State Transfer Tax: _____
Certified Copies: _____
Copy Fee: _____ _21_
Certificates: _____
Certificate of Status Fee: _____ _20_
Personal Property Filings: _____
Mail Processing Fee: _____
Other: _____

TOTAL FEES: _606_

Credit Card _____    Check _____    Cash _____

_1_ Documents on _3_ Checks

Approved By: _16_

Keyed By: _____

COMMENT(S):

*The good standing should show the date/time when the name change occurred*

---

```
1000362009853062
```

ID # D05095757 ACK # 1000362009853062
PAGES: 0002
CORECIVIC, INC.

11/09/2016  AT 10:05 A  WO # 0004698642

New Name  *CoreCivic, Inc.*

CERTIFIED
COPY MADE

✓ Change of Name
___ Change of Principal Office
___ Change of Resident Agent
___ Change of Resident Agent Address
___ Resignation of Resident Agent
___ Designation of Resident Agent
     and Resident Agent's Address
___ Change of Business Code

___ Adoption of Assumed Name

___ Other Change(s)

_____

Code  _007_

Attention: _____

Mail Names and Address

THE CORPORATION TRUST INCORPORATED
351 W CAMDEN ST
BALTIMORE MD 21201-7912

CUST ID:0003482065
WORK ORDER:0004698642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

# Business License Application

City of California City
21000 Hacienda Blvd
California City, CA  93505
cityclerk@californiacity-ca.gov
760-373-7140

License # _____
Approved by _____
Processed by_____
Processed On _____

Name of Business

Business Owner(s) Name

Business Address

Mailing Address

Business Phone #

Email Address

Nature of Business

Planned Business Begin Date

Have you had a license for this business in the past?          Yes          No

Do you own or rent the space          Own          Rent (If rent, building owner/landlord

Will the business have Annual Gross Income of $10.000 or more?          Yes          No
Business Emergency Contact:  Name                              Phone Number

**State/County Licensing Information:**

Seller's Permit #

ABC License #
(Required for Alcohol & Liquor Sales)

Health Certificate #
(Required for Food Services – attach copy)

**Contractors:**
State License #                              Expiration Date
State License Type
(Required for Contractors)

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**
Inspection Date          Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct.  I agree to all of the terms of the City of California City business license requirements.  I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature                              Date

Printed Name



**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.**

_____
Provided by City

## SITE PLAN REVIEW (SPR) MINOR APPLICATION
### *(Existing Building/Business/Ownership)*

### 1. Applicant Information

**Applicant/Representative's Name:**  Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

_____

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc. (California City Immigration Processing Center)

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93504

**Zoning Designation:**  Classification A, Type Major, Code CAC, O/RA

### 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** *Marcelo Ariola*

**Date:** 07-22-25

### 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** *Marcelo Ariola*

**Date:** 07/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville    **State:** TN    **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

---

## FOR DEPARTMENTAL USE ONLY

Fees: *(Refer to the Master Fee Schedule)*

☐ $ _____250.00_____ , Planning SPR Application Fee *(mandatory)* **GL 10-3218**

☐ $ _____90.00_____ , Fire Department Inspection *(mandatory)* **GL 19-3641**

☐ $ _____150.00_____ , Building Inspection Fee *(mandatory)*

☐ $ _____ , Other

$ _____ , **Total Fee Collected**

Application complete:

☐ Date: _____    Staff Member _____

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

## SITE PLAN REVIEW (SPR) MINOR CHECKLIST
### *(Existing Building/Business/Ownership)*

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   o   Total Parking Spaces: _____
   o   ADA Accessible Spaces: _____
   o   Bicycle Parking (if required): _____
7. ☐ **Distance from Nearest Functional Fire Hydrant:** _____ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   o   North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified – separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

ATTACHMENT P

ATTACHMENT P

**From:** "Lilia Garcia" <lgarcia@californiacity-ca.gov>
**Sent:** 07/23/2025 1:52:23 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Anu Doravari"
<adoravari@californiacity-ca.gov>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo"
<Marcelo.Ariola@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan
**Attachments:** IMG_3994.jpg

> CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hi Roseann,

Please find the attached receipt for your records.

Best regards,
Planning Admin Secretary
Lilia Garcia
760-338-1377
Email: lgarcia@californiacity-ca.gov

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 11:45 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>;
Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

> **EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Liz, thank you for speaking with me today concerning the payment on the SPR fee. Looking forward to
receiving your call so we can pay by p-Card over the phone.
My numbers are listed below. If you have difficulty getting me on the office phone, please call my cell.

