**EXHIBIT 4**

**EXHIBIT 4**

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent-Defendant
CoreCivic, Inc.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE, | Case No. 1:25-cv-01292-KES-CDB |
| Petitioners and Plaintiffs, | **DECLARATION OF CHRISTOPHER CHESTNUT** |
| v. | U.S. District Judge: Kirk E. Sherriff |
| City of California City and CoreCivic, Inc., | U.S. Magistrate Judge: Christopher D. Baker |
| Respondents and Defendants. | |
| — | |
| CORECIVIC, INC., | |
| Real Party in Interest. | |

I, Christopher Chestnut, state the following based upon my personal knowledge.

1.    I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2.    I am currently the Warden at CoreCivic's California City Correctional Facility[1] ("the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

---

[1] The facility has also been variously referred to as the California City Correctional Center, California City Immigration Processing Center, and California City Detention Facility.

- 1 -

3. Prior to that, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

4. I have been employed by CoreCivic since 1995 and have more than 27 years of corrections experience.

5. I am familiar with the allegations in the lawsuit filed by the Dignity Not Detention Coalition and John Doe against California City and CoreCivic in the Kern County Superior Court, which has since been removed by CoreCivic to the Eastern District of California.

6. I have also reviewed the Declarations of Joseph Petta, Jehan Laner, and John Doe in support of Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction.

7. The Declarations contain a number of allegations that are not accurate.

8. The facility is not ill-equipped to handle "extreme heat events" as claimed by Plaintiffs. The entire facility, including all interior areas accessible to detainees, has central air conditioning, as well as central heating.

9. Additionally, CoreCivic takes steps to protect detainees from heat-related illness during recreation, including provision of coolers with drinking water, limiting outdoor recreation to one-hour blocks and allowing detainees to come in early if they choose, and curtailing outdoor recreation during heat waves.

10. The Declaration of John Doe alleges that his pod has been permitted to go outside for recreation only four times, which is not accurate. We offer one hour of outdoor recreation at least six days a week, which exceeds the standard set forth in the ICE National Detention Standards 2025 ("NDS") of at least one hour per day, five days per week, or six or more hours per week offered at on at least four days per week. *See* NDS 5.2 Section II.A.1.

11. The Declarations make multiple references to crowding and people being "packed into" the facility. However, the facility is currently operating at less than one-third

of its total capacity with a detainee population on October 25, 2025 of 746.[2] Moreover, even if the facility were operating at full capacity, the physical plant is designed to accommodate the full population without crowding.

12.    The facility consists of 10 housing units, each of which contains three pods—two of which have 44 cells and one of which has 40 cells.

13.    There are no open dormitory-style housing units at the facility.

14.    The facility is designed to house detainees in two-person cells, which each contain two bunk beds, a desk, a sink, and a toilet. Each cell has a window with a view outside, and each cell door has a narrow window that provides a view into the dayroom area.

15.    The following photograph shows the layout of the cells.



16.    The toilet in each cell is positioned in such a way as to maximize privacy and cannot be seen when viewing the cell head on from the day room with the door closed.

---

[2] Of the 746 detainees, 595 are male, and 151 are female. 250 of the male detainees are classified as High/Mod-High, while 345 are classified as Low/Mod-Low. 12 of the female detainees are classified as High/Mod-High, while 139 are classified as Low/Mod-Low. All detainees classified as High/Mod-High have criminal convictions, the majority of which are in the United States, but some are in their countries of origin.

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

1    However, staff must be able to see into the cell when doing their security rounds to ensure

2    detainee safety.

3        17.    The following photograph shows the view of the cells from the outside with

4    the door closed, demonstrating that the toilet is not visible.



5

6

7

8

9

10

11

12

13

14

15    18.    Each pod has a large dayroom area, which contains tables with integrated

16    seats, multiple televisions, a bank of telephones, a microwave, a drinking fountain, and a

17    shower room.

