JOSEPH D. PETTA (State Bar No. 286665)
MINDY K. JIAN (State Bar No. 336139)
RYAN K. GALLAGHER (State Bar No. 344349)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
Petta@smwlaw.com
Mjian@smwlaw.com
Rgallagher@smwlaw.com

Attorneys for Dignity Not Detention Coalition

CALLARD E. COWDERY (State Bar No. 329697)
AFRICAN ADVOCACY NETWORK
3106 Folsom St
San Francisco, California 94110
Telephone: (415) 889-9573
ccowdery@aansf.org

Attorneys for John Doe

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

|  |  |
|---|---|
| DIGNITY NOT DETENTION COALITION and JOHN DOE, <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CITY OF CALIFORNIA CITY and CORECIVIC, INC., <br><br> Respondents and Defendants. <br><br>———————————————————<br><br> CORECIVIC, INC., <br><br> Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB <br><br> **CONSOLIDATED REPLY TO RESPONDENTS' OPPOSITIONS TO PETITIONERS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> Date:     November 3, 2025 <br> Time:     1:00 p.m. <br> Judge:    Hon. Kirk E. Sherriff <br> Crtrm.:   6 <br><br> Hon. Hon. Kirk E. Sherriff, District Judge <br> Hon. Christopher D. Baker, Magistrate Judge <br><br> Trial Date:     None set |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 1

I.    The Coalition has standing.................................................................................. 1

II.    Petitioners have established that a TRO is warranted......................................... 4

    A.    Undisputed facts show that Petitioners are likely to succeed on their claims. ........................................................................................... 4

        1.    CoreCivic and the City both admit that the Facility has been operating without a business license. .............................................. 4

        2.    Petitioners are likely to succeed in showing that the Facility cannot operate without amendment of the Zoning Code or issuance of a new CUP, or both................................................................................. 5

            a.    The Zoning Code's and CUP's plain language exclude the Facility. ..................................................................................... 5

            b.    Petitioners' claims against the City are ripe because the City has a mandatory duty to enforce against zoning law violations................................................................................. 8

        3.    The City should have, yet failed to, comply with SB 29's notice and hearing requirements before issuing any approvals for the Facility. .............................................................................................. 9

        4.    CoreCivic's purported federal defenses are meritless. ............................. 11

            a.    SB 29's constitutionality has no bearing on the merits of Petitioners' claims against CoreCivic. ............................................ 12

            b.    The only provision of SB 29 at issue here, California Civil Code section 1670.9(d), is constitutional....................................... 12

                i.    Intergovernmental immunity ............................................. 12

                ii.    Preemption ........................................................................ 16

            c.    CoreCivic is not entitled to derivative sovereign immunity. ......... 17

    B.    Petitioners are suffering irreparable harm from the City's and CoreCivic's ongoing violations of law.............................................................................. 19

        1.    Despite CoreCivic's efforts, Petitioners have pursued interim relief as promptly as possible. ................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.    CoreCivic has not refuted Petitioners' showing of irreparable injury. ...............................................................................19

3.    Granting the TRO would lessen ongoing harms to the Coalition, Doe, and the general public. ............................................21

C.    The balance of equities weighs in Petitioners' favor because Respondents will not suffer any irreparable harm if the Court grants injunctive relief. .............22

D.    The public interest factor clearly weighs in favor of granting injunctive relief. .........................................................................................23

III.    The proposed order is appropriate in scope and detail. ...................................24

CONCLUSION...........................................................................................................24

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

1

# TABLE OF AUTHORITIES

2

**Page**

3

**FEDERAL CASES**

4    *Alliance for the Wild Rockies v. Cottrell,*
        632 F.3d 1127 (9th Cir. 2011) ................................................................. 20

5

6    *Arizona v. United States,*
        567 U.S. 387 (2012) ................................................................................. 16

7    *California v. Azar,*
        911 F.3d 558 (9th Cir. 2018) ................................................................... 20

8

9    *Commure, Inc. v. Canopy Works, Inc.,*
        No. 24-cv-02592-NW, 2025 WL 2601616 (N.D. Cal. Apr. 25, 2025) ......................... 5

10   *DeCanas v. Bica,*
        424 U.S. 351 (1976) ................................................................................. 16

11

12   *Food & Drug Admin. v. All. for Hippocratic Med.,*
        602 U.S. 367 (2024) ................................................................................... 3

13   *Friends of the Wild Swan v. Weber,*
        767 F.3d 936 (9th Cir. 2014) ..................................................................... 4

14

15   *Geo Grp., Inc. v. Inslee,*
        151 F.4th 1107 (9th Cir., Aug. 19, 2025) ......................................... passim

16   *Geo Grp., Inc. v. Newsom,*
        50 F.4th 745 (9th Cir. 2022) (en banc) ................................................. 14

17

18   *Havens Realty Corp. v. Coleman,*
        455 U.S. 363 (1982) ................................................................................... 3

19   *Hernandez v. Sessions,*
        872 F.3d 976 (9th Cir. 2017) ................................................................... 23

20

21   *Hernandez v. Wofford,*
        No. 1:25-cv-00986-KES-CDB (HC), 2025 WL 2420390 (E.D. Cal. Aug. 21, 2025) ....... 4, 23, 24

22   *Hunt v. Washington State Apple Advertising Comm'n,*
        432 U.S. 333 (1977) ................................................................................... 3

23

24   *Idaho v. Coeur d'Alene Tribe,*
        794 F.3d 1039 (9th Cir. 2015) ................................................................. 22

25   *Immigrant Defenders Law Center v. Noem,*
        145 F.4th 972 (9th Cir.) .......................................................................... 2, 3

26

27   *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton,*
        752 F.3d 755 (9th Cir. 2014) ..................................................................... 5

28

*Lopez v. Heckler,*
   713 F.2d 1432 (9th Cir. 1983) ........................................................................... 23

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................... 2

*Lydo Enters., Inc. v. City of Las Vegas,*
   745 F.2d 1211 (9th Cir. 1985) ......................................................................... 19

*McHenry County v. Raoul,*
   44 F.4th 581 (7th Cir. 2022) ................................................................. 13, 15, 16

*Nwauzor v. Geo Grp., Inc.,*
   127 F.4th 750 (9th Cir. 2025) ................................................................. passim

*Oakland Trib., Inc. v. Chronicle Pub. Co., Inc.,*
   762 F.2d 1374 (9th Cir. 1985) ......................................................................... 19

*Sampson v. Murray,*
   415 U.S. 61 (1974) ........................................................................................... 23

*Satanic Temple v. Labrador,*
   149 F.4th 1047 (9th Cir. 2025) .......................................................................... 3

*Sheetz v. County of El Dorado,*
   601 U.S. 267 (2024) ......................................................................................... 16

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019) ................................................................... passim

*United States v. Washington,*
   596 U.S. 832 (2022) ......................................................................................... 13

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ......................................................................................... 4, 20

**<u>STATE CASES</u>**

*Fox v. County of Fresno,*
   170 Cal.App.3d 1238 (1985) .............................................................................. 9

*Haggis v. City of Los Angeles,*
   22 Cal.4th 490 (2000) ........................................................................................ 9

*Orange Citizens for Parks & Recreation v. Sup. Court,*
   2 Cal.5th 141 (2016) .......................................................................................... 6

*Riggs v. City of Oxnard,*
   154 Cal.App.3d 526 (1984) ................................................................................ 9

*Tulare Lake Canal Company v. Stratford Public Utility District,*
   92 Cal.App.5th 380 (2023) .............................................................................. 20

## FEDERAL STATUTES

6 U.S.C. § 112 ................................................................................................................ 16

8 U.S.C. § 1231 ............................................................................................................... 16

28 U.S.C. § 530C ............................................................................................................. 16

Fed. R. Civ. Proc. 17(b) .................................................................................................... 2

Fed. R. Evid. 801 ............................................................................................................ 18

## STATE STATUTES

Cal. Civ. Code § 1670.9 ........................................................................................... passim

Cal. Code. Civ. Proc. § 369.5 ........................................................................................... 1

Cal. Gov. Code § 12532 ..................................................................................................... 6

Cal. Gov. Code §§ 65853-57 ..................................................................................... 14, 15

Cal. Penal Code § 6082 ...................................................................................................... 6

## FEDERAL REGULATIONS

6 C.F.R. § 5.44(a) ........................................................................................................... 18

## MISCELLANEOUS

Black's Law Dictionary (12th ed. 2024) .............................................................................. 7

## CALIFORNIA CITY MUNICIPAL CODE

§ 1-4.02 .......................................................................................................................... 20

