1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   DIGNITY NOT DETENTION                    Case No. 1:25-cv-01292 JLT CDB
     COALITION and JOHN DOE,
12                                            ORDER DENYING REQUEST FOR
                                              TEMPORARY RESTRAINING ORDER;
         Petitioners and Plaintiffs,          ORDER DENYING MOTION TO FILE
13                                            SUPPLEMENTAL RESPONSE
14   v.
                                              (Doc. 10, 32)
15   CITY OF CALIFORNIA CITY and
     CORECIVIC, INC.,
16
         Respondents and Defendants.
17

18                              **I.    INTRODUCTION**

19          Plaintiffs, a Coalition[1] of community organizations concerned with immigrant rights and

20   municipal planning issues, (*see* Doc. 1-3, ¶ 7), as well as one detainee at the California City

21   Correctional Facility (*id.*, ¶ 9), filed suit in Kern County Superior Court on September 16, 2025,

22   against the City of California City and CoreCivic, Inc., the federal contractor operating the

23   Facility. (*See generally id.*) Plaintiffs allege that California City unlawfully approved (or tacitly

24   approved) the reopening of the Facility and its "conversion" into immigration detention facility

25   (the "Project") in violation of the California City Municipal Code and state planning and zoning

26   _____

27   [1] The Coalition identifies itself as "Dignity not Detention." Contrary to Defendant CoreCivic's suggestion (Doc. 18 at
     11), an unincorporated association of this nature appears to have the capacity to sue in this Court. *See* Fed. R. Civ.
     Proc. 17(b) ("Capacity to sue or be sued is determined . . . by the law of the state where the court is located"); Cal.
28   Code. Civ. Proc. § 369.5 ("A partnership or other unincorporated association, whether organized for profit or not,
     may sue and be sued in the name it has assumed or by which it is known.").

                                              1

1    laws (*id.*, ¶¶ 39–51); that California City relatedly failed to enforce its own zoning code against

2    the Project, which Plaintiffs assert is a mandatory duty (*id.*, ¶¶ 52–56); that California City

3    violated California Civil Code § 1670.9(a) (alternatively referenced as SB 29) by tacitly

4    approving the Project without complying with SB 29's notice and public hearing requirements

5    (*id.*, ¶¶ 57–63); that CoreCivic is operating the Facility without a proper business license (*id.*,

6    ¶¶ 64–70); and that the above allegations also amount to violations of California's Unfair

7    Competition Law, Cal. Bus. Prof. Code § 17200 et seq. (*Id.*, ¶¶ 71–77.) The Complaint requests

8    writs of mandate that direct the City to vacate and set aside any approval of the Project and

9    require the City to comply with SB 29 and its own municipal code; injunctive relief restraining

10    Defendants from taking any actions to "implement the Project"; and other related declaratory and

11    injunctive relief. (*Id.* at 18–19.)

12        The matter was removed to this Court on October 1, 2025, and was randomly assigned to

13    another district judge at that time. (Doc. 1.) On October 17, 2025, Plaintiffs formally noticed a

14    motion for temporary restraining order requesting that: (1) California City be enjoined from

15    issuing new approvals or permits for the operation or expansion of the Facility unless and until

16    the City has complied with applicable provisions of its Municipal Code and SB 29; and (2)

17    CoreCivic be enjoined from (a) physically expanding or remodeling the Facility for the purpose

18    of expanding the current detained population, and/or (b) accepting and detaining new immigrant

19    transferees at the Facility, unless and until CoreCivic has obtained the necessary approvals under

20    the City's Municipal Code. (Doc. 10.) According to undisputed facts in the record, as of October

21    25, 2025, the facility held 746 detainees. (Doc. 18-4, ¶ 11, n. 2.) CoreCivic expects the facility to

22    reach its full capacity of 2,560 detainees in early 2026. (Doc. 1-5, ¶¶ 22, 25.)

23        Defendants filed oppositions to the request for injunctive relief, (Docs. 17, 18), and

24    Plaintiffs filed a consolidated reply. (Doc. 23.) On October 31, 2025, the matter was reassigned to

25    the undersigned after the initially assigned district judge recused himself. (Doc. 26.)

