# EXHIBIT 3

EXHIBIT 3

Daniel P. Struck, Pro Hac Vice
AZ Bar #012377
Dana M. Keene, CA Bar #324993
STRUCK LOVE ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com

Nicholas H. Rasmussen, Bar #285736
McCORMICK BARSTOW, LLP
7647 North Fresno Street
Fresno, CA 93720
Tel: (559) 433-1300
Fax: (559) 433-2300
nrasmussen@mccormickbarstow.com

Attorneys for Respondent-Defendant CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION AND JOHN DOE,<br>Petitioners and Plaintiffs,<br>v.<br>CITY OF CALIFORNIA CITY; CORECIVIC, INC.,<br>Respondents and Defendants.<br>CORECIVIC, INC.,<br>Real Party in Interest. | Case No. 1:25-cv-01292-JLT-CDB<br>**SECOND DECLARATION OF MICHAEL GIARDINA**<br>U.S. District Judge: Hon. Jennifer L. Thurston<br>U.S. Magistrate Judge: Hon. Christopher D. Baker<br>Trial Date: None |

I, Michael Giardina, state the following based upon my personal knowledge.

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could competently testify to these facts.

2. Since February 2006, I have continuously worked under the supervision of Daniel P. Struck as a paralegal on complex matters for a variety of corporate and governmental clients, including CoreCivic. At all relevant times in this case I have acted

under the supervision and direction of counsel for Defendant CoreCivic. My professional experience is detailed in the Declaration I previously executed in this matter on October 27, 2025.

3. I have signed up to receive email updates relating to public hearings held by the City Council through the City of California City's Granicus site at https://californiacity.granicus.com/viewpublisher?view_id=1.

4. Attachment A is a true and correct copy of the email notification I received on October 24, 2025, at approximately 9:01 PM from the GovDelivery Communications Cloud on behalf of California City, California, providing notice of the Agenda for the City Council Meeting Scheduled for October 28, 2025.

5. Attachment B is a true and correct copy of excerpted pages of the 143-page agenda package for the City of California City Regular Meeting of the City Council on October 28, 2025, containing the agenda and staff report relating to New Business Item #4, "Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City", which I downloaded from the link in the email, and which is also available at https://californiacity.granicus.com/AgendaViewer.php?view_id=1&clip_id=557.

6. A review of the video of the City Council's October 28, 2025 Regular Meeting, available on the City's Granicus website at https://californiacity.granicus.com/MediaPlayer.php?view_id=1&clip_id=557, confirms that the public hearing was held on this date and the public comment period lasted more than 90 minutes. The full hearing may be viewed in the video from 1:22:10 to 2:54:45.

7. Attachment C is a true and correct copy of an article published, with accompanying video, by Bakersfield TV Station, KGET-TV, on December 12, 2025, titled "Cal City to hold 2nd public hearing on CoreCivic ICE Detention Facility", which I accessed at https://www.kget.com/news/local-news/cal-city-to-hold-2nd-public-hearing-on-corecivic-ice-detention-facility/.

8. Attachment D is a true and correct copy of excerpted pages of the agenda packet for the December 16, 2025 Planning Commission Meeting of the City of California

City, including the agenda and Staff Report relating to New Business Item 1, "CoreCivic Hearing II", with the subject of "Hearing on CoreCivic Operation of an Immigration Detention Facility within the City".

9. A review of the video of Planning Commission's December 16, 2025 meeting, available on the City's Granicus website at: https://californiacity.granicus.com/MediaPlayer.php?view_id=1&clip_id=564, confirms that the public hearing was held on that date and the public comment period lasted more than two hours. The full hearing may be viewed on that video from 0:26:04 to 2:33:03.

10. On July 2, 2026, CoreCivic sold the facility, including Parcels 1, 2 and 3, as shown on Parcel Map No. 12374, recorded January 19, 2021, in Book 62 at Page 30, of Parcel Maps, Kern County Records to the U.S. Department of Homeland Security. Attachment E is a true and correct copy of the General Warranty Deed, which I obtained on August 19, 2026, from the Kern County Assessor Recorder through the Parcelquest Property Search, available at https://www.kerncounty.com/government/departments/assessor-recorder/property/parcelquest-property-search

11. Attachment F is a true and correct copy of the Kern County Assessor Recorder Property Details for the Facility, located at 22844 Virginal Blvd. in California City, accessed on September 15, 2026, from https://assessorapps.kerncounty.com/PropertySearch/Parcels/PropertyDetails.aspx?srctext=35003128000&srctype=atn

12. Attachment G is a true and correct copy of the email notification I received on July 1, 2026, at approximately 4:26 PM from the GovDelivery Communications Cloud on behalf of California City, California, providing notice of the Agenda for the Planning Commission Meeting Scheduled for July 7, 2026.

13. Attachment H is a true and correct copy of the agenda packet for the July 7, 2026 Planning Commission Meeting of the City of California City, including the agenda; Staff Report relating to the Appeal of Planning Director Approval of Site Plan Review No.

SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APR 250-031-02; and administrative record, including CoreCivic's response to the appeal submitted on June 24, 2026, relating to DND Coalition's appeal of the Site Plan Review, which I downloaded from the link in the email, and which is also available at https://californiacity.granicus.com/AgendaViewer.php?view_id=1&clip_id=594

14. A review of the video of the Planning Commission's July 7, 2026 meeting, available on the City's Granicus website at https://californiacity.granicus.com/MediaPlayer.php?view_id=1&clip_id=594, confirmed that the public hearing was held on that date, with a public comment period lasting more than four hours. The full hearing may be viewed on that video from 0:18:53 to 5:03:21 and concluded with a 2-1 vote of the Planning Commission to deny the appeal and approve SPR 25-09.

15. Attachment I is a true and correct copy of excerpted pages from the agenda packet for the August 18, 2026 Planning Commission Meeting, specifically the minutes of the July 7, 2027 meeting reflecting the Planning Commission's vote to deny the appeal and uphold the Planning Director approval of Site Plan Review No. SPR 25-09, obtained at https://californiacity.granicus.com/AgendaViewer.php?view_id=1&clip_id=601.

16. Attachment J is a true and correct copy of the City Manager's Decision denying the appeal of the issuance of business license to CoreCivic, received in my office by email on July 9, 2026.

17. On July 13, 2026, the City of California City provided notice to Daniel Struck that second level appeals to the City Council had been submitted on behalf of the Immigrant Legal Resource Center ("ILRC") and Dignity Not Detention Coalition. Attachment K is a true and correct copy of the July 9, 2026 ILRC letter regarding the appeal of the Planning Commission's decision to affirm the approval of a site plan review and all related approvals in favor of CoreCivic, Inc. for the operation of the California City Detention Facility (SPR 25-09).

18. Attachment L is a true and correct copy of the July 10, 2026 ILRC letter regarding the appeal of the City Manager's decision to affirm the approval of the issuance of a business license and all related approvals to CoreCivic, Inc. for the operation of the California City Detention Facility.

19. Attachment M is a true and correct copy of the email notification I received on August 21, 2026 ,at approximately 8:30 PM from the GovDelivery Communications Cloud on behalf of California City, California, providing notice of the Agenda for the Planning Commission Meeting Scheduled for August 25, 2026.

20. Attachment N is a true and correct copy of the excerpted agenda packet for the August 25, 2026 City Council Meeting of the City of California City, including the agenda relating to agenda items "N.B. 1, Appeal of the City Manager's Decision Denying the Appeal of the Deputy City Manager Approval of the Business License Issued to CoreCivic for the California City Correctional Facility 22844 Virginia Boulevard" and "N.B. 2, Appeal of Planning Commission Resolution No. PC 2026-07-07 Denying the Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APN 250-031-021," along with the Staff Reports and administrative record for each, including the submission made by CoreCivic on August 20, 2026, which I downloaded from the link in the email, and which may also be accessed from the City's Granicus website at https://californiacity.granicus.com/AgendaViewer.php?view_id=1&clip_id=602. A review of the video of the City Council's August 25, 2026 meeting, available at https://californiacity.granicus.com/MediaPlayer.php?view_id=1&clip_id=602, confirms that the public hearing was held on that date, with a public comment period lasting more than three and a half-hours for both appeals combined. The full portion of the hearing on each appeal may be viewed on that video from 3:05:50 to 7:40:19, and each hearing concluded with a 4-1 vote of the City Council to deny each appeal.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on November 9, 2026.

Michael Giardina

# ATTACHMENT A

ATTACHMENT A

**Mike Giardina**

**From:** California City, CA <californiacity@public.govdelivery.com>
**Sent:** Friday, October 24, 2025 9:01 PM
**To:** Mike Giardina
**Subject:** Agenda for CITY COUNCIL MEETING on Tuesday, October 28, 2025 at 6:00 PM PDT has been posted

**LATEST MEETING AGENDA AVAILABLE**

# CITY COUNCIL MEETING

## Tuesday, October 28, 2025 at 6:00 PM PDT

## 21000 HACIENDA BLVD
## California City, California 93505

VIEW AGENDA

SUBSCRIBER SERVICES:

Manage Subscriptions | Unsubscribe All | Help

This email was sent to mgiardina@strucklove.com using govDelivery Communications Cloud on behalf of: California City, California · 21000 Hacienda Blvd · California City, CA 93505

GOVDELIVERY

# ATTACHMENT B

ATTACHMENT B

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

Marquette Hawkins
**MAYOR**

Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Christopher Lopez
**CITY MANAGER**

# AGENDA

***CITY COUNCIL/ HOUSING AUTHORITY/ SUCCESSOR AGENCY***
***REGULAR MEETING TUESDAY OCTOBER 28, 2025 @ 5:00 PM***
***COUNCIL CHAMBERS & VIA ZOOM***
***21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505***

If you need special assistance to participate in this meeting, contact the City Clerk at (760) 373-7140 or via email at cityclerk@californiacity-ca.gov. We request a 24-hour notification prior to the meeting in order for the City to make reasonable arrangements to ensure accessibility. (28 CFR 35.102-35.104 American Disabilities Act Title II)

**Zoom instructions and notes:**

Web Link: https://us06web.zoom.us/j/89032283757
Meeting ID: 890 3228 3757

1. Public can dial into the Zoom line:
   a. One tap mobile: +16694449171,87254527178# US
   b. Dial the following number: +1 564 217 2000 US
2. Comments
   a. Public must join Zoom meeting to comment
   b. Keep your mic on Mute until you are requested to speak
   c. Use the "Raise your Hand" button to request to speak or,
   d. Send a chat request to City Clerk for request to speak
   e. When requested to speak state your name for the record
   f. Re-mute when your time to speak has ended

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

---

***Public is urged to listen to the meeting in a quiet place, to avoid background noise. We also request public to MUTE your audio device when not commenting to avoid disruption during meeting.***

*****Please take this time to turn off your cell phones *****

---

***CLOSED SESSION 4:00PM***

**CALL TO ORDER**

**ROLL CALL**

Councilmembers: Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

**ADOPT THE AGENDA**

**PUBLIC COMMENT**

Members of the public are welcome to address the City Council **ONLY** on those items listed on the Closed Session agenda. Each member of the public will be given (3) three minutes to speak

**CLOSED SESSION**

CS 1. CONFERENCE WITH LEGAL COUNSEL—EXISTING LITIGATION
(Government Code Section 54956.9(d)(1))
One case:
1. Lamberth v. California City (case no. 25CUB00029)

CS 2. CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION
Significant exposure to litigation pursuant to Government Code Section 54956.9(d)(2):
Two cases

CS 3. PUBLIC EMPLOYMENT (Government Code 54957)
Title: Department of Cannabis Management

**REPORT OUT OF CLOSED SESSION**

**CITY COUNCIL CONVENES TO REGULAR MEETING**

***REGULAR MEETING 5:00PM***

**CALL TO ORDER**

# CITY OF CALIFORNIA CITY



**PLEDGE OF ALLEGIANCE / INVOCATION**

**ROLL CALL** –
Councilmembers: Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

**DEPARTMENT REPORTS**
PW
PD / AC
Building
Finance
Treasurer
Planning

**CITY CLERK REPORTS/RECEIVED COMMUNICATIONS**
JM POWERS- DATED:
-OCTOBER 17, 2025
-OCTOBER 18, 2025
-OCTOBER 19, 2025

**CIVIC/COMMUNITY/ORGANIZATION ANNOUNCEMENTS**

**PRESENTATIONS**
Mayor Saul Ayon McFarland CA

**PUBLIC BUSINESS FROM THE FLOOR / PUBLIC COMMENT**
This portion of the meeting is reserved for the public to address the City Council on any matter **NOT on this agenda** and over which the City Council has jurisdiction. Please state your name for the record and limit your comments to (3) three minutes. The City Council will receive the comments but cannot engage in back-and- forth discussion with the public or make any decision. The City Council can direct staff to bring the item back to a future agenda for discussion.

**CONSENT CALENDAR**
**WAIVER OF FULL READING OF RESOLUTIONS AND ORDINANCES**
Consideration to waive full-text reading of all Resolutions and Ordinances by single motion made at the start of each meeting, subject to the ability of the City Council / Agency to read the full text of selected resolutions and ordinances when the item is addressed by subsequent motion. All items on the consent calendar are considered routine, and non-controversial and will be approved by (1) one motion if no member of the council, staff, or public wishes to comment or ask questions. Public comments are to be limited to (3) three minutes. Roll call vote required.

**CC 1.** Approve **City Check Register dated 10/10/25- 10/23/25**

**CC 2.** Approve **Minutes dated 10/14/2025**

**CC 3.** Staff Report: Christopher Lopez
Subject: A Resolution of The Mayor and City Council of California City Repealing Resolution 24-3061 And Reprioritizing the AES Clean Energy Donation to The City Of California City for Previously Specified Community Benefits Purchases for The City of California City
**Recommendation:** Staff recommends the City Council Adopt Resolution No. 25-3181

**CONTINUED BUSINESS**

**CB 1.** Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of the City Council of the City of California City Approving the Process of Setting New Water and Wastewater Division Rates through a Rate Study
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3167

**CB 2.** Staff Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of the City Council of the City of California City Approving the Belfor Proposals to Clean the Public Works Yard
**Recommendation:** Staff recommends the City Council Adopt Resolution No. 25-3164

**NEW BUSINESS**

**NB 1.** Staff Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of The City Council of the City of California City Approving the Earthscope Lease Agreement for GPS Stations at California City Airport
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3179

**NB 2.** Staff Report: Christopher Lopez, City Manager- Shannon Hayes, Acting Public Safety Director
Subject: A Resolution of the City Council of The City of California City, California, Authorizing the Police Department to Proceed with AT&T For the 9-1-1 Emergency Phone System Upgrade, and Authorization for the City Manager or Designee to Execute All Related Documents and Accept Cpe Allotment Funds
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3180

**NB 3.** Staff Report: Christopher Lopez, City Manager- Anu Doravari, Planning Consultant
Subject: Housing Element Certification Update

**NB 4.** Staff Report: Christopher Lopez, City Manager- Anu Doravari, Planning Consultant
Subject: Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City
**Recommendation:** Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the City Council, as this application is a ministerial, staff-level decision

**NB 5.** Discuss and Provide Direction Regarding the Council Meeting Schedule for November and December 2025

**NB 6.** A Resolution Authorizing the City Manager and Mayor to Execute a Cooperative Agreement Between California City and the County of Kern for the Provision of an Interim Fire Chief and Receive Direction from the City Council Regarding this Item

**COUNCILMEMBER COMMENTS, AGENDA REQUESTS, AND AB1234 REPORTS**

This portion of the meeting is reserved for council members to present information, announcements, and items that

have come to their attention. The Brown Act precludes Council, staff, or public discussion. Short staff responses are appropriate. The Council will take no formal action. A Council member may request the City Clerk to calendar an item for consideration at a future meeting or refer an item to staff.

**ADJOURNMENT**

**AFFIDAVIT OF POSTING-**October 24, 2025

I, Leanndrea Weible, Acting City Clerk for the City of California City, California, DO HEREBY CERTIFY that the foregoing notice was posted on all official City bulletin boards and the City's website at least 72 hours prior to the meeting in compliance with the provisions of the Brown Act.

**CITY COUNCIL AGENDA ITEM**
**October 28, 2025**

**TO:** **The City Council**
**FROM:** **Christopher Lopez, City Manager**
**Anu Doravari, Planning Consultant**

**SUBJECT:** **Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City**

## BACKGROUND

City staff has received a Site Plan Review (SPR) application from CoreCivic for the operation of a detention center at an existing facility within the City. The application is currently under administrative review, and staff is evaluating it for compliance with all applicable zoning, land use, and design standards.

Under the California City Municipal Code, this type of application is ministerial in nature, meaning that City staff must approve the project if it meets all objective requirements set forth in the City's codes and regulations. A ministerial review does not involve discretion or policy judgment. The City Council is not the decision maker on a ministerial SPR.

## DISCUSSIONS

Senate Bill (SB) 29 (Civil Code § 1670.9(d)) requires 180 days' public notice and two public meetings before a city "issues a permit for the building or reuse of existing buildings" by a private corporation to detain noncitizens. Tonight's agendized item is that hearing to receive public input and provide transparency to the extent SPR approval constitutes a "permit for the building or reuse of existing buildings." The Council is not being asked to make findings, impose conditions, or take action on the SPR.

At this time, no approvals, permits, or entitlements have been issued for the proposed use. Staff continues to review the application and anticipates that it may move forward to approval once compliance with all applicable regulations, including SB 29, is established.

**Next Steps**

- Staff will document the hearing, comments received, and responses as part of the administrative record for the SPR.
- Staff will complete the review of the pending SPR application for objective compliance with local and state requirements.
- Upon confirmation of compliance with SB 29 and applicable municipal standards, staff may proceed with administrative approval of the SPR.

- Staff will provide future status updates as appropriate.

**RECOMMENDATION**

Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the City Council, as this application is a ministerial, staff-level decision.

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

*California City Immigration Processing Center*
California City, CA

**Facility:** California City Immigration Processing Center
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

California City Immigration Processing Center is owned and operated by CoreCivic. The facility will serve as a detention center focused on housing residents based on contractual requirements with Immigration and Customs Enforcement. The security and operation of the facility will follow policies and procedures in alignment/compliance with the National Detention Standards 2025 revision. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled. Additionally, food service, recreational and religious opportunities, legal access, attorney and social visitation, mail procedures, detainee communication, and transportation will be provided in accordance with the aforementioned ICE standards.

The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year. At operational capacity, the facility will employ 488 total staff to include approximately 309 security staff, 70 medical professionals, 12 maintenance staff with the remainder administrative and support personnel.

**Facility Description:**

California City Immigration Processing Center is located in California City, California in Antelope Valley in Kern County, California. The facility is approximately 20 miles North of Edwards Air Force Base. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999. Major airports near CCIPC are Meadows Field Airport (84 miles) and Los Angeles International Airport (126 miles). The nearest hospitals are Adventist Health-Tehachapi Valley (37 miles), Antelope Valley Hospital (54.3 miles), Ridgecrest Regional Hospital (57.7 miles), Southwest Healthcare Palmdale Regional Medical Coneter (58.4 miles)

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems providing year-round environmental comfort for all staff and residents.

Each cell provides residents with access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. All residents have access to showers with thermostatically controlled hot and cold water. Adjacent to each resident's sleeping area is a central dayroom that contains tables, chairs, televisions and telephones for residents' use.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. An administrative area that includes space for staff, conference room, employee lounge and locker rooms

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located Health Services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# ATTACHMENT C

ATTACHMENT C

72°
KGET.com

LIVE NOW Watch KGET+ Live

GAS PRICES IN BAKERSFIELD
Find the lowest gas prices in Bakersfield ›



LOCAL NEWS

# Cal City to hold 2nd public hearing on CoreCivic ICE detention facility

by: Sangmin Kim
Posted: Dec 12, 2025 / 01:20 PM PST
Updated: Dec 12, 2025 / 01:36 PM PST

SHARE

BAKERSFIELD, Calif. (KGET) — Members of the community can provide input on the CoreCivic immigrant detention center at a hearing one last time on Tuesday before California City can potentially approve a permit for the facility, according to the Cal City Planning Commission agenda.

CoreCivic submitted a Site Plan Review application to Cal City to operate the detention facility at the existing California City Correctional Facility.

City staff is assessing the application to see if it complies with zoning, land use and design standards, according to the agenda.

Cal City's municipal code requires city staff to approve the CoreCivic detention center if it meets all requirements set in the city codes and regulations, the agenda said.

ADVERTISEMENT




Under Senate Bill 29, the city has to notify the public at least 180 days in advance of a proposed permit execution for a private company seeking to detain non-citizens in new or existing buildings.

It also has to hold two public meetings before the city can issue a permit, according to the agenda. Through the meeting, city officials aim to receive public comments and provide transparency about the extent of allowing permits after approving a Site Plan Review.

**Article Continues After the Ad**

ADVERTISEMENT

Ad by CRITEO

Report this ad

Ad choic

**READ NEXT >**

**Man guilty of monthslong sexual abuse of minor**



**READ NEXT >**

Next story in 5

# ATTACHMENT D

ATTACHMENT D

**PLANNING COMMISSION MEETING**
**OF THE**
**CITY OF CALIFORNIA CITY**

**TUESDAY, DECEMBER 16, 2025 @**
**6:00PM**
**VIDEO CONFERENCE/IN-PERSON**
**21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505**

---

If you need special assistance to participate in this meeting, please contact the planning department at (760) 373-7141 or via email at planning@californiacity-ca.gov. Notification 48 hours prior to the meeting will enable the city to make reasonable arrangements to ensure accessibility to this meeting. (28 CFR 35.102-35.104 American Disabilities Act Title II).

---

**Zoom**

1. Public may join Planning Commission Meeting live via Zoom:
   - https://us06web.zoom.us/j/85808671526
   - Meeting ID: 858 0867 1526

2. One tap mobile
   - +16694449171,,85808671526# US
   - +17207072699,,85808671526# US (Denver)

3. Public can dial into the Zoom line:
   - One tap mobile: 16694449171,85808671526# US
   - +17207072699,,85808671526# US (Denver)
   - Dial the above number and enter the meeting ID: 858 0867 1526

**Granicus**

1. Agenda can be viewed via Granicus: https://californiacity.granicus.com/viewpublisher?view_id=1
2. Public may eComment on agenda items via Granicus https://www.californiacity-ca.gov/CC/images/Ecomment_Instruction_Guide_2020.pdf

**City Website**

1. Agenda can be viewed on the City's website.
2. Recording of this meeting will be made available on the City's website.

**LATE COMMUNICATIONS:** Following the posting of the agenda, any emails, writings, or documents that the public would like to submit to the Commission must be received by the Secretary no later than 3:00 p.m. the day prior to the scheduled meeting.

Public is urged to listen to the meeting in a quiet place, to avoid background noise. We also request the public **MUTE** your audio device when not commenting to avoid disruption during the meeting.

****At this time, please take a moment to turn off your cell phones****

1. **CALL TO ORDER**

2. **PLEDGE OF ALLEGIANCE/INVOCATION**

3. **ROLL CALL**

| | |
|---|---|
| **Chairman** | Brottlund |
| **Vice Chair** | Marsh |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |

4. **ADOPT AGENDA**
   Adopt Agenda: December 16, 2025.

5. **DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
   Disclosure by Commissioners of site visits and ex-parte contact for items on the agenda.

6. **PUBLIC BUSINESS FROM THE FLOOR**
   This portion of the meeting is reserved for the public to address the Planning Commission on any matter not on the agenda and over which the Planning Commission has jurisdiction. Comments are to be limited to three (3) minutes. The Planning Commission will receive the comments but cannot engage in back-and-forth discussion with the public or make any decision. The Planning Commission may direct staff to bring the item back to a future agenda for discussion.

7. **CONSENT CALENDAR**
   **CC1:** Meeting Minutes 09/02/2025

8. **INFORMATION ITEMS**
   **II 1. Information Item – Update on the 6th Cycle Housing Element**
   Provide an update on the City's progress, including delays due to issues requiring clarification from the City Attorney's Office, and the revised timeline for bringing the Housing Element forward for adoption.

9. **DEPARTMENT REPORT**

10. **NEW BUSINESS**
    **NB 1.** CoreCivic Hearing II
    **Subject:** Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City.
    **Recommendation**: Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the Planning Commission.

## 11. COMMISSIONER COMMENTS

This portion of the meeting is reserved for Planning Commissioners to present information, announcements and items that have come to their attention. Short staff responses may be appropriate. The Planning Commission will take no formal action. A Planning Commissioner may request to calendar an item for consideration at a future meeting or refer an item to staff.

| | |
|---|---|
| **Chairman** | Brottlund |
| **Vice Chair** | Marsh |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |

## ADJOURNMENT

**AFFIDAVIT OF POSTING**: This agenda was posted on all official City bulletin boards, the City's website and agenda packets were completely accessible to the public at City Hall at least 72 hours (for special meetings 24 hours), prior to the Planning Commission Meeting. *Planning Department*

10.

NB 1

PLANNING COMISSION
AGENDA ITEM
**December 16, 2025**

**TO:** Honorable Chair and Members of the Planning Commission
**FROM:** Anu Doravari, Planner
Christopher Lopez, City Manager
**TITLE:** Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City

---

**Background**

City staff has received a Site Plan Review (SPR) application from CoreCivic for the operation of a detention center at an existing facility within the City. The application is currently under administrative review, and staff is evaluating it for compliance with all applicable zoning, land use, and design standards.

Under the California City Municipal Code, this type of application is ministerial in nature, meaning that City staff must approve the project if it meets all objective requirements set forth in the City's codes and regulations. A ministerial review does not involve discretion or policy judgment. The Planning Commission is not the decision-making body for a ministerial SPR.

Senate Bill (SB) 29 (Civil Code § 1670.9(d)) requires 180 days' public notice and two public meetings before a city "issues a permit for the building or reuse of existing buildings" by a private corporation to detain noncitizens. Tonight's agendized item is that second hearing to receive public input and provide transparency to the extent SPR approval constitutes a "permit for the building or reuse of existing buildings." The Planning Commission is not being asked to make findings, impose conditions, or take action on the SPR.

At this time, no approvals, permits, or entitlements have been issued for the proposed use. Staff continues to review the application and anticipates that it may move forward to approval once compliance with all applicable regulations, including SB 29, is established.

**Next Steps**

• Staff will document the hearing, comments received, and responses as part of the administrative record for the SPR.
• Staff will complete the review of the pending SPR application for objective compliance with local and state requirements.
• Upon confirmation of compliance with SB 29 and applicable municipal standards, staff may proceed with administrative approval of the SPR.
• Staff will provide future status updates to the Planning Commission and City Council as appropriate.

**Recommendation**

Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the Planning Commission, as this application is a ministerial, staff-level decision.

# ATTACHMENT E

ATTACHMENT E

Laura Avila, Assessor-Recorder
Kern County Official Records

JL
7/06/2026
12:52 PM

Recorded Electronically by:
56A Chicago Title Co LA

DOC #: 226076987

226076987

| Stat Types: 1 | Pages: 5 |
|---|---|
| FEES | 25.00 |
| TAXES | .00 |
| OTHER | .00 |
| PAID | 25.00 |

RECORDING REQUESTED BY:
CHICAGO TITLE COMPANY

AFTER RECORDING RETURN
AND UNLESS OTHERWISE SHOWN
BELOW, MAIL TAX STATEMENT TO:
Department of Homeland Security
Facilities Management Division
500 12th Street SW, Suite 3000
Washington, D.C. 20536
Attn: Tamim Chowdhury

A.P.N.: 350-031-28-00, 350-031-29-00 and 350-031-30-00
Title Insurer: Chicago Title Company

## GENERAL WARRANTY DEED

THE UNDERSIGNED GRANTOR DECLARES:
Exempt from fee per GC27388. 1(A)(2); Document subject to the imposition of documentary transfer tax

No Documentary Transfer tax is due on this document pursuant to Revenue and Taxation Code Section 11922. Governmental agency acquiring title.

This General Warranty Deed, made July 2, 2026, by CORECIVIC, INC., a Maryland corporation successor by name change to CORRECTIONS CORPORATION OF AMERICA ("**Grantor**"), whose street address is 5501 Virginia Way, Brentwood, Tennessee 37027, in favor of the United States of America, and its assigns, by and through the Department of Homeland Security ("**Grantee**"), whose street address is 500 12th Street SW, Suite 3000, Washington D.C. 20536.

WITNESSETH:

That for and in consideration of the sum of $732,571,392.00 cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby grant, bargain, sell and convey, in fee simple, with General Warranty, unto said Grantee, that certain property located in the City of California City, County of Kern, State of California, as is more particularly described on **Exhibit A** attached hereto, together with all rights, title, and interest of Grantor in and to any alleys, streets, ways, strips, or gores abutting or adjoining the land (collectively, the "**Property**"); subject to and with the benefit of all easements, restrictions, agreements, rights of way and reservations of record, insofar as the same are now in force and affect the Property.

The acquiring federal agency is the U.S. Department of Homeland Security.

TO HAVE AND TO HOLD the Property, together with each and every title, right, privilege, appurtenance and advantage thereunto belonging, or in anywise appertaining, unto and for the use, benefit and behoof of Grantee, its successors and assigns, in fee simple forever.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against the lawful claims of all persons whomsoever,

except for the exceptions stated. Title to the Property hereinabove described is subject to the following exceptions: ANY AND ALL OF PUBLIC RECORD.

[signature page follows]

**GRANTOR:**

**CORECIVIC, INC.,** a Maryland Corporation successor by name change to Corrections Corporation of America,

By: [signature]
Name: Lucibeth Mayberry
Title: Executive Vice President & Chief Strategy Officer

**ACKOWLEDGEMENT**

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Tennessee }
}
County of Williamson }

On 06/11/2026, before me, Faviana Magill-Vasquez notary public, personally appeared Lucibeth Mayberry, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] (Seal)

FAVIANA MAGILL-VASQUEZ
TENNESSEE NOTARY PUBLIC
My Comm Exp. December 01, 2029
COUNTY OF WILLIAMSON

CERTIFICATE OF ACCEPTANCE

This is to certify that the interest in real property conveyed by the deed or grant dated July 2, 2026 from CoreCivic, Inc., successor by name change to Corrections Corporation of America to the United States of America, and its assigns, by and through the Department of Homeland Security, a governmental agency is hereby accepted by the undersigned officer or agent on behalf of the United States of America, and its assigns, by and through the Department of Homeland Security pursuant to authority conferred by the warrant of contracting authority issued to Tamim Chowdhury effective as of January 15, 2026 and the grantee consents to recordation thereof by its duly authorized warrant officer.

Dated: 7/2/26

By: ______________________
Tamim Chowdhury
Senior Real Estate Contracting Officer

**EXHIBIT A**

**LEGAL DESCRIPTION**

LAND SITUATED IN THE CITY OF CALIFORNIA CITY, COUNTY OF KERN, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

Parcels 1, 2 and 3, as shown on Parcel Map No. 12374, recorded January 19, 2021, in Book 62, at Page 30, of Parcel Maps, Kern County Records.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in Deed recorded April 25, 1960, in Book 3261, Page 639, records of said County.

**From:** pqlite@parcelquest.com
**To:** Mike Giardina
**Subject:** PQLite Order
**Date:** Wednesday, August 19, 2026 10:28:42 AM
**Attachments:** doc KER-2026-2026.76987 pq.pdf

You don't often get email from pqlite@parcelquest.com. Learn why this is important

***Thank you for your Order!***

Dear Michael,

Thank you for your purchase. Your order **312762** has been processed! Your ordered files are attached to this email.

If you have any further questions or concerns about the transaction, please call us toll free at 844-893-7216.

Sincerely,
ParcelQuest

## Files Included in this e-mail

| Report | APN | Address |
|---|---|---|
| Doc 202676987 | 35003128000 | 22844 VIRGINIA BLVD CALIFORNIA CITY CA 93504 |

# ATTACHMENT F

ATTACHMENT F

# Assessor Property Search - Property Details

Note: You are not currently in a decline in value status.

| General Property Information | | | |
|---|---|---|---|
| **ATN** | 350-031-28-00-0 | **Status** | Active |
| **Parcel Num.** | 350-031-28-2 | View Assessor's Parcel Map | View GIS Map |
| **Site Addr.** | 22844 VIRGINIA BL CALIFORNIA CITY | | |
| **Legal** | PARCEL MAP 12374 LOT 1 | | |
| **Acres** | 61.19 | | |
| **Use Code** | 1716 - DETENTION FACILITY/PRISON | | |
| **Prior APN(s)** | 350-031-02 | | |
| **Supervisorial District** | 2 - Chris Parlier | | |

| Property Characteristics | |
|---|---|
| **No. of Buildings** | 6 |
| **Total No. of Units** | 0 |
| **Total Sq. Ft. of All Buildings** | 510980 |
| **Has Parking Lot** | No |
| **Has Parking Structure** | No |
| **Yard Improvements** | |
| Building #1 | |
| **Year Built** | 1999 |
| **No. of Stories** | 2 |
| **Construction Type** | S |
| **Roof Cover Type** | Hot Mop |
| **Roof Type** | Flat |
| **Heating Type** | Electricity |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 501208 |
| **Total Building Area (Sq. Ft.)** | 501208 |
| Building #2 | |
| **Year Built** | 2008 |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 1200 |
| **Total Building Area (Sq. Ft.)** | 1200 |
| Building #3 | |
| **Year Built** | 2008 |
| **Quality** | Average |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 4000 |
| **Total Building Area (Sq. Ft.)** | 4000 |
| Building #4 | |
| **No. of Stories** | 2 |
| **Has Escalators** | No |
| Building #5 | |

| | |
|---|---|
| **Year Built** | 2013 |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 2340 |
| **Total Building Area (Sq. Ft.)** | 2340 |
| Building #6 | |
| **Year Built** | 2013 |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 2232 |
| **Total Building Area (Sq. Ft.)** | 2232 |

## Current tax roll values that are used to calculate the bills due in December 2026 and April 2027

| | |
|---|---|
| **Land Value** | $542,763 |
| **Mineral Value** | $0 |
| **Improvement Value** | $165,362,972 |
| **Other Improvements** | $942,783 |
| **Personal Property Value** | $4,683,251 |
| **Total** | $171,531,769 |
| **Less Exemption Value** | $0 |
| **Net Total Taxable Value** | $171,531,769 |
| **Tax Rate Area** | 011-010 - CALIFORNIA CITY INSIDE-MOJAVE |

## Tax Bill Information

**Questions regarding tax bills should be directed to the Tax Collector at (661) 868-3490.**

**Go to Bill Details on Kern County Treasurer-Tax Collector's website**

| | | | | |
|---|---|---|---|---|
| **Lien Date Bill** | | 26-1253159-00-8 | | Billed |
| | **Net Billed Value** | **Tax Rate Area** | | **Proration Period** |
| | $171,531,769 | 011-010 | | 1 Year |
| **General Amount** | **Special Amount** | **Special Assessments** | **General Rate** | **Special Rate** |
| $2,223,422.23 | $0.00 | $0.00 | 1.296216 | 0.000000 |

| | Due Date | Amount | Date Paid | Penalty | Total Paid |
|---|---|---|---|---|---|
| **1st Installment** | 12/10/2026 | $1,111,711.12 | | $111,171.11 | $0.00 |
| **2nd Installment** | 4/12/2027 | $1,111,711.11 | | $111,181.11 | $0.00 |
| **Total** | | $2,223,422.23 | | | $0.00 |

## INFORMATION FOR PROPERTY OWNER

### Overview

Pursuant to California Revenue & Taxation Code § 619 and § 621, this notice informs you of THE TAXABLE VALUE of your property. It also serves to inform you of your opportunity to request reconsideration of our findings or to file an assessment appeal. If you believe that your property is worth less than the indicated amount, you may discuss the matter with the Assessor's staff by calling (661)-868-3485. Decline-in-value review requests are taken between July 2 and November 30. For details, visit the Decline-in-Value Review (Proposition 8) page

If you and the County Assessor cannot agree on the assessed value, you may appeal the assessment to the Assessment Appeals Board. Applications are accepted between July 2 and November 30, and are processed by the Clerk of the Assessment Appeal Board, located at the

County Administration Center, 5th floor, 1115 Truxtun Avenue, Bakersfield, California 93301. For more information, visit the Assessment Appeals page

Revenue and Taxation Code § 1607 provides that the taxpayer need not attend the scheduled equalization hearing and testify to the property's value. If an agreement can be reached with the Assessor, the applicant or applicant's agent may sign a written stipulation setting forth the facts upon which a reduction in value is premised. The Board can either accept the stipulation or reject it and set a new hearing date.

**How and when property is assessed**

Article XIIIA of the California Constitution provides that property shall be taxed in proportion to its value. In part:

- Property is appraised at its 1975-76 market value unless it has been sold, newly constructed, or had a change in ownership after March 1, 1975.
- Property transferred after March 1, 1975 will have a new base year market value established as of the date of the change in ownership.
- New construction will be assessed at market value and added to the base year value as of its date of completion.
- The base year value is subject to an annual rate of inflation not to exceed 2 percent increase per year.
- The taxable value of real property on the local roll shall be the lesser of: (a) factored base year value, (b) current market value, or (c) the value of the property if it was damaged or destroyed by calamity pursuant to Revenue and Taxation Code § 170

A copy of the local assessment roll is available for public inspection during regular office hours (8-5) Monday through Friday in the Assessor's Office at 1115 Truxtun Ave, 2nd floor.

# ATTACHMENT G

ATTACHMENT G

**Mike Giardina**

**From:** California City, CA <californiacity@public.govdelivery.com>
**Sent:** Wednesday, July 1, 2026 4:26 PM
**To:** Mike Giardina
**Subject:** Agenda for PLANNING COMMISSION MEETING on Tuesday, July 7, 2026 at 6:00 PM PDT has been posted

**LATEST MEETING AGENDA AVAILABLE**

## PLANNING COMMISSION MEETING

## Tuesday, July 7, 2026 at 6:00 PM PDT

VIEW AGENDA

SUBSCRIBER SERVICES:

Manage Subscriptions | Unsubscribe All | Help

This email was sent to mgiardina@strucklove.com using Granicus Communications Cloud on behalf of: California City, California · 21000 Hacienda Blvd · California City, CA 93505

**PLANNING COMMISSION MEETING**
**OF THE**
**CITY OF CALIFORNIA CITY**

**TUESDAY, JULY 7, 2026 @ 6:00 PM**
**VIDEO CONFERENCE/IN-PERSON**
**21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505**

---

If you need special assistance to participate in this meeting, please contact the planning department at (760) 373-7141 or via email at planning@californiacity-ca.gov. Notification 48 hours prior to the meeting will enable the city to make reasonable arrangements to ensure accessibility to this meeting. (28 CFR 35.102-35.104 American Disabilities Act Title II).

---

**Zoom**

1. Public may join Planning Commission Meeting live via Zoom:

- https://us06web.zoom.us/j/89958907490
- Meeting ID: 899 5890 7490

2. One tap mobile

- ++16694449171,89958907490# US
- +17207072699,89958907490# US (Denver)

3. Public can dial into the Zoom line:
   - One tap mobile: +16694449171,89958907490# US
   - +17207072699,89958907490 # US
   - Dial the above number and enter the meeting ID: 89958907490

**Granicus**

1. Agenda can be viewed via Granicus: https://californiacity.granicus.com/viewpublisher?view_id=1
2. Public may eComment on agenda items via Granicus https://www.californiacity-ca.gov/CC/images/Ecomment_Instruction_Guide_2020.pdf

**City Website**

1. Agenda can be viewed on the City's website.
2. Recording of this meeting will be made available on the City's website.

**LATE COMMUNICATIONS:** Following the posting of the agenda, any emails, writings, or documents that the public would like to submit to the Commission must be received by the Secretary no later than 3:00 p.m. the day prior to the scheduled meeting.

****At this time, please take a moment to silence your cell phones****

1. **CALL TO ORDER**

2. **PLEDGE OF ALLEGIANCE/INVOCATION**

3. **ROLL CALL**

| | |
|---|---|
| **Chairman** | Brottlund |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |
| **Commissioner** | Perez |

4. **Oath of Office**

5. **Selection of Vice Chair**
   **Recommendation:** Entertain a Motion for Nominations to Select the Chair by Majority Vote.

6. **ADOPT AGENDA**
   Adopt Agenda: July 7, 2026

7. **DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
   Disclosure by Commissioners of site visits and ex-parte contact for items on the agenda.

8. **PUBLIC BUSINESS FROM THE FLOOR**
   This portion of the meeting is reserved for the public to address the Planning Commission on any matter not on the agenda and over which the Planning Commission has jurisdiction. Comments are to be limited to three (3) minutes. The Planning Commission will receive the comments but cannot engage in back-and-forth discussion with the public or make any decision. The Planning Commission may direct staff to bring the item back to a future agenda for discussion.

9. **PUBLIC HEARING**

**PH 1.** Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02

**RECOMMENDATION**
Staff recommends that the Planning Commission:
1. Receive the staff report, public testimony, and record materials submitted for the appeal;
2. Find that the appellant failed to meet the required burden of proof to overturn the Planning Director's approval of SPR 25-09 and find that the Planning Commission's action on the appeal does not approve new construction, expansion, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use; and
3. Adopt Resolution No. PC 2026-07-07 denying the appeal and upholding the Planning Director's February 26, 2026, approval of SPR 25-09 as issued.

## 10. COMMISSIONER COMMENTS

This portion of the meeting is reserved for Planning Commissioners to present information, announcements and items that have come to their attention. Short staff responses may be appropriate. The Planning Commission will take no formal action. A Planning Commissioner may request to calendar an item for consideration at a future meeting or refer an item to staff.

| | |
|---|---|
| **Chairman** | Brottlund |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |
| **Commissioner** | Perez |

## ADJOURNMENT

**AFFIDAVIT OF POSTING**: This agenda was posted on all official City bulletin boards, the City's website and agenda packets were completely accessible to the public at City Hall at least 72 hours (for special meetings 24 hours), prior to the Planning Commission Meeting. *Planning Department*

# PLANNING COMMISSION

## Staff Report

July 07, 2026

| | |
|---|---|
| **TO:** | Honorable Chair and Members of the Planning Commission |
| **FROM:** | Anu Doravari, Planning Director |
| **SUBJECT:** | Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02 |
| **APPLICANT:** | CoreCivic, Inc. |
| **APPELLANT:** | Dignity Not Detention Coalition |
| **REQUEST:** | Consider the appeal and determine whether to uphold the Planning Director's February 26, 2026 approval of SPR 25-09 as issued. |

### RECOMMENDATION

Staff recommends that the Planning Commission:

1. Receive the staff report, public testimony, and record materials submitted for the appeal;
2. Find that the appellant failed to meet the required burden of proof to overturn the Planning Director's approval of SPR 25-09 and find that the Planning Commission's action on the appeal does not approve new construction, expansion, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use; and
3. Adopt Resolution No. PC 2026-07-07 denying the appeal and upholding the Planning Director's February 26, 2026 approval of SPR 25-09 as issued.

**Recommended motion:** I move to adopt Resolution No. PC 2026-07-07 denying the appeal and upholding the Planning Director's February 26, 2026 approval of SPR 25-09 as issued.

### EXECUTIVE SUMMARY

SPR 25-09 concerns the California City Correctional Facility at 22844 Virginia Boulevard. The application was submitted on the City's Minor Site Plan Review application form for an existing building/business/ownership and is dated August 22, 2025. The operative business plan submitted with the application describes the facility as owned and operated by CoreCivic, Inc., opened in 1999, and expected to operate in the same manner it has since construction.

The Planning Director issued a determination letter on February 26, 2026, approving SPR 25-09. The determination was based on the City's existing entitlement record—including Conditional Use Permit (CUP) 97-01, CUP 98-02, and the CEQA Transmittal Addendum No. 1 2014.pdf—the associated environmental record, application materials, and applicable Municipal Code provisions. The determination letter states that the approval implements CUP 97-01 and CUP 98-02, reflects a maximum vested entitlement capacity of 2,816 beds, applies to the previously approved 70-acre facility footprint, and does not authorize any expansion or modification of the approved project.

Dignity Not Detention Coalition initiated its appeal of the Site Plan Review approval on February 27, 2026. This staff report addresses the Site Plan Review appeal before the Planning Commission under standard California land-use frameworks. Business licensing and contract matters are administered through separate City procedures and are outside the purview of this land-use evaluation.

Based on the complete administrative and environmental record, staff recommends that the Planning Commission deny the appeal and uphold the February 26, 2026, SPR 25-09 approval as issued.

## APPLICATION MATERIALS AND REVIEW BACKGROUND

SPR 25-09 was submitted as a Minor Site Plan Review application for an existing building/business/ownership. The application materials did not request new construction, expansion of the approved facility footprint, ground disturbance, or changes to the approved site layout. No new site plan was submitted for SPR 25-09. Staff reviewed the application based on the existing entitlement record, City records on file, the operative business plan, and applicable Municipal Code requirements.

The operative business plan describes the California City Correctional Facility as a 2,560-bed facility with an approximately 522,363 square foot physical plant. The Planning Director's determination letter identifies the entitlement record as CUP 97-01 for 2,304 beds and CUP 98-02 for an additional 512 beds, for a total authorized entitlement capacity of 2,816 beds. Because the applied-for operational capacity of 2,560 beds remains well below the maximum authorized capacity, SPR 25-09 did not approve any expansion or increase beyond the historical entitlement record.

The determination letter also states that the facility satisfied all objective requirements of the Building & Safety Division and Fire Department.

## ENTITLEMENT RECORD

| Approval / Record | Summary | Relevance to SPR 25-09 |
|---|---|---|
| **CUP 97-01 / PC Resolution No. 01-98-1802** | Approved a conditional use permit for a 2,304-bed prison facility on approximately 70 acres and adopted a Mitigation Monitoring Program. | Establishes the original conditional use entitlement and identifies site plan review, utility connection, and Municipal Code compliance obligations. |
| **CUP 97-01 / CC Resolution No. 01-98-1801** | Certified the Final EIR Supplement / CEQA findings for the 2,304-bed prison project and approved the project following Planning Commission action. | Establishes the City Council approval and prior CEQA record for the original facility. |
| **CUP 98-02 / Resolution No. 11-98-02** | Approved modification of CUP 97-01 for a 512-bed expansion and affirmed CUP 97-01 except as provided in that resolution. | Supports the determination that the combined entitlement record reflects a maximum authorized capacity of 2,816 beds. |
| **CEQA Transmittal Addendum No. 1 2014.pdf** | Documented and filed a CEQA Notice of Determination (NOD) on June 9, 2014, for a 256-bed internal repurposing of the facility structure. | Formally establishes that the environmental impacts of a 2,560-bed operational configuration within the existing facility footprint have been fully evaluated, cleared, and mitigated. |
| **Prior CEQA documents and adopted mitigation programs** | The facility and correctional use were evaluated through the EIR Supplement (CUP 97-01), the MND (CUP 98-02), **and Addendum No. 1 (2014)**. | Existing adopted mitigation programs remain enforceable according to their own terms. SPR 25-09 did not **alter or** adopt new mitigation measures. |

## MUNICIPAL CODE FRAMEWORK

- **CCMC Section 9-2.212 (Site Plan Review):** applications are filed with the Planning Director. The Planning Director reviews the proposal to determine whether it satisfies the requirements of the section. The section explicitly mandates that the site plan *shall be approved* if the application shows the site conforms to existing Municipal Code requirements.
- **CCMC Section 9-2.402 (RA District Conditional Uses):** "Governmental or quasi-governmental correction, probation or prison facilities and services" may be permitted in the RA District with a conditional use permit.
- **CCMC Section 9-2.103 (Code Interpretation):** Establishes guidelines for interpreting general code language. SPR 25-09 was reviewed under the existing entitlement record and the listed RA conditional-use category; it was not processed as a new citywide code interpretation or a new conditional use permit.

**SCOPE OF THE APPEAL BEFORE THE PLANNING COMMISSION**

The item before the Planning Commission is the appeal of the Planning Director's approval of SPR 25-09 under CCMC Section 9-2.212.

Under California zoning law, when a local code utilizes mandatory phrasing such as "shall be approved," the review is strictly ministerial (non-discretionary) once objective conformity is demonstrated. CCMC Section 9-2.212(d) explicitly removes discretionary authority from the Planning Director, stating that the *"site plan shall be approved if application shows the site will be developed in accordance with the requirements of the Municipal Code."*

The Planning Commission's review is strictly limited to whether the application demonstrates conformance with the Municipal Code per CCMC Section 9-2.212(d). This appeal hearing is not a revocation proceeding for CUP 97-01 or CUP 98-02, nor is it a public hearing for a new conditional use permit. Under California's vested rights doctrine, long-standing entitlements cannot be retroactively extinguished or re-adjudicated through a ministerial site plan compliance check.

**PROCEDURE OF THE APPEAL**

The appeal hearing before the Planning Commission is considered de novo under CCMC Section 1-4.04(d). This means that the Planning Commission is not bound by the decision of the Planning Director. The appeal hearing shall be based on the following evidence:

(1) Any relevant evidence, including staff reports, *etc.*, submitted at the time of the prior decision and at the appeal hearing; and

(2) Findings, if any, and decision of the Planning Director, but the Planning Commission shall not be bound by the findings and decisions of the original decision being appealed.

**BURDEN OF PROOF AT THE APPEAL HEARING**

Under CCMC Section 1-4.04(e), the appellant, Dignity Not Detention Coalition, has the burden of proof to support the overturning of the Planning Director's decision on SPR 25-09.

**MINOR SPR PROCESSING AND DIRECTOR HEARING**

SPR 25-09 was properly submitted on the City's Minor Site Plan Review application form because it applies strictly to an existing building with no physical modifications. The application did not propose new construction, new ground disturbance, expansion of the approved facility footprint, or modifications to the existing site layout.

While the Planning Department utilizes Director Hearings for projects involving active discretionary reviews or major site design alterations, CCMC Section 9-2.212 does not require a formal public hearing for an administrative verification of an existing, approved structure.

**NO NEW SPR CONDITIONS**

SPR 25-09 did not impose new discretionary Planning conditions, did not adopt new mitigation measures, and did not modify CUP 97-01 or CUP 98-02. The approval simply recognizes that the facility remains bound by its existing entitlement record, previously adopted environmental documents, and active mitigation programs. Any compliance review or enforcement related to those existing obligations remains completely separate from this limited SPR approval.

**APPEAL ISSUES AND STAFF REVIEW**

| Appeal Issue | Staff Land Use Review |
|---|---|
| **Zoning / Use Classification** | CCMC Section 9-2.402 explicitly identifies "[g]overnmental or quasi-governmental correction, probation or prison facilities and services" as a conditional use in the RA District. The existing entitlement record includes CUP 97-01 and CUP 98-02. Under standard California planning practices, land-use classifications track the physical characteristics, structural demands, and impacts of a facility (e.g., Institutional Group I-3 occupancy), not the specific demographics or civil/criminal status of the occupants. The facility remains a secured correction/detention facility and falls squarely within the broad categorical language of the CCMC and the existing CUPs. |
| **Civil Immigration Detention /** | The appellant asserts that civil immigration detention represents a separate use category requiring a new CUP. However, the City has historically interpreted this land-use |

| Appeal Issue | Staff Land Use Review |
|---|---|
| **"Change of Use" Argument** | classification to encompass federal civil detainees, notably during the facility's operations under the 2010–2013 Intergovernmental Service Agreement (IGSA). Furthermore, the certified CEQA Transmittal Addendum No. 1 2014.pdf explicitly cleared the "repurposing" of internal bed configurations up to 2,560 beds within the existing structure. Shifting the supervising agency contract between state and federal authorities does not alter the physical land-use footprint or generate distinct zoning impacts. |
| **New Conditional Use Permit Requirement** | Because SPR 25-09 requested no new construction, zero ground disturbance, and no increase in bed capacity beyond the established 2,816-bed entitlement, no triggers for a new or modified CUP have occurred. Any future proposal to physically expand the development footprint or exceed the 2,816-bed limit would legally require a separate discretionary CUP amendment and subsequent CEQA review. |
| **CEQA Compliance** | Under California Public Resources Code § 21080(b)(1) CEQA Guidelines Section 15268, and CCMC Section 2-6.303(b)(2), ministerial actions are entirely exempt from CEQA. Because the Planning Director was legally mandated by CCMC Section 9-2.212(d) to approve the site plan upon demonstration of code conformity, the action involves no discretionary balancing of environmental options. Furthermore, the physical facility and its 2,560-bed operational ceiling were already fully analyzed under the certified EIR Supplement (CUP 97-01), the MND (CUP 98-02), and CEQA Transmittal Addendum No. 1 2014.pdf. |

## FINDINGS SUPPORTING RECOMMENDED ACTION

1. SPR 25-09 was submitted as a Minor Site Plan Review application for an existing building/business/ownership and is dated August 22, 2025.
2. The City's Site Plan Review process ensures that development of an approved use conforms to Municipal Code standards for site design, infrastructure, and improvements.
3. The application materials did not request new construction, expansion of the approved facility footprint, ground disturbance, or modification to the approved site layout.

4. The operative business plan states that the facility opened in 1999, is owned and operated by CoreCivic, and is expected to operate in the same physical manner it has since it was constructed.
5. CUP 97-01 approved a 2,304-bed prison facility on approximately 70 acres at the project site.
6. CUP 98-02 approved a 512-bed expansion and affirmed CUP 97-01, establishing a combined entitlement capacity of 2,816 beds.
7. The facility's operational configuration of 2,560 beds was explicitly evaluated and cleared under CEQA Transmittal Addendum No. 1 2014.pdf, which concluded that internal bed repurposing within the existing structure generates no new significant environmental impacts.
8. CUP 97-01 and CUP 98-02 run with the land and remain valid, active entitlements absent a formal, separate revocation proceeding.
9. CCMC Section 9-2.402 allows governmental or quasi-governmental correction, probation, or prison facilities and services in the RA District with a conditional use permit.
10. The Planning Director's approval of SPR 25-09 did not impose new discretionary conditions, adopt new mitigation measures, or modify the underlying vested CUPs.
11. Because SPR 25-09 demonstrated compliance with objective Municipal Code requirements, approval was mandatory under the ministerial command of CCMC Section 9-2.212(d).
12. The appeal materials do not identify an **objective** basis under CCMC Section 9-2.212 to set aside the February 26, 2026, SPR 25-09 approval.

## ATTACHMENTS

1. Planning Commission Resolution No. PC 2026-07-07
2. Combined Administrative Record for SPR 25-09 Appeal

The combined record can include:

- Planning Director Determination Letter
- Appeal Letter
- SPR Application Materials
- Business Plan / Operational Information
- CUP 97-01 Record
- CUP 98-02 Record
- Prior CEQA Documents
- 2014 CEQA Addendum / NOD Materials
- Building, Fire, and Occupancy Materials
- DOJ Correspondence
- Prior agenda/hearing materials
- Record exhibits

**ATTACHMENT 1:**

**PLANNING COMMISSION RESOLUTION NO. PC 2026-07-07**

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY DENYING THE APPEAL FILED BY THE DIGNITY NOT DETENTION COALITION AND UPHOLDING THE PLANNING DIRECTOR'S FEBRUARY 26, 2026 APPROVAL OF SITE PLAN REVIEW NO. SPR 25-09 AS ISSUED FOR THE CALIFORNIA CITY CORRECTIONAL FACILITY LOCATED AT 22844 VIRGINIA BOULEVARD, APN 350-031-02**

**WHEREAS**, CoreCivic, Inc. submitted Site Plan Review No. SPR 25-09 for the California City Correctional Facility located at 22844 Virginia Boulevard, APN 350-031-02; and

**WHEREAS**, SPR 25-09 was submitted on the City's Minor Site Plan Review application form for an existing building/business/ownership and is dated August 22, 2025; and

**WHEREAS**, the operative business plan describes the facility as owned and operated by CoreCivic, opened in 1999, and expected to operate inside the same physical plant footprint since construction; and

**WHEREAS**, the project site is subject to Conditional Use Permit No. 97-01, approved for a 2,304-bed facility, and Conditional Use Permit No. 98-02, approved for an additional 512 beds, representing a total authorized capacity of 2,816 beds; and

**WHEREAS**, the proposed operational scale of 2,560 beds was formally evaluated, cleared, and certified under CEQA Transmittal Addendum No. 1 2014.pdf, with a Notice of Determination properly filed with the Kern County Clerk on June 9, 2014; and

**WHEREAS**, the Planning Director issued a determination letter dated February 26, 2026, finding that SPR 25-09 satisfies all objective Municipal Code requirements; and

**WHEREAS**, the Dignity Not Detention Coalition submitted an appeal dated February 27, 2026; and

**WHEREAS**, the Planning Commission considered the staff report, the appeal materials, the entitlement record, the prior CEQA record, applicable Municipal Code provisions, and public testimony at a regular meeting.

**NOW, THEREFORE, THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY DOES HEREBY RESOLVE AS FOLLOWS:**

**SECTION 1. RECITALS.** The foregoing recitals are true and correct and are incorporated herein by this reference.

**SECTION 2. SCOPE OF ACTION.** The action before the Planning Commission is strictly limited to the appeal of the Planning Director's approval of SPR 25-09 under CCMC Section 9-2.212. This Resolution does not authorize or approve new construction, physical expansion of the facility footprint, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use.

**SECTION 3. CEQA FINDINGS.** The Planning Commission hereby affirms that SPR 25-09 is exempt from the California Environmental Quality Act pursuant to CEQA Guidelines Section 15268 (Ministerial Projects). The approval is a non-discretionary action limited to the verification of compliance with objective Municipal Code standards. The Commission further finds that the environmental impacts of the 2,560-bed configuration within the existing structural footprint were fully analyzed and mitigated under CEQA Transmittal Addendum No. 1 2014.pdf, and no triggers for a subsequent or supplemental EIR exist under CEQA Guidelines Section 15262.

**SECTION 4. LAND USE FINDINGS.**

1. SPR 25-09 applies strictly to an existing building/business/ownership and is dated August 22, 2025.
2. The application materials requested zero new construction, zero ground disturbance, and no expansion of the approved facility footprint.
3. CUP 97-01 and CUP 98-02 establish a combined, valid land-use entitlement capacity of 2,816 beds on the project site, which runs with the land and remains unrevoked.
4. CCMC Section 9-2.402 explicitly permits "governmental or quasi-governmental correction, probation or prison facilities and services" in the RA District via a CUP. The physical land-use impacts of the facility are consistent across federal and state operational contracts, and the current use falls squarely within this approved zoning category.
5. Under CCMC Section 9-2.212(d), site plan approval is mandatory if the application demonstrates conformance with existing code standards. Because the application satisfies all objective Planning, Building, and Fire standards, the Planning Director possessed no discretionary authority to deny the application. The appeal record provides no objective legal or land-use basis under the CCMC to set aside the approval.

**SECTION 5. DECISION.** The Planning Commission hereby denies the appeal filed by the Dignity Not Detention Coalition and upholds the Planning Director's February 26, 2026, approval of SPR 25-09 as issued.

**SECTION 6. EFFECTIVE DATE.** This Resolution shall become effective immediately upon adoption.

**PASSED, APPROVED, AND ADOPTED** by the Planning Commission of the City of California City at a regular meeting held on July 7, 2026, by the following vote:

ATTEST:

____________________________________
Planning Secretary/City Clerk

STATE OF CALIFORNIA )
COUNTY OF KERN ) ss.
CITY OF CALIFORNIA CITY )

I, ____________________________, City Clerk of the City of California City, do hereby certify that the foregoing Resolution was duly adopted by the Planning Commission at a regular meeting held on July 7, 2026, by the following vote:

**AYES:**

**NOES:**

**ABSENT:**

**ABSTAIN:**

____________________________________
City Clerk

February 27, 2026

***U.S. mail and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, Members of the Planning Commission, Interim City Manager Grayson, City Attorney Ponto, and City Clerk,

On behalf of the Dignity Not Detention Coalition, I write to appeal the decision by California City to approve a business license, site plan review, and all related approvals to CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 9-2.212(b) of the California City Municipal Code (CCMC). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.
- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City

to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $381.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of any appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner
Senior Staff Attorney
Immigrant Legal Resource Center

cc: Brandon Sanchez

2031489.2

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**
Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**INTERIM CITY MANAGER**

## Site Plan Review 25-09

Determination Letter

To,
Marcelo Ariola
VP Real Estate
CoreCivic, Inc.
5501 Virginia Way, Suite 110,
Brentwood, TN 37027

Date: 26 February 2026

**Subject:** Approval of Site Plan Review (SPR 25-09) at 22844 Virginia Blvd, California City, CA 93505

Dear Marcelo Ariola,

The City of California City ("City") Planning Department has completed its review of Site Plan Review Application SPR 25-09 for the California City Corrections Facility located at 22844 Virginia Blvd (APN 350-031-02). Based upon review of the City's entitlement record and associated environmental documents, the following determination is issued.

**Background:**

The facility located at Virginia Boulevard was originally approved under Conditional Use Permit (CUP) 97-01, adopted via Resolution No. 01-98-1802, for a 2,304-bed "prison facility." In October 1998, the City granted CUP 98-02 to expand the permitted use by 512 beds.

The facility was inactive for approximately one year. Neither CUP 97-01 nor CUP 98-02 expires due to inactivity. Further, each CUP runs with the land and is valid unless and until revoked after a notice and opportunity to be heard according to applicable law.

On August 22, 2025, the facility applied for Site Plan Review approval "to operate in the same manner it has since it was constructed in 1999."

**Discussion:**

Pursuant to California City Municipal Code ("CCMC") section 9-2.212(b), the Planning Director reviews the proposal to determine whether it satisfies the requirements of this section. Section 9-2.212(d), further provides that "The site plan shall be approved if application shows the site will be developed in accordance with the requirements of the Municipal Code." As such, Section 9-2.212 directs ministerial approval when the proposal demonstrates Municipal Code compliance.

The Planning Department has reviewed the Site Plan Review Application and finds the use is authorized subject to compliance with CUP 97-01 and CUP 98-02. In particular, these permits collectively allow for a total bed count of 2,816.

The facility has satisfied the requirements of the Building & Safety Division and Fire Department.

According to CCMC section 9-2.402, "correction, probation or prison facilities and services" are permitted in the Residential Agricultural (RA) zone with a conditional use permit. The facility's current operations appear to fall within the scope of the use approved in CUP 97-01 and expanded by CUP 98-02. Therefore, the proposed use is a continuation of the previously entitled use.

**CEQA Determination:**

The Site Plan Review approval is a ministerial action limited to verification of compliance with objective Municipal Code standards and does not involve the exercise of discretion. Accordingly, this approval is exempt from the California Environmental Quality Act ("CEQA") pursuant to CEQA Guidelines Section 15268 (Ministerial Projects).

The facility and correctional facility use were previously evaluated in a certified Environmental Impact Report Supplement (SCH No. 97091045) adopted in connection with CUP 97-01 and a Mitigated Negative Declaration adopted in connection with CUP 98-02. This administrative approval implements existing entitlements and does not authorize any expansion or modification of the approved project.

**Planning Department Findings:**

The facility remains subject to the use category approved under CUP 97-01: Governmental or quasi-governmental correction, probation, or prison facilities and services. Pursuant to CCMC section 9-2.212(d), the application shows the site will be used in accordance with the requirements of the CCMC, and as such "the site plan shall be approved."

This Site Plan Review approval:

1. Implements CUP 97-01 and CUP 98-02 as reflected in the City's entitlement record;
2. Reflects a maximum occupancy of 2,816 beds;
3. Applies solely to the previously approved 70-acre facility footprint (APN 350-031-02); and

4. References the previously certified environmental documents and adopted mitigation programs associated with CUP 97-01 and CUP 98-02.
5. Affirms that the operator maintains ongoing compliance with all applicable mitigation measures contained in both adopted programs. The City reserves the right to conduct inspections and request documentation necessary to verify continued compliance.

Failure to comply with the conditions of CUP 97-01 or CUP 98-02 the adopted mitigation programs may result in enforcement action, including potential revocation proceedings in accordance with the CCMC and California law.

Any proposal to expand the development area, increase bed capacity beyond 2,816 beds, or materially modify the approved use shall require amendment to the applicable Conditional Use Permit(s) and compliance with CEQA.

This letter constitutes the Planning Department's formal approval of SPR 25-09 consistent with the above-referenced entitlements and environmental determinations.

Anu Doravari

Sincerely,
Anu Doravari
Planning Director
Planning Division
Community Development
City of California City

# EXHIBIT 1

EXHIBIT 1

STRUCK LOVE ACEDO, PLC
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>City of California City and CoreCivic, Inc.,<br><br>Respondents and Defendants.<br><br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No.<br><br>**DECLARATION OF BART E. VERHULST**<br><br>U.S. District Judge:<br>U.S. Magistrate Judge:<br><br>Complaint Filed:<br>Trial Date: |

I, Bart E. Verhulst, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic, Inc. ("CoreCivic") since 2007 and currently hold the position of Vice President of Federal and Local Partnership Relations.

3. Based on eighteen (18) years of negotiating hundreds of contracts and modifications with the Federal Government and the U.S. Immigration and Customs Enforcement (ICE), I am intimately familiar with CoreCivic's process for procuring and maintaining government contracts, including with ICE.

4. I am also familiar with the history of CoreCivic's facility located at 22844 Virginia Boulevard, California City, CA 93505, recently renamed as the California City

Immigration Processing Center, including the history of CoreCivic's contracts and agreements with the Federal Government, including ICE, as well as the previous lease of the facility to the California Department of Corrections and Rehabilitation ("CDCR").[1]

5. I submit this Declaration based upon my personal knowledge, informed by business records of CoreCivic which are known to me, and in support of CoreCivic's Notice of Removal in this matter.

6. CoreCivic is one of the country's largest private prison operators. It currently operates thirty-eight (38) correctional/detention facilities in sixteen (16) states under contracts with local municipalities, states, and the Federal Government. As relevant here, CoreCivic currently houses ICE detainees in nineteen (19) facilities in eleven (11) states under contract with federal and local governmental agencies. CoreCivic currently provides detention services to ICE for approximately fourteen thousand (14,000) detainees.

7. In 1997, CoreCivic, formerly known as Corrections Corporation of America ("CCA") submitted a proposal to the City of California City to construct a private prison, with 2,304 general population beds, as well as a 256-bed segregation unit and a 4-bed medical unit, which was ultimately approved.

8. On January 20, 1998, the City Council of City of California City granted Conditional Use Permit 97-01 to establish and operate the facility. Construction began later that year.

9. On December 1, 1998, the City Council of the City of California City granted Conditional Use Permit Amendment 98-02, which expanded the permitted use of the site by 512 general population beds. That Amendment was extended, and on November 15, 2001, the City Manager/Planning Director clarified that the Amendment extension was "granted indefinitely."

10. In September 2000, the Federal Bureau of Prisons ("BOP") awarded CCA a contract to utilize the California City Correctional Facility under the Criminal Alien

[1] The facility was previously known as the California City Correctional Facility.

Requirement program. The Criminal Alien Requirement sought to obtain housing in privately owned and operated facilities of Criminal Aliens who were serving federally imposed sentences, and who would be subject to removal at the completion of their sentences.

11. On September 28, 2000, the BOP provided CoreCivic with a Notice to Proceed, and the facility began receiving BOP inmates on October 2, 2000.

12. After several extensions, the BOP contract terminated on October 1, 2010.

13. In September 2010, the City of California City entered into a 15-year Intergovernmental Service Agreement ("IGSA") with the Office of the Federal Detention Trustee, which authorized the U.S. Marshals Service and ICE to use 2,532 beds at the California City Correctional Facility, with CCA as the City's Service Provider.

14. Under that IGSA, more than 9,500 ICE detainees were placed at the California City Correctional Facility between 2010 and 2013.

15. In December 2013, CCA began leasing the California City Correctional Facility to CDCR to house sentenced state prisoners.

16. CDCR made full use of the available space at the California City Correctional Facility, and, in January 2019, CDCR housed more than 2,500 state inmates at the California City Correctional Facility.

17. Due to declining state inmate populations, CDCR removed its inmates from the California City Correctional Facility by November 1, 2023, and the lease expired in March 2024.

18. Despite the removal of CDCR inmates and lease termination, CoreCivic continued to maintain the California City Correctional Facility so that it could remain in use. Among other things, CoreCivic maintained staff on-site, marketed, responded to requests for proposals , and engaged in contract negotiations for use of the California City Correctional Facility with potential partners, including ICE.

19. On January 20, 2025, President Trump signed Executive Order 14159, titled "Protecting the American People Against Invasion," which, in part, reversed prior decisions limiting federal contracts for the operation of detention facilities.

20. In April 2025, CoreCivic entered into a letter contract with ICE to utilize all available bed space at the Facility. The contract provided a monthly payment to CoreCivic for the ramp up and preparation of the Facility, and authorized the detention of 512 ICE detainees during the ramp-up period.

21. In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the Facility, and ICE did so on August 27, 2025.

22. In September 2025, ICE formalized the contract for the Facility, authorizing use of up to 2,560 beds at the Facility. The contract calls for services to be provided from April 1, 2025 until August 31, 2027.

23. The operation and structure of the Facility is the same today for ICE detainees as it was for all prior inmate and detainee populations since the Facility opened. Detainees are housed in bunks in the same cells, have access to a medical area, are provided meals prepared in a central kitchen, and have the ability to attend religious services, access a library, go to recreation, and visit with friends, family, and legal counsel, either in person or by video. As with all prior inmate and detainee populations, ICE detainees are escorted by CoreCivic personnel at all times when outside their housing units.

24. ICE detainees at the Facility can attend Immigration Court proceedings by video so that Immigration Court proceedings can be held at the Facility, which will reduce detainee transport needs.

25. CoreCivic expects ICE to continue to use additional space and may fill the Facility in early 2026. At capacity, CoreCivic values the contract at more than $10 million per month, and $130 million per year. During the ramp up period, CoreCivic values the contract at a prorated amount, depending on the ICE detainee population at the facility.

26. CoreCivic has invested over $22 million for, among other things, staffing and equipping the Facility to house civil immigration detainees. In addition to amounts already

incurred, CoreCivic has also committed to spend $5.3 million in incremental capital costs to renovate the physical plant, including conversion of existing program space to Immigration Courtrooms and offices for use by ICE, the Executive Office of Immigration Review, and the Office of the Principal Legal Advisor, and has a monthly run rate of approximately$4.5 million in monthly operating costs to maintain the Facility in its current state with a projection to reach a normalized run rate of approximately $7.5 million in monthly operating costs.

27. These investments would be lost, and CoreCivic's operations and the property would likely need to be shut down entirely, if the continued operation and ramp up of the facility were enjoined.

28. Moreover, CoreCivic's relationship with ICE depends on delivering timely service in the highly competitive field of private immigrant detention at various locations nationwide. Each ICE field office places ICE detainees at numerous facilities under that field office's supervision. These facilities must be geographically diverse to reduce the distance detainees are transported from point of arrest or apprehension. CoreCivic's current ability to admit detainees to the Facility reduces difficulties for ICE's San Francisco Field Office because detainees can be easily transferred to the Facility, which frees up space in smaller facilities located closer to larger population centers. If ICE were unable to utilize the Facility, it would need to transport these detainees more frequently over longer distances to be placed in suitable housing. For these reasons, the Facility is essential to ICE's operations. Enjoining CoreCivic from accepting any more ICE detainees will severely disrupt ICE's ability to discharge its statutory duties and strain CoreCivic's relationship with ICE at this and other locations.

/ / /

/ / /

/ / /

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 1, 2025.

Bart E. Verhulst

# EXHIBIT 2

EXHIBIT 2

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com
sknorr@strucklove.com

Nicholas H. Rasmussen, Bar #285736
Nancy Flores-Castaneda, Bar #357148
McCORMICK, BARSTOW, SHEPPARD,
WAYTE & SMITH, LLP
7647 North Fresno Street
Fresno, CA 93720
Tel: (559) 433-1300
Fax: (559) 433-2300
nrasmussen@mccormickbarstow.com
nancy.flores-castaneda@mccormickbarstow.com

Attorneys for Respondent-Defendant
CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>City of California City and CoreCivic, Inc.,<br><br>Respondents and Defendants.<br><br>—<br><br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF JOHN MALLOY**<br><br>U.S. District Judge: Kirk E. Sherriff<br>U.S. Magistrate Judge: Christopher D. Baker |

I, John Malloy, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic[1] since November 2008, when I was hired as Senior Director, Partnership Development with responsibility for managing CoreCivic's relationships with the states of California, Arizona and Oklahoma, relating to each of those states' respective correctional services agreements with CoreCivic. For the past seven years, I have held the position of Managing Director, Government Relations with a primary focus on CoreCivic's relationships with its local governmental partners.

3. The facts set forth are based on my personal knowledge and/or information and knowledge gained in my capacity as a corporate representative of CoreCivic, including information obtained through discussions with other CoreCivic employees and my review of CoreCivic's corporate records.

4. The California City Correctional Facility ("the facility") is located at 22844 Virginia Boulevard, California City.[2]

5. CoreCivic constructed the facility in the late 1990s and began operating it in 2000 under a contract with the Federal Bureau of Prisons.

6. In September 2010, the City of California City entered into a 15-year Intergovernmental Service Agreement ("IGSA") with the United States Department of Justice, Office of the Federal Detention Trustee to provide an estimated 2,532 federal beds for use by the United States Marshals Service, Bureau of Prisoners, and Immigration and Customs Enforcement, with CoreCivic to be the service provider for those agencies at the facility. Attachment A is a true and correct copy of IGSA ODT-10-0002, which is maintained as a business record of CoreCivic, and reflects the estimated total number of federal beds on page 1.

7. Due to the opening of other facilities and declining population levels at the facility, as well as an acute need by the State of California to reduce overcrowding in its

---

[1] Prior to November 2016, CoreCivic was known as Corrections Corporation of America.

[2] The facility has also been variously known at times as the California City Correctional Center, the California City Immigration Processing Center, and the California City Detention Facility.

facilities, in 2013, the OFDT authorized CoreCivic to pursue the leasing of the entire facility to the California Department of Rehabilitation and Corrections ("CDCR").

8. In 2013, CoreCivic entered into a Lease Agreement with CDCR for the use of the 2,560-bed facility. That lease agreement was subsequently extended several times until it terminated in 2024.

9. Although the facility was not used for federal detention between December 2013 and April 2024, neither the City of California City nor the United States cancelled Agreement ODT-10-0002, and it remained in effect until it terminated in September 2025.

10. Once CoreCivic entered into a letter agreement with ICE in April 2025 and began planning to fully restaff the facility to comply with ICE's requirements, I began to have communications with various City representatives relating to the contract.

11. In early June 2025, City Manager Christopher Lopez requested that we provide tours of the facility for the Mayor, City Council, and various members of the City's Management Team, which I facilitated on June 17, 2025.

12. At the end of July 2025, I was provided an email from then Director of Public Safety, Justin Vincent, in which he was complimentary of the fire life safety inspection he and Deputy Fire Marshal Hightower conducted. Dr. Vincent noted that there were "just three areas" which needed to be addressed prior to "his final inspection and sign-off for the facility." Those issues were limited to: 1) installing "704 placards" which indicate to first responders the location of potentially hazardous materials; 2) placement of keys which first responders may use to access the secure perimeter of the facility in the Knox box; and 3) ensuring that City of California City fire and police department radio communications are possible throughout all locations of the facility. Attachment B is a true and correct copy of my email forwarding Dr. Vincent's report to City Manager Lopez on July 29, 2025, and is a business record of CoreCivic.

13. On July 29, 2025, I received a memorandum from City Manager Lopez regarding the California City Fire Department Inspection. Attachment C is a true and correct copy of this memorandum. In it, the issues raised by the City are limited to the radio issues

of which I was aware, as well as financial concerns of the City related to potentially increased demand for police, fire, and EMS response due to any calls for service to the facility.

14. At Dr. Vincent's suggestion, CoreCivic engaged with the City's recommended contractor, Roger Goodman, to address the radio communications issue. He conducted tests with the City's fire department radios on July 30, 2025 and noted that "the signal is very strong inside the facility." Mr. Goodman confirmed that radio communications were also available with Kern County Communications on existing channels. As a temporary solution, he recommended that first responders change to Kern County channel 5 until a bi-directional amplifier was installed at the facility. Attachment D is a true and correct copy of my July 31, 2025 email to City Manager Lopez forwarding the results of the radio test and is a business record of CoreCivic.

15. In response to follow-up correspondence from the City Manager, Dr. Vincent sent another message on July 31, 2025 noting that once the temporary solution of changing channels in response to public safety call for service at the facility was confirmed to be effective for all fire, police, and ambulance services, he would approve that resolution for 90 days, with the requirement that a permanent solution be provided so that first responders do not have to switch radio channels at the prison when responding to a call for service in the future. He concluded that "the only item from our safety inspection still pending is the communications issue" but directed CoreCivic to remove staff from the facility until the temporary solutions had been confirmed effective for all first responders. Attachment E is a true and correct copy of the email thread containing Dr. Vincent's email response to the City Manager, on which I was copied, as well as my reply, and is a business record of CoreCivic.

16. That same day, I replied that CoreCivic has had productive conversations regarding the need for full dispatch capabilities and expected work to be completed in the very near future. See Attachment E.

17. To effect the temporary radio communications solution, CoreCivic purchased a repeater trailer to boost the radio signal at the facility to Kern County dispatch. On August 5, 2025, I provided notification that permission had been obtained from Kern County for use of the repeater and provided the license authorization to the City Attorney, City Manager, and Dr. Vincent. Attachment F is a true and correct copy of the City Attorney's confirmation of receipt of my message and is a business record of CoreCivic.

18. The temporary radio solution was tested, and on August 7, 2025, I received confirmation from Deputy Fire Marshal Hightower that the temporary radio system was now working, along with Fire Clearance, and was instructed to "contact city hall to obtain your business license." Attachment G is a true and correct copy of the email and attachment I received, which is a business record of CoreCivic.

19. On August 7, 2025, I, along with other CoreCivic personnel, had a meeting at the facility with Acting Director of Public Safety, Lt. Hayes, who confirmed he had verified the radio system was fully functional, but stated there were a few outstanding items for CoreCivic to address relating to potential financial impacts to the City should emergency services be required at the facility. Attachment H is a true and correct copy of Lt. Hayes' email, which accurately reflects our conversations on that day and is a business record of CoreCivic.

20. On August 8, 2025, CoreCivic provided a complete response to the concerns raised in City Manager Lopez's July 29th memorandum. In particular, Daren Swenson, CoreCivic's Senior Vice President and Chief Corrections Officer, confirmed that the radio communications solutions were underway and acknowledged the City's financial concerns. Mr. Swenson confirmed, based upon CoreCivic's considerable experience managing multiple populations for various governmental partners, that the likely need for police response to calls for service is expected to be considerably lower for the ICE population than for prior populations at the facility. Moreover, he noted that since the facility's construction in 1999, there has never been a single instance requiring the California City Fire Department to respond to a call for service at the facility. Finally, Mr. Swenson

explained that the facility's robust medical unit should reduce the need for emergency medical services, but that CoreCivic has contracted with an ambulance service for any emergency medical transports. Mr. Swenson also confirmed CoreCivic's willingness to reimburse the City for any costs related to emergency responses at the facility, whether by police, fire, or EMS. Attachment I is a true and correct copy of this letter, which is a business record of CoreCivic.

21. In addition, on August 8, 2025, CoreCivic's General Counsel, Cole Carter, sent separate correspondence, confirming that CoreCivic would reimburse actual costs incurred by the City for emergency response, indemnify and defend the City, and provide insurance coverage for the City to avoid placing any unnecessary strain on the City's and its agencies' valuable responses. Attachment J is a true and correct copy of this letter, which is business record of CoreCivic.

22. On August 13–14, 2025, I was copied on and exchanged multiple emails with the City's Consultant Planner, Anu Doravari, who noted that she was "coordinating with all City departments to ensure compliance," requested that CoreCivic submit an application for a sign permit, and asked for a copy of CoreCivic's response to City Manager Lopez's July 29, 2025 memorandum. Attachment K is a true and correct copy of that email thread, which included my reply providing the requested documents, and is a business record of CoreCivic.

23. Later on August 14, 2024, I was surprised to receive correspondence from Ms. Doravari stating that she believed SB 29 was applicable to the facility, SB 29 required a Site Plan Review independent of the existing valid Conditional Use Permit for the facility, and that no permit or final project approval would be executed or issued by the City before February 1, 2026. Attachment L is a true and correct copy of this email and is a business record of CoreCivic.

24. Notwithstanding Ms. Doravari's representation that no permit would be approved, executed, or issued before February 1, 2026, a few hours later, the City Building Department transmitted the completed sign permit documents and payment receipt.

Attachment M is a true and correct copy of the email and attachments received by CoreCivic personnel on August 14, 2025, and is a business record of CoreCivic.

25. I made several requests to City Officials for an explanation as to why a new Site Plan Review is required for the facility when CoreCivic is not making any substantive alterations to the property or its use. Since 1999, CoreCivic has maintained the facility and operated it in conjunction with its government partners, including the United States (to house BOP inmates), the City of California City (to house ICE and USMS detainees), and the State of California (to house CDCR inmates). During each of those prior transitions, the City did not request or require any Site Plan Review, despite changes in the identity of the government entity whose inmates or detainees were housed at the facility.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 27, 2025.

John Malloy (Oct 27, 2025 17:02:55 CDT)

John Malloy

# ATTACHMENT A

ATTACHMENT A

| 1. Agreement Number<br>ODT-10-0002 | 2. Effective Date<br>See Block 19. | 3. Facility Code(s) | 4. DUNS Number<br>159734151 |
|---|---|---|---|

| | |
|---|---|
| 5. Issuing Federal Agency<br>U.S. Department of Justice<br>Office of the Federal Detention Trustee<br>4601 N. Fairfax Drive, Suite 910<br>Arlington, Virginia 20530 | 6. Local Government<br>California City<br>21000 Hacienda Ave<br>California City, California 93505<br><br>TAX ID# 62-1806755 |
| 7. Appropriation Data | 8. Local Contact Person<br>Tom Weil, City Manager<br><br>9. Tel: (760) 373-7170<br>Fax: (760) 373-7532<br>Email: citymgr@californiacity.com |

| **Services** | **Number of Federal Beds** | **Per-Diem Rate** |
|---|---|---|
| 10. This agreement is for the housing, safekeeping, and subsistence of federal prisoners, in accordance with content set forth herein. | 11.<br><br>Male: 2,276 Female: 256<br><br>(Estimated Federal Beds) | 12.<br><br>See Page #18 |

| | |
|---|---|
| 13. Optional Guard/Transportation Services:<br><br>☒ Medical Services<br><br>☒ U.S. Courthouse | 14.<br><br>Guard Hour Rate: $53.03<br><br>Mileage shall be reimbursed by the Federal Government at the GSA Federal Travel Regulation Mileage Rate. |
| 15. Local Government Certification<br><br>*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct, this document has been duly authorized by the governing of the Department or Agency and the Department or Agency will comply with all provisions set forth herein.* | 16. Signature of Person Authorized to Sign (Local)<br><br>[signature]<br>Signature<br><br>Tom Weil<br>Name<br><br>City Manager, California City — 07/21/10<br>Title — Date |

| 17. Prisoner and Detainee Type Authorized | 18. Other Authorized Agency User | 19. Signature of Person Authorized to Sign (Federal) |
|---|---|---|
| ☒ Adult Male<br><br>☒ Adult Female<br><br>☐ Juvenile Male<br><br>☐ Juvenile Female<br><br>☐ ICE Detainees | ☒ BOP<br><br>☒ ICE | [signature]<br>Signature<br><br>Scott P. Stermer<br>Name<br><br>Assistant Trustee for Procurement, OFDT — 9/23/10<br>Title — Date |

A.1 Background ........ 3
A.2 Services Required ........ 3
A.2.1 Standard Receiving and Discharge of Prisoners/Detainees ........ 4
A.2.2 Records Management ........ 5
A.2.3 Indemnification ........ 5
A.2.4 Transportation ........ 5
A.2.5 Medical Services ........ 7
A.2.5a Prisoner Rape Elimination Act (PREA) ........ 8
A.2.6 Contacts and Incident Reporting ........ 8
A.2.7 Detainee Work Program ........ 9
A.3 Quality Control Management ........ 10
A.4 Quality Assurance ........ 10
A.4.1 Inspection Clause ........ 11
A.5 Performance Reviews ........ 12
A.6 Performance Ratings ........ 12
A.7 Performance Matrix ........ 13
A.8 Contact for Agreement Administration ........ 17
A.9 Financial Provisions ........ 17
A.9.1 Service Contract Act ........ 17
A.9.2 Price Schedule ........ 18
A.9.3 Invoice and Payment ........ 18
A.10 Modification and Disputes ........ 19
A.11 Termination ........ 19
A.12 Litigation ........ 20
Prisoner Rape Elimination Act Reporting Information ........ 21

## A.1 Background

Federal detention is a large component of criminal and immigration case processing by the U.S. Marshals Service (USMS) and, U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS). Law enforcement initiatives and increases in illegal immigration to the United States have created a complex detention program that the Department of Justice (DOJ) must effectively manage with available detention resources or acquire additional resources to meet increasing demands.

In response to the increasing concern regarding federal detention, the Office of the Federal Detention Trustee (OFDT) was established by a Congressional directive to exercise all power and functions authorized by law relating to the detention of federal prisoners and illegal aliens. Accordingly, OFDT leads the development of DOJ detention policy and manages federal detention resources to maximize available detention space.

Currently, non-federal detention bed space for federal detainees and prisoners is acquired through Intergovernmental Agreements (IGAs), where a daily rate is paid to state and local governments, and facility-specific contracts with private service providers. The Department of Justice Appropriations Act for 2001 (Public Law 106-553) is designed to allow for the use of non-traditional contract vehicles when acquiring detention and other related services. This authority states:

*"Sec. 119 - Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."*

In an effort to operate in the most effective way and receive the maximum benefit of Section 119 to meet the Government's current and future goals, and acquire additional resources, OFDT desires to award an Agreement to California City for detention services at the California City Correctional Center.

## A.2 Services Required

California City will provide, by the terms and conditions identified in this agreement, all necessary personnel, equipment, materials, supplies, and services for the management of comprehensive detention services, which include, but are not limited to, security, medical services, food service, safety, and sanitation. Additionally, the facility shall have sound proof rooms to accommodate video conferencing that permit prisoners and their attorneys to communicate in a secure manner which preserve the confidentiality of the attorney-client relationship.

These comprehensive detention services shall provide for the safe, secure, and humane confinement for male and female population principally consisting of prisoners or

detainees charged with federal offenses' and detained while awaiting trial or sentencing. Services are to be provided at the California City.

Performance shall be in accordance with the most current editions of the Federal Performance-Based Detention Standards (FPBDS), Performance-Based Detention Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement. California City shall maintain American Correctional Association (ACA) and Joint Commission on Accreditation of Healthcare Organizations (JCAHO) accreditation throughout the life of the agreement.

All services and programs shall comply with this Performance Work Statement (PWS): the U.S. Constitution; all applicable federal, state, and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders and Consent Decrees. Should a conflict exist between any of the aforementioned standards, the most stringent shall apply. When a conflict exists and a conclusion cannot be made as to which standard is more stringent, the Contracting Officer (CO) shall determine the appropriate standard. California City shall comply with DOJ and/or USMS regulation, Congressional mandate, federal law or E.O. and all existing California City polices.

California City will:

- Provide a means for verification of their ACA and JCAHO accreditation.
- Operate in full and complete compliance of the Federal Performance-Based Detention Standards as defined. Those standards are available at http://www. justice.gov/ofdt/major-activities.htm
- Operate in full complete compliance with California laws and regulations.
- California City will ensure that all employees and contractors comply with their policies regarding employment suitability and background clearances and that any violations of California City Standards of Conduct are investigated and adjudicated appropriately and promptly.

### A.2.1 Standard Receiving and Discharge of Prisoners/Detainees

California City agrees to accept federal detainees only upon presentation by a law enforcement officer of the Federal Government with proper agency credentials and shall not relocate a federal detainee from one facility under its control to another without the permission of the Federal Government.

California City shall only release federal prisoners/detainees only to law enforcement officers of the Federal Government agency initially committing the detainee (i.e., DEA, ICE, etc.) or to a Deputy United States Marshal (USM). Those detainees who are

remanded to custody by a USM may only be released to a USM or an agent specified by the USM of the Judicial District.

Federal prisoners detainees sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the Federal Government.

### A.2.2 Records Management

All records related to agreement performance should be retained in a retrievable format for the duration of the agreement. Except as otherwise expressly provided in this PWS, California City shall, upon completion or termination of the resulting agreement, transmit to the Government any records related to performance of the agreement.

### A.2.3 Indemnification

California City shall protect, defend, indemnify, save, and hold harmless the United States Government, the DOJ and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of California City, its agents, sub-contractors, employees, assignees, or any one for whom California City may be responsible. California City shall also be liable for any and all costs, expenses, and attorneys' fees incurred as a result of any such claim, demand, and cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government, the DOJ and its employees or agents. California City's liability shall not be limited by any provision or limits of insurance set forth in the resulting agreement.

In awarding this agreement, the Government does not assume any liability to third parties, nor will the Government reimburse California City for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the agreement or any subagreement under this agreement.

California City shall be responsible for all litigation, including the cost of litigation brought against it, its employees or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this agreement and be provided copies of any pleadings filed or said litigation within five (5) working days of receipt of service. California City shall cooperate with government legal staff and/or the United States Attorney regarding any requests pertaining to federal or State litigation.

### A.2.4 Transportation

California City is responsible for the movement/transportation of prisoners designated to the institution as requested in writing by the USMS as specified below. Examples of

circumstances requiring prisoner movement/transportation include, but are not limited to: outside medical care; transfer or movement to/from other Government facilities; and airlift sites. California City's transportation procedures shall ensure staff and prisoner security and safety. California City shall utilize restraint equipment identical to the USMS when one-for-one equipment exchange is required (e.g., airlifts).

Transportation and escort guard services will be performed by at least two (2) armed qualified detention or correctional officer personnel under applicable policies, procedures, and practices. California City agrees to augment such practices as may be requested by the USMS to enhance specific requirement for security, prisoner monitoring, visitation, and contraband control.

California City shall establish procedures for the disposition of prisoner/detainee property/funds upon final transfer from the facility. California City shall establish procedures to allow prisoner/detainee one set of clothes that he/she is wearing at time of final transfer from the facility. California City shall ensure that prisoner/detainee transport clothing provided is properly fitted, climatically suitable, durable and presentable. These procedures shall be approved in writing by the USMS.

Specific services, California City agrees, upon request of the USMS in whose custody a prisoner is held, to provide:

1) Transportation and escort guard services for federal prisoners housed at their facility to and from a medical facility for outpatient care ***(within per-day rate)***;

2) Transportation and stationary guard services for federal prisoners admitted to a medical facility ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

3) Transportation and escort guard services for federal prisoners/detainees housed at the facility are transported to and from the San Diego Courthouse four times a week ***(within per-day rate)***;

4) And, the Justice Prisoner and Alien Transportation (JPATS) airlift site in Victorville, CA ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

5) Transportation and escort guard services for federal prisoners once a week from the California City Correctional Center to the Nevada Southern Detention Center in Pahrump, Nevada ***(within per-day rate)***.

### A.2.5 Medical Services

Provide sufficient on-site medical coverage to accomplish the deliverables listed below while containing costs, with an understanding that California City Correctional Center's proximity to other California facilities allows the medical provider to provide certain coverage, care and relief using staff from nearby institutions.

Specifically, the goal is to provide these services on-site:

- Initial (intake) medical screening of new admissions including administration and reading of PPD tests.
- Health appraisals (physicals) within the 14 day requirement after intake.
- 24 hour/ 7 day basic care to respond to emergent situations and distribute medications.
- Sick call Monday through Friday days.
- Chronic care clinics when needed.

California City is financially responsible for all medical treatment provided to federal detainees within the facility. California City shall provide either through its staff or contractors the full range of medical care required within the facility including dental care, mental health care, pharmaceuticals, and record keeping, as necessary to meet the standards of the JCAHO. California City shall not be responsible for the cost of necessary outside medical care or treatment. The USMS shall be responsible for the cost of necessary outside medical care or treatment.

In the event of an emergency, California City shall proceed immediately with necessary medical treatment. In such event, California City shall notify the USMS Contracting Officer's Technical Representative (COTR) immediately regarding the nature of the federal detainee's illness or injury and type of treatment provided.

The facility shall have in place an adequate infectious disease control program, which includes testing all prisoners at the facility for Tuberculosis (TB) as soon as possible upon intake (not to exceed 14 days) and read within 72 hours. TB testing shall be accomplished in accordance with the latest Center for Disease Control (CDC) Guidelines and the results documented on the federal detainee's medical record. California City shall immediately notify the USMS of any cases of suspected or active TB so that any scheduled transports or production can be delayed until a physician verifies the federal detainee's TB status. (Refer to USMS Directive: 9.4 Prisoner Health - Prisoner Airborne Pathogen Control)

When a federal detainee is being transferred and/or released from the facility, he will be provided with seven (7) days of prescription medication which will be dispensed from the detention facility. When possible, generic medications should be prescribed. Medical records must travel with the federal detainee.

If the records are maintained at a medical contractor's facility, it is the detention facility's responsibility to obtain them before a federal detainee is moved.

### A.2.5a Prisoner Rape Elimination Act (PREA)

The facility is required to post the Prisoner Rape Elimination Act (PREA) brochure/bulletin in each housing unit of the facility. All prisoners or detainees have a right to be safe and free from sexual harassment and sexual assaults. The facility shall include the PREA information in their handbooks and orientations at the California City (Refer to Attachment: Prisoner Rape Elimination Act Information).

## A.2.6 Contacts and Incident Reporting

Policy and procedures shall be developed which ensure a positive relationship is maintained with all levels of the federal judiciary. California City's procedures shall ensure a tracking system is established which mandates that all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and California City responses, specifically related to a detainee, shall be made part of the detainee's file.

California City shall notify the COTR (with copy to the CO) when a member of the United States Congress or the media requests information or requests to visit the facility. California City shall coordinate all public information related issues with the COTR. All press statements and releases shall be cleared, in advance, with the COTR.

California City, their employees, agents, or sub-contractors shall not release any information regarding the facility population, security level, personal identifiers, or medical issues to anyone outside the USMS without express permission of the CO, COTR, or their designee. Any inquiries regarding any inmate or other matter related to the contract shall immediately be referred to the USMS. California City shall immediately notify the USMS of any incident where they believe information was released by their employee, agent, or sub-contractor related to a USMS' matter. California City shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the DOJ in any public presentations they make or articles they write that relate to any aspect of contract performance or the facility operations.

California City shall immediately report all criminal activity related to the performance of this contract to the USMS, who shall contact the appropriate law enforcement investigative agency. California City shall immediately report all serious incidents to the COTR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, sexual assault/abuse, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force, assaults on staff/detainees resulting in

injuries that require medical attention (does not include routine medical evaluation after the incident); fires; full or partial lockdown of the facility; escape; any security breaches; weapons discharge; suicide attempts; deaths; hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; significant environmental problems that impact the facility operations; transportation accidents if a detainee is in the vehicle.

California City shall provide a safe, secure, and humane environment for alleged victims of sexual assaults and detainees undergoing mental health treatment for sexual assault.

The Government may investigate any incident pertaining to performance of this contract. California City shall cooperate with the Government on all such investigations.

### A.2.7 Detainee Work Program

Detainee labor shall be used in accordance with the detainee work plan developed by California City and approved by the USMS. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service or other jobs. The USMS detainees may not be required to work. USMS detainees may volunteer to work within the secure confines of the contract facility if they sign a waiver of their right not to work. USMS detainees with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state or federal agencies will not be considered for the volunteer program. USMS detainees are not permitted to act as Trustees and they may not work in positions that permit unsupervised contact with segregated prisoners or detainees of the opposite sex. USMS detainees are restricted from operating equipment that may expose the prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens or other inmates. USMS detainees will not have access to prisoner or employee records. In addition, the State will ensure that detainees who volunteer to work are denied access to prescription medications. USMS detainees must obtain required medical clearances before working in the food service areas. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations. Detainees shall not be used to perform the responsibilities or duties of an employee of California City. Appropriate safety/protective clothing and equipment shall be provided to detainee workers as appropriate. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands.

Volunteer prisoner/detainee workers can be paid the identical rates of pay as other California City inmates.

USMS prisoner/detainees shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in

privileges may be used as incentives to ensure that USMS' detainees keep their living areas clean (FPBDS Services and Programs Section – G.3 & G.4.).

### A.3 Quality Control Management

California City is responsible for management and quality control actions necessary to meet the quality standards set forth in this agreement. In compliance with the FAR Clause 52.246-4, Inspection of Services-Fixed Price, California City must provide a Quality Control Plan (QCP) to the CO no later than 60 days after award.

The plan must include:

1) A description of the methods to be used for identifying and preventing defects in the quality of service performed;

2) A description of the records to be kept to document inspections and corrective or preventive actions taken;

3) Records of inspection that must be kept and made available to the Contracting Officer, when requested, through the agreement performance period and for the period after agreement completion until final settlement of any claims under this agreement.

### A.4 Quality Assurance

The Government quality assurance (QA) is comprised of the various functions, including inspection, performed by the Government to determine whether a provider has fulfilled its agreement obligations pertaining to quality. The Government's QA program is not a substitute for quality control by the provider.

Each phase of the services rendered under this agreement is subject to Government inspection both during California City's operations and after completion of the tasks. When California City is advised of any unsatisfactory condition(s), California City shall submit a written report to the CO addressing corrective/preventive actions taken. The COTR may check California City's performance and document any non-compliance, but only the CO may take formal action against California City for unsatisfactory performance.

The COTR will be designated subsequent to agreement award and a delegation of COTR duties and authority will be furnished to California City. The Government may reduce California City's invoice or otherwise withhold payment for any individual item of nonconforming service observed as specified in Contractor's Failure to Perform Required Services. The Government may apply various inspection and extrapolation techniques to determine the quality of service and the total payment due.

### A.4.1 Inspection Clause

**Failure to Perform Required Services**

The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this solicitation. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the contractor's invoice shall reflect the contract's reduced value resulting from the contractor's failure to perform required services. The contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

This agreement incorporates FAR clause 52.246-4 Inspection of Services—Fixed-Price:

INSPECTION OF SERVICES—FIXED-PRICE (AUG 1996)

(a) Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform to contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the Government may—

(1) Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and

(2) Reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may –

(1) By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

(2) Terminate the contract for default.

(End of clause)

## A.5 Performance Reviews

In accordance with the Federal Acquisition Regulations (FAR), subpart 37.601 Performance-based Acquisition, the Government must have a method of assessing contractor performance against performance standards. Further, the agreement provides procedures for reductions to the price of a fixed-price agreement when services are not performed or do not meet agreement requirements. This Performance Summary establishes the performance level required by the Government to meet the agreement requirements.

The following methods of surveillance may be used in the assessments of agreement performance:

A) **Systematic**: These reviews will be scheduled inspections focusing on a specific discipline. Assessments may be performed by Government monitors or by other parties designated by the Government.

B) **Ad-Hoc**: These reviews will be conducted as a result of special interests arising from routine monitoring of the contractor's quality control system an unusual occurrence pertaining to the agreement or other Government concerns.

## A.6 Performance Ratings

The service requirements are divided into various disciplines, each of which has a number of key functions. Successful performance of a key function is essential for successful performance of the related discipline. Each discipline comprises a specific percentage of the overall agreement requirement. Reductions in agreement price will be based on these percentages applied to the overall monthly invoice.

At the conclusion of any review, a report will be written and an adjectival rating of contractor performance within each discipline will be assigned. The following rating system will be used:

Excellent: The program conforms to the FPBDS in an exceptional manner and conformance is maintained with exceptional internal controls. Policies and procedures for achieving the program standards are documented and adequate for the mission of the facility; the policies and procedures are communicated to staff; the policies and procedures are fully implemented; and the desired outcome is achieved. Level of performance in the aggregate exceeds the minimum performance standard by substantial margin; deficiencies are nonexistent or extremely minor.

Good: The program conforms to the FPBDS in an acceptable manner. Internal controls limit procedural deficiencies. The facility more than accomplishes the requirements of program standards. Level of performance in the aggregate meets the performance standard; deficiencies are minor and offset by outstanding elements of performance within the review guideline.

Acceptable: The program is meeting the requirements of the FPBDS. There are no breakdowns that would keep the program from continuing to accomplish the mission of the facility. Level of performance in the aggregate meets the performance standards; deficiencies are minor and there are no outstanding elements of performance present within the review guideline.

Deficient: The program is unable to meet the requirements of one or more of the FPBDS. Internal controls are weak, resulting in serious deficiencies in one or more areas. The level of performance in the aggregate fails to meet the performance standards: deficiencies are pervasive.

At-Risk: Operation of the program is impaired to the point that the facility is unable to accomplish its mission. The program is unable to meet the requirements of the FPBDS and is unlikely to meet those requirements in the foreseeable future without substantial corrective action. The level of performance in the aggregate fails to meet the performance standards: deficiencies require immediate corrective actions.

## A.7 Performance Matrix

This Performance Matrix serves to communicate what the Government intends to qualitatively inspect. The matrix identifies:

A. Each service requirement and the key functions essential to successful performance of each agreement requirement;

B. Define the minimum performance rating acceptable for each agreement requirement; and

C. Specify the maximum percentage of total agreement value attributable to each agreement requirement.

**Administration and Management**

*Objective* - Addresses policy development and monitoring; internal quality control; maintenance of detainee records, funds, and property; admission and orientation procedures; detainee release; and accommodations for the disabled.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (A.1) | Policy Development and Monitoring |
| (A.2) (K.1) | Internal Inspections and/or Reviews |
| (A.3) | Detainee Records |
| (A.4) | Admission and Orientation |
| (A.5) (K.2) | Personal Property and Monies |
| (A.6) (K.3) | Detainee Release |
| (A.7) | Accommodations for the Disabled |

**Health Care**

*Objective* - Addresses the policies and procedures for administering quality health care by licensed personnel; maintaining accurate health information data; timely health screening, treatment, program intervention and follow-up of all cases; access to routine, acute chronic, and emergency health services, response to medical, mental and dental health needs of detainees; suicide prevention; infectious disease; hunger strikes; and detainee death.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (B.1) | Intake Health Screening |
| (B.2) (K.4) | Medical, Dental, and Mental Health Appraisals |
| (B.3) (K.5) | Access to Routine, Acute Chronic, and Emergency Health Services |
| (B.4) | Experimental Research |
| (B.5) | Response to Medical, Mental, and Dental Health Needs |
| (B.6) | Suicide Prevention |
| (B.7) | Detainee Hunger Strikes |
| (B.8) | Detainee Death |
| (B.9) | Informed Consent/Involuntary Treatment |
| (B.10) | Infectious Disease |

**Security and Control**

*Objective* - Addresses the issuance of policies and procedures to staff; appropriate use of force; maintenance of daily incident logs; emergency readiness; and detainee accountability and discipline.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (C.1)(K.6) | Post Orders |
| (C.2) | Permanent Logs |
| (C.3) (K.7) | Security Features |
| (C.4) (K.8) | Security Inspections and/or reviews |
| (C.5) | Control of Contraband |
| (C.6) | Detainee Searches |
| (C.7) | Detainee Accountability and Supervision |
| (C.8) | Use of Force |
| (C.9) | Non-routine Use of Restraints |
| (C.10) | Tool & Equipment Control |
| (C.11) | Weapons Control |
| (C.12) | Detainee Discipline |
| (C.13) | Supervision for Special Housing |
| (C.14)(K.9) | Contingency/Emergency Plan |

**Food Service**
*Objective* - Address basic sanitation procedures and the adequacy of meals provided to detainees.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (D.1) (K.10) | Sanitation Requirements |
| (D.2) (K.11) | Ensure Meals are Varied |
| (D.3) | Special Diets |

**Staff and Detainee Communication**
*Objective* - Address opportunities for detainees to communicate with staff; detainee grievance procedures; and the provision of diversity training.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (E.1) (K.12) | Staff-Detainee Communication |
| (E.2) | Diversity Training |
| (E.3)(K.13) | Detainee Grievances |

**Safety and Sanitation**
*Objective* - Addresses the adequacy of fire safety programs; the control of dangerous materials and/or hazards; air quality, noise levels, and sanitation of the facility; and the cleanliness of clothing and bedding.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (F.1) | Fire Safety |
| (F.2) | Non-Hazardous Furnishings |

| | |
|---|---|
| (F.3) | Control of Dangerous Materials |
| (F.4) | Environmental Control |
| (F.5) (K.14) | Clothing and Bedding |
| (F.6) | Personal Hygiene/Well-being |
| (F.7) (K.15) | Physical Facility and Equipment |

**Services and Programs**
*Objective* - Addresses detainee classification; religious practices; work assignments; availability of exercise opportunities; access to legal materials and legal representation; access to a telephone; visitation privileges; and the handling of detainee mail and correspondence.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (G.1) (K.16) | Classification, Review, and Housing |
| (G.2) (K.17) | Religious Practices |
| (G.3) | Volunteer Work Assignments |
| (G.4) | Work Assignments and Security |
| (G.5) | Exercise and Out-of-Cell Opportunities |
| (G.6) | Legal Materials |
| (G.7) (K.18) | Legal Representation |
| (G.8) | Telephone Access |
| (G.9) | Visitation Privileges |
| (G.10)(K.19) | Detainee Mail and Correspondence |

**Workforce Integrity**
*Objective* - Address the adequacy of the facility's hiring process and background check procedures, and the adequacy of procedures to respond to allegations of staff misconduct.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (H.1) | Staff Background and Reference Checks |
| (H.2) | Staff Training, Licensing, and Credentialing |
| (H.3) | Staff Misconduct |

**Detainee Discrimination**
*Objective* – Address the adequacy of policies and procedures designed to prevent discrimination against detainees based on gender, race, religion, national origin, or disability.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (I.1) | Discrimination Prevention |

### A.8 Contact for Agreement Administration

California City shall designate a person to serve as the agreement administrator for the requirement. The agreement administrator is responsible for overall compliance with agreement terms and conditions. California City designation of representatives to handle certain functions under this agreement does not relieve the agreement administrator of responsibility for agreement compliance.

| | |
|---|---|
| **Name** | **Tom Weil** |
| **Title** | California City City Manager |
| **Address** | 21000 Hacienda Avenue<br>California City, California |
| **Zip Code** | 93505 |
| **Telephone** | (760) 373-7170 |
| **FAX** | (760) 373-7532 |
| **E-Mail Address** | citymgr@californiacity.com |

### A.9 Financial Provisions

#### A.9.1 Service Contract Act

This Agreement incorporates the following clause by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at this address: www.arnet.gov.

Federal Acquisition Regulation Clause(s):

52.222-41 Service Contract Act of 1965, as Amended (July 2005)

52.222-42 Statement of Equivalent Rates for Federal Hires (May 1989)

52.222-43 Fair Labor Standards Act and the Service Contract Act - Price Adjustment (Multiyear and Option Contracts) (May 1989)

The current State of California City, California wage rates shall be the prevailing wages unless notified by the Federal Government.

### A.9.2 Price Schedule

The Federal Government will use various price analysis techniques and procedures to ensure the per-diem rate established by this Agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

1. Comparison of the requested per-diem rate with the independent government estimate for detention services, otherwise known has the Core Rate;
2. Comparison with per-diem rates at other state or local facilities of similar size and economic conditions;
3. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items;
4. Evaluation of the provided jail operating expense information;

The firm-fixed per-diem rate for services is $77.50, and shall not be subject to adjustment on the basis of California City actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of the Agreement forward for 36 months. The per-diem rate covers the support of one federal detainee per "federal detainee day", which shall include the day of arrival, but not the day of departure.

After 36 months, if a rate adjustment is desired, the Local Government shall submit a request through the Electronic Intergovernmental Agreements area of the Detention Services Network (DSNetwork). All information pertaining to the jail on DSNetwork will be required before a new per-diem rate can be considered.

### A.9.3 Invoice and Payment

California City shall prepare and submit for certification and payment, original and separate invoices each month to the USMS Southern District of California. To constitute a proper monthly invoice, the name and address of the facility, the name of each federal detainee, *his* specific dates of confinement, the total days to be paid, the appropriate per diem rate, and the total amount billed (total days multiplied by the rate per day) shall be listed, along with the name, title, complete address and telephone number of the official responsible for invoice preparation. The invoice shall be submitted to the COTR at the address listed below must include:

- Name and address of California City;
- Invoice date and number;
- Agreement number;

- Description, quantity, unit of measure, unit price and extended price of the services provided;
- Terms of any discount for prompt payment offered;
- Name and address of official to whom payment is to be sent;
- Name, title, and phone number of person to notify in event of defective invoice; and
- Taxpayer Identification Number; and
- Electronic funds transfer banking information in accordance with FAR 52.232-33. Payment by Electronic Funds TransferCCentral Contractor Registration.

The invoice shall be sent to:

USMS Southern District of California

Address: Edward J. Schwartz Courthouse
U.S. District Court
Southern District of CA
940 Front Street
San Diego, CA 92101-8900

The Government will make payments to California City on a monthly basis, promptly pursuant to the Prompt Payment Act after receipt of an appropriate invoice.

### A.10 Modification and Disputes

Either party may initiate a request for modification to this Agreement in writing. All modifications negotiated will be effective only upon written approval of both parties.

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

### A.11 Termination

This Agreement shall terminate after fifteen (15) calendar years or by either party upon one-hundred and eighty days (180) advanced written notice to the other party. Within 180 days of the giving, or receipt, of such notice the USMS shall retake custody of all prisoners(s) transferred to the California City under this Agreement. The City of California City agrees to consult with the USMS and OFDT at least 90-days prior to any action(s) to terminate to allow sufficient time to prepare for loss and replacement of services.

### A.12 Litigation

The Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and/or the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

# Prisoner Rape Elimination Act Reporting Information

## SEXUAL ASSAULT AWARENESS

This document is requested to be posted in each Housing Unit Bulletin Board at all Contract Detention Facilities. This document may be used and adapted by Intergovernmental Service Agreement Providers.

While detained by the Department of Justice, United States Marshals Service, you have a right to be safe and free from sexual harassment and sexual assaults.

## Definitions

### A. Detainee-on-Detainee Sexual Abuse/Assault

One or more detainees engaging in or attempting to engage in a sexual act with another detainee or the use of **threats, intimidation, inappropriate touching** or other actions and/or communications by0 one or more detainees aimed at **coercing and/or pressuring** another detainee to engage in a sexual act.

### B. Staff-on-Detainee Sexual Abuse/Assault

Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. **Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by DOJ policy and the law.**

### C. Staff Sexual Misconduct is:

Sexual behavior between a staff member and detainee which can include, but is not limited to indecent, profane or abusive language or gestures and inappropriate visual surveillance of detainees.

## Prohibited Acts

A detainee, who engages in inappropriate sexual behavior with or directs it at others, can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy.

- **Using Abusive or Obscene Language**
- **Sexual Assault**
- **Making a Sexual Proposal**
- **Indecent Exposure**
- **Engaging in Sex Act**

## Detention as a Safe Environment

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity. Regardless of your sexual orientation, you have the right to be safe from unwanted sexual advances and acts.

## Confidentiality

Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the detainee-victim's welfare and for law enforcement investigative purposes.

## Report All Assaults!

If you become a victim of a sexual assault, you should report it immediately to any staff person you trust, to include housing officers, chaplains, medical staff, supervisors or Deputy U.S. Marshals. Staff members keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. If you are not comfortable reporting the assault to staff, you have other options:

- Write a letter reporting the sexual misconduct to the person in charge or the United States Marshal. To ensure confidentiality, use special (Legal) mail procedures.
- File an Emergency Detainee Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the Field Office Director. You can get the forms from your housing unit officer, or a facility supervisor.
- Write to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC 20530
- Call, **at no expense to you,** the Office of Inspector General (OIG). The phone number is 1-800-869-4499.

**Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported.**

A publication of the Office of the
Federal Detention Trustee
Washington, DC

Published February 2008

# ATTACHMENT B

ATTACHMENT B

**From:** "Malloy, John"
**Sent:** 07/29/2025 2:58:23 PM (-07:00)
**To:** "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** Fw: Fire inspection update- prison

---

**From:** Justin Vincent <jvincent@calcityfire.us>
**Sent:** Monday, July 21, 2025 12:55 PM
**To:** Welton, Brandon <brandon.welton@corecivic.com>
**Cc:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Fire inspection update- prison

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Mr. Welton- Safety Manager at Core Civic

Thank you very much for your incredible attention to detail and your thorough explanation of the safety measures that have been taken at the prison facility. Today's walkthrough with Deputy Fire Marshal Hightower was very successful in many facets. First, she was able to finalize the open fire alarm system permit, that has been open since 2022. This finalization will be updated in the building department's permit system today. She was also able to identify that most of the fire life safety concerns have been addressed by Core Civic. She was very appreciative of your professionalism and impressed with the progress you made.

There are just three areas that need to be addressed, prior to my visit for a final inspection and sign-off for the facility. One, the facility needs to have the "704 placards" that were discussed with you, installed by the time of the final sign-off visit. Second, the applicable Knox box keys shall be in the Knox box by the time of the final inspection and sign-off. Lastly, Core Civic will need to ensure that fire department and police department radio communications are possible throughout the entire facility. I suggest that you contact our radio contractor, Roger at 661 Communications, to have him address the radio dead zones in your facility. You may need to install a bi-directional amplifier to ensure that the fire department and police department maintain radio communications in the prison during an emergency response. Once these three items are completed, I will come do a final walkthrough and sign-off the fire life safety permitting for the facility.

Radio Contact:

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

Dr. Justin Vincent, DPA
Director of Public Safety
Chief of Police & Fire Chief
City of California City
JVincent@calcityfire.us

Station: 760-373-4841
Cell: 760-808-7546

# ATTACHMENT C

ATTACHMENT C

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**

Michael Hurles
Ronald Smith
**COUNCIL MEMBERS**

Christopher Lopez
**CITY MANAGER**

To: John Molloy, CoreCivic

From: Christopher Lopez, City Manager, City of California City

Date: July 29, 2025

Re: California City Fire Department Inspection of 22844Virgina Blvd. on July 22, 2025

As you know, I am the City Manager for the City of California City (City). This letter is being sent as the City has substantial concerns related to the re-opening of the facility at 22844 Virginia Blvd. As detailed further below, the facility does not comply with applicable codes and the operation of the facility does or will pose a serious and imminent threat to the health and safety of the community of California City, City's emergency personnel, future detainees, those employed at the facility and visitors.

Unless and until CoreCivic can demonstrate that it complies with all applicable codes and can operate in a manner that is safe for the community of California City, the City's emergency personnel and those employed or detained at the facility, the facility cannot legally operate in the City.

The City's concerns related to the operation of facility include:

1. Emergency Communications Operations are insufficient (described in detail below regarding the Fire Code).
2. Increased demand upon the City in responding to Penal Code violations or other violations and investigation demands that will require a California City Police Department (CCPD) response.
3. Increase demand upon the City in responding to fires at the facility by the California City Fire Department (CCFD).
4. Increase demand upon other emergency personnel, including paramedics/ambulances, in responding to medical emergencies.

Fire Code Requirements:

As you are aware, on July 22, 2025, CCFD conducted an inspection, including a radio test, at the CoreCivic facility. As you are further aware, there is a substantial number of individuals

expected to be present at the facility. This factor was considered while CCFD conducted the fire life safety inspection.

During the inspection some serious concerns were identified by CCFD. And, while the Director of Public Safety hoped that CoreCivic could address the issues with a one hundred and twenty (120) day extension, it has been determined that is not possible due to the significant threats to the general public's health and safety, those who are or will be present at the facility including detainees, CoreCivic's employees, contractors, visitors and first responders.

It should be noted, after the inspection, the City conducted further research, deliberation, and analysis of the hazards and it has been determined that risks to the public's health and safety are of such significance that the City cannot permit or otherwise allow for the operation of the facility at this time and in its current condition.

By way of background, the City of California City has adopted the California State Fire Code (see California City Municipal Code (CCMC) section 4-1.101 adopting the State Fire Code as adopted by the California Building Standards Commission). With the facility being privately owned and located within the City limits, the California City Fire Department is the authority having jurisdiction for fire life safety and enforcement of Chapter 11 of the Fire Code. Chapter 11 governs *Construction Requirements for Existing Buildings* which addresses the issue of two-way emergency response communications for existing buildings. More specifically, Fire Code section 1103.2 addresses emergency responder communications capability in the existing facility as follows:

1103.2 Emergency responder communications enhancement in existing buildings.

> Existing buildings other than Group R-3 that do not have approved in-building emergency response communications enhancement for emergency responders in the building based on existing coverage levels of the public safety communication systems, shall be equipped with such coverage according to one of the following:
>
> 1. Where an existing wired communication system cannot be repaired or is being replaced, or where not approved in accordance with Section 510.1, Exception 1.
> 2. Within a time frame established by the adopting authority.
>
> Exception: Where it is determined by the fire code official that the in-building emergency responder communications enhancement system is not needed.

According to the City's Director of Public Safety, pursuant to the Building and Fire Code, this large building is classified as an I-3 occupancy. Further, the Director of Public Safety has determined (as further detailed below) that based on the existing coverage levels of the public safety communications system, the facility does not have an approved in-building emergency responder communications enhancement system in the building. That is, based on the determination of the Director of Public Safety, the current emergency communications system at the facility is not sufficient to meet the emergency communication needs of the facility, first responders or the City.

During the July 22, 2025 inspection, the Director of Public Safety conducted a basic radio test utilizing a fire department portable radio in multiple locations throughout the facility and determined that the building construction did not conform to this section of the Fire Code.

Specifically, the rooms that house the building's fire panel, the mechanics shop which houses multiple flammable and combustible liquids, multiple IT server rooms, and multiple cells did not have an ability to transmit radio signals to first responders in an emergency as required by the Fire Code.

With an inability to communicate, emergency responders would not be able to radio transmit a "mayday" or "firefighter down" call from multiple critical locations in the facility, nor would law enforcement officers be capable of calling for backup in an emergency. Studies have consistently demonstrated a strong link between communication failures and firefighter fatalities. Research by the National Institute for Occupational Safety and Health (NIOSH) and the National Fire Protection Association (NFPA) highlights how ineffective communication on the fireground can contribute to line-of-duty deaths.

As such, CoreCivic must demonstrate the emergency communications at the facility meet the requirements of the Fire Code and Director of Public Safety and that CoreCivic has taken all steps necessary to ensure the public's safety, the safety of emergency responders and all those who are or will be present at the facility.

Conclusion:

Based upon the information available at this time, the City has determined that the facility is not safe to and cannot be operated in the City. More specifically, the California City Fire Department has determined that the facility should not be occupied and utilized for business purposes, until such time that the facility has an approved in-building emergency responder communications enhancement system in the building (that is, fire, police, sheriff, and ambulance radio transmissions will need to be fully operational and capable throughout the entire facility).

The City's main priority is to ensure the safety of both the public, first responders and those present at the facility. As such, at this time, the City is requesting that CoreCivic and its employees, contractors, staff, and others vacate the premises until such time that the Director of Public Safety has inspected and approved the improvements needed to ensure the safety of personnel during a potential emergency response.

Please note, any additional code violations, safety concerns or other issues may be later communicated to CoreCivic as information becomes available and further inspections are conducted including any inspections necessary related to CoreCivic's expected application for a business license.

For further questions, comments, or concerns regarding this letter, please feel free to reach out to Justin Vincent, Director of Public Safety.

Respectfully,

Christopher Lopez

Christopher Lopez
City Manager
City of California City

# ATTACHMENT D

ATTACHMENT D

**From:** "Malloy, John"
**Sent:** 07/31/2025 9:17:33 AM (-07:00)
**To:** "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** FW: XKE SE channel

Please see the below response.

**From:** Roger Goodman
**Sent:** Wednesday, July 30, 2025 11:33:53 PM
**To:** tom.kessler@corecivic.com <tom.kessler@corecivic.com>; Public Safety <chief@californiacity-ca.gov>
**Subject:** XKE SE channel

Chief,
We did test all over the facility, medical, jail cells, fire panel rooms, IT rack rooms, laundry room, dry goods, kitchen area, and hallways in between.
I had one CoreCivic go around with a 450 radio, and I did a 150 radio, we talked and did 5 counts. The signal is very strong inside the facility.
Afterwards we did a few radio checks on Kern 1 and they copied clear and I heard them clearly as well. I changed the radio to Kern 5. According to Kern County Communications they dispatch everyone on 1 and roll to 5 to keep traffic clear on 1 for other incoming calls.
So, the procedure is if you come onsite Kern should dispatch you to 5 if you go in the facility. Until the BDA is done then Kern 1 and 5 should work as well as Kern SO, and CCPD 1.
I'm happy to answer any questions regarding this but you should be okay inside the building on XKE SE channel for police or fire to dispatch from Kern 5.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

# ATTACHMENT E

ATTACHMENT E

**From:** "Malloy, John"
**Sent:** 07/31/2025 6:01:08 PM (-07:00)
**To:** "Justin Vincent" <jvincent@calcityfire.us>; "Christopher Lopez" <clopez@californiacity-ca.gov>
**Cc:** "Kristy Hightower" <khightower@calcityfire.us>
**Subject:** Re: CoreCivic Facility

We've had productive conversations with Chief Vincent on the need for dispatch capabilities for the Police and Hall ambulance and have already started work on this effort. That work is expected to be completed as soon as this Saturday. Once completed, we will work with Roger Goodman from 661 Communications to test the equipment to ensure that all communications are clear at the facility and that the individual dispatch capabilities are working. As requested, we will have Mr. Goodman report back to Chief Vincent once we have confirmation that the system is operational for fire, police, and ambulance. At that time, it is our expectation that we will have addressed all concerns related to radio communications at the facility and therefore our business license would be issued. We understand that this solution is acceptable for 90 days and have already started the process for the more permanent solution.

Please let me know if you have any questions.

Get Outlook for iOS
**From:** Justin Vincent <jvincent@calcityfire.us>
**Sent:** Thursday, July 31, 2025 11:18 AM
**To:** Christopher Lopez <clopez@californiacity-ca.gov>
**Cc:** Malloy, John <John.Malloy@corecivic.com>; Kristy Hightower <khightower@calcityfire.us>
**Subject:** Re: CoreCivic Facility

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

All,

Thank you for the forum for correspondence. As far as public safety is concerned in regards to only the radio communications issue, there is a temporary solution that would require all first responders to change channels when at the prison to speak. This is acceptable as a temporary 90-day solution once it is confirmed that it is operational for fire, police, and ambulance

After speaking to Roger Goodman this morning, it appears that it is operational capable for Fire but not yet set up for PD dispatch or Hall ambulance services. Once this temporary solution is fixed and confirmed, I will draft a policy for the PD and FD on switching radio channels at the prison for the next 90 days.

This will meet the minimum requirement on a temporary basis. Core Civic will need to complete the permanent solution within 90 days so that first responders do not have to switch radio channels when responding to the facility. Once we have a confirmation that all first responders can talk safely on the temporary solution, I will draft an official letter to the City Manager stating as such.

The fire and pd do not issue a business license. Those are issued from City Hall and are dependent on all city departments signing off on their respective responsibilities. The fire department has completed its inspection, and the only item from our safety inspection still pending is the communications issue. The other very real

concerns noted in the City Managers letter about staffing and response capabilities should be directed to the City Manager as he has overall control of budget and staffing for the city.

Lastly, the issue of people being in the building remains valid. Placing hundreds of staff in a building that does not meet the fire code is a risk to staff and first responders. The cart was placed before the horse and for safety purposes, CoreCivic needs to step back and remove the staff from the unsafe environment until communications have been established. Thank you all again for the forum to discuss these safety matters.
Sincerely,

Dr. Justin Vincent

**Dr. Justin Vincent, DPA**
Director of Public Safety
*Chief of Police & Fire Chief*
City of California City
JVincent@calcityfire.us
Station: 760-373-4841
Cell: 760-808-7546

On Jul 31, 2025, at 10:58 AM, Christopher Lopez <clopez@californiacity-ca.gov> wrote:

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Good morning Justin and John,

I have sent separate correspondence to Justin Vincent, the Director of Public Safety, and Kristi Hightower, Deputy Fire Marshal so that everyone is on the same page.

The communications regarding the improvements to the facility based on the City's safety concerns are to flow to the Director of Public Safety, who is tasked with this responsibility. I received an email from Justin Vincent directing CoreCivic to my office, but that is not how this will be conducted. Justin is not to direct CoreCivic to my office, as it is Justin's responsibility to ensure public safety items are addressed. For the record, and to be clear, the City Manager's Office will not override any recommendations or requirements put in place by the Director of Public Safety.

I am directing Justin and Kristy to formalize all correspondence with CoreCivic via email so that there is a clear record of all communications.

Thank you.

Christopher Lopez
City Manager
City of California City

# ATTACHMENT F

ATTACHMENT F

**From:** "Ponto, Victor M." <VPonto@bwslaw.com>
**Sent:** 08/05/2025 2:34:16 PM (-07:00)
**To:** "Malloy, John" <John.Malloy@corecivic.com>; "Christopher Lopez" <clopez@californiacity-ca.gov>; "Lopez, Christy M." <CLopez@bwslaw.com>; "Justin Vincent" <jvincent@calcityfire.us>
**Subject:** Re: Kern County FCC License and Approval
**Attachments:** 5175724202575177999.pdf

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Received and copied to the appropriate team
Sent from my iPhone

On Aug 5, 2025, at 2:30 PM, Malloy, John <John.Malloy@corecivic.com> wrote:

[EXTERNAL]

---

Please find the attached FCC license for the XKE repeater we are using to boost the radio signal at the facility to Kern County dispatch. Please note that Kern County Radio License Group is the holder of the license, signifying their approval of this solution (with our address listed 22844 Virginia Blvd as the location of the repeater on page two). This license is good through 11/1/2025 which is in line with the technology solution discussed with the City and County.

Please let me know if you have any questions.

Get Outlook for iOS

REFERENCE COPY

This is not an official FCC license. It is a record of public information contained in the FCC's licensing database on the date that this reference copy was generated. In cases where FCC rules require the presentation, posting, or display of an FCC license, this document may not be used in place of an official FCC license.

# Federal Communications Commission

## Public Safety and Homeland Security Bureau

## RADIO STATION AUTHORIZATION

LICENSEE: KERN, COUNTY OF

ATTN: RADIO LICENSE GROUP
KERN, COUNTY OF
2601 PANORAMA DR., BLDG. A
BAKERSFIELD, CA 93306-1013

| Call Sign | File Number |
|---|---|
| WSJJ774 | 0011669211 |

**Radio Service**
PW - Public Safety Pool, Conventional

**Regulatory Status**
PMRS

**Frequency Coordination Number**
46PWAP75026489

**FCC Registration Number (FRN):** 0004514535

| Grant Date | Effective Date | Expiration Date | Print Date |
|---|---|---|---|
| 08-01-2025 | 08-01-2025 | 11-01-2025 | 08-02-2025 |

## STATION TECHNICAL SPECIFICATIONS

**Fixed Location Address or Mobile Area of Operation**

**Loc. 1** **Area of operation**
Operating within a 5.0 km radius around 35-09-10.8 N, 117-51-31.8 W, CALIFORNIA CITY, KERN county, CA

**Antennas**

| Loc No. | Ant No. | Frequencies (MHz) | Sta. Cls. | No. Units | No. Pagers | Emission Designator | Output Power (watts) | ERP (watts) | Ant. Ht./Tp meters | Ant. AAT meters | Construct Deadline Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 000154.75500000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 120.000 | | | |
| 1 | 1 | 000460.20000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 100.000 | | | |

**Conditions:**
Pursuant to §309(h) of the Communications Act of 1934, as amended, 47 U.S.C. §309(h), this license is subject to the following conditions: This license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized herein. Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended. See 47 U.S.C. § 310(d). This license is subject in terms to the right of use or control conferred by §706 of the Communications Act of 1934, as amended. See 47 U.S.C. §606.

**Licensee Name:** KERN, COUNTY OF

**Call Sign:** WSJJ774 **File Number:** 0011669211 **Print Date:** 08-02-2025

**Antennas**

| Loc No. | Ant No. | Frequencies (MHz) | Sta. Cls. | No. Units | No. Pagers | Emission Designator | Output Power (watts) | ERP (watts) | Ant. Ht./Tp meters | Ant. AAT meters | Construct Deadline Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 000453.75000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 90.000 | 200.000 | | | |
| 1 | 1 | 000151.10000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 150.000 | | | |

---

**Control Points**

**Control Pt. No. 1**

**Address:** 22844 VIRGINIA BLVD

**City:** CALIFORNIA CITY **County:** KERN **State:** CA **Telephone Number:** (760)246-7600

---

**Associated Call Signs**

WSL679, KCI548

---

<NA>

---

**Waivers/Conditions:**

Special Temporary Authority is authorized on a secondary non-interference basis.

Antenna structures for land, base and fixed stations authorized for operation at temporary unspecified locations may be erected without specific prior approval of the Commission where such antenna structures do not exceed a height of 60.96 meters (200 feet) above ground level; provided that the overall height of such antennas more than 6.10 meters (20 feet) above ground, including their supporting structures (whether natural formation or man-made), do not exceed any of the slope ratios set forth in Section 17.7(b). Any antenna to be erected in excess of the foregoing limitations requires prior Commission approval. Licensees seeking such approval should file application for modification of license. In addition, notification to the Federal Aviation Administration is required whenever the antenna will exceed 60.96 meters (200 feet) above the ground and whenever notification is otherwise required by Section 17.7 of the Commission's Rules. Such notification should be given by filing FAA Form 7460-1, Notice of Proposed Construction or Alteration, in duplicate, with the nearest office of the Federal Aviation Administration, which form is available from that office.

**Licensee Name:** KERN, COUNTY OF

**Call Sign:** WSJJ774 **File Number:** 0011669211 **Print Date:** 08-02-2025

This Special Temporary Authorization may be terminated at the Bureau's discretion, without a hearing, if conditions warrant. Under no circumstances may the facility(ies) authorized herein become a hazard to air navigation or violate the terms of an international agreement or treaty. If an application for permanent authority is on file with the Commission, this action is taken without prejudice to that application. Post and/or retain a copy of this authorization as required by the Commission's Rules.

# ATTACHMENT G

ATTACHMENT G

STATE OF CALIFORNIA – FORESTRY AND FIRE PROTECTION



# FIRE SAFETY INSPECTION REQUEST

STD. 850 (REV. 10/2019)

***See Instructions on reverse.***

| AGENCY CONTACT'S NAME | TELEPHONE NUMBER | REQUEST DATE | PROGRAM |
|---|---|---|---|
| Daughenbaugh, Shawn | (615) 854-0464 | 5/30/2025 | |
| EVALUATOR'S NAME | REQUESTING AGENCY FACILITY NUMBER | | REQUEST CODE 1B |

LICENSING AGENCY NAME AND ADDRESS

**CODES**

1. ORIGINAL — A. FIRE CLEARANCE
2. RENEWAL — B. LIFE SAFETY
3. CAPACITY CHANGE
4. OWNERSHIP CHANGE
5. ADDRESS CHANGE
6. NAME CHANGE
7. OTHER

| AMBULATORY | | NONAMBULATORY | | BEDRIDDEN | | TOTAL CAPACITY |
|---|---|---|---|---|---|---|
| CAPACITY | PREVIOUS CAPACITY | CAPACITY | PREVIOUS CAPACITY | CAPACITY | PREVIOUS CAPACITY | |
| 2480 | N/A | 7 | N/A | N/A | N/A | 2,487 |

| | |
|---|---|
| FACILITY NAME: California City Immagration Processing Center | LICENSE CATEGORY: |
| STREET ADDRESS *(Actual Location)*: 22844 Virginia Blvd | NUMBER OF BUILDINGS: 9 |
| CITY: California City | RESTRAINT: |
| FACILITY CONTACT PERSON'S NAME: Christopher Chestnut; FACILITY CONTACT PERSON'S TELEPHONE NUMBER: (229) 315-7861 | HOURS: 24 |

SPECIAL CONDITIONS

Detention Facility: The nonambulatory beds listed are medical observation beds. They could house nonambulatriy detainees.

**TO BE COMPLETED BY INSPECTING AUTHORITY**

CLEARANCE /DENIAL CODE: 1

FIRE AUTHORITY NAME AND ADDRESS

California City Fire Department
20890 Hacienda Blvd.
California City CA, 93505

**CODES**

1. FIRE CLEARANCE GRANTED
2. FIRE CLEARANCE DENIED
   - A. EXITS
   - B. CONSTRUCTION
   - C. FIRE ALARM
   - D. SPRINKLERS
   - E. HOUSEKEEPING
   - F. SPECIAL HAZARD
   - G. OTHER

| INSPECTOR'S NAME *(Typed or Printed)* | TELEPHONE NUMBER | CFIRS NUMBER | OCCUPANCY CLASS |
|---|---|---|---|
| Kristy Hightower | 760-373-4841 | 10565 | I-3 |

| INSPECTION DATE | INSPECTOR'S SIGNATURE *(Typed or Printed)* |
|---|---|
| 7-21-25 | [signature] |

EXPLAIN DENIAL OR LIST SPECIAL CONDITIONS

ATTACHMENT H

ATTACHMENT H

# ATTACHMENT I

ATTACHMENT I

CoreCivic

Daren Swenson
*Senior Vice President and Chief Corrections Officer*

August 8, 2025

VIA EMAIL
Christopher Lopez, City Manager
clopez@californiacity-ca.gov
City of California City
21000 Hacienda Boulevard
California City, CA 93505

**RE: California City, CA July 29, 2025, Memorandum**

Dear Mr. Lopez,

CoreCivic appreciates the opportunity to address the issues outlined in the city's July 29th memo that stems from the city's fire inspection conducted on July 22, 2025. That letter addressed 4 main concerns: one related to radio communication issues inside the facility and three items that are interrelated, specifically the potential of increased demand on the Police Department and the Fire Department as well as other emergency personnel like paramedics and ambulance services.

On the radio communication issue, we have worked collaboratively with Roger Goodman with 661 Communications on both a temporary and permanent fix which has already been approved by the city. We very much appreciate the collaboration that occurred to solve this issue, and we concur that having effective radio communication at the facility is imperative to a safe and secure facility operation.

We also understand the issues raised about the potential impact the facility's operation could have on the limited resources within California City. CoreCivic has partnered with the U.S. Immigration and Customs Enforcement (ICE) since 1983, and we have a long track record of success managing detainees for the federal government. In fact, the company currently houses over 13,000 non-citizens across 18 facilities nationwide. This vast experience has allowed us to implement policies and procedures that significantly reduce the need for local law enforcement and emergency response at our facilities housing ICE detainees. These policies and procedures are further explained in our numbered responses at the end of this letter.

While we are confident that the need for local police, fire and emergency services will be low, we understand that when those calls do take place, they result in costs. Because of this, we commit to fully reimburse the city for any costs incurred responding to any incident at the facility. Furthermore, we will fully indemnify and hold harmless the city of California City against any claims, suits or judgements that arise as a result of the activation and operation of the facility. Further details on cost reimbursement and indemnification have been included in a separate correspondence from our General Counsel, Cole Carter.

1. Emergency Communications Operations are insufficient (described in detail below regarding the Fire Code).

*We appreciate the city approving the plan to provide appropriate Emergency Communications Operations as referenced in the email from Shannon Hayes August 7, 2025.*

2. Increased demands upon the city in response to Penal code violations or other violations and investigation demands that will require California City Police Department (CCPD) response.

*Immigration and Customs Enforcement (ICE) detention is a civil process, not a criminal one, and is used to ensure individuals appear for immigration hearings and asylum proceedings or to facilitate their removal from the United States. ICE detainees are measurably less demanding on investigative resources than inmates serving criminal sentences.*

*Albeit rare, the most common demand for investigative resources involves requests to investigate allegations of sexual assault. The CoreCivic 14-2-DHS Sexual Abuse Prevention and Response in Immigration Detention Facilities policy provides CoreCivic operated facilities with procedures for complying with the Prison Rape Elimination Act (PREA) of 2003, Department of Homeland Security (DHS) Standards to Prevent Detect and Respond to Sexual Abuse and Assault in Confinement Facilities (79 Fed. Reg. 13100 March 7, 2014), and the Immigration and Customs Enforcement (ICE) 2025 National Detention Standards.*

*In accordance with the aforementioned statutes, policies, and standards, any allegations of sexual abuse that may constitute criminal conduct must be promptly reported to a law enforcement agency authorized to conduct such investigations. CoreCivic endeavors to establish a written Memorandum of Understanding (MOU) with an external investigating agency, delineating the respective roles and responsibilities of both the facility and the investigative entity in conducting sexual abuse investigations. The capacity of law enforcement agencies to investigate these incidents is dependent on their available resources.*

*Criminal investigative referrals remain relatively infrequent. For instance, CoreCivic's Otay Mesa Detention Center (OMDC) in San Diego, CA, averages approximately two investigative requests per month related to PREA allegations. It is important to note that the OMDC population comprises a significant number of U.S. Marshals Service inmates. By contrast, the California City ICE Processing Center (CCIPC) will exclusively house ICE detainees.*

*If CCPD responds to investigate these allegations, such requests are expected to be uncommon and would depend on available resources. In the event that CCPD does not have the resources to investigate, CoreCivic staff work with ICE staff to conduct an administrative investigation.*

*Should internal disturbances occur, CCIPC would not request assistance from CCPD. CCIPC would deploy its Critical Incident Response Team (CIRT), whose members are trained to manage such events. For major incidents, the Special Operation Response Team (SORT) — comprised of 38 specially trained staff from Nevada Southern Detention Center and Otay Mesa Detention Center—can respond within four hours.*

*Public Safety Director Vincent of California City expressed concerns regarding the California City Police Department's (CCPD) ability to respond effectively to potential protests. California's Law Enforcement Mutual Aid System is designed to support local agencies in maintaining order during emergencies—including incidents of civil unrest—as well as other extraordinary events or catastrophic disasters. As an integral part of the Standardized Emergency Management System (SEMS), the Mutual Aid System operates across four organizational levels: cities, counties, regions, and the State.*

*Fundamentally, the system facilitates mutual assistance among neighboring law enforcement agencies within an operational area. When an incident exceeds the resources available at the county level, regional agencies provide the necessary support. If regional resources remain insufficient, the Regional Coordinator will contact the Cal OES Law Enforcement Branch to coordinate further resource allocation.*

3. Increased demands upon the city in responding to fires at the facility by the California City Fire Department (CCFD).

*CoreCivic's California City facility, built in 1999, is equipped with fire detection and suppression systems. On July 21, 2025, Kristy Hightower of the CCFD completed a fire inspection on CCIPC and fire clearance was granted.*

*Since CoreCivic has operated the facility, there have been no recorded incidents requiring CCFD to respond to a fire at the site. While we do not anticipate any increased demands on CCFD, CoreCivic is committed to reimbursing the city for any costs related to any emergency response at the facility. Additionally, we do conduct emergency response drills with first responders and local law enforcement to streamline emergency response services and strengthen community partnerships.*

4. Increased demands by other personnel, including paramedics/ambulances, in responding to medical emergencies.

*CCIPC has a robust medical unit that is staffed by Physicians, Psychiatrists, Nurse Practitioners, Dentists, RNs, and LPNs, all providing medical care inside of the facility, which greatly reduces the need to transport detainees by ambulance outside for medical care. This medical unit is staffed 24 hours a day, seven days a week, with a physician on call 24 hours a day. Once operational, the facility will be accredited by the National Commission on Correctional Health Care (NCCHC), which is an independent, non-profit organization that provides oversight of correctional facilities across the country, both public and private. NCCHC accreditation requires health service standards and includes audits to ensure compliance. In total, the facility will have over 70 medical personnel providing health care services to the population on a daily basis.*

*We have coordinated with Hall Ambulance to provide medical transportation in the event a detainee needs to be transported outside of the facility for medical care. CoreCivic transportation staff accompany all outside ambulance transports, providing security detail for any hospital stay. All ambulance transport costs, as well as the costs of providing security, are paid by CoreCivic. There will be no cost to Hall ambulance or the city for any emergency service calls.*

In closing, we very much appreciate the opportunity to address the concerns raised in your July 29th letter and we trust our response here has alleviated those concerns. Should you have any further questions or wish to discuss them further, please do not hesitate to reach out to me or my team. We are proud of our longstanding partnership with the city and we look forward to continued collaboration in the years to come.

Sincerely,

Daren Swenson
Senior Vice President and Chief Corrections Officer

cc: Victor Ponto, City Attorney
California City, CA

Lieutenant Shannon Hayes, Acting Director of Public Safety
California City, CA

# ATTACHMENT J

ATTACHMENT J

CoreCivic
General Counsel

August 8, 2025

Christopher Lopez, City Manager
City of California City
21000 Hacienda Blvd
California City, CA 93505

Subject: Public Safety and Emergency Response

Dear Sir:

On behalf of CoreCivic, I am writing to present our firm commitment to ensuring that the activation and operation of the California City Immigration Processing Center (the "Facility") will not place unnecessary strain on the valuable resources of California City and its agencies. We recognize the importance of a cooperative relationship with the City and wish to set forth the following offers of indemnification, defense, cost reimbursement, and insurance coverage:

**Indemnification and Defense**

CoreCivic offers to indemnify, defend, and hold harmless the City of California City, as well as its officers and employees, from any liability and all claims, suits, judgments, and damages to the extent such claims, suits, judgments, or damages arise as a result of CoreCivic's acts and/or omissions in the activation, or operation of the Facility.

**Reimbursement of Public Safety Costs**

To further support the City, CoreCivic offers that, in the event of an incident at the Facility involving (i) a death from other than natural causes, (ii) a loss of control affecting a housing, recreational, medical, or general activity area, or (iii) the serious bodily injury of a member of the public, and to the extent such an incident requires the response of City public safety personnel for safety or emergency services, CoreCivic will reimburse the actual costs incurred by the City due to such response.

**Insurance Provisions**

CoreCivic also offers to name the City, together with its agents, employees, and representatives, as an additional insured on its general liability policy. A copy of the declaration page of the policy evidencing this coverage will be provided to the City for your records and assurance.

We trust these commitments address any concerns regarding the Facility's impact on City resources and stand as a testament to CoreCivic's dedication to responsible partnership. Should you require any clarification or wish to discuss these provisions further, please do not hesitate to contact us.

Thank you for your attention and collaboration.

Sincerely,

Cole Carter, CAO and General Counsel

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@struckove.com
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

Dignity Not Detention Coalition and JOHN DOE,

Petitioners and Plaintiffs,

v.

City of California City and CoreCivic, Inc.,

Respondents and Defendants.

---

CORECIVIC, INC.,

Real Party in Interest.

Case No. 1:25-cv-01292-KES-CDB

**DECLARATION OF MARCELO ARIOLA**

U.S. District Judge: Kirk E. Sherriff
U.S. Magistrate Judge: Christopher D. Baker

I, Marcelo Ariola, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic[1] since April 2007, when I was hired as Senior Director of Site Acquisition. I became Managing Director of Project Development in 2012. As Managing Director of Project Development, I was responsible for leading a team which provided financial analysis, land development oversight, due diligence,

[1] Until November 2016, CoreCivic was known as Corrections Corporation of America ("CCA").

entitlements, operational systems improvements, and pre-construction services (including planning and ensuring zoning compliance), as well as fostering governmental relations for all projects. In January 2025, I assumed my current position of Vice President, Real Estate. In that new role, I continue to discharge my prior responsibilities relating to Project Development but also assumed responsibility of oversight and management of facility maintenance at all CoreCivic-owned facilities.

3. The facts set forth are based on my personal knowledge and/or information obtained in my capacity as a corporate representative of CoreCivic, including information obtained through discussions with other CoreCivic employees and my review of CoreCivic's corporate records.

4. The CoreCivic facility ("the facility") is located at 22844 Virginia Boulevard, California City. It is at the terminus of Virgina Boulevard and south of Twenty Mule Team Parkway.

5. In 1993, the then California Department of Corrections ("CDCR") commenced an Environmental Impact Report ("EIR") (State Clearinghouse Number 93082030) evaluating the environmental effects resulting from construction and operation of a CDCR prison facility on one of two properties located in California City, which included the current site of the facility. Specifically, the CDCR Final EIR addressed a new 2,200-bed prison or up to a 4,400-bed prison complex, and an associated wastewater treatment facility on an adjacent 160-acre parcel.

6. While that report was completed and certified by CDCR in August 1994, due to funding constraints, CDCR chose not to proceed with development of a prison facility in California City.

7. In 1997, CoreCivic's predecessor, CCA, proposed the construction and operation of a medium security facility in California City, which would occupy approximately 70 acres of a site approximately five miles from downtown California City. The proposal specified that the facility would have 2,304 general population beds, and

consistent with federal facility requirements, also include an additional 260 beds over design capacity, for special uses including Restrictive Housing and medical housing.

8. Pursuant to the California Environmental uality Act ("CE A") guidelines (Section 15163), the City of California City, as lead agency, elected to prepare a supplement to the CDCR Environmental Impact Report and incorporated the original report.

9. The City of California City issued a Notice of Preparation for an EIR Supplement on September 11, 1997. The Draft EIR was completed and circulated for review beginning on October 24, 1997, and comments were prepared and included in the Final EIR Supplement in January 1998 (State Clearinghouse Number 97091045).

10. On January 20, 1998, the City Council of City of California City adopted Resolution No. 01-98-1801, Making Certain Environmental Findings and Adopting a Statement of Overriding Considerations in Connection with the Corrections Corporation of America Prison. Attachment A is a true and correct copy of that resolution, which is maintained as a business record of CoreCivic.

11. As noted in Attachment A, the most significant environmental impacts tend to arise during the construction phase of the facility, rather than during the operations of a completed facility.

12. At a duly noticed public hearing on January 15, 1998, the City of California City Planning Commission recommended granting Conditional Use Permit ("CUP") 97-01 for the proposed facility. The City Council granted CUP 97-01 on January 20, 1998. Attachment B is a true and correct copy of Resolution No. 01-98-1902, A Resolution of the City Council Granting Conditional Use Permit 97-01 Prison Facility, which is maintained as a business record of CoreCivic.

13. CUP 97-01 contained a provision stating that it expired twelve months from January 20, 1998 (the date of the City Council's Approval) if the prison facility operation was not commenced and diligently pursued.

14. In June 1998, CoreCivic diligently pursued the prison facility operation by acquiring the 320-acre site originally contemplated by CDCR and considered by the City.

Attachment C is a true and correct copy of the Deed for the property, which is maintained as a business record of CoreCivic.

15. Following the acquisition of the property by CoreCivic, the site was subdivided into three parcels. Parcel 1 is approximately 70 acres at the northwest corner of the property and is the site of the facility. Parcel 2 is approximately 35 acres and is directly south of Parcel 1. Parcel 3 is comprised of approximately 215 acres to the east and south of Parcel 1.

16. Completing the requirement to commence and diligently pursue facility operation, construction of the facility began later in 1998.

17. Based upon the final configuration of the site when construction began, in 1998 CoreCivic applied to the City of California City to amend CUP 97-01 and construct two additional 256-bed housing units on the site. A Mitigation Monitoring Plan was approved and adopted by the City on December 1, 1998, and CUP Amendment 98-02 approving the 512-bed expansion of the facility was issued that same date. After an initial extension, in November 2001 the City extended the time for CUP Amendment 98-02 "indefinitely." Attachment D is a true and correct copy of records relating to the issuance and extension of CUP Amendment 98-02, which are maintained as business records of CoreCivic.

18. Construction of the facility was completed, and in 2000 CoreCivic began to receive Federal Bureau of Prisons inmates at the facility.

19. At no point did the City of California City ever revoke, rescind, or cancel either CUP 97-01 or CUP Amendment 98-02.

20. In 2006, CoreCivic submitted a proposal to the City for construction of a second 2,200-bed facility on the southern 35-acre parcel. The December 2009 Addendum to the Final Subsequent Environmental Impact Report, noted that this proposed second 2,200-bed facility would not have significant operational impacts relating to traffic, air quality, noise, or other factors required for consideration under the California Environmental uality Act. Attachment E is a true and correct copy of the December 2009

Addendum to the Final Subsequent EIR, which is maintained as a business record of CoreCivic.

21. On December 22, 2009, the City of California City Planning Commission approved CUP 09-04 for the construction and operation of a 2,200-bed facility on that parcel. Attachment F is a true and correct copy of the City of California City Planning Commission Resolution No. 12-09-2990PC to Approve Conditional Use Permit 09-04, which is maintained as a business record of CoreCivic, and does not contain any expiration date.

22. In December 2013, CDCR entered into a lease agreement for the facility. The lease agreement permitted CDCR to utilize up to 2,560 beds at the facility but required CDCR to request permission from CoreCivic if they were to have more than 2,560 inmates assigned to the facility.

23. On May 27, 2014, the City Manager for California City confirmed to both CDCR and CoreCivic that a land use review had been completed and provided authorization and full permitting for use of 2,560 beds at the facility. Attachment G is a true and correct copy of the May 27, 2014 letter from City Manager Tom Weil and is maintained as a business record of CoreCivic.

24. As part of the CDCR lease agreement, significant upgrades related to ADA compliance were made to the facility in two phases. Attachment H is a true and correct copy of the Certificate of Occupancy issued by the Office of the State Fire Marshal for Phase 1 on May 29, 2014, which is maintained as a business record of CoreCivic. Attachment I is a true and correct copy of the Certificate of Occupancy issued by the Office of the State Fire Marshal for Phase 2 on December 11, 2014, which is maintained as a business record of CoreCivic.

25. Notably, the Office of the State Fire Marshal noted on the Certificates of Occupancy that the occupancy classification of the facility under CCR Title 24 (2013 Edition) was "I-3." "I-3" is an Occupancy Classification under the California Building Code, formerly known as Institutional Group 3, which includes "buildings or portions of

buildings and structures that are inhabited by one or more persons who are under restraint or security and are generally incapable of self-preservation due to security measures not under the occupants' control which includes persons restrained." The California Building Code notes that this group "shall include, the following: Correctional Centers Detention centers Jails Prisons Temporary holding facility." *See* Attachment J, 2022 California Building Code, Title 24, Part 2, Section 308.4 (emphasis added).

26. On August 18, 2014, the Office of the State Fire Marshal completed and issued its Final Inspection Report and grant of occupancy for the ADA renovations. Attachment K is a true and correct copy of that Inspection Report, which is maintained as a business record of CoreCivic.

27. In 2016, at the request of CDCR, construction of three additional structures for use as administrative office space outside of the secure southern perimeter of the facility began. Those spaces were completed, and the California City Building Department issued a Certificate of Occupancy for the administrative buildings on January 31, 2017. Attachment L is a true and correct copy of the Certificate of Occupancy for the administrative structures, which is maintained as a business record of CoreCivic.

28. Beginning in 2017, CoreCivic began to explore proposed development of the eastern 215-acre parcel to construct two 1,512-bed correctional centers. An application for CUP 20-02 was opened with the City, and the notice of Availability of a Draft Environmental Impact Report (State Clearinghouse No. 2017121069) was issued by the City on May 21, 2021. However, because this separate project was placed on "pause" by CoreCivic, CUP 20-02 has not been approved and remains pending.

29. Despite the expiration of the lease of the existing facility to CDCR in 2024, CoreCivic never "shuttered" the facility or discontinued its use as an Institutional Group I-3 facility.

30. CoreCivic has consistently utilized and maintained its property for use as an Institutional Group I-3 facility since its completion. It has no intent, and never had any

intent, to discontinue or abandon the property or to change the use or occupancy classification of the facility.

31. CoreCivic has always employed individuals to provide nearly around-the-clock operations and maintenance at the property, seven days a week.

32. Attachment M is a true and correct copy of the Kern County Assessor Record's Property Detail Report for the facility, which is available at: https://www.kerncounty.com/government/departments/assessor-recorder/property/assessor-property-search. Of note, the Assessor assigned the facility Use Code 1716 – Detention Facility/Prison.

33. Specifically, while continuing to proactively market the facility, CoreCivic applied to the City of California City and was issued Plumbing Permit No. 21170 on January 7, 2025 for waterline repairs. Similarly, the City issued permit number 20989 on January 15, 2025 for repairs to the facility roof.

34. In addition, the City issued Plumbing Permit No. 21309 on May 14, 2025 to remodel a handicapped shower stall for ADA compliance.

35. Each of those three permits expires one year from the date of issue. The permitted work has been completed for all three permits, and the only outstanding item is the final inspection by the City. None of these permits is a major or significant repair or renovation which requires the issuance of a new Certificate of Occupancy, as confirmed to me by the Building Department on August 14, 2025. Attachment N is a true and correct copy of an email I received from the City of California City Building Department on August 14, 2025 confirming that these permits do not require a new Certificate of Occupancy.

36. On July 14, 2025, I became aware that the City was requiring CoreCivic to submit a Site Plan Review Application Form for the facility.

37. Because there has been no change in use and the Institutional Group I-3 Occupancy Classification of the facility has never changed, there is no need to undertake a Site Plan Review. A Site Plan Review is usually required for a different use which requires

a change in the Occupancy Classification, such as reuse of a warehouse space into a restaurant.

38. I had numerous telephone calls with Joe Barragan, the City's Public Works Director, regarding the City's request that CoreCivic submit a Site Plan Review. He agreed that the City had most of the documents already and noted that CoreCivic was only required to make minimal additional submissions, consisting mainly of ADA Compliance certificates and studies. He represented that this was simply a ministerial review, which would be quickly completed after the fees were paid.

39. As specified by Mr. Barragan, CoreCivic submitted the Site Plan Review Minor application, which I signed on July 22, 2025, along with a letter from me regarding the ADA requirements, a Disabled Accessibility Certification completed after the renovations requested by CDCR in 2014, and some other potentially relevant documents. Attachment O is a true and correct copy of that submission, which is a business record of CoreCivic.

40. On July 23, 2025, CoreCivic received confirmation that it had paid the City's 250.00 fee for the Site Plan Review. Attachment P is a true and correct copy of that email confirmation and attached receipt, which are business records of CoreCivic.

41. On the morning of July 24, 2025, I participated in a meeting involving former Public Safety Director Justin Vincent, who had raised some concerns relating to emergency radio communications observed during his inspection of the facility on July 21, 2025. Specifically, Director Vincent reported that a portable fire department radio did not receive an adequate signal in a few of the locations he tested throughout the facility.

42. At Director Vincent's suggestion, CoreCivic engaged the City's radio consultant to obtain and install a mobile repeater trailer to extend the radio signal range.

43. On July 24, 2025, I received confirmation from the City that the ADA Certification we submitted was sufficient and CoreCivic was not required to remit payment for a building inspection. Attachment is a true and correct copy of that email communication and is a business record of CoreCivic.

44. A few hours later, I received a second email communication from Public Works Director Barragan, stating that only the fire inspection remained to be completed before CoreCivic's business license would issue. Attachment R is a true and correct copy of that email communication and is a business record of CoreCivic.

45. On August 7, 2025, CoreCivic received confirmation from Deputy Fire Marshal Hightower that the temporary radio system, which included the repeater trailer acquired by CoreCivic at a cost of more than 75,000, had been tested and approved. Ms. Hightower further instructed that CoreCivic would have 90 days to install a permanent solution to boost radio signals in the facility.

46. CoreCivic engaged Berk-Tel Communications to install an Emergency Responder Radio System in the facility. Plans were submitted to Deputy Fire Marshal Hightower on August 19, 2025, and after submission of a permit to the Fire Department and payment of a 1,000 plan review fee, the permit was issued by the Fire Department. The City also stated that an additional commercial electrical permit would be required for the installation of the permanent system. Attachment S is a true and correct copy of an email thread I was copied on during the period from August 19–21, 2025 regarding the permitting for the permanent radio solution and is a business record of CoreCivic.

47. Eventually, the commercial electrical permit was issued, and the permanent radio solution was installed with final testing scheduled for Tuesday, October 14, 2025. Attachment T is a true and correct copy of the email thread I was copied on during the period from August 19 to October 8, 2025, confirming the schedule for the inspection and testing and is a business record of CoreCivic.

48. The City Fire Department, in conjunction with Kern County Communications, confirmed that the permanent radio Emergency Responder Radio System, which CoreCivic installed at a cost of nearly 700,000, was fully operational on October 14, 2025.

49. The facility at issue was, and has been at all times, constructed and operated pursuant to CUP 97-01 and CUP Amendment 98-02, for an Occupancy Classification

Institutional Group I-3 facility. While the identity of the government partner utilizing the facility has changed several times since 2000, from a zoning and permitting standpoint, the classification and use of the 70-acre site at issue have not changed.

50. Aside from the permitted ADA upgrades requested by CDCR which were completed in 2014 and the construction of additional administrative office space outside of the secure perimeter of the facility, but still on the 70-acre site, CoreCivic has not undertaken any major renovations or modifications of the facility requiring further amendment of the CUP, which remains valid and effective for an Occupancy Classification Institutional Group I-3 facility.

51. CoreCivic has also obtained CUP 09-04 for construction of a separate 2,200-bed facility on the southern 35-acre site, which is separate and distinct from the facility at issue in this lawsuit, and also has a pending CUP 20-02 for construction of a separate and distinct 3,324-bed correctional complex on the eastern 215-acre site. Neither of these permits or applications, however, are relevant to the facility currently being utilized by Immigration and Customs Enforcement.

52. Although no CE A study is required to continue using the existing facility for its intended use, the fact that two additional proposed facilities with a combined capacity of 5,500-beds have been studied extensively on the site with no findings of significant adverse environmental impact further demonstrates that the continued use of the existing facility, merely by a different government partner, will not have any significant adverse environmental impact.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 25, 2025.

Marcelo Ariola

Marcelo Ariola

# ATTACHMENT A

ATTACHMENT A

ORIGINAL

# RESOLUTION NO. 01-98-1801

## A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS AND ADOPTING A STATEMENT OF OVERRIDING CONSIDERATIONS IN CONNECTION WITH THE CORRECTIONS CORPORATION OF AMERICA PRISON

WHEREAS, Corrections Corporation of America (CCA) has filed various applications with the City requesting approval to construct a 2,304-inmate capacity prison and related utility improvements (the "Project"); and

WHEREAS, the Planning Department has determined an Environmental Impact Report (EIR) Supplement be prepared pursuant to the California Environmental Quality Act (CEQA) to determine the individual and cumulative environmental impacts associated with the Project; and

WHEREAS, the Draft EIR Supplement was prepared by RUST Environment and Infrastructure under contract to the City and under the supervision of the Planning Department, and circulated for review from October 24, 1997 to December 9, 1998; and

WHEREAS, responses to comments were prepared and included in the Final EIR Supplement; and

WHEREAS, the Planning Commission considered and approved an application for a conditional use permit at a duly noticed public hearing on January 15, 1998;

NOW THEREFORE BE IT RESOLVED by the City Council of the City of California City as follows:

# SECTION 1

# INTRODUCTION

## 1. PRELIMINARY

CCA will develop a 2,304 bed prison on a 320 acre property in California City, Kern County. The Project will accommodate medium security inmates. The City was the Lead Agency for the preparation of an Environmental Impact Report (EIR) Supplement in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources Code §§ 21000 et seq.) and the CEQA Guidelines ( California Administrative Code §§ 15000 et seq., as amended).

Because the EIR Supplement identified significant effects which may occur as a result of the Project, City adopts these findings as part of the approval of the CCA Project. In adopting this Statement of Findings, the City approves the construction of the CCA Prison at California City on a 320 acre property known as the Virginia Boulevard site.

Section 1 of these findings provides an introduction and description of the proposed Project and the certification of the Final EIR Supplement. Section 2 discusses potential environmental effects considered to have no significant impacts and require no mitigation. Section 3 discusses potential environmental effects which are not significant or which have been mitigated to a level that is less than significant. Section 4 discusses the significant unavoidable environmental effects of the Project, which cannot be feasibly mitigated to a level that is less than significant. Section 5 discusses Project alternatives. Section 6 discusses changes in mitigation measures and recirculation. Section 7 discusses the Mitigation Monitoring Plan. Section 8 presents the Statement of Overriding considerations. Section 9 presents a Section 21092.1 finding regarding independent judgment.

## 2. DESCRIPTION OF THE APPROVED PROJECT

The site is located at the terminus of Virginia Boulevard, approximately one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The site encompasses 320 acres of vacant terrain comprised of, and surrounded by, natural desert environment.

Approximately 70 acres of the proposed prison site will be developed for the prison facility and support uses.

The 2,304 bed prison will accommodate 2,304 inmates at 100 percent design bed capacity, and meet the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.
- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates.
- Provide excellent long term employment and career opportunities for surrounding communities.

## 3. CERTIFICATION

The Planning Department has reviewed the Final EIR Supplement for the proposed Project and has considered the public record on the Project, including without limitation the following:

- Record of Public Hearing on the Final Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, on January 15, 1998, before the Planning Commission.
- Final Environmental Impact Report Supplement, January, 1998.
- Responses to Comments on the Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, 1997 (Volume II).
- Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, October 1997.

The custodian of the documents and other materials which constitute the record upon which these findings are based is the Planning Department. The record is available for public review at the City of California City, 2100 Hacienda Boulevard, California City, California, 93505.

**Finding**

Based upon complete review of the record, the Planning Commission certifies that the Final EIR Supplement is adequate and has been completed in compliance with CEQA.

## SECTION 2

## POTENTIAL ENVIRONMENTAL EFFECTS CONSIDERED TO HAVE NO SIGNIFICANT IMPACTS AND REQUIRE NO MITIGATION MEASURES

**Finding**

The EIR Supplement identified thresholds of significance and evaluated environmental impacts for the following issues. The EIR Supplement determined that these environmental impacts did not cross

the thresholds of significance for these issues. Therefore, no mitigation measures are required for these issues.

Land Use, Employment, Population and Housing, Hospitals, Judicial Services, Law Enforcement, Fire Protection, Wastewater Treatment and Disposal, Solid Waste Disposal, Energy, Telephone and Cable.

## SECTION 3

## POTENTIAL ENVIRONMENTAL EFFECTS WHICH ARE NOT SIGNIFICANT OR WHICH HAVE BEEN MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. PUBLIC UTILITIES AND COMMUNITY SERVICES

**School Impacts**

Implementation of the Project would result in enrollment of approximately 124 new students in the Mojave Unified School District (MUSD) resulting in the need for up to four additional classrooms.

**Mitigation**

The following mitigation measure will be employed to reduce potential impacts to MUSD schools to a less than significant level:

- Mitigation for impacts resulting from additional students generated indirectly by the proposed prison would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules.

  The school mitigation fees for MUSD which are collected by the California City Building Department at issuance of building permits are as follows:

  - $0.32 per square foot of new industrial/commercial floor space.

  - $1.84 per square foot of new residential floor space.

  Based on the conceptual building plans for the proposed prison, which indicate approximately 500,000 square feet of floor space, CCA would be responsible for payment of approximately $160,000 to offset any direct impacts to MUSD. Additionally, new residential development resulting from any direct and indirect growth would contribute separately to school fees at the rate noted above. The collected fees could be utilized to lease the portable classrooms or contribute to funding for permanent facilities necessary for additional students.

Information provided by the MUSD Superintendent's office indicates that payment of the school mitigation fees by CCA and other new developments, and other funding mechanisms will mitigate potential impacts to a less than significant level.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to schools to a less than significant level.

**Water Supply Impacts**

The proposed Project would require 392,000 gallons per day of water. Implementation of the proposed Project would include improvements to the offsite water infrastructure facilities to provide adequate operational and fire/emergency water service to the site.

**Mitigation**

The following mitigation measures will be adopted to ensure that water is available to serve the Project, and that the Project uses the minimum practical amount of water.

- Design of the proposed prison would include provisions to minimize water use at the proposed prison:
  - Use of low-flow fixtures, and
  - Use of drought-tolerant, native landscaping.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to the water system to a level that is less than significant.

## B. TRANSPORTATION

**Traffic Impacts**

During operations, the Project would generate approximately 1,320 daily vehicle trips on peak weekdays. This impact would contribute to an existing unacceptable level of service at the intersection of SR 58 / California City Boulevard in the unincorporated area of Kern County. Cumulative plus peak weekday traffic would result in a significant impact between 5:30 AM and 6:30 AM at the SR 58 / California City Boulevard intersection.

**Mitigation**

The following measure would reduce the project-related impact to a less than significant level:

- The addition of a traffic signal is shown to be warranted for existing conditions and this improvement would mitigate the unacceptable Level of Service (LOS) condition. Caltrans has jurisdiction over SR 58 and according to Caltrans the Project would be required to participate in funding interim improvements at SR 58/ California City Boulevard, rather than a traffic signal at this intersection. The proposed CCA Prison would contribute 4.2% of the interim improvement costs based on the proportionate share of Project traffic impact to this intersection. Implementation of this mitigation measure would reduce the Project's impact to a less than significant level.

**Finding**

The impacted intersection is within the dual jurisdiction of Caltrans, a state agency, and Kern County. California City shall ensure through the Mitigation Monitoring Plan that the applicant makes its proportionate share of funds available to Caltrans and Kern County for interim improvements to the intersection. However, California City, as lead agency, has no jurisdiction to implement this mitigation. Caltrans and Kern County can and should implement this mitigation measure to reduce project-related impacts to a less than significant level.

Should Caltrans and Kern County implement this mitigation measure, changes or alterations will have been required in, or incorporated into, the Project which will avoid or reduce Project-related traffic impacts to a less than significant level. If, however, Caltrans and Kern County do not utilize fair share contributions to mitigate the Project's contribution to the current unacceptable LOS condition at SR 58/California City Boulevard, then the increased traffic generated by the Project would be considered a significant and unavoidable adverse impact. Therefore, and in that case, the City shall find that the impact is overridden by the Project benefits stated in the Statement of Overriding Considerations as set forth in Section 8 below.

## C. NOISE

**Noise Impacts**

If dwellings were to be constructed in the approved residential subdivision to the east of the site prior to prison construction, future residents could be subjected to high noise levels during Project construction.

**Mitigation**

No sensitive receptors are currently located near the Project. Prison operations will not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operations. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore the Final EIR recommends the following mitigation measures to reduce the noise impacts of construction should residences be built adjacent to the Project prior to Project construction:

- Construction activities within 2,000 feet of occupied residences will be limited to the hours of 7 a.m. to 8 p.m. Monday through Saturday, with no construction allowed on Sundays or City holidays.

- Properly muffled equipment and trucks will be used.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce noise impacts to a less than significant level.

## D. HYDROLOGY, STORM DRAINAGE, AND FLOOD CONTROL

**Hydrology Impacts**

Implementation of the Project would result in the covering of between 50 and 70 acres with impervious surfaces such as buildings, access roads, and parking areas. Implementation of the Project as proposed could result in an increase of the 100-year storm peak runoff from the watershed.

**Mitigation**

The City will adopt the following measures to reduce the potential impacts related to stormwater runoff to a less than significant level:

- Stormwater drainage and collection facilities will be designed to maintain the volume of surface water runoff at pre-Project levels. Facilities will include ditches or swales, constructed along the perimeter of the prison complex, and lined only with natural vegetation. The ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to an on-site detention basin.

- An unlined storm water detention basin will be developed on-site to retain a volume of storm water necessary to control runoff from impervious surfaces, and maintain surface runoff volumes at the property boundaries at pre-Project levels. The capacity of the detention basin will be based on calculated storm water flows above natural conditions, resulting from impervious surfaces of the proposed Project. The sizing and design of this detention basin will be reviewed and approved by the City Engineering Department as part of the final site plan approval.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hydrology impacts to a less than significant level.

**Storm Drainage Impacts**

Project implementations could result in urban pollutants entering stormwater runoff. Such pollutants may include oil, grease, antifreeze, trace metals, dust and dirt, fertilizers, herbicides and pesticides.

**Mitigation**

The City will adopt the following measure to reduce potential water quality impacts to a less than significant level:

- The proposed Project will comply with all applicable requirements of the NPDES permit program.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce storm drainage impacts to a less than significant level.

## E. BIOLOGICAL RESOURCES

**Utility Infrastructure Impacts**

Based on the low quality of habitat, and complete absence of presence or sign for any sensitive species within the 25-acre utilities construction path, significant impacts which would require comprehensive mitigation measures are not anticipated. Biologists estimated that approximately ten percent (10%) or 2.5 acres of property along the utility installation area contain habitat which could be considered Category III as designated by the Bureau of Land Management.

**Mitigation**

The City will adopt the following measures to reduce the potential impact on utilities construction path to less than significant:

- The off-site compensation measures described in Section 4(A) include preservation of 2.5 acres of habitat to off-set the loss described above.
- Prior to installing underground utilities, a final inspection of these areas will be conducted to verify the findings of previous biological surveys
- Biologist shall survey utility construction path immediately prior to trenching activities, and biologist shall move any tortoise from the construction path to adjacent habitat, out of harms way.
- All vehicles, including heavy equipment and personal vehicles, shall use established roadways to access the site. All vehicles shall be restricted to the site and shall not disturb areas adjacent to the utility construction area.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- The open utility trench will be kept to the minimum width and length as practicable for construction purposes which can be completed on a day-to-day basis.

- The utility trench shall be filled or covered at the completion of each construction day.

- The utility trench shall be visually inspected for tortoise immediately prior to commencing construction each morning.

- Areas disturbed within the utilities construction path will be regraded to blend with adjacent topography.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce utility infrastructure impacts to a less than significant level.

## F. CULTURAL RESOURCES

**Cultural Resources Impacts**

A recorded archaeological site is located on a portion of the site. Because implementation of the proposed Project could result in the disturbance of prehistoric material, this impact is considered significant.

**Mitigation**

The City will adopt the following measures to reduce potential impacts on cultural resources to a less than significant level:

- If human skeleton remains are encountered during construction, work within 20 meters of the discovery will be stopped immediately and the County Coroner notified. If the remains are Native American, the Coroner has 24 hours to notify the Native American Heritage Commission.

- If any buried cultural remains are encountered during development and construction, work within 20 meters of the discovery will be stopped until a professional archeologist is retained to determine the significance of the find and to develop management actions. Actions needed to manage the resource will be implemented.

- Avoidance of archaeological sites is the preferred management technique. Avoidance may be achieved through implementation of the following measure:

- A qualified archaeologist will be retained to fence the perimeter of the archaeological site prior to Project grading. The fence will be located approximately 15 feet outside the actual resource site boundary and remain there for the duration of construction activities. The fenced area will be unmarked to prevent unauthorized collecting.

If avoidance is infeasible, the following measure will be implemented:

- Prior to site grading or other construction activities, a qualified archaeologist will collect surface artifacts. A report containing a lithic analysis will be filed with the Southern San Joaquin Valley Information Center at California State University, Bakersfield.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce cultural resource impacts to a less than significant level.

## G. GEOLOGY, SOILS, SEISMICITY AND GROUNDWATER

**Soil Impacts**

Potentially expansive soil was encountered in one boring at the site during a geotechnical investigation conducted for the 1994 EIR. Construction on expansive soils can result in structural damage or failure.

**Mitigation**

The City will adopt the following measures to reduce potential impacts relative to expansive soils to a less than significant level:

- Expansive soil, will be removed or treated, and/or an expansion-resistant foundation system will be constructed.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce soil impacts to a less than significant level.

**Soils Impact**

The surface soil, upper 1 to 4.5 feet, at the site is generally of a loose consistency and may be subject to excessive immediate settlement under loading. Such settlement can result in structural damage or failure.

**Mitigation**

The following measures will be adopted to reduce potential impacts relative to collapsible or compressible soils to a less than significant level:

- Collapsible soils or compressible soils, if determined to be present at the site, will be mitigated by modification of soil, or through structural foundation design.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce collapsible or compressible soils impacts to a less than significant level.

**Seismic Impacts**

Based on probabilistic analysis conducted for the preparation of the 1994 Final EIR, the highest maximum peak horizontal accelerations at the site could range from 0.30g to 0.35g for the estimated maximum credible event of M7.5 at the Lockhart Fault.

**Mitigation**

The following measure will be adopted to reduce potential impacts relative to seismic shaking to a less than significant level:

- Facilities will be designed to the standards required by the regulatory agencies governing the Project, or other pertinent building codes, to withstand the expected ground motions. Through site specific studies, seismic criteria has been developed that should be evaluated by structural designers to determine whether the standard seismic design for prisons meets or exceeds the criteria.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce seismic impacts to a less than significant level.

## H. HAZARDOUS MATERIALS

### Hazardous Materials Impacts

Review of historic aerial photographs, and local, state, and federal records revealed no evidence of hazardous substance use, storage, or releases on the Project site. No evidence of hazardous materials storage or contamination was identified on the site or in adjacent areas. However, due to the size of the site, the possibility of an isolated area of contamination, e.g. isolated illegal dumping of hazardous waste, cannot be completely dismissed.

**Mitigation**

The City will adopt the following measure to reduce potential impacts with respect to potential site contamination to less than significant:

- In the event that hazardous materials or waste contamination are encountered during grading, construction or operation of the proposed Project, the subject wastes shall be assessed, reported to appropriate agencies, and remediated. Appropriate remediation shall be determined through consultation with the affected health and state agencies.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts to a less than significant level.

### Hazardous Materials Impacts During Construction and Operations

Construction and operation of the Project would require the use and storage of hazardous materials such as paints and solvents. The misuse, improper disposal, and/or mismanagement of these materials could affect groundwater quality, soil quality, and possibly create hazards to human health and safety.

**Mitigation**

The City will adopt the following measures to reduce potential hazardous materials impacts during Project construction and operation to a level that is less than significant:

- Hazardous materials on the prison grounds will be properly stored in suitable containers and in accordance with manufacturers directions for safe storage.

- Hazardous materials used at the prison will be properly disposed of as needed, at a Class I landfill, a County-sponsored "hazardous materials round-up", or other suitable disposal method sanctioned by the Department of Toxic Substances Control.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts during construction to a less than significant level.

## SECTION 4

## SIGNIFICANT UNAVOIDABLE ENVIRONMENTAL IMPACTS WHICH CANNOT BE MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. BIOLOGICAL RESOURCES

**Desert Tortoise Habitat Impacts**

The Project site is located outside of U.S. Fish and Wildlife (USFWS) designated critical habitat areas for the desert tortoise. However, the Project would result in the loss of approximately 70 acres of desert tortoise habitat. The loss of occupied habitat could be considered a take pursuant to Section 2081 of the California Endangered Species Act (CESA). Any net loss of any occupied desert tortoise habitat is considered a significant and unavoidable impact. Individual tortoises could be destroyed as a result of grading and construction activities. Destroying a tortoise would be considered a take of a listed species pursuant to both the ESA and the CESA, and considered a significant impact.

**Mitigation**

To mitigate the above impacts and comply with the Federal Endangered Species Act (ESA) and California Endangered Species Act (CESA), the applicant will obtain necessary permits from both USFWS and California Department of Fish and Game (CDFG). USFWS will require the submittal of a ESA Section 10(a) permit application and the preparation of a Habitat Conservation Plan (HCP) that includes a Project description with an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. This document will also provide the information required during CDFG Section 2081 permitting process as mandated by CESA.

The following mitigation recommendations are typical of those included in desert tortoise habitat HCP's. Actual mitigation requirements will be determined by USFWS and CDFG during the required permitting process. The agencies may require additional measures to mitigate for the proposed habitat loss for the desert tortoise.

**Construction Site Measures**

- Prior to implementation of any of the following measures, CCA must provide fees for the

acquisition of up to 70-acres of compensation lands to the Desert Tortoise Preserve Committee (DTPC) to mitigate impacts of the prison development.

- Grading limits should be chosen in an effort to minimize impacts to mapped tortoise activity areas.

- An enclosure should be placed around the boundary of the limits of grading and should consist of an appropriate type of fencing to keep desert tortoises from re-entering the construction area.

- Clearance surveys should be conducted by qualified and permitted biologists to locate and remove any tortoises from within the limits of grading. All tortoises will be relocated to an appropriate, and preferably, adjacent habitat within the western one-half which are not part and placed within created, artificial burrows of any area disturbed by the proposed prison or any potential future facility expansions.

- The undeveloped portion of the western one-half of the site will be dedicated as a conservation easement to provide and enhance habitat for sensitive biological species.

- A biological monitor should be present during all initial ground clearing and grading activities to ensure that no incidental take of desert tortoise occurs.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- Access to the 320-acre site will be strictly controlled by perimeter signage and 24-hour patrols by prison correctional officers. Human recreational activities will be prohibited within the undeveloped portions of the site for environmental and security purposes. Native wildlife activity and migration within the property boundary, and outside the boundaries of prison security fencing, will not be disturbed.

- Provide signage along site access road to beware of desert tortoise.

**Finding**

The Project impacts to desert tortoise and related habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which significantly reduce the potential for take of listed species and substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Mojave Ground Squirrel Habitat Impacts**

Although no Mojave ground squirrels were observed at the site, the loss of Mojave ground squirrel

habitat is considered a significant impact.

**Mitigation**

The impact on the Mojave ground squirrel habitat will be significant and unavoidable, however, the. City will adopt the following measure to partially mitigate the impact on the Mojave ground squirrel habitat:

- A mitigation plan for the loss of habitat will be approved in coordination with the permitting for the loss of desert tortoise habitat discussed above.

**Finding**

The impacts to the Mojave ground squirrel habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Burrowing Owl Impacts**

Although no burrowing owls were observed at the site, the loss of burrowing owl habitat is considered a significant impact.

**Mitigation**

Project impacts on the burrowing owl habitat will be significant and unavoidable, however, the City will adopt the following measure to partially mitigate the impact on the burrowing owl habitat:

- Although no burrowing owls were observed at the site, and no impacts to burrowing owls are expected, mitigation which will be developed for the desert tortoise includes protection of Mojave creosote bush scrub habitat form grazing and recreational vehicle activity. This mitigation will enhance the potential for use of the protected area of the site as burrowing owl habitat.

**Finding**

The impact identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## B. AIR QUALITY

**Construction Impacts**

The Project would modify/develop between 50 to 70 acres, and up to 35 acres could be exposed at any one time during construction. The Project could generate 1,848 pounds per day of fine particulate matter ($PM_{10}$). Construction related emissions would exceed Kern County Air Pollution Control Department CEQA thresholds of significance for $PM_{10}$ and nitrogen oxides ($NO_2$) , and would therefore represent a significant and unavoidable impact of the Project.

**Mitigation**

Although the impacts associated with $NO_2$ and $PM_{10}$ are significant and unavoidable, construction activities shall be partially mitigated by employing the best available control measures for fugitive dust control described in the EIR Supplement and included in the Mitigation Monitoring Program.

**Finding**

Project construction air quality impacts identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement.

**Construction Equipment Impacts**

Use of employee vehicles, trucks and heavy equipment would result in construction emissions throughout the construction period. The Project would generate approximately 172 tons/year of carbon monoxide, 21 tons/year of total organic gases, 59.8 tons/year of nitrogen oxides, 5.7 tons/year of sulfur oxides, and 6.4 tons/year of particulate matter during construction. Construction related emissions would exceed KCAPCD CEQA thresholds of significance for $PM_{10}$ and $NO_2$.

**Mitigation**

Although the impacts from construction equipment and construction employee vehicles will be significant and unavoidable, the following measures will partially mitigate the identified impacts:

- Equipment will be maintained to minimize emissions.
- Information will be provided to construction employees to facilitate car pooling.
- Information will be provided to construction employees to facilitate extended stays in the Project vicinity to reduce long distance commuting.

**Finding**

Project air quality impacts arising from construction activities cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Operations Impacts**

Total daily trips to the site during operation peak weekdays are estimated to be 1,320. Vehicle emissions would total 48.4 tons/year reactive organic gases, 330 tons/year carbon monoxide, 37.5 tons/year nitrogen oxides, and 6.1 tons/year of $PM_{10}$. Operation of the Project would result in significant and unavoidable impacts from emissions of organic compounds and nitrogen oxides, which exceed KCAPCD CEQA thresholds of significance.

**Mitigation**

City will adopt the following measures to partially mitigate the air quality impacts from operational emissions:

- Information will be provided to employees to facilitate car pooling.

- Equipment, such as generators, will meet all Kern County Air Pollution Control District requirements.

**Finding**

Project air quality impacts arising from operations cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## C. AESTHETICS/VISUAL CONSIDERATIONS

**Aesthetic Impacts**

The Project would result in the conversion of vacant desert lands to a developed prison facility with buildings, parking lots, lighting, and other related features. Although no residences presently exist in the immediate vicinity, the prison would represent a significant change in the visual landscape, or viewshed, to future residents of approved residential subdivisions adjacent to the proposed prison site.

Even with mitigation in place, implementation of the proposed Project will result in an unavoidable significant visual impact to future residents of the approved subdivisions east of the Project site. The

site is relatively small, thereby affording limited flexibility in terms of placement of the prison structures. There are no feasible mitigation measures available to reduce the potential visual impact to less than significant

**Mitigation**

The Project impact on the viewshed will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Areas of the site disturbed during Project construction which would remain unpaved will be revegetated for runoff control and to enhance visual blending with the surrounding area.

**Finding**

Changes or alterations to the Project to reduce visual and aesthetic impacts have been incorporated into the Project as the mitigation measures, however, the visual and aesthetic impacts associated with the Project cannot be mitigated to a less than significant level. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Lighting Impacts**

Indirect lighting of adjacent areas and skyglow from the proposed prison would occur because the Project site is surrounded by vacant desert lands with no light-blocking features, and because there are no other sources of nighttime lighting in the vicinity. Although currently no residences exist in the immediate vicinity, skyglow would be visible and would be a visual nuisance to existing and future sensitive receptors.

Even with mitigation in place, skyglow will be noticeable in California City. Only the no-Project alternative would avoid significant light and glare impacts. However, implementation of this alternative would not meet the basic objectives of the Project.

**Mitigation**

The impact from nighttime lighting and skyglow will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Mast lighting posts will not exceed 30 feet in height, and where applicable and required by design, the lighting will be shielded and directed downward to minimize off-site illumination.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which substantially

lessen the significant environmental effects as identified in the Final EIR Supplement. However, the residual effect, after mitigation, of nighttime lighting has been identified as significant and unavoidable. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## SECTION 5

## ALTERNATIVES

The Final EIR Supplement identifies and evaluates five potential alternatives to the Project that "could feasibly accomplish most of the basic purposes of the Project". The five alternatives include (1) no Project, (2)Virginia Boulevard-Less Intense Prison, (3) Randsburg-Mojave site, (4) Remote Site, and (5) Virginia Boulevard/190% Development alternative. The alternatives discussed in the Final EIR Supplement constitute a reasonable range of potential options necessary to permit a reasoned choice of alternatives in light of the Project Objectives identified in Sections 1.3 and 7.0 of the Draft EIR Supplement. The Final EIR identifies the No Project Alternative and the Less-Intensive Prison Alternative as environmentally superior to the Project and they would reduce or eliminate the unavoidable significant impacts associated with the Project. However, neither of these alternatives fulfill the Project objectives. In addition, specific economic and social considerations make the environmentally superior alternatives identified in the Final EIR Supplement infeasible. Therefore, pursuant to CEQA Guideline 15364, and Public Resources Code Section 21081(a)(3), the Planning Commission will reject the environmentally superior alternatives as infeasible.

The alternatives considered in the Final Supplement are summarized below:

1. **No Project Alternative**- Under the no-Project alternative, a correctional facility would not be constructed. None of the potential impacts associated with development of the Project would occur. Unavoidable adverse impacts related to light and glare, biological resources and air quality (particulate and ozone-producing gases) during both construction and facility operation would be avoided.

**Finding**

The Planning Commission finds the No-Project Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative will fail to meet any of the Project objectives identified in the Final EIR; and
- This alternative would forego the substantial benefits of the Project, particularly:
    - Construction of the Corrections Corporation of America Prison at California City is necessary to provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for surrounding communities. Between 85 to 90 percent of the prison employees are expected to be drawn from the Project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

- In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees will stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

2. **The Virginia Boulevard-Less Intense Prison-** The EIR Supplement evaluated a smaller scale Project on the same site comprised of 1,000 beds on a 40 acre site.

**Finding**

The Planning Commission finds the Virginia Boulevard-Less Intense Prison Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative provides environmental benefits, however, this alternative will not provide as many employment opportunities as the proposed Project and would provide less capacity to serve the incarceration needs of government correctional agencies. Thus, this alternative will do less to meet Project objectives; and

- Based on the required investment in land and facility development costs, a smaller prison on the 320- acre site would not be economically viable. Thus, this alternative does not present a cost effective alternative to a publicly funded and operated correctional facility.

3. **Randsburg-Mojave Site-**While not an unavoidable significant impact, this alternative would remove potential (but somewhat degraded) habitat for the burrowing owl and the Mojave ground squirrel. Additionally, the Randsburg-Mojave property is not currently served by paved access roads, and public utilities would require extension from a greater distance to serve the site. Furthermore, as discussed in the 1994 EIR, construction at this site would require enhanced engineering design and more stringent building requirements to withstand potential levels of seismic shaking due to the proximity of an active fault, thus representing a fiscal constraint. Lastly, during the initial search by CCA for an appropriate site to accommodate the proposed Project, the Randsburg-Mojave property was not available for sale.

4. **Remote Site Alternative-**Through the site selection process used to find the prison site, properties located in the region which would be reasonably feasible alternatives, would meet the majority of the Project objectives, and fit most of the criteria identified as necessary, were

not found. Specifically, the biological resources and habitat quality of more remote sites tended to improve; however, the areas further to the east and north tend to be served by fewer paved roads with limited access to utilities and services. Thus a Remote Site alternative was not feasible.

5. **The Virginia Boulevard/190% Development Alternative-** This alternative would result in additional significant unavoidable impacts such as viewshed impacts; increased light, glare and aesthetic impacts; impacts to Mojave Unified School District; additional particulate and ozone producing impacts generated during operations; and loss of additional acreage of potential desert tortoise, burrowing owl, and Mojave ground squirrel habitat. The larger prison could also result in land use incompatibilities and incrementally increase demands on public utilities and community services which could potentially limit the ability to provide adequate services. This alternative was rejected since it would not offer an environmental advantage over the proposed Project.

## SECTION 6

## RECIRCULATION

## SECTION 21092.1 FINDING

Finding: Pursuant to CEQA Guideline 15088.5, and Public Resources Code Section 21092.1, on the basis of its review and consideration of the Final EIR Supplement this Planning Commission finds that:

- The Project mitigation for impacts to biological resources has been revised from an on-site habitat conservation plan to an off-site habitat conservation plan as described in Section 3 of these findings and as shall be incorporated into the Project as part of the Mitigation Monitoring Plan.

- The revised mitigation measures and revised water system design are not substantial changes in the Draft EIR Supplement that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative; and

- The revised mitigation measures and revised water system design will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR Supplement; and

- The revised mitigation measures and revised water system design will not involve or require mitigation measures or alternatives which are considerably different from those analyzed in the Draft EIR Supplement that would substantially reduce one or more significant effects on the environment; and

- The revised mitigation measures and revised water system design do not render the Draft EIR Supplement so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded;

- Thus, none of the conditions set forth in CEQA Guideline 15088.5 or Public Res. Code § 21092.1 requiring recirculation of a Draft EIR Supplement have been met. Incorporation of the revised mitigation measures and revised water system design into the Final EIR Supplement does not require that the EIR Supplement be recirculated for public comment.

## SECTION 7

## FINDINGS REGARDING THE MITIGATION MONITORING PROGRAM

Section 21081.6 of the Public Resources Code requires that when a public agency is making the findings required by State CEQA Guidelines Section 15091(a)(1) and Section 21081(a) of the Public Resources Code the public agency shall adopt a program for reporting on or monitoring the changes which it has either required of the Project or made a condition of approval to avoid or substantially lessen significant environmental effects. These measures must be fully enforceable through permit conditions, agreements, or other measures.

The Planning Commission hereby finds that the Mitigation Monitoring Program dated January, 1998, and adopted as part of the Project's Conditional Use Permit meets the requirements of Section 21081.6 of the Public Resources Code by providing for and enforcing the implementation and monitoring of Project conditions intended to mitigate potential environmental effects of the Project.

## SECTION 8

## STATEMENT OF OVERRIDING CONSIDERATIONS

Having reduced the effects of the proposed Project by adopting mitigation measures, and balanced the benefits of the proposed Project against the proposed Project's potential unavoidable adverse impacts, the City hereby determines the benefits of the proposed Project outweigh the potential unavoidable adverse impacts, and the unavoidable adverse impacts are acceptable, based on the following overriding considerations, which are sufficient to outweigh the proposed Project's unavoidable adverse impacts:

- Construction of the Corrections Corporation of America Prison at California City will provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for

Surrounding communities. Between 80 to 90 percent of the prison employees are expected to be drawn from the project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees wil stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

## SECTION 9

## INDEPENDENT JUDGEMENT

## SECTION 21082.1 (C) (3) FINDING

Facts: The Planning Department, acting as lead agency, has reviewed and edited as necessary the Draft EIR Supplement and the Final EIR Supplement to reflect its own independent judgement to the extent of its ability, including reliance on concerned County technical personnel from other departments.

Finding: Pursuant to Public Resources Code Sec. 21082.1 (c) (3) the City Council hereby finds that the Final EIR Supplement reflects the independent judgement of the lead agency.

---

Introduced, approved and adopted this 20th Day of January, 1998 by the following vote:

AYES: 5
NAYS: 0
ABSTAIN: 0
ABSENT: 0

Larry Adams, Mayor

January 20, 1998
Date

ATTEST:

Helen Dennis, City Clerk

# ATTACHMENT B

ATTACHMENT B

ORIGINAL

**RESOLUTION NO.** 01-98-1802
A RESOLUTION OF THE CITY COUNCIL
GRANTING CONDITIONAL USE PERMIT 97-01
PRISON FACILITY

**WHEREAS**, governmental and quasi-governmental uses, such as prison facilities may be permitted in Residential/Agricultural District zones with a conditional use permit (Ord. No. 96-529); and

**WHEREAS**, the property located approximately 0.5 miles South of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian also known as Assessor's Parcel Number (APN) 350-031-02 is within the R/A, Residential/Agricultural District zone and that a portion of the 320-acre site is zoned Conservation Land, which is a compatible use with the R/A zone as defined by the City of California City General Plan 2012 Land Use Designation Chart; and

**WHEREAS**, Corrections Corporation of America has requested and filed an application with the Planning Commission to establish and operate a 2,304 bed prison facility on approximately 70 acres of the 320-acre above-mentioned address; and

**WHEREAS**, notice of a public hearing was mailed to all property owners within 300 feet of the above-mentioned parcel and published as required by the Zoning Regulations; and

**WHEREAS**, the Planning Commission did conduct a public hearing on January 15, 1998, heard public testimony, and made the following findings:

1. That a prison facility use is necessary for the preservation and enjoyment of a substantial property right.
2. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.

3. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
4. That the Final Environmental Impact Report (EIR) Supplement State Clearinghouse (SCH) #97091045 is certified as adequate and in compliance with California Environmental Quality Act (CEQA) for the proposed prison project.
5. That the Mitigation Monitoring Program dated January 1998 for the proposed prison be adopted as part of Conditional Use Permit 97-01.
6. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
7. Site plan review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
8. This conditional use permit expires twelve (12) months from that date of the City Council's approval if the prison facility operation is not commenced and diligently pursued.
9. All provisions of the City of California City Municipal Code currently in effect must be complied with.

**WHEREAS**, the Planning Commission hereby approves the conditional use permit and directs that this resolution be prepared and presented to the City Council for the consideration and granting of Conditional Use Permit 97-01.

**APPROVED THIS 15TH DAY OF JANUARY, 1998** by the Planning Commission.

Reuben W Dennis Jr.
Planning Commission Chairman

Attest:

Ronna L. Greene
Planning Secretary

**NOW, THEREFORE, BE IT RESOLVED** by the City Council of the City of California City that the Conditional Use Permit 97-01 is granted to Corrections Corporation of America to establish and operate a prison facility in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**PASSED, APPROVED AND ADOPTED** this 20th day of January, 1998, by the City Council, by the following Roll Call Vote: AYES: 5 ; NOES: 0 ; ABSTAIN: 0; ABSENT: 0.

Mayor

ATTEST:

Secretary
(SEAL)

# ATTACHMENT C

ATTACHMENT C

Real Estate

Recording Requested by:
Commonwealth Land Title Company

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $RECORDING IN COUNTERPART County $ ______ City
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Lisa Christine Hendry
personally appeared Channing C. Ahn

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

______
Moohay A. Choe

______
Angela H. Ahn Mouradian

[signature]
Channing C. Ahn

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

MAIL TAX STATEMENTS TO ADDRESS ABOVE

(This area for official notarial seal)

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 1,812.80 County $ ______ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June ~~5,~~ 10 1998

STATE OF ~~CALIFORNIA~~ Massachusetts } ss
COUNTY OF Norfolk }
On 6-10-1998 before me Tracy K Kenney
personally appeared Angela H Ahn Mouradian
personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(ies), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature] Tracy K Kenney
My Commission expires Oct. 13, 2000

MAIL TAX STATEMENTS TO ADDRESS ABOVE

______
Moohay A. Choe

[signature] Angela H. Ahn Mouradian
Angela H. Ahn Mouradian

______
Channing C. Ahn

**(This area for official notarial seal)**

Recording Requested by:
Commonwealth Land Title Company

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

James ... Kern County Official Records
DOCUMENT #:0198081113
Pages: 3
6/19/1998
8:00:00

*0198081113*

Fees.... 13.00
Taxes.... 1812.80
Other....
TOTAL PAID.... 1825.80

THIS SPACE FOR RECORDER'S USE ONLY:

Stat. Types: 1

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ RECORDING IN COUNTERPART County $ ______ City
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

Moohay A. Choe (signature)
Moohay A. Choe

Angela H. Ahn Mouradian

Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Morton M. Schneider
personally appeared Moohay A. Choe.

personally known to me or proved to me on this basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature Morton M. Schneider (signature)

MAIL TAX STATEMENTS TO ADDRESS ABOVE

BCT1
MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999
BCT1

(This area for official notarial seal)

# ATTACHMENT D

ATTACHMENT D

# CITY OF CALIFORNIA CITY
# MEMORANDUM TO THE FILE

**DATE:** November 15, 2001

**FROM:** Jack Stewart, City Manager/Planning Director

**SUBJECT** Extension of Conditional Use Permit - Amendment (CUP-A) 98-02 512-bed Expansion for CCA Prison

**MEMO TO THE FILE**

CCA's current extension expires on November 30, 2001 for CUP-A 98-02 for the 512-bed expansion. The expansion is on-going in the confines of the existing approved 70 acres and within the existing structures. This extension is granted indefinitely and is limited to the above referenced expansion.

This approval is granted by the City Council through their authority to delegate such power to the City Manager as their representative and in accordance with the Zoning Ordinance, Section 9-2.2202 (b) 2, page 104 and Section 9-2.2503 (a) 2., page 116 with the pre-existing conditional use being CUP 97-01.



# City of California City

Incorporated 1965
City Hall
PHONE (760) 373-8661
21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

November 9, 1999

Mr. Kenneth M. Avant, Director
Maintenance and Construction
10 Burton Hills Boulevard
Nashville, Tennessee 37215

SUBJECT: Request for Two-Year Extension to Conditional Use Permit Amendment (CUP-A) 98-02 for the 512-bed Prison Expansion

The Planning Commission reviewed and approved your request for an extension to November 30, 2001 for Conditional Use Permit Amendment (CUP-A) 98-02 for the 512-bed prison expansion.

If you have any questions, please contact my office at 760-373-8670.

Sincerely,

Jack Stewart

Jack P. Stewart
City Manager

cc: James M. Hunter
✓File

# PLANNING COMMISSION

Meeting Date: October 26, 1999

**DATE OF PREPARATION:** October 22, 1999

**TO:** Planning Commission

**FROM:** Planning Director

**SUBJECT:** Consider Request for Two-Year Extension to Conditional Use Permit Amendment (CUP-A) 98-02 from CCA for the 512-bed Prison Expansion - Planning Director

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:**

Staff has received a request from CCA for a two-year extension to CUP-A 98-02 scheduled to expire on November 30, 1999. The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion.

**RECOMMENDATION:**

Staff recommends granting CCA's request for an extension to November 30, 2001 for CUP-A 98-02.

**SOURCE OF FUNDING:** N/A

**ENVIRONMENTAL ACTION:** None.

Attachments:
1. CCA's letter of request (10-12-99)

**NB 2.**

17671 Cowan Avenue, Suite 150, Irvine, California 92614-6031

RECEIVED
OCT 19 1999

October 12, 1999

Mr. Jack Stewart
City Manager
City of California City
21000 Hacienda Boulevard
California City, CA 93505

Subject: **Modified Conditional Use Permit for 512-Bed Expansion at CCA's California City Correctional Center**

Mr. Stewart:

As you may be aware, the City Council of California City on December 1, 1998, passed, approved and adopted a Resolution modifying Conditional Use Permit (CUP) 97-01 to allow a 512-bed expansion at Corrections Corporation of America's (CCA) California City Correctional Center – CUP Amendment 98-02. Provisions of the California City Municipal Code Section 9-2.2202(b) indicate the following:

> "A use permit shall lapse and shall become void twelve (12) months following the date on which the use permit became effective unless by conditions of the use permit, a lesser or greater time is prescribed below, or unless prior to the expiration of the twelve months, Building Permit is issued by the Building Official and construction is commenced and diligently pursued toward completion on the site which was the subject of the use permit application. A use permit may be renewed for an additional period of twelve (12) months or for a lesser or greater period as prescribed in paragraph b(2); provided that prior to the expiration of the time period granted, an application of renewal of the use permit is filed with the Planning Commission ...."

Since the current use permit for the 512-bed expansion will expire on November 30, 1999, a two-year renewal is requested for CUP Amendment 98-02. The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion require a certain amount of regulatory flexibility. Please accept this letter as CCA's formal application to the City of California City for a two-year renewal of CUP Amendment 98-02. If you have any questions regarding this request, please feel free to contact me at 949.251.6417.

Telephone
949.251.6400
Facsimile
949.251.6444

Very truly yours,

***Earth Tech, Inc.***

James M. Hunter
Irvine Operations Manager

CC: Ken Avant - CCA

# CITY COUNCIL

Meeting Date: December 1, 1998

**DATE OF PREPARATION:** November 25, 1998

**TO:** Mayor and City Council
**FROM:** Interim City Manager

**SUBJECT:** Consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 and Mitigated Negative Declaration for the Proposed 512-Bed Expansion at Corrections Corporation of America's California City Correctional Center.

**BACKGROUND:** On November 24, 1998 this matter was reviewed by the Planning Commission during their regular Planning Commission meeting. The Commission voted on the following two separate issues.

Resolution 11-98-02 modifying Conditional Use Permit 97-01 as it relates to the proposed 512-bed expansion at Corrections Corporation of America's California City Correctional Center (Conditional Use Permit-Amendment 98-02): AYES: 4, NOES: 0, ABSTAIN: 1, ABSENT: 0

The Planning Commission further voted to forward the Proposed Mitigated Negative Declaration, to the City Council for approval and after full consideration, approved the application: AYES: 4, NOES: 0, ABSTAIN: 1, ABSENT: 0

**RECOMMENDATION:** The City Council approved Resolution 11-98-02 and the Proposed Mitigated Negative Declaration as presented.

**SOURCE OF FUNDING:** N/A.

**ENVIRONMENTAL ACTION:** Direct staff to file a Notice of Determination with the Kern County Clerk's Office.

Attachments:

1. Planning Commission's 11-24-98 Agenda Item
2. Resolutions

Correspondence: None

Public Comment: None

Motion to close the public hearing at 6:24 by Councilman Bailey, second by Councilman Lessenevitch. Carried.

Council action: Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the extension to September 1, 2000, and adopt "**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 96-05 AS IT RELATES TO THE DEADLINE FOR COMPLETING A FINANCIAL PLAN**." Roll Call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

**PH 2.** Consider approving amendment to Conditional Use Permit-Amendment (CUP-A) for Proposed 512-Bed Expansion at California City Correctional Center -

Mayor Adams declared the Public Hearing open at 6:27 pm. Staff report was given by the City Engineer. There was no correspondence received on either part 1 or part 2 of the public hearing.

Council discussion: Procedural matters were discussed on how to conduct the two-part hearing.

Public comment: None

Motion to close the public hearing at 6:35 p.m. by Councilman Lessenevitch, second by Councilman Bailey. Carried.

Council action: On the advice of the City Attorney, the second Resolution, making certain environmental findings, was adopted first, as follows:

Motion by Councilman Lessenevitch, second by Councilman Bailey, to adopt the Mitigated Negative Declaration and adopt "**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS IN CONNECTION WITH THE 512-BED EXPANSION OF THE CALIFORNIA CITY CORRECTIONAL CENTER**." Roll

Call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the Amendment to Conditional Use Permit-Amendment to allow a 512-bed expansion to the original CUP, by adopting **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTION CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER."** Roll call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

**CONTINUED BUSINESS:** None

**NEW BUSINESS:**

**NB 1.** Council members consider making appointments for Vice Mayor, as well as appointments to various boards and commissions:

Councilman Lessenevitch suggested they review the whole list and vote the appointments as decided by a single vote at the end. Mayor Adams said he had no problem with that approach, but asked that the position of Vice Mayor be settled first and separately. He asked that the position return to its historical roots where the Vice Mayor serves for one year only, with the position rotating through the Council so everyone has an opportunity to be Vice Mayor for one year out of their four-year term.

Councilman Lessenevitch nominated Harry Bailey for Vice Mayor, second by Councilman Dempsey. Carried.

The balance of the list was determined as follows:

| | |
|---|---|
| **KernCOG:** | Councilman Lessenevitch; alternate is Councilman Eddington. |
| **KCAC:** | Councilman Eddington. |
| **KCBOT:** | (appointed by supervisors) |
| **League of Cities:** | Councilman Dempsey |
| **KCEDC:** | Councilman Dempsey |

# NOTICE OF PUBLIC HEARING

**NOTICE IS HEREBY GIVEN** that the City Council of the City of California City will hold a **PUBLIC HEARING** on Tuesday, December 1, 1998, for the purpose of Adopting a Mitigated Negative Declaration of Environmental Impact and to consider a Conditional Use Permit Amendment (CUP-A) Application No. 98-02, for a proposed 512-bed expansion at the California City Correctional Center.

**ALL INTERESTED PARTIES** are invited to attend and express opinions and commentary on the above-calendared matter

**DATE:** Tuesday, December 1, 1998
**TIME:** 6:00 p.m. or as soon thereafter as possible
**PLACE:** City Council Chambers, City Hall, 21000 Hacienda Blvd., Calif. City

**DATED:** November 16, 1998

Helen Dennis
Helen Dennis, City Clerk

**AFFIDAVIT OF POSTING:**
**I, Helen Dennis, City Clerk of California City** do hereby attest that I caused this Notice of Public Hearing to be posted on Tuesday, November 17, 1998 on all official City bulletin boards, and that said Notice was published in the Mojave Desert News, a newspaper of general circulation within California City, on Thursday, October 29; 1998.

Helen Dennis
Helen Dennis, City Clerk

**NOTICE OF INTENT TO ADOPT MITIGATED NEGATIVE DECLARATION (MND), AND NOTICE OF PUBLIC HEARING TO CONSIDER CONDITIONAL USE PERMIT-AMENDMENT 98-02 FOR PROPOSED 512-BED EXPANSION AT CALIFORNIA CITY CORRECTIONAL CENTER BY CORRECTIONS CORPORATION OF AMERICA (CCA) BY CITY OF CALIFORNIA CITY PLANNING COMMISSION AND CITY COUNCIL**

NOTICE IS HEREBY GIVEN that two public hearings will be held in the Council Chambers of City Hall, 21000 Hacienda Boulevard, California City, California, to consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 for the proposed 512-bed expansion at Corrections Corporation of America's California City Correctional Center, located at 22844 Virginia Boulevard, California City, CA.

Public hearing dates are:

Tuesday, November 24, 1998, 6:00 p.m. - Planning Commission

Tuesday, December 1, 1998, 6:00 p.m. - City Council

This Public Hearing will be necessary depending upon the action of the Planning Commission on November 24, 1998.

NOTICE IS FURTHER GIVEN that the City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The Initial study was undertaken for the purpose of deciding whether the proposed project may have a significant effect on the environment. The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. A proposed Mitigated Negative Declaration has been prepared and is available for public review at City Hall, 21000 Hacienda Boulevard, California City, from 8 a.m. to 5 p.m., Monday through Friday. The required public comment period begins on October 29, 1998 and ends on November 17, 1998 at 5:00 p.m. Written comments on the proposed MND should be addressed to Mike Shahbakhti at City Hall. Publication in a local newspaper satisfies notification requirements under PUB. RES. CODE ("PRC") Section 21092 (b) (3) and CEQA Guideline Section 15072 (b) (1).

DATED: October 26, 1998

/s/Terry Hicks
Terry Hicks
Interim City Manager

Published in The Mojave Desert News October 29, 1998

# PLANNING COMMISSION

Meeting Date: November 24, 1998

**DATE OF PREPARATION:** November 17, 1998

**TO:** Planning Commission
**FROM:** Planning Director

**SUBJECT:** Consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 and Mitigated Negative Declaration for the Proposed 512-Bed Expansion at Corrections Corporation of America's California City Correctional Center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:**

On January 15, 1998 the Planning Commission approved Conditional Use Permit 97-01 and certified the Draft Environmental Impact Report (EIR) Supplement for the 2,304-bed Corrections Corporation of America's (CCA) California City Correctional Center, located at 22844 Virginia Boulevard, California City.

Staff has received an application from CCA to consider Conditional Use Permit-Amendment 98-02 for the proposed additional 512 beds.

The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. The proposed Mitigated Negative Declaration was available for public review at City Hall from October 29, 1998 and the review period ended on November 17, 1998. Staff published a notice of public hearing in the local newspaper. Notice of Preparation letters were sent certified return receipt requested to 33 affected property owners on October 28, 1998. The same letter was sent first class to 13 public agencies on October 27, 1998. One response letter, generally supporting the proposed prison expansion was received at the Planning Department on November 10, 1998.

The Planning Commission shall review the information, receive pertinent evidence and testimony, make required findings, and approve, modify and approve or deny the application. If approved, the Planning Commission shall adopt resolution(s) setting forth its findings and conditions of approval within thirty (30) days following the closing of the public hearing. The use permit becomes effective when granted by resolution of the Council.

Staff has reviewed the information submitted by the applicant and the Mitigated Negative Declaration (MND) prepared by Rust Environment and Infrastructure, and finds that the use complies with the provisions of the Zoning Regulations and The Municipal Code. Of particular note is the following findings:

1. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.
2. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
3. That the Conditional Use Permit-Amendment 98-02 and the Proposed Mitigated Negative Declaration appears adequate and in compliance with CEQA for the proposed 512-bed prison project expansion.
4. That the Mitigation Monitoring Program is being enforced.
5. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
6. Site Plan Review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
7. All provisions of the California City Municipal Code currently in effect must be complied with.

**RECOMMENDATION:**
The Planning Commission conduct the public hearing and consider the attached resolution(s) which would make findings and set conditions for the adoption of the Mitigated Negative Declaration (MND) and approval of Conditional Use Permit-Amendment 98-02. Direct the Planning Director to pass the resolution(s) onto the City Council for its consideration and approval.

**SOURCE OF FUNDING:** N/A.

**ENVIRONMENTAL ACTION:** The City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The initial study was undertaken for the purpose of deciding whether the proposed project may have a significant affect on the environment.

Attachments:
1. CUP-A 98-02 Application w/Environmental Information Form
2. Proposed Mitigated Negative Declaration
3. Public Hearing Notice
4. Letter to public agencies and property owners
5. Mailing List
6. Communications: Mr. and Mrs. Richard Manuell
7. Resolution(s)

**RESOLUTION NO. 11-98-02**

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT-AMENDMENT 98-02)**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**Section 1. Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America (CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee filed an application to expand the permitted use by 512 beds. This resolution sets forth the Commission's decision on the application.

**Section 2. Findings**

The Commission finds as follows:

(a) Operation of a prison facility is in accordance with the general plan and the objectives of the Zoning Regulations;

(b) Facility complies with the applicable provisions of the Municipal Code; and

(c) A Mitigated Negative Declaration for the proposal will satisfy California Environmental Quality Act (CEQA).

# ATTACHMENT E

ATTACHMENT E

# Addendum No. 1 to California City Prison Project Final Subsequent Environmental Impact Report

Lead Agency:

**City of California City**
21000 Hacienda Boulevard
California City, CA 93505
(760) 373-8661

Project Applicant:

**Corrections Corporation of America**
10 Burton Hills Boulevard
Nashville, TN 37215

December 2009

Prepared by

CH2MHILL
1000 Wilshire Boulevard, 21st Floor
Los Angeles, CA 90017

# Contents


| Section | | | Page |
|---|---|---|---|
| 1 | Introduction | | 1-1 |
| | 1.1 | Purpose of this Addendum | 1-1 |
| | | 1.1.1 CEQA Requirements | 1-1 |
| | 1.2 | Overview of the Environmental Review Process | 1-3 |
| | | 1.2.1 Subsequent Environmental Impact Report (Subsequent EIR) | 1-3 |
| 2 | Description of Project Changes | | 2-1 |
| | 2.1 | Project Location and Setting | 2-1 |
| | 2.2 | Proposed Changes to the Project Description | 2-3 |
| 3 | Environmental Impact Analysis | | 3-1 |
| | 3.1 | Land Use | 3-1 |
| | 3.2 | Aesthetic and Visual Considerations | 3-1 |
| | 3.3 | Employment, Population, and Housing | 3-2 |
| | | 3.3.1 Impacts | 3-2 |
| | | 3.3.2 Mitigation Measures | 3-3 |
| | 3.4 | Public Utilities and Community Services | 3-3 |
| | | 3.4.1 Law Enforcement | 3-3 |
| | | 3.4.2 Fire Protection | 3-3 |
| | | 3.4.3 Schools | 3-4 |
| | | 3.4.4 Hospitals | 3-4 |
| | | 3.4.5 Judicial Services | 3-4 |
| | | 3.4.6 Water Supply | 3-5 |
| | | 3.4.7 Wastewater Treatment and Disposal | 3-5 |
| | | 3.4.8 Solid Waste | 3-5 |
| | | 3.4.9 Energy | 3-6 |
| | | 3.4.10 Telephone and Cable | 3-6 |
| | 3.5 | Transportation | 3-6 |
| | | 3.5.1 Construction Impacts | 3-6 |
| | | 3.5.2 Operation Impacts | 3-6 |
| | 3.6 | Air Quality | 3-7 |
| | | 3.6.1 Construction Impacts | 3-8 |
| | | 3.6.2 Operation Impacts | 3-9 |
| | 3.7 | Noise | 3-10 |
| | 3.8 | Hydrology, Storm Drainage, and Flood Control | 3-11 |
| | 3.9 | Biological Resources | 3-11 |
| | | 3.9.1 Environmental Setting | 3-12 |
| | | 3.9.2 Environmental Impacts | 3-13 |
| | 3.10 | Cultural Resources | 3-15 |
| | 3.11 | Cumulative Impacts | 3-15 |
| | 3.12 | Environmental Impact Analysis Conclusions | 3-15 |

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 61 of 161

**Figures**

1 Project Option .......... 2-2
2 Corrections Corporation of America Revised Project .......... 2-4

**Tables**

AAQS, Designation Classification, and Monitoring Values[1] .......... 3-7

# Acronyms and Abbreviations

| | |
|---|---|
| AAQS | Ambient Air Quality Standards |
| ARB | Air Resources Board |
| BMP | best management practice |
| CAAQS | California Ambient Air Quality Standards |
| CCA | Corrections Corporation of America |
| CCCF | California City Correctional Facility |
| CCFD | California City Fire Department |
| CCPD | California City Police Department |
| CDCR | California Department of Corrections and Rehabilitation |
| CDFG | California Department of Fish and Game |
| CEQA | California Environmental Quality Act |
| CESA | California Endangered Species Act |
| CNDDB | California Natural Diversity Database |
| CO | carbon monoxide |
| ESA | Endangered Species Act |
| gpid | gallons per inmate per day |
| gpm | gallons per minute |
| HCP | Habitat Conservation Plan |
| LOS | level of service |
| MBTA | Migratory Bird Treaty Act |
| MUSD | Mojave Unified School District |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | nitrogen oxide |
| NPDES | National Pollutant Discharge Elimination System |
| OHV | off-highway vehicle |
| OHWM | Ordinary High Water Mark |
| $PM_{10}$ | particulate matter less than 10 micrometers in aerodynamic diameter |

| | |
|---|---|
| $PM_{2.5}$ | particulate matter less than 2.5 micrometers in aerodynamic diameter |
| ppm | parts per million |
| RFP | Request for Proposal |
| SCE | Southern California Edison Company |
| $SO_2$ | sulfur dioxide |
| Subsequent EIR | Subsequent Environmental Impact Report |
| USFWS | U.S. Fish and Wildlife Service |
| VMT | vehicle miles traveled |

SECTION 1

# Introduction

This document is Addendum Number 1 to the certified 2006 Final Subsequent Environmental Impact Report (Subsequent EIR) for the California City Prison Project, dated November 2006 (State Clearinghouse No. 2006071009). This addendum provides an evaluation of proposed revisions to one of the two project options evaluated in the Subsequent EIR.

## 1.1 Purpose of this Addendum

The purpose of Addendum No. 1 is to address the potential environmental effects of the increased capacity of the 2,200-bed correctional facility described in Section 2, and to determine whether the findings associated with the California City Prison Project Subsequent EIR remain valid in light of the revision to the Proposed Project and the Project Option. To the extent that these changes may constitute additional information that was not previously anticipated or analyzed in the Subsequent EIR, the City of California City Planning Department determined such changes should be addressed in an Addendum (No. 1) to the Subsequent EIR. This method of documentation presents a clear and informative document to specifically outline the subsequent changes to the project, and mitigation measures, as it was presented to the Planning Commission in the Subsequent EIR.

The project revisions assessed in Addendum No. 1 do not change the basic objectives for the project and do not substantially change the conclusions of the environmental analysis as stated in the Subsequent EIR. The revisions to the project do not raise any new significant environmental impacts that were not previously identified in the Subsequent EIR.

### 1.1.1 CEQA Requirements

Prepared in accordance with the California Environmental Quality Act (CEQA) (PRC 21000 et seq.) and the Guidelines for Implementation of the California Environmental Quality Act, as amended, this Addendum summarizes minor revisions associated with a project analyzed in the Subsequent EIR. Section No. 15164 of the CEQA Guidelines provides the following directions for the preparation of an Addendum:

(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR [...] have occurred;...

(c) An addendum need not be circulated for public review but can be included in or attached to the final EIR [...];

(d) The decision-making body shall consider the addendum with the final EIR [...] prior to making a decision on the project.

(e) A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's findings required on the project, or elsewhere in the record. The explanation must be supported by substantial evidence.

The relevant conditions described in Section 15162 indicate that:

(a) When an EIR has been certified [...], no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in light of the whole record, one or more of the following:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR [...] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR ... due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete [...], shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR [...];

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

As discussed in Chapter 2 of this Addendum, project impacts resulting from changes to the project are not substantially different from those assessed in the Subsequent EIR. In all respects, the proposed changes result in impacts that would be the same, more beneficial to the environment, or would further reduce the level of impact to levels below significance.

Regarding Section 15162 (a)(1) above, revisions to the project as described in Chapter 2 of this Addendum are not considered substantial and do not require major revisions to the Subsequent EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

Regarding Section 15162 (a)(3) above, there has been no new information of substantial importance that has come to light since the certification of the EIR. More specifically,

(A) The information in this Addendum does not reveal a new significant environmental effect not discussed in the previous EIR;

(B) The information in the Addendum does not reveal that a substantial increase in the severity of an environmental impact would result.

(C) & (D) The information in the Addendum does not reveal feasible mitigation measures or alternatives different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

A lead agency may not prepare a Subsequent EIR unless any of the conditions identified in CEQA Guidelines §15162 are found to exist. As discussed previously, none of those conditions has been met and, therefore, no Subsequent EIR can be required. Consequently, an Addendum is considered the appropriate document to discuss the environmental implications of the Revised Project. Nonetheless, CEQA requires that the lead agency support this determination with substantial evidence in the record. This Addendum serves as that vehicle, and a review of its contents substantiates the conclusion that the information provided herein merely updates, clarifies, and amplifies the information provided in the Subsequent EIR for the California City Prison Project.

## 1.2 Overview of the Environmental Review Process

### 1.2.1 Subsequent Environmental Impact Report (Subsequent EIR)

Under CEQA Guidelines, Section 15162, the lead or responsible agency may choose to prepare a Subsequent EIR if, following circulation of a previous EIR, the lead agency determines that there are substantial changes proposed in the project, substantial changes occur with respect to the circumstances under which the project is undertaken, or there is new information of substantial importance that would result in new significant effects or significantly greater impacts than previously disclosed.

In 2006, the lead agency for the project, the City of California City, determined that a Subsequent EIR should be prepared to evaluate an additional portion of the Virginia Boulevard site for construction and operation of a smaller prison facility than that proposed in the previous 1994 EIR. Specifically, the Subsequent EIR contained a co-equal level of environmental analysis for two projects: a 550-bed Modified Community Corrections Center in response to a solicitation from California Department of Corrections and Rehabilitation (CDCR); and a 1,596-bed detention center to meet federal detention needs.

The Subsequent EIR required only information necessary to make the previous EIR adequate for the current project. Therefore, the 1994 certified EIR (SCH No. 93082030) and the Subsequent EIR (SCH No. 2006071009) are incorporated by reference into this Addendum. The California City Planning Commission certified the Subsequent EIR in November 2006.

SECTION 2

# Description of Project Changes

## 2.1 Project Location and Setting

Figure 2-1 shows the project site, which is located in the City of California City, Kern County, California, approximately 0.5 mile south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The project site elevation is roughly 2,540 feet above mean sea level, approximately 5 miles east of downtown California City. The property and most of the vicinity are composed of vacant undeveloped desert land, characterized by creosote bush vegetation. The project site is adjacent to the existing California City Correctional Facility (CCCF) and, as such, the project site is served by public utilities. The CCCF is the only property within 0.5 mile that contains any significant structural improvements. Detailed information on the regional setting is set forth in the Subsequent EIR.

The certified Subsequent EIR evaluated two project options: (1) a 550-bed *Proposed Project* to respond to CDCR Male Bed Expansion Request for Proposal (RFP) Number 050271; and (2) a 1,596-bed *Project Option* to meet to federal demands for detention space in the event that the CDCR contract for the 550-bed facility was not awarded.

If Corrections Corporation of America (CCA) had implemented the 2006 Proposed Project, CCA would have constructed and operated a 550-bed Modified Community Corrections Center on approximately 35 acres located at the southwestern corner of the 320-acre Virginia Boulevard site. The Proposed Project would have been a state-of-the-art, secure correctional facility designed to meet American Correctional Association standards with several facilities including a 125,790-square-foot main building, an outdoor recreation area, an armory for storing weapons and riot gear, a perimeter compound security system, and site improvements including a parking lot for 177 vehicles, an access road, and petroleum-powered generators.

The 2006 Project Option was a 1,596-bed detention center CCA proposed to design, construct, and manage to meet federal demands for detention space. Like the Proposed Project, CCA proposed the Project Option on the same 35-acre section of the 320-acre Virginia Boulevard site, and intended to design the facility to meet American Correctional Association standards. Unlike the previous CDCR proposal, CCA intended the Project Option to accommodate federal prisoners and detainees in a medium-security facility. Figure 1 shows a conceptual site plan of the prison.

It is noteworthy that the Subsequent EIR contained a co-equal and detailed environmental impact analyses for both the 550-bed CDCR Modified Community Correctional Center for State of California inmates and a 1,596-bed detection center intended for federal inmates or detainees. Because the 1,596-bed Project Option had more significant impacts identified than the 550-bed Proposed Project, this Addendum describes and evaluates the 2,200-bed Revised Project in relation to the 1,596-bed detention center.




**FIGURE 1**
Project Option
Conceptual Site Plan
*California City, California*

SCO345802.ED.02 conceptsiteplan_rev.ai 12/09

The 1,596-bed Project Option evaluated in the Subsequent EIR included a state-of-the-art secure correctional facility consisting of the following:

- Secure inmate housing buildings equipped with staff and inmate support facilities, and a central, linear courtyard containing five partially covered recreation areas for inmate recreation activities.
- An administration building composed of offices for prison management, support staff, and support spaces for correctional officers. An armory, containing weapons and riot gear, would be located in a secure portion of the administration building (CCA correctional officers do not carry weapons as part of normal operations).
- With the exception of the outside administration building, all improvements described previously would be located within a perimeter compound security system that would include two rows of chain-link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system and nighttime security lights on 30-foot-tall posts. To facilitate security patrols, a perimeter road would encompass the exterior of the entire fenced prison compound.
- Site improvements located external to the secured inmate housing would include an extension of the existing parking lot for the adjacent CCCF to accommodate an additional 285 employee and visitor vehicles.

## 2.2 Proposed Changes to the Project Description

As stated previously, the proposed revisions to the Project Option, as defined and analyzed in the Subsequent EIR, do not materially change the objectives or general development pattern for the project site.

Since certification of the Subsequent EIR, CCA is proposing a design revision to accommodate an additional 604 beds – totaling 2,200 beds. The proposed change is necessary to meet CCA's needs for new potential business opportunities with federal and other correctional agencies. CCA proposes to construct and operate a similar correctional facility on the same 35 acres of vacant land on the 320-acre Virginia Boulevard site. Like the Project Option design, the Revised Project design includes several single-story and single-story-with-mezzanine buildings, with heights of 20 to 40 feet, intended to accommodate federal prisoners and detainees. The Revised Project will include all of the ancillary facilities listed for the Project Option described previously. A significant design change is in the secure inmate housing area. Where the 2006 Project Option had mostly double-bunk hard-wall cells, the Revised Project would include a mix of dormitory-style housing units and cells. To accommodate various potential federal clients, the Revised Project would also have expanded administrative facilities for inmate programs and agency management, and an additional 120 parking spaces. Figure 2 shows a conceptual site plan of the Revised Project.




FIGURE 2
Corrections Corporation of America
Revised Project
2200 Bed Correctional Facility
*California City, California*
*December 2009*

SCO397014.01.02 CAL CITY SITE PLAN_HALF_12-15-09_2.ai 12/09

SECTION 3

# Environmental Impact Analysis

The following discussion examines the environmental impacts of the Revised Project (see Section 2 for a description of revisions to the Project Option). Except where specifically noted, the assessment methodologies are the same as those employed in the Subsequent EIR.

## 3.1 Land Use

The Subsequent EIR identified no adverse land use impacts from construction and operation of the 1,596-bed detention center. A prison would be consistent with the adjacent CCCF and would not affect other adjacent land uses, since all other surrounding parcels are vacant. As noted in the Subsequent EIR, the prison facility could be located in proximity to future residential development, resulting in a potential land use conflict due to air quality, noise, and visual/aesthetic issues. These potential impacts were addressed in the appropriate sections of the Subsequent EIR.

Because the Revised Project will be constructed on the same site as the 2006 Project Option, no adverse impacts to land use are anticipated. The zoning for the project site, unchanged since certification of the Subsequent EIR, allows for governmental or quasi-governmental correction, probation, or prison facilities, and services with a conditional use permit. Because CCA will obtain a conditional use permit for the Revised Project described in this Addendum, the project will be consistent with the zoning and land use designated for the project site. No adverse impacts relative to land use are anticipated from the proposed revisions. As such, the conclusions of the land use analysis in the Subsequent EIR would not be affected.

## 3.2 Aesthetic and Visual Considerations

Similar to the 1,596-bed detention center evaluated in the Subsequent EIR, the Revised Project would impact daytime viewsheds, resulting in degradation of the existing visual character and quality of the project site. Like the 1,596-bed detention center, the Revised Project would also cause nighttime light and glare. The project site is adjacent to vacant undeveloped desert land that has been entitled for residential subdivisions. While there are no immediate plans for construction in these neighboring subdivisions, the Revised Project would subject future residents to direct and unobstructed views of the prison facility.

The 1,596-bed detention center included single-story and single-story-with-mezzanine structures with a building height of 20 to 40 feet (similar to the adjacent CCCF). The Project Option also included mast light posts up to 30 feet in height (similar to the adjacent CCCF). Where feasible, lighting would be shielded and directed downward. Further, the prison buildings would have an exterior finish that would blend with the surrounding natural environment. Because the Project Option would substantially degrade the visual character

and quality of the project site and cause nighttime light and glare, the Subsequent EIR considered these visual impacts significant. The Subsequent EIR contained mitigation measures that (1) restricted mast lighting posts to 30 feet in height and (2) required lighting to be shielded and directed downward to minimize offsite illumination, where applicable, and required by design.

Because the Revised Project does not (1) increase the severity of the previously identified visual and aesthetic impacts, and (2) incorporates the mitigation measures for the 2006 Project Option, no significant effects examined in this Addendum will be substantially more severe or change the conclusions in the Subsequent EIR.

## 3.3 Employment, Population, and Housing

Similar to the project site development options evaluated in the Subsequent EIR, the Revised Project would create employment opportunities that would likely increase population and demand for housing in California City and the surrounding areas.

### 3.3.1 Impacts

#### Employment

The Revised Project would generate approximately 250 temporary construction jobs and approximately 320 full-time permanent positions during facility operations. Approximately 70 percent of the permanent employment opportunities would be for correctional officers; other job opportunities would include medical, education, administrative, trade, and clerical positions. In addition to jobs provided by the prison, the purchase of local goods and services for the prison facility, and by CCA employees individually, would stimulate the local economy, resulting in additional employment opportunities in the region. The additional employment opportunities are considered a beneficial effect of the Revised Project.

#### Population

The Revised Project would have a prison inmate population of 2,200 at full operating capacity. Based on CCA's experience with more than 60 correctional facilities, generally 1 percent of the inmate families and 10 to 15 percent of the prison employees would relocate to the region. For the Revised Project, approximately 20 families may relocate to the project vicinity. The remainder of prison employment and indirect job opportunities from the prison would be filled by the existing population of California City and surrounding communities. Using the California average household size of 2.9 persons per household, the population increase from relocating inmate and employee families may be approximately 135 persons for the Revised Project.

Population growth associated with a prison typically increases demand for public services, such as water and wastewater facilities. As described in Section 3.4 of this Addendum, and consistent with the Subsequent EIR, impacts resulting from population growth would be less than significant.

#### Housing

The vacancy rate in California City and surrounding communities indicates that ample housing is available to accommodate relocation of inmate families and employee families resulting from the Revised Project.

### 3.3.2 Mitigation Measures

No adverse impacts to employment, population, and housing would result from construction and operation of the Revised Project. As such, no mitigation measures are required. The proposed changes to the project will not affect the findings and conclusions of the Subsequent EIR with respect to employment, population, and housing.

## 3.4 Public Utilities and Community Services

Like the 550-bed Proposed Project and 1,596-bed Project Option evaluated in the Subsequent EIR, the Revised Project has the potential to affect public utilities and community services in California City and in surrounding communities. These effects can occur in two primary ways: (1) by increasing the demand for California City services to the Revised Project directly; and (2) by increasing the demand for services in California City and the surrounding communities to accommodate population growth. The Revised Project would directly and indirectly generate significant tax benefits to the City of California City's general revenue fund and regional governments, which would offset the potential costs of community services.

### 3.4.1 Law Enforcement

The Subsequent EIR determined that the Proposed Project or Project Option would cause (1) a slight increase in calls requesting assistance from the California City Police Department (CCPD), and (2) an increase in the demand for law enforcement services due to project-related and indirect population growth. Based on the small number of additional phone calls for service, the Subsequent EIR concluded that significant impacts to CCPD services would not occur and mitigation measures would not be required.

The Revised Project proposes a 604-bed increase in capacity from the Project Option. Compared to the Project Option, the larger Revised Project would generate a slightly higher number of calls to CCPD and possibly an increased demand for law enforcement services due to population growth directly and indirectly related to the project. Despite the potential increase in calls to CCPD and increased demand for law enforcement services due to direct and indirect project-related population growth, the impacts to law enforcement from the Revised Project would remain within the service capability of CCPD and would not be significant; mitigation measures, therefore, would not be required.

### 3.4.2 Fire Protection

The Proposed Project and Project Option analyzed in the Subsequent EIR were designed to comply with all applicable fire building codes, to be equipped with a comprehensive fire suppression system, and to be constructed with primarily noncombustible building materials. The Subsequent EIR determined that the Proposed Project or Project Option may (1) increase demand on the California City Fire Department (CCFD) for fire suppression, fire

prevention, and investigation duties, and (2) increase the demand for fire protection services resulting from project-related and indirect population growth. Based on the design features included in the facility and CCFD's indication that current staffing levels would be able to accommodate the increased duties that may be generated by the project, impacts to CCFD would be less than significant.

Like the projects analyzed in the Subsequent EIR, the Revised Project described in this Addendum will also be designed to comply with applicable fire building codes, equipped with a comprehensive fire suppression system, and constructed primarily with noncombustible building materials. The 604-bed increase proposed in the Revised Project may cause a slightly increased demand on CCFD for fire suppression, fire prevention, and investigation duties, and a slight increase in the demand for fire protection services due to project-related and indirect population growth. Impacts of the Revised Project would not, however, affect the service capability of CCFD or be significant. As such, the conclusions of the fire protection services analysis in the Subsequent EIR would not be affected.

### 3.4.3 Schools

The Subsequent EIR determined that the Proposed Project and Project Option would cause population growth that would affect student enrollment with the Mojave Unified School District (MUSD). However, MUSD has indicated that it would be able to accommodate additional students resulting from the Proposed Project and Project Option without adverse impacts. Further, mitigation for impacts from additional students generated indirectly by the Revised Project would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules. Based on this description, the Subsequent EIR determined that no adverse impacts would occur from the project or from direct or indirect population growth.

Similarly, the Revised Project described in this Addendum may cause increased demand on MUSD to accommodate additional students; however, based on existing MUSD school capacity, impacts of the Revised Project would not be significant.

### 3.4.4 Hospitals

The Subsequent EIR determined that no significant impact to hospital services would occur because (1) both the Proposed Project and Project Option would include medical facilities onsite 24 hours per day, and (2) the number of hospitals available for the community around California City would be able to accommodate project-related direct or indirect population growth. Because the Revised Project also proposes onsite medical facilities available 24 hours per day, no significant or different impacts would occur.

### 3.4.5 Judicial Services

The Subsequent EIR determined that impacts to judicial services would vary based on the contracting agency providing inmates to the proposed facility. The Project Option would have generated up to two court cases per month, while the adjacent CCCF generates only two court cases per year. The impacts on judicial services are fiscal issues and not environmental impacts. Similarly, the Revised Project proposed in this Addendum would

generate two to three court cases per month. Like the Project Option in the Subsequent EIR, environmental impacts resulting from the Revised Project would not be significant.

### 3.4.6 Water Supply

The Subsequent EIR estimated water demand for the Proposed Project and Project Option by calculating the average daily water usage over time at the existing CCCF and dividing that usage by the number of inmates. The data showed that the water demand in a facility such as that described in the Project Option is approximately 230 gallons per inmate per day (gpid), inclusive of prison staff and support services. California City Public Works Department staff indicated that the Project Option could be served from existing City supply and conveyance facilities. The Project Option proposed design features to minimize water use at the proposed prison, including use of low-flow fixtures and drought-tolerant, native landscaping.

The Revised Project includes the following water-conserving features: ultra low-flow showerheads (1.2 gallons per minute [gpm]); 1.28-gallon-per-flush toilets; grey water recycling for toilet flushing and laundry water recycling; and a water management system to provide correctional officers control of the function of the inmate water closets and inmate showers. Solar-powered hot water could be utilized depending on design parameters and local conditions.

These design features are part of the Revised Project, not mitigation measures, and with implementation of these design and operational features, the Revised Project would significantly reduce the anticipated per-inmate water use and related environmental impacts. Therefore, the proposed changes would not affect California City water services, water conservation efforts, or the water conservation impact analysis as presented in the Subsequent EIR.

### 3.4.7 Wastewater Treatment and Disposal

The Subsequent EIR determined that no significant impacts to wastewater treatment and disposal would be anticipated for the Proposed Project or the Project Option. This determination was based on an estimated wastewater flow of 230 gpid, inclusive of all prison staff and support services. The Revised Project described in this Addendum incorporates additional water-conserving features that would also reduce the amount of wastewater generated per inmate (i.e., grey water recycling, laundry water recycling). A reduction in the quantity of wastewater produced by each inmate is a beneficial or reduced impact of the Revised Project compared to the 2006 Proposed Project or the Project Option.

### 3.4.8 Solid Waste

The Subsequent EIR determined that no significant impacts to solid waste disposal would be anticipated for the Proposed Project or the Project Option. Landfill capacity is expected to remain adequate to accommodate the additional waste generated by the Revised Project and associated direct and indirect population growth related to the project. Kern County has seven landfills and additional recycling facilities that are estimated by County staff to have approximately 70 years of operational capacity to manage solid waste generated in Kern County (Ferguson, 2009). No significant impacts related to solid waste disposal would occur

from the Revised Project. As such, the conclusions of the solid waste impact analysis in the Subsequent EIR would not be affected.

### 3.4.9 Energy

The Subsequent EIR determined that no significant impacts to energy would occur from the Proposed Project or the Project Option. Southern California Edison Company (SCE) has indicated that the electrical loads of the Revised Project are within the parameters of projected load growth that SCE is planning to meet in the vicinity. Southern California Gas Company has indicated that it has adequate natural gas supply and facilities to supply the Revised Project. The existing propane tanks on the adjacent CCCF property also have the capacity to serve the Revised Project. No significant impacts related to energy would occur from the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

### 3.4.10 Telephone and Cable

The Subsequent EIR determined that no significant impacts to telephone and cable would be anticipated for the Proposed Project or the Project Option. With regard to telephone service, telephone line improvements previously installed to support the adjacent CCCF would also serve the Revised Project. As such, the conclusions of the public utilities telephone and cable analysis in the Subsequent EIR would not be affected.

## 3.5 Transportation

### 3.5.1 Construction Impacts

The Subsequent EIR determined that construction of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, construction of the 2,200-bed Revised Project would require similar numbers of construction workers and equipment and a similar duration time to the requirements to construct the 1,596-bed Project Option evaluated in the Subsequent EIR. Because the Revised Project would cause similar construction traffic trip generation, including ready-mix concrete truck, tractor trailer, and flatbed truck trips, impacts to traffic and transportation during construction would not be significant, and no additional mitigation measures would be required to address construction of the Revised Project. As such, the conclusions of the transportation project construction impact analysis in the Subsequent EIR would not be affected.

### 3.5.2 Operation Impacts

The Subsequent EIR determined that operation of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, operation of the Revised Project may result in a slight increase in trip generation due to a nominal increase in the number of employees required to operate a prison facility that accommodates an additional 604 beds. Further, additional increases to trip generation may occur as a result of increased inmate visitations, inmate transfers, and deliveries to the 2,200-bed Revised Project facility. Although the Revised Project could result in an incremental increase in traffic in the areas surrounding the prison facility, as explained in the following paragraphs, these impacts to

traffic and transportation would not be significant, and no additional mitigation measures would be required to address operation of the Revised Project.

The 2006 California City Prison Subsequent EIR traffic analysis was based on projected 2008 traffic operations. The projected traffic was based on available field data collected in 2004 and 2006. Those 2004/2006 counts were factored up to 2008 with an assumed 1 percent annual growth factor.

The Caltrans database annual traffic counts for the last 4 years (2004 to 2008) for the two state highways (State Routes [SR] 14 and 58) was reviewed to assess the need for changes in the traffic estimates. The volumes were nearly unchanged where there are common data points. For example, for SR 14, the traffic volumes increased by 1 percent between 2004 and 2005 and have stayed the same for the last 3 years. In other words, the estimates for 2008 were likely higher than actually occurred. Therefore, the projected 2008 volumes are reasonable estimates for 2010 or 2011.

Even if some increase in volume occurred, it would take very high changes in volumes to change the conclusions. Most of the roadway segments would operate at level of service (LOS) A to C. The stated significance threshold value is LOS E, and only one segment (SR 14) is projected to operate at LOS D. It would take increases in background volumes of 60 percent (for the proposed project analysis) or 43 percent (for the Project Option analysis) to reach LOS E. Therefore, the revised project timeline and additional inmate capacity would not result in new or more significant traffic impacts than those analyzed in the Subsequent EIR.

## 3.6 Air Quality

Table 1 in the Air Quality section of the Subsequent EIR showed the latest 3 years available at that time (that is, 2003 through 2005) of the concentrations of criteria pollutants at the nearest monitoring site: the Mojave monitoring station, which is located less than 20 miles southwest of the project site. Table 1 below shows an updated version of Table 1 from the Air Quality section of the Subsequent EIR, with the latest 3 years currently available, 2006 to 2008. Based on the updated monitoring station data (summarized in Table 1), the air quality environmental setting has not experienced meaningful change since the Subsequent EIR was certified.

**TABLE 1**
AAQS, Designation Classification, and Monitoring Values[1]

| Pollutant | Ozone (ppm) | $PM_{2.5}$ (µg/m3) | | $PM_{10}$ (µg/m3) | | CO (ppm) | | NO2 (ppm) | | $SO_2$ (ppm) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Averaging Period | 8-hr | 24-hr | Annual | 24-hr | Annual | 8-hr | 1-hr | 1-hr | Annual | 1-hr | 3-hr | 24-hr | Annual |
| **CAAQS** | 0.070 | * | 12 | 50 | 20 | 9.0 | 20 | 0.25 | * | 0.25 | * | 0.04 | * |
| **NAAQS** | 0.08 | 65 | 15 | 150 | 50 | 9 | 35 | * | 0.053 | * | 0.5 | 0.14 | 0.030 |
| **Mojave Monitor 2006** | 0.102 | 21.3 | * | 58 | 19.5 | * | * | * | * | * | * | * | * |
| **Mojave Monitor 2007** | 0.085 | 21.1 | * | 70 | * | * | * | * | * | * | * | * | * |

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 79 of 161



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 0.103 | 19.1 | * | 145 | 22.4 | * | * | * | * | * | * | * | * |

*An ambient standard has not been established or the pollutant was not monitored at the Mojave monitor.

[1] The monitor data is from the California ARB Web site http://www.arb.ca.gov/adam/cgi-bin/db2www/adamtop4b.d2w/start.

### 3.6.1 Construction Impacts

The Subsequent EIR concluded that potential impacts from construction of the Proposed Project and the Project Option were shown to be less than significant for all pollutants, except for daily emissions of nitrogen oxide ($NO2$) and particulate matter less than 10 micrometers in aerodynamic diameter ($PM_{10}$). The following best management practices (BMPs) were implemented as mitigation measures to control fugitive $PM_{10}$ during construction:

- Water exposed areas to increase the stability of the soil by increasing moisture content on a continuous basis, or as needed.
- Water soil prior to removal to the depth of the proposed cuts.
- Compact soil following grading to 85 to 95 percent and maintain surfaces.

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications.
- Provide information to construction employees to facilitate carpooling.
- Provide information to construction and operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

To improve the Revised Project's air quality performance during construction including greenhouse gas reductions to meet AB 32 requirements, the Revised Project proposes to incorporate the following:

- Prior to construction, certify that all onsite construction equipment meets the Tier 2 and Tier 3 California Air Resources Board (ARB) certification standards.
- During construction, require all onsite construction equipment to meet the Tier 2 and Tier 3 California ARB certification standards, and that each piece of equipment has proof of certification from the ARB.
- Prior to construction and any land disturbances, require certification that all onsite construction equipment utilizes 20 percent biodiesel fuel.
- During construction, require that all construction equipment utilize 20 percent biodiesel fuel.
- During construction, prohibit the use of portable generators and require that all electrical power be provided by an energy supplier.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction intensity compared to the Project Option. The construction air quality impacts would be similar because the duration and

anticipated equipment mix of construction would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. As such, the conclusions of the project air quality construction impact analysis in the Subsequent EIR would not be affected.

### 3.6.2 Operation Impacts

The Subsequent EIR determined that potential impacts from stationary sources associated with operation of the Project Option would be less than significant. To improve the Revised Project's air quality performance during operation including greenhouse gas reductions to meet AB 32 requirements, the Revised Project would incorporate the following design features to implement energy efficiency and water conservation measures, and programs to reduce vehicle miles traveled (VMT):

- Plumbing measures including ultra low-flow fixtures - 1.2 gpm for showers and 1.28 gallon/flush toilets; implementation of a water management system to reduce waste; high-efficiency gas or propane water heaters (92 percent efficiency condensing type) plus solar hot water; and recycling grey water from showers to water closets and laundry grey water recycling.
- Electrical measures including the use of premium T8 lamps for indoor lighting and an optimized lighting design; and daylight harvesting and automatic networked lighting control systems in dayrooms and dormitories.
- Architectural measures including use of R-28.8 exterior wall insulation and R-30 roof insulation; use of skylights for dayrooms, administrative and other support areas with 54 percent transmittance value to allow daylight harvesting; facility design and implementation may be LEED-certified and may include additional measures to meet LEED certification requirements.
- Kitchen measures including use of variable volume kitchen hoods and more efficient freezers and coolers; use of low-emitting stoves that meet EnergyStar requirements; and implementation of an enhanced onsite recycling /waste reduction/diversion and reuse program.
- Landscape measures including a design and maintenance program that includes drought-resistant and low water use plantings; and use of light-colored/high-albedo materials for paved surfaces including parking lots and walkways.
- Measures to reduce VMT including preferential parking for carpools and vanpools to the facility; bicycle racks and end-of-trip facilities for employees; and onsite lunch services for employees.

The additional operational emissions associated with vehicle exhaust from the Revised Project would also be less than significant for all pollutants except for carbon monoxide (CO), NO2, and $PM_{10}$ emissions, which would remain significant after mitigation. Thus, the conclusions of the operational air quality impact analysis contained in the Subsequent EIR would not change.

### Mitigation

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications, and ARB-certified as described previously.
- Provide information to construction employees to facilitate carpooling.
- Implement project construction features addressing fuel and electrical energy use.
- Provide information to operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

### Finding

The Revised Project does not substantially increase the significant air quality CO, $PM_{10}$, and NO2 impacts of the 2006 Project Option. Air quality impacts arising from CO, $PM_{10}$, and NO2 emissions during project operation cannot be mitigated to a less-than- significant level. However, changes or alterations have been required in, or incorporated into, the project that substantially lessens the significant environmental effects identified in the Subsequent EIR. This finding would also apply to the Revised Project.

## 3.7 Noise

No sensitive noise receptors are currently located near the Revised Project. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore, the following mitigation measures would be implemented to reduce the noise impacts of construction only in the event that residences are built adjacent to the Revised Project prior to project construction: limit construction activities within 2,000 feet of occupied residences to the hours of 7 a.m. to 8 p.m., Monday through Saturday, with no construction allowed on Sundays or federal holidays; and use properly muffled equipment and trucks.

Prison operation would not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operation. Thus, the conclusions of the Subsequent EIR would not change.

## 3.8 Hydrology, Storm Drainage, and Flood Control

The Revised Project would cover approximately 16 acres with impervious surfaces such as buildings, access roads, and parking areas. By covering approximately 16 acres of vacant desert land, the Revised Project would cause similar stormwater flow from the project site as the 2006 Project Option. Thus, the conclusions of the drainage analysis contained in the Subsequent EIR would not change.

### Mitigation

The following measures were adopted in the prior Subsequent EIR to reduce the potential impacts related to stormwater runoff to a less-than-significant level:

- The project will comply with all applicable requirements of the National Pollutant Discharge Elimination System (NPDES) permit program.
- Unlined ditches or swales that will be allowed to revegetate naturally will be constructed along the perimeter of the project site. Erosion control structures will be constructed to reduce the potential for sedimentation. Most ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to at least one detention basin located on the project site. Other ditches may direct runoff offsite, but the total flow rates leaving the site will be maintained at pre-project levels.
- An unlined stormwater detention basin will be developed onsite to retain a volume of stormwater necessary to (1) control runoff from impervious surfaces, and (2) maintain pre-project levels of surface runoff volumes at the property boundaries. The capacity of the detention basin will be based on calculated stormwater flows above natural conditions, resulting from impervious surfaces of the proposed project. The sizing and design of this detention basin will be reviewed and approved by the California City Engineering Department as part of the final project site plan approval.

## 3.9 Biological Resources

Biologists from CH2M HILL reviewed and updated the evaluation of biological resources provided in the previously certified Subsequent EIR. To complete this updated evaluation of biological resources, CH2M HILL biologists conducted a 1-day site reconnaissance on May 12, 2009, to assess current biological conditions and determine whether significant changes have occurred since the previous biological surveys. The current legal status of biological resources onsite was also verified. In addition, an updated search of the California Natural Diversity Database (CNDDB) was conducted for known records of occurrence of sensitive biological resources on or in the site vicinity of the proposed project. Because CEQA significance criteria for biological resources have not changed since the Subsequent EIR, the impact analysis methodology remains unchanged. Finally, the recommended

biological mitigation measures from the previous Subsequent EIR were reviewed for current applicability.

## 3.9.1 Environmental Setting

### Vegetation and Habitat

The 35-acre study area remains generally unchanged from surveys conducted in July 2006, as reported in the Subsequent EIR, except that off-highway vehicle (OHV) use of the project site has continued to result in habitat degradation. The project site lies just south of existing developed prison facilities, and although undeveloped, shows extensive evidence of off-highway travel by vehicles and motorcycles. Vegetated land is relatively homogeneous, composed of sandy soils with sparse vegetation resembling a creosote bush community. Plant species occurring on the project site include, but are not limited to, creosote bush (*Larrea tridentata*), burro bush (*Ambrosia dumosa*), split grass (*Schismus barbatus*), desert trumpet (*Eriogonum inflatum*), spine flower (*Chorizanthe* sp.), filaree (*Erodium cicutarium*), and fiddleneck (*Amsinckia tessellata*). Other species observed included saltbush (*Atriplex* spp.), annual woollystar (*Eriastrum* spp.), and cheesebush (*Hymenoclea salsola*).

The creosote bush on the project site is highly disturbed from heavy OHV traffic. The area receives intensive use from OHV traffic year-round, but use in this and surrounding areas is reported to be exceptionally high on weekends and holidays. Trails from OHV traffic bisect the landscape, and the proposed project site is not currently fenced or excluded from OHV traffic. The resulting disturbed and degraded landscape does not support high-quality wildlife habitat, as evidenced by the scarcity of tortoise sign on portions of the project site, which might otherwise have supported this species. While creosote bushes remain intact, additional shrub coverage is significantly reduced relative to that of an undisturbed creosote bush community. In addition, the herbaceous plant community, while it could not be assessed during optimal seasonal conditions, is probably also severely degraded.

### Special-status Plants

Consistent with findings in the Subsequent EIR, no state-listed or federally listed rare plants are anticipated in the vicinity of the project site. Conditions for establishment of special-status plant species are unlikely as a result of the lack of suitable conditions, past disturbances, and the naturally sparse nature of the vegetation community at the study area.

### Special-status Wildlife

Conditions for special-status wildlife remain unchanged from the Subsequent EIR, except that OHV use has further degraded the habitat. Because of sparse vegetation providing limited cover and forage within the study area, wildlife diversity and abundance are considered low. Wildlife observed during the survey were consistent with observations during the 2006 survey, consisting of common species typically associated with Mojave desert scrub habitats.

A pair of burrowing owls (*Athene cunicularia*) was observed in the southeastern corner of the parking lot of the existing correctional facility, north of the 35-acre project site. The nest burrow was located on the north side of the berm that runs along the southern perimeter of the parking lot. Although the nest burrow was located on the facility, the owls would be

expected to forage within the proposed project area. No additional nest burrows or burrow complexes were observed on the project site.

The study area does not lie within critical habitat for the desert tortoise. Based on the 2009 surveys, conditions for desert tortoise remain generally unchanged on the proposed project site from the 2006 field surveys, except that OHV use has further degraded the quality of the habitat. Live desert tortoises or their burrows were not observed during the survey on the project site, and there appears to be a relatively low density of sign in the general vicinity of the project site. A higher density of sign occurs in areas surveyed approximately 1 mile east of the 35-acre project site; nevertheless, because habitat is present, and tortoises have been observed in the area, the potential occurrence of desert tortoise cannot be precluded.

#### Regulated Waters

An analysis of all drainages in the vicinity of the proposed project site indicated a general lack of consistent flows or channel-forming events. Most drainages were small, incipient channels that appeared to only infrequently convey flows. Evidence of Ordinary High Water Mark (OHWM), which normally defines waters regulated by either federal or state agencies, was lacking. Evidence of OHWM within drainages normally includes recent evidence of flow showing as erosion, depositional surfaces, bent or scoured vegetation, sediment sorting, cracking, mineral staining, or debris deposits. None of these characteristics is consistently observed within drainages on the project site, and it is anticipated that drainages would not be jurisdictional under federal or state regulations.

In addition, no riparian vegetation, which normally consists of desert wash vegetation in arid regions, was present. Riparian vegetation, with potential to support certain wildlife species, in conjunction with OHWM, is normally a requirement for jurisdictional streambed and bank regulated by the California Department of Fish and Game (CDFG).

### 3.9.2 Environmental Impacts

Based on findings from the updated survey in 2009, the Revised Project causes no new impacts to biological resources and does not substantially increase the severity of the impacts identified in the Subsequent EIR. CEQA significance criteria remain unchanged, and because biological conditions on the project site have not changed substantially since 2006, impacts remain the same. This section provides a summary of those impacts and proposed mitigation measures.

#### General Wildlife and Habitat

The impacts to general wildlife or their habitats would not differ significantly from those described in the Subsequent EIR. This loss of habitat for general wildlife species (not protected or otherwise designated as sensitive) would not be considered significant under CEQA because it is abundant in the area. Established native resident or migratory wildlife corridors as well as nursery sites do not occur onsite and would not be affected by project activities. Joshua trees (*Yucca brevifolia*) and other tree species do not occur onsite and would not be affected by project activities. Wetlands, marshes, ephemeral washes, or riparian areas do not occur onsite and would not be affected by project activities.

### Migratory Birds

Conditions affecting migratory birds protected under the federal Migratory Bird Treaty Act (MBTA) and CDFG Code Section 3513 remain unchanged. The proposed prison structure may attract these species, and operations represent a potential significant impact to migratory birds. Mitigation has been identified in the Subsequent EIR to reduce these impacts to less than significant.

### Special-status Plants

Because project site conditions are not favorable for desert cymopterus or other rare plants, there are no anticipated impacts to this special-status plant species.

### Special-status Wildlife

Like the Proposed Project and Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. However, because the habitat is previously disturbed, and generally of a low quality, the loss of habitat is not likely to cause the population of these species to decrease to less-than-sustainable levels.

Adverse effects may also include injury or death of individual burrowing owls, desert tortoise, or Mohave ground squirrel encountered during project construction, especially during earth-moving activities and when species are underground in burrows. The loss of individuals of these species would be considered a significant impact under CEQA, requiring mitigation, described as follows.

### Habitat Loss

Like the Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. In order to comply with the federal Endangered Species Act (ESA) and the California Endangered Species Act (CESA), CCA would be required to obtain necessary approvals and permits with the U.S. Fish and Wildlife Service (USFWS) and CDFG. USFWS requires the submittal of an ESA Section 10(a) permit application and preparation of a Habitat Conservation Plan (HCP) that includes an impact assessment; mitigation measures to avoid or minimize impacts; compensation for any unavoidable impacts; implementation measures; and provisions for any unforeseen circumstances and amendment to the HCP and permits. CDFG requires the submittal of a 2081 permit application and a copy of the HCP.

In 1998, CCA prepared a Supplemental EIR for development of a prison facility (the CCCF). In the course of coordinating with USFWS and CDFG and obtaining appropriate permits for the CCCF, CCA prepared the appropriate ESA and CESA permit applications and HCP for 105 acres, including the 70-acre CCCF site, as well as the 35-acre project site evaluated in the Subsequent EIR and this Addendum. As a result, the Revised Project has the necessary HCP, Incidental Take Permits, and Implementing Agreement in place, as required by USFWS and CDFG. The Revised Project would be required to comply with all mitigation measures of USFWS and CDFG Incidental Take Permits (#PRT-842781 and #2081-1998-17-4, respectively).

#### Finding

The Revised Project does not cause new significant impacts or make more severe the significant impacts identified in the Subsequent EIR. The impacts of the Project Option associated with the loss of 35 acres of habitat for burrowing owl, desert tortoise, Mojave ground squirrel cannot be mitigated to a less-than-significant level and similar impacts would occur if the Revised Project were implemented. However, changes or alterations have been required in, or incorporated into, the Subsequent EIR and carried forward in this Addendum that substantially lessen the significant environmental effects identified in the previous EIR. Thus, the conclusions of the Subsequent EIR would not change.

## 3.10 Cultural Resources

A recorded archaeological site is located adjacent to the project site. The potential disturbance of prehistoric material is considered a significant project impact. The mitigation measures contained in the Subsequent EIR would apply to the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

## 3.11 Cumulative Impacts

The Subsequent EIR identified significant cumulative impact contributions for the Proposed Project and Project Option in the following resource areas.

- Aesthetics and Visual Considerations – Changing the visual character of the project vicinity over time as the urbanized area expands.
- Air Quality – Emitting emissions of CO, NO2, and $PM_{10}$ from construction and operation is considered significant and unavoidable.
- Biological Resources – Loss of habitat for burrowing owl, desert tortoise, and Mohave ground squirrel.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction and operation intensity compared to the Project Option. The construction impacts would be similar because the duration and anticipated equipment mix would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. Revised Project operations would occur on the same 35 acres as the 2006 Project Option. While staffing levels and other operational facets would incrementally increase for the Revised Project as compared to the 2006 Project Option, no additional significant impacts or new impacts not analyzed in the prior EIR would occur. As such, the conclusions of the cumulative impacts analysis in the Subsequent EIR would not be affected.

## 3.12 Environmental Impact Analysis Conclusions

Based on the previously stated information, there are no changes in circumstances that would constitute a substantial change that would require major revisions of the previously

certified Subsequent EIR due to new environmental effects; no increases in severity of previously identified substantial effects would occur; no new information of substantial importance, which was not previously known, shows that the project would have one or more significant effects not discussed in the previously certified Subsequent EIR; no significant effects previously examined would be substantially more severe than shown in the previously certified Subsequent EIR; no mitigation measure or alternative previously found not to be feasible would be feasible and would substantially reduce one or more significant effects; and/or no mitigation measures or alternatives not considered in the previously certified Subsequent EIR would substantially reduce one or more significant effects on the environment.




Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 88 of 161

CORRECTIONS CORPORATION OF AMERICA
2200 BED CORRECTIONAL FACILITY
CALIFORNIA CITY, CA
DECEMBER 2009

PROJ # 345802

CH2MHILL

# ATTACHMENT F

ATTACHMENT F

**RESOLUTION NO. 12-09-2009PC**
**A RESOLUTION OF THE PLANNING COMMISSION**
**OF THE CITY OF CALIFORNIA CITY**
**TO APPROVE CONDITIONAL USE PERMIT (CUP) 09-04**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**SECTION 1. PURPOSE.**

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Sace/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

**WHERE AS**; the property is located in North one-half of Section 13, T32S, R38E, MDB&M, APN 350-031-02.

**WHERE AS**; conditions of approval for the prison as per Exhibit A (2-pages), hereinafter referred to as "prison conditions," were prepared.

**SECTION 2. FINDINGS.**

The Planning Commission finds, determines and declares:

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department

prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2. The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3. CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4. Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide

redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5. If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6. CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7. The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8. CUP 09-04 allows for construction and operation of a 2,200-bed prison facility.

9. There shall be no expiration date associated with CUP 09-04.

10. A mitigation monitoring and reporting plan to document compliance with all mitigation

measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.

**SECTION 3. ENVIRONMENTAL FINDINGS**

An addendum as required by CEQA for the revised project has been conducted and all conclusions of the 2006 Subsequent Environmental Impact Report (EIR) are valid and accurate.

**NOW, THEREFORE, BE IT RESOLVED** that the Planning Commission of the City of California City does hereby approve CUP 09-04, with all conditions of approval as stipulated in Exhibit A, and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**I HEREBY CERTIFY** that the foregoing resolution was duly passed and adopted by the Planning Commission on the 22nd day of December, 2009.

**AYES:** 4
**NOES:** 0
**ABSENT:** 1
**ABSTAIN:** 0

Ruben W Dennis Jr.
Chairman

**ATTEST:**

Ronna Greene
Recording Secretary

# CCA 2200-Bed Prison
# CUP 09-04

## CONDITIONS OF APPROVAL

## "EXHIBIT A"

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Space/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2. The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3. CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4. Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5. If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6. CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7. The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8. CUP 09-04 allows for construction and operation of a 2,200-bed prison facility. There shall be no expiration date associated with CUP 09-04.

10. A mitigation monitoring and reporting plan to document compliance with all mitigation measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.
diligently pursued.

# ATTACHMENT G

ATTACHMENT G



Incorporated 1965
City of California City
City Hall
PHONE (760) 373-8661
21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

May 27, 2014

Ms. Deborah Hysen, Deputy Director
Facility Planning, Construction and Management
California Department of Corrections and Rehabilitation
1515 S Street, Suite 502S
Sacramento, CA 95811

Dear Ms. Hysen:

Reference is made to the Lease Agreement made between Corrections Corporation of America ("CCA") and the California Department of Corrections and Rehabilitation ("CDCR"), in which CDCR leases and operates the California City Corrections Center (CCCC), located at 22844 Virginia Boulevard, California City CA 935055.

The Planning Department has completed a review of the land use permitting associate with the CCCC, and this is to notify you that CDCR is authorized and fully permitted to operate 2,560 beds at the CCCC.

We look forward to working with you, and please let me know if I may answer any questions.

Sincerely,

Tom Weil
City Manager

Cc: Brad Wiggins, CCA

ATTACHMENT H

ATTACHMENT H

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**

# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111 Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal. Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

**Facility:** CCA- California City Correctional Facility

**Address:** 22844 Virginia Blvd. California City, Ca.

**CA State Fire Marshal File #:** 02-15-44-0020

**Occupancy Classification:** I-3 (Under CCR Title 24 2013 Edition)

**Project No. or Name:** ADA Phase 1 Upgrades (S.S., Dayrooms & Cells)

**Name and Title of Approving Official:** George D. Mavrikis, Deputy State Fire Marshal

**Signature:** [signature] **Date:** May 29, 2014

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*

**This Certificate Shall Be Filed on Location**

# ATTACHMENT I

ATTACHMENT I

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**

# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111 Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal. Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

**Facility:** CCA- California City Correctional Facility

**Address:** 22844 Virginia Blvd. California City, Ca.

**CA State Fire Marshal File #:** 02-15-44-0020

**Occupancy Classification:** I-3 (Under CCR Title 24 2013 Edition)

**Project No. or Name:** ADA Phase 2 Upgrades (Entire Facility)

**Name and Title of Approving Official:** George D. Mavrikis, Deputy State Fire Marshal III Specialist

**Signature:** **Date:** December 11, 2014

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*

**This Certificate Shall Be Filed on Location**

# ATTACHMENT J

ATTACHMENT J

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 103 of 161


**308.4 Institutional Group I-3.**

Institutional Group I-3 occupancy shall include buildings *or portions of buildings* and structures that are inhabited by *one or* more persons who are under restraint or security. A Group I-3 facility is occupied by persons who are generally incapable of self-preservation due to security measures not under the occupants' control *which includes persons restrained*. This group shall include, but not be limited to, the following:

Correctional centers

*Correctional hospitals*

*Correctional nursing facilities*

*Correctional mental health facilities*

*Correctional treatment centers*

*Courthouse holding facility*

Detention centers

*Detention treatment room*

Jails

*Juvenile halls*

Prerelease centers

Prisons

Reformatories

*Secure interview rooms*

*Temporary holding facility*

Buildings of Group I-3 shall be classified as one of the occupancy conditions specified in Sections 308.4.1 through *308.5.8* and shall comply with Section 408.

**308.4.1 Condition 1.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas, and other spaces where access or occupancy is permitted, to the exterior via means of egress without restraint. A Condition 1 facility is permitted to be constructed as Group R.

**308.4.2 Condition 2.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas and any other occupied smoke compartment to one or more other smoke compartments. Egress to the exterior is impeded by locked exits.

**308.4.3 Condition 3.**

This occupancy condition shall include buildings in which free movement is allowed within individual smoke compartments, such as within a residential unit composed of individual sleeping units and group activity spaces, where egress is impeded by remote-controlled release of means of egress from such a smoke compartment to another smoke compartment.

**308.4.4 Condition 4.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Remote-controlled release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

**308.4.5 Condition 5.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Staff-controlled manual release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

***308.4.6 Condition 6.***

*This occupancy condition shall include buildings containing only one temporary holding facility with six or fewer persons*

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
*Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.*

*under restraint or security where the building is protected throughout with an automatic sprinkler system installed in accordance with Section 903.3.1.1 and where the temporary holding facility is protected throughout with an automatic fire alarm system with notification appliances. A Condition 6 building shall be permitted to be classified as a Group B occupancy.*

***308.4.7 Condition 7.***

*This occupancy condition shall include buildings containing only one temporary holding facility with nine or less persons under restraint or security where limited to the first or second story, provided the building complies with Section 408.1.2.6. A Condition 7 building shall be permitted to be classified as a Group B occupancy.*

***308.4.8 Condition 8.***

*This occupancy condition shall include buildings containing not more than four secure interview rooms located within the same fire area where not more than six occupants under restraint are located in the same fire area. A Condition 8 building shall be is permitted to be classified as a Group B occupancy, provided the requirements in Section 408.1.2.7 are met.*

***308.4.9 Condition 9.***

*This occupancy condition shall include buildings where the use of the building is for correctional medical care or correctional mental health care.*

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
*Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.*

PDF from: http://codes.iccsafe.org/content/CABC2022P4/chapter-3-occupancy-classification-and-use#CABC2022P4_Ch03_Sec308.4

# ATTACHMENT K

ATTACHMENT K

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY
DEPARTMENT OF FORESTRY AND FIRE PROTECTION
**OFFICE OF THE STATE FIRE MARSHAL**
FIRE AND LIFE SAFETY DIVISION
**INSPECTION REPORT**
EN-02 (12/08)

## INSPECTION REPORT

| | | | |
|---|---|---|---|
| FILE NUMBER<br>**02-15-44-0020** | | PAGE<br>**01** | OF PAGE<br>**01** |
| NAME OF FACILITY<br>**CCA- California City Correctional Facility- California City (Kern County)** | | HOURS | MINUTES |
| NAME OF BUILDING<br>***Project # I-000803*** | | | |
| ADDRESS<br>**22844 Virginia Blvd. California City, Ca.** | | | |
| DISCUSSED WITH<br>**Gary Stowers** | TITLE<br>***CSII / IWL*** | | |
| ACCOMPANIED BY<br>**Mike Mejia** | TITLE<br>**CDCR Fire Captain** | | |

On August 18, 2014, a final inspection was conducted of the above mention facility, Accompanied by Gary Stowers – CSI-2, Randy Monette-CSI, David Silva-CSI, Mike Mejia-CDCR Fire Captain.
The following Projects was noted:

2014-01 – HVAC for Room B103
2014-02 – Yard Toilets, Lavatories & drinking fountains
2014-03 – Trunk Radio, Trailer, Tower & Infrastructure
2014-04 – Exercise Yard Fencing & Gates (Main Yard)
2014-07 – Administrative Segregation Unit Modification
201408 – Change Glazing in AD Seg. Exterior Windows.

**~ A Final & a Grant of Occupancy is issued on today's Date ~**

###

| | |
|---|---|
| RECEIVED BY | DATE<br>***August 18, 2014*** |
| DEPUTY STATE FIRE MARSHAL<br>***George D. Mavrikis*** | DATE OF INSPECTION<br>***August 18, 2014*** |

# ATTACHMENT L

ATTACHMENT L

# Certificate of Occupancy

## California City Building Department

*This Certificate issued pursuant to the requirements of Section 109 of the California Building Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following:*

## Corrections Corporation of America

Use Classification: I1 Occupancy Group: B Type of Construction: **V** Permit No. 15990

Use Zone: Building Address: 22844 Virginia Blvd.

Locality : **California City** Final Date: **1/31/17**

1/31/17

Joe Barragan 1/31/17
Date

# ATTACHMENT M

ATTACHMENT M

KERN COUNTY Assessor Recorder

# Assessor Property Search - Property Details

Note: You are not currently in a decline in value status.

## General Property Information

| | | | |
|---|---|---|---|
| **ATN** | 350-031-28-00-0 | **Status** | Active |
| **Parcel Num.** | 350-031-28-2 | View Assessor's Parcel Map | View GIS Map |
| **Site Addr.** | 22844 VIRGINIA BL CALIFORNIA CITY | | |
| **Legal** | PARCEL MAP 12374 LOT 1 | | |
| **Acres** | 61.19 | | |
| **Use Code** | 1716 - DETENTION FACILITY/PRISON | | |
| **Prior APN(s)** | 350-031-02 | | |
| **Supervisorial District** | 2 - Chris Parlier | | |

## Property Characteristics

| | |
|---|---|
| **No. of Buildings** | 6 |
| **Total No. of Units** | 0 |
| **Total Sq. Ft. of All Buildings** | 510980 |
| **Has Parking Lot** | No |
| **Has Parking Structure** | No |
| **Yard Improvements** | |
| **Building #1** | |
| **Year Built** | 1999 |
| **No. of Stories** | 2 |
| **Construction Type** | S |
| **Roof Cover Type** | Hot Mop |
| **Roof Type** | Flat |
| **Heating Type** | Electricity |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 501208 |
| **Total Building Area (Sq. Ft.)** | 501208 |
| **Building #2** | |
| **Year Built** | 2008 |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 1200 |
| **Total Building Area (Sq. Ft.)** | 1200 |
| **Building #3** | |
| **Year Built** | 2008 |
| **Quality** | Average |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 4000 |
| **Total Building Area (Sq. Ft.)** | 4000 |

| Building #4 | |
|---|---|
| No. of Stories | 2 |
| Has Escalators | No |
| **Building #5** | |
| Year Built | 2013 |
| Construction Type | S |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2340 |
| Total Building Area (Sq. Ft.) | 2340 |
| **Building #6** | |
| Year Built | 2013 |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2232 |
| Total Building Area (Sq. Ft.) | 2232 |

| Current tax roll values that are used to calculate the bills due in December 2025 and April 2026 | |
|---|---|
| Land Value | $532,121 |
| Mineral Value | $0 |
| Improvement Value | $162,120,561 |
| Other Improvements | $1,084,566 |
| Personal Property Value | $2,638,655 |
| Total | $166,375,903 |
| Less Exemption Value | $0 |
| Net Total Taxable Value | $166,375,903 |
| Tax Rate Area | 011-010 - CALIFORNIA CITY INSIDE-MOJAVE |

## Tax Bill Information

Current Year Billing in progress, bill information will be available in September.

Go to prior year tax information on Kern County Treasurer-Tax Collector's website

### INFORMATION FOR PROPERTY OWNER

### Overview

Pursuant to California Revenue & Taxation Code § 619 and § 621, this notice informs you of THE TAXABLE VALUE of your property. It also serves to inform you of your opportunity to request reconsideration of our findings or to file an assessment appeal. If you believe that your property is worth less than the indicated amount, you may discuss the matter with the Assessor's staff by calling (661)-868-3485. Decline-in-value review requests are taken between July 2 and November 30. For details, visit the Decline-in-Value Review (Proposition 8) page

If you and the County Assessor cannot agree on the assessed value, you may appeal the assessment to the Assessment Appeals Board. Applications are accepted between July 2 and November 30, and are processed by the Clerk of the Assessment Appeal Board, located at the County Administration Center, 5th floor, 1115 Truxtun Avenue, Bakersfield, California 93301. For more information, visit the Assessment Appeals page

Revenue and Taxation Code § 1607 provides that the taxpayer need not attend the scheduled equalization hearing and testify to the property's value. If an agreement can be reached with the Assessor, the applicant or applicant's agent may sign a written stipulation setting forth the facts upon which a reduction in value is premised. The Board can either accept the stipulation or reject it and set a new hearing date.

**How and when property is assessed**

Article XIIIA of the California Constitution provides that property shall be taxed in proportion to its value. In part:

- Property is appraised at its 1975-76 market value unless it has been sold, newly constructed, or had a change in ownership after March 1, 1975.
- Property transferred after March 1, 1975 will have a new base year market value established as of the date of the change in ownership.
- New construction will be assessed at market value and added to the base year value as of its date of completion.
- The base year value is subject to an annual rate of inflation not to exceed 2 percent increase per year.
- The taxable value of real property on the local roll shall be the lesser of: (a) factored base year value, (b) current market value, or (c) the value of the property if it was damaged or destroyed by calamity pursuant to Revenue and Taxation Code § 170

A copy of the local assessment roll is available for public inspection during regular office hours (8-5) Monday through Friday in the Assessor's Office at 1115 Truxtun Ave, 2nd floor.

# ATTACHMENT N

ATTACHMENT N

**From:** "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:** 08/14/2025 2:37:30 PM (-07:00)
**To:** "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Cc:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Anu Doravari" <adoravari@californiacity-ca.gov>; "Stone, Stacey" <Stacey.Stone@corecivic.com>; "Malloy, John" <John.Malloy@corecivic.com>; "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Wiggins, Brad" <Brad.Wiggins@corecivic.com>
**Subject:** RE: Open Permits

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon Marcelo,

That is correct. Per our conversation the only "open" permits we have would only be for mild modifications/repairs. A certificate of occupancy is typically required for new construction, significant renovations, additions, or changes in the occupancy category. Since minor plumbing and a re-roof do not fall into those categories, a C of O should not be required.

You mentioned cancelling these permits during or phone call, please let me know if you would like to move forward with cancelling the 3 open permits we have.

Also, Roseann called and made payment on the sign permit and it will be issued shortly.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, August 14, 2025 2:22 PM
**To:** Susan Weber <sweber@californiacity-ca.gov>
**Cc:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Anu Doravari <adoravari@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Malloy, John <John.Malloy@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Wiggins, Brad <Brad.Wiggins@corecivic.com>
**Subject:** Open Permits

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Susan

Thank you for your time this afternoon. To confirm our conversation, you confirmed that there are 3 open permits for our facility in California City. These permits do not require a new Certificate of Occupancy, and a valid one is in place. The open building permits should not hold up issuance of our business license. Please acknowledge receipt and understanding of our conversation. We look forward to our continued partnership with California City.

Best regards,

Marcelo Ariola
Vice President, Real Estate
CoreCivic

CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office: 615-263-3047
Cell: 615-445-9163
NYSE: CXW

# ATTACHMENT O

ATTACHMENT O

**From:** "Montanary, Roseann"
**Sent:** 07/22/2025 1:15:40 PM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <jbarragan@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan
**Attachments:** Backup for Cal City SPR.pdf, CCA Name Change CoreCivic, Inc. 1116.pdf, Business License Application CoreCivic California City.pdf, SPR Minor 2025 Application CoreCivic California City.pdf

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

CoreCivic

July 21, 2025

Joe Barragan MBA, CBO

Public Works Director

City of California City

21000 Hacienda Blvd.

California City, CA 93505

Dear Mr. Barragan:

Pursuant to our Site Plan Review (SPR) Minor Application, the letter shall serve as a formal statement to confirm ADA requirements listed on the application.

California City Correctional center was originally built in 1998 and opened for operation in 1999. The facility was originally permitted under the Americans with Disabilities Act of 1990 (ADA). In 2013, the facility was leased to the California Department of Correction and Rehabilitation (CDCR). As a condition of the Lease the facility required CASp certification in compliance with the Americans with Disabilities Act (ADA) and California's Building Code (Title 24). Sally Swanson Architects was hired to do a full ADA inspection. As a result of the inspection, approximately $1.5 Million dollars in ADA upgrades to the facility were completed to meet CASp certification by a registered (Certified Access Specialist, Registered in the State of California. See attached letter from Sally Swanson Architects dated October 20, 2014.

Subsequently in 2017 as part of the lease extension/renewal with CDCR, an Administrative Office Building was added near the parking lot and part of the parking lot was modified to accommodate the new building. That building and parking was required to be CASp certified. See attached CASp certification. No additional construction has been performed at the facility since 2017.

The facilities past CASp certifications demonstrate our commitment to ADA standards. The California City Correctional Center is fully compliant with ADA and Title 24 requirements, as evidenced by the attached documentation. All facilities and modifications have been inspected and certified by a Certified Access Specialist (CASp) to ensure that they meet the necessary standards for accessibility. We are committed to maintaining compliance with these regulations and will continue to address any issues that may arise promptly.

Should you have any further questions or require additional information, please do not hesitate to contact our office.

Sincerely,

Marcelo Ariola

Marcelo Ariola

Vice President, Real Estate

SALLY SWANSON
ARCHITECTS, INC.

**Disabled Accessibility Certification (Provisional)**

Date: September 30, 2014

Timothy S. Aebie, AIA, NCARB, DBIA, LEED
Sr. Director, Project Development - Real Estate Development
Corrections Corporation of America, Inc.
10 Burton Hills Blvd.
Nashville, TN 37215

| | |
|---|---|
| Re: Project: | Disabled Accessibility Certification (Provisional) CASp Corrective Action Plan<br>Certification Limited to:<br>Phase 2 Inmate Housing Pods |
| Project location: | CCA, California City, CA |
| SSA project #: | 13054.03 |
| Certification by: | Brian H. Lee |
| Title: | Sr. Technical Architect |

In accordance with contract provisions for the above named Architect to act as a Disabled Accessibility Consultant representing the owner – Corrections Corporation of America (CCA) and the Architect-of-Record – Arrington Watkins Architects (AWA) for the said project, by due diligence of reviewing the project plans, reviewing alternate means of compliance for specific application to the prison environment, making personal site observations with measurements of the subject project work, and ensuring any concerns raised were successfully corrected; the following declaration is made:

The project area identified above (clarifications and exceptions as noted below) has been found in compliance (provisional clarifications and exceptions as noted below) with applicable disabled access code requirements in the 2013 California Building Code (CBC) and pertinent provisions applicable in the 2010 ADA Accessibility Standards and Title II of the Americans with Disabilities Act.

Clarified as part of this certification is the guard use only type-restrooms which were not modified as part of this project and which were found to be in general (albeit, not strict) compliance with the standards associated with 1991 ADA and respective edition of the CBC. Correction of any and all non-compliant conditions is required when CCA/CDCR should have an employee that requires these accommodations be made as part of Title 1 – Employment requirements of the Americans with Disabilities Act and of the State of California Unruh Act.

Respectfully Submitted to the Corrections Corporation of America (CCA),

Brian H. Lee,
Architect Lic. No. C-32739
CASp No. 0182

cc: Michael Conder, Arrington Watkins Architects
Andrew Johnson, Lydig Construction
Colm McGlynn, Lydig Construction
Kevin Atkinson, Lydig Construction
Sally Swanson, SSA
Arfraraz Khambatta, SSA
Jasper Kirsch, SSA
Mike Connell, SSA

end

Real Estate

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $** RECORDING IN COUNTERPART **County $ ____ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

________________
Moohay A. Choe

________________
Angela H. Ahn Mouradian

[signature]
Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Lisa Christine Hendry
personally appeared Channing C. Ahn

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

**(This area for official notarial seal)**

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 1,812.80 County $ ______ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June ~~9~~ 10, 1998

STATE OF ~~CALIFORNIA~~ Massachusetts } ss
COUNTY OF Norfolk }
On 6-10-1998 before me Tracy K Kenney
personally appeared Angela H Ahn Mouradian
personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(ies), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature: Tracy K Kenney]
My Commission expires Oct. 13, 2000

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

______________________
Moohay A. Choe

[signature: Angela H. Ahn Mouradian]
Angela H. Ahn Mouradian

______________________
Channing C. Ahn

**(This area for official notarial seal)**

Recording Requested by:
Commonwealth Land Title Company

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

Kern County Official Records
DOCUMENT #:0198081113
*0198081113*

Pages: 3
6/19/1998
8:00:00

| | |
|---|---|
| Fees | 13.00 |
| Taxes. | 1812.80 |
| Other. | |
| TOTAL PAID | 1825.80 |

THIS SPACE FOR RECORDER'S USE ONLY:

Stat. Types: 1

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ RECORDING IN COUNTERPART County $ ________ City
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

THIS DEED IS BEING SIGNED IN COUNTERPART.

Dated: June 5, 1998

[signature] Moohay A. Choe

________ Angela H. Ahn Mouradian

________ Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Morton M. Schneider
personally appeared Moohay A Choe.

personally known to me or proved to me on this basis of satisfactory evidence to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity~~(ies)~~, and that by ~~his~~/her/~~their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999
BCT1

MAIL TAX STATEMENTS TO ADDRESS ABOVE

(This area for official notarial seal)

C. Emergency Lighting - Housing units have battery back-up emergency and exit lighting to provide sufficient illumination for entry into areas during emergencies. An emergency power generator will be used as an emergency power source when commercial power has failed.

## XIV. PLAN REVIEW

The facility fire plan shall be reviewed annually by the facility safety manager for accuracy and any changes. Approval from the California City Fire Marshal will be obtained before re-issuance. If no changes are required a memorandum shall be prepared by the facility safety manager for submission to the California City Fire Marshal stating this fact.

## XV. IMT

Incident Management may be initiated based upon the severity of the fire.

---

**CORE CIVIC/CALIFORNIA CITY IMMIGRATION PROCESSING CENTER**
**FIRE AND EMERGENCY EVACUATION PLAN**

By: [signature] DATE: 7/21/25
Director, Safety & Environmental

By: [signature] DATE: 7/21/25
Warden

REVIEWED:

By: [signature] DATE: 7/21/25
California City Fire Marshal's Office

(2)

**ARTICLES OF AMENDMENT**
**OF**
**CORRECTIONS CORPORATION OF AMERICA**

The undersigned, being duly authorized to execute and file these Articles of Amendment of Corrections Corporation of America, a Maryland corporation (the "Corporation"), hereby certifies to the State Department of Assessments and Taxation of the State of Maryland that:

FIRST: The Corporation desires to amend its charter as currently in effect.

SECOND: The charter is hereby amended by deleting Article FIRST in its entirety and inserting the following in place thereof:

**FIRST: The name of the corporation (which is hereinafter called the "Corporation") is:**

**CoreCivic, Inc.**

THIRD: The foregoing amendment was unanimously approved by the entire board of directors and the amendment is limited to a change expressly authorized by § 2-605 of the Maryland General Corporation Law to be made without action by the stockholders.

FOURTH: The undersigned President acknowledges these Articles of Amendment to be the corporate act of the Corporation and, as to all matters or facts required to be verified under oath, the undersigned President acknowledges that, to the best of his knowledge, information and belief, those matters and facts are true in all material respects and that this statement is made under the penalties for perjury.

IN WITNESS WHEREOF, the Corporation has caused these Articles of Amendment to be signed in its name and on its behalf by its President on this 9th day of November 2016.

ATTEST:

CORRECTIONS CORPORATION OF AMERICA

Scott D Irwin
Secretary

Damon T. Hininger
President and Chief Executive Officer

CUST ID:0003482065
WORK ORDER:0004698642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

STATE OF MARYLAND
I certify that this is a true and complete copy of the 2 page document on file in this office. DATED: 11/11/16
STATE DEPARTMENT OF ASSESSMENTS AND TAXATION
BY: ____________, Custodian
This stamp replaces our previous certification system. Effective: 6/95

# CORPORATE CHARTER APPROVAL SHEET

**** EXPEDITED SERVICE **** **** KEEP WITH DOCUMENT ****

DOCUMENT CODE 09A BUSINESS CODE ______

\# D05095757

1000362009853062

Close ______ Stock ______ Nonstock ______

P A ______ Religious ______

Merging (Transferor) ______

ID # D05095757 ACK # 1000362009853062
PAGES: 0002
CORECIVIC, INC.

11/09/2016 AT 10:05 A WO # 0004698642

Surviving (Transferee) ______

New Name CoreCivic, Inc.

LOCATED
COPY MADE

FEES REMITTED

| | | |
|---|---|---|
| | Base Fee: | 100 |
| | Org. & Cap. Fee: | 465 |
| | Expedite Fee: | |
| | Penalty: | |
| | State Recordation Tax: | |
| | State Transfer Tax: | |
| 1 | Certified Copies: | |
| | Copy Fee: | 21 |
| 1 | Certificates | |
| | Certificate of Status Fee: | 20 |
| | Personal Property Filings: | |
| | Mail Processing Fee: | |
| | Other: | |
| | TOTAL FEES: | 606 |

✓ Change of Name
___ Change of Principal Office
___ Change of Resident Agent
___ Change of Resident Agent Address
___ Resignation of Resident Agent
___ Designation of Resident Agent and Resident Agent's Address
___ Change of Business Code

___ Adoption of Assumed Name

___ Other Change(s)

Credit Card ______ Check ✓ Cash ______

1 Documents on 3 Checks

Code 007

Attention ______

Mail Name and Address

THE CORPORATION TRUST INCORPORATED
351 W CAMDEN ST
BALTIMORE MD 21201-7912

Approved By: 16

Keyed By: ______

COMMENT(S)

The good standing should show the date/time when the name change occurred

CUST ID:0003462065
WORK ORDER:0004698642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

Case 1:25-cv-01292-KES-CDB Document 1-3 Filed 10/27/25 Page 127 of 161

# Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ____________
Approved by ____________
Processed by ____________
Processed On ____________

Name of Business: CoreCivic, Inc. California City Immigration Processing Center

Business Owner(s) Name: CoreCivic Inc.

Business Address: 22844 Virginia Blvd, California City, CA 93504-0590

Mailing Address: PO Box 2511, California City, CA 93504

Business Phone #: 760-338-6670

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Center

Planned Business Begin Date: 

Have you had a license for this business in the past? (●) Yes ( ) No

Do you own or rent the space (●) Own ( ) Rent (If rent, building owner/landlord: )

Will the business have Annual Gross Income of $10.000 or more? (●) Yes ( ) No

Business Emergency Contact: Name: Christopher Chestnut Phone Number: 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # 
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-
(Required for Food Services – attach copy)

**Contractors:**
State License # 
State License Type 
(Required for Contractors)

Expiration Date 

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**

Inspection Date: 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature: [signature]

Date: 07/22/2025

Printed Name: Christopher Chestnut

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.**

______________
Provided by City

# SITE PLAN REVIEW (SPR) MINOR APPLICATION

*(Existing Building/Business/Ownership)*

## 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc. (California City Immigration Processing Center)

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93504

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

## 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 07-22-25

## 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 07/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

## FOR DEPARTMENTAL USE ONLY

Fees: *(Refer to the Master Fee Schedule)*

☐ $ 250.00, Planning SPR Application Fee *(mandatory)* ***GL 10-3218***

☐ $ 90.00, Fire Department Inspection *(mandatory)* ***GL 19-3641***

☐ $ 150.00, Building Inspection Fee *(mandatory)*

☐ $ __________, Other

$ __________, **Total Fee Collected**

Application complete:

☐ Date: __________ Staff Member __________

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

***(Existing Building/Business/Ownership)***

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   - Total Parking Spaces: ________
   - ADA Accessible Spaces: ________
   - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified – separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 131 of 161

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

# ATTACHMENT P

ATTACHMENT P

**From:** "Lilia Garcia" <lgarcia@californiacity-ca.gov>
**Sent:** 07/23/2025 1:52:23 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan
**Attachments:** IMG_3994.jpg

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hi Roseann,

Please find the attached receipt for your records.

Best regards,
Planning Admin Secretary
Lilia Garcia
760-338-1377
Email: lgarcia@californiacity-ca.gov

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 11:45 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Liz, thank you for speaking with me today concerning the payment on the SPR fee. Looking forward to receiving your call so we can pay by p-Card over the phone.
My numbers are listed below. If you have difficulty getting me on the office phone, please call my cell.

Appreciate the assistance.

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

City of California City
21000 Hacienda Blvd
California City CA 9350 (760) 373-8661

Receipt No: 2.000177758 Jul 23, 2025

SPR25-09 CoreCivic

| | |
|---|---|
| Permits/Fees | |
| SDR Applications | 250.00 |
| 10-3218 | |
| Permit Fee | |
| | --------------- |
| Total: | 250.00 |
| | =============== |
| Credit Card | |
| Check No: mc | 250.00 |
| Payor: | |
| SPR25-09 CoreCivic | |
| Total Applied: | 250.00 |
| | --------------- |
| Change Tendered: | .00 |
| | =============== |

Duplicate Copy
07/23/2025 1:43 PM

# ATTACHMENT Q

ATTACHMENT Q

**From:** "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:** 07/24/2025 1:22:39 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** RE: Information Discussed

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

That is correct, you will not have to pay the $150.00 since the ADA document sent to us was sufficient.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Thursday, July 24, 2025 11:36 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Susan Weber <sweber@californiacity-ca.gov>
**Subject:** RE: Information Discussed

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Ms. Weber, based on the conversation we had yesterday afternoon, it appears CoreCivic is not required to pay the $150.00 building inspection fee. Please confirm if my understanding is correct.
If we still owe the fee, would like to pay for it this afternoon via P-card over the phone.

Appreciate you time and consideration.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 4:36 PM
**To:** Joe D. Barragan <jbarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; SWeber@californiacity ca.gov
**Subject:** Information Discussed

Ms. Weber, thank you for taking the time today to discuss the payment of the $150.00 building Inspection Fee. I understand this fee may not be necessary. Please find attached the information on ADA requirements.

Appreciate the guidance.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 5:15 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** Attached Image

# ATTACHMENT R

ATTACHMENT R

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 07/24/2025 3:02:26 PM (-07:00)
**To:** "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION:** This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

I asked the City Clerk earlier about Core Civic's Business License and she stated that she believed it was just the Fire inspection that was needed. But she did not look it up, she was going off of memory.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, July 24, 2025 3:00 PM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Joe - Just touching base. Any update from Anu? Safe to assume all is in order?

Marcelo Ariola
Vice President, Real Estate
CoreCivic
CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office: 615-263-3047
Cell: 615-445-9163
NYSE: CXW

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Wednesday, July 23, 2025 9:04 AM
**To:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Marcelo,

I will speak with Anu and get back to you.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Wednesday, July 23, 2025 6:20 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Joe - Thank you for your time yesterday. Please advise if there is anything substantive materials missing in our application. We are prepared to make payment as soon as possible assuming by now internet is up and running.

Anu - Thank you for your review.

Thanks,

Marcelo

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

# ATTACHMENT S

ATTACHMENT S

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 08/21/2025 8:57:35 AM (-07:00)
**To:** "Susan Weber" <sweber@californiacity-ca.gov>
**Cc:** "bberken@berk-tel.com" <bberken@berk-tel.com>; "Roger@661comm.com" <roger@661comm.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Josh DuFour" <jdufour@berk-tel.com>; "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey" <stacey.stone@corecivic.com>; "Kristy Hightower" <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Susie,

Please send them a commercial electrical application.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:56 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Director Barragan --- Thanks for your time on the phone. I appreciate your assistance.
As we discussed, please have Suzy in your office send us the permit form on Monday when she's back in the office.
Best,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 10:27 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

Yes, give me a call.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:22 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

**Deputy Fire Marshal Hightower ---** Thank you for connecting all parties! We appreciate your help.

**Director Barragan ---** Do you have time today for a brief phone call to discuss your questions / permit needs? I want to make sure we're on the same page with our project and what we need for a second possible permit. We have installed thousands of these low voltage systems all around the country, and we have never needed a "building permit", so this request is new to us.
There is nothing structural or obtrusive (no changes to the building), so we are confused by the request and need more information --- but happy to oblige.

The only published permit information we were able to find from your county / city (attached) for this technology is:

- ***Permits shall comply with the 2019 California Fire Code (CFC) Chapter 5, Section 510***

(No mention of a building permit; hence --- our delay and confusion.)

From your email:

We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations

I have attached the single line drawing sheets from our AHJ Submittal Packet that answers the questions above, but maybe I'm not understanding what you need (?)
I'm not sure what "*foundation plan*" or "*load calculations*" are in reference to for this ERRCS low voltage system?

Hope you have time to discuss today, so we can get you what you need.

Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 9:09 AM
**To:** Brian Berken <bberken@berk-tel.com>; jbarragan@californiacity-ca.gov
**Cc:** Roger@661comm.com
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,

Please see below. I have included you both in this email so that you can discuss the building departments permitting needs.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 6:33 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning Kirsty,

Those are not plans. What they attached to the email are submittals and specifications. We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations. Also, from the package they submitted, it appears that a Building Permit will be required.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 6:24 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Joe,

I'm forwarding the email below to you.
Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 2:47 PM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Please see below information in red from Brian with BERK-TEL covering the questions Mr. Barragan had. If you can please forward the email to Mr. Barragan this should answer his questions. If he has any additional questions BERK-TEL email is in the below string or he can contact Brian Berken directly.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, August 20, 2025 2:25:52 PM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Thanks for your email.
We already paid for ($1,000) and received the permit, yesterday (see attached).
We received approval from **Fire Marshall Hightower** with the FD and **Dawn Ferguson** with City Hall.
All the information answering Mr. Barragan's questions are included in the original packet (see attached).
Answers are below in **BOLD RED**, for ease of finding:

- Will any component require an electrical connection?
    - **YES – see attached plan for electric needs.**
    - **Site electricians will provide dedicated circuits as needed.**
- Are there footings or a foundation for the antennas?
    - **A single mast will be mechanically mounted to parapet wall.**
- We need to see a single-line schematic?
    - **PAGE 34 of the ATTACHED contains the full system design.**

Thank you,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 4:01 PM
**To:** Brian Berken <bberken@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
Please see forwarded email that Kristy Hightower sent me regarding the building permit questions city hall had.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Wednesday, August 20, 2025 1:00:57 PM
**To:** Roger Goodman <Roger@661comm.com>
**Subject:** Fwd: AHJ / Fire Marshal SUBMITTAL PACKET

Sent from my iPhone

Begin forwarded message:

> **From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
> **Date:** August 20, 2025 at 9:32:42 AM PDT
> **To:** Susan Weber <sweber@californiacity-ca.gov>, Kristy Hightower <khightower@calcityfire.us>, Tiffany Carter <tcarter@californiacity-ca.gov>
> **Subject: Re: AHJ / Fire Marshal SUBMITTAL PACKET**
>
> **EXTERNAL MESSAGE:** Use caution when clicking links or attachments
>
> The plans are incomplete:
> - Will any component require an electrical connection?
> - Are there footings or a foundation for the antennas?
> - We need to see a single-line schematic?
>
> If the answer to the first two questions is yes, then a permit will be required.
>
> Sincerely,
> Joe Barragan MBA, CBO
> Public Works Director

City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Susan Weber <sweber@californiacity-ca.gov>
**Sent:** Tuesday, August 19, 2025 10:53 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning Kristy,

I believe you are correct but we are going to let Joe answer this when he gets back tomorrow.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:35 AM
**To:** Susan Weber <sweber@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi guys!

Am I correct in assuming this needs a permit? They can't move forward until I sign off on it.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review. Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman <Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

*****Do you want to submit this to the correct person (people) on our behalf -or- do you want to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

# ATTACHMENT T

ATTACHMENT T

**From:** "Kristy Hightower" <khightower@calcityfire.us>
**Sent:** 10/08/2025 12:36:55 PM (-07:00)
**To:** "Roger Goodman" <Roger@661comm.com>; "Brian Berken" <bberken@berk-tel.com>
**Cc:** "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey" <stacey.stone@corecivic.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Dawn Ferguson" <dferguson@calcityfire.us>; "Shannon Haycs" <shaycs@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello,

Yes, I can be there at 2 on Tuesday. I will not be able to be out any earlier though as Tuesday and Wednesday are full of other inspections next week.

Thank you!

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, October 8, 2025 10:49 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Brian,
I can come out Tuesday if that works for Fire Marshall Hightower.

Thank you,
Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, October 8, 2025 10:45:07 AM
**To:** Roger Goodman <Roger@661comm.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Hello Fire Marshall Hightower and Mr. Goodman...
We are on track and on schedule to finalize the system on Tuesday AM and **would appreciate your help testing for approvals on Tuesday afternoon (10/14) around 2:00 PDT.**
Can we all confirm that date and time for the final inspections?

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Monday, September 29, 2025 10:13 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
I can be available should a weekend be needed for testing. When we do decide on a date let me know. I need to give Kern County Communications a heads up to dispatch that we will be on channels.

Get Outlook for Android

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Monday, September 29, 2025 8:06:00 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Fire Marshall Hightower — Thanks for the positive reply.
Pending our actual completion date, **do you have any weekend availability for testing?**
I don't know that it will be needed, but trying to plan for all possible dates/times in order to get the system powered ON and commissioned ASAP.
Thoughts?

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Monday, September 29, 2025 9:54 AM
**To:** Brian Berken <bberken@berk-tel.com>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,

Yes, I would like to attend the testing/inspection, but I would very much appreciate Roger's assistance. Please keep me updated.

Have a great day!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Friday, September 26, 2025 10:09 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning, Fire Marshall Hightower…
As we move closer to finalizing the BDA / ERRCS installation at the **CoreCivic Detention Center**, I am proposing the following to ensure you know there is adequate coverage throughout the facility.
Because there is no control channel within your radio system, we will be available to areas - checked, verified and documented - with your radios.
Roger Goodman has also volunteered to be present and complete radio tests with you (or on your behalf).

Typically, a spectrum analyzer can be used to quickly verify RF signals, but that requires radio traffic or a control channel (which constantly broadcasts RF).
Because there is no control channel in that area, there is no RF for the spectrum analyzer to measure --- unless you are using your radio.

We are forecasting we should have the system finalized and ready to be commissioned and then tested in the coming 7-10 days.
As we get closer, I would like to set up a time with you or your team (or Roger Goodman) to complete the radio checks for both 150MHz and 450 MHz frequencies.
*****Are you in agreement with that method and that possible timeline?**
I should be able to confirm a more specific date Monday or Tuesday next week.

Please let me know your thoughts...
Thank you,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:56 PM
**To:** Brian Berken <bberken@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Here are your plans. I hope that you have a great afternoon!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:50 PM
**To:** Dawn Ferguson <dferguson@calcityfire.us>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>

**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Dawn… I just spoke to Destiny.
She took my **$1,000** payment and gave me **CONFIRMATION # 619154.**
Destiny said she would email the receipt to you.

**With that task completed ---- we should be ready to begin the installation, correct?**

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Dawn Ferguson <dferguson@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:29 PM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

You can contact City Hall (760-373-8661) with GL code: 19-3641/6-667 for Plan review, with payment of $1000.00, and have them email me the receipt, and you will be good to go. Thank you very much.

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:23 PM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Dawn Ferguson <dferguson@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET
**Importance:** High

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi **Deputy Fire Marshal Hightower ---** THANK YOU for the quick turnaround time with the approval for the submittal packet.
We will do a great job protecting your radio network and bringing signal inside the facility for the safety and protection of your team.

Hi **Dawn** --- Please find the attached, completed and signed application form.
Per the form, please advise if you need a hard copy sent via mail or your records.
Please let me know if you have any questions or need additional information.

Thank you,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 3:30 PM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Cc:** Dawn Ferguson <dferguson@calcityfire.us>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

I've looked over them and I don't see any issues, but for me to stamp/approve plans, you'll need to complete an application with Dawn. I have attached the form.

You can contact her at dferguson@calcityfire.us

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 10:39 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Sounds great hope you have a great week as well. I believe this is just a site plan that needs your approval and then a building permit will be applied for once the design is approved by you.

Roger Goodman
661 Communications
661-384-3537

Roger@661comm.com

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:33:08 AM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger,

I appreciate you sending this to me. It will likely need a permit from the building department; I will check with them and let you know. I will review it as quickly as possible so that it can get started.

I hope that you're having a great week!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review.
Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman <Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

*****Do you want to submit this to the correct person (people) on our behalf -or- do you want to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

# EXHIBIT 4

EXHIBIT 4

**From:** "Montanary, Roseann"
**Sent:** 08/11/2025 12:32:10 PM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>; "Lilia Garcia" <lgarcia@californiacity-ca.gov>; "Malloy, John" <John.Malloy@corecivic.com>; "Stone, Staccy" <Staccy.Stone@corecivic.com>; "Barker, Michelle" <Michelle.Barker@corecivic.com>; "Miller, Max" <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan
**Attachments:** California City Facility Operational Information 2025.doc

Afternoon Anu, please find information requested attached.
Advise if there is any additional information needed.
I understand we are on different time zones, happy to accommodate.

Thank you,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 10:49 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi Roseann.

I am reviewing your application documents and could not locate the business operations document describing the daily operations and operational hours and other related details. Please send that over when you can.

Regards,
Anu Doravari
Consultant Planner

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 1:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

*California City Immigration Processing Center*
California City, CA

**Facility:** California City Immigration Processing Center
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

California City Immigration Processing Center is owned and operated by CoreCivic. The facility will serve as a detention center focused on housing residents based on contractual requirements with Immigration and Customs Enforcement. The security and operation of the facility will follow policies and procedures in alignment/compliance with the National Detention Standards 2025 revision. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled. Additionally, food service, recreational and religious opportunities, legal access, attorney and social visitation, mail procedures, detainee communication, and transportation will be provided in accordance with the aforementioned ICE standards.

The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year. At operational capacity, the facility will employ 488 total staff to include approximately 309 security staff, 70 medical professionals, 12 maintenance staff with the remainder administrative and support personnel.

**Facility Description:**

California City Immigration Processing Center is located in California City, California in Antelope Valley in Kern County, California. The facility is approximately 20 miles North of Edwards Air Force Base. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999. Major airports near CCIPC are Meadows Field Airport (84 miles) and Los Angeles International Airport (126 miles). The nearest hospitals are Adventist Health-Tehachapi Valley (37 miles), Antelope Valley Hospital (54.3 miles), Ridgecrest Regional Hospital (57.7 miles), Southwest Healthcare Palmdale Regional Medical Coneter (58.4 miles)

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems providing year-round environmental comfort for all staff and residents.

*California City Immigration Processing Center*
California City, CA

Each cell provides residents with access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. All residents have access to showers with thermostatically controlled hot and cold water. Adjacent to each resident's sleeping area is a central dayroom that contains tables, chairs, televisions and telephones for residents' use.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. An administrative area that includes space for staff, conference room, employee lounge and locker rooms

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located Health Services area in the main facility with space for waiting, examination, treatment. dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# EXHIBIT 5

EXHIBIT 5

**From:** "Malloy, John"
**Sent:** 08/25/2025 9:06:16 AM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <jbarragan@californiacity-ca.gov>; "Lilia Garcia" <lgarcia@californiacity-ca.gov>; "Susan Weber" <sweber@californiacity-ca.gov>; "lweible@californiacity-ca.gov" <lweible@californiacity-ca.gov>
**Subject:** CoreCivic Business License Application
**Attachments:** Business_License_Application_2025-08-22 - Signed FINAL.pdf, California City Correctional Facility Business Plan August.pdf, SPR Minor 2025 Application CoreCivic California City SIGNED.pdf

All:

Please find the attached business license application as well as a Site Plan Review (SPR) Minor Application. The SPR is being submitted as we understand that to be required by the City Planning Department. The business license request and SPR application will replace the original application that was submitted to your office on July 22nd. This revised license and SPR application is for the activation and operation of the facility under a contract with the United States Marshals Service (USMS) and is consistent with how CoreCivic operated the facility before the lease to the State of California in 2013. Please let me know if you have any questions or if you require any additional information.

Thank you.

John Malloy
CoreCivic
(602) 680-9868

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.** ____________
Provided by City

## SITE PLAN REVIEW (SPR) MINOR APPLICATION

***(Existing Building/Business/Ownership)***

### 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc.

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93505

**Zoning Designation:** Classification A, Type Major, Code CAC. O/RA

### 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 08-22-25

### 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 08/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

## FOR DEPARTMENTAL USE ONLY

Fees: *(Refer to the Master Fee Schedule)*

- ☐ $ 250.00 . Planning SPR Application Fee *(mandatory) GL 10-3218*
- ☐ $ 90.00 . Fire Department Inspection *(mandatory) GL 19-3641*
- ☐ $ 150.00 . Building Inspection Fee *(mandatory)*
- ☐ $ ______ . Other

$ ______ , **Total Fee Collected**

Application complete:

☐ Date: ______ Staff Member ______

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

*(Existing Building/Business/Ownership)*

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   - Total Parking Spaces: ________
   - ADA Accessible Spaces: ________
   - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

**Business License Application**

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ______
Approved by ______
Processed by ______
Processed On ______

Name of Business: California City Correctional Facility

Business Owner(s) Name: CoreCivic, Inc

Business Address: 22844 Virginia Blvd California City, CA 93505

Mailing Address: PO Box 2511 California City, CA 93504

Business Phone #: (760) 491-8100

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Facility/Prison

Planned Business Begin Date: 

Have you had a license for this business in the past? (●) Yes ( ) No

Do you own or rent the space (●) Own ( ) Rent (If rent, building owner/landlord 

Will the business have Annual Gross Income of $10.000 or more? (●) Yes ( ) No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # 
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-
(Required for Food Services – attach copy)

**Contractors:**
State License # 
State License Type 
(Required for Contractors)

Expiration Date 

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**

Inspection Date: 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature [signature] Digitally signed by Christopher Chestnut Date: 2025.08.22 17 07 29 -07'00'

Date: 08/22/2025

Printed Name: Christopher Chestnut

Clear Form Submit

*California City Correctional Facility*
California City, CA

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# EXHIBIT 6

EXHIBIT 6

**From:** "Malloy, John"
**Sent:** 09/15/2025 9:18:06 AM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Subject:** Clarifying Business Plan Language

Anu:

I wanted to follow up on our most recent business license application and include some clarifying language due to the expiration of the City's IGA with the United States Marshals Service (USMS) this month. As such, we are revising language in our business plan that is part of our Minor Site Plan Review (SPR) to state that the facility will operate under a contract with the federal government, consistent with how the facility operated before the lease to the State of California in 2013.

Please let me know if you have any questions.

# EXHIBIT 7

EXHIBIT 7

**Mike Giardina**

**From:** California City, CA <californiacity@public.govdelivery.com>
**Sent:** Friday, October 24, 2025 9:01 PM
**To:** Mike Giardina
**Subject:** Agenda for CITY COUNCIL MEETING on Tuesday, October 28, 2025 at 6:00 PM PDT has been posted

LATEST MEETING AGENDA AVAILABLE

CITY COUNCIL MEETING

Tuesday, October 28, 2025 at 6:00 PM PDT

21000 HACIENDA BLVD
California City, California 93505

VIEW AGENDA

SUBSCRIBER SERVICES:

Manage Subscriptions | Unsubscribe All | Help

This email was sent to mgiardina@strucklove.com using govDelivery Communications Cloud on behalf of: California City, California · 21000 Hacienda Blvd · California City, CA 93505

GOVDELIVERY

# EXHIBIT 8

EXHIBIT 8

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

Marquette Hawkins
**MAYOR**

Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Christopher Lopez
**CITY MANAGER**

# AGENDA

***CITY COUNCIL/ HOUSING AUTHORITY/ SUCCESSOR AGENCY***
***REGULAR MEETING TUESDAY OCTOBER 28, 2025 @ 5:00 PM***
***COUNCIL CHAMBERS & VIA ZOOM***
***21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505***

If you need special assistance to participate in this meeting, contact the City Clerk at (760) 373-7140 or via email at cityclerk@californiacity-ca.gov. We request a 24-hour notification prior to the meeting in order for the City to make reasonable arrangements to ensure accessibility. (28 CFR 35.102-35.104 American Disabilities Act Title II)

**Zoom instructions and notes:**

Web Link: https://us06web.zoom.us/j/89032283757
Meeting ID: 890 3228 3757

1. Public can dial into the Zoom line:
   a. One tap mobile: +16694449171,87254527178# US
   b. Dial the following number: +1 564 217 2000 US
2. Comments
   a. Public must join Zoom meeting to comment
   b. Keep your mic on Mute until you are requested to speak
   c. Use the “Raise your Hand” button to request to speak or,
   d. Send a chat request to City Clerk for request to speak
   e. When requested to speak state your name for the record
   f. Re-mute when your time to speak has ended

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

---

***Public is urged to listen to the meeting in a quiet place, to avoid background noise. We also request public to MUTE your audio device when not commenting to avoid disruption during meeting.***

***Please take this time to turn off your cell phones ***

---

***CLOSED SESSION 4:00PM***

**CALL TO ORDER**

**ROLL CALL**
Councilmembers: Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

**ADOPT THE AGENDA**

**PUBLIC COMMENT**
Members of the public are welcome to address the City Council **ONLY** on those items listed on the Closed Session agenda. Each member of the public will be given (3) three minutes to speak

**CLOSED SESSION**

CS 1. CONFERENCE WITH LEGAL COUNSEL—EXISTING LITIGATION
(Government Code Section 54956.9(d)(1))
One case:
1. Lamberth v. California City (case no. 25CUB00029)

CS 2. CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION
Significant exposure to litigation pursuant to Government Code Section 54956.9(d)(2):
Two cases

CS 3. PUBLIC EMPLOYMENT (Government Code 54957)
Title: Department of Cannabis Management

**REPORT OUT OF CLOSED SESSION**

**CITY COUNCIL CONVENES TO REGULAR MEETING**

***REGULAR MEETING 5:00PM***

**CALL TO ORDER**

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

**PLEDGE OF ALLEGIANCE / INVOCATION**

**ROLL CALL** –
Councilmembers: Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

**DEPARTMENT REPORTS**
PW
PD / AC
Building
Finance
Treasurer
Planning

**CITY CLERK REPORTS/RECEIVED COMMUNICATIONS**
JM POWERS- DATED:
-OCTOBER 17, 2025
-OCTOBER 18, 2025
-OCTOBER 19, 2025

**CIVIC/COMMUNITY/ORGANIZATION ANNOUNCEMENTS**

**PRESENTATIONS**
Mayor Saul Ayon McFarland CA

**PUBLIC BUSINESS FROM THE FLOOR / PUBLIC COMMENT**
This portion of the meeting is reserved for the public to address the City Council on any matter **NOT on this agenda** and over which the City Council has jurisdiction. Please state your name for the record and limit your comments to (3) three minutes. The City Council will receive the comments but cannot engage in back-and- forth discussion with the public or make any decision. The City Council can direct staff to bring the item back to a future agenda for discussion.

**CONSENT CALENDAR**
**WAIVER OF FULL READING OF RESOLUTIONS AND ORDINANCES**
Consideration to waive full-text reading of all Resolutions and Ordinances by single motion made at the start of each meeting, subject to the ability of the City Council / Agency to read the full text of selected resolutions and ordinances when the item is addressed by subsequent motion. All items on the consent calendar are considered routine, and non-controversial and will be approved by (1) one motion if no member of the council, staff, or public wishes to comment or ask questions. Public comments are to be limited to (3) three minutes. Roll call vote required.

**CC 1.** Approve **City Check Register dated 10/10/25- 10/23/25**

**CC 2.** Approve **Minutes dated 10/14/2025**

**CC 3.** Staff Report: Christopher Lopez
Subject: A Resolution of The Mayor and City Council of California City Repealing Resolution 24-3061 And Reprioritizing the AES Clean Energy Donation to The City Of California City for Previously Specified Community Benefits Purchases for The City of California City
**Recommendation:** Staff recommends the City Council Adopt Resolution No. 25-3181

# CITY OF CALIFORNIA CITY

OCTOBER 28, 2025

## CONTINUED BUSINESS

**CB 1.** Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of the City Council of the City of California City Approving the Process of Setting New Water and Wastewater Division Rates through a Rate Study
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3167

**CB 2.** Staff Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of the City Council of the City of California City Approving the Belfor Proposals to Clean the Public Works Yard
**Recommendation:** Staff recommends the City Council Adopt Resolution No. 25-3164

## NEW BUSINESS

**NB 1.** Staff Report: Christopher Lopez, City Manager- Joe Barragan, Public Works Director
Subject: A Resolution of The City Council of the City of California City Approving the Earthscope Lease Agreement for GPS Stations at California City Airport
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3179

**NB 2.** Staff Report: Christopher Lopez, City Manager- Shannon Hayes, Acting Public Safety Director
Subject: A Resolution of the City Council of The City of California City, California, Authorizing the Police Department to Proceed with AT&T For the 9-1-1 Emergency Phone System Upgrade, and Authorization for the City Manager or Designee to Execute All Related Documents and Accept Cpe Allotment Funds
**Recommendation:** Staff recommends the City Council adopt Resolution No. 25-3180

**NB 3.** Staff Report: Christopher Lopez, City Manager- Anu Doravari, Planning Consultant
Subject: Housing Element Certification Update

**NB 4.** Staff Report: Christopher Lopez, City Manager- Anu Doravari, Planning Consultant
Subject: Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City
**Recommendation:** Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the City Council, as this application is a ministerial, staff-level decision

**NB 5.** Discuss and Provide Direction Regarding the Council Meeting Schedule for November and December 2025

**NB 6.** A Resolution Authorizing the City Manager and Mayor to Execute a Cooperative Agreement Between California City and the County of Kern for the Provision of an Interim Fire Chief and Receive Direction from the City Council Regarding this Item

## COUNCILMEMBER COMMENTS, AGENDA REQUESTS, AND AB1234 REPORTS

This portion of the meeting is reserved for council members to present information, announcements, and items that

have come to their attention. The Brown Act precludes Council, staff, or public discussion. Short staff responses are appropriate. The Council will take no formal action. A Council member may request the City Clerk to calendar an item for consideration at a future meeting or refer an item to staff.

**ADJOURNMENT**

**AFFIDAVIT OF POSTING**-October 24, 2025

I, Leanndrea Weible, Acting City Clerk for the City of California City, California, DO HEREBY CERTIFY that the foregoing notice was posted on all official City bulletin boards and the City's website at least 72 hours prior to the meeting in compliance with the provisions of the Brown Act.

NB 4

CITY COUNCIL AGENDA ITEM
October 28, 2025

**TO:** The City Council
**FROM:** Christopher Lopez, City Manager
Anu Doravari, Planning Consultant

**SUBJECT:** Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City

## BACKGROUND

City staff has received a Site Plan Review (SPR) application from CoreCivic for the operation of a detention center at an existing facility within the City. The application is currently under administrative review, and staff is evaluating it for compliance with all applicable zoning, land use, and design standards.

Under the California City Municipal Code, this type of application is ministerial in nature, meaning that City staff must approve the project if it meets all objective requirements set forth in the City's codes and regulations. A ministerial review does not involve discretion or policy judgment. The City Council is not the decision maker on a ministerial SPR.

## DISCUSSIONS

Senate Bill (SB) 29 (Civil Code § 1670.9(d)) requires 180 days' public notice and two public meetings before a city "issues a permit for the building or reuse of existing buildings" by a private corporation to detain noncitizens. Tonight's agendized item is that hearing to receive public input and provide transparency to the extent SPR approval constitutes a "permit for the building or reuse of existing buildings." The Council is not being asked to make findings, impose conditions, or take action on the SPR.

At this time, no approvals, permits, or entitlements have been issued for the proposed use. Staff continues to review the application and anticipates that it may move forward to approval once compliance with all applicable regulations, including SB 29, is established.

### Next Steps

- Staff will document the hearing, comments received, and responses as part of the administrative record for the SPR.
- Staff will complete the review of the pending SPR application for objective compliance with local and state requirements.
- Upon confirmation of compliance with SB 29 and applicable municipal standards, staff may proceed with administrative approval of the SPR.

- Staff will provide future status updates as appropriate.

**RECOMMENDATION**

Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the City Council, as this application is a ministerial, staff-level decision.

*California City Correctional Facility*
California City, CA

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

*California City Immigration Processing Center*
California City, CA

**Facility:** California City Immigration Processing Center
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

California City Immigration Processing Center is owned and operated by CoreCivic. The facility will serve as a detention center focused on housing residents based on contractual requirements with Immigration and Customs Enforcement. The security and operation of the facility will follow policies and procedures in alignment/compliance with the National Detention Standards 2025 revision. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled. Additionally, food service, recreational and religious opportunities, legal access, attorney and social visitation, mail procedures, detainee communication, and transportation will be provided in accordance with the aforementioned ICE standards.

The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year. At operational capacity, the facility will employ 488 total staff to include approximately 309 security staff, 70 medical professionals, 12 maintenance staff with the remainder administrative and support personnel.

**Facility Description:**

California City Immigration Processing Center is located in California City, California in Antelope Valley in Kern County, California. The facility is approximately 20 miles North of Edwards Air Force Base. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999. Major airports near CCIPC are Meadows Field Airport (84 miles) and Los Angeles International Airport (126 miles). The nearest hospitals are Adventist Health-Tehachapi Valley (37 miles), Antelope Valley Hospital (54.3 miles), Ridgecrest Regional Hospital (57.7 miles), Southwest Healthcare Palmdale Regional Medical Coneter (58.4 miles)

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems providing year-round environmental comfort for all staff and residents.

Each cell provides residents with access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. All residents have access to showers with thermostatically controlled hot and cold water. Adjacent to each resident's sleeping area is a central dayroom that contains tables, chairs, televisions and telephones for residents' use.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. An administrative area that includes space for staff, conference room, employee lounge and locker rooms

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located Health Services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# EXHIBIT 9

EXHIBIT 9

72° KGET.com

LIVE NOW Watch KGET+ Live

GAS PRICES IN BAKERSFIELD
Find the lowest gas prices in Bakersfield ›



LOCAL NEWS

# Cal City to hold 2nd public hearing on CoreCivic ICE detention facility

by: Sangmin Kim
Posted: Dec 12, 2025 / 01:20 PM PST
Updated: Dec 12, 2025 / 01:36 PM PST

SHARE

BAKERSFIELD, Calif. (KGET) — Members of the community can provide input on the CoreCivic immigrant detention center at a hearing one last time on Tuesday before California City can potentially approve a permit for the facility, according to the Cal City Planning Commission agenda.

CoreCivic submitted a Site Plan Review application to Cal City to operate the detention facility at the existing California City Correctional Facility.

| 'I'm just concerned': Cal City residents call for ICE facility to close down ›

City staff is assessing the application to see if it complies with zoning, land use and design standards, according to the agenda.

Cal City's municipal code requires city staff to approve the CoreCivic detention center if it meets all requirements set in the city codes and regulations, the agenda said.




Under Senate Bill 29, the city has to notify the public at least 180 days in advance of a proposed permit execution for a private company seeking to detain non-citizens in new or existing buildings.

It also has to hold two public meetings before the city can issue a permit, according to the agenda. Through the meeting, city officials aim to receive public comments and provide transparency about the extent of allowing permits after approving a Site Plan Review.

**Article Continues After the Ad**

Ad by CRITEO

Ad choic

READ NEXT >

**Man guilty of monthslong sexual abuse of minor**

READ NEXT >

Next story in 5

# EXHIBIT 10

EXHIBIT 10

# PLANNING COMMISSION MEETING
# OF THE
# CITY OF CALIFORNIA CITY

**TUESDAY, DECEMBER 16, 2025 @**
**6:00PM**
**VIDEO CONFERENCE/IN-PERSON**
**21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505**

If you need special assistance to participate in this meeting, please contact the planning department at (760) 373-7141 or via email at planning@californiacity-ca.gov. Notification 48 hours prior to the meeting will enable the city to make reasonable arrangements to ensure accessibility to this meeting. (28 CFR 35.102-35.104 American Disabilities Act Title II).

**Zoom**

1. Public may join Planning Commission Meeting live via Zoom:

   - https://us06web.zoom.us/j/85808671526
   - Meeting ID: 858 0867 1526

2. One tap mobile
   - +16694449171,,85808671526# US
   - +17207072699,,85808671526# US (Denver)

3. Public can dial into the Zoom line:
   - One tap mobile: 16694449171,85808671526# US
   - +17207072699,,85808671526# US (Denver)
   - Dial the above number and enter the meeting ID: 858 0867 1526

**Granicus**

1. Agenda can be viewed via Granicus: https://californiacity.granicus.com/viewpublisher?view_id=1
2. Public may eComment on agenda items via Granicus https://www.californiacity-ca.gov/CC/images/Ecomment_Instruction_Guide_2020.pdf

**City Website**

1. Agenda can be viewed on the City's website.
2. Recording of this meeting will be made available on the City's website.

**LATE COMMUNICATIONS:** Following the posting of the agenda, any emails, writings, or documents that the public would like to submit to the Commission must be received by the Secretary no later than 3:00 p.m. the day prior to the scheduled meeting.

Public is urged to listen to the meeting in a quiet place, to avoid background noise. We also request the public **MUTE** your audio device when not commenting to avoid disruption during the meeting.

****At this time, please take a moment to turn off your cell phones****

1. **CALL TO ORDER**

2. **PLEDGE OF ALLEGIANCE/INVOCATION**

3. **ROLL CALL**

| | |
|---|---|
| **Chairman** | Brottlund |
| **Vice Chair** | Marsh |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |

4. **ADOPT AGENDA**
   Adopt Agenda: December 16, 2025.

5. **DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
   Disclosure by Commissioners of site visits and ex-parte contact for items on the agenda.

6. **PUBLIC BUSINESS FROM THE FLOOR**
   This portion of the meeting is reserved for the public to address the Planning Commission on any matter not on the agenda and over which the Planning Commission has jurisdiction. Comments are to be limited to three (3) minutes. The Planning Commission will receive the comments but cannot engage in back-and-forth discussion with the public or make any decision. The Planning Commission may direct staff to bring the item back to a future agenda for discussion.

7. **CONSENT CALENDAR**
   **CC1:** Meeting Minutes 09/02/2025

8. **INFORMATION ITEMS**
   **II 1. Information Item – Update on the 6th Cycle Housing Element**
   Provide an update on the City's progress, including delays due to issues requiring clarification from the City Attorney's Office, and the revised timeline for bringing the Housing Element forward for adoption.

9. **DEPARTMENT REPORT**

10. **NEW BUSINESS**
    **NB 1.** CoreCivic Hearing II
    **Subject:** Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City.
    **Recommendation**: Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the Planning Commission.

## 11. COMMISSIONER COMMENTS

This portion of the meeting is reserved for Planning Commissioners to present information, announcements and items that have come to their attention. Short staff responses may be appropriate. The Planning Commission will take no formal action. A Planning Commissioner may request to calendar an item for consideration at a future meeting or refer an item to staff.

| | |
|---|---|
| **Chairman** | Brottlund |
| **Vice Chair** | Marsh |
| **Commissioner** | Cantrell |
| **Commissioner** | Coleman |

## ADJOURNMENT

**AFFIDAVIT OF POSTING**: This agenda was posted on all official City bulletin boards, the City's website and agenda packets were completely accessible to the public at City Hall at least 72 hours (for special meetings 24 hours), prior to the Planning Commission Meeting. *Planning Department*

10.

NB 1

# PLANNING COMISSION
# AGENDA ITEM
**December 16, 2025**

**TO:** Honorable Chair and Members of the Planning Commission
**FROM:** Anu Doravari, Planner
Christopher Lopez, City Manager
**TITLE:** Hearing on CoreCivic Operation of an Immigrant Detention Facility within the City

---

## Background

City staff has received a Site Plan Review (SPR) application from CoreCivic for the operation of a detention center at an existing facility within the City. The application is currently under administrative review, and staff is evaluating it for compliance with all applicable zoning, land use, and design standards.

Under the California City Municipal Code, this type of application is ministerial in nature, meaning that City staff must approve the project if it meets all objective requirements set forth in the City's codes and regulations. A ministerial review does not involve discretion or policy judgment. The Planning Commission is not the decision-making body for a ministerial SPR.

Senate Bill (SB) 29 (Civil Code § 1670.9(d)) requires 180 days' public notice and two public meetings before a city "issues a permit for the building or reuse of existing buildings" by a private corporation to detain noncitizens. Tonight's agendized item is that second hearing to receive public input and provide transparency to the extent SPR approval constitutes a "permit for the building or reuse of existing buildings." The Planning Commission is not being asked to make findings, impose conditions, or take action on the SPR.

At this time, no approvals, permits, or entitlements have been issued for the proposed use. Staff continues to review the application and anticipates that it may move forward to approval once compliance with all applicable regulations, including SB 29, is established.

## Next Steps

- Staff will document the hearing, comments received, and responses as part of the administrative record for the SPR.
- Staff will complete the review of the pending SPR application for objective compliance with local and state requirements.
- Upon confirmation of compliance with SB 29 and applicable municipal standards, staff may proceed with administrative approval of the SPR.
- Staff will provide future status updates to the Planning Commission and City Council as appropriate.

## Recommendation

Receive and file this report concerning the SB 29 hearing and the status of the ministerial Site Plan Review application submitted by CoreCivic. No action is requested from the Planning Commission, as this application is a ministerial, staff-level decision.

# EXHIBIT 11

EXHIBIT 11

THIS DOCUMENT HAS A TRUE DOCUCHECK™ WATERMARK AND VISIBLE FIBERS DISCERNIBLE FROM BOTH SIDES

NOT TRANSFERABLE

**CITY OF CALIFORNIA CITY**
**21000 HACIENDA BLVD**
**CALIFORNIA CITY, CA 93505-2293**
**BUSINESS LICENSE CERTIFICATE**

**POST IN CONSPICUOUS PLACE**
**AT BUSINESS LOCATION**

ACCOUNT NUMBER
20250209

**EXPIRATION DATE**
06/30/2026

Business Address: 22844 Virginia Blvd
California City CA 93505

CONTACT (S) None

BUSINESS NAME CoreCivic, Inc
DBA California City Correctional Facility
PO Box 2511
California City CA 93504
United States

**CITY CLERK**

THIS DOCUMENT IS ALTERATION PROTECTED AND REFLECTS FLUORESCENT FIBERS UNDER UV LIGHT

KEEP FOR YOUR RECORDS

BUSINESS LICENSE RECEIPT

ACCT NO. 20250209

DATE ISSUED 02/26/2026

$

Last Pmt Date

Subject to Suspension
Cancellation or Revocation

FEES PAID IN ACCORDANCE WITH CITY
BUSINESS LICNESE ORDINANCE

**CITY OF**
**CALIFORNIA CITY**

# EXHIBIT 12

EXHIBIT 12

Victor M. Ponto (SBN 284005)
CITY ATTORNEY FOR CITY OF CALIFORNIA CITY
E-mail: vponto@bwslaw.com
Mark J. Austin (SBN 208880)
E-mail: maustin@bwslaw.com
Brandon A. Sanchez (SBN 300718)
E-mail: bsanchez@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1770 Iowa Avenue, Suite 240
Riverside, California 92507-2479
Tel: 951.788.0100 Fax: 951.788.5785

FILING FEE EXEMPT PURSUANT TO GOVERNMENT CODE § 6103

Attorneys for Respondent and Defendant
CITY OF CALIFORNIA CITY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CITY OF CALIFORNIA CITY and CORECIVIC, INC.,<br><br>Respondents and Defendants. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF CITY PLANNER ANUPAMA DORAVARI IN SUPPORT OF OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| CORECIVIC, INC.,<br><br>Real Party in Interest. | TRO Application Hearing<br>Date: November 3, 2025<br>Time: 1:00 p.m.<br>Judge: Hon. Kirk E. Sherriff<br>Crtrm: 6<br><br>Trial Date: None Set |

**DECLARATION OF CITY PLANNER ANUPAMA DORAVARI**

**IN SUPPORT OF OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION**

I, Anupama Doravari, declare as follows:

1. I am the City Planner for the City of California City ("City"). I held a planning position with the City from 2017 to 2018. Since June 2023 I have served as City Planner. My duties include administering the City's zoning and development regulations, as set forth in the California City Municipal Code ("CCMC"). I also oversee the City's review and processing of conditional use permit ("CUP") applications, site plan reviews, and provide analysis and recommendations to the City Council and Planning Commission on all development projects in the City. As part of my duties, I assist with coordinating inter-departmental permit routing, make use determinations and CCMC interpretations, and maintain the City's planning records. As a result, I am intimately familiar with and tasked with interpreting and applying the CCMC to various uses and projects in the City. I have personal knowledge of the facts stated here or know them based on my review of City records kept in the ordinary course of business. If called, I could and would testify competently.

2. This declaration is in support of the City's opposition to the TRO Application.

3. The documents attached to this declaration are true and correct copies of records the City maintains in the ordinary course of business, or accurate printouts of such records from the City's electronic repositories.

4. In my various capacities, I am familiar with the property commonly known as 22844 Virginia Boulevard, California City, California ("Property"). The Property is located within the RA (Residential/Agricultural) District.

5. After the Facility's reopening in 2025, the City undertook a multi-step review to determine what, if any, local approvals were required and whether any such approvals would trigger the notice-and-hearing procedures in SB 29. This was a time-consuming process. The City searched physical archives and digital repositories across Planning, Building, Fire, and the City Clerk for historical records. The City gathered information from the operator regarding current operations and conducted inspections. Planning compared current operations against historical

approvals located during the records search. Staff identified which, if any, administrative approvals (e.g., site plan review) could apply and whether issuing them would be covered by SB 29.

6. As is relevant to the TRO Application, the City's investigation revealed the following. In January 1998, the City approved CUP 97-01 for a 2,304-bed "prison facility" on approximately 70 acres of the 320-acre Property. In October 1998, the City approved CUP 98-02 expanding the permitted capacity by 512 beds. Neither CUP limits the entitlement to criminal custody or to a particular inmate/detainee population. True and correct copies of CUP 97-01 and CUP 98-02 are collectively attached to this declaration as **Exhibit A** and are incorporated herein.

7. Based on my review of the CUP terms, the records on file, and my understanding of current operations, the Facility's ongoing operations remain within the scope of CUP 97-01 and CUP 98-02 and within the RA-district allowance for "correction, probation, or prison facilities and services." The CCMC does not define "prison." In ordinary usage a prison is a "place of confinement," and immigration detention is a place of confinement of the same kind.

8. This present determination is also consistent with past practice. In 2010, the City entered Intergovernmental Agreement ODT-10-0002 with the operator for federal detainee housing, including immigration detainees. That use occurred under the 1998 CUPs. So immigrant detention has historically been determined by the City to be a "prison facility" use conditionally permitted under the 1998 CUPs. A true and correct copy of the IGA is attached to this declaration as **Exhibit B** and is incorporated herein.

9. In my role as City Planner, I am familiar with the City's record keeping system for land use approvals. After a thorough review, as of the date of this declaration, no application for a new CUP or for a CUP modification has been filed or required, and the Planning Division has not determined that current operations constitute an expansion outside the existing entitlements.

10. On August 22, 2025, the operator submitted applications for a business license and an administrative site plan review (SPR). Both applications are being processed with inter-departmental routing to Fire, Police, and Building staff. The facility has passed its final Fire and Building inspections. As of the date of this declaration, all deficiencies have been corrected to the

satisfaction of the respective authorities, and there are no outstanding Building or Fire violations for the facility. True and correct copies of the business license application and site plan review application are collectively attached to this declaration as **Exhibit C** and are incorporated herein.

11. In an abundance of caution, staff determined that any SPR approval potentially covered by SB 29 will not be issued unless and until the City completes SB 29's prerequisites. The City has scheduled the first SB 29 public hearing for October 28, 2025 before the City Council, with additional hearing(s) to follow as required.

12. The City will issue no SB-29-covered approval before it has both (a) provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution and (b) soliciting and hearing public comment at two meetings open to the public, as the statute requires.

13. As of the date of this declaration, the City has not approved, signed, or issued any deed, contract, lease, or permit for "the building or reuse of existing buildings" for immigration detention. Accordingly, there is no City permitting action presently outstanding that could constitute a past violation of SB 29.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 27, 2025 in California City, California.

[signature]

Anupama Doravari

# EXHIBIT A

ORIGINAL

# RESOLUTION NO. 01-98-1801

## A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS AND ADOPTING A STATEMENT OF OVERRIDING CONSIDERATIONS IN CONNECTION WITH THE CORRECTIONS CORPORATION OF AMERICA PRISON

WHEREAS, Corrections Corporation of America (CCA) has filed various applications with the City requesting approval to construct a 2,304 inmate capacity prison and related utility improvements (the "Project"); and

WHEREAS, the Planning Department has determined an Environmental Impact Report (EIR) Supplement be prepared pursuant to the California Environmental Quality Act (CEQA) to determine the individual and cumulative environmental impacts associated with the Project; and

WHEREAS, the Draft EIR Supplement was prepared by RUST Environment and Infrastructure under contract to the City and under the supervision of the Planning Department, and circulated for review from October 24, 1997 to December 9, 1998; and

WHEREAS, responses to comments were prepared and included in the Final EIR Supplement; and

WHEREAS, the Planning Commission considered and approved an application for a conditional use permit at a duly noticed public hearing on January 15, 1998;

NOW THEREFORE BE IT RESOLVED by the City Council of the City of California City as follows:

## SECTION 1

## INTRODUCTION

### 1. PRELIMINARY

CCA will develop a 2,304 bed prison on a 320 acre property in California City, Kern County. The Project will accommodate medium security inmates. The City was the Lead Agency for the preparation of an Environmental Impact Report (EIR) Supplement in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources Code §§ 21000 et seq.) and the CEQA Guidelines ( California Administrative Code §§ 15000 et seq., as amended).

Because the EIR Supplement identified significant effects which may occur as a result of the Project, City adopts these findings as part of the approval of the CCA Project. In adopting this Statement of Findings, the City approves the construction of the CCA Prison at California City on a 320 acre property known as the Virginia Boulevard site.

Section 1 of these findings provides an introduction and description of the proposed Project and the certification of the Final EIR Supplement. Section 2 discusses potential environmental effects considered to have no significant impacts and require no mitigation. Section 3 discusses potential environmental effects which are not significant or which have been mitigated to a level that is less than significant. Section 4 discusses the significant unavoidable environmental effects of the Project, which cannot be feasibly mitigated to a level that is less than significant. Section 5 discusses Project alternatives. Section 6 discusses changes in mitigation measures and recirculation. Section 7 discusses the Mitigation Monitoring Plan. Section 8 presents the Statement of Overriding considerations. Section 9 presents a Section 21092.1 finding regarding independent judgment.

### 2. DESCRIPTION OF THE APPROVED PROJECT

The site is located at the terminus of Virginia Boulevard, approximately one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The site encompasses 320 acres of vacant terrain comprised of, and surrounded by, natural desert environment.

Approximately 70 acres of the proposed prison site will be developed for the prison facility and support uses.

The 2,304 bed prison will accommodate 2,304 inmates at 100 percent design bed capacity, and meet the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.
- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates.
- Provide excellent long term employment and career opportunities for surrounding communities.

## 3. CERTIFICATION

The Planning Department has reviewed the Final EIR Supplement for the proposed Project and has considered the public record on the Project, including without limitation the following:

- Record of Public Hearing on the Final Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, on January 15, 1998, before the Planning Commission.
- Final Environmental Impact Report Supplement, January, 1998.
- Responses to Comments on the Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, 1997 (Volume II).
- Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, October 1997.

The custodian of the documents and other materials which constitute the record upon which these findings are based is the Planning Department. The record is available for public review at the City of California City, 2100 Hacienda Boulevard, California City, California, 93505.

**Finding**

Based upon complete review of the record, the Planning Commission certifies that the Final EIR Supplement is adequate and has been completed in compliance with CEQA.

## SECTION 2

## POTENTIAL ENVIRONMENTAL EFFECTS CONSIDERED TO HAVE NO SIGNIFICANT IMPACTS AND REQUIRE NO MITIGATION MEASURES

**Finding**

The EIR Supplement identified thresholds of significance and evaluated environmental impacts for the following issues. The EIR Supplement determined that these environmental impacts did not cross

the thresholds of significance for these issues. Therefore, no mitigation measures are required for these issues.

Land Use, Employment, Population and Housing, Hospitals, Judicial Services, Law Enforcement, Fire Protection, Wastewater Treatment and Disposal, Solid Waste Disposal, Energy, Telephone and Cable.

## SECTION 3

## POTENTIAL ENVIRONMENTAL EFFECTS WHICH ARE NOT SIGNIFICANT OR WHICH HAVE BEEN MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. PUBLIC UTILITIES AND COMMUNITY SERVICES

**School Impacts**

Implementation of the Project would result in enrollment of approximately 124 new students in the Mojave Unified School District (MUSD) resulting in the need for up to four additional classrooms.

**Mitigation**

The following mitigation measure will be employed to reduce potential impacts to MUSD schools to a less than significant level:

- Mitigation for impacts resulting from additional students generated indirectly by the proposed prison would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules.

  The school mitigation fees for MUSD which are collected by the California City Building Department at issuance of building permits are as follows:

  - $0.32 per square foot of new industrial/commercial floor space.

  - $1.84 per square foot of new residential floor space.

  Based on the conceptual building plans for the proposed prison, which indicate approximately 500,000 square feet of floor space, CCA would be responsible for payment of approximately $160,000 to offset any direct impacts to MUSD. Additionally, new residential development resulting from any direct and indirect growth would contribute separately to school fees at the rate noted above. The collected fees could be utilized to lease the portable classrooms or contribute to funding for permanent facilities necessary for additional students.

Information provided by the MUSD Superintendent's office indicates that payment of the school mitigation fees by CCA and other new developments, and other funding mechanisms will mitigate potential impacts to a less than significant level.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to schools to a less than significant level.

**Water Supply Impacts**

The proposed Project would require 392,000 gallons per day of water. Implementation of the proposed Project would include improvements to the offsite water infrastructure facilities to provide adequate operational and fire/emergency water service to the site.

**Mitigation**

The following mitigation measures will be adopted to ensure that water is available to serve the Project, and that the Project uses the minimum practical amount of water.

- Design of the proposed prison would include provisions to minimize water use at the proposed prison:
  - Use of low-flow fixtures, and
  - Use of drought-tolerant, native landscaping.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to the water system to a level that is less than significant.

**B. TRANSPORTATION**

**Traffic Impacts**

During operations, the Project would generate approximately 1,320 daily vehicle trips on peak weekdays. This impact would contribute to an existing unacceptable level of service at the intersection of SR 58 / California City Boulevard in the unincorporated area of Kern County. Cumulative plus peak weekday traffic would result in a significant impact between 5:30 AM and 6:30 AM at the SR 58 / California City Boulevard intersection.

**Mitigation**

The following measure would reduce the project-related impact to a less than significant level:

- The addition of a traffic signal is shown to be warranted for existing conditions and this improvement would mitigate the unacceptable Level of Service (LOS) condition. Caltrans has jurisdiction over SR 58 and according to Caltrans the Project would be required to participate in funding interim improvements at SR 58/ California City Boulevard, rather than a traffic signal at this intersection. The proposed CCA Prison would contribute 4.2% of the interim improvement costs based on the proportionate share of Project traffic impact to this intersection. Implementation of this mitigation measure would reduce the Project's impact to a less than significant level.

**Finding**

The impacted intersection is within the dual jurisdiction of Caltrans, a state agency, and Kern County. California City shall ensure through the Mitigation Monitoring Plan that the applicant makes its proportionate share of funds available to Caltrans and Kern County for interim improvements to the intersection. However, California City, as lead agency, has no jurisdiction to implement this mitigation. Caltrans and Kern County can and should implement this mitigation measure to reduce project-related impacts to a less than significant level.

Should Caltrans and Kern County implement this mitigation measure, changes or alterations will have been required in, or incorporated into, the Project which will avoid or reduce Project-related traffic impacts to a less than significant level. If, however, Caltrans and Kern County do not utilize fair share contributions to mitigate the Project's contribution to the current unacceptable LOS condition at SR 58/California City Boulevard, then the increased traffic generated by the Project would be considered a significant and unavoidable adverse impact. Therefore, and in that case, the City shall find that the impact is overridden by the Project benefits stated in the Statement of Overriding Considerations as set forth in Section 8 below.

## C. NOISE

**Noise Impacts**

If dwellings were to be constructed in the approved residential subdivision to the east of the site prior to prison construction, future residents could be subjected to high noise levels during Project construction.

**Mitigation**

No sensitive receptors are currently located near the Project. Prison operations will not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operations. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore the Final EIR recommends the following mitigation measures to reduce the noise impacts of construction should residences be built adjacent to the Project prior to Project construction:

- Construction activities within 2,000 feet of occupied residences will be limited to the hours of 7 a.m. to 8 p.m. Monday through Saturday, with no construction allowed on Sundays or City holidays.

- Properly muffled equipment and trucks will be used.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce noise impacts to a less than significant level.

## D. HYDROLOGY, STORM DRAINAGE, AND FLOOD CONTROL

### Hydrology Impacts

Implementation of the Project would result in the covering of between 50 and 70 acres with impervious surfaces such as buildings, access roads, and parking areas. Implementation of the Project as proposed could result in an increase of the 100-year storm peak runoff from the watershed.

**Mitigation**

The City will adopt the following measures to reduce the potential impacts related to stormwater runoff to a less than significant level:

- Stormwater drainage and collection facilities will be designed to maintain the volume of surface water runoff at pre-Project levels. Facilities will include ditches or swales, constructed along the perimeter of the prison complex, and lined only with natural vegetation. The ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to an on-site detention basin.

- An unlined storm water detention basin will be developed on-site to retain a volume of storm water necessary to control runoff from impervious surfaces, and maintain surface runoff volumes at the property boundaries at pre-Project levels. The capacity of the detention basin will be based on calculated storm water flows above natural conditions, resulting from impervious surfaces of the proposed Project. The sizing and design of this detention basin will be reviewed and approved by the City Engineering Department as part of the final site plan approval.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hydrology impacts to a less than significant level.

### Storm Drainage Impacts

Project implementations could result in urban pollutants entering stormwater runoff. Such pollutants may include oil, grease, antifreeze, trace metals, dust and dirt, fertilizers, herbicides and pesticides.

**Mitigation**

The City will adopt the following measure to reduce potential water quality impacts to a less than significant level:

- The proposed Project will comply with all applicable requirements of the NPDES permit program.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce storm drainage impacts to a less than significant level.

## E. BIOLOGICAL RESOURCES

**Utility Infrastructure Impacts**

Based on the low quality of habitat, and complete absence of presence or sign for any sensitive species within the 25-acre utilities construction path, significant impacts which would require comprehensive mitigation measures are not anticipated. Biologists estimated that approximately ten percent (10%) or 2.5 acres of property along the utility installation area contain habitat which could be considered Category III as designated by the Bureau of Land Management.

**Mitigation**

The City will adopt the following measures to reduce the potential impact on utilities construction path to less than significant:

- The off-site compensation measures described in Section 4(A) include preservation of 2.5 acres of habitat to off-set the loss described above.

- Prior to installing underground utilities, a final inspection of these areas will be conducted to verify the findings of previous biological surveys

- Biologist shall survey utility construction path immediately prior to trenching activities, and biologist shall move any tortoise from the construction path to adjacent habitat, out of harms way.

- All vehicles, including heavy equipment and personal vehicles, shall use established roadways to access the site. All vehicles shall be restricted to the site and shall not disturb areas adjacent to the utility construction area.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- The open utility trench will be kept to the minimum width and length as practicable for construction purposes which can be completed on a day-to-day basis.

- The utility trench shall be filled or covered at the completion of each construction day.

- The utility trench shall be visually inspected for tortoise immediately prior to commencing construction each morning.

- Areas disturbed within the utilities construction path will be regraded to blend with adjacent topography.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce utility infrastructure impacts to a less than significant level.

## F. CULTURAL RESOURCES

<u>**Cultural Resources Impacts**</u>

A recorded archaeological site is located on a portion of the site. Because implementation of the proposed Project could result in the disturbance of prehistoric material, this impact is considered significant.

**Mitigation**

The City will adopt the following measures to reduce potential impacts on cultural resources to a less than significant level:

- If human skeleton remains are encountered during construction, work within 20 meters of the discovery will be stopped immediately and the County Coroner notified. If the remains are Native American, the Coroner has 24 hours to notify the Native American Heritage Commission.

- If any buried cultural remains are encountered during development and construction, work within 20 meters of the discovery will be stopped until a professional archeologist is retained to determine the significance of the find and to develop management actions. Actions needed to manage the resource will be implemented.

- Avoidance of archaeological sites is the preferred management technique. Avoidance may be achieved through implementation of the following measure:

- A qualified archaeologist will be retained to fence the perimeter of the archaeological site prior to Project grading. The fence will be located approximately 15 feet outside the actual resource site boundary and remain there for the duration of construction activities. The fenced area will be unmarked to prevent unauthorized collecting.

If avoidance is infeasible, the following measure will be implemented:

- Prior to site grading or other construction activities, a qualified archaeologist will collect surface artifacts. A report containing a lithic analysis will be filed with the Southern San Joaquin Valley Information Center at California State University, Bakersfield.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce cultural resource impacts to a less than significant level.

## G. GEOLOGY, SOILS, SEISMICITY AND GROUNDWATER

**Soil Impacts**

Potentially expansive soil was encountered in one boring at the site during a geotechnical investigation conducted for the 1994 EIR. Construction on expansive soils can result in structural damage or failure.

**Mitigation**

The City will adopt the following measures to reduce potential impacts relative to expansive soils to a less than significant level:

- Expansive soil, will be removed or treated, and/or an expansion-resistant foundation system will be constructed.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce soil impacts to a less than significant level.

**Soils Impact**

The surface soil, upper 1 to 4.5 feet, at the site is generally of a loose consistency and may be subject to excessive immediate settlement under loading. Such settlement can result in structural damage or failure.

**Mitigation**

The following measures will be adopted to reduce potential impacts relative to collapsible or compressible soils to a less than significant level:

- Collapsible soils or compressible soils, if determined to be present at the site, will be mitigated by modification of soil, or through structural foundation design.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce collapsible or compressible soils impacts to a less than significant level.

**Seismic Impacts**

Based on probabilistic analysis conducted for the preparation of the 1994 Final EIR, the highest maximum peak horizontal accelerations at the site could range from 0.30g to 0.35g for the estimated maximum credible event of M7.5 at the Lockhart Fault.

**Mitigation**

The following measure will be adopted to reduce potential impacts relative to seismic shaking to a less than significant level:

- Facilities will be designed to the standards required by the regulatory agencies governing the Project, or other pertinent building codes, to withstand the expected ground motions. Through site specific studies, seismic criteria has been developed that should be evaluated by structural designers to determine whether the standard seismic design for prisons meets or exceeds the criteria.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce seismic impacts to a less than significant level.

## H. HAZARDOUS MATERIALS

### Hazardous Materials Impacts

Review of historic aerial photographs, and local, state, and federal records revealed no evidence of hazardous substance use, storage, or releases on the Project site. No evidence of hazardous materials storage or contamination was identified on the site or in adjacent areas. However, due to the size of the site, the possibility of an isolated area of contamination, e.g. isolated illegal dumping of hazardous waste, cannot be completely dismissed.

**Mitigation**

The City will adopt the following measure to reduce potential impacts with respect to potential site contamination to less than significant:

- In the event that hazardous materials or waste contamination are encountered during grading, construction or operation of the proposed Project, the subject wastes shall be assessed, reported to appropriate agencies, and remediated. Appropriate remediation shall be determined through consultation with the affected health and state agencies.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts to a less than significant level.

### Hazardous Materials Impacts During Construction and Operations

Construction and operation of the Project would require the use and storage of hazardous materials such as paints and solvents. The misuse, improper disposal, and/or mismanagement of these materials could affect groundwater quality, soil quality, and possibly create hazards to human health and safety.

**Mitigation**

The City will adopt the following measures to reduce potential hazardous materials impacts during Project construction and operation to a level that is less than significant:

- Hazardous materials on the prison grounds will be properly stored in suitable containers and in accordance with manufacturers directions for safe storage.

- Hazardous materials used at the prison will be properly disposed of as needed, at a Class I landfill, a County-sponsored "hazardous materials round-up", or other suitable disposal method sanctioned by the Department of Toxic Substances Control.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts during construction to a less than significant level.

## SECTION 4

## SIGNIFICANT UNAVOIDABLE ENVIRONMENTAL IMPACTS WHICH CANNOT BE MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. BIOLOGICAL RESOURCES

**Desert Tortoise Habitat Impacts**

The Project site is located outside of U.S. Fish and Wildlife (USFWS) designated critical habitat areas for the desert tortoise. However, the Project would result in the loss of approximately 70 acres of desert tortoise habitat. The loss of occupied habitat could be considered a take pursuant to Section 2081 of the California Endangered Species Act (CESA). Any net loss of any occupied desert tortoise habitat is considered a significant and unavoidable impact. Individual tortoises could be destroyed as a result of grading and construction activities. Destroying a tortoise would be considered a take of a listed species pursuant to both the ESA and the CESA, and considered a significant impact.

**Mitigation**

To mitigate the above impacts and comply with the Federal Endangered Species Act (ESA) and California Endangered Species Act (CESA), the applicant will obtain necessary permits from both USFWS and California Department of Fish and Game (CDFG). USFWS will require the submittal of a ESA Section 10(a) permit application and the preparation of a Habitat Conservation Plan (HCP) that includes a Project description with an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. This document will also provide the information required during CDFG Section 2081 permitting process as mandated by CESA.

The following mitigation recommendations are typical of those included in desert tortoise habitat HCP's. Actual mitigation requirements will be determined by USFWS and CDFG during the required permitting process. The agencies may require additional measures to mitigate for the proposed habitat loss for the desert tortoise.

**Construction Site Measures**

- Prior to implementation of any of the following measures, CCA must provide fees for the

acquisition of up to 70-acres of compensation lands to the Desert Tortoise Preserve Committee (DTPC) to mitigate impacts of the prison development.

- Grading limits should be chosen in an effort to minimize impacts to mapped tortoise activity areas.

- An enclosure should be placed around the boundary of the limits of grading and should consist of an appropriate type of fencing to keep desert tortoises from re-entering the construction area.

- Clearance surveys should be conducted by qualified and permitted biologists to locate and remove any tortoises from within the limits of grading. All tortoises will be relocated to an appropriate, and preferably, adjacent habitat within the western one-half which are not part and placed within created, artificial burrows of any area disturbed by the proposed prison or any potential future facility expansions.

- The undeveloped portion of the western one-half of the site will be dedicated as a conservation easement to provide and enhance habitat for sensitive biological species.

- A biological monitor should be present during all initial ground clearing and grading activities to ensure that no incidental take of desert tortoise occurs.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- Access to the 320-acre site will be strictly controlled by perimeter signage and 24-hour patrols by prison correctional officers. Human recreational activities will be prohibited within the undeveloped portions of the site for environmental and security purposes. Native wildlife activity and migration within the property boundary, and outside the boundaries of prison security fencing, will not be disturbed.

- Provide signage along site access road to beware of desert tortoise.

**Finding**

The Project impacts to desert tortoise and related habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which significantly reduce the potential for take of listed species and substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Mojave Ground Squirrel Habitat Impacts**

Although no Mojave ground squirrels were observed at the site, the loss of Mojave ground squirrel

habitat is considered a significant impact.

**Mitigation**

The impact on the Mojave ground squirrel habitat will be significant and unavoidable, however, the. City will adopt the following measure to partially mitigate the impact on the Mojave ground squirrel habitat:

- A mitigation plan for the loss of habitat will be approved in coordination with the permitting for the loss of desert tortoise habitat discussed above.

**Finding**

The impacts to the Mojave ground squirrel habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Burrowing Owl Impacts**

Although no burrowing owls were observed at the site, the loss of burrowing owl habitat is considered a significant impact.

**Mitigation**

Project impacts on the burrowing owl habitat will be significant and unavoidable, however, the City will adopt the following measure to partially mitigate the impact on the burrowing owl habitat:

- Although no burrowing owls were observed at the site, and no impacts to burrowing owls are expected, mitigation which will be developed for the desert tortoise includes protection of Mojave creosote bush scrub habitat form grazing and recreational vehicle activity. This mitigation will enhance the potential for use of the protected area of the site as burrowing owl habitat.

**Finding**

The impact identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## B. AIR QUALITY

### Construction Impacts

The Project would modify/develop between 50 to 70 acres, and up to 35 acres could be exposed at any one time during construction. The Project could generate 1,848 pounds per day of fine particulate matter ($PM_{10}$). Construction related emissions would exceed Kern County Air Pollution Control Department CEQA thresholds of significance for $PM_{10}$ and nitrogen oxides ($NO_2$) , and would therefore represent a significant and unavoidable impact of the Project.

**Mitigation**

Although the impacts associated with $NO_2$ and $PM_{10}$ are significant and unavoidable, construction activities shall be partially mitigated by employing the best available control measures for fugitive dust control described in the EIR Supplement and included in the Mitigation Monitoring Program.

**Finding**

Project construction air quality impacts identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement.

### Construction Equipment Impacts

Use of employee vehicles, trucks and heavy equipment would result in construction emissions throughout the construction period. The Project would generate approximately 172 tons/year of carbon monoxide, 21 tons/year of total organic gases, 59.8 tons/year of nitrogen oxides, 5.7 tons/year of sulfur oxides, and 6.4 tons/year of particulate matter during construction. Construction related emissions would exceed KCAPCD CEQA thresholds of significance for $PM_{10}$ and $NO_2$.

**Mitigation**

Although the impacts from construction equipment and construction employee vehicles will be significant and unavoidable, the following measures will partially mitigate the identified impacts:

- Equipment will be maintained to minimize emissions.
- Information will be provided to construction employees to facilitate car pooling.
- Information will be provided to construction employees to facilitate extended stays in the Project vicinity to reduce long distance commuting.

**Finding**

Project air quality impacts arising from construction activities cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Operations Impacts**

Total daily trips to the site during operation peak weekdays are estimated to be 1,320. Vehicle emissions would total 48.4 tons/year reactive organic gases, 330 tons/year carbon monoxide, 37.5 tons/year nitrogen oxides, and 6.1 tons/year of $PM_{10}$. Operation of the Project would result in significant and unavoidable impacts from emissions of organic compounds and nitrogen oxides, which exceed KCAPCD CEQA thresholds of significance.

**Mitigation**

City will adopt the following measures to partially mitigate the air quality impacts from operational emissions:

- Information will be provided to employees to facilitate car pooling.
- Equipment, such as generators, will meet all Kern County Air Pollution Control District requirements.

**Finding**

Project air quality impacts arising from operations cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## C. AESTHETICS/VISUAL CONSIDERATIONS

**Aesthetic Impacts**

The Project would result in the conversion of vacant desert lands to a developed prison facility with buildings, parking lots, lighting, and other related features. Although no residences presently exist in the immediate vicinity, the prison would represent a significant change in the visual landscape, or viewshed, to future residents of approved residential subdivisions adjacent to the proposed prison site.

Even with mitigation in place, implementation of the proposed Project will result in an unavoidable significant visual impact to future residents of the approved subdivisions east of the Project site. The

site is relatively small, thereby affording limited flexibility in terms of placement of the prison structures. There are no feasible mitigation measures available to reduce the potential visual impact to less than significant

**Mitigation**

The Project impact on the viewshed will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Areas of the site disturbed during Project construction which would remain unpaved will be revegetated for runoff control and to enhance visual blending with the surrounding area.

**Finding**

Changes or alterations to the Project to reduce visual and aesthetic impacts have been incorporated into the Project as the mitigation measures, however, the visual and aesthetic impacts associated with the Project cannot be mitigated to a less than significant level. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**<u>Lighting Impacts</u>**

Indirect lighting of adjacent areas and skyglow from the proposed prison would occur because the Project site is surrounded by vacant desert lands with no light-blocking features, and because there are no other sources of nighttime lighting in the vicinity. Although currently no residences exist in the immediate vicinity, skyglow would be visible and would be a visual nuisance to existing and future sensitive receptors.

Even with mitigation in place, skyglow will be noticeable in California City. Only the no-Project alternative would avoid significant light and glare impacts. However, implementation of this alternative would not meet the basic objectives of the Project.

**Mitigation**

The impact from nighttime lighting and skyglow will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Mast lighting posts will not exceed 30 feet in height, and where applicable and required by design, the lighting will be shielded and directed downward to minimize off-site illumination.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which substantially

lessen the significant environmental effects as identified in the Final EIR Supplement. However, the residual effect, after mitigation, of nighttime lighting has been identified as significant and unavoidable. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## SECTION 5

## ALTERNATIVES

The Final EIR Supplement identifies and evaluates five potential alternatives to the Project that "could feasibly accomplish most of the basic purposes of the Project". The five alternatives include (1) no Project, (2)Virginia Boulevard-Less Intense Prison, (3) Randsburg-Mojave site, (4) Remote Site, and (5) Virginia Boulevard/190% Development alternative. The alternatives discussed in the Final EIR Supplement constitute a reasonable range of potential options necessary to permit a reasoned choice of alternatives in light of the Project Objectives identified in Sections 1.3 and 7.0 of the Draft EIR Supplement. The Final EIR identifies the No Project Alternative and the Less-Intensive Prison Alternative as environmentally superior to the Project and they would reduce or eliminate the unavoidable significant impacts associated with the Project. However, neither of these alternatives fulfill the Project objectives. In addition, specific economic and social considerations make the environmentally superior alternatives identified in the Final EIR Supplement infeasible. Therefore, pursuant to CEQA Guideline 15364, and Public Resources Code Section 21081(a)(3), the Planning Commission will reject the environmentally superior alternatives as infeasible.

The alternatives considered in the Final Supplement are summarized below:

1. **No Project Alternative**- Under the no-Project alternative, a correctional facility would not be constructed. None of the potential impacts associated with development of the Project would occur. Unavoidable adverse impacts related to light and glare, biological resources and air quality (particulate and ozone-producing gases) during both construction and facility operation would be avoided.

**Finding**

The Planning Commission finds the No-Project Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative will fail to meet any of the Project objectives identified in the Final EIR; and
- This alternative would forego the substantial benefits of the Project, particularly:
    - Construction of the Corrections Corporation of America Prison at California City is necessary to provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for surrounding communities. Between 85 to 90 percent of the prison employees are expected to be drawn from the Project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

- In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees will stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

2. **The Virginia Boulevard-Less Intense Prison-** The EIR Supplement evaluated a smaller scale Project on the same site comprised of 1,000 beds on a 40 acre site.

**Finding**

The Planning Commission finds the Virginia Boulevard-Less Intense Prison Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative provides environmental benefits, however, this alternative will not provide as many employment opportunities as the proposed Project and would provide less capacity to serve the incarceration needs of government correctional agencies. Thus, this alternative will do less to meet Project objectives; and

- Based on the required investment in land and facility development costs, a smaller prison on the 320- acre site would not be economically viable. Thus, this alternative does not present a cost effective alternative to a publicly funded and operated correctional facility.

3. **Randsburg-Mojave Site**-While not an unavoidable significant impact, this alternative would remove potential (but somewhat degraded) habitat for the burrowing owl and the Mojave ground squirrel. Additionally, the Randsburg-Mojave property is not currently served by paved access roads, and public utilities would require extension from a greater distance to serve the site. Furthermore, as discussed in the 1994 EIR, construction at this site would require enhanced engineering design and more stringent building requirements to withstand potential levels of seismic shaking due to the proximity of an active fault, thus representing a fiscal constraint. Lastly, during the initial search by CCA for an appropriate site to accommodate the proposed Project, the Randsburg-Mojave property was not available for sale.

4. **Remote Site Alternative**-Through the site selection process used to find the prison site, properties located in the region which would be reasonably feasible alternatives, would meet the majority of the Project objectives, and fit most of the criteria identified as necessary, were

not found. Specifically, the biological resources and habitat quality of more remote sites tended to improve; however, the areas further to the east and north tend to be served by fewer paved roads with limited access to utilities and services. Thus a Remote Site alternative was not feasible.

5. **The Virginia Boulevard/190% Development Alternative-** This alternative would result in additional significant unavoidable impacts such as viewshed impacts; increased light, glare and aesthetic impacts; impacts to Mojave Unified School District; additional particulate and ozone producing impacts generated during operations; and loss of additional acreage of potential desert tortoise, burrowing owl, and Mojave ground squirrel habitat. The larger prison could also result in land use incompatibilities and incrementally increase demands on public utilities and community services which could potentially limit the ability to provide adequate services. This alternative was rejected since it would not offer an environmental advantage over the proposed Project.

## SECTION 6

## RECIRCULATION

### SECTION 21092.1 FINDING

<u>Finding</u>: Pursuant to CEQA Guideline 15088.5, and Public Resources Code Section 21092.1, on the basis of its review and consideration of the Final EIR Supplement this Planning Commission finds that:

- The Project mitigation for impacts to biological resources has been revised from an on-site habitat conservation plan to an off-site habitat conservation plan as described in Section 3 of these findings and as shall be incorporated into the Project as part of the Mitigation Monitoring Plan.

- The revised mitigation measures and revised water system design are not substantial changes in the Draft EIR Supplement that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative; and

- The revised mitigation measures and revised water system design will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR Supplement; and

- The revised mitigation measures and revised water system design will not involve or require mitigation measures or alternatives which are considerably different from those analyzed in the Draft EIR Supplement that would substantially reduce one or more significant effects on the environment; and

- The revised mitigation measures and revised water system design do not render the Draft EIR Supplement so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded;

- Thus, none of the conditions set forth in CEQA Guideline 15088.5 or Public Res. Code § 21092.1 requiring recirculation of a Draft EIR Supplement have been met. Incorporation of the revised mitigation measures and revised water system design into the Final EIR Supplement does not require that the EIR Supplement be recirculated for public comment.

## SECTION 7

## FINDINGS REGARDING THE MITIGATION MONITORING PROGRAM

Section 21081.6 of the Public Resources Code requires that when a public agency is making the findings required by State CEQA Guidelines Section 15091(a)(1) and Section 21081(a) of the Public Resources Code the public agency shall adopt a program for reporting on or monitoring the changes which it has either required of the Project or made a condition of approval to avoid or substantially lessen significant environmental effects. These measures must be fully enforceable through permit conditions, agreements, or other measures.

The Planning Commission hereby finds that the Mitigation Monitoring Program dated January, 1998, and adopted as part of the Project's Conditional Use Permit meets the requirements of Section 21081.6 of the Public Resources Code by providing for and enforcing the implementation and monitoring of Project conditions intended to mitigate potential environmental effects of the Project.

## SECTION 8

## STATEMENT OF OVERRIDING CONSIDERATIONS

Having reduced the effects of the proposed Project by adopting mitigation measures, and balanced the benefits of the proposed Project against the proposed Project's potential unavoidable adverse impacts, the City hereby determines the benefits of the proposed Project outweigh the potential unavoidable adverse impacts, and the unavoidable adverse impacts are acceptable, based on the following overriding considerations, which are sufficient to outweigh the proposed Project's unavoidable adverse impacts:

- Construction of the Corrections Corporation of America Prison at California City will provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for

Surrounding communities. Between 80 to 90 percent of the prison employees are expected to be drawn from the project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees wil stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

## SECTION 9

## INDEPENDENT JUDGEMENT

## SECTION 21082.1 (C) (3) FINDING

Facts: The Planning Department, acting as lead agency, has reviewed and edited as necessary the Draft EIR Supplement and the Final EIR Supplement to reflect its own independent judgement to the extent of its ability, including reliance on concerned County technical personnel from other departments.

Finding: Pursuant to Public Resources Code Sec. 21082.1 (c) (3) the City Council hereby finds that the Final EIR Supplement reflects the independent judgement of the lead agency.

---

Introduced, approved and adopted this 20th Day of January, 1998 by the following vote:

AYES: 5
NAYS: 0
ABSTAIN: 0
ABSENT: 0

Larry Adams, Mayor

January 20, 1998
Date

ATTEST:

Helen Dennis, City Clerk

DRAFT

**SUPPLEMENT TO FINAL ENVIRONMENTAL IMPACT REPORT**

**CORRECTIONS CORPORATION OF AMERICA PRISON AT CALIFORNIA CITY**

**State Clearinghouse No. 97091045**

**Lead Agency:**
City of California City
21000 Hacienda Boulevard
California City, CA 93505
(760)373-8661

**Prepared by:**
Rust Environment & Infrastructure
18401 Von Karman
Suite 550
Irvine, California 92612
(714)251-6400

**Project Applicant:**
Corrections Corporation of America
102 Woodmont Boulevard,
Suite 800
Nashville, Tennessee 37205

**October 1997**

**Rust Environment & Infrastructure**

# 1.0 INTRODUCTION

DRAFT

## 1.1 PREFACE

The proposed project involves construction and operation of a new 2,304 bed medium security prison facility located in California City, Kern County, California. The proposed prison would occupy approximately 70 acres of a 320 acre property situated at the terminus of Virginia Boulevard, roughly one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The proposed project will require extension of public utilities to serve the facility, and issuance of a Conditional Use Permit by California City and other necessary agency approvals.

This project is being proposed by Corrections Corporation of America (CCA), the leading private sector provider of detention and correction services to federal, state and local governments in the United States. CCA was founded in 1984, and currently has contracts to operate 62 correctional facilities in several states. CCA's full range of services includes finance, design, construction and management of new or existing facilities, as well as long-distance inmate transportation. CCA's mission is "Quality corrections, at less cost to the taxpayer, in partnership with government."

## 1.2 PURPOSE OF THIS DOCUMENT

This document is prepared as a Supplement to a prior Environmental Impact Report (EIR) (State Clearinghouse No. 93082030) which evaluated the environmental effects resulting from construction and operation of a new State of California Department of Corrections (CDC) prison facility on one of two properties located in California City. One of the properties evaluated in the prior EIR, the Virginia Boulevard site, is being evaluated in this document for construction and operation of a similar, yet less intense prison facility that would be constructed, owned and operated by CCA.

Under California Environmental Quality Act (CEQA) Guidelines (Section 15163), the lead or responsible agency may choose to prepare a Supplement if minor additions or changes in the proposed action have occurred since circulation of a previous EIR. The EIR Supplement need only contain information necessary to make the previous EIR adequate for the currently proposed project. Therefore, the 1994 certified EIR (SCH#93082030) is incorporated by reference into this Supplement in accordance with CEQA Guidelines Section 15150. The Executive Summary of the certified EIR is attached as Appendix A of this Supplement. The entire certified EIR is available for review at the City of California City Planning Department offices located at 21000 Hacienda Blvd. in California City.

Based on the evaluation conducted to complete the Initial Study, and a review of impacts and mitigation measures identified in the prior EIR, the areas for which this Supplement provides revised

or clarified information for the proposed action include:

- Changes to the description of the proposed action.
- Land use and planning.
- Visual considerations.
- Employment, population and housing.
- Public utilities and community services.
- Transportation.
- Air quality.
- Hydrology and drainage.
- Biological resources.
- Cultural resources.

DRAFT

The technical reports used in the preparation of this Supplement are attached as appendices. The prior EIR and associated technical appendices are available for review at the City of California City offices noted on the cover of this report.

This EIR Supplement will be used by the City of California City Planning Commission and City Council, and various local, state, and federal responsible agencies during consideration of the proposed project (see Section --- for an overview of the permits/approvals required for the proposed project). The primary purpose of this EIR Supplement is to:

- Identify and evaluate potential environmental consequences of the proposed project.
- Indicate the manner in which those consequences can be mitigated or avoided.
- Identify and analyze alternatives that may reduce or eliminate potentially significant environmental impacts associated with the proposed project.
- Identify any impacts, that even with mitigation measures would be unavoidable.
- Provide, or refer to, documentation supporting these determinations.

## 1.3 PROJECT OBJECTIVES

In planning the California City prison facility, and in accordance with section 15124(b) of CEQA Guidelines, CCA identified the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.

- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates as required by contracting agencies.

- Provide excellent long term employment and career opportunities for surrounding communities.

## 1.4 PROJECT BACKGROUND

In August 1994, the CDC certified a Final EIR which addressed a new 2,200 bed prison or up to a 4,400 bed prison complex, and an associated waste water treatment facility located on one of two sites in California City. Prior to EIR certification, a 30-day Notice of Preparation was distributed, and a public scoping meeting was held to encourage public participation in that environmental review process. The Draft EIR, which provided an extensive evaluation of potential environmental impacts resulting from the proposed projects, was distributed for a 45-day public review period. Following the close of the review period, CDC held a subsequent public hearing to obtain verbal comments on the Draft EIR. The Final EIR was certified by CDC after additional technical studies were conducted, and responses were prepared to all comments received during the public review process.

The first of the two alternative prison sites evaluated in the prior EIR is referred to as the Randsburg-Mojave site. This property, which is located north of Randsburg-Mojave Road and comprised of 1,780 acres, was evaluated for construction and operation of up to a 4,400 bed prison to accommodate up to 8,360 inmates. The second site, referred to as the Virginia Boulevard site, is a 480 acre property located south of Twenty Mule Team Parkway at the terminus of Virginia Boulevard. The Virginia site was evaluated for operation of a 2,200 bed prison to accommodate up to 4,180 inmates. A CDC prison facility on either property would have included a 160-acre waste water treatment facility. Due to funding constraints, the State of California did not proceed with construction or operation of a prison on either of the sites evaluated.

Since certification of the prior EIR, CCA has submitted a proposal to the City of California City to construct and operate a medium security prison facility on the Virginia Boulevard site. This facility would be connected to municipal water, sewer, electricity and gas services. The proposed action includes a 2,304 bed prison on the 320 acre parcel described herein. The 160 acre parcel previously evaluated for a wastewater treatment plant is not a part of the proposed CCA prison. Similarly, the Randsburg-Mojave site evaluated in the prior EIR is not a part of the CCA proposed prison.

To respond to potential environmental effects of the proposed action addressed in the EIR certified by CDC which may require updating or clarification, California City, as the new lead agency for the project, has determined that a Supplement to the prior EIR should be prepared. As noted above, this Supplement provides additional analysis/clarification of various issues, and provides an opportunity for public review and comment. The City of California City issued a Notice of Preparation (NOP) for an EIR Supplement for the proposed action on September 11, 1997. A copy of this NOP, the Initial Study, and Responses to the NOP are included in Appendix B.

DRAFT

## 1.5 SUPPLEMENT FORMAT

The contents of this Supplement are arranged in a format similar to the prior EIR to assist in cross referencing the two documents. Only revised and/or clarified information is addressed in this Supplement. Unless otherwise addressed in this Supplement, the information included in the prior EIR remains unchanged. The remainder of the Supplement is organized in the following sections:

- **2.0 - Executive Summary** - This section summarizes the proposed action, related environmental impacts, identified mitigation measures, cumulative impacts, and alternatives to the proposed action.

- **3.0 - Project Description** - This section describes the prison facility proposed by CCA, including the property location and setting, site improvements and neccessary infrastructure extensions.

- **4.0 - Environmental Setting, Revised/Clarified Impacts, and Mitigation Measures** - This section discusses the current environmental condition of the site and vicinity, and describes the revised or clarified potential impacts resulting from implementation of the proposed action, and evaluates the significance of these impacts. Revised or additional mitigation measures that would reduce or avoid environmental effects are identified.

- **5.0 - Cumulative Impacts** - This section includes additional information on potential cumulative impacts from the proposed action and other projects in the region.

- **6.0 - Alternatives to the Proposed Action** - This section will describe alternatives potentially capable of eliminating or reducing significant environmental effects associated with the proposed action. This section will also address a maximum prison development (4,180 bed facility) scenario for the project site, consistent with the information presented in the prior EIR.

- **7.0 - Persons and Organizations Consulted** - This section provides a list of individuals and organizations that contributed data of concerns in this EIR Supplement. Persons or organizations who contributed to the preparation of this EIR Supplement are also identified.

- **8.0 - References** - A list of references used in the preparation of this Supplement is included in this section.

- **Appendices** - The following appendices to the EIR Supplement are included:
  - **Appendix A** - Notice of Preparation, Initial Study, and Responses to the NOP
  - **Appendix B** - Executive Summary From Prior EIR
  - **Appendix C** - Updated Traffic Study
  - **Appendix D** - Biological Resources Survey
  - **Appendix E** - Cultural Resources Survey

**DRAFT**

## 2.0 EXECUTIVE SUMMARY

TO BE COMPILED FOLLOWING INITIAL REVIEW OF ADMINISTRATIVE DRAFT AND PRIOR TO DISTRIBUTION OF SUPPLEMENT FOR PUBLIC REVIEW

DRAFT

# 3.0 PROJECT DESCRIPTION

DRAFT

## 3.1 PROJECT LOCATION AND SETTING

As shown in Figure 1, the 320 acre project site is located in the City of California City, Kern County California, approximately 0.5 miles south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The site is situated at an elevation of roughly 2,555 feet above mean sea level, approximately 5 miles east of downtown California City. The property and vicinity is comprised of vacant undeveloped desert land, characterized by creosote bush and scrub vegetation. The site is not currently served directly by any public utilities. The subject property nor any of the surrounding parcels within 0.5 miles contain any significant structural improvements. For more detailed information on the regional setting refer to the 1994 EIR.

## 3.2 FACILITY DESCRIPTION

The currently proposed action is a private venture by Corrections Corporation of America (CCA) to design, construct and operate a 2,304 bed medium security prison facility on approximately 70 acres of the 320 acre Virginia Boulevard site previously evaluated by CDC for a prison in EIR 93082030. Unlike the previous proposal, the CCA proposed facility will only accommodate 2,304 inmates, the intended capacity of the prison. This facility will be designed to meet American Correctional Association standards and is intended to accommodate inmates from the State of California. A conceptual site plan of the prison is shown in Figure 2. This site plan will be finalized in accordance with all applicable State and local codes and regulations.

The primary elements of the proposed prison will include the following:

- An administration building comprised of offices for the prison management, support staff and correctional officers. This building will also include space for medical response facilities, central kitchen and dining area, chapel, housekeeping, facility maintenance, inmate educational facilities, and visitation. The administration building will also be equipped with a fenced service yard for the storage of inmate transfer and security vehicles.

- Secure inmate housing buildings, constructed of precast concrete panels, would be connected to the administration building by twelve-foot wide precast concrete corridors. Inmate housing units would be equipped with staff and inmate support facilities, including programmatic meeting areas, restrooms and a commissary. Secure inmate housing units would be comprised of double occupancy cells.

- A gymnasium building that would include indoor sports and exercise areas, classrooms, and vocational areas would also be linked by a precast concrete corridor to the administration building.

- An armory, containing weapons and riot gear would be located in a secure building, detached

from the main prison building. CCA correctional officers do not carry any weapons as part of normal operations.

- An outdoor recreation and exercise area would be centrally located, near the inmate housing buildings and the administration building.

- All of the improvements described above will be situated within a perimeter compound security system that will include two rows of chain link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system, and nighttime security lights on thirty-foot tall posts. To facilitate security patrols, an asphalt paved perimeter road would encompass the exterior of the entire fenced prison compound.

- Site improvements located external to the fenced and secured prison facility would include, an asphalt paved parking lot to accommodate approximately 216 employee and visitor vehicles. An asphalt paved, two lane road would provide access to the parking lot and prison. Petroleum powered generators would be installed to provide electricity to the facility in the event of a power failure.

## 3.3 FACILITY CONSTRUCTION

The construction of the proposed facility is projected to involve a total of 250 employees over a 15 - 18 month period. It is anticipated that within this construction period, there would be a peak activity period, where the number of employees would increase to about 350. This peak would last about three months. Based on the contractor's experience and the remote location of the site, it is estimated that 30% of the construction employees would carpool to the site.

DRAFT

## 3.4 FACILITY OPERATIONS

Operating at full capacity, the proposed CCA prison would employ approximately 640 staff during three correctional officer shifts seven days per week, and one administrative staff shift five days per week. Staff distribution per eight hour shift would be as follows:

- The first shift of 180 correctional officers would begin at 6:00 AM.
- The second shift of 180 correctional officers would begin at 2:00 PM.
- The third shift of 180 correctional officers would begin at 10:00 PM.
- The administrative staff shift of 100 people would begin at 8:00 AM.

As part of standard prison operations, inmates would be transported to and from the proposed prison on a weekly, or more frequent basis, as required by the contracting agencies supplying inmates for the proposed prison. Educational and vocational programs for inmates would be implemented by CCA staff to meet the needs of individual inmates and as specified by the requirements of the contracting agencies.

## 3.5 PUBLIC UTILITIES IMPROVEMENTS

The proposed prison would require the extension of electricity, water, natural gas and sewer utilities to the property. Water and electricity lines would be extended from existing utilities located along Twenty Mule Team Parkway. A water line providing service to the site would be placed underground within the Virginia Boulevard right-of-way. Electricity will likely be provided by an overhead extension along the east side of Virginia Boulevard. Natural gas lines would be extended from existing gas utilities located approximately four miles west of the prison site, near the intersection of Randsburg-Mojave Road and Hooker Street. Extension of electricity, water and natural gas as described above were also required for the previously proposed CDC prison, and the associated environmental impacts of these utility extensions were evaluated in the prior EIR.

Sewer service to the proposed prison would be provided by constructing an underground sewer line extension from the existing California City treatment facilities located approximately four and one-half miles west of the prison site. This extension, which would be located primarily within public street right-of-ways, would be designed and constructed in accordance with the rules and regulations of the City of California City. In contrast, the CDC proposal addressed in the 1994 EIR designated a 160-acre parcel adjacent to the prison for an on-site waste water treatment facility.

A complete discussion of the status of the public utilities and services in the vicinity, and the environmental impacts associated with implementation of the proposed prison are discussed in Section 4.4 of this Supplement.

DRAFT




VICINITY




Source: U.S.G.S. Map 7.5' Quadrangle, Galileo Hill, California

LOCATION

DRAFT

RUST
Rust Environment & Infrastructure Inc.

CORRECTIONS CORPORATION OF AMERICA
PRISON FACILITY

SITE VICINITY/LOCATION

FIGURE 1



OCT 10 '97 12:02PM RUST ENV INFRA P.11




Reference: DLR GROUP ARCHITECTS AND ENGINEERS

RUST

Rust Environment & Infrastructure Inc.

CORRECTIONS CORPORATION OF AMERICA
PRISON FACILITY

CONCEPTUAL SITE PLAN

FIGURE
2



25155

CUP 98-02

RESOLUTION NO. 11-98-02

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT--AMENDMENT 98-02)**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**Section 1. Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America (CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee filed an application to expand the permitted use by 512 beds. This resolution sets forth the Commission's decision on the application.

**Section 2. Findings**

The Commission finds as follows:

(a) Operation of a prison facility is in accordance with the general plan and the objectives of the Zoning Regulations;

(b) Facility complies with the applicable provisions of the Municipal Code; and

(c) A Mitigated Negative Declaration for the proposal will satisfy California Environmental Quality Act (CEQA).

**Section 3. Conditions**

The application to amend Conditional Use Permit No. 97-01 is approved subject to the following conditions:

(a) Buildings must be connected to electricity, water, sewer, natural gas, telephone and cable television;

(b) Site Plan Review for the project will be to the satisfaction of the City Engineer and in accordance with the Municipal Code; and

(c) Other provisions of the Municipal Code shall be followed.

**Section 4. Other**

Except as provided herein, Conditional Use Permit No. 97-01 is hereby affirmed.

**PASSED, APPROVED AND ADOPTED** on November 24, 1998, by the following votes:

AYES: 4
NOES: -0-
ABSENT: -0-
ABSTAIN: 1

Robert L. Tryon
Chair

ATTEST:

Ronna Greene
Secretary

(SEAL)

# EXHIBIT B

| | | | |
|---|---|---|---|
| 1. Agreement Number<br>ODT-10-0002 | 2. Effective Date<br>See Block 19. | 3. Facility Code(s) | 4. DUNS Number<br>159734151 |

**5. Issuing Federal Agency**
U.S. Department of Justice
Office of the Federal Detention Trustee
4601 N. Fairfax Drive, Suite 910
Arlington, Virginia 20530

**6. Local Government**
California City
21000 Hacienda Ave
California City, California 93505

TAX ID# 62-1806755

**7. Appropriation Data**

**8. Local Contact Person**
Tom Weil, City Manager

**9.** Tel: (760) 373-7170
Fax: (760) 373-7532
Email: citymgr@californiacity.com

**10.** This agreement is for the housing, safekeeping, and subsistence of federal prisoners, in accordance with content set forth herein.

**11.**
Male: 2,276 Female: 256
(Estimated Federal Beds)

**12.**
See Page #18

**13. Optional Guard/Transportation Services:**

☒ Medical Services

☒ U.S. Courthouse

**14.**
Guard Hour Rate: $53.03

Mileage shall be reimbursed by the Federal Government at the GSA Federal Travel Regulation Mileage Rate.

**15. Local Government Certification**

*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct, this document has been duly authorized by the governing of the Department or Agency and the Department or Agency will comply with all provisions set forth herein.*

**16. Signature of Person Authorized to Sign (Local)**

[signature]
Signature

Tom Weil
Name

City Manager, California City — 09/21/10
Title — Date

**17. Prisoner and Detainee Type Authorized**

☒ Adult Male
☒ Adult Female
☐ Juvenile Male
☐ Juvenile Female
☐ ICE Detainees

**18. Other Authorized Agency User**

☒ BOP
☒ ICE

**19. Signature of Person Authorized to Sign (Federal)**

[signature]
Signature

Scott P. Stermer
Name

Assistant Trustee for Procurement, OFDT — 9/23/10
Title — Date

A.1 Background ..... 3
A.2 Services Required ..... 3
A.2.1 Standard Receiving and Discharge of Prisoners/Detainees ..... 4
A.2.2 Records Management ..... 5
A.2.3 Indemnification ..... 5
A.2.4 Transportation ..... 5
A.2.5 Medical Services ..... 7
A.2.5a Prisoner Rape Elimination Act (PREA) ..... 8
A.2.6 Contacts and Incident Reporting ..... 8
A.2.7 Detainee Work Program ..... 9
A.3 Quality Control Management ..... 10
A.4 Quality Assurance ..... 10
A.4.1 Inspection Clause ..... 11
A.5 Performance Reviews ..... 12
A.6 Performance Ratings ..... 12
A.7 Performance Matrix ..... 13
A.8 Contact for Agreement Administration ..... 17
A.9 Financial Provisions ..... 17
A.9.1 Service Contract Act ..... 17
A.9.2 Price Schedule ..... 18
A.9.3 Invoice and Payment ..... 18
A.10 Modification and Disputes ..... 19
A.11 Termination ..... 19
A.12 Litigation ..... 20
Prisoner Rape Elimination Act Reporting Information ..... 21

## A.1 Background

Federal detention is a large component of criminal and immigration case processing by the U.S. Marshals Service (USMS) and, U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS). Law enforcement initiatives and increases in illegal immigration to the United States have created a complex detention program that the Department of Justice (DOJ) must effectively manage with available detention resources or acquire additional resources to meet increasing demands.

In response to the increasing concern regarding federal detention, the Office of the Federal Detention Trustee (OFDT) was established by a Congressional directive to exercise all power and functions authorized by law relating to the detention of federal prisoners and illegal aliens. Accordingly, OFDT leads the development of DOJ detention policy and manages federal detention resources to maximize available detention space.

Currently, non-federal detention bed space for federal detainees and prisoners is acquired through Intergovernmental Agreements (IGAs), where a daily rate is paid to state and local governments, and facility-specific contracts with private service providers. The Department of Justice Appropriations Act for 2001 (Public Law 106-553) is designed to allow for the use of non-traditional contract vehicles when acquiring detention and other related services. This authority states:

*"Sec. 119 - Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."*

In an effort to operate in the most effective way and receive the maximum benefit of Section 119 to meet the Government's current and future goals, and acquire additional resources, OFDT desires to award an Agreement to California City for detention services at the California City Correctional Center.

## A.2 Services Required

California City will provide, by the terms and conditions identified in this agreement, all necessary personnel, equipment, materials, supplies, and services for the management of comprehensive detention services, which include, but are not limited to, security, medical services, food service, safety, and sanitation. Additionally, the facility shall have sound proof rooms to accommodate video conferencing that permit prisoners and their attorneys to communicate in a secure manner which preserve the confidentiality of the attorney-client relationship.

These comprehensive detention services shall provide for the safe, secure, and humane confinement for male and female population principally consisting of prisoners or

detainees charged with federal offenses' and detained while awaiting trial or sentencing. Services are to be provided at the California City.

Performance shall be in accordance with the most current editions of the Federal Performance-Based Detention Standards (FPBDS), Performance-Based Detention Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement. California City shall maintain American Correctional Association (ACA) and Joint Commission on Accreditation of Healthcare Organizations (JCAHO) accreditation throughout the life of the agreement.

All services and programs shall comply with this Performance Work Statement (PWS); the U.S. Constitution; all applicable federal, state, and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders and Consent Decrees. Should a conflict exist between any of the aforementioned standards, the most stringent shall apply. When a conflict exists and a conclusion cannot be made as to which standard is more stringent, the Contracting Officer (CO) shall determine the appropriate standard. California City shall comply with DOJ and/or USMS regulation, Congressional mandate, federal law or E.O. and all existing California City polices.

California City will:

- Provide a means for verification of their ACA and JCAHO accreditation.
- Operate in full and complete compliance of the Federal Performance-Based Detention Standards as defined. Those standards are available at http://www.justice.gov/ofdt/major-activities.htm
- Operate in full complete compliance with California laws and regulations.
- California City will ensure that all employees and contractors comply with their policies regarding employment suitability and background clearances and that any violations of California City Standards of Conduct are investigated and adjudicated appropriately and promptly.

### A.2.1 Standard Receiving and Discharge of Prisoners/Detainees

California City agrees to accept federal detainees only upon presentation by a law enforcement officer of the Federal Government with proper agency credentials and shall not relocate a federal detainee from one facility under its control to another without the permission of the Federal Government.

California City shall only release federal prisoners/detainees only to law enforcement officers of the Federal Government agency initially committing the detainee (i.e., DEA, ICE, etc.) or to a Deputy United States Marshal (USM). Those detainees who are

remanded to custody by a USM may only be released to a USM or an agent specified by the USM of the Judicial District.

Federal prisoners detainees sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the Federal Government.

**A.2.2 Records Management**

All records related to agreement performance should be retained in a retrievable format for the duration of the agreement. Except as otherwise expressly provided in this PWS, California City shall, upon completion or termination of the resulting agreement, transmit to the Government any records related to performance of the agreement.

**A.2.3 Indemnification**

California City shall protect, defend, indemnify, save, and hold harmless the United States Government, the DOJ and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of California City, its agents, sub-contractors, employees, assignees, or any one for whom California City may be responsible. California City shall also be liable for any and all costs, expenses, and attorneys' fees incurred as a result of any such claim, demand, and cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government, the DOJ and its employees or agents. California City's liability shall not be limited by any provision or limits of insurance set forth in the resulting agreement.

In awarding this agreement, the Government does not assume any liability to third parties, nor will the Government reimburse California City for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the agreement or any subagreement under this agreement.

California City shall be responsible for all litigation, including the cost of litigation brought against it, its employees or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this agreement and be provided copies of any pleadings filed or said litigation within five (5) working days of receipt of service. California City shall cooperate with government legal staff and/or the United States Attorney regarding any requests pertaining to federal or State litigation.

**A.2.4 Transportation**

California City is responsible for the movement/transportation of prisoners designated to the institution as requested in writing by the USMS as specified below. Examples of

circumstances requiring prisoner movement/transportation include, but are not limited to: outside medical care; transfer or movement to/from other Government facilities; and airlift sites. California City's transportation procedures shall ensure staff and prisoner security and safety. California City shall utilize restraint equipment identical to the USMS when one-for-one equipment exchange is required (e.g., airlifts).

Transportation and escort guard services will be performed by at least two (2) armed qualified detention or correctional officer personnel under applicable policies, procedures, and practices. California City agrees to augment such practices as may be requested by the USMS to enhance specific requirement for security, prisoner monitoring, visitation, and contraband control.

California City shall establish procedures for the disposition of prisoner/detainee property/funds upon final transfer from the facility. California City shall establish procedures to allow prisoner/detainee one set of clothes that he/she is wearing at time of final transfer from the facility. California City shall ensure that prisoner/detainee transport clothing provided is properly fitted, climatically suitable, durable and presentable. These procedures shall be approved in writing by the USMS.

Specific services, California City agrees, upon request of the USMS in whose custody a prisoner is held, to provide:

1) Transportation and escort guard services for federal prisoners housed at their facility to and from a medical facility for outpatient care ***(within per-day rate)***;

2) Transportation and stationary guard services for federal prisoners admitted to a medical facility ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

3) Transportation and escort guard services for federal prisoners/detainees housed at the facility are transported to and from the San Diego Courthouse four times a week ***(within per-day rate)***;

4) And, the Justice Prisoner and Alien Transportation (JPATS) airlift site in Victorville, CA ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

5) Transportation and escort guard services for federal prisoners once a week from the California City Correctional Center to the Nevada Southern Detention Center in Pahrump, Nevada ***(within per-day rate)***.

### A.2.5 Medical Services

Provide sufficient on-site medical coverage to accomplish the deliverables listed below while containing costs, with an understanding that California City Correctional Center's proximity to other California facilities allows the medical provider to provide certain coverage, care and relief using staff from nearby institutions.

Specifically, the goal is to provide these services on-site:

- Initial (intake) medical screening of new admissions including administration and reading of PPD tests.
- Health appraisals (physicals) within the 14 day requirement after intake.
- 24 hour/ 7 day basic care to respond to emergent situations and distribute medications.
- Sick call Monday through Friday days.
- Chronic care clinics when needed.

California City is financially responsible for all medical treatment provided to federal detainees within the facility. California City shall provide either through its staff or contractors the full range of medical care required within the facility including dental care, mental health care, pharmaceuticals, and record keeping, as necessary to meet the standards of the JCAHO. California City shall not be responsible for the cost of necessary outside medical care or treatment. The USMS shall be responsible for the cost of necessary outside medical care or treatment.

In the event of an emergency, California City shall proceed immediately with necessary medical treatment. In such event, California City shall notify the USMS Contracting Officer's Technical Representative (COTR) immediately regarding the nature of the federal detainee's illness or injury and type of treatment provided.

The facility shall have in place an adequate infectious disease control program, which includes testing all prisoners at the facility for Tuberculosis (TB) as soon as possible upon intake (not to exceed 14 days) and read within 72 hours. TB testing shall be accomplished in accordance with the latest Center for Disease Control (CDC) Guidelines and the results documented on the federal detainee's medical record. California City shall immediately notify the USMS of any cases of suspected or active TB so that any scheduled transports or production can be delayed until a physician verifies the federal detainee's TB status. (Refer to USMS Directive: 9.4 Prisoner Health– Prisoner Airborne Pathogen Control)

When a federal detainee is being transferred and/or released from the facility, he will be provided with seven (7) days of prescription medication which will be dispensed from the detention facility. When possible, generic medications should be prescribed. Medical records must travel with the federal detainee.

If the records are maintained at a medical contractor's facility, it is the detention facility's responsibility to obtain them before a federal detainee is moved.

### A.2.5a Prisoner Rape Elimination Act (PREA)

The facility is required to post the Prisoner Rape Elimination Act (PREA) brochure/bulletin in each housing unit of the facility. All prisoners or detainees have a right to be safe and free from sexual harassment and sexual assaults. The facility shall include the PREA information in their handbooks and orientations at the California City (Refer to Attachment: Prisoner Rape Elimination Act Information).

### A.2.6 Contacts and Incident Reporting

Policy and procedures shall be developed which ensure a positive relationship is maintained with all levels of the federal judiciary. California City's procedures shall ensure a tracking system is established which mandates that all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and California City responses, specifically related to a detainee, shall be made part of the detainee's file.

California City shall notify the COTR (with copy to the CO) when a member of the United States Congress or the media requests information or requests to visit the facility. California City shall coordinate all public information related issues with the COTR. All press statements and releases shall be cleared, in advance, with the COTR.

California City, their employees, agents, or sub-contractors shall not release any information regarding the facility population, security level, personal identifiers, or medical issues to anyone outside the USMS without express permission of the CO, COTR, or their designee. Any inquiries regarding any inmate or other matter related to the contract shall immediately be referred to the USMS. California City shall immediately notify the USMS of any incident where they believe information was released by their employee, agent, or sub-contractor related to a USMS' matter. California City shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the DOJ in any public presentations they make or articles they write that relate to any aspect of contract performance or the facility operations.

California City shall immediately report all criminal activity related to the performance of this contract to the USMS, who shall contact the appropriate law enforcement investigative agency. California City shall immediately report all serious incidents to the COTR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, sexual assault/abuse, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force, assaults on staff/detainees resulting in

injuries that require medical attention (does not include routine medical evaluation after the incident); fires; full or partial lockdown of the facility; escape; any security breaches; weapons discharge; suicide attempts; deaths; hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; significant environmental problems that impact the facility operations; transportation accidents if a detainee is in the vehicle.

California City shall provide a safe, secure, and humane environment for alleged victims of sexual assaults and detainees undergoing mental health treatment for sexual assault.

The Government may investigate any incident pertaining to performance of this contract. California City shall cooperate with the Government on all such investigations.

### A.2.7 Detainee Work Program

Detainee labor shall be used in accordance with the detainee work plan developed by California City and approved by the USMS. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service or other jobs. The USMS detainees may not be required to work. USMS detainees may volunteer to work within the secure confines of the contract facility if they sign a waiver of their right not to work. USMS detainees with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state or federal agencies will not be considered for the volunteer program. USMS detainees are not permitted to act as Trustees and they may not work in positions that permit unsupervised contact with segregated prisoners or detainees of the opposite sex. USMS detainees are restricted from operating equipment that may expose the prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens or other inmates. USMS detainees will not have access to prisoner or employee records. In addition, the State will ensure that detainees who volunteer to work are denied access to prescription medications. USMS detainees must obtain required medical clearances before working in the food service areas. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations. Detainees shall not be used to perform the responsibilities or duties of an employee of California City. Appropriate safety/protective clothing and equipment shall be provided to detainee workers as appropriate. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands.

Volunteer prisoner/detainee workers can be paid the identical rates of pay as other California City inmates.

USMS prisoner/detainees shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in

privileges may be used as incentives to ensure that USMS' detainees keep their living areas clean (FPBDS Services and Programs Section – G.3 & G.4.).

### A.3 Quality Control Management

California City is responsible for management and quality control actions necessary to meet the quality standards set forth in this agreement. In compliance with the FAR Clause 52.246-4, Inspection of Services-Fixed Price, California City must provide a Quality Control Plan (QCP) to the CO no later than 60 days after award.

The plan must include:

1) A description of the methods to be used for identifying and preventing defects in the quality of service performed;

2) A description of the records to be kept to document inspections and corrective or preventive actions taken;

3) Records of inspection that must be kept and made available to the Contracting Officer, when requested, through the agreement performance period and for the period after agreement completion until final settlement of any claims under this agreement.

### A.4 Quality Assurance

The Government quality assurance (QA) is comprised of the various functions, including inspection, performed by the Government to determine whether a provider has fulfilled its agreement obligations pertaining to quality. The Government's QA program is not a substitute for quality control by the provider.

Each phase of the services rendered under this agreement is subject to Government inspection both during California City's operations and after completion of the tasks. When California City is advised of any unsatisfactory condition(s), California City shall submit a written report to the CO addressing corrective/preventive actions taken. The COTR may check California City's performance and document any non-compliance, but only the CO may take formal action against California City for unsatisfactory performance.

The COTR will be designated subsequent to agreement award and a delegation of COTR duties and authority will be furnished to California City. The Government may reduce California City's invoice or otherwise withhold payment for any individual item of nonconforming service observed as specified in Contractor's Failure to Perform Required Services. The Government may apply various inspection and extrapolation techniques to determine the quality of service and the total payment due.

### A.4.1 Inspection Clause

**Failure to Perform Required Services**

The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this solicitation. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the contractor's invoice shall reflect the contract's reduced value resulting from the contractor's failure to perform required services. The contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

This agreement incorporates FAR clause 52.246-4 Inspection of Services—Fixed-Price:

INSPECTION OF SERVICES—FIXED-PRICE (AUG 1996)

(a) Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform to contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the Government may—

(1) Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and

(2) Reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may—

(1) By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

(2) Terminate the contract for default.

(End of clause)

### A.5 Performance Reviews

In accordance with the Federal Acquisition Regulations (FAR), subpart 37.601 Performance-based Acquisition, the Government must have a method of assessing contractor performance against performance standards. Further, the agreement provides procedures for reductions to the price of a fixed-price agreement when services are not performed or do not meet agreement requirements. This Performance Summary establishes the performance level required by the Government to meet the agreement requirements.

The following methods of surveillance may be used in the assessments of agreement performance:

A) **Systematic**: These reviews will be scheduled inspections focusing on a specific discipline. Assessments may be performed by Government monitors or by other parties designated by the Government.

B) **Ad-Hoc**: These reviews will be conducted as a result of special interests arising from routine monitoring of the contractor's quality control system an unusual occurrence pertaining to the agreement or other Government concerns.

### A.6 Performance Ratings

The service requirements are divided into various disciplines, each of which has a number of key functions. Successful performance of a key function is essential for successful performance of the related discipline. Each discipline comprises a specific percentage of the overall agreement requirement. Reductions in agreement price will be based on these percentages applied to the overall monthly invoice.

At the conclusion of any review, a report will be written and an adjectival rating of contractor performance within each discipline will be assigned. The following rating system will be used:

Excellent: The program conforms to the FPBDS in an exceptional manner and conformance is maintained with exceptional internal controls. Policies and procedures for achieving the program standards are documented and adequate for the mission of the facility; the policies and procedures are communicated to staff; the policies and procedures are fully implemented; and the desired outcome is achieved. Level of performance in the aggregate exceeds the minimum performance standard by substantial margin; deficiencies are nonexistent or extremely minor.

Good: The program conforms to the FPBDS in an acceptable manner. Internal controls limit procedural deficiencies. The facility more than accomplishes the requirements of program standards. Level of performance in the aggregate meets the performance standard: deficiencies are minor and offset by outstanding elements of performance within the review guideline.

Acceptable: The program is meeting the requirements of the FPBDS. There are no breakdowns that would keep the program from continuing to accomplish the mission of the facility. Level of performance in the aggregate meets the performance standards; deficiencies are minor and there are no outstanding elements of performance present within the review guideline.

Deficient: The program is unable to meet the requirements of one or more of the FPBDS. Internal controls are weak, resulting in serious deficiencies in one or more areas. The level of performance in the aggregate fails to meet the performance standards: deficiencies are pervasive.

At-Risk: Operation of the program is impaired to the point that the facility is unable to accomplish its mission. The program is unable to meet the requirements of the FPBDS and is unlikely to meet those requirements in the foreseeable future without substantial corrective action. The level of performance in the aggregate fails to meet the performance standards: deficiencies require immediate corrective actions.

## A.7 Performance Matrix

This Performance Matrix serves to communicate what the Government intends to qualitatively inspect. The matrix identifies:

A. Each service requirement and the key functions essential to successful performance of each agreement requirement;

B. Define the minimum performance rating acceptable for each agreement requirement; and

C. Specify the maximum percentage of total agreement value attributable to each agreement requirement.

**Administration and Management**

*Objective* - Addresses policy development and monitoring; internal quality control; maintenance of detainee records, funds, and property; admission and orientation procedures; detainee release; and accommodations for the disabled.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(A.1)** | Policy Development and Monitoring |
| **(A.2) (K.1)** | Internal Inspections and/or Reviews |
| **(A.3)** | Detainee Records |
| **(A.4)** | Admission and Orientation |
| **(A.5) (K.2)** | Personal Property and Monies |
| **(A.6) (K.3)** | Detainee Release |
| **(A.7)** | Accommodations for the Disabled |

**Health Care**

*Objective* - Addresses the policies and procedures for administering quality health care by licensed personnel; maintaining accurate health information data; timely health screening, treatment, program intervention and follow-up of all cases; access to routine, acute chronic, and emergency health services, response to medical, mental and dental health needs of detainees; suicide prevention; infectious disease; hunger strikes; and detainee death.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(B.1)** | Intake Health Screening |
| **(B.2) (K.4)** | Medical, Dental, and Mental Health Appraisals |
| **(B.3) (K.5)** | Access to Routine, Acute Chronic, and Emergency Health Services |
| **(B.4)** | Experimental Research |
| **(B.5)** | Response to Medical, Mental, and Dental Health Needs |
| **(B.6)** | Suicide Prevention |
| **(B.7)** | Detainee Hunger Strikes |
| **(B.8)** | Detainee Death |
| **(B.9)** | Informed Consent/Involuntary Treatment |
| **(B.10)** | Infectious Disease |

**Security and Control**

*Objective* - Addresses the issuance of policies and procedures to staff; appropriate use of force; maintenance of daily incident logs; emergency readiness; and detainee accountability and discipline.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (C.1)(K.6) | Post Orders |
| (C.2) | Permanent Logs |
| (C.3) (K.7) | Security Features |
| (C.4) (K.8) | Security Inspections and/or reviews |
| (C.5) | Control of Contraband |
| (C.6) | Detainee Searches |
| (C.7) | Detainee Accountability and Supervision |
| (C.8) | Use of Force |
| (C.9) | Non-routine Use of Restraints |
| (C.10) | Tool & Equipment Control |
| (C.11) | Weapons Control |
| (C.12) | Detainee Discipline |
| (C.13) | Supervision for Special Housing |
| (C.14)(K.9) | Contingency/Emergency Plan |

**Food Service**
*Objective* - Address basic sanitation procedures and the adequacy of meals provided to detainees.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (D.1) (K.10) | Sanitation Requirements |
| (D.2) (K.11) | Ensure Meals are Varied |
| (D.3) | Special Diets |

**Staff and Detainee Communication**
*Objective* - Address opportunities for detainees to communicate with staff; detainee grievance procedures; and the provision of diversity training.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (E.1) (K.12) | Staff-Detainee Communication |
| (E.2) | Diversity Training |
| (E.3)(K.13) | Detainee Grievances |

**Safety and Sanitation**
*Objective* - Addresses the adequacy of fire safety programs; the control of dangerous materials and/or hazards; air quality, noise levels, and sanitation of the facility; and the cleanliness of clothing and bedding.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (F.1) | Fire Safety |
| (F.2) | Non-Hazardous Furnishings |

| | |
|---|---|
| (F.3) | Control of Dangerous Materials |
| (F.4) | Environmental Control |
| (F.5) (K.14) | Clothing and Bedding |
| (F.6) | Personal Hygiene/Well-being |
| (F.7) (K.15) | Physical Facility and Equipment |

**Services and Programs**
*Objective* - Addresses detainee classification; religious practices; work assignments; availability of exercise opportunities; access to legal materials and legal representation; access to a telephone; visitation privileges; and the handling of detainee mail and correspondence.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (G.1) (K.16) | Classification, Review, and Housing |
| (G.2) (K.17) | Religious Practices |
| (G.3) | Volunteer Work Assignments |
| (G.4) | Work Assignments and Security |
| (G.5) | Exercise and Out-of-Cell Opportunities |
| (G.6) | Legal Materials |
| (G.7) (K.18) | Legal Representation |
| (G.8) | Telephone Access |
| (G.9) | Visitation Privileges |
| (G.10)(K.19) | Detainee Mail and Correspondence |

**Workforce Integrity**
*Objective* - Address the adequacy of the facility's hiring process and background check procedures, and the adequacy of procedures to respond to allegations of staff misconduct.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (H.1) | Staff Background and Reference Checks |
| (H.2) | Staff Training, Licensing, and Credentialing |
| (H.3) | Staff Misconduct |

**Detainee Discrimination**
*Objective* – Address the adequacy of policies and procedures designed to prevent discrimination against detainees based on gender, race, religion, national origin, or disability.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (I.1) | Discrimination Prevention |

### A.8 Contact for Agreement Administration

California City shall designate a person to serve as the agreement administrator for the requirement. The agreement administrator is responsible for overall compliance with agreement terms and conditions. California City designation of representatives to handle certain functions under this agreement does not relieve the agreement administrator of responsibility for agreement compliance.

| | |
|---|---|
| **Name** | **Tom Weil** |
| **Title** | California City City Manager |
| **Address** | 21000 Hacienda Avenue<br>California City, California |
| **Zip Code** | 93505 |
| **Telephone** | (760) 373-7170 |
| **FAX** | (760) 373-7532 |
| **E-Mail Address** | citymgr@californiacity.com |

### A.9 Financial Provisions

#### A.9.1 Service Contract Act

This Agreement incorporates the following clause by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at this address: www.arnet.gov.

Federal Acquisition Regulation Clause(s):

52.222-41 Service Contract Act of 1965, as Amended (July 2005)

52.222-42 Statement of Equivalent Rates for Federal Hires (May 1989)

52.222-43 Fair Labor Standards Act and the Service Contract Act – Price Adjustment (Multiyear and Option Contracts) (May 1989)

The current State of California City, California wage rates shall be the prevailing wages unless notified by the Federal Government.

### A.9.2 Price Schedule

The Federal Government will use various price analysis techniques and procedures to ensure the per-diem rate established by this Agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

1. Comparison of the requested per-diem rate with the independent government estimate for detention services, otherwise known has the Core Rate;
2. Comparison with per-diem rates at other state or local facilities of similar size and economic conditions;
3. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items;
4. Evaluation of the provided jail operating expense information;

The firm-fixed per-diem rate for services is $77.50, and shall not be subject to adjustment on the basis of California City actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of the Agreement forward for 36 months. The per-diem rate covers the support of one federal detainee per "federal detainee day", which shall include the day of arrival, but not the day of departure.

After 36 months, if a rate adjustment is desired, the Local Government shall submit a request through the Electronic Intergovernmental Agreements area of the Detention Services Network (DSNetwork). All information pertaining to the jail on DSNetwork will be required before a new per-diem rate can be considered.

### A.9.3 Invoice and Payment

California City shall prepare and submit for certification and payment, original and separate invoices each month to the USMS Southern District of California. To constitute a proper monthly invoice, the name and address of the facility, the name of each federal detainee, *his* specific dates of confinement, the total days to be paid, the appropriate per diem rate, and the total amount billed (total days multiplied by the rate per day) shall be listed, along with the name, title, complete address and telephone number of the official responsible for invoice preparation. The invoice shall be submitted to the COTR at the address listed below must include:

- Name and address of California City;
- Invoice date and number;
- Agreement number;

- Description, quantity, unit of measure, unit price and extended price of the services provided;
- Terms of any discount for prompt payment offered;
- Name and address of official to whom payment is to be sent;
- Name, title, and phone number of person to notify in event of defective invoice; and
- Taxpayer Identification Number; and
- Electronic funds transfer banking information in accordance with FAR 52.232-33, Payment by Electronic Funds TransferCCentral Contractor Registration.

The invoice shall be sent to:

USMS Southern District of California

Address: Edward J. Schwartz Courthouse
U.S. District Court
Southern District of CA
940 Front Street
San Diego, CA 92101-8900

The Government will make payments to California City on a monthly basis, promptly pursuant to the Prompt Payment Act after receipt of an appropriate invoice.

**A.10 Modification and Disputes**

Either party may initiate a request for modification to this Agreement in writing. All modifications negotiated will be effective only upon written approval of both parties.

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

**A.11 Termination**

This Agreement shall terminate after fifteen (15) calendar years or by either party upon one-hundred and eighty days (180) advanced written notice to the other party. Within 180 days of the giving, or receipt, of such notice the USMS shall retake custody of all prisoners(s) transferred to the California City under this Agreement. The City of California City agrees to consult with the USMS and OFDT at least 90-days prior to any action(s) to terminate to allow sufficient time to prepare for loss and replacement of services.

### A.12 Litigation

The Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and/or the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

# Prisoner Rape Elimination Act Reporting Information

## SEXUAL ASSAULT AWARENESS

This document is requested to be posted in each Housing Unit Bulletin Board at all Contract Detention Facilities. This document may be used and adapted by Intergovernmental Service Agreement Providers.

While detained by the Department of Justice, United States Marshals Service, you have a right to be safe and free from sexual harassment and sexual assaults.

## Definitions

### A. Detainee-on-Detainee Sexual Abuse/Assault

One or more detainees engaging in or attempting to engage in a sexual act with another detainee or the use of **threats, intimidation, inappropriate touching** or other actions and/or communications by0 one or more detainees aimed at **coercing and/or pressuring** another detainee to engage in a sexual act.

### B. Staff-on-Detainee Sexual Abuse/Assault

Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. **Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by DOJ policy and the law.**



### C. Staff Sexual Misconduct is:

Sexual behavior between a staff member and detainee which can include, but is not limited to indecent, profane or abusive language or gestures and inappropriate visual surveillance of detainees.

## Prohibited Acts

A detainee, who engages in inappropriate sexual behavior with or directs it at others, can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy.

- **Using Abusive or Obscene Language**
- **Sexual Assault**
- **Making a Sexual Proposal**
- **Indecent Exposure**
- **Engaging in Sex Act**

## Detention as a Safe Environment

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity. Regardless of your sexual orientation, you have the right to be safe from unwanted sexual advances and acts.

## Confidentiality

Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the detainee-victim's welfare and for law enforcement investigative purposes.

## Report All Assaults!

If you become a victim of a sexual assault, you should report it immediately to any staff person you trust, to include housing officers, chaplains, medical staff, supervisors or Deputy U.S. Marshals. Staff members keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. If you are not comfortable reporting the assault to staff, you have other options:

- Write a letter reporting the sexual misconduct to the person in charge or the United States Marshal. To ensure confidentiality, use special (Legal) mail procedures.
- File an Emergency Detainee Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the Field Office Director. You can get the forms from your housing unit officer, or a facility supervisor.
- Write to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530
- Call, **at no expense to you,** the Office of Inspector General (OIG). The phone number is 1-800-869-4499.

**Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported.**

A publication of the Office of the Federal Detention Trustee
Washington, DC

Published February 2008

# EXHIBIT C

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.**

______________
Provided by City

# SITE PLAN REVIEW (SPR) MINOR APPLICATION

*(Existing Building/Business/Ownership)*

## 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc.

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93505

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

## 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 08-22-25

## 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 08/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

**FOR DEPARTMENTAL USE ONLY**

Fees: *(Refer to the Master Fee Schedule)*

☐ $ 250.00, Planning SPR Application Fee *(mandatory)* *GL 10-3218*

☐ $ 90.00, Fire Department Inspection *(mandatory)* *GL 19-3641*

☐ $ 150.00, Building Inspection Fee *(mandatory)*

☐ $ ________, Other

$ ________, **Total Fee Collected**

Application complete:

☐ Date: ________ Staff Member ________

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

*(Existing Building/Business/Ownership)*

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   - Total Parking Spaces: ________
   - ADA Accessible Spaces: ________
   - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified – separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

Case 1:25-cv-01292-KES-CDB Document 1-4 Filed 10/27/25 Page 6 of 7

**Business License Application**

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ______
Approved by ______
Processed by ______
Processed On ______

Name of Business: CoreCivic, Inc. California City Immigration Processing Center

Business Owner(s) Name: CoreCivic Inc.

Business Address: 22844 Virginia Blvd California City, CA 93504-0590

Mailing Address: PO Box 2511 California City, CA 93504

Business Phone #: 760-338-6670

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Center

Planned Business Begin Date: 

Have you had a license for this business in the past? ○ Yes ○ No

Do you own or rent the space ○ Own ○ Rent (If rent, building owner/landlord ______

Will the business have Annual Gross Income of $10.000 or more? ○ Yes ○ No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # ______
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-1
(Required for Food Services – attach copy)

**Contractors:**
State License # ______
State License Type ______
(Required for Contractors)

Expiration Date ______

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**
Inspection Date 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature

Date 07/22/2025

Printed Name Christopher Chestnut

Clear Form Submit

*California City Correctional Facility*
California City, CA

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

CALIFORNIA
DEPARTMENT OF JUSTICE

**Rob Bonta**
***Attorney General***

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 95814
Public: (916) 445-9555
Telephone: (916) 210-6642
E-Mail: ashley.werner@doj.ca.gov

***SENT VIA EMAIL AND CERTIFIED U.S. MAIL***

June 15, 2026

Sean Grayson, City Manager & Hearing Officer
David Brottlund, Planning Commission Chair
City of California City
21000 Hacienda Boulevard
California City, CA 93505
sgrayson@californiacity-ca.gov
dbrottlund@californiacity-ca.gov

**RE: Comments on Appeals of California City's Issuance of Entitlements for CoreCivic, Inc.'s Immigrant Detention Operations at the California City Correctional Facility**

Dear City Manager Grayson and Planning Commission Chair Brottlund:

The California Attorney General's Bureau of Environmental Justice respectfully submits these comments regarding the appeals of California City's approval of CoreCivic, Inc.'s ("CoreCivic") applications for a business license and a site plan for its current use of the California City Correctional Facility ("Facility"), a former prison located on approximately 70 acres of land at 22844 Virginia Boulevard, California City, for immigrant detention operations. We submit these comments to City Manager Grayson in his capacity as the hearing officer for the business license appeal and to the Planning Commission in its role as the hearing body for the site plan appeal, pursuant to California City Municipal Code sections 1-4.09, subsection (a), and 9-2.212, subsection (b).[1]

As explained further below, the City Manager and Planning Commission (individually and collectively referred to herein as "City") should not approve CoreCivic's business license and site plan review applications because doing so would violate the City's duties under its Municipal Code for several reasons. First, as a preliminary matter, pursuant to section 3-.2.3.203, subdivision (b), the City may not approve a business license or site plan application that fails to include information or materials required by the Municipal Code or that contains material misrepresentations. Based on records provided to our office by the City and publicly available information, it appears that CoreCivic did not provide the City with proof of compliance with workers' compensation laws or a site plan with its applications, as required by the Municipal Code, and CoreCivic's applications obscure the nature of its immigrant detention operations at

[1] All references in this letter to statutory provisions are to the California City Municipal Code, unless otherwise stated.

the Facility. Second, pursuant to section 3-2.3.211, the City may not issue a business license unless the proposed use conforms to the zoning regulations. Here, CoreCivic's use of the Facility as an immigrant detention center violates the City's zoning regulations and the existing conditional use permit for the Facility because immigrant detention is not permitted within the zone district or pursuant to the conditional use permit. Further, the existing conditional use permit for the Facility allows up to 2,304 beds at the Facility, not the 2,816 beds which the City has purported are authorized.[2]

As adopted by the City Council, the Municipal Code Zoning Chapter "preserves, protects and promotes the public health, safety, peace, comfort, convenience, prosperity, and general welfare."[3] The City's adherence to its own Municipal Code, which the Municipal Code mandates, is essential to achieving these objectives.[4] This principle applies to the City's actions to process entitlement applications for proposed business operations and land uses.[5] The necessity of the City's correct application of its Municipal Code requirements to CoreCivic's business license and site plan applications is magnified by the serious public health and safety failures that courts and our office have documented at the Facility and in other immigrant detention facilities operated by CoreCivic.

For these reasons, we urge the City to deny CoreCivic's site plan and business license applications.

## I. CoreCivic's Immigrant Detention Operations at the Facility

On August 27, 2025, without obtaining a business license or any other entitlement required by the Municipal Code, and more than a year after the closure of the former prison operations at the Facility, CoreCivic began to receive immigrants who had been detained by the federal government at the site.[6] In a press release, CoreCivic announced that it would hold immigrant detainees at the "2,560-bed California City Immigration Processing Center" pursuant to a contract with the U.S. Immigrations and Customs Enforcement ("ICE").[7] News reports estimate, based on statements by the City's Mayor, that the Facility held 500 detainees within

---

[2] Ex. I (Res. No. 01-98-1802), p. 1.
[3] § 9-2.101.
[4] §§ 1-3.01, 1-3.03, subd. (a)(1), 9-2.2803.
[5] §§ 9-2.2803, subd. (a), 3-2.3.214.
[6] Elliott, State Removes All Inmates from Cal. City Prison, Remaining Staff Working to Close Facility, Tehachapi News (Nov. 18, 2023), https://www.tehachapinews.com/news/state-removes-all-inmates-from-cal-city-prison-remaining-staff-working-to-close-facility/article_f6920d7c-864e-11ee-88b2-3f4bee2c5642.html.
[7] CoreCivic, CoreCivic Announces New Contract Awards at California City Immigration Processing Center and Midwest Regional Reception Center (Sept. 29, 2025), https://ir.corecivic.com/news-releases/news-release-details/corecivic-announces-new-contract-awards-california-city.

just two weeks of its opening as an immigration detention center.[8] By January 2026, the detained population at the Facility had ballooned to over 1,400 people.[9]

Since CoreCivic began to receive detainees at the Facility in 2025, inhumane conditions of confinement have been repeatedly documented by detainees, non-profit organizations, and government entities, including the California Department of Justice. In September 2025, Disability Rights California conducted a monitoring visit of the Facility and concluded that ICE and CoreCivic were subjecting people with disabilities to abuse and neglect by failing to provide access to critical medical and mental health care and failing to address disability-related requests in a timely manner, in addition to other critical shortcomings.[10] In November 2025, seven detainees filed a class action lawsuit against ICE and the Department of Homeland Security ("DHS") alleging that detainees at the Facility have been deprived of access to basic medical care, disability accommodations, and access to their lawyers and loved ones, in violation of their rights under the U.S. Constitution.[11,12] The lawsuit further alleges that detainees have been subjected to crumbling and unhygienic infrastructure conditions in the Facility, including clogged toilets and showers, foul smelling and discolored tap water, raw sewage, mold, insects, leaks, and flooding, as well as inadequate clothing, excessive solitary confinement and threats of force, and a lack of privacy in bathing and toilet facilities.[13] On February 10, 2026, the United States District Court for the Northern District of California issued a preliminary injunction

---

[8] Montalvo, ICE awards $130M contract to run Kern County facility amid deportation crackdown, FresnoBee (Oct. 22, 2025), https://www.fresnobee.com/news/local/article312344657.html.

[9] Fry, California's Newest ICE Center Has 1,400 Detainees - What Adam Schiff and Alex Padilla Saw There, CalMatters (Jan. 20, 2026), https://calmatters.org/justice/2026/01/california-city-ice-detention-senators/.

[10] Disability Rights California, Newly Opened California City ICE Detention Facility: Dangerous for Disabled People (Nov. 3, 2025), https://www.disabilityrightsca.org/reports/california-city-ice-processing-center-a-dangerous-expansion-of-immigration-detention-in; see also Montalvo, Immigrants Protest Solitary Confinement - Abuse at CA's Largest ICE Detention Center, FresnoBee (Oct. 22, 2025) (describing inhumane conditions and treatment reported by detainees at the Facility and detainees' sit-ins and refusal to eat in protest), https://www.fresnobee.com/news/california/article312180017.html.

[11] *Gomez-Ruiz, et al v. ICE, et al.* (N.D.Cal. Nov. 12, 2025, No. 3:25-cv-09757), ECF No. 1 ("*Gomez-Ruiz* Complaint"), ¶ 1.

[12] In a lawsuit filed against CoreCivic and the City by the Dignity Not Detention Coalition and a John Doe detainee in September 2025, the petitioners have also alleged that detainees have been subjected to invasive body searches, a lack of privacy in bathing and toilet facilities, cold water showers, inconsistent electricity, and inadequate hygiene and cleaning supplies and have been denied consistent recreational time outside of their cells and access to medicine. (Supp. Dec. of John Doe In Support of Ex Parte App. for Temp. Rest. Order and Order to Show Cause, ¶¶ 4, 7-12.)

[13] *Gomez-Ruiz* Complaint, *supra,* ¶¶ 38, 40 76, 114.

ordering the federal government to provide detainees with adequate access to medical care, attorneys, appropriate clothing, and recreation spaces.[14]

The California Department of Justice, through an on-site inspection and interviews with detainees conducted by our Civil Rights Enforcement Section on November 20 and 21, 2025, pursuant to the Attorney General's authority under Assembly Bill 103 (2017), has also identified extensive violations of the ICE standards that apply to the Facility. Our office documented these findings in a report published this year entitled "Immigration Detention in California, A Review of Conditions of Confinement." The Department's findings on violations at the Facility include the premature opening of the Facility without adequate staffing, crisis-level understaffing for healthcare, denial of access to outside medical specialists, exposure of detainees to extremely cold temperatures, the infiltration of rainwater and plumbing leaks into detainees' living quarters, reports of inadequate food quantities to meet nutritional needs, excessively long lockdowns, and reports of a failure to provide detainees with recreational time, among other problems.[15]

The inhumane conditions of confinement at the Facility highlight the urgent need for government at all levels, including local jurisdictions, to faithfully exercise their respective oversight responsibilities over CoreCivic's immigrant detention operations in accordance with the applicable laws.

## II. CoreCivic's Applications Are Inaccurate and Incomplete

Based on documents provided to our office by the City and publicly available information, it is our office's understanding that the present appeals are based on the City's approval of the business license and site plan review applications and corresponding business plan submitted to the City by CoreCivic on August 25, 2025, and attached hereto respectively as Exhibits A, B, and C. Concerningly, the applications obscure the true nature of CoreCivic's current operations as an immigrant detention facility, thereby preventing the City from correctly processing the applications. Further, CoreCivic's business license and site plan applications to operate the Facility appear to lack material information that is required by the Municipal Code for the City to process and make a decision on the applications. The City must not approve

[14] *Gomez-Ruiz, et al v. ICE, et al.* (N.D.Cal. Nov. 12, 2025, No. 3:25-cv-09757), ECF No. 72 (Order Granting in Part Plaintiffs' Motions for Preliminary Injunction and Class Cert., p. 1.)
[15] Our office's findings from its inspection of the Facility and other detention facilities in the state are detailed in a report issued on May 15, 2026, entitled "Immigration Detention in California, A Review of Conditions of Confinement." The report is available at https://oag.ca.gov/system/files/media/immigration-detention-2026.pdf. In January 2026, California State Senators Adam Schiff and Alex Padilla toured the Facility and described reports from detainees of foul odors emanating from the drinking water and encountering mold in their food and water. Mejia and Vives, U.S. Senators Tour California City ICE Facility, Decry Conditions and Inadequate Medical Care, Los Angeles Times (Jan. 21, 2026), https://www.latimes.com/california/story/2026-01-20/u-s-senators-tour-california-city-detention-center-decry-conditions-inadequate-medical-care.

CoreCivic's business license and site plan based on applications containing incomplete and misleading information.

The Municipal Code sets forth specific, mandatory requirements for the contents of business license and site plan applications submitted to the City. Business license applications must identify the "name and business of the applicant," the "nature of the business," proof of compliance with workers' compensation laws, and other specified information.[16] The applicant must verify the application under oath.[17] Further, the City must revoke or suspend a business license if a licensee violates the Municipal Code's business license provisions, including because the licensee operated its business in an unlawful manner or misrepresented information to obtain a business license.[18] Likewise, site plan review applications must meet certain criteria, including by providing a plan with specified information relating to the site's layout and development.[19] The City is required to enforce the Municipal Code's business license and site plan requirements.[20]

CoreCivic's August 2025 business license and site plan applications cannot be approved since they fail to disclose CoreCivic's immigrant detention operations at the Facility. Correspondence between the City and CoreCivic shows that CoreCivic withdrew the business license and site plan applications it originally submitted in July 2025, which accurately described CoreCivic's operations at the Facility as immigration processing and detention subject to a contract with ICE, and replaced it with new versions in August 2025 that omit any reference to immigrant detention and ICE's involvement.[21] Instead, the August 2025 application materials describe the Facility generically as a "Detention Facility/Prison" and state that CoreCivic "will be operating…under a contract with the United States Marshals Service."[22] City records indicate that CoreCivic revised its business license and site plan applications in response to the City's determination that CoreCivic's proposed use of immigrant detention at the Facility would trigger Senate Bill 29 (2017)—a determination which CoreCivic disputed.[23] Without an accurate and complete description of CoreCivic's intended use of the Facility in CoreCivic's business license

[16] § 3-.2.3.203, subd. (b).
[17] § 3-2.3.203, subd. (d).
[18] § 3-2.3.208, subds. (a), (c).
[19] § 9-2.212.
[20] § 3-2.3.214; see §§ 1-3.01, subd. (a)(1); 1-3.03 (prohibiting the aiding or abetting of omissions that are unlawful under the Municipal Code).
[21] Exs. A-C, D (CoreCivic July 2025 Business License Application), E (CoreCivic July 2025 Site Plan Review Application), F (CoreCivic July 2025 Business Plan), G (Malloy Aug. 14, 2025 Email); H (Carter Aug. 8, 2025 Letter).
[22] Exs. A-C.
[23]See Exs. D-F. Senate Bill 29 (2017) prohibits a city, county, or other public agency from approving a deed, instrument, or other conveyance of land or issuing a permit for civil immigration proceedings without first providing at least 180-days advanced notice and soliciting public comments at a minimum of two public hearings. (Ch. 494, Stats. 2017, § 2.)

and site plan applications, the City cannot accurately determine whether CoreCivic's operations conform to zoning regulations, which is a required step to issue a business license or site plan.[24]

CoreCivic's August 2025 business license and site plan applications also do not appear to include all of the information required by the Municipal Code, and thus cannot be approved by the City as submitted. First, we have not identified any documents indicating that CoreCivic provided the City with proof of its compliance with workers' compensation laws with its business license application.[25] Compliance with the Municipal Code's requirement to provide proof of compliance with workers' compensation laws is especially important in light of both critical understaffing identified at CoreCivic detention facilities, which have contributed to worker injuries, and the lawsuits alleging CoreCivic's use of forced labor practices.[26] Second, it does not appear that CoreCivic submitted an actual site plan, as required, with its site plan review application.[27] It is important that CoreCivic provide a site plan, because a site plan provides the City with information about the Facility's physical layout and its compatibility with Building and Fire Code standards.

## III. CoreCivic's Operations at the Facility Do Not Conform to the City's Zoning Regulations

The City's Municipal Code prohibits the issuance of a business license "unless the place of business and the purposes and methods of conducting such business conform to health, fire, and zoning regulations."[28] Similarly, the Municipal Code does not allow the City to approve a site plan where the application does not show that the site "will be developed in accordance" with the Code's requirements.[29] Here, the City may not issue CoreCivic a business license or site plan for its current immigrant detention operations, because CoreCivic's current operations do not conform to the zoning regulations contained in Title 9 of the Municipal Code for several reasons. First, immigrant detention is not a permitted use, either by right or by conditional use

[24] §§ 3-2.3.208, subds. (a), (c), 3-2.3.211, subd. (d), 3-2.3.214, 9-2.212, subd. (d).
[25] § 3-2.3.203, subd. (b).
[26] See Meza, Protected Whistleblowers' Disclosures Regarding Gross Waste and Unlawful Contract Performance at the Torrance County Detention Facility, Government Accountability Project (Feb. 18, 2025), p. 2, https://whistleblower.org/wp-content/uploads/2025/02/02-18-2025-Whistleblower-Letter-to-Congress-and-Oversight-re-Torrance.pdf; Office of the Insp. Gen., U.S. Dep't. of Jus., Audit of the U.S. Marshals Service Contract No. DJJoDT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center, Leavenworth, Kansas (Apr. 2017), https://oig.justice.gov/sites/default/files/reports/a1722.pdf; *Wilhen Hill Barrientos, et al., v. CoreCivic, Inc.*, Dist. Ct. Ga. Middle, Apr. 17, 2026, No. 4:18cv70 (resulting in settlement requiring CoreCivic to notify detainees of their labor rights and provide confidential benefits to petitioners, according to a statement issued by petitioners' counsel, https://www.splcenter.org/presscenter/settlement-forced-labor-case-against-private-prison-company-operating-immigration/).
[27] § 9-2.212, subd. (c)(4).
[28] § 3-2.3.211, subd. (d).
[29] §§ 1-3.03, 9-2.212, subd. (b), 9-2.2803 (stating that a permit or license issued in conflict with the zoning regulations is null and void).

permit, within the zone district that applies to the Facility. Second, CoreCivic's immigrant detention operations are not authorized by the existing conditional use permit that applies to the Facility (Conditional Use Permit ("CUP") No. 97-01), which allows only prison operations and not immigrant detention. Finally, CoreCivic is authorized to operate only up to 2,304 beds at the Facility under CUP No. 97-01, far below the 2,560-bed capacity which CoreCivic's application attributes to the Facility as well as the 2,816 beds which the City determined are allowed when it approved CoreCivic's site plan application.

### A. Immigrant Detention is Not a Permitted Use Within the Open Space / Residential Agricultural Zone District

22844 Virginia Boulevard, the property on which the Facility is located, is zoned for Open Space ("O") / Residential Agricultural ("RA").[30] Immigrant detention is not an allowed use within this zone district,[31] and uses not authorized in the RA / O zone district are prohibited by the zoning regulations.[32] Yet, CoreCivic is using the Facility for immigrant processing and detention—a fact prominently displayed on a sign at the Facility entry stating "CoreCivic Immigration Processing Center" and documented in our office's report issued this year following its inspection of the Facility.[33] Accordingly, CoreCivic's use of the Facility does not conform to the zoning regulations.

Further, immigrant detention is not covered by the one functionally comparable use category that is allowed by a conditional use permit in the O / RA zone district—"[g]overnmental or quasi-governmental correction, probation or prison facilities and services."[34] The plain meaning of "correction, probation, and prison facilities" does not include immigrant detention facilities.[35] While correction, probation, and prison facilities are all facilities used to hold or provide services to people charged with a crime, immigration enforcement and detention is generally premised on a civil law violation.[36] In addition, the Municipal Code assigns

---

[30] See Kern County Interactive Zoning Map, https://www.californiacity-ca.gov/CC/index.php/54-your-city-government/243-interactive-zoning-map.
[31] §§ 9-2.102, 2.401, 2.402, 2.2801.
[32] See §§ 9-2.102 (stating that the Zoning Regulations control the uses of land under the City's jurisdiction), 9-2.401 (listing the uses permitted in the RA zone district), 9-2.402 (listing the uses that "may be" permitted with a conditional use permit in the RA zone district); see also *Blankenship v. Allstate Ins. Co.* (2010) 186 Cal.App.4th 87, 94 (a legislative body's "omission of a term in a list of terms indicates that (it) did not intend to include the term.").
[33] Elliott, Private Prison in California City may reopen for immigration processing, Bakersfield Californian (Jun. 19, 2025), https://www.bakersfield.com/news/private-prison-in-california-city-may-reopen-for-immigration-processing/article_0a138bb1-1d92-4f6a-a612-59c93d28e4f4.html; Cal. Dep't. of Just., Immig. Det. in Cal., A Review of Cond. of Confin. (2026), p. 13.
[34] § 9-2.402, subd. (p).
[35] *J. Arthur Properties, II, LLC v. City of San Jose* (2018) 21 Cal.App.5th 480, 486 (local government laws are interpreted consistent with the general rules of statutory interpretation, starting with the plain language of the enactment).
[36] See Civ. Code, § 1670.9, subd. (h); Mayorkas, Guidelines for Enforcement of Civil Immigration Law, DHS (Sept. 30, 2021), https://www.corecivic.com/private-detention; see also

undefined terms the meanings ascribed to them by state law and courts, and California statute and court decisions clearly distinguish between "prisons" and immigrant detention facilities as separate use types.[37]

Despite the prohibition on immigrant detention use at the Facility under the regulations applicable to the O / RA zone district, it appears from City records that it permissively allowed immigrant detention use to occur at certain points in the Facility's history. The City's failure to require CoreCivic to adhere to the Zoning Regulations' prohibition on immigrant detention uses in the O / RA zone district does not render CoreCivic's present use of the site lawful.[38]

### B. CUP No. 97-01 Allows Only Prison Use at the Site, Not Immigrant Detention

As discussed above, immigrant detention is not an allowed use, either by right or by a conditional use permit, in the zone district that applies to the Facility. However, even if immigration processing and detention were a type of "correction, probation, or prison facilit[y]" that could be allowed under a conditional use permit in the City, immigration processing and detention is not allowed under CUP No. 97-01. The California City Council issued CUP No. 97-01 in 1998 to authorize the construction and operation of a "2,304 bed prison facility" on approximately 70-acres of the 320-acre parcel at Virginia Boulevard.[39] The existing Facility at 22844 Virginia Boulevard was constructed the next year and then began operating as a prison. By its terms, CUP No. 97-01 allows only a "prison facility."[40] The permit application materials and environmental review prepared for CUP No. 97-01 also make clear that the intended use of the site was for correctional, not civil detention, purposes.[41] Nothing in CUP No. 97-01 or in the

---

CoreCivic, A Limited But Important Role in America's Immigration System (describing CoreCivic's immigrant detention facilities as "designed to care specifically for civil detainees), https://www.corecivic.com/private-detention.

[37] § 1-2.08; see, e.g., Gov. Code, § 27491.56, subd. (f) (identifying correctional and immigrant detention facilities as distinct facility types for purposes of forensic accountability requirements for the determination of the cause of in-custody deaths); *Cal. Att'y for Crim. Just. v. Newsom, et al* (2020) 2020 Cal.LEXIS 3220 (addressing state authorities' responsibilities to protect the health and safety of inmates subject to transfer between state prison and federal immigrant detention facilities); see also *Zadvydas v. Davis* (2001) 553 U.S. 678, 699.

[38] See *Hansen Bros. Enter. v. Bd. of Sup.* (1996) 12 Cal.4th 533, 564 (local government lacks power to waive or consent to violation of the zoning law); *Fontana v. Atkinson* (1963) 212 Cal.App.2d 499, 509 (no vested right to violate a city ordinance may be acquired by continued violations, and city failure to enforce a zoning ordinance does not estop a city from subsequently enforcing it).

[39] Ex. I, p. 1; Ex. J (Mit. Mon. Prog. CCA Prison at Cal. City, State Clearinghouse No. 97091045), p. 2.

[40] Ex. I.

[41] See *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 74 (holding that the Superior Court reasonably found from the permit application and other documents generated during the permit issuance process that a conditional use permit was limited in scope); Env. Impact Report Suppl., CCA Prison at Cal. City, Oct. 1997 (CUP No. 97-01) (describing the facility objectives as

application materials indicate that CoreCivic or the City intended or anticipated the Facility would be used for non-correctional purposes, including for immigrant detention. Therefore, CUP No. 97-01 does not authorize CoreCivic's current use of the Facility.

### C. A Maximum of 2,304 Beds is Authorized in the Facility Under CUP No. 97-01

CUP No. 97-01's terms are similarly limiting when it comes to the specific number of beds permitted at the Facility.[42] The application for CUP No. 97-01 confirms the intention for the Facility to operate a maximum of 2,304 beds.[43] The Mitigation and Monitoring Program prepared for CUP No. 97-01 was explicit that the Facility would "only accommodate 2,304 inmates, the intended capacity of the prison."[44]

Despite CUP No. 97-01's clear 2,304-bed cap on the existing Facility's capacity, the City Planning Director's determination letter for its review of CoreCivic's site plan application finds that 2,816 beds are allowed. To reach this conclusion, the letter adds the number of beds authorized by CUP No. 97-01 to the number of beds authorized by CUP No. 98-02. However, CUP No. 98-02's terms are inapplicable to the existing Facility. CUP No. 98-02 and its associated application materials authorized the construction of an additional 512-bed prison facility on approximately 1.5 acres, but this construction never occurred.[45] These materials make it clear that the 512-bed expansion authorized by CUP No. 98-02 was designed to occur in an entirely new building and facility located near, but outside of, the structures previously approved by CUP No. 97-01.[46] Therefore, the 512 beds authorized by CUP No. 98-02 were allowed only within the additional facility authorized by that permit—which were never built—and were not transferable to the existing Facility.

In pending litigation brought by the Dignity Not Detention Coalition against the City and CoreCivic, CoreCivic has attempted to characterize CUP No. 98-02 as allowing an additional 512 beds, beyond the 2,304 authorized by CUP No. 97-01, within the existing Facility.[47] In

---

serving the "inmate incarceration needs of government correctional agencies," and referring to facility staff as "correctional officers"), pp. 1-2, 3-1.

[42] Ex. I, p. 1; Ex. K (Cal. City Planning Dep't., App. for Conditional Use Permit, Case No. 97-01), p. 4-5.

[43] Ex. K, pp. 4-5.

[44] Ex. J, p. 2, underline added.

[45] Ex. L (Res. No. 11-98-02), pp. 1-2 (allowing for a 512-bed expansion in additional buildings connected to wet and dry utilities); Ex. M (Cal. City Planning Dep't., App. for Conditional Use Permit—Amendment, Case No. CUP-A 98-02), p. 5; Ex. N (Initial Study, Eval. of Env. Impacts, City of. Cal. City, Proposed 512-Bed Expansion of CCA), p. 2; *Dignity Not Detention Coalition, et al v. City of California City* (*DNDC v. Cal. City*) (2025), Cal.E.D. (Case 1:25-cv-01292, ECF No. 18 (CoreCivic's Resp. to Pet. Ex Parte App. for Temp. Rest. Order, Ex. p. 2, ¶¶ 12-14 (citing Ex. 1 [Ariola Decl., Att. D (Stewart, Mem. to File, Nov. 15, 2001]).

[46] Ex. J, p. 2.

[47] *DNDC v. Cal. City* (2025), *supra*, ECF No. 18 (CoreCivic's Resp. to Pet. Ex Parte App. for Temp. Rest. Order, p. 2, ¶¶ 12-14 (citing Ex. 1 [Ariola Decl., Att. D].)

support of this characterization, CoreCivic points to a memorandum-to-file dated November 15, 2001, and purportedly signed by the then-City Manager stating that CUP No. 98-02 would expire on November 30, 2001 and purporting to approve the 512-bed expansion authorized by CUP No. 98-02 *within* the existing Facility.[48] But this memorandum is not persuasive for several reasons. First, the nearly quarter-century old memorandum is not on letterhead, rendering its authenticity uncertain. Second, as evidence of the City Manager's authority to grant the change to CUP No. 98-02's terms, the memorandum cites to several Municipal Code sections which have since been repealed and which the City has indicated to our office cannot be located. Without verification of the contents of those repealed Municipal Code sections, the memorandum does not establish that it constitutes a legally valid modification to CUP No. 98-02.

Similarly, a letter by another City Manager dated May 27, 2014, which CoreCivic points to as evidence of its authorization to operate up to 2,560 beds at the Facility, is also unconvincing. That letter states that the "Planning Department has completed a review of the land use permitting associated with" the California City Correctional Facility, and the letter serves as notification that the Facility is "authorized and fully permitted to operate 2,560 beds."[49] However, the letter provides no support for this statement. As discussed above, continued violations of a local law do not create a vested right to continue to violate the law.[50]

## IV. Conclusion

In conclusion, we urge the City to deny CoreCivic's business license and site plan applications, as required by the Municipal Code. In addition, in light of the significant public interest in this matter, we encourage the City to take steps to facilitate public participation in the appeals process, including by providing public notice of the date and time of the appeal hearings on its website at least ten days before the hearing; inviting and considering written comments; and allowing the public to provide verbal comments at both the business license and site plan hearings. If you would like to meet to discuss our concerns, please do not hesitate to let us know. Thank you for considering our comments.

Sincerely,

Ashley Werner

ASHLEY WERNER
Deputy Attorney General
Bureau of Environmental Justice

For ROB BONTA
California Attorney General

---

[48] *Id.*
[49] *Id.* at p. 3, ¶¶ 12-13 [citing Ex. 1 (Ariola Decl., Att. F [Weil, May 27, 2014])].
[50] *Fontana v. Atkinson, supra,* 212 Cal.App.2d 499, 509; *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d. 813, 822-23 (holding that estoppel will not be invoked against a government agency where it would defeat the effective operation of a policy adopted to protect the public, such as zoning laws, which involve a vital public interest).

cc: Gesele Marsh, Planning Commission Vice Chair
Salena Coleman, Commissioner
Ralph Cantrell, Commissioner
John Paul Maier, Deputy City Manager/City Clerk
Brandon Sanchez, Esq., Burke, Williams & Sorensen, LLP

FILED
KERN COUNTY

JUN 09 2014

# CEQA
## Transmittal Form

This form must be completed and attached to each CEQA document filed with the County Clerk. Type or print clearly. MARY B. BEDARD KERN COUNTY CLERK
1) If notice requires Fish & Game (F&G) receipt, you must provide three (3) copies of the document for county purposes.
2) If notice does not require F&G receipt, you must provide at least two (2) copies of the document for county purposes. DEPUTY

LEAD AGENCY City of California City

PROJECT TITLE A 256-bed repurposing of a previously approved 512-bed expansion of a prison located at the south terminus of Virginia Blvd. in California City. This project represents an expansion of an approved prison which was evaluated in a previous Supplemental Environmental Impact Report (SEIR) certified by the City of California City in Jan. 1998 (SCH #97091045).

PROJECT APPLICANT City of California City

PHONE NUMBER (760) 373-7141

PROJECT APPLICANT'S ADDRESS 21000 Hacienda Boulevard

CITY California City STATE CA ZIP CODE 93505-2293

WORK ORDER # ____________ ☒ 30-Day Posting ☐ 45-Day Posting

CONTACT PERSON Ronna Greene PHONE NUMBER (760) 373-7141

CHECK DOCUMENT BEING FILED:

☐ Notice of Preparation ........ No Fee

☐ Notice of Availability ........ No Fee

☐ Notice of Public Hearing ........ No Fee

☒ Other Notice Addendum No. 1 ........ No Fee

☐ Environmental Impact Report (EIR) ........ $2,919.00
- ☐ Previously paid (**must attach receipt**) Receipt # ____________
- ☐ DFG No Effect Determination (**F&G letter must be attached**) ........ No Fee
- ☐ County Administrative Fee ........ $ 50.00

☐ Negative Declaration/ Mitigated Negative Declaration ........ $2,101.50
- ☐ Previously paid (**must attach receipt**) Receipt # ____________
- ☐ DFG No Effect Determination (**F&G letter must be attached**) ........ No Fee
- ☐ County Administrative Fee ........ $ 50.00

☐ Notice of Exemption ........ No Fee
- ☐ County Administrative Fee ........ $ 50.00

TOTAL $ 0

PAYMENT METHOD:

☒ Cash/Money Order ☐ Check ☐ Credit Card ☐ JV (complete the following)

Dept ____________
Fund ____________
Expense Key ____________

# Notice of Determination

**Appendix D**

**To:**
☒ Office of Planning and Research

*U.S. Mail:*
P.O. Box 3044
Sacramento, CA 95812-3044

*Street Address:*
1400 Tenth St., Rm 113
Sacramento, CA 95814

☒ County Clerk
County of: Kern
Address: 1655 Chester Ave.
Bakersfield, CA 93301

**From:**
Public Agency: City of California City
Address: 21000 Hacienda Blvd.
California City, CA 93505
Contact: William T. Weil, Jr., City Manager
Phone: (760) 373-7170

Lead Agency (if different from above):

Address:

Contact:
Phone:

***SUBJECT: Filing of Notice of Determination in compliance with Section 21108 or 21152 of the Public Resources Code.***

State Clearinghouse Number (if submitted to State Clearinghouse): Part of Sch # 97091045

Project Title: 512 Bed Expansion at the Corrections Corporation of America California City Correctional Center

Project Applicant: Corrections Corporation of America

Project Location (include county): 22844 Virginia Blvd., California City, Kern, California

Project Description:
A 256-bed repurposing of a previously approved 512-bed expansion of a prison located at the south terminus of Virginia Boulevard in California City. This project represents an expansion of an approved prison which was evaluated in a previous Supplemental Environmental Impact Report (SEIR) certified by the City of California City in January 1998 (SCH#97091045).

This is to advise that the City of California City (☒ Lead Agency or ☐ Responsible Agency) has approved the above described project on 5/27/14 (date) and has made the following determinations regarding the above described project.

1. The project [☐ will ☒ will not] have a significant effect on the environment.
2. ☒ An Environmental Impact Report was prepared for this project pursuant to the provisions of CEQA.
   ☐ A Negative Declaration was prepared for this project pursuant to the provisions of CEQA.
3. Mitigation measures [☐ were ☒ were not] made a condition of the approval of the project.
4. A mitigation reporting or monitoring plan [☐ was ☒ was not] adopted for this project.
5. A statement of Overriding Considerations [☐ was ☒ was not] adopted for this project.
6. Findings [☒ were ☐ were not] made pursuant to the provisions of CEQA.

This is to certify that the final EIR with comments and responses and record of project approval, or the negative Declaration, is available to the General Public at:

Signature (Public Agency): [signature] Title: City Manager

Date: ______ Date Received for filing at OPR: ______

Authority cited: Sections 21083, Public Resources Code.
Reference Section 21000-21174, Public Resources Code.

Revised 2011

# Addendum No. 1 to California City Prison Project Final Subsequent Environmental Impact Report

Lead Agency:

**City of California City**
21000 Hacienda Boulevard
California City, CA 93505
(760) 373-8661

Project Applicant:

**Corrections Corporation of America**
10 Burton Hills Boulevard
Nashville, TN 37215

December 2009

Prepared by

CH2MHILL
1000 Wilshire Boulevard, 21st Floor
Los Angeles, CA 90017

# Contents


| Section | | | Page |
|---|---|---|---|
| 1 | Introduction | | 1-1 |
| 1.1 | Purpose of this Addendum | | 1-1 |
| 1.1.1 | CEQA Requirements | | 1-1 |
| 1.2 | Overview of the Environmental Review Process | | 1-3 |
| 1.2.1 | Subsequent Environmental Impact Report (Subsequent EIR) | | 1-3 |
| 2 | Description of Project Changes | | 2-1 |
| 2.1 | Project Location and Setting | | 2-1 |
| 2.2 | Proposed Changes to the Project Description | | 2-3 |
| 3 | Environmental Impact Analysis | | 3-1 |
| 3.1 | Land Use | | 3-1 |
| 3.2 | Aesthetic and Visual Considerations | | 3-1 |
| 3.3 | Employment, Population, and Housing | | 3-2 |
| 3.3.1 | Impacts | | 3-2 |
| 3.3.2 | Mitigation Measures | | 3-3 |
| 3.4 | Public Utilities and Community Services | | 3-3 |
| 3.4.1 | Law Enforcement | | 3-3 |
| 3.4.2 | Fire Protection | | 3-3 |
| 3.4.3 | Schools | | 3-4 |
| 3.4.4 | Hospitals | | 3-4 |
| 3.4.5 | Judicial Services | | 3-4 |
| 3.4.6 | Water Supply | | 3-5 |
| 3.4.7 | Wastewater Treatment and Disposal | | 3-5 |
| 3.4.8 | Solid Waste | | 3-5 |
| 3.4.9 | Energy | | 3-6 |
| 3.4.10 | Telephone and Cable | | 3-6 |
| 3.5 | Transportation | | 3-6 |
| 3.5.1 | Construction Impacts | | 3-6 |
| 3.5.2 | Operation Impacts | | 3-6 |
| 3.6 | Air Quality | | 3-7 |
| 3.6.1 | Construction Impacts | | 3-8 |
| 3.6.2 | Operation Impacts | | 3-9 |
| 3.7 | Noise | | 3-10 |
| 3.8 | Hydrology, Storm Drainage, and Flood Control | | 3-11 |
| 3.9 | Biological Resources | | 3-11 |
| 3.9.1 | Environmental Setting | | 3-12 |
| 3.9.2 | Environmental Impacts | | 3-13 |
| 3.10 | Cultural Resources | | 3-15 |
| 3.11 | Cumulative Impacts | | 3-15 |
| 3.12 | Environmental Impact Analysis Conclusions | | 3-15 |

**Figures**

1 Project Option ........................................ 2-2
2 Corrections Corporation of America Revised Project ........................................ 2-4

**Tables**

AAQS, Designation Classification, and Monitoring Values[1] ........................................ 3-7

# Acronyms and Abbreviations

| | |
|---|---|
| AAQS | Ambient Air Quality Standards |
| ARB | Air Resources Board |
| BMP | best management practice |
| CAAQS | California Ambient Air Quality Standards |
| CCA | Corrections Corporation of America |
| CCCF | California City Correctional Facility |
| CCFD | California City Fire Department |
| CCPD | California City Police Department |
| CDCR | California Department of Corrections and Rehabilitation |
| CDFG | California Department of Fish and Game |
| CEQA | California Environmental Quality Act |
| CESA | California Endangered Species Act |
| CNDDB | California Natural Diversity Database |
| CO | carbon monoxide |
| ESA | Endangered Species Act |
| gpid | gallons per inmate per day |
| gpm | gallons per minute |
| HCP | Habitat Conservation Plan |
| LOS | level of service |
| MBTA | Migratory Bird Treaty Act |
| MUSD | Mojave Unified School District |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | nitrogen oxide |
| NPDES | National Pollutant Discharge Elimination System |
| OHV | off-highway vehicle |
| OHWM | Ordinary High Water Mark |
| $PM_{10}$ | particulate matter less than 10 micrometers in aerodynamic diameter |

| | |
|---|---|
| $PM_{2.5}$ | particulate matter less than 2.5 micrometers in aerodynamic diameter |
| ppm | parts per million |
| RFP | Request for Proposal |
| SCE | Southern California Edison Company |
| $SO_2$ | sulfur dioxide |
| Subsequent EIR | Subsequent Environmental Impact Report |
| USFWS | U.S. Fish and Wildlife Service |
| VMT | vehicle miles traveled |

SECTION 1

# Introduction

This document is Addendum Number 1 to the certified 2006 Final Subsequent Environmental Impact Report (Subsequent EIR) for the California City Prison Project, dated November 2006 (State Clearinghouse No. 2006071009). This addendum provides an evaluation of proposed revisions to one of the two project options evaluated in the Subsequent EIR.

## 1.1 Purpose of this Addendum

The purpose of Addendum No. 1 is to address the potential environmental effects of the increased capacity of the 2,200-bed correctional facility described in Section 2, and to determine whether the findings associated with the California City Prison Project Subsequent EIR remain valid in light of the revision to the Proposed Project and the Project Option. To the extent that these changes may constitute additional information that was not previously anticipated or analyzed in the Subsequent EIR, the City of California City Planning Department determined such changes should be addressed in an Addendum (No. 1) to the Subsequent EIR. This method of documentation presents a clear and informative document to specifically outline the subsequent changes to the project, and mitigation measures, as it was presented to the Planning Commission in the Subsequent EIR.

The project revisions assessed in Addendum No. 1 do not change the basic objectives for the project and do not substantially change the conclusions of the environmental analysis as stated in the Subsequent EIR. The revisions to the project do not raise any new significant environmental impacts that were not previously identified in the Subsequent EIR.

### 1.1.1 CEQA Requirements

Prepared in accordance with the California Environmental Quality Act (CEQA) (PRC 21000 et seq.) and the Guidelines for Implementation of the California Environmental Quality Act, as amended, this Addendum summarizes minor revisions associated with a project analyzed in the Subsequent EIR. Section No. 15164 of the CEQA Guidelines provides the following directions for the preparation of an Addendum:

(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR [...] have occurred;...

(c) An addendum need not be circulated for public review but can be included in or attached to the final EIR [...];

(d) The decision-making body shall consider the addendum with the final EIR [...] prior to making a decision on the project.

(e) A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's findings required on the project, or elsewhere in the record. The explanation must be supported by substantial evidence.

The relevant conditions described in Section 15162 indicate that:

(a) When an EIR has been certified [...], no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in light of the whole record, one or more of the following:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR [...] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR ... due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete [...], shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR [...];

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

As discussed in Chapter 2 of this Addendum, project impacts resulting from changes to the project are not substantially different from those assessed in the Subsequent EIR. In all respects, the proposed changes result in impacts that would be the same, more beneficial to the environment, or would further reduce the level of impact to levels below significance.

Regarding Section 15162 (a)(1) above, revisions to the project as described in Chapter 2 of this Addendum are not considered substantial and do not require major revisions to the Subsequent EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

Regarding Section 15162 (a)(3) above, there has been no new information of substantial importance that has come to light since the certification of the EIR. More specifically,

(A) The information in this Addendum does not reveal a new significant environmental effect not discussed in the previous EIR;

(B) The information in the Addendum does not reveal that a substantial increase in the severity of an environmental impact would result.

(C) & (D) The information in the Addendum does not reveal feasible mitigation measures or alternatives different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

A lead agency may not prepare a Subsequent EIR unless any of the conditions identified in CEQA Guidelines §15162 are found to exist. As discussed previously, none of those conditions has been met and, therefore, no Subsequent EIR can be required. Consequently, an Addendum is considered the appropriate document to discuss the environmental implications of the Revised Project. Nonetheless, CEQA requires that the lead agency support this determination with substantial evidence in the record. This Addendum serves as that vehicle, and a review of its contents substantiates the conclusion that the information provided herein merely updates, clarifies, and amplifies the information provided in the Subsequent EIR for the California City Prison Project.

## 1.2 Overview of the Environmental Review Process

### 1.2.1 Subsequent Environmental Impact Report (Subsequent EIR)

Under CEQA Guidelines, Section 15162, the lead or responsible agency may choose to prepare a Subsequent EIR if, following circulation of a previous EIR, the lead agency determines that there are substantial changes proposed in the project, substantial changes occur with respect to the circumstances under which the project is undertaken, or there is new information of substantial importance that would result in new significant effects or significantly greater impacts than previously disclosed.

In 2006, the lead agency for the project, the City of California City, determined that a Subsequent EIR should be prepared to evaluate an additional portion of the Virginia Boulevard site for construction and operation of a smaller prison facility than that proposed in the previous 1994 EIR. Specifically, the Subsequent EIR contained a co-equal level of environmental analysis for two projects: a 550-bed Modified Community Corrections Center in response to a solicitation from California Department of Corrections and Rehabilitation (CDCR); and a 1,596-bed detention center to meet federal detention needs.

The Subsequent EIR required only information necessary to make the previous EIR adequate for the current project. Therefore, the 1994 certified EIR (SCH No. 93082030) and the Subsequent EIR (SCH No. 2006071009) are incorporated by reference into this Addendum. The California City Planning Commission certified the Subsequent EIR in November 2006.

SECTION 2

# Description of Project Changes

## 2.1 Project Location and Setting

Figure 2-1 shows the project site, which is located in the City of California City, Kern County, California, approximately 0.5 mile south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The project site elevation is roughly 2,540 feet above mean sea level, approximately 5 miles east of downtown California City. The property and most of the vicinity are composed of vacant undeveloped desert land, characterized by creosote bush vegetation. The project site is adjacent to the existing California City Correctional Facility (CCCF) and, as such, the project site is served by public utilities. The CCCF is the only property within 0.5 mile that contains any significant structural improvements. Detailed information on the regional setting is set forth in the Subsequent EIR.

The certified Subsequent EIR evaluated two project options: (1) a 550-bed *Proposed Project* to respond to CDCR Male Bed Expansion Request for Proposal (RFP) Number 050271; and (2) a 1,596-bed *Project Option* to meet to federal demands for detention space in the event that the CDCR contract for the 550-bed facility was not awarded.

If Corrections Corporation of America (CCA) had implemented the 2006 Proposed Project, CCA would have constructed and operated a 550-bed Modified Community Corrections Center on approximately 35 acres located at the southwestern corner of the 320-acre Virginia Boulevard site. The Proposed Project would have been a state-of-the-art, secure correctional facility designed to meet American Correctional Association standards with several facilities including a 125,790-square-foot main building, an outdoor recreation area, an armory for storing weapons and riot gear, a perimeter compound security system, and site improvements including a parking lot for 177 vehicles, an access road, and petroleum-powered generators.

The 2006 Project Option was a 1,596-bed detention center CCA proposed to design, construct, and manage to meet federal demands for detention space. Like the Proposed Project, CCA proposed the Project Option on the same 35-acre section of the 320-acre Virginia Boulevard site, and intended to design the facility to meet American Correctional Association standards. Unlike the previous CDCR proposal, CCA intended the Project Option to accommodate federal prisoners and detainees in a medium-security facility. Figure 1 shows a conceptual site plan of the prison.

It is noteworthy that the Subsequent EIR contained a co-equal and detailed environmental impact analyses for both the 550-bed CDCR Modified Community Correctional Center for State of California inmates and a 1,596-bed detection center intended for federal inmates or detainees. Because the 1,596-bed Project Option had more significant impacts identified than the 550-bed Proposed Project, this Addendum describes and evaluates the 2,200-bed Revised Project in relation to the 1,596-bed detention center.




**FIGURE 1**
Project Option
Conceptual Site Plan
*California City, California*

SCO345802.ED.02 conceptsiteplan_rev.ai 12/09

The 1,596-bed Project Option evaluated in the Subsequent EIR included a state-of-the-art secure correctional facility consisting of the following:

- Secure inmate housing buildings equipped with staff and inmate support facilities, and a central, linear courtyard containing five partially covered recreation areas for inmate recreation activities.
- An administration building composed of offices for prison management, support staff, and support spaces for correctional officers. An armory, containing weapons and riot gear, would be located in a secure portion of the administration building (CCA correctional officers do not carry weapons as part of normal operations).
- With the exception of the outside administration building, all improvements described previously would be located within a perimeter compound security system that would include two rows of chain-link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system and nighttime security lights on 30-foot-tall posts. To facilitate security patrols, a perimeter road would encompass the exterior of the entire fenced prison compound.
- Site improvements located external to the secured inmate housing would include an extension of the existing parking lot for the adjacent CCCF to accommodate an additional 285 employee and visitor vehicles.

## 2.2 Proposed Changes to the Project Description

As stated previously, the proposed revisions to the Project Option, as defined and analyzed in the Subsequent EIR, do not materially change the objectives or general development pattern for the project site.

Since certification of the Subsequent EIR, CCA is proposing a design revision to accommodate an additional 604 beds—totaling 2,200 beds. The proposed change is necessary to meet CCA's needs for new potential business opportunities with federal and other correctional agencies. CCA proposes to construct and operate a similar correctional facility on the same 35 acres of vacant land on the 320-acre Virginia Boulevard site. Like the Project Option design, the Revised Project design includes several single-story and single-story-with-mezzanine buildings, with heights of 20 to 40 feet, intended to accommodate federal prisoners and detainees. The Revised Project will include all of the ancillary facilities listed for the Project Option described previously. A significant design change is in the secure inmate housing area. Where the 2006 Project Option had mostly double-bunk hard-wall cells, the Revised Project would include a mix of dormitory-style housing units and cells. To accommodate various potential federal clients, the Revised Project would also have expanded administrative facilities for inmate programs and agency management, and an additional 120 parking spaces. Figure 2 shows a conceptual site plan of the Revised Project.




FIGURE 2
Corrections Corporation of America
Revised Project
2200 Bed Correctional Facility
*California City, California*
*December 2009*

SC0397014.01.07 CAL CITY SITE PLAN_HALF_12-15-09_2.ai 12/09

SECTION 3

# Environmental Impact Analysis

The following discussion examines the environmental impacts of the Revised Project (see Section 2 for a description of revisions to the Project Option). Except where specifically noted, the assessment methodologies are the same as those employed in the Subsequent EIR.

## 3.1 Land Use

The Subsequent EIR identified no adverse land use impacts from construction and operation of the 1,596-bed detention center. A prison would be consistent with the adjacent CCCF and would not affect other adjacent land uses, since all other surrounding parcels are vacant. As noted in the Subsequent EIR, the prison facility could be located in proximity to future residential development, resulting in a potential land use conflict due to air quality, noise, and visual/aesthetic issues. These potential impacts were addressed in the appropriate sections of the Subsequent EIR.

Because the Revised Project will be constructed on the same site as the 2006 Project Option, no adverse impacts to land use are anticipated. The zoning for the project site, unchanged since certification of the Subsequent EIR, allows for governmental or quasi-governmental correction, probation, or prison facilities, and services with a conditional use permit. Because CCA will obtain a conditional use permit for the Revised Project described in this Addendum, the project will be consistent with the zoning and land use designated for the project site. No adverse impacts relative to land use are anticipated from the proposed revisions. As such, the conclusions of the land use analysis in the Subsequent EIR would not be affected.

## 3.2 Aesthetic and Visual Considerations

Similar to the 1,596-bed detention center evaluated in the Subsequent EIR, the Revised Project would impact daytime viewsheds, resulting in degradation of the existing visual character and quality of the project site. Like the 1,596-bed detention center, the Revised Project would also cause nighttime light and glare. The project site is adjacent to vacant undeveloped desert land that has been entitled for residential subdivisions. While there are no immediate plans for construction in these neighboring subdivisions, the Revised Project would subject future residents to direct and unobstructed views of the prison facility.

The 1,596-bed detention center included single-story and single-story-with-mezzanine structures with a building height of 20 to 40 feet (similar to the adjacent CCCF). The Project Option also included mast light posts up to 30 feet in height (similar to the adjacent CCCF). Where feasible, lighting would be shielded and directed downward. Further, the prison buildings would have an exterior finish that would blend with the surrounding natural environment. Because the Project Option would substantially degrade the visual character

and quality of the project site and cause nighttime light and glare, the Subsequent EIR considered these visual impacts significant. The Subsequent EIR contained mitigation measures that (1) restricted mast lighting posts to 30 feet in height and (2) required lighting to be shielded and directed downward to minimize offsite illumination, where applicable, and required by design.

Because the Revised Project does not (1) increase the severity of the previously identified visual and aesthetic impacts, and (2) incorporates the mitigation measures for the 2006 Project Option, no significant effects examined in this Addendum will be substantially more severe or change the conclusions in the Subsequent EIR.

## 3.3 Employment, Population, and Housing

Similar to the project site development options evaluated in the Subsequent EIR, the Revised Project would create employment opportunities that would likely increase population and demand for housing in California City and the surrounding areas.

### 3.3.1 Impacts

#### Employment

The Revised Project would generate approximately 250 temporary construction jobs and approximately 320 full-time permanent positions during facility operations. Approximately 70 percent of the permanent employment opportunities would be for correctional officers; other job opportunities would include medical, education, administrative, trade, and clerical positions. In addition to jobs provided by the prison, the purchase of local goods and services for the prison facility, and by CCA employees individually, would stimulate the local economy, resulting in additional employment opportunities in the region. The additional employment opportunities are considered a beneficial effect of the Revised Project.

#### Population

The Revised Project would have a prison inmate population of 2,200 at full operating capacity. Based on CCA's experience with more than 60 correctional facilities, generally 1 percent of the inmate families and 10 to 15 percent of the prison employees would relocate to the region. For the Revised Project, approximately 20 families may relocate to the project vicinity. The remainder of prison employment and indirect job opportunities from the prison would be filled by the existing population of California City and surrounding communities. Using the California average household size of 2.9 persons per household, the population increase from relocating inmate and employee families may be approximately 135 persons for the Revised Project.

Population growth associated with a prison typically increases demand for public services, such as water and wastewater facilities. As described in Section 3.4 of this Addendum, and consistent with the Subsequent EIR, impacts resulting from population growth would be less than significant.

#### Housing

The vacancy rate in California City and surrounding communities indicates that ample housing is available to accommodate relocation of inmate families and employee families resulting from the Revised Project.

### 3.3.2 Mitigation Measures

No adverse impacts to employment, population, and housing would result from construction and operation of the Revised Project. As such, no mitigation measures are required. The proposed changes to the project will not affect the findings and conclusions of the Subsequent EIR with respect to employment, population, and housing.

## 3.4 Public Utilities and Community Services

Like the 550-bed Proposed Project and 1,596-bed Project Option evaluated in the Subsequent EIR, the Revised Project has the potential to affect public utilities and community services in California City and in surrounding communities. These effects can occur in two primary ways: (1) by increasing the demand for California City services to the Revised Project directly; and (2) by increasing the demand for services in California City and the surrounding communities to accommodate population growth. The Revised Project would directly and indirectly generate significant tax benefits to the City of California City's general revenue fund and regional governments, which would offset the potential costs of community services.

### 3.4.1 Law Enforcement

The Subsequent EIR determined that the Proposed Project or Project Option would cause (1) a slight increase in calls requesting assistance from the California City Police Department (CCPD), and (2) an increase in the demand for law enforcement services due to project-related and indirect population growth. Based on the small number of additional phone calls for service, the Subsequent EIR concluded that significant impacts to CCPD services would not occur and mitigation measures would not be required.

The Revised Project proposes a 604-bed increase in capacity from the Project Option. Compared to the Project Option, the larger Revised Project would generate a slightly higher number of calls to CCPD and possibly an increased demand for law enforcement services due to population growth directly and indirectly related to the project. Despite the potential increase in calls to CCPD and increased demand for law enforcement services due to direct and indirect project-related population growth, the impacts to law enforcement from the Revised Project would remain within the service capability of CCPD and would not be significant; mitigation measures, therefore, would not be required.

### 3.4.2 Fire Protection

The Proposed Project and Project Option analyzed in the Subsequent EIR were designed to comply with all applicable fire building codes, to be equipped with a comprehensive fire suppression system, and to be constructed with primarily noncombustible building materials. The Subsequent EIR determined that the Proposed Project or Project Option may (1) increase demand on the California City Fire Department (CCFD) for fire suppression, fire

prevention, and investigation duties, and (2) increase the demand for fire protection services resulting from project-related and indirect population growth. Based on the design features included in the facility and CCFD's indication that current staffing levels would be able to accommodate the increased duties that may be generated by the project, impacts to CCFD would be less than significant.

Like the projects analyzed in the Subsequent EIR, the Revised Project described in this Addendum will also be designed to comply with applicable fire building codes, equipped with a comprehensive fire suppression system, and constructed primarily with noncombustible building materials. The 604-bed increase proposed in the Revised Project may cause a slightly increased demand on CCFD for fire suppression, fire prevention, and investigation duties, and a slight increase in the demand for fire protection services due to project-related and indirect population growth. Impacts of the Revised Project would not, however, affect the service capability of CCFD or be significant. As such, the conclusions of the fire protection services analysis in the Subsequent EIR would not be affected.

### 3.4.3 Schools

The Subsequent EIR determined that the Proposed Project and Project Option would cause population growth that would affect student enrollment with the Mojave Unified School District (MUSD). However, MUSD has indicated that it would be able to accommodate additional students resulting from the Proposed Project and Project Option without adverse impacts. Further, mitigation for impacts from additional students generated indirectly by the Revised Project would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules. Based on this description, the Subsequent EIR determined that no adverse impacts would occur from the project or from direct or indirect population growth.

Similarly, the Revised Project described in this Addendum may cause increased demand on MUSD to accommodate additional students; however, based on existing MUSD school capacity, impacts of the Revised Project would not be significant.

### 3.4.4 Hospitals

The Subsequent EIR determined that no significant impact to hospital services would occur because (1) both the Proposed Project and Project Option would include medical facilities onsite 24 hours per day, and (2) the number of hospitals available for the community around California City would be able to accommodate project-related direct or indirect population growth. Because the Revised Project also proposes onsite medical facilities available 24 hours per day, no significant or different impacts would occur.

### 3.4.5 Judicial Services

The Subsequent EIR determined that impacts to judicial services would vary based on the contracting agency providing inmates to the proposed facility. The Project Option would have generated up to two court cases per month, while the adjacent CCCF generates only two court cases per year. The impacts on judicial services are fiscal issues and not environmental impacts. Similarly, the Revised Project proposed in this Addendum would

generate two to three court cases per month. Like the Project Option in the Subsequent EIR, environmental impacts resulting from the Revised Project would not be significant.

### 3.4.6 Water Supply

The Subsequent EIR estimated water demand for the Proposed Project and Project Option by calculating the average daily water usage over time at the existing CCCF and dividing that usage by the number of inmates. The data showed that the water demand in a facility such as that described in the Project Option is approximately 230 gallons per inmate per day (gpid), inclusive of prison staff and support services. California City Public Works Department staff indicated that the Project Option could be served from existing City supply and conveyance facilities. The Project Option proposed design features to minimize water use at the proposed prison, including use of low-flow fixtures and drought-tolerant, native landscaping.

The Revised Project includes the following water-conserving features: ultra low-flow showerheads (1.2 gallons per minute [gpm]); 1.28-gallon-per-flush toilets; grey water recycling for toilet flushing and laundry water recycling; and a water management system to provide correctional officers control of the function of the inmate water closets and inmate showers. Solar-powered hot water could be utilized depending on design parameters and local conditions.

These design features are part of the Revised Project, not mitigation measures, and with implementation of these design and operational features, the Revised Project would significantly reduce the anticipated per-inmate water use and related environmental impacts. Therefore, the proposed changes would not affect California City water services, water conservation efforts, or the water conservation impact analysis as presented in the Subsequent EIR.

### 3.4.7 Wastewater Treatment and Disposal

The Subsequent EIR determined that no significant impacts to wastewater treatment and disposal would be anticipated for the Proposed Project or the Project Option. This determination was based on an estimated wastewater flow of 230 gpid, inclusive of all prison staff and support services. The Revised Project described in this Addendum incorporates additional water-conserving features that would also reduce the amount of wastewater generated per inmate (i.e., grey water recycling, laundry water recycling). A reduction in the quantity of wastewater produced by each inmate is a beneficial or reduced impact of the Revised Project compared to the 2006 Proposed Project or the Project Option.

### 3.4.8 Solid Waste

The Subsequent EIR determined that no significant impacts to solid waste disposal would be anticipated for the Proposed Project or the Project Option. Landfill capacity is expected to remain adequate to accommodate the additional waste generated by the Revised Project and associated direct and indirect population growth related to the project. Kern County has seven landfills and additional recycling facilities that are estimated by County staff to have approximately 70 years of operational capacity to manage solid waste generated in Kern County (Ferguson, 2009). No significant impacts related to solid waste disposal would occur

from the Revised Project. As such, the conclusions of the solid waste impact analysis in the Subsequent EIR would not be affected.

### 3.4.9 Energy

The Subsequent EIR determined that no significant impacts to energy would occur from the Proposed Project or the Project Option. Southern California Edison Company (SCE) has indicated that the electrical loads of the Revised Project are within the parameters of projected load growth that SCE is planning to meet in the vicinity. Southern California Gas Company has indicated that it has adequate natural gas supply and facilities to supply the Revised Project. The existing propane tanks on the adjacent CCCF property also have the capacity to serve the Revised Project. No significant impacts related to energy would occur from the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

### 3.4.10 Telephone and Cable

The Subsequent EIR determined that no significant impacts to telephone and cable would be anticipated for the Proposed Project or the Project Option. With regard to telephone service, telephone line improvements previously installed to support the adjacent CCCF would also serve the Revised Project. As such, the conclusions of the public utilities telephone and cable analysis in the Subsequent EIR would not be affected.

## 3.5 Transportation

### 3.5.1 Construction Impacts

The Subsequent EIR determined that construction of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, construction of the 2,200-bed Revised Project would require similar numbers of construction workers and equipment and a similar duration time to the requirements to construct the 1,596-bed Project Option evaluated in the Subsequent EIR. Because the Revised Project would cause similar construction traffic trip generation, including ready-mix concrete truck, tractor trailer, and flatbed truck trips, impacts to traffic and transportation during construction would not be significant, and no additional mitigation measures would be required to address construction of the Revised Project. As such, the conclusions of the transportation project construction impact analysis in the Subsequent EIR would not be affected.

### 3.5.2 Operation Impacts

The Subsequent EIR determined that operation of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, operation of the Revised Project may result in a slight increase in trip generation due to a nominal increase in the number of employees required to operate a prison facility that accommodates an additional 604 beds. Further, additional increases to trip generation may occur as a result of increased inmate visitations, inmate transfers, and deliveries to the 2,200-bed Revised Project facility. Although the Revised Project could result in an incremental increase in traffic in the areas surrounding the prison facility, as explained in the following paragraphs, these impacts to

traffic and transportation would not be significant, and no additional mitigation measures would be required to address operation of the Revised Project.

The 2006 California City Prison Subsequent EIR traffic analysis was based on projected 2008 traffic operations. The projected traffic was based on available field data collected in 2004 and 2006. Those 2004/2006 counts were factored up to 2008 with an assumed 1 percent annual growth factor.

The Caltrans database annual traffic counts for the last 4 years (2004 to 2008) for the two state highways (State Routes [SR] 14 and 58) was reviewed to assess the need for changes in the traffic estimates. The volumes were nearly unchanged where there are common data points. For example, for SR 14, the traffic volumes increased by 1 percent between 2004 and 2005 and have stayed the same for the last 3 years. In other words, the estimates for 2008 were likely higher than actually occurred. Therefore, the projected 2008 volumes are reasonable estimates for 2010 or 2011.

Even if some increase in volume occurred, it would take very high changes in volumes to change the conclusions. Most of the roadway segments would operate at level of service (LOS) A to C. The stated significance threshold value is LOS E, and only one segment (SR 14) is projected to operate at LOS D. It would take increases in background volumes of 60 percent (for the proposed project analysis) or 43 percent (for the Project Option analysis) to reach LOS E. Therefore, the revised project timeline and additional inmate capacity would not result in new or more significant traffic impacts than those analyzed in the Subsequent EIR.

## 3.6 Air Quality

Table 1 in the Air Quality section of the Subsequent EIR showed the latest 3 years available at that time (that is, 2003 through 2005) of the concentrations of criteria pollutants at the nearest monitoring site: the Mojave monitoring station, which is located less than 20 miles southwest of the project site. Table 1 below shows an updated version of Table 1 from the Air Quality section of the Subsequent EIR, with the latest 3 years currently available, 2006 to 2008. Based on the updated monitoring station data (summarized in Table 1), the air quality environmental setting has not experienced meaningful change since the Subsequent EIR was certified.

TABLE 1
AAQS, Designation Classification, and Monitoring Values[1]

| Pollutant | Ozone (ppm) | $PM_{2.5}$ (µg/m3) | | $PM_{10}$ (µg/m3) | | CO (ppm) | | NO2 (ppm) | | $SO_2$ (ppm) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Averaging Period | 8-hr | 24-hr | Annual | 24-hr | Annual | 8-hr | 1-hr | 1-hr | Annual | 1-hr | 3-hr | 24-hr | Annual |
| CAAQS | 0.070 | * | 12 | 50 | 20 | 9.0 | 20 | 0.25 | * | 0.25 | * | 0.04 | * |
| NAAQS | 0.08 | 65 | 15 | 150 | 50 | 9 | 35 | * | 0.053 | * | 0.5 | 0.14 | 0.030 |
| Mojave Monitor 2006 | 0.102 | 21.3 | * | 58 | 19.5 | * | * | * | * | * | * | * | * |
| Mojave Monitor 2007 | 0.085 | 21.1 | * | 70 | * | * | * | * | * | * | * | * | * |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | 0.103 | 19.1 | * | 145 | 22.4 | * | * | * | * | * | * | * | * |

*An ambient standard has not been established or the pollutant was not monitored at the Mojave monitor.

[1] The monitor data is from the California ARB Web site http://www.arb.ca.gov/adam/cgi-bin/db2www/adamtop4b.d2w/start.

### 3.6.1 Construction Impacts

The Subsequent EIR concluded that potential impacts from construction of the Proposed Project and the Project Option were shown to be less than significant for all pollutants, except for daily emissions of nitrogen oxide (NO2) and particulate matter less than 10 micrometers in aerodynamic diameter ($PM_{10}$). The following best management practices (BMPs) were implemented as mitigation measures to control fugitive $PM_{10}$ during construction:

- Water exposed areas to increase the stability of the soil by increasing moisture content on a continuous basis, or as needed.
- Water soil prior to removal to the depth of the proposed cuts.
- Compact soil following grading to 85 to 95 percent and maintain surfaces.

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications.
- Provide information to construction employees to facilitate carpooling.
- Provide information to construction and operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

To improve the Revised Project's air quality performance during construction including greenhouse gas reductions to meet AB 32 requirements, the Revised Project proposes to incorporate the following:

- Prior to construction, certify that all onsite construction equipment meets the Tier 2 and Tier 3 California Air Resources Board (ARB) certification standards.
- During construction, require all onsite construction equipment to meet the Tier 2 and Tier 3 California ARB certification standards, and that each piece of equipment has proof of certification from the ARB.
- Prior to construction and any land disturbances, require certification that all onsite construction equipment utilizes 20 percent biodiesel fuel.
- During construction, require that all construction equipment utilize 20 percent biodiesel fuel.
- During construction, prohibit the use of portable generators and require that all electrical power be provided by an energy supplier.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction intensity compared to the Project Option. The construction air quality impacts would be similar because the duration and

anticipated equipment mix of construction would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. As such, the conclusions of the project air quality construction impact analysis in the Subsequent EIR would not be affected.

### 3.6.2 Operation Impacts

The Subsequent EIR determined that potential impacts from stationary sources associated with operation of the Project Option would be less than significant. To improve the Revised Project's air quality performance during operation including greenhouse gas reductions to meet AB 32 requirements, the Revised Project would incorporate the following design features to implement energy efficiency and water conservation measures, and programs to reduce vehicle miles traveled (VMT):

- Plumbing measures including ultra low-flow fixtures - 1.2 gpm for showers and 1.28 gallon/flush toilets; implementation of a water management system to reduce waste; high-efficiency gas or propane water heaters (92 percent efficiency condensing type) plus solar hot water; and recycling grey water from showers to water closets and laundry grey water recycling.
- Electrical measures including the use of premium T8 lamps for indoor lighting and an optimized lighting design; and daylight harvesting and automatic networked lighting control systems in dayrooms and dormitories.
- Architectural measures including use of R-28.8 exterior wall insulation and R-30 roof insulation; use of skylights for dayrooms, administrative and other support areas with 54 percent transmittance value to allow daylight harvesting; facility design and implementation may be LEED-certified and may include additional measures to meet LEED certification requirements.
- Kitchen measures including use of variable volume kitchen hoods and more efficient freezers and coolers; use of low-emitting stoves that meet EnergyStar requirements; and implementation of an enhanced onsite recycling /waste reduction/diversion and reuse program.
- Landscape measures including a design and maintenance program that includes drought-resistant and low water use plantings; and use of light-colored/high-albedo materials for paved surfaces including parking lots and walkways.
- Measures to reduce VMT including preferential parking for carpools and vanpools to the facility; bicycle racks and end-of-trip facilities for employees; and onsite lunch services for employees.

The additional operational emissions associated with vehicle exhaust from the Revised Project would also be less than significant for all pollutants except for carbon monoxide (CO), NO2, and $PM_{10}$ emissions, which would remain significant after mitigation. Thus, the conclusions of the operational air quality impact analysis contained in the Subsequent EIR would not change.

### Mitigation

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications, and ARB-certified as described previously.
- Provide information to construction employees to facilitate carpooling.
- Implement project construction features addressing fuel and electrical energy use.
- Provide information to operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

### Finding

The Revised Project does not substantially increase the significant air quality CO, $PM_{10}$, and NO2 impacts of the 2006 Project Option. Air quality impacts arising from CO, $PM_{10}$, and NO2 emissions during project operation cannot be mitigated to a less-than- significant level. However, changes or alterations have been required in, or incorporated into, the project that substantially lessens the significant environmental effects identified in the Subsequent EIR. This finding would also apply to the Revised Project.

## 3.7 Noise

No sensitive noise receptors are currently located near the Revised Project. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore, the following mitigation measures would be implemented to reduce the noise impacts of construction only in the event that residences are built adjacent to the Revised Project prior to project construction: limit construction activities within 2,000 feet of occupied residences to the hours of 7 a.m. to 8 p.m., Monday through Saturday, with no construction allowed on Sundays or federal holidays; and use properly muffled equipment and trucks.

Prison operation would not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operation. Thus, the conclusions of the Subsequent EIR would not change.

## 3.8 Hydrology, Storm Drainage, and Flood Control

The Revised Project would cover approximately 16 acres with impervious surfaces such as buildings, access roads, and parking areas. By covering approximately 16 acres of vacant desert land, the Revised Project would cause similar stormwater flow from the project site as the 2006 Project Option. Thus, the conclusions of the drainage analysis contained in the Subsequent EIR would not change.

### Mitigation

The following measures were adopted in the prior Subsequent EIR to reduce the potential impacts related to stormwater runoff to a less-than-significant level:

- The project will comply with all applicable requirements of the National Pollutant Discharge Elimination System (NPDES) permit program.
- Unlined ditches or swales that will be allowed to revegetate naturally will be constructed along the perimeter of the project site. Erosion control structures will be constructed to reduce the potential for sedimentation. Most ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to at least one detention basin located on the project site. Other ditches may direct runoff offsite, but the total flow rates leaving the site will be maintained at pre-project levels.
- An unlined stormwater detention basin will be developed onsite to retain a volume of stormwater necessary to (1) control runoff from impervious surfaces, and (2) maintain pre-project levels of surface runoff volumes at the property boundaries. The capacity of the detention basin will be based on calculated stormwater flows above natural conditions, resulting from impervious surfaces of the proposed project. The sizing and design of this detention basin will be reviewed and approved by the California City Engineering Department as part of the final project site plan approval.

## 3.9 Biological Resources

Biologists from CH2M HILL reviewed and updated the evaluation of biological resources provided in the previously certified Subsequent EIR. To complete this updated evaluation of biological resources, CH2M HILL biologists conducted a 1-day site reconnaissance on May 12, 2009, to assess current biological conditions and determine whether significant changes have occurred since the previous biological surveys. The current legal status of biological resources onsite was also verified. In addition, an updated search of the California Natural Diversity Database (CNDDB) was conducted for known records of occurrence of sensitive biological resources on or in the site vicinity of the proposed project. Because CEQA significance criteria for biological resources have not changed since the Subsequent EIR, the impact analysis methodology remains unchanged. Finally, the recommended

biological mitigation measures from the previous Subsequent EIR were reviewed for current applicability.

## 3.9.1 Environmental Setting

### Vegetation and Habitat

The 35-acre study area remains generally unchanged from surveys conducted in July 2006, as reported in the Subsequent EIR, except that off-highway vehicle (OHV) use of the project site has continued to result in habitat degradation. The project site lies just south of existing developed prison facilities, and although undeveloped, shows extensive evidence of off-highway travel by vehicles and motorcycles. Vegetated land is relatively homogeneous, composed of sandy soils with sparse vegetation resembling a creosote bush community. Plant species occurring on the project site include, but are not limited to, creosote bush (*Larrea tridentata*), burro bush (*Ambrosia dumosa*), split grass (*Schismus barbatus*), desert trumpet (*Eriogonum inflatum*), spine flower (*Chorizanthe* sp.), filaree (*Erodium cicutarium*), and fiddleneck (*Amsinckia tessellata*). Other species observed included saltbush (*Atriplex* spp.), annual woollystar (*Eriastrum* spp.), and cheesebush (*Hymenoclea salsola*).

The creosote bush on the project site is highly disturbed from heavy OHV traffic. The area receives intensive use from OHV traffic year-round, but use in this and surrounding areas is reported to be exceptionally high on weekends and holidays. Trails from OHV traffic bisect the landscape, and the proposed project site is not currently fenced or excluded from OHV traffic. The resulting disturbed and degraded landscape does not support high-quality wildlife habitat, as evidenced by the scarcity of tortoise sign on portions of the project site, which might otherwise have supported this species. While creosote bushes remain intact, additional shrub coverage is significantly reduced relative to that of an undisturbed creosote bush community. In addition, the herbaceous plant community, while it could not be assessed during optimal seasonal conditions, is probably also severely degraded.

### Special-status Plants

Consistent with findings in the Subsequent EIR, no state-listed or federally listed rare plants are anticipated in the vicinity of the project site. Conditions for establishment of special-status plant species are unlikely as a result of the lack of suitable conditions, past disturbances, and the naturally sparse nature of the vegetation community at the study area.

### Special-status Wildlife

Conditions for special-status wildlife remain unchanged from the Subsequent EIR, except that OHV use has further degraded the habitat. Because of sparse vegetation providing limited cover and forage within the study area, wildlife diversity and abundance are considered low. Wildlife observed during the survey were consistent with observations during the 2006 survey, consisting of common species typically associated with Mojave desert scrub habitats.

A pair of burrowing owls (*Athene cunicularia*) was observed in the southeastern corner of the parking lot of the existing correctional facility, north of the 35-acre project site. The nest burrow was located on the north side of the berm that runs along the southern perimeter of the parking lot. Although the nest burrow was located on the facility, the owls would be

expected to forage within the proposed project area. No additional nest burrows or burrow complexes were observed on the project site.

The study area does not lie within critical habitat for the desert tortoise. Based on the 2009 surveys, conditions for desert tortoise remain generally unchanged on the proposed project site from the 2006 field surveys, except that OHV use has further degraded the quality of the habitat. Live desert tortoises or their burrows were not observed during the survey on the project site, and there appears to be a relatively low density of sign in the general vicinity of the project site. A higher density of sign occurs in areas surveyed approximately 1 mile east of the 35-acre project site; nevertheless, because habitat is present, and tortoises have been observed in the area, the potential occurrence of desert tortoise cannot be precluded.

#### Regulated Waters

An analysis of all drainages in the vicinity of the proposed project site indicated a general lack of consistent flows or channel-forming events. Most drainages were small, incipient channels that appeared to only infrequently convey flows. Evidence of Ordinary High Water Mark (OHWM), which normally defines waters regulated by either federal or state agencies, was lacking. Evidence of OHWM within drainages normally includes recent evidence of flow showing as erosion, depositional surfaces, bent or scoured vegetation, sediment sorting, cracking, mineral staining, or debris deposits. None of these characteristics is consistently observed within drainages on the project site, and it is anticipated that drainages would not be jurisdictional under federal or state regulations.

In addition, no riparian vegetation, which normally consists of desert wash vegetation in arid regions, was present. Riparian vegetation, with potential to support certain wildlife species, in conjunction with OHWM, is normally a requirement for jurisdictional streambed and bank regulated by the California Department of Fish and Game (CDFG).

### 3.9.2 Environmental Impacts

Based on findings from the updated survey in 2009, the Revised Project causes no new impacts to biological resources and does not substantially increase the severity of the impacts identified in the Subsequent EIR. CEQA significance criteria remain unchanged, and because biological conditions on the project site have not changed substantially since 2006, impacts remain the same. This section provides a summary of those impacts and proposed mitigation measures.

#### General Wildlife and Habitat

The impacts to general wildlife or their habitats would not differ significantly from those described in the Subsequent EIR. This loss of habitat for general wildlife species (not protected or otherwise designated as sensitive) would not be considered significant under CEQA because it is abundant in the area. Established native resident or migratory wildlife corridors as well as nursery sites do not occur onsite and would not be affected by project activities. Joshua trees (*Yucca brevifolia*) and other tree species do not occur onsite and would not be affected by project activities. Wetlands, marshes, ephemeral washes, or riparian areas do not occur onsite and would not be affected by project activities.

### Migratory Birds

Conditions affecting migratory birds protected under the federal Migratory Bird Treaty Act (MBTA) and CDFG Code Section 3513 remain unchanged. The proposed prison structure may attract these species, and operations represent a potential significant impact to migratory birds. Mitigation has been identified in the Subsequent EIR to reduce these impacts to less than significant.

### Special-status Plants

Because project site conditions are not favorable for desert cymopterus or other rare plants, there are no anticipated impacts to this special-status plant species.

### Special-status Wildlife

Like the Proposed Project and Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. However, because the habitat is previously disturbed, and generally of a low quality, the loss of habitat is not likely to cause the population of these species to decrease to less-than-sustainable levels.

Adverse effects may also include injury or death of individual burrowing owls, desert tortoise, or Mohave ground squirrel encountered during project construction, especially during earth-moving activities and when species are underground in burrows. The loss of individuals of these species would be considered a significant impact under CEQA, requiring mitigation, described as follows.

### Habitat Loss

Like the Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. In order to comply with the federal Endangered Species Act (ESA) and the California Endangered Species Act (CESA), CCA would be required to obtain necessary approvals and permits with the U.S. Fish and Wildlife Service (USFWS) and CDFG. USFWS requires the submittal of an ESA Section 10(a) permit application and preparation of a Habitat Conservation Plan (HCP) that includes an impact assessment; mitigation measures to avoid or minimize impacts; compensation for any unavoidable impacts; implementation measures; and provisions for any unforeseen circumstances and amendment to the HCP and permits. CDFG requires the submittal of a 2081 permit application and a copy of the HCP.

In 1998, CCA prepared a Supplemental EIR for development of a prison facility (the CCCF). In the course of coordinating with USFWS and CDFG and obtaining appropriate permits for the CCCF, CCA prepared the appropriate ESA and CESA permit applications and HCP for 105 acres, including the 70-acre CCCF site, as well as the 35-acre project site evaluated in the Subsequent EIR and this Addendum. As a result, the Revised Project has the necessary HCP, Incidental Take Permits, and Implementing Agreement in place, as required by USFWS and CDFG. The Revised Project would be required to comply with all mitigation measures of USFWS and CDFG Incidental Take Permits (#PRT-842781 and #2081-1998-17-4, respectively).

### Finding

The Revised Project does not cause new significant impacts or make more severe the significant impacts identified in the Subsequent EIR. The impacts of the Project Option associated with the loss of 35 acres of habitat for burrowing owl, desert tortoise, Mojave ground squirrel cannot be mitigated to a less-than-significant level and similar impacts would occur if the Revised Project were implemented. However, changes or alterations have been required in, or incorporated into, the Subsequent EIR and carried forward in this Addendum that substantially lessen the significant environmental effects identified in the previous EIR. Thus, the conclusions of the Subsequent EIR would not change.

## 3.10 Cultural Resources

A recorded archaeological site is located adjacent to the project site. The potential disturbance of prehistoric material is considered a significant project impact. The mitigation measures contained in the Subsequent EIR would apply to the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

## 3.11 Cumulative Impacts

The Subsequent EIR identified significant cumulative impact contributions for the Proposed Project and Project Option in the following resource areas.

- Aesthetics and Visual Considerations – Changing the visual character of the project vicinity over time as the urbanized area expands.
- Air Quality – Emitting emissions of CO, NO2, and $PM_{10}$ from construction and operation is considered significant and unavoidable.
- Biological Resources – Loss of habitat for burrowing owl, desert tortoise, and Mohave ground squirrel.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction and operation intensity compared to the Project Option. The construction impacts would be similar because the duration and anticipated equipment mix would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. Revised Project operations would occur on the same 35 acres as the 2006 Project Option. While staffing levels and other operational facets would incrementally increase for the Revised Project as compared to the 2006 Project Option, no additional significant impacts or new impacts not analyzed in the prior EIR would occur. As such, the conclusions of the cumulative impacts analysis in the Subsequent EIR would not be affected.

## 3.12 Environmental Impact Analysis Conclusions

Based on the previously stated information, there are no changes in circumstances that would constitute a substantial change that would require major revisions of the previously

certified Subsequent EIR due to new environmental effects; no increases in severity of previously identified substantial effects would occur; no new information of substantial importance, which was not previously known, shows that the project would have one or more significant effects not discussed in the previously certified Subsequent EIR; no significant effects previously examined would be substantially more severe than shown in the previously certified Subsequent EIR; no mitigation measure or alternative previously found not to be feasible would be feasible and would substantially reduce one or more significant effects; and/or no mitigation measures or alternatives not considered in the previously certified Subsequent EIR would substantially reduce one or more significant effects on the environment.




PROJ # 345802

394

CORRECTIONS CORPORATION OF AMERICA
2200 BED CORRECTIONAL FACILITY
CALIFORNIA CITY, CA
DECEMBER 2009

CH2MHILL

FILE

# Addendum No. 1 to Corrections Corporation of America Prison at California City

# Supplement to Environmental Impact Report

Lead Agency:

City of California City
21000 Hacienda Boulevard
California City, CA 93505
(760) 373-8661

Project Applicant:

Corrections Corporation of America
10 Burton Hills Boulevard
Nashville, TN 37215

April 2014

Prepared by

CH2MHILL
1000 Wilshire Boulevard, 21st Floor
Los Angeles, CA 90017

# Contents

Section — Page

Acronyms and Abbreviations .......... v

1 Introduction .......... 1-1
1.1 Purpose of this Addendum .......... 1-1
1.1.1 CEQA Requirements .......... 1-1
1.2 Overview of the Environmental Review Process .......... 1-3
1.2.1 Supplement to an Environmental Impact Report .......... 1-3
1.2.2 Mitigated Negative Declaration .......... 1-3

2 Description of Proposed Repurposing .......... 2-1
2.1 Project Location and Setting .......... 2-1
2.2 Project Background .......... 2-1
2.3 Proposed Changes to the Project Description .......... 2-1

3 Environmental Impact Analysis .......... 3-1
3.1 Land Use .......... 3-1
3.1.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-1
3.2 Aesthetic and Visual Considerations .......... 3-1
3.2.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-2
3.3 Employment, Population, and Housing .......... 3-2
3.3.1 Impacts .......... 3-2
3.3.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-2
3.4 Public Utilities and Community Services .......... 3-3
3.4.1 Law Enforcement .......... 3-3
3.4.2 Fire Protection .......... 3-3
3.4.3 Schools .......... 3-3
3.4.4 Hospitals .......... 3-4
3.4.5 Judicial Services .......... 3-4
3.4.6 Water Supply .......... 3-4
3.4.7 Wastewater Treatment and Disposal .......... 3-4
3.4.8 Solid Waste .......... 3-5
3.4.9 Energy .......... 3-5
3.4.10 Telephone and Cable .......... 3-5
3.4.11 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-5
3.5 Transportation .......... 3-5
3.5.1 Mitigation Measures .......... 3-6
3.5.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-6
3.6 Air Quality .......... 3-6
3.6.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-6
3.7 Greenhouse Gas Emissions .......... 3-7
3.7.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-7
3.8 Noise .......... 3-7
3.8.1 Mitigation Measures .......... 3-7
3.8.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-7
3.9 Hydrology, Storm Drainage, and Flood Control .......... 3-8
3.9.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162 .......... 3-8
3.10 Biological Resources .......... 3-8

3.10.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162.............3-8
3.11 Cultural Resources.......................................................................................3-9
3.11.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162.............3-9
3.12 Cumulative Impacts.......................................................................................3-9
3.13 Environmental Impact Analysis Conclusions...........................................................3-9

**4 References........................................................................................................4-1**

**Figure**

1 Site Vicinity Map

# Acronyms and Abbreviations

| | |
|---|---|
| CCA | Corrections Corporation of America |
| CCCC | California City Correctional Center |
| CCFD | California City Fire Department |
| CCPD | California City Police Department |
| CDFW | California Department of Fish and Wildlife |
| CEQA | California Environmental Quality Act |
| CESA | California Endangered Species Act |
| CUP | Conditional Use Permit |
| EIR Supplement | 1997 Supplement to Environmental Impact Report |
| ESA | Endangered Species Act |
| gpid | gallons per inmate per day |
| HCP | Habitat Conservation Plan |
| MND | Mitigated Negative Declaration |
| MUSD | Mojave Unified School District |
| $PM_{10}$ | particulate matter less than 10 micrometers in aerodynamic diameter |
| SCE | Southern California Edison Company |
| USFWS | U.S. Fish and Wildlife Service |
| WWTP | wastewater treatment plant |

SECTION 1

# Introduction

This document is Addendum No. 1 to the Supplement to Environmental Impact Report for the Corrections Corporation of America Prison at California City (EIR Supplement), which was drafted in 1997 and certified in January 1998 (State Clearinghouse No. 97091045).

A Mitigated Negative Declaration (MND), adopted by California City in December 1998, proposed a 512-bed expansion at the facility. Because the project as proposed in the MND was never undertaken, this Addendum describes and evaluates the proposed repurposing of 256 beds and associated improvements in relation to the 512-bed expansion project, and the existing 2,304-bed California City Correctional Center (CCCC) facility evaluated in the EIR Supplement.

## 1.1 Purpose of this Addendum

Addendum No. 1 addresses the reasonably foreseeable potential environmental effects of the proposed repurposing of 256 beds of the 512 beds approved in 1998, as described in Section 2. This Addendum also evaluates whether the findings associated with the EIR Supplement and MND remain valid in light of the proposed repurposing. The Addendum evaluates the extent that these changes may constitute additional information that was not previously anticipated or analyzed in the EIR Supplement and MND. This method of documentation presents a clear and informative document specifically to outline the subsequent changes to the project, and mitigation measures, as it was presented to the Planning Commission in the EIR Supplement and MND.

The project revisions assessed in Addendum No. 1 do not change the basic objectives for the project and do not substantially change the conclusions of the environmental analyses in the EIR Supplement and MND. The revisions to the project do not raise any new significant environmental impacts that were not previously identified in the EIR Supplement and MND.

### 1.1.1 CEQA Requirements

Prepared in accordance with the California Environmental Quality Act (CEQA) (Public Resources Code Section 21000 et seq.) and the Guidelines for Implementation of the CEQA, as amended, this Addendum summarizes minor revisions associated with a project analyzed in the EIR Supplement. Section No. 15164 of the CEQA Guidelines provides the following directions for the preparation of an Addendum:

(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred. [...]

(c) An addendum need not be circulated for public review but can be included in or attached to the final EIR [...].

(d) The decision-making body shall consider the addendum with the final EIR [...] prior to making a decision on the project.

(e) A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's findings required on the project, or elsewhere in the record. The explanation must be supported by substantial evidence.

The relevant conditions described in Section 15162 indicate that:

(a) When an EIR has been certified [...], no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in light of the whole record, one or more of the following:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR [...] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR ... due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete [...], shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR [...];

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

As discussed in Section 2 of this Addendum, impacts resulting from changes to the project are not substantially different from those assessed in the EIR Supplement and MND. In all respects, the proposed repurposing results in impacts that would be the same, less detrimental to the environment, or would further reduce the level of impact to less than significant.

Regarding Section 15162 (a)(1) and (a)(2) above, revisions to the project as described in Section 2 of this Addendum are not considered substantial and do not require major revisions to the EIR Supplement or MND due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

Regarding Section 15162 (a)(3) above, there has been no new information of substantial importance that has come to light since the certification of the EIR. More specifically,

(A) The information in this Addendum does not reveal a new significant environmental effect not discussed in the previous EIR;

(B) The information in the Addendum does not reveal that a substantial increase in the severity of an environmental impact would result;

(C) & (D) The information in the Addendum does not reveal feasible mitigation measures or alternatives different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

A lead agency may not prepare a Subsequent EIR unless any of the conditions identified in CEQA Guidelines Section 15162 are found to exist. As discussed previously, none of those conditions has been met and, therefore, no Subsequent EIR can be required. Consequently, an Addendum is considered the appropriate document to discuss the environmental implications of the proposed repurposing. Nonetheless, CEQA requires that the lead agency support this determination with substantial evidence in the record. This Addendum serves as that vehicle, and a review of its contents substantiates the conclusion that the

information provided herein merely updates, clarifies, and amplifies the information provided in the previous EIR and MND.

# 1.2 Overview of the Environmental Review Process

## 1.2.1 Supplement to an Environmental Impact Report

Under CEQA Guidelines, Section 15163, the lead or responsible agency may choose to prepare a supplement to an EIR rather than a Subsequent EIR if, any of the conditions described in Section 15162 would require the preparation of a Subsequent EIR, and only minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation.

In 1997, the lead agency for the project, California City determined that an EIR Supplement should be prepared to evaluate a similar, yet less extensive prison facility on a portion of one of the properties evaluated in the previous 1994 EIR, the Virginia Boulevard site. Specifically, the EIR Supplement evaluated the development of a medium-security, 2,304-bed-inmate-capacity prison, related support facilities, and utility improvements on 70 acres of the larger 320-acre Virginia Boulevard property owned by Corrections Corporation of America (CCA).

The EIR Supplement required only the information necessary to make the previous EIR adequate for the project as revised. Therefore, the 1994 certified EIR (SCH No. 93082030) and the EIR Supplement (SCH No. 97091045) are incorporated by reference into this Addendum. The California City Planning Commission certified the EIR Supplement in January 1998.

## 1.2.2 Mitigated Negative Declaration

Under CEQA Guidelines, Section 15070, a public agency shall prepare [...] a proposed [...] mitigated negative declaration for a project subject to CEQA when:

(a) The initial study shows that there is no substantial evidence, in light of the whole record before the agency, that the project may have a significant effect on the environment, or

(b) The initial study identifies potentially significant effects, but:

(1) Revisions in the project plans or proposals made by or agreed to by the applicant before a proposed mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and

(2) There is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment.

In 1998, the City of California City, determined that an MND should be prepared to evaluate a proposed increased in the number of beds and associated support facilities within the existing CCCC property fence line. Specifically, the MND evaluated an expansion to increase the inmate housing capacity of the improved 70-acre CCCC site. The California City Planning Commission adopted the MND in January 1998. Therefore, the 1998 MND is incorporated by reference into this Addendum.

# Description of Proposed Repurposing

## 2.1 Project Location and Setting

The project is located in California City, Kern County, California, approximately 0.5 mile south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard (Figure 1). The project site is approximately 5 miles east of downtown California City at an elevation of roughly 2,540 feet above mean sea level. The previously approved 512-bed expansion and the proposed repurposing are both within the boundaries of the existing CCCC and, as such, the project site has been cleared, graded, and fenced for security/operational purposes and is served by public utilities. The CCCC is the only property within 0.5 mile that contains any significant structural improvements. Surrounding properties and most of the vicinity are composed of vacant undeveloped desert land, characterized by creosote bush vegetation. Detailed information on the regional setting is set forth in the Draft Supplement to the Environmental Impact Report (EIR Supplement; Rust Environment & Infrastructure, 1997).

## 2.2 Project Background

The EIR Supplement evaluated the development of a medium-security, 2,304-bed-inmate-capacity prison and related support facilities such as an administration building, armory, gymnasium, outdoor recreation area, and associated utility improvements on 70 acres of a larger 320-acre property known as the Virginia Boulevard site owned by CCA. The CCCC facility was constructed as permitted by Conditional Use Permit (CUP) 97-01 and has been operational since 1999.

An MND, adopted by California City in 1998, anticipated increased beds within the CCCC property fence line. The project included a housing unit for inmates, a support services structure containing offices and meeting rooms, use of existing utility infrastructure services, and an increase in operational and security staff. This project was never undertaken; however, Conditional Use Permit 98-02 was granted and is still a valid entitlement on the existing improved 70-acre CCCC site.

California City issued ministerial permits to CCA for parking lot improvements, installation of two modular buildings, and other minor site improvements at CCCC in 2013.

## 2.3 Proposed Changes to the Project Description

The proposed revisions to the project, as defined and analyzed in the 1997 EIR Supplement and MND, do not materially change the objectives, general development pattern, or operations at CCCC. Since certification of the 1997 EIR Supplement and MND, CCA is proposing to repurpose 256 beds of the permitted site capacity within the existing 2,304-bed facility structure. This would increase the capacity of the existing CCCC to accommodate 2,560 beds, consistent with existing land use permitting issued by California City.

The proposed repurposing includes the following potential environmental benefits:

- Reduced facility building footprint;
- Fewer impacts associated with repurposing within the existing facility than with construction of new facilities (ground disturbance, air quality, truck traffic, noise, aesthetics, etc.); and
- Minimized long-term impacts from not operating an additional inmate housing building.

The proposed repurposing is necessary to meet current or future tenant requirements to operate a 2,560-bed facility when the repurposing is complete. Specific improvements to allow for the repurposing of the 256 beds into the existing CCCC and to meet tenant-operating requirements include:

- Installation of additional beds inside the existing CCCC inmate housing areas;

- Miscellaneous changes to interior administrative, operational, and security functions; and
- Use of existing utilities and infrastructure serving the existing facility.

All proposed improvements would occur within the existing 70-acre property over a 6-month period.

The MND contained an environmental impact analysis for the full build-out of the 512-bed expansion project. Because the project was never undertaken, this Addendum describes and evaluates the proposed repurposing of 256 beds in relation to the 512-bed expansion project, and the 2,304-bed CCCC facility evaluated in the 1997 EIR Supplement referenced above.




Vicinity




Location

CCCC = California City Correctional Center

North

404

Reference: Topozone, 2006; USGS 7-5 minute quadrangle maps, California City North, CA, 1973 and Galileo Hill, CA, 1973.

ES\ES011414134134SAC.SCO CCA_vicinity_map.ai 1/14

FIGURE 1
**Site Vicinity Map**
*CCA 256-Bed Repurposing Project*
**CH2MHILL.**

SECTION 3

# Environmental Impact Analysis

The following discussion examines the environmental impacts of the proposed repurposing. Except where specifically noted, the assessment methodologies are the same as those employed in the EIR Supplement and MND.

## 3.1 Land Use

The EIR Supplement identified no adverse land use impacts from construction and operation of the 2,304-bed prison facility. The proposed repurposing is consistent with the CCCC onsite uses and would not affect other adjacent land uses because all other surrounding parcels are vacant. As noted in the EIR Supplement, the prison facility could be located in proximity to future residential development, resulting in a potential land use conflict due to air quality, noise, and visual/aesthetic issues. These potential impacts were addressed in the appropriate sections of the EIR Supplement.

Because the proposed repurposing would occur within existing structures at the 70-acre developed property, no adverse impacts to land use are anticipated. The zoning for the project site, unchanged since certification of the EIR Supplement, allows for governmental or quasi-governmental correction, probation, or prison facilities, and services with a conditional use permit. The City issued CUP 98-02 in 1998 for the expansion of the existing prison facility and an increase of the inmate housing capacity of the improved 70-acre site. While the project was never undertaken, CUP 98-02 is still a valid entitlement on the site. The proposed repurposing would not increase the inmate housing capacity beyond approved limits of existing land use permits issued for the CCCC by California City.

No adverse impacts relative to land use are anticipated from the proposed revisions. As such, the conclusions of the land use analysis in the EIR Supplement and MND would not be affected.

### 3.1.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant land use impacts nor result in increased severity of significant land use impacts. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.2 Aesthetic and Visual Considerations

The project site is currently developed as an existing 2,304-bed prison facility. The existing facility includes single-story structures with a building height ranging from approximately 18 to 26 feet with an exterior finish that blends with the surrounding natural environment. The proposed repurposing includes improvements that would occur within existing structures at the facility; no additional structures are proposed. Therefore, the proposed repurposing would not alter views in the project vicinity.

Because the proposed repurposing does not increase the severity of the previously identified visual and aesthetic impacts in the EIR Supplement or MND, no change in the findings and conclusions of the EIR Supplement or MND would occur.

### 3.2.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant impacts to aesthetic resources nor result in increased severity of significant impacts to aesthetic resources. Based on this information, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.3 Employment, Population, and Housing

### 3.3.1 Impacts

#### Employment

The proposed repurposing would generate approximately 25 temporary jobs over a 6-month period to complete interior facility improvements. Staffing at the prison facility and long-term job opportunities will be consistent with what was addressed in the EIR Supplement and MND. Permanent employment opportunities would be for correctional officers as well as medical, education, administrative, trade, and clerical positions. In addition to jobs provided by the prison, the purchase of local goods and services for the prison facility, and by CCCC employees individually, would stimulate the local economy, resulting in additional employment opportunities in the region. The additional employment opportunities are considered a beneficial effect of the proposed repurposing.

#### Population

The proposed repurposing would increase the existing number of beds by 256 and have a prison inmate population of 2,560 at full operating capacity. Based on CCA's experience with more than 60 correctional facilities, generally 1 percent of the inmate families and 10 to 15 percent of prison employees may relocate to the region. Therefore, for the proposed repurposing, approximately three families may relocate to the project vicinity. The remainder of prison employment and indirect job opportunities from the prison are anticipated to be filled by the existing population of California City and surrounding communities. Using the California average household size of 2.9 persons per household, the population increase from relocating inmate and employee families may be approximately 9 persons for the proposed repurposing. This increase would be less than the 512-bed increase analyzed in the MND and permitted by CUP 98-02. Potential housing needs resulting from the proposed repurposing would be no more significant than those evaluated in the EIR Supplement and less significant than those disclosed in the MND.

Population growth associated with a prison typically increases demand for public services, such as water and wastewater facilities. As described in Section 3.4 of this Addendum, and consistent with the EIR Supplement, impacts resulting from population growth would be less than significant.

#### Housing

The vacancy rate in California City and surrounding communities indicates that ample housing is available to accommodate relocation of inmate families and employee families resulting from the proposed repurposing.

No adverse impacts to employment, population, and housing would result from construction and operation of the proposed repurposing. As such, no mitigation measures are required. The proposed repurposing will not affect the findings and conclusions of the EIR Supplement or MND with respect to employment, population, and housing.

### 3.3.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant impacts to employment, population, or housing nor result in increased severity of significant impacts to employment, population, or housing. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.4 Public Utilities and Community Services

Like the 2,304-bed project evaluated in the EIR Supplement and the 512-bed expansion evaluated in the MND, the proposed repurposing has the potential to affect public utilities and community services in California City and the surrounding communities. These effects can occur in two primary ways: (1) by increasing the demand for California City services to the facility directly; and (2) by increasing the demand for services in California City and the surrounding communities to accommodate population growth. The proposed repurposing would directly and indirectly generate significant tax benefits to the City of California City's general revenue fund and regional governments, which would offset the potential costs of community services.

### 3.4.1 Law Enforcement

The EIR Supplement determined that the 2,304-bed facility would cause (1) a slight increase in calls requesting assistance from the California City Police Department (CCPD), and (2) an increase in the demand for law enforcement services due to project-related and indirect population growth. Based on the small number of additional phone calls for service, the EIR Supplement concluded that significant impacts to CCPD services would not occur and mitigation measures would not be required.

The proposed repurposing would not increase inmate capacity or staff beyond what is currently permitted at CCCC. Therefore, while a slightly higher number of calls to CCPD and possibly an increase in demand for law enforcement services due to population growth directly and indirectly related to the project may occur, impacts to CCPD services would not increase over what was analyzed in the MND. Despite the potential increase in calls to CCPD and increased demand for law enforcement services due to direct and indirect project-related population growth, the impacts to law enforcement from the proposed repurposing would remain within the service capability of CCPD and would not be significant; mitigation measures, therefore, would not be required.

### 3.4.2 Fire Protection

The 2,304-bed facility analyzed in the EIR Supplement was designed to comply with all applicable fire building codes, to be equipped with a comprehensive fire suppression system, and to be constructed with primarily noncombustible building materials (e.g., steel and concrete). The EIR Supplement determined that the facility may (1) increase demand on the California City Fire Department (CCFD) for fire suppression, fire prevention, and investigation duties, and (2) increase the demand for fire protection services resulting from project-related and indirect population growth. Based on the design features included in the facility and CCFD's indication that current staffing levels would be able to accommodate the increased duties that may be generated by the project, the EIR Supplement determined that impacts to CCFD would be less than significant.

Like the project analyzed in the EIR Supplement, the proposed repurposing described in this Addendum will also be designed to comply with applicable fire building codes, equipped with a comprehensive fire suppression system, and constructed primarily with noncombustible building materials. While the proposed repurposing may cause a slightly increased demand on CCFD for fire suppression, fire prevention, and investigation duties, and a slight increase in the demand for fire protection services due to project-related and indirect population growth, it would not be an increase over what was analyzed in the MND. As such, the conclusions of the fire protection services analysis in the EIR Supplement and MND would not be affected.

### 3.4.3 Schools

The EIR Supplement determined that the 2,304-bed facility would cause population growth that would affect student enrollment with the Mojave Unified School District (MUSD). However, MUSD indicated that it would be able to accommodate additional students resulting from the project without adverse impacts. Further, mitigation for impacts of additional students generated indirectly by the proposed repurposing would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules. Based on this

description, the EIR Supplement determined that no adverse impacts would occur from the project or from direct or indirect population growth.

The MUSD currently maintains six schools within the district. As stated above, approximately three families (or an estimated nine persons) may relocate to the project vicinity as a result of the proposed repurposing. Conservatively estimating five of those nine persons are school-aged children, it is anticipated that the existing capacity of the six schools within the MUSD would be able to easily accommodate up to five new students. Therefore, while the proposed repurposing described in this Addendum may cause increased demand on MUSD to accommodate additional students, it would not be an increase over what was analyzed in the MND and, based on existing MUSD school capacity, impacts of the proposed repurposing would not be significant.

### 3.4.4 Hospitals

The EIR Supplement determined that no significant impact to hospital services would occur because (1) the project would include medical facilities onsite 24 hours per day, and (2) the number of hospitals available for the community around California City would be able to accommodate project-related direct or indirect population growth. Because the proposed repurposing would utilize the onsite medical facilities available 24 hours per day, no significant or different impacts would occur.

### 3.4.5 Judicial Services

The EIR Supplement determined that impacts to judicial services would vary based on the contracting agency providing inmates to the proposed facility. The project was estimated to generate up to three court cases per month. The impacts on judicial services are fiscal issues and not environmental impacts. The proposed repurposing evaluated in this Addendum would generate up to one court case per month. Like the 2,304-bed facility analyzed in the EIR Supplement, impacts to judicial services resulting from the proposed repurposing would not be significant.

### 3.4.6 Water Supply

The EIR Supplement estimated water demand for the project by calculating the average daily water usage over time at the existing CCCC and dividing that usage by the number of inmates. At that time, the data showed that the water demand in a facility such as that described in the EIR Supplement is approximately 170 gallons per inmate per day (gpid), inclusive of prison staff and support services. The EIR Supplement indicated that the project could be served from existing City supply based on the extent of recent and planned system-wide improvements. The project proposed design features to minimize water use at the proposed prison, including use of low-flow fixtures and drought-tolerant, native landscaping. Based on recent facility improvements, the CCCC is using approximately 120 gpid, significantly less than evaluated in the EIR Supplement.

An increase in inmate capacity (256 beds) will create a slight increase in water demand at the facility; however, it would not be an increase over what was analyzed in the MND (512 beds). In addition, the proposed repurposing includes use of existing low-flow fixtures and does not include landscaping. Therefore, the proposed repurposing based on projected lower per inmate water use is not anticipated to affect California City water services, water conservation efforts, or change the results of the water supply impact analysis presented in the EIR Supplement and MND.

### 3.4.7 Wastewater Treatment and Disposal

The EIR Supplement determined that no significant impacts to wastewater treatment and disposal would occur due to available capacity at the California City wastewater treatment plant (WWTP). This determination was based on an estimated wastewater flow of 150 gpid, inclusive of all prison staff and support services.

The proposed repurposing will create increased demand on California City WWTP capacity; however, it would be less of an increase over what was analyzed in the MND based on the reduced per inmate water use described in Section 3.4.6. No extension of additional utilities to the property is proposed, and existing services are expected to be sufficient to accommodate the demands of the proposed improvements. Therefore, the proposed repurposing is not anticipated to affect wastewater treatment services provided by the California City WWTP, or change the results of the wastewater treatment and disposal impact analysis presented in the EIR Supplement and MND.

### 3.4.8 Solid Waste

The EIR Supplement determined that no significant impacts to solid waste disposal would occur for the project. Landfill capacity is expected to remain adequate to accommodate the additional waste generated by the proposed repurposing and associated direct and indirect population growth related to the project. Kern County has seven landfills and additional recycling facilities that are estimated by County staff to have approximately 65 years of operational capacity to manage solid waste generated in Kern County. No significant impacts related to solid waste disposal would occur from the proposed repurposing. As such, the conclusions of the solid waste impact analysis in the EIR Supplement would not be affected.

### 3.4.9 Energy

The EIR Supplement determined that no significant impacts to energy would occur from the project. Per the analysis in the EIR Supplement, Southern California Edison Company (SCE) indicated that the electrical loads of the project were within the parameters of projected load growth that SCE is planning to meet in the vicinity, and Southern California Gas Company indicated that it had adequate natural gas supply and facilities to supply the proposed facility.

Repurposing 256 previously approved beds would not increase energy demand over what was previously analyzed in the MND and approved for the site, and is not anticipated to affect SCE, Southern California Gas Company service capacity, or the existing onsite propane system. Therefore, no significant impacts related to energy would occur from the proposed repurposing, and the conclusions of the EIR Supplement and MND would not change.

### 3.4.10 Telephone and Cable

The EIR Supplement determined that no significant impacts to telephone and cable would be anticipated for the project. With regard to telephone service, telephone line improvements previously installed to support the CCCC would also serve the proposed repurposing. As such, the conclusions of the public utilities telephone and cable analysis in the EIR Supplement would not be affected.

### 3.4.11 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant public services impacts nor result in increased severity of significant public services impacts. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.5 Transportation

The EIR Supplement identified no significant adverse transportation impacts from construction of the 2,304-bed prison facility. Short-term construction activities associated with the proposed repurposing would require approximately 25 workers over a 6-month period. This would be a temporary increase in trips per day over existing conditions. However, it would not result in an increase in daily worker trips during construction from what was evaluated in the EIR Supplement or the MND.

The proposed repurposing would increase the existing number of beds by 256, which would result in a slight increase in daily visitor and employee trips during operations. As noted in the EIR Supplement, with

the exception of State Route 58/California City Boulevard intersection, no significant adverse transportation impacts from operation of the 2,304-bed prison facility were identified. Consistent with the mitigation measures provided in the EIR Supplement, when applicable, the applicant would contribute to improvement costs, based on the proportionate share of traffic impacts at this intersection. This mitigation measure would allow the traffic impacts associated with the proposed repurposing to remain less than significant. Furthermore, transportation impacts associated with this slight increase in daily visitor and employee trips would be less than what were previously approved in the MND. The repurposing of 256 beds represents an incremental increase in traffic impacts compared to the project approved in the EIR Supplement. Thus, the prison entrance and onsite road system designed for the 2,304-bed prison will accommodate the proposed repurposing.

No additional adverse transportation impacts beyond those already disclosed are anticipated from the proposed repurposing. As such, the conclusions of the transportation analysis in the EIR Supplement and MND would not change.

### 3.5.1 Mitigation Measures

Consistent with the mitigation measures provided in the EIR Supplement, the applicant would contribute to improvement costs when applicable, based on the proportionate share of traffic impacts at this intersection.

### 3.5.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant transportation impacts nor result in increased severity of transportation impacts from those disclosed in the EIR Supplement and MND. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.6 Air Quality

The EIR Supplement identified significant and unavoidable project and cumulative air quality impacts from construction and operation of the 2,304-bed prison facility. No new structures are proposed and no grading is required for the proposed repurposing; therefore, air quality impacts associated with construction would be less than what were previously evaluated in the MND. As noted in Section 2, the proposed repurposing includes environmental benefits associated with repurposing inmate housing within the existing CCCC facility rather than constructing and operating new inmate housing facilities.

While long-term operations associated with the proposed repurposing could contribute additional air emissions in the Mojave Desert Air Basin, above those evaluated in the EIR Supplement, these additional air emissions would be nominal and would not increase the severity of impacts disclosed in the EIR Supplement or MND. Furthermore, the proposed repurposing would not expose sensitive receptors to substantial pollutants or objectionable odors.

No adverse impacts relative to air quality beyond those already disclosed are anticipated from the proposed repurposing. As such, the conclusions of the air quality analysis in the EIR Supplement and MND would not change.

### 3.6.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant air quality impacts nor result in increased severity of significant air quality impacts from those disclosed in the EIR Supplement and MND. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.7 Greenhouse Gas Emissions

Greenhouse gas emissions would occur during construction and operation of the proposed repurposing described in Section 2. Greenhouse gas emissions from construction would be temporary and would be generated by on-road vehicles. Due to reduced duration and intensity of facility improvements, the proposed repurposing would not generate new or increased greenhouse gas emissions from construction.

Long-term greenhouse gas emissions from facility operation would be generated by electricity use, space heating, and staff and visitors driving to and from the facility. The proposed repurposing would not increase staff or inmate capacity beyond what is currently permitted at the facility.

While the proposed repurposing would contribute to greenhouse gas emissions, as noted in Section 2, these revisions include environmental benefits associated with repurposing within the existing facility rather than constructing new inmate housing structures. In this respect, greenhouse gas emissions associated with the proposed repurposing would be less than greenhouse gas emissions generated by the project evaluated in the MND.

No adverse impacts from greenhouse gas emissions that are in addition to those generated by development of the project evaluated in the MND are anticipated from the proposed repurposing. As such, no mitigation measures are required.

### 3.7.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would include environmental benefits associated with repurposing within the existing facility rather than constructing and operating new inmate housing structures. In this respect, greenhouse gas emissions associated with the proposed repurposing would be less than greenhouse gas emissions generated by the project evaluated in the MND, and therefore a Subsequent EIR is not required.

## 3.8 Noise

Short-term noise from the proposed repurposing incudes noise generated by equipment during construction. Long-term noise would be associated with potential increase in vehicular traffic (due to increase in inmate capacity and staff). However, both short-term and long-term noise increases would be less than that analyzed in the EIR Supplement and MND as construction would be a shorter duration, and inmate capacity and staffing would not exceed what is currently permitted for the site.

### 3.8.1 Mitigation Measures

No sensitive noise receptors are currently located near the facility. Noise from construction activities would only be considered significant if residences are constructed prior to construction of the proposed repurposing. Therefore, the following mitigation measures would be implemented to reduce the noise impacts of construction only in the event that residences are built adjacent to the facility prior to project construction: limit construction activities within 2,000 feet of occupied residences to the hours of 7 a.m. to 8 p.m., Monday through Saturday, with no construction allowed on Sundays or federal holidays; and use properly muffled equipment and trucks.

Prison operation would not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operation. Thus, the conclusions of the EIR Supplement would not change.

### 3.8.2 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant noise impacts nor result in increased severity of significant noise impacts. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.9 Hydrology, Storm Drainage, and Flood Control

The repurposing of 256 beds of the permitted site capacity would occur within the existing 2,304-bed prison facility structure. Thus, the addition of 256 beds within the existing facility structure would not result in new impacts related to hydrology, storm drainage, and flood control. As noted in Section 2, the proposed repurposing includes environmental benefits associated with repurposing within the existing facility rather than construction of new inmate housing facilities, including minimized long-term impacts. In this respect, hydrology, storm drainage, and flood control impacts would be less than what was previously approved in the MND.

Stormwater runoff controls for the 70-acre improved site approved in the EIR Supplement will serve the proposed repurposing without modification. No adverse impacts relative to hydrology, storm drainage, and flood control in addition to those already disclosed are anticipated. As such, the conclusions of the hydrology, storm drainage, and flood control analysis in the EIR Supplement and MND would not be affected.

### 3.9.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant hydrology, storm drainage, and flood control impacts nor result in increased severity of significant hydrology, storm drainage, and flood control impacts from those disclosed in the EIR Supplement and MND. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.10 Biological Resources

The EIR Supplement identified and analyzed the elimination of 70 acres of suitable habitat for three sensitive species: desert tortoise (*Gopherus agassizii*), burrowing owl (*Athene cunicularia*), and Mohave ground squirrel (*Spermophilus mohavensis*) for the construction and operation of the CCCC facility. In order to comply with the federal Endangered Species Act (ESA) and the California Endangered Species Act (CESA), CCA obtained necessary approvals and permits from the U.S. Fish and Wildlife Service (USFWS) and California Department of Fish and Wildlife (CDFW). USFWS required the submittal of an ESA Section 10(a) permit application and preparation of a Habitat Conservation Plan (HCP) that included an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. CDFW required the submittal of a 2081 incidental take permit application and a copy of the HCP.

In the course of coordinating with USFWS and CDFW and obtaining appropriate permits for the CCCC, CCA prepared the appropriate ESA and CESA permit applications and HCP for 105 acres, including the 70-acre CCCC site evaluated in the EIR Supplement. The proposed repurposing is within the previously disturbed 70-acre property of the existing CCCC prison facility. As a result, the proposed repurposing has the necessary HCP, Incidental Take Permits, and Implementing Agreement in place, as required by USFWS and CDFW. The proposed repurposing would be required to comply with all mitigation measures of USFWS and CDFW Incidental Take Permits (#PRT-842781 and #2081-1998-17-4, respectively).

The proposed repurposing would occur within the existing 2,304-bed prison facility structure. Any natural habitat that previously existed at the site was eliminated during construction of the 2,304-bed prison facility and was fully mitigated in the EIR Supplement. The proposed repurposing does not cause new impacts to biological resources and does not increase the severity of the impacts identified in the EIR Supplement or MND.

### 3.10.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant impacts to biological resources nor result in increased severity of significant impacts to biological resources. Based on this

information, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.11 Cultural Resources

The proposed repurposing is within the existing 2,304-bed CCCC prison facility structure. According to Appendix C of the EIR Supplement (Cultural Resources Survey), there are no resources in the project area listed on the National Register of Historic Places, the California Historical Landmarks, or the California Inventory of Historic Resources. Thus, the site was found to contain no areas of cultural resources and no impacts to cultural resources would occur.

### 3.11.1 Summary Conclusion Regarding Applicability of CEQA Guidelines §15162

As discussed above, the proposed repurposing would neither result in new significant impacts to cultural resources nor result in increased severity of significant impacts to cultural resources. Based on these findings, the proposed repurposing is considered minor and would be consistent with the impacts disclosed in the EIR Supplement and MND; therefore, a Subsequent EIR is not required.

## 3.12 Cumulative Impacts

The EIR Supplement identified significant cumulative impact contributions for the 2,304-bed facility in the following resource areas:

- Aesthetics and Visual Considerations: Changing the visual character of the project vicinity over time as the urbanized area expands.
- Air Quality: Emissions of carbon monoxide, nitrogen dioxide, and $PM_{10}$ from construction and operation is considered significant and unavoidable.
- Biological Resources: Loss of habitat for burrowing owl, desert tortoise, and Mohave ground squirrel.

When compared to the project analyzed in the MND that is currently approved at the site per CUP 98-02, the proposed repurposing includes: a reduced facility building footprint, fewer impacts associated with repurposing within the existing facility than with constructing new facilities (ground disturbance, air quality, truck traffic, noise, aesthetics, etc.), and minimized long-term impacts from not operating an additional inmate housing building.

Although the proposed repurposing increases inmate capacity of the facility by 256 beds, this is less than what is currently permitted at this site per CUP 98-02. The proposed repurposing would not increase the inmate housing capacity beyond the limits of existing land use permits issued for the CCCC by California City.

Due to reduced duration and intensity of proposed construction, potential construction impacts of the proposed repurposing would be less significant than those identified in the EIR Supplement and MND. Operations would occur on the same 70-acre property as the existing facility. While staffing levels and other operational facets would incrementally increase over existing conditions, levels would not be increased over what is currently approved for the facility and no additional significant impacts or new impacts not analyzed in the EIR Supplement and MND would occur. As such, the conclusions of the cumulative impacts analysis in the EIR Supplement would not be affected.

## 3.13 Environmental Impact Analysis Conclusions

Based on the previously stated information, the following conclusions apply:

- No changes in circumstances that would constitute a substantial change that would require major revisions of the previously certified EIR Supplement or MND due to new environmental effects;
- No increases in severity of previously identified substantial effects would occur;

- No new information of substantial importance, which was not previously known, shows that the project would have one or more significant effects not discussed in the previously certified EIR Supplement and MND;
- No significant effects previously examined would be substantially more severe than shown in the previously certified EIR Supplement or MND;
- No mitigation measure or alternative previously found not to be feasible would be feasible and would substantially reduce one or more significant effects; and/or
- No mitigation measures or alternatives not considered in the previously certified EIR Supplement would substantially reduce one or more significant effects on the environment.

SECTION 4

# References

Earth Tech/Rust Environment & Infrastructure. 1998. Proposed Mitigated Negative Declaration, Corrections Corporation of America 512-Bed Expansion at California City Correctional Center. October.

Rust Environment & Infrastructure. 1997. Draft Supplement to Environmental Impact Report, Corrections Corporation of America Prison at California City. State Clearinghouse No. 97091045. October.

Rust Environment & Infrastructure. 1998. Final Environmental Impact Report, Corrections Corporation of America Prison at California City. State Clearinghouse No. 97091045. January.

June 24, 2026

**U.S. mail and electronic transmittal**

City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

Dear City Planning Commission Chair David Brottlund, Commissioners, City Manager Sean Grayson, and City Clerk John Paul Maier:

CoreCivic, Inc. responds to and opposes the February 27, 2026 application for appeal submitted by the Dignity Not Detention ("DND") Coalition. The application seeks to appeal the City Planner's approval of CoreCivic's Site Plan Review ("SPR") Minor and the City Clerk's issuance of CoreCivic's Business License. The application should be denied because the DND Coalition does not have standing to appeal under the Municipal Code, and the grounds for the appeal are based on false and misleading information.

## I. Relevant Background.

CoreCivic, previously known as Corrections Corporation of America, owns and operates detention facilities in partnership with federal, state, and municipal governments/agencies across the country. For the past thirty years, CoreCivic has been a member in good standing with the community, conducted business in the City, paid property and other taxes, contributed to the City's economy, and employed many of its residents.

The DND Coalition is not a legal entity, much less a member of the community. Rather, it is a collection of social and political advocacy groups that oppose the federal government's current immigration policies. The application to appeal is a pretext to advance its members' political goals and social agenda.

### A. CoreCivic's Facility.

In 1997, CoreCivic submitted a proposal to construct a facility at 22844 Virginia Boulevard, consisting of 2,304 general population beds, a 256-bed segregation unit, and a 4-bed medical unit. (Ex. 1, Verhulst Declaration, ¶ 7; Ex. 2, Malloy Declaration, ¶ 4.) CoreCivic's application for a

conditional use permit for the facility did not designate a particular detention population. At a noticed public hearing on January 15, 1998, the California City Planning Commission recommended granting Conditional Use Permit ("CUP") 97-01 for the proposed facility, known as the California City Correctional Facility ("the Facility"). (Ex. 3, Ariola Declaration, ¶ 11.) The City Council granted CUP 97-01 on January 20, 1998, and in June 1998, CoreCivic purchased the 320-acre site, a vacant terrain surrounded by natural desert. (*Id.*, ¶¶ 11, 14.)

Construction began in 1998. (*Id.*, ¶ 16.) During construction, CoreCivic applied to amend CUP 97-01 to construct two additional 256-bed housing units at the site. (*Id.*, ¶ 17.) On December 1, 1998, the City granted CUP Amendment 98-02, which expanded the site's permitted use by 512 general population beds. (*Id.* and Attachment D at Page 48, 50–51 and 57 of 161.) On November 15, 2001, the City Manager/Planning Director clarified that the Amendment extension was "granted indefinitely." (Ex. 3, ¶ 17 and Attachment D at Page 45 of 161.) Neither CUP 97-01 nor CUP Amendment 98-02 has been revoked, rescinded, or canceled. (Ex. 3, ¶ 19.)

CoreCivic operated the Facility as a federal detention center from 2000 to 2013. (Ex. 1, ¶¶ 11–14; Ex. 3, ¶ 18.) From 2000 to 2010, CoreCivic housed criminal aliens in the custody of the Bureau of Prisons ("BOP") through a direct contract with BOP. (Ex. 1, ¶¶ 10–12; Ex. 3, ¶ 18.) From 2010 to 2013, CoreCivic housed detainees in the custody of the United States Marshals Service ("USMS") and immigration detainees in the custody of United States Immigration and Customs Enforcement ("ICE") through an Intergovernmental Services Agreement ("IGSA") with the City. (Ex. 1, ¶¶ 13–14.) During that period, there were more than 9,500 ICE detainees at the Facility. (*Id.*) In 2013, CoreCivic leased the Facility to the California Department of Corrections and Rehabilitation ("CDCR") to house California inmates.[1] (Ex. 1, ¶ 15; Ex. 3, ¶ 22.) In 2014, the City confirmed that a land-use review had been completed and authorized and permitted the use of 2,560 beds at the Facility. (Ex. 3, ¶ 23 and Attachment G at Page 97 of 161.) CDCR made full use of the available space and regularly housed more than 2,304 inmates at the Facility during the lease. (Ex. 1, ¶ 16.)

After CDCR's lease expired in 2024, CoreCivic did not close the Facility or discontinue its use as an Institutional Group I-3 facility. (Ex. 3, ¶ 29.) To the contrary, CoreCivic continued to staff the Facility with operations and maintenance employees while it identified and explored opportunities to enter into a new contract. (*Id.*, ¶ 30.)

In April 2025, CoreCivic entered into a new contract with ICE to operate the Facility once again as a federal detention facility. (Ex. 1, ¶ 20.) In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the Facility; the first group of detainees arrived on August 27, 2025. (*Id.*, ¶ 21.) In September 2025, ICE formalized a contract for up to 2,560 beds, which expires on August 31, 2027. (*Id.*, ¶ 21.) The USMS is an authorized user of beds space under that contract.

[1] On May 27, 2014, the City confirmed that CDCR was "authorized and fully permitted to operate 2,560 beds" at the Facility. (Ex. 3, ¶ 23 and Attachment G at Page 97 of 161.)

As of June 9, 2026, the Facility held 1,615 detainees. Of those detainees, 1,592 are ICE immigration detainees (1,371 males and 221 females). Detainees are classified as High/Mod-High or Low/Mod-Low. Most detainees classified as High/Mod-High have criminal convictions (and/or a documented history of predatory behavior), the majority of which were in the United States. Currently, 584 male detainees (42.6%) and 76 female detainees (34.4%) are classified as High/Mod-High. The Facility also held 23 USMS male pretrial criminal detainees as of June 9, 2026.

### B. CoreCivic's Applications for a SPR Minor and a Business License.

On July 22, 2025, CoreCivic applied for an SPR Minor and a Business License. (Ex. 3, ¶¶ 39–40 and Attachment O at Page 117–131 of 161.) It submitted the SPR Minor application at the City Planner's instruction. (Ex. 3, ¶¶ 36–39 and Attachment O at Page 117 of 161.) An SPR Major application was not required because CoreCivic did not plan any structural modifications to the Facility, and it merely sought to use the Facility for immigration detention as it had previously done in partnership with the City. (Ex. 3, ¶ 37.) That application was supplemented with a business plan for the operation of the Facility on August 11, 2025. (Ex. 4, Aug. 11, 2025 Business Plan Submission.) The City provided public notice that it was considering CoreCivic's application no later than August 12, 2025.

CoreCivic also submitted a second SPR Minor and Business License application on August 25, 2025, in response to interest by the USMS to place detainees at the Facility. (Ex. 5, Aug. 25, 2025 2d SPR Minor & Biz License Submission.) That application was clarified on September 15, 2025. (Ex. 6, Sept. 15, 2025 2d SPR Minor Clarification.)

The City provided advance notice and held the first hearing on both of CoreCivic's applications before the City Council on October 28, 2025. (Ex. 7, Oct. 25, 2025 Agenda Notice; Ex. 8, Oct. 28, 2026 Agenda Excerpts.) The City also provided advance notice, which was reported in local media, and held a second public hearing on CoreCivic's applications before the Planning Commission on December 16, 2025. (Ex. 9, Dec. 12, 2025 KGET17 Article; Ex. 10, Dec. 16, 2025 Planning Comm. Agenda Excerpts.) After holding two noticed public hearings under the procedures set forth in California Civil Code § 1670.9 ("SB 29"), the City Planner approved the SPR Minor, and the City Clerk issued CoreCivic's Business License on February 26, 2026. (Ex. 11, Business License.)

## II. The DND Coalition Cannot Appeal the Approved SPR Minor or Issued Business License.

The Municipal Code permits only an "affected person" to file an application for appeal. CCMC § 1-4.04(a). The Code defines an "affected person" as a "person … who has an interest in the matter at issue or whose health, safety, or welfare may be affected by the decision." CCMC § 1-4.02(a). A "person" is defined as "any natural person," a "firm, company, corporation, partnership, association," or a public entity. CCMC § 1-4.02(f); CCMC § 1-2.07(k).

The DND Coalition may not appeal because it is not a "natural person" or a "firm, company, corporation, partnership, association," or public entity. Nor is it otherwise registered under

California law as any other type of incorporated or unincorporated association. *See* Cal. Corp. Code § 12585 (requiring nonprofit associations that receive government grants or charitable funding to register). Rather, the DND Coalition is merely a label, assigned to a belief that several social and political advocacy groups hold. Because it is not an "affected person," it cannot file an application for appeal.

The application fails to provide any information to show that the DND Coalition qualifies as an "affected person." For example, it does not assert that the DND Coalition has an office or officers, owns property, operates a business, or resides in the City, or pays City taxes. The failure to provide this information is fatal to the application for appeal because the Code requires that any "application shall contain sufficient information to identify the party, **its interest in the matter**, and the reasons for requesting an appeal." CCMC § 1-4.04(a) (emphasis added). And the Code mandates that "any decision becomes final for all purposes when it is made" unless the decision was "appealed … in the time and manner provided." CCMC § 1-4.10.

The City should deny the application for appeal filed by the DND Coalition for these reasons alone.[2]

## III. The Application's Grounds for Appeal Lack Merit.

Although the application for appeal lists several reasons to challenge the City Planner's approval of the SPR Minor and/or the City Clerk's issuance of the Business License, they are all based on the same false factual and legal premise that the Zoning Regulations do not permit CoreCivic's use of the Facility as an immigration detention facility under the existing CUP 97-01 and CUP Amendment 98-02.

*First*, the application for appeal asserts that the approval of the SPR Minor and the issuance of the Business License do not conform with CCMC § 9-2.803(a). But CCMC § 9-2.803(a) is irrelevant because it sets a minimum lot area (80,000 square feet) for sites and structures in an R4 district (One-Family Residential District Estate). The Facility is located in an RA (Residential/Agricultural) district, not an R4 district. (Ex. 12, City Planner Doravari Declaration, ¶ 4.) Nonetheless, the Facility satisfies this minimum lot area requirement because the lot (parcel num. 350-031-28-2) is 61.19 acres, which is 2,665,436.4 sq. ft. (Ex. 3, Attachment M at Page 110 of 161.)

*Second*, the application for appeal asserts that CCMC § 9-2.102(b) prohibits the use of the Facility as an immigration detention facility because CCMC §§ 9-2.401 and 9-2.402 do not permit that use. This argument is also wrong.

[2] The application for appeal cites CCMC § 9-2.212(b), but that section is irrelevant because it applies only to the approval of CoreCivic's SPR for construction of the Facility in 1998, not the SPR Minor for use of the Facility as an immigration detention center. Moreover, CCMC § 9-2.212(b) allows only an "interested party" to file an appeal. The DND Coalition may not file an application for appeal because it is not an interested party for all the reasons above.

CCMC § 9-2.102(b) provides only that "[n]o structure shall be erected or altered or used Except as provided in this Chapter." CoreCivic has not erected or altered any structure, and its use of the Facility for immigration detention is a permitted use. Although CCMC § 9-2.401 permits certain uses, CCMC § 9-2.402 permits other uses with a "conditional use permit." Among these uses is "[g]overnment or quasi-government correction, probation or prison facilities and services." CCMC § 9-2.402(p). CoreCivic's use of the Facility for immigration detention services and USMS detention services is thus permitted under CCMC § 9-2.402(p) as a conditional use with CUP 97-01 and CUP Amendment 98-02. This is consistent with the Facility's historical use as well as the City's own interpretation of the Zoning Regulations.

The California City Final General Plan 2009-2028, adopted by the City Council in 2009, expressly recognizes that the "Facility houses over 2,300 Federal detainees awaiting deportation." (https://www.californiacity-ca.gov/CC/index.php/planning/final-general-plan-2009-2028/download, at page 5-15.) Between 2000 and 2010, the Facility housed criminal aliens in the custody of BOP who were subject to removal at the completion of their sentences. (Ex. 1, ¶¶ 10–12.) And between 2010 and 2013, the Facility housed more than 9,500 civil immigration detainees in the custody of ICE. (*Id.*, ¶ 14.) Indeed, those immigration detention services were performed pursuant to an IGSA between the City and ICE. (Ex. 1, ¶¶ 13–14; Ex. 12, ¶ 8 and Exhibit B at 2 and 4 of 22.) The City did not require CoreCivic to obtain a new CUP for any of these populations, nor has it ever found that CoreCivic needs a new one.

The City's interpretation is also consistent with the interpretations of both Kern County and the State. The Kern County Assessor classifies the Facility with a use code of "1716 – Detention Facility/Prison." (Ex. 3, ¶ 32 and Attachment M at Page 110–111 of 161.) And the Certificates of Occupancy issued to the Facility by the State Fire Marshal list the occupancy classification as Institutional Group I-3. (Ex. 3, ¶ 25.)

Moreover, the California Building Code, which CCMC § 8-1.01 adopts as the Municipal Code for Building and Safety, defines Institutional Group I-3 occupancy to "include buildings or portions of buildings and structures that are inhabited by more than five persons who are under restraint or security." Cal. Building Code § 308.4. The Building Code further provides that Institutional Group I-3 "shall include, **but not be limited to** the following: Correctional Centers … **Detention centers** … Jails … Prisons … Temporary holding facility." *Id.* (emphasis added.)

Further, CUP 97-01 and CUP Amendment 98-02 have not expired. The City has never taken any action to revoke CUP 97-01 and CUP Amendment 98-02, which run with the land unless they expire or are revoked. *See* CCMC § 9-2502(a). CCMC § 9-2.2502(c) further provides that the City must provide due process, which includes notice of revocation and a revocation hearing, before revoking any CUP. These requirements are consistent with the City's constitutional due process obligations, which prohibit it from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. If the City were to attempt to revoke CUP 97-01 and CUP Amendment 98-02 without complying with these procedural requirements, the City would be in violation of not only its own regulations but also CoreCivic's constitutional rights.

The fact that the Facility's use for immigration detention is and has always been permitted as a conditional use with CUP 97-01 and CUP Amendment 98-02 is also consistent with the City Planner's conclusions after she investigated this matter and before she approved the SPR Minor:

> After the Facility's reopening in 2025, the City undertook a multi-step review to determine what, if any, local approvals were required and whether any such approvals would trigger the notice-and-hearing procedures in SB 29. This was a time-consuming process. The City searched physical archives and digital repositories across Planning, Building, Fire, and the City Clerk for historical records. The City gathered information from the operator regarding current operations and conducted inspections. Planning compared current operations against historical approvals located during the records search. Staff identified which, if any, administrative approvals (e.g., site plan review) could apply and whether issuing them would be covered by SB 29.
>
> [T]he City's investigation revealed the following. In January 1998, the City approved CUP 97-01 for a 2,304-bed 'prison facility' on approximately 70 acres of the 320-acre Property. In October 1998, the City approved CUP 98-02 expanding the permitted capacity by 512 beds. Neither CUP limits the entitlement to criminal custody or to a particular inmate/detainee population.
>
> Based on my review of the CUP terms, the records on file, and my understanding of current operations, the Facility's ongoing operations remain within the scope of CUP 97-01 and CUP 98-02 and within the RA-district allowance for 'correction, probation, or prison facilities and services.' The CCMC does not define 'prison.' In ordinary usage a prison is a 'place of confinement,' and immigration detention is a place of confinement of the same kind.
>
> This present determination is also consistent with past practice. In 2010, the City entered Intergovernmental Agreement ODT-10-0002 with the operator for federal detainee housing, including immigration detainees. That use occurred under the 1998 CUPs. So immigrant detention has historically been determined by the City to be a "prison facility" use conditionally permitted under the 1998 CUPs.

(Ex. 12, ¶¶ 5–8 and Exhibits A and B.)

*Third*, the application for appeal asserts that CCMC § 9-2.103 requires the City Council to resolve any ambiguity as to whether the Facility's use for immigration detention is in fact permitted before the SPR Minor and the Business License may be approved. This argument is also wrong because there is no ambiguity for the City Council to resolve. To the extent one may have existed

in the past, the City resolved it years ago by allowing CoreCivic to use and continue using the Facility for immigration detention. The City itself entered into an IGSA with ICE for the same use under CUP 97-01 and CUP Amendment 98-02 in 2010. (Ex. 1, ¶¶ 13–14; Ex. 12, ¶ 8 and Exhibit B at 2 and 4 of 22.)

*Fourth*, the application for appeal asserts that, even if the Zoning Regulations permit the Facility's use for immigration detention services, CoreCivic must follow the procedures under CCMC § 9-2.2501 to obtain a new CUP because it has somehow "converted" the Facility into an immigration detention facility. This argument improperly assumes that CoreCivic has exceeded the scope of CUP 97-01 and CUP Amendment 98-02 by using the Facility for immigration detention. As explained in detail above, that assumption is false.

*Fifth*, the application for appeal asserts that CCMC §§ 9-2.2803(b) and 9-2.2804(c) are enforcement provisions that require the City to revoke or suspend a business license if the licensee is operating without a business license. This argument is wrong for many reasons.

These enforcement provisions do not authorize the City to revoke or suspend CoreCivic's Business License. Instead, they are Zoning Regulations that authorize City employees to enter and inspect the premises (but not a building unless the owner consents) "affected by this chapter," *see* CCMC § 9-2.2803(b), and the City to file a lawsuit to enjoin a land use "contrary to this chapter," *see* CCMC § 9-2.2804(c).

Moreover, the "chapter" these sections refer to is the Zoning Regulations Chapter under "Title 9, Land Use and Development, Chapter 2 – Zoning." They are thus irrelevant to the City Clerk's issuance of CoreCivic's Business License, which is governed by the Business Licenses Chapter under "Title 3, Finance, Chapter 2, Revenue, Article 3, Fees and Charges, Division 2, Business Licenses."[3]

Nonetheless, CoreCivic is not in violation of the Zoning Regulations because both its historical and current use of the Facility for ICE immigration detention and USMS detention services is permitted with CUP 97-01 and CUP Amendment 98-02. If the City were to suddenly disallow that permitted use, CoreCivic's continued use of the Facility for that same purpose would still be deemed a "lawful nonconforming use" under CCMC § 9-2.2802(a). That section expressly provides that "a use of property existing after April 4, 1966, which was permitted by the then current zoning regulations of the City, but which was subsequently prohibited by the zoning regulations, is a lawful nonconforming use." *Id.*

The application for appeal also incorrectly cites to CCMC § 3-2.3.201, which prohibits the operation of a business "without having first obtained a license as provided in this Chapter," or "after the date of such suspension or revocation without having again procured a license." That

[3] The application for appeal also cites CCMC § 1-3.01, which is a general provision that prohibits any violation of the Municipal Code. But the penalties for a Code violation do not include revocation or suspension of a Business License. CCMC § 1-3.01(b).

section does not apply because CoreCivic had a business license to operate a detention facility. Although it expired, CoreCivic's business license was never suspended or revoked.

Nevertheless, these enforcement provisions of the Business Licenses Chapter do not permit DND to file an application for appeal to suspend or revoke the City Clerk's grant of the Business License. CCMC § 3-2.3.214 authorizes the City Clerk to examine a business premises and demand to see a business license, and to file a complaint if the Clerk finds a violation of the Business Licenses Chapter (not the Zoning Regulations).

CCMC § 3-2.3.208 also allows the City Clerk to suspend or revoke a license, but it requires the City Clerk to provide written notice of a suspension or revocation and permits the **licensee** to file an appeal to the City Manager. CCMC § 3-2.3.208(a) and (b). **If the licensee files an appeal,** the City Manager must then conduct a hearing to determine whether the licensee willfully or knowingly violated the Municipal "Code or laws of the State" or failed to follow their provisions. *See* CCMC § 3-2.3.208(c)(4) and (6).

These enforcement sections do not apply because the City Clerk did not suspend or revoke CoreCivic's Business License, and CoreCivic—the licensee—is not filing any such appeal. Nothing in these sections permits the DND Coalition—who is not the licensee—to file an appeal, even if the City Clerk suspended or revoked CoreCivic's Business License, much less to file an appeal of the City Clerk's **issuance** of the Business License. These enforcement provisions further prove that the DND Coalition has no right to appeal to further its abstract sociopolitical goal of ending federal immigration detention. Such concerns should be addressed with the federal government. They have no place in a neutral administrative hearing under the Municipal Code. The City should not inject itself into that political issue under the guise of a business-license appeal.

*Sixth*, the application for appeal misleadingly suggests that a judge in a pending federal lawsuit, *Gomez Ruiz v. ICE*, No. 3:25-cv-09757 (N.D. Cal.), "set forth" "egregious violations of state and federal law" at the Facility which, the application contends, "would require the City to automatically suspend or terminate any *existing* business license" and "should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance." Once again, the application misrepresents both the facts and the law.

As noted above, the enforcement provisions of the Business License Chapters authorize only the **licensee** to appeal the City Clerk's suspension or revocation of a license, and only upon notice and a hearing where the City Manager may uphold the suspension or revocation if he or she finds a violation of the Municipal "Code or laws of the State." CCMC § 3-2.3.208(a), (c)(4) and (6).

The *Gomez Ruiz* case does not allege that CoreCivic violated either the Municipal Code or the laws of the State. Rather, that case involves allegations that United States agencies and officials violated **federal** law by allegedly failing to provide constitutional conditions of confinement, legal access, and disability accommodations to detainees at the Facility. Nor has the judge found a violation of any law, municipal, state, or federal. The allegations in the *Gomez Ruiz* case are thus completely irrelevant to the City Planner's approval of the SPR Minor and the City Clerk's issuance of CoreCivic's Business License.

Significantly, the application for appeal fails to inform the City about another lawsuit pending in federal court where the DND Coalition has sued the City and CoreCivic based on allegations that the City violated the Municipal Code by approving the Facility's use for immigration detention and state law by not following the notice and hearing process applicable to building permits under SB 29 before issuing CoreCivic's Business License. *See Dignity Not Detention Coalition, et al. v. City of California City, et al.*, No. 1:25-cv-01292 JLT CDB (E.D. Cal.). Although the City Planner's approval of CoreCivic's SPR Minor and the City Clerk's issuance of the Business License were not subject to SB 29, the City voluntarily complied with that statute out of an abundance of caution in defending against the DND Coalition's lawsuit. Because the City's approvals of CoreCivic's SPR Minor and issuance of the Business License after complying with SB 29 moots those claims, the DND Coalition is improperly using this application for appeal to avoid their dismissal. The City should not reward the DND Coalition's litigation tactic to use this application for appeal as a pretext to save its claims against the City and CoreCivic in that federal lawsuit.

## IV. Conclusion.

For the above reasons, the DND Coalition has no right to file this application for appeal, and the reasons for an appeal are misleadingly based on false facts and misapplication of the law. CoreCivic respectfully requests that: (1) the City Planning Commission deny the application for appeal of the City Planner's approval of the SPR Minor; and (2) the City Manager deny the application for appeal of the City's Clerk's issuance of the Business License.

Sincerely,

Daniel P. Struck

DPS/KLN/eap

cc: Brandon A. Sanchez *(via email only)*

Enclosures: As stated

# ATTACHMENT I

ATTACHMENT I

**PLANNING COMMISSION MEETING**
**OF THE**
**CITY OF CALIFORNIA CITY**

**TUESDAY, AUGUST 18, 2026 @ 6:00PM**
**VIDEO CONFERENCE/IN-PERSON**
**21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505**

If you need special assistance to participate in this meeting, please contact the planning department at (760) 373-7141 or via email at planning@californiacity-ca.gov. Notification 48 hours prior to the meeting will enable the city to make reasonable arrangements to ensure accessibility to this meeting. (28 CFR 35.102-35.104 American Disabilities Act Title II).

**Zoom**

1. Public may join Planning Commission Meeting live via Zoom:

- https://us06web.zoom.us/j/86309204817
- Meeting ID: 863 0920 4817

2. One tap mobile

- ++16694449171,86309204817# US
- +17193594580,86309204817# US (Denver)

3. Public can dial into the Zoom line:
   - One tap mobile: +16694449171,86309204817# US
   - +17193594580,86309204817 # US
   - Dial the above number and enter the meeting ID: 89958907490

**Granicus**

1. Agenda can be viewed via Granicus: https://californiacity.granicus.com/viewpublisher?view_id=1
2. Public may eComment on agenda items via Granicus https://www.californiacity-ca.gov/CC/images/Ecomment_Instruction_Guide_2020.pdf

**City Website**

1. Agenda can be viewed on the City's website.
2. Recording of this meeting will be made available on the City's website.

**LATE COMMUNICATIONS:** Following the posting of the agenda, any emails, writings, or documents that the public would like to submit to the Commission must be received by the Secretary no later than 3:00 p.m. the day prior to the scheduled meeting.

****At this time, please take a moment to silence your cell phones****

1. **CALL TO ORDER**

2. **PLEDGE OF ALLEGIANCE/INVOCATION**

3. **ROLL CALL**

**Chairman** Brottlund
**Commissioner** Cantrell
**Commissioner** Coleman
**Commissioner** Perez
Commissioner White

4. **OATH OF OFFICE**

5. **ADOPT AGENDA**
Adopt Agenda: August 18, 2026.

6. **DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
Disclosure by Commissioners of site visits and ex-parte contact for items on the agenda.

7. **PUBLIC BUSINESS FROM THE FLOOR**
This portion of the meeting is reserved for the public to address the Planning Commission on any matter not on the agenda and over which the Planning Commission has jurisdiction. Comments are to be limited to three (3) minutes. The Planning Commission will receive the comments but cannot engage in back-and-forth discussion with the public or make any decision. The Planning Commission may direct staff to bring the item back to a future agenda for discussion.

8. **CONSENT CALENDAR**
**CC1:** Meeting Minutes 05/05/2026, 7/72026

9. **DEPARTMENT REPORT**

10. **COMMISSIONER COMMENTS**
This portion of the meeting is reserved for Planning Commissioners to present information, announcements and items that have come to their attention. Short staff responses may be appropriate. The Planning Commission will take no formal action. A Planning Commissioner may request to calendar an item for consideration at a future meeting or refer an item to staff.

**Chairman** Brottlund
**Commissioner** Cantrell
**Commissioner** Coleman
**Commissioner** Perez
Commissioner White

**ADJOURNMENT**

**AFFIDAVIT OF POSTING**: This agenda was posted on all official City bulletin boards, the City's website and agenda packets were completely accessible to the public at City Hall at least 72 hours (for special meetings 24 hours), prior to the Planning Commission Meeting. *Planning Department*

# CITY OF CALIFORNIA CITY
# PLANNING COMMISSION MEETING MINUTES
**July 7, 2026**

**CALL TO ORDER**
Chair Brottlund called the meeting to order at 6:02 p.m.

**ROLL CALL**
Present: Chair Brottlund; Commissioner Cantrell; Commissioner Coleman; Commissioner Perez.

Commissioner Perez was sworn in.

**MOTION CARRIED 4-0 TO APPOINT COMMISSIONER COLEMAN AS VICE CHAIR.**

**MOTION CARRIED 3-1 TO ESTABLISH A TWO-MINUTE PUBLIC COMMENT LIMIT (BROTTLUND, COLEMAN, PEREZ - YES; CANTRELL - NO).**

**PLEDGE OF ALLEGIANCE AND INVOCATION**
Pledge of Allegiance led by Chair Brottlund; invocation by Pastor Rob Troutman.

**ADOPT THE AGENDA**
**MOTION CARRIED 4-0 TO ADOPT THE AGENDA.**

**DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
Commissioners Perez and Cantrell reported no site visits. Vice Chair Coleman disclosed visiting the exterior of the subject site.

**PUBLIC BUSINESS FROM THE FLOOR**
Public comment was received. No action taken.

**CONSENT CALENDAR**
None.

**PUBLIC HEARING**
**PH 1. Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 - California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02**

**MOTION TO CONTINUE THE HEARING FOR 30 DAYS FAILED ON A 2-2 VOTE (CANTRELL, COLEMAN - YES; BROTTLUND, PEREZ - NO).**

Staff Report: Planning Director Anu Doravari presented the item and recommended denial of the appeal and adoption of Resolution PC 2026-07-07.

The Commission received presentations from the appellant and applicant.

**RECESS / RECONVENE**
Chair Brottlund called a five-minute recess. The meeting subsequently reconvened.

Written and oral public comments were received.

Vice Chair Coleman was absent for the final action.

**MOTION CARRIED 2-1 TO ADOPT RESOLUTION PC 2026-07-07, DENY THE APPEAL, AND UPHOLD THE PLANNING DIRECTOR'S APPROVAL OF SPR 25-09 (BROTTLUND, PEREZ - YES; CANTRELL - NO; COLEMAN - ABSENT).**

**DEPARTMENT REPORT**
None.

**COMMISSIONER COMMENTS**
No action taken.

**ADJOURNMENT**
**MOTION CARRIED 3-0 TO ADJOURN (BROTTLUND, CANTRELL, PEREZ - YES; COLEMAN - ABSENT).**

# ATTACHMENT J

ATTACHMENT J

**Mike Giardina**

| | |
|---|---|
| **From:** | Sean Grayson <sgrayson@californiacity-ca.gov> |
| **Sent:** | Thursday, July 9, 2026 1:44 PM |
| **To:** | jlaner@ilrc.org; gruiz@ilrc.org; dstruck@strucklove.com |
| **Cc:** | John Maier; City Clerk; Michael Torres; Anu Doravari; Lilia Garcia; John.Malloy@corecivic.com; Anne Orcutt; Elaine Percevecz; Ashley Werner; Abigail Blodgett |
| **Subject:** | Decision of City Manager Regarding Appeal of Issuance of a Business License |
| **Attachments:** | City Manager Appeal Decision - Business License Issuance CoreCivic - 7-9-26.pdf |

Dear Ms. Laner, Ms. Ruiz, and Mr. Struck-

Attached please find my decision regarding Dignity Not Detention Coalition's appeal of California City's February 26, 2026, issuance of a Business License to CoreCivic, Inc.

*Respectfully,*

*Sean Grayson*
City Manager
*City of California City*
*21000 Hacienda Blvd*
*California City, CA 93505*

*Desk: (760) 373-7170*
*City Cell: (760) 338-1317*
*Fax: (760) 373-7809*
*Email: sgrayson@californiacity-ca.gov*
*City Web: www.californiacity-ca.gov*

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**

Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**CITY MANAGER**

**July 9, 2026**

***DELIVERED VIA U.S. MAIL & ELECTRONIC MAIL:***
jlaner@ilrc.org; gruiz@ilrc.org; dstruck@strucklove.com

Jehan Laner & Grisel Ruiz
Dignity Not Detention Coalition
268 Bush Street, #3933
San Francisco, CA 94104

Daniel P. Struck
Struck Love Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226

**RE: Decision of City Manager Regarding Dignity Not Detention Coalition's Appeal of California City's February 26, 2026, Issuance of a Business License to CoreCivic, Inc.**

Dear Ms. Laner, Ms. Ruiz, and Mr. Struck:

On July 7, 2026, at 3:30 p.m. P.S.T. an administrative appeal hearing was held in the above referenced matter using the online platform Zoom and in person at California City's City Hall, City Council Chambers located at 21000 Hacienda Blvd., California City, CA 93505. The administrative appeal hearing was conducted pursuant to the authority and process provided under California City Municipal Code ("CCMC") Chapter 4 (Appeals and Review). City Clerk John Paul Maier appeared on behalf of the City of California City ("City"). Jehan Laner and Grisel Ruize, as legal counsel, appeared on behalf of the Appellant and Daniel P. Struck, as legal counsel, appeared on behalf of the Applicant. Pursuant to CCMC Section 1-4.09(b), the City Manager served as the hearing officer.

After reviewing all of the evidence submitted by the City, the Appellant, and the Applicant prior to and at the administrative appeal hearing as well as the Appellant's supplemental briefing, and based upon a preponderance of that evidence, this hearing officer upholds the City Clerk's February 26, 2026 issuance of a Business License to CoreCivic, Inc., and denies Appellant's appeal.

**<u>Scope of Hearing Officer's Review at Administrative Appeal Hearing</u>**

Pursuant to CCMC Section 1-4.04(d), at the administrative appeal hearing, the hearing officer was charged with conducting a de novo hearing based upon the following evidence:

(1) Any relevant evidence, including staff reports, etc., submitted at the time of the prior decision and at the appeal hearing; and

(2) Findings, if any, and decision of the person or body whose decision is being appealed, but the person or body hearing the matter shall not be bound by the findings and decisions of the original decision being appealed.

**Burden of Proof at the Administrative Appeal Hearing**

Under CCMC Section 1-4.04(e), because the appeal involved the issuance of a Business License the Appellant had the burden of proof to support the overturning of the prior decision.

**Hearing Officer's Decision**

Based upon a preponderance of the evidence, the Appellant failed to show that the City Clerk erred or did not comply with the requirements of the CCMC when s/he issued a Business License to CoreCivic, Inc. on February 26, 2026. Thus, the appeal filed by the Appellant is denied and the issuance of the Business License is upheld.

**Right of Appeal**

This decision may be appealed by any affected person within seven (7) days of the hearing officer's decision pursuant to CCMC Sections 1-4.04(a), 1-4.05(b) and 1-4.09(c).

Respectfully Submitted,



Sean Grayson
City Manager
City of California City

# ATTACHMENT K

ATTACHMENT K

ilrc IMMIGRANT LEGAL RESOURCE CENTER
TEACHING, INTERPRETING, AND CHANGING LAW SINCE 1979

EXECUTIVE DIRECTOR
Eric Cohen

San Francisco
Washington, D.C.
San Antonio
Houston

ilrc@ilrc.org
www.ilrc.org

July 9, 2026

***U.S. mail and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, City Attorney Ponto, and City Clerk,

On behalf of the Immigrant Legal Resource Center and the Dignity Not Detention Coalition, I write to appeal the decision by the Planning Commission to affirm the approval of a site plan review and all related approvals in favor of CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 1-4.09(d) of the California City Municipal Code ("CCMC"). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business

cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.

- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, but the Office of the Attorney General in its comment letter to the City, and past public comments, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $461.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of the appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner

cc: Brandon Sanchez

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EMS

From: Jehan Laner
Immigrant Legal Resource Center
268 Bush St # 3933
San Francisco, CA 94104

To: City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

# FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

JEHAN M LANER
[redacted]
Immigrant Legal Resource Center
Attn: Jehan
268 Bush St. # 3933
San Francisco, CA 94104

241

Date 7/9/2026

16-7838/3220
0

Pay to the Order of City of California City $ 461.00

Four hundred and sixty one xx/100 Dollars

F&A FEDERAL CREDIT UNION
2625 Corporate Place, Monterey Park, CA 91754-7645

For California City Appeal Fee - SPR Minor

⑆322078383⑆ 0000040393563⑈0241

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

GUARANTEED* ▪ TRACKED ▪ INSURED

...ight is 70 lbs. For ... shipments, the maximum weight is 20 lbs.

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EMS

From: Jehan Laner
Immigrant Legal Resource Center
268 Bush St #3933
San Francisco, CA 94104

To: City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

UNITED STATES POSTAL SERVICE. Retail

E

US POSTAGE PAID
$35.90
Origin: 94610
07/09/26
0555040017-28

FLA
ONE RAT
To schec
s

PRIORITY MAIL EXPRESS®

JELAN LANER
IMMIGRANT LEGAL RESOURCE CEN
#3933
268 BUSH ST
SAN FRANCISCO CA 94104
(415) 725-1417

0 Lb 1.90 Oz
RDC 07

US

SCHEDULED DELIVERY DAY: 07/13/26 06:00 PM

VISIT
ORDER

C007

SHIP TO:
CITY OF CALIFORNIA CITY HALL
21000 HACIENDA BLVD
CALIFORNIA CITY CA 93505-2259

PS

USPS TRACKING® #

9570 1110

GUARANTEED* ▪ TRACKED ▪ INSURED

# ATTACHMENT L

ATTACHMENT L

TEACHING, INTERPRETING, & CHANGING LAW SINCE 1979

EXECUTIVE DIRECTOR
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

July 10, 2026

***FedEx and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, City Attorney Ponto, and City Clerk,

On behalf of the Immigrant Legal Resource Center and the Dignity Not Detention Coalition, I write to appeal the decision by the City Manager to affirm the approval of the issuance of a business license and all related approvals to CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 1-4.09(c) of the California City Municipal Code ("CCMC"). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business

cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.

- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, but the Office of the Attorney General in its comment letter to the City, and past public comments, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $461.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of the appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner
Immigrant Legal Resource Center

cc: Brandon Sanchez

JEHAN M LANER
[redacted]

268 Bush St., # 3933
San Francisco, CA
94104

242

Date 7/10/2026

16-7838/3220
0

Pay to the Order of City of California City $ 461.00

Four hundred and sixty one xx/100 Dollars

Security features are included. Details on back.

©Clarke American

F&A FEDERAL CREDIT UNION
2625 Corporate Place, Monterey Park, CA 91754-7645

For California City Appeal Fee
Business License

MP

⑆322078383⑆ 000004039356 3⑈0242

FedEx

Envelo

Recycle

ORIGIN ID:CCDA (415) 725-1417
JEHAN REYESLANER

268 BUSH STREET
3933
SAN FRANCISCO, CA 94104
UNITED STATES US

SHIP DATE: 11JUL26
ACTWGT: 0.15 LB
CAD: 6571900/ROSA2710

TO CITY OF CALIFORNIA CITY
CITY HALL
21000 HACIENDA BOULEVARD

CALIFORNIA CITY CA 93505
(000) 000-0000
INV:
PO: REF: DEPT:

FedEx
Express
E

TRK# 0201 8742 5985 3875

TUE - 14 JUL 5:00P
** 2DAY **

SP WJFA

93505
CA-US BUR

Part # 156297-435 RRDB EXP 05/27

here.

# ATTACHMENT M

ATTACHMENT M

**Mike Giardina**

**From:** California City, CA <californiacity@public.govdelivery.com>
**Sent:** Friday, August 21, 2026 8:30 PM
**To:** Mike Giardina
**Subject:** Agenda for CITY COUNCIL MEETING on Tuesday, August 25, 2026 at 5:00 PM PDT has been posted

**LATEST MEETING AGENDA AVAILABLE**

CITY COUNCIL MEETING

Tuesday, August 25, 2026 at 5:00 PM PDT

VIEW AGENDA

SUBSCRIBER SERVICES:

Manage Subscriptions | Unsubscribe All | Help

This email was sent to mgiardina@strucklove.com using Granicus Communications Cloud on behalf of: California City, California · 21000 Hacienda Blvd · California City, CA 93505

August 25, 2026

# CITY OF CALIFORNIA CITY

Marquette Hawkins
**MAYOR**

Jim Creighton
**MAYOR PRO TEM**

Shawn Bradley
Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**CITY MANAGER**

# AGENDA

***CITY COUNCIL/ HOUSING AUTHORITY/ SUCCESSOR AGENCY***
***REGULAR MEETING TUESDAY, AUGUST 25, 2026 @ 4:00 PM***
***COUNCIL CHAMBERS***
***21000 HACIENDA BLVD., CALIFORNIA CITY, CA 93505 &***
***VIA ZOOM***

If you need special assistance to participate in this meeting, contact the City Clerk at (760) 373-7140 or via email at cityclerk@californiacity-ca.gov. We request a 24-hour notification prior to the meeting in order for the City to make reasonable arrangements to ensure accessibility. (28 CFR 35.102-35.104 American Disabilities Act Title II)

**Zoom instructions and notes:**

Web Link: https://us06web.zoom.us/j/82424125440
Meeting ID: 824 2412 5440
Passcode: 288834

1. Public can dial into the Zoom line:
   a. One tap mobile: +16694449171,87254527178# US
   b. Dial the following number: +1 564 217 2000 US
2. Comments
   a. Public must join Zoom Webinar to comment
   b. Keep your mic on Mute until you are requested to speak
   c. Use the "Raise your Hand" button to request to speak or,
   d. Send a chat request to the City Clerk for a request to speak, and the City Clerk will unmute you.
   e. When requested to speak, state your name for the record
   f. Re-mute when your time to speak has ended

# CITY OF CALIFORNIA CITY

*The public is urged to listen to the meeting in a quiet place to avoid background noise. We also request public to MUTE your audio device when not commenting to avoid disruption during meeting.*

***Please take this time to turn off your cell phones ***

## CLOSED SESSION 3:00 PM

**CALL TO ORDER**

**ROLL CALL**
Councilmembers: Bradley, Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

**ADOPT THE AGENDA**

**PUBLIC COMMENT**
Members of the public are welcome to address the City Council **ONLY** on those items listed on the Closed Session agenda. Each member of the public will be given (3) three minutes to speak

**CLOSED SESSION**

CS 1. **CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION**
**Significant exposure to litigation pursuant to Government Code Section 54956.9(d)(2):**
Two cases.

CS 2. **CONFERENCE WITH LEGAL COUNSEL—EXISTING LITIGATION**
**Government Code Section 54956.9(d)(1):**
California City Miscellaneous Employees' Association v. City of California City
CSMCS Case Nos. ARB-24-0216, ARB 24-0217

CS 3. **PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE**
**Government Code Section 54957**

CS 4. **PUBLIC EMPLOYMENT**
**Government Code Section 54957 (Two positions)**
*Title:* Acting City Manager
*Title:* Assistant to the City Manager

**REPORT OUT OF CLOSED SESSION**

**CITY COUNCIL CONVENES TO REGULAR MEETING**

## REGULAR MEETING 4:00 PM

**CALL TO ORDER**

# CITY OF CALIFORNIA CITY

## PLEDGE OF ALLEGIANCE / INVOCATION

## ROLL CALL –

Councilmembers: Bradley, Clark, Smith, Mayor Pro Tem Creighton, Mayor Hawkins

## DEPARTMENT REPORTS

| | |
|---|---|
| City Clerk | Animal Control |
| Code Enforcement | Finance |
| Planning | Police Department |
| Public Works | Treasurer |
| City Manager | Cannabis |

## CITY CLERK REPORTS/RECEIVED COMMUNICATIONS

J.M. Powers – August 18, 2026

## CIVIC/COMMUNITY/ORGANIZATION ANNOUNCEMENTS

## PUBLIC BUSINESS FROM THE FLOOR / PUBLIC COMMENT

This portion of the meeting is reserved for the public to address the City Council on any matter **NOT on this agenda** and over which the City Council has jurisdiction. Please state your name for the record and limit your comments to (3) three minutes. The City Council will receive the comments but cannot engage in back-and- forth discussion with the public or make any decision. The City Council can direct staff to bring the item back to a future agenda for discussion.

## PUBLICHEARING

**PH 1.** Subject: **A Public Hearing for Adoption of the Fiscal Year 2026/27 Final Budget by Adoption of the Following Resolutions:**

1) **Resolution No. 2026-3270: A Resolution of the City Council of the City of California City, California Adopting the Fiscal Year 2026/27 Final Budget and Authorized Staffing Levels**
2) **Resolution No. 2026-3271: A Resolution of the City Council of the City of California City, California Adopting the Fiscal Year 2026/27 Salary Schedule (BUDGET DOCUMENT)**

   **A.** Open Public Hearing
   **B.** Staff Report: Sean Grayson, City Manager
   Kenny Cooper, Finance Manager
   **C.** Public Comment
   **D.** Close Public Hearing
   **E.** Discussion
   **F.** **Recommended Action**: Staff recommends that the City Council
      1. Conduct Public Hearing for the adoption of Resolutions 2026-3270 and 2026-3271
      2. Close the public hearing.
      3. Adopt Resolutions 2026-3270 and 2026-3271

## CONSENT CALENDAR

### WAIVER OF FULL READING OF RESOLUTIONS AND ORDINANCES

Consideration to waive full-text reading of all Resolutions and Ordinances by single motion made at the start of each meeting, subject to the ability of the City Council / Agency to read the full text of selected resolutions and ordinances when the item is addressed by subsequent motion. All items on the consent calendar are considered routine, and non-controversial and will be approved by (1) one motion if no member of the council, staff, or public wishes to comment or ask questions. Public comments are to be limited to (3) three minutes. Roll call vote required.

# CITY OF CALIFORNIA CITY

**CC 1.** Approve City Check Register dated 08/07/2026-08/20/2026

**CC 2.** Staff Report: Joe Barragan, Public Works Director
Subject: **Resolution No. 2026-3272: A Resolution of the City Council of the City of California City Authorizing the Submittal of an Application, Acceptance of an Allocation of Funds, and Execution of a Grant Agreement with the California Department of Transportation, for an Airport Improvement Program (AIP) Matching Grant**
**Recommendation:** It is recommended that the City Council adopt the resolution approving the AIP matching grant

**CC 3.** Staff Report: Joe Barragan, Public Works Director
Subject: **Resolution No. 2026-3273: A Resolution of the City Council of the City of California City, Approving Program Supplement Agreement for Federal Projects No. 09-5399F15, for the California City Blvd. Shoulder Paving From Baron Blvd. to Maverick St. – CML – 5399 (034) Project and Authorizing the City Manager and/or Public Works Director to Sign and Execute the Agreement**
**Recommendation:** It is recommended that the City Council adopt the resolution approving the program supplement agreement

**CC 4.** Staff Report: Victor Ponto, City Attorney
Subject: **Resolution No. 2026-3276: A Resolution of the City Council of the City of California City, Adopting the New Position of Assistant to the City Manager and Job Description**
**Recommendation:** It is recommended that the City Council adopt the resolution establishing the position and job description for the position of Assistant to the City Manager

## CONTINUED BUSINESS

**CB 1.** Staff Report: Joe Barragan, Public Works Director
Subject: **Resolution No. 2026-3274: A Resolution of the City Council of the City of California City Accepting an FAA Grant for the Municipal Airport Runway 6-24 Resealing Project; Authorizing the City Manager and Public Works Director to Execute the Grant Agreement on Behalf of the City; Certifying the Availability of the City's Required Matching Funds; Approving a Construction Agreement with Nagle Earthworks, Inc. in the Amount of $282,614.99; and Authorizing BHT Engineering, Inc. to Provide Construction Management and Grant Closeout Services for the Project**
**Recommendation:** It is recommended that the City Council adopt the resolution to implement the airport runway resealing project and grant funding

**CB 2.** Staff Report: Joe Barragan, Public Works Director
Subject: **Resolution No. 2026-3275: A Resolution of the City Council of the City of California City, California Adopting the 2025 Urban Water Management Plan**
**Recommendation:** It is recommended that the City Council adopt the resolution to adopt the UWMP

**CB 3.** Staff Report: Sean Grayson, City Manager
Subject: **Consideration of Appointment of Two Community Members to Serve on the Potentially Dangerous or Vicious Dog Review Board**
**Recommendation:** It is recommended that the City Council appoint two community members to the Board

## NEW BUSINESS

**NB 1.** Staff Report: John Paul Maier, Deputy City Manager
Subject: **Appeal of the City Manager's Decision Denying the Appeal of the Deputy City Manager Approval of the Business License Issued to CoreCivic for the California City Correctional Facility, 22844 Virginia Boulevard**

# CITY OF CALIFORNIA CITY

**Recommendation:** Staff recommends that the City Council: 1) Receive and file the informational update regarding the issuance of CoreCivic Inc.'s 2026 Business License; 2) Conduct the Appeal Hearing; and 3) Uphold the decision of the City Manager denying the appeal and uphold the decision by the City Clerk for the Issuance of CoreCivic Inc.'s 2026 Business License

**NB 2.** Staff Report: Anu Doravari, Planning Director
Subject: **Appeal of Planning Commission Resolution No. PC 2026-07-07 Denying the Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02**
**Recommendation:** Staff recommends that the City Council deny the appeal and uphold the Planning Commission denial of the Planning Director's February 26, 2026, approval of SPR 25-09 as issued

## COUNCILMEMBER COMMENTS, AGENDA REQUESTS, AND AB1234 REPORTS

This portion of the meeting is reserved for council members to present information, announcements, and items that have come to their attention. The Brown Act precludes Council, staff, or public discussion. Short staff responses are appropriate. The Council will take no formal action. A Council member may request the City Clerk to calendar an item for consideration at a future meeting or refer an item to staff.

## ADJOURNMENT

**AFFIDAVIT OF POSTING-** August 21, 2026

I, John Paul Maier, Deputy City Manager / City Clerk for the City of California City, California, DO HEREBY CERTIFY that the foregoing notice was posted on all official City bulletin boards and the City's website at least 72 hours prior to the meeting in compliance with the provisions of the Brown Act.

**DR – CITY CLERK**

# COUNCIL AGENDA ITEM

**August 25, 2026**

**TO:** **Mayor and City Council**

**FROM:** **John Paul Maier, MBA, MMC, Deputy City Manager / City Clerk**

**SUBJECT:** **City Clerk's Report**

The City Clerk Department has produced the following activity statistics, reflecting its ongoing administrative and legislative support functions:

1. **Public Records Act Requests:** The department responded to 19 Public Records Act requests, with five fully completed requests. This reflects the City Clerk's commitment to transparency, compliance, and timely public access to information.
2. **Notice of Hearings:** Two Appeal Hearings were coordinated and scheduled for August 25, 2026, related to CoreCivic Inc.
3. **Notice of Business License Renewals:** Over 800 notices for business license renewals were sent to business owners, and over 400 business license renewals have been processed, ensuring compliance with licensing requirements.
4. **Special Election Update and General Election Update:** The Nomination Period was open until August 7, 2026, at 5:00 p.m. The Nomination Period for the At-Large City Council Member Seat was extended to August 12, 2026, at 5:00 p.m. Candidates were encouraged to make an appointment with the City Clerk for a brief orientation and to receive Nomination Forms. The open seats include City Council Member Districts One and Three, City Council Member At-Large, Mayor, and City Treasurer. A total of 12 candidates received nomination papers and a total of 10 candidates qualified to be on the ballot for the November 3, 2026 Elections. More information can be found on who is running at: https://www.californiacity-ca.gov/CC/index.php/departments-1/city-clerk
5. The County has provided that the Transient Occupancy Tax (TOT) was designated as Measure J on the ballot for the November 3, 2026 General Election. More information, including frequently asked questions, can be found on the City's website: https://www.californiacity-ca.gov/CC/images/Measure_J_Website_Information_Sheet.pdf
6. Over the next two months, the City Clerk's Office will be providing additional information, including a community presentation to the public for Measure J and additional Election information.

These statistics highlight the City Clerk Department's essential role in maintaining legislative records, promoting transparency, and providing efficient administrative services to the public and other City departments.

**DR - CITY MANAGER**

# COUNCIL AGENDA ITEM

**August 25, 2026**

**TO:** **Mayor and City Council**

**FROM:** **Sean Grayson, City Manager**

**SUBJECT:** **City Manager's Report**

**August 11, 2026 City Council Meeting AB1234, Questions and Comments Follow-Up:**

At the August 11, 2026, City Council meeting, there were questions and direction provided by the City Council. Below, please find the answers and responses to be shared with the City Council and the community.

The following is an update on information, questions, or requests that came from agendized items:

- **Can a better description of the items being purchased by Public Works be included in the check register?**
  - Director Barragan will work with Finance to add additional detail to provide clarity to the purchased items.

- **Can information about the crack seal scheduling be put on the website?**
  - Director Barragan will work to place the information on the website and update it as needed.

- **Can staff work with REACH on possible future tree installations near the splash pad?**
  - Staff will reach out and see what can be done.

- **Provide the GES Mega Seven contract to the City Council.**
  - A hard copy and digital copy of all contracts will be available to the City Council. The specific GES Mega Seven contract is publicly available beginning on page #240 at the following link for the May 12, 2026, City Council meeting agenda packet: https://granicus_production_attachments.s3.amazonaws.com/californiacity/500e2a31946d06784f7e4762aedc90950.pdf

- **Direction on elements of the Debt Collection Services RFP including language, hourly billing, certified debt collectors, no complaints under the FDCPA, and skip tracing abilities.**
  - Staff will include the changes in the RFP and it will be released the week of August 17.

- **The sooner the better for scheduling of the SDI Advisory Committee meeting.**
  - An email was sent the night of August 11 to the committee members and the committee counsel to find a date that will work for all parties.

## DR - CITY MANAGER

**The following is an update on information, questions, or requests that came from AB1234 reports:**

*Councilmember Bradley*

- **Can the save the lake information be removed from the City website?**
  - Staff will remove this section from the website.

- **Request to agendize the topic of "Public Safety" at a future City Council meeting.**
  - Staff will review when and how this might be agendized at a future meeting.

- **Request to agendize the topic of private wells and water access in the city at a future City Council meeting.**
  - Staff will review when and how this might be agendized at a future meeting. Private wells are not allowed by the City's Municipal Code. Even if the code were changed the State Waterboard has indicated they would not allow private wells in the City.

- **Reminder of the Councilmember's town hall meeting .**
  - August 23 from 6-8pm virtually with information available on social media.

*Councilmember Clark*

- **Comments about the work of Council and the collective desires of the Council and community.**
  - No staff action

*Councilmember Smith*

- **Enforcement or lack of enforcement of cannabis odor is not fair to the residents, specific complaint about North Neuralia building venting odor through upon windows.**
  - This has been referred to Code Enforcement and the Cannabis Manager.

- **Request on the status of the Kern County Hazardous Vegetation Ordinance being brought to California City.**
  - A review of the County ordinance and how it might be applied in Cal City is anticipated to be presented at the September 8 City Council meeting.

- **The City needs to do better for weed abatement on its own properties, especially CCB.**
  - No staff action.

- **Have all contracts been made available to the City Council and will they be for the new City Manager.**
  - Yes for both.

- **Request for action to abate trash where new houses are being built in the 8800 block of Glade.**
  - This has been referred to Code Enforcement

- **Request for process of election complaints.**

- Election complaints can be submitted to the City Clerk and/or the Kern County registrar of voters. Neither entity is the enforcement body for elections and potentially substantiated claims will be referred to the District Attorney for disposition.

- **Re-request for an update on the containers on Neuralia**
  - This is a continuing code enforcement action.

*Vice Mayor Creighton*

- **When with the City begin the education campaign for the November ballot measure to increase the Transient Occupancy Tax (TOT).**
  - The argument in favor of the measure is due the week of August 10. Staff will begin educational components once the argument has been posted. The Deputy City Manager will also share the education through newly created social media channels for the City.

- **Can the City put information about projects and infrastructure out to the people?**
  - The Deputy City Manager will share information through newly created social media channels for the City.

- **Comments on taking the job seriously and misinformation.**
  - No staff action

*Mayor Hawkins*

- **When will the CoreCivic appeal be?**
  - It is scheduled for August 25. The appellant may submit a request for a continuance at the meeting to a future date which the City Council can accept or decline at the hearing.

- **The City's submission was not included in the states' listing of Opportunity Zone 2.0 tracts.**
  - Staff will work with the City Council and other stakeholders for a writing campaign on the topic.

- **There are still active gofundme accounts for the victims of the dog attack in Central Park**
  - No staff action

- **When will the water wastewater updated fees be presented to the Council?**
  - Staff anticipates the public presentation of the new fees will either be in December 2026, or January 2027. The new fees would go into effect July 1, 2027.

- **When will the Self-Help Homeownership Opportunity Program (SHOP) workshop be?**
  - The meeting will likely be September 3 at the Strata Center.

**August 18, 2026 Special City Council Meeting Follow-Up:**

At the August 18, 2026, Special City Council meeting, there was a request to provide a written copy of the statement provided by the City at the meeting. The written statement is provided as an attachment to this report.

NB 1

# APPEAL STAFF REPORT

**August 25, 2026**

| | |
|---|---|
| **TO:** | **City Council** |
| **FROM:** | **John Paul Maier, MBA, MMC, Deputy City Manager / City Clerk** |
| **SUBJECT:** | **Appeal of the City Manager's Decision Denying the Appeal of the Deputy City Manager Approval of the Business License Issued to CoreCivic for the California City Correctional Facility, 22844 Virginia Boulevard** |

## BACKGROUND:

CoreCivic submitted its 2026 Business License renewal application to the City of California City (City) for processing on August 22, 2025. The renewal application was approved by the City on February 26, 2026, following approval of the related Site Plan Review. On February 27, 2026, Dignity Not Detention Coalition appealed the City's approval of CoreCivic Inc.'s Business License.

On July 7, 2026, the Appeal was heard by Sean Grayson, City Manager. The Applicant (CoreCivic) and the Appellant (Dignity Not Detention Coalition) provided brief presentations to Mr. Grayson. On July 9, 2026, Mr. Grayson sent Ms. Laner a letter of determination, providing the following Hearing Officer's Determination (see Attachment 4, the Decision of City Manager, for full text):

> *"Based upon a preponderance of the evidence, the Appellant failed to show that the City Clerk erred or did not comply with the requirements of the CCMC when s/he issued a Business License to CoreCivic, Inc. on February 26, 2026. Thus, the appeal filed by the Appellant is denied, and the issuance of the Business License is upheld."*

On July 13, 2026, Ms. Laner submitted an Appeal of the City Manager's decision (see attached for full text).

## DISCUSSION:

On February 26, 2026, City Planner Anu Doravari completed the review of the Site Plan Review application and issued the SPR determination letter. The determination letter was provided to John Malloy of CoreCivic on February 26, 2026.

Following the issuance of the SPR determination, staff completed the remaining administrative processing of the Business License renewal. Upon confirmation that the required Site Plan Review process had been completed, the City issued CoreCivic Inc.'s 2026 Business License on February 26, 2026.

The Business License was issued after completion of the required Site Plan Review process and in accordance with the City's administrative procedures for business license renewals or new applications, including but not limited to California City Municipal Code (CCMC) Title 3, Article 3, Division 2 (Business Licenses) beginning at Section 3-2.3.201. This process includes the standard submittal of the application and payment.

The City's approval of the Business License was subsequently appealed by the Dignity Not Detention Coalition under CCMC Section 1-4.08.

## STANDARD OF REVIEW AND BURDEN OF PROOF:

The Council hears this appeal de novo under CCMC section 1-4.04(d). Because this appeal involves the issuance of a license, CCMC section 1-4.04(e) places the burden of proof squarely on the Coalition to support overturning the prior decision. The City Manager already found the Coalition failed to carry that burden. To prevail here, the Coalition must identify a specific requirement of Division 2 of Chapter 3 that CoreCivic's application failed to satisfy, or a specific code provision the Clerk violated in issuing the license. It has identified neither.

## ANALYSIS:

Division 2 sets fixed, objective criteria for issuance. The applicant must file a verified application containing the items listed in CCMC section 3-2.3.203(b), pay the fee in advance under Section 3-2.3.211(b), and satisfy Section 3-2.3.211(d): "No license shall be issued unless the place of business and the purposes and methods of conducting such business, conform to health, fire and zoning regulations."

CoreCivic did all of that. Its application was complete and verified, the fee was paid, and building, fire, and planning staff each confirmed conformance with their respective regulations. Once those boxes were checked, nothing in the chapter authorized the City Clerk to withhold the license.

Whether the Site Plan Review was properly granted is attached to the land use approval, SPR 25-09. Under the CCMC, this business license appeal hearing is not properly a second forum for the SPR dispute. If, however, the Coalition prevails on the SPR appeal, the zoning conformance finding and predicate changes, and the City has revocation grounds under Section 3-2.3.208(c).

The Coalition has not identified any requirement of the licensing chapter that CoreCivic failed to meet or that the City Clerk failed to apply. The application was complete, the fee was paid, and building, fire, and planning each confirmed conformance. The City Clerk properly approved the business license as the code required.

## FISCAL IMPACT:

There is no fiscal impact associated with this appeal.

## HEARING NOTICE:

This item has been noticed in accordance with CCMC Section 1-4.08. The Notice was posted in three locations, including on the City's website.

## RECOMMENDATION:

Staff recommends that the City Council:

1. Receive and file the informational update regarding the issuance of CoreCivic Inc.'s 2026 Business License.
2. Conduct the Appeal Hearing
3. Uphold the decision of the City Manager denying the appeal and uphold the decision by the City Clerk for the Issuance of CoreCivic Inc.'s 2026 Business License.

## ATTACHMENTS:

Attachment 1: Business License Application
Attachment 2: Site Plan Review Issuance Letter
Attachment 3: Business License
Attachment 4: City Manager's Determination Letter
Attachment 5: Dignity Not Detention Coalition's Appeal Letter
Attachment 6: Notice of Public Hearing – Appeal of City Manager's Decision for the Issuance of CoreCivic Inc.'s 2026 Business License
Attachment 7: Dignity Not Detention Coalition's Correspondence – Request for Continuance

License # ____________
Approved by ____________
Processed by ____________
Processed On ____________

## Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

| | | | |
|---|---|---|---|
| Name of Business | California City Correctional Facility | Business Owner(s) Name | CoreCivic, Inc |
| Business Address | 22844 Virginia Blvd<br>California City, CA 93505 | Mailing Address | PO Box 2511<br>California City, CA 93504 |
| Business Phone # | (760) 491-8100 | Email Address | CalCityInvoices@corecivic.com |
| Nature of Business | Detention Facility/Prison | Planned Business Begin Date | |

Have you had a license for this business in the past? (●) Yes ( ) No

Do you own or rent the space (●) Own ( ) Rent (If rent, building owner/landlord ____________

Will the business have Annual Gross Income of $10.000 or more? (●) Yes ( ) No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # ____________
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-
(Required for Food Services – attach copy)

**Contractors:**
State License # ____________
State License Type ____________
(Required for Contractors)

Expiration Date ____________

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**

Inspection Date 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature

Date 08/22/2025

Printed Name Christopher Chestnut

**Clear Form** **Submit**

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**
Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**INTERIM CITY MANAGER**

# Site Plan Review 25-09

Determination Letter

To,
Marcelo Ariola
VP Real Estate
CoreCivic, Inc.
5501 Virginia Way, Suite 110,
Brentwood, TN 37027

Date: 26 February 2026

**Subject:** Approval of Site Plan Review (SPR 25-09) at 22844 Virginia Blvd, California City, CA 93505

Dear Marcelo Ariola,

The City of California City ("City") Planning Department has completed its review of Site Plan Review Application SPR 25-09 for the California City Corrections Facility located at 22844 Virginia Blvd (APN 350-031-02). Based upon review of the City's entitlement record and associated environmental documents, the following determination is issued.

**Background:**

The facility located at Virginia Boulevard was originally approved under Conditional Use Permit (CUP) 97-01, adopted via Resolution No. 01-98-1802, for a 2,304-bed "prison facility." In October 1998, the City granted CUP 98-02 to expand the permitted use by 512 beds.

The facility was inactive for approximately one year. Neither CUP 97-01 nor CUP 98-02 expires due to inactivity. Further, each CUP runs with the land and is valid unless and until revoked after a notice and opportunity to be heard according to applicable law.

On August 22, 2025, the facility applied for Site Plan Review approval "to operate in the same manner it has since it was constructed in 1999."

**Discussion:**

Pursuant to California City Municipal Code ("CCMC") section 9-2.212(b), the Planning Director reviews the proposal to determine whether it satisfies the requirements of this section. Section 9-2.212(d), further provides that "The site plan shall be approved if application shows the site will be developed in accordance with the requirements of the Municipal Code." As such, Section 9-2.212 directs ministerial approval when the proposal demonstrates Municipal Code compliance.

The Planning Department has reviewed the Site Plan Review Application and finds the use is authorized subject to compliance with CUP 97-01 and CUP 98-02. In particular, these permits collectively allow for a total bed count of 2,816.

The facility has satisfied the requirements of the Building & Safety Division and Fire Department.

According to CCMC section 9-2.402, "correction, probation or prison facilities and services" are permitted in the Residential Agricultural (RA) zone with a conditional use permit. The facility's current operations appear to fall within the scope of the use approved in CUP 97-01 and expanded by CUP 98-02. Therefore, the proposed use is a continuation of the previously entitled use.

**CEQA Determination:**

The Site Plan Review approval is a ministerial action limited to verification of compliance with objective Municipal Code standards and does not involve the exercise of discretion. Accordingly, this approval is exempt from the California Environmental Quality Act ("CEQA") pursuant to CEQA Guidelines Section 15268 (Ministerial Projects).

The facility and correctional facility use were previously evaluated in a certified Environmental Impact Report Supplement (SCH No. 97091045) adopted in connection with CUP 97-01 and a Mitigated Negative Declaration adopted in connection with CUP 98-02. This administrative approval implements existing entitlements and does not authorize any expansion or modification of the approved project.

**Planning Department Findings:**

The facility remains subject to the use category approved under CUP 97-01: Governmental or quasi-governmental correction, probation, or prison facilities and services. Pursuant to CCMC section 9-2.212(d), the application shows the site will be used in accordance with the requirements of the CCMC, and as such "the site plan shall be approved."

This Site Plan Review approval:

1. Implements CUP 97-01 and CUP 98-02 as reflected in the City's entitlement record;
2. Reflects a maximum occupancy of 2,816 beds;
3. Applies solely to the previously approved 70-acre facility footprint (APN 350-031-02); and

4. References the previously certified environmental documents and adopted mitigation programs associated with CUP 97-01 and CUP 98-02.
5. Affirms that the operator maintains ongoing compliance with all applicable mitigation measures contained in both adopted programs. The City reserves the right to conduct inspections and request documentation necessary to verify continued compliance.

Failure to comply with the conditions of CUP 97-01 or CUP 98-02 the adopted mitigation programs may result in enforcement action, including potential revocation proceedings in accordance with the CCMC and California law.

Any proposal to expand the development area, increase bed capacity beyond 2,816 beds, or materially modify the approved use shall require amendment to the applicable Conditional Use Permit(s) and compliance with CEQA.

This letter constitutes the Planning Department's formal approval of SPR 25-09 consistent with the above-referenced entitlements and environmental determinations.

Anu Doravari

Sincerely,
Anu Doravari
Planning Director
Planning Division
Community Development
City of California City

THIS DOCUMENT HAS A TRUE DOCUCHECK™ WATERMARK AND VISIBLE FIBERS DISCERNIBLE FROM BOTH SIDES

NOT TRANSFERABLE

ACCOUNT NUMBER
[redacted]

**CITY OF CALIFORNIA CITY**
**21000 HACIENDA BLVD**
**CALIFORNIA CITY, CA 93505-2293**
**BUSINESS LICENSE CERTIFICATE**

**POST IN CONSPICUOUS PLACE**
**AT BUSINESS LOCATION**

**EXPIRATION DATE**
06/30/2026

COPY

Business Address: 22844 Virginia Blvd
California City CA 93505

CONTACT (S) None

BUSINESS NAME CoreCivic, Inc
DBA California City Correctional Facility
PO Box 2511
California City CA 93504
United States

**CITY CLERK**

THIS DOCUMENT IS ALTERATION PROTECTED AND REFLECTS FLUORESCENT FIBERS UNDER UV LIGHT

KEEP FOR YOUR RECORDS

BUSINESS LICENSE RECEIPT

ACCT NO. [redacted]

DATE ISSUED 02/26/2026

$

Last Pmt Date

Subject to Suspension
Cancellation or Revocation

FEES PAID IN ACCORDANCE WITH CITY
BUSINESS LICNESE ORDINANCE

**CITY OF**
**CALIFORNIA CITY**

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**

Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**CITY MANAGER**

**July 9, 2026**

***DELIVERED VIA U.S. MAIL & ELECTRONIC MAIL:***
jlaner@ilrc.org; gruiz@ilrc.org; dstruck@strucklove.com

Jehan Laner & Grisel Ruiz
Dignity Not Detention Coalition
268 Bush Street, #3933
San Francisco, CA 94104

Daniel P. Struck
Struck Love Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226

**RE: Decision of City Manager Regarding Dignity Not Detention Coalition's Appeal of California City's February 26, 2026, Issuance of a Business License to CoreCivic, Inc.**

Dear Ms. Laner, Ms. Ruiz, and Mr. Struck:

On July 7, 2026, at 3:30 p.m. P.S.T. an administrative appeal hearing was held in the above referenced matter using the online platform Zoom and in person at California City's City Hall, City Council Chambers located at 21000 Hacienda Blvd., California City, CA 93505. The administrative appeal hearing was conducted pursuant to the authority and process provided under California City Municipal Code ("CCMC") Chapter 4 (Appeals and Review). City Clerk John Paul Maier appeared on behalf of the City of California City ("City"). Jehan Laner and Grisel Ruize, as legal counsel, appeared on behalf of the Appellant and Daniel P. Struck, as legal counsel, appeared on behalf of the Applicant. Pursuant to CCMC Section 1-4.09(b), the City Manager served as the hearing officer.

After reviewing all of the evidence submitted by the City, the Appellant, and the Applicant prior to and at the administrative appeal hearing as well as the Appellant's supplemental briefing, and based upon a preponderance of that evidence, this hearing officer upholds the City Clerk's February 26, 2026 issuance of a Business License to CoreCivic, Inc., and denies Appellant's appeal.

**Scope of Hearing Officer's Review at Administrative Appeal Hearing**

Pursuant to CCMC Section 1-4.04(d), at the administrative appeal hearing, the hearing officer was charged with conducting a de novo hearing based upon the following evidence:

(1) Any relevant evidence, including staff reports, etc., submitted at the time of the prior decision and at the appeal hearing; and

(2) Findings, if any, and decision of the person or body whose decision is being appealed, but the person or body hearing the matter shall not be bound by the findings and decisions of the original decision being appealed.

**Burden of Proof at the Administrative Appeal Hearing**

Under CCMC Section 1-4.04(e), because the appeal involved the issuance of a Business License the Appellant had the burden of proof to support the overturning of the prior decision.

**Hearing Officer's Decision**

Based upon a preponderance of the evidence, the Appellant failed to show that the City Clerk erred or did not comply with the requirements of the CCMC when s/he issued a Business License to CoreCivic, Inc. on February 26, 2026. Thus, the appeal filed by the Appellant is denied and the issuance of the Business License is upheld.

**Right of Appeal**

This decision may be appealed by any affected person within seven (7) days of the hearing officer's decision pursuant to CCMC Sections 1-4.04(a), 1-4.05(b) and 1-4.09(c).

Respectfully Submitted,

Sean Grayson
City Manager
City of California City

ilrc IMMIGRANT LEGAL RESOURCE CENTER

TEACHING, INTERPRETING, AND CHANGING LAW SINCE 1979

**EXECUTIVE DIRECTOR**
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

July 9, 2026

RECEIVED
JUL 13 2026

***U.S. mail and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, City Attorney Ponto, and City Clerk,

On behalf of the Immigrant Legal Resource Center and the Dignity Not Detention Coalition, I write to appeal the decision by the Planning Commission to affirm the approval of a site plan review and all related approvals in favor of CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 1-4.09(d) of the California City Municipal Code ("CCMC"). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business

ilrc IMMIGRANT LEGAL RESOURCE CENTER

TEACHING, INTERPRETING, AND CHANGING LAW SINCE 1979

cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.

- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, but the Office of the Attorney General in its comment letter to the City, and past public comments, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $461.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of the appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner

cc: Brandon Sanchez

# NOTICE OF PUBLIC HEARING
# CITY OF CALIFORNIA CITY
# CITY COUNCIL

**MATTER:** Appeal of City Manager Decision to the City Council
**PROJECT/REVIEW:** Business License for CoreCivic Inc.
**APPLICANT/FACILITY:** California City Correctional Facility / CoreCivic Inc.
**LOCATION:** 22844 Virginia Boulevard, California City, CA 93505; APN:350-031-28-2

**NOTICE IS HEREBY GIVEN** pursuant to California City's California Municipal Code Chapter 4. Sec. 1-4.08 that the City Council of the City of California City will consider an appeal of the City Manager's Decision dated July 7, 2026, determination approving the issuance of a Business License for the California City Correctional Facility located at 22844 Virginia Boulevard, California City, CA 93505 (APN 350-031-28- 2). Jehan Laner, on behalf of Immigrant Legal Resource Center and Dignity Not Detention Coalition, appealed the City Manager's decision to uphold the City Clerk's issuance of a business license to CoreCivic Inc. Following deliberate consideration of the matter, the City Council may uphold, modify, reverse, or remand the City Manager determination.

## HEARING SCHEDULE & VENUE

Hearing Date: Tuesday, August 25, 2026

Hearing Time: 5:00 p.m. Pacific Standard Time, or as soon thereafter as this matter may be heard
Location: City Council Chambers, 21000 Hacienda Boulevard, California City, CA 93505

## REMOTE DIGITAL PARTICIPATION

Zoom Video Link: https://us06web.zoom.us/j/82424125440
Webinar ID: 824 2412 5440
+1 669 444 9171 US
+1 253 205 0468 US

## SUBMISSION OF WRITTEN MATERIALS

Interested parties may submit written comments, letters, or supplemental evidence prior to the hearing via mail or email to: Mail: City of California City Clerk, 21000 Hacienda Boulevard, California City, CA 93505 or Email: jmaier@californiactity-ca.gov

To ensure adequate time for review and inclusion in the official hearing record, written submissions are strongly encouraged to be received at least twenty-four (24) hours prior to the hearing. While materials presented live at the hearing will be accepted, the Planning Commission reserves the right to continue the hearing to a subsequent date if additional time is required to evaluate late-submitted documentation.

This notice is posted, published, and distributed in strict accordance with applicable California Brown Act requirements and municipal procedures. Questions / Public Inquiry may be submitted to: City Clerk at jmaier@calforniacity-ca.gov or (760) 338-1377.

ilrc IMMIGRANT LEGAL RESOURCE CENTER

TEACHING, INTERPRETING,
& CHANGING LAW SINCE 1979

EXECUTIVE DIRECTOR
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

August 19, 2026

*Via email*

City Council
City of California City
21000 Hacienda Boulevard
California City, CA 93505

Cc: City Clerk

**Motion for Continuance of August 25, 2026 Appeal Hearing for CoreCivic Inc.'s Site Plan Review and Business License for the California City Correctional Facility**

1. Appellants respectfully move the City Council to continue the August 25, 2026 hearing date for the appeal of the Planning Commission's decision to sustain the grant of the SPR Minor Permit (SPR 25-09), and the City Manager's decision to sustain the grant the of the Business License for CoreCivic Inc. for the reasons stated below.
2. The City Clerk set this City Council hearing for the Appeal of the Planning Commission's decision to sustain the grant of the SPR Minor Permit (SPR 25-09), and the City Manager's decision to sustain the grant the of the Business License to CoreCivic Inc. on August 25, 2026 at 5:00pm.
3. On August 6, 2026, the City Clerk asked to confirm appellants' availability for August 25, 2026, and stated he could explore additional hearing dates. On that same date, appellants informed the City Clerk that due to urgent medical issues neither Ms. Ruiz or Ms. Laner could attend the August 25, 2026 date, and requested that the City Clerk schedule the hearing to a date after September 18, 2026 to allow appellants to appear in person.
4. Due to appellants' correspondence with the City Clerk, appellants reasonably expected that the hearing date remained under discussion. On August 14, 2026, appellants received electronic notice that the hearing date was scheduled for August 25, 2026.
5. Appellants now respectfully move the City Council to continue this hearing to another date. Based on the upcoming City Council meeting dates provided by the City Clerk, appellants believe the following dates would work to hold this hearing, and respectfully request that the City Council consider a continuance of the appeal to one of these dates:
    a. September 22, 2026

   b. October 13, 2026
   c. October 27, 2026 (less preferred).
6. Appellants respectfully request and move for this continuance for the reasons stated below.
7. First, appellants incorporate the previous reason for requesting a different date due to unforeseen medical issues.
8. Second, because appellants were under the impression that the City Clerk could accommodate a request for a different date, appellants only received official electronic notice on August 14, 2026. This is only 7 business days before the hearing. The City Code requires at least 10 days' notice and does not specify whether those are calendar or business days. *See* California City Municipal (CCM) Code Sec. 1-4.04 (requiring at least 10 days' notice for an appeal before a body which conducts regularly scheduled meetings). The August 25th hearing date does not provide 10 business days' notice.
9. Third, even if the City interprets the code as only requiring 10 calendar days' notice before an appeal hearing, the City Code does require that hearing notice be given in "the *same manner* as any required notice for the hearing at which the decision subject to the appeal or review was made." CCM Code Sec. 1-4.08 (emphasis added).
10. In this case, the Planning Commission and City Manager hearings for the SPR Minor Permit and Business License were held on July 7, 2026, and appellants received official electronic notice on June 18, 2026, which is 19 calendar days (13 business days) before the hearings. Therefore, the shortened notice provided for the August 25, 2026 hearing does not satisfy Section 1-4.08's requirement that notice be given in the "same manner" as notice for the underlying hearings being appealed.
11. Appellants' request is limited and reasonable. Appellants do not seek an indefinite continuance, but request that the hearing be continued to one of three identified, regularly scheduled City Council meetings. The earliest proposed date, September 22, is only four weeks after the currently scheduled hearing. A brief continuance would allow Appellants to appear in person and permit additional public notice and participation without materially delaying the City's consideration of the appeals.
12. Finally, a brief continuance would promote meaningful public notice, transparency, and participation in the City's decision-making process. These appeals concern the permitting and licensing of the California City Detention Facility, a matter of significant public interest. The permit and business license at issue relate to one of the largest detention centers in the United States, likely to operate for at least fifteen years or more, with significant and long-term impact on city infrastructure including on roads, water, and emergency services. Providing only 7 business days' notice between official notice and the hearing limits the ability of California City residents and other interested members of

the public to learn of the hearing, review the relevant materials, arrange their schedules and other obligations, and prepare meaningful public comment. Sufficient public notice, transparency, and civic engagements are basic tenants of democracy. A continuance to one of the regularly scheduled City Council meetings identified above would provide additional time for public participation while causing only a brief delay in consideration of the appeals. Appellants are unaware of any statutory or other deadline requiring the Council to hear these appeals on August 25, 2026. Particularly where Appellants themselves are unable to attend on August 25 because of unforeseen medical circumstances that they communicated to the City before the hearing was set, the interests of fairness, transparency, and meaningful public participation favor a brief continuance.

Respectfully submitted,

Jehan Laner
Managing Attorney
Immigrant Legal Resource Center

# COUNCIL AGENDA ITEM

**August 25, 2026**

| | |
|---|---|
| **TO:** | Honorable Mayor and Members of the City Council |
| **FROM:** | Anu Doravari, Planning Director |
| **SUBJECT:** | Appeal of Planning Commission Decision - Site Plan Review No. SPR 25-09 |
| **PROJECT:** | California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02 |
| **APPLICANT:** | CoreCivic, Inc. |
| **APPELLANT:** | Immigrant Legal Resource Center / Dignity Not Detention Coalition |

## RECOMMENDATION

Staff recommends that the City Council:

1. Receive the staff report, public testimony, and the record materials submitted for the appeal;
2. Find that the Council's action on the appeal does not approve new construction, expansion of the approved facility footprint, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use; and
3. Adopt the attached draft resolution denying the July 9, 2026, appeal and upholding the Planning Commission's July 7, 2026 decision sustaining SPR 25-09, as clarified by the findings and scope limitations in the resolution.

## DECISION BEFORE THE COUNCIL

Under CCMC Sections 1-4.04 and 1-4.09(d), the Council hears the appeal de novo from the Planning Commission. Because the appealed decision granted an approval, the appellant bears the burden under CCMC Section 1-4.04(e) to support overturning the prior decision. Under CCMC Section 9-2.212(d), a site plan shall be approved if the application shows the site will be developed in accordance with the requirements of the Municipal Code. If the application demonstrates conformance, approval is mandatory, and neither the Planning Director, nor the Planning Commission, nor the Council has discretion to withhold it. The question is whether the appeal establishes a Planning or zoning basis to overturn SPR 25-09 for the existing facility.

## THE APPEAL CHALLENGES:

1. **Use:** civil immigration detention is not an allowed O/RA use under CUP 97-01 and therefore requires a new CUP or separate code-interpretation process.
2. **Site plan:** SPR 25-09 should not have been approved because a newly prepared site-plan drawing was not submitted with the 2025 application.
3. **1998 expansion record:** the Attorney General argues that the 1998 expansion amendment was tied to additional construction and cannot be used to support the existing facility configuration.

## CITY RECORD - HOW STAFF GOT HERE

| DATE | CITY RECORD |
|---|---|
| JAN. 1998 | CUP 97-01 approved the correctional facility at 22844 Virginia Boulevard. |

| DATE | CITY RECORD |
|---|---|
| NOV.-DEC. 1998 | CCA applied to amend CUP 97-01 for an expansion. Planning Commission Resolution No. 11-98-02 states that the applicant sought to "expand the permitted use by 512 beds." On December 1, the City Council approved the amendment to CUP 97-01 and the related environmental findings. |
| OCT. 2009 | The City Council adopted the Final General Plan 2009-2028. At page 5-15, the City identifies the same O/RA facility as a privately owned prison housing federal detainees awaiting deportation. |
| SEPT. 2010 | The City Council approved the federal detention-services IGSA and the related CCA agreement. The City Manager advised Council that authorized agencies could include ICE and BOP. |
| 2014 | A City land-use review documented the facility's then-existing operating configuration. The State Fire Marshal later issued a Certificate of Occupancy for the entire facility as I-3 institutional occupancy. |
| 2025-2026 | SPR 25-09 concerned the existing physical plant and proposed no new construction or replacement site layout. The Planning Director approved SPR 25-09 on February 26, 2026; the Planning Commission denied the appeal on July 7, 2026. |

**STAFF ANALYSIS**

**1. Existing use / claimed need for a new CUP**

CCMC Section 9-2.402(p) allows governmental or quasi-governmental correction, probation, or prison facilities and services in the RA District with a conditional use permit. CUP 97-01 is the site-specific CUP for this prison facility. Planning determined that the federal detention operation described in SPR 25-09 remains within the existing correctional/prison-facility use authorized by CUP 97-01. SPR 25-09 is a Minor Site Plan Review for an existing building, business, and ownership. SPR 25-09 did not create a new land-use category or approve new development.

The City's own later record is consistent with that treatment. The Council-adopted 2009 General Plan identifies this same O/RA facility as a prison housing federal detainees awaiting deportation, and the 2010 Council record documents City approval of federal detention services that could include ICE and BOP. Staff relies on those City records as historical land-use context, not as amendments to CUP 97-01 or the zoning code.

**2. Site-plan record**

CCMC Section 9-2.212 requires site-plan information as part of the administrative review. SPR 25-09 involved an existing facility and proposed no physical site change. It proposed no new construction, no ground disturbance, no expansion of the approved footprint, and no change to the site layout. Planning reviewed the application together with historical site-layout and entitlement materials maintained in the

City project record because the application proposed no change to the physical site layout. The historical record includes the 1998 CUP-amendment application, which expressly refers to an attached site plan, and a 2017 conceptual site plan that labels and depicts the existing approximately 70-acre facility. SPR 25-09 did not approve a new site layout or construction plan.

**3. 1998 expansion record / existing configuration**

The original CUP approved the facility in 1998. Later that year, the City approved an amendment to CUP 97-01 for a 512-bed expansion. These CUPs run with the land. The associated Initial Study describes a specific housing-unit/support-building expansion. The Attorney General argues that the later amendment cannot be used to establish additional capacity within the buildings that exist today.

That historical construction question does not need to be resolved broadly to decide this SPR. The operative 2025 business plan describes the facility as it exists today, and SPR 25-09 requested no construction, grading, additional detention housing, or expansion of the developed footprint. Staff therefore recommends that Council decide only whether the administrative SPR for the existing facility should stand, without independently authorizing any unbuilt portion of the 1998 expansion or any additional physical capacity.

**4. Approval was mandatory**

Section 9-2.212 commits site plan review to the Planning Director. Subsection (d) then removes the discretion the appeal assumes exists: the site plan "shall" be approved if the application shows the site will be developed in accordance with the requirements of the Municipal Code.

On this record, Section 9-2.212(d) required approval.

**BURDEN OF PROOF**

Under Section 1-4.04(e), because this appeal challenges an approval that issued, Appellant bears the burden of proof and must support overturning the prior decision by a preponderance of the evidence. The Council need not find affirmatively that the Planning Director was right. Appellant must show the Planning Director was wrong: that the application failed to demonstrate Municipal Code conformance on February 26, 2026.

**THE GROUNDS FOR APPEAL DO NOT SHOW THAT THE APPROVAL WAS WRONG**

Appellant contends the Municipal Code does not expressly allow civil immigration detention, so the use is unclassified and unentitled.

The premise fails on the text. Section 9-2.402 speaks in broad categorical terms: governmental or quasi-governmental correction, probation, or prison facilities and services. A secure detention facility operated under contract with federal agencies sits comfortably inside those categories, as it has since the facility's first contract with the U.S. Marshals Service. The legal status of the persons detained (criminal inmates or civil detainees) changes nothing about the facility's function, form, footprint, or impacts. The building is the same building and its purpose-built nature means it can only function in one way; the operation is the operation the CUPs studied and approved.

The premise also fails on the record. CUP 97-01 and CUP 98-02 authorized this use at this site nearly 30 years ago, after public hearings and full CEQA review. Those permits run with the land and remain valid absent revocation. SPR 25-09 did not classify a use. It implemented an existing entitlement.

Appellant also argues that any ambiguity about whether the Code covers civil detention had to be resolved through the City's code-interpretation procedure before SPR 25-09 could issue. Section 9-2.103 supplies a procedure for resolving genuine ambiguity about uses the Code does not address. It is not a mandatory process for uses the Municipal Code does address and the City has already permitted. There is no ambiguity to resolve. And a third party cannot compel this process and suspend ministerial approval.

**CORRESPONDENCE RECEIVED**

Two documents arrived shortly before the hearing. Both are attached and are part of the record for this item. Each addresses this appeal and the companion SPR 25-09 appeal together.

Counsel for Appellants submitted a 'motion' to continue the August 25, 2026 hearing on both appeals to September 22, October 13, or October 27, 2026. The motion states that medical issues prevent counsel from personally appearing on August 25, and argues that the electronic notice given on August 14, 2026 does not satisfy CCMC Section 1-4.04 or the requirement in Section 1-4.08 that notice be given in the same manner as notice for the hearing below. The motion asks the Council to set a continued date.

Counsel for CoreCivic also submitted a combined response opposing both appeals, with nine exhibits, including declarations from CoreCivic personnel and the City Planner, the 2025 application submissions and business plan, and the July 2, 2026 general warranty deed conveying the facility to the United States. CoreCivic argues that neither Appellant is an affected person entitled to appeal under CCMC Sections 1-4.02(a) and 1-4.04(a); that federal ownership and the Supremacy Clause bar the relief the appeals seek; and that each of the six grounds fails on the merits. Staff's recommendation rests on the grounds set out in this report. It does not depend on CoreCivic's standing arguments, and staff takes no position on them here.

## CEQA

Planning treated SPR 25-09 as a ministerial administrative approval under CEQA Guidelines Section 15268. The SPR applied objective City standards to an existing facility and authorized no new construction, grading, expanded developed footprint, additional detention housing, or replacement site layout. The prior environmental documents remain part of the historical entitlement record; SPR 25-09 did not amend those physical projects.

## CONCLUSION AND RECOMMENDED MOTION

The City's record shows an existing correctional facility approved by CUP in 1998, a later expansion amendment, a Council-adopted 2009 General Plan documenting federal detainees awaiting deportation at the same O/RA prison facility, and a 2010 Council-approved federal detention arrangement that could include ICE and BOP. SPR 25-09 did not create a new facility, change the site layout, or approve physical expansion. Staff recommends denial of the appeal.

**Recommended motion: I move to adopt Resolution No. 26-0825 denying the appeal and upholding the Planning Commission's July 7, 2026 decision sustaining SPR 25-09, subject to the scope limitations stated in the resolution.**

## ATTACHMENTS

1. Draft City Council Resolution No. 26-0825.
2. Appeal Record: February 27, 2026 DNDC Appeal to the Planning Commission; July 7, 2026 Planning Commission Staff Report and final meeting minutes; and July 9, 2026 City Council Appeal.
3.SPR 25-09 Planning Director Determination dated February 26, 2026.
4. Controlling Entitlement Record: CUP 97-01, CUP Amendment 98-02, and December 1, 1998 City Council action on the amendment.
5. City Historical Land-Use Record: Final General Plan 2009-2028 (adoption page and p. 5-15), September 21, 2010 City Council minutes, and 2017 historical site-layout drawing.
6. June 15, 2026 California Attorney General comment letter (letter only; duplicate exhibits omitted).
7. Appellants' Motion for Continuance of August 25, 2026 Appeal Hearing, dated August 19, 2026

8. CoreCivic, Inc. combined response in opposition to the applications for appeal, dated August 20, 2026, with Exhibits 1 through 9

**ATTACHMENT 1**

**DRAFT RESOLUTION NO. 26-0825**

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY DENYING THE APPEAL OF THE PLANNING COMMISSION DECISION UPHOLDING SITE PLAN REVIEW NO. SPR 25-09 FOR THE CALIFORNIA CITY CORRECTIONAL FACILITY AT 22844 VIRGINIA BOULEVARD**

WHEREAS, the California City Correctional Facility at 22844 Virginia Boulevard is an existing correctional facility located on property zoned O/RA and subject to Conditional Use Permit No. 97-01, approved in January 1998 for a prison facility; and

WHEREAS, in 1998 Corrections Corporation of America applied to amend CUP 97-01 for an expansion, and the City subsequently approved that amendment and its related environmental findings; and

WHEREAS, the City Council adopted the Final General Plan 2009-2028 on October 6, 2009, which identifies the same O/RA facility as a privately owned prison housing federal detainees awaiting deportation, and on September 21, 2010 the Council approved federal detention-service agreements after being advised that authorized federal users could include ICE and BOP; and

WHEREAS, the City's later land-use record and the operative SPR 25-09 business plan describe the existing physical and operational configuration of the facility; and

WHEREAS, on August 22, 2025, CoreCivic, Inc. submitted SPR 25-09 using the City's Minor Site Plan Review application for an existing building/business/ownership, and the application did not request new construction, grading, additional detention housing, expansion of the developed facility footprint, or a replacement site layout; and

WHEREAS, on February 26, 2026, the Planning Director approved SPR 25-09 as a ministerial administrative review of the existing facility; and

WHEREAS, the Planning Commission denied an appeal of SPR 25-09 on July 7, 2026, and the Immigrant Legal Resource Center and Dignity Not Detention Coalition filed a further appeal to the City Council on July 9, 2026; and

WHEREAS, pursuant to CCMC Sections 1-4.04 and 1-4.09(d), the City Council considered the appeal de novo, and under CCMC Section 1-4.04(e) the appellant bears the burden to support overturning the prior approval.

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY DOES HEREBY RESOLVE AS FOLLOWS:**

**SECTION 1. RECITALS AND RECORD.**

The foregoing recitals are true and correct and are incorporated into this Resolution. The Council's decision is based on the administrative record before it, including the staff report and attachments for this appeal.

**SECTION 2. SCOPE OF COUNCIL ACTION.**

This Resolution concerns only the appeal of SPR 25-09 and the existing approximately 70-acre correctional facility. It does not approve new construction, grading, additional detention housing, expansion of the developed facility footprint, a replacement site layout, or a new or modified conditional use. Nothing in this Resolution independently authorizes additional physical capacity or construction.

**SECTION 3. FINDINGS ON THE APPEAL.**

**A.** Existing land use. Council determines that the federal detention operation described in SPR 25-09 remains within the existing correctional/prison-facility use authorized by CUP 97-01 and does not require a new CUP on the record before the Council. The Council-adopted 2009 General Plan and the 2010 Council-approved federal detention arrangement document the City's historical treatment of federal detention at this same facility. This Resolution does not create a new zoning category.

**B.** Site-plan record. SPR 25-09 proposed no physical site change. Planning reviewed the existing facility using historical site-layout and entitlement materials in the City project record. The appeal does not establish a basis to overturn the administrative SPR solely because a newly prepared site-layout drawing was not submitted where no physical layout change was proposed. This finding does not approve a new site layout or construction plan.

**C. 1998 expansion record.** The City record includes CUP 97-01 and the later 1998 expansion amendment. The associated Initial Study describes a specific housing-unit/support-building expansion. SPR 25-09 concerns the facility as it exists today and requests no new construction or expansion. The Council therefore need not determine the full numerical capacity authorized by the combined 1998 approvals or whether any unbuilt portion of the 1998 expansion is physically present. This Resolution does not independently authorize additional physical capacity or construction.

**D.** Burden on appeal. Considering the record as a whole, the appellant has not met the burden under CCMC Section 1-4.04(e) to establish a Planning or zoning basis to overturn SPR 25-09 within the limited scope stated in this Resolution.

**SECTION 4. CEQA.**

SPR 25-09 is a ministerial administrative approval exempt from the California Environmental Quality Act pursuant to CEQA Guidelines Section 15268. The action applies objective City standards to an existing facility and does not authorize new construction, grading, expansion of the developed footprint, additional detention housing, or a replacement site layout.

**SECTION 5. DECISION.**

The City Council denies the July 9, 2026 appeal and upholds the Planning Commission's July 7, 2026 decision sustaining SPR 25-09, as clarified by the express scope limitations and findings stated in this Resolution. The Council does not independently authorize additional physical capacity, construction, or an unbuilt portion of the 1998 expansion.

**SECTION 6. EFFECTIVE DATE AND NOTICE.**

This Resolution shall take effect immediately upon adoption. The City Clerk is directed to provide notice of the Council's decision in accordance with applicable City procedures.

PASSED, APPROVED AND ADOPTED this 25th day of August 2026, by the following vote:

AYES: ______________________________

NOES: ______________________________

ABSENT: ______________________________

ABSTAIN: ______________________________

______________________________
Marquette Hawkins, Mayor

ATTEST:

______________________________
City Clerk

APPROVED AS TO FORM:

______________________________
City Attorney

# ATTACHMENT 2

February 27, 2026

***U.S. mail and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, Members of the Planning Commission, Interim City Manager Grayson, City Attorney Ponto, and City Clerk,

On behalf of the Dignity Not Detention Coalition, I write to appeal the decision by California City to approve a business license, site plan review, and all related approvals to CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 9-2.212(b) of the California City Municipal Code (CCMC). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.
- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City

to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $381.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of any appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner
Senior Staff Attorney
Immigrant Legal Resource Center

cc: Brandon Sanchez

2031489.2

# PLANNING COMMISSION

## Staff Report

July 07, 2026

| | |
|---|---|
| **TO:** | Honorable Chair and Members of the Planning Commission |
| **FROM:** | Anu Doravari, Planning Director |
| **SUBJECT:** | Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 for the California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02 |
| **APPLICANT:** | CoreCivic, Inc. |
| **APPELLANT:** | Dignity Not Detention Coalition |
| **REQUEST:** | Consider the appeal and determine whether to uphold the Planning Director's February 26, 2026 approval of SPR 25-09 as issued. |

### RECOMMENDATION

Staff recommends that the Planning Commission:

1. Receive the staff report, public testimony, and record materials submitted for the appeal;
2. Find that the appellant failed to meet the required burden of proof to overturn the Planning Director's approval of SPR 25-09 and find that the Planning Commission's action on the appeal does not approve new construction, expansion, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use; and
3. Adopt Resolution No. PC 2026-07-07 denying the appeal and upholding the Planning Director's February 26, 2026 approval of SPR 25-09 as issued.

**Recommended motion:** I move to adopt Resolution No. PC 2026-07-07 denying the appeal and upholding the Planning Director's February 26, 2026 approval of SPR 25-09 as issued.

### EXECUTIVE SUMMARY

SPR 25-09 concerns the California City Correctional Facility at 22844 Virginia Boulevard. The application was submitted on the City's Minor Site Plan Review application form for an existing building/business/ownership and is dated August 22, 2025. The operative business plan submitted with the application describes the facility as owned and operated by CoreCivic, Inc., opened in 1999, and expected to operate in the same manner it has since construction.

The Planning Director issued a determination letter on February 26, 2026, approving SPR 25-09. The determination was based on the City's existing entitlement record—including Conditional Use Permit (CUP) 97-01, CUP 98-02, and the CEQA Transmittal Addendum No. 1 2014.pdf—the associated environmental record, application materials, and applicable Municipal Code provisions. The determination letter states that the approval implements CUP 97-01 and CUP 98-02, reflects a maximum vested entitlement capacity of 2,816 beds, applies to the previously approved 70-acre facility footprint, and does not authorize any expansion or modification of the approved project.

Dignity Not Detention Coalition initiated its appeal of the Site Plan Review approval on February 27, 2026. This staff report addresses the Site Plan Review appeal before the Planning Commission under standard California land-use frameworks. Business licensing and contract matters are administered through separate City procedures and are outside the purview of this land-use evaluation.

Based on the complete administrative and environmental record, staff recommends that the Planning Commission deny the appeal and uphold the February 26, 2026, SPR 25-09 approval as issued.

## APPLICATION MATERIALS AND REVIEW BACKGROUND

SPR 25-09 was submitted as a Minor Site Plan Review application for an existing building/business/ownership. The application materials did not request new construction, expansion of the approved facility footprint, ground disturbance, or changes to the approved site layout. No new site plan was submitted for SPR 25-09. Staff reviewed the application based on the existing entitlement record, City records on file, the operative business plan, and applicable Municipal Code requirements.

The operative business plan describes the California City Correctional Facility as a 2,560-bed facility with an approximately 522,363 square foot physical plant. The Planning Director's determination letter identifies the entitlement record as CUP 97-01 for 2,304 beds and CUP 98-02 for an additional 512 beds, for a total authorized entitlement capacity of 2,816 beds. Because the applied-for operational capacity of 2,560 beds remains well below the maximum authorized capacity, SPR 25-09 did not approve any expansion or increase beyond the historical entitlement record.

The determination letter also states that the facility satisfied all objective requirements of the Building & Safety Division and Fire Department.

## ENTITLEMENT RECORD

| Approval / Record | Summary | Relevance to SPR 25-09 |
|---|---|---|
| **CUP 97-01 / PC Resolution No. 01-98-1802** | Approved a conditional use permit for a 2,304-bed prison facility on approximately 70 acres and adopted a Mitigation Monitoring Program. | Establishes the original conditional use entitlement and identifies site plan review, utility connection, and Municipal Code compliance obligations. |
| **CUP 97-01 / CC Resolution No. 01-98-1801** | Certified the Final EIR Supplement / CEQA findings for the 2,304-bed prison project and approved the project following Planning Commission action. | Establishes the City Council approval and prior CEQA record for the original facility. |
| **CUP 98-02 / Resolution No. 11-98-02** | Approved modification of CUP 97-01 for a 512-bed expansion and affirmed CUP 97-01 except as provided in that resolution. | Supports the determination that the combined entitlement record reflects a maximum authorized capacity of 2,816 beds. |
| **CEQA Transmittal Addendum No. 1 2014.pdf** | Documented and filed a CEQA Notice of Determination (NOD) on June 9, 2014, for a 256-bed internal repurposing of the facility structure. | Formally establishes that the environmental impacts of a 2,560-bed operational configuration within the existing facility footprint have been fully evaluated, cleared, and mitigated. |
| **Prior CEQA documents and adopted mitigation programs** | The facility and correctional use were evaluated through the EIR Supplement (CUP 97-01), the MND (CUP 98-02), **and Addendum No. 1 (2014)**. | Existing adopted mitigation programs remain enforceable according to their own terms. SPR 25-09 did not **alter or** adopt new mitigation measures. |

## MUNICIPAL CODE FRAMEWORK

- **CCMC Section 9-2.212 (Site Plan Review):** applications are filed with the Planning Director. The Planning Director reviews the proposal to determine whether it satisfies the requirements of the section. The section explicitly mandates that the site plan *shall be approved* if the application shows the site conforms to existing Municipal Code requirements.
- **CCMC Section 9-2.402 (RA District Conditional Uses):** "Governmental or quasi-governmental correction, probation or prison facilities and services" may be permitted in the RA District with a conditional use permit.
- **CCMC Section 9-2.103 (Code Interpretation):** Establishes guidelines for interpreting general code language. SPR 25-09 was reviewed under the existing entitlement record and the listed RA conditional-use category; it was not processed as a new citywide code interpretation or a new conditional use permit.

## SCOPE OF THE APPEAL BEFORE THE PLANNING COMMISSION

The item before the Planning Commission is the appeal of the Planning Director's approval of SPR 25-09 under CCMC Section 9-2.212.

Under California zoning law, when a local code utilizes mandatory phrasing such as "shall be approved," the review is strictly ministerial (non-discretionary) once objective conformity is demonstrated. CCMC Section 9-2.212(d) explicitly removes discretionary authority from the Planning Director, stating that the *"site plan shall be approved if application shows the site will be developed in accordance with the requirements of the Municipal Code."*

The Planning Commission's review is strictly limited to whether the application demonstrates conformance with the Municipal Code per CCMC Section 9-2.212(d). This appeal hearing is not a revocation proceeding for CUP 97-01 or CUP 98-02, nor is it a public hearing for a new conditional use permit. Under California's vested rights doctrine, long-standing entitlements cannot be retroactively extinguished or re-adjudicated through a ministerial site plan compliance check.

## PROCEDURE OF THE APPEAL

The appeal hearing before the Planning Commission is considered de novo under CCMC Section 1-4.04(d). This means that the Planning Commission is not bound by the decision of the Planning Director. The appeal hearing shall be based on the following evidence:

(1) Any relevant evidence, including staff reports, *etc.*, submitted at the time of the prior decision and at the appeal hearing; and

(2) Findings, if any, and decision of the Planning Director, but the Planning Commission shall not be bound by the findings and decisions of the original decision being appealed.

## BURDEN OF PROOF AT THE APPEAL HEARING

Under CCMC Section 1-4.04(e), the appellant, Dignity Not Detention Coalition, has the burden of proof to support the overturning of the Planning Director's decision on SPR 25-09.

**MINOR SPR PROCESSING AND DIRECTOR HEARING**

SPR 25-09 was properly submitted on the City's Minor Site Plan Review application form because it applies strictly to an existing building with no physical modifications. The application did not propose new construction, new ground disturbance, expansion of the approved facility footprint, or modifications to the existing site layout.

While the Planning Department utilizes Director Hearings for projects involving active discretionary reviews or major site design alterations, CCMC Section 9-2.212 does not require a formal public hearing for an administrative verification of an existing, approved structure.

**NO NEW SPR CONDITIONS**

SPR 25-09 did not impose new discretionary Planning conditions, did not adopt new mitigation measures, and did not modify CUP 97-01 or CUP 98-02. The approval simply recognizes that the facility remains bound by its existing entitlement record, previously adopted environmental documents, and active mitigation programs. Any compliance review or enforcement related to those existing obligations remains completely separate from this limited SPR approval.

**APPEAL ISSUES AND STAFF REVIEW**

| Appeal Issue | Staff Land Use Review |
|---|---|
| **Zoning / Use Classification** | CCMC Section 9-2.402 explicitly identifies "[g]overnmental or quasi-governmental correction, probation or prison facilities and services" as a conditional use in the RA District. The existing entitlement record includes CUP 97-01 and CUP 98-02. Under standard California planning practices, land-use classifications track the physical characteristics, structural demands, and impacts of a facility (e.g., Institutional Group I-3 occupancy), not the specific demographics or civil/criminal status of the occupants. The facility remains a secured correction/detention facility and falls squarely within the broad categorical language of the CCMC and the existing CUPs. |
| **Civil Immigration Detention /** | The appellant asserts that civil immigration detention represents a separate use category requiring a new CUP. However, the City has historically interpreted this land-use |

| Appeal Issue | Staff Land Use Review |
|---|---|
| **"Change of Use" Argument** | classification to encompass federal civil detainees, notably during the facility's operations under the 2010–2013 Intergovernmental Service Agreement (IGSA). Furthermore, the certified CEQA Transmittal Addendum No. 1 2014.pdf explicitly cleared the "repurposing" of internal bed configurations up to 2,560 beds within the existing structure. Shifting the supervising agency contract between state and federal authorities does not alter the physical land-use footprint or generate distinct zoning impacts. |
| **New Conditional Use Permit Requirement** | Because SPR 25-09 requested no new construction, zero ground disturbance, and no increase in bed capacity beyond the established 2,816-bed entitlement, no triggers for a new or modified CUP have occurred. Any future proposal to physically expand the development footprint or exceed the 2,816-bed limit would legally require a separate discretionary CUP amendment and subsequent CEQA review. |
| **CEQA Compliance** | Under California Public Resources Code § 21080(b)(1) CEQA Guidelines Section 15268, and CCMC Section 2-6.303(b)(2), ministerial actions are entirely exempt from CEQA. Because the Planning Director was legally mandated by CCMC Section 9-2.212(d) to approve the site plan upon demonstration of code conformity, the action involves no discretionary balancing of environmental options. Furthermore, the physical facility and its 2,560-bed operational ceiling were already fully analyzed under the certified EIR Supplement (CUP 97-01), the MND (CUP 98-02), and CEQA Transmittal Addendum No. 1 2014.pdf. |

## FINDINGS SUPPORTING RECOMMENDED ACTION

1. SPR 25-09 was submitted as a Minor Site Plan Review application for an existing building/business/ownership and is dated August 22, 2025.
2. The City's Site Plan Review process ensures that development of an approved use conforms to Municipal Code standards for site design, infrastructure, and improvements.
3. The application materials did not request new construction, expansion of the approved facility footprint, ground disturbance, or modification to the approved site layout.

4. The operative business plan states that the facility opened in 1999, is owned and operated by CoreCivic, and is expected to operate in the same physical manner it has since it was constructed.
5. CUP 97-01 approved a 2,304-bed prison facility on approximately 70 acres at the project site.
6. CUP 98-02 approved a 512-bed expansion and affirmed CUP 97-01, establishing a combined entitlement capacity of 2,816 beds.
7. The facility's operational configuration of 2,560 beds was explicitly evaluated and cleared under CEQA Transmittal Addendum No. 1 2014.pdf, which concluded that internal bed repurposing within the existing structure generates no new significant environmental impacts.
8. CUP 97-01 and CUP 98-02 run with the land and remain valid, active entitlements absent a formal, separate revocation proceeding.
9. CCMC Section 9-2.402 allows governmental or quasi-governmental correction, probation, or prison facilities and services in the RA District with a conditional use permit.
10. The Planning Director's approval of SPR 25-09 did not impose new discretionary conditions, adopt new mitigation measures, or modify the underlying vested CUPs.
11. Because SPR 25-09 demonstrated compliance with objective Municipal Code requirements, approval was mandatory under the ministerial command of CCMC Section 9-2.212(d).
12. The appeal materials do not identify an **objective** basis under CCMC Section 9-2.212 to set aside the February 26, 2026, SPR 25-09 approval.

## ATTACHMENTS

1. Planning Commission Resolution No. PC 2026-07-07
2. Combined Administrative Record for SPR 25-09 Appeal

The combined record can include:

- Planning Director Determination Letter
- Appeal Letter
- SPR Application Materials
- Business Plan / Operational Information
- CUP 97-01 Record
- CUP 98-02 Record
- Prior CEQA Documents
- 2014 CEQA Addendum / NOD Materials
- Building, Fire, and Occupancy Materials
- DOJ Correspondence
- Prior agenda/hearing materials
- Record exhibits

## ATTACHMENT 1:

## PLANNING COMMISSION RESOLUTION NO. PC 2026-07-07

## A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY DENYING THE APPEAL FILED BY THE DIGNITY NOT DETENTION COALITION AND UPHOLDING THE PLANNING DIRECTOR'S FEBRUARY 26, 2026 APPROVAL OF SITE PLAN REVIEW NO. SPR 25-09 AS ISSUED FOR THE CALIFORNIA CITY CORRECTIONAL FACILITY LOCATED AT 22844 VIRGINIA BOULEVARD, APN 350-031-02

**WHEREAS**, CoreCivic, Inc. submitted Site Plan Review No. SPR 25-09 for the California City Correctional Facility located at 22844 Virginia Boulevard, APN 350-031-02; and

**WHEREAS**, SPR 25-09 was submitted on the City's Minor Site Plan Review application form for an existing building/business/ownership and is dated August 22, 2025; and

**WHEREAS**, the operative business plan describes the facility as owned and operated by CoreCivic, opened in 1999, and expected to operate inside the same physical plant footprint since construction; and

**WHEREAS**, the project site is subject to Conditional Use Permit No. 97-01, approved for a 2,304-bed facility, and Conditional Use Permit No. 98-02, approved for an additional 512 beds, representing a total authorized capacity of 2,816 beds; and

**WHEREAS**, the proposed operational scale of 2,560 beds was formally evaluated, cleared, and certified under CEQA Transmittal Addendum No. 1 2014.pdf, with a Notice of Determination properly filed with the Kern County Clerk on June 9, 2014; and

**WHEREAS**, the Planning Director issued a determination letter dated February 26, 2026, finding that SPR 25-09 satisfies all objective Municipal Code requirements; and

**WHEREAS**, the Dignity Not Detention Coalition submitted an appeal dated February 27, 2026; and

**WHEREAS**, the Planning Commission considered the staff report, the appeal materials, the entitlement record, the prior CEQA record, applicable Municipal Code provisions, and public testimony at a regular meeting.

**NOW, THEREFORE, THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY DOES HEREBY RESOLVE AS FOLLOWS:**

**SECTION 1. RECITALS.** The foregoing recitals are true and correct and are incorporated herein by this reference.

**SECTION 2. SCOPE OF ACTION.** The action before the Planning Commission is strictly limited to the appeal of the Planning Director's approval of SPR 25-09 under CCMC Section 9-2.212. This Resolution does not authorize or approve new construction, physical expansion of the facility footprint, an increase in bed capacity beyond the existing entitlement record, or a new or modified conditional use.

**SECTION 3. CEQA FINDINGS.** The Planning Commission hereby affirms that SPR 25-09 is exempt from the California Environmental Quality Act pursuant to CEQA Guidelines Section 15268 (Ministerial Projects). The approval is a non-discretionary action limited to the verification of compliance with objective Municipal Code standards. The Commission further finds that the environmental impacts of the 2,560-bed configuration within the existing structural footprint were fully analyzed and mitigated under CEQA Transmittal Addendum No. 1 2014.pdf, and no triggers for a subsequent or supplemental EIR exist under CEQA Guidelines Section 15262.

**SECTION 4. LAND USE FINDINGS.**

1. SPR 25-09 applies strictly to an existing building/business/ownership and is dated August 22, 2025.
2. The application materials requested zero new construction, zero ground disturbance, and no expansion of the approved facility footprint.
3. CUP 97-01 and CUP 98-02 establish a combined, valid land-use entitlement capacity of 2,816 beds on the project site, which runs with the land and remains unrevoked.
4. CCMC Section 9-2.402 explicitly permits "governmental or quasi-governmental correction, probation or prison facilities and services" in the RA District via a CUP. The physical land-use impacts of the facility are consistent across federal and state operational contracts, and the current use falls squarely within this approved zoning category.
5. Under CCMC Section 9-2.212(d), site plan approval is mandatory if the application demonstrates conformance with existing code standards. Because the application satisfies all objective Planning, Building, and Fire standards, the Planning Director possessed no discretionary authority to deny the application. The appeal record provides no objective legal or land-use basis under the CCMC to set aside the approval.

**SECTION 5. DECISION.** The Planning Commission hereby denies the appeal filed by the Dignity Not Detention Coalition and upholds the Planning Director's February 26, 2026, approval of SPR 25-09 as issued.

**SECTION 6. EFFECTIVE DATE.** This Resolution shall become effective immediately upon adoption.

**PASSED, APPROVED, AND ADOPTED** by the Planning Commission of the City of California City at a regular meeting held on July 7, 2026, by the following vote:

ATTEST:

______________________________
Planning Secretary/City Clerk

STATE OF CALIFORNIA )
COUNTY OF KERN ) ss.
CITY OF CALIFORNIA CITY )

I, ______________________________, City Clerk of the City of California City, do hereby certify that the foregoing Resolution was duly adopted by the Planning Commission at a regular meeting held on July 7, 2026, by the following vote:

**AYES:**

**NOES:**

**ABSENT:**

**ABSTAIN:**

______________________________
City Clerk

# CITY OF CALIFORNIA CITY
# PLANNING COMMISSION MEETING MINUTES
**July 7, 2026**

**CALL TO ORDER**
Chair Brottlund called the meeting to order at 6:02 p.m.

**PLEDGE OF ALLEGIANCE AND INVOCATION**
Pledge of Allegiance led by Chair Brottlund; invocation by Pastor Rob Troutman.

**ROLL CALL**
Present: Chair Brottlund; Commissioner Cantrell; Commissioner Coleman; Commissioner Perez.
Commissioner Perez was sworn in.

**MOTION CARRIED 4-0 TO APPOINT COMMISSIONER COLEMAN AS VICE CHAIR.**

**MOTION CARRIED 3-1 TO ESTABLISH A TWO-MINUTE PUBLIC COMMENT LIMIT (BROTTLUND, COLEMAN, PEREZ - YES; CANTRELL - NO).**

**ADOPT THE AGENDA**
**MOTION CARRIED 4-0 TO ADOPT THE AGENDA.**

**DISCLOSURE OF SITE VISITS AND EX-PARTE CONTACTS**
Commissioners Brottlund, Perez and Cantrell reported no site visits. Vice Chair Coleman disclosed visiting the exterior of the subject site.

**PUBLIC BUSINESS FROM THE FLOOR**
Public comment was received. No action taken.

**CONSENT CALENDAR**
None.

**PUBLIC HEARING**
**PH 1. Appeal of Planning Director Approval of Site Plan Review No. SPR 25-09 - California City Correctional Facility, 22844 Virginia Boulevard, APN 350-031-02**

**MOTION TO CONTINUE THE HEARING FOR 30 DAYS FAILED ON A 2-2 VOTE (CANTRELL, COLEMAN - YES; BROTTLUND, PEREZ - NO).**

Staff Report: Planning Director Anu Doravari presented the item and recommended denial of the appeal and adoption of Resolution PC 2026-07-07.

The Commission received presentations from the appellant and applicant. Written and oral public comments were received.

Vice Chair Coleman was absent for the final action.

**MOTION CARRIED 2-1 TO ADOPT RESOLUTION PC 2026-07-07, DENY THE APPEAL, AND UPHOLD THE PLANNING DIRECTOR'S APPROVAL OF SPR 25-09 (BROTTLUND, PEREZ - YES; CANTRELL - NO; COLEMAN - ABSENT).**

**DEPARTMENT REPORT**
None.

**COMMISSIONER COMMENTS**
No action taken.

**ADJOURNMENT**
**MOTION CARRIED 3-0 TO ADJOURN (BROTTLUND, CANTRELL, PEREZ - YES; COLEMAN - ABSENT).**

ilrc IMMIGRANT LEGAL RESOURCE CENTER
TEACHING, INTERPRETING, AND CHANGING LAW SINCE 1979

EXECUTIVE DIRECTOR
Eric Cohen

San Francisco
Washington, D.C.
San Antonio
Houston

ilrc@ilrc.org
www.ilrc.org

July 9, 2026

***U.S. mail and electronic transmittal***
City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

To Mayor Hawkins, Members of the City Council, City Attorney Ponto, and City Clerk,

On behalf of the Immigrant Legal Resource Center and the Dignity Not Detention Coalition, I write to appeal the decision by the Planning Commission to affirm the approval of a site plan review and all related approvals in favor of CoreCivic, Inc. for the operation of the California City Detention Facility, 22844 Virginia Blvd., California City, CA. This appeal is brought pursuant to sections 1-4.04, 1-4.05, and 1-4.09(d) of the California City Municipal Code ("CCMC"). The grounds for appeal are outlined below.

- The Business License, Site Plan Review, and all related approvals are not in conformance with the City's zoning for the facility. *See* CCMC § 9-2.803(a).
- The facility's zoning does not on its face allow civil immigration detention facilities. CCMC §§ 9-2.401, 9-2.402. Under the Municipal Code, any uses not expressly allowed within a zoning district are prohibited. CCMC § 9-2.102(b).
- Even if the facility's zoning district could allow civil immigration detention as a use similar to a "prison", whether it in fact does is ambiguous. The Municipal Code mandates that the Planning Commission and City Council resolve any ambiguities in interpreting the Code to allow uses not expressly permitted. CCMC § 9-2.103. The Council must make such determination before any Business License, Site Plan Review, or other permit for the facility may issue.
- Even if civil immigration detention is conditionally allowed in the facility's zoning district, then the converted facility still requires a Conditional Use Permit, including notice, public hearings, and public right of appeal. CCMC §§ 9-2.2501, 1-4.02(a).
- The City is prohibited from issuing a business license to CoreCivic because CoreCivic has been violating the Code by operating the facility without a license. The Code states that the City "shall" revoke or suspend a license if the licensee is violating the provisions of the business license chapter, which also includes the requirement that a business

ilrc

TEACHING, INTERPRETING, AND CHANGING LAW SINCE 1979

cannot operate without a license. CCMC §§ 1-3.01(a)(1), 9-2.2803(b), 9-2.2804(c), 3-2.3.201.

- Similarly, the Code provides that a license "shall be" suspended, cancelled, or revoked if the licensee has "[f]ailed to observe . . . the laws of the State" or has "[w]illfully or knowingly permitted violations of . . . the laws of the State." CCMC § 3-2.3.208(c)(4), (6). As set forth in the federal lawsuit pending against the federal government regarding conditions at the facility, but the Office of the Attorney General in its comment letter to the City, and past public comments, CoreCivic has engaged in and knowingly facilitated numerous, egregious violations of state and federal law. *See Gomez Ruiz v. ICE*, Case No. 3:25-cv-09757 (N.D. Cal.; filed Nov. 12, 2025). Because these violations would require the City to automatically suspend or terminate any *existing* business license, they should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance.

A check for the $461.00 appeal fee, pursuant to the City's current fee schedule, has been mailed to the City Clerk. Please provide notice of the appeal hearing once the date and time are set. CCMC § 1-4.08. If this appeal will be decided without a hearing, please provide the date of the anticipated decision and immediate notice of the appeal body's determination so that we may exercise any further appeal rights to which we are entitled by law.

Sincerely,

Jehan Laner

cc: Brandon Sanchez

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EMS

From: Jehan Laner
Immigrant Legal Resource Center
268 Bush St # 3933
San Francisco, CA 94104

To City of California City
City Hall
21000 Hacienda Blvd
California City, CA 93505

# FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

JEHAN M LANER Immigrant Legal Resource Center
[redacted]
Attn: Jehan
268 Bush St. #3933
San Francisco, CA 94104

241

Date 7/9/2026

16-7838/3220
0

Pay to the Order of City of California City $ 461.00

Four hundred and sixty one xx/100 Dollars

F&A FEDERAL CREDIT UNION
2625 Corporate Place, Monterey Park, CA 91754-7845

For California City Appeal Fee - SPR Minor

⑆322078383⑆ 00000403935631⑈0241

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

GUARANTEED* ▪ TRACKED ▪ INSURED

...t is 70 lbs. For ... shipments, the maximum weight is 20 lbs.

UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL EXPRESS®**

EMS

From Jehan Laner
Immigrant Legal Resource Center
268 Bush St #3933
San Francisco, CA 94104

To: City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

UNITED STATES POSTAL SERVICE. Retail

FLA
ONE RAT
To schec
s

E

US POSTAGE PAID
$35.90
Origin: 94610
07/09/26
0555040017-28

PRIORITY MAIL EXPRESS®

JELAN LANER
IMMIGRANT LEGAL RESOURCE CEN
#3933
268 BUSH ST
SAN FRANCISCO CA 94104
(415) 725-1417

0 Lb 1.80 Oz
RDC 07

US

SCHEDULED DELIVERY DAY: 07/13/26 06:00 PM

VISIT
ORDER

C007

SHIP TO:
CITY OF CALIFORNIA CITY HALL
21000 HACIENDA BLVD
CALIFORNIA CITY CA 93505-2259

PS

USPS TRACKING® #

[redacted]

9570 1110

**GUARANTEED* ▪ TRACKED ▪ INSURED**

# ATTACHMENT 3

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**
Jim Creighton
**MAYOR PRO TEM**

Della Clark
Ronald Smith
**COUNCIL MEMBERS**

Sean Grayson
**INTERIM CITY MANAGER**

## Site Plan Review 25-09

Determination Letter

To,
Marcelo Ariola
VP Real Estate
CoreCivic, Inc.
5501 Virginia Way, Suite 110,
Brentwood, TN 37027

Date: 26 February 2026

**Subject:** Approval of Site Plan Review (SPR 25-09) at 22844 Virginia Blvd, California City, CA 93505

Dear Marcelo Ariola,

The City of California City ("City") Planning Department has completed its review of Site Plan Review Application SPR 25-09 for the California City Corrections Facility located at 22844 Virginia Blvd (APN 350-031-02). Based upon review of the City's entitlement record and associated environmental documents, the following determination is issued.

**Background:**

The facility located at Virginia Boulevard was originally approved under Conditional Use Permit (CUP) 97-01, adopted via Resolution No. 01-98-1802, for a 2,304-bed "prison facility." In October 1998, the City granted CUP 98-02 to expand the permitted use by 512 beds.

The facility was inactive for approximately one year. Neither CUP 97-01 nor CUP 98-02 expires due to inactivity. Further, each CUP runs with the land and is valid unless and until revoked after a notice and opportunity to be heard according to applicable law.

On August 22, 2025, the facility applied for Site Plan Review approval "to operate in the same manner it has since it was constructed in 1999."

**Discussion:**

Pursuant to California City Municipal Code ("CCMC") section 9-2.212(b), the Planning Director reviews the proposal to determine whether it satisfies the requirements of this section. Section 9-2.212(d), further provides that "The site plan shall be approved if application shows the site will be developed in accordance with the requirements of the Municipal Code." As such, Section 9-2.212 directs ministerial approval when the proposal demonstrates Municipal Code compliance.

The Planning Department has reviewed the Site Plan Review Application and finds the use is authorized subject to compliance with CUP 97-01 and CUP 98-02. In particular, these permits collectively allow for a total bed count of 2,816.

The facility has satisfied the requirements of the Building & Safety Division and Fire Department.

According to CCMC section 9-2.402, "correction, probation or prison facilities and services" are permitted in the Residential Agricultural (RA) zone with a conditional use permit. The facility's current operations appear to fall within the scope of the use approved in CUP 97-01 and expanded by CUP 98-02. Therefore, the proposed use is a continuation of the previously entitled use.

**CEQA Determination:**

The Site Plan Review approval is a ministerial action limited to verification of compliance with objective Municipal Code standards and does not involve the exercise of discretion. Accordingly, this approval is exempt from the California Environmental Quality Act ("CEQA") pursuant to CEQA Guidelines Section 15268 (Ministerial Projects).

The facility and correctional facility use were previously evaluated in a certified Environmental Impact Report Supplement (SCH No. 97091045) adopted in connection with CUP 97-01 and a Mitigated Negative Declaration adopted in connection with CUP 98-02. This administrative approval implements existing entitlements and does not authorize any expansion or modification of the approved project.

**Planning Department Findings:**

The facility remains subject to the use category approved under CUP 97-01: Governmental or quasi-governmental correction, probation, or prison facilities and services. Pursuant to CCMC section 9-2.212(d), the application shows the site will be used in accordance with the requirements of the CCMC, and as such "the site plan shall be approved."

This Site Plan Review approval:

1. Implements CUP 97-01 and CUP 98-02 as reflected in the City's entitlement record;
2. Reflects a maximum occupancy of 2,816 beds;
3. Applies solely to the previously approved 70-acre facility footprint (APN 350-031-02); and

4. References the previously certified environmental documents and adopted mitigation programs associated with CUP 97-01 and CUP 98-02.
5. Affirms that the operator maintains ongoing compliance with all applicable mitigation measures contained in both adopted programs. The City reserves the right to conduct inspections and request documentation necessary to verify continued compliance.

Failure to comply with the conditions of CUP 97-01 or CUP 98-02 the adopted mitigation programs may result in enforcement action, including potential revocation proceedings in accordance with the CCMC and California law.

Any proposal to expand the development area, increase bed capacity beyond 2,816 beds, or materially modify the approved use shall require amendment to the applicable Conditional Use Permit(s) and compliance with CEQA.

This letter constitutes the Planning Department's formal approval of SPR 25-09 consistent with the above-referenced entitlements and environmental determinations.

Anu Doravari

Sincerely,
Anu Doravari
Planning Director
Planning Division
Community Development
City of California City

# ATTACHMENT 4

ORIGINAL

**RESOLUTION NO.** 01-98-1802
A RESOLUTION OF THE CITY COUNCIL
GRANTING CONDITIONAL USE PERMIT 97-01
PRISON FACILITY

**WHEREAS**, governmental and quasi-governmental uses, such as prison facilities may be permitted in Residential/Agricultural District zones with a conditional use permit (Ord. No. 96-529); and

**WHEREAS**, the property located approximately 0.5 miles South of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian also known as Assessor's Parcel Number (APN) 350-031-02 is within the R/A, Residential/Agricultural District zone and that a portion of the 320-acre site is zoned Conservation Land, which is a compatible use with the R/A zone as defined by the City of California City General Plan 2012 Land Use Designation Chart; and

**WHEREAS**, Corrections Corporation of America has requested and filed an application with the Planning Commission to establish and operate a 2,304 bed prison facility on approximately 70 acres of the 320-acre above-mentioned address; and

**WHEREAS**, notice of a public hearing was mailed to all property owners within 300 feet of the above-mentioned parcel and published as required by the Zoning Regulations; and

**WHEREAS**, the Planning Commission did conduct a public hearing on January 15, 1998, heard public testimony, and made the following findings:

1. That a prison facility use is necessary for the preservation and enjoyment of a substantial property right.
2. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.

3. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
4. That the Final Environmental Impact Report (EIR) Supplement State Clearinghouse (SCH) #97091045 is certified as adequate and in compliance with California Environmental Quality Act (CEQA) for the proposed prison project.
5. That the Mitigation Monitoring Program dated January 1998 for the proposed prison be adopted as part of Conditional Use Permit 97-01.
6. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
7. Site plan review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
8. This conditional use permit expires twelve (12) months from that date of the City Council's approval if the prison facility operation is not commenced and diligently pursued.
9. All provisions of the City of California City Municipal Code currently in effect must be complied with.

**WHEREAS**, the Planning Commission hereby approves the conditional use permit and directs that this resolution be prepared and presented to the City Council for the consideration and granting of Conditional Use Permit 97-01.

**APPROVED THIS 15TH DAY OF JANUARY, 1998** by the Planning Commission.

Ruben W Dennis Jr.
Planning Commission Chairman

Attest:

Ronna L. Greene
Planning Secretary

**NOW, THEREFORE, BE IT RESOLVED** by the City Council of the City of California City that the Conditional Use Permit 97-01 is granted to Corrections Corporation of America to establish and operate a prison facility in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**PASSED, APPROVED AND ADOPTED** this 20th day of January, 1998, by the City Council, by the following Roll Call Vote: AYES: 5 ; NOES: 0 ; ABSTAIN: 0; ABSENT: 0.

Mayor

ATTEST:

Secretary
(SEAL)

CUP 98-02

RESOLUTION NO. 11-98-02

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT-- AMENDMENT 98-02)**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**Section 1. Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America (CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee filed an application to expand the permitted use by 512 beds. This resolution sets forth the Commission's decision on the application.

**Section 2. Findings**

The Commission finds as follows:

(a) Operation of a prison facility is in accordance with the general plan and the objectives of the Zoning Regulations;

(b) Facility complies with the applicable provisions of the Municipal Code; and

(c) A Mitigated Negative Declaration for the proposal will satisfy California Environmental Quality Act (CEQA).

**Section 3. Conditions**

The application to amend Conditional Use Permit No. 97-01 is approved subject to the following conditions:

(a) Buildings must be connected to electricity, water, sewer, natural gas, telephone and cable television;

(b) Site Plan Review for the project will be to the satisfaction of the City Engineer and in accordance with the Municipal Code; and

(c) Other provisions of the Municipal Code shall be followed.

**Section 4. Other**

Except as provided herein, Conditional Use Permit No. 97-01 is hereby affirmed.

**PASSED, APPROVED AND ADOPTED** on November 24, 1998, by the following votes:

| | |
|---|---|
| AYES: | 4 |
| NOES: | -0- |
| ABSENT: | -0- |
| ABSTAIN: | 1 |

Robert L. Tryon
Chair

ATTEST:

Ronna Greene
Secretary

(SEAL)

ORIGINAL

# REGULAR MEETING
# CALIFORNIA CITY CITY COUNCIL
# TUESDAY, December 1, 1998, 6:00 P.M.
# COUNCIL CHAMBERS
# MINUTES

**OPENING CEREMONIES**:Mayor Adams called the meeting to order at 6:00 p.m. Pastor kathryn Efford, California City Christian Center, gave the Invocation. Following the Pledge of Allegiance, the Deputy City Clerk called the roll:

**PRESENT**: Council members Bailey, Lessenevitch, Walker, Benson, Adams
**ABSENT**: None

Also Present:
City Manager Terry Hicks, City Attorney Steven O'Neill, Police Chief Wayne Dickerson, Fire Chief Mike Antonucci, City Engineer Mike Shahbakhti, Public Works Superintendent Ron Wallace, Airport Manager Tom Weil, City Treasurer Lauralee Wagner, Deputy City Clerk Ronna Greene.

**ADOPTION OF THE AGENDA:**
Motion by Vice Mayor Benson, second by Councilman Lessenevitch, to adopt the agenda with the following changes: On Public Hearing 2, reverse the order the Resolutions are adopted, and Councilman Lessenevitch requested that under New Business 1, the matter of selecting RDA Chairman and Vice Chairman be deferred to the RDA meeting. Roll call vote as follows:

**AYES**: Council members Bailey, Lessenevitch, Walker, Benson, Adams.
**NAYS**: None
**ABSENT**: None

**ADOPTION OF RESOLUTION DECLARING RESULTS OF ELECTION** - Motion to adopt by Vice Mayor Benson, second by Councilman Lessenevitch, **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY RECITING THE FACT OF THE MUNCIPAL ELECTION HELD ON NOVEMBER 3, 1998, DECLARING THE RESULTS AND SUCH OTHER MATTERS AS PROVIDED BY LAW**." - Carried.

**ISSUANCE OF OATH OF OFFICE**:
Deputy City Clerk Ronna Greene issued the Oath of Office to Mayor Larry Adams, Councilman Bill Dempsey, Councilman Russell Eddington, Treasurer Lauralee Wagner

**PRESENTATIONS:**

Deputy Clerk Ronna Greene presented Vice Mayor Benson and Councilwoman Lottie Walker with Certificates of Appreciation and plaques in honor of their dedication and service to the City of California City while serving in public office.

**CIVIC/COMMUNITY ORGANIZATION ANNOUNCEMENTS:**

1. Jim Norris, Youth Football, announced a pancake breakfast for December 12, 7 am, at the new Pizza Factory building.
2. Cheryl Hoffman, Calif. Air and Space Museum, announced the Fly-In at Calif. City Municipal Airport on December 12; there are a number of activities going on including a swap meet. .
3. Jack Stewart, EDC regarding the dance at the Sports Arena on December 12, 7:30 pm on.
4. Buford Land, Chamber of Commerce, re the December mixer on the 18th at the Courtyard. Part of the proceeds to go to the food bank in Calif. City.

**PUBLIC BUSINESS FROM THE FLOOR:**

1. Kathryn Efford, Cal City Christian Center, encouraged everyone to come out to the dance and have a good time. Bring the young people; not just for adults.
2. Aurora Stratton, asking the status of the proposed blinking red light at the intersection of 82nd and CCB: also complimented the street crew for the installation of a stop sign at Kennedy Blvd. And Craig, second community.

**STAFF ANNOUNCEMENTS:** None

**PUBLIC HEARINGS:**

**PH 1.** Consider approving Conditional Use Permit-Amendment (CUP-A) Application No. 98-01, extension to CUP No. 96-05 -

Mayor Adams opened the Public Hearing at 6:21 p.m. Staff report was given by the City Engineer, explaining that the Baptist Church had requested extension of condition no. 5 on their CUP until March, 1999.

Council discussion: Mayor Adams asked why, if the Church asked for a 6-month extension past their deadline of September 1, 1998, were there dates of September 2000 shown as the extension.

Planning Commissioner Dennis explained to the Mayor that the Planning Commission didn't believe that was sufficient time, and recommended an extension to September 1, 2000.

Correspondence: None

Public Comment: None

Motion to close the public hearing at 6:24 by Councilman Bailey, second by Councilman Lessenevitch. Carried.

Council action: Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the extension to September 1, 2000, and adopt **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 96-05 AS IT RELATES TO THE DEADLINE FOR COMPLETING A FINANCIAL PLAN."** Roll Call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

**PH 2.** Consider approving amendment to Conditional Use Permit-Amendment (CUP-A) for Proposed 512-Bed Expansion at California City Correctional Center -

Mayor Adams declared the Public Hearing open at 6:27 pm. Staff report was given by the City Engineer. There was no correspondence received on either part 1 or part 2 of the public hearing.

Council discussion: Procedural matters were discussed on how to conduct the two-part hearing.

Public comment: None

Motion to close the public hearing at 6:35 p.m. by Councilman Lessenevitch, second by Councilman Bailey. Carried.

Council action: On the advice of the City Attorney, the second Resolution, making certain environmental findings, was adopted first, as follows:

Motion by Councilman Lessenevitch, second by Councilman Bailey, to adopt the Mitigated Negative Declaration and adopt **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS IN CONNECTION WITH THE 512-BED EXPANSION OF THE CALIFORNIA CITY CORRECTIONAL CENTER."** Roll

Call vote as follows:

**AYES:** Council members Bailey, Dempsey. Eddington, Lessenevitch, Adams.
**NAYS:** None
**ABSENT:** None

Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the Amendment to Conditional Use Permit-Amendment to allow a 512-bed expansion to the original CUP, by adopting **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTION CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER**." Roll call vote as follows:

**AYES:** Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams.
**NAYS:** None
**ABSENT:** None

**CONTINUED BUSINESS:** None

**NEW BUSINESS:**

**NB 1.** Council members consider making appointments for Vice Mayor, as well as appointments to various boards and commissions:

Councilman Lessenevitch suggested they review the whole list and vote the appointments as decided by a single vote at the end. Mayor Adams said he had no problem with that approach, but asked that the position of Vice Mayor be settled first and separately. He asked that the position return to its historical roots where the Vice Mayor serves for one year only, with the position rotating through the Council so everyone has an opportunity to be Vice Mayor for one year out of their four-year term.

Councilman Lessenevitch nominated Harry Bailey for Vice Mayor, second by Councilman Dempsey. Carried.

The balance of the list was determined as follows:

**KernCOG:** Councilman Lessenevitch; alternate is Councilman Eddington
**KCAC:** Councilman Eddington.
**KCBOT:** (appointed by supervisors)
**League of Cities:** Councilman Dempsey
**KCEDC:** Councilman Dempsey

| | |
|---|---|
| **CCMUSD:** | Vice Mayor Bailey |
| **CIV/MIL:** | Russell Eddington |
| **KCAPCD:** | Mayor Adams |
| **Golf subcom.** | Mayor Adams |
| **EMCAB:** | Councilman Lessenevitch |
| **EK Alliance:** | Russell Eddington |
| **EAFB RAB** | Jim Otero retains |
| **Planning Comm.** | Retain current members through their terms. |
| **Airport Adv. Bd.** | Councilman Bailey, liaison |
| **CCAC:** | Mayor Adams, Liaison |
| **CCEDC:** | Vice Mayor Bailey |
| **Sports Council:** | Needs to be added in the future |
| **CC Trans. Comm:** | Reactivate as need arises. |
| **CC Housing Corp.** | Vice Mayor Bailey replaces former Vice Mayor Benson. |
| **PARSAC:** | Terry Hicks and Wayne Dickerson continue. |

No motion required, per City Attorney; Mayor declared the appointments made as determined.

**NB 2.** Council consider awarding bid for the Regional Surface Transportation Program (RSTP) project; other matters as recommended by Staff:

Staff report was given by City Engineer. The bidding process is complete and of the two bids received and opened on November 2, 1998, the results are as follows: Granite Construction, $364,463.00; Asphalt Construction, $419,600.60. Staff has examined the bids and finds them complete and acceptable. The City has a grant of $580.748.00 for the construction. The City is authorized under the grant to increase change orders from 25% up to whatever the Council wishes up to the amount of the grant. Staff is requesting that they be allowed to negotiate the remaining monies after the 25% allowed for change orders (approx. $100.,000) with the low bidder to increase the amount of work in the project.

Mayor Adams said the scope of the project was from Mitchell to South Loop. Does the overage mean the amount of paving can go beyond that project limit, or does it mean that the extra funds will make a better road within those limits? The City Engineer said that we are locked into the boundaries; the extra monies mean that we can do more work to make a better road than was planned in the initial project.

Public Comment: Dottie Helton asked if there was a time limit on the project. If possible, could the improvements wait until the prison construction is complete and then do the

work. The project can't wait until then; the money will be lost to us if not used now.

Motion by Vice Mayor to award the bid to Granite Construction, with permission to negotiate change orders to meet the entire grant; second by Councilman Lessenevitch. Roll call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Dempsey, Eddington, Lessenevitch, Bailey, Adams |
| **NAYS:** | None |
| **ABSENT:** | None |

**NB 3.** Council consider findings of staff regarding the abatement of the Service Road at Victor Plaza -

City Engineer Shahbakhti provided the staff report. The project if approved would require a street vacation by the City. How the ownership of the property if vacated by the City works out, is dependent on how the property is currently owned. If the frontage road was dedicated as a part of the subdivision, and vacated, the land becomes part of the property where the Plaza is located. If it was deeded to the City as an easement, then it is no longer valid and if it was deeded to the city in fee title, then once vacated it would have to be sold as excess property to the highest bidder.

Councilman Bailey said it would have been easier to decide if the title report was complete; the City Engineer noted there was not sufficient time between Council's direction to put the matter on the agenda and the meeting tonight, to get a title report. The City Engineer is seeking definitive direction from the Council whether they wish to vacate the service road.

Mayor Adams said there has to be changes in the traffic flow for safety in and out of the plaza; that once it is decided how those changes will be made, then it's time to decide what form of ownership is on the property.

Chief Dickerson said he had spoken to the property owners and they are not interested in receiving the property and having to fill in the roadway and pave over it; owners prefer to create a drive between CCB and the service road and closing off the exit eastbound off the service road.

There was no action required on this item; Council consensus was to have staff complete their investigations, draw up options and return with plans and whatever other documents are necessary.

NB 4 Council consider the request of the Community Church of California City to use Lot 375/Tract 2066 for a fireworks stand (formerly granted to the California City Cardinals Baseball Club) -

Church spokesman David Steckel showed a map of the location and the question arose again about the Fireworks Ordinance they will be giving First Reading to, tonight. The consensus was that they were qualified to ask for the location.

Motion by Vice Mayor Bailey, second by Councilman Lessenevitch, that they will be permitted to use the lot providing they are first on the waiting list for permits. Roll call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Dempsey, Lessenevitch, Bailey, Adams |
| **NAYS:** | None |
| **ABSTAIN:** | Councilman Eddington |
| **ABSENT:** | None |

**COUNCIL AGENDA:**

1. Councilman Lessenevitch said that workshops should be set up with City staff to determine priorities, how funding of the streets department will go, what the new employees will be doing, etc.

2. Mayor Adams wants the Annexation process to get underway for AES; the City should become the lead agency in the project, using Jack Stewart's expertise to work through the bureaucracies involved. He also wants the Master Fee resolution amended regarding how sewer charges are computed for commercial customers. He wants the City to be able to measure effluent on large user accounts. He also congratulated Councilmen Dempsey and Eddington for their arrival on the Council and thanked Vice Mayor Benson and Councilwoman Walker for their service once again, to the City.

**COUNCIL REPORTS**: None

**CONSENT CALENDAR**:

**CC 1.** Warrant Register of 11/24/98

**CC 2.** Adopt Minutes of the Regular City Council meeting of 11/17/98

**CC 3.** Give First Reading by Title Only with Further Reading Waived, of **"AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY AMENDING THE CALIFORNIA CITY MUNICIPAL CODE AS IT**

**RELATES TO PERMITS FOR THE SALE OF FIREWORKS."**

**CC 4.** Participation Agreement to the 457 plan Trust, Equitable Life Assurance Society of the United States (Authorizes Finance Director to sign agreement for City of California City).

Council discussion:

Motion to adopt the Consent Calendar by Vice Mayor Bailey, second by Councilman Lessenevitch. Roll Call vote as follows:

| | |
|---|---|
| AYES: | Council members Dempsey, Eddington, Lessenevitch, Bailey, Adams |
| NAYS: | None |
| ABSENT: | None |

**CLOSED SESSION:** None

**ADDITIONAL PUBLIC COMMENT:**

Tim Rifenberg provided his vote of confidence to Jack Stewart as City Manager. Alis Clausen, So. Cal Edison, noted the Council members were invited to participate in meetings with the Antelope Valley Board of Trade and the military support organizations trying to keep Edwards AFB and China Lake NWC open and continued growth of the military complex in the region. Kathryn Efford said she would like to support Larry Boyles for City manager. She also noted the City Council would be "carolled" for Christmas at the second meeting in December. Lottie Walker said she thought the applications for City Manager were confidential; in all the years she has been involved on the Council or with City business this is the first time applicants names have been put out in the community before they are selected. Lyle Cyrus put in his vote for Jack Stewart for City Manager.

**ADJOURNMENT**

Motion by Councilman Lessenevitch, second by Vice Mayor Bailey, to adjourn at 7:35 p.m. Carried.

Respectfully Submitted:

Helen Dennis, City Clerk

**STATE OF CALIFORNIA )**
**) ss**
**COUNTY OF KERN )**

**I, HELEN DENNIS, CITY CLERK OF THE CITY OF CALIFORNIA CITY, CALIFORNIA,** do hereby certify that the foregoing is a complete and accurate copy of the Minutes of the Regular Meeting of the City Council of the City of California City, held on December 1, 1998 , and adopted as written by a vote of the City Council at their Regular Meeting of December 15, 1998, by the following vote:

**AYES:** Council members Dempsey, Eddington, Lessenevitch, Bailey, Adams
**NAYS:** 0
**ABSTAIN:** 0
**ABSENT:** 0

**DATED:** December 16, 1998

Helen Dennis, City Clerk
(Seal)

# ATTACHMENT 5

# CITY OF CALIFORNIA CITY

# FINAL

# GENERAL PLAN

# 2009-2028

Adopted by City Council
October 6, 2009
Resolution# 10-09-2359
SCH# 1992062069

City of California City
21000 Hacienda Boulevard
California City, CA 93505-2293
(760) 373-8661

ORIGINAL

**RESOLUTION NO. 10-09 -2359**

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY ADOPTING GENERAL PLAN UPDATE 2009-2028**

**BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY as follows:**

**1. Purpose and Scope.**
This Resolution adopts the General Plan for 2009-2028.

**2. Findings.**
The City Council finds, determines and declares:

(a) The General Plan amendments described herein ("subject amendment") will benefit the City, its residents and property;

(b) The subject amendment is otherwise consistent with the remainder of the General Plan and zoning regulations;

(c) The subject amendment will not be accompanied by any significant, adverse environmental impacts; and

(d) The subject amendment was considered as a duly noticed public meeting by the Planning Commission and by the City Council.

**3. Amendment.**
The General Plan for 2009-2028 is hereby amended as set forth on Exhibit "A", attached hereto and hereby incorporated by this reference.

**PASSED, APPROVED AND ADOPTED** on October 6, 2009, by the following vote:

AYES: Smith, Strong, Lessenevitch, Edmiston, Adams
NOES: None
ABSENT: None
ABSTAIN: None

Mayor

ATTEST:

City Clerk

(SEAL)



CC\Reso\PH 1
XX∴Pεσο∴ΠΗ 1

4. **Citywide California City General Plan,** ***Environmental Impact Report, incorporated by reference, (SCH #1992062069), General Plan Update 2012.***

5. **Villages Specific Plan,** ***incorporated by reference, The Villages of California City Supplemental Environmental Impact Report, April 1993 (SCH #1992072089) amending the 2028 City of California City Redevelopment Plan and Project Area Environmental Impact Report (SCH #1987110918), known as the first amendment. Documents are on file in the California City Planning Dept., 21000 Hacienda Blvd., California City.*** The Villages Specific Plan, approved in April 1993 is 500 acres located in the central core of California City with access to infrastructure for recreational, residential, government, medical, and regional commercial development. Bound on the north by North Loop Boulevard, on the east by Randsburg-Mojave/California City Boulevard, on the South by South Loop Boulevard and on the west by Hacienda Boulevard.

6. **Corrections Corporation of America (CCA) at 22844 Virginia Boulevard, California City, California,** ***incorporated by reference, Environmental Impact Report (SCH #1993082030 and SEIR 1997091045). Documents are on file in the California City Planning Dept., 21000 Hacienda Blvd., California City.*** California City has within its jurisdictional boundaries a minimum security, privately owned and operated prison by Corrections Corporation of America (CCA) at 22844 Virginia Boulevard, California City, California. The California City Correctional Facility houses over 2,300 Federal detainees awaiting deportation. The overall site is 320 acres and zoned open space/residential agricultural (O/RA), of which there is a 105-acre footprint that incorporates the existing 70-acre facility and an additional 35 acres for future expansion. This 105-acre footprint has received all of its environmental approvals.

7. **Annexation/Detachment #5,** ***incorporated by reference 2002 Final Environmental Impact Report Redevelopment Area Expansion, Detachment, Annexation and Automotive Test Course Project, Volume III, October 4, 2002, (SCH #2002041025). This report incorporates Clarifications and Revisions to the Draft EIR, Comment Letters on the Draft EIR, and Responses to Comments. The final EIR (which consists of Volume I: Draft EIR dated July 17, 2002; Volume II: Technical Appendices to the Draft EIR dated July 17, 2002; Environmental Findings of Fact and Statement of Overriding Considerations for the Redevelopment Area Expansion, Detachment, Annexation and Automotive Test Course Project dated October 4, 2002; Mitigation Monitoring Program for the Redevelopment Area Expansion, Detachment, Annexation and Automotive Test Course Project dated October 2, 2002; Environmental Assessment/Habitat Conservation for issuance of an Endangered Species Section 10(A)1(B) Permit /2081 Permit for the Incidental Take of the Desert Tortoise and Mojave Ground Squirrel dated July 2, 2002; Initial Study: Annexation, Detachment, Sphere of Influence Amendment, Redevelopment Area Expansion, General Plan Update Including the Housing Element), and Automotive Test Course Project dated April 4, 2002. Documents are on file in the California City Planning Dept., 21000 Hacienda Blvd., California City.*** The existing sphere of influence includes the previous annexation (Annexation #5) of approximately 17,993 acres or 28.1 square miles in the southeast portion of the City and detachment of 18,676 acres or 29.1 square miles generally in the northeastern and eastern portion of the City, approved in 2003 by the Local Agency Formation Commission (LAFCO). In addition, in 2003 approximately 5.04 square miles was acquired by Hyundai Proving Grounds and Technical Center for the purpose of providing additional desert tortoise habitat in order to mitigate potential impacts to the desert tortoise and its habitat, as a result of the construction and on-going operation of the Hyundai Proving Grounds and Technical Center. This mitigation area is located to the north of the General Plan Planning Area, in the vicinity of the Desert Tortoise Research Natural Area. The privately owned and operated Hyundai Proving Grounds and Technical Center is zoned Light Industrial and Research (M1).

8. **California City Motocross Track,** ***incorporated by reference, (SCH #2003081099). Documents are on file in the California City Planning Dept., 21000 Hacienda Blvd., California City.*** Cal City

# REGULAR MEETING
# CITY OF CALIFORNIA CITY
# CITY COUNCIL
# Tuesday September 21, 2010
# Council Chambers, 21000 Hacienda Blvd.
# MINUTES

## CALL TO ORDER

Mayor Adams called the meeting to order at 5:38 pm

**Following the Pledge of Allegiance the city clerk called the roll:**

**PRESENT:** Councilmembers Smith, Strong, Lessenevitch, Edmiston
Mayor Adams
**ABSENT:** None

## ADOPTION OF AGENDA

Mayor Adams announced that there were two addendums to the Agenda; CC6 and CC7. Also, that these items will be heard and acted on first under New Business.

Motion by Councilmember Lessenevitch, second by Councilmember Strong to adopt the agenda with the addendums and the order in which they will be heard. Motion carried.

## PRESENTATIONS

Patrick Welling outlined his proposed Eagle Scout Project

## STAFF ANNOUNCEMENTS/REPORTS

Public Works Director Bevins provided an update on the CCB resurface project including that the grinds will be used on the cemetery parking lot. He also reported that the Mendiburu project; 96th to Hacienda will start on 9/30/10 and will be closed while the tortoise fence is installed. Project to last approximately 22 days.

## CIVIC / COMMUNITY ORGANIZATION ANNOUNCEMENTS

Helen Dennis, Community Club - "Meet the Candidates" 10/7 and 10/14, CCMS at 6pm. Also as Chairman of the Parks and Recreation Commission she announced there is a shorter revised survey available for the public to fill out regarding the parks.
Shirley Heathman - Cancer Assistance Walk to be held 10/23/10 at Central Park. Registration is at 7:30 am
MaryAnn Leblanc, EDC - 5th Thursday Dinner 9/30/10 at Senior Center
Kim Collins, Citizens Advisory Committee - Next meeting 9/24/10 5:30 City Hall

**PUBLIC BUSINESS FROM THE FLOOR**

Public comment was received from Pat Bohannon, Buford Land and Kim Collins

**CONSENT CALENDAR / PUBLIC COMMENT**

**CC 1.** City check registers dated through 9/15/10
**CC 2.** Approve minutes of meeting dated 9/07/10

Motion by Councilmember Lessenevitch, second by Councilmember Strong, to approve the consent calendar. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: None
**ABSTAIN**: Smith Ck #82529
**ABSENT**: None

**NEW BUSINESS**

**NB 6.** Intergovernmental Service Agreement (IGSA)

**NB 7.** Corrections Corporation of America (CCA)

City Manager Weil reported that NB 6 and NB7 go hand in hand. First is the agreement between the City and the Office of the Federal Detention Trustee to house US Marshall detainees. This gives the City the opportunity to sign contracts with the federal government and then CCA becomes our subcontractor. He outlined the details of the agreements and how the City is in no way can be held responsible for the actual running of the prison. Staff is requesting permission for the City Manager to sign both agreements. Mr. Weil further explained that the IGSA agreement also opens up the opportunity to receive inmates from other authorized agencies, such as ICE and BOP. This will allow our prison to fill back up to capacity and reinstate a huge portion of the jobs that were lost. Further positive action resulting from these agreements will be the new revenue stream that will be created to the City through CCA. The City will receive .50 per day, per inmate. Staff is recommending these funds be put into a reserve fund.

Jeb Beasley, representing CCA, was present from the Tennessee corporate office to answer any questions. Both council and public received clarification on their concerns and to their questions.

Motion by Mayor Pro Tem Edmiston, second by Councilmember Strong to allow the City Manager to sign and approve the Intergovernmental Service Agreement,. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: None
**ABSTAIN**: None
**ABSENT**: None

Motion by Mayor Pro Tem Edmiston, second by Councilmember Strong to allow the City Manager to sign and approve the agreement with Corrections Corporation of America. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: Nonce
**ABSTAIN**: None
**ABSENT**: None

Mayor Adams reported that the City has been working on securing an agreement since it was announced that CCA contract had been cancelled. He thanked Congressman Kevin McCarthy for stepping up to help the City.

**NB1.** Special Tax Commission Ordinance

City Attorney Lemieux reported that it was asked to prepare this ordinance amending the municipal code to establish am over site commission to ensure that the special tax proceeds will be spent for specific purposes i.e. infrastructure replacement . (Pending the massage of Measure E in November). He outlined the proposed ordinance.

City Manager Weil added that this is to ensure oversight by future councils and that the proceeds of the tax could not be used for operating expenses.

Mayor Pro Tem Edmiston noted that he is concerned about Sec 2-2.905 regarding compensation. Staff agrees that this should be an unpaid position. It has always been that way in the past, regarding the Citizens Advisory Committee.

Councilmember Smith expressed his concerns regarding design cost of the water system as referred to in Sec 2-2.907

Motion by Mayor Pro Tem Edmiston, second by Councilmember Strong to give First Reading, by Title only, with Further Reading waived of **"AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY AMENDING THE CALIFORNIA CITY MUNICIPAL CODE BY ESTABLISHING THE SPECIAL TAX COMMISSION"** deleting section 2-2.905. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: None
**ABSTAIN**: None
**ABSENT**: None

**NB 2.** Scout Island - Plans and Specifications

Public Works director Bevins reported that is June 2010 staff received an email from the Committee Chairman of California City Boy Scout Troop 413, requesting improvements to the existing Scout Hut. During the review of the situation it was recommended by citizens Rhonda and Alan Vasquez that the former Sports Arena property would be an ideal location for future Scout related activities. A rough design was prepared by staff. It was then reviewed by both Councils for the Boy Scouts of America and the Girl Scouts of Greater Los Angeles, with changes made per their suggestions. Staff has determined that funding in the amount of $70,000 was firmly available from the current year budget for the purchase of materials. Additional funding would come from donations and fund raising. The project is planned to be constructed by volunteer labor and landscaped by the Scouts. Two architects who attended the review process were approached to provide bids on the creation of construction plans for the Scout Lodge. Both are presented for review.

Staff is recommending that the council adopt Scout Island project and to award the design for the Bob Parker scout Lodge to Mountain View Studios for $1000 per their submission.

Helen Dennis, Chairman of the Parks & Recreation Commission, voiced her support for this project and urged the council to approve.

Motion by Mayor Pro Tem Edmiston, second by Councilmember Strong to approve. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS:** None
**ABSTAIN:** None
**ABSENT:** None

**NB 3.** Municipal Code Review - Title 6

City Attorney Lemieux explained this is the continuation of the review of the Municipal Code. He explained that on this large Title 6 he has mostly done clean up with the exception of a few area. He proceeded to review the proposed changes, stopping and discussing areas of concern noted by Mayor Pro Tem Edmiston and Councilmember Smith.

After lengthy review it is the consensus of the council to have staff make discussed revisions and bring back a new draft for further review.

**NB 4.** Scout Island Drive and Aspen Avenue Extension

Public Works Director Bevins reported that the Redevelopment Agency has previously allocated $100,000 for the construction of a new road for the Cerro Coso Community College / Best Western access road. Keeping with current county 911 policy, existing alignment names will be used, where a current alignment exists. Survey work and staking needs to be completed to provide water to the proposed hotel and college site across CCB, before those streets are resurfaced. Mr. Bevins provided a map designating the proposed alignments for the two streets. Staff recommends that the council adopt the proposed alignment for Scout Island Drive and Aspen Avenue Extension and request that deeded easements and final road maps be prepared and recorded. Funding, in the amount of $10,000, would come from Street Improvement.

No council or public comments noted.

Motion by Councilmember Smith, second by Mayor Pro Tem Edmiston to approve the proposed alignment. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: None
**ABSTAIN**: None
**ABSENT**: None

**NB 5.** CCB Resurface Project Change Order

Public Works Director Bevins reported that the City has entered into a construction contract with Bowman Construction to resurface CCB at various locations. The current project does not include plans to construct a deceleration lane along CCB in the Scout Island Drive area. The plan was originally submitted by WRA Engineering for the Ellison project. WRA has released the design and survey information to the City for its use. Bowman requires a change order in the amount not to exceed $79, 331.52. The proposal affects the southern edge of the City right of way from the west end of the ARRA project, west to the Tierra del Sol golf course.
Staff recommends that the council authorize the deceleration lane change order to the CCB Resurface contract with Bowman Construction. Funding source would be Street Improvements.

Public comments were addressed.

Motion by Mayor Pro Tem Edmiston, second by Councilmember Lessenevitch to approve the change order with Bowman Construction. Roll call vote as follows:

**AYES:** Smith, Strong, Lessenevitch, Edmiston, Adams
**NAYS**: None

**ABSTAIN**: None
**ABSENT**: None

**COUNCIL AGENDA**
Councilmember Smith - See attached written report
Mayor Pro Tem Edmiston - Thanks to Mayor Adams and City Manager Weil for they successful efforts on acquiring the contract with CCA
Mayor Adams - Updates from the recent attendance to the League of Cities Annual Conference; electric car requirements, new technology in pipes and "Healthy Eating" Program

**ADJOURNMENT**
Motion by Mayor Pro Tem Edmiston, second by Councilmember Smith to adjourn at 7:18 pm. Motion carried.

Respectfully submitted by,

Denise Hilliker, City Clerk

**APPROVED BY CITY COUNCIL ON** ______________________________




Conceptual Site Plan

*Correctional Development Facility at California City (CDFCC)*

# ATTACHMENT 6

C A L I F O R N I A
DEPARTMENT OF JUSTICE

**Rob Bonta**
***Attorney General***

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 95814
Public: (916) 445-9555
Telephone: (916) 210-6642
E-Mail: ashley.werner@doj.ca.gov

***SENT VIA EMAIL AND CERTIFIED U.S. MAIL***

June 15, 2026

Sean Grayson, City Manager & Hearing Officer
David Brottlund, Planning Commission Chair
City of California City
21000 Hacienda Boulevard
California City, CA 93505
sgrayson@californiacity-ca.gov
dbrottlund@californiacity-ca.gov

**RE: Comments on Appeals of California City's Issuance of Entitlements for CoreCivic, Inc.'s Immigrant Detention Operations at the California City Correctional Facility**

Dear City Manager Grayson and Planning Commission Chair Brottlund:

The California Attorney General's Bureau of Environmental Justice respectfully submits these comments regarding the appeals of California City's approval of CoreCivic, Inc.'s ("CoreCivic") applications for a business license and a site plan for its current use of the California City Correctional Facility ("Facility"), a former prison located on approximately 70 acres of land at 22844 Virginia Boulevard, California City, for immigrant detention operations. We submit these comments to City Manager Grayson in his capacity as the hearing officer for the business license appeal and to the Planning Commission in its role as the hearing body for the site plan appeal, pursuant to California City Municipal Code sections 1-4.09, subsection (a), and 9-2.212, subsection (b).[1]

As explained further below, the City Manager and Planning Commission (individually and collectively referred to herein as "City") should not approve CoreCivic's business license and site plan review applications because doing so would violate the City's duties under its Municipal Code for several reasons. First, as a preliminary matter, pursuant to section 3-.2.3.203, subdivision (b), the City may not approve a business license or site plan application that fails to include information or materials required by the Municipal Code or that contains material misrepresentations. Based on records provided to our office by the City and publicly available information, it appears that CoreCivic did not provide the City with proof of compliance with workers' compensation laws or a site plan with its applications, as required by the Municipal Code, and CoreCivic's applications obscure the nature of its immigrant detention operations at

[1] All references in this letter to statutory provisions are to the California City Municipal Code, unless otherwise stated.

the Facility. Second, pursuant to section 3-2.3.211, the City may not issue a business license unless the proposed use conforms to the zoning regulations. Here, CoreCivic's use of the Facility as an immigrant detention center violates the City's zoning regulations and the existing conditional use permit for the Facility because immigrant detention is not permitted within the zone district or pursuant to the conditional use permit. Further, the existing conditional use permit for the Facility allows up to 2,304 beds at the Facility, not the 2,816 beds which the City has purported are authorized.[2]

As adopted by the City Council, the Municipal Code Zoning Chapter "preserves, protects and promotes the public health, safety, peace, comfort, convenience, prosperity, and general welfare."[3] The City's adherence to its own Municipal Code, which the Municipal Code mandates, is essential to achieving these objectives.[4] This principle applies to the City's actions to process entitlement applications for proposed business operations and land uses.[5] The necessity of the City's correct application of its Municipal Code requirements to CoreCivic's business license and site plan applications is magnified by the serious public health and safety failures that courts and our office have documented at the Facility and in other immigrant detention facilities operated by CoreCivic.

For these reasons, we urge the City to deny CoreCivic's site plan and business license applications.

## I. CoreCivic's Immigrant Detention Operations at the Facility

On August 27, 2025, without obtaining a business license or any other entitlement required by the Municipal Code, and more than a year after the closure of the former prison operations at the Facility, CoreCivic began to receive immigrants who had been detained by the federal government at the site.[6] In a press release, CoreCivic announced that it would hold immigrant detainees at the "2,560-bed California City Immigration Processing Center" pursuant to a contract with the U.S. Immigrations and Customs Enforcement ("ICE").[7] News reports estimate, based on statements by the City's Mayor, that the Facility held 500 detainees within

---

[2] Ex. I (Res. No. 01-98-1802), p. 1.
[3] § 9-2.101.
[4] §§ 1-3.01, 1-3.03, subd. (a)(1), 9-2.2803.
[5] §§ 9-2.2803, subd. (a), 3-2.3.214.
[6] Elliott, State Removes All Inmates from Cal. City Prison, Remaining Staff Working to Close Facility, Tehachapi News (Nov. 18, 2023), https://www.tehachapinews.com/news/state-removes-all-inmates-from-cal-city-prison-remaining-staff-working-to-close-facility/article_f6920d7c-864e-11ee-88b2-3f4bee2c5642.html.
[7] CoreCivic, CoreCivic Announces New Contract Awards at California City Immigration Processing Center and Midwest Regional Reception Center (Sept. 29, 2025), https://ir.corecivic.com/news-releases/news-release-details/corecivic-announces-new-contract-awards-california-city.

just two weeks of its opening as an immigration detention center.[8] By January 2026, the detained population at the Facility had ballooned to over 1,400 people.[9]

Since CoreCivic began to receive detainees at the Facility in 2025, inhumane conditions of confinement have been repeatedly documented by detainees, non-profit organizations, and government entities, including the California Department of Justice. In September 2025, Disability Rights California conducted a monitoring visit of the Facility and concluded that ICE and CoreCivic were subjecting people with disabilities to abuse and neglect by failing to provide access to critical medical and mental health care and failing to address disability-related requests in a timely manner, in addition to other critical shortcomings.[10] In November 2025, seven detainees filed a class action lawsuit against ICE and the Department of Homeland Security ("DHS") alleging that detainees at the Facility have been deprived of access to basic medical care, disability accommodations, and access to their lawyers and loved ones, in violation of their rights under the U.S. Constitution.[11,12] The lawsuit further alleges that detainees have been subjected to crumbling and unhygienic infrastructure conditions in the Facility, including clogged toilets and showers, foul smelling and discolored tap water, raw sewage, mold, insects, leaks, and flooding, as well as inadequate clothing, excessive solitary confinement and threats of force, and a lack of privacy in bathing and toilet facilities.[13] On February 10, 2026, the United States District Court for the Northern District of California issued a preliminary injunction

---

[8] Montalvo, ICE awards $130M contract to run Kern County facility amid deportation crackdown, FresnoBee (Oct. 22, 2025), https://www.fresnobee.com/news/local/article312344657.html.

[9] Fry, California's Newest ICE Center Has 1,400 Detainees - What Adam Schiff and Alex Padilla Saw There, CalMatters (Jan. 20, 2026), https://calmatters.org/justice/2026/01/california-city-ice-detention-senators/.

[10] Disability Rights California, Newly Opened California City ICE Detention Facility: Dangerous for Disabled People (Nov. 3, 2025), https://www.disabilityrightsca.org/reports/california-city-ice-processing-center-a-dangerous-expansion-of-immigration-detention-in; see also Montalvo, Immigrants Protest Solitary Confinement - Abuse at CA's Largest ICE Detention Center, FresnoBee (Oct. 22, 2025) (describing inhumane conditions and treatment reported by detainees at the Facility and detainees' sit-ins and refusal to eat in protest), https://www.fresnobee.com/news/california/article312180017.html.

[11] *Gomez-Ruiz, et al v. ICE, et al.* (N.D.Cal. Nov. 12, 2025, No. 3:25-cv-09757), ECF No. 1 ("*Gomez-Ruiz* Complaint"), ¶ 1.

[12] In a lawsuit filed against CoreCivic and the City by the Dignity Not Detention Coalition and a John Doe detainee in September 2025, the petitioners have also alleged that detainees have been subjected to invasive body searches, a lack of privacy in bathing and toilet facilities, cold water showers, inconsistent electricity, and inadequate hygiene and cleaning supplies and have been denied consistent recreational time outside of their cells and access to medicine. (Supp. Dec. of John Doe In Support of Ex Parte App. for Temp. Rest. Order and Order to Show Cause, ¶¶ 4, 7-12.)

[13] *Gomez-Ruiz* Complaint, *supra,* ¶¶ 38, 40 76, 114.

ordering the federal government to provide detainees with adequate access to medical care, attorneys, appropriate clothing, and recreation spaces.[14]

The California Department of Justice, through an on-site inspection and interviews with detainees conducted by our Civil Rights Enforcement Section on November 20 and 21, 2025, pursuant to the Attorney General's authority under Assembly Bill 103 (2017), has also identified extensive violations of the ICE standards that apply to the Facility. Our office documented these findings in a report published this year entitled "Immigration Detention in California, A Review of Conditions of Confinement." The Department's findings on violations at the Facility include the premature opening of the Facility without adequate staffing, crisis-level understaffing for healthcare, denial of access to outside medical specialists, exposure of detainees to extremely cold temperatures, the infiltration of rainwater and plumbing leaks into detainees' living quarters, reports of inadequate food quantities to meet nutritional needs, excessively long lockdowns, and reports of a failure to provide detainees with recreational time, among other problems.[15]

The inhumane conditions of confinement at the Facility highlight the urgent need for government at all levels, including local jurisdictions, to faithfully exercise their respective oversight responsibilities over CoreCivic's immigrant detention operations in accordance with the applicable laws.

## II. CoreCivic's Applications Are Inaccurate and Incomplete

Based on documents provided to our office by the City and publicly available information, it is our office's understanding that the present appeals are based on the City's approval of the business license and site plan review applications and corresponding business plan submitted to the City by CoreCivic on August 25, 2025, and attached hereto respectively as Exhibits A, B, and C. Concerningly, the applications obscure the true nature of CoreCivic's current operations as an immigrant detention facility, thereby preventing the City from correctly processing the applications. Further, CoreCivic's business license and site plan applications to operate the Facility appear to lack material information that is required by the Municipal Code for the City to process and make a decision on the applications. The City must not approve

---

[14] *Gomez-Ruiz, et al v. ICE, et al.* (N.D.Cal. Nov. 12, 2025, No. 3:25-cv-09757), ECF No. 72 (Order Granting in Part Plaintiffs' Motions for Preliminary Injunction and Class Cert., p. 1.)

[15] Our office's findings from its inspection of the Facility and other detention facilities in the state are detailed in a report issued on May 15, 2026, entitled "Immigration Detention in California, A Review of Conditions of Confinement." The report is available at https://oag.ca.gov/system/files/media/immigration-detention-2026.pdf. In January 2026, California State Senators Adam Schiff and Alex Padilla toured the Facility and described reports from detainees of foul odors emanating from the drinking water and encountering mold in their food and water. Mejia and Vives, U.S. Senators Tour California City ICE Facility, Decry Conditions and Inadequate Medical Care, Los Angeles Times (Jan. 21, 2026), https://www.latimes.com/california/story/2026-01-20/u-s-senators-tour-california-city-detention-center-decry-conditions-inadequate-medical-care.

CoreCivic's business license and site plan based on applications containing incomplete and misleading information.

The Municipal Code sets forth specific, mandatory requirements for the contents of business license and site plan applications submitted to the City. Business license applications must identify the "name and business of the applicant," the "nature of the business," proof of compliance with workers' compensation laws, and other specified information.[16] The applicant must verify the application under oath.[17] Further, the City must revoke or suspend a business license if a licensee violates the Municipal Code's business license provisions, including because the licensee operated its business in an unlawful manner or misrepresented information to obtain a business license.[18] Likewise, site plan review applications must meet certain criteria, including by providing a plan with specified information relating to the site's layout and development.[19] The City is required to enforce the Municipal Code's business license and site plan requirements.[20]

CoreCivic's August 2025 business license and site plan applications cannot be approved since they fail to disclose CoreCivic's immigrant detention operations at the Facility. Correspondence between the City and CoreCivic shows that CoreCivic withdrew the business license and site plan applications it originally submitted in July 2025, which accurately described CoreCivic's operations at the Facility as immigration processing and detention subject to a contract with ICE, and replaced it with new versions in August 2025 that omit any reference to immigrant detention and ICE's involvement.[21] Instead, the August 2025 application materials describe the Facility generically as a "Detention Facility/Prison" and state that CoreCivic "will be operating…under a contract with the United States Marshals Service."[22] City records indicate that CoreCivic revised its business license and site plan applications in response to the City's determination that CoreCivic's proposed use of immigrant detention at the Facility would trigger Senate Bill 29 (2017)—a determination which CoreCivic disputed.[23] Without an accurate and complete description of CoreCivic's intended use of the Facility in CoreCivic's business license

[16] § 3-.2.3.203, subd. (b).
[17] § 3-2.3.203, subd. (d).
[18] § 3-2.3.208, subds. (a), (c).
[19] § 9-2.212.
[20] § 3-2.3.214; see §§ 1-3.01, subd. (a)(1); 1-3.03 (prohibiting the aiding or abetting of omissions that are unlawful under the Municipal Code).
[21] Exs. A-C, D (CoreCivic July 2025 Business License Application), E (CoreCivic July 2025 Site Plan Review Application), F (CoreCivic July 2025 Business Plan), G (Malloy Aug. 14, 2025 Email); H (Carter Aug. 8, 2025 Letter).
[22] Exs. A-C.
[23]See Exs. D-F. Senate Bill 29 (2017) prohibits a city, county, or other public agency from approving a deed, instrument, or other conveyance of land or issuing a permit for civil immigration proceedings without first providing at least 180-days advanced notice and soliciting public comments at a minimum of two public hearings. (Ch. 494, Stats. 2017, § 2.)

and site plan applications, the City cannot accurately determine whether CoreCivic's operations conform to zoning regulations, which is a required step to issue a business license or site plan.[24]

CoreCivic's August 2025 business license and site plan applications also do not appear to include all of the information required by the Municipal Code, and thus cannot be approved by the City as submitted. First, we have not identified any documents indicating that CoreCivic provided the City with proof of its compliance with workers' compensation laws with its business license application.[25] Compliance with the Municipal Code's requirement to provide proof of compliance with workers' compensation laws is especially important in light of both critical understaffing identified at CoreCivic detention facilities, which have contributed to worker injuries, and the lawsuits alleging CoreCivic's use of forced labor practices.[26] Second, it does not appear that CoreCivic submitted an actual site plan, as required, with its site plan review application.[27] It is important that CoreCivic provide a site plan, because a site plan provides the City with information about the Facility's physical layout and its compatibility with Building and Fire Code standards.

### III. CoreCivic's Operations at the Facility Do Not Conform to the City's Zoning Regulations

The City's Municipal Code prohibits the issuance of a business license "unless the place of business and the purposes and methods of conducting such business conform to health, fire, and zoning regulations."[28] Similarly, the Municipal Code does not allow the City to approve a site plan where the application does not show that the site "will be developed in accordance" with the Code's requirements.[29] Here, the City may not issue CoreCivic a business license or site plan for its current immigrant detention operations, because CoreCivic's current operations do not conform to the zoning regulations contained in Title 9 of the Municipal Code for several reasons. First, immigrant detention is not a permitted use, either by right or by conditional use

---

[24] §§ 3-2.3.208, subds. (a), (c), 3-2.3.211, subd. (d), 3-2.3.214, 9-2.212, subd. (d).
[25] § 3-2.3.203, subd. (b).
[26] See Meza, Protected Whistleblowers' Disclosures Regarding Gross Waste and Unlawful Contract Performance at the Torrance County Detention Facility, Government Accountability Project (Feb. 18, 2025), p. 2, https://whistleblower.org/wp-content/uploads/2025/02/02-18-2025-Whistleblower-Letter-to-Congress-and-Oversight-re-Torrance.pdf; Office of the Insp. Gen., U.S. Dep't. of Jus., Audit of the U.S. Marshals Service Contract No. DJJoDT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center, Leavenworth, Kansas (Apr. 2017), https://oig.justice.gov/sites/default/files/reports/a1722.pdf; *Wilhen Hill Barrientos, et al., v. CoreCivic, Inc.*, Dist. Ct. Ga. Middle, Apr. 17, 2026, No. 4:18cv70 (resulting in settlement requiring CoreCivic to notify detainees of their labor rights and provide confidential benefits to petitioners, according to a statement issued by petitioners' counsel, https://www.splcenter.org/presscenter/settlement-forced-labor-case-against-private-prison-company-operating-immigration/).
[27] § 9-2.212, subd. (c)(4).
[28] § 3-2.3.211, subd. (d).
[29] §§ 1-3.03, 9-2.212, subd. (b), 9-2.2803 (stating that a permit or license issued in conflict with the zoning regulations is null and void).

permit, within the zone district that applies to the Facility. Second, CoreCivic's immigrant detention operations are not authorized by the existing conditional use permit that applies to the Facility (Conditional Use Permit ("CUP") No. 97-01), which allows only prison operations and not immigrant detention. Finally, CoreCivic is authorized to operate only up to 2,304 beds at the Facility under CUP No. 97-01, far below the 2,560-bed capacity which CoreCivic's application attributes to the Facility as well as the 2,816 beds which the City determined are allowed when it approved CoreCivic's site plan application.

### A. Immigrant Detention is Not a Permitted Use Within the Open Space / Residential Agricultural Zone District

22844 Virginia Boulevard, the property on which the Facility is located, is zoned for Open Space ("O") / Residential Agricultural ("RA").[30] Immigrant detention is not an allowed use within this zone district,[31] and uses not authorized in the RA / O zone district are prohibited by the zoning regulations.[32] Yet, CoreCivic is using the Facility for immigrant processing and detention—a fact prominently displayed on a sign at the Facility entry stating "CoreCivic Immigration Processing Center" and documented in our office's report issued this year following its inspection of the Facility.[33] Accordingly, CoreCivic's use of the Facility does not conform to the zoning regulations.

Further, immigrant detention is not covered by the one functionally comparable use category that is allowed by a conditional use permit in the O / RA zone district—"[g]overnmental or quasi-governmental correction, probation or prison facilities and services."[34] The plain meaning of "correction, probation, and prison facilities" does not include immigrant detention facilities.[35] While correction, probation, and prison facilities are all facilities used to hold or provide services to people charged with a crime, immigration enforcement and detention is generally premised on a civil law violation.[36] In addition, the Municipal Code assigns

---

[30] See Kern County Interactive Zoning Map, https://www.californiacity-ca.gov/CC/index.php/54-your-city-government/243-interactive-zoning-map.
[31] §§ 9-2.102, 2.401, 2.402, 2.2801.
[32] See §§ 9-2.102 (stating that the Zoning Regulations control the uses of land under the City's jurisdiction), 9-2.401 (listing the uses permitted in the RA zone district), 9-2.402 (listing the uses that "may be" permitted with a conditional use permit in the RA zone district); see also *Blankenship v. Allstate Ins. Co.* (2010) 186 Cal.App.4th 87, 94 (a legislative body's "omission of a term in a list of terms indicates that (it) did not intend to include the term.").
[33] Elliott, Private Prison in California City may reopen for immigration processing, Bakersfield Californian (Jun. 19, 2025), https://www.bakersfield.com/news/private-prison-in-california-city-may-reopen-for-immigration-processing/article_0a138bb1-1d92-4f6a-a612-59c93d28e4f4.html; Cal. Dep't. of Just., Immig. Det. in Cal., A Review of Cond. of Confin. (2026), p. 13.
[34] § 9-2.402, subd. (p).
[35] *J. Arthur Properties, II, LLC v. City of San Jose* (2018) 21 Cal.App.5th 480, 486 (local government laws are interpreted consistent with the general rules of statutory interpretation, starting with the plain language of the enactment).
[36] See Civ. Code, § 1670.9, subd. (h); Mayorkas, Guidelines for Enforcement of Civil Immigration Law, DHS (Sept. 30, 2021), https://www.corecivic.com/private-detention; see also

undefined terms the meanings ascribed to them by state law and courts, and California statute and court decisions clearly distinguish between "prisons" and immigrant detention facilities as separate use types.[37]

Despite the prohibition on immigrant detention use at the Facility under the regulations applicable to the O / RA zone district, it appears from City records that it permissively allowed immigrant detention use to occur at certain points in the Facility's history. The City's failure to require CoreCivic to adhere to the Zoning Regulations' prohibition on immigrant detention uses in the O / RA zone district does not render CoreCivic's present use of the site lawful.[38]

**B. CUP No. 97-01 Allows Only Prison Use at the Site, Not Immigrant Detention**

As discussed above, immigrant detention is not an allowed use, either by right or by a conditional use permit, in the zone district that applies to the Facility. However, even if immigration processing and detention were a type of "correction, probation, or prison facilit[y]" that could be allowed under a conditional use permit in the City, immigration processing and detention is not allowed under CUP No. 97-01. The California City Council issued CUP No. 97-01 in 1998 to authorize the construction and operation of a "2,304 bed prison facility" on approximately 70-acres of the 320-acre parcel at Virginia Boulevard.[39] The existing Facility at 22844 Virginia Boulevard was constructed the next year and then began operating as a prison. By its terms, CUP No. 97-01 allows only a "prison facility."[40] The permit application materials and environmental review prepared for CUP No. 97-01 also make clear that the intended use of the site was for correctional, not civil detention, purposes.[41] Nothing in CUP No. 97-01 or in the

---

CoreCivic, A Limited But Important Role in America's Immigration System (describing CoreCivic's immigrant detention facilities as "designed to care specifically for civil detainees), https://www.corecivic.com/private-detention.

[37] § 1-2.08; see, e.g., Gov. Code, § 27491.56, subd. (f) (identifying correctional and immigrant detention facilities as distinct facility types for purposes of forensic accountability requirements for the determination of the cause of in-custody deaths); *Cal. Att'y for Crim. Just. v. Newsom, et al* (2020) 2020 Cal.LEXIS 3220 (addressing state authorities' responsibilities to protect the health and safety of inmates subject to transfer between state prison and federal immigrant detention facilities); see also *Zadvydas v. Davis* (2001) 553 U.S. 678, 699.

[38] See *Hansen Bros. Enter. v. Bd. of Sup.* (1996) 12 Cal.4th 533, 564 (local government lacks power to waive or consent to violation of the zoning law); *Fontana v. Atkinson* (1963) 212 Cal.App.2d 499, 509 (no vested right to violate a city ordinance may be acquired by continued violations, and city failure to enforce a zoning ordinance does not estop a city from subsequently enforcing it).

[39] Ex. I, p. 1; Ex. J (Mit. Mon. Prog. CCA Prison at Cal. City, State Clearinghouse No. 97091045), p. 2.

[40] Ex. I.

[41] See *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 74 (holding that the Superior Court reasonably found from the permit application and other documents generated during the permit issuance process that a conditional use permit was limited in scope); Env. Impact Report Suppl., CCA Prison at Cal. City, Oct. 1997 (CUP No. 97-01) (describing the facility objectives as

application materials indicate that CoreCivic or the City intended or anticipated the Facility would be used for non-correctional purposes, including for immigrant detention. Therefore, CUP No. 97-01 does not authorize CoreCivic's current use of the Facility.

**C. A Maximum of 2,304 Beds is Authorized in the Facility Under CUP No. 97-01**

CUP No. 97-01's terms are similarly limiting when it comes to the specific number of beds permitted at the Facility.[42] The application for CUP No. 97-01 confirms the intention for the Facility to operate a maximum of 2,304 beds.[43] The Mitigation and Monitoring Program prepared for CUP No. 97-01 was explicit that the Facility would "only accommodate 2,304 inmates, the intended capacity of the prison."[44]

Despite CUP No. 97-01's clear 2,304-bed cap on the existing Facility's capacity, the City Planning Director's determination letter for its review of CoreCivic's site plan application finds that 2,816 beds are allowed. To reach this conclusion, the letter adds the number of beds authorized by CUP No. 97-01 to the number of beds authorized by CUP No. 98-02. However, CUP No. 98-02's terms are inapplicable to the existing Facility. CUP No. 98-02 and its associated application materials authorized the construction of an additional 512-bed prison facility on approximately 1.5 acres, but this construction never occurred.[45] These materials make it clear that the 512-bed expansion authorized by CUP No. 98-02 was designed to occur in an entirely new building and facility located near, but outside of, the structures previously approved by CUP No. 97-01.[46] Therefore, the 512 beds authorized by CUP No. 98-02 were allowed only within the additional facility authorized by that permit—which were never built—and were not transferable to the existing Facility.

In pending litigation brought by the Dignity Not Detention Coalition against the City and CoreCivic, CoreCivic has attempted to characterize CUP No. 98-02 as allowing an additional 512 beds, beyond the 2,304 authorized by CUP No. 97-01, within the existing Facility.[47] In

---

serving the "inmate incarceration needs of government correctional agencies," and referring to facility staff as "correctional officers"), pp. 1-2, 3-1.

[42] Ex. I, p. 1; Ex. K (Cal. City Planning Dep't., App. for Conditional Use Permit, Case No. 97-01), p. 4-5.

[43] Ex. K, pp. 4-5.

[44] Ex. J, p. 2, underline added.

[45] Ex. L (Res. No. 11-98-02), pp. 1-2 (allowing for a 512-bed expansion in additional buildings connected to wet and dry utilities); Ex. M (Cal. City Planning Dep't., App. for Conditional Use Permit—Amendment, Case No. CUP-A 98-02), p. 5; Ex. N (Initial Study, Eval. of Env. Impacts, City of. Cal. City, Proposed 512-Bed Expansion of CCA), p. 2; *Dignity Not Detention Coalition, et al v. City of California City* (*DNDC v. Cal. City*) (2025), Cal.E.D. (Case 1:25-cv-01292, ECF No. 18 (CoreCivic's Resp. to Pet. Ex Parte App. for Temp. Rest. Order, Ex. p. 2, ¶¶ 12-14 (citing Ex. 1 [Ariola Decl., Att. D (Stewart, Mem. to File, Nov. 15, 2001]).

[46] Ex. J, p. 2.

[47] *DNDC v. Cal. City* (2025), *supra*, ECF No. 18 (CoreCivic's Resp. to Pet. Ex Parte App. for Temp. Rest. Order, p. 2, ¶¶ 12-14 (citing Ex. 1 [Ariola Decl., Att. D].)

support of this characterization, CoreCivic points to a memorandum-to-file dated November 15, 2001, and purportedly signed by the then-City Manager stating that CUP No. 98-02 would expire on November 30, 2001 and purporting to approve the 512-bed expansion authorized by CUP No. 98-02 *within* the existing Facility.[48] But this memorandum is not persuasive for several reasons. First, the nearly quarter-century old memorandum is not on letterhead, rendering its authenticity uncertain. Second, as evidence of the City Manager's authority to grant the change to CUP No. 98-02's terms, the memorandum cites to several Municipal Code sections which have since been repealed and which the City has indicated to our office cannot be located. Without verification of the contents of those repealed Municipal Code sections, the memorandum does not establish that it constitutes a legally valid modification to CUP No. 98-02.

Similarly, a letter by another City Manager dated May 27, 2014, which CoreCivic points to as evidence of its authorization to operate up to 2,560 beds at the Facility, is also unconvincing. That letter states that the "Planning Department has completed a review of the land use permitting associated with" the California City Correctional Facility, and the letter serves as notification that the Facility is "authorized and fully permitted to operate 2,560 beds."[49] However, the letter provides no support for this statement. As discussed above, continued violations of a local law do not create a vested right to continue to violate the law.[50]

## IV. Conclusion

In conclusion, we urge the City to deny CoreCivic's business license and site plan applications, as required by the Municipal Code. In addition, in light of the significant public interest in this matter, we encourage the City to take steps to facilitate public participation in the appeals process, including by providing public notice of the date and time of the appeal hearings on its website at least ten days before the hearing; inviting and considering written comments; and allowing the public to provide verbal comments at both the business license and site plan hearings. If you would like to meet to discuss our concerns, please do not hesitate to let us know. Thank you for considering our comments.

Sincerely,

ASHLEY WERNER
Deputy Attorney General
Bureau of Environmental Justice

For ROB BONTA
California Attorney General

---

[48] *Id.*
[49] *Id.* at p. 3, ¶¶ 12-13 [citing Ex. 1 (Ariola Decl., Att. F [Weil, May 27, 2014])].
[50] *Fontana v. Atkinson, supra,* 212 Cal.App.2d 499, 509; *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d. 813, 822-23 (holding that estoppel will not be invoked against a government agency where it would defeat the effective operation of a policy adopted to protect the public, such as zoning laws, which involve a vital public interest).

cc: Gesele Marsh, Planning Commission Vice Chair
Salena Coleman, Commissioner
Ralph Cantrell, Commissioner
John Paul Maier, Deputy City Manager/City Clerk
Brandon Sanchez, Esq., Burke, Williams & Sorensen, LLP

ilrc
TEACHING, INTERPRETING,
& CHANGING LAW SINCE 1979

EXECUTIVE DIRECTOR
Eric Cohen

San Francisco

Washington, D.C.

San Antonio

Houston

ilrc@ilrc.org
www.ilrc.org

# ATTACHMENT 7

August 19, 2026

*Via email*

City Council
City of California City
21000 Hacienda Boulevard
California City, CA 93505

Cc: City Clerk

**Motion for Continuance of August 25, 2026 Appeal Hearing for CoreCivic Inc.'s Site Plan Review and Business License for the California City Correctional Facility**

1. Appellants respectfully move the City Council to continue the August 25, 2026 hearing date for the appeal of the Planning Commission's decision to sustain the grant of the SPR Minor Permit (SPR 25-09), and the City Manager's decision to sustain the grant the of the Business License for CoreCivic Inc. for the reasons stated below.
2. The City Clerk set this City Council hearing for the Appeal of the Planning Commission's decision to sustain the grant of the SPR Minor Permit (SPR 25-09), and the City Manager's decision to sustain the grant the of the Business License to CoreCivic Inc. on August 25, 2026 at 5:00pm.
3. On August 6, 2026, the City Clerk asked to confirm appellants' availability for August 25, 2026, and stated he could explore additional hearing dates. On that same date, appellants informed the City Clerk that due to urgent medical issues neither Ms. Ruiz or Ms. Laner could attend the August 25, 2026 date, and requested that the City Clerk schedule the hearing to a date after September 18, 2026 to allow appellants to appear in person.
4. Due to appellants' correspondence with the City Clerk, appellants reasonably expected that the hearing date remained under discussion. On August 14, 2026, appellants received electronic notice that the hearing date was scheduled for August 25, 2026.
5. Appellants now respectfully move the City Council to continue this hearing to another date. Based on the upcoming City Council meeting dates provided by the City Clerk, appellants believe the following dates would work to hold this hearing, and respectfully request that the City Council consider a continuance of the appeal to one of these dates:
   a. September 22, 2026

b. October 13, 2026
c. October 27, 2026 (less preferred).

6. Appellants respectfully request and move for this continuance for the reasons stated below.
7. First, appellants incorporate the previous reason for requesting a different date due to unforeseen medical issues.
8. Second, because appellants were under the impression that the City Clerk could accommodate a request for a different date, appellants only received official electronic notice on August 14, 2026. This is only 7 business days before the hearing. The City Code requires at least 10 days' notice and does not specify whether those are calendar or business days. *See* California City Municipal (CCM) Code Sec. 1-4.04 (requiring at least 10 days' notice for an appeal before a body which conducts regularly scheduled meetings). The August 25th hearing date does not provide 10 business days' notice.
9. Third, even if the City interprets the code as only requiring 10 calendar days' notice before an appeal hearing, the City Code does require that hearing notice be given in "the *same manner* as any required notice for the hearing at which the decision subject to the appeal or review was made." CCM Code Sec. 1-4.08 (emphasis added).
10. In this case, the Planning Commission and City Manager hearings for the SPR Minor Permit and Business License were held on July 7, 2026, and appellants received official electronic notice on June 18, 2026, which is 19 calendar days (13 business days) before the hearings. Therefore, the shortened notice provided for the August 25, 2026 hearing does not satisfy Section 1-4.08's requirement that notice be given in the "same manner" as notice for the underlying hearings being appealed.
11. Appellants' request is limited and reasonable. Appellants do not seek an indefinite continuance, but request that the hearing be continued to one of three identified, regularly scheduled City Council meetings. The earliest proposed date, September 22, is only four weeks after the currently scheduled hearing. A brief continuance would allow Appellants to appear in person and permit additional public notice and participation without materially delaying the City's consideration of the appeals.
12. Finally, a brief continuance would promote meaningful public notice, transparency, and participation in the City's decision-making process. These appeals concern the permitting and licensing of the California City Detention Facility, a matter of significant public interest. The permit and business license at issue relate to one of the largest detention centers in the United States, likely to operate for at least fifteen years or more, with significant and long-term impact on city infrastructure including on roads, water, and emergency services. Providing only 7 business days' notice between official notice and the hearing limits the ability of California City residents and other interested members of

the public to learn of the hearing, review the relevant materials, arrange their schedules and other obligations, and prepare meaningful public comment. Sufficient public notice, transparency, and civic engagements are basic tenants of democracy. A continuance to one of the regularly scheduled City Council meetings identified above would provide additional time for public participation while causing only a brief delay in consideration of the appeals. Appellants are unaware of any statutory or other deadline requiring the Council to hear these appeals on August 25, 2026. Particularly where Appellants themselves are unable to attend on August 25 because of unforeseen medical circumstances that they communicated to the City before the hearing was set, the interests of fairness, transparency, and meaningful public participation favor a brief continuance.

Respectfully submitted,

Jehan Laner
Managing Attorney
Immigrant Legal Resource Center

# ATTACHMENT 8

STRUCK LOVE

STRUCK LOVE ACEDO, PLC

Daniel P. Struck
480.420.1601
dstruck@strucklove.com

August 20, 2026

**VIA FEDEX and EMAIL**

City of California City
City Hall
21000 Hacienda Blvd.
California City, CA 93505

Dear Mayor Marquette E. Hawkins, Mayor Pro Tem Jim Creighton, and City Council Members Ronald Smith, Della Clark, and Shawn Bradley:

CoreCivic, Inc. files this combined response to and opposes the July 9, 2026 and July 10, 2026 applications for appeal filed on behalf of the Dignity Not Detention ("DND") Coalition and the Immigration Legal Resource Center ("ILRC"). The applications for appeal request the City Council to review: (1) the Planning Commission's decision to adopt Resolution No. PC 2026-07-07 denying the DND Coalition's prior application for appeal of the City Planner's approval of CoreCivic's Site Plan Review ("SPR") Minor; and (2) the City Manager's decision denying the DND Coalition's prior appeal of the City Clerk's issuance of CoreCivic's Business License. These applications for appeal should be denied because the Planning Commission's and City Manager's decisions are both correct. Neither the DND Coalition nor the ILRC has standing to appeal under the Municipal Code, and their grounds for the appeal are based on false and misleading information.

## I. Relevant Background.

CoreCivic, previously known as Corrections Corporation of America, owns and operates detention facilities in partnership with federal, state, and municipal governments/agencies across the country. For the past thirty years, CoreCivic has been a member in good standing with the community, conducted business in the City, paid property and other taxes, contributed to the City's economy, and employed many of its residents.[1]

[1] The City recognized that the Facility was a "primary economic driver in the community" due to its "large, stable source" of "high-wage employment" when it was previously open. (*See* https://www.californiacity-ca.gov/CC/images/stories/2017-04-07-California-City-Economic-Assessment--SWOT---FINAL.pdf (PDF at 1, 3 and 6).) Under the contract with ICE, CoreCivic now pays prevailing wages at the Facility that far exceed the state minimum wage. For example, Detention Officers, the most common entry-level position at the Facility, are paid $50.04 per hour. (https://sam.gov/wage-determination/2015-5603/28). The Facility currently employs nearly 450 individuals.

3100 West Ray Road | Suite 300 | Chandler AZ 85226
480.420.1600 | STRUCKLOVE.COM

The DND Coalition is not a legal entity, much less a member of the California City community. Rather, it is a collection of social and political advocacy groups that oppose the federal government's current immigration policies.

The ILRC is a member of the DND Coalition and also not a member of the California City community. Rather, it is a national nonprofit organization founded and headquartered in the City and County of San Francisco. It provides training and education to legal professionals on immigration law and engages in advocacy for immigration rights across the country. The DND Coalition and the ILRC's applications to appeal to the City Council are pretexts to advance their political goals and social agenda to oppose federal immigration detention operations.

**A. CoreCivic's Facility.**

In 1997, CoreCivic submitted a proposal to construct a facility at 22844 Virginia Boulevard, consisting of 2,304 general population beds, a 256-bed segregation unit, and a 4-bed medical unit. (Ex. 1, Verhulst Declaration, ¶ 7; Ex. 2, Malloy Declaration, ¶ 4.) CoreCivic's application for a conditional use permit for the facility did not designate a particular detention population. At a noticed public hearing on January 15, 1998, the California City Planning Commission recommended granting Conditional Use Permit ("CUP") 97-01 for the proposed facility, known as the California City Correctional Facility ("the Facility"). (Ex. 3, Ariola Declaration, ¶ 11.) The City Council granted CUP 97-01 on January 20, 1998, and in June 1998, CoreCivic purchased the 320-acre site, a vacant terrain surrounded by natural desert. (*Id.*, ¶¶ 11, 14.)

Construction began in 1998. (*Id.*, ¶ 16.) During construction, CoreCivic applied to amend CUP 97-01 to construct two additional 256-bed housing units at the site. (*Id.*, ¶ 17.) On December 1, 1998, the City granted CUP Amendment 98-02, which expanded the site's permitted use by 512 general population beds. (*Id.* and Attachment D at Page 48, 50–51 and 57 of 161.) On November 15, 2001, the City Manager/Planning Director clarified that the Amendment extension was "granted indefinitely." (Ex. 3, ¶ 17 and Attachment D at Page 45 of 161.) Neither CUP 97-01 nor CUP Amendment 98-02 has been revoked, rescinded, or canceled. (Ex. 3, ¶ 19.)

CoreCivic operated the Facility as a federal detention center from 2000 to 2013. (Ex. 1, ¶¶ 11–14; Ex. 3, ¶ 18.) From 2000 to 2010, CoreCivic housed criminal aliens in the custody of the Bureau of Prisons ("BOP") through a direct contract with BOP. (Ex. 1, ¶¶ 10–12; Ex. 3, ¶ 18.) From 2010 to 2013, CoreCivic housed detainees in the custody of the United States Marshals Service ("USMS") and immigration detainees in the custody of United States Immigration and Customs Enforcement ("ICE") through an Intergovernmental Services Agreement ("IGSA") with the City. (Ex. 1, ¶¶ 13–14.) During that period, there were more than 9,500 ICE detainees at the Facility. (*Id.*) In 2013, CoreCivic leased the Facility to the California Department of Corrections and Rehabilitation ("CDCR") to house California inmates.[2] (Ex. 1, ¶ 15; Ex. 3, ¶ 22.) In 2014, the City confirmed that a land-use review had been completed and authorized and permitted the use of 2,560 beds at the Facility. (Ex. 3, ¶ 23 and Attachment G at Page 97 of 161.) CDCR made full use

---

[2] On May 27, 2014, the City confirmed that CDCR was "authorized and fully permitted to operate 2,560 beds" at the Facility. (Ex. 3, ¶ 23 and Attachment G at Page 97 of 161.)

of the available space and regularly housed more than 2,304 inmates at the Facility during the lease. (Ex. 1, ¶ 16.)

After CDCR's lease expired in 2024, CoreCivic did not close the Facility or discontinue its use as an Institutional Group I-3 facility. (Ex. 3, ¶ 29.) To the contrary, CoreCivic continued to staff the Facility with operations and maintenance employees while it identified and explored opportunities to enter into a new contract. (*Id.*, ¶ 30.)

In April 2025, CoreCivic entered a new contract with ICE to operate the Facility once again as a federal detention facility. (Ex. 1, ¶ 20.) In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the Facility; the first group of detainees arrived on August 27, 2025. (*Id.*, ¶ 21.) In September 2025, ICE formalized a contract for up to 2,560 beds, which expires on August 31, 2027. (*Id.*, ¶ 21.) The USMS is an authorized and active user of the Facility as well. The Facility houses ICE detainees, who are classified as High/Mod-High or Low/Mod-Low. Most detainees classified as High/Mod-High have criminal convictions (and/or a documented history of predatory behavior), the majority of which were in the United States. The Facility also houses USMS male pretrial criminal detainees.

On July 2, 2026, the United States Department of Homeland Security ("DHS") purchased the Facility from CoreCivic. (Ex. 8, Declaration of Warden Chestnut, ¶ 27; Ex. 9, General Warranty Deed.) The Facility has since been owned by the federal government, and CoreCivic has continued performing immigration detention operations at ICE's direction and on its behalf, as well as federal pretrial detention operations at the USMS's direction.

**B. CoreCivic's Applications for a SPR Minor and a Business License.**

On July 22, 2025, CoreCivic applied for an SPR Minor and a Business License. (Ex. 3, ¶¶ 39–40 and Attachment O at Page 117–131 of 161.) It submitted the SPR Minor application at the City Planner's instruction. (Ex. 3, ¶¶ 36–39 and Attachment O at Page 117 of 161.) An SPR Major application was not required because CoreCivic did not plan any structural modifications to the Facility, and it merely sought to use the Facility for immigration detention as it had previously done in partnership with the City. (Ex. 3, ¶ 37.) That application was supplemented with a business plan for the operation of the Facility on August 11, 2025. (Ex. 4, Aug. 11, 2025 Business Plan Submission.) The City provided public notice that it was considering CoreCivic's application no later than August 12, 2025.

CoreCivic also submitted a second SPR Minor and Business License application on August 25, 2025, in response to interest by the USMS to place detainees at the Facility. (Ex. 5, Aug. 25, 2025 2d SPR Minor & Biz License Submission.) That application was clarified on September 15, 2025. (Ex. 6, Sept. 15, 2025 2d SPR Minor Clarification.) At the time of these submissions, the City was aware and even received public comments from the floor at numerous meetings relating to ICE's desire to use the facility.

The City provided advance notice and held the first hearing on both of CoreCivic's applications before the City Council on October 28, 2025. The City also provided advance notice, which was reported in local media, and held a second public hearing on CoreCivic's applications

before the Planning Commission on December 16, 2025. After holding two noticed public hearings under the procedures set forth in California Civil Code § 1670.9 ("SB 29"), the City Planner approved the SPR Minor, and the City Clerk issued CoreCivic's Business License on February 26, 2026.

**C. The DND Coalition's Prior Applications for Appeal.**

On February 27, 2026, an application for appeal challenging the City Planner's approval of the SPR Minor and the City Clerk's issuance of the Business License was filed on behalf of only the DND Coalition. On July 7, 2026, the Planning Commission held a public meeting and adopted Resolution No. PC 2026-07-07, denying the DND Coalition's application for appeal and upholding the City Planner's February 26, 2026 approval of the SPR Minor. On July 7, 2026, the City Manager heard arguments on the DND Coalition's application for appeal and issued a decision on July 8, 2026, denying that application and upholding the City Clerk's issuance of the Business License.

**II. The Applications for Appeal Should Be Denied Because the Federal Government Owns the Facility and CoreCivic Performs Operations on ICE's Behalf.**

The applications for appeal should be denied because the relief they request is unconstitutional. Under the guise of enforcing the City's permitting and licensing regulations, the DND Coalition and ILRC lobby the City to revoke the historically authorized use of the Facility for immigration detention under CUP 97-01 and CUP Amendment 98-02 (the "Conditional Use Permits"), revoke the Business License, and shut down the Facility until CoreCivic has complied with their incorrect interpretations of the Municipal Code. The applications for appeal, however, omit the crucial fact that shows this cannot be done because the United States now owns the Facility. (Ex. 8, ¶ 27 and Ex. 9.) Thus, the City may not impose its permitting and licensing requirements to interfere with and/or override the federal government's decision to use the Facility for its immigration detention operations. This includes interfering with ICE's decision to hire CoreCivic to perform immigration detention services at the Facility by shutting it down until the City is satisfied that its permitting and licensing requirements have been met. This is because the Supremacy Clause prohibits the City from exercising any veto power over the federal government, such as by regulating or discriminating against it and its contractors without Congress's express consent.[3]

[3] *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188–90 (1956) (invalidating fine against contractor for commencing work without obtaining a state license as preempted by federal law because subjecting the contractor to state licensing requirements would effectively grant the state licensing board a "virtual power of review" over the federal government's power to select its contractor and schedule construction); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 754–58 (9th Cir. 2022) (explaining California may not impose licensing requirements to deny a particular federal contractor the right to perform federal work, much less impose regulations that would effectively override the federal government's decision to use private detention operators in the state); *United States v. King County*, 122 F.4th 740, 756–57 (9th Cir. 2024) (invalidating executive order that directed county officials to ensure that future leases prohibit servicing ICE charter flights at a county airfield); *Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 438–41 (9th Cir. 1991) (holding California authorities were preempted from imposing fines on a private

The applications for appeal also fail to inform the City of another important fact. The DND Coalition's members, including the ILRC, have been advocating for the California Legislature to pass SB 1367, a bill that would prohibit cities and counties from approving a new land use authorizing construction of a detention facility, or a change of use permitting an existing building to be used as a detention facility. *See* https://sjud.senate.ca.gov/system/files/2026-06/ab-2465-ortega-sjud-analysis.pdf. Thus, in opposing federal immigration detention operations, their plan is nuclear. They not only seek to shut down the Facility, but also to categorically prohibit the City in the future from authorizing the new use or change of use for any detention facility operated by a private entity on behalf of any government entity, whether for civil, criminal, or administrative purposes. Any argument that the applications for appeal merely seek CoreCivic's compliance with the Municipal Code to obtain a new conditional use permit or business license is simply a ruse under this plan.

## III. The DND Coalition and the ILRC Cannot Appeal the Approved SPR Minor or Issued Business License.

The Municipal Code permits only an "affected person" to file an application for appeal. CCMC § 1-4.04(a). It defines an "affected person" as a "person … who has an interest in the matter at issue or whose health, safety, or welfare may be affected by the decision." CCMC § 1-4.02(a). A "person" is defined as "any natural person," a "firm, company, corporation, partnership, association," or a public entity. CCMC § 1-4.02(f); CCMC § 1-2.07(k).

The DND Coalition may not appeal because it is not a "natural person," a "firm, company, corporation, partnership, association," or a public entity. Nor is it otherwise registered under California law as any other type of incorporated or unincorporated association. *See* Cal. Corp. Code § 12585 (requiring nonprofit associations that receive government grants or charitable funding to register). Rather, the DND Coalition is merely a label, assigned to a belief that several social and political advocacy groups hold. It has no office or any officers. It does not own property, operate a business, or reside in the City of California. Nor does it pay City taxes. CoreCivic raised these objections in its response to the DND Coalition's prior application for appeal, but the DND Coalition does not dispute them here. Thus, the DND Coalition concedes that it is not "person," let alone an "affected person."

Realizing the defect in the DND Coalition's appeal, the ILRC attempts to add itself as an appellant for the first time in these appeals. But this tactic fails for two reasons. First, the ILRC's applications to appeal are untimely because the City Planner's approval of the SPR Minor and the City Clerk's issuance of the Business License both occurred six months ago, on February 26, 2026. Because the February 27, 2026 application for appeal was filed on behalf of only the DND Coalition, the ILRC's applications to appeal are untimely. *See* CCMC § 1-4.05(a) (requiring application for appeal to be filed "within seven (7) days" from the decision subject to appeal).

---

contractor for not obtaining a state license to perform work exclusively for the federal government); *California Attorney General Opinion No. 85-102*, 68 Cal. Op. Att'y Gen. 310 (1985) ("The United States Postal Service need not comply with county zoning regulations in constructing a post office on land owned or leased by the United States."); *see also Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) (analyzing the constitutionality of local ordinances the same way as state laws).

Second, the ILRC's application for appeal also fails to provide any information that shows it is an "affected person." Like the DND Coalition, the ILRC does not assert that it has an office, owns property, operates a business, or resides in the City, or that it pays City taxes. To the contrary, public records show that the ILRC's office and headquarters are located in San Francisco. *See* https://rct.doj.ca.gov/Verification/Web/Details.aspx?result=6f54a3aa-2187-4f1f-a674-e4a1027026c8.[4] The failure to provide any information to establish the ILRC's interests is fatal to its appeal because the Municipal Code requires that any "application shall contain sufficient information to identify the party, **its interest in the matter**, and the reasons for requesting an appeal." CCMC § 1-4.04(a) (emphasis added). And the Municipal Code mandates that "any decision becomes final for all purposes when it is made" unless the decision was "appealed … in the time and manner provided," CCMC § 1-4.10.

The City should deny the applications for appeal filed by the DND Coalition and the ILRC for these reasons alone.[5]

## IV. The Applications' Grounds for Appeal Lack Merit.

Although the DND Coalition and the ILRC have requested the City Council to review the Planning Commission's decision to uphold the approved SPR Minor and the City Manager's decision to uphold issuance of the Business License, their applications fail to identify any error in those decisions. Thus, they fail to meet their burden of proof under the Municipal Code "to support overturning of the prior decision[s]." CCMC 1-4.04(e). Instead, they merely copy and paste the same six grounds that the DND Coalition unsuccessfully argued in its prior application for appeal. Nonetheless, all six grounds for appeal are based on the same false factual and legal premise that the Zoning Regulations do not permit CoreCivic's use of the Facility as an immigration detention facility under the existing Conditional Use Permits.

---

[4] In a July 7, 2026 letter to City Manager Grayson in support of the DND Coalition's prior appeal, the Managing Attorney for the ILRC, Jehan Laner, argued she was an "affected person" because she "serves the inside of immigration detention centers." These appeals, however, were not filed on her behalf. Although Ms. Laner asserts that she provides services "inside immigration detention centers," the ILRC's website belies any claim that the ILRC provides services to detainees in the Facility. *See* https://www.ilrc.org/community-resources ("For over 40 years, we have impacted the field of immigration law with a three-pronged approach – capacity building, policy advocacy, and civic engagement. Because this work is generally focused around teaching, interpreting, and changing law to empower legal practitioners, we do not directly represent clients at the ILRC, nor do we provide individual legal consultations."); https://www.ilrc.org/about-us ("The ILRC trains attorneys, paralegals, and community-based advocates who work with immigrants around the country. We inform the media, elected officials, and public to shape effective and just immigration policy and law. Our staff works with grassroots immigrant organizations to promote civic engagement and social change."); https://www.ilrc.org/what-we-do ("We Help Immigration Law Professionals and Advocates Expand Their Expertise." "We Educate and Train Immigrant Communities to Advocate for Themselves." "We Shape Immigration Law and Policy.").

[5] The applications for appeal cite CCMC § 9-2.212(b), but that section is irrelevant because it applies only to the approval of CoreCivic's SPR for construction of the Facility in 1998, not the SPR Minor for use of the Facility as an immigration detention center. Moreover, CCMC § 9-2.212(b) allows only an "interested party" to file an appeal. The DND Coalition and the ILRC may not file an application for appeal because they are not interested parties for all the reasons above. Further, CCMC § 9-2.212(b) provides that the Planning Director's decision "shall be final unless appealed to the Planning Commission by any interested party **prior to the issuance of any building permit for the party**." (Emphasis added). Thus, even assuming that this section applied to the SPR Minor approval, it is final and cannot be appealed because the DND Coalition's prior applications and these applications for appeal were filed after February 26, 2026.

*First*, the applications for appeal assert that the approval of the SPR Minor and the issuance of the Business License do not conform with CCMC § 9-2.803(a). But CCMC § 9-2.803(a) is irrelevant because it sets a minimum lot area (80,000 square feet) for sites and structures in an R4 district (One-Family Residential District Estate). The Facility is located in an RA (Residential/Agricultural) district, not an R4 district. (Ex. 7, City Planner Doravari Declaration, ¶ 4.) Nonetheless, the Facility satisfies this minimum lot area requirement because the lot (parcel num. 350-031-28-2) is 61.19 acres, which is 2,665,436.4 sq. ft. (Ex. 3, Attachment M at Page 110 of 161.)

*Second*, the applications for appeal assert that CCMC § 9-2.102(b) prohibits the use of the Facility as an immigration detention facility because CCMC §§ 9-2.401 and 9-2.402 do not permit that use. This argument is also wrong.

CCMC § 9-2.102(b) provides only that "[n]o structure shall be erected or altered or used Except as provided in this Chapter." CoreCivic has not erected or altered any structure, and its use of the Facility for immigration detention is a permitted use. Although CCMC § 9-2.401 permits certain uses, CCMC § 9-2.402 permits other uses with a "conditional use permit." Among these uses is "[g]overnment or quasi-government correction, probation or prison facilities and services." CCMC § 9-2.402(p). CoreCivic's use of the Facility for immigration detention services and USMS detention services is thus permitted under CCMC § 9-2.402(p) as a conditional use. This is consistent with the Facility's historical use as well as the City's own interpretation of the Zoning Regulations.

The California City Final General Plan 2009-2028, adopted by the City Council in 2009, expressly recognizes that the "Facility houses over 2,300 Federal detainees awaiting deportation." (https://www.californiacity-ca.gov/CC/index.php/planning/final-general-plan-2009-2028/download, at page 5-15.) Between 2000 and 2010, the Facility housed criminal aliens in the custody of BOP who were subject to removal at the completion of their sentences. (Ex. 1, ¶¶ 10–12.) And between 2010 and 2013, the Facility housed more than 9,500 civil immigration detainees in the custody of ICE. (*Id.*, ¶ 14.) Indeed, those immigration detention services were performed pursuant to an IGSA between the City and ICE. (Ex. 1, ¶¶ 13–14; Ex. 7, ¶ 8 and Exhibit B at 2 and 4 of 22.) The City did not require CoreCivic to obtain a new CUP for any of these populations, nor has it ever found that CoreCivic needs a new one.[6]

The City's interpretation is also consistent with the interpretations of both Kern County and the State. The Kern County Assessor classifies the Facility with a use code of "1716 – Detention Facility/Prison." (Ex. 3, ¶ 32 and Attachment M at Page 110–111 of 161.) And the Certificates of

---

[6] *See Anderson First Coal. v. City of Anderson*, 130 Cal. App. 4th 1173, 1193, 30 Cal. Rptr. 3d 738, 754 (2005) (holding city's "interpretation of its own general plan" and its "view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized.") (alteration in original and citation omitted).

Occupancy issued to the Facility by the State Fire Marshal list the occupancy classification as Institutional Group I-3. (Ex. 3, ¶ 25.)

Moreover, the California Building Code, which CCMC § 8-1.01 adopts as the Municipal Code for Building and Safety, defines Institutional Group I-3 occupancy to "include buildings or portions of buildings and structures that are inhabited by more than five persons who are under restraint or security." Cal. Building Code § 308.4. The Building Code further provides that Institutional Group I-3 "shall include, **but not be limited to** the following: Correctional Centers … **Detention centers** … Jails … Prisons … Temporary holding facility." *Id.* (emphasis added.)

Further, the Conditional Use Permits have not expired. The City has never taken any action to revoke the Conditional Use Permits, which run with the land unless they expire or are revoked. *See* CCMC § 9-2502(a). CCMC § 9-2.2502(c) further provides that the City must provide due process, which includes notice of revocation and a revocation hearing, before revoking any conditional use permit. These requirements are consistent with the City's constitutional due process obligations, which prohibit it from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. If the City were to now attempt to revoke the Conditional Use Permits without complying with these procedural requirements, the City would be in violation of not only its own regulations but also CoreCivic's constitutional rights.

The fact that the Facility's use for immigration detention is and has always been permitted as a conditional use at the site is also consistent with the City Planner's conclusions after she investigated this matter and before she approved the SPR Minor:

> After the Facility's reopening in 2025, the City undertook a multi-step review to determine what, if any, local approvals were required and whether any such approvals would trigger the notice-and-hearing procedures in SB 29. This was a time-consuming process. The City searched physical archives and digital repositories across Planning, Building, Fire, and the City Clerk for historical records. The City gathered information from the operator regarding current operations and conducted inspections. Planning compared current operations against historical approvals located during the records search. Staff identified which, if any, administrative approvals (e.g., site plan review) could apply and whether issuing them would be covered by SB 29.
>
> [T]he City's investigation revealed the following. In January 1998, the City approved CUP 97-01 for a 2,304-bed 'prison facility' on approximately 70 acres of the 320-acre Property. In October 1998, the City approved CUP 98-02 expanding the permitted capacity by 512 beds. Neither CUP limits the entitlement to criminal custody or to a particular inmate/detainee population.
>
> Based on my review of the CUP terms, the records on file, and my understanding of current operations, the Facility's ongoing operations remain within the scope of CUP 97-01 and CUP 98-02

> and within the RA-district allowance for 'correction, probation, or prison facilities and services.' The CCMC does not define 'prison.' In ordinary usage a prison is a 'place of confinement,' and immigration detention is a place of confinement of the same kind.
>
> This present determination is also consistent with past practice. In 2010, the City entered Intergovernmental Agreement ODT-10-0002 with the operator for federal detainee housing, including immigration detainees. That use occurred under the 1998 CUPs. So immigrant detention has historically been determined by the City to be a "prison facility" use conditionally permitted under the 1998 CUPs.

(Ex. 7, ¶¶ 5–8 and Exhibits A and B.)

*Third*, the applications for appeal assert that CCMC § 9-2.103 requires the City Council to resolve any ambiguity as to whether the Facility's use for immigration detention is in fact permitted before the SPR Minor and the Business License may be approved. This argument is also wrong because there is no ambiguity for the City Council to resolve. To the extent one may have existed in the past, the City resolved it years ago by allowing CoreCivic to use and continue using the Facility for immigration detention. The City itself entered into an IGSA with ICE for the same use under the Conditional Use Permits in 2010. (Ex. 1, ¶¶ 13–14; Ex. 7, ¶ 8 and Exhibit B at 2 and 4 of 22.)

*Fourth*, the applications for appeal assert that, even if the Zoning Regulations permit the Facility's use for immigration detention services, CoreCivic must follow the procedures under CCMC § 9-2.2501 to obtain a new CUP because it has somehow "converted" the Facility into an immigration detention facility. This argument improperly assumes that CoreCivic has exceeded the scope of the Conditional Use Permits by using the Facility for immigration detention. As explained in detail above, that assumption is false.

*Fifth*, the applications for appeal assert that CCMC §§ 9-2.2803(b) and 9-2.2804(c) are enforcement provisions that require the City to revoke or suspend a business license if the licensee is operating without a business license. This argument is wrong for several reasons.

These enforcement provisions do not authorize the City to revoke or suspend CoreCivic's Business License. Instead, they are Zoning Regulations that authorize City employees to enter and inspect the premises (but not a building unless the owner consents) "affected by this chapter," *see* CCMC § 9-2.2803(b), and the City to file a lawsuit to enjoin a land use "contrary to this chapter," *see* CCMC § 9-2.2804(c).

Moreover, the "chapter" these sections refer to is the Zoning Regulations Chapter under "Title 9, Land Use and Development, Chapter 2 – Zoning." They are thus irrelevant to the City Clerk's issuance of CoreCivic's Business License, which is governed by the Business Licenses

Chapter under "Title 3, Finance, Chapter 2, Revenue, Article 3, Fees and Charges, Division 2, Business Licenses."[7]

Nonetheless, CoreCivic is not in violation of the Zoning Regulations because both its historical and current use of the Facility for ICE immigration detention and USMS detention services is permitted with the Conditional Use Permits. If the City Council were to suddenly disallow that permitted use, CoreCivic's continued use of the Facility for that same purpose would still be deemed a "lawful nonconforming use" under CCMC § 9-2.2802(a). That section expressly provides that "a use of property existing after April 4, 1966, which was permitted by the then current zoning regulations of the City, but which was subsequently prohibited by the zoning regulations, is a lawful nonconforming use." *Id.*

The applications for appeal also incorrectly cite to CCMC § 3-2.3.201, which prohibits the operation of a business "without having first obtained a license as provided in this Chapter," or "after the date of such suspension or revocation without having again procured a license." That section does not apply because CoreCivic had a business license to operate a detention facility. Although it expired, CoreCivic's business license was never suspended or revoked.

Nevertheless, these enforcement provisions of the Business Licenses Chapter do not permit the DND Coalition or the ILRC to file an appeal to suspend or revoke the City Clerk's grant of the Business License. CCMC § 3-2.3.214 authorizes the City Clerk to examine a business premises and demand to see a business license, and to file a complaint if the Clerk finds a violation of the Business Licenses Chapter (not the Zoning Regulations).

CCMC § 3-2.3.208 also allows the City Clerk to suspend or revoke a license, but it requires the City Clerk to provide written notice of a suspension or revocation and permits the **licensee** to file an appeal to the City Manager. CCMC § 3-2.3.208(a) and (b). **If the licensee files an appeal**, the City Manager must then conduct a hearing to determine whether the licensee willfully or knowingly violated the Municipal "Code or laws of the State" or failed to follow their provisions. *See* CCMC § 3-2.3.208(c)(4) and (6).

These enforcement sections do not apply here because the City Clerk did not suspend or revoke CoreCivic's Business License, and CoreCivic—the licensee—is not filing any such appeal. Nothing in these sections permits the DND Coalition or the ILRC—neither of whom is the licensee—to file an appeal, even if the City Clerk suspended or revoked CoreCivic's Business License, much less to file an appeal of the City Clerk's **issuance** of the Business License. These enforcement provisions further prove that the DND Coalition and the ILRC have no right to appeal to advance their abstract sociopolitical goal of ending federal immigration detention. Such concerns should be addressed with the federal government. They have no place in a neutral administrative hearing under the Municipal Code. The City Council should not inject itself into that political issue under the guise of a business-license appeal.

---

[7] The applications for appeal also cite CCMC § 1-3.01, which is a general provision that prohibits any violation of the Municipal Code. But the penalties for a Municipal Code violation do not include revocation or suspension of a Business License. CCMC § 1-3.01(b).

*Sixth*, the applications for appeal misleadingly suggest that a judge in a pending federal lawsuit, *Gomez Ruiz v. ICE*, No. 3:25-cv-09757 (N.D. Cal.), "set forth" "egregious violations of state and federal law" at the Facility which, the application contends, "would require the City to automatically suspend or terminate any *existing* business license" and "should preclude the City from *issuing* CoreCivic a business license for the facility in the first instance." Once again, the application misrepresents both the facts and the law.

As noted above, the enforcement provisions of the Business License Chapter authorize only the **licensee** to appeal the City Clerk's suspension or revocation of a license, and only upon notice and a hearing where the City Manager may uphold the suspension or revocation if he or she finds the CoreCivic actually "committed" a violation of the Municipal "Code or laws of the State." CCMC § 3-2.3.208(a), (c)(4) and (6). Moreover, the City Council cannot suspend or revoke the Business License because the Municipal Code authorizes only the City Manager to make that determination, and the City Manager did not find any violations of the Municipal Code or state law. CCMC § 3-2.3.208(c). The federal cases and comments that these applications for appeal cite for alleged violations of state and federal law do not change the analysis or otherwise support a finding that CoreCivic willfully or knowingly engaged in violations of the Municipal Code or state law.

The *Gomez Ruiz* case does not allege that CoreCivic violated either the Municipal Code or the laws of the State. Rather, that case involves allegations that United States agencies and officials violated **federal** law by allegedly failing to provide constitutional conditions of confinement, legal access, and disability accommodations to detainees at the Facility. Nor has the judge found that CoreCivic committed any violation of any law, municipal, state, or federal. The allegations in the *Gomez Ruiz* case are thus completely irrelevant to the City Planner's approval of the SPR Minor and the City Clerk's issuance of CoreCivic's Business License.[8]

The applications for appeal also improperly cite allegations in the Office of Attorney General's June 15, 2026 Comment Letter ("OAG comment") and "past public comments." The OAG comment, however, simply parrots the same unfounded allegations about Facility conditions in *Gomez* to assert constitutional violations, not state law violations. The OAG comment in turn cites a California Department of Justice ("DOJ") report that alleges only that the DOJ observed during a Facility visit that the conditions did not conform to ICE's detention standards.[9] The DOJ

[8] In the July 7, 2026 letter, Jehan Lenar cited three federal habeas cases to misleadingly suggest that those federal courts found "the Facility's substandard conditions, constitutional violations, or both." CoreCivic was not a defendant in any of those cases. Nor did the courts find constitutional violations stemming from substandard conditions of care at the Facility. In all three cases, the court addressed procedural due process claims based on prolonged detention periods, finding no violation in two of the cases. *See Carias Valenzuela v. Warden*, No. 1:26-CV-01249 DJC SCR, 2026 WL 901337, at *5 (E.D. Cal. Apr. 2, 2026) (denying habeas petition based on procedural due process claim of prolonged detention period without a bond hearing); *Chantha v. Warden*, No. 1:26-CV-01052-DJC-SCR, 2026 WL 925995, at *7 (E.D. Cal. Apr. 6, 2026) (denying habeas petition based on alleged facility conditions but granting bond hearing for procedural due process claim of prolonged detention period without a bond hearing); *Rivas Campos v. Chestnut*, No. 1:26-CV-01330 DJC SCR, 2026 WL 1816190, at *12 (E.D. Cal. June 24, 2026) (finding alleged "conditions do not strongly factor towards a due process violation," but granting habeas petition based on procedural due process claim of prolonged detention period).

[9] Observations made during a pastoral visit two weeks after the DOJ's visit contradicted the DOJ report's allegations that the Facility conditions fell below ICE standards. *See* Kayla Canas, *Bishop Joseph Brennan Visits ICE Detention Center, Leads Mass Amid Prior Scrutiny*, Mohave Desert News (Feb. 27, 2026), https://www.desertnews.com/

report did not allege, much less find, that CoreCivic committed any violations of federal or state law.[10] Indeed, nothing in the OAG comment establishes violations of federal or state law.[11] And although the applications for appeal fail to identify any particular "past public comment," such opinions and commentary from the general public—the majority of whom do not reside in California City and lack any property or local interest in this matter—do not prove CoreCivic committed any violations of state or federal law, much less the Municipal Code.

Significantly, the applications for appeal fail mention another lawsuit pending in federal court where the DND Coalition (and the ILRC as a coalition member) has sued the City and CoreCivic based on allegations that the City violated the Municipal Code by approving the Facility's use for immigration detention and state law by not following the notice and hearing process applicable to building permits under SB 29 before issuing CoreCivic's Business License. *See Dignity Not Detention Coalition, et al. v. City of California City, et al.*, No. 1:25-cv-01292 JLT CDB (E.D. Cal.). Although the City Planner's approval of CoreCivic's SPR Minor and the City Clerk's issuance of the Business License were not subject to SB 29, the City voluntarily complied with that statute out of an abundance of caution in defending against the DND Coalition's lawsuit. Because the City's approvals of CoreCivic's SPR Minor and issuance of the Business License after complying with SB 29 moots those claims, the DND Coalition and the ILRC are improperly using these applications for appeal to avoid their dismissal. The City should not reward their litigation tactic to use these applications for appeal as a pretext to save the DND Coalition's claims against the City and CoreCivic in that federal lawsuit.

---

news/article_6bd751cf-7750-4f85-ad0e-11bbbcf40cd5.html (reporting that two weeks after the DOJ visit, Bishop Brennan and parish leaders visited the Facility and "observed 'absolute cleanliness' and did not witness 'awful conditions.'"); Steve Virgen, *Fresno bishop leads Mass, prays with detainee at California City Detention Center*, Eyewitness News (Feb. 16, 2026), https://kmph.com/news/local/fresno-bishop-leads-mass-prays-with-detainees-at-california-city-detention-center (Bishop "Brennan said that if there were any awful conditions at the facility, he did not see them."); Chandler Marquez, *What California faith leaders saw inside a divisive immigration facility*, The Fresno Bee (Feb. 20, 2026), https://www.fresnobee.com/opinion/readers-opinion/article314749157.html ("The areas of the facility we were permitted to see were clean and orderly. Nothing we witnessed in those spaces caused alarm among our delegation, and staff members remained professional to everyone throughout our visit.").

[10] The DOJ report admits that the Facility "was used to house … ICE detainees from 2010 2013." https://oag.ca.gov/system/files/media/immigration-detention-2026.pdf (PDF at Page 145).

[11] Although these applications for appeal do not rely on them, allegations in the OAG comment that CoreCivic violated the Municipal Code are also false. CoreCivic did not conceal the nature of business on its license application. While CoreCivic initially sought a business license and SPR Minor for an immigration detention facility, those applications were amended in August 2025, when CoreCivic learned the USMS also wished to use available space at the Facility for federal pretrial detainees and corrected them for accuracy. Nor did CoreCivic provide an incomplete application. The Business License Application form provided by the City Clerk in accordance with CCMC Sec. 3-2.3.203(c) was fully completed, and CoreCivic signed the application certifying under penalty of perjury that the information required on the form is true and correct, that it agreed to the terms of the City's business license requirements, and that it has complied with relevant state and county business license requirements, which include compliance with state workers' compensation laws. Likewise, the SPR Minor application was accompanied by documents the Planning Department requested because many documents, including a Site Plan, had been previously submitted and there were no changes to the site. Further, the OAG's criticism that certain historic documents may not be authentic because they were not printed on letterhead or cannot provide copies of prior and subsequently repealed versions of the Municipal Code are unavailing. The OAG does not dispute the City Planner's testimony or any of the other records that conclusively prove the City issued approval on May 27, 2014 to use 2,560 beds at the Facility (Ex. 3, ¶ 23 and Attachment J).

## V. Conclusion.

For the above reasons, the DND Coalition and the ILRC have no right to file these applications for appeal, and their reasons for the appeals are misleadingly based on false facts and misapplication of the law. The Planning Commission's and the City Manager's decisions are correct. CoreCivic respectfully requests that the City Council deny the applications for appeal and uphold: (1) the Planning Commission's adoption of Resolution No. PC 2026-07-07 denying the DND Coalition's prior appeal of the City Planner's approval of CoreCivic's SPR Minor; and (2) the City Manager's decision denying the DND Coalition's prior appeal of the City Clerk's issuance of CoreCivic's Business License.

Sincerely,

Daniel P. Struck

DPS/KLN/eap

cc: Brandon A. Sanchez *(via email only)*

Enclosures: As stated

# EXHIBIT 1

EXHIBIT 1

STRUCK LOVE ACEDO, PLC
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>City of California City and CoreCivic, Inc.,<br><br>Respondents and Defendants.<br><br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No.<br><br>**DECLARATION OF BART E. VERHULST**<br><br>U.S. District Judge:<br>U.S. Magistrate Judge:<br><br>Complaint Filed:<br>Trial Date: |

I, Bart E. Verhulst, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic, Inc. ("CoreCivic") since 2007 and currently hold the position of Vice President of Federal and Local Partnership Relations.

3. Based on eighteen (18) years of negotiating hundreds of contracts and modifications with the Federal Government and the U.S. Immigration and Customs Enforcement (ICE), I am intimately familiar with CoreCivic's process for procuring and maintaining government contracts, including with ICE.

4. I am also familiar with the history of CoreCivic's facility located at 22844 Virginia Boulevard, California City, CA 93505, recently renamed as the California City

Immigration Processing Center, including the history of CoreCivic's contracts and agreements with the Federal Government, including ICE, as well as the previous lease of the facility to the California Department of Corrections and Rehabilitation ("CDCR").[1]

5. I submit this Declaration based upon my personal knowledge, informed by business records of CoreCivic which are known to me, and in support of CoreCivic's Notice of Removal in this matter.

6. CoreCivic is one of the country's largest private prison operators. It currently operates thirty-eight (38) correctional/detention facilities in sixteen (16) states under contracts with local municipalities, states, and the Federal Government. As relevant here, CoreCivic currently houses ICE detainees in nineteen (19) facilities in eleven (11) states under contract with federal and local governmental agencies. CoreCivic currently provides detention services to ICE for approximately fourteen thousand (14,000) detainees.

7. In 1997, CoreCivic, formerly known as Corrections Corporation of America ("CCA") submitted a proposal to the City of California City to construct a private prison, with 2,304 general population beds, as well as a 256-bed segregation unit and a 4-bed medical unit, which was ultimately approved.

8. On January 20, 1998, the City Council of City of California City granted Conditional Use Permit 97-01 to establish and operate the facility. Construction began later that year.

9. On December 1, 1998, the City Council of the City of California City granted Conditional Use Permit Amendment 98-02, which expanded the permitted use of the site by 512 general population beds. That Amendment was extended, and on November 15, 2001, the City Manager/Planning Director clarified that the Amendment extension was "granted indefinitely."

10. In September 2000, the Federal Bureau of Prisons ("BOP") awarded CCA a contract to utilize the California City Correctional Facility under the Criminal Alien

[1] The facility was previously known as the California City Correctional Facility.

Requirement program. The Criminal Alien Requirement sought to obtain housing in privately owned and operated facilities of Criminal Aliens who were serving federally imposed sentences, and who would be subject to removal at the completion of their sentences.

11. On September 28, 2000, the BOP provided CoreCivic with a Notice to Proceed, and the facility began receiving BOP inmates on October 2, 2000.

12. After several extensions, the BOP contract terminated on October 1, 2010.

13. In September 2010, the City of California City entered into a 15-year Intergovernmental Service Agreement ("IGSA") with the Office of the Federal Detention Trustee, which authorized the U.S. Marshals Service and ICE to use 2,532 beds at the California City Correctional Facility, with CCA as the City's Service Provider.

14. Under that IGSA, more than 9,500 ICE detainees were placed at the California City Correctional Facility between 2010 and 2013.

15. In December 2013, CCA began leasing the California City Correctional Facility to CDCR to house sentenced state prisoners.

16. CDCR made full use of the available space at the California City Correctional Facility, and, in January 2019, CDCR housed more than 2,500 state inmates at the California City Correctional Facility.

17. Due to declining state inmate populations, CDCR removed its inmates from the California City Correctional Facility by November 1, 2023, and the lease expired in March 2024.

18. Despite the removal of CDCR inmates and lease termination, CoreCivic continued to maintain the California City Correctional Facility so that it could remain in use. Among other things, CoreCivic maintained staff on-site, marketed, responded to requests for proposals , and engaged in contract negotiations for use of the California City Correctional Facility with potential partners, including ICE.

19. On January 20, 2025, President Trump signed Executive Order 14159, titled "Protecting the American People Against Invasion," which, in part, reversed prior decisions limiting federal contracts for the operation of detention facilities.

20. In April 2025, CoreCivic entered into a letter contract with ICE to utilize all available bed space at the Facility. The contract provided a monthly payment to CoreCivic for the ramp up and preparation of the Facility, and authorized the detention of 512 ICE detainees during the ramp-up period.

21. In August 2025, ICE informed CoreCivic that it would begin delivering detainees to the Facility, and ICE did so on August 27, 2025.

22. In September 2025, ICE formalized the contract for the Facility, authorizing use of up to 2,560 beds at the Facility. The contract calls for services to be provided from April 1, 2025 until August 31, 2027.

23. The operation and structure of the Facility is the same today for ICE detainees as it was for all prior inmate and detainee populations since the Facility opened. Detainees are housed in bunks in the same cells, have access to a medical area, are provided meals prepared in a central kitchen, and have the ability to attend religious services, access a library, go to recreation, and visit with friends, family, and legal counsel, either in person or by video. As with all prior inmate and detainee populations, ICE detainees are escorted by CoreCivic personnel at all times when outside their housing units.

24. ICE detainees at the Facility can attend Immigration Court proceedings by video so that Immigration Court proceedings can be held at the Facility, which will reduce detainee transport needs.

25. CoreCivic expects ICE to continue to use additional space and may fill the Facility in early 2026. At capacity, CoreCivic values the contract at more than $10 million per month, and $130 million per year. During the ramp up period, CoreCivic values the contract at a prorated amount, depending on the ICE detainee population at the facility.

26. CoreCivic has invested over $22 million for, among other things, staffing and equipping the Facility to house civil immigration detainees. In addition to amounts already

incurred, CoreCivic has also committed to spend $5.3 million in incremental capital costs to renovate the physical plant, including conversion of existing program space to Immigration Courtrooms and offices for use by ICE, the Executive Office of Immigration Review, and the Office of the Principal Legal Advisor, and has a monthly run rate of approximately$4.5 million in monthly operating costs to maintain the Facility in its current state with a projection to reach a normalized run rate of approximately $7.5 million in monthly operating costs.

27. These investments would be lost, and CoreCivic's operations and the property would likely need to be shut down entirely, if the continued operation and ramp up of the facility were enjoined.

28. Moreover, CoreCivic's relationship with ICE depends on delivering timely service in the highly competitive field of private immigrant detention at various locations nationwide. Each ICE field office places ICE detainees at numerous facilities under that field office's supervision. These facilities must be geographically diverse to reduce the distance detainees are transported from point of arrest or apprehension. CoreCivic's current ability to admit detainees to the Facility reduces difficulties for ICE's San Francisco Field Office because detainees can be easily transferred to the Facility, which frees up space in smaller facilities located closer to larger population centers. If ICE were unable to utilize the Facility, it would need to transport these detainees more frequently over longer distances to be placed in suitable housing. For these reasons, the Facility is essential to ICE's operations. Enjoining CoreCivic from accepting any more ICE detainees will severely disrupt ICE's ability to discharge its statutory duties and strain CoreCivic's relationship with ICE at this and other locations.

///

///

///

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 1, 2025.

Bart E. Verhulst

# EXHIBIT 2

EXHIBIT 2

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com
sknorr@strucklove.com

Nicholas H. Rasmussen, Bar #285736
Nancy Flores-Castaneda, Bar #357148
McCORMICK, BARSTOW, SHEPPARD,
WAYTE & SMITH, LLP
7647 North Fresno Street
Fresno, CA 93720
Tel: (559) 433-1300
Fax: (559) 433-2300
nrasmussen@mccormickbarstow.com
nancy.flores-castaneda@mccormickbarstow.com

Attorneys for Respondent-Defendant
CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>City of California City and CoreCivic, Inc.,<br><br>Respondents and Defendants.<br>—<br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF JOHN MALLOY**<br><br>U.S. District Judge: Kirk E. Sherriff<br>U.S. Magistrate Judge: Christopher D. Baker |

I, John Malloy, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic[1] since November 2008, when I was hired as Senior Director, Partnership Development with responsibility for managing CoreCivic's relationships with the states of California, Arizona and Oklahoma, relating to each of those states' respective correctional services agreements with CoreCivic. For the past seven years, I have held the position of Managing Director, Government Relations with a primary focus on CoreCivic's relationships with its local governmental partners.

3. The facts set forth are based on my personal knowledge and/or information and knowledge gained in my capacity as a corporate representative of CoreCivic, including information obtained through discussions with other CoreCivic employees and my review of CoreCivic's corporate records.

4. The California City Correctional Facility ("the facility") is located at 22844 Virginia Boulevard, California City.[2]

5. CoreCivic constructed the facility in the late 1990s and began operating it in 2000 under a contract with the Federal Bureau of Prisons.

6. In September 2010, the City of California City entered into a 15-year Intergovernmental Service Agreement ("IGSA") with the United States Department of Justice, Office of the Federal Detention Trustee to provide an estimated 2,532 federal beds for use by the United States Marshals Service, Bureau of Prisoners, and Immigration and Customs Enforcement, with CoreCivic to be the service provider for those agencies at the facility. Attachment A is a true and correct copy of IGSA ODT-10-0002, which is maintained as a business record of CoreCivic, and reflects the estimated total number of federal beds on page 1.

7. Due to the opening of other facilities and declining population levels at the facility, as well as an acute need by the State of California to reduce overcrowding in its

---

[1] Prior to November 2016, CoreCivic was known as Corrections Corporation of America.

[2] The facility has also been variously known at times as the California City Correctional Center, the California City Immigration Processing Center, and the California City Detention Facility.

facilities, in 2013, the OFDT authorized CoreCivic to pursue the leasing of the entire facility to the California Department of Rehabilitation and Corrections ("CDCR").

8. In 2013, CoreCivic entered into a Lease Agreement with CDCR for the use of the 2,560-bed facility. That lease agreement was subsequently extended several times until it terminated in 2024.

9. Although the facility was not used for federal detention between December 2013 and April 2024, neither the City of California City nor the United States cancelled Agreement ODT-10-0002, and it remained in effect until it terminated in September 2025.

10. Once CoreCivic entered into a letter agreement with ICE in April 2025 and began planning to fully restaff the facility to comply with ICE's requirements, I began to have communications with various City representatives relating to the contract.

11. In early June 2025, City Manager Christopher Lopez requested that we provide tours of the facility for the Mayor, City Council, and various members of the City's Management Team, which I facilitated on June 17, 2025.

12. At the end of July 2025, I was provided an email from then Director of Public Safety, Justin Vincent, in which he was complimentary of the fire life safety inspection he and Deputy Fire Marshal Hightower conducted. Dr. Vincent noted that there were "just three areas" which needed to be addressed prior to "his final inspection and sign-off for the facility." Those issues were limited to: 1) installing "704 placards" which indicate to first responders the location of potentially hazardous materials; 2) placement of keys which first responders may use to access the secure perimeter of the facility in the Knox box; and 3) ensuring that City of California City fire and police department radio communications are possible throughout all locations of the facility. Attachment B is a true and correct copy of my email forwarding Dr. Vincent's report to City Manager Lopez on July 29, 2025, and is a business record of CoreCivic.

13. On July 29, 2025, I received a memorandum from City Manager Lopez regarding the California City Fire Department Inspection. Attachment C is a true and correct copy of this memorandum. In it, the issues raised by the City are limited to the radio issues

of which I was aware, as well as financial concerns of the City related to potentially increased demand for police, fire, and EMS response due to any calls for service to the facility.

14. At Dr. Vincent's suggestion, CoreCivic engaged with the City's recommended contractor, Roger Goodman, to address the radio communications issue. He conducted tests with the City's fire department radios on July 30, 2025 and noted that "the signal is very strong inside the facility." Mr. Goodman confirmed that radio communications were also available with Kern County Communications on existing channels. As a temporary solution, he recommended that first responders change to Kern County channel 5 until a bi-directional amplifier was installed at the facility. Attachment D is a true and correct copy of my July 31, 2025 email to City Manager Lopez forwarding the results of the radio test and is a business record of CoreCivic.

15. In response to follow-up correspondence from the City Manager, Dr. Vincent sent another message on July 31, 2025 noting that once the temporary solution of changing channels in response to public safety call for service at the facility was confirmed to be effective for all fire, police, and ambulance services, he would approve that resolution for 90 days, with the requirement that a permanent solution be provided so that first responders do not have to switch radio channels at the prison when responding to a call for service in the future. He concluded that "the only item from our safety inspection still pending is the communications issue" but directed CoreCivic to remove staff from the facility until the temporary solutions had been confirmed effective for all first responders. Attachment E is a true and correct copy of the email thread containing Dr. Vincent's email response to the City Manager, on which I was copied, as well as my reply, and is a business record of CoreCivic.

16. That same day, I replied that CoreCivic has had productive conversations regarding the need for full dispatch capabilities and expected work to be completed in the very near future. See Attachment E.

17. To effect the temporary radio communications solution, CoreCivic purchased a repeater trailer to boost the radio signal at the facility to Kern County dispatch. On August 5, 2025, I provided notification that permission had been obtained from Kern County for use of the repeater and provided the license authorization to the City Attorney, City Manager, and Dr. Vincent. Attachment F is a true and correct copy of the City Attorney's confirmation of receipt of my message and is a business record of CoreCivic.

18. The temporary radio solution was tested, and on August 7, 2025, I received confirmation from Deputy Fire Marshal Hightower that the temporary radio system was now working, along with Fire Clearance, and was instructed to "contact city hall to obtain your business license." Attachment G is a true and correct copy of the email and attachment I received, which is a business record of CoreCivic.

19. On August 7, 2025, I, along with other CoreCivic personnel, had a meeting at the facility with Acting Director of Public Safety, Lt. Hayes, who confirmed he had verified the radio system was fully functional, but stated there were a few outstanding items for CoreCivic to address relating to potential financial impacts to the City should emergency services be required at the facility. Attachment H is a true and correct copy of Lt. Hayes' email, which accurately reflects our conversations on that day and is a business record of CoreCivic.

20. On August 8, 2025, CoreCivic provided a complete response to the concerns raised in City Manager Lopez's July 29th memorandum. In particular, Daren Swenson, CoreCivic's Senior Vice President and Chief Corrections Officer, confirmed that the radio communications solutions were underway and acknowledged the City's financial concerns. Mr. Swenson confirmed, based upon CoreCivic's considerable experience managing multiple populations for various governmental partners, that the likely need for police response to calls for service is expected to be considerably lower for the ICE population than for prior populations at the facility. Moreover, he noted that since the facility's construction in 1999, there has never been a single instance requiring the California City Fire Department to respond to a call for service at the facility. Finally, Mr. Swenson

explained that the facility's robust medical unit should reduce the need for emergency medical services, but that CoreCivic has contracted with an ambulance service for any emergency medical transports. Mr. Swenson also confirmed CoreCivic's willingness to reimburse the City for any costs related to emergency responses at the facility, whether by police, fire, or EMS. Attachment I is a true and correct copy of this letter, which is a business record of CoreCivic.

21. In addition, on August 8, 2025, CoreCivic's General Counsel, Cole Carter, sent separate correspondence, confirming that CoreCivic would reimburse actual costs incurred by the City for emergency response, indemnify and defend the City, and provide insurance coverage for the City to avoid placing any unnecessary strain on the City's and its agencies' valuable responses. Attachment J is a true and correct copy of this letter, which is business record of CoreCivic.

22. On August 13–14, 2025, I was copied on and exchanged multiple emails with the City's Consultant Planner, Anu Doravari, who noted that she was "coordinating with all City departments to ensure compliance," requested that CoreCivic submit an application for a sign permit, and asked for a copy of CoreCivic's response to City Manager Lopez's July 29, 2025 memorandum. Attachment K is a true and correct copy of that email thread, which included my reply providing the requested documents, and is a business record of CoreCivic.

23. Later on August 14, 2024, I was surprised to receive correspondence from Ms. Doravari stating that she believed SB 29 was applicable to the facility, SB 29 required a Site Plan Review independent of the existing valid Conditional Use Permit for the facility, and that no permit or final project approval would be executed or issued by the City before February 1, 2026. Attachment L is a true and correct copy of this email and is a business record of CoreCivic.

24. Notwithstanding Ms. Doravari's representation that no permit would be approved, executed, or issued before February 1, 2026, a few hours later, the City Building Department transmitted the completed sign permit documents and payment receipt.

Attachment M is a true and correct copy of the email and attachments received by CoreCivic personnel on August 14, 2025, and is a business record of CoreCivic.

25. I made several requests to City Officials for an explanation as to why a new Site Plan Review is required for the facility when CoreCivic is not making any substantive alterations to the property or its use. Since 1999, CoreCivic has maintained the facility and operated it in conjunction with its government partners, including the United States (to house BOP inmates), the City of California City (to house ICE and USMS detainees), and the State of California (to house CDCR inmates). During each of those prior transitions, the City did not request or require any Site Plan Review, despite changes in the identity of the government entity whose inmates or detainees were housed at the facility.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 27, 2025.

John Malloy (Oct 27, 2025 17:02:55 CDT)

John Malloy

ATTACHMENT A

ATTACHMENT A

| | | | |
|---|---|---|---|
| 1. Agreement Number<br>ODT-10-0002 | 2. Effective Date<br>See Block 19. | 3. Facility Code(s) | 4. DUNS Number<br>159734151 |
| 5. Issuing Federal Agency<br>U.S. Department of Justice<br>Office of the Federal Detention Trustee<br>4601 N. Fairfax Drive, Suite 910<br>Arlington, Virginia 20530 | | 6. Local Government<br>California City<br>21000 Hacienda Ave<br>California City, California 93505<br><br>TAX ID# 62-1806755 | |
| 7. Appropriation Data | | 8. Local Contact Person<br>Tom Weil, City Manager<br><br>9. Tel: (760) 373-7170<br>Fax: (760) 373-7532<br>Email: citymgr@californiacity.com | |
| **Services** | | **Number of Federal Beds** | **Per-Diem Rate** |
| 10. This agreement is for the housing, safekeeping, and subsistence of federal prisoners, in accordance with content set forth herein. | | 11.<br>Male: 2,276 Female: 256<br>(Estimated Federal Beds) | 12.<br>See Page #18 |
| 13. Optional Guard/Transportation Services:<br>☒ Medical Services<br>☒ U.S. Courthouse | | 14.<br>Guard Hour Rate: $53.03<br>Mileage shall be reimbursed by the Federal Government at the GSA Federal Travel Regulation Mileage Rate. | |
| 15. Local Government Certification<br>*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct, this document has been duly authorized by the governing of the Department or Agency and the Department or Agency will comply with all provisions set forth herein.* | | 16. Signature of Person Authorized to Sign (Local)<br>[signature]<br>Signature<br>Tom Weil<br>Name<br>City Manager, California City — 07/21/10<br>Title — Date | |
| 17.Prisoner and Detainee Type Authorized<br>☒ Adult Male<br>☒ Adult Female<br>☐ Juvenile Male<br>☐ Juvenile Female<br>☐ ICE Detainees | 18. Other Authorized Agency User<br>☒ BOP<br>☒ ICE | 19. Signature of Person Authorized to Sign (Federal)<br>[signature]<br>Signature<br>Scott P. Stermer<br>Name<br>Assistant Trustee for Procurement, OFDT — 9/23/10<br>Title — Date | |

A.1 Background ... 3
A.2 Services Required ... 3
A.2.1 Standard Receiving and Discharge of Prisoners/Detainees ... 4
A.2.2 Records Management ... 5
A.2.3 Indemnification ... 5
A.2.4 Transportation ... 5
A.2.5 Medical Services ... 7
A.2.5a Prisoner Rape Elimination Act (PREA) ... 8
A.2.6 Contacts and Incident Reporting ... 8
A.2.7 Detainee Work Program ... 9
A.3 Quality Control Management ... 10
A.4 Quality Assurance ... 10
A.4.1 Inspection Clause ... 11
A.5 Performance Reviews ... 12
A.6 Performance Ratings ... 12
A.7 Performance Matrix ... 13
A.8 Contact for Agreement Administration ... 17
A.9 Financial Provisions ... 17
A.9.1 Service Contract Act ... 17
A.9.2 Price Schedule ... 18
A.9.3 Invoice and Payment ... 18
A.10 Modification and Disputes ... 19
A.11 Termination ... 19
A.12 Litigation ... 20
Prisoner Rape Elimination Act Reporting Information ... 21

## A.1 Background

Federal detention is a large component of criminal and immigration case processing by the U.S. Marshals Service (USMS) and, U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS). Law enforcement initiatives and increases in illegal immigration to the United States have created a complex detention program that the Department of Justice (DOJ) must effectively manage with available detention resources or acquire additional resources to meet increasing demands.

In response to the increasing concern regarding federal detention, the Office of the Federal Detention Trustee (OFDT) was established by a Congressional directive to exercise all power and functions authorized by law relating to the detention of federal prisoners and illegal aliens. Accordingly, OFDT leads the development of DOJ detention policy and manages federal detention resources to maximize available detention space.

Currently, non-federal detention bed space for federal detainees and prisoners is acquired through Intergovernmental Agreements (IGAs), where a daily rate is paid to state and local governments, and facility-specific contracts with private service providers. The Department of Justice Appropriations Act for 2001 (Public Law 106-553) is designed to allow for the use of non-traditional contract vehicles when acquiring detention and other related services. This authority states:

*"Sec. 119 - Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."*

In an effort to operate in the most effective way and receive the maximum benefit of Section 119 to meet the Government's current and future goals, and acquire additional resources, OFDT desires to award an Agreement to California City for detention services at the California City Correctional Center.

## A.2 Services Required

California City will provide, by the terms and conditions identified in this agreement, all necessary personnel, equipment, materials, supplies, and services for the management of comprehensive detention services, which include, but are not limited to, security, medical services, food service, safety, and sanitation. Additionally, the facility shall have sound proof rooms to accommodate video conferencing that permit prisoners and their attorneys to communicate in a secure manner which preserve the confidentiality of the attorney-client relationship.

These comprehensive detention services shall provide for the safe, secure, and humane confinement for male and female population principally consisting of prisoners or

detainees charged with federal offenses' and detained while awaiting trial or sentencing. Services are to be provided at the California City.

Performance shall be in accordance with the most current editions of the Federal Performance-Based Detention Standards (FPBDS), Performance-Based Detention Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement. California City shall maintain American Correctional Association (ACA) and Joint Commission on Accreditation of Healthcare Organizations (JCAHO) accreditation throughout the life of the agreement.

All services and programs shall comply with this Performance Work Statement (PWS): the U.S. Constitution; all applicable federal, state, and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders and Consent Decrees. Should a conflict exist between any of the aforementioned standards, the most stringent shall apply. When a conflict exists and a conclusion cannot be made as to which standard is more stringent, the Contracting Officer (CO) shall determine the appropriate standard. California City shall comply with DOJ and/or USMS regulation, Congressional mandate, federal law or E.O. and all existing California City polices.

California City will:

- Provide a means for verification of their ACA and JCAHO accreditation.
- Operate in full and complete compliance of the Federal Performance-Based Detention Standards as defined. Those standards are available at http://www.justice.gov/ofdt/major-activities.htm
- Operate in full complete compliance with California laws and regulations.
- California City will ensure that all employees and contractors comply with their policies regarding employment suitability and background clearances and that any violations of California City Standards of Conduct are investigated and adjudicated appropriately and promptly.

### A.2.1 Standard Receiving and Discharge of Prisoners/Detainees

California City agrees to accept federal detainees only upon presentation by a law enforcement officer of the Federal Government with proper agency credentials and shall not relocate a federal detainee from one facility under its control to another without the permission of the Federal Government.

California City shall only release federal prisoners/detainees only to law enforcement officers of the Federal Government agency initially committing the detainee (i.e., DEA, ICE, etc.) or to a Deputy United States Marshal (USM). Those detainees who are

remanded to custody by a USM may only be released to a USM or an agent specified by the USM of the Judicial District.

Federal prisoners detainees sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the Federal Government.

### A.2.2 Records Management

All records related to agreement performance should be retained in a retrievable format for the duration of the agreement. Except as otherwise expressly provided in this PWS, California City shall, upon completion or termination of the resulting agreement, transmit to the Government any records related to performance of the agreement.

### A.2.3 Indemnification

California City shall protect, defend, indemnify, save, and hold harmless the United States Government, the DOJ and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of California City, its agents, sub-contractors, employees, assignees, or any one for whom California City may be responsible. California City shall also be liable for any and all costs, expenses, and attorneys' fees incurred as a result of any such claim, demand, and cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government, the DOJ and its employees or agents. California City's liability shall not be limited by any provision or limits of insurance set forth in the resulting agreement.

In awarding this agreement, the Government does not assume any liability to third parties, nor will the Government reimburse California City for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the agreement or any subagreement under this agreement.

California City shall be responsible for all litigation, including the cost of litigation brought against it, its employees or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this agreement and be provided copies of any pleadings filed or said litigation within five (5) working days of receipt of service. California City shall cooperate with government legal staff and/or the United States Attorney regarding any requests pertaining to federal or State litigation.

### A.2.4 Transportation

California City is responsible for the movement/transportation of prisoners designated to the institution as requested in writing by the USMS as specified below. Examples of

circumstances requiring prisoner movement/transportation include, but are not limited to: outside medical care; transfer or movement to/from other Government facilities; and airlift sites. California City's transportation procedures shall ensure staff and prisoner security and safety. California City shall utilize restraint equipment identical to the USMS when one-for-one equipment exchange is required (e.g., airlifts).

Transportation and escort guard services will be performed by at least two (2) armed qualified detention or correctional officer personnel under applicable policies, procedures, and practices. California City agrees to augment such practices as may be requested by the USMS to enhance specific requirement for security, prisoner monitoring, visitation, and contraband control.

California City shall establish procedures for the disposition of prisoner/detainee property/funds upon final transfer from the facility. California City shall establish procedures to allow prisoner/detainee one set of clothes that he/she is wearing at time of final transfer from the facility. California City shall ensure that prisoner/detainee transport clothing provided is properly fitted, climatically suitable, durable and presentable. These procedures shall be approved in writing by the USMS.

Specific services, California City agrees, upon request of the USMS in whose custody a prisoner is held, to provide:

1) Transportation and escort guard services for federal prisoners housed at their facility to and from a medical facility for outpatient care ***(within per-day rate)***;

2) Transportation and stationary guard services for federal prisoners admitted to a medical facility ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

3) Transportation and escort guard services for federal prisoners/detainees housed at the facility are transported to and from the San Diego Courthouse four times a week ***(within per-day rate)***;

4) And, the Justice Prisoner and Alien Transportation (JPATS) airlift site in Victorville, CA ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

5) Transportation and escort guard services for federal prisoners once a week from the California City Correctional Center to the Nevada Southern Detention Center in Pahrump, Nevada ***(within per-day rate)***.

### A.2.5 Medical Services

Provide sufficient on-site medical coverage to accomplish the deliverables listed below while containing costs, with an understanding that California City Correctional Center's proximity to other California facilities allows the medical provider to provide certain coverage, care and relief using staff from nearby institutions.

Specifically, the goal is to provide these services on-site:

- Initial (intake) medical screening of new admissions including administration and reading of PPD tests.
- Health appraisals (physicals) within the 14 day requirement after intake.
- 24 hour/ 7 day basic care to respond to emergent situations and distribute medications.
- Sick call Monday through Friday days.
- Chronic care clinics when needed.

California City is financially responsible for all medical treatment provided to federal detainees within the facility. California City shall provide either through its staff or contractors the full range of medical care required within the facility including dental care, mental health care, pharmaceuticals, and record keeping, as necessary to meet the standards of the JCAHO. California City shall not be responsible for the cost of necessary outside medical care or treatment. The USMS shall be responsible for the cost of necessary outside medical care or treatment.

In the event of an emergency, California City shall proceed immediately with necessary medical treatment. In such event, California City shall notify the USMS Contracting Officer's Technical Representative (COTR) immediately regarding the nature of the federal detainee's illness or injury and type of treatment provided.

The facility shall have in place an adequate infectious disease control program, which includes testing all prisoners at the facility for Tuberculosis (TB) as soon as possible upon intake (not to exceed 14 days) and read within 72 hours. TB testing shall be accomplished in accordance with the latest Center for Disease Control (CDC) Guidelines and the results documented on the federal detainee's medical record. California City shall immediately notify the USMS of any cases of suspected or active TB so that any scheduled transports or production can be delayed until a physician verifies the federal detainee's TB status. (Refer to USMS Directive: 9.4 Prisoner Health - Prisoner Airborne Pathogen Control)

When a federal detainee is being transferred and/or released from the facility, he will be provided with seven (7) days of prescription medication which will be dispensed from the detention facility. When possible, generic medications should be prescribed. Medical records must travel with the federal detainee.

If the records are maintained at a medical contractor's facility, it is the detention facility's responsibility to obtain them before a federal detainee is moved.

### A.2.5a Prisoner Rape Elimination Act (PREA)

The facility is required to post the Prisoner Rape Elimination Act (PREA) brochure/bulletin in each housing unit of the facility. All prisoners or detainees have a right to be safe and free from sexual harassment and sexual assaults. The facility shall include the PREA information in their handbooks and orientations at the California City (Refer to Attachment: Prisoner Rape Elimination Act Information).

### A.2.6 Contacts and Incident Reporting

Policy and procedures shall be developed which ensure a positive relationship is maintained with all levels of the federal judiciary. California City's procedures shall ensure a tracking system is established which mandates that all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and California City responses, specifically related to a detainee, shall be made part of the detainee's file.

California City shall notify the COTR (with copy to the CO) when a member of the United States Congress or the media requests information or requests to visit the facility. California City shall coordinate all public information related issues with the COTR. All press statements and releases shall be cleared, in advance, with the COTR.

California City, their employees, agents, or sub-contractors shall not release any information regarding the facility population, security level, personal identifiers, or medical issues to anyone outside the USMS without express permission of the CO, COTR, or their designee. Any inquiries regarding any inmate or other matter related to the contract shall immediately be referred to the USMS. California City shall immediately notify the USMS of any incident where they believe information was released by their employee, agent, or sub-contractor related to a USMS' matter. California City shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the DOJ in any public presentations they make or articles they write that relate to any aspect of contract performance or the facility operations.

California City shall immediately report all criminal activity related to the performance of this contract to the USMS, who shall contact the appropriate law enforcement investigative agency. California City shall immediately report all serious incidents to the COTR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, sexual assault/abuse, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force, assaults on staff/detainees resulting in

injuries that require medical attention (does not include routine medical evaluation after the incident); fires; full or partial lockdown of the facility; escape; any security breaches; weapons discharge; suicide attempts; deaths; hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; significant environmental problems that impact the facility operations; transportation accidents if a detainee is in the vehicle.

California City shall provide a safe, secure, and humane environment for alleged victims of sexual assaults and detainees undergoing mental health treatment for sexual assault.

The Government may investigate any incident pertaining to performance of this contract. California City shall cooperate with the Government on all such investigations.

### A.2.7 Detainee Work Program

Detainee labor shall be used in accordance with the detainee work plan developed by California City and approved by the USMS. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service or other jobs. The USMS detainees may not be required to work. USMS detainees may volunteer to work within the secure confines of the contract facility if they sign a waiver of their right not to work. USMS detainees with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state or federal agencies will not be considered for the volunteer program. USMS detainees are not permitted to act as Trustees and they may not work in positions that permit unsupervised contact with segregated prisoners or detainees of the opposite sex. USMS detainees are restricted from operating equipment that may expose the prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens or other inmates. USMS detainees will not have access to prisoner or employee records. In addition, the State will ensure that detainees who volunteer to work are denied access to prescription medications. USMS detainees must obtain required medical clearances before working in the food service areas. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations. Detainees shall not be used to perform the responsibilities or duties of an employee of California City. Appropriate safety/protective clothing and equipment shall be provided to detainee workers as appropriate. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands.

Volunteer prisoner/detainee workers can be paid the identical rates of pay as other California City inmates.

USMS prisoner/detainees shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in

privileges may be used as incentives to ensure that USMS' detainees keep their living areas clean (FPBDS Services and Programs Section – G.3 & G.4.).

### A.3 Quality Control Management

California City is responsible for management and quality control actions necessary to meet the quality standards set forth in this agreement. In compliance with the FAR Clause 52.246-4, Inspection of Services-Fixed Price, California City must provide a Quality Control Plan (QCP) to the CO no later than 60 days after award.

The plan must include:

1) A description of the methods to be used for identifying and preventing defects in the quality of service performed;

2) A description of the records to be kept to document inspections and corrective or preventive actions taken;

3) Records of inspection that must be kept and made available to the Contracting Officer, when requested, through the agreement performance period and for the period after agreement completion until final settlement of any claims under this agreement.

### A.4 Quality Assurance

The Government quality assurance (QA) is comprised of the various functions, including inspection, performed by the Government to determine whether a provider has fulfilled its agreement obligations pertaining to quality. The Government's QA program is not a substitute for quality control by the provider.

Each phase of the services rendered under this agreement is subject to Government inspection both during California City's operations and after completion of the tasks. When California City is advised of any unsatisfactory condition(s), California City shall submit a written report to the CO addressing corrective/preventive actions taken. The COTR may check California City's performance and document any non-compliance, but only the CO may take formal action against California City for unsatisfactory performance.

The COTR will be designated subsequent to agreement award and a delegation of COTR duties and authority will be furnished to California City. The Government may reduce California City's invoice or otherwise withhold payment for any individual item of nonconforming service observed as specified in Contractor's Failure to Perform Required Services. The Government may apply various inspection and extrapolation techniques to determine the quality of service and the total payment due.

### A.4.1 Inspection Clause

**Failure to Perform Required Services**

The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this solicitation. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the contractor's invoice shall reflect the contract's reduced value resulting from the contractor's failure to perform required services. The contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

This agreement incorporates FAR clause 52.246-4 Inspection of Services—Fixed-Price:

INSPECTION OF SERVICES—FIXED-PRICE (AUG 1996)

(a) Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform to contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the Government may

(1) Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and

(2) Reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may –

(1) By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

(2) Terminate the contract for default.

(End of clause)

### A.5 Performance Reviews

In accordance with the Federal Acquisition Regulations (FAR), subpart 37.601 Performance-based Acquisition, the Government must have a method of assessing contractor performance against performance standards. Further, the agreement provides procedures for reductions to the price of a fixed-price agreement when services are not performed or do not meet agreement requirements. This Performance Summary establishes the performance level required by the Government to meet the agreement requirements.

The following methods of surveillance may be used in the assessments of agreement performance:

A) **Systematic**: These reviews will be scheduled inspections focusing on a specific discipline. Assessments may be performed by Government monitors or by other parties designated by the Government.

B) **Ad-Hoc**: These reviews will be conducted as a result of special interests arising from routine monitoring of the contractor's quality control system an unusual occurrence pertaining to the agreement or other Government concerns.

### A.6 Performance Ratings

The service requirements are divided into various disciplines, each of which has a number of key functions. Successful performance of a key function is essential for successful performance of the related discipline. Each discipline comprises a specific percentage of the overall agreement requirement. Reductions in agreement price will be based on these percentages applied to the overall monthly invoice.

At the conclusion of any review, a report will be written and an adjectival rating of contractor performance within each discipline will be assigned. The following rating system will be used:

Excellent: The program conforms to the FPBDS in an exceptional manner and conformance is maintained with exceptional internal controls. Policies and procedures for achieving the program standards are documented and adequate for the mission of the facility; the policies and procedures are communicated to staff; the policies and procedures are fully implemented; and the desired outcome is achieved. Level of performance in the aggregate exceeds the minimum performance standard by substantial margin; deficiencies are nonexistent or extremely minor.

Good: The program conforms to the FPBDS in an acceptable manner. Internal controls limit procedural deficiencies. The facility more than accomplishes the requirements of program standards. Level of performance in the aggregate meets the performance standard: deficiencies are minor and offset by outstanding elements of performance within the review guideline.

Acceptable: The program is meeting the requirements of the FPBDS. There are no breakdowns that would keep the program from continuing to accomplish the mission of the facility. Level of performance in the aggregate meets the performance standards; deficiencies are minor and there are no outstanding elements of performance present within the review guideline.

Deficient: The program is unable to meet the requirements of one or more of the FPBDS. Internal controls are weak, resulting in serious deficiencies in one or more areas. The level of performance in the aggregate fails to meet the performance standards: deficiencies are pervasive.

At-Risk: Operation of the program is impaired to the point that the facility is unable to accomplish its mission. The program is unable to meet the requirements of the FPBDS and is unlikely to meet those requirements in the foreseeable future without substantial corrective action. The level of performance in the aggregate fails to meet the performance standards: deficiencies require immediate corrective actions.

### A.7 Performance Matrix

This Performance Matrix serves to communicate what the Government intends to qualitatively inspect. The matrix identifies:

A. Each service requirement and the key functions essential to successful performance of each agreement requirement:

B. Define the minimum performance rating acceptable for each agreement requirement: and

C. Specify the maximum percentage of total agreement value attributable to each agreement requirement.

**Administration and Management**

*Objective* - Addresses policy development and monitoring; internal quality control; maintenance of detainee records, funds, and property; admission and orientation procedures; detainee release; and accommodations for the disabled.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (A.1) | Policy Development and Monitoring |
| (A.2) (K.1) | Internal Inspections and/or Reviews |
| (A.3) | Detainee Records |
| (A.4) | Admission and Orientation |
| (A.5) (K.2) | Personal Property and Monies |
| (A.6) (K.3) | Detainee Release |
| (A.7) | Accommodations for the Disabled |

**Health Care**

*Objective* - Addresses the policies and procedures for administering quality health care by licensed personnel; maintaining accurate health information data; timely health screening, treatment, program intervention and follow-up of all cases; access to routine, acute chronic, and emergency health services, response to medical, mental and dental health needs of detainees; suicide prevention; infectious disease; hunger strikes; and detainee death.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (B.1) | Intake Health Screening |
| (B.2) (K.4) | Medical, Dental, and Mental Health Appraisals |
| (B.3) (K.5) | Access to Routine, Acute Chronic, and Emergency Health Services |
| (B.4) | Experimental Research |
| (B.5) | Response to Medical, Mental, and Dental Health Needs |
| (B.6) | Suicide Prevention |
| (B.7) | Detainee Hunger Strikes |
| (B.8) | Detainee Death |
| (B.9) | Informed Consent/Involuntary Treatment |
| (B.10) | Infectious Disease |

**Security and Control**

*Objective* - Addresses the issuance of policies and procedures to staff; appropriate use of force; maintenance of daily incident logs; emergency readiness; and detainee accountability and discipline.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (C.1)(K.6) | Post Orders |
| (C.2) | Permanent Logs |
| (C.3) (K.7) | Security Features |
| (C.4) (K.8) | Security Inspections and/or reviews |
| (C.5) | Control of Contraband |
| (C.6) | Detainee Searches |
| (C.7) | Detainee Accountability and Supervision |
| (C.8) | Use of Force |
| (C.9) | Non-routine Use of Restraints |
| (C.10) | Tool & Equipment Control |
| (C.11) | Weapons Control |
| (C.12) | Detainee Discipline |
| (C.13) | Supervision for Special Housing |
| (C.14)(K.9) | Contingency/Emergency Plan |

**Food Service**
*Objective* - Address basic sanitation procedures and the adequacy of meals provided to detainees.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (D.1) (K.10) | Sanitation Requirements |
| (D.2) (K.11) | Ensure Meals are Varied |
| (D.3) | Special Diets |

**Staff and Detainee Communication**
*Objective* - Address opportunities for detainees to communicate with staff; detainee grievance procedures; and the provision of diversity training.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (E.1) (K.12) | Staff-Detainee Communication |
| (E.2) | Diversity Training |
| (E.3)(K.13) | Detainee Grievances |

**Safety and Sanitation**
*Objective* - Addresses the adequacy of fire safety programs; the control of dangerous materials and/or hazards; air quality, noise levels, and sanitation of the facility; and the cleanliness of clothing and bedding.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (F.1) | Fire Safety |
| (F.2) | Non-Hazardous Furnishings |

| | |
|---|---|
| (F.3) | Control of Dangerous Materials |
| (F.4) | Environmental Control |
| (F.5) (K.14) | Clothing and Bedding |
| (F.6) | Personal Hygiene/Well-being |
| (F.7) (K.15) | Physical Facility and Equipment |

**Services and Programs**

*Objective* - Addresses detainee classification; religious practices; work assignments; availability of exercise opportunities; access to legal materials and legal representation; access to a telephone; visitation privileges; and the handling of detainee mail and correspondence.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (G.1) (K.16) | Classification, Review, and Housing |
| (G.2) (K.17) | Religious Practices |
| (G.3) | Volunteer Work Assignments |
| (G.4) | Work Assignments and Security |
| (G.5) | Exercise and Out-of-Cell Opportunities |
| (G.6) | Legal Materials |
| (G.7) (K.18) | Legal Representation |
| (G.8) | Telephone Access |
| (G.9) | Visitation Privileges |
| (G.10)(K.19) | Detainee Mail and Correspondence |

**Workforce Integrity**

*Objective* - Address the adequacy of the facility's hiring process and background check procedures, and the adequacy of procedures to respond to allegations of staff misconduct.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (H.1) | Staff Background and Reference Checks |
| (H.2) | Staff Training, Licensing, and Credentialing |
| (H.3) | Staff Misconduct |

**Detainee Discrimination**

*Objective* – Address the adequacy of policies and procedures designed to prevent discrimination against detainees based on gender, race, religion, national origin, or disability.

**Value: 2.5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (I.1) | Discrimination Prevention |

### A.8 Contact for Agreement Administration

California City shall designate a person to serve as the agreement administrator for the requirement. The agreement administrator is responsible for overall compliance with agreement terms and conditions. California City designation of representatives to handle certain functions under this agreement does not relieve the agreement administrator of responsibility for agreement compliance.

| | |
|---|---|
| **Name** | **Tom Weil** |
| **Title** | California City City Manager |
| **Address** | 21000 Hacienda Avenue<br>California City, California |
| **Zip Code** | 93505 |
| **Telephone** | (760) 373-7170 |
| **FAX** | (760) 373-7532 |
| **E-Mail Address** | citymgr@californiacity.com |

### A.9 Financial Provisions

#### A.9.1 Service Contract Act

This Agreement incorporates the following clause by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at this address: www.arnet.gov.

Federal Acquisition Regulation Clause(s):

52.222-41 Service Contract Act of 1965, as Amended (July 2005)

52.222-42 Statement of Equivalent Rates for Federal Hires (May 1989)

52.222-43 Fair Labor Standards Act and the Service Contract Act - Price Adjustment (Multiyear and Option Contracts) (May 1989)

The current State of California City, California wage rates shall be the prevailing wages unless notified by the Federal Government.

### A.9.2 Price Schedule

The Federal Government will use various price analysis techniques and procedures to ensure the per-diem rate established by this Agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

1. Comparison of the requested per-diem rate with the independent government estimate for detention services, otherwise known has the Core Rate;

2. Comparison with per-diem rates at other state or local facilities of similar size and economic conditions;

3. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items;

4. Evaluation of the provided jail operating expense information;

The firm-fixed per-diem rate for services is $77.50, and shall not be subject to adjustment on the basis of California City actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of the Agreement forward for 36 months. The per-diem rate covers the support of one federal detainee per "federal detainee day", which shall include the day of arrival, but not the day of departure.

After 36 months, if a rate adjustment is desired, the Local Government shall submit a request through the Electronic Intergovernmental Agreements area of the Detention Services Network (DSNetwork). All information pertaining to the jail on DSNetwork will be required before a new per-diem rate can be considered.

### A.9.3 Invoice and Payment

California City shall prepare and submit for certification and payment, original and separate invoices each month to the USMS Southern District of California. To constitute a proper monthly invoice, the name and address of the facility, the name of each federal detainee, *his* specific dates of confinement, the total days to be paid, the appropriate per diem rate, and the total amount billed (total days multiplied by the rate per day) shall be listed, along with the name, title, complete address and telephone number of the official responsible for invoice preparation. The invoice shall be submitted to the COTR at the address listed below must include:

- Name and address of California City;
- Invoice date and number;
- Agreement number;

- Description, quantity, unit of measure, unit price and extended price of the services provided;
- Terms of any discount for prompt payment offered;
- Name and address of official to whom payment is to be sent;
- Name, title, and phone number of person to notify in event of defective invoice; and
- Taxpayer Identification Number; and
- Electronic funds transfer banking information in accordance with FAR 52.232-33. Payment by Electronic Funds TransferCCentral Contractor Registration.

The invoice shall be sent to:

USMS Southern District of California

Address: Edward J. Schwartz Courthouse
U.S. District Court
Southern District of CA
940 Front Street
San Diego, CA 92101-8900

The Government will make payments to California City on a monthly basis, promptly pursuant to the Prompt Payment Act after receipt of an appropriate invoice.

### A.10 Modification and Disputes

Either party may initiate a request for modification to this Agreement in writing. All modifications negotiated will be effective only upon written approval of both parties.

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

### A.11 Termination

This Agreement shall terminate after fifteen (15) calendar years or by either party upon one-hundred and eighty days (180) advanced written notice to the other party. Within 180 days of the giving, or receipt, of such notice the USMS shall retake custody of all prisoners(s) transferred to the California City under this Agreement. The City of California City agrees to consult with the USMS and OFDT at least 90-days prior to any action(s) to terminate to allow sufficient time to prepare for loss and replacement of services.

## A.12 Litigation

The Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and/or the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

# Prisoner Rape Elimination Act Reporting Information

## SEXUAL ASSAULT AWARENESS

This document is requested to be posted in each Housing Unit Bulletin Board at all Contract Detention Facilities. This document may be used and adapted by Intergovernmental Service Agreement Providers.

While detained by the Department of Justice, United States Marshals Service, you have a right to be safe and free from sexual harassment and sexual assaults.

## Definitions

### A. Detainee-on-Detainee Sexual Abuse/Assault

One or more detainees engaging in or attempting to engage in a sexual act with another detainee or the use of **threats, intimidation, inappropriate touching** or other actions and/or communications by0 one or more detainees aimed at **coercing and/or pressuring** another detainee to engage in a sexual act.

### B. Staff-on-Detainee Sexual Abuse/Assault

Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. **Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by DOJ policy and the law.**

### C. Staff Sexual Misconduct is:

Sexual behavior between a staff member and detainee which can include, but is not limited to indecent, profane or abusive language or gestures and inappropriate visual surveillance of detainees.

## Prohibited Acts

A detainee, who engages in inappropriate sexual behavior with or directs it at others, can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy.

- **Using Abusive or Obscene Language**
- **Sexual Assault**
- **Making a Sexual Proposal**
- **Indecent Exposure**
- **Engaging in Sex Act**

## Detention as a Safe Environment

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity. Regardless of your sexual orientation, you have the right to be safe from unwanted sexual advances and acts.

## Confidentiality

Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the detainee-victim's welfare and for law enforcement investigative purposes.

## Report All Assaults!

If you become a victim of a sexual assault, you should report it immediately to any staff person you trust, to include housing officers, chaplains, medical staff, supervisors or Deputy U.S. Marshals. Staff members keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. If you are not comfortable reporting the assault to staff, you have other options:

- Write a letter reporting the sexual misconduct to the person in charge or the United States Marshal. To ensure confidentiality, use special (Legal) mail procedures.
- File an Emergency Detainee Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the Field Office Director. You can get the forms from your housing unit officer, or a facility supervisor.
- Write to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530
- Call, **at no expense to you,** the Office of Inspector General (OIG) The phone number is 1-800-869-4499.

**Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported.**

A publication of the Office of the Federal Detention Trustee
Washington, DC

Published February 2008

# ATTACHMENT B

ATTACHMENT B

**From:** "Malloy, John"
**Sent:** 07/29/2025 2:58:23 PM (-07:00)
**To:** "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** Fw: Fire inspection update- prison

---

**From:** Justin Vincent <jvincent@calcityfire.us>
**Sent:** Monday, July 21, 2025 12:55 PM
**To:** Welton, Brandon <brandon.welton@corecivic.com>
**Cc:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Fire inspection update- prison

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Mr. Welton- Safety Manager at Core Civic

Thank you very much for your incredible attention to detail and your thorough explanation of the safety measures that have been taken at the prison facility. Today's walkthrough with Deputy Fire Marshal Hightower was very successful in many facets. First, she was able to finalize the open fire alarm system permit, that has been open since 2022. This finalization will be updated in the building department's permit system today. She was also able to identify that most of the fire life safety concerns have been addressed by Core Civic. She was very appreciative of your professionalism and impressed with the progress you made.

There are just three areas that need to be addressed, prior to my visit for a final inspection and sign-off for the facility. One, the facility needs to have the "704 placards" that were discussed with you, installed by the time of the final sign-off visit. Second, the applicable Knox box keys shall be in the Knox box by the time of the final inspection and sign-off. Lastly, Core Civic will need to ensure that fire department and police department radio communications are possible throughout the entire facility. I suggest that you contact our radio contractor, Roger at 661 Communications, to have him address the radio dead zones in your facility. You may need to install a bi-directional amplifier to ensure that the fire department and police department maintain radio communications in the prison during an emergency response. Once these three items are completed, I will come do a final walkthrough and sign-off the fire life safety permitting for the facility.

Radio Contact:

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

Dr. Justin Vincent, DPA
Director of Public Safety
Chief of Police & Fire Chief
City of California City
JVincent@calcityfire.us

Station: 760-373-4841
Cell: 760-808-7546

# ATTACHMENT C

ATTACHMENT C

CITY HALL
21000 Hacienda Blvd.
California City, CA 93505

760-373-8661
www.californiacity-ca.gov

Marquette Hawkins
**MAYOR**

Michael Hurles
Ronald Smith
**COUNCIL MEMBERS**

Christopher Lopez
**CITY MANAGER**

To: John Molloy, CoreCivic

From: Christopher Lopez, City Manager, City of California City

Date: July 29, 2025

Re: California City Fire Department Inspection of 22844Virgina Blvd. on July 22, 2025

As you know, I am the City Manager for the City of California City (City). This letter is being sent as the City has substantial concerns related to the re-opening of the facility at 22844 Virginia Blvd. As detailed further below, the facility does not comply with applicable codes and the operation of the facility does or will pose a serious and imminent threat to the health and safety of the community of California City, City's emergency personnel, future detainees, those employed at the facility and visitors.

Unless and until CoreCivic can demonstrate that it complies with all applicable codes and can operate in a manner that is safe for the community of California City, the City's emergency personnel and those employed or detained at the facility, the facility cannot legally operate in the City.

The City's concerns related to the operation of facility include:

1. Emergency Communications Operations are insufficient (described in detail below regarding the Fire Code).
2. Increased demand upon the City in responding to Penal Code violations or other violations and investigation demands that will require a California City Police Department (CCPD) response.
3. Increase demand upon the City in responding to fires at the facility by the California City Fire Department (CCFD).
4. Increase demand upon other emergency personnel, including paramedics/ambulances, in responding to medical emergencies.

Fire Code Requirements:

As you are aware, on July 22, 2025, CCFD conducted an inspection, including a radio test, at the CoreCivic facility. As you are further aware, there is a substantial number of individuals

expected to be present at the facility. This factor was considered while CCFD conducted the fire life safety inspection.

During the inspection some serious concerns were identified by CCFD. And, while the Director of Public Safety hoped that CoreCivic could address the issues with a one hundred and twenty (120) day extension, it has been determined that is not possible due to the significant threats to the general public's health and safety, those who are or will be present at the facility including detainees, CoreCivic's employees, contractors, visitors and first responders.

It should be noted, after the inspection, the City conducted further research, deliberation, and analysis of the hazards and it has been determined that risks to the public's health and safety are of such significance that the City cannot permit or otherwise allow for the operation of the facility at this time and in its current condition.

By way of background, the City of California City has adopted the California State Fire Code (see California City Municipal Code (CCMC) section 4-1.101 adopting the State Fire Code as adopted by the California Building Standards Commission). With the facility being privately owned and located within the City limits, the California City Fire Department is the authority having jurisdiction for fire life safety and enforcement of Chapter 11 of the Fire Code. Chapter 11 governs *Construction Requirements for Existing Buildings* which addresses the issue of two-way emergency response communications for existing buildings. More specifically, Fire Code section 1103.2 addresses emergency responder communications capability in the existing facility as follows:

1103.2 Emergency responder communications enhancement in existing buildings.

> Existing buildings other than Group R-3 that do not have approved in-building emergency response communications enhancement for emergency responders in the building based on existing coverage levels of the public safety communication systems, shall be equipped with such coverage according to one of the following:
>
> 1. Where an existing wired communication system cannot be repaired or is being replaced, or where not approved in accordance with Section 510.1, Exception 1.
> 2. Within a time frame established by the adopting authority.
>
> Exception: Where it is determined by the fire code official that the in-building emergency responder communications enhancement system is not needed.

According to the City's Director of Public Safety, pursuant to the Building and Fire Code, this large building is classified as an I-3 occupancy. Further, the Director of Public Safety has determined (as further detailed below) that based on the existing coverage levels of the public safety communications system, the facility does not have an approved in-building emergency responder communications enhancement system in the building. That is, based on the determination of the Director of Public Safety, the current emergency communications system at the facility is not sufficient to meet the emergency communication needs of the facility, first responders or the City.

During the July 22, 2025 inspection, the Director of Public Safety conducted a basic radio test utilizing a fire department portable radio in multiple locations throughout the facility and determined that the building construction did not conform to this section of the Fire Code.

Specifically, the rooms that house the building's fire panel, the mechanics shop which houses multiple flammable and combustible liquids, multiple IT server rooms, and multiple cells did not have an ability to transmit radio signals to first responders in an emergency as required by the Fire Code.

With an inability to communicate, emergency responders would not be able to radio transmit a "mayday" or "firefighter down" call from multiple critical locations in the facility, nor would law enforcement officers be capable of calling for backup in an emergency. Studies have consistently demonstrated a strong link between communication failures and firefighter fatalities. Research by the National Institute for Occupational Safety and Health (NIOSH) and the National Fire Protection Association (NFPA) highlights how ineffective communication on the fireground can contribute to line-of-duty deaths.

As such, CoreCivic must demonstrate the emergency communications at the facility meet the requirements of the Fire Code and Director of Public Safety and that CoreCivic has taken all steps necessary to ensure the public's safety, the safety of emergency responders and all those who are or will be present at the facility.

Conclusion:

Based upon the information available at this time, the City has determined that the facility is not safe to and cannot be operated in the City. More specifically, the California City Fire Department has determined that the facility should not be occupied and utilized for business purposes, until such time that the facility has an approved in-building emergency responder communications enhancement system in the building (that is, fire, police, sheriff, and ambulance radio transmissions will need to be fully operational and capable throughout the entire facility).

The City's main priority is to ensure the safety of both the public, first responders and those present at the facility. As such, at this time, the City is requesting that CoreCivic and its employees, contractors, staff, and others vacate the premises until such time that the Director of Public Safety has inspected and approved the improvements needed to ensure the safety of personnel during a potential emergency response.

Please note, any additional code violations, safety concerns or other issues may be later communicated to CoreCivic as information becomes available and further inspections are conducted including any inspections necessary related to CoreCivic's expected application for a business license.

For further questions, comments, or concerns regarding this letter, please feel free to reach out to Justin Vincent, Director of Public Safety.

Respectfully,

Christopher Lopez

Christopher Lopez
City Manager
City of California City

# ATTACHMENT D

ATTACHMENT D

**From:** "Malloy, John"
**Sent:** 07/31/2025 9:17:33 AM (-07:00)
**To:** "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** FW: XKE SE channel

Please see the below response.

**From:** Roger Goodman
**Sent:** Wednesday, July 30, 2025 11:33:53 PM
**To:** tom.kessler@corecivic.com <tom.kessler@corecivic.com>; Public Safety <chief@californiacity-ca.gov>
**Subject:** XKE SE channel

Chief,
We did test all over the facility, medical, jail cells, fire panel rooms, IT rack rooms, laundry room, dry goods, kitchen area, and hallways in between.
I had one CoreCivic go around with a 450 radio, and I did a 150 radio, we talked and did 5 counts. The signal is very strong inside the facility.
Afterwards we did a few radio checks on Kern 1 and they copied clear and I heard them clearly as well. I changed the radio to Kern 5. According to Kern County Communications they dispatch everyone on 1 and roll to 5 to keep traffic clear on 1 for other incoming calls.
So, the procedure is if you come onsite Kern should dispatch you to 5 if you go in the facility. Until the BDA is done then Kern 1 and 5 should work as well as Kern SO, and CCPD 1.
I'm happy to answer any questions regarding this but you should be okay inside the building on XKE SE channel for police or fire to dispatch from Kern 5.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

# ATTACHMENT E

ATTACHMENT E

**From:** "Malloy, John"
**Sent:** 07/31/2025 6:01:08 PM (-07:00)
**To:** "Justin Vincent" <jvincent@calcityfire.us>; "Christopher Lopez" <clopez@californiacity-ca.gov>
**Cc:** "Kristy Hightower" <khightower@calcityfire.us>
**Subject:** Re: CoreCivic Facility

We've had productive conversations with Chief Vincent on the need for dispatch capabilities for the Police and Hall ambulance and have already started work on this effort. That work is expected to be completed as soon as this Saturday. Once completed, we will work with Roger Goodman from 661 Communications to test the equipment to ensure that all communications are clear at the facility and that the individual dispatch capabilities are working. As requested, we will have Mr. Goodman report back to Chief Vincent once we have confirmation that the system is operational for fire, police, and ambulance. At that time, it is our expectation that we will have addressed all concerns related to radio communications at the facility and therefore our business license would be issued. We understand that this solution is acceptable for 90 days and have already started the process for the more permanent solution.

Please let me know if you have any questions.

Get Outlook for iOS
**From:** Justin Vincent <jvincent@calcityfire.us>
**Sent:** Thursday, July 31, 2025 11:18 AM
**To:** Christopher Lopez <clopez@californiacity-ca.gov>
**Cc:** Malloy, John <John.Malloy@corecivic.com>; Kristy Hightower <khightower@calcityfire.us>
**Subject:** Re: CoreCivic Facility

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

All,

Thank you for the forum for correspondence. As far as public safety is concerned in regards to only the radio communications issue, there is a temporary solution that would require all first responders to change channels when at the prison to speak. This is acceptable as a temporary 90-day solution once it is confirmed that it is operational for fire, police, and ambulance.

After speaking to Roger Goodman this morning, it appears that it is operational capable for Fire but not yet set up for PD dispatch or Hall ambulance services. Once this temporary solution is fixed and confirmed, I will draft a policy for the PD and FD on switching radio channels at the prison for the next 90 days.

This will meet the minimum requirement on a temporary basis. Core Civic will need to complete the permanent solution within 90 days so that first responders do not have to switch radio channels when responding to the facility. Once we have a confirmation that all first responders can talk safely on the temporary solution, I will draft an official letter to the City Manager stating as such.

The fire and pd do not issue a business license. Those are issued from City Hall and are dependent on all city departments signing off on their respective responsibilities. The fire department has completed its inspection, and the only item from our safety inspection still pending is the communications issue. The other very real

concerns noted in the City Managers letter about staffing and response capabilities should be directed to the City Manager as he has overall control of budget and staffing for the city.

Lastly, the issue of people being in the building remains valid. Placing hundreds of staff in a building that does not meet the fire code is a risk to staff and first responders. The cart was placed before the horse and for safety purposes, CoreCivic needs to step back and remove the staff from the unsafe environment until communications have been established. Thank you all again for the forum to discuss these safety matters.
Sincerely,

Dr. Justin Vincent

**Dr. Justin Vincent, DPA**
Director of Public Safety
*Chief of Police & Fire Chief*
City of California City
JVincent@calcityfire.us
Station: 760-373-4841
Cell: 760-808-7546

On Jul 31, 2025, at 10:58 AM, Christopher Lopez <clopez@californiacity-ca.gov> wrote:

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Good morning Justin and John,

I have sent separate correspondence to Justin Vincent, the Director of Public Safety, and Kristi Hightower, Deputy Fire Marshal so that everyone is on the same page.

The communications regarding the improvements to the facility based on the City's safety concerns are to flow to the Director of Public Safety, who is tasked with this responsibility. I received an email from Justin Vincent directing CoreCivic to my office, but that is not how this will be conducted. Justin is not to direct CoreCivic to my office, as it is Justin's responsibility to ensure public safety items are addressed. For the record, and to be clear, the City Manager's Office will not override any recommendations or requirements put in place by the Director of Public Safety.

I am directing Justin and Kristy to formalize all correspondence with CoreCivic via email so that there is a clear record of all communications.

Thank you.

Christopher Lopez
City Manager
City of California City

# ATTACHMENT F

ATTACHMENT F

**From:** "Ponto, Victor M." <VPonto@bwslaw.com>
**Sent:** 08/05/2025 2:34:16 PM (-07:00)
**To:** "Malloy, John" <John.Malloy@corecivic.com>; "Christopher Lopez" <clopez@californiacity-ca.gov>; "Lopez, Christy M." <CLopez@bwslaw.com>; "Justin Vincent" <jvincent@calcityfire.us>
**Subject:** Re: Kern County FCC License and Approval
**Attachments:** 5175724202575177999.pdf

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Received and copied to the appropriate team
Sent from my iPhone

On Aug 5, 2025, at 2:30 PM, Malloy, John <John.Malloy@corecivic.com> wrote:

[EXTERNAL]

---

Please find the attached FCC license for the XKE repeater we are using to boost the radio signal at the facility to Kern County dispatch. Please note that Kern County Radio License Group is the holder of the license, signifying their approval of this solution (with our address listed 22844 Virginia Blvd as the location of the repeater on page two). This license is good through 11/1/2025 which is in line with the technology solution discussed with the City and County.

Please let me know if you have any questions.

Get Outlook for iOS

**REFERENCE COPY**

This is not an official FCC license. It is a record of public information contained in the FCC's licensing database on the date that this reference copy was generated. In cases where FCC rules require the presentation, posting, or display of an FCC license, this document may not be used in place of an official FCC license.

# Federal Communications Commission

## Public Safety and Homeland Security Bureau

## RADIO STATION AUTHORIZATION

LICENSEE: KERN, COUNTY OF

ATTN: RADIO LICENSE GROUP
KERN, COUNTY OF
2601 PANORAMA DR., BLDG. A
BAKERSFIELD, CA 93306-1013

| Call Sign | File Number |
|---|---|
| WSJJ774 | 0011669211 |

**Radio Service**
PW - Public Safety Pool, Conventional

**Regulatory Status**
PMRS

**Frequency Coordination Number**
46PWAP75026489

**FCC Registration Number (FRN):** 0004514535

| Grant Date | Effective Date | Expiration Date | Print Date |
|---|---|---|---|
| 08-01-2025 | 08-01-2025 | 11-01-2025 | 08-02-2025 |

## STATION TECHNICAL SPECIFICATIONS

**Fixed Location Address or Mobile Area of Operation**

**Loc. 1** **Area of operation**
Operating within a 5.0 km radius around 35-09-10.8 N, 117-51-31.8 W, CALIFORNIA CITY, KERN county, CA

**Antennas**

| Loc No. | Ant No. | Frequencies (MHz) | Sta. Cls. | No. Units | No. Pagers | Emission Designator | Output Power (watts) | ERP (watts) | Ant. Ht./Tp meters | Ant. AAT meters | Construct Deadline Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 000154.75500000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 120.000 | | | |
| 1 | 1 | 000460.20000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 100.000 | | | |

**Conditions:**
Pursuant to §309(h) of the Communications Act of 1934, as amended, 47 U.S.C. §309(h), this license is subject to the following conditions: This license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized herein. Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended. See 47 U.S.C. § 310(d). This license is subject in terms to the right of use or control conferred by §706 of the Communications Act of 1934, as amended. See 47 U.S.C. §606.

**Licensee Name:** KERN, COUNTY OF

**Call Sign:** WSJJ774 **File Number:** 0011669211 **Print Date:** 08-02-2025

**Antennas**

| Loc No. | Ant No. | Frequencies (MHz) | Sta. Cls. | No. Units | No. Pagers | Emission Designator | Output Power (watts) | ERP (watts) | Ant. Ht./Tp meters | Ant. AAT meters | Construct Deadline Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 000453.75000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 90.000 | 200.000 | | | |
| 1 | 1 | 000151.10000000 | FB2T | 1 | | 11K2F1D<br>11K2F1E<br>11K2F3E<br>8K10F1D<br>8K10F1E | 100.000 | 150.000 | | | |

---

**Control Points**

**Control Pt. No. 1**

**Address:** 22844 VIRGINIA BLVD

**City:** CALIFORNIA CITY **County:** KERN **State:** CA **Telephone Number:** (760)246-7600

---

**Associated Call Signs**

WSL679, KCI548

---

<NA>

---

**Waivers/Conditions:**

Special Temporary Authority is authorized on a secondary non-interference basis.

Antenna structures for land, base and fixed stations authorized for operation at temporary unspecified locations may be erected without specific prior approval of the Commission where such antenna structures do not exceed a height of 60.96 meters (200 feet) above ground level; provided that the overall height of such antennas more than 6.10 meters (20 feet) above ground, including their supporting structures (whether natural formation or man-made), do not exceed any of the slope ratios set forth in Section 17.7(b). Any antenna to be erected in excess of the foregoing limitations requires prior Commission approval. Licensees seeking such approval should file application for modification of license. In addition, notification to the Federal Aviation Administration is required whenever the antenna will exceed 60.96 meters (200 feet) above the ground and whenever notification is otherwise required by Section 17.7 of the Commission's Rules. Such notification should be given by filing FAA Form 7460-1, Notice of Proposed Construction or Alteration, in duplicate, with the nearest office of the Federal Aviation Administration, which form is available from that office.

**Licensee Name:** KERN, COUNTY OF

**Call Sign:** WSJJ774 **File Number:** 0011669211 **Print Date:** 08-02-2025

This Special Temporary Authorization may be terminated at the Bureau's discretion, without a hearing, if conditions warrant. Under no circumstances may the facility(ies) authorized herein become a hazard to air navigation or violate the terms of an international agreement or treaty. If an application for permanent authority is on file with the Commission, this action is taken without prejudice to that application. Post and/or retain a copy of this authorization as required by the Commission's Rules.



**FCC 601-ULSHS1**
**August 2007**

# ATTACHMENT G

ATTACHMENT G

**From:** "Kristy Hightower" <khightower@calcityfire.us>
**Sent:** 08/07/2025 4:29:12 PM (-07:00)
**To:** "Malloy, John" <john.malloy@corecivic.com>; "Daughenbaugh, Shawn" <shawn.daughenbaugh@corecivic.com>
**Cc:** "Shannon Hayes" <shayes@californiacitypd.org>
**Subject:** Core Civic Fire Clearance
**Attachments:** Prison fire clearance.pdf

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

I have been informed that the temporary radio system is now working. You will have 90 days to have the system fully operational.

Attached you will find your fire clearance. Please contact city hall to obtain your business license.

I hope that you have a great night!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

STATE OF CALIFORNIA – FORESTRY AND FIRE PROTECTION

# FIRE SAFETY INSPECTION REQUEST

STD. 850 (REV. 10/2019)

***See instructions on reverse.***

| AGENCY CONTACT'S NAME | TELEPHONE NUMBER | REQUEST DATE | PROGRAM |
|---|---|---|---|
| Daughenbaugh, Shawn | (615) 854-0464 | 5/30/2025 | |
| EVALUATOR'S NAME | REQUESTING AGENCY FACILITY NUMBER | | REQUEST CODE: 1B |

**LICENSING AGENCY NAME AND ADDRESS**

**CODES**

1. ORIGINAL
2. RENEWAL
3. CAPACITY CHANGE
4. OWNERSHIP CHANGE
5. ADDRESS CHANGE
6. NAME CHANGE
7. OTHER

A. FIRE CLEARANCE
B. LIFE SAFETY

| AMBULATORY | | NONAMBULATORY | | BEDRIDDEN | | TOTAL CAPACITY |
|---|---|---|---|---|---|---|
| CAPACITY | PREVIOUS CAPACITY | CAPACITY | PREVIOUS CAPACITY | CAPACITY | PREVIOUS CAPACITY | |
| 2480 | N/A | 7 | N/A | N/A | N/A | 2,487 |

FACILITY NAME: California City Immagration Processing Center

LICENSE CATEGORY:

STREET ADDRESS *(Actual Location)*: 22844 Virginia Blvd

NUMBER OF BUILDINGS: 9

CITY: California City

RESTRAINT:

FACILITY CONTACT PERSON'S NAME: Christopher Chestnut

FACILITY CONTACT PERSON'S TELEPHONE NUMBER: (229) 315-7861

HOURS: 24

SPECIAL CONDITIONS

Detention Facility: The nonambulatory beds listed are medical observation beds. They could house nonambulatriy detainees.

**TO BE COMPLETED BY INSPECTING AUTHORITY**

CLEARANCE /DENIAL CODE: 1

**FIRE AUTHORITY NAME AND ADDRESS**

California City Fire Department
20890 Hacienda Blvd.
California City CA, 93505

**CODES**

1. FIRE CLEARANCE GRANTED
2. FIRE CLEARANCE DENIED
   - A. EXITS
   - B. CONSTRUCTION
   - C. FIRE ALARM
   - D. SPRINKLERS
   - E. HOUSEKEEPING
   - F. SPECIAL HAZARD
   - G. OTHER

| INSPECTOR'S NAME *(Typed or Printed)* | TELEPHONE NUMBER | CFIRS NUMBER | OCCUPANCY CLASS |
|---|---|---|---|
| Kristy Hightower | 760-373-4841 | 10565 | I-3 |

INSPECTION DATE: 7-21-25

INSPECTOR'S SIGNATURE *(Typed or Printed)*: [signature]

EXPLAIN DENIAL OR LIST SPECIAL CONDITIONS

# ATTACHMENT H

ATTACHMENT H

**From:** "Shannon Hayes" <shayes@californiacitypd.org>
**Sent:** 08/07/2025 6:55:53 PM (-07:00)
**To:** "Daughenbaugh, Shawn" <shawn.daughenbaugh@corecivic.com>; "K Hightower" <khightower@calcityfire.us>; "Malloy, John" <john.malloy@corecivic.com>
**Cc:** "Stone, Stacey" <Stacey.Stone@corecivic.com>; "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>; "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** Re: Core Civic Fire Clearance

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good evening Shawn,

By way of introduction, my name is Shannon Hayes. I am a Lieutenant with the California City Police Department and will filling in acting as the Director Public Safety temporarily. I just returned from the facility where I met with Mr. Malloy, Mr. Stone, and Warden Chestnut. They took the time to show me around the facility as well as the temporary radio system that has been installed. I was also able to speak with the radio installation expert who built the system who assured me that the system is fully functional. Mrs. Hightower was able send to you the Fire Clearance Letter which addresses the concern of fire radio systems as well as police radio systems reliability within the facility.

There remains a few questions on the Police Department side which Mr. Malloy and I briefly spoke about during my visit. After our conversation, Mr. Malloy stated that he was drafting a response letter to the correspondence from our City Manager and Director Vincent. I am confident after our conversation that we will be able to work out the issues that are still on the table in the effort to get the facility open to accept detainees in the near future.

Respectfully,

California City Police Department
21130 Hacienda Blvd
California City, CA 93505
(760)373-8606
shayes@californiacitypd.org

**From:** Daughenbaugh, Shawn <shawn.daughenbaugh@corecivic.com>
**Sent:** Thursday, August 7, 2025 4:42 PM
**To:** K Hightower <khightower@calcityfire.us>; Malloy, John <John.Malloy@corecivic.com>
**Cc:** Shannon Hayes <shayes@californiacitypd.org>; Stone, Stacey <Stacey.Stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** RE: Core Civic Fire Clearance

You don't often get email from shawn.daughenbaugh@corecivic.com. Learn why this is important

EXTERNAL MESSAGE::

Use caution when clicking links or attachments

Hello Mrs. Hightower,

I wanted to take a moment to express my sincere appreciation for your partnership and for keeping us informed about the temporary radio system. It's great to hear that it is now working.

Thank you also for sending the fire clearance. We will reach out to city hall promptly to obtain our business license.

Shawn Daughenbaugh
Sr. Director of Safety & Environmental
CoreCivic Facility Support Center
CoreCivic
5501 Virginia Way
Suite 110
Brentwood, TN 37027
O (615) 263-3000 ext. 33086
M (615) 854-0464

*Our Purpose at CoreCivic is to help government better the public good*

*"To be the best fully integrated Health, Safety, and Environmental Team supporting and providing "OPERATIONAL EXCELLENCE" for our Correctional Facilities and Residential Rehabilitation Centers."*

INDIVIDUAL NFPA MEMBER

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 7, 2025 6:29 PM
**To:** Malloy, John <john.malloy@corecivic.com>; Daughenbaugh, Shawn <shawn.daughenbaugh@corecivic.com>
**Cc:** Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Core Civic Fire Clearance

**CAUTION:** This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

I have been informed that the temporary radio system is now working. You will have 90 days to have the system fully operational.

Attached you will find your fire clearance. Please contact city hall to obtain your business license.

I hope that you have a great night!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

# ATTACHMENT I

ATTACHMENT I

CoreCivic
Daren Swenson
*Senior Vice President and Chief Corrections Officer*

August 8, 2025

<u>VIA EMAIL</u>
Christopher Lopez, City Manager
clopez@californiacity-ca.gov
City of California City
21000 Hacienda Boulevard
California City, CA 93505

**RE: California City, CA July 29, 2025, Memorandum**

Dear Mr. Lopez,

CoreCivic appreciates the opportunity to address the issues outlined in the city's July 29th memo that stems from the city's fire inspection conducted on July 22, 2025. That letter addressed 4 main concerns: one related to radio communication issues inside the facility and three items that are interrelated, specifically the potential of increased demand on the Police Department and the Fire Department as well as other emergency personnel like paramedics and ambulance services.

On the radio communication issue, we have worked collaboratively with Roger Goodman with 661 Communications on both a temporary and permanent fix which has already been approved by the city. We very much appreciate the collaboration that occurred to solve this issue, and we concur that having effective radio communication at the facility is imperative to a safe and secure facility operation.

We also understand the issues raised about the potential impact the facility's operation could have on the limited resources within California City. CoreCivic has partnered with the U.S. Immigration and Customs Enforcement (ICE) since 1983, and we have a long track record of success managing detainees for the federal government. In fact, the company currently houses over 13,000 non-citizens across 18 facilities nationwide. This vast experience has allowed us to implement policies and procedures that significantly reduce the need for local law enforcement and emergency response at our facilities housing ICE detainees. These policies and procedures are further explained in our numbered responses at the end of this letter.

While we are confident that the need for local police, fire and emergency services will be low, we understand that when those calls do take place, they result in costs. Because of this, we commit to fully reimburse the city for any costs incurred responding to any incident at the facility. Furthermore, we will fully indemnify and hold harmless the city of California City against any claims, suits or judgements that arise as a result of the activation and operation of the facility. Further details on cost reimbursement and indemnification have been included in a separate correspondence from our General Counsel, Cole Carter.

1. Emergency Communications Operations are insufficient (described in detail below regarding the Fire Code).

*We appreciate the city approving the plan to provide appropriate Emergency Communications Operations as referenced in the email from Shannon Hayes August 7, 2025.*

2. Increased demands upon the city in response to Penal code violations or other violations and investigation demands that will require California City Police Department (CCPD) response.

*Immigration and Customs Enforcement (ICE) detention is a civil process, not a criminal one, and is used to ensure individuals appear for immigration hearings and asylum proceedings or to facilitate their removal from the United States. ICE detainees are measurably less demanding on investigative resources than inmates serving criminal sentences.*

*Albeit rare, the most common demand for investigative resources involves requests to investigate allegations of sexual assault. The CoreCivic 14-2-DHS Sexual Abuse Prevention and Response in Immigration Detention Facilities policy provides CoreCivic operated facilities with procedures for complying with the Prison Rape Elimination Act (PREA) of 2003, Department of Homeland Security (DHS) Standards to Prevent Detect and Respond to Sexual Abuse and Assault in Confinement Facilities (79 Fed. Reg. 13100 March 7, 2014), and the Immigration and Customs Enforcement (ICE) 2025 National Detention Standards.*

*In accordance with the aforementioned statutes, policies, and standards, any allegations of sexual abuse that may constitute criminal conduct must be promptly reported to a law enforcement agency authorized to conduct such investigations. CoreCivic endeavors to establish a written Memorandum of Understanding (MOU) with an external investigating agency, delineating the respective roles and responsibilities of both the facility and the investigative entity in conducting sexual abuse investigations. The capacity of law enforcement agencies to investigate these incidents is dependent on their available resources.*

*Criminal investigative referrals remain relatively infrequent. For instance, CoreCivic's Otay Mesa Detention Center (OMDC) in San Diego, CA, averages approximately two investigative requests per month related to PREA allegations. It is important to note that the OMDC population comprises a significant number of U.S. Marshals Service inmates. By contrast, the California City ICE Processing Center (CCIPC) will exclusively house ICE detainees.*

*If CCPD responds to investigate these allegations, such requests are expected to be uncommon and would depend on available resources. In the event that CCPD does not have the resources to investigate, CoreCivic staff work with ICE staff to conduct an administrative investigation.*

*Should internal disturbances occur, CCIPC would not request assistance from CCPD. CCIPC would deploy its Critical Incident Response Team (CIRT), whose members are trained to manage such events. For major incidents, the Special Operation Response Team (SORT) — comprised of 38 specially trained staff from Nevada Southern Detention Center and Otay Mesa Detention Center—can respond within four hours.*

*Public Safety Director Vincent of California City expressed concerns regarding the California City Police Department's (CCPD) ability to respond effectively to potential protests. California's Law Enforcement Mutual Aid System is designed to support local agencies in maintaining order during emergencies—including incidents of civil unrest—as well as other extraordinary events or catastrophic disasters. As an integral part of the Standardized Emergency Management System (SEMS), the Mutual Aid System operates across four organizational levels: cities, counties, regions, and the State.*

*Fundamentally, the system facilitates mutual assistance among neighboring law enforcement agencies within an operational area. When an incident exceeds the resources available at the county level, regional agencies provide the necessary support. If regional resources remain insufficient, the Regional Coordinator will contact the Cal OES Law Enforcement Branch to coordinate further resource allocation.*

**3. Increased demands upon the city in responding to fires at the facility by the California City Fire Department (CCFD).**

*CoreCivic's California City facility, built in 1999, is equipped with fire detection and suppression systems. On July 21, 2025, Kristy Hightower of the CCFD completed a fire inspection on CCIPC and fire clearance was granted.*

*Since CoreCivic has operated the facility, there have been no recorded incidents requiring CCFD to respond to a fire at the site. While we do not anticipate any increased demands on CCFD, CoreCivic is committed to reimbursing the city for any costs related to any emergency response at the facility. Additionally, we do conduct emergency response drills with first responders and local law enforcement to streamline emergency response services and strengthen community partnerships.*

**4. Increased demands by other personnel, including paramedics/ambulances, in responding to medical emergencies.**

*CCIPC has a robust medical unit that is staffed by Physicians, Psychiatrists, Nurse Practitioners, Dentists, RNs, and LPNs, all providing medical care inside of the facility, which greatly reduces the need to transport detainees by ambulance outside for medical care. This medical unit is staffed 24 hours a day, seven days a week, with a physician on call 24 hours a day. Once operational, the facility will be accredited by the National Commission on Correctional Health Care (NCCHC), which is an independent, non-profit organization that provides oversight of correctional facilities across the country, both public and private. NCCHC accreditation requires health service standards and includes audits to ensure compliance. In total, the facility will have over 70 medical personnel providing health care services to the population on a daily basis.*

*We have coordinated with Hall Ambulance to provide medical transportation in the event a detainee needs to be transported outside of the facility for medical care. CoreCivic transportation staff accompany all outside ambulance transports, providing security detail for any hospital stay. All ambulance transport costs, as well as the costs of providing security, are paid by CoreCivic. There will be no cost to Hall ambulance or the city for any emergency service calls.*

In closing, we very much appreciate the opportunity to address the concerns raised in your July 29th letter and we trust our response here has alleviated those concerns. Should you have any further questions or wish to discuss them further, please do not hesitate to reach out to me or my team. We are proud of our longstanding partnership with the city and we look forward to continued collaboration in the years to come.

Sincerely,

Daren Swenson
Senior Vice President and Chief Corrections Officer

cc: Victor Ponto, City Attorney
California City, CA

Lieutenant Shannon Hayes, Acting Director of Public Safety
California City, CA

# ATTACHMENT J

ATTACHMENT J

CoreCivic
General Counsel

August 8, 2025

Christopher Lopez, City Manager
City of California City
21000 Hacienda Blvd
California City, CA 93505

Subject: Public Safety and Emergency Response

Dear Sir:

On behalf of CoreCivic, I am writing to present our firm commitment to ensuring that the activation and operation of the California City Immigration Processing Center (the "Facility") will not place unnecessary strain on the valuable resources of California City and its agencies. We recognize the importance of a cooperative relationship with the City and wish to set forth the following offers of indemnification, defense, cost reimbursement, and insurance coverage:

**Indemnification and Defense**

CoreCivic offers to indemnify, defend, and hold harmless the City of California City, as well as its officers and employees, from any liability and all claims, suits, judgments, and damages to the extent such claims, suits, judgments, or damages arise as a result of CoreCivic's acts and/or omissions in the activation, or operation of the Facility.

**Reimbursement of Public Safety Costs**

To further support the City, CoreCivic offers that, in the event of an incident at the Facility involving (i) a death from other than natural causes, (ii) a loss of control affecting a housing, recreational, medical, or general activity area, or (iii) the serious bodily injury of a member of the public, and to the extent such an incident requires the response of City public safety personnel for safety or emergency services, CoreCivic will reimburse the actual costs incurred by the City due to such response.

**Insurance Provisions**

CoreCivic also offers to name the City, together with its agents, employees, and representatives, as an additional insured on its general liability policy. A copy of the declaration page of the policy evidencing this coverage will be provided to the City for your records and assurance.

We trust these commitments address any concerns regarding the Facility's impact on City resources and stand as a testament to CoreCivic's dedication to responsible partnership. Should you require any clarification or wish to discuss these provisions further, please do not hesitate to contact us.

Thank you for your attention and collaboration.

Sincerely,

Cole Carter, CAO and General Counsel

# ATTACHMENT K

ATTACHMENT K

**From:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Sent:** 08/14/2025 9:23:49 AM (-07:00)
**To:** "Malloy, John" <John.Malloy@corecivic.com>; "Montanary, Roseann" <roseann.montanary@corecivic.com>
**Cc:** "Christopher Lopez" <clopez@californiacity-ca.gov>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Susan Weber" <sweber@californiacity-ca.gov>
**Subject:** City of California City Business License and SPR Plan

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello John,

Short answer – Yes. You will need to submit a new sign permit application for the sign.

Long answer:

Please be advised that under California City Municipal Code § 9-4.305 (Duration of Permits):

*"If the applicant for a sign permit is required to obtain a business license, the duration of the sign permit shall be the same as the business license."*

Because your business license application indicates that signage will be displayed in connection with the reopening of your facility, you are required to obtain a valid sign permit. The duration of that sign permit will match the term of your business license, as required by § 9-4.305.

Please coordinate with the building department to ensure the sign permit is obtained prior to operation.

If you have any questions about this requirement, you may contact @Susan Weber

Regards,
Anu Doravari
Consultant Planner

**From:** Malloy, John <John.Malloy@corecivic.com>
**Sent:** Wednesday, August 13, 2025 3:05 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Subject:** Re: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Thanks Anu. Please call anytime with questions. On the sign permit, do we need to go an apply or are we good as all we did was put a wrap around existing sign. Nothing about the sign changed other than the name. Thank you!

Get Outlook for iOS

---

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Wednesday, August 13, 2025 3:01:34 PM
**To:** Malloy, John <John.Malloy@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>; Montanary, Roseann

<Roseann.Montanary@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi John,

Thank you for your email. I will review the information with our team and get back to you.

Regards,
Anu Doravari
Consultant Planner

---

**From:** Malloy, John <John.Malloy@corecivic.com>
**Sent:** Wednesday, August 13, 2025 2:46 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu:

As a follow-up, please find the company's response to the city's letter attached to this email. These responses address issues 1-4 referenced in your email below. Please let me know if you have any questions or wish to discuss further.

John Malloy
CoreCivic
(602) 680-9868

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Wednesday, August 13, 2025 12:44 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi Roseann,

I am coordinating with all City departments to ensure compliance across teams. As part of this effort, I requested the Building Department to reach out regarding the submission of a sign permit application, and I understand they contacted a team member yesterday.

Additionally, I would like to request an update on the progress of items 1 through 4 outlined in the attached letter. Please provide the current status of each item when convenient.

Regards,
Anu Doravari
Consultant Planner

---

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, August 12, 2025 10:28 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Morning/afternoon Anu, wanted to touch base with you to see if there was any additional information needed.

Thank you. Hope your day is going well.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 2:34 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Recieved. Thank you!

Regards,
Anu Doravari
Consultant Planner

---

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Monday, August 11, 2025 9:32:10 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Afternoon Anu, please find information requested attached.
Advise if there is any additional information needed.
I understand we are on different time zones, happy to accommodate.

Thank you,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 10:49 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi Roseann,

I am reviewing your application documents and could not locate the business operations document describing the daily operations and operational hours and other related details. Please send that over when you can.

Regards,
Anu Doravari
Consultant Planner

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 1:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>

**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

# ATTACHMENT L

ATTACHMENT L

**From:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Sent:** 08/14/2025 12:32:16 PM (-07:00)
**To:** "Malloy, John" <John.Malloy@corecivic.com>; "Montanary, Roseann" <roseann.montanary@corecivic.com>
**Cc:** "Christopher Lopez" <clopez@californiacity-ca.gov>; "VPonto" <VPonto@bwslaw.com>; "Vazquez, Joaquin" <jvazquez@bwslaw.com>
**Subject:** Permit Timeline

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello John,

California SB 29 (i.e., Civil Code, § 1670.9, subd. (d)) mandates that local agencies: both (1) solicit and hear comments at least two meetings open to the public and (2) provide at least 180 days' notice before executing any permit for the use of buildings to house or detain noncitizens for purposes of civil immigration proceedings. This correspondence confirms that the provisions of SB 29 apply to CoreCivic's proposed immigration intake and detention facility, which requires a site plan review, business license, and building permits. CoreCivic has already applied for three separate building permits, including work that will require a Certificate of Occupancy. Accordingly, the City will notice and conduct two public hearings—within a 180-day review period—to ensure compliance with state law.

The project involves establishing a CoreCivic-operated ICE detention facility at an existing prison site which vacated in 2024. Although the location already has a valid Conditional Use Permit (CUP) authorizing correctional facility use under local zoning, the establishment of the ICE facility for the reuse of existing buildings by a private corporation to house or detain noncitizens for civil immigration proceedings qualifies as a project subject to the SB 29 public review process. This is not a demolition and rebuild; however, the statutory requirements still apply. These requirements operate independently of any existing CUP.

For purposes of SB 29 compliance, August 5, 2025 — the date of the Planning Commission meeting — is being considered Day 1 of the 180-day public review period. This 180-day window will conclude on February 1, 2026. No permits or final project approvals may be executed or issued prior to the completion of both required SB 29 City Council hearings and before this review period expires.

The following schedule identifies the proposed City Council public hearing dates, alternate backup dates. City Council hearings occur on the 2nd and 4th Tuesdays of each month.

| Milestone | City Council Date |
|---|---|
| City Council Hearing 1 – Primary | October 14, 2025 |
| City Council Hearing 1 – Backup | October 28, 2025 |
| City Council Hearing 2 – Primary | January 13, 2026 |
| City Council Hearing 2 – Backup | January 27, 2026 |

Please review the above schedule and advise if you have any questions, concerns, or proposed adjustments. Staff will ensure that all SB 29 noticing requirements are met and that City Council hearing materials are prepared in full compliance with applicable statutes.

Best Regards,
Anu Doravari
Consultant Planner

**From:** Malloy, John <John.Malloy@corecivic.com>
**Sent:** Thursday, August 14, 2025 9:28 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Montanary, Roseann <roseann.montanary@corecivic.com>
**Cc:** Christopher Lopez <clopez@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Susan Weber <sweber@californiacity-ca.gov>
**Subject:** Re: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Thank you Anu. We are on it and apologize for the confusion.

Do you have a timeline on when the business license will be issued?

Thank you!

Get Outlook for iOS
**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Thursday, August 14, 2025 9:23 AM
**To:** Malloy, John <John.Malloy@corecivic.com>; Montanary, Roseann <roseann.montanary@corecivic.com>
**Cc:** Christopher Lopez <clopez@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Susan Weber <sweber@californiacity-ca.gov>
**Subject:** City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hello John,

Short answer – Yes. You will need to submit a new sign permit application for the sign.

Long answer:

Please be advised that under California City Municipal Code § 9-4.305 (Duration of Permits):

*"If the applicant for a sign permit is required to obtain a business license, the duration of the sign permit shall be the same as the business license."*

Because your business license application indicates that signage will be displayed in connection with the reopening of your facility, you are required to obtain a valid sign permit. The duration of that sign permit will match the term of your business license, as required by § 9-4.305.

Please coordinate with the building department to ensure the sign permit is obtained prior to operation.

If you have any questions about this requirement, you may contact @Susan Weber

Regards,
Anu Doravari
Consultant Planner

---

**From:** Malloy, John <John.Malloy@corecivic.com>
**Sent:** Wednesday, August 13, 2025 3:05 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Subject:** Re: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Thanks Anu. Please call anytime with questions. On the sign permit, do we need to go an apply or are we good as all we did was put a wrap around existing sign. Nothing about the sign changed other than the name. Thank you!

Get Outlook for iOS

---

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Wednesday, August 13, 2025 3:01:34 PM
**To:** Malloy, John <John.Malloy@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi John,

Thank you for your email. I will review the information with our team and get back to you.

Regards,
Anu Doravari
Consultant Planner

---

**From:** Malloy, John <John.Malloy@corecivic.com>
**Sent:** Wednesday, August 13, 2025 2:46 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu:

As a follow-up, please find the company's response to the city's letter attached to this email. These responses address issues 1-4 referenced in your email below. Please let me know if you have any questions or wish to discuss further.

John Malloy
CoreCivic
(602) 680-9868

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Wednesday, August 13, 2025 12:44 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi Roseann,

I am coordinating with all City departments to ensure compliance across teams. As part of this effort, I requested the Building Department to reach out regarding the submission of a sign permit application, and I understand they contacted a team member yesterday.

Additionally, I would like to request an update on the progress of items 1 through 4 outlined in the attached letter. Please provide the current status of each item when convenient.

Regards,
Anu Doravari
Consultant Planner

---

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, August 12, 2025 10:28 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Morning/afternoon Anu, wanted to touch base with you to see if there was any additional information needed.

Thank you. Hope your day is going well.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

---

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 2:34 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>;

Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Recieved. Thank you!

Regards,
Anu Doravari
Consultant Planner

---

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Monday, August 11, 2025 9:32:10 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>; Malloy, John <John.Malloy@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>; Barker, Michelle <Michelle.Barker@corecivic.com>; Miller, Max <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Afternoon Anu, please find information requested attached.
Advise if there is any additional information needed.
I understand we are on different time zones, happy to accommodate.

Thank you,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

---

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 10:49 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hi Roseann.

I am reviewing your application documents and could not locate the business operations document describing the daily operations and operational hours and other related details. Please send that over when you can.

Regards,
Anu Doravari
Consultant Planner

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 1:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

# ATTACHMENT M

ATTACHMENT M

**From:** "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:** 08/14/2025 5:18:50 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Anu Doravari" <adoravari@californiacity-ca.gov>
**Cc:** "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Christopher Lopez" <clopez@californiacity-ca.gov>
**Subject:** RE: Cal City sign Permit Application and Pictures.
**Attachments:** 21381 inspection.pdf, 21381 receipt 8-14-25.pdf, 21381 permit card.pdf

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

Attached are your sign permit documents and receipt.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Thursday, August 14, 2025 11:19 AM
**To:** Susan Weber <sweber@californiacity-ca.gov>
**Cc:** Gallagher, Sean <Sean.Gallagher@corecivic.com>; Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** Cal City sign Permit Application and Pictures.

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Morning Susan, please find attached the sign permit application and pictures of the sign at the facility.
Please advise is any other information is needed.

Appreciate the guidance.
Roseann

R C Montanary-Lett
Director, Operations Support

CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Sent:** Thursday, August 14, 2025 1:07 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Gallagher, Sean <Sean.Gallagher@corecivic.com>
**Subject:** FW: Items

Chris

**From:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Sent:** Thursday, August 14, 2025 10:39 AM
**To:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** Sign

Chris

**California City Building Dept.**
21000 Hacienda Blvd.
California City, Calif. 93505
(760) 338-1498

## C - Sign Permit

**Permit Number:** 21381

### Applicant

**Approval Date:** 08/14/2025
**Name:** Core Civic LLC
**Phone:** 817-917-8501
**Address:** 5501 Virginia Way #110
Brentwood, TN 37027

### Parcel

**Parcel Number:** 350 031 02
**Zoning:**
**Address:** 22844 Virginia Blvd
California City, Ca 93505
**Addition:** S13T32R38
**Block:**
**Lot(s):** S13T32R38
**Legal Description:** 350-031-02
**Section/Township/Range:**

### Owner

**Name:**
**Phone:**
**Address:**

,

### Contractor

**Contractor Type:** Sign
**Name:** Bennu Enterprises
**Phone:** 615-522-4588
**Address:** 1116 Fowler St
Old Hickory, TN 37138

### Fees and Receipts

| | | |
|---|---|---|
| Application Fee | Code 3 319 | $46.00 |
| Bldg Stand Spec Rev Fund | Code 6 614 | $1.00 |
| Min Permit Fee | Code 3 319 | $56.00 |

**Fee** **Description**

**Total Fees:** $103.00

### Description

**Structure Use:**
**Start Date:**
**Purpose:** Sign Permit (After the Fact) installed new vinyl wrap on existing sign structure for Core Civic. No other changes to sign made.
**End Date:**
**Construction Value:** $2800.00
**Floor Areas**
**Commercial Buildings**

**Living Space:**
**Basement/Storage:**
**Garage:**
**Decks:**
**Porches:**
**Other:**
**Total Area:**

**Building 1:**
**Building 2:**
**Accessory 1:**
**Accessory 2:**
**Other:**
**Total:**

**Structure Area:** **Site Area:** **Percentage of Site:**

---

## Conditions

**Date:** **Status:** **Code:**
**Condition Description:**
**Condition Comments:**

---

LICENSED CONTRACTORS DECLARATION: I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

Class: ____________ Lic. #: ____________ Date: ____________ Contractor: ____________

---

WORKER'S COMPENSATION DECLARATION: I hereby affirm that I have a certificate of consent to self-insure, or a certificate of Worker's Compensation Insurance, or a certified copy thereof (Sec. 3800, I.A.B.O.)

Policy#: ____________ Company: ____________ Exp: ____________ Applicant: ____________

---

CERTIFICATE OF EXEMPTION FROM WORKER'S COMPENSATION INSURANCE: (This section performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the Worker's Compensation Laws of California.

Date: ____________ Applicant: ____________

NOTICE TO APPLICANT: If, after making this Certificate of Exemption, you should become subject to the Worker's Compensation provisions of the Labor Code, you must forthwith comply with such provisions or this permit shall be deemed revoked.

---

_______ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale (Sec. 7044, Business & Professions Code: The Contractor's License Law does not apply to an owner of property who builds or improves thereon, and who does such work himself or through his own employees, provided that if such improvement is sold within one year of completion, the owner-builder will have the burden of proving that he did not build or improve for the purpose of sale).

_______ I, as of the property, am exclusively contracting with licensed contractors to construct the project (Sec. 7044, Business & Professions Code)

_______ I am exempt under Sec.____________, Business & Professions Code, for this reason:

---

Date: ____________ Owner: ____________

---

I certify that I have read this application and state that the information is correct. I agree to comply with all City Ordinances and State Laws regulating construction. I certify that in the performance of this work for which this permit is issued, I shall not employ any person in violation of the Labor Code of California relating to Workman's Compensation. This permit becomes null and void if work is not commenced within 180 days from date of issuance.

Signature of Applicant or Agent: ____________ Date: ____________

City of California City
21000 Hacienda Blvd
California City CA 93505
(760) 373-8661

Receipt No: 9.000003207 Aug 14, 2025

350-031-02/Core Civic

| | |
|---|---|
| Permits/Fees - Building Permits<br>10-3221 Building Permits | 46.00 |
| Permits/Fees - Building Permits<br>10-3221 Building Permits | 56.00 |
| Total: | 102.00 |
| Misc Revenue - Revolving State Fund<br>10-02082 Special Revolving State Fund | 1.00 |
| Total: | 1.00 |
| Credit Card Check No: mc<br>Payor: 350-031-02/Core Civic | 103.00 |
| Total Applied: | 103.00 |
| Change Tendered: | .00 |

Duplicate Copy

08/14/2025 5:12 PM

# INSPECTION RECORD

## POST THIS CARD AT JOBSITE

# California City

## BUILDING DEPARTMENT

| Required Inspections | Appr'd | Date |
|---|---|---|
| ☐ Set Backs / Land Survey | | |
| ☐ Underground Plumbing | | |
| ☐ Footing and Slab | | |
| ☐ Foundation / Block Walls | | |
| ☐ Framing Roof Sheathing | | |
| ☐ Framing Rough (Walls/Shear Panels) | | |
| ☐ Ventilation Attic/Floor | | |
| ☐ Rough Electrical | | |
| ☐ UFER for Electrical Service | | |
| ☐ Gas Pressure Test | | |
| ☐ Rough Mechanical | | |
| ☐ Rough Plumbing | | |
| ☐ Seepage Pit/Leach Field/Special Trench | | |
| ☐ Septic Tank | | |
| ☐ Sewer Line | | |
| ☐ Drainage / Rain Gutters | | |
| ☐ Insulation | | |
| ☐ Lathing | | |
| ☐ Drywall Nailing | | |
| ☐ Sewer Compaction | | |
| ☐ Progress | | |
| ☐ Fireplace and Stoves | | |
| ☐ Framing Floor | | |
| ☐ Masonry and Concrete Walls | | |
| ☐ Underground Electrical | | |
| ☐ HVAC | | |
| ☐ Fire Bucket | | |
| ☐ Fire Rough | | |
| ☐ Fire Sprinkler System | | |
| ☐ Temporary Electrical | | |
| ☐ Elevation Certification | | |
| ☐ Asphalt Patch | | |
| ☐ Concrete Approach with Flow Line | | |
| ☐ CF1R | | |
| ☐ CF2R | | |
| ☐ CF3R | | |
| ☐ Other | | |
| ☐ Other | | |
| ☐ Other | | |

**NOTICE**

**POST THIS CARD IN A SAFE, CONSPICUOUS PLACE ON JOB. GIVE 48-HOUR NOTICE TO BUILDING DEPARTMENT WHEN READY FOR INSPECTION. CALL (760) 338-8387. GIVE A GOOD PHONE NUMBER, PERMIT NUMBER, AND WORK TO BE INSPECTED. PLANS SHALL BE ON JOB SITE OR INSPECTION CANNOT BE MADE.**

**PROJECT**

Address: 22844 Virginia Blvd
Owner: Core Civic LLC
Phone: 817-917-8501
Permit Type: C - Sign Permit
Description: Sign Permit (After the Fact) installed new vinyl wrap on existing sign structure for Core Civic. No other changes to sign made.
Contractor: Bennu Enterprises
Lot: S13T32R38 Tract:
Permit #: 21381 Date: 08/14/2025

**FINAL**

| DO NOT REQUEST FINAL INSPECTION UNLESS ALL WORK HAS BEEN COMPLETED | Appr'd | Date |
|---|---|---|
| Building | | |
| Smoke Detectors/ $CO_2$ Sensors | | |
| Energy Code | | |
| Mechanical | | |
| Plumbing | | |
| Roofing Certification | | |
| Grading | | |
| Flood Zone | | |
| Right of Way Improvements | | |
| Solar System | | |
| Electrical | | |
| Service Panel | | |
| Elevation Certificate | | |
| Fire | | |
| Backflow Certification | | |
| Backflow Cert I.D. | | |
| Insulation Certificate | | |

Comments:
**RECEIPTS MUST BE SUBMITTED TO BUILDING DEPARTMENT WITHIN 90 DAYS OR BEFORE PROJECT IS FINALED (WHICHEVER COMES FIRST.)**

****MPU's MUST CONTACT EDISON FOR DISCONNECT****

**CERTIFICATE OF OCCUPANCY**

DATE:

# EXHIBIT 3

EXHIBIT 3

STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Dana M. Keene, Bar #324993
Shannon L. Knorr, Bar #300399
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@struckove.com
dkeene@strucklove.com
sknorr@strucklove.com

Attorneys for Respondent CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Dignity Not Detention Coalition and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>City of California City and CoreCivic, Inc.,<br><br>Respondents and Defendants.<br><br>—<br><br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF MARCELO ARIOLA**<br><br>U.S. District Judge: Kirk E. Sherriff<br>U.S. Magistrate Judge: Christopher D. Baker |

I, Marcelo Ariola, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I have been employed by CoreCivic[1] since April 2007, when I was hired as Senior Director of Site Acquisition. I became Managing Director of Project Development in 2012. As Managing Director of Project Development, I was responsible for leading a team which provided financial analysis, land development oversight, due diligence,

[1] Until November 2016, CoreCivic was known as Corrections Corporation of America ("CCA").

entitlements, operational systems improvements, and pre-construction services (including planning and ensuring zoning compliance), as well as fostering governmental relations for all projects. In January 2025, I assumed my current position of Vice President, Real Estate. In that new role, I continue to discharge my prior responsibilities relating to Project Development but also assumed responsibility of oversight and management of facility maintenance at all CoreCivic-owned facilities.

3. The facts set forth are based on my personal knowledge and/or information obtained in my capacity as a corporate representative of CoreCivic, including information obtained through discussions with other CoreCivic employees and my review of CoreCivic's corporate records.

4. The CoreCivic facility ("the facility") is located at 22844 Virginia Boulevard, California City. It is at the terminus of Virgina Boulevard and south of Twenty Mule Team Parkway.

5. In 1993, the then California Department of Corrections ("CDCR") commenced an Environmental Impact Report ("EIR") (State Clearinghouse Number 93082030) evaluating the environmental effects resulting from construction and operation of a CDCR prison facility on one of two properties located in California City, which included the current site of the facility. Specifically, the CDCR Final EIR addressed a new 2,200-bed prison or up to a 4,400-bed prison complex, and an associated wastewater treatment facility on an adjacent 160-acre parcel.

6. While that report was completed and certified by CDCR in August 1994, due to funding constraints, CDCR chose not to proceed with development of a prison facility in California City.

7. In 1997, CoreCivic's predecessor, CCA, proposed the construction and operation of a medium security facility in California City, which would occupy approximately 70 acres of a site approximately five miles from downtown California City. The proposal specified that the facility would have 2,304 general population beds, and

consistent with federal facility requirements, also include an additional 260 beds over design capacity, for special uses including Restrictive Housing and medical housing.

8. Pursuant to the California Environmental uality Act ("CE A") guidelines (Section 15163), the City of California City, as lead agency, elected to prepare a supplement to the CDCR Environmental Impact Report and incorporated the original report.

9. The City of California City issued a Notice of Preparation for an EIR Supplement on September 11, 1997. The Draft EIR was completed and circulated for review beginning on October 24, 1997, and comments were prepared and included in the Final EIR Supplement in January 1998 (State Clearinghouse Number 97091045).

10. On January 20, 1998, the City Council of City of California City adopted Resolution No. 01-98-1801, Making Certain Environmental Findings and Adopting a Statement of Overriding Considerations in Connection with the Corrections Corporation of America Prison. Attachment A is a true and correct copy of that resolution, which is maintained as a business record of CoreCivic.

11. As noted in Attachment A, the most significant environmental impacts tend to arise during the construction phase of the facility, rather than during the operations of a completed facility.

12. At a duly noticed public hearing on January 15, 1998, the City of California City Planning Commission recommended granting Conditional Use Permit ("CUP") 97-01 for the proposed facility. The City Council granted CUP 97-01 on January 20, 1998. Attachment B is a true and correct copy of Resolution No. 01-98-1902, A Resolution of the City Council Granting Conditional Use Permit 97-01 Prison Facility, which is maintained as a business record of CoreCivic.

13. CUP 97-01 contained a provision stating that it expired twelve months from January 20, 1998 (the date of the City Council's Approval) if the prison facility operation was not commenced and diligently pursued.

14. In June 1998, CoreCivic diligently pursued the prison facility operation by acquiring the 320-acre site originally contemplated by CDCR and considered by the City.

Attachment C is a true and correct copy of the Deed for the property, which is maintained as a business record of CoreCivic.

15. Following the acquisition of the property by CoreCivic, the site was subdivided into three parcels. Parcel 1 is approximately 70 acres at the northwest corner of the property and is the site of the facility. Parcel 2 is approximately 35 acres and is directly south of Parcel 1. Parcel 3 is comprised of approximately 215 acres to the east and south of Parcel 1.

16. Completing the requirement to commence and diligently pursue facility operation, construction of the facility began later in 1998.

17. Based upon the final configuration of the site when construction began, in 1998 CoreCivic applied to the City of California City to amend CUP 97-01 and construct two additional 256-bed housing units on the site. A Mitigation Monitoring Plan was approved and adopted by the City on December 1, 1998, and CUP Amendment 98-02 approving the 512-bed expansion of the facility was issued that same date. After an initial extension, in November 2001 the City extended the time for CUP Amendment 98-02 "indefinitely." Attachment D is a true and correct copy of records relating to the issuance and extension of CUP Amendment 98-02, which are maintained as business records of CoreCivic.

18. Construction of the facility was completed, and in 2000 CoreCivic began to receive Federal Bureau of Prisons inmates at the facility.

19. At no point did the City of California City ever revoke, rescind, or cancel either CUP 97-01 or CUP Amendment 98-02.

20. In 2006, CoreCivic submitted a proposal to the City for construction of a second 2,200-bed facility on the southern 35-acre parcel. The December 2009 Addendum to the Final Subsequent Environmental Impact Report, noted that this proposed second 2,200-bed facility would not have significant operational impacts relating to traffic, air quality, noise, or other factors required for consideration under the California Environmental uality Act. Attachment E is a true and correct copy of the December 2009

Addendum to the Final Subsequent EIR, which is maintained as a business record of CoreCivic.

21. On December 22, 2009, the City of California City Planning Commission approved CUP 09-04 for the construction and operation of a 2,200-bed facility on that parcel. Attachment F is a true and correct copy of the City of California City Planning Commission Resolution No. 12-09-2990PC to Approve Conditional Use Permit 09-04, which is maintained as a business record of CoreCivic, and does not contain any expiration date.

22. In December 2013, CDCR entered into a lease agreement for the facility. The lease agreement permitted CDCR to utilize up to 2,560 beds at the facility but required CDCR to request permission from CoreCivic if they were to have more than 2,560 inmates assigned to the facility.

23. On May 27, 2014, the City Manager for California City confirmed to both CDCR and CoreCivic that a land use review had been completed and provided authorization and full permitting for use of 2,560 beds at the facility. Attachment G is a true and correct copy of the May 27, 2014 letter from City Manager Tom Weil and is maintained as a business record of CoreCivic.

24. As part of the CDCR lease agreement, significant upgrades related to ADA compliance were made to the facility in two phases. Attachment H is a true and correct copy of the Certificate of Occupancy issued by the Office of the State Fire Marshal for Phase 1 on May 29, 2014, which is maintained as a business record of CoreCivic. Attachment I is a true and correct copy of the Certificate of Occupancy issued by the Office of the State Fire Marshal for Phase 2 on December 11, 2014, which is maintained as a business record of CoreCivic.

25. Notably, the Office of the State Fire Marshal noted on the Certificates of Occupancy that the occupancy classification of the facility under CCR Title 24 (2013 Edition) was "I-3." "I-3" is an Occupancy Classification under the California Building Code, formerly known as Institutional Group 3, which includes "buildings or portions of

buildings and structures that are inhabited by one or more persons who are under restraint or security and are generally incapable of self-preservation due to security measures not under the occupants' control which includes persons restrained." The California Building Code notes that this group "shall include, the following: Correctional Centers Detention centers Jails Prisons Temporary holding facility." *See* Attachment J, 2022 California Building Code, Title 24, Part 2, Section 308.4 (emphasis added).

26. On August 18, 2014, the Office of the State Fire Marshal completed and issued its Final Inspection Report and grant of occupancy for the ADA renovations. Attachment K is a true and correct copy of that Inspection Report, which is maintained as a business record of CoreCivic.

27. In 2016, at the request of CDCR, construction of three additional structures for use as administrative office space outside of the secure southern perimeter of the facility began. Those spaces were completed, and the California City Building Department issued a Certificate of Occupancy for the administrative buildings on January 31, 2017. Attachment L is a true and correct copy of the Certificate of Occupancy for the administrative structures, which is maintained as a business record of CoreCivic.

28. Beginning in 2017, CoreCivic began to explore proposed development of the eastern 215-acre parcel to construct two 1,512-bed correctional centers. An application for CUP 20-02 was opened with the City, and the notice of Availability of a Draft Environmental Impact Report (State Clearinghouse No. 2017121069) was issued by the City on May 21, 2021. However, because this separate project was placed on "pause" by CoreCivic, CUP 20-02 has not been approved and remains pending.

29. Despite the expiration of the lease of the existing facility to CDCR in 2024, CoreCivic never "shuttered" the facility or discontinued its use as an Institutional Group I-3 facility.

30. CoreCivic has consistently utilized and maintained its property for use as an Institutional Group I-3 facility since its completion. It has no intent, and never had any

intent, to discontinue or abandon the property or to change the use or occupancy classification of the facility.

31. CoreCivic has always employed individuals to provide nearly around-the-clock operations and maintenance at the property, seven days a week.

32. Attachment M is a true and correct copy of the Kern County Assessor Record's Property Detail Report for the facility, which is available at: https://www.kerncounty.com/government/departments/assessor-recorder/property/assessor-property-search. Of note, the Assessor assigned the facility Use Code 1716 – Detention Facility/Prison.

33. Specifically, while continuing to proactively market the facility, CoreCivic applied to the City of California City and was issued Plumbing Permit No. 21170 on January 7, 2025 for waterline repairs. Similarly, the City issued permit number 20989 on January 15, 2025 for repairs to the facility roof.

34. In addition, the City issued Plumbing Permit No. 21309 on May 14, 2025 to remodel a handicapped shower stall for ADA compliance.

35. Each of those three permits expires one year from the date of issue. The permitted work has been completed for all three permits, and the only outstanding item is the final inspection by the City. None of these permits is a major or significant repair or renovation which requires the issuance of a new Certificate of Occupancy, as confirmed to me by the Building Department on August 14, 2025. Attachment N is a true and correct copy of an email I received from the City of California City Building Department on August 14, 2025 confirming that these permits do not require a new Certificate of Occupancy.

36. On July 14, 2025, I became aware that the City was requiring CoreCivic to submit a Site Plan Review Application Form for the facility.

37. Because there has been no change in use and the Institutional Group I-3 Occupancy Classification of the facility has never changed, there is no need to undertake a Site Plan Review. A Site Plan Review is usually required for a different use which requires

a change in the Occupancy Classification, such as reuse of a warehouse space into a restaurant.

38. I had numerous telephone calls with Joe Barragan, the City's Public Works Director, regarding the City's request that CoreCivic submit a Site Plan Review. He agreed that the City had most of the documents already and noted that CoreCivic was only required to make minimal additional submissions, consisting mainly of ADA Compliance certificates and studies. He represented that this was simply a ministerial review, which would be quickly completed after the fees were paid.

39. As specified by Mr. Barragan, CoreCivic submitted the Site Plan Review Minor application, which I signed on July 22, 2025, along with a letter from me regarding the ADA requirements, a Disabled Accessibility Certification completed after the renovations requested by CDCR in 2014, and some other potentially relevant documents. Attachment O is a true and correct copy of that submission, which is a business record of CoreCivic.

40. On July 23, 2025, CoreCivic received confirmation that it had paid the City's 250.00 fee for the Site Plan Review. Attachment P is a true and correct copy of that email confirmation and attached receipt, which are business records of CoreCivic.

41. On the morning of July 24, 2025, I participated in a meeting involving former Public Safety Director Justin Vincent, who had raised some concerns relating to emergency radio communications observed during his inspection of the facility on July 21, 2025. Specifically, Director Vincent reported that a portable fire department radio did not receive an adequate signal in a few of the locations he tested throughout the facility.

42. At Director Vincent's suggestion, CoreCivic engaged the City's radio consultant to obtain and install a mobile repeater trailer to extend the radio signal range.

43. On July 24, 2025, I received confirmation from the City that the ADA Certification we submitted was sufficient and CoreCivic was not required to remit payment for a building inspection. Attachment is a true and correct copy of that email communication and is a business record of CoreCivic.

44. A few hours later, I received a second email communication from Public Works Director Barragan, stating that only the fire inspection remained to be completed before CoreCivic's business license would issue. Attachment R is a true and correct copy of that email communication and is a business record of CoreCivic.

45. On August 7, 2025, CoreCivic received confirmation from Deputy Fire Marshal Hightower that the temporary radio system, which included the repeater trailer acquired by CoreCivic at a cost of more than 75,000, had been tested and approved. Ms. Hightower further instructed that CoreCivic would have 90 days to install a permanent solution to boost radio signals in the facility.

46. CoreCivic engaged Berk-Tel Communications to install an Emergency Responder Radio System in the facility. Plans were submitted to Deputy Fire Marshal Hightower on August 19, 2025, and after submission of a permit to the Fire Department and payment of a 1,000 plan review fee, the permit was issued by the Fire Department. The City also stated that an additional commercial electrical permit would be required for the installation of the permanent system. Attachment S is a true and correct copy of an email thread I was copied on during the period from August 19–21, 2025 regarding the permitting for the permanent radio solution and is a business record of CoreCivic.

47. Eventually, the commercial electrical permit was issued, and the permanent radio solution was installed with final testing scheduled for Tuesday, October 14, 2025. Attachment T is a true and correct copy of the email thread I was copied on during the period from August 19 to October 8, 2025, confirming the schedule for the inspection and testing and is a business record of CoreCivic.

48. The City Fire Department, in conjunction with Kern County Communications, confirmed that the permanent radio Emergency Responder Radio System, which CoreCivic installed at a cost of nearly 700,000, was fully operational on October 14, 2025.

49. The facility at issue was, and has been at all times, constructed and operated pursuant to CUP 97-01 and CUP Amendment 98-02, for an Occupancy Classification

Institutional Group I-3 facility. While the identity of the government partner utilizing the facility has changed several times since 2000, from a zoning and permitting standpoint, the classification and use of the 70-acre site at issue have not changed.

50. Aside from the permitted ADA upgrades requested by CDCR which were completed in 2014 and the construction of additional administrative office space outside of the secure perimeter of the facility, but still on the 70-acre site, CoreCivic has not undertaken any major renovations or modifications of the facility requiring further amendment of the CUP, which remains valid and effective for an Occupancy Classification Institutional Group I-3 facility.

51. CoreCivic has also obtained CUP 09-04 for construction of a separate 2,200-bed facility on the southern 35-acre site, which is separate and distinct from the facility at issue in this lawsuit, and also has a pending CUP 20-02 for construction of a separate and distinct 3,324-bed correctional complex on the eastern 215-acre site. Neither of these permits or applications, however, are relevant to the facility currently being utilized by Immigration and Customs Enforcement.

52. Although no CE A study is required to continue using the existing facility for its intended use, the fact that two additional proposed facilities with a combined capacity of 5,500-beds have been studied extensively on the site with no findings of significant adverse environmental impact further demonstrates that the continued use of the existing facility, merely by a different government partner, will not have any significant adverse environmental impact.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on October 25, 2025.

Marcelo Ariola

# ATTACHMENT A

ATTACHMENT A

ORIGINAL

**RESOLUTION NO. 01-98-1801**

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS AND ADOPTING A STATEMENT OF OVERRIDING CONSIDERATIONS IN CONNECTION WITH THE CORRECTIONS CORPORATION OF AMERICA PRISON**

WHEREAS, Corrections Corporation of America (CCA) has filed various applications with the City requesting approval to construct a 2,304-inmate capacity prison and related utility improvements (the "Project"); and

WHEREAS, the Planning Department has determined an Environmental Impact Report (EIR) Supplement be prepared pursuant to the California Environmental Quality Act (CEQA) to determine the individual and cumulative environmental impacts associated with the Project; and

WHEREAS, the Draft EIR Supplement was prepared by RUST Environment and Infrastructure under contract to the City and under the supervision of the Planning Department, and circulated for review from October 24, 1997 to December 9, 1998; and

WHEREAS, responses to comments were prepared and included in the Final EIR Supplement; and

WHEREAS, the Planning Commission considered and approved an application for a conditional use permit at a duly noticed public hearing on January 15, 1998;

NOW THEREFORE BE IT RESOLVED by the City Council of the City of California City as follows:

## SECTION 1

## INTRODUCTION

### 1. PRELIMINARY

CCA will develop a 2,304 bed prison on a 320 acre property in California City, Kern County. The Project will accommodate medium security inmates. The City was the Lead Agency for the preparation of an Environmental Impact Report (EIR) Supplement in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources Code §§ 21000 et seq.) and the CEQA Guidelines ( California Administrative Code §§ 15000 et seq., as amended).

Because the EIR Supplement identified significant effects which may occur as a result of the Project, City adopts these findings as part of the approval of the CCA Project. In adopting this Statement of Findings, the City approves the construction of the CCA Prison at California City on a 320 acre property known as the Virginia Boulevard site.

Section 1 of these findings provides an introduction and description of the proposed Project and the certification of the Final EIR Supplement. Section 2 discusses potential environmental effects considered to have no significant impacts and require no mitigation. Section 3 discusses potential environmental effects which are not significant or which have been mitigated to a level that is less than significant. Section 4 discusses the significant unavoidable environmental effects of the Project, which cannot be feasibly mitigated to a level that is less than significant. Section 5 discusses Project alternatives. Section 6 discusses changes in mitigation measures and recirculation. Section 7 discusses the Mitigation Monitoring Plan. Section 8 presents the Statement of Overriding considerations. Section 9 presents a Section 21092.1 finding regarding independent judgment.

### 2. DESCRIPTION OF THE APPROVED PROJECT

The site is located at the terminus of Virginia Boulevard, approximately one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The site encompasses 320 acres of vacant terrain comprised of, and surrounded by, natural desert environment.

Approximately 70 acres of the proposed prison site will be developed for the prison facility and support uses.

The 2,304 bed prison will accommodate 2,304 inmates at 100 percent design bed capacity, and meet the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.
- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates.

- Provide excellent long term employment and career opportunities for surrounding communities.

## 3. CERTIFICATION

The Planning Department has reviewed the Final EIR Supplement for the proposed Project and has considered the public record on the Project, including without limitation the following:

- Record of Public Hearing on the Final Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, on January 15, 1998, before the Planning Commission.

- Final Environmental Impact Report Supplement, January, 1998.

- Responses to Comments on the Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, 1997 (Volume II).

- Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, October 1997.

The custodian of the documents and other materials which constitute the record upon which these findings are based is the Planning Department. The record is available for public review at the City of California City, 2100 Hacienda Boulevard, California City, California, 93505.

**Finding**

Based upon complete review of the record, the Planning Commission certifies that the Final EIR Supplement is adequate and has been completed in compliance with CEQA.

## SECTION 2

## POTENTIAL ENVIRONMENTAL EFFECTS CONSIDERED TO HAVE NO SIGNIFICANT IMPACTS AND REQUIRE NO MITIGATION MEASURES

**Finding**

The EIR Supplement identified thresholds of significance and evaluated environmental impacts for the following issues. The EIR Supplement determined that these environmental impacts did not cross

the thresholds of significance for these issues. Therefore, no mitigation measures are required for these issues.

Land Use, Employment, Population and Housing, Hospitals, Judicial Services, Law Enforcement, Fire Protection, Wastewater Treatment and Disposal, Solid Waste Disposal, Energy, Telephone and Cable.

## SECTION 3

## POTENTIAL ENVIRONMENTAL EFFECTS WHICH ARE NOT SIGNIFICANT OR WHICH HAVE BEEN MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. PUBLIC UTILITIES AND COMMUNITY SERVICES

**School Impacts**

Implementation of the Project would result in enrollment of approximately 124 new students in the Mojave Unified School District (MUSD) resulting in the need for up to four additional classrooms.

**Mitigation**

The following mitigation measure will be employed to reduce potential impacts to MUSD schools to a less than significant level:

- Mitigation for impacts resulting from additional students generated indirectly by the proposed prison would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules.

  The school mitigation fees for MUSD which are collected by the California City Building Department at issuance of building permits are as follows:

  - $0.32 per square foot of new industrial/commercial floor space.

  - $1.84 per square foot of new residential floor space.

  Based on the conceptual building plans for the proposed prison, which indicate approximately 500,000 square feet of floor space, CCA would be responsible for payment of approximately $160,000 to offset any direct impacts to MUSD. Additionally, new residential development resulting from any direct and indirect growth would contribute separately to school fees at the rate noted above. The collected fees could be utilized to lease the portable classrooms or contribute to funding for permanent facilities necessary for additional students.

Information provided by the MUSD Superintendent's office indicates that payment of the school mitigation fees by CCA and other new developments, and other funding mechanisms will mitigate potential impacts to a less than significant level.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to schools to a less than significant level.

**Water Supply Impacts**

The proposed Project would require 392,000 gallons per day of water. Implementation of the proposed Project would include improvements to the offsite water infrastructure facilities to provide adequate operational and fire/emergency water service to the site.

**Mitigation**

The following mitigation measures will be adopted to ensure that water is available to serve the Project, and that the Project uses the minimum practical amount of water.

- Design of the proposed prison would include provisions to minimize water use at the proposed prison:
  - Use of low-flow fixtures, and
  - Use of drought-tolerant, native landscaping.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to the water system to a level that is less than significant.

**B. TRANSPORTATION**

**Traffic Impacts**

During operations, the Project would generate approximately 1,320 daily vehicle trips on peak weekdays. This impact would contribute to an existing unacceptable level of service at the intersection of SR 58 / California City Boulevard in the unincorporated area of Kern County. Cumulative plus peak weekday traffic would result in a significant impact between 5:30 AM and 6:30 AM at the SR 58 / California City Boulevard intersection.

**Mitigation**

The following measure would reduce the project-related impact to a less than significant level:

- The addition of a traffic signal is shown to be warranted for existing conditions and this improvement would mitigate the unacceptable Level of Service (LOS) condition. Caltrans has jurisdiction over SR 58 and according to Caltrans the Project would be required to participate in funding interim improvements at SR 58/ California City Boulevard, rather than a traffic signal at this intersection. The proposed CCA Prison would contribute 4.2% of the interim improvement costs based on the proportionate share of Project traffic impact to this intersection. Implementation of this mitigation measure would reduce the Project's impact to a less than significant level.

**Finding**

The impacted intersection is within the dual jurisdiction of Caltrans, a state agency, and Kern County. California City shall ensure through the Mitigation Monitoring Plan that the applicant makes its proportionate share of funds available to Caltrans and Kern County for interim improvements to the intersection. However, California City, as lead agency, has no jurisdiction to implement this mitigation. Caltrans and Kern County can and should implement this mitigation measure to reduce project-related impacts to a less than significant level.

Should Caltrans and Kern County implement this mitigation measure, changes or alterations will have been required in, or incorporated into, the Project which will avoid or reduce Project-related traffic impacts to a less than significant level. If, however, Caltrans and Kern County do not utilize fair share contributions to mitigate the Project's contribution to the current unacceptable LOS condition at SR 58/California City Boulevard, then the increased traffic generated by the Project would be considered a significant and unavoidable adverse impact. Therefore, and in that case, the City shall find that the impact is overridden by the Project benefits stated in the Statement of Overriding Considerations as set forth in Section 8 below.

## C. NOISE

**Noise Impacts**

If dwellings were to be constructed in the approved residential subdivision to the east of the site prior to prison construction, future residents could be subjected to high noise levels during Project construction.

**Mitigation**

No sensitive receptors are currently located near the Project. Prison operations will not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operations. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore the Final EIR recommends the following mitigation measures to reduce the noise impacts of construction should residences be built adjacent to the Project prior to Project construction:

- Construction activities within 2,000 feet of occupied residences will be limited to the hours of 7 a.m. to 8 p.m. Monday through Saturday, with no construction allowed on Sundays or City holidays.

- Properly muffled equipment and trucks will be used.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce noise impacts to a less than significant level.

## D. HYDROLOGY, STORM DRAINAGE, AND FLOOD CONTROL

**Hydrology Impacts**

Implementation of the Project would result in the covering of between 50 and 70 acres with impervious surfaces such as buildings, access roads, and parking areas. Implementation of the Project as proposed could result in an increase of the 100-year storm peak runoff from the watershed.

**Mitigation**

The City will adopt the following measures to reduce the potential impacts related to stormwater runoff to a less than significant level:

- Stormwater drainage and collection facilities will be designed to maintain the volume of surface water runoff at pre-Project levels. Facilities will include ditches or swales, constructed along the perimeter of the prison complex, and lined only with natural vegetation. The ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to an on-site detention basin.

- An unlined storm water detention basin will be developed on-site to retain a volume of storm water necessary to control runoff from impervious surfaces, and maintain surface runoff volumes at the property boundaries at pre-Project levels. The capacity of the detention basin will be based on calculated storm water flows above natural conditions, resulting from impervious surfaces of the proposed Project. The sizing and design of this detention basin will be reviewed and approved by the City Engineering Department as part of the final site plan approval.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hydrology impacts to a less than significant level.

**Storm Drainage Impacts**

Project implementations could result in urban pollutants entering stormwater runoff. Such pollutants may include oil, grease, antifreeze, trace metals, dust and dirt, fertilizers, herbicides and pesticides.

**Mitigation**

The City will adopt the following measure to reduce potential water quality impacts to a less than significant level:

- The proposed Project will comply with all applicable requirements of the NPDES permit program.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce storm drainage impacts to a less than significant level.

## E. BIOLOGICAL RESOURCES

**Utility Infrastructure Impacts**

Based on the low quality of habitat, and complete absence of presence or sign for any sensitive species within the 25-acre utilities construction path, significant impacts which would require comprehensive mitigation measures are not anticipated. Biologists estimated that approximately ten percent (10%) or 2.5 acres of property along the utility installation area contain habitat which could be considered Category III as designated by the Bureau of Land Management.

**Mitigation**

The City will adopt the following measures to reduce the potential impact on utilities construction path to less than significant:

- The off-site compensation measures described in Section 4(A) include preservation of 2.5 acres of habitat to off-set the loss described above.
- Prior to installing underground utilities, a final inspection of these areas will be conducted to verify the findings of previous biological surveys
- Biologist shall survey utility construction path immediately prior to trenching activities, and biologist shall move any tortoise from the construction path to adjacent habitat, out of harms way.
- All vehicles, including heavy equipment and personal vehicles, shall use established roadways to access the site. All vehicles shall be restricted to the site and shall not disturb areas adjacent to the utility construction area.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- The open utility trench will be kept to the minimum width and length as practicable for construction purposes which can be completed on a day-to-day basis.

- The utility trench shall be filled or covered at the completion of each construction day.

- The utility trench shall be visually inspected for tortoise immediately prior to commencing construction each morning.

- Areas disturbed within the utilities construction path will be regraded to blend with adjacent topography.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce utility infrastructure impacts to a less than significant level.

## F. CULTURAL RESOURCES

**Cultural Resources Impacts**

A recorded archaeological site is located on a portion of the site. Because implementation of the proposed Project could result in the disturbance of prehistoric material, this impact is considered significant.

**Mitigation**

The City will adopt the following measures to reduce potential impacts on cultural resources to a less than significant level:

- If human skeleton remains are encountered during construction, work within 20 meters of the discovery will be stopped immediately and the County Coroner notified. If the remains are Native American, the Coroner has 24 hours to notify the Native American Heritage Commission.

- If any buried cultural remains are encountered during development and construction, work within 20 meters of the discovery will be stopped until a professional archeologist is retained to determine the significance of the find and to develop management actions. Actions needed to manage the resource will be implemented.

- Avoidance of archaeological sites is the preferred management technique. Avoidance may be achieved through implementation of the following measure:

- A qualified archaeologist will be retained to fence the perimeter of the archaeological site prior to Project grading. The fence will be located approximately 15 feet outside the actual resource site boundary and remain there for the duration of construction activities. The fenced area will be unmarked to prevent unauthorized collecting.

If avoidance is infeasible, the following measure will be implemented:

- Prior to site grading or other construction activities, a qualified archaeologist will collect surface artifacts. A report containing a lithic analysis will be filed with the Southern San Joaquin Valley Information Center at California State University, Bakersfield.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce cultural resource impacts to a less than significant level.

## G. GEOLOGY, SOILS, SEISMICITY AND GROUNDWATER

**Soil Impacts**

Potentially expansive soil was encountered in one boring at the site during a geotechnical investigation conducted for the 1994 EIR. Construction on expansive soils can result in structural damage or failure.

**Mitigation**

The City will adopt the following measures to reduce potential impacts relative to expansive soils to a less than significant level:

- Expansive soil, will be removed or treated, and/or an expansion-resistant foundation system will be constructed.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce soil impacts to a less than significant level.

**Soils Impact**

The surface soil, upper 1 to 4.5 feet, at the site is generally of a loose consistency and may be subject to excessive immediate settlement under loading. Such settlement can result in structural damage or failure.

**Mitigation**

The following measures will be adopted to reduce potential impacts relative to collapsible or compressible soils to a less than significant level:

- Collapsible soils or compressible soils, if determined to be present at the site, will be mitigated by modification of soil, or through structural foundation design.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce collapsible or compressible soils impacts to a less than significant level.

**Seismic Impacts**

Based on probabilistic analysis conducted for the preparation of the 1994 Final EIR, the highest maximum peak horizontal accelerations at the site could range from 0.30g to 0.35g for the estimated maximum credible event of M7.5 at the Lockhart Fault.

**Mitigation**

The following measure will be adopted to reduce potential impacts relative to seismic shaking to a less than significant level:

- Facilities will be designed to the standards required by the regulatory agencies governing the Project, or other pertinent building codes, to withstand the expected ground motions. Through site specific studies, seismic criteria has been developed that should be evaluated by structural designers to determine whether the standard seismic design for prisons meets or exceeds the criteria.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce seismic impacts to a less than significant level.

## H. HAZARDOUS MATERIALS

**Hazardous Materials Impacts**

Review of historic aerial photographs, and local, state, and federal records revealed no evidence of hazardous substance use, storage, or releases on the Project site. No evidence of hazardous materials storage or contamination was identified on the site or in adjacent areas. However, due to the size of the site, the possibility of an isolated area of contamination, e.g. isolated illegal dumping of hazardous waste, cannot be completely dismissed.

**Mitigation**

The City will adopt the following measure to reduce potential impacts with respect to potential site contamination to less than significant:

- In the event that hazardous materials or waste contamination are encountered during grading, construction or operation of the proposed Project, the subject wastes shall be assessed, reported to appropriate agencies, and remediated. Appropriate remediation shall be determined through consultation with the affected health and state agencies.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts to a less than significant level.

**Hazardous Materials Impacts During Construction and Operations**

Construction and operation of the Project would require the use and storage of hazardous materials such as paints and solvents. The misuse, improper disposal, and/or mismanagement of these materials could affect groundwater quality, soil quality, and possibly create hazards to human health and safety.

**Mitigation**

The City will adopt the following measures to reduce potential hazardous materials impacts during Project construction and operation to a level that is less than significant:

- Hazardous materials on the prison grounds will be properly stored in suitable containers and in accordance with manufacturers directions for safe storage.

- Hazardous materials used at the prison will be properly disposed of as needed, at a Class I landfill, a County-sponsored "hazardous materials round-up", or other suitable disposal method sanctioned by the Department of Toxic Substances Control.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts during construction to a less than significant level.

## SECTION 4

## SIGNIFICANT UNAVOIDABLE ENVIRONMENTAL IMPACTS WHICH CANNOT BE MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. BIOLOGICAL RESOURCES

**Desert Tortoise Habitat Impacts**

The Project site is located outside of U.S. Fish and Wildlife (USFWS) designated critical habitat areas for the desert tortoise. However, the Project would result in the loss of approximately 70 acres of desert tortoise habitat. The loss of occupied habitat could be considered a take pursuant to Section 2081 of the California Endangered Species Act (CESA). Any net loss of any occupied desert tortoise habitat is considered a significant and unavoidable impact. Individual tortoises could be destroyed as a result of grading and construction activities. Destroying a tortoise would be considered a take of a listed species pursuant to both the ESA and the CESA, and considered a significant impact.

**Mitigation**

To mitigate the above impacts and comply with the Federal Endangered Species Act (ESA) and California Endangered Species Act (CESA), the applicant will obtain necessary permits from both USFWS and California Department of Fish and Game (CDFG). USFWS will require the submittal of a ESA Section 10(a) permit application and the preparation of a Habitat Conservation Plan (HCP) that includes a Project description with an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. This document will also provide the information required during CDFG Section 2081 permitting process as mandated by CESA.

The following mitigation recommendations are typical of those included in desert tortoise habitat HCP's. Actual mitigation requirements will be determined by USFWS and CDFG during the required permitting process. The agencies may require additional measures to mitigate for the proposed habitat loss for the desert tortoise.

**Construction Site Measures**

- Prior to implementation of any of the following measures, CCA must provide fees for the

acquisition of up to 70-acres of compensation lands to the Desert Tortoise Preserve Committee (DTPC) to mitigate impacts of the prison development.

- Grading limits should be chosen in an effort to minimize impacts to mapped tortoise activity areas.
- An enclosure should be placed around the boundary of the limits of grading and should consist of an appropriate type of fencing to keep desert tortoises from re-entering the construction area.
- Clearance surveys should be conducted by qualified and permitted biologists to locate and remove any tortoises from within the limits of grading. All tortoises will be relocated to an appropriate, and preferably, adjacent habitat within the western one-half which are not part and placed within created, artificial burrows of any area disturbed by the proposed prison or any potential future facility expansions.
- The undeveloped portion of the western one-half of the site will be dedicated as a conservation easement to provide and enhance habitat for sensitive biological species.
- A biological monitor should be present during all initial ground clearing and grading activities to ensure that no incidental take of desert tortoise occurs.
- An educational program should be developed and presented to all construction personnel who will be present on-site.
- Access to the 320-acre site will be strictly controlled by perimeter signage and 24-hour patrols by prison correctional officers. Human recreational activities will be prohibited within the undeveloped portions of the site for environmental and security purposes. Native wildlife activity and migration within the property boundary, and outside the boundaries of prison security fencing, will not be disturbed.
- Provide signage along site access road to beware of desert tortoise.

**Finding**

The Project impacts to desert tortoise and related habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which significantly reduce the potential for take of listed species and substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Mojave Ground Squirrel Habitat Impacts**

Although no Mojave ground squirrels were observed at the site, the loss of Mojave ground squirrel

habitat is considered a significant impact.

**Mitigation**

The impact on the Mojave ground squirrel habitat will be significant and unavoidable, however, the. City will adopt the following measure to partially mitigate the impact on the Mojave ground squirrel habitat:

- A mitigation plan for the loss of habitat will be approved in coordination with the permitting for the loss of desert tortoise habitat discussed above.

**Finding**

The impacts to the Mojave ground squirrel habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Burrowing Owl Impacts**

Although no burrowing owls were observed at the site, the loss of burrowing owl habitat is considered a significant impact.

**Mitigation**

Project impacts on the burrowing owl habitat will be significant and unavoidable, however, the City will adopt the following measure to partially mitigate the impact on the burrowing owl habitat:

- Although no burrowing owls were observed at the site, and no impacts to burrowing owls are expected, mitigation which will be developed for the desert tortoise includes protection of Mojave creosote bush scrub habitat form grazing and recreational vehicle activity. This mitigation will enhance the potential for use of the protected area of the site as burrowing owl habitat.

**Finding**

The impact identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## B. AIR QUALITY

### Construction Impacts

The Project would modify/develop between 50 to 70 acres, and up to 35 acres could be exposed at any one time during construction. The Project could generate 1,848 pounds per day of fine particulate matter ($PM_{10}$). Construction related emissions would exceed Kern County Air Pollution Control Department CEQA thresholds of significance for $PM_{10}$ and nitrogen oxides ($NO_2$), and would therefore represent a significant and unavoidable impact of the Project.

**Mitigation**

Although the impacts associated with $NO_2$ and $PM_{10}$ are significant and unavoidable, construction activities shall be partially mitigated by employing the best available control measures for fugitive dust control described in the EIR Supplement and included in the Mitigation Monitoring Program.

**Finding**

Project construction air quality impacts identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement.

### Construction Equipment Impacts

Use of employee vehicles, trucks and heavy equipment would result in construction emissions throughout the construction period. The Project would generate approximately 172 tons/year of carbon monoxide, 21 tons/year of total organic gases, 59.8 tons/year of nitrogen oxides, 5.7 tons/year of sulfur oxides, and 6.4 tons/year of particulate matter during construction. Construction related emissions would exceed KCAPCD CEQA thresholds of significance for $PM_{10}$ and $NO_2$.

**Mitigation**

Although the impacts from construction equipment and construction employee vehicles will be significant and unavoidable, the following measures will partially mitigate the identified impacts:

- Equipment will be maintained to minimize emissions.
- Information will be provided to construction employees to facilitate car pooling.
- Information will be provided to construction employees to facilitate extended stays in the Project vicinity to reduce long distance commuting.

**Finding**

Project air quality impacts arising from construction activities cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Operations Impacts**

Total daily trips to the site during operation peak weekdays are estimated to be 1,320. Vehicle emissions would total 48.4 tons/year reactive organic gases, 330 tons/year carbon monoxide, 37.5 tons/year nitrogen oxides, and 6.1 tons/year of $PM_{10}$. Operation of the Project would result in significant and unavoidable impacts from emissions of organic compounds and nitrogen oxides, which exceed KCAPCD CEQA thresholds of significance.

**Mitigation**

City will adopt the following measures to partially mitigate the air quality impacts from operational emissions:

- Information will be provided to employees to facilitate car pooling.
- Equipment, such as generators, will meet all Kern County Air Pollution Control District requirements.

**Finding**

Project air quality impacts arising from operations cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## C. AESTHETICS/VISUAL CONSIDERATIONS

**Aesthetic Impacts**

The Project would result in the conversion of vacant desert lands to a developed prison facility with buildings, parking lots, lighting, and other related features. Although no residences presently exist in the immediate vicinity, the prison would represent a significant change in the visual landscape, or viewshed, to future residents of approved residential subdivisions adjacent to the proposed prison site.

Even with mitigation in place, implementation of the proposed Project will result in an unavoidable significant visual impact to future residents of the approved subdivisions east of the Project site. The

site is relatively small, thereby affording limited flexibility in terms of placement of the prison structures. There are no feasible mitigation measures available to reduce the potential visual impact to less than significant

**Mitigation**

The Project impact on the viewshed will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Areas of the site disturbed during Project construction which would remain unpaved will be revegetated for runoff control and to enhance visual blending with the surrounding area.

**Finding**

Changes or alterations to the Project to reduce visual and aesthetic impacts have been incorporated into the Project as the mitigation measures, however, the visual and aesthetic impacts associated with the Project cannot be mitigated to a less than significant level. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Lighting Impacts**

Indirect lighting of adjacent areas and skyglow from the proposed prison would occur because the Project site is surrounded by vacant desert lands with no light-blocking features, and because there are no other sources of nighttime lighting in the vicinity. Although currently no residences exist in the immediate vicinity, skyglow would be visible and would be a visual nuisance to existing and future sensitive receptors.

Even with mitigation in place, skyglow will be noticeable in California City. Only the no-Project alternative would avoid significant light and glare impacts. However, implementation of this alternative would not meet the basic objectives of the Project.

**Mitigation**

The impact from nighttime lighting and skyglow will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Mast lighting posts will not exceed 30 feet in height, and where applicable and required by design, the lighting will be shielded and directed downward to minimize off-site illumination.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which substantially

lessen the significant environmental effects as identified in the Final EIR Supplement. However, the residual effect, after mitigation, of nighttime lighting has been identified as significant and unavoidable. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## SECTION 5

## ALTERNATIVES

The Final EIR Supplement identifies and evaluates five potential alternatives to the Project that "could feasibly accomplish most of the basic purposes of the Project". The five alternatives include (1) no Project, (2)Virginia Boulevard-Less Intense Prison, (3) Randsburg-Mojave site, (4) Remote Site, and (5) Virginia Boulevard/190% Development alternative. The alternatives discussed in the Final EIR Supplement constitute a reasonable range of potential options necessary to permit a reasoned choice of alternatives in light of the Project Objectives identified in Sections 1.3 and 7.0 of the Draft EIR Supplement. The Final EIR identifies the No Project Alternative and the Less-Intensive Prison Alternative as environmentally superior to the Project and they would reduce or eliminate the unavoidable significant impacts associated with the Project. However, neither of these alternatives fulfill the Project objectives. In addition, specific economic and social considerations make the environmentally superior alternatives identified in the Final EIR Supplement infeasible. Therefore, pursuant to CEQA Guideline 15364, and Public Resources Code Section 21081(a)(3), the Planning Commission will reject the environmentally superior alternatives as infeasible.

The alternatives considered in the Final Supplement are summarized below:

1. **No Project Alternative**- Under the no-Project alternative, a correctional facility would not be constructed. None of the potential impacts associated with development of the Project would occur. Unavoidable adverse impacts related to light and glare, biological resources and air quality (particulate and ozone-producing gases) during both construction and facility operation would be avoided.

**Finding**

The Planning Commission finds the No-Project Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative will fail to meet any of the Project objectives identified in the Final EIR; and
- This alternative would forego the substantial benefits of the Project, particularly:
    - Construction of the Corrections Corporation of America Prison at California City is necessary to provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for surrounding communities. Between 85 to 90 percent of the prison employees are expected to be drawn from the Project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

- In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees will stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

2. **The Virginia Boulevard-Less Intense Prison-** The EIR Supplement evaluated a smaller scale Project on the same site comprised of 1,000 beds on a 40 acre site.

**Finding**

The Planning Commission finds the Virginia Boulevard-Less Intense Prison Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative provides environmental benefits, however, this alternative will not provide as many employment opportunities as the proposed Project and would provide less capacity to serve the incarceration needs of government correctional agencies. Thus, this alternative will do less to meet Project objectives; and

- Based on the required investment in land and facility development costs, a smaller prison on the 320- acre site would not be economically viable. Thus, this alternative does not present a cost effective alternative to a publicly funded and operated correctional facility.

3. **Randsburg-Mojave Site-**While not an unavoidable significant impact, this alternative would remove potential (but somewhat degraded) habitat for the burrowing owl and the Mojave ground squirrel. Additionally, the Randsburg-Mojave property is not currently served by paved access roads, and public utilities would require extension from a greater distance to serve the site. Furthermore, as discussed in the 1994 EIR, construction at this site would require enhanced engineering design and more stringent building requirements to withstand potential levels of seismic shaking due to the proximity of an active fault, thus representing a fiscal constraint. Lastly, during the initial search by CCA for an appropriate site to accommodate the proposed Project, the Randsburg-Mojave property was not available for sale.

4. **Remote Site Alternative-**Through the site selection process used to find the prison site, properties located in the region which would be reasonably feasible alternatives, would meet the majority of the Project objectives, and fit most of the criteria identified as necessary, were

not found. Specifically, the biological resources and habitat quality of more remote sites tended to improve; however, the areas further to the east and north tend to be served by fewer paved roads with limited access to utilities and services. Thus a Remote Site alternative was not feasible.

5. **The Virginia Boulevard/190% Development Alternative-** This alternative would result in additional significant unavoidable impacts such as viewshed impacts; increased light, glare and aesthetic impacts; impacts to Mojave Unified School District; additional particulate and ozone producing impacts generated during operations; and loss of additional acreage of potential desert tortoise, burrowing owl, and Mojave ground squirrel habitat. The larger prison could also result in land use incompatibilities and incrementally increase demands on public utilities and community services which could potentially limit the ability to provide adequate services. This alternative was rejected since it would not offer an environmental advantage over the proposed Project.

## SECTION 6

## RECIRCULATION

## SECTION 21092.1 FINDING

Finding: Pursuant to CEQA Guideline 15088.5, and Public Resources Code Section 21092.1, on the basis of its review and consideration of the Final EIR Supplement this Planning Commission finds that:

- The Project mitigation for impacts to biological resources has been revised from an on-site habitat conservation plan to an off-site habitat conservation plan as described in Section 3 of these findings and as shall be incorporated into the Project as part of the Mitigation Monitoring Plan.

- The revised mitigation measures and revised water system design are not substantial changes in the Draft EIR Supplement that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative; and

- The revised mitigation measures and revised water system design will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR Supplement; and

- The revised mitigation measures and revised water system design will not involve or require mitigation measures or alternatives which are considerably different from those analyzed in the Draft EIR Supplement that would substantially reduce one or more significant effects on the environment; and

- The revised mitigation measures and revised water system design do not render the Draft EIR Supplement so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded;

- Thus, none of the conditions set forth in CEQA Guideline 15088.5 or Public Res. Code § 21092.1 requiring recirculation of a Draft EIR Supplement have been met. Incorporation of the revised mitigation measures and revised water system design into the Final EIR Supplement does not require that the EIR Supplement be recirculated for public comment.

## SECTION 7

## FINDINGS REGARDING THE MITIGATION MONITORING PROGRAM

Section 21081.6 of the Public Resources Code requires that when a public agency is making the findings required by State CEQA Guidelines Section 15091(a)(1) and Section 21081(a) of the Public Resources Code the public agency shall adopt a program for reporting on or monitoring the changes which it has either required of the Project or made a condition of approval to avoid or substantially lessen significant environmental effects. These measures must be fully enforceable through permit conditions, agreements, or other measures.

The Planning Commission hereby finds that the Mitigation Monitoring Program dated January, 1998, and adopted as part of the Project's Conditional Use Permit meets the requirements of Section 21081.6 of the Public Resources Code by providing for and enforcing the implementation and monitoring of Project conditions intended to mitigate potential environmental effects of the Project.

## SECTION 8

## STATEMENT OF OVERRIDING CONSIDERATIONS

Having reduced the effects of the proposed Project by adopting mitigation measures, and balanced the benefits of the proposed Project against the proposed Project's potential unavoidable adverse impacts, the City hereby determines the benefits of the proposed Project outweigh the potential unavoidable adverse impacts, and the unavoidable adverse impacts are acceptable, based on the following overriding considerations, which are sufficient to outweigh the proposed Project's unavoidable adverse impacts:

- Construction of the Corrections Corporation of America Prison at California City will provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for

Surrounding communities. Between 80 to 90 percent of the prison employees are expected to be drawn from the project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees wil stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

## SECTION 9

## INDEPENDENT JUDGEMENT

## SECTION 21082.1 (C) (3) FINDING

Facts: The Planning Department, acting as lead agency, has reviewed and edited as necessary the Draft EIR Supplement and the Final EIR Supplement to reflect its own independent judgement to the extent of its ability, including reliance on concerned County technical personnel from other departments.

Finding: Pursuant to Public Resources Code Sec. 21082.1 (c) (3) the City Council hereby finds that the Final EIR Supplement reflects the independent judgement of the lead agency.

---

Introduced, approved and adopted this 20th Day of January, 1998 by the following vote:

AYES: 5
NAYS: 0
ABSTAIN: 0
ABSENT: 0

Larry Adams, Mayor

January 20, 1998
Date

ATTEST:

Helen Dennis, City Clerk

# ATTACHMENT B

ATTACHMENT B

ORIGINAL

**RESOLUTION NO.** 01-98-1802
**A RESOLUTION OF THE CITY COUNCIL GRANTING CONDITIONAL USE PERMIT 97-01 PRISON FACILITY**

**WHEREAS**, governmental and quasi-governmental uses, such as prison facilities may be permitted in Residential/Agricultural District zones with a conditional use permit (Ord. No. 96-529); and

**WHEREAS**, the property located approximately 0.5 miles South of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian also known as Assessor's Parcel Number (APN) 350-031-02 is within the R/A, Residential/Agricultural District zone and that a portion of the 320-acre site is zoned Conservation Land, which is a compatible use with the R/A zone as defined by the City of California City General Plan 2012 Land Use Designation Chart; and

**WHEREAS**, Corrections Corporation of America has requested and filed an application with the Planning Commission to establish and operate a 2,304 bed prison facility on approximately 70 acres of the 320-acre above-mentioned address; and

**WHEREAS**, notice of a public hearing was mailed to all property owners within 300 feet of the above-mentioned parcel and published as required by the Zoning Regulations; and

**WHEREAS**, the Planning Commission did conduct a public hearing on January 15, 1998, heard public testimony, and made the following findings:

1. That a prison facility use is necessary for the preservation and enjoyment of a substantial property right.
2. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.

3. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
4. That the Final Environmental Impact Report (EIR) Supplement State Clearinghouse (SCH) #97091045 is certified as adequate and in compliance with California Environmental Quality Act (CEQA) for the proposed prison project.
5. That the Mitigation Monitoring Program dated January 1998 for the proposed prison be adopted as part of Conditional Use Permit 97-01.
6. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
7. Site plan review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
8. This conditional use permit expires twelve (12) months from that date of the City Council's approval if the prison facility operation is not commenced and diligently pursued.
9. All provisions of the City of California City Municipal Code currently in effect must be complied with.

**WHEREAS**, the Planning Commission hereby approves the conditional use permit and directs that this resolution be prepared and presented to the City Council for the consideration and granting of Conditional Use Permit 97-01.

**APPROVED THIS 15TH DAY OF JANUARY, 1998** by the Planning Commission.

Reuben W. Dennis Jr.
Planning Commission Chairman

Attest:

Ronna L. Greene
Planning Secretary

**NOW, THEREFORE, BE IT RESOLVED** by the City Council of the City of California City that the Conditional Use Permit 97-01 is granted to Corrections Corporation of America to establish and operate a prison facility in the North one-half of Section 13, Township 32 South, Range 38 East, Mount Diablo Base and Meridian and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**PASSED, APPROVED AND ADOPTED** this 20th day of January, 1998, by the City Council, by the following Roll Call Vote: AYES: 5 ; NOES: 0 ; ABSTAIN: 0; ABSENT: 0.

Mayor

ATTEST:

Secretary
(SEAL)

# ATTACHMENT C

ATTACHMENT C

Recording Requested by:
Commonwealth Land Title Company

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $** RECORDING IN COUNTERPART **County $ ____ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

________________
Moohay A. Choe

________________
Angela H. Ahn Mouradian

[signature]
Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Lisa Christine Hendry
personally appeared Channing C. Ahn

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/~~her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

**(This area for official notarial seal)**

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 1,812.80 County $ ______ City**
**___ Computed on the consideration or value of property conveyed; OR**
**___ Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June ~~5,~~ 10 1998

STATE OF ~~CALIFORNIA~~ Massachusetts } ss
COUNTY OF Norfolk }
On 6-10-1998 before me Tracy K Kenney
personally appeared Angela H Ahn Mouradian
personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(ies), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Tracy K Kenney
My Commission expires Oct. 13, 2000

MAIL TAX STATEMENTS TO ADDRESS ABOVE

______________________
Moohay A. Choe

Angela H. Ahn Mouradian
Angela H. Ahn Mouradian

______________________
Channing C. Ahn

(This area for official notarial seal)

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 43 of 161

Recording Requested by:
Commonwealth Land Title Company

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

James ... Kern County Official Records
DOCUMENT #:0198081113
*0198081113*
Pages: 3
6/19/1998
8:00:00
Fees 13.00
Taxes 1812.80
Other
TOTAL PAID 1825 80
Stat Types: 1

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ RECORDING IN COUNTERPART County $ ______ City
____ Computed on the consideration or value of property conveyed; OR
____ Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

Moohay A. Choe [signature]
Moohay A. Choe

Angela H. Ahn Mouradian

Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Morton M. Schneider
personally appeared Moohay A. Choe.

personally known to me or proved to me on this basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]

MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

**(This area for official notarial seal)**

# ATTACHMENT D

ATTACHMENT D

# CITY OF CALIFORNIA CITY
# MEMORANDUM TO THE FILE

**DATE:** November 15, 2001

**FROM:** Jack Stewart, City Manager/Planning Director

**SUBJECT** Extension of Conditional Use Permit - Amendment (CUP-A) 98-02 512-bed Expansion for CCA Prison

**MEMO TO THE FILE**

CCA's current extension expires on November 30, 2001 for CUP-A 98-02 for the 512-bed expansion. The expansion is on-going in the confines of the existing approved 70 acres and within the existing structures. This extension is granted indefinitely and is limited to the above referenced expansion.

This approval is granted by the City Council through their authority to delegate such power to the City Manager as their representative and in accordance with the Zoning Ordinance, Section 9-2.2202 (b) 2, page 104 and Section 9-2.2503 (a) 2., page 116 with the pre-existing conditional use being CUP 97-01.



City of California City
Incorporated 1965
City Hall
PHONE (760) 373-8661
21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

November 9, 1999

Mr. Kenneth M. Avant, Director
Maintenance and Construction
10 Burton Hills Boulevard
Nashville, Tennessee 37215

SUBJECT: Request for Two-Year Extension to Conditional Use Permit Amendment (CUP-A) 98-02 for the 512-bed Prison Expansion

The Planning Commission reviewed and approved your request for an extension to November 30, 2001 for Conditional Use Permit Amendment (CUP-A) 98-02 for the 512-bed prison expansion.

If you have any questions, please contact my office at 760-373-8670.

Sincerely,

Jack Stewart

Jack P. Stewart
City Manager

cc: James M. Hunter
✓File

# PLANNING COMMISSION

Meeting Date: October 26, 1999

**DATE OF PREPARATION:** October 22, 1999

**TO:** Planning Commission

**FROM:** Planning Director

**SUBJECT:** Consider Request for Two-Year Extension to Conditional Use Permit Amendment (CUP-A) 98-02 from CCA for the 512-bed Prison Expansion - Planning Director

**BACKGROUND:**
Staff has received a request from CCA for a two-year extension to CUP-A 98-02 scheduled to expire on November 30, 1999. The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion.

**RECOMMENDATION:**
Staff recommends granting CCA's request for an extension to November 30, 2001 for CUP-A 98-02.

**SOURCE OF FUNDING:** N/A

**ENVIRONMENTAL ACTION:** None.

Attachments:
1. CCA's letter of request (10-12-99)

**NB 2.**

17671 Cowan Avenue, Suite 150, Irvine, California 92614-6031

RECEIVED
OCT 1 5 1999

October 12, 1999

Mr. Jack Stewart
City Manager
City of California City
21000 Hacienda Boulevard
California City, CA 93505

Subject: **Modified Conditional Use Permit for 512-Bed Expansion at CCA's California City Correctional Center**

Mr. Stewart:

As you may be aware, the City Council of California City on December 1, 1998, passed, approved and adopted a Resolution modifying Conditional Use Permit (CUP) 97-01 to allow a 512-bed expansion at Corrections Corporation of America's (CCA) California City Correctional Center – CUP Amendment 98-02. Provisions of the California City Municipal Code Section 9-2.2202(b) indicate the following:

> "A use permit shall lapse and shall become void twelve (12) months following the date on which the use permit became effective unless by conditions of the use permit, a lesser or greater time is prescribed below, or unless prior to the expiration of the twelve months, Building Permit is issued by the Building Official and construction is commenced and diligently pursued toward completion on the site which was the subject of the use permit application. A use permit may be renewed for an additional period of twelve (12) months or for a lesser or greater period as prescribed in paragraph b(2); provided that prior to the expiration of the time period granted, an application of renewal of the use permit is filed with the Planning Commission ...."

Since the current use permit for the 512-bed expansion will expire on November 30, 1999, a two-year renewal is requested for CUP Amendment 98-02. The duration of the requested renewal is based on the size and complexity of the entire California City Correctional Center project, and the unique market factors relevant to scheduling the construction of the 512-bed expansion require a certain amount of regulatory flexibility. Please accept this letter as CCA's formal application to the City of California City for a two-year renewal of CUP Amendment 98-02. If you have any questions regarding this request, please feel free to contact me at 949.251.6417.

Very truly yours,

*Earth Tech, Inc.*

James M. Hunter
James M. Hunter
Irvine Operations Manager

CC: Ken Avant - CCA

Telephone
949.251.6400
Facsimile
949.251.6444

EARTH TECH

A tyco INTERNATIONAL LTD. COMPANY

# CITY COUNCIL

Meeting Date: December 1, 1998

**DATE OF PREPARATION:** November 25, 1998

**TO:** Mayor and City Council
**FROM:** Interim City Manager

**SUBJECT:** Consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 and Mitigated Negative Declaration for the Proposed 512-Bed Expansion at Corrections Corporation of America's California City Correctional Center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:** On November 24, 1998 this matter was reviewed by the Planning Commission during their regular Planning Commission meeting. The Commission voted on the following two separate issues.

Resolution 11-98-02 modifying Conditional Use Permit 97-01 as it relates to the proposed 512-bed expansion at Corrections Corporation of America's California City Correctional Center (Conditional Use Permit-Amendment 98-02): AYES: 4, NOES: 0, ABSTAIN: 1, ABSENT: 0

The Planning Commission further voted to forward the Proposed Mitigated Negative Declaration, to the City Council for approval and after full consideration, approved the application: AYES: 4, NOES: 0, ABSTAIN: 1, ABSENT: 0

**RECOMMENDATION:** The City Council approved Resolution 11-98-02 and the Proposed Mitigated Negative Declaration as presented.

**SOURCE OF FUNDING:** N/A.

**ENVIRONMENTAL ACTION:** Direct staff to file a Notice of Determination with the Kern County Clerk's Office.

Attachments:
1. Planning Commission's 11-24-98 Agenda Item
2. Resolutions

PH 2.

Correspondence: None

Public Comment: None

Motion to close the public hearing at 6:24 by Councilman Bailey, second by Councilman Lessenevitch. Carried.

Council action: Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the extension to September 1, 2000, and adopt "**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 96-05 AS IT RELATES TO THE DEADLINE FOR COMPLETING A FINANCIAL PLAN.**" Roll Call vote as follows:

**AYES:** Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams.
**NAYS:** None
**ABSENT:** None

**PH 2.** Consider approving amendment to Conditional Use Permit-Amendment (CUP-A) for Proposed 512-Bed Expansion at California City Correctional Center -

Mayor Adams declared the Public Hearing open at 6:27 pm. Staff report was given by the City Engineer. There was no correspondence received on either part 1 or part 2 of the public hearing.

Council discussion: Procedural matters were discussed on how to conduct the two-part hearing.

Public comment: None

Motion to close the public hearing at 6:35 p.m. by Councilman Lessenevitch, second by Councilman Bailey. Carried.

Council action: On the advice of the City Attorney, the second Resolution, making certain environmental findings, was adopted first, as follows:

Motion by Councilman Lessenevitch, second by Councilman Bailey, to adopt the Mitigated Negative Declaration and adopt "**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS IN CONNECTION WITH THE 512-BED EXPANSION OF THE CALIFORNIA CITY CORRECTIONAL CENTER.**" Roll

Call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

Motion by Councilman Lessenevitch, second by Councilman Bailey, to approve the Amendment to Conditional Use Permit-Amendment to allow a 512-bed expansion to the original CUP, by adopting **"A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT NO. 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTION CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER."** Roll call vote as follows:

| | |
|---|---|
| **AYES:** | Council members Bailey, Dempsey, Eddington, Lessenevitch, Adams. |
| **NAYS:** | None |
| **ABSENT:** | None |

**CONTINUED BUSINESS:** None

**NEW BUSINESS:**

**NB 1.** Council members consider making appointments for Vice Mayor, as well as appointments to various boards and commissions:

Councilman Lessenevitch suggested they review the whole list and vote the appointments as decided by a single vote at the end. Mayor Adams said he had no problem with that approach, but asked that the position of Vice Mayor be settled first and separately. He asked that the position return to its historical roots where the Vice Mayor serves for one year only, with the position rotating through the Council so everyone has an opportunity to be Vice Mayor for one year out of their four-year term.

Councilman Lessenevitch nominated Harry Bailey for Vice Mayor, second by Councilman Dempsey. Carried.

The balance of the list was determined as follows:

| | |
|---|---|
| **KernCOG:** | Councilman Lessenevitch; alternate is Councilman Eddington. |
| **KCAC:** | Councilman Eddington. |
| **KCBOT:** | (appointed by supervisors) |
| **League of Cities:** | Councilman Dempsey |
| **KCEDC:** | Councilman Dempsey |

# NOTICE OF PUBLIC HEARING

**NOTICE IS HEREBY GIVEN** that the City Council of the City of California City will hold a **PUBLIC HEARING** on Tuesday, December 1, 1998, for the purpose of Adopting a Mitigated Negative Declaration of Environmental Impact and to consider a Conditional Use Permit Amendment (CUP-A) Application No. 98-02, for a proposed 512-bed expansion at the California City Correctional Center.

**ALL INTERESTED PARTIES** are invited to attend and express opinions and commentary on the above-calendared matter

**DATE:** Tuesday, December 1, 1998
**TIME:** 6:00 p.m. or as soon thereafter as possible
**PLACE:** City Council Chambers, City Hall, 21000 Hacienda Blvd., Calif. City

**DATED:** November 16, 1998

Helen Dennis

Helen Dennis, City Clerk

**AFFIDAVIT OF POSTING:**
**I, Helen Dennis, City Clerk of California City** do hereby attest that I caused this Notice of Public Hearing to be posted on Tuesday, November 17, 1998 on all official City bulletin boards, and that said Notice was published in the Mojave Desert News, a newspaper of general circulation within California City, on Thursday, October 29, 1998.

Helen Dennis

Helen Dennis, City Clerk

**NOTICE OF INTENT TO ADOPT MITIGATED NEGATIVE DECLARATION (MND), AND NOTICE OF PUBLIC HEARING TO CONSIDER CONDITIONAL USE PERMIT-AMENDMENT 98-02 FOR PROPOSED 512-BED EXPANSION AT CALIFORNIA CITY CORRECTIONAL CENTER BY CORRECTIONS CORPORATION OF AMERICA (CCA) BY CITY OF CALIFORNIA CITY PLANNING COMMISSION AND CITY COUNCIL**

NOTICE IS HEREBY GIVEN that two public hearings will be held in the Council Chambers of City Hall, 21000 Hacienda Boulevard, California City, California, to consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 for the proposed 512-bed expansion at Corrections Corporation of America's California City Correctional Center, located at 22844 Virginia Boulevard, California City, CA.

Public hearing dates are:

Tuesday, November 24, 1998, 6:00 p.m. - Planning Commission

Tuesday, December 1, 1998, 6:00 p.m. - City Council

This Public Hearing will be necessary depending upon the action of the Planning Commission on November 24, 1998.

NOTICE IS FURTHER GIVEN that the City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The initial study was undertaken for the purpose of deciding whether the proposed project may have a significant effect on the environment. The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. A proposed Mitigated Negative Declaration has been prepared and is available for public review at City Hall, 21000 Hacienda Boulevard, California City, from 8 a.m. to 5 p.m., Monday through Friday. The required public comment period begins on October 29, 1998 and ends on November 17, 1998 at 5:00 p.m. Written comments on the proposed MND should be addressed to Mike Shahbakhti at City Hall. Publication in a local newspaper satisfies notification requirements under PUB. RES. CODE ("PRC") Section 21092 (b) (3) and CEQA Guideline Section 15072 (b) (1).

DATED: October 26, 1998

/s/Terry Hicks
Terry Hicks
Interim City Manager

Published in The Mojave Desert News
October 29, 1998

# PLANNING COMMISSION

Meeting Date: November 24, 1998

**DATE OF PREPARATION:** November 17, 1998

**TO:** Planning Commission
**FROM:** Planning Director

**SUBJECT:** Consider Conditional Use Permit-Amendment 98-02 to Conditional Use Permit 97-01 and Mitigated Negative Declaration for the Proposed 512-Bed Expansion at Corrections Corporation of America's California City Correctional Center.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**BACKGROUND:**

On January 15, 1998 the Planning Commission approved Conditional Use Permit 97-01 and certified the Draft Environmental Impact Report (EIR) Supplement for the 2,304-bed Corrections Corporation of America's (CCA) California City Correctional Center, located at 22844 Virginia Boulevard, California City.

Staff has received an application from CCA to consider Conditional Use Permit-Amendment 98-02 for the proposed additional 512 beds.

The proposed expansion is entirely within the fenced and graded portion of the 2,304-bed CCA Facility, which was previously approved in January of this year following a lengthy environmental review process and preparation of an Environmental Impact Report. The proposed Mitigated Negative Declaration was available for public review at City Hall from October 29, 1998 and the review period ended on November 17, 1998. Staff published a notice of public hearing in the local newspaper. Notice of Preparation letters were sent certified return receipt requested to 33 affected property owners on October 28, 1998. The same letter was sent first class to 13 public agencies on October 27, 1998. One response letter, generally supporting the proposed prison expansion was received at the Planning Department on November 10, 1998.



PH 2.

The Planning Commission shall review the information, receive pertinent evidence and testimony, make required findings, and approve, modify and approve or deny the application. If approved, the Planning Commission shall adopt resolution(s) setting forth its findings and conditions of approval within thirty (30) days following the closing of the public hearing. The use permit becomes effective when granted by resolution of the Council.

Staff has reviewed the information submitted by the applicant and the Mitigated Negative Declaration (MND) prepared by Rust Environment and Infrastructure, and finds that the use complies with the provisions of the Zoning Regulations and The Municipal Code. Of particular note is the following findings:

1. That the operation of a prison facility is in accordance with the objective of Article 4 of the Zoning Regulations, and the purposes of the Residential/Agricultural District.
2. That the prison facility use complies with the applicable provisions of Title 9, Chapter 2 of the Municipal Code.
3. That the Conditional Use Permit-Amendment 98-02 and the Proposed Mitigated Negative Declaration appears adequate and in compliance with CEQA for the proposed 512-bed prison project expansion.
4. That the Mitigation Monitoring Program is being enforced.
5. Buildings must be connected to all utilities (electricity, water, sewer, natural gas, telephone, cable, etc.).
6. Site Plan Review for the project will be in accordance with Ordinance No. 95-506 and to the satisfaction of the City Engineer.
7. All provisions of the California City Municipal Code currently in effect must be complied with.

CUP-A 98-02
November 24, 1998

**RECOMMENDATION:**
The Planning Commission conduct the public hearing and consider the attached resolution(s) which would make findings and set conditions for the adoption of the Mitigated Negative Declaration (MND) and approval of Conditional Use Permit-Amendment 98-02. Direct the Planning Director to pass the resolution(s) onto the City Council for its consideration and approval.

**SOURCE OF FUNDING:** N/A.

**ENVIRONMENTAL ACTION:** The City of California City has undertaken and completed an Initial Study of the proposed Conditional Use Permit-Amendment 98-02 request in accordance with the provisions of the California Environmental Quality Act (CEQA) and the Guidelines for Implementation of CEQA which have been adopted by the California Resources Agency. The initial study was undertaken for the purpose of deciding whether the proposed project may have a significant affect on the environment.

Attachments:
1. CUP-A 98-02 Application w/Environmental Information Form
2. Proposed Mitigated Negative Declaration
3. Public Hearing Notice
4. Letter to public agencies and property owners
5. Mailing List
6. Communications: Mr. and Mrs. Richard Manuell
7. Resolution(s)

# RESOLUTION NO. 11-98-02

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT-- AMENDMENT 98-02)**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**Section 1. Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America (CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee filed an application to expand the permitted use by 512 beds. This resolution sets forth the Commission's decision on the application.

**Section 2. Findings**

The Commission finds as follows:

(a) Operation of a prison facility is in accordance with the general plan and the objectives of the Zoning Regulations;

(b) Facility complies with the applicable provisions of the Municipal Code; and

(c) A Mitigated Negative Declaration for the proposal will satisfy California Environmental Quality Act (CEQA).

# ATTACHMENT E

ATTACHMENT E

# Addendum No. 1 to California City Prison Project Final Subsequent Environmental Impact Report

Lead Agency:

**City of California City**
21000 Hacienda Boulevard
California City, CA 93505
(760) 373-8661

Project Applicant:

**Corrections Corporation of America**
10 Burton Hills Boulevard
Nashville, TN 37215

December 2009

Prepared by

CH2MHILL
1000 Wilshire Boulevard, 21st Floor
Los Angeles, CA 90017

# Contents


| Section | | | | Page |
|---|---|---|---|---|
| 1 | Introduction | | | 1-1 |
| | 1.1 | Purpose of this Addendum | | 1-1 |
| | | 1.1.1 | CEQA Requirements | 1-1 |
| | 1.2 | Overview of the Environmental Review Process | | 1-3 |
| | | 1.2.1 | Subsequent Environmental Impact Report (Subsequent EIR) | 1-3 |
| 2 | Description of Project Changes | | | 2-1 |
| | 2.1 | Project Location and Setting | | 2-1 |
| | 2.2 | Proposed Changes to the Project Description | | 2-3 |
| 3 | Environmental Impact Analysis | | | 3-1 |
| | 3.1 | Land Use | | 3-1 |
| | 3.2 | Aesthetic and Visual Considerations | | 3-1 |
| | 3.3 | Employment, Population, and Housing | | 3-2 |
| | | 3.3.1 | Impacts | 3-2 |
| | | 3.3.2 | Mitigation Measures | 3-3 |
| | 3.4 | Public Utilities and Community Services | | 3-3 |
| | | 3.4.1 | Law Enforcement | 3-3 |
| | | 3.4.2 | Fire Protection | 3-3 |
| | | 3.4.3 | Schools | 3-4 |
| | | 3.4.4 | Hospitals | 3-4 |
| | | 3.4.5 | Judicial Services | 3-4 |
| | | 3.4.6 | Water Supply | 3-5 |
| | | 3.4.7 | Wastewater Treatment and Disposal | 3-5 |
| | | 3.4.8 | Solid Waste | 3-5 |
| | | 3.4.9 | Energy | 3-6 |
| | | 3.4.10 | Telephone and Cable | 3-6 |
| | 3.5 | Transportation | | 3-6 |
| | | 3.5.1 | Construction Impacts | 3-6 |
| | | 3.5.2 | Operation Impacts | 3-6 |
| | 3.6 | Air Quality | | 3-7 |
| | | 3.6.1 | Construction Impacts | 3-8 |
| | | 3.6.2 | Operation Impacts | 3-9 |
| | 3.7 | Noise | | 3-10 |
| | 3.8 | Hydrology, Storm Drainage, and Flood Control | | 3-11 |
| | 3.9 | Biological Resources | | 3-11 |
| | | 3.9.1 | Environmental Setting | 3-12 |
| | | 3.9.2 | Environmental Impacts | 3-13 |
| | 3.10 | Cultural Resources | | 3-15 |
| | 3.11 | Cumulative Impacts | | 3-15 |
| | 3.12 | Environmental Impact Analysis Conclusions | | 3-15 |

**Figures**

1 Project Option ........ 2-2
2 Corrections Corporation of America Revised Project ........ 2-4

**Tables**

AAQS, Designation Classification, and Monitoring Values[1] ........ 3-7

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 62 of 161

# Acronyms and Abbreviations

| | |
|---|---|
| AAQS | Ambient Air Quality Standards |
| ARB | Air Resources Board |
| BMP | best management practice |
| CAAQS | California Ambient Air Quality Standards |
| CCA | Corrections Corporation of America |
| CCCF | California City Correctional Facility |
| CCFD | California City Fire Department |
| CCPD | California City Police Department |
| CDCR | California Department of Corrections and Rehabilitation |
| CDFG | California Department of Fish and Game |
| CEQA | California Environmental Quality Act |
| CESA | California Endangered Species Act |
| CNDDB | California Natural Diversity Database |
| CO | carbon monoxide |
| ESA | Endangered Species Act |
| gpid | gallons per inmate per day |
| gpm | gallons per minute |
| HCP | Habitat Conservation Plan |
| LOS | level of service |
| MBTA | Migratory Bird Treaty Act |
| MUSD | Mojave Unified School District |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | nitrogen oxide |
| NPDES | National Pollutant Discharge Elimination System |
| OHV | off-highway vehicle |
| OHWM | Ordinary High Water Mark |
| $PM_{10}$ | particulate matter less than 10 micrometers in aerodynamic diameter |

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 63 of 161

| | |
|---|---|
| $PM_{2.5}$ | particulate matter less than 2.5 micrometers in aerodynamic diameter |
| ppm | parts per million |
| RFP | Request for Proposal |
| SCE | Southern California Edison Company |
| $SO_2$ | sulfur dioxide |
| Subsequent EIR | Subsequent Environmental Impact Report |
| USFWS | U.S. Fish and Wildlife Service |
| VMT | vehicle miles traveled |

SECTION 1

# Introduction

This document is Addendum Number 1 to the certified 2006 Final Subsequent Environmental Impact Report (Subsequent EIR) for the California City Prison Project, dated November 2006 (State Clearinghouse No. 2006071009). This addendum provides an evaluation of proposed revisions to one of the two project options evaluated in the Subsequent EIR.

## 1.1 Purpose of this Addendum

The purpose of Addendum No. 1 is to address the potential environmental effects of the increased capacity of the 2,200-bed correctional facility described in Section 2, and to determine whether the findings associated with the California City Prison Project Subsequent EIR remain valid in light of the revision to the Proposed Project and the Project Option. To the extent that these changes may constitute additional information that was not previously anticipated or analyzed in the Subsequent EIR, the City of California City Planning Department determined such changes should be addressed in an Addendum (No. 1) to the Subsequent EIR. This method of documentation presents a clear and informative document to specifically outline the subsequent changes to the project, and mitigation measures, as it was presented to the Planning Commission in the Subsequent EIR.

The project revisions assessed in Addendum No. 1 do not change the basic objectives for the project and do not substantially change the conclusions of the environmental analysis as stated in the Subsequent EIR. The revisions to the project do not raise any new significant environmental impacts that were not previously identified in the Subsequent EIR.

### 1.1.1 CEQA Requirements

Prepared in accordance with the California Environmental Quality Act (CEQA) (PRC 21000 et seq.) and the Guidelines for Implementation of the California Environmental Quality Act, as amended, this Addendum summarizes minor revisions associated with a project analyzed in the Subsequent EIR. Section No. 15164 of the CEQA Guidelines provides the following directions for the preparation of an Addendum:

(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR [...] have occurred;...

(c) An addendum need not be circulated for public review but can be included in or attached to the final EIR [...];

(d) The decision-making body shall consider the addendum with the final EIR [...] prior to making a decision on the project.

(e) A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's findings required on the project, or elsewhere in the record. The explanation must be supported by substantial evidence.

The relevant conditions described in Section 15162 indicate that:

(a) When an EIR has been certified [...], no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in light of the whole record, one or more of the following:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR [...] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR ... due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete [...], shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR [...];

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

As discussed in Chapter 2 of this Addendum, project impacts resulting from changes to the project are not substantially different from those assessed in the Subsequent EIR. In all respects, the proposed changes result in impacts that would be the same, more beneficial to the environment, or would further reduce the level of impact to levels below significance.

Regarding Section 15162 (a)(1) above, revisions to the project as described in Chapter 2 of this Addendum are not considered substantial and do not require major revisions to the Subsequent EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

Regarding Section 15162 (a)(3) above, there has been no new information of substantial importance that has come to light since the certification of the EIR. More specifically,

(A) The information in this Addendum does not reveal a new significant environmental effect not discussed in the previous EIR;

(B) The information in the Addendum does not reveal that a substantial increase in the severity of an environmental impact would result.

(C) & (D) The information in the Addendum does not reveal feasible mitigation measures or alternatives different from others previously analyzed that would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it.

A lead agency may not prepare a Subsequent EIR unless any of the conditions identified in CEQA Guidelines §15162 are found to exist. As discussed previously, none of those conditions has been met and, therefore, no Subsequent EIR can be required. Consequently, an Addendum is considered the appropriate document to discuss the environmental implications of the Revised Project. Nonetheless, CEQA requires that the lead agency support this determination with substantial evidence in the record. This Addendum serves as that vehicle, and a review of its contents substantiates the conclusion that the information provided herein merely updates, clarifies, and amplifies the information provided in the Subsequent EIR for the California City Prison Project.

## 1.2 Overview of the Environmental Review Process

### 1.2.1 Subsequent Environmental Impact Report (Subsequent EIR)

Under CEQA Guidelines, Section 15162, the lead or responsible agency may choose to prepare a Subsequent EIR if, following circulation of a previous EIR, the lead agency determines that there are substantial changes proposed in the project, substantial changes occur with respect to the circumstances under which the project is undertaken, or there is new information of substantial importance that would result in new significant effects or significantly greater impacts than previously disclosed.

In 2006, the lead agency for the project, the City of California City, determined that a Subsequent EIR should be prepared to evaluate an additional portion of the Virginia Boulevard site for construction and operation of a smaller prison facility than that proposed in the previous 1994 EIR. Specifically, the Subsequent EIR contained a co-equal level of environmental analysis for two projects: a 550-bed Modified Community Corrections Center in response to a solicitation from California Department of Corrections and Rehabilitation (CDCR); and a 1,596-bed detention center to meet federal detention needs.

The Subsequent EIR required only information necessary to make the previous EIR adequate for the current project. Therefore, the 1994 certified EIR (SCH No. 93082030) and the Subsequent EIR (SCH No. 2006071009) are incorporated by reference into this Addendum. The California City Planning Commission certified the Subsequent EIR in November 2006.

SECTION 2

# Description of Project Changes

## 2.1 Project Location and Setting

Figure 2-1 shows the project site, which is located in the City of California City, Kern County, California, approximately 0.5 mile south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The project site elevation is roughly 2,540 feet above mean sea level, approximately 5 miles east of downtown California City. The property and most of the vicinity are composed of vacant undeveloped desert land, characterized by creosote bush vegetation. The project site is adjacent to the existing California City Correctional Facility (CCCF) and, as such, the project site is served by public utilities. The CCCF is the only property within 0.5 mile that contains any significant structural improvements. Detailed information on the regional setting is set forth in the Subsequent EIR.

The certified Subsequent EIR evaluated two project options: (1) a 550-bed *Proposed Project* to respond to CDCR Male Bed Expansion Request for Proposal (RFP) Number 050271; and (2) a 1,596-bed *Project Option* to meet to federal demands for detention space in the event that the CDCR contract for the 550-bed facility was not awarded.

If Corrections Corporation of America (CCA) had implemented the 2006 Proposed Project, CCA would have constructed and operated a 550-bed Modified Community Corrections Center on approximately 35 acres located at the southwestern corner of the 320-acre Virginia Boulevard site. The Proposed Project would have been a state-of-the-art, secure correctional facility designed to meet American Correctional Association standards with several facilities including a 125,790-square-foot main building, an outdoor recreation area, an armory for storing weapons and riot gear, a perimeter compound security system, and site improvements including a parking lot for 177 vehicles, an access road, and petroleum-powered generators.

The 2006 Project Option was a 1,596-bed detention center CCA proposed to design, construct, and manage to meet federal demands for detention space. Like the Proposed Project, CCA proposed the Project Option on the same 35-acre section of the 320-acre Virginia Boulevard site, and intended to design the facility to meet American Correctional Association standards. Unlike the previous CDCR proposal, CCA intended the Project Option to accommodate federal prisoners and detainees in a medium-security facility. Figure 1 shows a conceptual site plan of the prison.

It is noteworthy that the Subsequent EIR contained a co-equal and detailed environmental impact analyses for both the 550-bed CDCR Modified Community Correctional Center for State of California inmates and a 1,596-bed detection center intended for federal inmates or detainees. Because the 1,596-bed Project Option had more significant impacts identified than the 550-bed Proposed Project, this Addendum describes and evaluates the 2,200-bed Revised Project in relation to the 1,596-bed detention center.




**FIGURE 1**
Project Option
Conceptual Site Plan
*California City, California*

SCO345802.ED.02 conceptsiteplan_rev.ai 12/09

The 1,596-bed Project Option evaluated in the Subsequent EIR included a state-of-the-art secure correctional facility consisting of the following:

- Secure inmate housing buildings equipped with staff and inmate support facilities, and a central, linear courtyard containing five partially covered recreation areas for inmate recreation activities.
- An administration building composed of offices for prison management, support staff, and support spaces for correctional officers. An armory, containing weapons and riot gear, would be located in a secure portion of the administration building (CCA correctional officers do not carry weapons as part of normal operations).
- With the exception of the outside administration building, all improvements described previously would be located within a perimeter compound security system that would include two rows of chain-link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system and nighttime security lights on 30-foot-tall posts. To facilitate security patrols, a perimeter road would encompass the exterior of the entire fenced prison compound.
- Site improvements located external to the secured inmate housing would include an extension of the existing parking lot for the adjacent CCCF to accommodate an additional 285 employee and visitor vehicles.

## 2.2 Proposed Changes to the Project Description

As stated previously, the proposed revisions to the Project Option, as defined and analyzed in the Subsequent EIR, do not materially change the objectives or general development pattern for the project site.

Since certification of the Subsequent EIR, CCA is proposing a design revision to accommodate an additional 604 beds—totaling 2,200 beds. The proposed change is necessary to meet CCA's needs for new potential business opportunities with federal and other correctional agencies. CCA proposes to construct and operate a similar correctional facility on the same 35 acres of vacant land on the 320-acre Virginia Boulevard site. Like the Project Option design, the Revised Project design includes several single-story and single-story-with-mezzanine buildings, with heights of 20 to 40 feet, intended to accommodate federal prisoners and detainees. The Revised Project will include all of the ancillary facilities listed for the Project Option described previously. A significant design change is in the secure inmate housing area. Where the 2006 Project Option had mostly double-bunk hard-wall cells, the Revised Project would include a mix of dormitory-style housing units and cells. To accommodate various potential federal clients, the Revised Project would also have expanded administrative facilities for inmate programs and agency management, and an additional 120 parking spaces. Figure 2 shows a conceptual site plan of the Revised Project.




FIGURE 2
Corrections Corporation of America
Revised Project
2200 Bed Correctional Facility
*California City, California*
*December 2009*

0 100 200 300
1" = 200'
N

SCO397014.01.02 CAL CITY SITE PLAN_HALF_12-15-09_2.ai 12/09

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 72 of 161

SECTION 3

# Environmental Impact Analysis

The following discussion examines the environmental impacts of the Revised Project (see Section 2 for a description of revisions to the Project Option). Except where specifically noted, the assessment methodologies are the same as those employed in the Subsequent EIR.

## 3.1 Land Use

The Subsequent EIR identified no adverse land use impacts from construction and operation of the 1,596-bed detention center. A prison would be consistent with the adjacent CCCF and would not affect other adjacent land uses, since all other surrounding parcels are vacant. As noted in the Subsequent EIR, the prison facility could be located in proximity to future residential development, resulting in a potential land use conflict due to air quality, noise, and visual/aesthetic issues. These potential impacts were addressed in the appropriate sections of the Subsequent EIR.

Because the Revised Project will be constructed on the same site as the 2006 Project Option, no adverse impacts to land use are anticipated. The zoning for the project site, unchanged since certification of the Subsequent EIR, allows for governmental or quasi-governmental correction, probation, or prison facilities, and services with a conditional use permit. Because CCA will obtain a conditional use permit for the Revised Project described in this Addendum, the project will be consistent with the zoning and land use designated for the project site. No adverse impacts relative to land use are anticipated from the proposed revisions. As such, the conclusions of the land use analysis in the Subsequent EIR would not be affected.

## 3.2 Aesthetic and Visual Considerations

Similar to the 1,596-bed detention center evaluated in the Subsequent EIR, the Revised Project would impact daytime viewsheds, resulting in degradation of the existing visual character and quality of the project site. Like the 1,596-bed detention center, the Revised Project would also cause nighttime light and glare. The project site is adjacent to vacant undeveloped desert land that has been entitled for residential subdivisions. While there are no immediate plans for construction in these neighboring subdivisions, the Revised Project would subject future residents to direct and unobstructed views of the prison facility.

The 1,596-bed detention center included single-story and single-story-with-mezzanine structures with a building height of 20 to 40 feet (similar to the adjacent CCCF). The Project Option also included mast light posts up to 30 feet in height (similar to the adjacent CCCF). Where feasible, lighting would be shielded and directed downward. Further, the prison buildings would have an exterior finish that would blend with the surrounding natural environment. Because the Project Option would substantially degrade the visual character

and quality of the project site and cause nighttime light and glare, the Subsequent EIR considered these visual impacts significant. The Subsequent EIR contained mitigation measures that (1) restricted mast lighting posts to 30 feet in height and (2) required lighting to be shielded and directed downward to minimize offsite illumination, where applicable, and required by design.

Because the Revised Project does not (1) increase the severity of the previously identified visual and aesthetic impacts, and (2) incorporates the mitigation measures for the 2006 Project Option, no significant effects examined in this Addendum will be substantially more severe or change the conclusions in the Subsequent EIR.

## 3.3 Employment, Population, and Housing

Similar to the project site development options evaluated in the Subsequent EIR, the Revised Project would create employment opportunities that would likely increase population and demand for housing in California City and the surrounding areas.

### 3.3.1 Impacts

#### Employment

The Revised Project would generate approximately 250 temporary construction jobs and approximately 320 full-time permanent positions during facility operations. Approximately 70 percent of the permanent employment opportunities would be for correctional officers; other job opportunities would include medical, education, administrative, trade, and clerical positions. In addition to jobs provided by the prison, the purchase of local goods and services for the prison facility, and by CCA employees individually, would stimulate the local economy, resulting in additional employment opportunities in the region. The additional employment opportunities are considered a beneficial effect of the Revised Project.

#### Population

The Revised Project would have a prison inmate population of 2,200 at full operating capacity. Based on CCA's experience with more than 60 correctional facilities, generally 1 percent of the inmate families and 10 to 15 percent of the prison employees would relocate to the region. For the Revised Project, approximately 20 families may relocate to the project vicinity. The remainder of prison employment and indirect job opportunities from the prison would be filled by the existing population of California City and surrounding communities. Using the California average household size of 2.9 persons per household, the population increase from relocating inmate and employee families may be approximately 135 persons for the Revised Project.

Population growth associated with a prison typically increases demand for public services, such as water and wastewater facilities. As described in Section 3.4 of this Addendum, and consistent with the Subsequent EIR, impacts resulting from population growth would be less than significant.

#### Housing

The vacancy rate in California City and surrounding communities indicates that ample housing is available to accommodate relocation of inmate families and employee families resulting from the Revised Project.

### 3.3.2 Mitigation Measures

No adverse impacts to employment, population, and housing would result from construction and operation of the Revised Project. As such, no mitigation measures are required. The proposed changes to the project will not affect the findings and conclusions of the Subsequent EIR with respect to employment, population, and housing.

## 3.4 Public Utilities and Community Services

Like the 550-bed Proposed Project and 1,596-bed Project Option evaluated in the Subsequent EIR, the Revised Project has the potential to affect public utilities and community services in California City and in surrounding communities. These effects can occur in two primary ways: (1) by increasing the demand for California City services to the Revised Project directly; and (2) by increasing the demand for services in California City and the surrounding communities to accommodate population growth. The Revised Project would directly and indirectly generate significant tax benefits to the City of California City's general revenue fund and regional governments, which would offset the potential costs of community services.

### 3.4.1 Law Enforcement

The Subsequent EIR determined that the Proposed Project or Project Option would cause (1) a slight increase in calls requesting assistance from the California City Police Department (CCPD), and (2) an increase in the demand for law enforcement services due to project-related and indirect population growth. Based on the small number of additional phone calls for service, the Subsequent EIR concluded that significant impacts to CCPD services would not occur and mitigation measures would not be required.

The Revised Project proposes a 604-bed increase in capacity from the Project Option. Compared to the Project Option, the larger Revised Project would generate a slightly higher number of calls to CCPD and possibly an increased demand for law enforcement services due to population growth directly and indirectly related to the project. Despite the potential increase in calls to CCPD and increased demand for law enforcement services due to direct and indirect project-related population growth, the impacts to law enforcement from the Revised Project would remain within the service capability of CCPD and would not be significant; mitigation measures, therefore, would not be required.

### 3.4.2 Fire Protection

The Proposed Project and Project Option analyzed in the Subsequent EIR were designed to comply with all applicable fire building codes, to be equipped with a comprehensive fire suppression system, and to be constructed with primarily noncombustible building materials. The Subsequent EIR determined that the Proposed Project or Project Option may (1) increase demand on the California City Fire Department (CCFD) for fire suppression, fire

prevention, and investigation duties, and (2) increase the demand for fire protection services resulting from project-related and indirect population growth. Based on the design features included in the facility and CCFD's indication that current staffing levels would be able to accommodate the increased duties that may be generated by the project, impacts to CCFD would be less than significant.

Like the projects analyzed in the Subsequent EIR, the Revised Project described in this Addendum will also be designed to comply with applicable fire building codes, equipped with a comprehensive fire suppression system, and constructed primarily with noncombustible building materials. The 604-bed increase proposed in the Revised Project may cause a slightly increased demand on CCFD for fire suppression, fire prevention, and investigation duties, and a slight increase in the demand for fire protection services due to project-related and indirect population growth. Impacts of the Revised Project would not, however, affect the service capability of CCFD or be significant. As such, the conclusions of the fire protection services analysis in the Subsequent EIR would not be affected.

### 3.4.3 Schools

The Subsequent EIR determined that the Proposed Project and Project Option would cause population growth that would affect student enrollment with the Mojave Unified School District (MUSD). However, MUSD has indicated that it would be able to accommodate additional students resulting from the Proposed Project and Project Option without adverse impacts. Further, mitigation for impacts from additional students generated indirectly by the Revised Project would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules. Based on this description, the Subsequent EIR determined that no adverse impacts would occur from the project or from direct or indirect population growth.

Similarly, the Revised Project described in this Addendum may cause increased demand on MUSD to accommodate additional students; however, based on existing MUSD school capacity, impacts of the Revised Project would not be significant.

### 3.4.4 Hospitals

The Subsequent EIR determined that no significant impact to hospital services would occur because (1) both the Proposed Project and Project Option would include medical facilities onsite 24 hours per day, and (2) the number of hospitals available for the community around California City would be able to accommodate project-related direct or indirect population growth. Because the Revised Project also proposes onsite medical facilities available 24 hours per day, no significant or different impacts would occur.

### 3.4.5 Judicial Services

The Subsequent EIR determined that impacts to judicial services would vary based on the contracting agency providing inmates to the proposed facility. The Project Option would have generated up to two court cases per month, while the adjacent CCCF generates only two court cases per year. The impacts on judicial services are fiscal issues and not environmental impacts. Similarly, the Revised Project proposed in this Addendum would

generate two to three court cases per month. Like the Project Option in the Subsequent EIR, environmental impacts resulting from the Revised Project would not be significant.

### 3.4.6 Water Supply

The Subsequent EIR estimated water demand for the Proposed Project and Project Option by calculating the average daily water usage over time at the existing CCCF and dividing that usage by the number of inmates. The data showed that the water demand in a facility such as that described in the Project Option is approximately 230 gallons per inmate per day (gpid), inclusive of prison staff and support services. California City Public Works Department staff indicated that the Project Option could be served from existing City supply and conveyance facilities. The Project Option proposed design features to minimize water use at the proposed prison, including use of low-flow fixtures and drought-tolerant, native landscaping.

The Revised Project includes the following water-conserving features: ultra low-flow showerheads (1.2 gallons per minute [gpm]); 1.28-gallon-per-flush toilets; grey water recycling for toilet flushing and laundry water recycling; and a water management system to provide correctional officers control of the function of the inmate water closets and inmate showers. Solar-powered hot water could be utilized depending on design parameters and local conditions.

These design features are part of the Revised Project, not mitigation measures, and with implementation of these design and operational features, the Revised Project would significantly reduce the anticipated per-inmate water use and related environmental impacts. Therefore, the proposed changes would not affect California City water services, water conservation efforts, or the water conservation impact analysis as presented in the Subsequent EIR.

### 3.4.7 Wastewater Treatment and Disposal

The Subsequent EIR determined that no significant impacts to wastewater treatment and disposal would be anticipated for the Proposed Project or the Project Option. This determination was based on an estimated wastewater flow of 230 gpid, inclusive of all prison staff and support services. The Revised Project described in this Addendum incorporates additional water-conserving features that would also reduce the amount of wastewater generated per inmate (i.e., grey water recycling, laundry water recycling). A reduction in the quantity of wastewater produced by each inmate is a beneficial or reduced impact of the Revised Project compared to the 2006 Proposed Project or the Project Option.

### 3.4.8 Solid Waste

The Subsequent EIR determined that no significant impacts to solid waste disposal would be anticipated for the Proposed Project or the Project Option. Landfill capacity is expected to remain adequate to accommodate the additional waste generated by the Revised Project and associated direct and indirect population growth related to the project. Kern County has seven landfills and additional recycling facilities that are estimated by County staff to have approximately 70 years of operational capacity to manage solid waste generated in Kern County (Ferguson, 2009). No significant impacts related to solid waste disposal would occur

from the Revised Project. As such, the conclusions of the solid waste impact analysis in the Subsequent EIR would not be affected.

### 3.4.9 Energy

The Subsequent EIR determined that no significant impacts to energy would occur from the Proposed Project or the Project Option. Southern California Edison Company (SCE) has indicated that the electrical loads of the Revised Project are within the parameters of projected load growth that SCE is planning to meet in the vicinity. Southern California Gas Company has indicated that it has adequate natural gas supply and facilities to supply the Revised Project. The existing propane tanks on the adjacent CCCF property also have the capacity to serve the Revised Project. No significant impacts related to energy would occur from the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

### 3.4.10 Telephone and Cable

The Subsequent EIR determined that no significant impacts to telephone and cable would be anticipated for the Proposed Project or the Project Option. With regard to telephone service, telephone line improvements previously installed to support the adjacent CCCF would also serve the Revised Project. As such, the conclusions of the public utilities telephone and cable analysis in the Subsequent EIR would not be affected.

## 3.5 Transportation

### 3.5.1 Construction Impacts

The Subsequent EIR determined that construction of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, construction of the 2,200-bed Revised Project would require similar numbers of construction workers and equipment and a similar duration time to the requirements to construct the 1,596-bed Project Option evaluated in the Subsequent EIR. Because the Revised Project would cause similar construction traffic trip generation, including ready-mix concrete truck, tractor trailer, and flatbed truck trips, impacts to traffic and transportation during construction would not be significant, and no additional mitigation measures would be required to address construction of the Revised Project. As such, the conclusions of the transportation project construction impact analysis in the Subsequent EIR would not be affected.

### 3.5.2 Operation Impacts

The Subsequent EIR determined that operation of the 1,596-bed Project Option would not result in any significant impacts to traffic and transportation in the project vicinity. Considering the revisions described in this Addendum, operation of the Revised Project may result in a slight increase in trip generation due to a nominal increase in the number of employees required to operate a prison facility that accommodates an additional 604 beds. Further, additional increases to trip generation may occur as a result of increased inmate visitations, inmate transfers, and deliveries to the 2,200-bed Revised Project facility. Although the Revised Project could result in an incremental increase in traffic in the areas surrounding the prison facility, as explained in the following paragraphs, these impacts to

traffic and transportation would not be significant, and no additional mitigation measures would be required to address operation of the Revised Project.

The 2006 California City Prison Subsequent EIR traffic analysis was based on projected 2008 traffic operations. The projected traffic was based on available field data collected in 2004 and 2006. Those 2004/2006 counts were factored up to 2008 with an assumed 1 percent annual growth factor.

The Caltrans database annual traffic counts for the last 4 years (2004 to 2008) for the two state highways (State Routes [SR] 14 and 58) was reviewed to assess the need for changes in the traffic estimates. The volumes were nearly unchanged where there are common data points. For example, for SR 14, the traffic volumes increased by 1 percent between 2004 and 2005 and have stayed the same for the last 3 years. In other words, the estimates for 2008 were likely higher than actually occurred. Therefore, the projected 2008 volumes are reasonable estimates for 2010 or 2011.

Even if some increase in volume occurred, it would take very high changes in volumes to change the conclusions. Most of the roadway segments would operate at level of service (LOS) A to C. The stated significance threshold value is LOS E, and only one segment (SR 14) is projected to operate at LOS D. It would take increases in background volumes of 60 percent (for the proposed project analysis) or 43 percent (for the Project Option analysis) to reach LOS E. Therefore, the revised project timeline and additional inmate capacity would not result in new or more significant traffic impacts than those analyzed in the Subsequent EIR.

## 3.6 Air Quality

Table 1 in the Air Quality section of the Subsequent EIR showed the latest 3 years available at that time (that is, 2003 through 2005) of the concentrations of criteria pollutants at the nearest monitoring site: the Mojave monitoring station, which is located less than 20 miles southwest of the project site. Table 1 below shows an updated version of Table 1 from the Air Quality section of the Subsequent EIR, with the latest 3 years currently available, 2006 to 2008. Based on the updated monitoring station data (summarized in Table 1), the air quality environmental setting has not experienced meaningful change since the Subsequent EIR was certified.

**TABLE 1**
AAQS, Designation Classification, and Monitoring Values[1]

| | Pollutant | Ozone (ppm) | $PM_{2.5}$ (µg/m3) | | $PM_{10}$ (µg/m3) | | CO (ppm) | | NO2 (ppm) | | $SO_2$ (ppm) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Averaging Period | 8-hr | 24-hr | Annual | 24-hr | Annual | 8-hr | 1-hr | 1-hr | Annual | 1-hr | 3-hr | 24-hr | Annual |
| | CAAQS | 0.070 | * | 12 | 50 | 20 | 9.0 | 20 | 0.25 | * | 0.25 | * | 0.04 | * |
| | NAAQS | 0.08 | 65 | 15 | 150 | 50 | 9 | 35 | * | 0.053 | * | 0.5 | 0.14 | 0.030 |
| Mojave Monitor | 2006 | 0.102 | 21.3 | * | 58 | 19.5 | * | * | * | * | * | * | * | * |
| | 2007 | 0.085 | 21.1 | * | 70 | * | * | * | * | * | * | * | * | * |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 0.103 | 19.1 | * | 145 | 22.4 | * | * | * | * | * | * | * | * |

*An ambient standard has not been established or the pollutant was not monitored at the Mojave monitor.

[1] The monitor data is from the California ARB Web site http://www.arb.ca.gov/adam/cgi-bin/db2www/adamtop4b.d2w/start.

### 3.6.1 Construction Impacts

The Subsequent EIR concluded that potential impacts from construction of the Proposed Project and the Project Option were shown to be less than significant for all pollutants, except for daily emissions of nitrogen oxide (NO2) and particulate matter less than 10 micrometers in aerodynamic diameter ($PM_{10}$). The following best management practices (BMPs) were implemented as mitigation measures to control fugitive $PM_{10}$ during construction:

- Water exposed areas to increase the stability of the soil by increasing moisture content on a continuous basis, or as needed.
- Water soil prior to removal to the depth of the proposed cuts.
- Compact soil following grading to 85 to 95 percent and maintain surfaces.

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications.
- Provide information to construction employees to facilitate carpooling.
- Provide information to construction and operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

To improve the Revised Project's air quality performance during construction including greenhouse gas reductions to meet AB 32 requirements, the Revised Project proposes to incorporate the following:

- Prior to construction, certify that all onsite construction equipment meets the Tier 2 and Tier 3 California Air Resources Board (ARB) certification standards.
- During construction, require all onsite construction equipment to meet the Tier 2 and Tier 3 California ARB certification standards, and that each piece of equipment has proof of certification from the ARB.
- Prior to construction and any land disturbances, require certification that all onsite construction equipment utilizes 20 percent biodiesel fuel.
- During construction, require that all construction equipment utilize 20 percent biodiesel fuel.
- During construction, prohibit the use of portable generators and require that all electrical power be provided by an energy supplier.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction intensity compared to the Project Option. The construction air quality impacts would be similar because the duration and

anticipated equipment mix of construction would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. As such, the conclusions of the project air quality construction impact analysis in the Subsequent EIR would not be affected.

### 3.6.2 Operation Impacts

The Subsequent EIR determined that potential impacts from stationary sources associated with operation of the Project Option would be less than significant. To improve the Revised Project's air quality performance during operation including greenhouse gas reductions to meet AB 32 requirements, the Revised Project would incorporate the following design features to implement energy efficiency and water conservation measures, and programs to reduce vehicle miles traveled (VMT):

- Plumbing measures including ultra low-flow fixtures - 1.2 gpm for showers and 1.28 gallon/flush toilets; implementation of a water management system to reduce waste; high-efficiency gas or propane water heaters (92 percent efficiency condensing type) plus solar hot water; and recycling grey water from showers to water closets and laundry grey water recycling.
- Electrical measures including the use of premium T8 lamps for indoor lighting and an optimized lighting design; and daylight harvesting and automatic networked lighting control systems in dayrooms and dormitories.
- Architectural measures including use of R-28.8 exterior wall insulation and R-30 roof insulation; use of skylights for dayrooms, administrative and other support areas with 54 percent transmittance value to allow daylight harvesting; facility design and implementation may be LEED-certified and may include additional measures to meet LEED certification requirements.
- Kitchen measures including use of variable volume kitchen hoods and more efficient freezers and coolers; use of low-emitting stoves that meet EnergyStar requirements; and implementation of an enhanced onsite recycling /waste reduction/diversion and reuse program.
- Landscape measures including a design and maintenance program that includes drought-resistant and low water use plantings; and use of light-colored/high-albedo materials for paved surfaces including parking lots and walkways.
- Measures to reduce VMT including preferential parking for carpools and vanpools to the facility; bicycle racks and end-of-trip facilities for employees; and onsite lunch services for employees.

The additional operational emissions associated with vehicle exhaust from the Revised Project would also be less than significant for all pollutants except for carbon monoxide (CO), NO2, and $PM_{10}$ emissions, which would remain significant after mitigation. Thus, the conclusions of the operational air quality impact analysis contained in the Subsequent EIR would not change.

### Mitigation

Equipment and vehicle emissions would be mitigated by the following measures:

- Maintain equipment used for construction and operation according to manufacturer's specifications, and ARB-certified as described previously.
- Provide information to construction employees to facilitate carpooling.
- Implement project construction features addressing fuel and electrical energy use.
- Provide information to operational employees to facilitate extended stays in the project vicinity to reduce long-distance commuting.

### Finding

The Revised Project does not substantially increase the significant air quality CO, $PM_{10}$, and NO2 impacts of the 2006 Project Option. Air quality impacts arising from CO, $PM_{10}$, and NO2 emissions during project operation cannot be mitigated to a less-than- significant level. However, changes or alterations have been required in, or incorporated into, the project that substantially lessens the significant environmental effects identified in the Subsequent EIR. This finding would also apply to the Revised Project.

## 3.7 Noise

No sensitive noise receptors are currently located near the Revised Project. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore, the following mitigation measures would be implemented to reduce the noise impacts of construction only in the event that residences are built adjacent to the Revised Project prior to project construction: limit construction activities within 2,000 feet of occupied residences to the hours of 7 a.m. to 8 p.m., Monday through Saturday, with no construction allowed on Sundays or federal holidays; and use properly muffled equipment and trucks.

Prison operation would not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operation. Thus, the conclusions of the Subsequent EIR would not change.

## 3.8 Hydrology, Storm Drainage, and Flood Control

The Revised Project would cover approximately 16 acres with impervious surfaces such as buildings, access roads, and parking areas. By covering approximately 16 acres of vacant desert land, the Revised Project would cause similar stormwater flow from the project site as the 2006 Project Option. Thus, the conclusions of the drainage analysis contained in the Subsequent EIR would not change.

### Mitigation

The following measures were adopted in the prior Subsequent EIR to reduce the potential impacts related to stormwater runoff to a less-than-significant level:

- The project will comply with all applicable requirements of the National Pollutant Discharge Elimination System (NPDES) permit program.
- Unlined ditches or swales that will be allowed to revegetate naturally will be constructed along the perimeter of the project site. Erosion control structures will be constructed to reduce the potential for sedimentation. Most ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to at least one detention basin located on the project site. Other ditches may direct runoff offsite, but the total flow rates leaving the site will be maintained at pre-project levels.
- An unlined stormwater detention basin will be developed onsite to retain a volume of stormwater necessary to (1) control runoff from impervious surfaces, and (2) maintain pre-project levels of surface runoff volumes at the property boundaries. The capacity of the detention basin will be based on calculated stormwater flows above natural conditions, resulting from impervious surfaces of the proposed project. The sizing and design of this detention basin will be reviewed and approved by the California City Engineering Department as part of the final project site plan approval.

## 3.9 Biological Resources

Biologists from CH2M HILL reviewed and updated the evaluation of biological resources provided in the previously certified Subsequent EIR. To complete this updated evaluation of biological resources, CH2M HILL biologists conducted a 1-day site reconnaissance on May 12, 2009, to assess current biological conditions and determine whether significant changes have occurred since the previous biological surveys. The current legal status of biological resources onsite was also verified. In addition, an updated search of the California Natural Diversity Database (CNDDB) was conducted for known records of occurrence of sensitive biological resources on or in the site vicinity of the proposed project. Because CEQA significance criteria for biological resources have not changed since the Subsequent EIR, the impact analysis methodology remains unchanged. Finally, the recommended

biological mitigation measures from the previous Subsequent EIR were reviewed for current applicability.

## 3.9.1 Environmental Setting

### Vegetation and Habitat

The 35-acre study area remains generally unchanged from surveys conducted in July 2006, as reported in the Subsequent EIR, except that off-highway vehicle (OHV) use of the project site has continued to result in habitat degradation. The project site lies just south of existing developed prison facilities, and although undeveloped, shows extensive evidence of off-highway travel by vehicles and motorcycles. Vegetated land is relatively homogeneous, composed of sandy soils with sparse vegetation resembling a creosote bush community. Plant species occurring on the project site include, but are not limited to, creosote bush (*Larrea tridentata*), burro bush (*Ambrosia dumosa*), split grass (*Schismus barbatus*), desert trumpet (*Eriogonum inflatum*), spine flower (*Chorizanthe* sp.), filaree (*Erodium cicutarium*), and fiddleneck (*Amsinckia tessellata*). Other species observed included saltbush (*Atriplex* spp.), annual woollystar (*Eriastrum* spp.), and cheesebush (*Hymenoclea salsola*).

The creosote bush on the project site is highly disturbed from heavy OHV traffic. The area receives intensive use from OHV traffic year-round, but use in this and surrounding areas is reported to be exceptionally high on weekends and holidays. Trails from OHV traffic bisect the landscape, and the proposed project site is not currently fenced or excluded from OHV traffic. The resulting disturbed and degraded landscape does not support high-quality wildlife habitat, as evidenced by the scarcity of tortoise sign on portions of the project site, which might otherwise have supported this species. While creosote bushes remain intact, additional shrub coverage is significantly reduced relative to that of an undisturbed creosote bush community. In addition, the herbaceous plant community, while it could not be assessed during optimal seasonal conditions, is probably also severely degraded.

### Special-status Plants

Consistent with findings in the Subsequent EIR, no state-listed or federally listed rare plants are anticipated in the vicinity of the project site. Conditions for establishment of special-status plant species are unlikely as a result of the lack of suitable conditions, past disturbances, and the naturally sparse nature of the vegetation community at the study area.

### Special-status Wildlife

Conditions for special-status wildlife remain unchanged from the Subsequent EIR, except that OHV use has further degraded the habitat. Because of sparse vegetation providing limited cover and forage within the study area, wildlife diversity and abundance are considered low. Wildlife observed during the survey were consistent with observations during the 2006 survey, consisting of common species typically associated with Mojave desert scrub habitats.

A pair of burrowing owls (*Athene cunicularia*) was observed in the southeastern corner of the parking lot of the existing correctional facility, north of the 35-acre project site. The nest burrow was located on the north side of the berm that runs along the southern perimeter of the parking lot. Although the nest burrow was located on the facility, the owls would be

expected to forage within the proposed project area. No additional nest burrows or burrow complexes were observed on the project site.

The study area does not lie within critical habitat for the desert tortoise. Based on the 2009 surveys, conditions for desert tortoise remain generally unchanged on the proposed project site from the 2006 field surveys, except that OHV use has further degraded the quality of the habitat. Live desert tortoises or their burrows were not observed during the survey on the project site, and there appears to be a relatively low density of sign in the general vicinity of the project site. A higher density of sign occurs in areas surveyed approximately 1 mile east of the 35-acre project site; nevertheless, because habitat is present, and tortoises have been observed in the area, the potential occurrence of desert tortoise cannot be precluded.

#### Regulated Waters

An analysis of all drainages in the vicinity of the proposed project site indicated a general lack of consistent flows or channel-forming events. Most drainages were small, incipient channels that appeared to only infrequently convey flows. Evidence of Ordinary High Water Mark (OHWM), which normally defines waters regulated by either federal or state agencies, was lacking. Evidence of OHWM within drainages normally includes recent evidence of flow showing as erosion, depositional surfaces, bent or scoured vegetation, sediment sorting, cracking, mineral staining, or debris deposits. None of these characteristics is consistently observed within drainages on the project site, and it is anticipated that drainages would not be jurisdictional under federal or state regulations.

In addition, no riparian vegetation, which normally consists of desert wash vegetation in arid regions, was present. Riparian vegetation, with potential to support certain wildlife species, in conjunction with OHWM, is normally a requirement for jurisdictional streambed and bank regulated by the California Department of Fish and Game (CDFG).

### 3.9.2 Environmental Impacts

Based on findings from the updated survey in 2009, the Revised Project causes no new impacts to biological resources and does not substantially increase the severity of the impacts identified in the Subsequent EIR. CEQA significance criteria remain unchanged, and because biological conditions on the project site have not changed substantially since 2006, impacts remain the same. This section provides a summary of those impacts and proposed mitigation measures.

#### General Wildlife and Habitat

The impacts to general wildlife or their habitats would not differ significantly from those described in the Subsequent EIR. This loss of habitat for general wildlife species (not protected or otherwise designated as sensitive) would not be considered significant under CEQA because it is abundant in the area. Established native resident or migratory wildlife corridors as well as nursery sites do not occur onsite and would not be affected by project activities. Joshua trees (*Yucca brevifolia*) and other tree species do not occur onsite and would not be affected by project activities. Wetlands, marshes, ephemeral washes, or riparian areas do not occur onsite and would not be affected by project activities.

### Migratory Birds

Conditions affecting migratory birds protected under the federal Migratory Bird Treaty Act (MBTA) and CDFG Code Section 3513 remain unchanged. The proposed prison structure may attract these species, and operations represent a potential significant impact to migratory birds. Mitigation has been identified in the Subsequent EIR to reduce these impacts to less than significant.

### Special-status Plants

Because project site conditions are not favorable for desert cymopterus or other rare plants, there are no anticipated impacts to this special-status plant species.

### Special-status Wildlife

Like the Proposed Project and Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. However, because the habitat is previously disturbed, and generally of a low quality, the loss of habitat is not likely to cause the population of these species to decrease to less-than-sustainable levels.

Adverse effects may also include injury or death of individual burrowing owls, desert tortoise, or Mohave ground squirrel encountered during project construction, especially during earth-moving activities and when species are underground in burrows. The loss of individuals of these species would be considered a significant impact under CEQA, requiring mitigation, described as follows.

### Habitat Loss

Like the Project Option described in the Subsequent EIR, the Revised Project would disturb 35 acres of habitat for burrowing owl, desert tortoise, and Mojave ground squirrel. In order to comply with the federal Endangered Species Act (ESA) and the California Endangered Species Act (CESA), CCA would be required to obtain necessary approvals and permits with the U.S. Fish and Wildlife Service (USFWS) and CDFG. USFWS requires the submittal of an ESA Section 10(a) permit application and preparation of a Habitat Conservation Plan (HCP) that includes an impact assessment; mitigation measures to avoid or minimize impacts; compensation for any unavoidable impacts; implementation measures; and provisions for any unforeseen circumstances and amendment to the HCP and permits. CDFG requires the submittal of a 2081 permit application and a copy of the HCP.

In 1998, CCA prepared a Supplemental EIR for development of a prison facility (the CCCF). In the course of coordinating with USFWS and CDFG and obtaining appropriate permits for the CCCF, CCA prepared the appropriate ESA and CESA permit applications and HCP for 105 acres, including the 70-acre CCCF site, as well as the 35-acre project site evaluated in the Subsequent EIR and this Addendum. As a result, the Revised Project has the necessary HCP, Incidental Take Permits, and Implementing Agreement in place, as required by USFWS and CDFG. The Revised Project would be required to comply with all mitigation measures of USFWS and CDFG Incidental Take Permits (#PRT-842781 and #2081-1998-17-4, respectively).

### Finding

The Revised Project does not cause new significant impacts or make more severe the significant impacts identified in the Subsequent EIR. The impacts of the Project Option associated with the loss of 35 acres of habitat for burrowing owl, desert tortoise, Mojave ground squirrel cannot be mitigated to a less-than-significant level and similar impacts would occur if the Revised Project were implemented. However, changes or alterations have been required in, or incorporated into, the Subsequent EIR and carried forward in this Addendum that substantially lessen the significant environmental effects identified in the previous EIR. Thus, the conclusions of the Subsequent EIR would not change.

## 3.10 Cultural Resources

A recorded archaeological site is located adjacent to the project site. The potential disturbance of prehistoric material is considered a significant project impact. The mitigation measures contained in the Subsequent EIR would apply to the Revised Project. Thus, the conclusions of the Subsequent EIR would not change.

## 3.11 Cumulative Impacts

The Subsequent EIR identified significant cumulative impact contributions for the Proposed Project and Project Option in the following resource areas.

- Aesthetics and Visual Considerations – Changing the visual character of the project vicinity over time as the urbanized area expands.
- Air Quality – Emitting emissions of CO, NO2, and $PM_{10}$ from construction and operation is considered significant and unavoidable.
- Biological Resources – Loss of habitat for burrowing owl, desert tortoise, and Mohave ground squirrel.

Although the Revised Project increases capacity of the 2006 Project Option by 604 beds, the Revised Project would involve similar construction and operation intensity compared to the Project Option. The construction impacts would be similar because the duration and anticipated equipment mix would be similar to the Project Option. The potential construction impacts, therefore, of the Revised Project would not be measurably greater than those identified in the Subsequent EIR. Revised Project operations would occur on the same 35 acres as the 2006 Project Option. While staffing levels and other operational facets would incrementally increase for the Revised Project as compared to the 2006 Project Option, no additional significant impacts or new impacts not analyzed in the prior EIR would occur. As such, the conclusions of the cumulative impacts analysis in the Subsequent EIR would not be affected.

## 3.12 Environmental Impact Analysis Conclusions

Based on the previously stated information, there are no changes in circumstances that would constitute a substantial change that would require major revisions of the previously

certified Subsequent EIR due to new environmental effects; no increases in severity of previously identified substantial effects would occur; no new information of substantial importance, which was not previously known, shows that the project would have one or more significant effects not discussed in the previously certified Subsequent EIR; no significant effects previously examined would be substantially more severe than shown in the previously certified Subsequent EIR; no mitigation measure or alternative previously found not to be feasible would be feasible and would substantially reduce one or more significant effects; and/or no mitigation measures or alternatives not considered in the previously certified Subsequent EIR would substantially reduce one or more significant effects on the environment.


1149 FT
ROW
VIRGINIA BLVD
KERN COUNTY
ASSESSORS MAP
NO. 350-03
14
11
13
12
NOTES:
1. TOTAL SITE AREA: 35 ACRES
2. ADDITIONAL PARKING SPACES:
- 392 STALLS
- 8 BUS
3. 12-FOOT PERIMETER PATROL ROAD
4. 25-FOOT MAIN ENTRY/EXIT ROAD
5. PROPOSED SITE IS NOT IN DESIGNATED FLOOD PLAIN
1321 FT
MAINT.
STORAGE
PLANT
FOOD SERVICE
SERVICE YARD
MEDICAL
LAUNDRY
STORMWATER DETENTION BASIN
ADMIN BLDG
FIRE HYDRANT APPROXIMATELY 285' FROM ADMIN. BLDG
EXISTING PRISON
EXISTING PARKING LOT
FIRE HYDRANT APPROXIMATELY 285' FROM UNIT 6
STORMWATER FLOWLINE, TYP
0 100 200 300
1" = 200'
N
PROJ # 345802
CORRECTIONS CORPORATION OF AMERICA
2200 BED CORRECTIONAL FACILITY
CALIFORNIA CITY, CA
DECEMBER 2009
CH2MHILL

# ATTACHMENT F

ATTACHMENT F

**RESOLUTION NO. 12-09-2009PC**
**A RESOLUTION OF THE PLANNING COMMISSION**
**OF THE CITY OF CALIFORNIA CITY**
**TO APPROVE CONDITIONAL USE PERMIT (CUP) 09-04**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**SECTION 1. PURPOSE.**

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Sace/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

**WHERE AS**; the property is located in North one-half of Section 13, T32S, R38E, MDB&M, APN 350-031-02.

**WHERE AS**; conditions of approval for the prison as per Exhibit A (2-pages), hereinafter referred to as "prison conditions," were prepared.

**SECTION 2. FINDINGS.**

The Planning Commission finds, determines and declares:

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department

prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2. The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3. CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4. Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide

redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5. If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6. CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7. The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8. CUP 09-04 allows for construction and operation of a 2,200-bed prison facility.

9. There shall be no expiration date associated with CUP 09-04.

10. A mitigation monitoring and reporting plan to document compliance with all mitigation

measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.

**SECTION 3. ENVIRONMENTAL FINDINGS**

An addendum as required by CEQA for the revised project has been conducted and all conclusions of the 2006 Subsequent Environmental Impact Report (EIR) are valid and accurate.

**NOW, THEREFORE, BE IT RESOLVED** that the Planning Commission of the City of California City does hereby approve CUP 09-04, with all conditions of approval as stipulated in Exhibit A, and shall remain in effect for as long as the use is conducted in accordance with the use permit, its stipulations, and is not otherwise in violation of the Zoning Regulations and Municipal Code.

**I HEREBY CERTIFY** that the foregoing resolution was duly passed and adopted by the Planning Commission on the 22nd day of December, 2009.

**AYES:** 4
**NOES:** 0
**ABSENT:** 1
**ABSTAIN:** 0

[signature]
Chairman

**ATTEST:**

[signature]
Recording Secretary

# CCA 2200-Bed Prison
# CUP 09-04

## CONDITIONS OF APPROVAL

## "EXHIBIT A"

The Commission considered and made recommendation for approval of CUP 09-04 for the purpose of constructing and operating a 2200-bed prison facility by Corrections Corporation of America (CCA) on their 320-acre site at 22844 Virginia Boulevard in California City, California in the Open Space/Residential Agricultural (O/RA) zone and the Municipal Code allows a prison with a conditional use permit.

1. CCA shall conduct an economic feasibility study on the viability of continuing operation of the current propane system versus converting to natural gas. Conversion to natural gas would necessarily include extending a high-pressure gas line approximately 4 miles to serve the CCA property, and replacing and recalibrating devices on all existing equipment currently connected to propane. A copy of the feasibility study on the propane system shall be provided to the Planning Department prior to any inmates occupying the new prison. CCA shall have sole discretion to implement the most cost effective means for propane or natural gas delivery for continued operation of the existing facility and development of a new facility such as might be contemplated for the CUP 09-04 subject property, provided delivery of said services is not contradictory with any CUP conditions previously imposed on the subject property.

2. The 2200-bed prison facility shall be connected to City sewer. CCA shall construct a pretreatment station (comminuter/grinder and flow meter) that will be located in a subsurface concrete vault within the unimproved portion of the Virginia Boulevard right-of-way adjacent to the proposed prison. As an alternative, the pretreatment station could be located near the headworks at the City's sanitary treatment facility. The purpose of this grinder is to ensure that any oversized materials entering the wastewater flow from the prison will be shredded and reduced in size before entering the City's wastewater treatment system. This pretreatment station shall be constructed and operational prior to any inmates occupying the prison. CCA's responsibility to construct the pretreatment station will be based on installation of a JWC Environmental Macho Monster Model No. 40000 (or equivalent equipment), bypass equipment and a flowmeter in a subsurface vault for a cost not to exceed $250,000. The long term maintenance and operation of the pretreatment station will be the responsibility of the California City Public Works Department.

3. CCA shall implement a waste food separation system for the prison. The purpose of this system is to reduce the water content and weight of food waste that would be managed as solid waste for disposal at a sanitary landfill.

4. Prior to any inmates occupying the new 2200-bed prison, CCA shall provide a water pump to serve the Phase II area of the City water system. The purpose of this pump is to provide redundancy in the water system for the proposed prison. CCA's responsibility to install the water pump at the existing Phase II pump location will be based on installation of a Worthington pump Model No. 12 M 75 (or equivalent equipment) for a cost not to exceed $40,000.

5. If CCA does not request building permits for the proposed prison within 3 years of approval of CUP 09-04, CCA shall conduct a feasibility study to determine the need for water system upgrades, including pump station, tank or well for the existing water system. Applicant shall forward a copy of the feasibility study to City Planning Department prior to issuance of a building permit if said permit is requested more than 3 years following approval of CUP 09-04.

6. CCA shall participate on a fair-share basis to re-surface Mojave/Randsburg Road from Mendiburu Road to Cemetery (not more than 0.5 miles). Resurfacing shall be limited to scarifying the existing road surface and installation of new asphalt pavement not more than 3-inches thick. CCA shall provide its fair share contribution prior to any inmates occupying the prison. Based on the extensive use of this roadway by City residents and public, CCA's fair share will be based on 2-way split of the costs to install the new pavement on the existing road surface. The 2 entities to equally share the cost will be CCA, and the City of California City. CCA's fair share shall not exceed $100,000.00.

7. The project is within the R2508 Restricted Airspace Complex. An individual Avigation Easement shall be obtained from Edwards Air Force Base prior to construction. All newly constructed lights shall face downward to reduce glare.

8. CUP 09-04 allows for construction and operation of a 2,200-bed prison facility. There shall be no expiration date associated with CUP 09-04.

10. A mitigation monitoring and reporting plan to document compliance with all mitigation measures and permit requirements set forth in the 2006 Subsequent EIR and CUP 09-04 shall be prepared during project design and construction and submitted to the City Planning Department prior to any inmates occupying the 2200-bed prison.
diligently pursued.

# ATTACHMENT G

ATTACHMENT G



Incorporated 1965

City of California City

City Hall

PHONE (760) 373-8661

21000 HACIENDA BLVD. - CALIFORNIA CITY, CALIFORNIA 93505

May 27, 2014

Ms. Deborah Hysen, Deputy Director
Facility Planning, Construction and Management
California Department of Corrections and Rehabilitation
1515 S Street, Suite 502S
Sacramento, CA 95811

Dear Ms. Hysen:

Reference is made to the Lease Agreement made between Corrections Corporation of America ("CCA") and the California Department of Corrections and Rehabilitation ("CDCR"), in which CDCR leases and operates the California City Corrections Center (CCCC), located at 22844 Virginia Boulevard, California City CA 935055.

The Planning Department has completed a review of the land use permitting associate with the CCCC, and this is to notify you that CDCR is authorized and fully permitted to operate 2,560 beds at the CCCC.

We look forward to working with you, and please let me know if I may answer any questions.

Sincerely,

Tom Weil
City Manager

Cc: Brad Wiggins, CCA

# ATTACHMENT H

ATTACHMENT H

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**

# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111 Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal. Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

**Facility:** **CCA- California City Correctional Facility**

**Address:** **22844 Virginia Blvd. California City, Ca.**

**CA State Fire Marshal File #:** **02-15-44-0020**

**Occupancy Classification:** **I-3 (Under CCR Title 24 2013 Edition)**

**Project No. or Name:** **ADA Phase 1 Upgrades (S.S., Dayrooms & Cells)**

**Name and Title of Approving Official:** **George D. Mavrikis, Deputy State Fire Marshal**

**Signature:** **Date:** **May 29, 2014**

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*

**This Certificate Shall Be Filed on Location**

# ATTACHMENT I

ATTACHMENT I

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**Office of the State Fire Marshal**
**Fire & Life Safety Division**

# CERTIFICATE OF OCCUPANCY

This Certificate of Occupancy is issued pursuant to the requirements of the California Building Code Section 111 Inspections required by the California Building Code have been completed and it has been determined that the below referenced facility conforms to the Codes and Standards adopted by the State Fire Marshal. Final approval is hereby granted and the facility may be occupied for the intended use as stated herein.

**Facility:** CCA- California City Correctional Facility

**Address:** 22844 Virginia Blvd. California City, Ca.

**CA State Fire Marshal File #:** 02-15-44-0020

**Occupancy Classification:** I-3 (Under CCR Title 24 2013 Edition)

**Project No. or Name:** ADA Phase 2 Upgrades (Entire Facility)

**Name and Title of Approving Official:** George D. Mavrikis, Deputy State Fire Marshal III Specialist

**Signature:** **Date:** December 11, 2014

*This certificate is valid until one of the following conditions occur: 1) change in the use of the building which would place it in a different occupancy classification, 2) the building becomes vacant for a period in excess of 180 days, or 3) this certificate is otherwise revoked under provisions of the Code.*

**This Certificate Shall Be Filed on Location**

# ATTACHMENT J

ATTACHMENT J

**308.4 Institutional Group I-3.**

Institutional Group I-3 occupancy shall include buildings *or portions of buildings* and structures that are inhabited by *one or* more persons who are under restraint or security. A Group I-3 facility is occupied by persons who are generally incapable of self-preservation due to security measures not under the occupants' control *which includes persons restrained.* This group shall include, but not be limited to, the following:

Correctional centers
*Correctional hospitals*
*Correctional nursing facilities*
*Correctional mental health facilities*
*Correctional treatment centers*
*Courthouse holding facility*
Detention centers
*Detention treatment room*
Jails
*Juvenile halls*
Prerelease centers
Prisons
Reformatories
*Secure interview rooms*
*Temporary holding facility*

Buildings of Group I-3 shall be classified as one of the occupancy conditions specified in Sections 308.4.1 through *308.5.8* and shall comply with Section 408.

**308.4.1 Condition 1.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas, and other spaces where access or occupancy is permitted, to the exterior via means of egress without restraint. A Condition 1 facility is permitted to be constructed as Group R.

**308.4.2 Condition 2.**

This occupancy condition shall include buildings in which free movement is allowed from sleeping areas and any other occupied smoke compartment to one or more other smoke compartments. Egress to the exterior is impeded by locked exits.

**308.4.3 Condition 3.**

This occupancy condition shall include buildings in which free movement is allowed within individual smoke compartments, such as within a residential unit composed of individual sleeping units and group activity spaces, where egress is impeded by remote-controlled release of means of egress from such a smoke compartment to another smoke compartment.

**308.4.4 Condition 4.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Remote-controlled release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

**308.4.5 Condition 5.**

This occupancy condition shall include buildings in which free movement is restricted from an occupied space. Staff-controlled manual release is provided to permit movement from sleeping units, activity spaces and other occupied areas within the smoke compartment to other smoke compartments.

***308.4.6 Condition 6.***

*This occupancy condition shall include buildings containing only one temporary holding facility with six or fewer persons*

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
*Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.*

*under ... building ... throughout with an automatic sprinkler system installed in accordance with Section 903.3.1.1 and where the temporary holding facility is protected throughout with an automatic fire alarm system with notification appliances. A Condition 6 building shall be permitted to be classified as a Group B occupancy.*

**308.4.7 Condition 7.**

*This occupancy condition shall include buildings containing only one temporary holding facility with nine or less persons under restraint or security where limited to the first or second story, provided the building complies with Section 408.1.2.6. A Condition 7 building shall be permitted to be classified as a Group B occupancy.*

**308.4.8 Condition 8.**

*This occupancy condition shall include buildings containing not more than four secure interview rooms located within the same fire area where not more than six occupants under restraint are located in the same fire area. A Condition 8 building shall be is permitted to be classified as a Group B occupancy, provided the requirements in Section 408.1.2.7 are met.*

**308.4.9 Condition 9.**

*This occupancy condition shall include buildings where the use of the building is for correctional medical care or correctional mental health care.*

Copyright © 2025 International Code Council, Inc., or its licensors (ALL RIGHTS RESERVED).
*Accessed by Michael Giardina on 10/17/2025 pursuant to License Agreement with ICC. No further reproduction or distribution authorized. Any Unauthorized reproduction or distribution is a violation of the federal copyright, and subject to civil and criminal penalties thereunder.*

PDF from: http://codes.iccsafe.org/content/CABC2022P4/chapter-3-occupancy-classification-and-use#CABC2022P4_Ch03_Sec308.4

# ATTACHMENT K

ATTACHMENT K

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY
DEPARTMENT OF FORESTRY AND FIRE PROTECTION
**OFFICE OF THE STATE FIRE MARSHAL**
FIRE AND LIFE SAFETY DIVISION
**INSPECTION REPORT**
EN-02 (12/08)

## INSPECTION REPORT

| | | | |
|---|---|---|---|
| FILE NUMBER<br>**02-15-44-0020** | | PAGE **01** | OF PAGE **01** |
| NAME OF FACILITY<br>**CCA- California City Correctional Facility- California City (Kern County)** | | HOURS | MINUTES |
| NAME OF BUILDING<br>***Project # I-000803*** | | | |
| ADDRESS<br>**22844 Virginia Blvd. California City, Ca.** | | | |
| DISCUSSED WITH<br>**Gary Stowers** | TITLE<br>***CSII / IWL*** | | |
| ACCOMPANIED BY<br>**Mike Mejia** | TITLE<br>**CDCR Fire Captain** | | |

On August 18, 2014, a final inspection was conducted of the above mention facility, Accompanied by Gary Stowers – CSI-2, Randy Monette-CSI, David Silva-CSI, Mike Mejia-CDCR Fire Captain.
The following Projects was noted:

2014-01 – HVAC for Room B103
2014-02 – Yard Toilets, Lavatories & drinking fountains
2014-03 – Trunk Radio, Trailer, Tower & Infrastructure
2014-04 – Exercise Yard Fencing & Gates (Main Yard)
2014-07 – Administrative Segregation Unit Modification
201408 – Change Glazing in AD Seg. Exterior Windows.

## ~ A Final & a Grant of Occupancy is issued on today's Date ~

###

| | |
|---|---|
| RECEIVED BY | DATE<br>***August 18, 2014*** |
| DEPUTY STATE FIRE MARSHAL<br>***George D. Mavrikis*** | DATE OF INSPECTION<br>***August 18, 2014*** |

# ATTACHMENT L

ATTACHMENT L

# Certificate of Occupancy

## California City Building Department

*This Certificate issued pursuant to the requirements of Section 109 of the California Building Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the City regulating building construction or use for the following:*

## Corrections Corporation of America

Use Classification: I1 Occupancy Group: B Type of Construction: V Permit No. 15990

Use Zone: Building Address: 22844 Virginia Blvd.

Locality : **California City** Final Date: **1/31/17**

1/31/17

Joe Barragan

1/31/17
Date

# ATTACHMENT M

ATTACHMENT M

KERN COUNTY Assessor Recorder

# Assessor Property Search - Property Details

Note: You are not currently in a decline in value status.

## General Property Information

| | | | |
|---|---|---|---|
| **ATN** | 350-031-28-00-0 | **Status** | Active |
| **Parcel Num.** | 350-031-28-2 | View Assessor's Parcel Map | View GIS Map |
| **Site Addr.** | 22844 VIRGINIA BL CALIFORNIA CITY | | |
| **Legal** | PARCEL MAP 12374 LOT 1 | | |
| **Acres** | 61.19 | | |
| **Use Code** | 1716 - DETENTION FACILITY/PRISON | | |
| **Prior APN(s)** | 350-031-02 | | |
| **Supervisorial District** | 2 - Chris Parlier | | |

## Property Characteristics

| | |
|---|---|
| **No. of Buildings** | 6 |
| **Total No. of Units** | 0 |
| **Total Sq. Ft. of All Buildings** | 510980 |
| **Has Parking Lot** | No |
| **Has Parking Structure** | No |
| **Yard Improvements** | |
| **Building #1** | |
| **Year Built** | 1999 |
| **No. of Stories** | 2 |
| **Construction Type** | S |
| **Roof Cover Type** | Hot Mop |
| **Roof Type** | Flat |
| **Heating Type** | Electricity |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 501208 |
| **Total Building Area (Sq. Ft.)** | 501208 |
| **Building #2** | |
| **Year Built** | 2008 |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 1200 |
| **Total Building Area (Sq. Ft.)** | 1200 |
| **Building #3** | |
| **Year Built** | 2008 |
| **Quality** | Average |
| **Construction Type** | S |
| **Has Escalators** | No |
| **Rentable Area (Sq. Ft.)** | 4000 |
| **Total Building Area (Sq. Ft.)** | 4000 |

| Building #4 | |
|---|---|
| No. of Stories | 2 |
| Has Escalators | No |
| **Building #5** | |
| Year Built | 2013 |
| Construction Type | S |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2340 |
| Total Building Area (Sq. Ft.) | 2340 |
| **Building #6** | |
| Year Built | 2013 |
| Has Escalators | No |
| Rentable Area (Sq. Ft.) | 2232 |
| Total Building Area (Sq. Ft.) | 2232 |

| Current tax roll values that are used to calculate the bills due in December 2025 and April 2026 | |
|---|---|
| Land Value | $532,121 |
| Mineral Value | $0 |
| Improvement Value | $162,120,561 |
| Other Improvements | $1,084,566 |
| Personal Property Value | $2,638,655 |
| Total | $166,375,903 |
| Less Exemption Value | $0 |
| Net Total Taxable Value | $166,375,903 |
| Tax Rate Area | 011-010 - CALIFORNIA CITY INSIDE-MOJAVE |

## Tax Bill Information

Current Year Billing in progress, bill information will be available in September.

Go to prior year tax information on Kern County Treasurer-Tax Collector's website

## INFORMATION FOR PROPERTY OWNER

### Overview

Pursuant to California Revenue & Taxation Code § 619 and § 621, this notice informs you of THE TAXABLE VALUE of your property. It also serves to inform you of your opportunity to request reconsideration of our findings or to file an assessment appeal. If you believe that your property is worth less than the indicated amount, you may discuss the matter with the Assessor's staff by calling (661)-868-3485. Decline-in-value review requests are taken between July 2 and November 30. For details, visit the Decline-in-Value Review (Proposition 8) page

If you and the County Assessor cannot agree on the assessed value, you may appeal the assessment to the Assessment Appeals Board. Applications are accepted between July 2 and November 30, and are processed by the Clerk of the Assessment Appeal Board, located at the County Administration Center, 5th floor, 1115 Truxtun Avenue, Bakersfield, California 93301. For more information, visit the Assessment Appeals page

Revenue and Taxation Code § 1607 provides that the taxpayer need not attend the scheduled equalization hearing and testify to the property's value. If an agreement can be reached with the Assessor, the applicant or applicant's agent may sign a written stipulation setting forth the facts upon which a reduction in value is premised. The Board can either accept the stipulation or reject it and set a new hearing date.

**How and when property is assessed**

Article XIIIA of the California Constitution provides that property shall be taxed in proportion to its value. In part:

- Property is appraised at its 1975-76 market value unless it has been sold, newly constructed, or had a change in ownership after March 1, 1975.
- Property transferred after March 1, 1975 will have a new base year market value established as of the date of the change in ownership.
- New construction will be assessed at market value and added to the base year value as of its date of completion.
- The base year value is subject to an annual rate of inflation not to exceed 2 percent increase per year.
- The taxable value of real property on the local roll shall be the lesser of: (a) factored base year value, (b) current market value, or (c) the value of the property if it was damaged or destroyed by calamity pursuant to Revenue and Taxation Code § 170

A copy of the local assessment roll is available for public inspection during regular office hours (8-5) Monday through Friday in the Assessor's Office at 1115 Truxtun Ave, 2nd floor.

ATTACHMENT N

ATTACHMENT N

**From:** "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:** 08/14/2025 2:37:30 PM (-07:00)
**To:** "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Cc:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Anu Doravari" <adoravari@californiacity-ca.gov>; "Stone, Stacey" <Stacey.Stone@corecivic.com>; "Malloy, John" <John.Malloy@corecivic.com>; "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Wiggins, Brad" <Brad.Wiggins@corecivic.com>
**Subject:** RE: Open Permits

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon Marcelo,

That is correct. Per our conversation the only "open" permits we have would only be for mild modifications/repairs. A certificate of occupancy is typically required for new construction, significant renovations, additions, or changes in the occupancy category. Since minor plumbing and a re-roof do not fall into those categories, a C of O should not be required.

You mentioned cancelling these permits during or phone call, please let me know if you would like to move forward with cancelling the 3 open permits we have.

Also, Roseann called and made payment on the sign permit and it will be issued shortly.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, August 14, 2025 2:22 PM
**To:** Susan Weber <sweber@californiacity-ca.gov>
**Cc:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Anu Doravari <adoravari@californiacity-ca.gov>; Stone, Stacey <Stacey.Stone@corecivic.com>; Malloy, John <John.Malloy@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Wiggins, Brad <Brad.Wiggins@corecivic.com>
**Subject:** Open Permits

EXTERNAL MESSAGE: Use caution when clicking links or attachments

Case 1:25-cv-01292-KES-CDB Document 18-1 Filed 10/27/25 Page 115 of 161

Susan

Thank you for your time this afternoon. To confirm our conversation, you confirmed that there are 3 open permits for our facility in California City. These permits do not require a new Certificate of Occupancy, and a valid one is in place. The open building permits should not hold up issuance of our business license. Please acknowledge receipt and understanding of our conversation. We look forward to our continued partnership with California City.

Best regards,

Marcelo Ariola
Vice President, Real Estate

CoreCivic

CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office: 615-263-3047
Cell: 615-445-9163
NYSE: CXW

**ATTACHMENT O**

**ATTACHMENT O**

**From:** "Montanary, Roseann"
**Sent:** 07/22/2025 1:15:40 PM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <jbarragan@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan
**Attachments:** Backup for Cal City SPR.pdf, CCA Name Change CoreCivic, Inc. 1116.pdf, Business License Application CoreCivic California City.pdf, SPR Minor 2025 Application CoreCivic California City.pdf

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

CoreCivic

July 21, 2025

Joe Barragan MBA, CBO

Public Works Director

City of California City

21000 Hacienda Blvd.

California City, CA 93505

Dear Mr. Barragan:

Pursuant to our Site Plan Review (SPR) Minor Application, the letter shall serve as a formal statement to confirm ADA requirements listed on the application.

California City Correctional center was originally built in 1998 and opened for operation in 1999. The facility was originally permitted under the Americans with Disabilities Act of 1990 (ADA). In 2013, the facility was leased to the California Department of Correction and Rehabilitation (CDCR). As a condition of the Lease the facility required CASp certification in compliance with the Americans with Disabilities Act (ADA) and California's Building Code (Title 24). Sally Swanson Architects was hired to do a full ADA inspection. As a result of the inspection, approximately $1.5 Million dollars in ADA upgrades to the facility were completed to meet CASp certification by a registered (Certified Access Specialist, Registered in the State of California. See attached letter from Sally Swanson Architects dated October 20, 2014.

Subsequently in 2017 as part of the lease extension/renewal with CDCR, an Administrative Office Building was added near the parking lot and part of the parking lot was modified to accommodate the new building. That building and parking was required to be CASp certified. See attached CASp certification. No additional construction has been performed at the facility since 2017.

The facilities past CASp certifications demonstrate our commitment to ADA standards. The California City Correctional Center is fully compliant with ADA and Title 24 requirements, as evidenced by the attached documentation. All facilities and modifications have been inspected and certified by a Certified Access Specialist (CASp) to ensure that they meet the necessary standards for accessibility. We are committed to maintaining compliance with these regulations and will continue to address any issues that may arise promptly.

Should you have any further questions or require additional information, please do not hesitate to contact our office.

Sincerely,

Marcelo Ariola

Marcelo Ariola

Vice President, Real Estate

SALLY SWANSON
ARCHITECTS, INC.

**Disabled Accessibility Certification (Provisional)**

Date: September 30, 2014

Timothy S. Aebie, AIA, NCARB, DBIA, LEED
Sr. Director, Project Development - Real Estate Development
Corrections Corporation of America, Inc.
10 Burton Hills Blvd.
Nashville, TN 37215

| | |
|---|---|
| Re: Project: | Disabled Accessibility Certification (Provisional) CASp Corrective Action Plan Certification Limited to: Phase 2 Inmate Housing Pods |
| Project location: | CCA, California City, CA |
| SSA project #: | 13054.03 |
| Certification by: | Brian H. Lee |
| Title: | Sr. Technical Architect |

In accordance with contract provisions for the above named Architect to act as a Disabled Accessibility Consultant representing the owner – Corrections Corporation of America (CCA) and the Architect-of-Record – Arrington Watkins Architects (AWA) for the said project, by due diligence of reviewing the project plans, reviewing alternate means of compliance for specific application to the prison environment, making personal site observations with measurements of the subject project work, and ensuring any concerns raised were successfully corrected; the following declaration is made:

The project area identified above (clarifications and exceptions as noted below) has been found in compliance (provisional clarifications and exceptions as noted below) with applicable disabled access code requirements in the 2013 California Building Code (CBC) and pertinent provisions applicable in the 2010 ADA Accessibility Standards and Title II of the Americans with Disabilities Act.

Clarified as part of this certification is the guard use only type-restrooms which were not modified as part of this project and which were found to be in general (albeit, not strict) compliance with the standards associated with 1991 ADA and respective edition of the CBC. Correction of any and all non-compliant conditions is required when CCA/CDCR should have an employee that requires these accommodations be made as part of Title 1 – Employment requirements of the Americans with Disabilities Act and of the State of California Unruh Act.

Respectfully Submitted to the Corrections Corporation of America (CCA),

Brian H. Lee,
Architect Lic. No. C-32739
CASp No. 0182

cc: Michael Conder, Arrington Watkins Architects
Andrew Johnson, Lydig Construction
Colm McGlynn, Lydig Construction
Kevin Atkinson, Lydig Construction
Sally Swanson, SSA
Arfraraz Khambatta, SSA
Jasper Kirsch, SSA
Mike Connell, SSA

end

Real Estate

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $** RECORDING IN COUNTERPART **County $ ________ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

____________________
Moohay A. Choe

____________________
Angela H. Ahn Mouradian

[signature]
Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Lisa Christine Hendry
personally appeared Channing C. Ahn

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature: Lisa Christine Hendry]

LISA CHRISTINE HENDRY
Commission # 1102896
Notary Public — California
Los Angeles County
My Comm. Expires Sep 20, 2000

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

**(This area for official notarial seal)**

**Recording Requested by:**
**Commonwealth Land Title Company**

**WHEN RECORDED MAIL TO:**
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

THIS SPACE FOR RECORDER'S USE ONLY

# GRANT DEED

**APN: 350-031-02**
**ESCROW NO: 486651JG**

**The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 1,812.80 County $ ______ City**
____ **Computed on the consideration or value of property conveyed; OR**
____ **Computed on the consideration or value less or encumbrances remaining at time of sale.**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June ~~5,~~ 10 1998

STATE OF ~~CALIFORNIA~~ Massachusetts } ss
COUNTY OF Norfolk }
On 6-10-1998 before me Tracy K Kenney
personally appeared Angela H Ahn Mouradian
personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(ies), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Tracy K Kenney
My Commission expires Oct. 13, 2000

MAIL TAX STATEMENTS TO ADDRESS ABOVE

______
Moohay A. Choe

Angela H. Ahn Mouradian
Angela H. Ahn Mouradian

______
Channing C. Ahn

(This area for official notarial seal)

Recording Requested by:
Commonwealth Land Title Company

WHEN RECORDED MAIL TO:
Corrections Corporation of America
Attn: Ken Avant
102 Woodmont
Nashville, TN 37205

Kern County Official Records
DOCUMENT #:0198081113
Pages: 3
6/19/1998
8:00:00
Fees 13.00
Taxes 1812.80
Other
TOTAL PAID 1825 80

THIS SPACE FOR RECORDER'S USE ONLY:
Stat. Types: 1

# GRANT DEED

APN: 350-031-02
ESCROW NO: 486651JG

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ RECORDING IN COUNTERPART County $ ____________ City
___ Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Moohay A. Choe, a married woman as to an undivided 1/3 interest, Angela H. Ahn Mouradian, a married woman, who acquired title as Angela H. Ahn, a single woman as to an undivided 1/3 interest and Channing C. Ahn, a single man, as to an undivided 1/3 interest
hereby GRANT(S) to CORRECTIONS CORPORATION OF AMERICA, A TENNESSEE CORPORATION
all the real property situated in the City of California City, County of Kern, State of California, described as:

The North 1/2 of Section 13, Township 32 South, Range 38 East, Mount Diablo Meridian.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in deed recorded April 25, 1960 in Book 3251, Page 639 of records of said County.

**THIS DEED IS BEING SIGNED IN COUNTERPART.**

Dated: June 5, 1998

Moohay A. Choe
Moohay A. Choe

Angela H. Ahn Mouradian

Channing C. Ahn

STATE OF CALIFORNIA } ss
COUNTY OF Los Angeles
On 6/9/98 before me Morton M. Schneider
personally appeared Moohay A Choe.

personally known to me or proved to me on this basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature Morton M. Schneider

MORTON M. SCHNEIDER
COMM. #1047263
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Jan. 21, 1999
BCT1

**MAIL TAX STATEMENTS TO ADDRESS ABOVE**

**(This area for official notarial seal)**

C. Emergency Lighting - Housing units have battery back-up emergency and exit lighting to provide sufficient illumination for entry into areas during emergencies. An emergency power generator will be used as an emergency power source when commercial power has failed.

## XIV. PLAN REVIEW

The facility fire plan shall be reviewed annually by the facility safety manager for accuracy and any changes. Approval from the California City Fire Marshal will be obtained before re-issuance. If no changes are required a memorandum shall be prepared by the facility safety manager for submission to the California City Fire Marshal stating this fact.

## XV. IMT

Incident Management may be initiated based upon the severity of the fire.

---

**CORE CIVIC/CALIFORNIA CITY IMMIGRATION PROCESSING CENTER**
**FIRE AND EMERGENCY EVACUATION PLAN**

By: [signature] Director, Safety & Environmental DATE: 7/21/25

By: [signature] Warden DATE: 7/21/25

REVIEWED:

By: [signature] California City Fire Marshal's Office DATE: 7/21/25

11/9/16

2

**ARTICLES OF AMENDMENT**
**OF**
**CORRECTIONS CORPORATION OF AMERICA**

The undersigned, being duly authorized to execute and file these Articles of Amendment of Corrections Corporation of America, a Maryland corporation (the "Corporation"), hereby certifies to the State Department of Assessments and Taxation of the State of Maryland that:

FIRST: The Corporation desires to amend its charter as currently in effect.

SECOND: The charter is hereby amended by deleting Article FIRST in its entirety and inserting the following in place thereof:

> **FIRST: The name of the corporation (which is hereinafter called the "Corporation") is:**
>
> **CoreCivic, Inc.**

THIRD: The foregoing amendment was unanimously approved by the entire board of directors and the amendment is limited to a change expressly authorized by § 2-605 of the Maryland General Corporation Law to be made without action by the stockholders.

FOURTH: The undersigned President acknowledges these Articles of Amendment to be the corporate act of the Corporation and, as to all matters or facts required to be verified under oath, the undersigned President acknowledges that, to the best of his knowledge, information and belief, those matters and facts are true in all material respects and that this statement is made under the penalties for perjury.

IN WITNESS WHEREOF, the Corporation has caused these Articles of Amendment to be signed in its name and on its behalf by its President on this 9th day of November 2016.

ATTEST:

CORRECTIONS CORPORATION OF AMERICA

Scott D Irwin
Secretary

Damon T. Hininger
President and Chief Executive Officer

CUST ID:0003482065
WORK ORDER:0004598642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

STATE OF MARYLAND
I hereby certify that this is a true and complete copy of the 2 page document on file in this office. DATED: 11/10/16
STATE DEPARTMENT OF ASSESSMENTS AND TAXATION:
BY: Custodian
This stamp replaces our previous certification system. Effective: 6/95

# CORPORATE CHARTER APPROVAL SHEET

**** EXPEDITED SERVICE **** **** KEEP WITH DOCUMENT ****

DOCUMENT CODE 09A BUSINESS CODE ______

\# D05095757

Close ______ Stock ______ Nonstock ______

P.A. ______ Religious ______

Merging (Transferor) ______

1000362009853062

ID # D05095757 ACK # 1000362009853062
PAGES: 0002
CORECIVIC, INC.

11/09/2016 AT 10:05 A WO # 0004698642

Surviving (Transferee) ______

New Name CoreCivic, Inc.

CERTIFIED COPY MADE

| FEES REMITTED | | |
|---|---|---|
| | Base Fee: | 100 |
| | Org. & Cap. Fee: | 465 |
| | Expedite Fee: | |
| | Penalty: | |
| | State Recordation Tax: | |
| | State Transfer Tax: | |
| 1 | Certified Copies | |
| | Copy Fee: | 21 |
| 1 | Certificates | |
| | Certificate of Status Fee: | 20 |
| | Personal Property Filings: | |
| | Mail Processing Fee: | |
| | Other: | |
| | TOTAL FEES: | 606 |

✓ Change of Name
___ Change of Principal Office
___ Change of Resident Agent
___ Change of Resident Agent Address
___ Resignation of Resident Agent
___ Designation of Resident Agent and Resident Agent's Address
___ Change of Business Code

___ Adoption of Assumed Name

___ Other Change(s)

Code 007

Attention: ______

Mail Name and Address

THE CORPORATION TRUST INCORPORATED
351 W CAMDEN ST
BALTIMORE MD 21201-7912

Credit Card ______ Check ✓ Cash ______

1 Documents on 3 Checks

Approved By: 16

Keyed By: ______

COMMENT(S)

The good standing should show the date/time when the name change occurred

CUST ID:0003482065
WORK ORDER:0004698642
DATE:11-09-2016 10:47 AM
AMT. PAID:$1,172.00

# Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ______
Approved by ______
Processed by ______
Processed On ______

Name of Business: CoreCivic, Inc. California City Immigration Processing Center

Business Owner(s) Name: CoreCivic Inc.

Business Address: 22844 Virginia Blvd California City, CA 93504-0590

Mailing Address: PO Box 2511 California City, CA 93504

Business Phone #: 760-338-6670

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Center

Planned Business Begin Date: 

Have you had a license for this business in the past? ○ Yes ○ No

Do you own or rent the space ○ Own ○ Rent (If rent, building owner/landlord ______

Will the business have Annual Gross Income of $10.000 or more? ○ Yes ○ No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # ______
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-1
(Required for Food Services – attach copy)

**Contractors:**
State License # ______
State License Type ______
(Required for Contractors)

Expiration Date ______

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**
Inspection Date 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature [signature]

Date 07/22/2025

Printed Name Christopher Chestnut

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.**

______________
Provided by City

# SITE PLAN REVIEW (SPR) MINOR APPLICATION

*(Existing Building/Business/Ownership)*

## 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc. (California City Immigration Processing Center)

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93504

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

## 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 07-22-25

## 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 07/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

## FOR DEPARTMENTAL USE ONLY

Fees: *(Refer to the Master Fee Schedule)*

☐ $ 250.00, Planning SPR Application Fee *(mandatory)* ***GL 10-3218***

☐ $ 90.00, Fire Department Inspection *(mandatory)* ***GL 19-3641***

☐ $ 150.00, Building Inspection Fee *(mandatory)*

☐ $ ______, Other

$ ______, **Total Fee Collected**

Application complete:

☐ Date: ______ Staff Member ______

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

***(Existing Building/Business/Ownership)***

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   - Total Parking Spaces: ________
   - ADA Accessible Spaces: ________
   - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified – separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

# ATTACHMENT P

ATTACHMENT P

**From:** "Lilia Garcia" <lgarcia@californiacity-ca.gov>
**Sent:** 07/23/2025 1:52:23 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan
**Attachments:** IMG_3994.jpg

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hi Roseann,

Please find the attached receipt for your records.

Best regards,
Planning Admin Secretary
Lilia Garcia
760-338-1377
Email: lgarcia@californiacity-ca.gov

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 11:45 AM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Liz, thank you for speaking with me today concerning the payment on the SPR fee. Looking forward to receiving your call so we can pay by p-Card over the phone.
My numbers are listed below. If you have difficulty getting me on the office phone, please call my cell.

Appreciate the assistance.

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

City of California City
21000 Hacienda Blvd
California City CA 9350 (760) 373-8661

Receipt No: 2.000177758 Jul 23, 2025

SPR25-09 CoreCivic

Permits/Fees
SDR Applications 250.00
10-3218
Permit Fee

Total: 250.00

Credit Card
Check No: mc 250.00
Payor:
SPR25-09 CoreCivic
Total Applied: 250.00

Change Tendered: .00

Duplicate Copy
07/23/2025 1:43 PM

# ATTACHMENT Q

ATTACHMENT Q

**From:** "Susan Weber" <sweber@californiacity-ca.gov>
**Sent:** 07/24/2025 1:22:39 PM (-07:00)
**To:** "Montanary, Roseann" <Roseann.Montanary@corecivic.com>; "Joe D. Barragan" <JBarragan@californiacity-ca.gov>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** RE: Information Discussed

**CAUTION:** This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

That is correct, you will not have to pay the $150.00 since the ADA document sent to us was sufficient.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Thursday, July 24, 2025 11:36 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Susan Weber <sweber@californiacity-ca.gov>
**Subject:** RE: Information Discussed

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Ms. Weber, based on the conversation we had yesterday afternoon, it appears CoreCivic is not required to pay the $150.00 building inspection fee. Please confirm if my understanding is correct.
If we still owe the fee, would like to pay for it this afternoon via P-card over the phone.

Appreciate you time and consideration.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 4:36 PM
**To:** Joe D. Barragan <jbarragan@californiacity-ca.gov>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; SWeber@californiacity-ca.gov
**Subject:** Information Discussed

Ms. Weber, thank you for taking the time today to discuss the payment of the $150.00 building Inspection Fee. I understand this fee may not be necessary. Please find attached the information on ADA requirements.

Appreciate the guidance.
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Wednesday, July 23, 2025 5:15 PM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Subject:** Attached Image

# ATTACHMENT R

ATTACHMENT R

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 07/24/2025 3:02:26 PM (-07:00)
**To:** "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

I asked the City Clerk earlier about Core Civic's Business License and she stated that she believed it was just the Fire inspection that was needed. But she did not look it up, she was going off of memory.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Thursday, July 24, 2025 3:00 PM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Joe - Just touching base. Any update from Anu? Safe to assume all is in order?

Marcelo Ariola
Vice President, Real Estate
CoreCivic
CoreCivic Facility Support Center
5501 Virginia Way, Suite 110, Brentwood, TN 37027
Office: 615-263-3047
Cell: 615-445-9163
NYSE: CXW

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Wednesday, July 23, 2025 9:04 AM
**To:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** Re: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Marcelo,

I will speak with Anu and get back to you.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Sent:** Wednesday, July 23, 2025 6:20 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>; Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Joe - Thank you for your time yesterday. Please advise if there is anything substantive materials missing in our application. We are prepared to make payment as soon as possible assuming by now internet is up and running.

Anu - Thank you for your review.

Thanks,

Marcelo

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 3:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <jbarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

# ATTACHMENT S

ATTACHMENT S

**From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
**Sent:** 08/21/2025 8:57:35 AM (-07:00)
**To:** "Susan Weber" <sweber@californiacity-ca.gov>
**Cc:** "bberken@berk-tel.com" <bberken@berk-tel.com>; "Roger@661comm.com" <roger@661comm.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Josh DuFour" <jdufour@berk-tel.com>; "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey" <stacey.stone@corecivic.com>; "Kristy Hightower" <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Susie,

Please send them a commercial electrical application.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:56 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Director Barragan --- Thanks for your time on the phone. I appreciate your assistance.
As we discussed, please have Suzy in your office send us the permit form on Monday when she's back in the office.
Best,

BERK-TEL
**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 10:27 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger@661comm.com; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

Yes, give me a call.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Thursday, August 21, 2025 8:22 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Roger@661comm.com <roger@661comm.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

**Deputy Fire Marshal Hightower** --- Thank you for connecting all parties! We appreciate your help.

**Director Barragan** --- Do you have time today for a brief phone call to discuss your questions / permit needs? I want to make sure we're on the same page with our project and what we need for a second possible permit. We have installed thousands of these low voltage systems all around the country, and we have never needed a "building permit", so this request is new to us.
There is nothing structural or obtrusive (no changes to the building), so we are confused by the request and need more information --- but happy to oblige.

The only published permit information we were able to find from your county / city (attached) for this technology is:

- ***Permits shall comply with the 2019 California Fire Code (CFC) Chapter 5, Section 510***

(No mention of a building permit; hence --- our delay and confusion.)

From your email:

We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations

I have attached the single line drawing sheets from our AHJ Submittal Packet that answers the questions above, but maybe I'm not understanding what you need (?)
I'm not sure what "*foundation plan*" or "*load calculations*" are in reference to for this ERRCS low voltage system?

Hope you have time to discuss today, so we can get you what you need.

Thank you,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 9:09 AM
**To:** Brian Berken <bberken@berk-tel.com>; jbarragan@californiacity-ca.gov
**Cc:** Roger@661comm.com
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,

Please see below. I have included you both in this email so that you can discuss the building departments permitting needs.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

**From:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Sent:** Thursday, August 21, 2025 6:33 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning Kirsty,

Those are not plans. What they attached to the email are submittals and specifications. We need to see a single-line diagram, a site plan, a foundation plan, and possibly load calculations. Also, from the package they submitted, it appears that a Building Permit will be required.

Sincerely,
Joe Barragan MBA, CBO
Public Works Director
City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Thursday, August 21, 2025 6:24 AM
**To:** Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Joe,

I'm forwarding the email below to you.
Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 2:47 PM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Please see below information in red from Brian with BERK-TEL covering the questions Mr. Barragan had. If you can please forward the email to Mr. Barragan this should answer his questions. If he has any additional questions BERK-TEL email is in the below string or he can contact Brian Berken directly.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, August 20, 2025 2:25:52 PM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Thanks for your email.
We already paid for ($1,000) and received the permit, yesterday (see attached).
We received approval from **Fire Marshall Hightower** with the FD and **Dawn Ferguson** with City Hall.
All the information answering Mr. Barragan's questions are included in the original packet (see attached).
Answers are below in **BOLD RED**, for ease of finding:

- Will any component require an electrical connection?
    - **YES – see attached plan for electric needs.**
    - **Site electricians will provide dedicated circuits as needed.**
- Are there footings or a foundation for the antennas?
    - **A single mast will be mechanically mounted to parapet wall.**
- We need to see a single-line schematic?
    - **PAGE 34 of the ATTACHED contains the full system design.**

Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, August 20, 2025 4:01 PM
**To:** Brian Berken <bberken@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
Please see forwarded email that Kristy Hightower sent me regarding the building permit questions city hall had.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Wednesday, August 20, 2025 1:00:57 PM
**To:** Roger Goodman <Roger@661comm.com>
**Subject:** Fwd: AHJ / Fire Marshal SUBMITTAL PACKET

Sent from my iPhone

Begin forwarded message:

> **From:** "Joe D. Barragan" <JBarragan@californiacity-ca.gov>
> **Date:** August 20, 2025 at 9:32:42 AM PDT
> **To:** Susan Weber <sweber@californiacity-ca.gov>, Kristy Hightower <khightower@calcityfire.us>, Tiffany Carter <tcarter@californiacity-ca.gov>
> **Subject: Re: AHJ / Fire Marshal SUBMITTAL PACKET**
>
> **EXTERNAL MESSAGE:** Use caution when clicking links or attachments
>
> The plans are incomplete:
>
> - Will any component require an electrical connection?
> - Are there footings or a foundation for the antennas?
> - We need to see a single-line schematic?
>
> If the answer to the first two questions is yes, then a permit will be required.
>
> Sincerely,
> Joe Barragan MBA, CBO
> Public Works Director

City of California City
21000 Hacienda Blvd
California City, CA 93505
Office (760) 373-7162
Fax (760) 373-7532
Email: jbarragan@californiacity-ca.gov
Website: www.californiacity-ca.gov

---

**From:** Susan Weber <sweber@californiacity-ca.gov>
**Sent:** Tuesday, August 19, 2025 10:53 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning Kristy,

I believe you are correct but we are going to let Joe answer this when he gets back tomorrow.

Thank you,

**Susie Weber**
**Administrative Secretary**
**City of California City**
**Building Department**
**O: (760) 373-7152**
**sweber@californiacity-ca.gov**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:35 AM
**To:** Susan Weber <sweber@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>; Tiffany Carter <tcarter@californiacity-ca.gov>
**Subject:** FW: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi guys!

Am I correct in assuming this needs a permit? They can't move forward until I sign off on it.

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review. Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman <Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

*****Do you want to submit this to the correct person (people) on our behalf -or- do you want to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

# ATTACHMENT T

ATTACHMENT T

**From:** "Kristy Hightower" <khightower@calcityfire.us>
**Sent:** 10/08/2025 12:36:55 PM (-07:00)
**To:** "Roger Goodman" <Roger@661comm.com>; "Brian Berken" <bberken@berk-tel.com>
**Cc:** "Ariola, Marcelo" <marcelo.ariola@corecivic.com>; "Stone, Stacey" <stacey.stone@corecivic.com>; "Brad Konkel" <bkonkel@berk-tel.com>; "Dawn Ferguson" <dferguson@calcityfire.us>; "Shannon Hayes" <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello,

Yes, I can be there at 2 on Tuesday. I will not be able to be out any earlier though as Tuesday and Wednesday are full of other inspections next week.

Thank you!

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Wednesday, October 8, 2025 10:49 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Brian,
I can come out Tuesday if that works for Fire Marshall Hightower.

Thank you,
Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Wednesday, October 8, 2025 10:45:07 AM
**To:** Roger Goodman <Roger@661comm.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Hello Fire Marshall Hightower and Mr. Goodman…
We are on track and on schedule to finalize the system on Tuesday AM and **would appreciate your help testing for approvals on Tuesday afternoon (10/14) around 2:00 PDT.**
Can we all confirm that date and time for the final inspections?

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Monday, September 29, 2025 10:13 AM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>
**Cc:** Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** Re: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Brian,
I can be available should a weekend be needed for testing. When we do decide on a date let me know. I need to give Kern County Communications a heads up to dispatch that we will be on channels.

Get Outlook for Android

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Monday, September 29, 2025 8:06:00 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Fire Marshall Hightower --- Thanks for the positive reply.
Pending our actual completion date, **do you have any weekend availability for testing?**
I don't know that it will be needed, but trying to plan for all possible dates/times in order to get the system powered ON and commissioned ASAP.
Thoughts?

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Monday, September 29, 2025 9:54 AM
**To:** Brian Berken <bberken@berk-tel.com>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Good morning,

Yes, I would like to attend the testing/inspection, but I would very much appreciate Roger's assistance. Please keep me updated.

Have a great day!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Friday, September 26, 2025 10:09 AM
**To:** Kristy Hightower <khightower@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Subject:** RE: Approved: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Good morning, Fire Marshall Hightower…
As we move closer to finalizing the BDA / ERRCS installation at the **CoreCivic Detention Center**, I am proposing the following to ensure you know there is adequate coverage throughout the facility.
Because there is no control channel within your radio system, we will be available to areas - checked, verified and documented - with your radios.
Roger Goodman has also volunteered to be present and complete radio tests with you (or on your behalf).

Typically, a spectrum analyzer can be used to quickly verify RF signals, but that requires radio traffic or a control channel (which constantly broadcasts RF).
Because there is no control channel in that area, there is no RF for the spectrum analyzer to measure --- unless you are using your radio.

We are forecasting we should have the system finalized and ready to be commissioned and then tested in the coming 7-10 days.
As we get closer, I would like to set up a time with you or your team (or Roger Goodman) to complete the radio checks for both 150MHz and 450 MHz frequencies.
*****Are you in agreement with that method and that possible timeline?**
I should be able to confirm a more specific date Monday or Tuesday next week.

Please let me know your thoughts...
Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:56 PM
**To:** Brian Berken <bberken@berk-tel.com>; Dawn Ferguson <dferguson@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** Approved: AHJ / Fire Marshal SUBMITTAL PACKET

Here are your plans. I hope that you have a great afternoon!

Thank you.

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:50 PM
**To:** Dawn Ferguson <dferguson@calcityfire.us>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>

**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi Dawn… I just spoke to Destiny.
She took my **$1,000** payment and gave me **CONFIRMATION # 619154.**
Destiny said she would email the receipt to you.

**With that task completed ---- we should be ready to begin the installation, correct?**

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Dawn Ferguson <dferguson@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 4:29 PM
**To:** Brian Berken <bberken@berk-tel.com>; Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

You can contact City Hall (760-373-8661) with GL code: 19-3641/6-667 for Plan review, with payment of $1000.00, and have them email me the receipt, and you will be good to go. Thank you very much.

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 2:23 PM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Dawn Ferguson <dferguson@calcityfire.us>
**Cc:** Roger Goodman <Roger@661comm.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET
**Importance:** High

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Hi **Deputy Fire Marshal Hightower ---** THANK YOU for the quick turnaround time with the approval for the submittal packet.
We will do a great job protecting your radio network and bringing signal inside the facility for the safety and protection of your team.

Hi **Dawn** --- Please find the attached, completed and signed application form.
Per the form, please advise if you need a hard copy sent via mail or your records.
Please let me know if you have any questions or need additional information.

Thank you,

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 3:30 PM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Cc:** Dawn Ferguson <dferguson@calcityfire.us>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

I've looked over them and I don't see any issues, but for me to stamp/approve plans, you'll need to complete an application with Dawn. I have attached the form.

You can contact her at dferguson@calcityfire.us

Thank you.

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us

**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 10:39 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Re: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Sounds great hope you have a great week as well. I believe this is just a site plan that needs your approval and then a building permit will be applied for once the design is approved by you.

Roger Goodman
661 Communications
661-384-3537

Roger@661comm.com

---

**From:** Kristy Hightower <khightower@calcityfire.us>
**Sent:** Tuesday, August 19, 2025 10:33:08 AM
**To:** Roger Goodman <Roger@661comm.com>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** RE: AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger,

I appreciate you sending this to me. It will likely need a permit from the building department; I will check with them and let you know. I will review it as quickly as possible so that it can get started.

I hope that you're having a great week!

Thank you,

**Kristy Hightower**
Deputy Fire Marshal
20890 Hacienda Blvd
California City, CA 93505
khightower@calcityfire.us




**From:** Roger Goodman <Roger@661comm.com>
**Sent:** Tuesday, August 19, 2025 8:37 AM
**To:** Kristy Hightower <khightower@calcityfire.us>; Shannon Hayes <shayes@californiacitypd.org>; Brian Berken <bberken@berk-tel.com>
**Subject:** Fw: AHJ / Fire Marshal SUBMITTAL PACKET

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Kristy,
Morning hope you are doing well today. I've forwarded this email from BERK-TEL for your review.
Brian Berken is on this email should you have any questions regarding the building amplifier for the ICE detention center.
This packet needs to be signed off by the Fire Marshall. Brian and I are available for any questions you may have.
The information contained in the packet goes over the frequencies and plans for improvements to the building. Such as the antenna plan for inside the building and signal improvements expected by the new system to the Kern Fire frequencies and CCPD PD Channels as well as Kern KCSO East, and Med channel.
If you have any questions, please let Brian or myself know and we will be happy to help.

Roger Goodman
661 Communications
661-384-3537
Roger@661comm.com

---

**From:** Brian Berken <bberken@berk-tel.com>
**Sent:** Tuesday, August 19, 2025 7:32:44 AM
**To:** Roger Goodman <Roger@661comm.com>
**Cc:** Josh DuFour <jdufour@berk-tel.com>; Ariola, Marcelo <marcelo.ariola@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Brad Konkel <bkonkel@berk-tel.com>; Josh DuFour <jdufour@berk-tel.com>; Schoening, Bryan <Bryan.Schoening@corecivic.com>; Roger Goodman <Roger@661comm.com>
**Subject:** AHJ / Fire Marshal SUBMITTAL PACKET

Hi Roger… Please find the attached Cal City Detention Center submittal packet for the AHJ / Fire Marshal review and approval.
The (64 page) packet contains all equipment, cable and accessories that will be used to complete the ERRCS solution.
There are also design pages, heat maps and link budget expectations from our signal simulations.

*****Do you want to submit this to the correct person (people) on our behalf -or- do you want to send me the contact names and info?**

Please let me know how you'd like to proceed.
Thank you,

BERK-TEL

**Brian Berken**
**BERK-TEL COMMUNICATIONS**
www.Berk-Tel.com www.GainBars.com
**1-877-362-6177**

# EXHIBIT 4

EXHIBIT 4

**From:** "Montanary, Roseann"
**Sent:** 08/11/2025 12:32:10 PM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Cc:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Ariola, Marcelo" <Marcelo.Ariola@corecivic.com>; "Lilia Garcia" <lgarcia@californiacity-ca.gov>; "Malloy, John" <John.Malloy@corecivic.com>; "Stone, Stacey" <Stacey.Stone@corecivic.com>; "Barker, Michelle" <Michelle.Barker@corecivic.com>; "Miller, Max" <Max.Miller@corecivic.com>
**Subject:** RE: City of California City Business License and SPR Plan
**Attachments:** California City Facility Operational Information 2025.doc

Afternoon Anu, please find information requested attached.
Advise if there is any additional information needed.
I understand we are on different time zones, happy to accommodate.

Thank you,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

**From:** Anu Doravari <adoravari@californiacity-ca.gov>
**Sent:** Monday, August 11, 2025 10:49 AM
**To:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>; Lilia Garcia <lgarcia@californiacity-ca.gov>
**Subject:** RE: City of California City Business License and SPR Plan

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Hi Roseann.

I am reviewing your application documents and could not locate the business operations document describing the daily operations and operational hours and other related details. Please send that over when you can.

Regards,
Anu Doravari
Consultant Planner

**From:** Montanary, Roseann <Roseann.Montanary@corecivic.com>
**Sent:** Tuesday, July 22, 2025 1:16 PM
**To:** Anu Doravari <adoravari@californiacity-ca.gov>; Joe D. Barragan <JBarragan@californiacity-ca.gov>
**Cc:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>; Ariola, Marcelo <Marcelo.Ariola@corecivic.com>
**Subject:** City of California City Business License and SPR Plan

**EXTERNAL MESSAGE:** Use caution when clicking links or attachments

Anu, hope all is well. As instructed by Mr. Barragan, please find attached the SPR Minor plan for CoreCivic California City.
It is our understanding and belief that the items requested for the SPR are already in the possession of the city.

Also attached to the email are additional back-up documents in support of the SPR.

- Letter concerning the ADA requirements - Mr. Ariola
- Disabled Accessibility Certification
- Deed showing ownership of the facility.
- Sign off from the Fire Marshal's office.
- Information on the company name change in case it is needed.
- Copy of the business license application.

We appreciate your time and consideration.
Regards,
Roseann

R C Montanary-Lett
Director, Operations Support
CoreCivic
Mobile 615-289-4943
Office 615-263-3068

*California City Immigration Processing Center*
California City, CA

**Facility:** California City Immigration Processing Center
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

California City Immigration Processing Center is owned and operated by CoreCivic. The facility will serve as a detention center focused on housing residents based on contractual requirements with Immigration and Customs Enforcement. The security and operation of the facility will follow policies and procedures in alignment/compliance with the National Detention Standards 2025 revision. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled. Additionally, food service, recreational and religious opportunities, legal access, attorney and social visitation, mail procedures, detainee communication, and transportation will be provided in accordance with the aforementioned ICE standards.

The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year. At operational capacity, the facility will employ 488 total staff to include approximately 309 security staff, 70 medical professionals, 12 maintenance staff with the remainder administrative and support personnel.

**Facility Description:**

California City Immigration Processing Center is located in California City, California in Antelope Valley in Kern County, California. The facility is approximately 20 miles North of Edwards Air Force Base. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999. Major airports near CCIPC are Meadows Field Airport (84 miles) and Los Angeles International Airport (126 miles). The nearest hospitals are Adventist Health-Tehachapi Valley (37 miles), Antelope Valley Hospital (54.3 miles), Ridgecrest Regional Hospital (57.7 miles), Southwest Healthcare Palmdale Regional Medical Coneter (58.4 miles)

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems providing year-round environmental comfort for all staff and residents.

*California City Immigration Processing Center*
California City, CA

Each cell provides residents with access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. All residents have access to showers with thermostatically controlled hot and cold water. Adjacent to each resident's sleeping area is a central dayroom that contains tables, chairs, televisions and telephones for residents' use.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. An administrative area that includes space for staff, conference room, employee lounge and locker rooms

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located Health Services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# EXHIBIT 5

EXHIBIT 5

**From:** "Malloy, John"
**Sent:** 08/25/2025 9:06:16 AM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>; "Joe D. Barragan" <jbarragan@californiacity-ca.gov>; "Lilia Garcia" <lgarcia@californiacity-ca.gov>; "Susan Weber" <sweber@californiacity-ca.gov>; "lweible@californiacity-ca.gov" <lweible@californiacity-ca.gov>
**Subject:** CoreCivic Business License Application
**Attachments:** Business_License_Application_2025-08-22 - Signed FINAL.pdf, California City Correctional Facility Business Plan August.pdf, SPR Minor 2025 Application CoreCivic California City SIGNED.pdf

All:

Please find the attached business license application as well as a Site Plan Review (SPR) Minor Application. The SPR is being submitted as we understand that to be required by the City Planning Department. The business license request and SPR application will replace the original application that was submitted to your office on July 22nd. This revised license and SPR application is for the activation and operation of the facility under a contract with the United States Marshals Service (USMS) and is consistent with how CoreCivic operated the facility before the lease to the State of California in 2013. Please let me know if you have any questions or if you require any additional information.

Thank you.

John Malloy
CoreCivic
(602) 680-9868

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.** ____________
Provided by City

# SITE PLAN REVIEW (SPR) MINOR APPLICATION

***(Existing Building/Business/Ownership)***

## 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc.

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93505

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

## 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 08-22-25

## 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 08/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

**FOR DEPARTMENTAL USE ONLY**

Fees: *(Refer to the Master Fee Schedule)*

☐ $ 250.00, Planning SPR Application Fee *(mandatory)* ***GL 10-3218***

☐ $ 90.00, Fire Department Inspection *(mandatory)* ***GL 19-3641***

☐ $ 150.00. Building Inspection Fee *(mandatory)*

☐ $ ______. Other

$ ______, **Total Fee Collected**

Application complete:

☐ Date: ______ Staff Member ______

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

*(Existing Building/Business/Ownership)*

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
    - Total Parking Spaces: ________
    - ADA Accessible Spaces: ________
    - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
    - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

## Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ____________
Approved by ____________
Processed by ____________
Processed On ____________

| | | | |
|---|---|---|---|
| Name of Business | California City Correctional Facility | Business Owner(s) Name | CoreCivic, Inc |
| Business Address | 22844 Virginia Blvd<br>California City, CA 93505 | Mailing Address | PO Box 2511<br>California City, CA 93504 |
| Business Phone # | (760) 491-8100 | Email Address | CalCityInvoices@corecivic.com |
| Nature of Business | Detention Facility/Prison | Planned Business Begin Date | |

Have you had a license for this business in the past? (●) Yes ( ) No

Do you own or rent the space (●) Own ( ) Rent (If rent, building owner/landlord ____________

Will the business have Annual Gross Income of $10.000 or more? (●) Yes ( ) No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # ____________
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-
(Required for Food Services – attach copy)

**Contractors:**
State License # ____________
State License Type ____________
(Required for Contractors)

Expiration Date ____________

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**

Inspection Date 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature [signature] Digitally signed by Christopher Chestnut Date: 2025.08.22 17:07:29 -07'00'

Date 08/22/2025

Printed Name Christopher Chestnut

Clear Form Submit

*California City Correctional Facility*
California City, CA

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

# EXHIBIT 6

EXHIBIT 6

**From:** "Malloy, John"
**Sent:** 09/15/2025 9:18:06 AM (-07:00)
**To:** "Anu Doravari" <adoravari@californiacity-ca.gov>
**Subject:** Clarifying Business Plan Language

Anu:

I wanted to follow up on our most recent business license application and include some clarifying language due to the expiration of the City's IGA with the United States Marshals Service (USMS) this month. As such, we are revising language in our business plan that is part of our Minor Site Plan Review (SPR) to state that the facility will operate under a contract with the federal government, consistent with how the facility operated before the lease to the State of California in 2013.

Please let me know if you have any questions.

**EXHIBIT 7**

**EXHIBIT 8**

Victor M. Ponto (SBN 284005)
City Attorney for City of California City
E-mail: vponto@bwslaw.com
Mark J. Austin (SBN 208880)
E-mail: maustin@bwslaw.com
Brandon A. Sanchez (SBN 300718)
E-mail: bsanchez@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1770 Iowa Avenue, Suite 240
Riverside, California 92507-2479
Tel: 951.788.0100 Fax: 951.788.5785

Attorneys for Respondent and Defendant
CITY OF CALIFORNIA CITY

FILING FEE EXEMPT PURSUANT TO GOVERNMENT CODE § 6103

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION and JOHN DOE,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CITY OF CALIFORNIA CITY and CORECIVIC, INC.,<br><br>Respondents and Defendants.<br><br>CORECIVIC, INC.,<br><br>Real Party in Interest. | Case No. 1:25-cv-01292-KES-CDB<br><br>**DECLARATION OF CITY PLANNER ANUPAMA DORAVARI IN SUPPORT OF OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br><u>TRO Application Hearing</u><br>Date: November 3, 2025<br>Time: 1:00 p.m.<br>Judge: Hon. Kirk E. Sherriff<br>Crtrm: 6<br><br>Trial Date: None Set |

**DECLARATION OF CITY PLANNER ANUPAMA DORAVARI**

**IN SUPPORT OF OPPOSITION TO PLAINTIFFS' EX PARTE APPLICATION**

I, Anupama Doravari, declare as follows:

1. I am the City Planner for the City of California City ("City"). I held a planning position with the City from 2017 to 2018. Since June 2023 I have served as City Planner. My duties include administering the City's zoning and development regulations, as set forth in the California City Municipal Code ("CCMC"). I also oversee the City's review and processing of conditional use permit ("CUP") applications, site plan reviews, and provide analysis and recommendations to the City Council and Planning Commission on all development projects in the City. As part of my duties, I assist with coordinating inter-departmental permit routing, make use determinations and CCMC interpretations, and maintain the City's planning records. As a result, I am intimately familiar with and tasked with interpreting and applying the CCMC to various uses and projects in the City. I have personal knowledge of the facts stated here or know them based on my review of City records kept in the ordinary course of business. If called, I could and would testify competently.

2. This declaration is in support of the City's opposition to the TRO Application.

3. The documents attached to this declaration are true and correct copies of records the City maintains in the ordinary course of business, or accurate printouts of such records from the City's electronic repositories.

4. In my various capacities, I am familiar with the property commonly known as 22844 Virginia Boulevard, California City, California ("Property"). The Property is located within the RA (Residential/Agricultural) District.

5. After the Facility's reopening in 2025, the City undertook a multi-step review to determine what, if any, local approvals were required and whether any such approvals would trigger the notice-and-hearing procedures in SB 29. This was a time-consuming process. The City searched physical archives and digital repositories across Planning, Building, Fire, and the City Clerk for historical records. The City gathered information from the operator regarding current operations and conducted inspections. Planning compared current operations against historical

approvals located during the records search. Staff identified which, if any, administrative approvals (e.g., site plan review) could apply and whether issuing them would be covered by SB 29.

6. As is relevant to the TRO Application, the City's investigation revealed the following. In January 1998, the City approved CUP 97-01 for a 2,304-bed "prison facility" on approximately 70 acres of the 320-acre Property. In October 1998, the City approved CUP 98-02 expanding the permitted capacity by 512 beds. Neither CUP limits the entitlement to criminal custody or to a particular inmate/detainee population. True and correct copies of CUP 97-01 and CUP 98-02 are collectively attached to this declaration as **Exhibit A** and are incorporated herein.

7. Based on my review of the CUP terms, the records on file, and my understanding of current operations, the Facility's ongoing operations remain within the scope of CUP 97-01 and CUP 98-02 and within the RA-district allowance for "correction, probation, or prison facilities and services." The CCMC does not define "prison." In ordinary usage a prison is a "place of confinement," and immigration detention is a place of confinement of the same kind.

8. This present determination is also consistent with past practice. In 2010, the City entered Intergovernmental Agreement ODT-10-0002 with the operator for federal detainee housing, including immigration detainees. That use occurred under the 1998 CUPs. So immigrant detention has historically been determined by the City to be a "prison facility" use conditionally permitted under the 1998 CUPs. A true and correct copy of the IGA is attached to this declaration as **Exhibit B** and is incorporated herein.

9. In my role as City Planner, I am familiar with the City's record keeping system for land use approvals. After a thorough review, as of the date of this declaration, no application for a new CUP or for a CUP modification has been filed or required, and the Planning Division has not determined that current operations constitute an expansion outside the existing entitlements.

10. On August 22, 2025, the operator submitted applications for a business license and an administrative site plan review (SPR). Both applications are being processed with inter-departmental routing to Fire, Police, and Building staff. The facility has passed its final Fire and Building inspections. As of the date of this declaration, all deficiencies have been corrected to the

satisfaction of the respective authorities, and there are no outstanding Building or Fire violations for the facility. True and correct copies of the business license application and site plan review application are collectively attached to this declaration as **Exhibit C** and are incorporated herein.

11. In an abundance of caution, staff determined that any SPR approval potentially covered by SB 29 will not be issued unless and until the City completes SB 29's prerequisites. The City has scheduled the first SB 29 public hearing for October 28, 2025 before the City Council, with additional hearing(s) to follow as required.

12. The City will issue no SB-29-covered approval before it has both (a) provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution and (b) soliciting and hearing public comment at two meetings open to the public, as the statute requires.

13. As of the date of this declaration, the City has not approved, signed, or issued any deed, contract, lease, or permit for "the building or reuse of existing buildings" for immigration detention. Accordingly, there is no City permitting action presently outstanding that could constitute a past violation of SB 29.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 27, 2025 in California City, California.

[signature]
Anupama Doravari

# EXHIBIT A

ORIGINAL

**RESOLUTION NO. 01-98-1801**

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CALIFORNIA CITY MAKING CERTAIN ENVIRONMENTAL FINDINGS AND ADOPTING A STATEMENT OF OVERRIDING CONSIDERATIONS IN CONNECTION WITH THE CORRECTIONS CORPORATION OF AMERICA PRISON**

WHEREAS, Corrections Corporation of America (CCA) has filed various applications with the City requesting approval to construct a 2,304 inmate capacity prison and related utility improvements (the "Project"); and

WHEREAS, the Planning Department has determined an Environmental Impact Report (EIR) Supplement be prepared pursuant to the California Environmental Quality Act (CEQA) to determine the individual and cumulative environmental impacts associated with the Project; and

WHEREAS, the Draft EIR Supplement was prepared by RUST Environment and Infrastructure under contract to the City and under the supervision of the Planning Department, and circulated for review from October 24, 1997 to December 9, 1998; and

WHEREAS, responses to comments were prepared and included in the Final EIR Supplement; and

WHEREAS, the Planning Commission considered and approved an application for a conditional use permit at a duly noticed public hearing on January 15, 1998;

NOW THEREFORE BE IT RESOLVED by the City Council of the City of California City as follows:

# SECTION 1

# INTRODUCTION

## 1. PRELIMINARY

CCA will develop a 2,304 bed prison on a 320 acre property in California City, Kern County. The Project will accommodate medium security inmates. The City was the Lead Agency for the preparation of an Environmental Impact Report (EIR) Supplement in compliance with the California Environmental Quality Act of 1970 (CEQA) (Public Resources Code §§ 21000 et seq.) and the CEQA Guidelines ( California Administrative Code §§ 15000 et seq., as amended).

Because the EIR Supplement identified significant effects which may occur as a result of the Project, City adopts these findings as part of the approval of the CCA Project. In adopting this Statement of Findings, the City approves the construction of the CCA Prison at California City on a 320 acre property known as the Virginia Boulevard site.

Section 1 of these findings provides an introduction and description of the proposed Project and the certification of the Final EIR Supplement. Section 2 discusses potential environmental effects considered to have no significant impacts and require no mitigation. Section 3 discusses potential environmental effects which are not significant or which have been mitigated to a level that is less than significant. Section 4 discusses the significant unavoidable environmental effects of the Project, which cannot be feasibly mitigated to a level that is less than significant. Section 5 discusses Project alternatives. Section 6 discusses changes in mitigation measures and recirculation. Section 7 discusses the Mitigation Monitoring Plan. Section 8 presents the Statement of Overriding considerations. Section 9 presents a Section 21092.1 finding regarding independent judgment.

## 2. DESCRIPTION OF THE APPROVED PROJECT

The site is located at the terminus of Virginia Boulevard, approximately one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The site encompasses 320 acres of vacant terrain comprised of, and surrounded by, natural desert environment.

Approximately 70 acres of the proposed prison site will be developed for the prison facility and support uses.

The 2,304 bed prison will accommodate 2,304 inmates at 100 percent design bed capacity, and meet the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.

- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates.
- Provide excellent long term employment and career opportunities for surrounding communities.

## 3. CERTIFICATION

The Planning Department has reviewed the Final EIR Supplement for the proposed Project and has considered the public record on the Project, including without limitation the following:

- Record of Public Hearing on the Final Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, on January 15, 1998, before the Planning Commission.
- Final Environmental Impact Report Supplement, January, 1998.
- Responses to Comments on the Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, 1997 (Volume II).
- Draft Supplement to Environmental Impact Report, Correction Corporation of America Prison at California City, October 1997.

The custodian of the documents and other materials which constitute the record upon which these findings are based is the Planning Department. The record is available for public review at the City of California City, 2100 Hacienda Boulevard, California City, California, 93505.

**Finding**

Based upon complete review of the record, the Planning Commission certifies that the Final EIR Supplement is adequate and has been completed in compliance with CEQA.

## SECTION 2

## POTENTIAL ENVIRONMENTAL EFFECTS CONSIDERED TO HAVE NO SIGNIFICANT IMPACTS AND REQUIRE NO MITIGATION MEASURES

**Finding**

The EIR Supplement identified thresholds of significance and evaluated environmental impacts for the following issues. The EIR Supplement determined that these environmental impacts did not cross

the thresholds of significance for these issues. Therefore, no mitigation measures are required for these issues.

Land Use, Employment, Population and Housing, Hospitals, Judicial Services, Law Enforcement, Fire Protection, Wastewater Treatment and Disposal, Solid Waste Disposal, Energy, Telephone and Cable.

## SECTION 3

## POTENTIAL ENVIRONMENTAL EFFECTS WHICH ARE NOT SIGNIFICANT OR WHICH HAVE BEEN MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. PUBLIC UTILITIES AND COMMUNITY SERVICES

<u>School Impacts</u>

Implementation of the Project would result in enrollment of approximately 124 new students in the Mojave Unified School District (MUSD) resulting in the need for up to four additional classrooms.

**Mitigation**

The following mitigation measure will be employed to reduce potential impacts to MUSD schools to a less than significant level:

- Mitigation for impacts resulting from additional students generated indirectly by the proposed prison would be provided in the form of school impact fees paid by CCA and developers of other commercial and residential land uses in accordance with California City Building Department fee schedules.

  The school mitigation fees for MUSD which are collected by the California City Building Department at issuance of building permits are as follows:

  - $0.32 per square foot of new industrial/commercial floor space.
  - $1.84 per square foot of new residential floor space.

  Based on the conceptual building plans for the proposed prison, which indicate approximately 500,000 square feet of floor space, CCA would be responsible for payment of approximately $160,000 to offset any direct impacts to MUSD. Additionally, new residential development resulting from any direct and indirect growth would contribute separately to school fees at the rate noted above. The collected fees could be utilized to lease the portable classrooms or contribute to funding for permanent facilities necessary for additional students.

Information provided by the MUSD Superintendent's office indicates that payment of the school mitigation fees by CCA and other new developments, and other funding mechanisms will mitigate potential impacts to a less than significant level.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to schools to a less than significant level.

**Water Supply Impacts**

The proposed Project would require 392,000 gallons per day of water. Implementation of the proposed Project would include improvements to the offsite water infrastructure facilities to provide adequate operational and fire/emergency water service to the site.

**Mitigation**

The following mitigation measures will be adopted to ensure that water is available to serve the Project, and that the Project uses the minimum practical amount of water.

- Design of the proposed prison would include provisions to minimize water use at the proposed prison:
  - Use of low-flow fixtures, and
  - Use of drought-tolerant, native landscaping.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which will avoid or reduce impacts to the water system to a level that is less than significant.

## B. TRANSPORTATION

**Traffic Impacts**

During operations, the Project would generate approximately 1,320 daily vehicle trips on peak weekdays. This impact would contribute to an existing unacceptable level of service at the intersection of SR 58 / California City Boulevard in the unincorporated area of Kern County. Cumulative plus peak weekday traffic would result in a significant impact between 5:30 AM and 6:30 AM at the SR 58 / California City Boulevard intersection.

**Mitigation**

The following measure would reduce the project-related impact to a less than significant level:

- The addition of a traffic signal is shown to be warranted for existing conditions and this improvement would mitigate the unacceptable Level of Service (LOS) condition. Caltrans has jurisdiction over SR 58 and according to Caltrans the Project would be required to participate in funding interim improvements at SR 58/ California City Boulevard, rather than a traffic signal at this intersection. The proposed CCA Prison would contribute 4.2% of the interim improvement costs based on the proportionate share of Project traffic impact to this intersection. Implementation of this mitigation measure would reduce the Project's impact to a less than significant level.

**Finding**

The impacted intersection is within the dual jurisdiction of Caltrans, a state agency, and Kern County. California City shall ensure through the Mitigation Monitoring Plan that the applicant makes its proportionate share of funds available to Caltrans and Kern County for interim improvements to the intersection. However, California City, as lead agency, has no jurisdiction to implement this mitigation. Caltrans and Kern County can and should implement this mitigation measure to reduce project-related impacts to a less than significant level.

Should Caltrans and Kern County implement this mitigation measure, changes or alterations will have been required in, or incorporated into, the Project which will avoid or reduce Project-related traffic impacts to a less than significant level. If, however, Caltrans and Kern County do not utilize fair share contributions to mitigate the Project's contribution to the current unacceptable LOS condition at SR 58/California City Boulevard, then the increased traffic generated by the Project would be considered a significant and unavoidable adverse impact. Therefore, and in that case, the City shall find that the impact is overridden by the Project benefits stated in the Statement of Overriding Considerations as set forth in Section 8 below.

## C. NOISE

**Noise Impacts**

If dwellings were to be constructed in the approved residential subdivision to the east of the site prior to prison construction, future residents could be subjected to high noise levels during Project construction.

**Mitigation**

No sensitive receptors are currently located near the Project. Prison operations will not exceed noise significance thresholds and, therefore, no mitigation is required for noise impacts from prison operations. Noise from construction activities would only be considered significant if residences are constructed prior to prison construction. Therefore the Final EIR recommends the following mitigation measures to reduce the noise impacts of construction should residences be built adjacent to the Project prior to Project construction:

- Construction activities within 2,000 feet of occupied residences will be limited to the hours of 7 a.m. to 8 p.m. Monday through Saturday, with no construction allowed on Sundays or City holidays.

- Properly muffled equipment and trucks will be used.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce noise impacts to a less than significant level.

## D. HYDROLOGY, STORM DRAINAGE, AND FLOOD CONTROL

**Hydrology Impacts**

Implementation of the Project would result in the covering of between 50 and 70 acres with impervious surfaces such as buildings, access roads, and parking areas. Implementation of the Project as proposed could result in an increase of the 100-year storm peak runoff from the watershed.

**Mitigation**

The City will adopt the following measures to reduce the potential impacts related to stormwater runoff to a less than significant level:

- Stormwater drainage and collection facilities will be designed to maintain the volume of surface water runoff at pre-Project levels. Facilities will include ditches or swales, constructed along the perimeter of the prison complex, and lined only with natural vegetation. The ditches, designed for 100-year peak storm flow, will intercept and convey storm runoff to an on-site detention basin.

- An unlined storm water detention basin will be developed on-site to retain a volume of storm water necessary to control runoff from impervious surfaces, and maintain surface runoff volumes at the property boundaries at pre-Project levels. The capacity of the detention basin will be based on calculated storm water flows above natural conditions, resulting from impervious surfaces of the proposed Project. The sizing and design of this detention basin will be reviewed and approved by the City Engineering Department as part of the final site plan approval.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hydrology impacts to a less than significant level.

**Storm Drainage Impacts**

Project implementations could result in urban pollutants entering stormwater runoff. Such pollutants may include oil, grease, antifreeze, trace metals, dust and dirt, fertilizers, herbicides and pesticides.

**Mitigation**

The City will adopt the following measure to reduce potential water quality impacts to a less than significant level:

- The proposed Project will comply with all applicable requirements of the NPDES permit program.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce storm drainage impacts to a less than significant level.

## E. BIOLOGICAL RESOURCES

**Utility Infrastructure Impacts**

Based on the low quality of habitat, and complete absence of presence or sign for any sensitive species within the 25-acre utilities construction path, significant impacts which would require comprehensive mitigation measures are not anticipated. Biologists estimated that approximately ten percent (10%) or 2.5 acres of property along the utility installation area contain habitat which could be considered Category III as designated by the Bureau of Land Management.

**Mitigation**

The City will adopt the following measures to reduce the potential impact on utilities construction path to less than significant:

- The off-site compensation measures described in Section 4(A) include preservation of 2.5 acres of habitat to off-set the loss described above.

- Prior to installing underground utilities, a final inspection of these areas will be conducted to verify the findings of previous biological surveys

- Biologist shall survey utility construction path immediately prior to trenching activities, and biologist shall move any tortoise from the construction path to adjacent habitat, out of harms way.

- All vehicles, including heavy equipment and personal vehicles, shall use established roadways to access the site. All vehicles shall be restricted to the site and shall not disturb areas adjacent to the utility construction area.

- An educational program should be developed and presented to all construction personnel who will be present on-site.

- The open utility trench will be kept to the minimum width and length as practicable for construction purposes which can be completed on a day-to-day basis.

- The utility trench shall be filled or covered at the completion of each construction day.

- The utility trench shall be visually inspected for tortoise immediately prior to commencing construction each morning.

- Areas disturbed within the utilities construction path will be regraded to blend with adjacent topography.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce utility infrastructure impacts to a less than significant level.

## F. CULTURAL RESOURCES

**Cultural Resources Impacts**

A recorded archaeological site is located on a portion of the site. Because implementation of the proposed Project could result in the disturbance of prehistoric material, this impact is considered significant.

**Mitigation**

The City will adopt the following measures to reduce potential impacts on cultural resources to a less than significant level:

- If human skeleton remains are encountered during construction, work within 20 meters of the discovery will be stopped immediately and the County Coroner notified. If the remains are Native American, the Coroner has 24 hours to notify the Native American Heritage Commission.

- If any buried cultural remains are encountered during development and construction, work within 20 meters of the discovery will be stopped until a professional archeologist is retained to determine the significance of the find and to develop management actions. Actions needed to manage the resource will be implemented.

- Avoidance of archaeological sites is the preferred management technique. Avoidance may be achieved through implementation of the following measure:

- A qualified archaeologist will be retained to fence the perimeter of the archaeological site prior to Project grading. The fence will be located approximately 15 feet outside the actual resource site boundary and remain there for the duration of construction activities. The fenced area will be unmarked to prevent unauthorized collecting.

If avoidance is infeasible, the following measure will be implemented:

- Prior to site grading or other construction activities, a qualified archaeologist will collect surface artifacts. A report containing a lithic analysis will be filed with the Southern San Joaquin Valley Information Center at California State University, Bakersfield.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce cultural resource impacts to a less than significant level.

## G. GEOLOGY, SOILS, SEISMICITY AND GROUNDWATER

**Soil Impacts**

Potentially expansive soil was encountered in one boring at the site during a geotechnical investigation conducted for the 1994 EIR. Construction on expansive soils can result in structural damage or failure.

**Mitigation**

The City will adopt the following measures to reduce potential impacts relative to expansive soils to a less than significant level:

- Expansive soil, will be removed or treated, and/or an expansion-resistant foundation system will be constructed.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce soil impacts to a less than significant level.

**Soils Impact**

The surface soil, upper 1 to 4.5 feet, at the site is generally of a loose consistency and may be subject to excessive immediate settlement under loading. Such settlement can result in structural damage or failure.

**Mitigation**

The following measures will be adopted to reduce potential impacts relative to collapsible or compressible soils to a less than significant level:

- Collapsible soils or compressible soils, if determined to be present at the site, will be mitigated by modification of soil, or through structural foundation design.

- A complete design-level geotechnical investigation of the site prior to final design and construction will be conducted. The investigation will be focused on actual building location and take into consideration building design and loading considerations. The purpose of the investigations will be to identify specific design criteria and provide final recommendations for site grading, foundations, paving, and other considerations.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce collapsible or compressible soils impacts to a less than significant level.

**<u>Seismic Impacts</u>**

Based on probabilistic analysis conducted for the preparation of the 1994 Final EIR, the highest maximum peak horizontal accelerations at the site could range from 0.30g to 0.35g for the estimated maximum credible event of M7.5 at the Lockhart Fault.

**Mitigation**

The following measure will be adopted to reduce potential impacts relative to seismic shaking to a less than significant level:

- Facilities will be designed to the standards required by the regulatory agencies governing the Project, or other pertinent building codes, to withstand the expected ground motions. Through site specific studies, seismic criteria has been developed that should be evaluated by structural designers to determine whether the standard seismic design for prisons meets or exceeds the criteria.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce seismic impacts to a less than significant level.

## H. HAZARDOUS MATERIALS

**Hazardous Materials Impacts**

Review of historic aerial photographs, and local, state, and federal records revealed no evidence of hazardous substance use, storage, or releases on the Project site. No evidence of hazardous materials storage or contamination was identified on the site or in adjacent areas. However, due to the size of the site, the possibility of an isolated area of contamination, e.g. isolated illegal dumping of hazardous waste, cannot be completely dismissed.

**Mitigation**

The City will adopt the following measure to reduce potential impacts with respect to potential site contamination to less than significant:

- In the event that hazardous materials or waste contamination are encountered during grading, construction or operation of the proposed Project, the subject wastes shall be assessed, reported to appropriate agencies, and remediated. Appropriate remediation shall be determined through consultation with the affected health and state agencies.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts to a less than significant level.

**Hazardous Materials Impacts During Construction and Operations**

Construction and operation of the Project would require the use and storage of hazardous materials such as paints and solvents. The misuse, improper disposal, and/or mismanagement of these materials could affect groundwater quality, soil quality, and possibly create hazards to human health and safety.

**Mitigation**

The City will adopt the following measures to reduce potential hazardous materials impacts during Project construction and operation to a level that is less than significant:

- Hazardous materials on the prison grounds will be properly stored in suitable containers and in accordance with manufacturers directions for safe storage.

- Hazardous materials used at the prison will be properly disposed of as needed, at a Class I landfill, a County-sponsored "hazardous materials round-up", or other suitable disposal method sanctioned by the Department of Toxic Substances Control.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which avoid or reduce hazardous materials impacts during construction to a less than significant level.

## SECTION 4

## SIGNIFICANT UNAVOIDABLE ENVIRONMENTAL IMPACTS WHICH CANNOT BE MITIGATED TO A LEVEL THAT IS LESS THAN SIGNIFICANT

### A. BIOLOGICAL RESOURCES

Desert Tortoise Habitat Impacts

The Project site is located outside of U.S. Fish and Wildlife (USFWS) designated critical habitat areas for the desert tortoise. However, the Project would result in the loss of approximately 70 acres of desert tortoise habitat. The loss of occupied habitat could be considered a take pursuant to Section 2081 of the California Endangered Species Act (CESA). Any net loss of any occupied desert tortoise habitat is considered a significant and unavoidable impact. Individual tortoises could be destroyed as a result of grading and construction activities. Destroying a tortoise would be considered a take of a listed species pursuant to both the ESA and the CESA, and considered a significant impact.

**Mitigation**

To mitigate the above impacts and comply with the Federal Endangered Species Act (ESA) and California Endangered Species Act (CESA), the applicant will obtain necessary permits from both USFWS and California Department of Fish and Game (CDFG). USFWS will require the submittal of a ESA Section 10(a) permit application and the preparation of a Habitat Conservation Plan (HCP) that includes a Project description with an impact assessment, mitigation measures to avoid or minimize impacts, compensation for any unavoidable impacts, implementation measures, and provisions for any unforeseen circumstances and amendment to the HCP and permits. This document will also provide the information required during CDFG Section 2081 permitting process as mandated by CESA.

The following mitigation recommendations are typical of those included in desert tortoise habitat HCP's. Actual mitigation requirements will be determined by USFWS and CDFG during the required permitting process. The agencies may require additional measures to mitigate for the proposed habitat loss for the desert tortoise.

Construction Site Measures

- Prior to implementation of any of the following measures, CCA must provide fees for the

acquisition of up to 70-acres of compensation lands to the Desert Tortoise Preserve Committee (DTPC) to mitigate impacts of the prison development.

- Grading limits should be chosen in an effort to minimize impacts to mapped tortoise activity areas.
- An enclosure should be placed around the boundary of the limits of grading and should consist of an appropriate type of fencing to keep desert tortoises from re-entering the construction area.
- Clearance surveys should be conducted by qualified and permitted biologists to locate and remove any tortoises from within the limits of grading. All tortoises will be relocated to an appropriate, and preferably, adjacent habitat within the western one-half which are not part and placed within created, artificial burrows of any area disturbed by the proposed prison or any potential future facility expansions.
- The undeveloped portion of the western one-half of the site will be dedicated as a conservation easement to provide and enhance habitat for sensitive biological species.
- A biological monitor should be present during all initial ground clearing and grading activities to ensure that no incidental take of desert tortoise occurs.
- An educational program should be developed and presented to all construction personnel who will be present on-site.
- Access to the 320-acre site will be strictly controlled by perimeter signage and 24-hour patrols by prison correctional officers. Human recreational activities will be prohibited within the undeveloped portions of the site for environmental and security purposes. Native wildlife activity and migration within the property boundary, and outside the boundaries of prison security fencing, will not be disturbed.
- Provide signage along site access road to beware of desert tortoise.

**Finding**

The Project impacts to desert tortoise and related habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which significantly reduce the potential for take of listed species and substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Mojave Ground Squirrel Habitat Impacts**

Although no Mojave ground squirrels were observed at the site, the loss of Mojave ground squirrel

habitat is considered a significant impact.

**Mitigation**

The impact on the Mojave ground squirrel habitat will be significant and unavoidable, however, the. City will adopt the following measure to partially mitigate the impact on the Mojave ground squirrel habitat:

- A mitigation plan for the loss of habitat will be approved in coordination with the permitting for the loss of desert tortoise habitat discussed above.

**Finding**

The impacts to the Mojave ground squirrel habitat identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Burrowing Owl Impacts**

Although no burrowing owls were observed at the site, the loss of burrowing owl habitat is considered a significant impact.

**Mitigation**

Project impacts on the burrowing owl habitat will be significant and unavoidable, however, the City will adopt the following measure to partially mitigate the impact on the burrowing owl habitat:

- Although no burrowing owls were observed at the site, and no impacts to burrowing owls are expected, mitigation which will be developed for the desert tortoise includes protection of Mojave creosote bush scrub habitat form grazing and recreational vehicle activity. This mitigation will enhance the potential for use of the protected area of the site as burrowing owl habitat.

**Finding**

The impact identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effects identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## B. AIR QUALITY

**Construction Impacts**

The Project would modify/develop between 50 to 70 acres, and up to 35 acres could be exposed at any one time during construction. The Project could generate 1,848 pounds per day of fine particulate matter ($PM_{10}$). Construction related emissions would exceed Kern County Air Pollution Control Department CEQA thresholds of significance for $PM_{10}$ and nitrogen oxides ($NO_2$), and would therefore represent a significant and unavoidable impact of the Project.

**Mitigation**

Although the impacts associated with $NO_2$ and $PM_{10}$ are significant and unavoidable, construction activities shall be partially mitigated by employing the best available control measures for fugitive dust control described in the EIR Supplement and included in the Mitigation Monitoring Program.

**Finding**

Project construction air quality impacts identified in the Final EIR Supplement cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement.

**Construction Equipment Impacts**

Use of employee vehicles, trucks and heavy equipment would result in construction emissions throughout the construction period. The Project would generate approximately 172 tons/year of carbon monoxide, 21 tons/year of total organic gases, 59.8 tons/year of nitrogen oxides, 5.7 tons/year of sulfur oxides, and 6.4 tons/year of particulate matter during construction. Construction related emissions would exceed KCAPCD CEQA thresholds of significance for $PM_{10}$ and $NO_2$.

**Mitigation**

Although the impacts from construction equipment and construction employee vehicles will be significant and unavoidable, the following measures will partially mitigate the identified impacts:

- Equipment will be maintained to minimize emissions.
- Information will be provided to construction employees to facilitate car pooling.
- Information will be provided to construction employees to facilitate extended stays in the Project vicinity to reduce long distance commuting.

**Finding**

Project air quality impacts arising from construction activities cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Operations Impacts**

Total daily trips to the site during operation peak weekdays are estimated to be 1,320. Vehicle emissions would total 48.4 tons/year reactive organic gases, 330 tons/year carbon monoxide, 37.5 tons/year nitrogen oxides, and 6.1 tons/year of $PM_{10}$. Operation of the Project would result in significant and unavoidable impacts from emissions of organic compounds and nitrogen oxides, which exceed KCAPCD CEQA thresholds of significance.

**Mitigation**

City will adopt the following measures to partially mitigate the air quality impacts from operational emissions:

- Information will be provided to employees to facilitate car pooling.
- Equipment, such as generators, will meet all Kern County Air Pollution Control District requirements.

**Finding**

Project air quality impacts arising from operations cannot be mitigated to a less than significant level. However, changes or alterations have been required in, or incorporated into, the Project which substantially lessen the significant environmental effect as identified in the Final EIR Supplement. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## C. AESTHETICS/VISUAL CONSIDERATIONS

**Aesthetic Impacts**

The Project would result in the conversion of vacant desert lands to a developed prison facility with buildings, parking lots, lighting, and other related features. Although no residences presently exist in the immediate vicinity, the prison would represent a significant change in the visual landscape, or viewshed, to future residents of approved residential subdivisions adjacent to the proposed prison site.

Even with mitigation in place, implementation of the proposed Project will result in an unavoidable significant visual impact to future residents of the approved subdivisions east of the Project site. The

site is relatively small, thereby affording limited flexibility in terms of placement of the prison structures. There are no feasible mitigation measures available to reduce the potential visual impact to less than significant

**Mitigation**

The Project impact on the viewshed will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Areas of the site disturbed during Project construction which would remain unpaved will be revegetated for runoff control and to enhance visual blending with the surrounding area.

**Finding**

Changes or alterations to the Project to reduce visual and aesthetic impacts have been incorporated into the Project as the mitigation measures, however, the visual and aesthetic impacts associated with the Project cannot be mitigated to a less than significant level. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

**Lighting Impacts**

Indirect lighting of adjacent areas and skyglow from the proposed prison would occur because the Project site is surrounded by vacant desert lands with no light-blocking features, and because there are no other sources of nighttime lighting in the vicinity. Although currently no residences exist in the immediate vicinity, skyglow would be visible and would be a visual nuisance to existing and future sensitive receptors.

Even with mitigation in place, skyglow will be noticeable in California City. Only the no-Project alternative would avoid significant light and glare impacts. However, implementation of this alternative would not meet the basic objectives of the Project.

**Mitigation**

The impact from nighttime lighting and skyglow will be significant and unavoidable, however, the following measure will be adopted to partially mitigate the identified impact, but not to a level that is less than significant:

- Mast lighting posts will not exceed 30 feet in height, and where applicable and required by design, the lighting will be shielded and directed downward to minimize off-site illumination.

**Finding**

Changes or alterations have been required in, or incorporated into, the Project which substantially

lessen the significant environmental effects as identified in the Final EIR Supplement. However, the residual effect, after mitigation, of nighttime lighting has been identified as significant and unavoidable. A Statement of Overriding Considerations has been prepared for the Project (See Section 8).

## SECTION 5

## ALTERNATIVES

The Final EIR Supplement identifies and evaluates five potential alternatives to the Project that "could feasibly accomplish most of the basic purposes of the Project". The five alternatives include (1) no Project, (2)Virginia Boulevard-LessIntense Prison, (3) Randsburg-Mojave site, (4) Remote Site, and (5) Virginia Boulevard/190% Development alternative. The alternatives discussed in the Final EIR Supplement constitute a reasonable range of potential options necessary to permit a reasoned choice of alternatives in light of the Project Objectives identified in Sections 1.3 and 7.0 of the Draft EIR Supplement. The Final EIR identifies the No Project Alternative and the Less-Intensive Prison Alternative as environmentally superior to the Project and they would reduce or eliminate the unavoidable significant impacts associated with the Project. However, neither of these alternatives fulfill the Project objectives. In addition, specific economic and social considerations make the environmentally superior alternatives identified in the Final EIR Supplement infeasible. Therefore, pursuant to CEQA Guideline 15364, and Public Resources Code Section 21081(a)(3), the Planning Commission will reject the environmentally superior alternatives as infeasible.

The alternatives considered in the Final Supplement are summarized below:

1. **No Project Alternative-** Under the no-Project alternative, a correctional facility would not be constructed. None of the potential impacts associated with development of the Project would occur. Unavoidable adverse impacts related to light and glare, biological resources and air quality (particulate and ozone-producing gases) during both construction and facility operation would be avoided.

**Finding**

The Planning Commission finds the No-Project Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative will fail to meet any of the Project objectives identified in the Final EIR; and
- This alternative would forego the substantial benefits of the Project, particularly:
    - Construction of the Corrections Corporation of America Prison at California City is necessary to provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for surrounding communities. Between 85 to 90 percent of the prison employees are expected to be drawn from the Project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

- In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees will stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

2. **The Virginia Boulevard-Less Intense Prison-** The EIR Supplement evaluated a smaller scale Project on the same site comprised of 1,000 beds on a 40 acre site.

**Finding**

The Planning Commission finds the Virginia Boulevard-Less Intense Prison Alternative is infeasible and rejects this alternative for the following reasons:

- This alternative provides environmental benefits, however, this alternative will not provide as many employment opportunities as the proposed Project and would provide less capacity to serve the incarceration needs of government correctional agencies. Thus, this alternative will do less to meet Project objectives; and

- Based on the required investment in land and facility development costs, a smaller prison on the 320- acre site would not be economically viable. Thus, this alternative does not present a cost effective alternative to a publicly funded and operated correctional facility.

3. **Randsburg-Mojave Site-**While not an unavoidable significant impact, this alternative would remove potential (but somewhat degraded) habitat for the burrowing owl and the Mojave ground squirrel. Additionally, the Randsburg-Mojave property is not currently served by paved access roads, and public utilities would require extension from a greater distance to serve the site. Furthermore, as discussed in the 1994 EIR, construction at this site would require enhanced engineering design and more stringent building requirements to withstand potential levels of seismic shaking due to the proximity of an active fault, thus representing a fiscal constraint. Lastly, during the initial search by CCA for an appropriate site to accommodate the proposed Project, the Randsburg-Mojave property was not available for sale.

4. **Remote Site Alternative-**Through the site selection process used to find the prison site, properties located in the region which would be reasonably feasible alternatives, would meet the majority of the Project objectives, and fit most of the criteria identified as necessary, were

not found. Specifically, the biological resources and habitat quality of more remote sites tended to improve; however, the areas further to the east and north tend to be served by fewer paved roads with limited access to utilities and services. Thus a Remote Site alternative was not feasible.

5. **The Virginia Boulevard/190% Development Alternative-** This alternative would result in additional significant unavoidable impacts such as viewshed impacts; increased light, glare and aesthetic impacts; impacts to Mojave Unified School District; additional particulate and ozone producing impacts generated during operations; and loss of additional acreage of potential desert tortoise, burrowing owl, and Mojave ground squirrel habitat. The larger prison could also result in land use incompatibilities and incrementally increase demands on public utilities and community services which could potentially limit the ability to provide adequate services. This alternative was rejected since it would not offer an environmental advantage over the proposed Project.

## SECTION 6

## RECIRCULATION

## SECTION 21092.1 FINDING

Finding: Pursuant to CEQA Guideline 15088.5, and Public Resources Code Section 21092.1, on the basis of its review and consideration of the Final EIR Supplement this Planning Commission finds that:

- The Project mitigation for impacts to biological resources has been revised from an on-site habitat conservation plan to an off-site habitat conservation plan as described in Section 3 of these findings and as shall be incorporated into the Project as part of the Mitigation Monitoring Plan.

- The revised mitigation measures and revised water system design are not substantial changes in the Draft EIR Supplement that would deprive the public of a meaningful opportunity to comment on a substantial adverse environmental effect of the project, a feasible way to mitigate or avoid such an effect, or a feasible project alternative; and

- The revised mitigation measures and revised water system design will not result in new significant environmental effects or substantially increase the severity of the previously identified significant effects disclosed in the Draft EIR Supplement; and

- The revised mitigation measures and revised water system design will not involve or require mitigation measures or alternatives which are considerably different from those analyzed in the Draft EIR Supplement that would substantially reduce one or more significant effects on the environment; and

- The revised mitigation measures and revised water system design do not render the Draft EIR Supplement so fundamentally inadequate and conclusory in nature that meaningful public review and comment would be precluded;

- Thus, none of the conditions set forth in CEQA Guideline 15088.5 or Public Res. Code § 21092.1 requiring recirculation of a Draft EIR Supplement have been met. Incorporation of the revised mitigation measures and revised water system design into the Final EIR Supplement does not require that the EIR Supplement be recirculated for public comment.

## SECTION 7

## FINDINGS REGARDING THE MITIGATION MONITORING PROGRAM

Section 21081.6 of the Public Resources Code requires that when a public agency is making the findings required by State CEQA Guidelines Section 15091(a)(1) and Section 21081(a) of the Public Resources Code the public agency shall adopt a program for reporting on or monitoring the changes which it has either required of the Project or made a condition of approval to avoid or substantially lessen significant environmental effects. These measures must be fully enforceable through permit conditions, agreements, or other measures.

The Planning Commission hereby finds that the Mitigation Monitoring Program dated January, 1998, and adopted as part of the Project's Conditional Use Permit meets the requirements of Section 21081.6 of the Public Resources Code by providing for and enforcing the implementation and monitoring of Project conditions intended to mitigate potential environmental effects of the Project.

## SECTION 8

## STATEMENT OF OVERRIDING CONSIDERATIONS

Having reduced the effects of the proposed Project by adopting mitigation measures, and balanced the benefits of the proposed Project against the proposed Project's potential unavoidable adverse impacts, the City hereby determines the benefits of the proposed Project outweigh the potential unavoidable adverse impacts, and the unavoidable adverse impacts are acceptable, based on the following overriding considerations, which are sufficient to outweigh the proposed Project's unavoidable adverse impacts:

- Construction of the Corrections Corporation of America Prison at California City will provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies, and to provide a cost effective alternative to publicly funded construction and operation of prisons.

- The prison will provide excellent long term employment and career opportunities for

Surrounding communities. Between 80 to 90 percent of the prison employees are expected to be drawn from the project vicinity. Approximately 480 positions for permanent correctional officers will be created. Other job opportunities will include medical, education, administrative, trade and clerical services.

In addition to the jobs directly created by the prison, the purchase of local goods and services for the prison facility, and by CCA employees wil stimulate the local economy and result in additional employment opportunities in the Project vicinity. Since California City has no base industries, the additional employment opportunities and the increased tax revenue generated by the prison will greatly benefit the local economy.

**SECTION 9**

**INDEPENDENT JUDGEMENT**

**SECTION 21082.1 (C) (3) FINDING**

Facts: The Planning Department, acting as lead agency, has reviewed and edited as necessary the Draft EIR Supplement and the Final EIR Supplement to reflect its own independent judgement to the extent of its ability, including reliance on concerned County technical personnel from other departments.

Finding: Pursuant to Public Resources Code Sec. 21082.1 (c) (3) the City Council hereby finds that the Final EIR Supplement reflects the independent judgement of the lead agency.

---

Introduced, approved and adopted this 20th Day of January, 1998 by the following vote:

AYES: 5
NAYS: 0
ABSTAIN: 0
ABSENT: 0

Larry Adams, Mayor

January 20, 1998
Date

ATTEST:

Helen Dennis, City Clerk

DRAFT

**SUPPLEMENT TO FINAL ENVIRONMENTAL IMPACT REPORT**

**CORRECTIONS CORPORATION OF AMERICA PRISON AT CALIFORNIA CITY**

**State Clearinghouse No. 97091045**

**Lead Agency:**
City of California City
21000 Hacienda Boulevard
California City, CA 93505
(760)373-8661

**Prepared by:**
Rust Environment & Infrastructure
18401 Von Karman
Suite 550
Irvine, California 92612
(714)251-6400

**Project Applicant:**
Corrections Corporation of America
102 Woodmont Boulevard, Suite 800
Nashville, Tennessee 37205

**October 1997**

**Rust Environment & Infrastructure**

# 1.0 INTRODUCTION

**DRAFT**

## 1.1 PREFACE

The proposed project involves construction and operation of a new 2,304 bed medium security prison facility located in California City, Kern County, California. The proposed prison would occupy approximately 70 acres of a 320 acre property situated at the terminus of Virginia Boulevard, roughly one-half mile south of Twenty Mule Team Parkway and approximately five miles east of downtown California City. The proposed project will require extension of public utilities to serve the facility, and issuance of a Conditional Use Permit by California City and other necessary agency approvals.

This project is being proposed by Corrections Corporation of America (CCA), the leading private sector provider of detention and correction services to federal, state and local governments in the United States. CCA was founded in 1984, and currently has contracts to operate 62 correctional facilities in several states. CCA's full range of services includes finance, design, construction and management of new or existing facilities, as well as long-distance inmate transportation. CCA's mission is "Quality corrections, at less cost to the taxpayer, in partnership with government."

## 1.2 PURPOSE OF THIS DOCUMENT

This document is prepared as a Supplement to a prior Environmental Impact Report (EIR) (State Clearinghouse No. 93082030) which evaluated the environmental effects resulting from construction and operation of a new State of California Department of Corrections (CDC) prison facility on one of two properties located in California City. One of the properties evaluated in the prior EIR, the Virginia Boulevard site, is being evaluated in this document for construction and operation of a similar, yet less intense prison facility that would be constructed, owned and operated by CCA.

Under California Environmental Quality Act (CEQA) Guidelines (Section 15163), the lead or responsible agency may choose to prepare a Supplement if minor additions or changes in the proposed action have occurred since circulation of a previous EIR. The EIR Supplement need only contain information necessary to make the previous EIR adequate for the currently proposed project. Therefore, the 1994 certified EIR (SCH#93082030) is incorporated by reference into this Supplement in accordance with CEQA Guidelines Section 15150. The Executive Summary of the certified EIR is attached as Appendix A of this Supplement. The entire certified EIR is available for review at the City of California City Planning Department offices located at 21000 Hacienda Blvd. in California City.

Based on the evaluation conducted to complete the Initial Study, and a review of impacts and mitigation measures identified in the prior EIR, the areas for which this Supplement provides revised

or clarified information for the proposed action include:

- Changes to the description of the proposed action.
- Land use and planning.
- Visual considerations.
- Employment, population and housing.
- Public utilities and community services.
- Transportation.
- Air quality.
- Hydrology and drainage.
- Biological resources.
- Cultural resources.

**DRAFT**

The technical reports used in the preparation of this Supplement are attached as appendices. The prior EIR and associated technical appendices are available for review at the City of California City offices noted on the cover of this report.

This EIR Supplement will be used by the City of California City Planning Commission and City Council, and various local, state, and federal responsible agencies during consideration of the proposed project (see Section --- for an overview of the permits/approvals required for the proposed project). The primary purpose of this EIR Supplement is to:

- Identify and evaluate potential environmental consequences of the proposed project.
- Indicate the manner in which those consequences can be mitigated or avoided.
- Identify and analyze alternatives that may reduce or eliminate potentially significant environmental impacts associated with the proposed project.
- Identify any impacts, that even with mitigation measures would be unavoidable.
- Provide, or refer to, documentation supporting these determinations.

## 1.3 PROJECT OBJECTIVES

In planning the California City prison facility, and in accordance with section 15124(b) of CEQA Guidelines, CCA identified the following objectives:

- Provide a secure prison facility to serve the inmate incarceration needs of government correctional agencies.

- Provide a cost effective alternative to publicly funded construction and operation of prisons.

- Provide opportunities for academic education, vocational training, and specialized treatment for inmates as required by contracting agencies.

- Provide excellent long term employment and career opportunities for surrounding communities.

## 1.4 PROJECT BACKGROUND

In August 1994, the CDC certified a Final EIR which addressed a new 2,200 bed prison or up to a 4,400 bed prison complex, and an associated waste water treatment facility located on one of two sites in California City. Prior to EIR certification, a 30-day Notice of Preparation was distributed, and a public scoping meeting was held to encourage public participation in that environmental review process. The Draft EIR, which provided an extensive evaluation of potential environmental impacts resulting from the proposed projects, was distributed for a 45-day public review period. Following the close of the review period, CDC held a subsequent public hearing to obtain verbal comments on the Draft EIR. The Final EIR was certified by CDC after additional technical studies were conducted, and responses were prepared to all comments received during the public review process.

The first of the two alternative prison sites evaluated in the prior EIR is referred to as the Randsburg-Mojave site. This property, which is located north of Randsburg-Mojave Road and comprised of 1,780 acres, was evaluated for construction and operation of up to a 4,400 bed prison to accommodate up to 8,360 inmates. The second site, referred to as the Virginia Boulevard site, is a 480 acre property located south of Twenty Mule Team Parkway at the terminus of Virginia Boulevard. The Virginia site was evaluated for operation of a 2,200 bed prison to accommodate up to 4,180 inmates. A CDC prison facility on either property would have included a 160-acre waste water treatment facility. Due to funding constraints, the State of California did not proceed with construction or operation of a prison on either of the sites evaluated.

Since certification of the prior EIR, CCA has submitted a proposal to the City of California City to construct and operate a medium security prison facility on the Virginia Boulevard site. This facility would be connected to municipal water, sewer, electricity and gas services. The proposed action includes a 2,304 bed prison on the 320 acre parcel described herein. The 160 acre parcel previously evaluated for a wastewater treatment plant is not a part of the proposed CCA prison. Similarly, the Randsburg-Mojave site evaluated in the prior EIR is not a part of the CCA proposed prison.

To respond to potential environmental effects of the proposed action addressed in the EIR certified by CDC which may require updating or clarification, California City, as the new lead agency for the project, has determined that a Supplement to the prior EIR should be prepared. As noted above, this Supplement provides additional analysis/clarification of various issues, and provides an opportunity for public review and comment. The City of California City issued a Notice of Preparation (NOP) for an EIR Supplement for the proposed action on September 11, 1997. A copy of this NOP, the Initial Study, and Responses to the NOP are included in Appendix B.

DRAFT

## 1.5 SUPPLEMENT FORMAT

The contents of this Supplement are arranged in a format similar to the prior EIR to assist in cross referencing the two documents. Only revised and/or clarified information is addressed in this Supplement. Unless otherwise addressed in this Supplement, the information included in the prior EIR remains unchanged. The remainder of the Supplement is organized in the following sections:

- **2.0 - Executive Summary** - This section summarizes the proposed action, related environmental impacts, identified mitigation measures, cumulative impacts, and alternatives to the proposed action.

- **3.0 - Project Description** - This section describes the prison facility proposed by CCA, including the property location and setting, site improvements and neccessary infrastructure extensions.

- **4.0 - Environmental Setting, Revised/Clarified Impacts, and Mitigation Measures** - This section discusses the current environmental condition of the site and vicinity, and describes the revised or clarified potential impacts resulting from implementation of the proposed action, and evaluates the significance of these impacts. Revised or additional mitigation measures that would reduce or avoid environmental effects are identified.

- **5.0 - Cumulative Impacts** - This section includes additional information on potential cumulative impacts from the proposed action and other projects in the region.

- **6.0 - Alternatives to the Proposed Action** - This section will describe alternatives potentially capable of eliminating or reducing significant environmental effects associated with the proposed action. This section will also address a maximum prison development (4,180 bed facility) scenario for the project site, consistent with the information presented in the prior EIR.

- **7.0 - Persons and Organizations Consulted** - This section provides a list of individuals and organizations that contributed data of concerns in this EIR Supplement. Persons or organizations who contributed to the preparation of this EIR Supplement are also identified.

- **8.0 - References** - A list of references used in the preparation of this Supplement is included in this section.

- **Appendices** - The following appendices to the EIR Supplement are included:
  - **Appendix A** - Notice of Preparation, Initial Study, and Responses to the NOP
  - **Appendix B** - Executive Summary From Prior EIR
  - **Appendix C** - Updated Traffic Study
  - **Appendix D** - Biological Resources Survey
  - **Appendix E** - Cultural Resources Survey

**DRAFT**

# 2.0 EXECUTIVE SUMMARY

**TO BE COMPILED FOLLOWING INITIAL REVIEW OF ADMINISTRATIVE DRAFT AND PRIOR TO DISTRIBUTION OF SUPPLEMENT FOR PUBLIC REVIEW**

**DRAFT**

## 3.0 PROJECT DESCRIPTION

DRAFT

### 3.1 PROJECT LOCATION AND SETTING

As shown in Figure 1, the 320 acre project site is located in the City of California City, Kern County California, approximately 0.5 miles south of Twenty Mule Team Parkway, at the terminus of Virginia Boulevard. The site is situated at an elevation of roughly 2,555 feet above mean sea level, approximately 5 miles east of downtown California City. The property and vicinity is comprised of vacant undeveloped desert land, characterized by creosote bush and scrub vegetation. The site is not currently served directly by any public utilities. The subject property nor any of the surrounding parcels within 0.5 miles contain any significant structural improvements. For more detailed information on the regional setting refer to the 1994 EIR.

### 3.2 FACILITY DESCRIPTION

The currently proposed action is a private venture by Corrections Corporation of America (CCA) to design, construct and operate a 2,304 bed medium security prison facility on approximately 70 acres of the 320 acre Virginia Boulevard site previously evaluated by CDC for a prison in EIR 93082030. Unlike the previous proposal, the CCA proposed facility will only accommodate 2,304 inmates, the intended capacity of the prison. This facility will be designed to meet American Correctional Association standards and is intended to accommodate inmates from the State of California. A conceptual site plan of the prison is shown in Figure 2. This site plan will be finalized in accordance with all applicable State and local codes and regulations.

The primary elements of the proposed prison will include the following:

- An administration building comprised of offices for the prison management, support staff and correctional officers. This building will also include space for medical response facilities, central kitchen and dining area, chapel, housekeeping, facility maintenance, inmate educational facilities, and visitation. The administration building will also be equipped with a fenced service yard for the storage of inmate transfer and security vehicles.

- Secure inmate housing buildings, constructed of precast concrete panels, would be connected to the administration building by twelve-foot wide precast concrete corridors. Inmate housing units would be equipped with staff and inmate support facilities, including programmatic meeting areas, restrooms and a commissary. Secure inmate housing units would be comprised of double occupancy cells.

- A gymnasium building that would include indoor sports and exercise areas, classrooms, and vocational areas would also be linked by a precast concrete corridor to the administration building.

- An armory, containing weapons and riot gear would be located in a secure building, detached

from the main prison building. CCA correctional officers do not carry any weapons as part of normal operations.

- An outdoor recreation and exercise area would be centrally located, near the inmate housing buildings and the administration building.

- All of the improvements described above will be situated within a perimeter compound security system that will include two rows of chain link fencing equipped with razor wire along the top and bottom of each fence. The facility would also be equipped with a motion detection system, and nighttime security lights on thirty-foot tall posts. To facilitate security patrols, an asphalt paved perimeter road would encompass the exterior of the entire fenced prison compound.

- Site improvements located external to the fenced and secured prison facility would include, an asphalt paved parking lot to accommodate approximately 216 employee and visitor vehicles. An asphalt paved, two lane road would provide access to the parking lot and prison. Petroleum powered generators would be installed to provide electricity to the facility in the event of a power failure.

## 3.3 FACILITY CONSTRUCTION

The construction of the proposed facility is projected to involve a total of 250 employees over a 15 - 18 month period. It is anticipated that within this construction period, there would be a peak activity period, where the number of employees would increase to about 350. This peak would last about three months. Based on the contractor's experience and the remote location of the site, it is estimated that 30% of the construction employees would carpool to the site.

## 3.4 FACILITY OPERATIONS

DRAFT

Operating at full capacity, the proposed CCA prison would employ approximately 640 staff during three correctional officer shifts seven days per week, and one administrative staff shift five days per week. Staff distribution per eight hour shift would be as follows:

- The first shift of 180 correctional officers would begin at 6:00 AM.
- The second shift of 180 correctional officers would begin at 2:00 PM.
- The third shift of 180 correctional officers would begin at 10:00 PM.
- The administrative staff shift of 100 people would begin at 8:00 AM.

As part of standard prison operations, inmates would be transported to and from the proposed prison on a weekly, or more frequent basis, as required by the contracting agencies supplying inmates for the proposed prison. Educational and vocational programs for inmates would be implemented by CCA staff to meet the needs of individual inmates and as specified by the requirements of the contracting agencies.

## 3.5 PUBLIC UTILITIES IMPROVEMENTS

The proposed prison would require the extension of electricity, water, natural gas and sewer utilities to the property. Water and electricity lines would be extended from existing utilities located along Twenty Mule Team Parkway. A water line providing service to the site would be placed underground within the Virginia Boulevard right-of-way. Electricity will likely be provided by an overhead extension along the east side of Virginia Boulevard. Natural gas lines would be extended from existing gas utilities located approximately four miles west of the prison site, near the intersection of Randsburg-Mojave Road and Hooker Street. Extension of electricity, water and natural gas as described above were also required for the previously proposed CDC prison, and the associated environmental impacts of these utility extensions were evaluated in the prior EIR.

Sewer service to the proposed prison would be provided by constructing an underground sewer line extension from the existing California City treatment facilities located approximately four and one-half miles west of the prison site. This extension, which would be located primarily within public street right-of-ways, would be designed and constructed in accordance with the rules and regulations of the City of California City. In contrast, the CDC proposal addressed in the 1994 EIR designated a 160-acre parcel adjacent to the prison for an on-site waste water treatment facility.

A complete discussion of the status of the public utilities and services in the vicinity, and the environmental impacts associated with implementation of the proposed prison are discussed in Section 4.4 of this Supplement.

DRAFT

OCT 10 '97 12:02PM RUST ENV INFRA P.11




VICINITY




Source: U.S.G.S. Map 7.5' Quadrangle, Galileo Hill, California

LOCATION

DRAFT

| | | |
|---|---|---|
| RUST<br>Rust Environment & Infrastructure Inc. | CORRECTIONS CORPORATION OF AMERICA<br>PRISON FACILITY<br><br>SITE VICINITY/LOCATION | FIGURE<br>1 |

25155

OCT 10 '97 12:03PM RUST ENV INFRA




Reference: DLR GROUP ARCHITECTS AND ENGINEERS

| | | |
|---|---|---|
| RUST<br>Rust Environment & Infrastructure Inc. | CORRECTIONS CORPORATION OF AMERICA<br>PRISON FACILITY<br><br>CONCEPTUAL SITE PLAN | FIGURE<br>2 |

P.12

25155

CUP 98-02

**RESOLUTION NO. 11-98-02**

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY MODIFYING CONDITIONAL USE PERMIT 97-01 AS IT RELATES TO THE PROPOSED 512-BED EXPANSION AT CORRECTIONS CORPORATION OF AMERICA'S CALIFORNIA CITY CORRECTIONAL CENTER (CONDITIONAL USE PERMIT--AMENDMENT 98-02)**

**BE IT RESOLVED BY THE PLANNING COMMISSION OF THE CITY OF CALIFORNIA CITY** as follows:

**Section 1. Scope**

The City granted a Conditional Use Permit 97-01 to Corrections Corporation of America (CCA) to operate a 2,304-bed Correctional Center at 22844 Virginia Boulevard. The permittee filed an application to expand the permitted use by 512 beds. This resolution sets forth the Commission's decision on the application.

**Section 2. Findings**

The Commission finds as follows:

(a) Operation of a prison facility is in accordance with the general plan and the objectives of the Zoning Regulations;

(b) Facility complies with the applicable provisions of the Municipal Code; and

(c) A Mitigated Negative Declaration for the proposal will satisfy California Environmental Quality Act (CEQA).

**Section 3. Conditions**

The application to amend Conditional Use Permit No. 97-01 is approved subject to the following conditions:

(a) Buildings must be connected to electricity, water, sewer, natural gas, telephone and cable television;

(b) Site Plan Review for the project will be to the satisfaction of the City Engineer and in accordance with the Municipal Code; and

(c) Other provisions of the Municipal Code shall be followed.

**Section 4. Other**

Except as provided herein, Conditional Use Permit No. 97-01 is hereby affirmed.

**PASSED, APPROVED AND ADOPTED** on November 24, 1998, by the following votes:

AYES: 4
NOES: -0-
ABSENT: -0-
ABSTAIN: 1

Robert L. Tryon
Chair

ATTEST:

Ronna Greene
Secretary

(SEAL)

# EXHIBIT B

| 1. Agreement Number | 2. Effective Date | 3. Facility Code(s) | 4. DUNS Number |
|---|---|---|---|
| ODT-10-0002 | See Block 19. | | 159734151 |

**5. Issuing Federal Agency**
U.S. Department of Justice
Office of the Federal Detention Trustee
4601 N. Fairfax Drive, Suite 910
Arlington, Virginia 20530

**6. Local Government**
California City
21000 Hacienda Ave
California City, California 93505

TAX ID# 62-1806755

**7. Appropriation Data**

**8. Local Contact Person**
Tom Weil, City Manager

**9.** Tel: (760) 373-7170
Fax: (760) 373-7532
Email: citymgr@californiacity.com

**10.** This agreement is for the housing, safekeeping, and subsistence of federal prisoners, in accordance with content set forth herein.

**11.**
Male: 2,276 Female: 256
(Estimated Federal Beds)

**12.**
See Page #18

**13. Optional Guard/Transportation Services:**

☒ Medical Services

☒ U.S. Courthouse

**14.**
Guard Hour Rate: $53.03

Mileage shall be reimbursed by the Federal Government at the GSA Federal Travel Regulation Mileage Rate.

**15. Local Government Certification**

*To the best of my knowledge and belief, information submitted in support of this agreement is true and correct, this document has been duly authorized by the governing of the Department or Agency and the Department or Agency will comply with all provisions set forth herein.*

**16. Signature of Person Authorized to Sign (Local)**

[signature]
Signature

Tom Weil
Name

City Manager, California City — 09/21/10
Title — Date

**17. Prisoner and Detainee Type Authorized**

☒ Adult Male

☒ Adult Female

☐ Juvenile Male

☐ Juvenile Female

☐ ICE Detainees

**18. Other Authorized Agency User**

☒ BOP

☒ ICE

**19. Signature of Person Authorized to Sign (Federal)**

[signature]
Signature

Scott P. Stermer
Name

Assistant Trustee for Procurement, OFDT — 9/23/10
Title — Date

A.1 Background ........ 3
A.2 Services Required ........ 3
A.2.1 Standard Receiving and Discharge of Prisoners/Detainees ........ 4
A.2.2 Records Management ........ 5
A.2.3 Indemnification ........ 5
A.2.4 Transportation ........ 5
A.2.5 Medical Services ........ 7
A.2.5a Prisoner Rape Elimination Act (PREA) ........ 8
A.2.6 Contacts and Incident Reporting ........ 8
A.2.7 Detainee Work Program ........ 9
A.3 Quality Control Management ........ 10
A.4 Quality Assurance ........ 10
A.4.1 Inspection Clause ........ 11
A.5 Performance Reviews ........ 12
A.6 Performance Ratings ........ 12
A.7 Performance Matrix ........ 13
A.8 Contact for Agreement Administration ........ 17
A.9 Financial Provisions ........ 17
A.9.1 Service Contract Act ........ 17
A.9.2 Price Schedule ........ 18
A.9.3 Invoice and Payment ........ 18
A.10 Modification and Disputes ........ 19
A.11 Termination ........ 19
A.12 Litigation ........ 20
Prisoner Rape Elimination Act Reporting Information ........ 21

## A.1 Background

Federal detention is a large component of criminal and immigration case processing by the U.S. Marshals Service (USMS) and, U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS). Law enforcement initiatives and increases in illegal immigration to the United States have created a complex detention program that the Department of Justice (DOJ) must effectively manage with available detention resources or acquire additional resources to meet increasing demands.

In response to the increasing concern regarding federal detention, the Office of the Federal Detention Trustee (OFDT) was established by a Congressional directive to exercise all power and functions authorized by law relating to the detention of federal prisoners and illegal aliens. Accordingly, OFDT leads the development of DOJ detention policy and manages federal detention resources to maximize available detention space.

Currently, non-federal detention bed space for federal detainees and prisoners is acquired through Intergovernmental Agreements (IGAs), where a daily rate is paid to state and local governments, and facility-specific contracts with private service providers. The Department of Justice Appropriations Act for 2001 (Public Law 106-553) is designed to allow for the use of non-traditional contract vehicles when acquiring detention and other related services. This authority states:

*"Sec. 119 - Notwithstanding any other provision of law, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."*

In an effort to operate in the most effective way and receive the maximum benefit of Section 119 to meet the Government's current and future goals, and acquire additional resources, OFDT desires to award an Agreement to California City for detention services at the California City Correctional Center.

## A.2 Services Required

California City will provide, by the terms and conditions identified in this agreement, all necessary personnel, equipment, materials, supplies, and services for the management of comprehensive detention services, which include, but are not limited to, security, medical services, food service, safety, and sanitation. Additionally, the facility shall have sound proof rooms to accommodate video conferencing that permit prisoners and their attorneys to communicate in a secure manner which preserve the confidentiality of the attorney-client relationship.

These comprehensive detention services shall provide for the safe, secure, and humane confinement for male and female population principally consisting of prisoners or

detainees charged with federal offenses' and detained while awaiting trial or sentencing. Services are to be provided at the California City.

Performance shall be in accordance with the most current editions of the Federal Performance-Based Detention Standards (FPBDS), Performance-Based Detention Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement. California City shall maintain American Correctional Association (ACA) and Joint Commission on Accreditation of Healthcare Organizations (JCAHO) accreditation throughout the life of the agreement.

All services and programs shall comply with this Performance Work Statement (PWS); the U.S. Constitution; all applicable federal, state, and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders and Consent Decrees. Should a conflict exist between any of the aforementioned standards, the most stringent shall apply. When a conflict exists and a conclusion cannot be made as to which standard is more stringent, the Contracting Officer (CO) shall determine the appropriate standard. California City shall comply with DOJ and/or USMS regulation, Congressional mandate, federal law or E.O. and all existing California City polices.

California City will:

- Provide a means for verification of their ACA and JCAHO accreditation.
- Operate in full and complete compliance of the Federal Performance-Based Detention Standards as defined. Those standards are available at http://www. justice.gov/ofdt/major-activities.htm
- Operate in full complete compliance with California laws and regulations.
- California City will ensure that all employees and contractors comply with their policies regarding employment suitability and background clearances and that any violations of California City Standards of Conduct are investigated and adjudicated appropriately and promptly.

### A.2.1 Standard Receiving and Discharge of Prisoners/Detainees

California City agrees to accept federal detainees only upon presentation by a law enforcement officer of the Federal Government with proper agency credentials and shall not relocate a federal detainee from one facility under its control to another without the permission of the Federal Government.

California City shall only release federal prisoners/detainees only to law enforcement officers of the Federal Government agency initially committing the detainee (i.e., DEA, ICE, etc.) or to a Deputy United States Marshal (USM). Those detainees who are

remanded to custody by a USM may only be released to a USM or an agent specified by the USM of the Judicial District.

Federal prisoners detainees sought for a state or local court proceeding must be acquired through a Writ of Habeas Corpus or the Interstate Agreement on Detainers and then only with the concurrence of the Federal Government.

### A.2.2 Records Management

All records related to agreement performance should be retained in a retrievable format for the duration of the agreement. Except as otherwise expressly provided in this PWS, California City shall, upon completion or termination of the resulting agreement, transmit to the Government any records related to performance of the agreement.

### A.2.3 Indemnification

California City shall protect, defend, indemnify, save, and hold harmless the United States Government, the DOJ and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of California City, its agents, sub-contractors, employees, assignees, or any one for whom California City may be responsible. California City shall also be liable for any and all costs, expenses, and attorneys' fees incurred as a result of any such claim, demand, and cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government, the DOJ and its employees or agents. California City's liability shall not be limited by any provision or limits of insurance set forth in the resulting agreement.

In awarding this agreement, the Government does not assume any liability to third parties, nor will the Government reimburse California City for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the agreement or any subagreement under this agreement.

California City shall be responsible for all litigation, including the cost of litigation brought against it, its employees or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this agreement and be provided copies of any pleadings filed or said litigation within five (5) working days of receipt of service. California City shall cooperate with government legal staff and/or the United States Attorney regarding any requests pertaining to federal or State litigation.

### A.2.4 Transportation

California City is responsible for the movement/transportation of prisoners designated to the institution as requested in writing by the USMS as specified below. Examples of

circumstances requiring prisoner movement/transportation include, but are not limited to: outside medical care; transfer or movement to/from other Government facilities; and airlift sites. California City's transportation procedures shall ensure staff and prisoner security and safety. California City shall utilize restraint equipment identical to the USMS when one-for-one equipment exchange is required (e.g., airlifts).

Transportation and escort guard services will be performed by at least two (2) armed qualified detention or correctional officer personnel under applicable policies, procedures, and practices. California City agrees to augment such practices as may be requested by the USMS to enhance specific requirement for security, prisoner monitoring, visitation, and contraband control.

California City shall establish procedures for the disposition of prisoner/detainee property/funds upon final transfer from the facility. California City shall establish procedures to allow prisoner/detainee one set of clothes that he/she is wearing at time of final transfer from the facility. California City shall ensure that prisoner/detainee transport clothing provided is properly fitted, climatically suitable, durable and presentable. These procedures shall be approved in writing by the USMS.

Specific services, California City agrees, upon request of the USMS in whose custody a prisoner is held, to provide:

1) Transportation and escort guard services for federal prisoners housed at their facility to and from a medical facility for outpatient care ***(within per-day rate)***;

2) Transportation and stationary guard services for federal prisoners admitted to a medical facility ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

3) Transportation and escort guard services for federal prisoners/detainees housed at the facility are transported to and from the San Diego Courthouse four times a week ***(within per-day rate)***;

4) And, the Justice Prisoner and Alien Transportation (JPATS) airlift site in Victorville, CA ***(outside per-day rate; paid on a per-hour basis for Guard Service)***;

5) Transportation and escort guard services for federal prisoners once a week from the California City Correctional Center to the Nevada Southern Detention Center in Pahrump, Nevada ***(within per-day rate)***.

### A.2.5 Medical Services

Provide sufficient on-site medical coverage to accomplish the deliverables listed below while containing costs, with an understanding that California City Correctional Center's proximity to other California facilities allows the medical provider to provide certain coverage, care and relief using staff from nearby institutions.

Specifically, the goal is to provide these services on-site:

- Initial (intake) medical screening of new admissions including administration and reading of PPD tests.
- Health appraisals (physicals) within the 14 day requirement after intake.
- 24 hour/ 7 day basic care to respond to emergent situations and distribute medications.
- Sick call Monday through Friday days.
- Chronic care clinics when needed.

California City is financially responsible for all medical treatment provided to federal detainees within the facility. California City shall provide either through its staff or contractors the full range of medical care required within the facility including dental care, mental health care, pharmaceuticals, and record keeping, as necessary to meet the standards of the JCAHO. California City shall not be responsible for the cost of necessary outside medical care or treatment. The USMS shall be responsible for the cost of necessary outside medical care or treatment.

In the event of an emergency, California City shall proceed immediately with necessary medical treatment. In such event, California City shall notify the USMS Contracting Officer's Technical Representative (COTR) immediately regarding the nature of the federal detainee's illness or injury and type of treatment provided.

The facility shall have in place an adequate infectious disease control program, which includes testing all prisoners at the facility for Tuberculosis (TB) as soon as possible upon intake (not to exceed 14 days) and read within 72 hours. TB testing shall be accomplished in accordance with the latest Center for Disease Control (CDC) Guidelines and the results documented on the federal detainee's medical record. California City shall immediately notify the USMS of any cases of suspected or active TB so that any scheduled transports or production can be delayed until a physician verifies the federal detainee's TB status. (Refer to USMS Directive: 9.4 Prisoner Health– Prisoner Airborne Pathogen Control)

When a federal detainee is being transferred and/or released from the facility, he will be provided with seven (7) days of prescription medication which will be dispensed from the detention facility. When possible, generic medications should be prescribed. Medical records must travel with the federal detainee.

If the records are maintained at a medical contractor's facility, it is the detention facility's responsibility to obtain them before a federal detainee is moved.

**A.2.5a Prisoner Rape Elimination Act (PREA)**

The facility is required to post the Prisoner Rape Elimination Act (PREA) brochure/bulletin in each housing unit of the facility. All prisoners or detainees have a right to be safe and free from sexual harassment and sexual assaults. The facility shall include the PREA information in their handbooks and orientations at the California City (Refer to Attachment: Prisoner Rape Elimination Act Information).

**A.2.6 Contacts and Incident Reporting**

Policy and procedures shall be developed which ensure a positive relationship is maintained with all levels of the federal judiciary. California City's procedures shall ensure a tracking system is established which mandates that all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and California City responses, specifically related to a detainee, shall be made part of the detainee's file.

California City shall notify the COTR (with copy to the CO) when a member of the United States Congress or the media requests information or requests to visit the facility. California City shall coordinate all public information related issues with the COTR. All press statements and releases shall be cleared, in advance, with the COTR.

California City, their employees, agents, or sub-contractors shall not release any information regarding the facility population, security level, personal identifiers, or medical issues to anyone outside the USMS without express permission of the CO, COTR, or their designee. Any inquiries regarding any inmate or other matter related to the contract shall immediately be referred to the USMS. California City shall immediately notify the USMS of any incident where they believe information was released by their employee, agent, or sub-contractor related to a USMS' matter. California City shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the DOJ in any public presentations they make or articles they write that relate to any aspect of contract performance or the facility operations.

California City shall immediately report all criminal activity related to the performance of this contract to the USMS, who shall contact the appropriate law enforcement investigative agency. California City shall immediately report all serious incidents to the COTR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, sexual assault/abuse, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force, assaults on staff/detainees resulting in

injuries that require medical attention (does not include routine medical evaluation after the incident); fires; full or partial lockdown of the facility; escape; any security breaches; weapons discharge; suicide attempts; deaths; hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; significant environmental problems that impact the facility operations; transportation accidents if a detainee is in the vehicle.

California City shall provide a safe, secure, and humane environment for alleged victims of sexual assaults and detainees undergoing mental health treatment for sexual assault.

The Government may investigate any incident pertaining to performance of this contract. California City shall cooperate with the Government on all such investigations.

### A.2.7 Detainee Work Program

Detainee labor shall be used in accordance with the detainee work plan developed by California City and approved by the USMS. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service or other jobs. The USMS detainees may not be required to work. USMS detainees may volunteer to work within the secure confines of the contract facility if they sign a waiver of their right not to work. USMS detainees with suicidal tendencies, attempted escapes or escape history, violent history, gang affiliations or with retainers for pending charges with other local, state or federal agencies will not be considered for the volunteer program. USMS detainees are not permitted to act as Trustees and they may not work in positions that permit unsupervised contact with segregated prisoners or detainees of the opposite sex. USMS detainees are restricted from operating equipment that may expose the prisoners to grave bodily harm or any work assignment requiring security risk items and controlled tools which could be used to facilitate an escape or used as a weapon that could endanger staff, citizens or other inmates. USMS detainees will not have access to prisoner or employee records. In addition, the State will ensure that detainees who volunteer to work are denied access to prescription medications. USMS detainees must obtain required medical clearances before working in the food service areas. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations. Detainees shall not be used to perform the responsibilities or duties of an employee of California City. Appropriate safety/protective clothing and equipment shall be provided to detainee workers as appropriate. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances and unusual physical demands.

Volunteer prisoner/detainee workers can be paid the identical rates of pay as other California City inmates.

USMS prisoner/detainees shall be required to participate in normal housekeeping duties which help ensure the cleanliness of their housing area. Increases and reductions in

privileges may be used as incentives to ensure that USMS' detainees keep their living areas clean (FPBDS Services and Programs Section – G.3 & G.4.).

### A.3 Quality Control Management

California City is responsible for management and quality control actions necessary to meet the quality standards set forth in this agreement. In compliance with the FAR Clause 52.246-4, Inspection of Services-Fixed Price, California City must provide a Quality Control Plan (QCP) to the CO no later than 60 days after award.

The plan must include:

1) A description of the methods to be used for identifying and preventing defects in the quality of service performed;

2) A description of the records to be kept to document inspections and corrective or preventive actions taken;

3) Records of inspection that must be kept and made available to the Contracting Officer, when requested, through the agreement performance period and for the period after agreement completion until final settlement of any claims under this agreement.

### A.4 Quality Assurance

The Government quality assurance (QA) is comprised of the various functions, including inspection, performed by the Government to determine whether a provider has fulfilled its agreement obligations pertaining to quality. The Government's QA program is not a substitute for quality control by the provider.

Each phase of the services rendered under this agreement is subject to Government inspection both during California City's operations and after completion of the tasks. When California City is advised of any unsatisfactory condition(s), California City shall submit a written report to the CO addressing corrective/preventive actions taken. The COTR may check California City's performance and document any non-compliance, but only the CO may take formal action against California City for unsatisfactory performance.

The COTR will be designated subsequent to agreement award and a delegation of COTR duties and authority will be furnished to California City. The Government may reduce California City's invoice or otherwise withhold payment for any individual item of nonconforming service observed as specified in Contractor's Failure to Perform Required Services. The Government may apply various inspection and extrapolation techniques to determine the quality of service and the total payment due.

### A.4.1 Inspection Clause

**Failure to Perform Required Services**

The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this solicitation. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the contractor's invoice shall reflect the contract's reduced value resulting from the contractor's failure to perform required services. The contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

This agreement incorporates FAR clause 52.246-4 Inspection of Services—Fixed-Price:

INSPECTION OF SERVICES—FIXED-PRICE (AUG 1996)

(a) Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform to contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the Government may—

(1) Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and

(2) Reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may—

(1) By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

(2) Terminate the contract for default.

(End of clause)

**A.5 Performance Reviews**

In accordance with the Federal Acquisition Regulations (FAR), subpart 37.601 Performance-based Acquisition, the Government must have a method of assessing contractor performance against performance standards. Further, the agreement provides procedures for reductions to the price of a fixed-price agreement when services are not performed or do not meet agreement requirements. This Performance Summary establishes the performance level required by the Government to meet the agreement requirements.

The following methods of surveillance may be used in the assessments of agreement performance:

A) **Systematic**: These reviews will be scheduled inspections focusing on a specific discipline. Assessments may be performed by Government monitors or by other parties designated by the Government.

B) **Ad-Hoc**: These reviews will be conducted as a result of special interests arising from routine monitoring of the contractor's quality control system an unusual occurrence pertaining to the agreement or other Government concerns.

**A.6 Performance Ratings**

The service requirements are divided into various disciplines, each of which has a number of key functions. Successful performance of a key function is essential for successful performance of the related discipline. Each discipline comprises a specific percentage of the overall agreement requirement. Reductions in agreement price will be based on these percentages applied to the overall monthly invoice.

At the conclusion of any review, a report will be written and an adjectival rating of contractor performance within each discipline will be assigned. The following rating system will be used:

Excellent: The program conforms to the FPBDS in an exceptional manner and conformance is maintained with exceptional internal controls. Policies and procedures for achieving the program standards are documented and adequate for the mission of the facility; the policies and procedures are communicated to staff; the policies and procedures are fully implemented; and the desired outcome is achieved. Level of performance in the aggregate exceeds the minimum performance standard by substantial margin; deficiencies are nonexistent or extremely minor.

Good: The program conforms to the FPBDS in an acceptable manner. Internal controls limit procedural deficiencies. The facility more than accomplishes the requirements of program standards. Level of performance in the aggregate meets the performance standard: deficiencies are minor and offset by outstanding elements of performance within the review guideline.

Acceptable: The program is meeting the requirements of the FPBDS. There are no breakdowns that would keep the program from continuing to accomplish the mission of the facility. Level of performance in the aggregate meets the performance standards; deficiencies are minor and there are no outstanding elements of performance present within the review guideline.

Deficient: The program is unable to meet the requirements of one or more of the FPBDS. Internal controls are weak, resulting in serious deficiencies in one or more areas. The level of performance in the aggregate fails to meet the performance standards: deficiencies are pervasive.

At-Risk: Operation of the program is impaired to the point that the facility is unable to accomplish its mission. The program is unable to meet the requirements of the FPBDS and is unlikely to meet those requirements in the foreseeable future without substantial corrective action. The level of performance in the aggregate fails to meet the performance standards: deficiencies require immediate corrective actions.

### A.7 Performance Matrix

This Performance Matrix serves to communicate what the Government intends to qualitatively inspect. The matrix identifies:

A. Each service requirement and the key functions essential to successful performance of each agreement requirement;

B. Define the minimum performance rating acceptable for each agreement requirement; and

C. Specify the maximum percentage of total agreement value attributable to each agreement requirement.

**Administration and Management**

*Objective* - Addresses policy development and monitoring; internal quality control; maintenance of detainee records, funds, and property; admission and orientation procedures; detainee release; and accommodations for the disabled.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (A.1) | Policy Development and Monitoring |
| (A.2) (K.1) | Internal Inspections and/or Reviews |
| (A.3) | Detainee Records |
| (A.4) | Admission and Orientation |
| (A.5) (K.2) | Personal Property and Monies |
| (A.6) (K.3) | Detainee Release |
| (A.7) | Accommodations for the Disabled |

**Health Care**

*Objective* - Addresses the policies and procedures for administering quality health care by licensed personnel; maintaining accurate health information data; timely health screening, treatment, program intervention and follow-up of all cases; access to routine, acute chronic, and emergency health services, response to medical, mental and dental health needs of detainees; suicide prevention; infectious disease; hunger strikes; and detainee death.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| (B.1) | Intake Health Screening |
| (B.2) (K.4) | Medical, Dental, and Mental Health Appraisals |
| (B.3) (K.5) | Access to Routine, Acute Chronic, and Emergency Health Services |
| (B.4) | Experimental Research |
| (B.5) | Response to Medical, Mental, and Dental Health Needs |
| (B.6) | Suicide Prevention |
| (B.7) | Detainee Hunger Strikes |
| (B.8) | Detainee Death |
| (B.9) | Informed Consent/Involuntary Treatment |
| (B.10) | Infectious Disease |

**Security and Control**

*Objective* - Addresses the issuance of policies and procedures to staff; appropriate use of force; maintenance of daily incident logs; emergency readiness; and detainee accountability and discipline.

**Value: 20%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(C.1)(K.6)** | Post Orders |
| **(C.2)** | Permanent Logs |
| **(C.3) (K.7)** | Security Features |
| **(C.4) (K.8)** | Security Inspections and/or reviews |
| **(C.5)** | Control of Contraband |
| **(C.6)** | Detainee Searches |
| **(C.7)** | Detainee Accountability and Supervision |
| **(C.8)** | Use of Force |
| **(C.9)** | Non-routine Use of Restraints |
| **(C.10)** | Tool & Equipment Control |
| **(C.11)** | Weapons Control |
| **(C.12)** | Detainee Discipline |
| **(C.13)** | Supervision for Special Housing |
| **(C.14)(K.9)** | Contingency/Emergency Plan |

**Food Service**
*Objective* - Address basic sanitation procedures and the adequacy of meals provided to detainees.

**Value: 15%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(D.1) (K.10)** | Sanitation Requirements |
| **(D.2) (K.11)** | Ensure Meals are Varied |
| **(D.3)** | Special Diets |

**<u>Staff and Detainee Communication</u>**
*Objective* - Address opportunities for detainees to communicate with staff; detainee grievance procedures; and the provision of diversity training.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(E.1) (K.12)** | Staff-Detainee Communication |
| **(E.2)** | Diversity Training |
| **(E.3)(K.13)** | Detainee Grievances |

**<u>Safety and Sanitation</u>**
*Objective* - Addresses the adequacy of fire safety programs; the control of dangerous materials and/or hazards; air quality, noise levels, and sanitation of the facility; and the cleanliness of clothing and bedding.

**Value: 5%**
**Minimum Successful Performance Rating: Acceptable**

| FPBDS Section | Standard |
|---|---|
| **(F.1)** | Fire Safety |
| **(F.2)** | Non-Hazardous Furnishings |

| | |
|---|---|
| (F.3) | Control of Dangerous Materials |
| (F.4) | Environmental Control |
| (F.5) (K.14) | Clothing and Bedding |
| (F.6) | Personal Hygiene/Well-being |
| (F.7) (K.15) | Physical Facility and Equipment |

**Services and Programs**

*Objective* - Addresses detainee classification; religious practices; work assignments; availability of exercise opportunities; access to legal materials and legal representation; access to a telephone; visitation privileges; and the handling of detainee mail and correspondence.

**Value: 15%**

**Minimum Successful Performance Rating:** **Acceptable**

| FPBDS Section | Standard |
|---|---|
| (G.1) (K.16) | Classification, Review, and Housing |
| (G.2) (K.17) | Religious Practices |
| (G.3) | Volunteer Work Assignments |
| (G.4) | Work Assignments and Security |
| (G.5) | Exercise and Out-of-Cell Opportunities |
| (G.6) | Legal Materials |
| (G.7) (K.18) | Legal Representation |
| (G.8) | Telephone Access |
| (G.9) | Visitation Privileges |
| (G.10)(K.19) | Detainee Mail and Correspondence |

**Workforce Integrity**

*Objective* - Address the adequacy of the facility's hiring process and background check procedures, and the adequacy of procedures to respond to allegations of staff misconduct.

**Value: 2.5%**

**Minimum Successful Performance Rating:** **Acceptable**

| FPBDS Section | Standard |
|---|---|
| (H.1) | Staff Background and Reference Checks |
| (H.2) | Staff Training, Licensing, and Credentialing |
| (H.3) | Staff Misconduct |

**Detainee Discrimination**

*Objective* – Address the adequacy of policies and procedures designed to prevent discrimination against detainees based on gender, race, religion, national origin, or disability.

**Value: 2.5%**

**Minimum Successful Performance Rating:** **Acceptable**

| FPBDS Section | Standard |
|---|---|
| (I.1) | Discrimination Prevention |

### A.8 Contact for Agreement Administration

California City shall designate a person to serve as the agreement administrator for the requirement. The agreement administrator is responsible for overall compliance with agreement terms and conditions. California City designation of representatives to handle certain functions under this agreement does not relieve the agreement administrator of responsibility for agreement compliance.

| | |
|---|---|
| **Name** | **Tom Weil** |
| **Title** | California City City Manager |
| **Address** | 21000 Hacienda Avenue<br>California City, California |
| **Zip Code** | 93505 |
| **Telephone** | (760) 373-7170 |
| **FAX** | (760) 373-7532 |
| **E-Mail Address** | citymgr@californiacity.com |

### A.9 Financial Provisions

#### A.9.1 Service Contract Act

This Agreement incorporates the following clause by reference, with the same force and effect as if it was given in full text. Upon request, the full text will be made available. The full text of this provision may be accessed electronically at this address: www.arnet.gov.

Federal Acquisition Regulation Clause(s):

52.222-41 Service Contract Act of 1965, as Amended (July 2005)

52.222-42 Statement of Equivalent Rates for Federal Hires (May 1989)

52.222-43 Fair Labor Standards Act and the Service Contract Act – Price Adjustment (Multiyear and Option Contracts) (May 1989)

The current State of California City, California wage rates shall be the prevailing wages unless notified by the Federal Government.

### A.9.2 Price Schedule

The Federal Government will use various price analysis techniques and procedures to ensure the per-diem rate established by this Agreement is considered a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

1. Comparison of the requested per-diem rate with the independent government estimate for detention services, otherwise known has the Core Rate;
2. Comparison with per-diem rates at other state or local facilities of similar size and economic conditions;
3. Comparison of previously proposed prices and previous Federal Government and commercial contract prices with current proposed prices for the same or similar items;
4. Evaluation of the provided jail operating expense information;

The firm-fixed per-diem rate for services is $77.50, and shall not be subject to adjustment on the basis of California City actual cost experience in providing the service. The per-diem rate shall be fixed for a period from the effective date of the Agreement forward for 36 months. The per-diem rate covers the support of one federal detainee per "federal detainee day", which shall include the day of arrival, but not the day of departure.

After 36 months, if a rate adjustment is desired, the Local Government shall submit a request through the Electronic Intergovernmental Agreements area of the Detention Services Network (DSNetwork). All information pertaining to the jail on DSNetwork will be required before a new per-diem rate can be considered.

### A.9.3 Invoice and Payment

California City shall prepare and submit for certification and payment, original and separate invoices each month to the USMS Southern District of California. To constitute a proper monthly invoice, the name and address of the facility, the name of each federal detainee, *his* specific dates of confinement, the total days to be paid, the appropriate per diem rate, and the total amount billed (total days multiplied by the rate per day) shall be listed, along with the name, title, complete address and telephone number of the official responsible for invoice preparation. The invoice shall be submitted to the COTR at the address listed below must include:

- Name and address of California City;
- Invoice date and number;
- Agreement number;

Case 1:25-cv-01292-KES-CDB Document 17-3 Filed 10/27/25 Page 20 of 22

- Description, quantity, unit of measure, unit price and extended price of the services provided;
- Terms of any discount for prompt payment offered;
- Name and address of official to whom payment is to be sent;
- Name, title, and phone number of person to notify in event of defective invoice; and
- Taxpayer Identification Number; and
- Electronic funds transfer banking information in accordance with FAR 52.232-33, Payment by Electronic Funds TransferCCentral Contractor Registration.

The invoice shall be sent to:

USMS Southern District of California

Address: Edward J. Schwartz Courthouse
U.S. District Court
Southern District of CA
940 Front Street
San Diego, CA 92101-8900

The Government will make payments to California City on a monthly basis, promptly pursuant to the Prompt Payment Act after receipt of an appropriate invoice.

**A.10 Modification and Disputes**

Either party may initiate a request for modification to this Agreement in writing. All modifications negotiated will be effective only upon written approval of both parties.

Disputes, questions, or concerns pertaining to this Agreement will be resolved between appropriate officials of each party. Both the parties agree that they will use their best efforts to resolve the dispute in an informal fashion through consultation and communication, or other forms of non-binding alternative dispute resolution mutually acceptable to the parties.

**A.11 Termination**

This Agreement shall terminate after fifteen (15) calendar years or by either party upon one-hundred and eighty days (180) advanced written notice to the other party. Within 180 days of the giving, or receipt, of such notice the USMS shall retake custody of all prisoners(s) transferred to the California City under this Agreement. The City of California City agrees to consult with the USMS and OFDT at least 90-days prior to any action(s) to terminate to allow sufficient time to prepare for loss and replacement of services.

### A.12 Litigation

The Federal Government shall be notified, in writing, of all litigation pertaining to this Agreement and provided copies of any pleadings filed or said litigation within 5 working days of the filing.

The Local Government shall cooperate with the Federal Government legal staff and/or the United States Attorney regarding any requests pertaining to Federal Government or Local Government litigation.

# Prisoner Rape Elimination Act Reporting Information

## SEXUAL ASSAULT AWARENESS

This document is requested to be posted in each Housing Unit Bulletin Board at all Contract Detention Facilities. This document may be used and adapted by Intergovernmental Service Agreement Providers.

While detained by the Department of Justice, United States Marshals Service, you have a right to be safe and free from sexual harassment and sexual assaults.

## Definitions

### A. Detainee-on-Detainee Sexual Abuse/Assault

One or more detainees engaging in or attempting to engage in a sexual act with another detainee or the use of **threats, intimidation, inappropriate touching** or other actions and/or communications by0 one or more detainees aimed at **coercing and/or pressuring** another detainee to engage in a sexual act.

### B. Staff-on-Detainee Sexual Abuse/Assault

Staff member engaging in, or attempting to engage in a sexual act with any detainee or the intentional touching of a detainee's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desires of any person. **Sexual abuse/assault of detainees by staff or other detainees is an inappropriate use of power and is prohibited by DOJ policy and the law.**



### C. Staff Sexual Misconduct is:

Sexual behavior between a staff member and detainee which can include, but is not limited to indecent, profane or abusive language or gestures and inappropriate visual surveillance of detainees.

## Prohibited Acts

A detainee, who engages in inappropriate sexual behavior with or directs it at others, can be charged with the following Prohibited Acts under the Detainee Disciplinary Policy.

- **Using Abusive or Obscene Language**
- **Sexual Assault**
- **Making a Sexual Proposal**
- **Indecent Exposure**
- **Engaging in Sex Act**

## Detention as a Safe Environment

While you are detained, no one has the right to pressure you to engage in sexual acts or engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity. Regardless of your sexual orientation, you have the right to be safe from unwanted sexual advances and acts.

## Confidentiality

Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have the need to know in order to make decisions concerning the detainee-victim's welfare and for law enforcement investigative purposes.

## Report All Assaults!

If you become a victim of a sexual assault, you should report it immediately to any staff person you trust, to include housing officers, chaplains, medical staff, supervisors or Deputy U.S. Marshals. Staff members keep the reported information confidential and only discuss it with the appropriate officials on a need to know basis. If you are not comfortable reporting the assault to staff, you have other options:

- Write a letter reporting the sexual misconduct to the person in charge or the United States Marshal. To ensure confidentiality, use special (Legal) mail procedures.
- File an Emergency Detainee Grievance - If you decide your complaint is too sensitive to file with the Officer in Charge, you can file your Grievance directly with the Field Office Director. You can get the forms from your housing unit officer, or a facility supervisor.
- Write to the Office of Inspector General (OIG), which investigates allegations of staff misconduct. The address is: Office of Inspector General, U.S. Department of Justice, 950 Pennsylvania Ave. Room 4706, Washington, DC. 20530
- Call, **at no expense** to you, the Office of Inspector General (OIG). The phone number is 1-800-869-4499.

**Individuals who sexually abuse or assault detainees can only be disciplined or prosecuted if the abuse is reported.**

A publication of the Office of the Federal Detention Trustee
Washington, DC

Published February 2008

# EXHIBIT C

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.** ______________
Provided by City

# SITE PLAN REVIEW (SPR) MINOR APPLICATION

*(Existing Building/Business/Ownership)*

## 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc.

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93505

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

## 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 08-22-25

## 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 08/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

**FOR DEPARTMENTAL USE ONLY**

Fees: *(Refer to the Master Fee Schedule)*

☐ $ 250.00, Planning SPR Application Fee *(mandatory) GL 10-3218*

☐ $ 90.00, Fire Department Inspection *(mandatory) GL 19-3641*

☐ $ 150.00, Building Inspection Fee *(mandatory)*

☐ $ ____________, Other

$ ____________, **Total Fee Collected**

Application complete:

☐ Date: ____________ Staff Member ____________

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

*(Existing Building/Business/Ownership)*

*All items below must be submitted for the application to be considered complete.*
**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
   - Total Parking Spaces: ________
   - ADA Accessible Spaces: ________
   - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
   - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified – separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

License # ______
Approved by ______
Processed by ______
Processed On ______

# Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

Name of Business: CoreCivic, Inc. California City Immigration Processing Center

Business Owner(s) Name: CoreCivic Inc.

Business Address: 22844 Virginia Blvd, California City, CA 93504-0590

Mailing Address: PO Box 2511, California City, CA 93504

Business Phone #: 760-338-6670

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Center

Planned Business Begin Date: 

Have you had a license for this business in the past? ◯ Yes ◯ No

Do you own or rent the space ◯ Own ◯ Rent (If rent, building owner/landlord 

Will the business have Annual Gross Income of $10.000 or more? ◯ Yes ◯ No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License # 
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-1
(Required for Food Services – attach copy)

**Contractors:**
State License # 
State License Type 
(Required for Contractors)

Expiration Date 

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**

Inspection Date: 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature

Date: 07/22/2025

Printed Name: Christopher Chestnut

**Clear Form** **Submit**

California City Correctional Facility
California City, CA

**Facility:** California City Correctional Facility
**Location:** California City, CA
**Opened:** 1999
**Owned By:** CoreCivic

The California City Correctional Facility is owned and operated by CoreCivic. The facility will be operating twenty-four hours a day, three hundred and sixty-five days a year, under an initial contract with the United States Marshals Service. We expect the facility to operate in the same manner it has since it was constructed in 1999.

**Facility Description:**

California City Correctional Facility is located in California City, California in Kern County, California. It is a 2,560 bed facility designed and built by CoreCivic and began operation in December 1999.

Capacity: 2,560
Cells or Dorms: Cells
Number of Units: 10
Campus style or all under one roof: Campus Style
Dining Hall: 2 Dining Halls
Number of recreation yards and gymnasiums: 11 Recreation Yards, 2 Gymnasiums
Medical Space: Yes
Programs Space: Yes
Visitation Space: Yes
Square Footage: Approximately 522,363

The facility's physical plant covers approximately 522,363 square feet and is fully monitored for security and fire. In all areas there are heating, ventilation and air conditioning systems.

Each cell provides access to toilets, wash basins with hot and cold running water, above-floor sleeping surfaces, clothes hooks, writing surfaces, seating, natural lighting and storage space for personal belongings. Showers are thermostatically controlled, providing hot and cold water. Adjacent to the sleeping area is a central dayroom that contains tables, chairs, televisions and telephones.

There is a centrally located library along with multipurpose rooms outside the housing units for counseling, leisure-time activities, programs, etc. There is also an administrative area that includes space for staff, conference room, employee lounge and locker rooms.

The facility has a full-size facility kitchen equipped with appliances including a walk-in freezer, cooler, food warehouse and dry storage. The facility has a centrally located health services area in the main facility with space for waiting, examination, treatment, dentistry, nurse's station, pharmacy, medical staff offices and medical segregation/observation cells.

**EXHIBIT 8**

**EXHIBIT 8**

Daniel P. Struck, Pro Hac Vice
AZ Bar #012377
Dana M. Keene, CA Bar #324993
STRUCK LOVE ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
dkeene@strucklove.com

Nicholas H. Rasmussen, Bar #285736
McCORMICK BARSTOW, LLP
7647 North Fresno Street
Fresno, CA 93720
Tel: (559) 433-1300
Fax: (559) 433-2300
nrasmussen@mccormickbarstow.com

Attorneys for Respondent-Defendant CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIGNITY NOT DETENTION COALITION AND JOHN DOE,<br>Plaintiffs,<br>v.<br>CITY OF CALIFORNIA CITY; CORECIVIC, INC.,<br>Defendants. | Case No. 1:25-cv-01292-JLT-CDB<br>**DECLARATION OF CHRISTOPHER CHESTNUT**<br>U.S. District Judge: Hon. Jennifer L. Thurston<br>U.S. Magistrate Judge: Hon. Christopher D. Baker |

I, Christopher Chestnut, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I am currently the Warden at CoreCivic's California City Immigration Processing Center[1] ("the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

[1] The facility has also been variously referred to as the California City Correctional Facility, California City Correctional Center, and California City Detention Facility.

3. Prior to that, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

4. I have been employed by CoreCivic since 1995 and have more than 28 years of corrections experience.

5. I am familiar with the allegations in the lawsuit filed by the Dignity Not Detention Coalition and John Doe against California City and CoreCivic in the Kern County Superior Court, which has since been removed by CoreCivic to the Eastern District of California.

6. On July 22, 2025, CoreCivic submitted a business license application to the City of California City.

7. I was copied on multiple emails in August 2025 with the ICE Contracting Officer's Representative ("COR") responsible for monitoring CoreCivic's performance under the contract between ICE and CoreCivic for operation of the facility. These emails related to the status of the business license application and CoreCivic's efforts to satisfy the City's evolving requests for documentation in support of the application.

8. I also had multiple conversations in August 2025 with the ICE COR, as well as the Deputy Field Office Director ("DFOD") and Assistant Field Office Director ("AFOD") for the ICE San Francisco Field Office, regarding ICE's plans for reopening the facility. ICE was aware during these discussions in August 2025 that the City had not yet approved CoreCivic's business license application for the facility.

9. On August 26, 2025, I received an email notification from the AFOD that ICE would be transferring a group of detainees from the Mesa Verde Immigration Processing Center to the facility the following day. The AFOD included a G-391 and an I-216. The G-391 is an official detail from ICE directing the transport of detainees from one location to another. The I-216 is a record of the detainees transferred.[2]

---

[2] In an August 5, 2025 email, we were advised by the COR that the email from ICE transmitting the I-216 serves as proof that ICE directed and approved the movement of the detainees listed. Attachment A is a true and correct copy of the email from the COR.

10. Later that same day, the AFOD sent a second email, in which she provided a booking packet for each detainee, including a Form I-203 for each. Form I-203 is entitled "Order to Detain Alien" and instructs the facility to detain the detainee.

11. Attachment B is a true and correct copy of the emails exchanged with the AFOD on August 26, 2025 regarding the incoming ICE detainees, with redactions to the names of the detainees, along with the attached G-391, I-216, and one of the I-203's for a single detainee, with identifying information of the detainees redacted.

12. On August 27, 2025, ICE sent the first group of detainees to the facility.

13. ICE was aware when they sent these detainees to the facility that the City had not yet issued the business license to CoreCivic and that the City was planning to follow the notice and comment procedures in SB 29 before issuing the license.

14. ICE continued sending groups of detainees to the facility before the issuance of the business license. On August 29, 2025, I received notice that a group of detainees from Golden State Annex, including Petitioner John Doe, would be transferred to the facility on September 2, 2025.

15. Attachment C is a true and correct copy of the email from an ICE Supervisory Detention and Deportation Officer, with redactions to detainee names and the sender's cell phone number, along with the attached I-203 Order to Detain Aliens, including John Doe.

16. On September 16, 2025, the AFOD emailed me, stating that the USPS address for the facility was incorrect and requesting that CoreCivic contact USPS to correct it so that ICE could ship equipment to the facility.

17. On September 17, 2025, I responded and informed her that CoreCivic had been attempting to correct the address with USPS for over a month but that USPS would not allow CoreCivic to change the official physical address for the facility until the business license was issued.

18. The AFOD confirmed receipt of the email and understanding of the issue.

19. Attachment D is a true and correct copy of the email exchange with the AFOD regarding CoreCivic's inability to update the mailing address without a business license.

20. On October 7, 2025, the COR asked me when a security fence would be installed around three trailers and parking spaces designated for ICE's use on the grounds of the facility. On October 8, 2025, I replied that installation of the security fence required a permit, which CoreCivic would not be able to obtain until after the business license was issued in February 2026.

21. Attachment E is a true and correct copy of the email exchange with the COR regarding the inability to obtain a permit for the security fence until after issuance of the business license in February 2026.

22. On October 10, 2025, the COR advised that the United States Marshals Service ("USMS") planned to begin housing detainees at the facility on November 14, 2025. The COR also advised that ICE planned to use all 256 female beds in one of the two female units.

23. Attachment F is a true and correct copy of the email from the COR regarding the plan for housing USMS detainees and ICE's intent to increase the female ICE detainee population.

24. On October 30 and 31, 2025, I sent documentation, including the pending business license application and Site Plan Review application, facility business plan, water plan, Kern County Health Certificate for Food Service, Clinical Lab License Certificate, Fire Alarm Permit Certificate, and Updated CLIA Certificate, to the COR.

25. Attachment G is a true and correct copy of my emails to the COR regarding the pending business license and SPR applications and supporting documents.

26. ICE continued to send detainees to the facility prior to the City's issuance of the business license on February 26, 2026 and has continued to send detainees during the pendency of the Dignity Not Detention Coalition's administrative appeal of the City's issuance of the license.

27. The Department of Homeland Security purchased the facility from CoreCivic on July 2, 2026.

[THE REST OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on August 3, 2026.

[signature]
Christopher Chestnut

# ATTACHMENT A

ATTACHMENT A

**From:** "Hill, Lela C" <Lela.C.Hill@ice.dhs.gov>
**Sent:** 08/05/2025 11:57:56 AM (-07:00)
**To:** "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Chestnut, Christopher" <christopher.chestnut@corecivic.com>
**Cc:** "Cruz, Orestes" <orestes.cruz@ice.dhs.gov>; "Maldonado, Tamara M" <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: G-391 Blank Upload Template for California City Detention Facility

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

For this first movement, the official email that came from AFOD Maldonado with the I-216s attached, etc. This is your proof that ICE requested and approved this 1st movement.

In the future, the ICE Control Room emails (providing the I-216) will be CoreCivic proof that ICE directed and approved movement.

Also, please have the CoreCivic Transportation Manager double check that G-391s are completed and signed; and then save them in an enveloped marked for that month for their reference for 6 months.

After six months the oldest envelope of G-391s is given to the Bakersfield ICE Control Room supervisor/lieutenant for ICE storage.

Best regards.

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
REDACTED

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Tuesday, August 5, 2025 11:21 AM
**To:** Gallagher, Sean <Sean.Gallagher@corecivic.com>; Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Cc:** Cruz, Orestes <orestes.cruz@ice.dhs.gov>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: G-391 Blank Upload Template for California City Detention Facility

I doubled checked and the SFR ICE Field Office does not sign G-391s for contractors, because we are not doing the "actual" the movement.

We do not have the correct information to fill out the G-391 before signing it.

The Contractor Supervisors consistently fill out the G-391s, because they have direct oversite as to which Contractor Transportation Officers are doing the movement, the date and time left and arrived.

CoreCivic can use the email from the ICE Control Room (providing the I-216) as proof that ICE directed and approved the movement, but CoreCivic is the one who fills out the G-391s.

Thank you,

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
REDACTED

**From:** Gallagher, Sean <Sean.Gallagher@corecivic.com>
**Sent:** Tuesday, August 5, 2025 9:56 AM
**To:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>; Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Cc:** Cruz, Orestes <orestes.cruz@ice.dhs.gov>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** Re: G-391 Blank Upload Template for California City Detention Facility

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi Lela,

The G-391 is the official detail form used to authorize transportation of detainees. It's filled out by the local ICE employee directing the movement.

Get Outlook for iOS

---

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Tuesday, August 5, 2025 9:50:24 AM
**To:** Gallagher, Sean <Sean.Gallagher@corecivic.com>; Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Cc:** Cruz, Orestes <orestes.cruz@ice.dhs.gov>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: G-391 Blank Upload Template for California City Detention Facility

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

I am checking with HQ Travel folks on your request below, since they handle G-391s. I will let you know as soon as I find out, etc.

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
REDACTED

**From:** Gallagher, Sean <Sean.Gallagher@corecivic.com>
**Sent:** Tuesday, August 5, 2025 9:30 AM
**To:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>; Chestnut, Christopher <christopher.chestnut@corecivic.com>

**Cc:** Cruz, Orestes <orestes.cruz@ice.dhs.gov>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** Re: G-391 Blank Upload Template for California City Detention Facility

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good Morning Lela,

TransCor will need a signed G-391 from ICE in order to do the pick up.

Thanks,

Sean

Get Outlook for iOS

---

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Tuesday, August 5, 2025 8:24:56 AM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Gallagher, Sean <sean.gallagher@corecivic.com>
**Cc:** Cruz, Orestes <orestes.cruz@ice.dhs.gov>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** G-391 Blank Upload Template for California City Detention Facility

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good morning,

Please see attached G-391 Blank template.

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
Enforcement and Removal Operations
U.S. Immigration & Customs Enforcement
800 Truxtun Ave, Bakersfield, CA 93301
REDACTED

ATTACHMENT B

ATTACHMENT B

**From:** "Maldonado, Tamara M" <Tamara.M.Maldonado@ice.dhs.gov>
**Sent:** 08/26/2025 2:13:07 PM (-07:00)
**To:** "Chestnut, Christopher" <christopher.chestnut@corecivic.com>; "Bonnar, Erik" <Erik.Bonnar@corecivic.com>; "cristian.pfeiffer@corecivic.com" <cristian.pfeiffer@corecivic.com>; "Reynolds, RaeLynn" <RaeLynn.Reynolds@corecivic.com>; "HALTERMAN, SHON" <SHON.HALTERMAN@transcor.com>; "Lewis, Ronnie" <Ronnie.Lewis@transcor.com>; "Lovato, Patric" <Patric.Lovato@corecivic.com>; "Alvarado, Aisha" <Aisha.Alvarado@corecivic.com>
**Cc:** "#ICE.BKI.CAL" <ICE.BKI.CAL@ice.dhs.gov>; "CalCity Movement CalCity Movement" <CalCityMovement.CalCityMovement@corecivic.com>
**Subject:** RE: MV to Cal City transfer manifest for 8.27.2025
**Attachments:** REDACTED.pdf, REDACTED.pdf, REDACTED REDACTED.pdf, 8.27.2025 MV to CAL CITY_I-216_203A_Manifest.xls

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

Attached are the remaining booking packets, with medicals, for tomorrow's transfers.

Thank you,

Tamara M. Maldonado
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
San Francisco Field Office
Bakersfield, Sub-office
Desk: 661-281-6566

Warning: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

**From:** Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Sent:** Tuesday, August 26, 2025 1:15 PM
**To:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>; Bonnar, Erik <Erik.Bonnar@corecivic.com>; cristian.pfeiffer@corecivic.com; Reynolds, RaeLynn <RaeLynn.Reynolds@corecivic.com>; HALTERMAN, SHON <SHON.HALTERMAN@transcor.com>; Lewis, Ronnie <Ronnie.Lewis@transcor.com>; Lovato, Patric <Patric.Lovato@corecivic.com>; Alvarado, Aisha <Aisha.Alvarado@corecivic.com>

**Cc:** #ICE.BKI.CAL <ICE.BKI.CAL@ice.dhs.gov>; CalCity Movement CalCity Movement <CalCityMovement.CalCityMovement@corecivic.com>
**Subject:** RE: MV to Cal City transfer manifest for 8.27.2025

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Received - thanks

Chris

**From:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Sent:** Tuesday, August 26, 2025 12:59 PM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Bonnar, Erik <erik.bonnar@corecivic.com>; cristian.pfeiffer@corecivic.com; Reynolds, RaeLynn <raelynn.reynolds@corecivic.com>; HALTERMAN, SHON <shon.halterman@transcor.com>; Lewis, Ronnie <ronnie.lewis@transcor.com>; Lovato, Patric <patric.lovato@corecivic.com>; Alvarado, Aisha <aisha.alvarado@corecivic.com>
**Cc:** #ICE.BKI.CAL <ICE.BKI.CAL@ice.dhs.gov>
**Subject:** MV to Cal City transfer manifest for 8.27.2025

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon,

Please see I-216 and G-391's for tomorrow's movement.

Thank you,

Tamara M. Maldonado
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
San Francisco Field Office
Bakersfield, Sub-office
Desk: 661-281-6566

Warning: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

Subject ID: REDACTED

## ORDER TO DETAIN OR RELEASE ALIEN

TO: (NAME and TITLE of Person in Charge of Facility)
OIC

(Name of Facility) CAL CITY ICE PROCESSING CENTER
22844 VIRGINIA AVE
CALIFORNIA CITY, CA 93505 US

Please [x] Detain [ ] Release

| Date | Time |
|---|---|
| | |

Name of Alien REDACTED

File Number REDACTED
Event No:

| Age | Date of Birth (Mo.Day.Yr.) | Sex | Nationality | Foreign Address |
|---|---|---|---|---|
| REDACTED | | | | |

| Nature of Proceedings | Signature of Officer Receiving Alien |
|---|---|
| REMOVAL | |

**REMARKS:**

HOLD FOR ICE

| Signature of Officer Authorizing Action | Title | Office |
|---|---|---|
| MURO, R 8147 | SDDO | BKI/T |

Form I-203 (Rev. 08/01/07)

UNITED STATES DEPARTMENT OF HOMELAND SECURITY

# ATTACHMENT C

ATTACHMENT C

**From:** "Boyd, Brandon J" <Brandon.J.Boyd@ice.dhs.gov>
**Sent:** 08/29/2025 3:31:42 PM (-07:00)
**To:** "Contreras, Cesar" <Cesar.Contreras@ice.dhs.gov>; "Chestnut, Christopher" <christopher.chestnut@corecivic.com>; "HALTERMAN, SHON" <shon.halterman@transcor.com>; "Lewis, Ronnie" <ronnie.lewis@transcor.com>; "Bonnar, Erik" <erik.bonnar@corecivic.com>; "Pfeiffer, Christian" <christian.pfeiffer@corecivic.com>; "Reynolds, RaeLynn" <raelynn.reynolds@corecivic.com>; "Jenkins, Anita" <Anita.Jenkins@transcor.com>; "Stephanie.Takashita@transcor.com" <Stephanie.Takashita@transcor.com>
**Cc:** "Cruz, Orestes" <orestes.cruz@ice.dhs.gov>; "Maldonado, Tamara M" <Tamara.M.Maldonado@ice.dhs.gov>; "Bayardo, Joanna" <Joanna.Bayardo@ice.dhs.gov>; "Hill, Lela C" <Lela.C.Hill@ice.dhs.gov>; "Gilbert, Rigoberto Jr" <Rigoberto.J.Gilbert@ice.dhs.gov>; "Vasquez, Cesar" <Cesar.Vasquez@ice.dhs.gov>; "Muro, Rigoberto" <Rigoberto.Muro@ice.dhs.gov>; "Guerra, Refugia M" <Refugia.M.Guerra@ice.dhs.gov>; "Mora, Sergio D" <Sergio.D.Mora@ice.dhs.gov>; "Cristobal, Susana Y" <Susana.Y.Cristobal@ice.dhs.gov>; "Ormonde, Katherine N" <Katherine.N.Ormonde@ice.dhs.gov>
**Subject:** GSA to Cal City 9.2.25
**Attachments:** I216 09.02.2025 GSA TO CAL CITY.xls, I203 GSA TO CAL CITY 09.02.2025.pdf, Medicals 9-2.pdf, REDACTED.pdf, G-391 GSA 9-2-25 #1.pdf

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good afternoon all,

Please see attached for the 9/2/25 transfer from GSA to Cal City.

Please let me know if you need any additional information.

Respectfully,

Brandon Boyd
Supervisory Detention and Deportation Officer
San Francisco Field Office, Fresno Sub-Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Cell: REDACTED

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

**ORDER TO Detain ALIEN**
9/2/2025 0500 HOURS

***Manifest No.*** 6986863 (page 1 of 2)

| | |
|---|---|
| TO: CAL CITY ICE PROCESSING CENTER<br>**BAKERSFIELD, CA, IHP** | NAME OF FACILITY:<br>**CAL CITY ICE PROCESSING CENTER** |
| Please detain or release the following<br>**Detain** | Nature of Proceedings<br>**TRANSFER** |

| NAME | POUCH NO. | AGE | SEX | NATIONALITY | BIRTHDATE Month/Date/Year | ALIEN NUMBER | CLS CODE | PREVIOUS Criminal History | FINS NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| REDACTED | | | | | | | LO | Marijuana | REDACTED |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | Possession Stolen Property | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |
| [redacted] | | | | | | | LO | NC | [redacted] |

FINGERPRINTS ___________. AM PHOTO ______.

| | | | |
|---|---|---|---|
| Signature Detention Officer, Sheriff, etc. (Receiving Officer) | Date<br>8/29/2025 | Signature of Officer Directing Action | Date<br>**8/29/2025** |
| | | Title<br>DO | Station<br>**FRESNO, CA** |

Form 1-203 Phila. DEPARTMENT OF HOMELAND SECURITY- US IMMIGRATION AND CUSTOMS ENFORCEMENT

ORDER TO Detain ALIEN
9/2/2025 0500 HOURS

***Manifest No.*** 6986863 (page 2 of 2)

TO: CAL CITY ICE PROCESSING CENTER
**BAKERSFIELD, CA, IHP**

Please detain or release the following
**Detain**

NAME OF FACILITY:
**CAL CITY ICE PROCESSING CENTER**

Nature of Proceedings
**TRANSFER**

| NAME | POUCH NO. | AGE | SEX | NATIONALITY | BIRTHDATE Month/Date/Year | ALIEN NUMBER | CLS CODE | PREVIOUS Criminal History | FINS NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | LO | NC | REDACTED |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| REDACTED - JOHN DOE | | | | | | | LO | NC | REDACTED - JOHN DOE |
| REDACTED | | | | | | | LO | NC | REDACTED |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |
| | | | | | | | LO | NC | |

FINGERPRINTS ________. AM PHOTO ______.

| Signature Detention Officer, Sheriff, etc (Receiving Officer) | Date 8/29/2025 | Signature of Officer Directing Action | Date 8/29/2025 |
|---|---|---|---|
| | | Title DO | Station FRESNO, CA |

Form 1-203 Phila. DEPARTMENT OF HOMELAND SECURITY- US IMMIGRATION AND CUSTOMS ENFORCEMENT

# ATTACHMENT D

ATTACHMENT D

**From:** "Maldonado, Tamara M" <Tamara.M.Maldonado@ice.dhs.gov>
**Sent:** 09/17/2025 8:17:02 AM (-07:00)
**To:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>; "Bonnar, Erik" <erik.bonnar@corecivic.com>; "Pfeiffer, Christian" <christian.pfeiffer@corecivic.com>
**Subject:** RE: Cal City USPS address

**CAUTION:** This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Understood.

Thank you for this update.

Thank you,

Tamara M. Maldonado
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
San Francisco Field Office
Bakersfield, Sub-office
Desk: 661-281-6566

Warning. This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

**From:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Sent:** Wednesday, September 17, 2025 8:11 AM
**To:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>; Bonnar, Erik <erik.bonnar@corecivic.com>; Pfeiffer, Christian <christian.pfeiffer@corecivic.com>
**Subject:** Re: Cal City USPS address

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

We have been working on this issue for over a month. The issue is the business license and they won't let us change the official physical address without one. I am not understanding why it would prevent deliveries in practice because we received thousands of items the past few months.

Chris

---

**From:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Sent:** Wednesday, September 17, 2025 7:49 AM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Bonnar, Erik <erik.bonnar@corecivic.com>;

Pfeiffer, Christian <christian.pfeiffer@corecivic.com>
**Subject:** RE: Cal City USPS address

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Good morning,

Any movement on the below? Can we send shipments there yet?

Thank you,

Tamara M. Maldonado
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
San Francisco Field Office
Bakersfield, Sub-office
Desk: 661-281-6566

Warning: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official No portion of this communication should be furnished to the media, either in written or verbal form

---

**From:** Maldonado, Tamara M
**Sent:** Tuesday, September 16, 2025 11:34 AM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Bonnar, Erik <erik.bonnar@corecivic.com>; Pfeiffer, Christian <christian.pfeiffer@corecivic.com>
**Subject:** Cal City USPS address

Good morning,

USPS is still not showing Cal city's address as valid. Can Core Civic contact USPS to resolve this ASAP? ICE would like to ship equipment as soon as possible.

22844 Virginia Boulevard
California City, CA 93505
United States

Thanking you in advance,

Tamara M. Maldonado
Assistant Field Office Director
U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations
San Francisco Field Office

Bakersfield, Sub-office
Desk: 661-281-6566

Warning: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552) It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

# ATTACHMENT E

ATTACHMENT E

**From:** "Hill, Lela C" <Lela.C.Hill@ice.dhs.gov>
**Sent:** 10/09/2025 1:49:23 AM (-07:00)
**To:** "Chestnut, Christopher" <Christopher.Chestnut@corecivic.com>
**Subject:** RE: ICE Administrative and Support Space Cleaned Daily & Chain-Link Fence

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Thank you

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Date:** Wednesday, Oct 08, 2025 at 8:23 PM
**To:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Cc:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** Re: ICE Administrative and Support Space Cleaned Daily & Chain-Link Fence

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

We will address the cleaning issue. We have a contracted janitorial service and will change their schedule to ensure they clean the buildings daily.

Regarding the fence, unfortunately the installation requires a permit, which we are unable to obtain until we receive the business license. I have been advised that we will not be able to obtain the permits until after February.

Chris

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Tuesday, October 7, 2025 3:30 PM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Cc:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** ICE Administrative and Support Space Cleaned Daily & Chain-Link Fence

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello Warden Chestnut:

Thank you for providing the bookshelves.

**1.3.4. ICE Administrative Space** (page 5)

All ICE administrative and support space shall be cleaned daily (between the hours of 8 a.m. and 4 p.m.) … Page 5 of PWS

Please ensure that ICE Administrative Space is cleaned daily.

Also, when will the fence be installed around the three (3) ICE trailers and designated parking spaces? **This is a security issue so a priority.**

Thanks again,

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
Enforcement and Removal Operations
U.S. Immigration & Customs Enforcement
800 Truxtun Ave, Bakersfield, CA 93301
REDACTED Desk
Cell

# ATTACHMENT F

ATTACHMENT F

**From:** "Chestnut, Christopher"
**Sent:** 10/20/2025 5:49:52 PM (-07:00)
**To:** "Hill, Lela C" <Lela.C.Hill@ice.dhs.gov>; "Gallagher, Sean" <Sean.Gallagher@corecivic.com>; "Stone, Stacey" <Stacey.Stone@corecivic.com>
**Cc:** "Maldonado, Tamara M" <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** Re: U.S. Marshalls Bedspace in California City IPC - Section P (or Section N)

Provided we have sufficient staff trained and cleared by that time, Cal City will be ready to accept 256 male USMS detainees within a single 256 bed unit starting November 14th as per the below section of the ramp schedule.

*Note: For operational reasons, it may not be N unit specifically*

- November 14, 2025 (Fri), 44 General Population
- November 15, 2025 (Sat), 44 General Population
- November 17, 2025 (Mon), 40 General Population
- November 18, 2025 (Tue), 40 General Population
- November 20, 2025 (Thu), 44 General Population
- November 21, 2025 (Fri), 44 General Population

Please let me know if you have any questions or need additional information. Thank you

---

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Friday, October 17, 2025 12:07 PM
**To:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>
**Cc:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: U.S. Marshalls Bedspace in California City IPC - Section P (or Section N)

CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.

Hello Warden Chestnut:

USMS will not be housing any females in California City IPC.

USMS knows that they can "tentatively" house up to 256 male detainees in Unit N within the timely that you provided.

Please ensure that Unit N is ready for housing USMS male detainees starting on November 14, 2025.

As always, we appreciate your time and efforts. Thank you!

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
REDACTED

---

**From:** Hill, Lela C
**Sent:** Friday, October 10, 2025 9:59 AM
**To:** 'Chestnut, Christopher' <christopher.chestnut@corecivic.com>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>
**Cc:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: U.S. Marshalls Bedspace in California City IPC - Section P (or Section N)

Hello Warden Chestnut:

The U.S. Marshalls will be housing detainees in Section N starting tentatively November 14, 2025. They will not be housing in Section P.

Per PWS, the U.S. Marshalls will have 160 male and 40 female bedspaces.

ICE will use all the 256 female beds in Section F.

Thank you,

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
REDACTED

---

**From:** Chestnut, Christopher <christopher.chestnut@corecivic.com>
**Sent:** Monday, September 29, 2025 10:43 AM
**To:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>; Gallagher, Sean <Sean.Gallagher@corecivic.com>; Stone, Stacey <Stacey.Stone@corecivic.com>
**Cc:** Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** RE: U.S. Marshalls Bedspace in California City IPC - Section P (or Section N)

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Below is the estimated timeframe for N & P to be ready for occupancy. This may be impacted by staff clearances or ongoing renovations.

| DATE | POD | COUNT | |
|---|---|---|---|
| 11/14/25 (Fri) | N-1 | 1580 | November 14, 2025 (Fri), 44 General Population Beds (1580) beds |
| 11/15/25 (Sat) | N-1 | 1624 | November 15, 2025 (Sat), 44 General Population Beds (1624) beds |
| 11/17/25 (Mon) | N-2 | 1664 | November 17, 2025 (Mon), 40 General Population Beds (1664) beds |

| | | | |
|---|---|---|---|
| 11/18/25 (Tue) | N-2 | 1704 | November 18, 2025 (Tue), 40 General Population Beds (1704) beds |
| 11/20/25 (Thu) | N-3 | 1748 | November 20, 2025 (Thu), 44 General Population Beds (1748) beds |
| 11/21/25 (Fri) | N-3 | 1792 | November 21, 2025 (Fri), 44 General Population Beds (1792) beds |
| 11/25/25 (Tue) | P-1 | 1836 | November 25, 2025 (Tue), 44 General Population Beds (1836) beds |
| 11/26/25 (Wed) | P-1 | 1880 | November 26, 2025 (Wed), 44 General Population Beds (1880) beds |
| 11/28/25 (Fri) | P-2 | 1920 | November 28, 2025 (Fri), 40 General Population Beds (1920) beds |
| 11/29/25 (Sat) | P-2 | 1960 | November 29, 2025 (Sat), 40 General Population Beds (1960) beds |
| 12/01/25 (Mon) | P-3 | 2004 | December 01, 2025 (Mon), 44 General Population Beds (2004) beds |
| 12/02/25 (Tue) | P-3 | 2048 | December 02, 2025 (Tue), 44 General Population Beds (2048) beds |

Chris

---

**From:** Hill, Lela C <Lela.C.Hill@ice.dhs.gov>
**Sent:** Monday, September 29, 2025 10:10 AM
**To:** Gallagher, Sean <sean.gallagher@corecivic.com>; Stone, Stacey <stacey.stone@corecivic.com>
**Cc:** Chestnut, Christopher <christopher.chestnut@corecivic.com>; Maldonado, Tamara M <Tamara.M.Maldonado@ice.dhs.gov>
**Subject:** U.S. Marshalls Bedspace in California City IPC - Section P (or Section N)

**CAUTION: This email came from outside the organization. Attachments and links may contain viruses and other malicious software.**

Dear Mr. Gallagher:

I hope you are doing well.

The U.S. Marshalls are anxious to start housing their detainees in California City IPC.

Please let me know when Section P (or Section N) will be ready for housing the U.S. Marshalls detainees.

Best regards,

Lela Hill
Management Program Analyst (COR)
San Francisco ERO / Bakersfield Sub-office
Enforcement and Removal Operations
U.S. Immigration & Customs Enforcement
800 Truxtun Ave, Bakersfield, CA 93301
REDACTED

REDACTED

# ATTACHMENT G

ATTACHMENT G

**From:** "Chestnut, Christopher"
**Sent:** 10/31/2025 10:30:49 AM (-07:00)
**To:** "Hill, Lela C" <lela.c.hill@ice.dhs.gov>
**Cc:** "Maldonado, Tamara M" <tamara.m.maldonado@ice.dhs.gov>
**Subject:** FW: COR License Documentation
**Attachments:** 04. Cal City Photos (combined).pdf, 21381 Sign Permit.pdf, Backup for Cal City SPR.pdf, Business_License_Application_2025-08-22 - Signed FINAL.pdf, Cal City Grant Deed.pdf, California City Correctional Facility Business Plan August.pdf, CCA Name Change CoreCivic, Inc. 1116.pdf, Dumpster.pdf, Kern County Health Certificate for Food Service.pdf, ON SITE WATER PLAN Cal City.pdf, SPR Minor 2025 Application CoreCivic California City SIGNED.pdf, Vicinity Map.png, Kern County Health Certificate for Food Service.pdf, Clinical Lab License Certificate 2025.PDF, Permit Certificate - Fire Alarm.PDF, Cal City Updated CLIA Certificate exp 10.26.27.pdf

Good morning,
It appears this didn't go through. Will try again

Chris

---

**From:** Chestnut, Christopher <Christopher.Chestnut@corecivic.com>
**Sent:** Thursday, October 30, 2025 11:26 AM
**To:** Hill, Lela C <lela.c.hill@ice.dhs.gov>
**Cc:** Maldonado, Tamara M <tamara.m.maldonado@ice.dhs.gov>
**Subject:** COR License Documentation

Please see the attached documentation regarding the business license as well as the certificate for the Clinical Lab license and Food Service certification.

If you have any questions or need additional information, please let me know.

Christopher Chestnut | Warden
California City Immigration Processing Center
22844 Virginia Blvd, California City, CA 93505
Office: (760) 491-8101
christopher.chestnut@corecivic.com
CoreCivic


RUDNICK BLVD
VIRGINIA BLVD
TWENTY MULE TEAM PKWY
CALIFORNIA CITY BLVD
PROCTOR BLVD
DOWNTOWN
CALIFORNIA CITY
SEQUOIA BLVD
Corecivic Property
VICINITY MAP
NOT TO SCALE
NORTH

## Business License Application

City of California City
21000 Hacienda Blvd
California City, CA 93505
cityclerk@californiacity-ca.gov
760-373-7140

License # ______________
Approved by ______________
Processed by ______________
Processed On ______________

Name of Business: California City Correctional Facility

Business Owner(s) Name: CoreCivic, Inc

Business Address: 22844 Virginia Blvd, California City, CA 93505

Mailing Address: PO Box 2511, California City, CA 93504

Business Phone #: (760) 491-8100

Email Address: CalCityInvoices@corecivic.com

Nature of Business: Detention Facility/Prison

Planned Business Begin Date:

Have you had a license for this business in the past? (●) Yes ( ) No

Do you own or rent the space (●) Own ( ) Rent (If rent, building owner/landlord

Will the business have Annual Gross Income of $10.000 or more? (●) Yes ( ) No

Business Emergency Contact: Name Christopher Chestnut Phone Number 229-315-7861

**State/County Licensing Information:**

Seller's Permit # 212481920-00005

ABC License #
(Required for Alcohol & Liquor Sales)

Health Certificate # 93505/RE11/EH-FDA-
(Required for Food Services – attach copy)

**Contractors:**
State License #
Expiration Date
State License Type
(Required for Contractors)

**Commercial Business & Fire Life Safety Inspection for Local Businesses:**
Inspection Date: 07/21/2025 Required Annually

**See the California City Master Fee Schedule on our website. Click here for cost of fees.**

By signing below, I certify under penalty of perjury that the foregoing information is true and correct. I agree to all of the terms of the City of California City business license requirements. I comply with the relevant state and county license requirements for my business and am aware that the City of California City business license does not cover state and county license requirements for my business.

Signature [signature] Digitally signed by Christopher Chestnut Date: 2025.08.22 17:07:29 -07'00'

Date: 08/22/2025

Printed Name: Christopher Chestnut

Clear Form Submit

**Planning Department**
21000 Hacienda Blvd.
California City, CA 93505
Phone: (760) 373-7141
planning@californiacity-ca.gov

**Project No.**

______________
Provided by City

## SITE PLAN REVIEW (SPR) MINOR APPLICATION

*(Existing Building/Business/Ownership)*

### 1. Applicant Information

**Applicant/Representative's Name:** Marcelo Ariola

**Mailing Address:** 5501 Virginia Way, Suite 110, Brentwood, TN 37027

**Phone Number:** 615-445-9163

**Email Address:** CalCityInvoices@CoreCivic.com

**Business/Company Name:** CoreCivic, Inc.

**Property Address / APN:** 22844 Virginia Blvd., California City, CA 93505

**Zoning Designation:** Classification A, Type Major, Code CAC, O/RA

### 2. Acknowledgements

I, the undersigned, understand that any permit issued pursuant to this application does not grant any right or privilege to use any building or land contrary to the provisions of the City of California City Municipal Code. I hereby certify that the information provided in this application is, to the best of my knowledge, true and correct.

**Applicant or Legal Agent (Print):** Marcelo Ariola, VP Real Estate

**Signature:** Marcelo Ariola

**Date:** 08-22-25

### 3. Property Owner Authorization

I certify that I am the legal property owner and authorize this application. I further certify that the information provided herein is true and correct to the best of my knowledge.

**Property Owner (Print):** Marcelo Ariola for CoreCivic, Inc.

**Signature:** Marcelo Ariola

**Date:** 08/22/2025

**Owner Mailing Address:** 5501 Virginia Way, Suite 110

**City:** Nashville **State:** TN **Zip:** 37027

**Phone Number:** 615-445-9163

**Email Address:** Marcelo.Ariola@CoreCivic.com

## FOR DEPARTMENTAL USE ONLY

Fees: *(Refer to the Master Fee Schedule)*

- ☐ $ 250.00 , Planning SPR Application Fee *(mandatory)* ***GL 10-3218***
- ☐ $ 90.00 , Fire Department Inspection *(mandatory)* ***GL 19-3641***
- ☐ $ 150.00 , Building Inspection Fee *(mandatory)*
- ☐ $ ____________ , Other

$ ____________ , **Total Fee Collected**

Application complete:

☐ Date: ____________ Staff Member ____________

Processing: In order to expedite this Site Plan Application and eliminate unnecessary delays, Planning staff will not accept this application unless all requirements have been met, the application form has been signed and dated, and fees have been paid.

*****In the event of errors or omissions are discovered, the application will be deemed incomplete and will be returned to the applicant for revision. ******

# SITE PLAN REVIEW (SPR) MINOR CHECKLIST

***(Existing Building/Business/Ownership)***

*All items below must be submitted for the application to be considered complete.*

**Attach this checklist with application and cross out or tick the items submitted.**

## A: Application Documents

1. ☐ **Completed Application Form (Signed by Applicant and Property Owner).**
2. ☐ **Current Lease Agreement or Proof of Property Control.**
3. ☐ **Copy of Business License (or Pending Application).**
4. ☐ **Aerial Photo** showing the project site and surrounding properties.
5. ☐ **Vicinity Map**
6. ☐ **Parking Summary:**
    - Total Parking Spaces: ________
    - ADA Accessible Spaces: ________
    - Bicycle Parking (if required): ________
7. ☐ **Distance from Nearest Functional Fire Hydrant:** ________ ft. (Include location map or photograph.)
8. ☐ **Business Plan** (include intended use, operating hours, and safety measures).
9. ☐ **Building Floor Plans and Site Plan Drawings (to scale).**
10. ☐ **Utility Connection Plan** (Water, Sewer, Electrical, Gas).
11. ☐ **Trash Enclosure Location and Design Details.**

## B: Photographic Documents

1. ☐ **Photos of Existing Trash Enclosure / Trash Bins.**
2. ☐ **Exterior & Interior Photos of the Building:**
    - North, South, East, and West elevations.
3. ☐ **Photos of Nearby Fire Hydrants (Front & Top view).**

## C: Additional Documents

1. ☐ **Landscape Plan** (if new or modified landscaping is proposed).
2. ☐ **Lighting and Security Plan** (If modified)
3. ☐ **Signage Plan** (if modified separate Sign Permit application is required).
4. ☐ **Accessibility Compliance Statement** (ADA) (Contact Building Department at 760-373-7152)
5. ☐ **Noise Impact Details** (if applicable)
6. ☐ **Hazardous Material Handling Plan** (if applicable)

## D: Inspections & Other Required Actions

1. ☐ **Kern County Health Department Approval** (Contact directly at 661-862-8791, if applicable).
2. ☐ **City Building Inspection Mandatory, $150 Fee** (Schedule at at 760-373-7152).

3. ☐ **City Fire Inspection (Mandatory, $90 Fee)** – Schedule at 760-373-4841.
4. ☐ **Apply for City Business License** – City Clerk's Office at 760-373-7140.
5. ☐ **Apply for City Sign Permit** – 760-373-7152.

---

## Processing Notice

Planning Staff will not accept incomplete applications. Submittal of this checklist with all applicable items checked and attached is required for processing. Applications deemed incomplete will be returned without processing.

# EXHIBIT 9

EXHIBIT 9

Laura Avila, Assessor-Recorder
Kern County Official Records

JL
7/06/2026
12:52 PM

Recorded Electronically by:
56A Chicago Title Co LA

DOC #: 226076987

226076987

| Stat Types: 1 | Pages: 5 |
|---|---|
| FEES | 25.00 |
| TAXES | .00 |
| OTHER | .00 |
| PAID | 25.00 |

RECORDING REQUESTED BY:
CHICAGO TITLE COMPANY

AFTER RECORDING RETURN
AND UNLESS OTHERWISE SHOWN
BELOW, MAIL TAX STATEMENT TO:
Department of Homeland Security
Facilities Management Division
500 12th Street SW, Suite 3000
Washington, D.C. 20536
Attn: Tamim Chowdhury

A.P.N.: 350-031-28-00, 350-031-29-00 and 350-031-30-00
Title Insurer: Chicago Title Company

## GENERAL WARRANTY DEED

THE UNDERSIGNED GRANTOR DECLARES:
Exempt from fee per GC27388. 1(A)(2); Document subject to the imposition of documentary transfer tax

No Documentary Transfer tax is due on this document pursuant to Revenue and Taxation Code Section 11922. Governmental agenc[y] acquiring title.

This General Warranty Deed, made July 2, 2026, by CORECIVIC, INC., a Maryland corporation successor by name change to CORRECTIONS CORPORATION OF AMERICA ("**Grantor**"), whose street address is 5501 Virginia Way, Brentwood, Tennessee 37027, in favor of the United States of America, and its assigns, by and through the Department of Homeland Security ("**Grantee**"), whose street address is 500 12th Street SW, Suite 3000, Washington D.C. 20536.

WITNESSETH:

That for and in consideration of the sum of $732,571,392.00 cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby grant, bargain, sell and convey, in fee simple, with General Warranty, unto said Grantee, that certain property located in the City of California City, County of Kern, State of California, as is more particularly described on **Exhibit A** attached hereto, together with all rights, title, and interest of Grantor in and to any alleys, streets, ways, strips, or gores abutting or adjoining the land (collectively, the "**Property**"); subject to and with the benefit of all easements, restrictions, agreements, rights of way and reservations of record, insofar as the same are now in force and affect the Property.

The acquiring federal agency is the U.S. Department of Homeland Security.

TO HAVE AND TO HOLD the Property, together with each and every title, right, privilege, appurtenance and advantage thereunto belonging, or in anywise appertaining, unto and for the use, benefit and behoof of Grantee, its successors and assigns, in fee simple forever.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against the lawful claims of all persons whomsoever,

except for the exceptions stated. Title to the Property hereinabove described is subject to the following exceptions: ANY AND ALL OF PUBLIC RECORD.

[signature page follows]

**GRANTOR:**

**CORECIVIC, INC.**, a Maryland Corporation successor by name change to Corrections Corporation of America,

By: [signature]
Name: Lucibeth Mayberry
Title: Executive Vice President & Chief Strategy Officer

**ACKOWLEDGEMENT**

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Tennessee }
}
County of Williamson }

On 06/11/2026, before me, Faviana Magill-Vasquez notary public, personally appeared Lucibeth Mayberry, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature] (Seal)

FAVIANA MAGILL-VASQUEZ
TENNESSEE NOTARY PUBLIC
My Comm Exp. December 01, 2029
COUNTY OF WILLIAMSON

CERTIFICATE OF ACCEPTANCE

This is to certify that the interest in real property conveyed by the deed or grant dated July 2, 2026 from CoreCivic, Inc., successor by name change to Corrections Corporation of America to the United States of America, and its assigns, by and through the Department of Homeland Security, a governmental agency is hereby accepted by the undersigned officer or agent on behalf of the United States of America, and its assigns, by and through the Department of Homeland Security pursuant to authority conferred by the warrant of contracting authority issued to Tamim Chowdhury effective as of January 15, 2026 and the grantee consents to recordation thereof by its duly authorized warrant officer.

Dated: 7/2/26

By: ____________________
Tamim Chowdhury
Senior Real Estate Contracting Officer

**EXHIBIT A**

**LEGAL DESCRIPTION**

LAND SITUATED IN THE CITY OF CALIFORNIA CITY, COUNTY OF KERN, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

Parcels 1, 2 and 3, as shown on Parcel Map No. 12374, recorded January 19, 2021, in Book 62, at Page 30, of Parcel Maps, Kern County Records.

EXCEPT 1/2 of all oil, gas and other minerals contained within the property above described, whether now known to exist or hereafter discovered and together with the right to produce, mine, extract and remove oil, gas, and other minerals upon, from and through said property but unless grantee, its successors or assigns shall give written consent to the drilling of wells upon the surface of said land, all of the foregoing rights shall be exercised only by the drilling of wells or conducting operations into and through said property at depths below 100 feet from locations on adjacent or neighboring lands in such manner as not to disturb the surface (or the first 100 feet of the subsurface) of said property or any improvements located upon the surface thereof as reserved in Deed recorded April 25, 1960, in Book 3261, Page 639, records of said County.

50998808.7