Appreciate the assistance.

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office   615-263-3068

**From:** Montanary, Roseann
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office   615-263-3068



City of California City
21000 Hacienda Blvd
California City  CA  9350 (760) 373-8661

Receipt No: 2.000177758      Jul 23, 2025

SPR25-09 CoreCivic

Permits/Fees
SDR Applications                    250.00
10-3218
Permit Fee
                              ----------------
Total:                              250.00
                              ================

Credit Card
   Check No: mc                     250.00
   Payor:
   SPR25-09 CoreCivic
Total Applied:                      250.00
                              ----------------
Change Tendered:                       .00
                              ================
            Duplicate Copy
            07/23/2025 1:43 PM

**ATTACHMENT Q**

**ATTACHMENT Q**

**From:**        "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:**        07/24/2025 1:22:39 PM (-07:00)
**To:**          "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Joe D. Barragan"
<JBarragan@californiacity-ca.gov>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:**     RE: Information Discussed

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

That is correct, you will not have to pay the $150.00 since the ADA document sent to us was sufficient.

Thank you,



**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Thursday, July 24, 2025 11:36 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Susan Weber <sweber@californiacity-ca.gov>
**Subject:** RE: Information Discussed

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Ms. Weber, based on the conversation we had yesterday afternoon, it appears CoreCivic is not required to pay the $150.00 building inspection fee.  Please confirm if my understanding is correct.
If we still owe the fee, would like to pay for it this afternoon via P-card over the phone.

Appreciate you time and consideration.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office   615-263-3068

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 4:36 PM
**To:** Joe D. Barragan <jbarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>;
SWeber@californiacity-ca.gov
**Subject:** Information Discussed

Ms. Weber, thank you for taking the time today to discuss the payment of the $150.00 building Inspection Fee.
I understand this fee may not be necessary. Please find attached the information on ADA requirements.

Appreciate the guidance.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office   615-263-3068


**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 5:15 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** Attached Image

**ATTACHMENT R**

**ATTACHMENT R**

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 07/24/2025 3:02:26 PM (-07:00)
**To:** "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

I asked the City Clerk earlier about Core Civic's Business License and she stated that she believed it was just the Fire inspection that was needed. But she did not look it up, she was going off of memory.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, July 24, 2025 3:00 PM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Hi Joe - Just touching base. Any update from Anu? Safe to assume all is in order?

Marcelo Ariola
Vice President, Real Estate



CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office: 615-263-3047
Cell: 615-445-9163
NYSE: CXW

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Wednesday, July 23, 2025 9:04 AM
**To:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

> **CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Marcelo,

I will speak with Anu and get back to you.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



---

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Wednesday, July 23, 2025 6:20 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Joe - Thank you for your time yesterday. Please advise if there is anything substantive materials missing in our application. We are prepared to make payment as soon as possible assuming by now internet is up and running.

Anu - Thank you for your review.

Thanks,

Marcelo

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.
- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office   615-263-3068

**ATTACHMENT S**

**ATTACHMENT S**

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 08/21/2025 8:57:35 AM (-07:00)
**To:** "Susan Weber" <sweber@californiacity-ca.gov>
**Cc:** "bberken@berk-tel.com" <bberken@berk-tel.com>; "Roger@661comm.com" <roger@661comm.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Josh DuFour" <jdufour@berk-tel.com>; "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey" <stacey.stone@corecivic.com>; "Kristy Hightower" <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

> CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Susie,

Please send them a commercial electrical application.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:56 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Director Barragan --- Thanks for your time on the phone. I appreciate your assistance.
As we discussed, please have Suzy in your office send us the permit form on Monday when she's back in the office.
Best,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 10:27 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola,
Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

Yes, give me a call.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:22 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour
<jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

EXTERNAL MESSAGE: Use caution when clicking links or attachments
**Deputy Fire Marshal Hightower** --- Thank you for connecting all parties!  We appreciate your help.

**Director Barragan** --- Do you have time today for a brief phone call to discuss your questions / permit needs?
I want to make sure we're on the same page with our project and what we need for a second possible permit.
We have installed thousands of these low voltage systems all around the country, and we have never needed
a "building permit", so this request is new to us.
There is nothing structural or obtrusive (no changes to the building), so we are confused by the request and
need more information --- but happy to oblige.