        19.    The following photograph shows the dayroom area.



18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

20. Each dayroom other than in the Restrictive Housing Unit ("RHU") contains enough seats for every detainee to sit at the tables if they choose to do so. In the larger pods, which are designed to house 88 detainees, there are 22 tables with four seats each. In the smaller pods, which are designed to house 80 detainees, there are 20 tables with four seats each. In RHU, there are fewer tables because the detainees are not permitted to intermingle with detainees from other cells, and meals are served in the cells. In addition, each cell has a desk and two seats that detainees can use for meals if they prefer. Each dayroom typically also has several plastic chairs that can be used by detainees.

21. Each of the dayrooms includes posters containing consulate information and a list of pro-bono legal organization phone numbers prepared by ICE.

22. The following photos show the consulate and pro bono posters that are posted in each housing pod.

 

23. The facility building schedule is also posted in each of the dayrooms.

24. The shower rooms in each pod consist of six shower stalls with solid partitions separating them. Each shower has a curtain that can be drawn to cover the entrance for

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

privacy. In the female pods, the solid partitions separating the shower stalls have been raised by five inches and the shower curtains are longer to ensure privacy.

25.    The following photo shows the raised wall in the female showers.



26.    The showers are designed to maximize privacy while still allowing staff to monitor who is present in the showers for security reasons. Fully enclosing the showers would allow detainees to engage in problematic behaviors, including physical or sexual assaults, as well as commit suicide by hanging, without staff awareness. The showers are designed consistent with widely accepted correctional and detention facility standards.

27.    In addition, any staff member entering a pod housing detainees of the opposite gender must announce his or her presence.

28.    The following photograph shows the shower enclosures and curtains in a male pod.



DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

29.    A male staff member is included in the below photograph to depict the height of the partitions relative to an individual utilizing the shower; the staff member is approximately six feet tall.



30.    The following photographs show the shower enclosures and curtains in a female pod. The female staff member in the photograph is approximately five feet six inches tall.




- 7 -

31.     The allegation in the Declaration of John Doe that there was no hot water at the facility from September 1st until the weekend of September 12th is not accurate. Each housing unit has its own hot water heater, the temperatures of which are tested weekly. Since reactivating the facility, we have experienced a few isolated times when an individual hot water heater stopped working. On each such occasion, we brought a contractor onsite and promptly fixed the issue within an hour or two.

32.     Detainees are provided access to cleaning supplies for use in their cells. In the early days following reactivation, we found that some detainees were hoarding cleaning supplies, leaving insufficient supplies for other detainees. This issue has been addressed during town halls and through more frequent replenishment of supplies. We now replenish cleaning supplies and chemicals four times a day. In addition, the voluntary work program ("VWP") has been established at the facility, through which detainees are assigned and paid to work as porters in the housing units, where they are responsible for cleaning the showers and common areas.

33.     Detainees may check out tablets in the dayrooms.

34.     The tablets are administered by Talton, a third-party service provider contracted directly with ICE. Talton and ICE determine the available applications on the tablets, which include video visitation, electronic messaging, law library research applications, and entertainment applications. The tablets also have access to facility forms, including sick call requests and grievance forms.

35.     Detainees may place outgoing telephone calls to their families and friends using the landline telephones in the dayroom.

36.     Detainees have access to legal resources through a legal kiosk in the pod. Each of the tablets also has access to Lexis Nexis for detainees to conduct legal research.

37.     Immigration forms are available in the pod in hard copy format and through the legal kiosk.

38.     Detainees are able to send legal mail by placing the mail in a designated box or handing it to their case manager or counselor.

- 8 -

39.    Envelopes are available for purchase through the commissary, but we also provide them free of charge to any indigent detainees. Contrary to the allegation in John Doe's Declaration, detainees have been provided pens and pencils free of charge since the facility was reactivated. However, some detainees complained about the type of pens provided, and the facility has recently switched to a different type of pen.

40.    Detainees are also provided basic hygiene items, including shampoo, soap, lotion, combs, tooth brushes, and toothpaste, at no charge upon intake at the facility. These items are replenished as needed. Female detainees may request feminine hygiene products.