§ 3-2.3.201 ........................................................................................................................ 4

§ 3-2.3.204 ...................................................................................................................... 15

§ 9-2.102 ........................................................................................................................... 4

§ 9-2.103 ..................................................................................................................... 8, 20

§ 9-2.402 ................................................................................................................... 4, 5, 8

§ 9-2.2501 .......................................................................................................... 14, 15, 20

§ 9-2.2804 ..................................................................................................................... 8, 9

**INTRODUCTION**

Through this Ex Parte Application for a Temporary Restraining Order and Order to Show Cause, Petitioners and Plaintiffs ("Petitioners") Dignity Not Detention Coalition ("Coalition") and John Doe ("Doe") seek only limited, temporary relief to prevent their serious injuries from worsening. They are not asking the Court to shut down CoreCivic's California City Correctional Facility ("Facility")—despite the dire conditions and mistreatment that Doe and his fellow *civil* detainees will face as long as the unpermitted Facility continues to operate in any capacity. Nor are they attempting to burden the City of California City ("City") with any onerous restrictions—though the City's utter complicity in CoreCivic's illegal conduct may warrant it. Instead, Petitioners simply ask that this Court maintain the status quo by preventing the Facility from expanding or taking on new detainees *unless and until* the City and CoreCivic comply with all procedures and secure all authorizations required under state and local law.

CoreCivic and the City staunchly oppose even this minimal relief. But their scattershot arguments are meritless. *First*, the Coalition plainly has Article III standing to maintain this action. *Second*, Petitioners have a strong likelihood of success on the merits of all of their claims. Indeed, in their opposition papers, CoreCivic and the City have *virtually conceded* that CoreCivic is violating the law by operating the Facility without all necessary permits. None of CoreCivic's purported federal defenses can excuse this illegal conduct. *Third*, Petitioners are suffering and will continue to suffer a range of serious, irreparable injuries that will be lessened—if not eliminated—through the requested relief. *Finally*, both the balance of the equities and the public interest strongly favor granting the requested relief.

Accordingly, the Court should grant the proposed Temporary Restraining Order ("TRO") and Order to Show Cause ("OSC").

**ARGUMENT**

**I.    The Coalition has standing.**

CoreCivic argues that the Coalition does not have Article III standing because the Coalition is not a "legal entity" registered with the California Attorney General's office. Dkt. 18 (Core Civic's Opposition, or "CC Opp.") at 11. But CoreCivic does not cite to any authority requiring incorporation or registration as part of the standing analysis. *See id.* at 11-12. Indeed, governing law is clear that unincorporated organizations have the capacity to sue and be sued. Cal. Code. Civ. Proc. § 369.5 ("A partnership or other

1

unincorporated association, whether organized for profit or not, may sue and be sued in the name it has assumed or by which it is known."); Fed. R. Civ. Proc. 17(b) ("Capacity to sue or be sued is determined . . . by the law of the state where the court is located"). And the registration "requirement" to which CoreCivic cites is an irrelevant provision regulating charitable organizations acting as trustees. *See* CC Opp. at 11 (citing Gov. Code § 12585). Federal and state law explicitly allow the Coalition to participate in litigation as an unincorporated organization; CoreCivic's argument to the contrary is frivolous.

In fact, the Complaint readily demonstrates the Coalition's standing. To establish standing, a plaintiff must show that (1) it suffered an "injury in fact," (2) the challenged conduct caused the injury, and (3) the court may redress the injury by a favorable decision. *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 987 (9th Cir.) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The Coalition is composed of community organizations that defend immigrants' and detainees' civil rights, including by protecting peoples' right to participate in decisionmaking affecting those rights and fighting against the negative impacts of mass immigration detention. *See* Dkt. 1-3 (Complaint, or "Compl.") ¶¶ 7-8. The City's and CoreCivic's violations of local and state law have directly injured the Coalition because the unpermitted and unlicensed operation of the Facility deprived the Coalition of the opportunity to advocate on behalf of immigrants and detainees prior to the Facility's opening. If Respondents had complied with applicable laws, the Coalition's advocacy could have also mitigated the Facility's negative impacts on the detainees and surrounding community. Due to the absence of any public process prior to the Facility's opening, the Coalition had to expend additional resources to communicate its concerns and protect immigrant and detainee rights that it would not have otherwise spent on these efforts. *Id.* ¶¶ 31, 75; *See also* Dkt. 10-3 (Memorandum of Points and Authorities in support of TRO and OSC, or "MPA") at 22; Dkt. 10-4 (Declaration of Jehan Laner, or "Laner Decl.") ¶ 14.

CoreCivic does not seriously dispute these injuries. They appear to argue that the Coalition does not have a "personal stake" in this case, must show more than mere frustration of organizational missions, and cannot "manufacture its injury" by unnecessarily spending money. *See* CC Opp. at 12.[1] But none of

---

[1] CoreCivic does not dispute that the Coalition has established causation and redressability. Nor could it. The Coalition's injuries directly result from CoreCivic's hasty, unpermitted, and unlicensed reopening
(footnote continued on next page)

these characterizations are true of the injuries alleged here. The Complaint describes injuries specific to the Coalition (e.g., deprivation of opportunities to provide comments) in addition to the physical harms faced by John Doe. *See* Compl. ¶¶ 7-9, 31-34, 75; Laner Decl. ¶ 14. Unlike in the cases cited by CoreCivic, these injuries are not speculative; they have already occurred. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024) (speculative increase in liability risk or insurance cost); *Satanic Temple v. Labrador*, 149 F.4th 1047, 1053 (9th Cir. 2025) (speculative impact to volume of clinic patrons). Furthermore, the Respondents' failure to follow required processes has directly interfered with the "core" of the Coalition's activities: advocating on behalf of immigrants and detainees. Because of Respondents' unlawful conduct, Coalition had to dedicate additional time and resources to speaking out against the Facility, corresponding with the City, coordinating support for detainees, educating residents, and planning community events, all outside of litigation. Laner Decl. ¶ 14. This sufficiently demonstrates that the Coalition has suffered an injury in fact. *See Immigrant Defenders Law Center*, 145 F.4th at 987-89 (immigration advocacy group demonstrated injury in fact where border policies interfered with group's "core activities and longstanding mission" and forced group to expend additional resources to do the same work); *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding injury in fact where challenged action "frustrated" plaintiff's "efforts to assist equal housing access" and plaintiff had to "devote significant resources to identify and counteract" discriminatory practices).[2]

---

and operation of the Facility as well as the City's failure to enforce its own Municipal Code to prevent these harms. A judgment from the Court enjoining the Facility's further expansion until Respondents comply with applicable laws would redress the Coalition's injuries.

[2] The Coalition would also have associational standing to represent the interests of its members. An organization has associational standing if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief request requires the participation of individual members" in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Here, the Coalition's members have standing because they have similarly been harmed by Respondents' impairment of their ability to advocate on behalf of immigrant and detainee rights and/or have physically suffered from the Facility's operations. The interests at issue are central to the Coalition's purposes of defending immigrants' and detainees' civil rights. Compl. ¶ 7. And participation of individual members is not required to prosecute the claims or obtain the relief request because the allegations center around Respondents' unlawful conduct.

3

## II.    Petitioners have established that a TRO is warranted.

### A.    Undisputed facts show that Petitioners are likely to succeed on their claims.

The Facility's premature reopening and unpermitted, unlicensed operation violates four different laws: (1) Section 3-2.3.201 of the City's Municipal Code, which requires that all businesses within the City are licensed; (2) Section 9-2.102(b) of the Municipal Code, which prohibits any unpermitted uses in a given zoning district; (3) Section 9-2.402 of the Municipal Code, which requires a conditional use permit for "governmental or quasi-governmental correction, probation or prison facilities and services;" and (4) SB 29, which requires the City to provide 180 days' public notice and two public meetings for public comment before undertaking any permitting action for detention facilities. Petitioners raise these violations through five different causes of action which allege that the City has allowed the Facility to operate in violation of state and local laws and failed to enforce its own Municipal Code, and that CoreCivic is operating the Facility in violation of the Municipal Code. Given that the balance of equities tips overwhelmingly in Petitioners' favor, and the other *Winter* factors also weigh in favor of injunctive relief, injunctive relief is still proper even if Petitioners "can only show that there are serious questions going to the merits."[3] *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014); *Hernandez v. Wofford*, No. 1:25-cv-00986-KES-CDB (HC), 2025 WL 2420390, at *2 (E.D. Cal. Aug. 21, 2025). Nonetheless, each of Petitioners' causes of action is likely to succeed because Petitioners will likely establish violations of the underlying laws and that CoreCivic's asserted defenses are meritless.