26        For the reasons set forth below, the Court finds that on the present record Plaintiffs have

27    not established irreparable injury sufficient to justify emergency injunctive relief.[2] The Court

28

---

[2] For this reason, it is not necessary to address the other prongs of the injunctive relief framework at this time.

1    therefore **DENIES** the TRO request[3] without prejudice to the filing of a properly noticed motion

2    for preliminary injunction, assuming the factual record can be developed to support such a

3    motion.

## II.    STANDARD OF DECISION

5        The standard for issuing a TRO is the same as the standard for issuing a preliminary

6    injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir.

7    2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

8    "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

9    "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

10   the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

11   "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

12   (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

13   test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

14   1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

15   *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

16   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

17   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

18   the issuance of a preliminary injunction where there are "serious questions on the merits … so

19   long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

20   injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

21   never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended "merely

22   to preserve the relative positions of the parties until a trial on the merits can be held, and to

23   balance the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025)

24   (citations omitted).

25        Both the traditional and the "sliding scale" standards require plaintiffs seeking a

---

[3] "A district court is not required to hold an evidentiary hearing before denying a motion seeking a preliminary injunction or TRO." *Manago v. McMahon*, No. 5:21-CV-01370 MCS (KES), 2022 WL 2235479, at *2 (C.D. Cal. Jan. 18, 2022) (citing *Kenneally v. Lungren*, 967 F.2d 329, 334–35 (9th Cir. 1992)).

temporary restraining order to establish that they are likely to suffer <u>irreparable</u> harm in the absence of the requested injunction. *Alliance for the Wild Rockies*, 632 F.3d 1134–35; *Winter*, 555 U.S. at 20–22 (rejecting an approach that permitted mere "possibility" of irreparable harm if there is a strong likelihood of success on the merits). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991)). "[M]onetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp*., 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). Irreparable harm is harm that is immediate, rather than remote or speculative. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (The requirement of irreparable injury "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged . . . ."); *see also Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (holding that a "speculative" injury does not constitute irreparable harm); *Nat'l Football League*, 634 F.2d at 1201 (holding that plaintiffs bear the "burden of demonstrating immediate threatened injury as a prerequisite to preliminary injunctive relief").

## III.     DISCUSSION

### A.     Harm to the Coalition and its Members

The Complaint alleges that Coalition member organizations engage in a variety of activities, including "providing resources and support to communities and organizations working on immigration enforcement issues, supporting formerly-incarcerated community members in leadership development, educating elected officials and the public on detention conditions and detention-relatcd state laws, and engaging elected officials to take steps to protect immigrant community members." (Doc. 1-3, ¶ 8.) According to Plaintiffs, "conversion and population of the Facility would frustrate the Coalition's mission and goals by undermining the protections of SB 29," a law Coalition members advocated for, "thereby setting a precedent that other cities or corporations could ignore the law as well." (*Id*.) However, this form of harm can be remedied at

law by way of a favorable decision in this litigation, so will be disregarded for purposes of determining whether Plaintiffs have established irreparable harm sufficient to justify preliminary injunctive relief.

The Coalition also claims that re-population of the Facility is causing its members to divert resources "to monitor yet another detention site and mobilize additional efforts to compel compliance with the law." (Doc. 1-3. ¶ 8.) Relatedly, the Coalition claims harm because its member organizations have been required to "expend resources to investigate the City's and CoreCivic's unlawful conduct and advocate for its clients and members who are being, and would continue to be harmed by City's and CoreCivic's actions." (*Id*.) This appears to boil down to an assertion that Coalition member organizations are being injured because they had to prepare for and prosecute this lawsuit. This form of injury does not constitute irreparable harm for the purposes of injunctive relief either. *See Renegotiation Bd. v. Bannercraft Clothing Co*., 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 736 n. 20 (9th Cir. 2017) (same).