The only published permit information we were able to find from your county / city (attached) for this technology is:

- ***Permits shall comply with the 2019 California Fire Code (CFC) Chapter 5, Section 510***

(No mention of a building permit; hence --- our delay and confusion.)

From your email:

We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations

I have attached the single line drawing sheets from our AHJ Submittal Packet that answers the questions above, but maybe I'm not understanding what you need (?)
I'm not sure what "*foundation plan*" or "*load calculations*" are in reference to for this ERRCS low voltage system?

Hope you have time to discuss today, so we can get you what you need.

Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com   www.GainBars.com
**1-877-362-6177**

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 9:09 AM
**To:** Brian Berken <bberken@berk-tel.com>; jbarragan@californiacity-ca.gov
**Cc:** Roger@661comm.com
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,

Please see below. I have included you both in this email so that you can discuss the building departments permitting needs.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 6:33 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning Kirsty,

Those are not plans. What they attached to the email are submittals and specifications. We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations. Also, from the package they submitted, it appears that a Building Permit will be required.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 6:24 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Joe,

I'm forwarding the email below to you.
Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 2:47 PM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

> **EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Please see below information in red from Brian with BERK-TEL covering the questions Mr. Barragan had. If you can please forward the email to Mr. Barragan this should answer his questions. If he has any additional questions BERK-TEL email is in the below string or he can contact Brian Berken directly.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, August 20, 2025 2:25:52 PM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Thanks for your email.
We already paid for ($1,000) and received the permit, yesterday (see attached).
We received approval from **Fire Marshall Hightower** with the FD and **Dawn Ferguson** with City Hall.
All the information answering Mr. Barragan's questions are included in the original packet (see attached).
Answers are below in **BOLD RED**, for ease of finding:

- Will any component require an electrical connection?
  - **YES – see attached plan for electric needs.**
  - **Site electricians will provide dedicated circuits as needed.**
- Are there footings or a foundation for the antennas?
  - **A single mast will be mechanically mounted to parapet wall.**
- We need to see a single-line schematic?
  - **PAGE 34 of the ATTACHED contains the full system design.**

Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 4:01 PM
**To:** Brian Berken <bberken@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
Please see forwarded email that Kristy Hightower sent me regarding the building permit questions city hall had.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Wednesday, August 20, 2025 1:00:57 PM
**To:** Roger Goodman <Roger@661comm.com>
**Subject:** Fwd: AHJ / Fire Marshal SUBMITTAL PACKET


Sent from my iPhone

Begin forwarded message:

> **From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
> **Date:** August 20, 2025 at 9:32:42 AM PDT
> **To:** Susan Weber <sweber@californiacity-ca.gov>, Kristy Hightower <khightower@calcityfire.us>, Tiffany Carter <tcarter@californiacity-ca.gov>
> **Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET


**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

The plans are incomplete:
- Will any component require an electrical connection?
- Are there footings or a foundation for the antennas?
- We need to see a single-line schematic.

If the answer to the first two questions is yes, then a permit will be required.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director

City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov



**From:** Susan Weber <sweber@californiacity-ca.gov>
**Sent:** Tuesday, August 19, 2025 10:53 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>;
Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning Kristy,

I believe you are correct but we are going to let Joe answer this when he gets back
tomorrow.

Thank you,



**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:35 AM
**To:** Susan Weber <sweber@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>;
Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi guys!

Am I correct in assuming this needs a permit? They can't move forward until I sign off on it.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review. Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>;
Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean
<Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour
<jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman
<Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire
Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete
the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

**\*\*\*Do you want to submit this to the correct person (people) on our behalf -or- do you want
to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**ATTACHMENT T**

**ATTACHMENT T**

**From:** "Kristy Hightower" <khightower@calcityfire.us>
**Sent:** 10/08/2025 12:36:55 PM (-07:00)
**To:** "Roger Goodman" <Roger@661comm.com>; "Brian Berken" <bberken@berk-tel.com>
**Cc:** "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey"
<stacey.stone@corecivic.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Dawn Ferguson" <dferguson@calcityfire.us>;
"Shannon Hayes" <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello,

Yes, I can be there at 2 on Tuesday. I will not be able to be out any earlier though as Tuesday and Wednesday are full of other inspections next week.

Thank you!