41.    Detainees are also permitted to purchase optional hygiene items from the commissary. Detainees who transfer into the facility with sealed, unopened commissary items from another facility are permitted to keep them, so long as they do not exceed authorized limits. If a detainee transfers in with more than the allotted amount of commissary items, the excess items will be stored in the detainee's property provided the total weight does not exceed the total weight limit for transport (40 lbs). However, opened commissary items transferred into the facility are disposed of due to the risk that they may contain contraband.

42.    The commissary is managed by Keefe, a third-party contractor. Keefe sets the commissary prices on a company-wide basis, and the facility has no control over them.

43.    Detainees are required to lock down in their cells overnight from approximately 10:00 pm to 5:00 am to allow for a period of rest.

44.    Detainees also lock down for count. There are seven counts per day, but three occur during the nighttime lock down period. The length of each count varies based on a number of factors. Immediately after the facility reopened, some counts took up to 90 minutes due to new staff, paperwork issues, and detainees not complying with count procedures. However, I am not aware of any counts lasting up to three hours as alleged by John Doe. The speed of count has increased significantly and now averages approximately 30 minutes. However, a particular count may take slightly longer if there are a large number of out counts (detainees who are not present in their assigned housing units at the time of

- 9 -

count due to being in medical, visitation, etc.) or if detainees fail to timely lock down or otherwise impede count, such as occurred during the sit down mentioned in John Doe's Declaration.

45.    Detainees may also be required to lock down based on security considerations or as a result of detainee behavioral issues.

46.    I am aware that John Doe alleges his pod was placed on lock down for 24 hours after refusing to return to their cells for count. It is accurate that one of the High custody housing units [3] was placed on lock down in September following a group demonstration during which a large number of detainees refused to comply with staff directives to return to their cells, and we had to bring in additional staff to negotiate to get the detainees back into their cells. The detainees remained in their cells while we investigated and identified the instigators of the incident. Once the investigators were removed, the pod was placed on a modified tier management schedule, in which meals were served in the cells and individual cells were permitted to access the dayroom and take showers, but were not permitted to congregate in the dayroom in groups. These restrictions were lifted after the investigation was completed.

47.    Under the NDS 2025, ICE requires CoreCivic to "promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply." This is no different than I have experienced in any other correctional or detention system.

48.    The purpose of imposing these rules is to promote and enhance the safety and security of the institution as a whole, including but not limited to, protecting the physical safety and individual rights of other detainees and staff members. As a result, the

---

[3] Based on John Doe's allegations regarding the group demonstration, I am able to determine that he is classified as High custody, which indicates that he has one or more criminal convictions.

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

disciplinary system imposes sanctions commensurate with the severity of the prohibited act to encourage a non-compliant detainee to conform to the rules and regulations in the future.

49.    The failure of a single detainee to comply with instructions, such as to return to his or her cell in preparation for count, is generally a relatively minor offense, unless it is a repeat behavior which may result in a temporary deprivation of privileges for the detainee.  However, the delay in a detainee returning to his or her assigned cell for a count does disrupt facility operations and extend the period of the count, which impacts all detainees in the facility, as the count cannot clear and no other detainees may be released from their cells until the count is complete.

50.    A group demonstration or refusal, however, is treated as a more severe infraction because it not only delays the count process and release of other detainees but also calls for a response by additional staff from other locations in the facility.  While those staff members are attending to the group demonstration, they are not available to respond to any other incident which may occur at the facility, such as a detainee in emergent medical distress.  Moreover, to the extent that certain detainees may coercively pressure detainees who do not wish to protest, their attempt to control other detainees violates those detainees' rights to refuse to engage in a demonstration.

51.    For that reason, inciting or leading a group demonstration is considered a more severe disciplinary infraction and may result in the involved detainee being given a disciplinary sanction following formal disciplinary proceedings, which include the right to a hearing on the disciplinary charge and an opportunity to call witnesses and present evidence to refute the disciplinary offense. If the detainee is found to have committed the charged infraction, the detainee may receive a disciplinary sanction of up to 30 days in restrictive housing. Detainees may also be placed in restrictive housing during investigatory and disciplinary proceedings, such as occurred with the instigators of the group demonstration mentioned in John Doe's Declaration.