### 1.    CoreCivic and the City both admit that the Facility has been operating without a business license.

The Municipal Code states that "[i]t shall be unlawful for a person to commence, maintain, conduct, or carry-on a business within the City without having first obtained a [business] license." Mun. Code § 3-2.3.201.[4] Yet, here, CoreCivic reopened the Facility and began operations without first obtaining a business license. Both Respondents admit these facts. *See* CC Opp. at 10 ("the first group of detainees

---

[3] The City argues that a TRO is improper because the Court should instead resolve "disputed facts . . . on notice motion with a fuller record." *See* Dkt. 17 (City's Opposition, or "City Opp.") at 2. But this argument is misguided. While some of the analysis here touches on the merits in this action, the Court is not resolving the merits at this stage; it is deciding whether to grant temporary injunctive relief.

[4] All citations to a Municipal Code are to the City's Municipal Code, the full text of which may be found here: https://library.municode.com/ca/california_city/codes/code_of_ordinances?nodeId=15428.

arrived on August 27, 2025), 22 ("the injunction would merely delay the issuance of a business license.");
Dkt. 17-1 (Declaration of City Planner, or "Planner Decl.") ¶¶ 5 (acknowledging facility's reopening in
2025), 10 (CoreCivic's business license is "being processed"). Therefore, CoreCivic's commencement
and ongoing operation of the Facility violates Municipal Code section 3-2.3.201 because CoreCivic does
not have a business license to operate the Facility. Neither Respondent argues otherwise. In fact, CoreCivic
seems to implicitly concede this argument because it submitted an application for a business license to the
City. *See* Planner Decl. ¶ 10, Ex. C. Nor does the City contend that it tried to enforce against this violation.[5]
Accordingly, Petitioners' claims against CoreCivic for violation of this section and against the City for its
failure to enforce against CoreCivic's unlawful actions will almost certainly succeed.

Given the undisputed facts and likelihood of Petitioners' success on these claims, the Court need
not analyze the merits of any other violations and claims. *See League of Wilderness Defenders/Blue
Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766, n. 3 (9th Cir. 2014) ("because the . .
. plaintiffs have shown likely success on one claim, we analyze whether the . . . plaintiffs can show the
balance of harms tips in their favor"); *Commure, Inc. v. Canopy Works, Inc.*, No. 24-cv-02592-NW, 2025
WL 2601616, at *3 (N.D. Cal. Apr. 25, 2025) ("the likelihood of success on a single claim is sufficient if
that claim supports the injunctive relief sought."). Notwithstanding this, Petitioners respond below to the
other arguments raised in Respondents' opposition papers, demonstrating that Petitioners are also likely
to succeed on their claims based on the other violations of state and local law.

> **2.      Petitioners are likely to succeed in showing that the Facility cannot operate
> without amendment of the Zoning Code or issuance of a new CUP, or both.**

> **a.      The Zoning Code's and CUP's plain language exclude the Facility.**

The Facility's operation violates two different provisions of the City's zoning law. First, the O/RA
zoning applicable to the Facility does not permit civil immigration detention centers. It expressly permits
only "governmental or quasi-governmental correction, probation or prison facilities and services." Mun.
Code § 9-2.402(p). Therefore, the Facility cannot operate as a civil immigration detention center unless

---

[5] In discussing Petitioners' other arguments, the City claims that it was not required to enforce against
Municipal Code violations and did not approve CoreCivic's activity. As explained in Section III.A.2.b
below, the City is wrong on both counts.

the City amends its Municipal Code to also include civil detention facilities. Second, even if that zoning designation could be interpreted to allow the Facility's operations, CoreCivic would nonetheless require a new conditional use permit ("CUP") because the prior CUP for a "prison facility" with a capacity of 2,304 beds does not cover the current use of the Facility as a civil immigration detention center with a capacity of 2,560 beds. *See* MPA at 17-20; Compl. ¶¶ 44-51. Once again, the relevant facts are undisputed. Respondents do not dispute that the Facility is located in an area zoned O/RA. Nor do they dispute that the Facility has reopened and is operating without a new CUP. *See* CC Opp. at 10; Planner Decl. ¶ 5. Rather, Respondents argue that the current zoning and prior CUP do permit civil immigration detention facilities and the Facility's 2,560-bed capacity, and that the Petitioners' claims against the City are unripe.

Respondents' primary argument is that the permitted uses covered by the O/RA zoning and the prior CUP include the Facility because civil immigration detention centers are synonymous with "correction, probation, or prison facilities." *See* CC Opp. at 12-13; City Opp. at 5. However, as discussed in Petitioners' opening brief, state law and binding Ninth Circuit precedent distinguish between *civil* immigration detention centers and *criminal* prisons or correctional facilities. *See* MPA at 18-19 (citing Cal. Penal Code § 6082; Cal. Gov. Code § 12532; *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1120 (9th Cir., Aug. 19, 2025). Respondents do not explain why this directly relevant authority is not determinative. Instead, they look to myriad less relevant and less authoritative sources. These scattershot arguments fail to rebut Petitioners' cited authority and are belied by Respondents' own assertions and evidence.

In large part, Respondents point to the Facility's prior use to support the validity of its current operations. They argue that, over a decade ago, the Facility housed civil immigration detainees in U.S. Immigration and Customs Enforcement ("ICE") custody without obtaining a new CUP, and that this justifies the current use of the Facility as a civil immigration detention center. *See* CC Opp. at 13; City Opp. at 5. But the mere fact that the Facility previously housed civil immigration detainees demonstrates only that such use has occurred in the past. It does not prove that use is lawful, particularly where the plain language of the Municipal Code and relevant authorities indicate the opposite is true. *See Orange Citizens for Parks & Recreation v. Sup. Court*, 2 Cal.5th 141, 156-57 (2016) (rejecting argument that a city's "history" of creat[ing] contradictions and ambiguities" within its planning documents "inject[ed] ambiguity into" an otherwise clear policy). In fact, a contract between the City and federal government

1   relating to the Facility's operations at the time shows that "ICE Detainees" was not an authorized prisoner

2   and detainee type at the Facility. *See* Planner Decl., Ex. B at 2. Nor is past practice, as CoreCivic contends

3   (*see* CC Opp. at 13), a persuasive indication of the City's interpretation of its Municipal Code here, when

4   the City's own briefing indicates a lack of confidence about such an interpretation. The City repeatedly

5   qualifies its statements about whether the Municipal Code language permits civil immigration detention

6   centers. *See* City Opp. at 5 ("CoreCivic's current operations *appear* to be functionally similar to past use,"

7   "the conditional use permits *appear* to cover the ongoing activity;" emphasis added).

8           Respondents then look everywhere but to relevant authorities for support. CoreCivic quotes an

9   excerpt from the City's General Plan, adopted in 2009, stating that the Facility "houses over 2,300 Federal

10  detainees awaiting deportation." *See* CC Opp. at 13. But again, this is not evidence of the City's

11  interpretation of the Municipal Code, it is merely a descriptive statement about the Facility's operations

12  at the time. CoreCivic also references the Kern County Assessor and California Fire Marshal

13  classifications, noting that detention facility and prison fall within the same classifications. *See id.* at 13-

14  14. These examples are unpersuasive. Neither purports to interpret the City's Municipal Code language.

15  And the Assessor's classification pertains to determining property value for tax assessments while the Fire

16  Marshal's classification appears to be based on occupancy ("buildings and structures that are inhabited by

17  more than five persons who are under restraint or security"), not use. In any event, CoreCivic does not

18  even attempt to explain why these examples are more authoritative than state laws interpreting "prisons"

19  and "detention facilities" or Ninth Circuit precedent precisely distinguishing between immigration

20  detention facilities and prisons. The City's reference to "Merriam-Webster's Collegiate Dictionary"

21  definition for "prison" is similarly unpersuasive. Indeed, Black's Law Dictionary defines "prison" more

22  narrowly to mean "a building . . . where people are kept . . . as punishment for a *crime*, or . . . while waiting

23  to go to court as *criminal defendants*," and "a state or federal facility of confinement for *convicted*

24  *criminals*." Black's Law Dictionary (12th ed. 2024) (emphases added).