In reply, Plaintiffs suggest they can demonstrate irreparable harm because the "Coalition, and hundreds of other organizations and individuals who have vigorously protested the Facility's illegal opening and operation, would continue to be unlawfully deprived of their statutory right to open and public hearings on the City's issuance of permits to the Facility." (Doc. 23 at 25–26.) "A procedural injury alone is insufficient to establish injury-in-fact for standing purposes, much less to demonstrate the irreparable injury required to justify injunctive relief." *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111 (E.D. Cal. 2013); s*ee Hoopa Valley Tribe v. U.S. Bureau of Reclamation*, No. 1:20-CV-01814 JLT EPG, 2023 WL 2617322, at *11 (E.D. Cal. Mar. 23, 2023) (collecting cases); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (noting in a case concerning a procedural injury that "a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it"). Nonetheless, procedural injury remains a "relevant consideration" because a showing of actual irreparable harm may be "compounded" by procedural injury. *See Citizens for Better*

5

1  *Forestry v. United States Dept. of Agriculture*, 341 F.3d 961, 970–71 (9th Cir. 2003). However,

2  as discussed below, the showing of irreparable harm is otherwise unsupported on this record.

3          Finally, the Coalition indicates that one of its individual member organizations serves

4  John Doe as a client. (Doc. 1-3, ¶ 8.) Whether John Doe has demonstrated irreparable harm

5  sufficient to justify an emergency injunction is discussed below.[4]

6  **B.    Showing of Possible Irreparable Harm to Detainee John Doe**

7          1.    Alleged Abuses by CoreCivic at Other Facilities

8          Plaintiffs allege that "CoreCivic has a long history of abusing the people it is paid to

9  imprison." (Doc. 10-3 at 12.) They direct the Court's attention to reports detailing conditions of

10  confinement at CoreCivic's other facilities, including a 2015 briefing to the U.S. Commission on

11  Civil Rights, which states, among other things, that detainees had been served maggot-filled food

12  and that many detainees lost weight during detention. (*See* Doc. 11, Ex. 23.) Another report,

13  dating to 2020, suggests that delays and denials of medical care, including for serious conditions,

14  were (at least then) common at detention facilities generally, with some examples provided from

15  CoreCivic's other facilities. (*Id.*, Ex. 24.) Another news article reports that a CoreCivic employee

16  at a different facility was a serial sexual predator who assaulted numerous detained females

17  before delivering them to their deportation flights. (*Id.*, Ex. 25.) Additional attached documents

---

[4] As discussed in some additional detail below, in their attempt to show irreparable harm, Plaintiffs appear to rely on harm to third parties, including to current detainees at the Facility (other than John Doe) as well as to future detainees at the Facility, even though this case is not styled as a class or other form of collective action. As one district court recently explained:

> On rare occasions, a plaintiff may vicariously assert the rights of third parties when the plaintiff (1) demonstrates that they have suffered an injury in fact giving them a "sufficiently concrete interest" in the issue in dispute; (2) demonstrates "a close relation" with the person who possesses the right; and (3) demonstrates a "hindrance to the Third Party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). *See also Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004); *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006) (noting that "a litigant who has already met the constitutional requirements" may also sometimes turn to third-party standing to assert the rights of others, provided they meet both Article III and prudential requirements). A relationship is "close," for purposes of third-party standing, where "the [litigant] is fully, or very nearly, as effective a proponent of the right as the [third party]." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976).

*Doe v. Lombardo*, 745 F. Supp. 3d 1109, 1122 (D. Nev. 2024). However, it is unclear whether any of the current detainees at the Facility (apart from John Doe who presumably is the client of a Coalition member referenced in paragraph 8 of the complaint) are clients of or otherwise have a "close relationship" with any Coalition member organization. Moreover, the Supreme Court has found that a future client relationship is not sufficiently close to confer third party standing. *See Kowalski*, 543 U.S. at 129-30. Thus, it is unclear how Plaintiffs can claim as irreparable harm injuries that may be suffered by unnamed future detainees at the Facility.