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, October 8, 2025 10:49 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel
<bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Brian,
I can come out Tuesday if that works for Fire Marshall Hightower.

Thank you,
Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, October 8, 2025 10:45:07 AM
**To:** Roger Goodman <Roger@661comm.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Hello Fire Marshall Hightower and Mr. Goodman…
We are on track and on schedule to finalize the system on Tuesday AM and **would appreciate your help testing for approvals on Tuesday afternoon (10/14) around 2:00 PDT.**
Can we all confirm that date and time for the final inspections?



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Monday, September 29, 2025 10:13 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
I can be available should a weekend be needed for testing. When we do decide on a date let me know. I need to give Kern County Communications a heads up to dispatch that we will be on channels.

Get Outlook for Android

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Monday, September 29, 2025 8:06:00 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Fire Marshall Hightower --- Thanks for the positive reply.
Pending our actual completion date, **do you have any weekend availability for testing?**
I don't know that it will be needed, but trying to plan for all possible dates/times in order to get the system powered ON and commissioned ASAP.
Thoughts?



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Monday, September 29, 2025 9:54 AM
**To:** Brian Berken <bberken@berk-tel.com>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,


Yes, I would like to attend the testing/inspection, but I would very much appreciate Roger's assistance. Please keep me updated.

Have a great day!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Friday, September 26, 2025 10:09 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning, Fire Marshall Hightower...
As we move closer to finalizing the BDA / ERRCS installation at the **CoreCivic Detention Center**, I am proposing the following to ensure you know there is adequate coverage throughout the facility.
Because there is no control channel within your radio system, we will be available to areas - checked, verified and documented - with your radios.
Roger Goodman has also volunteered to be present and complete radio tests with you (or on your behalf).

Typically, a spectrum analyzer can be used to quickly verify RF signals, but that requires radio traffic or a control channel (which constantly broadcasts RF).
Because there is no control channel in that area, there is no RF for the spectrum analyzer to measure --- unless you are using your radio.

We are forecasting we should have the system finalized and ready to be commissioned and then tested in the coming 7-10 days.
As we get closer, I would like to set up a time with you or your team (or Roger Goodman) to complete the radio checks for both 150MHz and 450 MHz frequencies.
***Are you in agreement with that method and that possible timeline?
I should be able to confirm a more specific date Monday or Tuesday next week.

Please let me know your thoughts...
Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:56 PM
**To:** Brian Berken <bberken@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Here are your plans. I hope that you have a great afternoon!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:50 PM
**To:** Dawn Ferguson <dferguson@calcityfire.us>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>

**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Hi Dawn… I just spoke to Destiny.
She took my **$1,000** payment and gave me **CONFIRMATION # 619154.**
Destiny said she would email the receipt to you.

**With that task completed ---- we should be ready to begin the installation, correct?**



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Dawn Ferguson <dferguson@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:29 PM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

You can contact City Hall (760-373-8661) with GL code: 19-3641/6-667 for Plan review, with payment of $1000.00, and have them email me the receipt, and you will be good to go. Thank you very much.

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:23 PM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Dawn Ferguson <dferguson@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET
**Importance:** High

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Hi **Deputy Fire Marshal Hightower ---** THANK YOU for the quick turnaround time with the approval for the submittal packet.
We will do a great job protecting your radio network and bringing signal inside the facility for the safety and protection of your team.

Hi **Dawn** --- Please find the attached, completed and signed application form.
Per the form, please advise if you need a hard copy sent via mail or your records.
Please let me know if you have any questions or need additional information.

Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com  www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 3:30 PM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Cc:** Dawn Ferguson <dferguson@calcityfire.us>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

I've looked over them and I don't see any issues, but for me to stamp/approve plans, you'll need to complete an application with Dawn. I have attached the form.

You can contact her at dferguson@calcityfire.us

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 10:39 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Sounds great hope you have a great week as well. I believe this is just a site plan that needs your approval and then a building permit will be applied for once the design is approved by you.

Roger Goodman
661 Communications
661-384-3537

Roger@661comm.com

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:33:08 AM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger,

I appreciate you sending this to me. It will likely need a permit from the building department; I will check with them and let you know. I will review it as quickly as possible so that it can get started.

I hope that you're having a great week!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us



**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review. Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman <Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

**\*\*\*Do you want to submit this to the correct person (people) on our behalf -or- do you want to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,



**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com   www.GainBars.com
**1-877-362-6177**