52.    As indicated in the NDS, these disciplinary sanctions are intended to promote pro-social behavior in an institutional environment, where detainees are cognizant of the

- 11 -

rights of their fellow detainees and staff, including each individual's right to live or work in a safe environment. Disciplinary sanctions are not assessed as a means of retaliation against detainees.

53.    Additionally, CoreCivic does not prohibit or punish any detainee who individually declares that he or she is on a hunger strike.  However, those instances are tracked, and after a set number of meals are missed, are reported to ensure that the detainee is subject to ongoing medical monitoring and counseling.  Detainees on hunger strikes may be relocated to the medical unit or other locations to facilitate monitoring of their health and well being. This is not done to retaliate against the detainees but rather to ensure their safety. Likewise, detainees are not denied access to water, toilet paper, or other basic necessities while on a hunger strike.

54.    I am not aware of any detainees being retaliated against for asking for their property or medications, nor would we move someone to restrictive housing for doing so, as alleged by John Doe. Likewise, I am not aware of any detainees being retaliated against for filing grievances. CoreCivic has a zero tolerance policy for retaliation by staff, and I enforce this policy at the facility.

55.    Detainees are escorted by staff at all times when outside their housing areas. Restraints are applied consistent with NDS 2025 standards.

56.    If a detainee leaves the pod, he or she will be subject to a pat search upon return. This is done to halt the spread of contraband, including drugs, between pods.

57.    Pat searches are conducted consistent with the NDS, which defines a pat search as "a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband," and accepted correctional/detention industry practices. Detainees' genitals and buttocks are not groped as alleged by John Doe.

58.    Consistent with NDS 2025 Standard 2.7 Section 2(c), detainees may be subject to strip searches upon reasonable suspicion that contraband is concealed on their

person. The NDS also provides that detainees may be subject to strip searches as a matter of course upon entry or reentry into the facility or following contact visitation.

59.    All security staff are trained regarding search procedures, including pat searches and strip searches, during their initial training and annual refresher training.

60.    During pill call, the medication cart is either brought into the pod or placed in the rotunda outside the pod. If pill call occurs in the pod, detainees are not subject to pat searches.

61.    Currently, food trays are brought to each housing pod for each meal, which is referred to as satellite feeding and is permitted by the NDS.

62.    Food service at the facility is provided by Trinity Services Group. A registered dietician conducts a complete nutritional analysis of every menu and certifies all menus to ensure they are compliant with the U.S. Food and Drug Administration's recommended daily allowances.

63.    Trinty also provides medical diets when ordered by a medical professional and religious diets when approved by the facility Chaplain.

64.    Detainees receive three hot meals per day. They also have the option to purchase snacks through the commissary. When clinically indicated, medical staff may also order snacks to be provided to a detainee free of charge.

65.    The following photograph shows a regular meal tray.



66.     The drinking water provided to detainees at the facility is from the California City municipal water system, which is regularly tested by the City.

67.     Most medications are administered by medical staff during pill call, in which a nurse brings a medication cart to the housing units twice per day and distributes medications to the detainees. I am not aware of any instances in which pill call did not occur twice per day.

68.     Certain medications are available as "keep on person" ("KOP").

69.     Detainees may request medical, mental health, and dental care through submission of a sick call request, either on a paper form or through the tablets. They may also make a verbal request for health care to any staff member.

70.     I have reviewed the allegation in the Declaration of John Doe that he was not provided medication for the flu. Because Plaintiffs have not provided his name, I am unable to review his records and provide a response to his specific allegations.