25          At minimum, whether the zoning code's reference to "correction, probation, or prison" facilities

26  and CUP's reference to "prison facility" include civil immigration detention centers is ambiguous. The

27  City appears to agree. *See* City Opp. at 5 ("CoreCivic's current operations *appear* to be functionally

28  similar to past use," "the conditional use permits *appear* to cover the ongoing activity;" emphases added).

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

1    Although both Respondents' briefing conspicuously ignores it, the Municipal Code requires that the City

2    resolve ambiguities in the Zoning Ordinance by Planning Commission resolution and City Council

3    approval. Mun. Code § 9-2.103(b). Individual attorneys or staff may not make such determinations merely

4    by saying so in a court filing.

5          CoreCivic also separately argues that the Facility's current capacity of 2,560 beds does not exceed

6    the CUP's allowance because the City subsequently approved the higher capacity via letter. *See* CC Opp.

7    at 15; Dkt. 18-1 (Declaration of Marcelo Ariola), Att. G. But the Municipal Code requires a conditional

8    use permit. *See* Mun. Code § 9-2.402. CoreCivic has not provided any evidence that the CUP itself was

9    amended to incorporate this higher capacity. The City has also admitted that it will review the Facility's

10   site plan for approval, which only further supports that the existing layout and capacity have never been

11   formally approved. *See* City Opp. at 5.

12                    **b.    Petitioners' claims against the City are ripe because the City has a
                            mandatory duty to enforce against zoning law violations.**

13         The City also argues that claims against it are not likely to succeed because they are not ripe. It

14   asserts that the cited Municipal Code provisions have not yet been violated because the City has not issued

15   any permits for the Facility, even though it acknowledges that the Facility is currently operating without

16   the required approvals. *See* City Opp. at 5-6. Even assuming that the City has not permitted or issued any

17   approvals for the Facility's operation in violation of the Municipal Code, the City nonetheless has a

18   mandatory duty to enforce against the CoreCivic's clear violations.[6] The Municipal Code mandates that

19   the City "shall commence actions and proceedings for the abatement, removal, and enjoinment" of zoning

20   code violations. *See* Mun. Code § 9-2.2804(c). Although the City quotes this language, it does not explain

21   how this clear requirement can be reconciled with the City's failure to take any action in response to

22   CoreCivic's admitted violations. *See* City Opp. at 6.

23

24   _____

25   [6] Evidence produced by CoreCivic shows that it has been in regular communication with the City, and
     specifically with regards to Facility permits. *See* Dkt. 18-1 ¶¶ 33-44; Dkt. 18-3 (Declaration of John

26   Malloy) ¶¶ 10-24. This includes communication from mid-August, 2025, just before the Facility reopened.
     *See* Dkt. 18-1, Att. N; Dkt. 18-3, Atts. K, L. Based on this information and the parties' juxtaposition in

27   this case, it is reasonable to assume that the City has somehow assented to or approved the Facility's
     premature reopening. Additionally, the City has not denied that it tacitly approved CoreCivic's operations.

28   It argues only that tacit approval is not equivalent to issuing a permit. *See* City Opp. at 4.

1    Without any explanation, the City asserts that is has not violated any mandatory duties because

2 "enforcement choices are quintessentially discretionary." But the cases cited by the City undermine its

3 argument. Each case emphasizes that "whether a particular statute is intended to impose a mandatory duty

4 . . . is a question of statutory interpretation." *Haggis v. City of Los Angeles*, 22 Cal.4th 490, 499 (2000).

5 The courts did not apply a blanket rule that all enforcement actions are discretionary, but instead looked

6 to the language of the applicable laws to determine the scope of discretion afforded in each respective

7 case. *See id.*; *Riggs v. City of Oxnard*, 154 Cal.App.3d 526, 530 (1984) ("the source of this discretionary

8 power is three fold: 1) the plain meaning of the statute establishes that the city may use discretion in

9 enforcement"); *Fox v. County of Fresno*, 170 Cal.App.3d 1238, 1243-44 (1985) (interpreting "shall" in

10 the context of permissive language in the same statutory provision). Here, the Municipal Code is clear that

11 the City "shall commence actions and proceedings" to "abate, remove, and enjoin" nonconforming

12 buildings and structures. *See* Mun. Code § 9-2.2804(c). Though the City may have discretion in how it

13 proceeds after commencement, it must nonetheless "commence actions and proceedings" in response to

14 zoning code violations. It cannot, as the City has done here, just sit idly by.

15    Accordingly, Petitioners are likely to succeed on their claims against the City and CoreCivic for

16 violations of the City's zoning code.

17    **3.    The City should have, yet failed to, comply with SB 29's notice and hearing
      requirements before issuing any approvals for the Facility.**

18

19    SB 29 prohibits the City from "issu[ing] a permit for the building or reuse of existing buildings by

20 any private corporation . . . to house or detain noncitizens for purposes of civil immigration proceedings"

21 unless it has (1) provided at least 180 days' public notice of the action and (2) solicited and heard public

22 comment on the action in at least two separate public meetings. Cal. Civ. Code § 1670.9(d)(1), (d)(2).

23 However, as the City has conceded, it did not give the public 180 days' notice or provide any opportunities

24 for public comment prior to the Facility's reopening. *See* City Opp. at 5 ("the City will hold its first SB

25 29 hearings on October 28, 2025"); Planner Decl. ¶ 5; MPA at 20-21. Nor does CoreCivic dispute that the

26 Facility opened without providing notice and hearings pursuant to SB 29. The City instead argues that SB

27 29 has not yet been violated because "[n]o permit has issued." *See* City Opp. at 4. But this ignores that the

28 City issued a sign permit for the Facility and contradicts the City's own expansive interpretation of SB

9

29. CoreCivic goes even farther, arguing that SB 29 does not apply here because the Facility needed only a business license to reopen and SB 29 does not apply issuance of licenses. However, this argument would create arbitrary distinctions without any basis in the statute and at odds with the law's purpose.

Though the City claims that SB 29 has not yet been violated, evidence presented by CoreCivic shows that the City issued a sign permit for the Facility on August 14, 2025 without providing the requisite notice and hearing. *See* Dkt. 18-3 ¶ 24, Att. M. This occurred well after the City became aware that CoreCivic intended to use the Facility for civil immigration detention. *See id.* ¶¶ 10 ("CoreCivic entered into a letter agreement with ICE in April 2025 . . . [and] began to have communications with various City representatives relating to the contract."), 11 ("In early June 2025, City Manager Christopher Lopez requested that we provide tours of the facility for the Mayor, City Council, and various members of the City's Management Team, which I facilitated on June 17, 2025). The City's issuance of the sign permit plainly falls within the scope of the plain language of SB 29, which expressly applies to permits for "reuse of existing buildings." Moreover, evidence shows that the City was in close communication with CoreCivic leading up to the Facility's reopening. *See* Dkt. 18-1 ¶¶ 33-44, Att. N; Dkt. 18-3 ¶¶ 10-24, Atts. K, L. In light of this evidence it is reasonable to infer that CoreCivic did receive some form of approval from the City prior to reopening the Facility and accepting detainees in late August. Consistent with the City's own interpretation of SB 29 to broadly apply to Facility-related approvals, such as "site plan review, business license, and building permits" (*see* Dkt. 18-3, Att. L), the City should have provided 180 days' notice and public hearings before issuing any such approvals. The City's belated compliance with SB 29 (*see* City Opp. at 2-3, 5; Dkt. 18-3, Att. L (outlining hearing timeline from October 14, 2025 through January 27, 2026)) cannot retroactively cure these violations.

CoreCivic argues that the City does not need to provide notice and hearings under SB 29 because SB 29 does not apply here. It asserts, contrary to the City's express statements, that CoreCivic needs only a business license in order to conduct civil immigration detention at the Facility, and that SB 29 does not apply to issuance of licenses. *See* CC Opp. at 15-16. To begin, the City has expressly stated that additional approvals are required before CoreCivic may operate the Facility as a detention center. *See* Dkt. 18-3, Att. L (City communication stating that "proposed" detention facility "requires a site plan review, business license, and building permits" and "qualifies as a project subject to the SB 29 public review process.");

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

Planner Decl. ¶ 10 (acknowledging ongoing site plan review). However, even if CoreCivic were missing only a business license, such authorization still requires notice and hearings under SB 29.