1  assert that at other CoreCivic facilities, the company may have been improperly using solitary

2  confinement, leading to detainee deaths by suicide (*id*., Exs. 26, 27); that detainees have sued

3  CoreCivic for subjecting them to forced labor (*id*., Ex. 28); and that detainees have at times

4  lacked access to clean water and that facilities have been contaminated by raw sewage (*id*., Ex.

5  29). Plaintiffs also point to several reports of detainee deaths inside other CoreCivic facilities or

6  shortly after detainees were transferred out of CoreCivic custody. (*See* Doc. 10-3 at 12.)

7      Three exhibits touch more directly upon conditions at the Facility. The first is an article

8  published by the Antelope Valley Press on August 14, 2025 that concerns a July 22, 2025 fire

9  inspection of the Facility. That issue is discussed below in greater detail. (Doc. 11, Ex. 11.) The

10 second is a Fresno Bee article that, among other things, quoted one detainee who stated the living

11 conditions at the Facility were unsanitary; reported on a sit-in/hunger strike staged by more than

12 100 detainees to protest "widespread poor living conditions"; and relayed another detainee's

13 accusation that detainees had been placed on 17-hour lockdowns and pepper-sprayed for

14 participating in the sit ins. (Doc. 11, Ex. 18.) The third, another Fresno Bee article dated

15 September 23, 2025, paints a mixed picture of conditions at the Facility, with some reporting

16 "humane" conditions, and others that personal hygiene products were being confiscated,

17 medication not promptly received, and detention center staff working extremely long shifts. (Doc.

18 11, Ex. 22.)

19     The Court has concerns about the evidentiary value of these media reports. The rules of

20 evidence are relaxed in the context of a motion for emergency injunctive relief, *see Flynt*

21 *Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984), so the Court may consider

22 hearsay evidence in relation to such motions, *see Franklin Data Ventures, Inc. v. Veristar*, LLC,

23 No. SACV 22-00215- CJC(JDEx), 2022 WL 20273276, at *2 (C.D. Cal. May 17, 2022), but the

24 Court has discretion to weigh the evidence as required to reflect its reliability, *id*. (finding reliance

25 on hearsay added to the "overall vague, speculative, and conclusory nature of [the] irreparable

26 harm showing). Plaintiffs appear to recognize this. While arguing they "would be justified to fear

27 irreparable harm based on CoreCivic's track record alone—particularly given that in this case, the

28 company has not bothered to comply with local permitting requirements before opening its

doors," they nonetheless advance "further, concrete and particularized reasons to believe this specific Facility poses imminent, irreparable harm to those who are imprisoned there" through the evidence presented by Plaintiff John Doe. (Doc. 10-3 at 13.) Thus, the Court will focus on that evidence.[5]

### 2.    John Doe's Declarations

John Doe was a detainee at Golden State Annex until early September 2025, when he was transferred to the California City Facility. (Doe Decl., ¶ 5.) He articulates various concerns about conditions at the Facility. In evaluating whether his declarations support a finding of irreparable harm, the Court focuses on any connection between his complaints and the key relief requested, namely an injunction against further population of the Facility.[6] As Plaintiffs put it, the inquiry is whether "Petitioner John Doe's . . . conditions of confinement will worsen as more people are packed into the substandard Facility." (Doc. 10-3 at 14.)[7]

### a.    *Concerns that Have Improved*

John Doe asserts that detainees did not have access to hot water in the shower area when they first arrived but admits that this situation was addressed by the weekend of September 12–13. (Doe Decl., ¶ 17.) There is no suggestion in the record that a lack of hot water has persisted.

John Doe also complains that the tablets detainees were provided, which normally allow detainees to buy commissary items, send messages to family, talk on the phone, put in medical requests, or file grievances, did not provide all these normal functions until September 18. (*Id.*, ¶ 21.) Again, there is no suggestion that these issues have persisted. Thus, the Court fails to see how these concerns support a finding of irreparable harm that could be remedied by the relief requested in this case.

---

[5] For these reasons, the Court does not find it necessary to consider CoreCivic's factual rebuttals to many of the assertions made in the media reports cited by Plaintiffs.