71.     Likewise, the John Doe Declaration does not include the name of the detainee who was awaiting surgery and was allegedly told by staff that he was faking his injuries and forced to walk, which prevents me from being able to review his records to specifically address these allegations. However, I am aware of a detainee who was scheduled for surgery prior to being transferred to the facility and reported to staff that he was having difficulty walking. He was evaluated by medical staff onsite, referred for an offsite surgical consult, and provided a wheelchair. We have a large supply of wheelchairs in medical that can be provided to detainees who are determined by medical staff to have a clinical need for them.

72.     There have been occasions when detainees have arrived at the facility without their medical records. In each such case, we reached out to ICE to obtain their records.

73.     The facility medical unit includes a detainee waiting area, medical exam rooms, a dental room with multiple dental chairs, a telehealth room, a lab, an x-ray room, mental health offices, four negative pressure cells, two medical observation cells, and a mental health watch cell.

- 14 -

74.    Detainees in RHU receive daily visits from medical and mental health staff.

75.    If a detainee is dissatisfied with the health care provided, he or she can submit a grievance.

76.    The facility grievance process is explained during orientation and included in the detainee handbook, which is provided to each detainee.

77.    The facility currently allows non-contact visitation with friends and families onsite. However, most detainees elect to connect with their friends and families through video visits on the tablets provided to them in the housing units.

78.    Attorneys may arrange for confidential legal telephone calls, in-person legal visits, and virtual attorney visits ("VAV") with detainees by calling or emailing the facility.

79.    The facility has installed sound proof booths to facilitate VAV.

80.    The following photo shows the VAV booths, including one that is designed for wheelchair access.



81.    Contrary to the Plaintiffs' claims, we are not conducting daily court transports. In fact, we have not done any court transports since the reactivation of the facility. Instead, detainees attend court appearances onsite in the video teleconferencing ("VTC") rooms at the facility. On a recent day, we facilitated a 19-person female court session by video. The VTC rooms are also used for asylum proceedings and VAVs.

82.    The following is a photograph of one of the VTC rooms.



83.    The facility does not receive direct intakes. Rather, incoming detainees arrive at the facility in groups after going through in processing at another facility or after being in-processed at an ICE office.

84.    Likewise, detainees are not released directly from the facility into the community.

85.    While the detainee population currently consists of immigration detainees in the custody of ICE, there is no functional difference in the way the facility operates now versus when it housed sentenced California state prisoners in the custody of the California Department of Corrections and Rehabilitation from approximately 2013 through 2023 or prior to that when it housed federal pretrial and sentenced detainees in the custody of the United States Marshals Service ("USMS") and criminal aliens in the custody of the Federal Bureau of Prisons ("BOP").

86.    In fact, the facility previously housed immigration detainees in the custody of ICE—the exact same population as it does now—from approximately 2010 through 2013.

87.    I have prior experience with federal detainee populations (including ICE, USMS, and BOP) and state prisoner populations from my work at other facilities. In my

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

1    experience, USMS detainee and state prisoner populations tend to generate more frequent

2    court transports than ICE detainee populations.

3        88.    The Declaration submitted by John Doe includes several inaccurate

4    allegations regarding an attempted suicide at the facility on October 9, 2021. Contrary to

5    his Declaration, there were four staff members present in the pod at the time of the incident,

6    and both security and medical staff responded promptly and within policy timeframes. The

7    first officer who responded to the incident and saved the detainee's life also responded to a

8    prior suicide attempt by the same detainee. Also contrary to John Doe's Declaration, most

9    officers carry cut-down tools on their duty belts, but in this instance, no cut-down tool was

10   needed, as the officer was able to remove the ligature used by the detainee.

11       89.    Although I was not present during the July 21, 2025 fire and safety inspection

12   at the facility, I was copied on emails regarding one minor finding during it. Specifically,

13   Deputy Fire Marshal Hightower concluded that an exit sign posted in the facility's visitation

14   area should be removed. The sign was removed the same day.

15       90.    The fire department has also requested that we provide a key for their use in

16   a secure Knox box, which we immediately complied with.

17       91.    I was present when California City Deputy Fire Marshal and Acting Director

18   of Public Safety Kristy Hightower re-toured the facility on September 28, 2025 and had no

19   concerns.