The plain language of SB 29 indicates that the business license is covered. The statute requires proceedings before local agencies "issue a permit for the building or *reuse* of existing buildings" for civil immigration detention. Cal. Civ. Code § 1670.9(d) (emphasis added). Here, the business license would authorize CoreCivic to reuse the Facility as a detention center. If, as CoreCivic contends, "permits" must be narrowly construed to apply only to approvals labeled as "permits" (*see* CC Opp. at 15-16), this would either turn SB 29's requirements into a game of semantics or render the second clause ("reuse of existing buildings") meaningless. Indeed, CoreCivic acknowledges that the statute cannot be construed so narrowly because it admits that SB 29 would apply to "zoning *actions*." *See id.* at 15 (emphasis added). CoreCivic then argues that the Court should distinguish between "purely ministerial functions" and approvals requiring discretion or "exercise of professional judgment." *See id.* at 15-16. But there is nothing in SB 29 to support such distinction. Nor does CoreCivic offer any supporting authority or rationale for reading this distinction into the statute. *See id.*

Interpreting SB 29 to cover business license approvals also comports with the law's purposes of increasing transparency and providing more opportunities for public comment. *See* CC Opp. at 16. It would betray these purposes to arbitrarily exclude business license or similar operating approvals from the law's purview, particularly if, as CoreCivic argues, this is the only approval required to open the Facility as a civil detention center. CoreCivic does not explain its bald contention that these purposes should be read to *limit* SB 29's scope. *See id.*

### 4.    CoreCivic's purported federal defenses are meritless.

Shifting gears, CoreCivic argues Petitioners are unlikely to succeed on the merits because several federal defenses allegedly "bar" their claims. *See* CC Opp. at 17-20. These theories suffer from numerous fatal defects. First, CoreCivic's arguments regarding intergovernmental immunity and preemption are limited exclusively to SB 29. *See id.* at 17-19. But neither of Petitioners' claims against CoreCivic hinges on SB 29, and thus those doctrines could not possibly "bar" Petitioners' claims. In any event, each of CoreCivic's constitutional claims is also wrong on the merits. SB 29 does not violate the doctrine of

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

intergovernmental immunity; it is not preempted by federal law; and CoreCivic is not entitled to derivative sovereign immunity.

### a. SB 29's constitutionality has no bearing on the merits of Petitioners' claims against CoreCivic.

CoreCivic first argues that SB 29 is unconstitutional and that this "bar[s] Petitioners' claims." CC Opp. at 11. This argument is incorrect for multiple reasons. First, even if CoreCivic were right that SB 29 is unconstitutional—and it is not—this would not bar *any* of Petitioners' claims against CoreCivic. Petitioners have presented two causes of action against CoreCivic: (1) that CoreCivic is violating the City's Municipal Code by operating the Facility in an O/RA zone, without first obtaining a conditional use permit, and without first obtaining a business license (*see* Compl. ¶¶ 64-70 (Fourth Cause of Action)); and (2) that, as a result of these violations of local law, CoreCivic has also violated California's Unfair Competition Law ("UCL") (*see id.* ¶¶ 71-77 (Fifth Cause of Action)). Neither cause of action relies upon or mentions SB 29, which does not regulate private actors. *See id.* ¶¶ 64-77; Cal. Civ. Code § 1670.9(d); *see also* Compl. ¶¶ 57-63 (Third Cause of Action alleging the *City*, not CoreCivic, is violating SB 29). Rather, Petitioners simply allege that CoreCivic is operating the Facility without the multiple authorizations required by City law. And CoreCivic has not argued that the doctrines of intergovernmental immunity or preemption would allow it to ignore these permitting and licensing requirements.[7] *See* CC Opp. at 11-13. Thus, even if SB 29 were unconstitutional, it would not excuse CoreCivic's ongoing violations of local law and the UCL, nor would it "bar" Petitioners' claims against CoreCivic.

### b. The only provision of SB 29 at issue here, California Civil Code section 1670.9(d), is constitutional.

Regardless, for the reasons set forth below, each of CoreCivic's two constitutional challenges to SB 29, on grounds of intergovernmental immunity and preemption, are also meritless. Section 1670.9(d) does not violate the intergovernmental immunity doctrine and is not preempted by federal law.

### i. Intergovernmental immunity

A state law violates the doctrine of intergovernmental immunity only when it "directly regulate[s]" the federal government or "discriminates against it." *Nwauzor v. Geo Grp., Inc.*, 127 F.4th 750, 760 (9th

---

[7] Indeed, CoreCivic has already acknowledged that it must comply with local laws by applying for a business license, which the City has not yet granted. *See* Planner Decl. ¶ 10; *id.* at Ex. C.

Cir. 2025) (quoting *United States v. Washington*, 596 U.S. 832, 835 (2022)). SB 29 does neither. It does not "directly regulate" CoreCivic, let alone the federal government. And it does not discriminate against CoreCivic or the federal government by treating them worse than any similarly situated entity.

At the outset, CoreCivic's intergovernmental immunity arguments misleadingly rely upon several subsections of SB 29 that are irrelevant to this case. *See* CC Opp. at 17-19. Petitioners have alleged that the *City alone* has violated *one* provision of SB 29, section 1670.9(d). *See* Compl. ¶ 63 (alleging "the City violated Civil Code section 1670.9(d)"); *id.* at p. 18 (Prayer for Relief ¶ 5; seeking a "declaration that the City violated its duties under SB 29"). Unlike other provisions of SB 29, section 1670.9(d) never once references the "federal government" or "federal agenc[ies]," nor does it bar local governments from entering into or renewing civil immigration detention contracts with those federal entities. *Compare* Cal. Civ. Code § 1670.9(a), (b) (including such language), *with id.* § 1670.9(d) (addressing only local government approvals of actions involving "private corporation[s], contractor[s], or vendor[s]"). Yet CoreCivic repeatedly quotes from those other, irrelevant sections of SB 29 as if they have any bearing on Petitioners' claims or the Court's intergovernmental immunity analysis. *See, e.g.*, Opp. at 17, 18-19. They do not.

The reason for CoreCivic's resort to irrelevant statutory language is clear: the plain text of section 1670.9(d) shows that the provision neither directly regulates nor discriminates against the federal government. First, on its face, section 1670.9(d) does not regulate the federal government—or its contractors—at all. Rather, it imposes narrow procedural requirements on only *local governments*—a "city, county, city and county, or public agency." Cal. Civ. Code § 1670.9(d). Courts have routinely held that state laws regulating local governments do not directly regulate the federal government or federal contractors, even where the law expressly involves federal immigration activities. *See McHenry County v. Raoul*, 44 F.4th 581, 593 & n.6 (7th Cir. 2022) (holding Illinois law that bans local governments from entering into immigrant detention agreements "imposes no direct regulation on any federal official or agency"); *see also United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019) (holding California law that requires employers to notify employees before federal enforcement inspections does "not violate the doctrine of intergovernmental immunity," because it "is directed at the conduct of *employers*, not the United States or its agents"). By its plain terms, section 1670.9(d) directly regulates the City—not

13

1   CoreCivic, and certainly not the federal government.[8]

2          Even if were it necessary to consider section 1670.9(d)'s indirect effects on CoreCivic, those

3   impacts are too minimal to render section 1670.9(d) a "direct regulation" of the federal government. At

4   most, section 1670.9(d) may cause a slightly longer delay before a local government may take action to

5   approve the development or reuse of a detention facility. *See* Cal. Civ. Code § 1670.9(d) (requiring at least

6   180 days' notice and two public meetings before issuing approvals). But *some* delay would occur

7   regardless of section 1670.9(d), because other state and local laws independently call for public notice and

8   hearings before local governments may issue final land use approvals.[9] *See, e.g.*, Mun. Code § 9-

9   2.2501(d)-(g) (setting forth City's conditional use permit application process); Cal. Gov. Code §§ 65853-

10  57 (calling for separate Planning Commission and City Council approvals for zoning amendments).

11  Moreover, section 1670.9(d) says nothing about the substance of the local government's decision, nor

12  does it provide the local government any mechanism to control the facility's ongoing operations after it

13  has executed the approvals subject to section 1670.9(d). *See* Cal. Civ. Code § 1670.9(d).

14         As a result, section 1670.9(d) itself has none of the forbidden effects on federal immigration

15  enforcement that the Ninth Circuit has recently articulated: it does not "require[] ICE to entirely transform

16  its approach to detention in the state or else abandon its California facilities;" it does not give California

17  or the City "'virtual power of review' over ICE's detention decisions;" and it does not "prevent ICE's

18  contractors from continuing to run detention facilities." *Inslee*, 151 F.4th at 1118 (citing *Geo Grp., Inc. v.*

19  *Newsom*, 50 F.4th 745, 750-51 (9th Cir. 2022) (en banc)). Instead, section 1670.9(d) is much more like

20  the state minimum wage or health and safety laws that the Ninth Circuit has repeatedly held do not

21  "directly regulate the federal government." *See Inslee*, 151 F.4th at 1118 (holding Washington state health

22  and safety laws for civil detainees did not violate intergovernmental immunity doctrine); *Nwauzor*, 127

23  F.4th at 760-63 (same, as to Washington minimum wage laws); *Newsom*, 50 F.4th at 755 & n.4

24  (recognizing states have "considerable room" to "enforce their generally applicable laws against federal

25

26  [8] Notably, the only party in this case that SB 29 *does* directly regulate—the City—has not argued that section 1670.9(d) is unconstitutional.