[6] As noted, Plaintiffs also request that California City be enjoined from issuing new approvals or permits for the operation or expansion of the Facility unless and until the City has complied with applicable provisions of its Municipal Code and SB 29, but that relief would remedy only the alleged procedural injuries, which are, on their own, insufficient to establish irreparable harm.

[7] The Court again notes that Plaintiffs have attempted to sweep into the irreparable harm analysis harm to unidentified current detainees and "new immigrant transferees," (Doc. 10-3 at 14), but they fail to explain how any of the current Plaintiffs have standing to advance the interests of those individuals. (*See supra* note 3.)

b.    *General Disorganization; Lack of Cleanliness; Lack of Privacy*

John Doe states that the Facility "do[es] not seem ready to house human beings." (Doe Decl. ¶ 15.) He indicates that the first cell he was placed in upon his arrival was filled with junk, including "tools and televisions" scattered on the floor. (*Id.*) However, he admits that officers moved them to another location. (*Id.*)

He also asserts that the Facility is "dirty and dusty" and that detainees were not given cleaning supplies until the end of September. *Id.* ¶¶ 15-16. Though they are now given cleaning supplies, he asserts "it is not enough for all of us to share." (*Id.*, ¶ 16.)

John Doe also complains that the Facility showers to not provide basic privacy because (1) you can see the shower area from the housing unit's tables (Doe Decl., ¶ 13); and the shower curtains are "held up by string or tied by plastic bags" and "often fall down while people are showering." (Supp. Doe Decl., ¶ 7.)

The Court again fails to see how these concerns rise to the level of harm that would warrant the emergency relief requested. Put another way, on this record, these concerns do not seem to relate to overpopulation but rather seem to be, if anything, reflective of CoreCivic's failure to have all services running smoothly and supplies in place when detainees first started to arrive.

c.    *Lack of Law Library or Legal Resources*

John Doe raises the following concerns about law library access:

> We do not have access to a library or any supplies to work on our immigration cases. Others have asked to be taken to the library but were refused. The facility does not seem to have a librarian to help us with our immigration cases. We are not given immigration forms here to help us with our cases. It is hard to send legal mail here as well. We are not given envelopes and have to buy them through commissary. On October 15, we were given pens for the first time.

(Doe Decl., ¶ 18.) In response, CoreCivic's Warden attests that every pod at the Facility has a kiosk where detainees can access legal research materials. (Doc. 18-4 at ¶ 36.) Even assuming, *arguendo*, that the provided form of legal research access is inadequate under prevailing standards, the Court fails to see on this record how that situation is connected to overcrowding at the Facility or how enjoining the transfer of new detainees to the Facility would remedy any lack

1   of access to legal research materials suffered by John Doe.

2              d.    *Lack of Access to the Outdoors*

3       John Doe indicates that since he arrived at California City he has "not been outside," (Doe

4   Decl., ¶ 12), but he admits that detainees are permitted at least some access to the outdoors. (*Id.*;

5   *see also* Supp. Doe Decl., ¶ 3 ("[T]he schedule posted in my door says that we are allowed

6   outside every day. In reality, we are only offered time outside inconsistently. For example, we

7   were not allowed outside on Monday, October 28, 2025, without any explanation. When we are

8   allowed outside, it is usually at different times of day than the posted schedule says.").) Crucially,

9   however, he admits that even when those in his dorm are allowed to go outside, he chooses not to

10  do so because he does not want to submit to the "invasive searches" the guards perform, which,

11  according to John Doe, involve "groping our genitals and buttocks." (Supp. Doe Decl., ¶ 4.)

12  Because of this admission, this is at its core an objection to the methods CoreCivic guards use to

13  search detainees prior to scheduled outdoor recreation. It is again unclear how this relates to the

14  relief requested here. An injunction against transferring additional detainees to the Facility will

15  not remedy or change these search methods. To the extent John Doe's evidence suggests that

16  outdoor activity time is occasionally not provided as scheduled, the Court finds this concern

17  insufficient to justify emergency injunctive relief.