20       92.    Since that time, the City has not notified CoreCivic of any additional fire or

21   safety concerns regarding the facility.

22       93.    CoreCivic has been issued permits by state and county agencies without

23   requiring compliance with SB 29. The California Department of Public Health issued a

24   Clinical and Public Health Laboratory License "authorizing operation of a clinical

25   laboratory" at the facility. Attachment A is a true and correct copy of the license and is a

26   business record of CoreCivic. Kern County issued an Environmental Health Permit to

27   operate the facility as a Food Facility. Attachment B is a true and correct copy of the license

28   and is a business record of CoreCivic.

94.    The facility is located in a remote desert area outside the developed boundary of the City with no visible neighbors. However, the entire route from California City to the facility is paved. There is a large offroad vehicle recreation area along the road between the edge of the City and the facility.

95.    When operating at full capacity, the facility is anticipated to employ nearly 500 staff.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 27, 2025.

Christopher Chestnut

DECLARATION OF CHRISTOPHER CHESTNUT                    CASE NO. 1:25-CV-01292-KES-CDB

**ATTACHMENT A**

**ATTACHMENT A**





# CLINICAL AND PUBLIC HEALTH LABORATORY LICENSE

In accordance with the provisions of Chapter 3, Division 2 of the Business and Professions Code, the persons named below are hereby issued a license authorizing operation of a clinical laboratory at the indicated address.

### CALIFORNIA CITY IMMIGRATION PROCESSING CENTER

22844 VIRGINIA BLVD.,
CALIFORNIA CITY, CA 93505

**STATE ID: CLR-00326233**
*SCAN QR CODE TO VERIFY LICENSE*
*OR VISIT: www.cdph.ca.gov/LFS*

**EFFECTIVE DATE:** 10/25/2025
**EXPIRATION DATE:** 10/24/2026

**LICENSE TYPE:**
CLINICAL LABORATORY REGISTRATION

| OWNER/S: | DIRECTOR/S: |
|---|---|
| CORECIVIC OF TENNESSEE | WALKITRIA A SMITH |

**DISPLAY:** State law requires that the clinical laboratory license shall be conspicuously posted in the clinical laboratory.
**CHANGE OF LABORATORY NAME, DIRECTOR, OWNER AND/OR ADDRESS:**
State law requires that the laboratory owner and/or the director notify this office within 30 days of any change in ownership, name, location, or laboratory directors.
If this office is not notified, your license may be revoked 30 days after major Owner and/or Director change.
If your license is revoked, you must cease engaging in clinical laboratory practice and apply for a new laboratory license.
To make these changes or to submit a new application, visit our website: https://www.cdph.ca.gov/LFS *(Go to Laboratory Facilities)*

**CHARLET ARCHULETA**
ACTING BRANCH CHIEF
LABORATORY FIELD SERVICES

LAB CERT 300 (03-2025)

**ATTACHMENT B**

**ATTACHMENT B**

# ENVIRONMENTAL HEALTH PERMIT

## Kern County Public Health Services Department

### Environmental Health Service Division

**2700 M Street, Suite 300 Bakersfield CA 93301-2370**

**(661) 862-8740**      http://kernpublichealth.com/environmental-health      e-mail: eh@kerncounty.com

**REGULATED FACILITY:**

California City Immigration Processing Center

22844 Virginia Blvd

California City CA 93505

**OWNER(S) OF RECORD:**

**FA ID:  EHFA-25-00223**

**General Health Program**

Food Facility

**Permit #**

EH-FDP-25-000058

**Additional Information**

California City Immigration Processing Center

**Permit Issued:  06/30/2025**

**Brynn Carrigan**
**Public Health Services Director**

This ENVIRONMENTAL HEALTH PERMIT is issued to the owner(s) and establishment shown above subject to compliance with all applicable laws and regulations. Permit is valid unless revoked or suspended for violation of applicable laws and regulations.

**PERMIT IS NON-TRANSFERABLE AND MUST BE PROMINENTLY DISPLAYED IN THE PLACE OF BUSINESS**