27  [9] Again, CoreCivic has not argued that preemption or intergovernmental immunity absolve it of any

28  obligation to apply for or receive a conditional use permit or business license, which are the underlying City decisions that would be subject to the section 1670.9(d) process.

contractors," including their "generally applicable health and safety laws").

Section 1670.9(d) also does not "single out contractors who work for the United States for discriminatory treatment." *Id.* at 1118-19. As discussed, the provision does not explicitly "single out" the federal government or federal contractors at all, and instead applies only—and equally—to each "city, county, city and county, or public agency" in California. *See Raoul*, 44 F.4th at 594-95 (holding state law that similarly regulated all local governments in Illinois does not discriminate against the federal government). And even assuming that section 1670.9(d) will be triggered only when a local government action involves a federal contractor (*see* CC Opp. at 13) this does "not, by itself, mean that it violates the intergovernmental immunity doctrine." *Inslee*, 151 F.4th at 1119. This is because a state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *California*, 921 F.3d at 881; *see also Raoul*, 44 F.4th at 594 ("The mere fact that [a law] touches on an exclusively federal sphere is not enough to establish discrimination."). Thus, a party invoking intergovernmental immunity must be able to point to "actors 'similarly situated' to the federal government that receive more favorable treatment." *Raoul*, 44 F.4th at 594; *see also Inslee*, 151 F.4th at 1119 (similar). Here, CoreCivic has alleged that SB 29 differentially *targets* the federal government. *See* CC Opp. at 18-19. But it has not even attempted to explain how SB 29 treats CoreCivic *worse* than similarly situated entities who are not federal contractors.[10] *See id.* Accordingly, CoreCivic has not demonstrated that section 1670.9(d) discriminates against it or the federal government.[11]

---

[10] Nor could it. As discussed above, other state and local laws impose procedural requirements on local governments' discretionary land use decisions that are akin to section 1670.9(d)'s notice and hearing requirements. *See, e.g.*, Mun. Code § 9-2.2501(d)-(g) (requiring public notice and Planning Commission hearing before City may issue *any* conditional use permit, and allowing interested parties to appeal Planning Commission decision to City Council); Cal. Gov. Code §§ 65853-57 (calling for separate Planning Commission and City Council approvals for zoning amendments). Even as to business licenses, the Municipal Code expressly grants the City Clerk discretion "make such investigation of the application as necessary" before granting or denying the application. Mun. Code § 3-2.3.204(a). That investigation could conceivably include the public notice and hearing procedures required under section 1670.9(d).

[11] Indeed, because section 1670.9(d) applies only to local government actions that involve "private corporation[s], contractor[s], or vendor[s]," the provision does not differentially target the federal government itself. *See* Cal. Civ. Code § 1670.9(d). In other words, if the federal government were to own and operate its own detention facility in the City, and if it sought the City's approval of any "deed" or "permit" in connection with that facility, section 1670.9(d) would not apply to that approval process.

15

1    Because section 1670.9.(d) neither directly regulates nor discriminates against the federal

2    government or CoreCivic, the only provision of SB 29 that is relevant to this case does not violate the

3    doctrine of intergovernmental immunity.

4                                    ii.        Preemption

5            Federal law also does not preempt section 1670.9(d). *Contra* CC Opp. at 19. Preliminarily, section

6    1670.9(d) is subject to the "presumption against preemption," because local land use decisionmaking is

7    "an area of historic state power." *Nwauzor*, 127 F.4th at 767; *see also Sheetz v. County of El Dorado*, 601

8    U.S. 267, 274 (2024) (recognizing states' inherent "police power to engage in land-use planning");

9    *California*, 921 F.3d at 886 (stating the state's historic police powers include "ensur[ing] the health and

10   welfare of inmates and detainees in facilities within its borders"). "The presumption applies to state laws

11   that affect areas of exclusive federal regulation, such as immigration, even if they have 'incidental effects

12   in area of federal interest.'" *Nwauzor*, 127 F.4th at 768 (quoting *DeCanas v. Bica*, 424 U.S. 351, 355

13   (1976)). That section 1670.9(d) might *indirectly* affect federal contractors or the federal government by

14   imposing minor procedural requirements on *local governments* "does not transform it into a law that has

15   more than an incidental effect on immigration." *Id.*; *see also Inslee*, 151 F.4th at 1123 (holding state health

16   and safety laws applicable to federal contractors were subject to presumption against preemption);

17   *California*, 921 F.3d at 885-86 (similar). Because the presumption applies, CoreCivic as "the challenging

18   party must show a 'clear and manifest purpose of Congress' to preempt state law." *Id.* (quoting *Arizona*

19   *v. United States*, 567 U.S. 387, 400 (2012)).

20           CoreCivic has not made—and cannot possibly make—that showing. CoreCivic points only to

21   scattered federal statutes that assign responsibility to the U.S. Department of Homeland Security ("DHS")

22   for "arrang[ing] for appropriate places of  detention" and that grant the DHS Secretary "reasonable

23   discretion" to enter into contracts to carry out those duties. CC Opp. at 19 (citing 6 U.S.C. § 112(b)(2), 8

24   U.S.C. § 1231(g), and 28 U.S.C. § 530C(a)(4)). Courts have rejected virtually identical preemption

25   arguments premised on the same or similar statutory provisions, explaining that the discretionary language

26   in these statutes does not come close to overcoming the presumption against preemption. *See Raoul*, 44

27   F.4th at 588-92; *California*, 921 F.3d at 885-86. Moreover, if CoreCivic's contracts with ICE expressly

28   require it to comply with state and local law—as federal detention contracts routinely do—this would

                                                    16

further demonstrate that Congress did not have "*any* intent, let alone 'clear and manifest,' . . . to supersede [state] authority." *California*, 921 F.3d at 886 & n.10. Finally, even assuming it is Congress's "clear and manifest purpose" to preempt state laws that regulate "whether or where an immigration detainee may be confined" or that actively frustrate the "federal government's ability to discharge its operations" (*see* CC Opp. at 19), section 1670.9(d) does neither of those things. It imposes limited, procedural requirements on local governments. It does not directly burden federal contractors or the federal government, much less dictate when or where immigrant detainees may be confined or how the federal government operates. Thus, CoreCivic has not carried its burden of proving that Congress intended to preempt section 1670.9(d).

### c. CoreCivic is not entitled to derivative sovereign immunity.

Finally, CoreCivic makes the sweeping contention that it is entitled to derivative sovereign immunity in this case because ICE "*directed*" it to operate in violation of state and local law. *See* CC Opp. at 20. This troubling argument is unsupported by the law or any admissible facts. As the Ninth Circuit recently explained in the immigration context, a "contractor whose challenged conduct is not dictated by its contract with the government, but is rather within the contractor's discretion, is not entitled to derivative sovereign immunity." *Nwauzor*, 127 F.4th at 770. Therefore, unless a private party's contract with the federal government "*forbid[s]*" it from complying with applicable state or local laws, the contractor is not entitled to derivative sovereign immunity for violating those laws. *Id.* at 771 (emphasis added).

CoreCivic's staunch refusal to disclose its contracts with ICE complicates this sovereign immunity analysis.[12] But there is no indication that these contracts *forbid* CoreCivic from adhering to state or local law. Rather, all available information suggests that CoreCivic's contract with ICE *requires* it to comply with state and local laws and to adhere to the most stringent standards in the event of a conflict between federal and local rules. These express requirements appeared in the City's own prior intergovernmental agreement regarding the operation of the Facility. *See* Planner Decl., Ex. B at 4 (requiring City's "compl[iance] with . . . all local laws and regulations," and providing that "[s]hould a conflict exist

---

[12] Counsel for Petitioners requested that CoreCivic voluntarily produce its contracts with ICE for the Facility, but CoreCivic declined to provide the contracts on the basis that they cannot disclose them without ICE's permission. *See* Declaration of Ryan K. Gallagher in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause (filed concurrently) ¶¶ 2-5.

between any of the aforementioned standards, the most stringent shall apply"). And they have appeared in the ICE contracts at issue in the Ninth Circuit's most recent immigration contractor immunity cases. *See Nwauzor*, 127 F.4th at 770-71 (quoting ICE contract as requiring federal detention center operator "to comply with 'all applicable federal, state, and local laws and standards'" and to adhere to the most stringent standard if a conflict exists); *Inslee*, 151 F.4th at 1117 (same); *see also California*, 921 F.3d at 886 n.10 (citing ICE and DHS contracts with similar requirements). If similar requirements appear in CoreCivic's ICE contract—or even if the contract merely does not *forbid* CoreCivic's compliance with local law—CoreCivic is not entitled to derivative sovereign immunity.