18              a.   Denial of Medical Care

19      John Doe reports that upon his arrival at the Facility, he initially was not provided with a

20  medication that he must take daily, which resulted in medical symptoms. (Doe Decl., ¶ 20.) After

21  a request and intervention by his attorney, he was given a packet of pills to take daily. (*Id.*) In his

22  supplemental declaration, he reports that he ran out of his medication again on October 18. (*Id.*) It

23  is unclear whether additional medication has been provided to him.[8] However, the Court again

24  does not see how the emergency injunctive relief requested here would address John Doe's

25  medication management situation.[9]

---

26  [8] CoreCivic objects to this and several other factual assertions in John Doe's supplemental declaration on the ground
    that they are new factual allegations disclosed for the first time after CoreCivic's opposition brief was due. (Doc. 31.)
27  Because the Court has determined it is not appropriate to grant the requested temporary restraining order, the Court
    finds it unnecessary to consider these objections in detail.

28  [9] John Doe also reports that upon his arrival he "began feeling sick with the flu" and developed a fever. (Doe Decl.,

John Doe also reports that he has witnessed multiple other persons being denied medical care at the Facility. For example, he states that another person detained in the same room as John Doe *"needs a hernia surgery and cannot walk without experiencing extreme pain."* (*Id.*, ¶ 23.) John Doe asserts that guards "accused him of faking his injury and are forcing him to walk," and they have threatened that if he does not comply with their orders, they will "tell the immigration court." *Id.* In response, CoreCivic's Warden attests that though he could not determine from the record which detainee John Doe was referencing, he is "aware of a detainee who was scheduled for surgery prior to being transferred to the facility and reported to staff that he was having difficulty walking." (Doc. 18-4, ¶ 71.) Warden Chestnut indicates that the detainee "was evaluated by medical staff onsite, referred for an offsite surgical consult, and provided a wheelchair." (*Id.*)

John Doe shares one other anecdote. He states that on or about October 9, 2025, an individual in Doe's dormitory attempted to hang himself. (Doe Decl. ¶ 31.) When Doe and others called for help, guards did not come right away, and when they did arrive, they appeared not to have proper equipment to immediately assist the individual. *Id.*[10] Warden Chestnut refutes these assertions, stating that

> [T]here were four staff members present in the pod at the time of the incident, and both security and medical staff responded promptly and within policy timeframes. The first officer who responded to the incident and saved the detainee's life also responded to a prior suicide attempt by the same detainee. Also contrary to John Doe's Declaration, most officers carry cut-down tools on their duty belts, but in this instance, no cut-down tool was needed, as the officer was able to remove the ligature used by the detainee.").)

(Doc. 18-4, ¶ 88.) John Doe rejoins in his Supplemental Declaration that in his recollection "only one guard initially helped the victim. That guard appeared not strong enough to hold the victim up to relieve pressure, and once other guards arrived, they had to break the string with their hands

---

¶ 22.) Though he mentioned this upon intake "nothing was done for [him]" and he "spent [his] first days here shivering through and sweating out the fever." (*Id.*) This anecdote lacks sufficient detail to support a finding of likely irreparable harm in the future. John Doe does not explain, for example, what any CoreCivic official may have known about his illness or symptoms or whether he asked for additional medical care.

[10] Without providing any foundation whatsoever, John Doe also states: "The day before he attempted suicide, the man was near me in line to talk to the officer on staff. I saw him hand the officer a note and the officer mocked him saying he could not speak Chinese. I believe this was a suicide note." (Doe Decl., ¶ 31.)

because they did not have cut-down tools with them." (*Id.*, ¶ 15.) Even accepting John Doe's versions of these events as true, Plaintiffs fail to explain how the Court can consider harm to non-parties in the context of the present motion. (*See supra* note 3.) Moreover, it is likewise unclear how this anecdotal information about medical care at the Facility demonstrates irreparable harm that could be remedied by the requested injunctive relief. The evidence does not demonstrate that the medical care problems are related to overcrowding, nor does the record suggest that limiting inmate population would likely avoid similar situations.