In support of its derivative sovereign immunity claims, CoreCivic has cited the declaration of an independent contractor retained by CoreCivic, Juan Acosta. *See* CC Opp. at 20 (citing Dkt. 1-4 ¶ 10); *see also* Dkt. 1-4 ¶ 10 (alleging "ICE determined that its urgent need to use detention space at the facility made it necessary for the facility to begin accepting detainees immediately, even if there were delays in obtaining an administrative license from the City"). Mr. Acosta's declaration does nothing to support CoreCivic's arguments. First, paragraph 10 of the declaration is inadmissible hearsay and should not be considered. *See* Fed. R. Evid. 801(c)(2). Mr. Acosta is neither a current ICE employee nor authorized to speak on ICE's behalf and has no personal knowledge of what ICE itself "determined" regarding the operation of the Facility. *See* Dkt. 1-4 ¶¶ 1, 10.[13] In any event, derivative sovereign immunity is dictated by the express language of the private party's *contract* with the federal government. *See Nwauzor*, 127 F.4th at 770 (characterizing derivative contractor immunity as turning on the "specifications of a federal government contract"). The scope of CoreCivic's derivative immunity is not dictated by stray statements from third parties about what the contracting government agency may have intended.

---

[13] Moreover, if the Acosta Declaration is purporting to speak *on behalf of* DHS or ICE, Mr. Acosta would likely be violating Code of Federal Regulations, Title 6, section 5.44(a) ("No employee, or former employee, of the Department shall, in response to a demand or request, including in connection with any litigation, provide oral or written testimony by deposition, declaration, affidavit, or otherwise concerning any information acquired while such person is or was an employee of the Department as part of the performance of that person's official duties or by virtue of that person's official status, unless authorized to do so by the Office of the General Counsel").

18

**B.     Petitioners are suffering irreparable harm from the City's and CoreCivic's ongoing violations of law.**

CoreCivic alone insists that Coalition and Doe are not experiencing irreparable harm. *See* CC Opp. at 14-23. The City does not press this argument, and for good reason. The harms that Petitioners are experiencing as a result of CoreCivic's and the City's unlawful conduct are concrete, severe, and thoroughly documented.

**1.     Despite CoreCivic's efforts, Petitioners have pursued interim relief as promptly as possible.**

As an initial matter, CoreCivic contends that Petitioners unduly delayed in seeking interim relief and that this should "weigh[] heavily" against a finding of irreparable harm. CC Opp. at 20-21. This argument is wrong multiple times over. First, it is *CoreCivic*—not Petitioners—who have frustrated efforts to promptly resolve this request for interim relief. Petitioners filed their application for a TRO in state court *a month ago*, only for CoreCivic to remove this case to federal court the same day—and one day before the scheduled hearing on the TRO. CoreCivic made the conscious decision to reset the TRO process by changing forums at the last minute. Second, to the extent CoreCivic's forum-shopping caused a brief, two-week disruption as Petitioners were forced to adapt their moving papers for federal court and reassess their litigation strategy, this is not close to the sort of delay that the Ninth Circuit has indicated would weigh against granting interim relief. *See, e.g.*, *Oakland Trib., Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (observing delay of "several years" between onset of challenged practice and request for relief); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1985) (noting four-year delay between enactment of ordinance and filing of application for TRO challenging its enforcement). Finally, even *if* Petitioners had unduly delayed in seeking interim relief, this would be at most a non-dispositive factor for the court to weigh against Petitioners' reams of evidence of actual, serious injury. *See Lydo Enters.*, 745 F.2d at 1214.

**2.     CoreCivic has not refuted Petitioners' showing of irreparable injury.**

Petitioners provide ample evidence of the immediate, irreparable harms they and others will suffer if the Facility is allowed to continue accepting new detained individuals. Petitioner Coalition, and hundreds of other organizations and individuals who have vigorously protested the Facility's illegal opening and operation, would continue to be unlawfully deprived of their statutory right to open and public

19

hearings on the City's issuance of permits to the Facility. *See* Mun. Code §§ 1-4.02(a); 9-2.103(b); 9-2.2501; Cal. Civ. Code § 1670.9(d). The gravity of this due process deprivation alone satisfies *Winter*'s irreparable harm requirement. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (listing *Winter* factors); *California v. Azar*, 911 F.3d 558, 581-82 (9th Cir. 2018); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011); *Tulare Lake Canal Company v. Stratford Public Utility District*, 92 Cal.App.5th 380, 410-11, 415 (2023) ("harm to the public interests in informed decisionmaking and in public disclosure should be considered" when deciding to grant injunctive relief).

That the Coalition and others—including immediate family members of people held inside the Facility—have persisted in lodging comments with the City, *in spite* of the lack of any formal hearing or notice thereof, does not lessen their harm or relieve either the City or CoreCivic of its legal obligations. *See* CC Opp. at 21 n.13 (claiming that public has been "heard" on a topic during a public meeting "even if the item is not listed on the agenda"). And the fact that the City held the first noticed hearing on the Facility more than *two months* after CoreCivic began illegally operating, by which time the Facility's detained population is already approaching a thousand individuals, merely underscores the due process injury here. *Id.* at 21 (pointing to October 28, 2025 hearing as evidence of due process sought).

Petitioner John Doe's substantial injuries, set forth in detail in the Doe Declaration and the Supplemental Doe Declaration ("Suppl. Doe Decl.") lodged on the same date as this filing, will likewise compound unless the Court grants Petitioners' requested relief. As an initial matter, Doe's sworn statements are based on his personal experience and observations. By contrast, many of the statements in the Declaration of Christopher Chestnut that attempt to rebut Doe's allegations are based on Mr. Chestnut's general understanding or impression of CoreCivic *policies*. *See, e.g.,* Dkt. 18-4 ("Chestnut Decl.") ¶ 10 (claiming that Doe's statement that his pod had only been allowed outside four times as of October 1, 2025 was "inaccurate" because CoreCivic "offer[s] one hour of outdoor recreation at least six days a week"); *id.* ¶ 57 (referencing policy manual in attempt to contradict Doe's allegations of genital groping). Mr. Chestnut also professes unawareness of some of Doe's allegations, further indicating his inability to meaningfully rebut them. *See, e.g.*, *id.* ¶ 54 (Chestnut "not aware" of CoreCivic employee retaliation against individuals requesting their personal property or medication, or filing grievances). Nor does Mr. Chestnut's version of events surrounding a suicide attempt in Doe's dorm indicate whether Mr.

Chestnut was present during the event, and thus, unlike Doe, able to personally attest to relevant details. *Id.* ¶ 88.

To the extent the City and CoreCivic claim that Doe's October 1, 2025 declaration is no longer timely, he has provided a supplemental declaration attesting to ongoing conditions at the Facility as of the time of this filing, including responses to some of the misleading allegations in the Chestnut Declaration. For instance, contrary to Mr. Chestnut's claim that CoreCivic "offers" time outside six days per week, Doe is "only offered time outside inconsistently" and not remotely in accordance with posted schedules. Suppl. Doe Decl. ¶ 3. There is still inadequate seating during mealtimes, forcing individuals to eat on their beds, or using a "composition notebook" sized desk in their cell. *Id.* ¶¶ 5-6. The Chestnut Declaration gives a misleading account of shower conditions, which in fact involve curtains "held up by string or tied by plastic bags," causing them to "often fall down while people are showering." *Id.* ¶ 7. The Facility continues to have intermittent hot water (*id.* ¶¶ 8-9), medicine continues to be unreliably administered (*id.* ¶ 12), and perhaps most concerningly, body searches have continuously involved "groping [individuals'] genitals and buttocks" (*id.* ¶ 4).[14]

### 3.    Granting the TRO would lessen ongoing harms to the Coalition, Doe, and the general public.

CoreCivic asserts in conclusory fashion that Petitioners' requested relief would not address these irreparable harms. *See* CC Opp. at 22, 29. Not so. The proposed TRO will serve two core functions: (1) it will immediately stop CoreCivic from physically expanding its operations at the Facility or accepting new immigrant transferees; and (2) it will prevent any future expansions or increases in detainee population unless and until CoreCivic seeks, and the City issues, all necessary approvals, in accordance with state and local law. *See* Dkt. 10-2 at 1. This relief will guarantee the Coalition's members and the general public multiple opportunities to comment on the Facility's expansion pursuant to the Municipal Code and SB 29—opportunities of which they so far have been illegally deprived. Additionally, the TRO will afford

---

[14] In response to unfounded assertions in CoreCivic's filings that Doe has "one or more criminal convictions" (Chestnut Decl., n.3) and may soon "no longer have standing in this action" if he is the same John Doe in a separate habeas case pending in the Eastern District (CC Opp. at 22 n.14), Doe's counsel of record has filed a sworn declaration stating that Doe has "no criminal convictions in any country" (Declaration of Callard Cowdery (filed concurrently) ¶ 3) and is not the same John Doe as that in the cited habeas case (*id.* ¶ 5).