### 3.    Fire Inspection

Plaintiffs next argue that there are structural deficiencies at the Facility that pose an imminent risk of harm to Petitioner John Doe.[11] (Doc. 10-3 at 14; *see also* Doc. 1-3, ¶ 28.) It is undisputed that on July 22, 2025, the California City Fire Department and the City's Director of Public Safety inspected the Facility, and that the Facility failed the inspection. (Doc. 11, Exh. 12.) The inspection found that—at least at that time—the Facility "does not comply with applicable codes" and that reopening it "will pose a serious and imminent threat to the health and safety of the community of California City, City's emergency personnel, future detainees, those employed at the facility and visitors." (*Id.* at 1.) Specifically, the report found that emergency communication technology was insufficient and that increased demand on the City law enforcement and emergency responders was a concern. (*See generally id.*) The Facility's safety deficiencies were so substantial at that time that the City determined it was "not possible" for CoreCivic to fix them before November 19, 2025. (*Id.*) Plaintiffs assert that nonetheless, "just 36 days later, starting on August 27, 2025, CoreCivic began locking people inside the Facility, claiming  that all of the fire safety issues had been addressed."(Doc. 10-3 at 14; *see also* Doc. 10-4, ¶ 8.)

However, in opposition, the City indicates that the Facility passed its final Fire and Building inspections. (Doc. 17-1, ¶ 10.) CoreCivic's opposition provides additional details:

---

[11] As mentioned, Plaintiffs insist that these concerns would pose risks of harm to other current and future detainees, but, again, they do not explain how those risks can be incorporated into the irreparable harm analysis here, given that this is not a class action and none of the associated organizations claim any other detainees as members. (*See supra* note 3.)

Following the inspection, and at Director [of Public Safety Justin] Vincent's recommendation, CoreCivic hired the City's radio consultant to address radio transmissions within the facility. (Ex. 3, ¶ 14; Ex. 4, ¶ 42.) The temporary solution consisted of CoreCivic's purchase of a repeater trailer at a cost of $75,000 to boost the radio signal to the facility and having emergency responders switch their radios to a different channel when entering the facility. (Ex. 3, ¶¶ 14–15, 17; Ex. 4, ¶ 45.) On August 7, 2025, the City tested and approved this temporary solution—nearly three weeks prior to any detainees entering the facility. (Ex. 3, ¶ 18; Ex. 4, ¶ 45.) That same day, the Deputy Fire Marshal issued a fire clearance for the facility and told CoreCivic to "contact city hall to obtain your business license." (Ex. 3, ¶ 18.) Deputy Fire Marshal Hightower also gave CoreCivic 90 days to install a permanent solution to boost radio signals in the facility. (Ex. 4, ¶ 45.) For the permanent solution, CoreCivic hired Berk-Tel Communications to install an emergency responder radio system in the facility at a cost of nearly $700,000. (*Id.*, ¶ 46–48.) The City Fire Department and Kern County Communications tested and confirmed that the emergency responder radio system was fully operational on October 14, 2025, well ahead of the 90-day deadline set by the City. (*Id.*, ¶ 48.)

As to the stated concern that impacts to City police, fire, and EMS response would strain the City budget, CoreCivic asserts that it addressed this concern by explaining in communications to the City that:

It explained that the ICE detainee population tends to generate fewer incidents requiring emergency response than other populations, assured the City that CoreCivic has sufficient resources onsite and regionally to respond to major security incidents at the facility, and noted that there have been no fire department responses to the facility during the entirety of its operation and CoreCivic has contracted with an ambulance service for any emergency medical transports, and agreed to reimburse the City for the cost of any future police, fire, or EMS responses to the facility.

(Doc. 18 at 25; Doc. 18-3, ¶¶ 20–21.) Plaintiffs offer no response to these assertions in reply. Thus, at this preliminary stage, Defendants rebuttal based upon subsequent developments is undisputed.