21

the general public and decisionmakers additional time to understand and mitigate the Facility's health, safety, and environmental impacts before any new expansion occurs. Most importantly, the TRO will provide real relief to Doe and other current detainees at the Facility by pausing CoreCivic's plans to *triple* the Facility's population over the coming months. *See* CC Opp. at 4, 22-23. Such a hasty and significant increase in the detainee population would inevitably exacerbate the dire conditions that Doe is already experiencing.[15] Suppl. Doe Decl. ¶ 16 (Facility is "already short staffed;" it is "short on hygiene items [such that] toilet paper often runs out and . . . people have to use their socks to clean themselves and then go take a shower;" and "officers . . . fall[] asleep in the dorms" during their shifts).

To be clear, Petitioners are well aware that the narrow, interim relief they request will not eliminate the severe and ongoing injuries that Doe is enduring. He will continue to bear the harms of being confined in an illegal, poorly operated Facility. He will still face cramped, dirty conditions, looming threats of retaliation or abuse, and prison-like treatment. *See* Doe Decl. ¶¶ 8-27, 29, 31. But he is at least entitled to an order preventing those harms from getting *worse*.

**C.    The balance of equities weighs in Petitioners' favor because Respondents will not suffer any irreparable harm if the Court grants injunctive relief.**

Respondents do not make any showing that they will suffer irreparable harm from a temporary restraining order. The City merely states that "[t]he equities favor letting the statutory process run." City Opp. at 6. But does not explain how it would be harmed if the Court were to grant Petitioners' requested injunctive relief. *See id.* at 6-7. CoreCivic admits that it would suffer only monetary harms if injunctive relief were granted. *See* CC Opp. at 29-30 ("[i]f CoreCivic were enjoined from accepting any new intakes . . . [it] would lose millions of dollars per month in revenue from the contract."). Such "purely economic harms are generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation." *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (citing *Sampson v.*

---

[15] CoreCivic alleges that Petitioners "have not asserted . . . that their requested relief would have any impact on the complained of conditions at the detention facility." CC Opp. at 22. This is false. Petitioners' opening brief repeatedly and specifically explained that the requested relief would address the real and imminent harms associated with the Facility by "preventing the Facility's conditions rapidly worsening as more individuals are packed into unlawful confinement." MPA at 6; *see also id.* at 14 (again explaining "Doe's and other current detainees' conditions of confinement will worsen as more people are packed into the substandard Facility"), 7 (explaining that without interim relief, City residents would face increased environmental impacts from expanded Facility operations), 16 (similar).

1  *Murray*, 415 U.S. 61, 61-62 (1974).

2      On the other hand, Petitioners have demonstrated that they and others will suffer from severe

3  irreparable harm in the absence of injunctive relief. Detainees will face worsening conditions in the

4  Facility, more families and individual will suffer from the emotional and physical consequences of forced

5  civil detention, community members and advocates will continue to be deprived of their due process, and

6  surrounding communities will suffer from increasingly worse externalities from the Facility. *See*, *supra*

7  Section III.B.2; MPA at 12-16. "Faced with such a conflict between financial concerns and preventable

8  human suffering, [courts] have little difficulty concluding that the balance of hardship tips decidedly in

9  plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (finding that deprivation of

10  disability benefits easily outweighed the $10,300,000 in financial harm alleged by Defendants"); *see also*

11  *Hernandez v. Sessions*, 872 F.3d 976, 995-96 (9th Cir. 2017) (finding balance tipped "decidedly" in

12  plaintiffs' favor where "additional administrative costs to government [we]re far outweighed" by

13  "prevent[ion of] the unnecessary detention of non-citizens").

14      **D.  The public interest factor clearly weighs in favor of granting injunctive relief.**

15      Respondents do not seriously argue that public interest weighs against injunctive relief. They

16  complain that Petitioners' requested relief would bar the City and CoreCivic from further expanding the

17  Facility or its operations, reduce revenue for the City, reduce employment opportunities, and worsen

18  conditions at the Facility by forcing CoreCivic to delay repairs. But these interests are either private

19  (enjoining *Respondents* from expanding the Facility or its operations, reduced revenue for *the City*) or

20  speculative (reduced employment opportunities, delayed repairs). To the contrary, it is well settled that

21  "[t]he public has a strong interest in upholding procedural protections against unlawful detention, and the

22  Ninth Circuit has recognized that the costs to the public of immigration detention are staggering."

23  *Hernandez*, 2025 WL 2420390, at *7 (internal quotation marks and citations omitted). Here, injunctive

24  relief would also serve the public interest by protecting the right to voice concerns about the Facility's

25  reopening and use as a detention center as well as by preventing additional people from suffering due to

26  harmful living conditions in an unpermitted facility. Therefore, this factor weighs in favor of granting

27  injunctive relief as well.

28

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB

**III.    The proposed order is appropriate in scope and detail.**

Both the City and CoreCivic take issue with the language in proposed order accompanying Petitioners' application. But the proposed temporary relief pending resolution of a motion for preliminary injunction is properly tailored to prevent further irreparable harm in light of the brazen local and state law violations at issue. The City argues that the requested injunctive relief is too vague because it does not specify the acts or approvals which would be enjoined or the code provisions with which the City must comply. But the proposed order does not bar any and all City action, as the City suggests. *See* City Opp. at 7. Importantly, Petitioners request that the Court enjoin only actions that would "expand the Facility or its operations or to authorize expansion of the Facility." *See* Dkt. 10-2 (Proposed Order) at 2. This is narrowly tailored to address the irreparable harms that would result from the continued addition of detainees in an unpermitted Facility.

The City also baldly asserts that the proposed relief is broader than the protections afforded by SB 29. City Opp. at 8. But the relief will naturally be broader that SB 29 because it also seeks to prevent violations of the various Municipal Code sections which are at issue here. And the scope of SB 29 is one of the issues at the center of this action. Accordingly, the Petitioners request that the Court first mitigate further irreparable harm while it resolves that question.[16]

CoreCivic complains that the proposed bond will not fully compensate CoreCivic for its financial losses and astonishingly requests that the Court require a $2 million bond from Petitioners. *See* CC Opp. at 31. However, CoreCivic does not explain how it risks further harm without securing such a bond. As such, there is no reason to make the bond so prohibitively expensive as to preclude otherwise warranted injunctive relief. *See also Hernandez*, 2025 WL 2420390, at *8 (waiving bond requirement where noncitizen sought injunctive relief from detention and holding that "Courts regularly waive security in cases like this one").

**CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court issue the requested TRO

---

[16] The City also argues that the language in the proposed order is broader than the relief noticed in the City's notice of its application. City Opp. at 8. But the City fails to explain how the notice was ineffective or how the minor differences in language materially affect the City's understanding of the requested relief.

enjoining the City and CoreCivic from further populating, expanding, or permitting any operation of the Facility and an order to show cause as to why the Court should not issue a preliminary injunction.

DATED:  October 30, 2025                      SHUTE, MIHALY & WEINBERGER LLP


By:          /s/Joseph D. Petta
                JOSEPH D. PETTA
                MINDY K. JIAN
                RYAN K. GALLAGHER

                Attorneys for Dignity Not Detention Coalition

CONSOLIDATED REPLY TO OPPOSITIONS TO PETITIONERS' APPLICATION FOR TRO AND OSC
Case No. 1:25-cv-01292-KES-CDB