4.    Vulnerability to Extreme Heat Event

Plaintiffs assert that because the Facility is in the Mojave Desert, it will be ill-equipped to handle extreme heat events. (Doc. 10-3 at 15.) They base this assertion on a 2023 spatial analysis that used climate modeling data to conclude that the Facility is among the detention facilities most vulnerable to heat-related endangerment of human health. (Doc. 11, Exh. 33.) Even assuming that modeling indicates a risk of harm during some months of the year despite

13

CoreCivic's undisputed assertion that the entire facility is air conditioned, (*see* Doc. 18-4, ¶ 8), it is now November, and the Court takes judicial notice of the fact that it will be many months before any extreme heat event is likely to impact the high desert of Eastern California. This alleged harm does not justify treating the instant motion as an emergency that cannot be noticed on the Court's regular calendar.

5.    <u>Environmental Impacts</u>

Plaintiffs also assert that without "immediate injunctions" against both the City and CoreCivic, City residents on whose behalf the Coalition advocates[12] will "suffer the negative externalities of the Facility's intensifying operations, including dust and other air quality impacts from increased transfers of detainees to and from the Facility" because, according to Plaintiffs:

> Immigration detention is typically shorter term than prison incarceration, with detained individuals transferred between facilities more frequently than those serving criminal sentences in prison. Laner Decl., ¶¶ 11, 12. For example, according to one report, sixty percent of detained immigrants are transferred at least once. In addition, people in immigration detention are often transferred to their court hearings on a daily basis or released on parole, bond, or when they win their cases. Laner Decl. ¶ 11 & Exh. 3. This substantial increase in ingress and egress, combined with the further increase in visits from family and the community, as well as any construction needed to make the Facility comply with federal standards for housing detainees, will result in increased vehicle miles traveled, traffic, noise, air pollution, greenhouse gas emissions, and other impacts that fall not only upon detainees, their families, and Facility employees, but also local residents. Laner Decl. ¶ 12. City residents will pay a heavy price for serving as unwilling hosts to CoreCivic's unlawful detention operation, in the form of unstudied and unmitigated impacts to their wellbeing.

(Doc. 10 at 24.) CoreCivic's evidence suggests that Plaintiffs' assertions, which rely on a 2018 third-party study, are based on false assumptions. Specifically, Warden Chestnut indicates that ICE detainee populations actually tend to generate less frequent court transports than prisoner populations; the Facility does not conduct daily court transports, but instead most court appearances occur onsite via video teleconference; and while the Facility does permit visits from family and friends, most detainees elect to communicate through video visits on the tablets

---

[12] As with the connection between the Coalition and detainees other than John Doe, the connection between the Coalition member organizations and any City residents is unclear on this record.

provided to them in the housing units. (Doc. 18-4, ¶¶ 77, 81, 87.) In addition, it is undisputed that the Facility is located on a remote parcel and is accessible by a paved road, suggesting that dust and noise impacts would be limited. (Doc. 18-5, ¶ 94.) Finally, the environmental impacts of operating a 2,304-bed prison/detention facility at the site appear to have been evaluated in 1998 (Doc. 18-1 ¶¶ 5–12), with the resulting environmental document revealing that most impacts would occur during the construction phase (which is long-since complete), though some ongoing impacts from operations would persist. (*See, e.g.*, Doc. 18-1 at 28–29 (air quality impact analysis).) Environmental review was also performed prior to the City granting permission to expand the facility by an additional 512 beds. (Doc. 18-1 at 57.) In addition, environmental approvals were also obtained for the construction and operation of an additional 2,200 bed facility on the adjacent 35-acre parcel, which concluded that the proposed additional facility would not have significant impacts related to traffic, air quality, or noise either. (Doc. 18-1, ¶ 20.) On this record, the Court finds this alleged impact is also too speculative to justify emergency intervention by way of injunctive relief.

## IV.    CONCLUSION AND ORDER

In sum, the Court finds that there has not been a sufficient showing of imminent irreparable harm to justify emergency treatment of this motion. Thus, the request for a temporary restraining order (Doc. 10) is **DENIED**. Based upon this ruling, the motion to file a supplemental response (Doc. 32) is **DENIED as MOOT**.

IT IS SO ORDERED.

Dated:    **November 7, 2025**

UNITED STATES DISTRICT JUDGE